UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ECOLAB, INC., *et al.*,                    )
                                           )
                                           )
            Plaintiffs,                    )
                                           )
v.                                         )          Case No. 1:22-cv-050-TRM-SKL
                                           )
ANTHONY RIDLEY, *et al.*,                  )
                                           )
                                           )
            Defendants.                    )

**ORDER**

Before the Court is a Motion to Compel Compliance with the Court's January 11, 2023

Order and for Sanctions [Doc. 122], filed by Defendant ChemTreat, Inc. ("ChemTreat"[1]).  The

motion is accompanied by a supporting brief [Doc. 123], and a number of exhibits[2].  Plaintiffs

filed a response in opposition [Doc. 139] to the motion to compel compliance, and ChemTreat

---

[1] The plaintiffs in this case are Ecolab, Inc. ("Ecolab"), and Nalco Company, LLC ("Nalco," and collectively, "Plaintiffs").  The defendants are ChemTreat and Anthony Ridley ("Ridley," and collectively, "Defendants").

[2] ChemTreat filed redacted versions of exhibits 1, 2, and 5 to the motion to compel compliance, accompanied by a motion for leave to file the unredacted versions under seal [Doc. 125]. ChemTreat did so pursuant to Plaintiffs' designation of the redacted information in these three exhibits as confidential pursuant to the parties' Agreed Protective Order [Doc. 92].  The Court denied the motion for leave to file exhibits 1, 2, and 5 under seal [Doc. 138].  ChemTreat then timely filed the unredacted versions of the documents in accordance with Court procedure [*see* Doc. 140; Doc. 6].

filed a reply [Doc. 145]. This matter is now ripe.[3] The Court conducted a hearing on February 22, 2023.

For the reasons stated below, ChemTreat's motion to compel compliance [Doc. 122] will be granted in part and denied in part.

## I.     BACKGROUND

The factual background, as alleged by Plaintiffs, is set forth in the Court's Memorandum Opinion regarding Defendants' motions to dismiss [Doc. 69], and need not be repeated herein. For present purposes, it suffices to note the following. The parties have been embroiled in numerous contentious discovery disputes for several months now [*see, e.g.,* Doc. 137]. The instant motion arises from the parties' failed attempt to resolve by agreement a prior motion to compel filed by ChemTreat on November 10, 2022 [Doc. 76]. At the parties' joint request, the Court extended the briefing deadlines on ChemTreat's November 10 motion to compel. On December 14, 2022, once the motion was ripe, the Court entered an Order [Doc. 93] setting a hearing and requiring the parties to meet and confer to attempt to narrow or resolve the discovery disputes at issue. Again at the parties' joint request, the hearing was continued by two weeks to January 11, 2023, and the briefing schedule was extended [Doc. 102 & Doc. 103]. The parties reported they were able to reach agreements regarding many of the disputed discovery requests through the conferral process.

---

[3] ChemTreat filed a motion to expedite the briefing on the motion to compel compliance [Doc. 124]. At a hearing held on February 3, 2023, on a different motion to compel, the parties agreed Plaintiffs would respond to the instant motion to compel on or before February 10, 2023, and ChemTreat would file its reply on or before February 14, 2023. The parties also agreed any hearing would be held February 22, 2023. Plaintiffs subsequently requested the hearing [Doc. 146]. The parties abided by the agreed-upon briefing schedule. Accordingly, the motion to expedite briefing on the motion to compel compliance will be granted pursuant to the parties' agreement. In addition, Plaintiffs previously filed a motion to alter or amend the same January 11 Order [Doc. 113] to extend certain deadlines set in the Order. All of the deadlines in the Order have now passed, as have all of the requested deadline extensions.

That is, they were able to agree to procedures for exchanging information and in large part they were able to agree on the information to be produced. They provided a "Joint Submission" to the Court via email.

The Joint Submission groups the information to be produced into four general sections (some with subsections). Section I generally encompasses ChemTreat's discovery requests to Plaintiffs that pertain to Plaintiffs' alleged trade secrets. Section II generally encompasses ChemTreat's discovery requests to Plaintiffs that pertain to Plaintiffs' alleged spoliation of ESI from Ridley's laptop and other devices. Section III generally encompasses ChemTreat's discovery requests to Plaintiffs that pertain to causation of Plaintiffs' alleged damages. Section IV pertains to agreements the parties previously reached regarding ChemTreat's discovery requests to Plaintiffs for which "the agreed information has not been provided." [Doc. 111 at Page ID # 1407].

The parties were unable to agree on response/production deadlines. Accordingly, at the January 11 hearing, the discussion primarily revolved around setting the relevant deadlines.

The same day the hearing was conducted, the Court entered the January 11 Order at issue in the instant motion [Doc. 111]. The January 11 Order incorporated verbatim the parties' agreement reflected in the Joint Submission. The January 11 Order also set deadlines for the production of the agreed-upon discovery.

Soon after the first deadlines set by the January 11 Order passed, Plaintiffs filed their motion to alter or amend the January 11 Order, referenced above [Doc. 113]. They did not request any substantive changes to the production or responses required by the January 11 Order; they only requested extensions of the Court-ordered deadlines. ChemTreat filed a response in opposition [Doc. 114] the same day the motion was filed. At the parties' request, the Court held a

status conference on Plaintiffs' motion to amend on January 24, 2023, but the parties were unable to reach an agreement regarding any deadline extensions.

ChemTreat filed the instant motion to compel compliance with the January 11 Order on February 1, 2023 [Doc. 122]. In the motion, ChemTreat asserts that Plaintiffs "have violated the terms of the Court's Order repeatedly, providing responses that are tardy, incomplete, and facially non-compliant." [Doc. 123 at Page ID # 1550]. ChemTreat asks the Court to "compel Plaintiffs to fully comply with the substantive requirements of the January 11, 2023 Order, and sanction Plaintiffs for their ongoing and unexcused violations of the Court's Order." [*Id.*]. Plaintiffs contend they have fully complied with the January 11 Order, other than missing some of the deadlines, and acted in good faith, and as result, sanctions are inappropriate [Doc. 139].

## II.    ANALYSIS

The Court recited the general standards defining the scope and limits of discovery in its February 10 Order [Doc. 137] on Plaintiffs' motion to compel. The Court will not reiterate those well-known standards herein.

Before addressing the substance of ChemTreat's motion to compel compliance, the Court offers a few brief observations regarding the January 11 Order. First, the instant dispute concerns whether Plaintiffs complied with the terms of the parties' agreement as reflected in the Joint Submission and incorporated into the January 11 Order. This Order does not address whether Plaintiffs' original responses to the discovery requests as written were sufficient, whether Plaintiffs' objections to the discovery requests have any merit, or whether the discovery requests were otherwise appropriate under applicable rules.[4] Further, nothing in the January 11 Order

---

[4] Nevertheless, the Court agrees with ChemTreat's statement that "the Federal Rules of Civil Procedure provide the context for, and so shape the requirements of, the Court's Order[.]" [Doc. 123 at Page ID # 1571].

4

prohibits the parties from conducting further discovery or serving additional discovery requests on the topics addressed therein, and the same is true for this Order. On a related note, the parties have a continuous obligation to "supplement or correct" any disclosure under Rule 26(a) and any response to "an interrogatory, request for production, or request for admission." Fed. R. Civ. P. 26(e). Nothing about the January 11 Order or this Order changes the parties' obligation in this regard.

The Court has endeavored to address the relevant issues in the general manner and sequence used by the parties in their Joint Submission (incorporated into the January 11 Order) and in their briefing on the instant motion to compel compliance.

a.      **Section I – Trade Secrets – Interrogatory Nos. 1, 2; RFP Nos. 11, 46[5]**

Section I generally deals with "Plaintiffs' identification of their alleged trade secrets and substantiation of the basis for that claim." [Doc. 111 at Page ID # 1400]. On December 19, 2022, Plaintiffs produced a Data Loss Prevention ("DLP") report which lists the documents and files Ridley allegedly misappropriated from Plaintiffs. "Plaintiffs agreed that not all the documents listed on the DLP report are at issue in their DTSA and TUTSA[6] claims." [Doc. 111 at Page ID # 1400]. Pursuant to the January 11 Order, for those documents listed on the DLP report that Plaintiffs claim are protected under the DTSA and TUTSA, Plaintiffs are required "assign each document to a category and to identify ten exemplar documents per category for which they will

_____

[5] Section I of the January 11 Order also addressed RFP nos. 4, 47, and 55. The parties do not explicitly address these RFP in their briefing on the instant motion, and so the Court does not address these RFP any further herein. This Order should not be interpreted as modifying any provision of the January 11 Order not specifically addressed by the parties in their briefs and addressed by the Court in this Order.

