# EXHIBIT 2

# Employee Sales, Service, Marketing & Inventions Agreement

**This AGREEMENT is made and entered into between Ecolab Inc., a Delaware corporation, its parent companies, sister companies and subsidiaries** Anthony Ridley **(the "Employee").**

The Company's business is highly competitive and the Company has invested considerable sums of money in developing products, equipment, training programs, sales programs, technical service programs and account records for the proper servicing of its customers. Such records include, but are not limited to, the type of equipment installed, the prices paid by each customer, the names and positions of the customer's key personnel, the types of services performed, the frequency and destination of shipments, and the products generally ordered by the customer. The Company also invests substantial sums on the training and development of its employees and the development of technology. While employed with the Company, the Employee will receive valuable training under the Company's sales and/or service programs and will be entrusted with the information in the Company's account records and may be entrusted with information regarding Company's Trade Secrets. In return for the Company providing the Employee with this training and information, the Employee agrees not to use this training and information against the Company. The Employee also agrees that the restraints imposed by this Agreement are reasonable and necessary to protect the Company's business, goodwill, customer relationships, and the jobs of other Company employees.

Therefore, in consideration of the Employee's employment and the covenants and agreements contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.** The Company will employ the Employee in a sales or sales management position, or a service or service management position, for such period of time and for such compensation, including salary and employee benefits, as may be mutually agreeable to both parties. The compensation shall be deemed to be mutually agreeable to both parties if the Company pays the compensation and the Employee accepts the compensation. The Company may at any time, with or without adjusting the Employee's compensation, alter the geographic limits of any sales or service territory assigned to the Employee, or assign the Employee to a new territory, or change the customers assigned to the Employee. Both the Company and the Employee have the same right to terminate the employment with or without cause or notice at any time, and this at-will employment relationship may not be modified except in a writing signed by Employee and an authorized officer of the Company.

**2.** Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing, business strategies, business methods, and employees (including the particular skills, talents and abilities of those employees).

Employee hereby agrees that Employee will hold in a fiduciary capacity for the benefit of Company and shall not, directly or indirectly, use or disclose any Trade Secrets, as defined hereinafter, that Employee may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret.

The term "Trade Secret" as used in this Agreement shall mean information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

**(a)** derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

**(b)** is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

In addition to the foregoing and not in limitation thereof, Employee agrees that while employed with the Company and for a period of three (3) years after termination of Employee's employment with Company, Employee will hold in a fiduciary capacity for the

**Exhibit 077**

benefit of Company and shall not, directly or indirectly, use or disclose any Confidential Information, as defined hereinafter, that Employee may have acquired (whether or not developed or compiled by Employee and whether or not Employee was authorized to have access to such Confidential Information) during the term of, in the course of, or as a result of Employee's employment by Company.

The term "Confidential Information" shall mean Company's confidential data or information which is valuable to Company but substantially inaccessible to the public and to competitors of Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets. Notwithstanding the foregoing, the term "Confidential Information" shall not include information that Employee can establish by competent proof: (i) was generally known to or accessible by the public at the time Company disclosed the information to Employee; (ii) became generally known to or accessible by the public after disclosure by Company through no act or omission by Employee; or (iii) was disclosed to Employee, after the Employee's termination of employment with the Company, by a third party having a bona fide right both to possess the information and to disclose the information to Employee, provided such third party is not subject to an obligation of confidentiality with respect to such information.

Employee understands Employee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that is made (a) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney if such disclosure is made solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and Employee does not disclose the Trade Secret except pursuant to a court order.

3. Ecolab is committed to compliance with applicable federal, state and local laws. As such, nothing in this Agreement prohibits Employee from reporting possible violations of law to any government agency if such report is made in confidence and good faith to a federal, state or local government official, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit relating to such report. Nothing in this Agreement is to be construed to prohibit the Company from bringing any claims against Employee, including but not limited to, statutory claims for Trade Secret misappropriation. Nothing in this Agreement is to be construed to unlawfully limit any rights Employee may have under the National Labor Relations Act.

