ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT          1

Page 1 of 14

```
 1           The following is a computer uncertified rough
 2   draft transcript of the deposition of DAVID GARZA taken
 3   on April 26, 2023.
 4           This uncertified rough draft transcript cannot
 5   be quoted in any pleading, motion, hearing, trial, or
 6   for any other purpose and may not be filed with any
 7   court.  All parties receiving this uncertified rough
 8   draft transcript agree that it will not be shared,
 9   given, copied, scanned, faxed, or in any way distributed
10   in any form to anyone except their own experts or staff,
11   and agree to destroy this rough draft in any form and
12   replace it with the final certified transcript once it
13   is completed.
14           There may be discrepancies when comparing this
15   uncertified rough draft transcript with the final
16   transcript, and the rough draft transcript may contain
17   untranslated steno, incorrect punctuation, incorrect
18   spelling, an occasional court reporter's note, and/or
19   nonsensical English word combinations.  This rough draft
20   transcript does not include any title, appearance,
21   index, or reporter certification pages.  Exhibits are
22   not attached.
23                   Thank you!
24
```

ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT          2

```
 1      THE VIDEOGRAPHER:  Good morning.  We are going on
 2   the record at 10:01 a.m. on April 26th, 2023.
 3           Please note the microphones are sensitive and
 4   may pick up whispering and private conversations.
 5   Please mute your phones at this time.
 6           Audio and video recording will continue to
 7   take place unless all parties agree to go off the record
 8            This is media unit 1 of the video-recorded
 9   deposition of Dave Garza taken in the matter of Ecolab,
10   et al. versus Anthony Ridley, et al.
11           The location of this deposition is being taken
12   at the Renaissance Chicago O'Hare located at 8500 West
13   Bryn Mawr Avenue, Chicago, Illinois.
14           My name is Nick Page, representing Veritext,
15   I'm the videographer.  The court reporter is Nadine
16   Watts, also from the firm Veritext.
17           I'm not related to any parties in this action,
18   nor am I financially interested in the outcome.
19           If there are any objections to the
20   proceedings, place state them at the time of your
21   appearance.
22           Counsel and all present, including remotely,
23   will now state their appearances and affiliations for
24   the record, beginning with the noticing attorney.
```

ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT          3

```
 1     MS. LUND:  This is Juli Ann Lund from Williams &
 2   Connolly on behalf of the defendant ChemTreat
 3   Incorporated, and with me is my colleague Mark Lyon.
 4     MR. POPE:  Lance Pope from Patrick Beard Schulman &
 5   Jacoway attending remotely on behalf of defendant
 6   Anthony Ridley.
 7     MR. WINSMAN:  And this is Edward Winsman from the
 8   firm Fisher & Phillips on behalf of plaintiffs Nalco and
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 2 of 14