[6] Defend Trade Secrets Act/Tennessee Uniform Trade Secrets Act

provide the information requested by Interrogatory No. 1[7]." [*Id.*].  Regarding the information requested by interrogatory no. 1, the January 11 Order states that "information available through Plaintiffs' document production (including the metadata), such as the author of the document or the location of the document on Plaintiffs' systems, need not be included in the response to Interrogatory No. 1." [Doc. 111 at Page ID # 1400-01].  Instead, Plaintiffs' response "will focus on the substantive basis for the trade secret claim by addressing the requirements for trade secret status under the statutes, including efforts to maintain the secrecy of the information and the economic value of the information." [Doc. 111 at Page ID # 1401].

The January 11 Order then requires the following:

> Upon receiving Plaintiffs' categorization of the documents and their supplemental interrogatory responses as to the exemplar documents, ChemTreat will review the forensic images of the OneDrive used by Ridley while employed by Plaintiffs and the USB drives sent by Ridley to Plaintiffs after the end of that employment (to be produced by Plaintiffs pursuant to their response to RFP No. 4) to locate and review the identified exemplars.  Based on its review, ChemTreat will determine whether there are categories of documents for which it does not require further document-specific information regarding the basis for Plaintiffs' allegation of trade secret status and so notify Plaintiffs.  To the extent that ChemTreat requires further information as to particular documents or categories of documents, ChemTreat will notify Plaintiffs so that the parties can confer regarding further supplementation.

[Doc. 111 at Page ID # 1401].

---

[7] As originally drafted, interrogatory no. 1 required Plaintiffs to: "Identify each document containing Ecolab trade secrets or confidential information alleged misappropriated by Ridley. For purposes of this Interrogatory, Identify means to state the date of the document; the title of the document; the subject of the document; the custodian of the document; the author(s), sender(s), and recipient(s) of the document, the location of the document on Ecolab's electronic systems; the basis for Ecolab's claim that the document is a trade secret or that it contains Ecolab's confidential information; and whether You contend the document was accessed or used by ChemTreat." [Doc. 140-4 at Page ID # 1915].

6

Interrogatory no. 2 and RFP no. 46 both seek information regarding any disclosures of Plaintiffs' alleged trade secrets. Interrogatory no. 2 asked Plaintiffs to "Identify and Describe in Detail any instance in which the Documents You identified in your responses to Interrogatory No. 1 were shared with, accessed by, or accessible to any third party or the public at any time prior to July 1, 2021." [Doc. 140-4 at Page ID # 1923]. In turn, RFP no. 46 sought production of "All Documents (including agreements or contracts) requiring third parties who received access to any Allegedly Misappropriated Documents at any time before July 1, 2021, to maintain their confidentiality or secrecy." [Doc. 123-10 at Page ID # 1644].

As described in the January 11 Order, Plaintiffs initially responded that they were "currently unaware of any disclosure of their alleged trade secrets to a third party other than a customer or potential customer." [Doc. 111 at Page ID # 1401]. Plaintiffs agreed to amend their response to interrogatory no. 2 "to the extent they come to learn of any such disclosure." [*Id.* at Page ID # 1402]. Further:

> Plaintiffs will identify which categories of documents would typically be disclosed to customers or potential customers (such as bid responses) and which would not (such as profit margin analyses). Plaintiffs will provide the information sought in Interrogatory No. 2 for each of the exemplars tied to a category in the first group (i.e., categories involving documents that would typically be disclosed to customers or potential customers).

[*Id.* at Page ID # 1401-02].

To resolve the dispute pertaining to RFP no. 46, the January 11 Order provides:

> The parties have agreed to narrow the underlying documents at issue to those that (1) are alleged to be trade secrets falling into a category that is customer-facing rather than purely internal; and (2) if applicable, documents that are alleged to be trade secrets that, although not falling into a category that is customer-facing, are known by Plaintiffs to have been provided to a customer, potential customer, or other third party. For such at-issue documents, Plaintiffs will produce the contracts or other documents reflecting

7

the recipient(s)'s agreement to maintain the secrecy of the information disclosed.

ChemTreat will review the foregoing information and documents from Plaintiffs and, if there remain any open issues as to documents or recipients, ChemTreat will notify Plaintiffs so that the parties can confer regarding further supplementation.

[Doc. 111 at Page ID # 1402].

RFP no. 11 relates specifically to exhibit 5 to ChemTreat's motion to dismiss [Doc. 68-1 ("Exhibit 5")]. The document appears to be Ridley's response to a request for a quote from a customer or potential customer, dated September 24, 2015. Regarding RFP no. 11, the January 11 Order states: "The parties have agreed that Plaintiffs will notify ChemTreat whether they contend the document was protected by the DTSA and/or TUTSA at the time that Ridley left Plaintiffs' employ, and, if so, Plaintiffs will provide responses to Interrogatory Nos. 1 and 2 and documents responsive to RFP no. 46." [Doc. 111 at Page ID # 1403].

ChemTreat's position is that Plaintiffs did not comply with the January 11 Order regarding any of these discovery requests in Section I.

### 1. Exemplar Customer Files and Documents

ChemTreat contends Plaintiffs failed to fulfill the requirement that, "[f]or those documents that [Plaintiffs] maintain are protected under the DTSA or TUTSA, . . . assign each document to a category and . . . identify ten exemplar documents per category." [Doc. 111 at Page ID # 1400]. Plaintiffs identified seven categories of documents: (1) Customer Files and Documents, (2) Business Plans, (3) Playbooks/Best Practices, (4) Training Documents, (5) Employee Compensation Documents, (6) Fact Packs, and (7) Customer Contact Information [*see* Doc. 123-4 at Page ID # 1615, Doc. 140-3 at Page ID # 1903. ChemTreat complains that Plaintiffs failed to identify ten exemplar documents for the first category—Customer Files and Documents.

8

Instead, Plaintiffs provided a list of ten exemplar file folders, identified by file path, which collectively contained thousands of individual documents [Doc. 123 at Page ID # 1551-52]. ChemTreat asserts this was "contrary to both the plain language and the spirit of the Court's Order." [*Id.* at Page ID # 1552].

It is undisputed that a compilation of documents can constitute a trade secret. *See, e.g.*, Tenn. Code Ann. 47-25-1702. Also, "[t]he fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." *Knox Trailers, Inc. v. Clark*, No. 3:20-cv-137, 2021 WL 2043188, at *7 (E.D. Tenn. May 21, 2021) (citation omitted) (on motion for preliminary injunction, finding database is likely protectable trade secret, reasoning: "Though a single piece of data, such as a customer name or an old invoice, may be available to others within the field, the entire collection of data is not publicly available, and the independent duplication of the system and collection of all the data from independent sources would be painstaking and expensive."). While the January 11 Order requires Plaintiffs to produce ten exemplar "documents," the Court agrees with Plaintiffs this is not possible with regard to alleged compilation trade secrets.[8] In this respect, it was reasonable for Plaintiffs to identify file paths rather than individual documents.[9]

The same reasoning does not apply to the extent Plaintiffs allege that individual customer documents within the customer files are themselves trade secrets, however. The assertion that a

---

[8] ChemTreat acknowledges in its January 19 letter to Plaintiffs: "You did not raise the issue of document compilations during any of our conferences of counsel leading up to the Joint Submission; as a result, such compilations are not contemplated by the Joint Submission." [Doc. 140-2 at Page ID # 1898].