4. When Company owned computers, computer devices, e-mail addresses, phones, and/or other electronic technology are issued to Employee, Employee shall conduct Company business and communicate with customers, vendors and the public regarding Company business only on the Company computer network and using such Company-provided electronic technology. Employee agrees that Employee will not transfer or store any Company information on any device or other storage medium (physical or virtual) not provided or authorized by the Company unless authorized to do so in writing by the Company. Employee has no right to privacy with respect to any data that is stored on any device issued to Employee by the Company and/or authorized for Employee to use for Company business. As soon as Employee begins to consider leaving the Company or Employee realizes Employee's employment with the Company has or will soon come to an end, Employee will not wipe, delete or transfer or cause any Company data to be wiped, deleted or transferred from any such device before returning the device to the Company.

5. The Employee shall perform such services as may be assigned to Employee from time to time in accordance with the Company's policies and procedures. The Employee shall timely submit written sales and service reports using the Company's standard report forms. Employee will devote Employee's whole working time and ability to the services of the Company in such capacity as the Company from time to time shall direct. Employee further agrees that during the course of employment by the Company, Employee will not have any financial interest, whether direct or indirect, in any firm or organization engaged in competitive services or products. This provision is not intended to preclude personal investments of the Employee which do not require Employee's significant day-to-day attention and management. Employee agrees to promptly disclose to the Company any conflict of interest or employment matter which may be adverse to the Company's interest.

6. During employment with the Company and for a period of one (1) year immediately following the termination of his employment with the Company, the Employee will not:

**(a)** solicit, encourage or induce any customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service;

**(b)** transact business with any Customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service.

During said one (1) year following termination, the employee also will not assist any Competing Firm to engage in the aforementioned activities prohibited by Subsections 6(a) and 6(b). A Competing Firm means any person or organization (including one owned in whole or in part by the Employee) which is engaged in the development, production, use, marketing or sale of a Competing Product or Competing Service. A Competing Product or Competing Service means any product or service which is the same as, or similar to, and competes with, a product or service of the Company which was part of the product or service line handled by the Employee, or by persons supervised by the Employee, during Employee's last year of employment with the Company. If the Employee violates the covenants contained in this Section, the term of said covenant shall be extended for one (1) year from and after the later of (a) the date on which the Employee permanently ceases such violation; or (b) the date on which any court issues an order or judgment enforcing the covenant; provided, that in no event shall the term of the covenant be extended for a term beyond twenty-four (24) months following termination of the Employee's employment with the Company.

7. During Employee's employment with Company and for a period of one (1) year immediately thereafter, Employee will not hire or induce, attempt to induce or in any way assist or act in concert with any other person or organization in hiring, inducing or attempting to induce any employee or agent of Company to terminate such employee's or agent's relationship with Company. This restriction is limited to those employees that Employee managed, or supervised, or had material contact with on the Company's behalf during the last twelve (12) months of Employee's employment with Company.

8. Employee will communicate and disclose in writing to Employee's manager or to such person as may be designated by the Company both during employment and thereafter, all inventions, discoveries, improvements, machines, devices, design, processes, products, software, treatments, formulae, mixtures, and/or compounds whether patentable or not as well as patents and patent applications (all collectively called "Inventions") made, conceived, developed or acquired by Employee or under which Employee acquired the right to grant licenses or become licensed, whether alone or jointly with others, during Employee's employment by the Company. All Employee's right, title and interest in, to and under such Inventions, including licenses and right to grant licenses, shall be the sole property of the Company and Employee hereby assign the same to the Company. Any Invention disclosed by Employee to anyone within one (1) year after termination of Employee's employment with the Company, which relates to any matters pertaining to, applicable to, or useful in connection with, the business of the Company shall be deemed to have been made or conceived or developed by Employee during Employee's employment by the Company, unless proved by Employee to have been made and conceived and developed after termination of Employee's employment with the Company.