```
14        Q    So if there's a Digital Guardian report that has
15   data for 62 days, how would that be possible?
16        A    How do you mean?
17        Q    Well, if the retention period of data in Digital
18   Guardian is only 60 days at the time we're talking about
19   in July of 2021, how could a Digital Guardian report
20   created in July of 2021 have 62 days worth of data?
21        A    The only way that could probably be is if they
22   were to be -- they would pull data that may reside still
23   within Digital Guardian logs.  You know, outside -- I
24   don't know how the data would come from that, from 62
```

              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT           34
```
 1   days.  It would have to be the back end system.  It
 2   would have to be within Digital Guardian where they --
 3   they would have had to do some more digging.  I'm not
 4   sure how that would be for 62 days.
 5        Q    Because 62 days is not a standard period, right?
 6        MR. WINSMAN:  Objection to form, outside the scope,
 7   misstates testimony.
 8        THE WITNESS:  We primarily focus on -- you know,
 9   that's what I've been told, is 60 days.
10        MS. LUND:  Q   Is there any documentation that would
11   reflect what the retention period was for Digital
12   Guardian data in July of 2021?
13        A    There are knowledge based articles that have
14   been created for support teams that document the 60
15   days.
16        Q    And where are those articles located?
17        A    Those articles are located on service now
18   support tool.  That's our help desk tool.
19        MS. LUND:  Is that the document you were required to
20   produce by April 19th that you haven't produced yet, the
21   policy that was identified as a reference in the policy
22   Ms. Semmler created?
23        MR. WINSMAN:  Well, this is Mr. -- the deposition of
24   the 30(b)(6) witness.
```

              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT           35
```
 1        MS. LUND:  Q   All right.  I will just make a
 2   request on the record that we received this knowledge
 3   based article which I believe is the same document that
 4   the court ordered plaintiffs to produce as of April 19th
 5   and which we have not yet received.
 6             So Mr. Garza, your testimony is that there are
 7   articles on service now, which that's an online
 8   resource, correct?
 9        A    That's correct.
10        Q    That would document what the retention period
11   was for the Digital Guardian data in July of 2021?
12        MR. WINSMAN:  Objection to form, misstates
13   testimony.
14        THE WITNESS:  Those documents would instruct our
15   analysts on what's available to them.
16        MS. LUND:  Q   And did you review those documents in
17   preparation for your testimony today?
18        A    I did not.
19        Q    Did you speak to Ms. Semmler about what the data
20   retention period is for Digital Guardian?
21        A    We did cover that.
22        Q    And did she tell you it was 60 days?
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 3 of 14

```
 8    all started with the normal manager request to get
 9    access to a terminated employee's data.
10        MS. LUND:  Q   So what manager made a request for
11    access to Mr. Ridley's data?
12        A   I believe it was Ms. Mahre.
13        Q   Ms. Mahre is a human resource manager, correct?
14        A   That's correct.
15        Q   Was Ms. Mahre Mr. Ridley's supervisor?
16        A   Not that I know of, but it's not uncommon for HR
17    to make the request.
18        Q   So why did Ms. Mahre make a request to get
19    access to Mr. Ridley's data?
20        MR. WINSMAN:  Objection, outside the scope.
21        THE WITNESS:  Other than just normal course of you
22    know terminated employee and requesting access to their
23    data, I'm not aware of a specific reason other than the
24    employee was gone and that's part of the process.
```

```
              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT          76
 1        MS. LUND:  Q   So is it your testimony that HR
 2    routinely requests access to employees data when they're
 3    terminated or when they leave the company?
 4        MR. WINSMAN:  Objection to form, misstates
 5    testimony.
 6        THE WITNESS:  I couldn't say it's routine, but it's
 7    not unheard of for that to be a request made by HR.
 8        MS. LUND:  Q   So, Mr. Garza, you understand that
 9    you are here today testifying on behalf of Ecolab,
10    correct?
11        A   That's correct.
12        Q   And you understand that your role is to give me
13    all of the information that Ecolab has about the topics
14    that you've been designated for, correct?
15        A   That's correct.
16        Q   And you understand that Ms. Mahre is an he can
17    employee, correct?
18        A   I do understand that.
19        Q   And you understand that Ms. Corona is an Ecolab
20    employee?
21        A   That's correct.
22        Q   So the actions they took and the reasons they
23    took those actions are information that Ecolab has and
24    that Ecolab could give me, correct?
```

```
              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT          77
 1        MR. WINSMAN:  Objection.  Mr. Garza has been
 2    designated for specific topics, including, and we're
 3    talking about topic number 6 right now, information
 4    regarding Ridley's alleged misappropriation.
 5        MS. LUND:  Yes, and you will see 6A, the dates on
 6    which you received information regarding Ridley's
 7    alleged misappropriation, including any information that
 8    led to Theresa Corona's request for review of Ridley's
 9    systems.
10             We've already established that that request
11    for review of Ridley's systems occurred on or before
12    July 18th, 2021.  And so I am now attempting to learn
13    what information it was that led to Theresa Corona's
14    request for review of Ridley's systems.  And I believe
15    Mr. Garza's testimony is that he does not know.
16             Is that correct, Mr. Garza?
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 4 of 14

```
17       A   I'm not aware of the details as to why the
18  request is made other than a terminated -- other than
19  that being part of the termination process.
20       Q   Okay.  Do you know when Ms. Corona made the
21  request to Ms. Mahre?
22       A   I am not aware of the exact date that happened.
23       Q   Do you know how she made that request?
24       A   I was not involved in the request.  So I'm not
```

```
               ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT         78
 1  sure.
 2       Q   So you don't know whether that was made orally
 3  or in writing?
 4       A   I am not.
 5       Q   Did Ecolab learn new information after July 1st
 6  that led Ms. Corona to request the review?
 7           MR. WINSMAN:  Objection to form, vague.
 8           THE WITNESS:  I'm not --
 9           MR. WINSMAN:  Mr. Garza can't testify as to what was
10  in the mind of counsel for Ecolab.
11           MS. LUND:  I'm not asking Mr. Garza what was in the
12  mind of counsel.  I'm asking what information Ecolab
13  obtained that led to the request.
14           Did Ecolab learn new information after July 1st
15  that led Ms. Corona to request the review?
16       A   If -- nothing like that was shared with myself.
17       Q   Okay.  So you don't know what information Ecolab
18  might have learned between July 1st and July 18th, 2021?
19           MR. WINSMAN:  Objection to form, misstates
20  testimony.
21           THE WITNESS:  Yes, our role is to ensure the proper
22  parties have the right to make these requests and
23  fulfill them, so.
24           MS. LUND:  Q   And I understand that that's your
```