[9] As addressed below, Plaintiffs will be required to produce actual copies or images of the exemplar customer files.

compilation of documents and information constitutes a trade secret says nothing about the claimed status of any individual document within the compilation.

The Court pauses to note there has been some confusion on this topic, which implicates not only this aspect of the motion to compel compliance, but also the discovery requests pertaining to any disclosure of alleged trade secrets to customers or potential customers. At the hearing, Plaintiffs seemingly took the position that there are no alleged trade secret customer documents contained within the customer files that are not properly categorized into one of the other six categories of trade secrets. However, ChemTreat indicated Plaintiffs have never clarified that position in discovery. Furthermore, it appears Plaintiffs assert Exhibit 5 is a trade secret, but it is not readily categorized as a Playbook/Best Practice, a Training Document, a Business Plan, an Employee Compensation Document, a Fact Pack, or Customer Contact Information. It does appear, however, to fit into the Customer Files and Documents category.

Accordingly, the Court will require Plaintiffs to identify (and produce) ten exemplar customer documents, in addition to the ten exemplar customer files, from the Customer Files and Documents category of alleged trade secrets.[10] The customer document exemplars should not be duplicative of documents identified and produced for the other six categories. Thus, ChemTreat's motion to compel compliance will be granted in part and denied in part as to Plaintiffs' identification of exemplars for the Customer Files and Documents.

### 2. Production of Exemplars

ChemTreat complains that "***Not one*** of the nearly 4,000 documents that Plaintiffs identified as exemplars (whether individually or as part of an 'exemplar file') was included on the forensic

---

[10] The parties may agree to split the Customer Files and Documents category into two separate categories to avoid further confusion. Either way, Plaintiffs are required to produce ten exemplar customer files and ten exemplar customer documents.

image of the OneDrive that Plaintiffs produced to ChemTreat," and only one of the exemplar files was on the forensic image of the USB drives Plaintiffs produced [Doc. 123 at Page ID # 1552 (emphasis in original)]. ChemTreat argues the January 11 Order "plainly contemplated that the exemplar documents identified by Plaintiffs would be documents available on the forensic images produced by Plaintiffs, so that ChemTreat could review those exemplars and assess the need for further information." [*Id.*]. ChemTreat refers to the following provision of the January 11 Order:

> Upon receiving Plaintiffs' categorization of the documents and their supplemental interrogatory responses as to the exemplar documents, ChemTreat will review the forensic images of the OneDrive used by Ridley while employed by Plaintiffs and the USB drives sent by Ridley to Plaintiffs after the end of that employment (to be produced by Plaintiffs pursuant to their response to RFP No. 4) to locate and review the identified exemplars. Based on its review, ChemTreat will determine whether there are categories of documents for which it does not require further document-specific information regarding the basis for Plaintiffs' allegation of trade secret status and so notify Plaintiffs. To the extent that ChemTreat requires further information as to particular documents or categories of documents, ChemTreat will notify Plaintiffs so that the parties can confer regarding further supplementation.

[Doc. 111 at Page ID # 1401].

In response to ChemTreat's argument regarding this provision, Plaintiffs state the following:

> Plaintiffs recognize that the exemplar files and documents that they identified, all of which Ridley downloaded from his OneDrive account, cannot be found on the recovered OneDrive that they produced to ChemTreat. But this is a problem entirely of Ridley's making, as, beyond just misappropriating thousands of Plaintiffs' trade secret files and documents, Ridley took the added measure of deleting those files from his OneDrive, thus ensuring that Plaintiffs would not have access to them. (D.E. 46 at ¶ 164). Obviously, Plaintiffs cannot provide examples of the actual files that Ridley misappropriated because: (1) he deleted them prior to his departure and (2) ChemTreat wiped his computer subsequent to the initiation of this lawsuit. Plaintiffs violated neither the letter nor the spirit of the Court's Order. They cannot produce what they do not have.

11

[Doc. 139 at Page ID # 1862-63].

Plaintiffs do not attempt to reconcile their current position with their prior agreement (from the Joint Submission, incorporated into the January 11 Order), which certainly reflects the expectation that ChemTreat would be able to review the exemplars, or copies or images thereof. The record does not clearly reflect when Plaintiffs themselves reviewed the forensic images. ChemTreat has previously claimed that metadata reveals the forensic image of Ridley's OneDrive was created more than one year ago, on January 25, 2022 [Doc. 114 at Page ID # 1432]. At the hearing, however, Plaintiffs stated that when the parties were negotiating the terms of the Joint Submission in January 2023, Plaintiffs did not know the forensic images referenced in the Joint Submission did not or would not include copies or otherwise reflect the content of the documents listed.

Regardless, nothing about the January 11 Order relieved Plaintiffs of the burden of providing copies or images of the exemplars to ChemTreat in the event the exemplars were not viewable on the forensic images. Indeed, the Order specifically provides that ChemTreat can request supplementation to the extent it requires additional information, which essentially is what ChemTreat is doing now. This would, of course, include the exemplar customer files. Moreover, the Court agrees with ChemTreat that Plaintiffs' search efforts, at least as described in ChemTreat's reply [Doc. 145 at Page ID # 1954-55] are insufficient to establish that Plaintiffs "do not have" copies or images of any of the exemplars stored somewhere—exemplars which Plaintiffs themselves chose. As ChemTreat further points out in its reply, at least some of the exemplars, like training manuals, certainly should be saved on Plaintiffs' systems in locations other than Ridley's OneDrive account. The motion to compel compliance will be granted in this regard with the following caveat.

At the hearing, the parties and the Court discussed that Plaintiffs do not have the precise file Ridley downloaded and deleted, and they may not even have a copy of the precise file (i.e., the same Fact Pack Ridley deleted saved on someone else's computer), for each exemplar, for various reasons including reorganization of sales districts. ChemTreat agreed that for those exemplars for which a copy is not available after a reasonable and diligent search, it would accept a reasonably close approximation, along with a description of Plaintiffs' search efforts to locate the copy. The parties have greater knowledge of the nature of the documents at issue, and the Court declines to offer specific descriptions of what would constitute a reasonably close approximation. The parties are instructed to cooperate and act in good faith through the process of identifying and producing the exemplars.

### 3. Categorization of Documents Listed on the DLP Report

ChemTreat also contends Plaintiffs' categorization of the documents listed on the DLP report was deficient. The January 11 Order requires: "For those documents [listed on the DLP report] that [Plaintiffs] maintain are protected under the DTSA or TUTSA, Plaintiffs have agreed to assign each document to a category[.]" [Doc. 111 at Page ID # 1400]. Plaintiffs assert that the following "narrative description"[11] of the documents on the DLP report is sufficient to satisfy the categorization required by the January 11 Order:

> The most efficient way to categorize the trade secrets stolen by Mr. Ridley is through a chronological review of his misappropriation.
>
> On May 24, 2021, the entirety of the files downloaded by Mr. Ridley fall under the category of Customer Files and Documents and are therefore trade secrets.

---

[11] Plaintiffs provided this narrative description in a letter to ChemTreat dated January 25, 2023. Plaintiffs concede this was untimely [*see* Doc. 139 at Page ID # 1864 n.2].

13

The next day, May 25, 2021, Mr. Ridley downloaded two massive subfolders. The first subfolder, "quint mccreary files" contains files that all fall under the trade secret category of Customer Files and Documents. The second subfolder, titled "Wl121 district folder" contains several categories of trade secret documents. All files with the term "fact pack" in their title are, just as the name suggests, trade secret Fact Packs. The files with the term "training" in the subfolder or file name all fall under the trade secret category of Training Documents. Files with the terms "compensation" and "performance review" in the subfolder or file name are trade secret Employee Compensation Documents. Files with the terms "coaching", "DM cam Pricer", "scope of work", "price plan", "value pricing", and similar files names in the subfolder or file name all fall under the trade secret category of Playbooks/Best Practices. Finally, files with the term "business plan" in their the subfolder or file name fall within the trade secret category of Business Plans.