9. For all Employee's Inventions, Employee will, upon request of the Company, during Employee's employment and thereafter:

**(a)** execute and deliver all documents which the Company shall deem necessary or appropriate to assign, transfer, and convey to the Company, all Employee's right, title, interest in and to Employee's Inventions, and enable the Company to file and prosecute applications for Letters Patent of the United States and any foreign countries on inventions as to which the Company wishes to file patent applications, and

**(b)** do all other things (including giving of evidence in suits and other proceedings) which the Company shall deem necessary or appropriate to obtain, maintain, and assert patents for any and all such inventions and to assert its rights in any inventions not patented

10. Employee's obligations under Sections 8 and 9 of this Agreement do not apply to Inventions for which no equipment, supplies, facility or Confidential Information of the Company was used, and which were developed entirely on Employee's own time unless the inventions relate to the business of the Company or to the Company's actual or demonstrably anticipated research or development or the inventions result from any work performed by Employee for the Company.

11. Upon termination of Employee's employment and/or promptly upon request, the Employee will return in good order all Company property and information in the Employee's possession, custody or control. Upon termination, Employee shall return all Company data, business information, credit cards, keys, automobiles and any other Company property in his possession. Employee shall not erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company. For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/or erase Company data from Employee's Company assigned phone and/or computer device.

12. In the event the Employee violates, or the Company reasonably believes the Employee is about to violate, this Agreement, the Employee agrees that the Company is entitled to injunctive relief to prevent violation(s) and/or preserve the *status quo* and confidentiality of the Company's Confidential Information and Trade Secrets. The Employee agrees that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and the Company will have the right to conduct forensic examination(s) of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions. The Employee further agrees that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis.

13. All of the provisions of the Agreement which are to be effective following termination of the Employee's employment, shall be effective regardless of whether such termination was voluntary or involuntary. The Employee warrants that prior to entering into this Agreement he has disclosed to the Company any agreements with any previous employers which would prevent him from performing any duties for the Company.

14. The restrictive covenants and provisions contained in this Agreement including but not limited to each section and subsections, are severable. The parties further agree that if any of the restrictions set forth in any section and/or any paragraph and the subparagraphs contained therein shall be held not to be enforceable because they are overbroad for any reason whatsoever, it is agreed that the restriction shall be effective to such extent as it may be enforceable. The parties specifically authorize a court of competent jurisdiction to strike, amend and/or alter such provisions to the extent necessary to render them reasonable and enforceable as this is the mutual intent of the Parties. All references to Company shall be construed to include subsidiaries of Company.

15. This Agreement supersedes any previous agreements between the parties, written or oral, relating to this subject matter and may be amended or modified only in writing signed by the Employee and an authorized employee of the Company. Notwithstanding the previous sentence, should a court of competent jurisdiction invalidate the restrictive covenants set forth at Section 6 because of either: (1) lack of consideration, or (2) for being unenforceable and not subject to being reformed by severing or judicial modification, the next most recent agreement between Employee and Company containing such noncompete restrictions shall be given effect. If any of the provisions of this Agreement are held to be invalid or unenforceable by a court of competent jurisdiction or by an Arbitrator in an arbitration proceeding, such holding shall not invalidate any of the other provisions of this Agreement, it being intended that the provisions of this Agreement are severable. This Agreement shall inure to the benefit of the Company's successors or assigns.

16. In any successful proceeding brought to enforce the Company's rights under this Agreement, the Company shall recover court costs and reimbursement of Company's attorney's fee and disbursements. These damages are in addition to any other relief, including injunctive relief, to which the Company may be entitled.

17. This Agreement shall not become effective or be binding upon the parties until accepted on behalf of the Company by the signature hereon of an authorized employee of the Company.

Please review this Employee Agreement and sign with your **full legal name**.

I have carefully read and understand and agree to all of the terms of this agreement.

Accepted by:

Ecolab Inc.
Laurie Marsh
<u>Executive Vice President, Human Resources</u>
1 Ecolab Place, St. Paul, MN 55102
09/10/2020

**Signature:** *Anthony Ridley*
Anthony Ridley (Sep 16, 2020 13:45 EDT)

**Email:** aridley@ecolab.com