```
               ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT         79
 1  role individually, Mr. Garza.  I'm asking you these
 2  questions as a representative of Ecolab and I understand
 3  it may not be within your personal knowledge.
 4           So I'm asking you as a representative of
 5  Ecolab, do you know what information, if any, Ecolab
 6  learned after July 1st, 2021 that led Ms. Corona to
 7  request a review of Mr. Ridley's digital activity?
 8           MR. WINSMAN:  Objection to form, vague, asked and
 9  answered.  Begin, the witness can't testify as to what
10  was in the mind of Ecolab's counsel.
11           THE WITNESS:  I'm not aware.
12           MS. LUND:  Q   And you do not know how he can
13  learned any information after July 1st, 2021 before July
14  18th, 2021 that would have raised -- created a basis to
15  request a review for a review of Mr. Ridley's digital
16  activity?
17       A   Activities of --
18           MR. WINSMAN:  Objection, vague, asked and answered.
19           THE WITNESS:  Activities and discussions prior to
20  July 18th, I would not be aware of.
21           MS. LUND:  Q   And so you don't know from whom it
22  learned any information it may have learned after July
23  1st that would lead to a request for review of
24  Mr. Ridley's digital activity?
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 5 of 14

```
 6    look at Exhibit 23, you'll see that Ms. Semmler
 7    indicates that this report, along with the underlying
 8    reports, including the Digital Guardian report, were all
 9    stored in a OneDrive folder that she maintained,
10    correct?
11        A    Yes.  Sorry, yes.
12        Q    Yes.  So was that OneDrive folder of
13    Ms. Semmler's put on legal hold in -- sorry, in July of
14    2021?
15        A    I'm not aware of a legal hold being put on our
16    collection of -- this repository that you speak of the,
17    of the OneDrive, no.
18        Q    So as far as you know there has never been a
19    legal hold put on the folder where Ms. Semmler stored
20    the Digital Guardian report that she ran on July 23rd of
21    '2021?
22        A    I'm not aware of a legal hold being put on
23    there.
24        Q    If I can direct your attention to page 2 of
```

```
              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT           90
 1    Exhibit 23, you'll see in the bottom half there's a
 2    title that says DLP files transfer data.
 3        A    I do.
 4        Q    It says DLP activity for Mr. Ridley can be
 5    reviewed accessing the link at the end of this report.
 6    The data export dash 2021 dash 07 dash 23 dash 11
 7    underscore 24 underscore 30 report contains a large
 8    amount of data.  Do you see that language?
 9        A    I do.
10        Q    And do you understand that that is the name of
11    the Digital Guardian report that Ms. Semmler prepared on
12    July 23rd, 2021?
13        A    The data export, yes, I do know.  I see that.
14        Q    Do you know why the version of the Digital
15    Guardian report that Ecolab produced in this litigation
16    has a different file name than the original Digital
17    Guardian report listed in Ms. Semmler's employee data
18    review for Mr. Ridley as reflected in Exhibit 23?
19        A    I'm not aware of the naming convention that she
20    used, why there would be a difference.
21        Q    What did Ecolab do to forensically preserve the
22    original Digital Guardian report?
23        A    I think other than you know store it into
24    OneDrive with limited access, I don't think anything
```

```
              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT           91
 1    more than that.  Again, that report can be generated at
 2    any time too.  Well, sorry, you're right.  There was
 3    nothing put onto that at the time.
 4        Q    And when you say limited access, what do you
 5    mean?
 6        A    Within -- as part of any investigation, only you
 7    know the analyst and perhaps legal or HR would have
 8    access to those.
 9        Q    Would anyone who received the report at Exhibit
10    23 have access through the link to the information in
11    that file?
12        A    If it was shared with them, they would have
13    access to it.
14        Q    All right.  So as I understand your testimony,
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 6 of 14

```
24   reviewed those documents at that time, if they were



              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT           94
 1   available.
 2       MS. LUND:  Q   Do you know whether Ecolab attempted
 3   to locate the documents listed on the Digital Guardian
 4   report in July of 2021?
 5       A   I know as part of that request there was --
 6   that's where the review of the OneDrive -- Mr. Ridley's
 7   OneDrive account came into play and upon review of the
 8   OneDrive, whatever was there -- whatever was available
 9   in OneDrive was produced -- was provided for review for
10   legal and HR.
11       Q   So who in July of 2021 reviewed Mr. Ridley's
12   OneDrive?
13       A   At that time I believe Theresa Corona and
14   perhaps Ms. Mahre from HR.  But I do know Theresa Corona
15   was involved in that review.
16       Q   And before these individuals began accessing
17   Mr. Ridley's OneDrive, what steps, if any, were taken to
18   forensically preserve it?
19       A   The forensic preservation of that file -- well,
20   I guess there's two pieces.  Once it was identified in
21   OneDrive, it was not -- it was moved out -- it wasn't --
22   it was held so it wouldn't be deleted my understanding.
23   That's how we preserved it, not being on legal hold.
24   But we did not have it set to be part of that