On May 26, 2021, Mr. Ridley downloaded files from the subfolders "pac-1 information", "pac-2 information", and "pac-3 information". These proprietary and highly confidential documents fall under the trade secret categories of Playbooks/Best Practices and Training Documents. This information is used for customer treatment plans and for best practice treatment. It is also part of Plaintiffs' training program as well as its documents that calculate the amount of chemicals (or of the actives) that need to be fed into the water to prevent scaling or corrosion.

On May 27, 2021, Mr. Ridley downloaded numerous files from multiple "monthly turndoc incentive reports" subfolders. These files, which contain information regarding incentive compensation for Plaintiffs' employees, all fall under the trade secret category of Employee Compensation Documents.

On June 1, 2021, Mr. Ridley's downloads included three subfolders which contained trade secret documents. Files downloaded from the subfolder "kirk's files" all fall under the trade secret category of Customer Files and Documents. Similarly, nearly all of the files that Mr. Ridley downloaded from the subfolder "anthony's files" can be categorized as Customer Files and Documents. Finally, all files downloaded from the subfolder "customer files – nalco water", as the name suggests, all fall under the trade secret category of Customer Files and Documents.

On June 21, 2021, Mr. Ridley downloaded his entire contact list. This document, which necessarily constitutes a compilation of Plaintiffs' customers and prospective customers as well as their

> contact information, and is therefore entitled to trade secret status. While this file could fall under the category of Customer Files and Documents, Plaintiffs believe it actually merits its own category, Customer Contact Information.

[Doc. 123-4 at Page ID # 1615-16].

In its reply, ChemTreat states that, applying these instructions "leaves *4,005 uncategorized lines* on the DLP report that appear to reflect document or system activity." [Doc. 145 at Page ID # 1955]. At the hearing, ChemTreat indicated some of these lines may not list file names for documents; rather, they may reflect system information or activity. In any event, ChemTreat contends there are a number of uncategorized documents on the DLP report.

Plaintiffs admit the DLP report contains entries for some non-trade secret documents, such as personal documents of Ridley's. But they defend their "narrative description" method of categorization, arguing it provides ChemTreat "with sufficient information" to categorize the trade secrets [Doc. 139 at Page ID # 1864].[12]

In light of the representations of both sides, it appears ChemTreat was able to apply the instructions in the narrative description to categorize the documents or files listed on the DLP report that Plaintiffs claim are trade secrets. At the hearing, ChemTreat represented it was willing and able to provide Plaintiffs with the list of the 4,005 uncategorized lines. The Court will require ChemTreat to provide Plaintiffs with the list, and allow Plaintiffs a brief time period to identify any lines that do in fact identify documents Plaintiffs contend are trade secrets. The Court expects that through this process, the parties will have identified and categorized all of Plaintiffs' alleged

---

[12] In their response to the instant motion to compel compliance, Plaintiffs state that only a "limited" number of documents identified on the DLP report are personal documents of Ridley's and therefore not trade secrets. Plaintiffs do not define "limited," nor do they otherwise provide even a rough estimate of the number of personal documents.

15

trade secrets. In other words, Plaintiffs risk waiving any claim of trade secret status as to any uncategorized lines or documents on the DLP report.

The motion to compel compliance will therefore be granted in part as to the categorization of alleged trade secrets on the DLP report.

### 4. Response to Interrogatory No. 1

As set forth in more detail above, Plaintiffs were required by the January 11 Order to provide information about each exemplar relating to its alleged status as a trade secret. Interrogatory no. 1, as originally drafted, required Plaintiffs to identify a number of pieces of basic information regarding each exemplar, including the title, date, and location on Ecolab's system, in addition to more substantive information about the exemplar's status as a trade secret. The January 11 Order relaxed the requirement to provide the basic information sought by interrogatory no. 1, instead requiring Plaintiffs to "focus on the substantive basis for the trade secret claim by addressing the requirements for trade secret status under the statutes, including efforts to maintain the secrecy of the information and the economic value of the information." [Doc. 111 at Page ID # 1401]. The January 11 Order specifically states that "information available through Plaintiffs' document production (including the metadata), such as the author of the document or the location of the document on Plaintiffs' systems, need not be included in the response to Interrogatory No. 1." [*Id.* at Page ID # 1400-01].

ChemTreat first complains that Plaintiffs' amended response to interrogatory no. 1 was untimely. The response was due on January 20, 2023, at noon. Plaintiffs provided a letter from their counsel on January 20, but did not provide the interrogatory response until January 27, and the January 27 response was not verified. Plaintiffs do not dispute ChemTreat's timeline; they simply state that their "original interrogatory responses were timely verified, and [they] will

16

correct the lack of verification for the amended responses." [Doc. 139 at Page ID # 1865]. The timeliness of their original response to interrogatory no. 1 is irrelevant for current purposes. Plaintiffs' failure to meet the January 20 deadline is in violation of the Court's January 11 Order. Plaintiffs' response to interrogatory no. 2 was similarly untimely.

ChemTreat's larger problem with Plaintiffs' amended response to interrogatory no. 1 is with its content. ChemTreat argues:

> Plaintiffs still did not provide a response to Interrogatory No. 1 for *each* exemplar document, instead responding only as to categories, and the information Plaintiffs provided remained focused on high-level assertions that the statutory requirements were met for those categories, without any substantive details as to *how* those requirements were met as to each document identified as an exemplar.

[Doc. 123 at Page ID # 1559]. ChemTreat specifically cites Plaintiffs' response as it pertains to the "Playbooks/Best Practices" category:

> Documents falling under this category describe Plaintiffs' core processes and practices. They are trade secrets and confidential information, under the DTSA and TUTSA since Plaintiffs derive independent economic value from the information in the documents and the information is not generally known nor readily ascertainable by proper means by other persons who would be able to obtain economic values from its disclosure or use, and Plaintiffs take reasonable measures under the circumstances to maintain its secrecy. Plaintiffs invest significant resources in both development and updating these documents, which serve as reference guide[s] to employees on best practices for servicing clients. Plaintiffs utilize agreements with employees as well as written policies and procedures to maintain secrecy of trade secret information as well as computer passwords and protective software to limit access to employees with a need to know. Plaintiff[s] developed the information found in these documents at great expense and over time, and such information, when kept confidential, gives them an advantage over their competitors. The aforementioned applies to each of the following exemplars, all of which can be found in the Digital Guardian report with the following Source File Paths[.]

[Doc. 140-4 at Page ID # 1919].

In response, Plaintiffs contend that they "discussed, *inter alia*, value to competitors, time and resources spent amassing information, and the use of employment agreements and confidentiality policies." [Doc. 139 at Page ID # 1865]. Plaintiffs further defend their method of responding on a category by category basis (versus providing a response for each exemplar within each category) [*id.*]. In short, Plaintiffs argue they fully complied with the January 1 Order as it pertains to interrogatory no. 1.

Plaintiffs will be required to either produce copies or images of the exemplars they previously identified, or to identify new exemplars that ChemTreat can review. As noted in its reply, if ChemTreat is able to identify the author, custodian, sender(s), and recipient(s) of the new exemplars, which it expects to be able to do from the metadata for any properly-produced exemplars, it can seek "discovery from those individuals regarding the nature or content of the documents." [Doc. 145 at Page ID # 1956 n.3]. And the exemplars themselves—once ChemTreat can actually review them—may answer some of ChemTreat's questions regarding the information sought by interrogatory no. 1.

As written, however, Plaintiffs' amended response to interrogatory no. 1 is insufficient. It adds little to the allegations in the amended complaint [*see, e.g.,* Doc. 46 at Page ID # 424, ¶ 191 ("The information contained in these documents is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. Nalco/Ecolab has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor, including ChemTreat.")]. The January 11 Order does not necessarily prohibit a category-wide response, to the extent such a response applies to each and every exemplar in the category. However, to the extent there are differences between exemplars, the January 11 Order plainly contemplates Plaintiffs will provide

18

exemplar-specific information. Indeed, contrary to Plaintiffs' suggestion, the January 11 Order provides that ChemTreat can request "further information . . . **as to particular documents** or categories of documents." [Doc. 111 at Page ID # 1401 (emphasis added)]. Further, there is little burden on Plaintiffs to repeat the same response for any applicable exemplar, and Plaintiffs will be required to do so.