              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT           95
 1   termination process.  So the OneDrive was then preserved
 2   at that time, not on legal hold, but it was available
 3   for review.  And that was in July, September timeframe.
 4       Q   Well, those are very different timeframes,
 5   antithey, July of 2021 and September of 2021?
 6       A   I don't -- I mean, there are two different
 7   months, sure, I guess if you want to say that.
 8       Q   Right, they're at least 60 days a part?
 9       A   Not necessarily, not if you're talking about the
10   middle of July timeframe.
11       Q   Okay.  Well, when specifically was the OneDrive
12   taken out of the deletion queue?
13       A   In July of '21 as part of the access request.
14       Q   Which access request?
15       A   From HR as far as -- it all kind of -- you have
16   to understand it all flows together with an access
17   request is made.
18       Q   So is it your testimony that when Ms. Mahre
19   submitted a request to Ms. Semmler to do the employee
20   data review, that at that time Mr. Ridley's OneDrive was
21   segregated in some way?
22       A   It was not set to be deleted.
23       Q   And who else had access to Mr. Ridley's OneDrive
24   in July of 2021?



              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT           96
 1       A   At that time I believe Theresa Corona was the
 2   primary person with access.
 3       Q   And do you know whether Mr. Ridley's former
 4   manager, Ms. Herrera, had access to his OneDrive in July
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 7 of 14

```
 5   of 2021?
 6       A   I am not aware of them having access -- her
 7   having access.
 8       Q   So is it your testimony that every time an
 9   employee data review is requested, that that employee's
10   OneDrive is taken out of the deletion queue?
11       MR. WINSMAN:  Objection to form, misstates
12   testimony.  Go ahead.
13       THE WITNESS:  For that period of time to give the
14   manager or HR or legal time to review it.  So that's
15   that 30 day window as part of that termination process.
16       MS. LUND:  Q   So what you're saying is not that
17   anything different was done with regard to Mr. Ridley's
18   OneDrive because of this employee data review, request,
19   but simply that the request occurred during the ordinary
20   30 day window for review?
21       A   That is my understanding, yes.
22       Q   And at the end of that 30 day window was
23   Mr. Ridley OneDrive put into the deletion queue?
24       A   As part of that review, IT security was asked to
```

```
             ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT      97
 1   ensure that it was not deleted.
 2       Q   And when was that request made to IT security?
 3       A   I believe that is at the end of July.
 4       Q   How is that request made?
 5       A   I'm not aware of exactly how that request was
 6   made, but we were told to make sure it was protected.
 7       Q   And who told you that?
 8       A   That was coming from Theresa Corona.
 9       Q   And what steps were taken to ensure that the
10   OneDrive was protected?
11       A   I'm not 100 percent on all technical aspects of
12   it, but it was not marked for deletion or as far as that
13   user -- that OneDrive was not part of the termination
14   process to delete the files in the regular scheduled
15   timeframe.  So I'm not sure what the technical
16   configuration is to mark it that way.
17       Q   So other than not moving Mr. Ridley's OneDrive
18   into the deletion queue, what steps, if any, were taken
19   to preserve that data?
20       MR. WINSMAN:  Objection to form, vague.
21       THE WITNESS:  Other than assurance not to delete it,
22   I'm not aware of any other controls.
23       MS. LUND:  Q   What steps were taken to recover any
24   documents that were in the recycle bin for Mr. Ridley's
```

```
             ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT      98
 1   OneDrive?
 2       A   As part of the review, we had some share --
 3   there was a technical session where the review was done
 4   and ensured that all the data that was in there, whether
 5   it was recycled or active, was saved.
 6       Q   And when was that technical session?
 7       A   I believe that was again as part of the access
 8   request, which would have been in July as far as
 9   granting access to legal and HR for review.
10       Q   And who was involved in that technical session?
11       A   There was Toua Vue that I had mentioned earlier,
12   myself and Jack Anderson and -- Yes, that's it.
13       Q   What records reflect that technical session?
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 8 of 14