Accordingly, the Court will grant the motion to compel compliance as it pertains to interrogatory no. 1.

### 5. Response to Interrogatory No. 2 and RFP No. 46

Interrogatory no. 2 and RFP no. 46 seek information regarding any disclosures of Plaintiffs' alleged trade secrets. Interrogatory no. 2 asked Plaintiffs to "Identify and Describe in Detail any instance in which the Documents You identified in your responses to Interrogatory No. 1 were shared with, accessed by, or accessible to any third party or the public at any time prior to July 1, 2021." [Doc. 140-4 at Page ID # 1923]. Plaintiffs initially responded they were only aware of such disclosures to customers or potential customers. Therefore, the January 11 Order requires Plaintiffs to identify the categories of documents that would typically be disclosed to customers, and then provide the information sought by interrogatory no. 2 "for each of the exemplars tied to a category" of documents that "would typically be disclosed to customers or potential customers" [Doc. 111 at Page ID # 1402]. Plaintiffs were also required to provide information responsive to interrogatory no. 2 for Exhibit 5, if they took the position the document was a trade secret. RFP no. 46 then required Plaintiffs to produce any confidentiality agreements (or similar agreements) signed by customers to whom the "at-issue documents" were disclosed [*id.*].

Plaintiffs' amended response to interrogatory no. 2 provides:

> Pursuant to the Court's January 11, 2023 Order (D.E. 111),
> Plaintiffs further state that Ridley took entire client files, the

19

contents of which Plaintiffs identified under the category of Customer Files and Documents. These files contain documents containing detailed information about everything that Nalco/Ecolab has done for a particular client, in most cases over several years. Some of the client files contain documents that were shared or given to clients. But the entire file was never shared or given to the client. These documents are part of the client files that Ridley copied from his Ecolab OneDrive account and then deleted upon exiting Ecolab and joining ChemTreat. The Digital Guardian Report contains an extensive listing of the trade secrets and confidential documents that Plaintiffs contend that Ridley misappropriated. Documents falling under the other trade secret/confidential documents listed on the Report (e.g., Fact Packs), including the exemplars previously identified by Plaintiffs, were not shown to clients. Plaintiffs have previously produced the Digital Guardian Report to ChemTreat and Ridley. Now that they have this Report, ChemTreat and Ridley are free to review it and, through Mr. Ridley, identify which specific documents were allegedly shared with clients. The burden of doing this is equal for both sides.

[Doc. 140-4 at Page ID # 1924]. Plaintiffs responded to RFP no. 46 as follows:

[P]ursuant to the Court's January [11], 2023 Order (D.E. 111), Plaintiffs state that they do not contend that all individual files falling under the category of Customer Files and Documents can be considered trade secrets in their own right. Rather, the files constitute trade secrets as a compilations of information for Plaintiffs' customers. Plaintiffs do not share their entire customer files with their customers. There are no agreements (or related documents) between Plaintiffs and their customers that would cover the sharing of an entire client file—like those that Mr. Ridley improperly downloaded. Again, Plaintiffs do not share entire customers files with their customers. Accordingly, the documents sought by RPD No. 46 do not exist. Further, Mr. Ridley deleted all Customer Files and Documents that he copied, including the very documents sought by this Request.

Doc. 123-10 at Page ID # 1644-45].

It thus appears Plaintiffs' position is that the only relevant category (out of the seven trade secret categories) is the Customer Files and Documents category. The Court finds Plaintiffs' responses to interrogatory no. 1 and RFP no. 46 sufficient as to any alleged compilation trade secrets. The responses are not sufficient as to any alleged individual document trade secrets falling

within the Customer Files and Documents category, however. Plaintiffs do not contend otherwise. Indeed, they readily admit documents from customer files were shared, and they do not specify the nature of the shared customer documents (i.e., whether such typically shared documents are alleged to be trade secrets). Furthermore, the January 11 Order clearly contemplates that some individual documents would be at issue in these discovery requests. The Order gives at least one example—bid responses.

The larger point, as discussed above in connection with the dispute concerning Plaintiffs' identification of exemplar customer file paths, is that to the extent Plaintiffs assert individual documents contained within the Customer Files and Documents category are trade secrets separate and apart from the alleged trade secret in the compilation of documents in a given customer file, Plaintiffs are required to provide the information sought by the discovery requests at issue in the January 11 Order.

Accordingly, the Court will grant in part the motion to compel compliance as it pertains to interrogatory no. 2, RFP no. 46 and, if applicable, RFP no. 11.

### 6. Conclusion Regarding Section I

For these reasons, the motion to compel compliance [Doc. 122] is **GRANTED IN PART AND DENIED IN PART** as to Section I. Plaintiffs are ordered to identify ten exemplar customer documents which Plaintiffs allege to be trade secrets. The exemplar customer documents should not be duplicative of documents identified in connection with the other six categories of alleged trade secrets. Plaintiffs shall identify (and produce) the ten exemplar customer documents within **SEVEN DAYS** of entry of this Order. The motion is denied to the extent it seeks relief based on Plaintiffs' designation of file paths instead of documents with regard to any alleged compilation trade secret customer files.

21

Plaintiffs are further ordered to produce copies or images of all exemplars for ChemTreat to review within **SEVEN DAYS** of entry of this Order. This includes the exemplars for the alleged compilation trade secrets (customer files). Pursuant to the parties' agreement expressed during the February 22 hearing, for any exemplars for which a copy is not available after a reasonable and diligent search, Plaintiffs may provide a reasonably close approximation along with a sworn statement describing Plaintiffs' search efforts to locate the copy. Such description should address the individuals who performed the searches, the repositories searched, the terms used, the dates of the searches, the known differences between the exemplar and the actual document Ridley allegedly misappropriated, and other pertinent information.

In its discretion, the Court orders ChemTreat to provide Plaintiffs with a list of the 4,005 lines from the DLP report left uncategorized within **THREE DAYS** of entry of this Order, if it has not already done so. Within **SEVEN DAYS** of entry of this Order, Plaintiffs shall identify which of the 4,005 lines, if any, are alleged trade secrets and the category to which any such alleged trade secrets belong. The motion is denied to the extent it seeks further relief regarding categorization.

Regarding interrogatory no. 1, Plaintiffs are ordered to provide more specific information relating to the exemplars it produces to Plaintiffs within **SEVEN DAYS** of entry of this Order. Such information will be provided as to each individual exemplar. Further, to the extent requested by ChemTreat, Plaintiffs are ordered to respond to reasonable follow-up questions regarding a particular category or document, as set forth in the January 11 Order.

As for interrogatory no. 2, RFP no. 46, and RFP no. 11, Plaintiffs are ordered to provide the relevant information for the exemplar customer documents within **SEVEN DAYS** of entry of this Order. The motion is denied to the extent it seeks further information and production regarding the alleged compilation trade secrets (customer files).

22

b.      **Section II – Spoliation – Interrogatory Nos. 3, 4, and 5[13]**

Section II of the January 11 Order "deal[s] with the circumstances surrounding the loss or destruction of the information on the laptop and mobile drive returned by Ridley after his resignation—including whether Plaintiffs were on notice of their duty to preserve that information at the time it was lost or destroyed." [Doc. 111 at Page ID # 1403]. At the hearing, ChemTreat indicated Plaintiffs very recently revealed Ridley used two laptops during the relevant time period. The requirements of the January 11 Order and this Order relate to both laptops.

1.      **Interrogatory No. 3**

As originally drafted, ChemTreat's interrogatory no. 3 asked Plaintiffs to:

> Describe in Detail all efforts You made to investigate whether Mr. Ridley downloaded, copied, or transferred in any way documents belonging to Ecolab to a personal hard drive, device, cloud-based storage platform, OneDrive, or email account, including the date when you began the investigation and the identity of the individuals involved in the investigation.