```
14       A    I think the only thing would have been maybe a
15   calendar invite.
16       Q    And so it's your testimony that at some point in
17   July of 2021 you and other individuals with whom you
18   work had a technical session in which you looked at the
19   recycle bin for Mr. Ridley's OneDrive, is that correct?
20       A    At that time, yes, we reviewed the OneDrive
21   account.
22       Q    And what was in the recycle bin?
23       MR. WINSMAN:  Objection to form, vague.
24       THE WITNESS:  I don't -- I don't recall exactly
```

```
              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT        99
 1   what -- what was in there for what was recovered.  But
 2   what we -- yes, I'm not 100 percent.
 3       MS. LUND:  Q   But it's your testimony that in July
 4   of 2021 you recovered whatever was in Mr. Ridley's
 5   recycle bin at that time, correct?
 6       A    Whatever was part of Mr. Ridley's OneDrive was
 7   recovered.
 8       Q    And that would include anything that he had
 9   deleted within the last 93 days, correct?
10       A    Based on Microsoft's policy, yes.
11       MS. LUND:  We've been going about an hour.  So why
12   don't we go ahead and take a break for lunch.
13       MR. WINSMAN:  Okay.
14       THE VIDEOGRAPHER:  Off the record at 12:16.
15           (Lunch recess was taken.)
16       THE VIDEOGRAPHER:  Back on the record at 1:15.
17       MS. LUND:  Q   So, Mr. Garza, before we broke for
18   lunch we were talking about what Ecolab did in July of
19   2021 to investigate Mr. Ridley's alleged
20   misappropriation of Ecolab's documents.
21           Is there anything else that Ecolab did in July
22   of 2021 that we haven't already discussed?
23       MR. WINSMAN:  Just objection in terms of privilege
24   to the extent that this is something that involved
```

```
              ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT       100
 1   communications with counsel or things done at the
 2   instruction of counsel I'd instruct you not to answer.
 3       THE WITNESS:  Nothing else was done at that time.
 4       MS. LUND:  Q   What did Ecolab do in August of 2021
 5   to investigate Mr. Ridley's alleged misappropriation of
 6   Ecolab's documents?
 7       MR. WINSMAN:  I'd make the same instruction and
 8   objection.
 9       THE WITNESS:  I'm not aware of anything -- anything
10   additional was going on at that time.
11       MS. LUND:  Q   What steps did Ecolab take in August
12   2021 to preserve Mr. Ridley's data?
13       A    The only thing I'm aware of is that once access
14   was granted to -- once OneDrive was identified, Ridley's
15   OneDrive was identified and granted access to legal, we
16   were asked not to delete it and nothing else was done at
17   that time.
18       Q    What steps did Ecolab take in August 2021 to
19   preserve Mr. Ridley's devices?
20       A    In August '21 I'm not aware of anything else.
21   At that time his device had already been -- I believe
22   re-allocated to the field, redeployed.
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 9 of 14

```
        21         MR. WINSMAN:  Objection.
        22         THE WITNESS:  It seems they were reviewing it at
        23   this point.
        24         MS. LUND:  Q  And if you look at the e-mail chain,


                 ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT       115
         1   Mr. Lammana doesn't write and say I already looked into
         2   this in July of '21, does he?
         3         A  Not on this e-mail chain.
         4         Q  And would you expect him to have raised that
         5   issue if he had looked for it at the time?
         6         MR. WINSMAN:  Objection to form, calls for
         7   speculation.
         8         THE WITNESS:  Yes, he could have replied to the
         9   e-mail or had a conversation with Janice.  But, yes,
        10   it's not on here.
        11         MS. LUND:  Q   And if Mr. Lammana had looked into
        12   the issue in July of 2021 and confirmed that just days
        13   after Ms. Ridley returned his mobile drive insight was
        14   unable to find it, would legal need to be asking about
        15   that issue months later in January of 2022?
        16         MR. WINSMAN:  Objection to form, calls for
        17   speculation.
        18         THE WITNESS:  Probably not.
        19         MS. LUND:  Q   Okay.  And then if you can -- if I
        20   can direct your attention to the first page, on the
        21   middle of the page you will see there's a second e-mail
        22   down a January 19th, 2022 e-mail from Ms. Coulter to the
        23   same group of individuals.  She writes, morning all,
        24   someone from legal just reached out asking about the


                 ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT       116
         1   hard drive again.  Did we find it or are we still
         2   looking for it.  Do you see that?
         3         A  I do see that.
         4         Q  And does that indicate to you that at least as
         5   of January 19th, 2022 legal did not know the status of
         6   that mobile drive?
         7         A  They sent this e-mail.  It seemed they were
         8   still looking for it.
         9         Q  Do you know why they didn't look for it before
        10   January of 2022?
        11         MR. WINSMAN:  Objection to form, assumes facts not
        12   in evidence.
        13         THE WITNESS:  I have no idea.
        14         MS. LUND:  Q  Are you aware of any evidence that
        15   legal did look for this mobile drive before January of
        16   2022?
        17         A  The primary interactions with legal was around
        18   OneDrive and the data.
        19         Q  Are you aware of any effort by Ecolab to reach
        20   out to insight at any time before January 2022 to locate
        21   the mobile drive that was returned by Mr. Ridley?
        22         A  I don't have any communications prior to that.
        23         Q  Is that something that you have looked for?
        24         A  It was not brought to my attention in


                 ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT       117
         1   preparation for this.
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 10 of 14