[Doc. 140-4 at Page ID # 1924]. Regarding interrogatory no. 3, the January 11 Order provides:

> Plaintiffs agreed to pin down the relevant details regarding the origin of the investigation[14] (such as the names and dates for the alleged solicitation of a Nalco/Ecolab employee by ChemTreat that spurred a broader investigation that included Ridley) and the creation of the DLP report (such as the date the report was requested and the names of the individuals involved in generating it) and then to provide that factual information in a letter from counsel, followed by a sworn interrogatory response.

---

[13] Section II of the January 11 Order also addressed RFP nos. 25 and 26. The parties do not explicitly address these RFP in their briefing on the instant motion, and so the Court does not address these RFP any further herein. This Order should not be interpreted as modifying any provision of the January 11 Order not specifically addressed by the parties in their briefs and addressed by the Court in this Order.

[14] "Investigation" here refers to Plaintiffs' investigation into Ridley's conduct while employed by Plaintiffs, i.e., the alleged misappropriation/downloading of confidential and trade secret information.

[*Id.* at Page ID # 1404].

The letter from counsel stated that Ridley's laptop was "wiped by the outside vendor (Insight) to which Ridley returned his laptop computer." [Doc. 140-1 at Page ID # 1888]. The letter went on to explain:

> Subsequent to Ridley's departure, Plaintiffs received concerning reports about ChemTreat's hiring and recruitment of Plaintiffs' employees, and ChemTreat's practice of inducing such employees to breach their post-employment obligations which they owed to Plaintiffs. In conjunction with such reports, Ecolab undertook a review of Ridley's electronic activities using Digital Guardian, a data-loss prevention program. Specifically, Ecolab IT ran a Digital Guardian report focused on Ridley's download activity.

[Doc. 140-1 at Page ID # 1888-89 (citation omitted)].

Plaintiffs' follow-up supplemental response to interrogatory no. 3 presents a different story. It omits any reference to the "concerning reports." Instead, it states that "Kristen Mahre, a Human Resources Manager for Plaintiff, submitted a request for a review of Ridley's systems on July 18, 2021 because he had gone to work for a competitor." [Doc. 140-4 at Page ID # 1925]. The supplemental response goes on to describe when the Digital Guardian Report was created, the work performed by one of Plaintiffs' experts, and various other details about the investigation [*Id.* at Page ID # 1925-26]. The supplemental response does not, however, discuss any further details "regarding the origin of the investigation (**such as the names and dates for the alleged solicitation of a Nalco/Ecolab employee by ChemTreat that spurred a broader investigation that included Ridley**)" [Doc. 111 at Page ID # 1404 (emphasis added)].

Plaintiffs do not address this requirement from the January 11 Order at all in their response to ChemTreat's motion to compel compliance. They focus on their identification of "the person who requested the DLP report, the date it was requested, the reason it was requested, the date the report was generated, and the person who generated it." [*Id.*]. But they completely gloss over the

requirement in the January 11 Order that they provide the details quoted above in bold. Even if the "such as" language could be interpreted as signaling these details are only examples of the types of details Plaintiffs were required to produce—which Plaintiffs do not argue is the case—Plaintiffs themselves brought up the "concerning reports" when discussing interrogatory no. 3 in their letter to counsel.

Accordingly, the motion to compel compliance will be granted as to interrogatory no. 3.

### 2. Interrogatory Nos. 4 and 5

Regarding interrogatory nos. 4 and 5, the January 11 Order states:

> For the laptops, Plaintiffs clarified that only one Nalco/Ecolab laptop is at issue . . . As to that laptop, Plaintiffs agreed to the compromise proposed by ChemTreat during the parties' previous meet-and-confer efforts, as outlined in ChemTreat's motion, and will provide a supplemental interrogatory response addressing: (1) the date on which Plaintiffs directed their IT personnel or vendor to wipe the contents of the laptop; (2) any efforts Plaintiffs took to preserve or image the information on the laptop before it was wiped; (3) the date on which Plaintiffs redeployed the laptop; (4) any efforts Plaintiffs made to recall the laptop from the employee to whom it was redeployed; (5) any efforts Plaintiffs made to recover the information wiped from the laptop (including the date(s) and result(s) of any such effort(s)); and (6) the current location of the laptop.

> For the mobile drive returned by Ridley, Plaintiffs have agreed to produce the letter from their vendor confirming receipt of the mobile drive, and to supplement their interrogatory responses to provide the last known location of the device. If the last known location is null because the device has been destroyed (as Plaintiffs have indicated may be the case), Plaintiffs will so state, and explain the circumstances of that destruction (i.e., when, why, and how the drive was destroyed).

[Doc. 111 at Page ID # 1404-05 (internal quotation marks, citation, and footnote omitted)].

Regarding the laptop they identified first, Plaintiffs' supplemental interrogatory response states, in pertinent part:

25

> At the time of [Ridley's] resignation, Plaintiffs were not aware of his misconduct. There was no duty to preserve any data maintained on his computer. As such, when Plaintiffs' vendor, Insight, received Mr. Ridley's laptop on July 12, 2021, it removed all data. The laptop was subsequently redeployed, though the exact date of redeployment is not known. Plaintiffs did not maintain a record of the use of the laptop following its return by Mr. Ridley as, again, they were under no obligation to do so. The current location of the laptop is not known. As such, it was not possible to recover any information that had been cleaned from the laptop. Plaintiffs reserve the right to supplement this response should any additional information be discovered.

[Doc. 140-4 at Page ID # 1927].

In their response to ChemTreat's motion to compel compliance, Plaintiffs candidly admit their supplemental response did not address a number of requirements from the January 11 Order regarding the laptop(s). Plaintiffs then proceed to supply the missing information noting: (1) they never directed their IT department to wipe the contents of Ridley's laptop; (2) they made no effort to preserve or image the laptop before it was wiped; (3) they made no effort to recall the laptop from the employee who received it after Ridley; and (4) they made no effort to recover any information from the laptop after it was wiped (because the laptop had been "restored to factory settings . . . and, as such, no information would be recoverable" [Doc. 139 at Page ID # 1869]). Plaintiffs then state they recently discovered information regarding the laptop, including its current location as well the date it was redeployed, and once they confirm the information they will "promptly supplement their response to interrogatory no. 4." [*Id.* at Page ID # 1869].

ChemTreat takes umbrage with Plaintiffs' failure to discover the location of the laptop and the date it was redeployed at an earlier point in this litigation. The Court acknowledges ChemTreat's frustration; however, the Court accepts Plaintiffs' representation that ChemTreat will receive the verified information in short order. Plaintiffs will be required to provide to ChemTreat the requested information regarding the current location of both laptops and the dates they were

26

redeployed in a verified, sworn supplemental response. The verified, sworn supplemental response shall also address the information listed immediately above regarding the wiping of both of Ridley's laptops.[15]

Regarding the mobile drive, Plaintiffs' supplemental interrogatory response states, in pertinent part:

> Plaintiffs have produced the record from their vendor confirming that Ridley returned a "mobile drive" on July 12, 2023. See PLAINTIFFSR-000000696. At the time of his resignation, Plaintiffs were not aware of Ridley's misconduct. There was no duty to preserve any data maintained on the "mobile drive" that he returned. The last known location of the "mobile drive" was with Plaintiffs' vendor, and Plaintiffs understand that it may have been destroyed. Plaintiffs reserve the right to supplement this response should any additional information be discovered.

[Doc. 140-4 at Page ID # 1928].

ChemTreat complains that Plaintiffs fail to explain why, 18 months after this case was filed, they "still do not know what happened to it, and are only able to speculate that 'it may have been destroyed.'" [Doc. 123 at Page ID # 1569]. ChemTreat contends that pursuant to the January 11 Order, Plaintiffs were required "to determine the ***actual facts*** that would confirm or disprove their 'understanding' by the Court-ordered deadline." [*Id.*].

Plaintiffs respond that they "are unable to say with absolute certainty that the 'mobile drive' was destroyed, and as such, they are unable to provide any further details regarding such destruction." [Doc. 139 at Page ID # 1870].

---

[15] ChemTreat makes an additional argument concerning the date the first identified laptop was actually wiped by Plaintiffs' vendor, and the interpretation of an ambiguously worded sentence in Plaintiffs' supplemental response to interrogatory no. 4. The January 11 Order does not require Plaintiffs to identify the date the laptop was actually wiped by the outside vendor, and therefore any dispute regarding such information is not properly before the Court.