```
 2       Q   Do you know whether that's something that Ecolab
 3   has looked for?
 4       A   I have not seen any communications around that.
 5   I'm not sure.
 6       Q   But there are a number of Ecolab employees
 7   copied on these e-mail chains, correct?
 8       A   On this exhibit, yes.
 9       Q   Okay.  On --
10       A   109.
11       Q   On Exhibit 108 and 109, both have multiple
12   Ecolab employees copied, correct?
13       A   They're Ecolab.  It's on both of those, yes.
14       Q   And you previously testified that the Veritas
15   system keeps a copy of every e-mail that is sent or
16   received by an Ecolab employee back through 2011,
17   correct?
18       A   Veritas has been in place since then, yes.
19       Q   So if there were communications between any
20   Ecolab employee and an insight employee regarding
21   Mr. Ridley's mobile drive or other devices that he had
22   returned, those would be locatable by Ecolab, correct?
23       A   All those communications would be in an archive,
24   in Ecolab's archive.
```

```
             ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT        118
 1       Q   And that archive is searchable?
 2       A   It is searchable.
 3       Q   So in September of 2021 Ecolab's inhouse legal
 4   department still had access to Mr. Ridley's OneDrive,
 5   correct?
 6       A   They still had access to the OneDrive, yes.
 7       Q   What restrictions, if any, were on -- were in
 8   place with regard to that access to prevent data from
 9   being altered by that access?
10       A   I'm not aware of any special actions taken.
11       Q   Did Ecolab take any steps in September of 2021
12   to locate the documents that are identified on the
13   Digital Guardian report as having been copied or
14   transferred by Mr. Ridley?
15       A   I'm not aware of any activity like that.
16       Q   Did Ecolab take any steps in September 2021 to
17   preserve the documents or data of other custodians who
18   would have information relevant to the alleged
19   misappropriation by Mr. Ridley?
20       A   I'm not aware of any other custodians or
21   requests.
22       Q   And Ecolab did not contact Mr. Ridley in
23   September 2021 regarding the alleged misappropriation?
24       A   I would not have been involved in any
```

```
             ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT        119
 1   communication with Mr. Ridley at that time.
 2       Q   And you don't know whether Ecolab had any such
 3   communications?
 4       A   No one explained to us that there was
 5   communication going on.
 6       Q   And you don't nope why Ecolab made the decision
 7   not to reach out to Mr. Ridley to find out his
 8   explanation for the information that was shown on the
 9   Digital Guardian report?
10       A   I have no information to that.
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 11 of 14

```
10   2021 about the alleged misappropriation, correct?
11        A   Not that I'm aware of.
12        Q   And Ecolab did not contact ChemTreat in December
13   2021 about Mr. Ridley's alleged misappropriation,
14   correct?
15        A   Correct.
16        Q   Is there anything else that Ecolab did in
17   December 2021 to investigate Mr. Ridley's alleged
18   misappropriation of Ecolab's documents that we haven't
19   already discussed?
20        MR. WINSMAN:  Objection, vague.  Privilege
21   instruction for the witness.
22        THE WITNESS:  Nothing more than we've already
23   discussed.
24        MS. LUND:  Q   And are you aware as the corporate
```

```
               ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT        127
 1   representative of Ecolab of any communications that
 2   Ecolab's inhouse counsel had with any employees of
 3   Ecolab in connection with the investigation into
 4   Mr. Ridley's alleged misappropriation of Ecolab's
 5   documents that occurred in December of 2021?
 6        A   I'm not aware of any communications.
 7        Q   What did Ecolab do in January 2022 to
 8   investigate Mr. Ridley's alleged misappropriation of
 9   Ecolab's documents?
10        MR. WINSMAN:  Objection, vague, privileged, and
11   instruct the witness not to reveal privileged
12   communications.
13        THE WITNESS:  I believe in January was when we first
14   began working with Mr. Lieb, Larry Lieb, and to get him
15   access into OneDrive.  And at that time that's when he
16   was going to take the forensic image for his own review.
17   And I believe at that time, in January, I believe it was
18   like January 25th when was the legal hold was put on
19   Mr. Ridley's -- was created.
20        MS. LUND:  Q   So Mr. Ridley resigned from Ecolab on
21   July 1st, 2021 and at the time informed Ecolab that he
22   was going to work for a competitor, ChemTreat, correct?
23        A   That's correct.
24        Q   And on July 18th, 2021 Theresa Corona, Ecolab's
```

```
               ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT        128
 1   inhouse counsel -- well, I guess I should say on or
 2   before July 18th, 2021, Theresa Corona, Ecolab's inhouse
 3   counsel, requested that Kristin Mahre request an
 4   employee data review of Mr. Ridley's digital activity,
 5   correct?
 6        A   That's correct.
 7        Q   And Ms. Mahre made that request on July 18th of
 8   2021, correct?
 9        A   Correct.
10        Q   And on July 23rd, 2021 Ms. Semmler transmitted
11   the results of that review of Mr. Ridley's digital
12   activity, including the Digital Guardian report,
13   correct?
14        A   That would have been the Digital Guardian
15   report, yes.
16        Q   And that report went to Kristin Mahre and
17   Theresa Corona, correct?
18        A   That's my understanding.
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 12 of 14