27

ChemTreat goes too far in its interpretation of Plaintiffs obligations under the January 11 Order. It may be impossible to determine whether the mobile drive was destroyed, for any number of reasons. However, Plaintiffs provide no information whatsoever regarding their efforts to investigate this issue, and the Court agrees this deficiency violates the January 11 Order. The Court did not adopt the Joint Submission and incorporate it into the January 11 Order as an exercise in futility. Plaintiffs will be required to provide a verified, sworn supplemental interrogatory response that explains in detail the basis for Plaintiffs' understanding regarding the mobile device, including their efforts to locate the mobile device, the identity of any individuals involved in the search, the basis for the claim that it may have been destroyed, and any other pertinent information.

### 3.    Conclusion Regarding Section II

For these reasons, ChemTreat's motion to compel compliance [Doc. 122] is **GRANTED IN PART AND DENIED IN PART** as to Section II. Regarding interrogatory no. 3, within **SEVEN DAYS** of entry of this Order, Plaintiffs are ordered to produce a sworn, verified supplemental response which addresses "the names and dates for the alleged solicitation of a Nalco/Ecolab employee by ChemTreat that spurred a broader investigation that included Ridley." [Doc. 111 at Page ID # 1404].

Regarding interrogatory nos. 4 and 5, within **SEVEN DAYS** of entry of this Order, Plaintiffs are ordered to produce sworn, verified supplemental responses (1) regarding the current location of Ridley's laptops and the dates they were redeployed; (2) setting forth the information identified in Plaintiffs' brief regarding the investigation into the wiping of the laptops; and (3) explaining in detail the basis for Plaintiffs' understanding regarding the mobile device, including their efforts to locate the mobile device, the identity of any individuals involved in the search, the

28

basis for the claim that it may have been destroyed, and any other pertinent information. The motion is denied as to interrogatory nos. 4 and 5 in all other respects.

### c. Section III – Causation of Damages – RFA Nos. 119, 120, 121; RFP Nos. 83 and 84

ChemTreat characterizes Section III as "directed to a specific aspect of ChemTreat's defense to liability: the lack of proximate causation (*i.e.*, whatever damages Plaintiffs may have suffered, they are not attributable to any conduct by ChemTreat)." [Doc. 123 at Page ID # 1570].

#### 1. RFA Nos. 119, 120, and 121

As originally drafted, RFA nos. 119, 120, and 121 provide as follows:

> **RFA No. 119**: Admit that, between January 1, 2021, and the present, at least one of Your Customers has informed You they were dissatisfied with Ecolab's customer service.
>
> **RFA No. 120**: Admit that, between January 1, 2021, and the present, at least one of Your Customers has informed You they were dissatisfied with Ecolab's prices.
>
> **RFA No. 121**: Admit that, between January 1, 2021, and the present, at least one of Your Customers has informed You they were dissatisfied with Ecolab's Products.

[Doc. 123-9 at Page ID # 1639-40]. The January 11 Order limits the scope of these RFA "to only those customers for which Plaintiffs allege they have suffered a reduction or loss of business as a result of the conduct alleged in this litigation (i.e., only those customers tied to Plaintiffs' damages claim)." [Doc. 111 at Page ID # 1406]. The relevant customers are identified in Plaintiffs' January 18, 2023 letter to ChemTreat [Doc. 140-1 at Page ID # 1889-90].

In their amended RFA responses, Plaintiffs denied RFA nos. 119, 120, and 121. However, the denials included the qualification, "Plaintiffs are unaware of any of these customers **specifically stating that they were 'dissatisfied with Ecolab's [customer service, prices, or Products]**." [Doc. 123-9 at Page ID # 1639-41 (emphasis added)]. ChemTreat contends Plaintiffs'

29

limitation to only those customers who "'specifically stat[ed]' the phrase that Plaintiffs placed in quotation marks" is inappropriate [Doc. 123 at Page ID # 1570-71].

In their response, Plaintiffs do not contest ChemTreat's interpretation of their amended responses to the RFA. Instead, they argue they "responded to RFA Nos. 119, 120, and 12[1] exactly as written." [Doc. 139 at Page ID # 1870].

Plaintiffs' position borders on being frivolous. The RFA ask Plaintiffs to admit whether any relevant customer "has informed" Plaintiffs they were dissatisfied with Plaintiffs' customer service, prices, or products. There is no requirement that the customer use any particular language when "informing" Plaintiffs they are dissatisfied. Plaintiffs' restriction to the particular phrasing quoted above violates the January 11 Order, and the motion to compel compliance will be granted as to these RFA.

### 2. RFP nos. 83 and 84

As originally drafted, RFP nos. 83 and 84 provide as follows:

> **RFP No. 83**: For the period January 1, 2016 to the present, all Documents that track, evaluate, or otherwise analyze Your client or Customer turnover.

> **RFP No. 84**: For the period January 1, 2016 to the present, all Documents that track or indicate the clients, Customers, or accounts Ecolab has lost.

[Doc. 123-10 at Page ID # 1645]. The January 11 Order limits the scope of these RFP "to only those customers for which Plaintiffs allege they have suffered a reduction or loss of business as a result of the conduct alleged in this litigation (i.e., only those customers tied to Plaintiffs' damages claim)." [Doc. 111 at Page ID # 1406].

ChemTreat complains that, in response to these RFP, Plaintiffs produced "a single heavily redacted spreadsheet, which they later identified as a 'Fact Pack[.]'" [Doc. 123 at Page ID #

1571].[16] ChemTreat contends the Fact Pack Plaintiffs produced does not cover the full time period, despite the fact that Fact Packs were "created on a monthly basis" throughout the defined time period. ChemTreat also emphasizes Plaintiffs produced the Fact Pack five days past the deadline set by the January 11 Order.

In response, Plaintiffs state the Fact Pack is a spreadsheet containing 15 tabs, "some of which have hundreds of columns and thousands of rows." [Doc. 139 at Page ID # 1871]. Plaintiffs contend the information relevant to ChemTreat was not redacted, which they pointed out to ChemTreat in a meet and confer call. Plaintiffs conclude: "While ChemTreat has expressed its unhappiness that Plaintiffs produced a 'single' spreadsheet to address these RFPs rather than multiple documents, it has not articulated exactly what information it contends is missing. Nor can it, because Plaintiffs have complied with the Order." [*Id.*].

Contrary to Plaintiffs' argument, ChemTreat has articulated what information it contends is missing: Fact Packs (and/or other responsive documents) dating back to January 1, 2016. In their response to the instant motion to compel compliance, Plaintiffs did not dispute the Fact Pack they produced to ChemTreat covers only the period of time between March 2019 and the end of 2022. They also did not dispute ChemTreat's assertion that Fact Packs are created on a monthly basis. They suggest ChemTreat failed to ask follow-up questions about Fact Packs covering the January 2016 through March 2019 time period, but they do not contend such Fact Packs do not exist or would not be responsive to RFP nos. 83 and 84, nor do they address why they failed to produce these Facts Packs (and/or other responsive documents) in the first place, as the January 11 Order requires. At the hearing, ChemTreat acknowledged Plaintiffs produced additional Fact

---

[16] At the hearing, ChemTreat acknowledged Plaintiffs very recently produced additional Fact Packs, and lamented the tardy, heavily redacted production. It is not necessary to address this further at this time.

Packs the night before; however, ChemTreat was not able to review them in detail in the short time they had prior to the hearing.

### 3.     Conclusion Regarding Section III

For these reasons, the motion to compel compliance [Doc. 122] is **GRANTED** as to Section III. Regarding RFA nos. 119, 120, and 121, within **SEVEN DAYS** of entry of this Order, Plaintiffs are ordered to submit verified, sworn supplemental responses, which shall address whether a relevant customer (as limited by the January 11 Order and identified in the January 18 letter) informed Plaintiffs they were dissatisfied with Ecolab's customer service, prices, or Products, without regard to the specific language the customer used to express their dissatisfaction.