```
  7         A    Uh-huh, yes.
  8         Q    And can you explain again what the operation
  9   type shows?
 10         A    Yes, that would show the action that was taken
 11   for the file.  So file copy means to take a copy from --
 12   you know from one destination, make a copy -- from one
 13   source and make a copy to another destination.
 14         Q    And you'll see that here all of the operation
 15   types that show up in Mr. Ridley's Digital Guardian
 16   report have been expanded.  Do you see that?
 17         A    Uh-huh.  I do.
 18         Q    And can you confirm that delete does not appear
 19   among the operation type?
 20         A    I can.
 21         Q    Okay.  And that's something where if deletion
 22   had occurred, that would show, correct?
 23         MR. WINSMAN:  Objection, misstates testimony.
 24         THE WITNESS:  If that action was taken, the


                ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT         148
  1   operation type is where it would be shown.
  2         MS. LUND:  Q   Right.  So if any deletion had
  3   occurred, it would show up in operation type, correct?
  4         MR. WINSMAN:  Objection to form, misstates
  5   testimony.
  6         THE WITNESS:  If that -- if a deletion occurred, it
  7   would be in operation type.
  8         MS. LUND:  Q  And you'll see one of the types is
  9   listed as filed moved, correct?
 10         A    That's correct.
 11         Q    So let's go ahead and filter for file moved.
 12   And let's see you might need to make the screen -- I
 13   can't see.  We should see how many results there are for
 14   this.
 15         A    There's 1400.
 16         Q    It's not showing up on my screen.  That might be
 17   a problem with me.
 18              So the total number you said is 1400?
 19         A    One report I had looked at it had that number.
 20   I don't know.  I can't see -- I can't see it here
 21   though.  Or is that 1,466?
 22         Q    Oh, I see.  Can you put the cursor back then?  I
 23   don't know if that was you or me.  Is there a way to
 24   minimize it on your screen so we can -- all right.  Do


                ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT         149
  1   you see that it shows that 1,466 of the 94,489 records
  2   reflect a file move?
  3         A    That's correct.
  4         Q    Okay.  So only those records are the records
  5   that were actually moved from one location to another,
  6   correct?
  7         A    That's what the report shows, yes.
  8         Q    Okay.  So no deletion and 1,466 files out of
  9   94,000 plus were moved?
 10         MR. WINSMAN:  Objection, misstates testimony.
 11         THE WITNESS:  But in a file move the -- where the
 12   file was moved from, that source would no longer have
 13   the file once it was done.
 14         MS. LUND:  Q   So 1,466 of the records of 94,000
 15   represent documents that were moved rather than simply
```