Regarding RFP nos. 83 and 84, within **SEVEN DAYS** of entry of this Order, Plaintiffs are ordered to produce all responsive documents covering the time period from January 1, 2016 to the present. Plaintiffs shall produce such documents without redaction (unless redacted for privilege).

### d.     Section IV – Prior Agreements – RFP Nos. 15-17 and 65[17]

Section IV of the January 11 Order addresses agreements the parties reached during discovery conferrals conducted in the lead up to the filing of ChemTreat's November 2022 motion to compel [Doc. 76]. The Order states that "Plaintiffs have not yet provided the agreed-to information and documents or agreed to a date certain to do so[.]" [Doc. 111 at Page ID # 1407]. Regarding RFP nos. 15-17, the January 11 Order requires Plaintiffs to "produce all correspondence with Ridley demanding that he return any devices in his possession." [Doc. 111 at Page ID # 1407].

---

[17] Section IV of the January 11 Order also encompassed RFA nos. 1-11, 27-40, 77-80, and 108. The parties do not address them in their briefing on the instant motion to compel compliance.

Regarding RFP no. 65, the January 11 Order requires Plaintiffs to "produce the LinkedIn messages referenced in Paragraph 109[18] of the Second Amended Complaint." [*Id.* at Page ID # 1408].

### 1. Delayed Production

ChemTreat's only complaint regarding these three RFP is that Plaintiffs produced the responsive documents on January 25 instead of January 23. ChemTreat complains Plaintiffs only produced three emails, which were sent to Ridley's email address and therefore could have been "easily . . . located with simple term or date searches." [Doc. 123 at Page ID # 1572]. ChemTreat also implies that when Plaintiffs first requested a two-day extension, their offered reason was disingenuous or outright untrue.[19] In light of Plaintiffs' alleged misrepresentations regarding the need for the extension and Plaintiffs' minimal production in response to these four RFP, ChemTreat requests that the Court "impose whatever further requirements it considers necessary (such as declarations or certifications of compliance) to ensure that any subsequent information provided by Plaintiffs is complete and based on an adequate investigation." [Doc. 123 at Page ID # 1572].

Plaintiffs acknowledge the late production, and they do not offer any further explanation as to why they were unable to comply with the January 23 deadline set by the January 11 Order.

---

[18] Paragraph 109 alleges that "[b]efore he resigned from Nalco/Ecolab, Ridley was contacted via LinkedIn by two former Nalco/Ecolab employees who were working for ChemTreat." [Doc. 46 at Page ID # 407].

[19] The January 11 Order required production responsive to RFP nos. 15-17 and 65 by January 23. Plaintiffs' January 20 motion to alter or amend [Doc. 113] states that Plaintiffs "need additional time since many of the files listed in the DLP report . . . were deleted by Ridley . . . and Plaintiff[s'] counsel is presently working with Plaintiffs to identify and gather any responsive documents." [*Id.* at Page ID # 1421]. In the instant motion to compel compliance, ChemTreat contends that none of the emails responsive to RFP nos. 15-17 and 65 "were identified in the DLP report or otherwise related to Ridley's alleged downloading (and deletion) of files from the OneDrive." [Doc. 123 at Page ID # 1572].

33

They contend ChemTreat suffered no prejudice from the two-day delay, and they imply ChemTreat failed to abide the Court's repeated instruction to work cooperatively when it refused to agree to the short extension.

Perhaps Plaintiffs could have located the emails with a simple search and easily complied with the January 23 deadline, as ChemTreat contends. However, the Court presumes Plaintiffs and their counsel, as officers of the Court, did not intentionally mislead the Court when they requested a brief extension in their motion to alter or amend [Doc. 113]. The Court finds the record on this issue does not clearly indicate Plaintiffs acted with some nefarious intent when they requested the extension informally via email to ChemTreat or when they filed the motion to alter or amend. Moreover, the Court agrees with Plaintiffs that ChemTreat has not shown it suffered any prejudice by the two-day delay.

Given that Plaintiffs' motion to alter or amend was pending when the January 23 deadline passed and ChemTreat has not shown it suffered prejudice by the short two-day delay, the Court will not sanction Plaintiffs' non-compliance with this deadline at this time. ChemTreat, of course, may choose to conduct discovery regarding Plaintiffs' investigation as it pertains to RFP nos. 15-17 and 65, time permitting.

### 2. Conclusion Regarding Section IV

For these reasons, the motion to compel compliance [Doc. 122] is **DENIED** as to Section IV. At this time, the Court will not issue a blanket requirement that Plaintiffs submit "declarations or certifications of compliance" regarding all future document production or other discovery responses [*see* Doc. 123 at Page ID # 1572].

34

### e.    Sanctions

ChemTreat requests reasonable expenses and attorney fees incurred it incurred in filing the motion to compel compliance, plus "whatever non-monetary sanctions the Court deems appropriate." [Doc. 123 at Page ID # 1574].

The Court remains concerned with Plaintiffs' failure to fully abide by the January 11 Order, and with the parties' conduct in discovery more generally.  Once again, the parties are reminded that the Federal Rules of Civil Procedure, including those governing discovery, "should be construed, administered and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.  Thus far, the parties have done precisely the opposite of Rule 1's directive.  The Court's Orders, even when based on negotiated agreements between the parties, have had the unintended effect of spawning additional rounds of extensive motion practice requesting compliance, clarification, status conferences, hearings, extensions of time, reconsideration, sanctions and so forth, with the parties refusing each other basic professional courtesies and inundating the Court with filings at every turn.  The Court's efforts to keep the parties focused on gathering relevant information and moving through discovery in a cooperative and efficient manner appear to have been in vain.

This Order requires Plaintiffs to provide verified, sworn supplemental responses to several disputed discovery requests, and where appropriate, the Order requires Plaintiffs to provide information regarding their efforts to produce the requested information and documents.  *See Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, No. 1:16-cv-10317, 2023 WL 1452062, at *10 (E.D. Mich. Feb. 1, 2023) ("Rule 37(b) allows Courts to sanction parties who violate discovery orders.  Although parties may move the Court to impose a particular

sanction, the Court has wide discretion to impose any sanction if finds appropriate." (citations omitted)).

To the extent ChemTreat is seeking monetary sanctions, the Court has not determined such sanctions are warranted and ChemTreat has not supported its request with evidence of any specific award. Given the parties' extensive filings, the Court will not further tax its finite resources to fully address any request for monetary sanctions at this time. Accordingly, under the circumstances, ChemTreat's request for monetary sanctions is **DENIED WITHOUT PREJUDICE** to refiling. Given that ChemTreat's request for monetary sanctions is based in part on the timeliness of Plaintiffs' compliance with the January 11 Order, and Plaintiffs' motion to alter or amend pertained only to the deadlines in the January 11 Order, Plaintiffs' motion to alter or amend [Doc. 113] is also **DENIED WITHOUT PREJUDICE** to refiling.

Any renewed request for sanctions or to alter the deadlines of the January 11 Order must be supported with appropriate evidence, and shall not be filed unless the parties have first engaged in mediation to resolve this case. If said mediation does not resolve this case in whole, any renewed motion must be filed within seven days of the conclusion of the mediation, along with the mediation report required by Eastern District of Tennessee Local Rule 16.4(m). As addressed in more detail in the hearing, the parties are forewarned that their ongoing discovery disputes may lead to appropriate sanctions. *See* Fed. R. Civ. P. 37(b)(2)(C) ("Instead of or in addition to [any nonmonetary sanctions], the court **must order the disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees**, . . . unless the failure was substantially justified or other circumstances make an award of expenses unjust.").

**IV.    CONCLUSION**

For the reasons stated herein, ChemTreat's motion to expedite briefing [Doc. 124] is **GRANTED** pursuant to the parties' agreement.

Further, ChemTreat's motion to compel compliance [Doc. 122] is **GRANTED IN PART AND DENIED IN PART** as set forth above.

Finally, Plaintiffs' motion to alter or amend the January 11 Order [Doc. 113] is **DENIED WITHOUT PREJUDICE**.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

37