```
23      A   Okay.  Okay.
24      Q   So both Exhibit 79 and Exhibit 110 were created
```

             ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT       166
```
 1  by jack Anderson, is that correct?
 2      A   Yes, that's correct.
 3      Q   And am I recalling correctly that Mr. Anderson
 4  works in your department?
 5      A   He does.
 6      Q   Okay.  Do you know why Mr. Anderson ran these
 7  reports?
 8      A   Just assisting legal with the request.
 9      Q   Are these the kinds of reports that your
10  department regularly runs?
11      A   If we're requested for hardware, sure.
12      Q   If I can direct your attention to Exhibit 110,
13  if you could flip to page 4 please.
14      A   Okay.
15      Q   You will see at the bottom it reflects that on
16  July 12th of 2021 Shreya Patel received at the insight
17  depot from Mr. Ridley a laptop with the serial number 5
18  CG 84132 TP as well as a USBC doc G4, a 65 watt charger
19  and a mobile drive.  Do you see that?
20      A   I do see that.
21      Q   And this is the same information that was
22  reflected in Exhibits 108 and 109 that we looked at
23  previously, correct?
24      A   Correct.
```

             ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT       167
```
 1      Q   And you will see that those devices were not
 2  moved to inventory until August 5th of 2021, correct?
 3  It's the line immediately above.
 4      A   The August 6th line there in.
 5      Q   Yes, you'll see it says --
 6      A   Yes, I see it.  Thank you.
 7      Q   So is it fair to say that if Ecolab had issued a
 8  legal hold on July 1st, 2021, when Mr. Ridley informed
 9  Ecolab he was departing to work for ChemTreat, a
10  competitor, that this laptop and the additional
11  accessories that Mr. Ridley returned on July 12th, 2021
12  could have been set aside and preserved?
13          MR. WINSMAN:  Objection, calls for speculation,
14  assumes facts not in evidence.
15          THE WITNESS:  Yes, if a legal hold would have been
16  issued it would have been retained.
17          MS. LUND:  Q   And insight as a matter of course
18  preserves all devices it receives for a two week period
19  after it receives them, correct?
20      A   That's correct.
21      Q   So is it fair to say that if Ecolab had issued a
22  legal hold on July 18th, 2021 when it requested the
23  employee data review of Mr. Ridley's data, that the
24  laptop returned by Mr. Ridley along with the various
```

             ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT       168
```
 1  accessories he returned, including the mobile drive,
 2  could have been preserved?
 3          MR. WINSMAN:  Object to the form, calls for
```

Exhibit 18 to ChemTreat's Reply in Support of Motion To Compel Evidence of Uploading, Downloading, or Deletion and a Privilege Log

Page 14 of 14

```
 4    speculation, assumes facts not in evidence.
 5        THE WITNESS:  Had a legal hold been in place, then
 6    we would have preserved it.
 7        MS. LUND:  Q   And is it fair to say that if Ecolab
 8    had issued a legal hold on July 23rd, 2021 when the
 9    results of Ms. Semmler's employee data review, including
10    the Digital Guardian report, were issued, that, again,
11    Mr. Ridley's laptop and the mobile drive that he
12    returned could have been preserved and the data on them
13    captured?
14        MR. WINSMAN:  Objection, assumes facts not in
15    evidence, calls for speculation.
16        THE WITNESS:  Had -- if they had enough time to
17    identify that and determine that, then yes.
18        MS. LUND:  Q   Well, in fact the laptop wasn't moved
19    into inventory until August 5th of 2021, correct?
20     A   That's what the record shows.  That's what this
21    shows, yes.
22     Q   So there was two weeks after the DLP Digital
23    Guardian report was prepared when a legal hold could
24    have been issued and the data on that laptop could have
```

```
           ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT        169
 1    been preserved, correct?
 2        MR. WINSMAN:  Objection to form, calls for
 3    speculation, assumes facts not in evidence.
 4        THE WITNESS:  If a legal hold would have been
 5    issued, yes, it could have been retained.
 6        MS. LUND:  Q   And would you agree that it is more
 7    likely that the mobile drive returned by Mr. Ridley
 8    could have been preserved and the data on it reviewed if
 9    Ecolab had issued a legal hold in July of 2021 rather
10    than waiting until January of 2022 to look for that
11    device?
12        MR. WINSMAN:  Objection to form, assumes facts not
13    in evidence, calls for speculation.
14        THE WITNESS:  Yes.  Yes, sorry.
15        MS. LUND:  Why don't we take a short break.
16        THE VIDEOGRAPHER:  Off the record at 2:56.
17          (Recess was taken.)
18        THE VIDEOGRAPHER:  Back on the record at 3:12.
19        MS. LUND:  Mr. Garza, I have no further questions at
20    this time.  I pass the witness.
21        MR. POPE:  Mr. Garza, I don't have any additional
22    questions for you.
23        MR. WINSMAN:  All right.  You know what?  Can we go
24    off the record then for another break and come back?
```

```
           ROUGH DRAFT - ROUGH DRAFT - ROUGH DRAFT        170
 1        THE VIDEOGRAPHER:  Off the record at 3:12.
 2          (Recess was taken.)
 3        THE VIDEOGRAPHER:  Back on the record at 3:23.
 4        MR. WINSMAN:  All right.  And I have nothing for the
 5    witness.
 6        MS. LUND:  Mr. Garza, thank you for your time
 7    witness within thank you.  Safe travels.
 8        MR. WINSMAN:  Thank you.
 9        THE VIDEOGRAPHER:  And we're off the record at 3:23.
10
11
12
```