## CERTIFICATION OF COMPLIANCE OF
## OBLIGATIONS TO PRIOR EMPLOYERS

I HEREBY CERTIFY THE FOLLOWING:

1. I will not disclose to ChemTreat Inc. (the "Company") or use in my work at the Company, any confidential information and/or trade secrets belonging to others, including my prior employers.

2. I have returned to my prior employer all hard copies of and electronic versions of confidential information of my prior employer and have not copied, downloaded, removed or e−mailed to myself improperly any confidential information belonging to my prior employer.

3. I am not subject to any restrictive covenants or obligations that would prevent me from fully performing my duties for the Company.

4. I will immediately inform my Supervisor at the Company and its designated legal representative, if any, in writing if I am asked to reveal any confidential information belonging to others.

5. I have not retained any confidential information, records or documents in hard copies or an electronic format from a prior employer.

6. I am being hired for my general skills and knowledge in the industry rather than any confidential or proprietary information that I may have had access to or possessed prior to my relationship with the Company. I have been expressly told by the Company that it is not hiring me for any confidential information I may possess and that it does not want me to reveal any confidential information belonging to others.

7. I have been instructed by the Company to consult with my personal attorney before accepting employment with the Company and cannot rely upon any information provided to me by the Company or its counsel regarding any obligations I may owe to any prior employer.

8. I understand that I may be subject to discipline, including termination of my employment with the Company, if I have falsely certified the information herein or do not follow the certifications I have made herein.

Signature: _Anthony L. Ridley_

Print Name: Anthony Ridley

Date: 06/19/2021

**Exhibit 52**
3/16/2023

CONFIDENTIAL                                                                 CHEMR-000000142

| | |
|---|---|
| **Date:** | Monday, August 17 2020 09:39 PM |
| **Subject:** | Anthony Ridley's resume |
| **From:** | Anthony Ridley <aridley75@hotmail.com> |
| **To:** | Cissell, Clay <richard.cissell@chemtreat.com>; |
| **Attachments:** | Ridley Resume 2020.pdf |

Clay,

Attached is my update resume. If you have any questions or need any additional information, don't hesitate to give me a call or send me an email.

Best Regards,

Anthony Ridley
mobile: 423-322-9506

CONFIDENTIAL                                              CHEMR-000000147

**Date:** Friday, August 21 2020 02:09 PM
**Subject:** RE: Anthony Ridley's resume
**From:** Cissell, Clay
**To:** Anthony Ridley <aridley75@hotmail.com>;

We are looking at potentially getting you and Steve together in mid September. No need to be in a rush currently as we are still in a hiring freeze. My thoughts are to get you in front of him in September and then maybe have you over to duck hunt with me and Steve in Dec. This will allow you guys get to know each other a bit more and for you to get more familiar with the TREAT. When our hiring freeze is lifted, you will feel real good about coming and he is comfortable with you.

That's the plan, so long as you are good with it. As soon as I hear back from Steve on some potential dates, I will follow up with you.

Clay

**From:** Anthony Ridley [mailto:aridley75@hotmail.com]
**Sent:** Tuesday, August 18, 2020 8:49 AM
**To:** Cissell, Clay <richard.cissell@chemtreat.com>
**Subject:** Re: Anthony Ridley's resume

Great! Let me know when Steve would like to meet.

Best Regards,


Anthony Ridley
Mobile: (423) 322-9506
Email: aridley75@hotmail.com
Sent from my iPhone

> On Aug 18, 2020, at 7:37 AM, Cissell, Clay <richard.cissell@chemtreat.com> wrote:
>
> Got it!!! Thanks
>
> Sent from my iPhone

>> On Aug 17, 2020, at 8:39 PM, Anthony Ridley <aridley75@hotmail.com> wrote:
>>
>> Clay,
>>
>> Attached is my update resume. If you have any questions or need any additional information, don't hesitate to give me a call or send me an email.
>>
>> Best Regards,
>>
>> Anthony Ridley
>> mobile: 423-322-9506
>> <Ridley Resume 2020.pdf>

Please be advised that this email may contain confidential information. If you are not the intended recipient, please notify us by email by replying to the sender and delete this message. The sender disclaims that the content of this email constitutes an offer to enter into, or the acceptance of, any agreement; provided that the foregoing does not invalidate the binding effect of any digital or other electronic reproduction of a manual signature that is included in any attachment.

CONFIDENTIAL                                                          CHEMR-000000154

| | |
|---|---|
| **From:** | Anthony Ridley <aridley75@hotmail.com> |
| **To:** | "Cissell, Clay" <richard.cissell@chemtreat.com> |
| **Subject:** | Fw: Attached Image |
| **Date:** | Wednesday, January 13 2021 04:38 PM |
| **Message-ID:** | <BN3PR01MB1987D327E93573766FDC0A64A3A90@BN3PR01MB1987.prod.exchangelabs.com > |
| **Attachments:** | 0215_001.pdf |

Clay,

Good afternoon.  Attached is the Employee Sales, Service, Marketing and Inventions Agreement that I signed when I moved into my new role with Ecolab.  The information you are looking for is contained on Page 2 and 3.

Best Regards,
Anthony

CONFIDENTIAL

CHEMR-000000237

CONFIDENTIAL

# Employee Sales, Service, Marketing & Inventions Agreement

**This AGREEMENT is made and entered into between Ecolab Inc., a Delaware corporation, its parent companies, sister companies and subsidiaries** Anthony Ridley **(the "Employee").**

The Company's business is highly competitive and the Company has invested considerable sums of money in developing products, equipment, training programs, sales programs, technical service programs and account records for the proper servicing of its customers. Such records include, but are not limited to, the type of equipment installed, the prices paid by each customer, the names and positions of the customer's key personnel, the types of services performed, the frequency and destination of shipments, and the products generally ordered by the customer. The Company also invests substantial sums on the training and development of its employees and the development of technology. While employed with the Company, the Employee will receive valuable training under the Company's sales and/or service programs and will be entrusted with the information in the Company's account records and may be entrusted with information regarding Company's Trade Secrets. In return for the Company providing the Employee with this training and information, the Employee agrees not to use this training and information against the Company. The Employee also agrees that the restraints imposed by this Agreement are reasonable and necessary to protect the Company's business, goodwill, customer relationships, and the jobs of other Company employees.

Therefore, in consideration of the Employee's employment and the covenants and agreements contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.** The Company will employ the Employee in a sales or sales management position, or a service or service management position, for such period of time and for such compensation, including salary and employee benefits, as may be mutually agreeable to both parties. The compensation shall be deemed to be mutually agreeable to both parties if the Company pays the compensation and the Employee accepts the compensation. The Company may at any time, with or without adjusting the Employee's compensation, alter the geographic limits of any sales or service territory assigned to the Employee, or assign the Employee to a new territory, or change the customers assigned to the Employee. Both the Company and the Employee have the same right to terminate the employment with or without cause or notice at any time, and this at-will employment relationship may not be modified except in a writing signed by Employee and an authorized officer of the Company.

**2.** Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing, business strategies, business methods, and employees (including the particular skills, talents and abilities of those employees).

Employee hereby agrees that Employee will hold in a fiduciary capacity for the benefit of Company and shall not, directly or indirectly, use or disclose any Trade Secrets, as defined hereinafter, that Employee may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret.

The term "Trade Secret" as used in this Agreement shall mean information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

**(a)** derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

**(b)** is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

In addition to the foregoing and not in limitation thereof, Employee agrees that while employed with the Company and for a period of three (3) years after termination of Employee's employment with Company, Employee will hold in a fiduciary capacity for the

CHEMR-00000238

CONFIDENTIAL

benefit of Company and shall not, directly or indirectly, use or disclose any Confidential Information, as defined hereinafter, that Employee may have acquired (whether or not developed or compiled by Employee and whether or not Employee was authorized to have access to such Confidential Information) during the term of, in the course of, or as a result of Employee's employment by Company.

The term "Confidential Information" shall mean Company's confidential data or information which is valuable to Company but substantially inaccessible to the public and to competitors of Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets. Notwithstanding the foregoing, the term "Confidential Information" shall not include information that Employee can establish by competent proof: (i) was generally known to or accessible by the public at the time Company disclosed the information to Employee; (ii) became generally known to or accessible by the public after disclosure by Company through no act or omission by Employee; or (iii) was disclosed to Employee, after the Employee's termination of employment with the Company, by a third party having a bona fide right both to possess the information and to disclose the information to Employee, provided such third party is not subject to an obligation of confidentiality with respect to such information.

Employee understands Employee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that is made (a) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney if such disclosure is made solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and Employee does not disclose the Trade Secret except pursuant to a court order.

3.   Ecolab is committed to compliance with applicable federal, state and local laws. As such, nothing in this Agreement prohibits Employee from reporting possible violations of law to any government agency if such report is made in confidence and good faith to a federal, state or local government official, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit relating to such report. Nothing in this Agreement is to be construed to prohibit the Company from bringing any claims against Employee, including but not limited to, statutory claims for Trade Secret misappropriation. Nothing in this Agreement is to be construed to unlawfully limit any rights Employee may have under the National Labor Relations Act.

4.   When Company owned computers, computer devices, e-mail addresses, phones, and/or other electronic technology are issued to Employee, Employee shall conduct Company business and communicate with customers, vendors and the public regarding Company business only on the Company computer network and using such Company-provided electronic technology. Employee agrees that Employee will not transfer or store any Company information on any device or other storage medium (physical or virtual) not provided or authorized by the Company unless authorized to do so in writing by the Company. Employee has no right to privacy with respect to any data that is stored on any device issued to Employee by the Company and/or authorized for Employee to use for Company business. As soon as Employee begins to consider leaving the Company or Employee realizes Employee's employment with the Company has or will soon come to an end, Employee will not wipe, delete or transfer or cause any Company data to be wiped, deleted or transferred from any such device before returning the device to the Company.

5.   The Employee shall perform such services as may be assigned to Employee from time to time in accordance with the Company's policies and procedures. The Employee shall timely submit written sales and service reports using the Company's standard report forms. Employee will devote Employee's whole working time and ability to the services of the Company in such capacity as the Company from time to time shall direct. Employee further agrees that during the course of employment by the Company, Employee will not have any financial interest, whether direct or indirect, in any firm or organization engaged in competitive services or products. This provision is not intended to preclude personal investments of the Employee which do not require Employee's significant day-to-day attention and management. Employee agrees to promptly disclose to the Company any conflict of interest or employment matter which may be adverse to the Company's interest.

6.   During employment with the Company and for a period of one (1) year immediately following the termination of his employment with the Company, the Employee will not:

CHEMR-00000239

CONFIDENTIAL

**(a)** solicit, encourage or induce any customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service;

**(b)** transact business with any Customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service.

During said one (1) year following termination, the employee also will not assist any Competing Firm to engage in the aforementioned activities prohibited by Subsections 6(a) and 6(b). A Competing Firm means any person or organization (including one owned in whole or in part by the Employee) which is engaged in the development, production, use, marketing or sale of a Competing Product or Competing Service. A Competing Product or Competing Service means any product or service which is the same as, or similar to, and competes with, a product or service of the Company which was part of the product or service line handled by the Employee, or by persons supervised by the Employee, during Employee's last year of employment with the Company. If the Employee violates the covenants contained in this Section, the term of said covenant shall be extended for one (1) year from and after the later of (a) the date on which the Employee permanently ceases such violation; or (b) the date on which any court issues an order or judgment enforcing the covenant; provided, that in no event shall the term of the covenant be extended for a term beyond twenty-four (24) months following termination of the Employee's employment with the Company.

**7.** During Employee's employment with Company and for a period of one (1) year immediately thereafter, Employee will not hire or induce, attempt to induce or in any way assist or act in concert with any other person or organization in hiring, inducing or attempting to induce any employee or agent of Company to terminate such employee's or agent's relationship with Company. This restriction is limited to those employees that Employee managed, or supervised, or had material contact with on the Company's behalf during the last twelve (12) months of Employee's employment with Company.

**8.** Employee will communicate and disclose in writing to Employee's manager or to such person as may be designated by the Company both during employment and thereafter, all inventions, discoveries, improvements, machines, devices, design, processes, products, software, treatments, formulae, mixtures, and/or compounds whether patentable or not as well as patents and patent applications (all collectively called "Inventions") made, conceived, developed or acquired by Employee or under which Employee acquired the right to grant licenses or become licensed, whether alone or jointly with others, during Employee's employment by the Company. All Employee's right, title and interest in, to and under such Inventions, including licenses and right to grant licenses, shall be the sole property of the Company and Employee hereby assign the same to the Company. Any Invention disclosed by Employee to anyone within one (1) year after termination of Employee's employment with the Company, which relates to any matters pertaining to, applicable to, or useful in connection with, the business of the Company shall be deemed to have been made or conceived or developed by Employee during Employee's employment by the Company, unless proved by Employee to have been made and conceived and developed after termination of Employee's employment with the Company.

**9.** For all Employee's Inventions, Employee will, upon request of the Company, during Employee's employment and thereafter:

**(a)** execute and deliver all documents which the Company shall deem necessary or appropriate to assign, transfer, and convey to the Company, all Employee's right, title, interest in and to Employee's Inventions, and enable the Company to file and prosecute applications for Letters Patent of the United States and any foreign countries on inventions as to which the Company wishes to file patent applications, and

**(b)** do all other things (including giving of evidence in suits and other proceedings) which the Company shall deem necessary or appropriate to obtain, maintain, and assert patents for any and all such inventions and to assert its rights in any inventions not patented

**10.** Employee's obligations under Sections 8 and 9 of this Agreement do not apply to Inventions for which no equipment, supplies, facility or Confidential Information of the Company was used, and which were developed entirely on Employee's own time unless the inventions relate to the business of the Company or to the Company's actual or demonstrably anticipated research or development or the inventions result from any work performed by Employee for the Company.

CHEMR-00000240

CONFIDENTIAL

**11.** Upon termination of Employee's employment and/or promptly upon request, the Employee will return in good order all Company property and information in the Employee's possession, custody or control. Upon termination, Employee shall return all Company data, business information, credit cards, keys, automobiles and any other Company property in his possession. Employee shall not erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company. For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/or erase Company data from Employee's Company assigned phone and/or computer device.

**12.** In the event the Employee violates, or the Company reasonably believes the Employee is about to violate, this Agreement, the Employee agrees that the Company is entitled to injunctive relief to prevent violation(s) and/or preserve the *status quo* and confidentiality of the Company's Confidential Information and Trade Secrets. The Employee agrees that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and the Company will have the right to conduct forensic examination(s) of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions. The Employee further agrees that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis.

**13.** All of the provisions of the Agreement which are to be effective following termination of the Employee's employment, shall be effective regardless of whether such termination was voluntary or involuntary. The Employee warrants that prior to entering into this Agreement he has disclosed to the Company any agreements with any previous employers which would prevent him from performing any duties for the Company.

**14.** The restrictive covenants and provisions contained in this Agreement including but not limited to each section and subsections, are severable. The parties further agree that if any of the restrictions set forth in any section and/or any paragraph and the subparagraphs contained therein shall be held not to be enforceable because they are overbroad for any reason whatsoever, it is agreed that the restriction shall be effective to such extent as it may be enforceable. The parties specifically authorize a court of competent jurisdiction to strike, amend and/or alter such provisions to the extent necessary to render them reasonable and enforceable as this is the mutual intent of the Parties. All references to Company shall be construed to include subsidiaries of Company.

**15.** This Agreement supersedes any previous agreements between the parties, written or oral, relating to this subject matter and may be amended or modified only in writing signed by the Employee and an authorized employee of the Company. Notwithstanding the previous sentence, should a court of competent jurisdiction invalidate the restrictive covenants set forth at Section 6 because of either: (1) lack of consideration, or (2) for being unenforceable and not subject to being reformed by severing or judicial modification, the next most recent agreement between Employee and Company containing such noncompete restrictions shall be given effect. If any of the provisions of this Agreement are held to be invalid or unenforceable by a court of competent jurisdiction or by an Arbitrator in an arbitration proceeding, such holding shall not invalidate any of the other provisions of this Agreement, it being intended that the provisions of this Agreement are severable. This Agreement shall inure to the benefit of the Company's successors or assigns.

**16.** In any successful proceeding brought to enforce the Company's rights under this Agreement, the Company shall recover court costs and reimbursement of Company's attorney's fee and disbursements. These damages are in addition to any other relief, including injunctive relief, to which the Company may be entitled.

**17.** This Agreement shall not become effective or be binding upon the parties until accepted on behalf of the Company by the signature hereon of an authorized employee of the Company.

Please review this Employee Agreement and sign with your **full legal name**.

I have carefully read and understand and agree to all of the terms of this agreement.

Accepted by:

CHEMR-00000241

CONFIDENTIAL

Ecolab Inc.

Laurie Marsh

Executive Vice President, Human Resources

1 Ecolab Place, St. Paul, MN 55102

09/10/2020

CHEMR-000000242

| | |
|---|---|
| **Date:** | Tuesday, March 2 2021 01:15 PM |
| **Subject:** | Ridley Business Plan |
| **From:** | Anthony Ridley <aridley75@hotmail.com> |
| **To:** | Cissell, Clay <richard.cissell@chemtreat.com>; |
| **Attachments:** | Ridley Business Plan 2021 - 2023.xlsx |

Clay,

Attached is the business plan that I prepared. The Business Plan cover 2021 - 2023. I used the revenue numbers you provided. In the plan, I did make some assumption for transition into the role, learning the ChemTreat business and chemistries, time needed to transfer accounts, and my non-compete. I did not add into the plan additional business from other ChemTreat reps that may retire in the near future. I assume that would be simply territory growth. Please let me know if you have any questions.

Best Regards,

Anthony Ridley

---

**From:** Cissell, Clay <richard.cissell@chemtreat.com>
**Sent:** Wednesday, January 13, 2021 4:40 PM
**To:** Anthony Ridley <aridley75@hotmail.com>
**Subject:** RE: Attached Image

This one is not signed........do you have a signed copy

**From:** Anthony Ridley [mailto:aridley75@hotmail.com]
**Sent:** Wednesday, January 13, 2021 3:39 PM
**To:** Cissell, Clay <richard.cissell@chemtreat.com>
**Subject:** Fw: Attached Image

Clay,

Good afternoon. Attached is the Employee Sales, Service, Marketing and Inventions Agreement that I signed when I moved into my new role with Ecolab. The information you are looking for is contained on Page 2 and 3.

Best Regards,
Anthony

Please be advised that this email may contain confidential information. If you are not the intended recipient, please notify us by email by replying to the sender and delete this message. The sender disclaims that the content of this email constitutes an offer to enter into, or the acceptance of, any agreement; provided that the foregoing does not invalidate the binding effect of any digital or other electronic reproduction of a manual signature that is included in any attachment.

**Exhibit 43**
3/16/2023

CONFIDENTIAL

CHEMR-000000277

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

| From: | Anthony Ridley <aridley75@hotmail.com> |
|---|---|
| To: | "Cissell, Clay" <richard.cissell@chemtreat.com> |
| Subject: | Re: Draft Pay Plan |
| Date: | Monday, March 29 2021 11:28 PM |
| Message-ID: | <BN3PR01MB1987330D7924B29102968A67A37D9@BN3PR01MB1987.prod.exchangelabs.com > |
| Attachments: | CT |

Clay,

Good evening.  The comp plan included in the previous email was used to create an excel file that allows the comp plans to be modified, modeled, and compared.  For the comp plan initially proposed, some adjustments were made.  The new business was altered to show the anticipated captured new business dollars, in a specific year, and carryover new business dollars to the next year.  The claimed new business amounts match what was forecasted in my Business Plan.  Alterations were also made to the territory base.  An attrition rate of 12% and 2% price increase each year was calculated into the base.  That equated to a net attrition of -10% annually.  Territory growth will be driven by new business sales.

In the file, I have provided two new comp plan options.  Option #1 is very similar to the originally proposed model, but all new business will be paid at 31%.  Option #2 significantly shortens the time I will be given a salary and allows me to bet on myself for territory growth.  Both options keep me whole at my current income level for Year 1.  As we discussed, it is not about Year 1, but future growth potential for me and Chemtreat.  Please review the information and let me know if you have any questions or concerns.  I look forward to continuing our discussion and working through this process.


Best Regards,

Anthony Ridley

---

**From:** Cissell, Clay <richard.cissell@chemtreat.com>
**Sent:** Monday, March 22, 2021 8:12 AM
**To:** Anthony Ridley <aridley75@hotmail.com>
**Subject:** Draft Pay Plan

Anthony
Here is the pay plan we discussed over the phone.  Looking forward to you joining the team.


*Regards,*

*Clay Cissell*
*South East Conference Leader*



5640 Cox Road
Glenn Allen, VA 23060
Cell# 270-748-6118

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY
CHEMR-000000316

*Richard.Cissell@chemtreat.com*

Please be advised that this email may contain confidential information. If you are not the intended recipient, please notify us by email by replying to the sender and delete this message. The sender disclaims that the content of this email constitutes an offer to enter into, or the acceptance of, any agreement; provided that the foregoing does not invalidate the binding effect of any digital or other electronic reproduction of a manual signature that is included in any attachment.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY                    CHEMR-000000317

| From: | "Sanderford, Kirsten B" <kirsten.sanderford@chemtreat.com > |
|---|---|
| To: | "Cissell, Clay" <richard.cissell@chemtreat.com > |
| Subject: | RE: Anthony Ridley Online Application |
| Date: | Wednesday, May 12 2021 03:32 PM |
| Message-ID: | <MN2PR07MB5902E53902533DDCAE89AD0C82529@MN2PR07MB5902.namprd07.prod.outlook.com > |

Great, thanks!

Kirsten Sanderford
Recruiting Manager
ChemTreat, Inc.
Kirsten.Sanderford@ChemTreat.com
804-714-9258



  

What you find could change the world.

**From:** Cissell, Clay <richard.cissell@chemtreat.com >
**Sent:** Wednesday, May 12, 2021 3:20 PM
**To:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com >
**Subject:** Re: Anthony Ridley Online Application

Yes Chattanooga, Knoxville (basically E TN) and Northern GA

Get Outlook for iOS

**From:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com >
**Sent:** Wednesday, May 12, 2021 1:18:41 PM
**To:** Cissell, Clay <richard.cissell@chemtreat.com >
**Subject:** RE: Anthony Ridley Online Application

In the Chattanooga area, correct? Will it expand beyond that?

Kirsten Sanderford
Recruiting Manager
ChemTreat, Inc.
Kirsten.Sanderford@ChemTreat.com
804-714-9258



CONFIDENTIAL

CHEMR-000000435

 

What you <u>find</u> could change the world.

**From:** Cissell, Clay <richard.cissell@chemtreat.com >
**Sent:** Wednesday, May 12, 2021 1:59 PM
**To:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com >
**Subject:** RE: Anthony Ridley Online Application

He will be taking over a territory for David Ellis, when David retires on 12/3/21
Clay

**From:** Sanderford, Kirsten B
**Sent:** Wednesday, May 12, 2021 12:05 PM
**To:** Cissell, Clay <richard.cissell@chemtreat.com >
**Subject:** RE: Anthony Ridley Online Application

Great, thank you!  Can you give me the high level overview of what Anthony will be doing with ChemTreat, that is the third component of what is needed for non-compete review.

--Kirsten

Kirsten Sanderford
Recruiting Manager
ChemTreat, Inc.
Kirsten.Sanderford@ChemTreat.com
804-714-9258



 

What you <u>find</u> could change the world.

**From:** Cissell, Clay <richard.cissell@chemtreat.com >
**Sent:** Wednesday, May 12, 2021 11:47 AM
**To:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com >
**Subject:** RE: Anthony Ridley Online Application

Here you go

**From:** Sanderford, Kirsten B
**Sent:** Wednesday, May 12, 2021 9:55 AM
**To:** Cissell, Clay <richard.cissell@chemtreat.com >

CONFIDENTIAL CHEMR-000000436

**Subject:** RE: Anthony Ridley Online Application

Understood!  Do you have a copy of his resume so I can get his non-compete reviewed?

Kirsten Sanderford
Recruiting Manager
ChemTreat, Inc.
Kirsten.Sanderford@ChemTreat.com
804-714-9258



 

What you find could change the world.

**From:** Cissell, Clay <richard.cissell@chemtreat.com >
**Sent:** Wednesday, May 12, 2021 10:53 AM
**To:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com >
**Subject:** Re: Anthony Ridley Online Application

He said he was traveling this week and hadn't got a chance to look at it yet

Clay

Get Outlook for iOS

**From:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com >
**Sent:** Wednesday, May 12, 2021 9:51:44 AM
**To:** Cissell, Clay <richard.cissell@chemtreat.com >
**Subject:** RE: Anthony Ridley Online Application

Great, I'll keep an eye out!

Kirsten Sanderford
Recruiting Manager
ChemTreat, Inc.
Kirsten.Sanderford@ChemTreat.com
804-714-9258



 

What you find could change the world.

**From:** Cissell, Clay <<u>richard.cissell@chemtreat.com</u>>
**Sent:** Wednesday, May 12, 2021 10:51 AM
**To:** Sanderford, Kirsten B <<u>kirsten.sanderford@chemtreat.com</u>>
**Cc:** Leavell, Steven R <<u>STEVEL@chemtreat.com</u>>
**Subject:** Re: Anthony Ridley Online Application

Spoke to Anthony yesterday and he committed to getting it done! Thanks

Get <u>Outlook for iOS</u>

---

**From:** Sanderford, Kirsten B <<u>kirsten.sanderford@chemtreat.com</u>>
**Sent:** Wednesday, May 12, 2021 9:47:20 AM
**To:** Cissell, Clay <<u>richard.cissell@chemtreat.com</u>>
**Cc:** Leavell, Steven R <<u>STEVEL@chemtreat.com</u>>
**Subject:** RE: Anthony Ridley Online Application

Hi Clay,

Just checked again for Anthony's application and don't see it.

--Kirsten

        Kirsten Sanderford
        Recruiting Manager
        ChemTreat, Inc.
        <u>Kirsten.Sanderford@ChemTreat.com</u>
        804-714-9258



 

What you <u>find</u> could change the world.

---

**From:** Cissell, Clay <<u>richard.cissell@chemtreat.com</u>>
**Sent:** Tuesday, May 11, 2021 9:10 AM
**To:** Sanderford, Kirsten B <<u>kirsten.sanderford@chemtreat.com</u>>
**Cc:** Leavell, Steven R <<u>STEVEL@chemtreat.com</u>>
**Subject:** Anthony Ridley Online Application

Kirsten
Can you confirm if Anthony has applied online yet for the Chattanooga TN position?

*Regards,*

*Clay Cissell*
*South East Conference Leader*

CONFIDENTIAL           CHEMR-000000438



5640 Cox Road
Glenn Allen, VA 23060
Cell# 270-748-6118
*Richard.Cissell@chemtreat.com*

CONFIDENTIAL

CHEMR-000000439

| | |
|---|---|
| From: | "Cissell, Clay" <richard.cissell@chemtreat.com > |
| To: | "Sanderford, Kirsten B" <kirsten.sanderford@chemtreat.com > |
| Subject: | RE: Anthony Ridley Non Compete Review |
| Date: | Monday, May 17 2021 03:04 PM |
| Message-ID: | <BN6PR07MB355464D7128F5B8BACD23130E62D9@BN6PR07MB3554.namprd07.prod.outlook.com > |

Okay….Thanks

---

**From:** Sanderford, Kirsten B
**Sent:** Monday, May 17, 2021 2:04 PM
**To:** Cissell, Clay <richard.cissell@chemtreat.com >
**Subject:** RE: Anthony Ridley Non Compete Review

Yes but I still need to interview him and he still needs to apply.   I'll forward the email approval for non-compete in a bit.

> Kirsten Sanderford
> Recruiting Manager
> ChemTreat, Inc.
> Kirsten.Sanderford@ChemTreat.com
> 804-714-9258



  

What you find could change the world.

---

**From:** Cissell, Clay <richard.cissell@chemtreat.com >
**Sent:** Monday, May 17, 2021 3:03 PM
**To:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com >
**Subject:** Anthony Ridley Non Compete Review

Kirsten
This am you mentioned that Anthony's non-compete review and completed and we had been approved to move forward.

*Regards,*

*Clay Cissell*
***South East Conference Leader***



5640 Cox Road
Glenn Allen, VA 23060

CONFIDENTIAL                    CHEMR-000000510

Cell# 270-748-6118
*Richard.Cissell@chemtreat.com*

CONFIDENTIAL

CHEMR-000000511

| From: | "Diegel, Nicole" <ndiegel@chemtreat.com> |
|---|---|
| To: | "Sanderford, Kirsten B" <kirsten.sanderford@chemtreat.com> |
| CC: | "Hamilton, Helen M" <helen.hamilton@chemtreat.com> |
| Subject: | RE: Anthony Ridley's Non-Compete |
| Date: | Monday, May 17 2021 10:21 AM |
| Message-ID: | <BL0PR07MB7905CD6D02C2D568D629D0CCA82D9@BL0PR07MB7905.namprd07.prod.outlook.com > |
| Attachments: | 0215_001.pdf; Ridley |

Kirsten,

I spoke with Helen on this one and we both agree that we do not see this non-compete being an issue so long as he follows the language in his non-compete in section 6A and 6B. Essentially he is unable to solicit, engage, or do business with any customer that he had interaction with for 12 months after his separation. As long as we are comfortable with him engaging with customers outside of those he had interaction with we can proceed. If that is not the case then we will need to escalate.

There is also an important piece in this Non-compete 2a and 2b, where for a period of 3 years is not share trade secrets and that is further defined in the non-compete. That is more on him to just realize that he has this and not to engage in activity that would be in violation of his agreement.

Thanks,

Nicole


Nicole Diegel
Sr. HR Business Partner- Commercial



---

**From:** Sanderford, Kirsten B
**Sent:** Wednesday, May 12, 2021 3:36 PM
**To:** Diegel, Nicole <ndiegel@chemtreat.com>
**Cc:** Hamilton, Helen M <helen.hamilton@chemtreat.com>
**Subject:** Anthony Ridley's Non-Compete

Hi Nicole,

Attached is Anthony Ridley's non-compete agreement and resume. We would be hiring Anthony to take over the business that David Ellis has when David retires. Anthony would be working in the Eastern Tennessee/Northern Georgia area. Anthony explained to Clay Cissell that this was "signed" online so there is no copy with his signature showing. Please review and let me know if it is okay to process with an offer to Anthony or if you need additional information.

--Kirsten

Kirsten Sanderford
Recruiting Manager
ChemTreat, Inc.
Kirsten.Sanderford@ChemTreat.com
804-714-9258

**Exhibit 72**

CONFIDENTIAL

CHEMR-000000535



  

What you find could change the world.

CONFIDENTIAL

CHEMR-000000536

| From: | Anthony Ridley <aridley75@hotmail.com> |
|---|---|
| To: | "Sanderford, Kirsten B" <kirsten.sanderford@chemtreat.com> |
| Subject: | Re: ChemTreat Offer |
| Date: | Sunday, June 20 2021 10:26 PM |
| Message-ID: | <BN3PR01MB19872D5F42D0906AAF7D0128A30A9@BN3PR01MB1987.prod.exchangelabs.com > |
| Attachments: | 2021; Anthony; Certification; Direct; Signing; US; US |

Kirsten,

Good evening.  Attached are the signed copied of all the documents sent to me with my job offer.  I have also completed the tasks in Workday.  Please let me know what are the next steps in the process.  Thank you for all of your assistance.

Best Regards,
Anthony

---

**From:** Sanderford, Kirsten B <kirsten.sanderford@chemtreat.com>
**Sent:** Friday, June 18, 2021 8:52 AM
**To:** aridley75@hotmail.com <aridley75@hotmail.com>
**Cc:** Cissell, Clay <richard.cissell@chemtreat.com>; Mathews, Valerie <valerie.mathews@chemtreat.com>; Leavell, Steven R <STEVEL@chemtreat.com>
**Subject:** ChemTreat Offer

Hi Anthony,

Congratulations on your offer to join the ChemTreat team! Your offer letter has been sent to you through the Workday account you set up when you applied for this role. Please sign into your account, click on the requisition number displayed that you applied for, and click on the link for the offer letter. Once you review the offer letter, you can "accept" or "decline" on the offer page. Once you indicate your choice you will need to click on "Ok" and you will be prompted to answer several questions before you are done accepting. Attached you will find our Non-Competition Agreement, and a folder of the New Hire paperwork. If you decide to accept the offer, please complete the attached forms, scan, and email them back to me *as soon as possible.* The signed Offer Letter,  Non-Competition Agreement (all four pages), and all of the below paperwork are necessary for us to have in order to proceed to next steps of the pre-employment screening process.

New Hire Folder contents:
- 2020 W-4 Tax Form
- Certification of Compliance of Obligations to Prior Employer
- ChemTreat's Anti-Corruption Policy
- Separate Anti-Corruption Signature Page (*read, and sign & return the acknowledgement*)
- Danaher and US OpCo Criminal History Questionnaire (*please read, fill out and return*)
- Danaher Standards of Conduct and Signature Page (*read and sign*)
- Direct Deposit Form (*complete to have your payroll checks direct deposited*)
- New Associate Information Form (*complete top section*)
- Protected Veteran Form
- Voluntary Self ID of Disabilities Form

Once I receive all of your signed documents back, we will initiate your pre-employment screening. This screening consists of a background check and a drug screen.

- You will receive an email from our background check vendor TrueScreen from the email address: applicationstation@truescreen.com , requesting you to complete your background check with

CONFIDENTIAL

the title "**Background Investigation Forms Requested**". Please do not delete this email and complete within 3 business days of receipt- the link has an expiration.

- Following completion of the above, you will get a second email titled, "DrugScreen Registration" with a link for you to register for your drug test. Please follow the link, and then enter in your Last Name and Social Security Number as prompted, and it will then take you through to schedule and register for your pre-employment drug screen where convenient for you. Once registration is complete, you will be taken to a confirmation page – please print and take with you to your drug screen.

I know there are a lot of pieces here, so please let me know if you have any questions—I'm here to help. Again, congratulations on your offer and we are really looking forward to having you join the team!

Kind regards,

Kirsten



Kirsten Sanderford
Recruiting Manager
kirsten.sanderford@chemtreat.com
(804) 714-9528

  

What you find could change the world.

Please be advised that this email may contain confidential information. If you are not the intended recipient, please notify us by email by replying to the sender and delete this message. The sender disclaims that the content of this email constitutes an offer to enter into, or the acceptance of, any agreement; provided that the foregoing does not invalidate the binding effect of any digital or other electronic reproduction of a manual signature that is included in any attachment.

CONFIDENTIAL

**Date:** Wednesday, September 29 2021 03:45 PM

**Subject:** AEDC response

**From:** Anthony Ridley <aridley75@hotmail.com>

**To:** Ridley, Anthony <anthony.ridley@chemtreat.com >;

**Attachments:** AEDC proposal for purchasing - HVAC Cooling Towers - October2015.doc

**Date:** Wednesday, September 29 2021 03:45 PM

**Subject:** AEDC response

**From:** Anthony Ridley <aridley75@hotmail.com>

**To:** Ridley, Anthony <anthony.ridley@chemtreat.com >;

**Attachments:** AEDC proposal for purchasing - HVAC Cooling Towers - October2015.doc

**Exhibit 66**

CHEMR-000001631



September 24, 2015


Mr. Chris Gipson
Arnold Air Force Base
ATA
1476 N. Hap Arnold Drive
AAFB, TN 37389-8000


Mr Gipson:

The following information is in response to ATA Request for Quotation for HVAC water treatment program, during the period of October 1, 2015 – September 30, 2016 . The Request for Quotation was regarding the cost associated with Nalco providing a water treatment program for the cooling towers at Building 1103 and Building 1088.   In the Request for Quotation ATA outlined several areas, which are to be met by Nalco.

The specifications of the Request for Quotation are that Nalco shall provide all labor, materials, equipment, a chemical storage system, and transportation necessary to provide a chemical treatment program for the cooling towers located at Building 1088 and Building 1103.   The vendor shall make an initial site visit to verify chemical feed points, make recommendations on changes to existing feed system, and determine location of any new chemical feed tanks.   The vendor shall supply all chemicals, make periodic on-site system evaluation and troubleshooting, chemical feed tanks, chemical deliveries, inhibitor monitoring equipment, wireless communication, and lab analysis as needed.  All chemicals must have a SDS (Safety Data Sheet) submitted for approval.  The contract shall be on an annual basis with a four-year option.  The selected chemicals will be purchased on an as needed basis.  Nalco will provide any training to on-site personnel that will be needed to monitor the chemical feed systems.  Materials and labor shall be provided in accordance with GSA contract number GS-10F-8607C, which is associated with Nalco.


Sincerely,



Anthony Ridley
District Manager
WPS Division
Nalco Company

CHEMR-000001632

# TREATMENT PROGRAM

The treatment program that has been selected for AEDC is one that meets the need of AEDC and also fits in with the system currently in place. All of the products in the program have a proven track record throughout the industry and are currently in place at other account with in this area. The treatment program for the cooling tower is as follows:

## Cooling Tower

- **Nalco 3DT265** is part of Nalco's new line of 3D TRASAR chemistries. Nalco 3DT265 is a scale and corrosion inhibitor that is monitored by a 3D TRASAR unit. The 3D TRASAR is a cooling water automation package that monitors the level of scale and corrosion inhibitor, conductivity, turbidity, OPR, pH, Nalco scale index, and Nalco Bio-Index on a real-time continuous basis. It automatically turns the chemical feed pumps on and off to maintain a proper chemical balance in the system. Because the 3D TRASAR ensures that the proper level of inhibitor will be in the system at all times, we are able to achieve higher cycles of concentration in the cooling tower, thereby saving the customer significant amounts of make-up water, bleed water to the sewer, and chemical. TRASAR comes with **Nalco *Dose and Diagnose Services*** that helps the customer exactly calculate critical system values like system volume, bleed rate, and holding time index. The TRASAR will also allow us to trace any leak that may occur in the system.

- **STA-BR-EX (ST70):** This patented Nalco innovation has changed the marketplace for a dual biocide approach to a single biocide approach. STA-BR-EX is highly persistent, stabilized bromine in a liquid format. Because it is so stable, it requires very nominal feed rates in order to achieve an effective kill of microorganisms. Bromine chemistry is much more effective biocide than chlorine-based biocides. In water, bleach will break down to HOCl (hypochlorous acid) and OCl⁻ stabilized bromine in water will form HOBr and OBr⁻ The relative concentrations of the hypohalous acid, which are more biocidally active, and the hypohalous ions, are dependent on pH. At a pH levels greater than 5.0, HOCl concentration start to drop and OCl⁻ begins to increase. At a pH of 8.5, the HOCl level to OCl⁻ is 10% to 90 %. At this pH, the HOBr level to OBr⁻ level is 60% to 40%, or six times more active than bleach. Also, since the product is stabilized, it is not susceptible to mechanical stripping across the tower and will not lose activity as it sits in a drum, as bleach is prone to do in as little as a weeks time. STA-BR-EX helps maximize heat transfer in the chillers and prevents corrosion caused by microorganisms. STA-BR-EX comes with **Nalco BioManage Services**, including lab analyses.

- **FEEDPOINTS:** The 3D TRASAR will be piped into your current system. It will be connected into the recirculation line that flows through your conductivity meter. The STA-BR-EX will need to be feed into the return line of the cooling tower after the bleed off, or into the sump of the tower. The Nalco 3DT265 needs to be feed into the supply line coming off of the tower. These feedpoints locations are the correct locations to feed this chemical program. If for some reason these points are not acceptable adaptation can be made to fit your system.

# SERVICE PROGRAM

At Nalco Chemical Company our goal is to maintain the highest levels of customer satisfaction and to insure that our customers receive a return on their investment with us. With this in mind, it is important for you to understand how we view our relationship with our customer.

The system that we have in place is to insure that we meet your needs through the growth stages of our relationship is our industry-leading **Six Service Standards**. All of the Nalco field representatives have been extensively trained

CHEMR-000001633

in these standards to insure that they are followed as we work with you in your facilities. These standards are designed to insure that we are meeting the needs of our customers and working together with them as we move up the growth curve toward a permanent business partnership. The following is a brief summary of the standards and what they will mean to you:

**PEOPLE SURVEY:**
Good business relationships start with good communication. Our representatives work toward understanding your organization and its needs. The better we get to know your team, the better chance we have of helping you meet and exceed your business objectives.

**PLANT SYSTEM SURVEY:**
We make sure we know your system as well as your people. Through the use of line diagrams and the collection of system design data, we insure that the proper treatment program is implemented, and this allows us to understand opportunities for improvement.

**SERVICE PLAN:**
Our goal is to work on projects that provide you with a payback. Your Nalco representative will work with you to set goals and objectives for our program. This allows us to work with you in organizing our efforts and schedule activities to meet your priorities.

**PROGRAM ADMINISTRATION MANUAL:**
Effective day-to-day control is a critical part of the process. That is why operator training, detailed operator guidelines and written contingency plans are part of our service standard. This manual is prepared specifically for your site in order to provide your operating personnel with all of the necessary information to manage the water treatment program in a safe and efficient manner.

**PERSONAL SERVICE REPORTS:**
These reports provide a mechanism for monitoring the progress that is being made. These reports document the service that is performed by your representative and includes recommendations for improvement. These reports will follow the agreed upon service plan and update you on the status of each project and any corrective action which needs to be taken in order to correct the problems.

**BUSINESS REVIEWS:**
Perhaps the most important element in these service standards is a formal review of the accomplishment of our program with key members of your team. The business review is an ideal time to set goals for the next service plan and to discuss opportunities for additional projects, which will provide you a further return on your investment.

Our service program is customized to address your specific Water/Energy management needs. A Nalco representative shall visit your facility at least once every other week; at first once per week minimum until the transition is fully successful.

Service programs tailored to your needs coupled with Nalco's commitment to frequent service visits allow you to:

- Achieve the maximum benefit from your Nalco program and realize the maximum results.
- Keep your system operating with minimal problems and minimal downtime.
- Realize maximum energy savings and system performance.

Enclosed is the Nalco service schedule we will use at your facility. It lists the specific services provided and degree of service frequency.

A key aspect of our service program is our Personal Service Reports. Service reports are a useful tool for documenting program conditions and are thorough, direct, and legible.

Necessary information which we include in these reports, is listed below:

CHEMR-000001634

- Water analyses, including all-important tests for each water system.
- Recommended control ranges for all tests.
- Current feed-rates and appropriate changes, if necessary.
- Performance parameters.
- Summary and recommendations section, which fully explains the status of the program, the benefits of correct system control, and possible consequences when, items are out of control.
- System recommendations that will increase system efficiency or correct operational problems.
- Reports distributed and discussed with appropriate personnel prior to leaving each visit.

## NALCO SERVICE SCHEDULE

| SERVICE | FREQUENCY |
|---|---|
| ON-SITE WATER TESTING | ONCE EVERY 4 WEEKS |
| COLLECTION OF WATER SAMPLES FOR OUTSIDE ANALYSES | AS NEEDED |
| EQUIPMENT INSPECTIONS | ON SHUTDOWN/ANNUALLY |
| DEPOSIT ANALYSES | AS NEEDED |
| MICROBIOLOGICAL ANALYSES | NALCO – PER VISIT<br>PLANT PERSONNEL - WEEKLY |
| SPECIAL PROJECTS | ESTABLISHED DURING BUSINESS REVIEWS |
| CORROSION/FOULING STUDIES:<br>A) COOLING SYSTEMS (1),(2),(3)<br>B) DOMESTIC WATER SYSTEMS (1) | (1) CORROSION COUPONS - 30, 60, OR 90 DAYS<br>(2) DEPOSIT MONITOR (IF NEEDED)<br>(3) BIO-FOULING MONITOR (IF NEEDED) |
| PLANT PERSONNEL TRAINING SEMINARS | IMMEDIATELY UPON CHANGES IN PROGRAM<br>SPECIAL TOPICS - SEMI-ANNUALLY |
| CHEMICAL SAFETY REVIEWS | MINIMUM ONCE PER YEAR AND WHEN PRODUCTS CHANGE |
| REVIEW OF WATER TESTING LOGSHEETS | DURING VISITS WITH OPERATOR |
| PLANT MANAGEMENT MEETINGS | QUARTERLY BUSINESS REVIEWS<br>ANNUAL FORMAL PRESENTATIONS |

Another key element to understand how we do business at Nalco Chemical Company is to recognize our commitment to the environment, health, and safety associated with our programs. Nalco's efforts in this area are covered by our PRODUCT STEWARDSHIP PROGRAM.

Nalco's Product Stewardship efforts are guided by Chemical Manufacturer's Association Responsible Care code of management practice that establishes corporate leadership and commitment, identifies and characterizes potential

risks associated with products, and develops a system to manage those risks. PRODUCT STEWARDSHIP affects our employees, suppliers, contract manufacturers, distributors and customers. We feel strongly that we play a major role in your ability to provide your employees with a safe working environment and to reduce potential liabilities associated with the chemical treatment of your boiler and cooling water systems.

# CHEMICAL HANDLING SYSTEM

Nalco Chemical Company is concerned about the safety of our employees, our customers, and our environment. Nalco's commitment to safe chemical handling is a direct result of this concern and is demonstrated through many of the programs and activities developed to promote this important area. The concern for safety is exemplified by Nalco's **Porta-Feed** program, which eliminates drum handling and disposal.

Nalco's **Porta-Feed** program has become the new industry standard for chemical handling. This exclusive program provides a convenient, safer, more economical alternative to drums. To meet the widest variety of customer needs **Porta-Feed** units are currently available in 400, 200,110, 75, and 30-gallon units.

Nalco offers a delivery option to meet almost any need. The **Porta-Feed** program is initiated with the delivery of a full base unit right to the application site. When chemical supply gets low, a refill unit is delivered to the application site. The base tank is filled, and Nalco takes the empty refill unit away. This simple process eliminates drum handling and disposal by your personnel.

The **Porta-Feed** system has been engineered with safety in mind. Advanced design features including, full drain bottom, 10-gauge stainless steel construction or polyethylene construction, sturdy stacking legs, and flooded suction to the feed pump, provide **Porta-Feed** users with the following advantages:

- Reduces chemical handling for improved worker safety.
- Eliminates excess costs due to residual chemical left in drums.
- Allows for more efficient use of storage space.
- Improves results by reducing the number of chemical feed problems incurred with a vacuum-lift feed system.
- Eliminates costs, hassles, and environmental concerns of drum disposal.

As a leader in specialty chemicals for water treatment and process applications, Nalco is committed to providing you with the best chemical treatment programs. We continually strive to provide innovations such as the **Porta-Feed** program to help ensure safe, reliable, and cost effective results.

Our program for your plant utilizes the **Porta-Feed** program for all liquid products that are to be fed into your systems by Nalco. The use of **Porta-Feed** units along with the neat feed will eliminate your personnel having to come in contact with the chemicals.

CHEMR-000001636

# WATER AND ENERGY MANAGEMENT PROGRAM

There are several areas that Nalco plans to focus on to improve AEDC's current water and energy management program. These areas will be where most of Nalco's documented Return on Investment saving come from. These areas are as follows:

- Increase control of chemical program with 3D TRASAR program

- Implement a Wireless Gateway for communication with 3D TRASAR system, in order to monitor cooling tower systems

- Optimization of cooling water systems

- Increase knowledge and awareness of operators through comprehensive training program.

- Provide a strong and knowledgeable consulting staff in the fields of Chemistry and Engineering

# PROGRAM COSTS

The cost for the Nalco Chemical program for Arnold Air Force Base in Tullahoma, Tennessee can be broken down as follows:

## Cooling Tower for building 1088

**Line Items for Bid Comparison:**
1. Equipment cost per month: $100.00
2. Chemical cost (per lb. usage) for liquid bromine biocide (ST70): 1MM X 9ppm X $2.73 = $24.57
3. Chemical cost (per lb. usage) for scale/corrosion inhibitor (3DT265): 1MM X 100ppm X $3.89 = $389.00

Nalco will provide the following equipment:
    -Nalco Porta-Feeds (in stainless steel)
    -Nalco 3D TRASAR w/ Junction Box
Total annual cost for equipment: $ 1,500.00

- Chemical treatment with Nalco 3DT265 and Nalco ST70
  - One mini Porta-Feed of 3DT265 (518lbs @ $3.89)
  - One mini Porta-Feed of ST70 (556lbs @ $2.73)
Total chemical cost for one year: $3,532.90

## Cooling Tower for building 1103

**Line Item for Bid Comparison:**
1. Equipment cost per month: **$100.00**
2. Chemical cost (per lb. usage) for liquid bromine biocide (ST70): 1MM X 9ppm X $2.73 = **$24.57**
1. Chemical cost (per lb. usage) for scale/corrosion inhibitor (3DT265): 1MM X 100ppm X $3.89 = **$389.00**

Nalco will provide the following equipment:

CHEMR-000001637

       -Nalco Porta-Feeds (in either stainless steel or polyethylene construction)
       -Nalco 3D TRASAR w/ Junction Box
Total annual cost for equipment: $1,500.00

Chemical treatment with Nalco 3DT265 and Nalco ST70
- Two mini Porta-Feeds of 3DT265 (1,036lbs. @ $3.89)
- Two mini Porta-Feeds of ST70 (1,112lbs @ $2.73)
Total chemical cost for one year: $7,065.80

Total Cost of Chemical Treatment Program for October 2015 – September 2016: $13,598.70

## Optional Additional Cost:

- Service Twice Per Month by Nalco Representative: $4,500/year.

- Tower Cleaning Provide by Nalco Service Group: $11,800/year for both cooling tower systems

These numbers are based current system conditions of the cooing towers. The cooling tower in building 1103 has a recirculation rate of 2460 gpm. The cooling tower in building F-1088 has a recirculation rate of 688 gpm. This cost is also based on Arnold Air Force Base purchasing the chemicals on a per pound basis at GSA pricing. Nalco will not be expected to be held to this cost if there are extreme upsets in the system that Nalco has no control over. Such as Arnold Air Force Base's equipment was to malfunction or if there was some sort of operator error.

In all cases, the program costs include all treatment chemicals for the both cooling towers, equipment, transportation necessary to provide chemical treatment of the cooling towers, operator training seminars, on-site visits by the Nalco representatives, all value-added services listed above, including system troubleshooting, chemical deliveries, Nalco TRASAR, wireless gateway system monitoring, and the Nalco mini Porta-Feed program.

Message

| | |
|---|---|
| **From**: | Anthony Ridley [aridley75@hotmail.com] |
| **Sent**: | 2/10/2022 7:04:44 AM |
| **To**: | Cissell, Clay [richard.cissell@chemtreat.com] |
| **Subject**: | Fw: 2022.02.09 Letter to A. Ridley.pdf |
| **Attachments**: | 2022.02.09 Letter to A. Ridley.pdf |

Clay,

Yesterday, I received the attached letter from a law firm representing Ecolab / Nalco Water. I do not have any files from Ecolab or Nalco Water that contain proprietary information, classified information, trade secrets, or pricing information. Do you have some time today to discuss this issue and determine the best path forward.

---

**From:** Walton, David <dwalton@fisherphillips.com>
**Sent:** Wednesday, February 9, 2022 11:58 AM
**To:** ARIDLEY75@HOTMAIL.COM <ARIDLEY75@HOTMAIL.COM>
**Cc:** Uppal, Pavneet <puppal@fisherphillips.com>; Honeycutt, Mike <jhoneycutt@fisherphillips.com>; Crainer, Brandon <bcrainer@fisherphillips.com>
**Subject:** 2022.02.09 Letter to A. Ridley.pdf

Mr. Ridley:

Please see the attached correspondence.



**David Walton**
**Partner**

Fisher Phillips
Two Logan Square | 12th Floor | 100 N. 18th Street | Philadelphia, PA 19103
dwalton@fisherphillips.com | O: (610) 230-6105

vCard | Website

*This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error, then immediately delete this message.*

<div style="border:1px solid yellow; background:yellow">
**Exhibit 64**
</div>



fisherphillips.com

**Philadelphia**
Two Logan Square
100 N. 18th Street
12th Floor
Philadelphia, PA 19103
(610) 230-2150 Tel
(610) 230-2151 Fax

**David J. Walton's Direct Dial:**
(610) 230-6105
**David J. Walton's E-mail:**
dwalton@fisherphillips.com

**Charlotte**
Suite 2020
227 West Trade Street (28202)
Post Office Box 36775
Charlotte, NC 28236
(704) 334-4565 Tel
(704) 334-9774 Fax

**Brandon J. Crainer's Direct Dial:**
(704) 778-4167
**Brandon J. Crainer's E-mail:**
bcrainer@fisherphillips.com

February 9, 2022

*VIA E-MAIL AND FEDEX*
*ARIDLEY75@HOTMAIL.COM*

Anthony Ridley
133 Gholdston Drive
Dayton, TN 37321

      Re:     *Your Post-Employment Legal Obligations to Nalco Company, LLC and Ecolab, Inc.*

Dear Mr. Ridley:

      Fisher & Phillips LLP represents Ecolab, Inc. and its wholly owned subsidiary Nalco Company, LLC (collectively "Ecolab") with regard to the matters set forth in this letter. Prior to your resignation on July 1, 2021, you were employed in Ecolab's Nalco Water business division and had access to our client's proprietary, confidential and trade secret information. At the time that you tendered your resignation, you informed Ecolab that you were joining its direct competitor, ChemTreat, Inc. ("ChemTreat"), and would be competing against the Nalco Water business division.

      We have recently discovered that – in the weeks leading up to your resignation from Ecolab – you downloaded or copied a massive amount of Ecolab's proprietary, confidential, and trade secret information. Based upon our analysis of your pre-departure activities, it is clear that you uploaded (or otherwise copied) several of Ecolab's key pricing documents to your personal email account. In addition, you downloaded thousands of Ecolab documents from our client's corporate OneDrive account to at least two different external drives. All of the information which you took related to Ecolab's Nalco Water business, as to which you unequivocally announced your intention to compete against in your new position at ChemTreat. The information which you misappropriated from Ecolab includes a large quantity of highly sensitive and confidential data about the Nalco Water business. Indeed, the information you downloaded and copied is exactly the type of information that someone would steal if he was planning to compete against or undermine Ecolab's Nalco Water business.

**Fisher & Phillips LLP**

Atlanta • Baltimore • Bethesda • Boston • Charlotte • Chicago • Cleveland • Columbia • Columbus • Dallas • Denver • Detroit • Fort Lauderdale • Gulfport
Houston • Irvine • Kansas City • Las Vegas • Los Angeles • Louisville • Memphis • Nashville • New Jersey • New Orleans • New York • Orlando • Philadelphia
Phoenix • Pittsburgh • Portland • Sacramento • San Diego • San Francisco • Seattle • Tampa • Washington, DC • Woodland Hills

CONFIDENTIAL
CHEMR-000001788

Because you were employed in a position of trust, you were privy to Ecolab's confidential information regarding its customers, employees and business operations; and, you were allowed to access Ecolab's trade secrets solely for the benefit of our client. As a condition of your employment with Ecolab and your promotion to Corporate Account Manager, in November 2020, you entered into an Employee Sales, Service, Marketing & Inventions Agreement (the "Employment Agreement", attached hereto as Exhibit "A").

In signing your Employment Agreement you promised to safeguard and protect Ecolab's trade secret and confidential information as follows:

2. Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing, business strategies, business methods, and employees (including the particular skills, talents and abilities of those employees).

**Employee hereby agrees that Employee will hold in a fiduciary capacity for the benefit of Company and shall not, directly or indirectly, use or disclose any Trade Secrets, as defined hereinafter, that Employee may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret.**

The term "Trade Secret" as used in this Agreement shall mean information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

(a) derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

*See* Exhibit A, Employment Agreement ¶ 2 (emphasis added).

Likewise, you promised to protect and refrain from using or disclosing Ecolab's confidential information after your separation from employment:

In addition to the foregoing and not in limitation thereof, Employee agrees that while employed with the Company and for a period of three (3) years after termination of Employee's employment with

CONFIDENTIAL

CHEMR-000001789

Company, **Employee will hold in a fiduciary capacity for the benefit of Company and shall not, directly or indirectly, use or disclose any Confidential Information, as defined hereinafter, that Employee may have acquired (whether or not developed or compiled by Employee and whether or not Employee was authorized to have access to such Confidential Information) during the term of, in the course of, or as a result of Employee's employment by Company.**

The term "Confidential Information" shall mean Company's confidential data or information which is valuable to Company but substantially inaccessible to the public and to competitors of Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets. Notwithstanding the foregoing, the term "Confidential Information" shall not include information that Employee can establish by competent proof: (i) was generally known to or accessible by the public at the time Company disclosed the information to Employee; (ii) became generally known to or accessible by the public after disclosure by Company through no act or omission by Employee; or (iii) was disclosed to Employee, after the Employee's termination of employment with the Company, by a third party having a bona fide right both to possess the information and to disclose the information to Employee, provided such third party is not subject to an obligation of confidentiality with respect to such information.

*See* Exhibit A, Employment Agreement ¶ 2 (emphasis added).

Additionally, you also certified and promised that you would return all of Ecolab's property including its business information from employment:

11. Upon termination of Employee's employment and/or promptly upon request, the Employee will return in good order all Company property and information in the Employee's possession, custody or control. Upon termination, Employee shall return all Company data, business information, credit cards, keys, automobiles and any other Company property in his possession. Employee shall not erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company. For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/or erase Company data from Employee's Company assigned phone and/or computer device.

*See* Exhibit A, Employment Agreement ¶ 11.

CONFIDENTIAL

CHEMR-000001790

Anthony Ridley
February 9, 2022
Page 4

You were not authorized to download, copy, and/or take any Ecolab documents and/or files after your employment ended. Your misconduct violates numerous aspects of your Employment Agreement as well as federal and state law regarding trade secret misappropriation and related common-law fiduciary duties, among other things. Ecolab is poised to seek appropriate legal redress to aggressively protect its proprietary, confidential, and trade secret information.

This letter serves as a notice to you of your obligation to preserve in an unaltered and forensically sound form any documents related to Ecolab, its business operations and its clients and employees. In this regard, the term "document" should be interpreted broadly to include, but not be limited to, writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, electronic messages, voicemail, electronic mail; text message, telephone and text messages, records, or logs; computer and network activity logs; data, hard drives, backup data, cloud storage accounts, removable computer storage media, such as thumb or flash drives, tapes, discs and cards, printouts, document image files, web pages, databases, spreadsheets, software, books, ledgers, journals, orders, invoices, bills, vouchers, checks, statements, worksheets, summaries, compilations, computations, charts, diagrams, graph presentations, drawings, films, digital or process photographs, video, phonographic; tape or digital recordings or transcripts thereof; drafts, jottings, notes, and any other tangible things. Information that serves to identify, locate, or link such material, such as file folders, indices, and metadata, are also included in this definition. You must also preserve and maintain all iPhone/iPad/iCloud backups or similar android based accounts.

The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. Accordingly, you must take every reasonable step to preserve this information. This includes, but is not limited to, an obligation to preserve information stored in your cell phone(s), cloud storage account(s), and email account(s). Should you fail or refuse to comply with your obligation to not spoliate evidence, my client will prosecute its rights to the fullest extent of the law.

Ecolab is continuing to investigate your actions and misconduct. Please be aware that Ecolab is evaluating potential pursuit of its legal remedies, including both injunctive relief from a court of competent jurisdiction and an action for damages to recover compensatory and exemplary damages caused by your improper conduct. In the interim, Ecolab demands that you do the following **within three (3) business days** of the date of this letter:

- Arrange for and complete forensic imaging/collection of all of your computers, electronic devices and accounts by a qualified computer expert (including your computer(s), tablet(s), smart phones, external hard drives, flash drives, cloud storage accounts, email and webmail accounts, text messages, chat communication accounts, social media accounts and any backup services which you may use such as iCloud, Samsung Cloud, etc.);

- Return all of Ecolab's physical property to us including, but not limited to, the external drives onto which you downloaded our client's electronic documents and business information;

- Cease and desist from using and/or disclosing any Ecolab information to anyone;

CONFIDENTIAL

CHEMR-000001791

- Identify all persons who have seen or otherwise been given access to any of our client's information that you took or retained after your resignation from Ecolab;

- Identify all computers, external hard drives, flash drives, other electronic devices or media, cloud storage accounts, email accounts, or other types of accounts in your possession, custody, or control that contain any Ecolab information; and

- Describe fully all efforts you have made to preserve potentially relevant evidence in this matter.

We strongly suggest that you retain counsel immediately and have him/her contact us to discuss the issues outlined above. Your failure to respond to this letter by the deadline set forth above and/or to provide the information requested above will be interpreted as a refusal to comply with your many legal obligations regarding Ecolab's proprietary, confidential, and trade secret information.

Best regards,

David J. Walton
Brandon J. Crainer
For FISHER & PHILLIPS LLP

DJW:mcc

cc:     Pavneet Singh Uppal
        J. Michael Honeycutt

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHONY RIDLEY, and CHEMTREAT, INC., <br><br> Defendants. | Case No. 1:22-cv-00050-TRM-SKL <br><br> Hon. Travis McDonough <br><br> Magistrate Judge Susan K. Lee |

## DECLARATION OF SUSAN TRIGGS

I, Susan Triggs, declare as follows:

1.    I am over the age of 18 years and understand the meaning of an oath.  The statements set forth herein are based on my personal knowledge.

2.    I am employed by Insight Enterprises, Inc. ("Insight") as a Corporate Paralegal.  I have been in this role since October 28, 2019.

3.    In connection with my responsibilities as a Corporate Paralegal, I have conducted targeted searches of relevant Insight employees' emails and assisted in coordinating and gathering information from those Insight employees who are familiar with Insight's work performed on behalf of its customer, Ecolab Inc., and its associated entities, including Nalco Company, LLC ("Ecolab").

4.    Insight is a third-party vendor that contracts with companies to provide device management services.  These services include the retrieval of devices, processing, repair, redeployment, and in some cases, destruction of devices sent to Insight by Insight's customers or their employees and former employees.

5. Insight provides services to Ecolab pursuant to a June 24, 2016, Master Agreement, a June 14, 2019 Statement of Work that was operative in the year 2021, and a March 19, 2021 Change Request Form that was operative in the year 2021.

6. Under these agreements, Insight offers a wide variety of services to Ecolab. These services include the management, repair, redeployment and, in some circumstances, disposal of returned devices.

7. Insight also offers services that allow Ecolab to request the transfer of data contained in returned devices to another device. Ecolab must request any data transfers. If a data transfer is not requested or initiated by Ecolab, the data contained in returned devices would be removed when the device is wiped of all prior information before redeployment or disposal.

8. Because data from returned devices may be needed in the future, Insight applies a "2 Week Hold," meaning that "[e]very refreshed device received [by Insight] will be held for two (2) weeks prior to processing to ensure the user has all required data." Statement of Work, Section 3.2.5. If the customer requests Insight to hold a returned device for a longer time period, Insight will do so. Additionally, some devices are held for longer than two weeks before the process of redeploying, repairing, or disposing of the device begins, depending on Insight's workflow.

9. If a device is subject to a litigation hold or needs to be preserved for purposes of litigation, Ecolab is required to inform Insight about the litigation hold. If Ecolab informs Insight that a particular device is subject to a litigation hold, it "will be kept in a secure location." Statement of Work, Section 3.2.5. Devices subject to a litigation hold or legal hold are not altered, modified, or destroyed. If Ecolab does not identify a device as being subject to a litigation hold, Insight follows its routine procedures for redeployment, repair, or disposal. Among the reasons that Ecolab may contact Insight to place a device on a litigation hold is the

departure of an Ecolab employee to work for a competitor. In those circumstances, Ecolab has in the past contacted Insight via email with the email subject line "LITIGATION PRESERVATION NOTICE."

10.     Insight assigns a group of technicians to address day-to-day needs for devices issued and collected on Ecolab's behalf, and these technicians are available to assist with locating devices for preservation, if requested.

11.     Insight's records reflect that Anthony Ridley, who at one time was an Ecolab employee, sent three devices to Insight between May 1, 2021, and August 1, 2021. These devices included (1) a laptop bearing Serial No. 5CG82658K7 (the "First Laptop"); (2) a laptop bearing Serial No. 5CG84132TP (the "Second Laptop"); and (3) a "mobile drive" (the "Mobile Drive").

**Mr. Ridley's First Laptop**

12.     The First Laptop was received by Insight between June 10 and July 12, 2021, and redeployed to a new user. Insight later sent the First Laptop to Sipi Corporation, a third-party IT asset disposal company, for disposal. Sipi provided a Certificate of Erasure confirming that it had "erased" "all data" on the First Laptop (Serial #5CG82658K7) on January 16, 2023.

13.     Based on a targeted search and review of Insight's business records, there was not a request from Ecolab that Insight transfer any data from the First Laptop to any other location.

14.     Based on a targeted search and review of Insight's business records, there was not a request from Ecolab to place the First Laptop under a legal hold or litigation hold.

15.     Based on a targeted search and review of Insight's business records, there was not a request from Ecolab that Insight preserve the First Laptop.

16.  Based on a targeted search and review of Insight's business records, there was not a request from Ecolab that Insight retrieve or secure the First Laptop for purposes of any litigation.

**Mr. Ridley's Second Laptop**

17.  Mr. Ridley returned the Second Laptop (Serial # 5CG84132TP) to Insight on July 12, 2021. The device was received by Shreya Patel, an Insight employee. Accompanying the Second Laptop were three accessories: a USB-C Dock G4, a 65-watt charger, and a "mobile drive."

18.  The Second Laptop was redeployed to a new user on September 10, 2021. Insight later sent the Second Laptop to Sipi Corporation, a third-party IT asset disposal company, for disposal. Sipi provided a Certificate of Erasure confirming that it had "erased" "all data" on the Second Laptop on January 31, 2023.

19.  Based on a targeted search and review of Insight's business records, Ecolab did not request that Insight transfer any data from the Second Laptop to any other location.

20.  Based on a targeted search and review of Insight's business records, Ecolab did not place the Second Laptop under a legal hold or litigation hold.

21.  Based on a targeted search and review of Insight's business records, Ecolab did not request that Insight preserve the Second Laptop.

22.  Based on a targeted search and review of Insight's business records, Ecolab did not request that Insight retrieve or secure the Second Laptop for purposes of any litigation.

**The "Mobile Drive"**

23.  Mr. Ridley returned a "mobile drive" to Insight on July 12, 2021. Unless instructed otherwise by the customer, Insight collects mobile drives until there are a sufficient number to justify sending them in a pallet to Sipi for mass destruction.

JA-46

24.     Based on a targeted search and review of Insight's business records, Ecolab did not request that Insight retrieve, secure, or search for the "mobile drive" until January 2022.  On January 12, 2022, an Ecolab employee contacted Insight to request the serial number for a "mobile drive" returned by Anthony Ridley.   On January 14, 2022, another Ecolab employee contacted Insight and stated that "Legal counsel is reaching out asking about this terminated user's old assets," and specifically asked about the location of a "'mobile drive' that was returned back in July 2021."   Upon information and belief, Insight sent the mobile drive to SIPI for destruction.

25.     Based on a targeted search and review of Insight's business records, Ecolab did not request that Insight transfer or harvest any data from the "mobile drive" to any other location.

26.     Based on a targeted search and review of Insight's business records, Ecolab did not place the "mobile drive" under a legal hold or litigation hold.

27.     Based on a targeted search and review of Insight's business records, Ecolab did not inquire about the "mobile drive" until January 2022.

\*       \*       \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in Chandler, State of Arizona, on the 27th day of April 2023.

Susan Triggs

Susan Triggs

Message
_____

**From:**       Sheppard, Bryan [besheppard@ecolab.com]
**Sent:**       1/19/2022 10:57:06 AM
**To:**         Coulter, Janice [janice.coulter@ecolab.com]; Patel, Shreya [Shreya.Patel@insight.com]; Nizamuddin, Sarah
                [sarah.nizamuddin@insight.com]; Elder, Allan [Allan.Elder@insight.com]; Miller, Greg [Greg.Miller@insight.com]
**CC:**         Lamanna, Bill [wlamanna@ecolab.com]
**Subject:**    RE: Legal issue: US5CG84132TP

_____

**External Message - Please be cautious when opening links or attachments in email**

Janice,

My bad for not making sure that you were on the email.  Shreya did not find any USB drive.

Bryan

---

**From:** Coulter, Janice <janice.coulter@ecolab.com>
**Sent:** Wednesday, January 19, 2022 9:55 AM
**To:** Patel, Shreya <Shreya.Patel@insight.com>; Nizamuddin, Sarah <sarah.nizamuddin@insight.com>; Elder, Allan
<Allan.Elder@insight.com>; Miller, Greg <Greg.Miller@insight.com>
**Cc:** Lamanna, Bill <wlamanna@ecolab.com>; Sheppard, Bryan <besheppard@ecolab.com>
**Subject:** RE: Legal issue: US5CG84132TP

Morning All,

Someone from Legal just reached out asking about the hard drive again. Did we find it or are we still looking for it?

Thanks,
Janice

---

**From:** Coulter, Janice
**Sent:** Friday, January 14, 2022 11:03 AM
**To:** Patel, Shreya <Shreya.Patel@insight.com>; Nizamuddin, Sarah <sarah.nizamuddin@insight.com>; Elder, Allan
<Allan.Elder@insight.com>; Miller, Greg <Greg.Miller@insight.com>
**Cc:** Lamanna, Bill <wlamanna@ecolab.com>; Sheppard, Bryan <besheppard@ecolab.com>
**Subject:** RE: Legal issue: US5CG84132TP

Lol...sorry for the doubled efforts Shreya! I didn't realize Legal had already reached out to Bryan as well.

Thanks for your help!

Janice

---

**From:** Patel, Shreya <Shreya.Patel@insight.com>
**Sent:** Friday, January 14, 2022 10:55 AM
**To:** Coulter, Janice <janice.coulter@ecolab.com>; Nizamuddin, Sarah <sarah.nizamuddin@insight.com>; Elder, Allan
<Allan.Elder@insight.com>; Miller, Greg <Greg.Miller@insight.com>
**Cc:** Lamanna, Bill <wlamanna@ecolab.com>
**Subject:** RE: Legal issue: US5CG84132TP

**Caution:** This email message originated from outside of the organization. **DO NOT CLICK** on links or open attachments unless you
recognize the sender and know the content is safe. If you think it is suspicious, please **report as suspicious**.

Good morning,

I am looking for this hard drive since yesterday, did not find any record need some time to check in the warehouse. Bryan Sheppard is looking for the same thing. I am hopping to find it.

Thanks,

---

**From:** Coulter, Janice <janice.coulter@ecolab.com>
**Sent:** Friday, January 14, 2022 8:59 AM
**To:** Nizamuddin, Sarah <Sarah.Nizamuddin@insight.com>; Patel, Shreya <Shreya.Patel@insight.com>; Elder, Allan <Allan.Elder@insight.com>; Miller, Greg <Greg.Miller@insight.com>
**Cc:** Lamanna, Bill <wlamanna@ecolab.com>
**Subject:** Legal issue: US5CG84132TP
**Importance:** High

External Message - Please be cautious when opening links or attachments in email

Morning All,

Legal counsel is reaching out asking about this terminated user's old assets. I did some research and it appears the majority of his old assets have either been disposed of or wiped. However, there is a question on a "mobile drive" that was returned back in July 2021 (see below).

Is it safe to assume a "mobile drive" is an external portable hard drive? If so, where would it have been placed? Can it be found at this point?



Thanks for your help,
Janice

**Janice Coulter**
IT Business Process Analyst
1601 West Diehl Road, Naperville, IL 60563
**M** 630 488 6315
**E** janice.coulter@ecolab.com

INSIGHTR-00000055

| | |
|---|---|
| Date: | Wednesday, January 12 2022 04:55 PM |
| Subject: | RE: USB Drive |
| From: | Patel, Shreya <Shreya.Patel@insight.com> |
| To: | Sheppard, Bryan <besheppard@ecolab.com>; |
| Attachments: | image001.png |

Hello Bryan,
I am sorry, tried but don't have any record of it.
Thanks,

---

**From:** Sheppard, Bryan <besheppard@ecolab.com>
**Sent:** Wednesday, January 12, 2022 2:28 PM
**To:** Patel, Shreya <Shreya.Patel@insight.com>
**Subject:** RE: USB Drive

<span style="background:black;color:white">External Message - Please be cautious when opening links or attachments in email</span>

Not a problem. Thanks for taking a look.
Bryan

---

**From:** Patel, Shreya <Shreya.Patel@insight.com>
**Sent:** Wednesday, January 12, 2022 2:23 PM
**To:** Sheppard, Bryan <besheppard@ecolab.com>
**Subject:** RE: USB Drive

> **Caution:** This email message originated from outside of the organization. **DO NOT CLICK** on links or open attachments unless you recognize the sender and know the content is safe. If you think it is suspicious, please **report as suspicious**.

Hello,
I am sorry for late response. I was at lunch.
Give me some time to investigate it.
Thanks,

---

**From:** Sheppard, Bryan <besheppard@ecolab.com>
**Sent:** Wednesday, January 12, 2022 1:14 PM
**To:** Patel, Shreya <Shreya.Patel@insight.com>
**Subject:** USB Drive

<span style="background:black;color:white">External Message - Please be cautious when opening links or attachments in email</span>

Shreya,
Please take a look at the below Service Now entry. I have a couple of questions.
First question, in the "additional accessories included", you list "mobile drive" . I am assuming that is an external usb drive of some type. Is that correct?
My second question may sound a bit ridiculous, but I need to ask it. Do you remember anything about this mobile drive? Any chance the serial number was recorded somewhere? I know this was back in July of last year, but I have been asked to see what I might be able to find out.

 Shreya Patel (20337632)

Your device has been received at the depot on: 7/12/2021
Assigned User Name: Anthony Ridley (00116331)
Device Received: 5CG84132TP
Tracking: 281165642252
INC/TASK: N/A
Additional Accessories included: USB-C Dock G4, 65w charger, mobile drive

Thank you Shreya.

**Bryan Sheppard**

Device Operations Manager

Enterprise Infrastructure Services

**ECOLAB** 655 LONE OAK RD, EAGAN, MN 55121

*Visit* IT Help Center *and "Chat" for support.*

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain proprietary and privileged information for the use of the designated recipients named above. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Message

| | |
|---|---|
| **From**: | Herrera, Jaqueline [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=09C9007F788449F8933AE9CCD405ED29-JHERRERA1@NALCO.COM] |
| **Sent**: | 7/1/2021 9:50:33 AM |
| **To**: | Zinnel, Judy [judy.zinnel@ecolab.com]; Morrow, Tracy (F&B) [tracy.morrow@ecolab.com] |
| **CC**: | Leme, Luciano [luciano.leme@ecolab.com]; Tambelli, Nathalia [nathalia.tambelli@ecolab.com]; Roller, Andrew [andrew.roller@ecolab.com] |
| **Subject**: | FW: Anthony Ridley Resignation |
| **Importance**: | High |

Hi Judy and Tracy,
Anthony Ridley resign today and we need to shutdown the information to him. What is the process to do so?

P.S: He is going to the competition.

Thanks,
Jackie

---

**From:** Herrera, Jaqueline
**Sent:** Thursday, July 1, 2021 9:08 AM
**To:** Leme, Luciano <Luciano.Leme@ECOLAB.com>; Mahre, Kristin <Kristin.Mahre@ecolab.com>
**Subject:** FW: Anthony Ridley Resignation
**Importance:** High

Luciano and Kristin,
I just got off the phone with Anthony Ridley. Please, see his resignation letter below. He shared the reason of his resignation is because he got an offer from Chemtreat with >30% base salary increase + commissions. He will move back to a field sales leadership position leading the East Tennessee area.

Please, let me know if you'd like to hurdle on a quick call to discuss next steps.

Thanks,
Jackie

---

**From:** Ridley, Anthony <aridley@ecolab.com>
**Sent:** Thursday, July 1, 2021 8:52 AM
**To:** Herrera, Jaqueline <jherrera1@ecolab.com>
**Subject:** Anthony Ridley Resignation

Jackie,
I write to inform you that I am resigning from my position as Corporate Account Manager from Ecolab. My last day will be July 14, 2021, unless Ecolab choose to terminate my employment before the forementioned date.

Thank you so much for all the opportunities Ecolab has provided me. I have learned so much these past twenty-two years and will never forget the kindness of all of my colleagues.

Let me know if there is anything I can do to make this transition easier.

Thank you again for your years of support and encouragement.

**Exhibit 0090**

CONFIDENTIAL

PLAINTIFFSR-000000145

Best Regards,

**_Anthony Ridley_**
Corporate Account Manager – Food & Beverage
**ECOLAB** 1 ECOLAB PLACE  ST. PAUL, MN 55102
**M** 423 322 9506 **E** aridley@ecolab.com

Notice:
This message and any attachments are property of ECOLAB and are intended for the named recipients or entity to whom this message
is addressed.  If you have received this message in error please inform the sender via e-mail and destroy the message.  If you are not
the intended recipient you are not allowed to use, copy or disclose the contents or attachments in whole or part.

CONFIDENTIAL                                                                                    PLAINTIFFSR-000000146

# Employee Sales, Service, Marketing & Inventions Agreement

**This AGREEMENT is made and entered into between Ecolab Inc., a Delaware corporation, its parent companies, sister companies and subsidiaries** Anthony Ridley **(the "Employee").**

The Company's business is highly competitive and the Company has invested considerable sums of money in developing products, equipment, training programs, sales programs, technical service programs and account records for the proper servicing of its customers. Such records include, but are not limited to, the type of equipment installed, the prices paid by each customer, the names and positions of the customer's key personnel, the types of services performed, the frequency and destination of shipments, and the products generally ordered by the customer. The Company also invests substantial sums on the training and development of its employees and the development of technology. While employed with the Company, the Employee will receive valuable training under the Company's sales and/or service programs and will be entrusted with the information in the Company's account records and may be entrusted with information regarding Company's Trade Secrets. In return for the Company providing the Employee with this training and information, the Employee agrees not to use this training and information against the Company. The Employee also agrees that the restraints imposed by this Agreement are reasonable and necessary to protect the Company's business, goodwill, customer relationships, and the jobs of other Company employees.

Therefore, in consideration of the Employee's employment and the covenants and agreements contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.** The Company will employ the Employee in a sales or sales management position, or a service or service management position, for such period of time and for such compensation, including salary and employee benefits, as may be mutually agreeable to both parties. The compensation shall be deemed to be mutually agreeable to both parties if the Company pays the compensation and the Employee accepts the compensation. The Company may at any time, with or without adjusting the Employee's compensation, alter the geographic limits of any sales or service territory assigned to the Employee, or assign the Employee to a new territory, or change the customers assigned to the Employee. Both the Company and the Employee have the same right to terminate the employment with or without cause or notice at any time, and this at-will employment relationship may not be modified except in a writing signed by Employee and an authorized officer of the Company.

**2.** Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing, business strategies, business methods, and employees (including the particular skills, talents and abilities of those employees).

Employee hereby agrees that Employee will hold in a fiduciary capacity for the benefit of Company and shall not, directly or indirectly, use or disclose any Trade Secrets, as defined hereinafter, that Employee may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret.

The term "Trade Secret" as used in this Agreement shall mean information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

**(a)** derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

**(b)** is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

In addition to the foregoing and not in limitation thereof, Employee agrees that while employed with the Company and for a period of three (3) years after termination of Employee's employment with Company, Employee will hold in a fiduciary capacity for the

CONFIDENTIAL PLAINTIFFSR-000000241

benefit of Company and shall not, directly or indirectly, use or disclose any Confidential Information, as defined hereinafter, that Employee may have acquired (whether or not developed or compiled by Employee and whether or not Employee was authorized to have access to such Confidential Information) during the term of, in the course of, or as a result of Employee's employment by Company.

The term "Confidential Information" shall mean Company's confidential data or information which is valuable to Company but substantially inaccessible to the public and to competitors of Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets. Notwithstanding the foregoing, the term "Confidential Information" shall not include information that Employee can establish by competent proof: (i) was generally known to or accessible by the public at the time Company disclosed the information to Employee; (ii) became generally known to or accessible by the public after disclosure by Company through no act or omission by Employee; or (iii) was disclosed to Employee, after the Employee's termination of employment with the Company, by a third party having a bona fide right both to possess the information and to disclose the information to Employee, provided such third party is not subject to an obligation of confidentiality with respect to such information.

Employee understands Employee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that is made (a) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney if such disclosure is made solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and Employee does not disclose the Trade Secret except pursuant to a court order.

3.   Ecolab is committed to compliance with applicable federal, state and local laws. As such, nothing in this Agreement prohibits Employee from reporting possible violations of law to any government agency if such report is made in confidence and good faith to a federal, state or local government official, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit relating to such report. Nothing in this Agreement is to be construed to prohibit the Company from bringing any claims against Employee, including but not limited to, statutory claims for Trade Secret misappropriation. Nothing in this Agreement is to be construed to unlawfully limit any rights Employee may have under the National Labor Relations Act.

4.   When Company owned computers, computer devices, e-mail addresses, phones, and/or other electronic technology are issued to Employee, Employee shall conduct Company business and communicate with customers, vendors and the public regarding Company business only on the Company computer network and using such Company-provided electronic technology. Employee agrees that Employee will not transfer or store any Company information on any device or other storage medium (physical or virtual) not provided or authorized by the Company unless authorized to do so in writing by the Company. Employee has no right to privacy with respect to any data that is stored on any device issued to Employee by the Company and/or authorized for Employee to use for Company business. As soon as Employee begins to consider leaving the Company or Employee realizes Employee's employment with the Company has or will soon come to an end, Employee will not wipe, delete or transfer or cause any Company data to be wiped, deleted or transferred from any such device before returning the device to the Company.

5.   The Employee shall perform such services as may be assigned to Employee from time to time in accordance with the Company's policies and procedures. The Employee shall timely submit written sales and service reports using the Company's standard report forms. Employee will devote Employee's whole working time and ability to the services of the Company in such capacity as the Company from time to time shall direct. Employee further agrees that during the course of employment by the Company, Employee will not have any financial interest, whether direct or indirect, in any firm or organization engaged in competitive services or products. This provision is not intended to preclude personal investments of the Employee which do not require Employee's significant day-to-day attention and management. Employee agrees to promptly disclose to the Company any conflict of interest or employment matter which may be adverse to the Company's interest.

6.   During employment with the Company and for a period of one (1) year immediately following the termination of his employment with the Company, the Employee will not:

CONFIDENTIAL

PLAINTIFFSR-000000242

**(a)** solicit, encourage or induce any customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service;

**(b)** transact business with any Customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service.

During said one (1) year following termination, the employee also will not assist any Competing Firm to engage in the aforementioned activities prohibited by Subsections 6(a) and 6(b). A Competing Firm means any person or organization (including one owned in whole or in part by the Employee) which is engaged in the development, production, use, marketing or sale of a Competing Product or Competing Service. A Competing Product or Competing Service means any product or service which is the same as, or similar to, and competes with, a product or service of the Company which was part of the product or service line handled by the Employee, or by persons supervised by the Employee, during Employee's last year of employment with the Company. If the Employee violates the covenants contained in this Section, the term of said covenant shall be extended for one (1) year from and after the later of (a) the date on which the Employee permanently ceases such violation; or (b) the date on which any court issues an order or judgment enforcing the covenant; provided, that in no event shall the term of the covenant be extended for a term beyond twenty-four (24) months following termination of the Employee's employment with the Company.

**7.** During Employee's employment with Company and for a period of one (1) year immediately thereafter, Employee will not hire or induce, attempt to induce or in any way assist or act in concert with any other person or organization in hiring, inducing or attempting to induce any employee or agent of Company to terminate such employee's or agent's relationship with Company. This restriction is limited to those employees that Employee managed, or supervised, or had material contact with on the Company's behalf during the last twelve (12) months of Employee's employment with Company.

**8.** Employee will communicate and disclose in writing to Employee's manager or to such person as may be designated by the Company both during employment and thereafter, all inventions, discoveries, improvements, machines, devices, design, processes, products, software, treatments, formulae, mixtures, and/or compounds whether patentable or not as well as patents and patent applications (all collectively called "Inventions") made, conceived, developed or acquired by Employee or under which Employee acquired the right to grant licenses or become licensed, whether alone or jointly with others, during Employee's employment by the Company. All Employee's right, title and interest in, to and under such Inventions, including licenses and right to grant licenses, shall be the sole property of the Company and Employee hereby assign the same to the Company. Any Invention disclosed by Employee to anyone within one (1) year after termination of Employee's employment with the Company, which relates to any matters pertaining to, applicable to, or useful in connection with, the business of the Company shall be deemed to have been made or conceived or developed by Employee during Employee's employment by the Company, unless proved by Employee to have been made and conceived and developed after termination of Employee's employment with the Company.

**9.** For all Employee's Inventions, Employee will, upon request of the Company, during Employee's employment and thereafter:

**(a)** execute and deliver all documents which the Company shall deem necessary or appropriate to assign, transfer, and convey to the Company, all Employee's right, title, interest in and to Employee's Inventions, and enable the Company to file and prosecute applications for Letters Patent of the United States and any foreign countries on inventions as to which the Company wishes to file patent applications, and

**(b)** do all other things (including giving of evidence in suits and other proceedings) which the Company shall deem necessary or appropriate to obtain, maintain, and assert patents for any and all such inventions and to assert its rights in any inventions not patented

**10.** Employee's obligations under Sections 8 and 9 of this Agreement do not apply to Inventions for which no equipment, supplies, facility or Confidential Information of the Company was used, and which were developed entirely on Employee's own time unless the inventions relate to the business of the Company or to the Company's actual or demonstrably anticipated research or development or the inventions result from any work performed by Employee for the Company.

CONFIDENTIAL

PLAINTIFFSR-000000243

**11.**  Upon termination of Employee's employment and/or promptly upon request, the Employee will return in good order all Company property and information in the Employee's possession, custody or control.  Upon termination, Employee shall return all Company data, business information, credit cards, keys, automobiles and any other Company property in his possession. Employee shall not erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company.  For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/ or erase Company data from Employee's Company assigned phone and/or computer device.

**12.**  In the event the Employee violates, or the Company reasonably believes the Employee is about to violate, this Agreement, the Employee agrees that the Company is entitled to injunctive relief to prevent violation(s) and/or preserve the *status quo* and confidentiality of the Company's Confidential Information and Trade Secrets.  The Employee agrees that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and the Company will have the right to conduct forensic examination(s) of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions.  The Employee further agrees that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis.

**13.**  All of the provisions of the Agreement which are to be effective following termination of the Employee's employment, shall be effective regardless of whether such termination was voluntary or involuntary.  The Employee warrants that prior to entering into this Agreement he has disclosed to the Company any agreements with any previous employers which would prevent him from performing any duties for the Company.

**14.**  The restrictive covenants and provisions contained in this Agreement including but not limited to each section and subsections, are severable.  The parties further agree that if any of the restrictions set forth in any section and/or any paragraph and the subparagraphs contained therein shall be held not to be enforceable because they are overbroad for any reason whatsoever, it is agreed that the restriction shall be effective to such extent as it may be enforceable.  The parties specifically authorize a court of competent jurisdiction to strike, amend and/or alter such provisions to the extent necessary to render them reasonable and enforceable as this is the mutual intent of the Parties.  All references to Company shall be construed to include subsidiaries of Company.

**15.** This Agreement supersedes any previous agreements between the parties, written or oral, relating to this subject matter and may be amended or modified only in writing signed by the Employee and an authorized employee of the Company. Notwithstanding the previous sentence, should a court of competent jurisdiction invalidate the restrictive covenants set forth at Section 6 because of either: (1) lack of consideration, or (2) for being unenforceable and not subject to being reformed by severing or judicial modification, the next most recent agreement between Employee and Company containing such noncompete restrictions shall be given effect. If any of the provisions of this Agreement are held to be invalid or unenforceable by a court of competent jurisdiction or by an Arbitrator in an arbitration proceeding, such holding shall not invalidate any of the other provisions of this Agreement, it being intended that the provisions of this Agreement are severable.  This Agreement shall inure to the benefit of the Company's successors or assigns.

**16.**  In any successful proceeding brought to enforce the Company's rights under this Agreement, the Company shall recover court costs and reimbursement of Company's attorney's fee and disbursements.  These damages are in addition to any other relief, including injunctive relief, to which the Company may be entitled.

**17.** This Agreement shall not become effective or be binding upon the parties until accepted on behalf of the Company by the signature hereon of an authorized employee of the Company.

Please review this Employee Agreement and sign with your **full legal name**.

I have carefully read and understand and agree to all of the terms of this agreement.

Accepted by:

CONFIDENTIAL

PLAINTIFFSR-000000244

Ecolab Inc.

Laurie Marsh

Executive Vice President, Human Resources

1 Ecolab Place, St. Paul, MN 55102

09/10/2020

**Signature:** *Anthony Ridley*
Anthony Ridley (Sep 16, 2020 13:45 EDT)

**Email:** aridley@ecolab.com

CONFIDENTIAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL



| | | | |
|---|---|---|---|
| **Report Title:** | Computer Details | | |
| **Run Date and Time:** | 01-30-2023 11:28:25 AM Central Standard Time | | |
| **Run by:** | Jack Anderson (20124865) | | |
| **Table name:** | cmdb_ci_computer | | |

## Computer

| | | | |
|---|---|---|---|
| Name: | USET5CG82658K7 | Company: | ecolab |
| Asset tag: | USET5CG82658K7 | Serial number: | 5CG82658K7 |
| Manufacturer: | HEWLETT-PACKARD | Model ID: | HP EliteBook x360 1030 G2 |
| Asset: | USET5CG82658K7 - HP EliteBook x360 1030 G2 | Assigned to (SCCM): | Katie Vetter (20117622) |
| Primary status: | In Inventory | Owned by: | |
| | | Azure AD Device Id: | 775d2810-5b10-449f-99cc-b1208c798666 |

## General

| | | | |
|---|---|---|---|
| Company: | ecolab | Primary status: | In Inventory |
| Report Region: | North America | Secondary status: | |
| Report Division: | | Asset recovery: | |
| Refresh communication: | 0 | Asset recovery changed: | 04-13-2022 02:22:01 PM |
| Tracking Number: | | Recovery Communication: | 0 |
| | | Proof of Delivery: | |

| Asset Information: |
|---|
| US |

| Additional info: |
|---|

| Comments: |
|---|

## SCCM

| | | | |
|---|---|---|---|
| Serial number (SCCM): | 5CG82658K7 | Operating System: | Microsoft Windows 10 Enterprise |
| Asset tag (SCCM): | IN-5CG82658K7 | IP Address: | |
| Model ID (SCCM): | HP EliteBook x360 1030 G2 | CPU core count: | 1 |
| Manufacturer (SCCM): | Hewlett-Packard | CPU manufacturer: | Hewlett-Packard |


| Last Scan: | 03-23-2022 02:03:28 PM | CPU type: | Intel(R) Core(TM) i5-7300U CPU |
|---|---|---|---|
| Shared Usage: | No | SCCM Feed: | EcolabCM12 |

**History**

Work Notes:


04-13-2022 01:51:09 PM - Norma Hoffman (20222284) (Work Notes)
Third retrieval email 4-13-22 - nrh

04-06-2022 10:48:25 AM - Norma Hoffman (20222284) (Work Notes)
Second Retrieval email sent 4-6-22 - nrh

03-31-2022 09:58:11 AM - Norma Hoffman (20222284) (Work Notes)
First retrieval email sent 3-31-22 - nrh

11-15-2021 04:48:18 PM - Paula Brown (20330160) (Work Notes)
Deployed per INC3662358 | Closed By: Paula Brown | Closure Notes:

08-04-2021 03:57:23 PM - Paula Brown (20330160) (Work Notes)
Set Recovery per INC3548347 | Closed By: Paula Brown | Closure Notes:

07-09-2021 12:40:12 PM - Paula Brown (20330160) (Work Notes)
Deployed per INC3520633 | Closed By: Paula Brown | Closure Notes:
Deployed Asset : EliteBook x360 1030 G2 : 5CG82658K7
Deployed to : Julie Palmer (20134374)
Accessories : No Accessories
Deploy Via FedEx : 774217844161

Recovery Asset : EliteBook x360 1030 G2 : 5CG80648BD
Status : Repair : Reason : USB-C port is damage
Return Via FedEx : 791173099979

06-09-2021 12:11:13 PM - Paula Brown (20330160) (Work Notes)
Set Recovery per INC3487710 | Closed By: Paula Brown | Closure Notes:
Deployed Asset : EliteBook x360 1030 G2 : 5CG84132TP
Deployed to : Anthony Ridley (00116331)
Accessories : No Accessories
Deploy Via FedEx : 773950320346


Recovery Asset : EliteBook x360 1030 G2 : 5CG82658K7
Status : Repair : Reason : Computer : Have constant buzzing and humming inside of it
Return Via FedEx : 791164334151


03-18-2021 03:37:12 PM - Paula Brown (20330160) (Work Notes)
Deployed per INC3386967 | Closed By: Paula Brown | Closure Notes:
Deployed Asset : EliteBook x360 1030 G2 : 5CG82658K7
Deployed to : Anthony Ridley (00116331)
Accessories : No Accessories
Deploy Via FedEx : 773201316302

Recovery Asset : EliteBook x360 1030 G2 : ? USNB1804308KEXE
Status : Repair : Reason : EliteBook x360 1030 G2 : Bottom part snapped
Return Via FedEx : 791139450697


12-07-2020 10:39:22 AM - ABBASQA (Work Notes)
Moving to inventory 12/4/2020


12-02-2020 12:56:09 PM - ABBASQA (Work Notes)
Your device has been received at the depot on:    12/1/2020
Assigned User Name:    Colleen Hirner (20310548)
Device Received:    5CG82658K7
Tracking:    N/A
INC/TASK:    N/A
Additional Accessories included:    none


11-05-2020 04:22:21 PM - LAMBEJ1 (Work Notes)
Awaiting Fedex pickup - shipping to Insight for NRC stock


11-08-2019 04:02:22 PM - MONIORY (Work Notes)
Case Number: INC2743857
New Computer (Asset Tag/Serial): USET5CG806473P/5CG806473P
Old Computer (Asset Tag/Serial): USET5CG82658K7/5CG82658K7
Tracking Number: 776942534794

Run By : Jack Anderson (20124865)

01-30-2023 11:28:25 AM Central Standard Time

Case 1:22-cv-00050-TRM-SKL    Document 255-2    Filed 05/25/23    Page 64 of 990    PageID #:
5242

CONFIDENTIAL

PLAINTIFFSR-000000945


Notes: Imaged PC, installed apps and configured the machine

11-08-2019 12:16:12 PM - CASSECH (Work Notes)
Colleen Hirner (20310548)
USET5CG82658K7
780804907849
INC2743857 - loud grinding noise
Battery
Sent to: Breakfix - Ryan Monio

08-28-2018 11:51:29 AM - HOESCMA (Work Notes)
Case Number: TASK0822002
New Computer (Asset Tag/Serial): USET5CG82658K7/5CG82658K7
FedEx Tracking Number: 773080570860 & 773080570837
Imaged PC, installed software and configured the machine.
Machine Deployed with: dock, keyboard/mouse, and 24" Monitor
Old Computer (Asset Tag/Serial) : N/A

07-09-2018 04:42:51 PM - Nick Ashby (77013902) (Work Notes)
Arrived 7/9 via UPS 5710724833

| | |
|---|---|
| **Related List Title:** | IP Address List |
| **Table name:** | cmdb_ci_ip_address |
| **Query Condition:** | Nic Configuration Item = USET5CG82658K7 AND Nic Primary status != Absent AND Primary status != Absent |
| **Sort Order:** | Name in ascending order |

None

| | |
|---|---|
| **Related List Title:** | DNS Name List |
| **Table name:** | cmdb_ci_dns_name |
| **Query Condition:** | Sys ID in |
| **Sort Order:** | Name in ascending order |

CONFIDENTIAL

PLAINTIFFSR-000000946

None

CONFIDENTIAL

PLAINTIFFSR-000000947



## Employee Data Sheet for Anthony Ridley (Corporate Account Manager - F&B) #48937

July 23rd 2021, 4:40:01 pm GMT

Generated by: jennifer.semmler@ecolab.com

### Case Details

| Severity | Unknown |
|---|---|
| Type | Employee Data Review |
| Owner | Jennifer Semmler |
| roles | N/A |
| Created | 2021-07-23 16:34:05.654835672 +0000 UTC |
| Occurred | 2021-07-23 16:34:05.654835538 +0000 UTC |
| Last Updated | 2021-07-23 16:38:56.721436107 +0000 UTC |
| Total Time | N/A |
| Closed Time | 0001-01-01 00:00:00 +0000 UTC |

**Exhibit 0023**

CONFIDENTIAL

PLAINTIFFSR-000000955

## Employee Information

| | |
|---|---|
| **Employee Display Name** | Ridley, Anthony |
| **Employee Email** | aridley@ecolab.com |
| **User Id** | aridley |
| **Title** | Corporate Account Manager - F&B |
| **Department** | F&B NA Corp Accts Protein |
| **Manager Name** | Herrera, Jaqueline |
| **Manager Email Address** | jherrera1@ecolab.com |

## Summary

| | |
|---|---|
| **Summary** | Separation of employment for employee. The employee has gone to work for a competitor (ChemTreat). Request for data review of data movement in the weeks prior to his departure. |

## System Access Overview

| | |
|---|---|
| **System Access Overview** | |
| **Risk Influence** | Low |

## DLP Files Transferred Data

**DLP Files Transferred Data**

DLP activity for Mr. Ridley can be reviewed accessing the link at the end of this report. The data-export-2021-07-23-11_24_30 report contains a large amount of data; using the Sort & Filter feature will aid the business in reviewing the data. Columns of interest may include:

Column AM shows the file path
Column AY indicates the original file name
Column DG indicates where the file was located
Column EH shows action for the file

## Cloud Activity

**Cloud Activity**

OneDrive and Sharepoint activity can also be reviewed at the link provided at the end of this report. Proofpoint_Fri_23_Jul_2021_11_07_36

CONFIDENTIAL

PLAINTIFFSR-000000956

## Email Summary

**Email Summary**

Mr. Ridley can has a personal email account; aridley75@hotmail.com. Not a lot of activity to this account, the messages for 2021 can be reviewed. The pst file will need to be opened within an Outlook Client.

PW: sandbox23

## Conclusions/Recommendations

**Recommendations**

Recommendation for business to review employee data and email files. If you have questions please let me know.

https://ecolab-my.sharepoint.com/:f:/r/personal/jennifer_semmler_ecolab_com/Documents/Investigations/Anthony%20Ridley?csf=1&web=1&e=9tYiEc

CONFIDENTIAL

PLAINTIFFSR-000000957



| | | | |
|---|---|---|---|
| **Report Title:** | Asset Portfolio Details | | |
| **Run Date and Time:** | 02-02-2023 02:11:31 PM Central Standard Time | | |
| **Run by:** | Jack Anderson (20124865) | | |
| **Table name:** | alm_hardware | | |

## Asset Portfolio

| | | | |
|---|---|---|---|
| Serial number: | 5CG84132TP | Configuration Item: | US5CG84132TP - EliteBook x360 1030 G2 |
| Asset tag: | US5CG84132TP | Purchased: | 10-17-2018 |
| Class: | Asset Portfolio | Usage type: | |
| Model ID: | HP EliteBook x360 1030 G2 | Location code: | NA-US-HAN-DPT |
| Model ID Raw Data Model ID: | HP EliteBook x360 1030 G2 | Location: | |
| Model category: | Computer | ADP Qualified: | false |
| Model standard: | Tablet | | |
| Manufacturer: | HEWLETT-PACKARD | | |

## General

| | | | |
|---|---|---|---|
| Company: | Ecolab | Primary status: | In Repair |
| Report region: | North America | Secondary status: | Awaiting Disposal |
| Report division: | | Asset recovery: | |
| Refresh Communication: | 0 | Recovery Communication: | 0 |
| Tracking Number: | | Proof of Delivery: | |

Asset information:

US

Additional info:

Comments:

## Financial

| | | | |
|---|---|---|---|
| Project number: | | GL account: | |
| Cost: | $1,265.00 | Cost center: | |
| Invoice number: | MBP20181000006325 | Po reference: | |

**Exhibit 0410**

CONFIDENTIAL

PLAINTIFFSR-000000970


| Vendor: | Insight | Acquisition method: | |
|---|---|---|---|
| Owning group: | | Charge Back Date: | |
| Legal Entity: | | Charge Back Notes: | |

## Ownership

| Wannabe class: | Computer | Owned by: | |
|---|---|---|---|
| Assigned to (SCCM): | Matthew Rocca (00100024) | Owned by User Location: | |
| Assigned to (SCCM) User Location: | USA-Remote Worker-California | Owned by User ID: | |
| Assigned to (SCCM) User ID: | MROCCA | Owned by Organizational Unit: | |
| Assigned to (SCCM) Organizational Unit: | NA Chemical Sales | Owned by Division: | |
| Assigned to (SCCM) Division: | NW Water Heavy Division | Owned by Title: | |
| Assigned to (SCCM) Title: | AVP Sales - NW | Owned by Employee number: | |
| Assigned to (SCCM) Employee number: | 100024 | Recovery Communication: | 0 |
| Assigned to (SCCM) Region: | North America | Owned by Region: | |
| Assigned Date: | 09-14-2021 | Owned By Date: | 06-13-2022 |

## Hardware Detail

| Discovery source: | Manual Entry | RAM (MB): | 16,259 |
|---|---|---|---|
| Validation: | | WAN Enabled: | false |
| Model Code: | | Asset Liability: | |
| Warranty expiration: | 10-17-2021 | Keyboard Localization: | |
| Manufacturer: | HEWLETT-PACKARD | Days Outstanding: | 94 Days 23 Hours |
| Manufacturer Raw Data Manufacturer: | | | |
| City: | | | |
| Correlation ID: | 17131196 | | |

## Communication Device

| Country Code: | | Provider: | |
|---|---|---|---|
| Area Code: | | WiFi Only: | false |
| Device ID: | | | |
| Storage (GB): | | | |
| Phone other: | | | |


| Service plan data: | |
| --- | --- |
| Service plan voice: | |

## MDM

| Enrolled User: | Matthew Rocca (00100024) | Last Seen: | 03-11-2022 07:06:04 PM |
| --- | --- | --- | --- |
| Device Name: | IN-5CG84132TP | Imei/esn: | 354577094668240 |
| Enrolled On: | 09-13-2021 10:59:25 PM | SIM Number: | |
| Enrollment Status: | Intune | Phone Number: | |
| WS1 Model: | HP EliteBook x360 1030 G2 | Airwatch License Assigned: | false |

## SCCM

| Serial Number (SCCM): | 5CG84132TP | Operating System: | Microsoft Windows 10 Enterprise |
| --- | --- | --- | --- |
| Asset tag (SCCM): | IN-5CG84132TP | IP address: | |
| Model ID (SCCM): | HP EliteBook x360 1030 G2 | CPU Core Count: | 1 |
| Manufacturer (SCCM): | Hewlett-Packard | CPU Manufacturer: | Hewlett-Packard |
| Last scan: | 03-07-2022 01:36:11 PM | CPU Type: | Intel(R) Core(TM) i5-7300U CPU |
| SCCM Usage: | | SCCM Feed: | EcolabCM12 |

## History

| Work notes(work_notes): | |
| --- | --- |


07-12-2022 10:24:14 AM - Shreya Patel (20337632) (Work notes(work_notes))
Moving to disposal 7/12/2022

06-13-2022 04:28:13 PM - Shreya Patel (20337632) (Work notes(work_notes))
Your device has been received at the depot on:   6/13/2022
Assigned User Name:   Matthew Rocca (00100024)
Device Received:   5CG84132TP
Tracking:   274146978130
INC/TASK:   N/A
Additional Accessories included:   65W CHARGER

03-10-2022 12:04:25 AM - System (Work notes(work_notes))
Set asset recovery per REQ0907531

09-10-2021 03:46:20 PM - Paula Brown (20330160) (Work notes(work_notes))
Deployed per INC3581181
Deployed Asset : EliteBook x360 1030 G2 : 5CG84132TP
Deployed to : Matthew Rocca (00100024)
Accessories : No Accessories
Deploy Via FedEx : 774768618222

Recovery Asset : EliteBook x360 1030 G2 : 5CG8020J9Y
Status : Repair : Reason : USA - No Sound - HP EliteBook - new or replacement computer.
Return Via FedEx : 791191091212

08-06-2021 02:46:39 PM - Shreya Patel (20337632) (Work notes(work_notes))
Moving to inventory 8/5/2021

07-12-2021 04:06:59 PM - Shreya Patel (20337632) (Work notes(work_notes))
Your device has been received at the depot on:   7/12/2021
Assigned User Name:   Anthony Ridley (00116331)
Device Received:   5CG84132TP
Tracking:   281165642252
INC/TASK:   N/A
Additional Accessories included:    USB-C Dock G4, 65w charger, mobile drive

06-09-2021 09:44:40 AM - Shreya Patel (20337632) (Work notes(work_notes))
Moving to inventory 6/4/2021

05-19-2021 03:29:11 PM - Shreya Patel (20337632) (Work notes(work_notes))

PLAINTIFFSR-000000973


Your device has been received at the depot on:   5/19/2021
Assigned User Name:   Jacquelyn Stark (20317837)
Device Received:   5CG84132TP
Tracking:   786744265598
INC/TASK:   N/A
Additional Accessories included:   Charger (45W)

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

Message

**From**: Irwin, Benjamin [benjamin.irwin@ecolab.com]
**Sent**: 10/22/2020 12:49:57 PM
**To**: Mackie, Karry [kamackie@ecolab.com]
**Subject**: RE: Tyler Bates Phone Screen

Yes, I like the sales experience and multiple industries. Local is great to see too.

**Benjamin Irwin**
Area Manager – WL 143 Central Illinois

**NALCO Water | An Ecolab Company**
**T/M** 217 891 2398 **E** benjamin.irwin@ecolab.com

---

**From:** Mackie, Karry <kamackie@ecolab.com>
**Sent:** Thursday, October 22, 2020 12:26 PM
**To:** Irwin, Benjamin <benjamin.irwin@ecolab.com>
**Subject:** FW: Tyler Bates Phone Screen

Fyi…..Once I get your paperwork approved on Friday, I'd like you to interview him first if you like his resume.

Thanks,


Karry

---

**From:** Burkett, Laurel <laurel.burkett@ecolab.com>
**Sent:** Thursday, October 22, 2020 9:56 AM
**To:** Mackie, Karry <kamackie@ecolab.com>
**Subject:** FW: Tyler Bates Phone Screen

Hi Karry,

Here's a candidate for the Chattanooga opening. He originally applied to this position before the hiring freeze and he is still interested. I would recommend moving forward with him.

Would you like for me to set up a phone interview for you?

Thank you,

**Laurel Burkett** (she, her)
Talent Acquisition Specialist I

---

**From:** Burkett, Laurel
**Sent:** Friday, March 6, 2020 3:13 PM
**To:** Ridley, Anthony <aridley@ecolab.com>
**Subject:** Tyler Bates Phone Screen

Hi Anthony,

CONFIDENTIAL

PLAINTIFFSR-000002001

I spoke with Tyler Bates this week. He sounded great over the phone. He said that he is looking to relocate to Chattanooga because that's where his girlfriend lives. Sounds like he is jack of all trades with his current company. He said that one of his biggest accomplishments has been that he has never ran out of fuel at any of the locations he manages. This is huge as it saves the company a lot of money. Compensation expectation is 65K-70K. I would recommend moving forward with him.

Thank you and have a great weekend,

**Laurel Burkett**
Talent Acquisition Specialist I

**NALCO Water | An Ecolab Company** 1601 W. DIEHL ROAD, NAPERVILLE, IL 60563
**M** 312-914-6964 **E** laurel.burkett@ecolab.com

CONFIDENTIAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

| From: | "Anthony Ridley" <aridley75@hotmail.com> |
|---|---|
| Sent: | Thu, 1 Jul 2021 17:26:23 -0500 |
| To: | "Anthony Ridley" <aridley75@hotmail.com> |
| Subject: | HR Information |
| Attachments: | Benefits Overview When Separating.pdf, EAPBrochure pdf.pdf, Terminated |

Associate Access to Workday.pdf, 2021 Benefits Vendor Contact List.pdf

Dear Anthony,

We were recently notified that you have chosen to resign from Ecolab.

As an organization, we look for ways to improve our workplace and employee experience. We would appreciate you taking approximately 10 minutes to answer the following questions as honestly as possible. The information gathered from this survey is reviewed on an aggregate level; however, your individual responses are treated as confidential, and will not be shared as coming specifically from you.
https://www.surveymonkey.com/r/IndustrialExitSurvey

If you prefer to speak with a Human Resource representative directly about your Ecolab experience, please contact us and we will coordinate a time to meet.

Attached you will find helpful separation information:
- Benefits Over when Separating
- Benefits Vendor Contact List
- Employee Assistance Brochure
- Workday job aid to access workday post-employment for limited access to view pay slips, year-end tax information and update contact information

***Other Non-HR Important Items:***
- Please work with your manager to return all company assets, including but not limited to items such as: fleet vehicle, company laptop, mi-fi devices, training manuals, etc…
  - You may request a shipping label to return your items to corporate.
  - OR, you may return your items directly to your manager.
- If you have a company fleet vehicle, coordinate the vehicle pick up with LeasePlan.
  - Fleet Department 1-800-753-5338
  - **IMPORTANT:** Enter outstanding personal mileage months into the LeasePlan reporting system – you have up to 30 days after your separation date. Failure to report person mileage will result in charges.
  - If >30 days, submit via email to Ecolab.fleet@leaseplan.com to have the mileage manually entered
- If you are on the Company mobile plan, you'll want to start the process to transfer your mobile number
  - Mobile Services 1-888-209-3733 or mobile.services@ecolab.com between 7am-7pm CST Monday-Friday
  - For additional information, visit the Mobile Services page on Inside Ecolab.
  - You will need to return your company owned device.
- Reconcile all final expenses

RIDLEY- 0000246 (Confidential)

- o Please make every effort to submit remaining expense reports prior to leaving; if you have un-reconciled expenses, receipts or recurring charges, please provide them to your manager at the time of termination.
- o For additional assistance, contact finance-myexpense@ecolab.com or call 855-332-6522, opt. 2

We are grateful for your time with Ecolab – and we wish you well in your future endeavors.

Kind regards,

**Industrial HR Operations - NA**
1601 W. DIEHL ROAD, NAPERVILLE, IL 60563
Kristin Mahre (HR): 1 (651) 250-4808 / (612) 414-6291
Judy Zinnel:  (651) 250-4464
**E** AskHR_IndustrialNA@ecolab.com

RIDLEY- 0000247 (Confidential)



11:33  5G 16

TB
Tyler ›

Sep 3, 2020 at 4:43 PM

Hey Anthony, I wanted to check with you. Hope things are going well. Are you seeing a light at the end of tunnel with the hiring freeze?

Sep 15, 2020 at 1:08 PM

I won't bug you too much but I noticed there is a technical sales rep position open in Nashville. Hopefully that's a good sign for you to able to start hiring again.

Sep 30, 2020 at 10:26 AM

Address: 133 Gholdston Drive. Dayton, TN 37321

Thanks!

Oct 15, 2020 at 8:46 AM

Location: Chattanooga, TN

Apply

iMessage

Cash

Ridley- 0000593 (Confidential)

11:34 · · · · 5G 16

TB
Tyler ›

Oct 15, 2020 at 8:46 AM



Location: Chattanooga, TN

Apply

**About this job**
What we offer
Our culture

Apply

<< Back to Search Results

District Representative
**Job Description**

Is this the same job?

Oct 15, 2020 at 10:21 AM

What group is it for?

As far as I can tell it's technical sales rep for Nalco Water. In Chattanooga

· Generate and execute sales plans in existing customer base and in assigned competitively-held accounts, to

iMessage

Ridley- 0000594 (Confidential)



11:34  •••• 5G 16

TB
Tyler ›

Oct 15, 2020 at 10:21 AM

What group is it for?

As far as I can tell it's technical sales rep for Nalco Water. In Chattanooga

- Generate and execute sales plans in existing customer base and in assigned competitively-held accounts, to meet profit increase goals.
- Work closely with current and prospective customers to understand business needs and recommend continuous improvement and innovation plans that will maintain and grow sales
- Develop strong relationships with key stakeholders in current and prospective customers, including plant or facility executives
- Provide technical support to customers; identifying and resolving customer challenges, escalating as required
- Engage in problem solving by performing system analysis, interpreting data and providing written recommendations to ensure customer operations are performing at optimal levels.
- Actively sell and support Nalco Water innovations and technology in assigned customers to promote long-term business relationships with Nalco Water

**Territory/Location Information:**

- This position is based in Chattanooga, TN
- Territory covers about a 150 mile radius of the surrounding area
- Targeted accounts are within the Light industries focusing in Food, Beverage and Manufacturing Markets
- 5% overnight travel required

As a trusted partner, your customers will rely on you for their success. Nalco Water is committed to seeing you succeed and provides several exceptional technical training programs to ensure you're prepared to solve any customer problem.

Oct 15, 2020 at 1:06 PM

Application submitted

iMessage

Ridley- 0000595 (Confidential)



11:34

TB
Tyler >

Oct 15, 2020 at 1:06 PM

Application submitted

Oct 20, 2020 at 2:15 PM

I had my phone interview. Was with the same girl from last time since she remembered me she Kept it short and sweet. Said she is going to pass me on to the VP and new manager.

Oct 20, 2020 at 5:30 PM

Great!

Oct 28, 2020 at 12:38 PM

Was Benjamin Irwin who you were expecting to be the new District Manager?

Yes

Ok, interview with him is next week. Maybe we can get in touch before.

Will do.

iMessage

Ridley- 0000596 (Confidential)



11:34 ·ıll 5G 16

TB
Tyler >

before.

Will do.

Thanks!

Nov 3, 2020 at 12:30 PM

Hey Anthony, let me know if you have a free minute to talk today about the interview tomorrow.

Nov 3, 2020 at 3:17 PM

I am free after 5:30

Perfect, I'll call you around. Thanks

Nov 4, 2020 at 2:08 PM

I think it went really well. Like you had said not having a technical degree will make it tough but he feels like after speaking with me he could coach and teach me everything I need to know

That is good to hear.  What are the next steps?

iMessage

Cash

Case 1:22-cv-00050-TRM-SKL   Document 255-7   Filed 06/25/23   Page 221 of 990   PageID #: 5208

Ridley- 0000597 (Confidential)



11:34

TB
Tyler ›

That is good to hear. What are the next steps?

Said he's trying to make an offer within 2 weeks. Said He'll have his boss call the front runners within the week. He really liked the fact I'm already in Chattanooga, I'm willing to drive, and I have sales some experience.

Sounds like all good stuff.

Yes, I felt good after we hung up. Thanks for the help. It went along way today

Nov 5, 2020 at 10:49 AM

Provide Your Address
ab.minted.com

I know you sent your address but if you or Jamie could fill this out it would be a huge help. Thanks!

Nov 6, 2020 at 11:56 AM

iMessage

Cash

Ridley- 0000598 (Confidential)



**TB**

Tyler >

Nov 6, 2020 at 11:56 AM

I'm moving forward in the process and supposed to be setting a time to speak with Karry.

Awesome

Nov 9, 2020 at 12:58 PM

I'm supposed to be hearing from Lilton Moore too. I'm sure you've worked with him before?

Yes

Does that seem standard? Meeting with him as well

Nov 13, 2020 at 12:37 PM

I spoke with Lilton Monday evening. Said I should be hearing back from Benjamin or Karry very soon. Still haven't. If I don't should I follow up Monday or stay patient?

iMessage

Ridley- 0000599 (Confidential)



**11:34**

**TB**

Tyler ›

should I follow up Monday or stay patient?

Nov 16, 2020 at 12:02 PM

You were right they are moving that territory into Lilton's district. Not sure what's going to happen now.

Nov 21, 2020 at 9:50 AM

I spoke with Lilton Tuesday. I should be expecting an offer soon but he's having to wait on HR. He asked my salary expectations again and I told $70-75 like you had said.

Nov 21, 2020 at 11:28 AM

Good deal. It is working like we planned.

Yes sir. I was afraid it was falling through after speaking with Benjamin Monday.

Why?

iMessage

Ridley- 0000600 (Confidential)



11:35 · 5G · 16

TB

Tyler >

Why?

He was vague with details. He Wasn't sure of the plans and next step.

I would think HR won't be in much of a rush this coming week. Will they reach out to me with the offer or Lilton?

Nov 21, 2020 at 12:59 PM

Lilton will present the offer

Ok great. Fingers crossed I hear something this week. Let's plan to go to dinner sometime soon.

Nov 23, 2020 at 4:06 PM

Job offer received!! Thanks for everything Anthony!!

Nov 23, 2020 at 5:28 PM

Great. Was the $$ what you wanted?

iMessage

Ridley- 0000601 (Confidential)

JA-226



11:35  5G 16

TB
Tyler ›

Nov 23, 2020 at 5:28 PM

Great. Was the $$ what you wanted?

Yes, very happy with the salary offered. I'm very excited. We owe you dinner

Good. Glad it worked out for you.

Dec 2, 2020 at 8:59 AM

When is your first day with NALCO?

As of now January 4th.

Do you know how long it typically takes to get all the pre employments screening results back?

About 7 -10 days

Ok good. I would hope I hear back from HR next week

Dec 9, 2020 at 11:05 AM

iMessage

Cash

Ridley- 0000602 (Confidential)



11:35                    5G  16

TB
Tyler ›

Ok good. I would hope I hear back from HR next week

Dec 9, 2020 at 11:05 AM

Everything is back but physical. I don't think I did but the testing center screwed and said I passed and failed the far sighted eye test. Which I don't think I did fail it. Would they revoke the offer if I did fail the eye test?

Never mind I think we are good.

Jan 4, 2021 at 8:44 AM

Did you start today?

Yes, sir. I've got a team call at 9:30, and then I'm not sure what else is in store for the day.

Are the fleet vehicles for Reps, trucks or does it depend?

Congratulations. Welcome to the team.

iMessage

Ridley- 0000603 (Confidential)



11:35  5G 16

**TB**

Tyler ›

Congratulations. Welcome to the team.

Thanks, Anthony!

It is extremely difficult for a rep to get a truck. You will most likely be given a Ford Escape.

Ok great, am I given a company credit card? Trying to piece a few things together before possibly being in the field tomorrow.

Yes.

Who is your Primary Trainer?

Don't worry about needing it on your first day in the field. You DM or PT can help you get any safety equipment you need. Get good steel toe boots. You will be in them all the time. Expect to pay $150–$200 for good boots

Jeremias Montejo. Will the boots come out of my pocket?

iMessage

Ridley- 0000604 (Confidential)



Ridley- 0000605 (Confidential)



11:36    5G 15

**TB**

Tyler >

That's good to know. Luckily we have a couple good boot stores in town. I've heard good things about red wings and I've worn Rocky and Ariats before.

Is the girl you hired for Huntsville Kaytie Haynie?

I typical get my at Elliots Boots.

Yes, I hired Katie Haynie for Huntsville.  Why?

That's where I'll go. Sounded like today was her first day under Lilton. Her and Jack?

That is my understanding

Ok, seems like a good group to be working with and for. Lilton seems like a great guy.

I don't know him extremely well, but I do know the rest of the team.  I managed them for most of 2019.  They are a good group.

iMessage

Ridley- 0000606 (Confidential)



11:36      5G 15

TB

Tyler ›

I don't know him extremely well, but I do know the rest of the team. I managed them for most of 2019. They are a good group.

Hopefully knowing me wont be too much of a disadvantage for you 😂

Lol let's hope not! Seriously let's get dinner on the books soon. Would love to see you guys and you meet Kacey.

Absolutely

let me know when you two are available

Ok, We are flexible. You let us know what works best for you and Jamie.

Jan 21, 2021 at 9:21 AM

Cammi bestowed a bucket and some tools that you had given her a long time ago to me yesterday.

iMessage

11:36    5G 15

**TB**

Tyler ›

Jan 21, 2021 at 9:21 AM

Cammi bestowed a bucket and some tools that you had given her a long time ago to me yesterday.

I am sure she was glad to get rid of them. I have some stuff for you, as well.

Lol yes, she was practically throwing it in my car. Sounds good! Let us know when you're free in the next couple weeks. Kacey and I will drive up to Dayton.

Feb 3, 2021 at 8:41 AM

I was strolling through Facebook and saw this. Isn't this your old club where I went?



iMessage

🍎Cash



Ridley- 0000609 (Confidential)



11:37

TB
Tyler ›

Feb 3, 2021 at 5:02 PM

Tool box or backpack for test kits? Which PAC would you start on first?

Feb 4, 2021 at 8:30 AM

Let me know about lunch today. I'm good whenever.

Feb 5, 2021 at 10:26 AM

What brand of screwdriver did you say? I'm going to run to Lowe's here in a little bit. 8 inch channel locks?

Mar 16, 2021 at 3:53 PM

Hey Anthony, could you send me Jerry deford's number?

Jerry DeFord
(USA) Nalco C...  JD  ›

Thank you

Welcome

iMessage

Ridley- 0000610 (Confidential)



11:37

TB
Tyler ›

Welcome

Apr 2, 2021 at 1:58 PM

PAC 2 down and 2 more to go!

Congratulations! What was your score?

70 which was pushing it but there were some questions on there probably shouldn't have been.

Wasn't lack of studying or care just didn't know what to expect. And there was so much on there that I don't and probably will never deal with.

They can be tough and get tougher

Would've been nice to have a little help but I passed and we're moving on.

A little help?

iMessage

Ridley- 0000611 (Confidential)

11:37                           5G  15

TB

Tyler ›

A little help?

Hell I know how Cammi was with
her trainees lol

Your Primary Trainer wasn't
much help

Not during the exam he wasn't

Apr 10, 2021 at 3:56 PM

Hey Anthony! Do y'all care to
RSVP for the wedding?



Kacey Conatser and Tyler Bates's
Wedding Website
theknot.com

iMessage

Case 1:22-cv-00093-TRM-SKL   Document 255-7   Filed 05/25/23   Page 236 of 990   PageID #: 5484

Ridley- 0000612 (Confidential)



11:37

TB

Tyler ›

Yes, we are coming.

There will be two of us

Jamie will enter the information on the website.

Great! Glad y'all are coming! Thank you.

Apr 10, 2021 at 5:15 PM

Are there going to be any hot, single bridesmaid?

Unfortunately not. They're all married haha

I guess I will still be there

Only downside to getting married 7-8 years after college

May 6, 2021 at 4:40 PM

Hey, was Andrew Hill a Kappa Sigma?

Yes

iMessage

Ridley- 0000613 (Confidential)



7:45    5G

CC

Clay

> Absolutely. Give me a call, at your convenience

Sorry....Monday's are crazy with conference calls

> No worries

Jan 11, 2021 at 5:52 PM

Heard you guys just hired several CAMs from Nalco

I am only aware of one in California.....who else?

> Lanae Pierce and CJ Bunger is what I heard today.

CJ took a job in the field as a rep and I didn't know about Lanae.....

Jan 13, 2021 at 4:28 PM

Can you send me your non compete

> Sure

iMessage

Cash

Ridley- 0000681 (Confidential)



7:45

CC

Clay

Sure

If you could scan it and email it would be great

Coming your way

Jan 13, 2021 at 7:09 PM

Was that what you needed?

Yes but it's not signed do you have a signed copy

It is signed electronically via Workday.

Ah....gotcha....that will work

Jan 14, 2021 at 2:03 PM

In a call will have to call you back

Okay. Just wanted to make sure that agreement is all you needed at this time

Yep good to go

iMessage

Ridley- 0000682 (Confidential)



7:46    ●●●● 5G 35

CC

Clay

Yep good to go

Great.

Feb 3, 2021 at 10:57 AM

Hey....could you put together a 3 yr business plan.....nothing fancy just an est of the $$ you can sell year one, two and three.....I like using reps estimates to put together their compensation model.

In a call

Feb 9, 2021 at 4:27 PM

Walking into a meeting......can I call u back

Sure. If I needed to move our meeting next week to Wednesday night would that screw up your schedule?

Yeah let's go ahead and push it, what day the first week of March works best?

iMessage

Cash

Ridley- 0000683 (Confidential)

7:46  ·ıll 5G 35

CC
Clay

Yeah let's go ahead and push it, what day the first week of March works best?

Feb 9, 2021 at 5:54 PM

Does March 2nd work for you?

Feb 10, 2021 at 9:21 AM

How about the 3rd or 4th......My son has a home basketball game on the 2nd and he only has six home games this year due to Covid so I'm trying not to miss any of them... Would that work

Either day is good with me. Sooner the better. Let's do March 3rd

Okay

Sounds Good

You get a chance to discuss business plan with D Pearson yet

Briefly

iMessage



Ridley- 0000684 (Confidential)



Ridley- 0000685 (Confidential)



7:46     5G 35

**CC**
Clay

Feb 18, 2021 at 1:33 PM

Whatever works best for you. I am fine with moving our meeting to March 4th.

4th it is

Looking forward to it. As I am preparing my BP, can you give me an estimated dollar value of the territory I could be inheriting

Feb 20, 2021 at 9:12 AM

Sorry it doesn't look like I ever answered this.....the territory you would inherit would is about $1M , but because of geography you may not inherit all of it......use $800k in your BP

Is that revenue or profit

Revenue

Mar 2, 2021 at 8:15 AM

Good morning. Hope your week

iMessage

Ridley- 0000686 (Confidential)

12:03

JH

Jackie >

Jul 1, 2021 at 6:51 PM

I am guessing that I am officially terminated today since I lost access to all my Ecolab systems?

Jul 6, 2021 at 8:01 AM

Good morning. Today I will be working to return my Ecolab stuff. I will reach out to LeasePlan to get my vehicle returned. In regards to my computer and accessories, I will send it to the address for Ecolab asset returns. I can shred my corporate credit card or FedEx it to you. Just let me know what you prefer me to do

Jul 6, 2021 at 10:03 AM

Good morning Anthony. Hope you had a good weekend. Once I am out of a meeting at 10:30 am I will reach out and confirm.

Jul 6, 2021 at 12:01 PM

Anthony, you can follow with plan

iMessage





12:03

JH

Jackie ›

Jul 6, 2021 at 10:03 AM

Good morning Anthony. Hope you had a good weekend. Once I am out of a meeting at 10:30 am I will reach out and confirm.

Jul 6, 2021 at 12:01 PM

Anthony, you can follow with plan you listed above. For the CC just destroy it – no need to FedEx to me.

Jul 6, 2021 at 5:13 PM

What is your email?

Jherrera1@ecolab.com

Thank you

Will you send me the address for me to return my computer

Jul 7, 2021 at 10:26 AM

Update: credit card has been shredded, computer and associated accessories have



iMessage



12:04

JH

Jackie

Jul 6, 2021 at 5:13 PM

What is your email?

Jherrera1@ecolab.com

Thank you

Will you send me the address for me to return my computer

Jul 7, 2021 at 10:26 AM

Update: credit card has been shredded, computer and associated accessories have been shipped back, and vehicle pick-up form has been completed and submitted

Thanks Anthony.

Jul 16, 2021 at 9:29 PM



voicemail-1803.m4a
Audio Recording · 61 KB

Voicemail message from Tyson

iMessage



12:04

JH

Jackie >

Update: credit card has been shredded, computer and associated accessories have been shipped back, and vehicle pick-up form has been completed and submitted

Thanks Anthony.

Jul 16, 2021 at 9:29 PM



**voicemail-1803.m4a**
Audio Recording · 61 KB

Voicemail message from Tyson about running low on inventory. Received the message today. First I have heard of the issue.

Thanks Anthony. I will check what location is and reach out to this lady. Thanks for letting me know

No problem

Delivered





iMessage

Microsoft

**Support**

Microsoft 365
Office
Windows
Surface
Xbox
Deals

All Microsoft ⌄

**Microsoft 365 support**

Products ⌄          Devices                    Search 🔎

What's new

Excel / Import and analyze data / Charts / Create a waterfall chart
Home / ... / Create a waterfall chart

Install Microsoft 365

Account & billing ⌄

# Create a waterfall chart

Templates

*Excel for Microsoft 365, Word for Microsoft 365, Outlook for Microsoft 365, [More...](#)*

More support ⌄

---

Accelerate your learning journey with Viva Learning                    ✕

Start now

---

A waterfall chart shows a running total as values are added or subtracted. It's useful for understanding how an initial value (for example, net income) is affected by a series of positive and negative values.

The columns are color coded so you can quickly tell positive from negative numbers. The initial and the final value columns often start on the horizontal axis, while the intermediate values are floating columns. Because of this "look", waterfall charts are also called bridge charts.



**Windows**     **macOS**

# Create a waterfall chart

1. Select your data.

|   | A | B |
|---|---|---|
| 1 | Revenue | 23,201 |
| 2 | Cost of goods | (8,273) |
| 3 | Gross margin | 14,928 |
| 4 | Administrative expense | (1,151) |
| 5 | Net income | 13,777 |

2. Click **Insert** > **Insert Waterfall or Stock chart** > **Waterfall**.



You can also use the **All Charts** tab in **Recommended Charts** to create a waterfall chart.

**Tip:** Use the **Design** and **Format** tabs to customize the look of your chart. If you don't see these tabs, click anywhere in the waterfall chart to add the **Chart Tools** to the ribbon.



## Start subtotals or totals from the horizontal axis

If your data includes values that are considered Subtotals or Totals, such as Net Income, you can set those values so they start on the horizontal axis at zero and don't "float".

- Double-click a data point to open the **Format Data Point** task pane, and check the **Set as total** box.



   **Note:** If you single-click the column, you'll select the data series and not the data point.

   To make the column "float" again, uncheck the **Set as total** box.

   **Tip:** You can also set totals by right-clicking on a data point and picking **Set as Total** from the shortcut menu.

## Show or hide connector lines

Connector lines connect the end of each column to the beginning of the next column, helping show the flow of the data in the chart.

- To hide the connector lines, right-click a data series to open the **Format Data Series** task pane, and uncheck the **Show connector lines** box.



To show the lines again, check the **Show connector lines** box.

**Tip:** The chart legend groups the different types of data points in the chart: **Increase**, **Decrease**, and **Total**. Clicking a legend entry highlights all the columns that make up that group on the chart.

# See Also

Create a Pareto chart

Create a histogram

Create a box and whisker chart

Create a treemap chart in Office

Create a sunburst chart in Office

  

---

# Need more help?

| How can we help you? |  |
|---|---|

# Want more options?

**🌐 Discover**　　😊 **Community**

Explore subscription benefits, browse training courses, learn how to secure your device, and more.




[Microsoft 365 subscription benefits]



[Microsoft 365 training]



[Microsoft security]



[Accessibility center]

## Accelerate your learning journey with Viva Learning ✕

Start now

**Was this information helpful?**     Yes     No

| What's new | Microsoft Store | Education | Business | Developer & IT | Company |
|---|---|---|---|---|---|
| Surface Pro 9 | Account profile | Microsoft in education | Microsoft Cloud | Azure | Careers |
| Surface Laptop 5 | Download Center | Devices for education | Microsoft Security | Developer Center | About Microsoft |
| Surface Studio 2+ | Microsoft Store support | Microsoft Teams for Education | Dynamics 365 | Documentation | Company news |
| Surface Laptop Go 2 | Returns | Microsoft 365 Education | Microsoft 365 | Microsoft Learn | Privacy at Microsoft |
| Surface Laptop Studio | Order tracking | How to buy for your school | Microsoft Power Platform | Microsoft Tech Community | Investors |
| Surface Go 3 | Virtual workshops and training | | Microsoft Teams | Azure Marketplace | Diversity and inclusion |
| Microsoft 365 | | | Microsoft Industry | | Accessibility |
| Windows 11 apps | | | Small Business | | |

Microsoft Store Promise

Flexible Payments

Educator training and development

Deals for students and parents

Azure for students

AppSource

Visual Studio

Sustainability

🌐 English (United States)

Sitemap     Contact Microsoft     Privacy     Terms of use     Trademarks     Safety & eco     About our ads

© Microsoft 2023

Date 11/21/2011

Nalco Company
1601 West Diehl Road
Naperville, IL 60563-1198
630 305 1000
www.nalco.com

Arrowhead Mt Spring Water
Adam Jennings
Director of Operations
5772 East Jurupa Street
Ontario, CA 91761

**Subject:** Nalco Membrane Performance Management Proposal

**Dear Adam Jennings,**

Thank you very much for the opportunity to submit our recommendations and pricing for Nalco's Membrane Performance Management program using 3D TRASAR Technology for Membranes.

Nalco's Membrane Performance Management program brings you many potential benefits:

- • Reduce water usage and waste water generated, with associated cost savings

- • Minimize the risk of problems associated with inadequate water quality and insufficient water production

- • Reduce your environmental footprint through water, chemical and energy savings

- • Reduce your total cost of ownership (TCO) by minimizing unscheduled shut downs, maximizing membrane life and optimizing cleaning frequency and other preventive maintenance tasks

- • Gain access to Nalco's extensive expertise on Membrane operations, and receive the benefit of having membrane experts monitoring your RO 24/7/365, alerting you to issues before they become problems and allowing you to take action before RO system performance is irreversibly affected

- • Explore options for cost effective partial or total outsourcing of system Operation & Management

- • Gain access to Web based Site and Enterprise wide view of critical water operations with 3D TRASAR Technology for Membranes, Cooling water and Boilers.

Based on the information we reviewed in the Discovery agreement we are projecting that by implementing Nalco's 3D TRASAR Technology for Membranes it may be possible to save between $78,000 -$129,000 per year compared to current operation. These savings do not take into account the value of preventing production problems or process upsets due to inadequate water quality or unreliable water supply.

Nalco greatly appreciates the opportunity to submit our proposal for your facility. We welcome the opportunity to discuss this offering and its benefits at your convenience.

**Sincerely,**

Michael Owens
Nalco Company

**Background**

Driving the operation of your RO system towards "Best Practices" will allow you to realize many potential savings such as feedwater, wastewater, chemicals, cleaners, membranes and labor. Nalco's Membrane Performance Management program using 3D TRASAR Technology for Membranes is a critical tool for successfully implementing best practices. Nalco will be able to help the plant quantify all of the potential savings once the system is online and we are able to start trending and analyzing data.

**Membrane Performance Management**

Nalco's Membrane Performance Management program consists of four key components

**3D TRASAR Technology for Membranes**

Nalco's proprietary technology for collecting operating data, controlling chemical addition,, alerting and alarming of key operating parameters, remote data analysis and normalization and expert advice and recommendations by the Nalco 360 expert center.

**PermaCare Chemistry** (Does not apply to plant)

"Membrane safe" chemicals for your membrane system. This includes antiscalants for different water chemistries, biocides for biofouling management, cleaners to remove many different foulants, and filter aids to improve the performance of your media filters.

**RO Service** (Does not apply to plant)

Nalco has available a wide array of services for your RO system; on-site and off-site cleaning, membrane installation and removal, routine service visits, emergency repairs, on-site and off-site training seminars, site audits and more. The specific services available to you depend on your distance to the Nalco service center.

The Membrane Performance Management program brings you many potential benefits:

- • Control and assurance of water quality and water quantity

- • Reduction in operating cost by reducing water usage and minimizing the amount of waste water generated

- • Achievement of "best in class" status by driving your operation towards Best practices and Optimizing system operation

- • Reduction in total cost of ownership (TCO) by minimizing unscheduled shut downs and maximizing membrane life

- • Providing an opportunity for partial or total outsourcing of system Operation & Management

- • Reduction of environmental footprint through water, chemical and energy savings

- • Site and Enterprise wide view of critical water operations with 3D TRASAR Technology for Membranes, Cooling water and Boilers.

**3D TRASAR Technology for Membranes**

3D TRASAR Technology for Membranes upgrades and expands the capabilities of your membrane system, saving water and energy, reducing operating cost and extending membrane life and enhancing performance. 3D TRASAR Technology for Membranes includes the services of the Nalco 360 Expert Center, providing you with a "virtual operator", supervising your system around the clock, alerting you of issues before they become problems that impact your operation.





3D TRASAR Technology for Membranes enables effective monitoring and control of antiscalant, monitoring of pH and ORP, in addition to monitoring of key operating variables for the membrane system (pressures, temperature, flows and conductivity).

The information obtained by the sensors is collected in the 3D TRASAR control unit and transmitted via the Nalco Global Gateway (NGG) to Nalco's secure server. The data is processed by Nalco's proprietary software and performance graphs, including easy to read normalized trending graphs, which are created and published on your company's secure 3D TRASAR web site.

Nalco's software also monitors performance and alerts the Nalco 360 expert center when sensor data or trends are indicating potential performance issues. Depending on the required response time an alarm or alert is either communicated directly to you, to the Nalco representative and to the Nalco 360 Expert center.

Furthermore, on a weekly basis the Membrane experts in the Nalco 360 Expert Center review all your system's performance data. If any trends raise concerns are the data in the Nalco server is used to further investigate the potential issue, and provide directions for trouble shooting and recommendations for proactive actions that would prevent or mitigate the problem.

**Chemical control**

In order to manage biological growth, the feed water to the RO often contains chlorine. City water typically contains between 0.5 – 1 ppm free chlorine. The RO membranes are degraded by chlorine (and other oxidizers). Most membrane manufactures state that if a membrane is exposed to 1 ppm chlorine for 1000 hours it will be destroyed.

Bisulfite is added to the feed water to deactivate the chlorine, usually at a rate of 3-4 ppm bisulfite solution for each ppm of free chlorine in the feed. It is common to see fluctuations in chlorine level, and dosing pumps may fail. The ORP probe that is part of the 3D TRASAR Technology for Membranes will detect when the oxidizing conditions change, and can alert you to a problem with chlorine before the membranes have been damaged to the point where they need to be replaced.

The pH will also be monitored in the system.

### Membrane Performance Management on the Web

Using the ASTM equations for normalization, the sensor data from the RO system is analyzed and the normalized trends are published on your private web site. According to best practices, when the normalized pressure drop increases by 15%, or either salt passage or permeate flow decrease by 15%, alerts are sent so that the required action can be taken. These action limits are also displayed in the graph, allowing you to verify that the system is operating as expected.

Another portion of the web site presents a dashboard showing current performance for critical parameters, as well as an interactive graph that allows you to explore the trending data for other time periods.



### Reporting

On a weekly basis reports are generated with the Normalized trends and recommendations are provided by the Nalco 360 Expert center and your local Nalco rep. The report also contains a list of all alarms that have been triggered in the last 7 days, with comments on the actions were taken to respond to the alarm condition.



This report is an important tool to gain a better understanding of the system performance, and to provide the ability to make decisions on proactive action that needs to be taken.

On a monthly or quarterly basis a Management report is created by the Nalco 360 center and your local Nalco representative. This report contains a high level consolidated summary, the total volume of water produced and wasted, with a comparison of actual performance to both historical and "target" performance. The Management report also includes an overview of key alarms that have been triggered, the corrective action that was taken, and a section with recommendations from the Nalco 360 expert. There is also a forward looking section highlighting when we expect the next cleaning to take place and the remaining life of the membranes.

### PRICING – Membrane Performance Management

| 3D TRASAR Technology for Membranes | $970 / month |
|---|---|
| 3D TRASAR equipment and sensors | included |
| Standard installation | included* |
| Pressure transducers, as required | included |
| Quarterly calibration visits for 3D TRASAR probes | included |
| Alerts and Alarms sent to e-mail and phones | included |
| N360 expert monitoring and recommendations | included |
| Non-standard installation (For details please see separate scope document) | $3,500** |

*After reviewing the system and discussing the requirements, this would be a standard installation and no additional cost. They mentioned that Nestle would be able to provide any taps for sample ports as well as sanitary connections that are not included in a standard installation. They also mentioned that poly tubing would be acceptable to use for sample lines.

**If the plant cannot provide the necessary taps, sanitary connections and stainless steel tubing is required, we will need

to quote a non-standard installation.

### Return on Investment - ROI

**Membrane Damage:**

The plant reported membrane damage due to chlorine leakage. The chlorine causes reduced life of the membranes and increased the maintenance costs at the plant. Improvement in the feed system has been discussed.

| | |
|---|---|
| 2009 – The plant replaced 72 membranes | $36,000 |
| 2010 – The plant replaced 108 membranes | $54,000 |
| 2011 – The plant estimates 72 membranes | $36,000 |

By improving the de-chlorination control membranes should last a minimum of 2-3 years. This would provide a savings of **$72,000 / year**

### Deionization Exchange Reduced capacity :

Reduced rejection of the Reverse Osmosis due to chlorine damage will reduce the water quality of the permeate. This reduction in water quality will dramatically increase the Deionization exchange frequency and increase Nestle's expenditures.

### DI Usage Calculations





The above example is estimating 500,000 gallons of RO water produced per day and estimating the water quality varying from 4 ppm to 8 ppm of TDS.

Based on the Nalco pricing $1,400 / tank this would show a savings of **$47,600 / year**.

**Improved De-Chlorination Control Total Savings: $119,600.00**


Membrane Performance Management General Terms and Conditions ("Agreement") **Nalco Company ("Nalco")**

### 1. THE PROGRAM:

Nalco shall provide the Services and Equipment set forth in Exhibit A. Nalco shall be responsible for reasonable diligence and care in providing its services and products. Customer acknowledges that the ultimate success of the program set forth in this Agreement (the "Program") is dependent upon the Customer's reasonably diligent application of the Program in accordance with Nalco's instructions. Nalco shall not be liable for any failure caused by Customer's lack of diligence or failure to follow Nalco instructions.

### 2. ACCEPTANCE:

Customer accepts all of the terms and conditions set forth in this Agreement, and agrees that any additional or different terms or conditions contained in Customer's purchase orders or other documents shall not modify this Agreement, notwithstanding any acknowledgment or acceptance of such documents by Nalco.

### 3. PRICE AND PAYMENT:

(a) Pricing shall be set forth on Exhibit A. Pricing shall include a standard installation charge. The criteria for standard installation is set forth on Exhibit B and to the extent Customer requires installation services not included in the standard offering, Customer shall be assessed additional charges.

(b) Payment terms shall be net 30 days unless specifically changed elsewhere in this Agreement, and payment shall be in lawful money of the United States, without deduction or offset. Past due invoices are subject to a late fee equal to the lesser of one and one-half percent per month or the highest rate permitted by law.

### 4. FORCE MAJEURE AND SHORTAGES:

Neither party shall be liable for any failure or delay in performance (other than payment) which is due, in whole or in part, to any cause of any nature beyond the reasonable control of the party affected. If there are product shortages for any reason, Nalco may allocate the available supply of product among itself, its affiliates and its customers on whatever basis it deems practical.

Nalco shall indemnify and hold harmless Customer for all losses, liabilities, costs (including, but not limited to, reasonable attorneys' fees), expenses and claims for personal injury or death, or tangible property damage or loss (collectively, the "Claims"), to the extent proximately caused by the negligence or willful misconduct of Nalco. Customer shall indemnify and hold harmless Nalco for all Claims to the extent proximately caused by the negligence or willful misconduct of Customer. In the event of a Claim arising out of the joint negligence or willful misconduct of Customer and Nalco, Customer and Nalco shall be liable to each other and to any damaged third party in proportion to their relative degree of fault. Either party

## 5. WARRANTIES AND LIMITATION ON LIABILITY:

(a) Nalco warrants that services provided as part of the Program will be performed in a good and workmanlike manner. Nalco will perform such services in accordance with sound generally accepted practices in effect at the time of performance.

(b) Nalco warrants that the equipment itself does not infringe any patent of the United States. Customer shall give Nalco prompt written notice of any patent infringement suit or claim, Nalco shall control the defense or settlement of same and Customer shall cooperate in such defense. Nalco's liability under this warranty is limited to such defense, and, if sale or use of the product is enjoined, refund of the price paid by Customer for such product (less a reasonable charge for use, damage and obsolescence). Nalco makes no warranty against patent infringement arising out of Customer's particular use of the equipment, alone or in combination with other materials or any product resulting from such use.

(c) Because many factors affect product application and performance, Nalco will be relying on information provided by Customer concerning its facility, operations and systems to develop a Program suitable for Customer's needs. Customer shall be responsible for the accuracy of the information provided to Nalco, and Nalco assumes no liability or obligation for any technical advice, services or products provided by Nalco based on incorrect information from Customer. Customer is responsible for designating appropriate places in its facilities and processes for feeding and storing chemical products, installing equipment products and conducting related sampling and testing activities.

(d) Nalco shall not be liable for any incidental, consequential, indirect or special damages, including, but not limited to, lost profits and lost production, whether arising under breach of warranty or contract, negligence, strict liability or other tort, indemnity or any other theory of liability. In any event, Nalco's liability for any and all claims, damages and causes of action arising out of the sale, use, storage, delivery or non-delivery of any product or equipment, performance of any services or any warranty shall be limited to the price (including freight charges if paid by Customer) paid to Nalco for such product or equipment.

**(e) THE FOREGOING WARRANTIES ARE EXCLUSIVE AND NALCO MAKES NO OTHER WRITTEN, ORAL, EXPRESS OR IMPLIED WARRANTIES. NALCO SPECIFICALLY DISCLAIMS THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER'S REMEDIES FOR BREACH OF ANY WARRANTY SHALL BE LIMITED TO THOSE REMEDIES DESCRIBED ABOVE.**

## 6. NALCO EQUIPMENT:

The following applies to equipment furnished to the Customer hereunder, including 3D TRASAR units ("Equipment):

(a) Equipment shall remain the sole personal property of Nalco even though attached to realty. Nalco may mark Equipment to indicate its ownership, and, Customer shall provide a suitable location and utilities for the Equipment, and is responsible for applicable personal property or use taxes. Customer agrees to provide reasonable cooperation in the filing of any financing statements believed necessary by Nalco at Nalco's sole distraction. After the termination of the agreement Nalco will, at its own expense, remove the hardware from the customer's property.

(b) Customer shall not use the Equipment with any materials or products other than those recommended or approved by Nalco. Customer shall operate the Equipment in accordance with Nalco's recommendations. Nalco shall have the right to inspect and service Equipment during normal business hours. Customer assumes all risk of loss, damage or liability arising from its possession or use of Equipment, and shall indemnify Nalco from all such losses, damages or liabilities. Customer shall obtain and maintain for the term of this Agreement property damage and liability insurance and insurance against loss or damage to the Equipment including without limitation, loss by fire and such other risks of loss as are customarily insured against on the type of Equipment provided hereunder by businesses in which Customer is engaged.

(c) Customer shall provide the required utilities (power, air, water) for the equipment supplied by Nalco and other appropriate needs (shelter, tank pads, spill protection, etc.).

(d) Any software and documentation provided by Nalco remains the sole and exclusive property of Nalco, and shall be used only for purposes authorized by Nalco. Nalco has one or more patents related to the know-how (the "TRASAR Technology") that cover the practice of this Program. Nalco hereby grants Customer a non-exclusive and expressed license to practice the TRASAR Technology as part of this Program. The license granted by this Agreement is not transferable or assignable. Customer may not grant any sublicense in the TRASAR Technology. Any implied or expressed license grant by this Agreement ends upon termination of the Agreement.

## 7. CONFIDENTIALITY:

Customer shall not: (a) disclose to any third party and shall prevent third parties from obtaining or becoming aware of the composition, design, operation or application of the Program and the contents of this Agreement (collectively, the "Proprietary Information") without in each instance securing the prior written consent of Nalco; or (b) use the Proprietary Information for any purpose other than the purpose for which Nalco provided the Proprietary Information to Customer. Customer shall not be liable for the use or disclosure of information that: (a) is already in the public domain at the time of the use or disclosure; (b) becomes part of the public domain through no fault of Customer; (c) is disclosed to Customer by a third party having the right to make such disclosure; or (d) is in the possession of Customer at the time of disclosure by Nalco.

**8. INDEMNIFICATION:**

**9. TERMINATION:**

may terminate this Agreement if (a) the other party fails to perform or meet a material obligation under this Agreement and (b) such default is not cured within 45 days after written notice of the failure. Each delivery under this Agreement shall be considered a separate and independent contract. If Customer fails to make a payment when due or Customer's financial condition becomes unsatisfactory to Nalco, then Nalco, at its option, may (a) withhold future performance until Customer cures the default or improves its financial condition to Nalco's satisfaction; (b) require payment in advance; or (c) terminate this Agreement. This Agreement may be terminated before the end of the contract period by either party upon 30 days prior written notice to the other. If Customer terminates this Agreement for convenience, 80% of all remaining fees for the length of the contract period become due immediately and Customer shall return Equipment to Nalco at Customer's sole expense in the same condition as received, ordinary wear and tear excepted, within 30 days. Customer may terminate this

**10. MISCELLANEOUS:**

(a) This Agreement shall be governed by the Uniform Commercial Code and other laws of Illinois, and not by the United Nations Convention for the International Sale of Goods. Customer agrees that the courts of the United States have non-exclusive jurisdiction for the resolution of disputes with respect to this Agreement.

(b) Customer shall inform Nalco of any special or unusual safety precautions that should be taken because of conditions in Customer's plant or process.

(c) Failure by either party to require strict compliance with any provision hereof shall not be construed as a waiver of that provision or any other provision. If any competent authority holds that any provision hereof is wholly or partially void or unenforceable, this Agreement shall be deemed modified to conform to applicable law and shall continue to be valid.

(d) All prior and contemporaneous proposals, negotiations and agreements, written and oral, with respect to the transactions contemplated herein are merged into this Agreement, which constitutes the entire agreement between Customer and Nalco with respect to such transactions. This Agreement may not be altered, modified or amended except pursuant to a writing signed by both Customer and a senior executive of Nalco.

(e) Nalco shall be an independent contractor with respect to the services to be performed under this Agreement. Nalco, its subcontractors and their respective employees shall not be deemed to be the servants, employees or agents of Customer.

(f) Nalco shall be entitled to subcontract portions of the work to be performed under this Agreement provided that the subcontractor shall be acceptable to the Customer.

**EXHIBIT A**

**SERVICES; TERM**

**SERVICES**

• Site survey

• Hardware required for monitoring 2 separate RO trains with one or two stages (Hardware remain the property of Nalco Company)

• Nalco Global Gateway (NGG remain the property of Nalco Company)

• Standard installation (defined in attachment)

• Data transfer costs

• Secure customer 3DT web site with normalization, trending graphs and documentation of cost savings and performance

vs. Best in class

• Alarms sent via e-mail and/or text message

• Alerts reviewed by System Assurance Center, and, as required, sent via e-mail and/or text message

• Weekly review of operating data by System Assurance Center (even if there are no alarms or alerts)

• Weekly reports with recommendations

• Quarterly calibration of 3D TRASAR for Membrane sensors

**[TRIAL PERIOD –OPTIONAL PROVISION**

Agreement within 90 days of the beginning of the Program on _____ ("Trial Period") and Nalco shall refund payments made by Customer to Nalco for the Program during the Trial Period, excluding non-standard installation charges. Customer shall immediately return the Equipment pursuant to the terms and conditions set forth in this Agreement if there is a termination during the Trial Period.]

## EXIBIT B

### INSTALLATION CRITERIA
### Standard Install

**Included In Monthly Fee:**

1. Install may consist of up to 4 man days (i.e. 1 person for 4 days or 2 people for 2 days), and will include the activities as described below. All work included in the basic install assumes the use of Nalco employees or Nalco approved contractors (at Nalco's discretion).

2. Install will include complete assembly and installation of all 3D TRASAR Technology for Membranes equipment. This includes assembly of skid components, electrical wiring of all components on the skid, connection of sampling lines to the RO skid, wiring of all sensors to the RO skid, and calibration of all RO skid components. 3D TRASAR Technology for Membranes skid should be located less than 20ft from the RO system.

3. Communications with the customer's PLC is also included (when applicable), provided that the customer has an open communications port and the necessary information to communicate with the PLC (i.e. protocol types, tags, etc…). Important, the PLC information must be confirmed prior to ordering equipment or scheduling the installation. Any other custom work around this will need to be quoted by Nalco separately (i.e. extra communication modules, custom programming, etc…).

**Not included in Monthly Fee (requires separate quote):**

1. RO Modifications are not included in the standard installation. All necessary sample points must have taps available for use, so that Nalco can properly tee the location. If additional pressure transducers need to be installed, there must also be a proper tap location. Flow meters that do not have a 4-20ma output or do not come through the PLC, need to have a new Nalco flow meter installed at an additional cost.

2. All special requirements for plumbing materials (i.e. stainless steel, etc…), installation scheduling (i.e. special hours), creating additional taps (welded / drilled and tapped) or any other condition not within the scope outlined here, need be quoted by Nalco separately.

**Additional Requirements for Program:**

1. Electrical power for the RO skid needs to be within 5ft (1.5m) of the 3DTfM skid location. Reasonable customer conduit requirements and appropriate electrical codes will be met for all Basic Installations. Any additional requirements will need to be quoted by Nalco separately.

2. The customer is responsible for maintaining and calibrating all non-Nalco sensors on the RO system. It is critical that all customer sensors that Nalco is relying on for information (i.e. pressure transducers or flow meters) are verified to be operational before the installation is complete, so that the customer can take any necessary action required.

3. All Basic Installs assumes that scaffolding, work on ladders or use of fall protection is not required in order to perform the services included as part of this offering. Any special customer specific training requirements are limited to 1hr. If required, these would be considered additions to the standard offering and would have to be quoted separately.

[Date]

Nalco Company
1601 West Diehl Road
Naperville, IL 60563-1198
630 305 1000
www.nalco.com

[CompanyName]
[CustomerName]
[CustomerDesignation]
[CompanyAddress1]
[CompanyAddress2]

Nalco is pleased to provide [CustomerName] with the following proposal for a Water Saver Program. The Water Saver Program will deliver value to your operation by helping meet your sustainability goals.

**This proposal will answer the following questions:**

1. What are the current conditions of your cooling system?

2. What is the Nalco Water Saver Program and how can it provide value to your cooling system?

3. What is the recommended Water Saver Program for your system?

4. What are the Water Saver Program costs?

**What are the current conditions of your cooling system?**

Based on the information from your system's survey, your system's heat rejection is achieved through the use of a [TypeOfCoolingTower] utilized for [TypeOfCoolingSystem]. The [TypeOfCoolingTower] is operated at [TypeOfCoolingTower] cycles of concentration limited by [CTCyclesLimitedBy].

In order to appropriately size your Water Saver program, key attributes of your cooling system were gathered during the site survey of your facility. The following information was gathered:

- Current system volume: [CurrentVolume] [CurrentVolumeUnit]

- Lowest operational cycles: [LowestCycle]

- Highest temperature drop: [HightestTemp] [HightestTempUnit]

- Maximum recirculation rate: [MaxRecirculationRate] gpm

- Maximum Ca ppm in makeup: [Max-Ca-Makeup] ppm

- Maximum M-Alk ppm in makeup: [Max-M-Alk-Makeup] ppm

- Maximum Cl ppm in makeup: [Max-Cl-Makeup] ppm

**What is the Water Saver Program and how can it provide value to your system?**

Nalco Company through its Water Saver offering is proud to provide a revolutionary, electrochemical treatment water conditioning technology for total control of scale and mineral sludge in recalculating cooling water systems. Nalco Company's Water Saver takes advantage of the power of electrolysis to create internal chemical and physical mechanisms driving capture of specific mineral elements as they start the process of scale and sludge formation. In this respect, the Water Saver produces partial softening of water similar to the multi-step cold lime softening process used municipally, but in one relatively compact step.

To attain elevated operating cycles in cooling water systems, many traditional cooling water chemical treatment programs employ acid to alter water chemistry or softener pretreatment so scale (calcium carbonate) cannot form. With either of these strategies, calcium or carbonates entering with cooling tower make-up must leave the system with bleed off or be retained as a deposit somewhere in the system. Un-transported calcium or carbonates can form scale on heat exchange surfaces, accumulate in the cooling tower sump as sludge, or contribute to thickening and mineralization of biofilm. The limitation of these programs are that bleed off of the tower system is required to transport calcium or carbonates before the concentrations by evaporation exceed the limit of the stabilization strategy used. The amount of bleed off is dictated by

make-up water properties, various cooling system mechanical parameters, and the treatment strategy used to address the system conditions.

Electrochemical treatment permits hardness to be dealt with in a totally different manner. Calcium carbonate formation is not prevented or controlled, but is promoted. In summary, small amounts of oxygen and carbon dioxide gas form at the positive conductors (anodes) and hydrogen gas and hydroxyl ion (caustic) at the negative conductors (cathodes). Gasses are highly mobile and rapidly carried away by water flowing through the Water Saver caustic formed at the cathode is far less mobile and is confined to a thin layer of water in immediate contact with the cathode. This caustic promotes highly localized conversion of soluble calcium bicarbonate from tower make-up to insoluble calcium carbonate. The cathode of each Water Saver cell accumulates a loose, layer of pasty, chalk-like material, primarily calcium carbonate and magnesium hydroxide, as product electrochemical water conditioning.

The Water Saver is revolutionary because it captures only the calcium and magnesium committed to form deposits if tower water were not treated in any way. Tower water retains stable soluble hardness to help minimize corrosion. Material trapped by the Water Saver is routinely removed by manual cleaning of the reactor cells. By capturing calcium and magnesium, the Water Saver significantly reduces reliance on bleed off for calcium transport from a cooling water system. This then permits substantial bleed off reduction compared to conventional chemical treatment. The remaining tower bleed off being beneficial in limiting capture of airborne contaminants contributing nutrients potentially supporting microbial activity.

The Water Saver Program:

    o Removal of up to 40% of hardness minerals in the tower allowing higher cycles of concentration and significant cooling tower blow down reduction.

    o Eliminates softeners (brine discharge) and pH control (sulfuric acid use).

    o Reduced scale and corrosion inhibitor usage due to higher cycles as well as reduced biocide consumption due to conversion of chlorides to free halogen.

    o Direct measurement & control of chemical inhibitor feed & active polymer using Nalco's 3D TRASAR technology.

    o Measurements taken every 6 seconds. Based on "leading indicators" to ensure system asset protection & efficient operational performance.

    o Detects Changes In System "Stresses" & Automatically Makes System Changes To Prevent Loss Of Efficiency.

    o Immediately alerts Nalco & site management to alarm conditions.

    o Trends critical performance information & KPI's in a data dashboard (scaling index, mpy corrosion, microbio index 24/7 on-line).

    o Water conservation and improved manpower utilization

In order to provide you with additional value, the Nalco Water Saver utilizes the **3D TRASAR®** platform for monitoring and alarming through Nalco enVision. Outputs from the Water Saver controller are sent to a **3D TRASAR®** controller. In this way, operation can be remotely monitored and a report can be provided to clearly present and document the value of this program. Web based alarming of unusual operation is included which may indicate a system upset or a malfunction.

Reduced Water Consumptions

With the current treatment program in place, your lowest operation cycles are [LowestCycle]. Implementation of the Water Saver offering would allow us to increase operating cycles from [LowestConc] to potentially [AA] cycles. The critical item to note is that in operating at [AA] cycles, we are optimizing water usages without incurring increased energy costs associated with changes in water properties due to highly cycled systems.

The increase in operating cycles would result in an annual water consumption reduction of roughly [AO]%. Based on our survey of the system and our records, this would equate to a reduction in water consumption by approximately [AH] gallons annually. These numbers have been calculated based on you current maximum makeup rate of [AE] gpm.

Based on the water rates for the area (roughly $[MakeupWaterCost]), the above annual reduction equates to a monetary savings of $[AI]/annually. In addition to the savings associated with the water reduction, further savings are possible in the form of incentives provided by the various local water agencies.

**What is the recommended Water Saver Program for your system?**

JA-265

Based on the size of your system as well as the current operating conditions, Nalco recommends the installation of [AP] reactors. The Water Saver will be connected to the Nalco 3D TRASAR® via a shielded signal wire bundle. We recommend that the installation be completed by trained Nalco personnel. An annual service plan is also a recommended option. For an annual fee, a trained Nalco technician will conduct a service visit [VisitPerYear] times per year. The service will include: cleaning of the reactors, inspection of Water Saver's internals, check operation of all Water Saver valves and components, adjustments of operational settings (if needed), and a full report of the service.

**What are Water Saver Program costs?**

| | |
|---|---|
| Water Saver Program | $[WaterSaverProgram] [WaterSaverUnit] |
| Digital System Controller | Included |
| Connectivity to 3D TRASAR® | Included |
| Remote Alarming of Operating Conditions | Included |
| Professional Installation (recommended) | $[InstallationCost] |
| Annual Service Plan (recommended) | $[Services] |
| Chemicals | $[Chemicals] |
| Additional Equipment | $[AdditionalEquipments] |

Nalco appreciates your interest in the Water Saver Program. We believe that it will provide you with significant value and help you meet your sustainability goals and objectives. If you have any questions regarding this proposal, please contact me at [SalesRepEngineerPhoneNo] or via email at [SalesRepEmail]

**Sincerely,**


[NalcoRep]
Nalco Company

Date : [Date]

[Customer Name]
[Address]
[City]
[State]
[Country]

[T_Pricing] Customer may terminate
this Agreement within 90 days of the
beginning of the Program on _____
("Trial Period") and Nalco shall refund
payments made by Customer to Nalco
for the Program during the Trial Period,
excluding non-standard installation
charges. Customer shall immediately
return the Equipment pursuant to the
terms and conditions set forth in this Agreement if there is a

Nalco Company
1601 West Diehl Road
Naperville, IL 60563-1198
630 305 1000
www.nalco.com

**Subject:** Nalco Membrane Performance Management Proposal

**Dear [Customer Name],**

Thank you very much for the opportunity to submit our recommendations and pricing for Nalco's Membrane Performance Management program using 3D TRASAR Technology for Membranes.

Nalco's Membrane Performance Management program brings you many potential benefits:

- Reduce water usage and waste water generated, with associated cost savings

- Minimize the risk of problems associated with inadequate water quality and insufficient water production

- Reduce your environmental footprint through water, chemical and energy savings

- Reduce your total cost of ownership (TCO) by minimizing unscheduled shut downs, maximizing membrane life and optimizing cleaning frequency and other preventive maintenance tasks

- Gain access to Nalco's extensive expertise on Membrane operations, and receive the benefit of having membrane experts monitoring your RO 24/7/365, alerting you to issues before they become problems and allowing you to take action before RO system performance is irreversibly affected

- Explore options for cost effective partial or total outsourcing of system Operation & Management

- Gain access to Web based Site and Enterprise wide view of critical water operations with 3D TRASAR Technology for Membranes, Cooling water and Boilers.

Based on the information we reviewed in the Discovery agreement we are projecting that by implementing Nalco's 3D TRASAR Technology for Membranes it may be possible to save between [TotalSaveCost] per year compared to current operation. These savings do not take into account the value of preventing production problems or process upsets due to inadequate water quality or unreliable water supply.

Nalco greatly appreciates the opportunity to submit our proposal for your facility. We welcome the opportunity to discuss this offering and its benefits at your convenience.

**Sincerely,**

[Sales Rep Name]
Nalco Company

## PRICING – Membrane Performance Management

Membrane Performance Management General Terms and Conditions ("Agreement") **Nalco Company ("Nalco")**

### 1. THE PROGRAM:

Nalco shall provide the Services and Equipment set forth in Exhibit A. Nalco shall be responsible for reasonable diligence and care in providing its services and products. Customer acknowledges that the ultimate success of the program set forth in this Agreement (the "Program") is dependent upon the Customer's reasonably diligent application of the Program in accordance with Nalco's instructions. Nalco shall not be liable for any failure caused by Customer's lack of diligence or failure to follow Nalco instructions.

### 2. ACCEPTANCE:

Customer accepts all of the terms and conditions set forth in this Agreement, and agrees that any additional or different terms or conditions contained in Customer's purchase orders or other documents shall not modify this Agreement, notwithstanding any acknowledgment or acceptance of such documents by Nalco.

## 3. PRICE AND PAYMENT:

(a) Pricing shall be set forth on Exhibit A. Pricing shall include a standard installation charge. The criteria for standard installation is set forth on Exhibit B and to the extent Customer requires installation services not included in the standard offering, Customer shall be assessed additional charges.

(b) Payment terms shall be net 30 days unless specifically changed elsewhere in this Agreement, and payment shall be in lawful money of the United States, without deduction or offset. Past due invoices are subject to a late fee equal to the lesser of one and one-half percent per month or the highest rate permitted by law.

## 4. FORCE MAJEURE AND SHORTAGES:

Neither party shall be liable for any failure or delay in performance (other than payment) which is due, in whole or in part, to any cause of any nature beyond the reasonable control of the party affected. If there are product shortages for any reason, Nalco may allocate the available supply of product among itself, its affiliates and its customers on whatever basis it deems practical.

## 5. WARRANTIES AND LIMITATION ON LIABILITY:

(a) Nalco warrants that services provided as part of the Program will be performed in a good and workmanlike manner. Nalco will perform such services in accordance with sound generally accepted practices in effect at the time of performance.

(b) Nalco warrants that the equipment itself does not infringe any patent of the United States. Customer shall give Nalco prompt written notice of any patent infringement suit or claim, Nalco shall control the defense or settlement of same and Customer shall cooperate in such defense. Nalco's liability under this warranty is limited to such defense, and, if sale or use of the product is enjoined, refund of the price paid by Customer for such product (less a reasonable charge for use, damage and obsolescence). Nalco makes no warranty against patent infringement arising out of Customer's particular use of the equipment, alone or in combination with other materials or any product resulting from such use.

(c) Because many factors affect product application and performance, Nalco will be relying on information provided by Customer concerning its facility, operations and systems to develop a Program suitable for Customer's needs. Customer shall be responsible for the accuracy of the information provided to Nalco, and Nalco assumes no liability or obligation for any technical advice, services or products provided by Nalco based on incorrect information from Customer. Customer is responsible for designating appropriate places in its facilities and processes for feeding and storing chemical products, installing equipment products and conducting related sampling and testing activities.

(d) Nalco shall not be liable for any incidental, consequential, indirect or special damages, including, but not limited to, lost profits and lost production, whether arising under breach of warranty or contract, negligence, strict liability or other tort, indemnity or any other theory of liability. In any event, Nalco's liability for any and all claims, damages and causes of action arising out of the sale, use, storage, delivery or non-delivery of any product or equipment, performance of any services or any warranty shall be limited to the price (including freight charges if paid by Customer) paid to Nalco for such product or equipment.

**(e) THE FOREGOING WARRANTIES ARE EXCLUSIVE AND NALCO MAKES NO OTHER WRITTEN, ORAL, EXPRESS OR IMPLIED WARRANTIES. NALCO SPECIFICALLY DISCLAIMS THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER'S REMEDIES FOR BREACH OF ANY WARRANTY SHALL BE LIMITED TO THOSE REMEDIES DESCRIBED ABOVE.**

## 6. NALCO EQUIPMENT:

The following applies to equipment furnished to the Customer hereunder, including 3D TRASAR units ("Equipment):

(a) Equipment shall remain the sole personal property of Nalco even though attached to realty. Nalco may mark Equipment to indicate its ownership, and, Customer shall provide a suitable location and utilities for the Equipment, and is responsible for applicable personal property or use taxes. Customer agrees to provide reasonable cooperation in the filing of any financing statements believed necessary by Nalco at Nalco's sole distraction. After the termination of the agreement Nalco will, at its own expense, remove the hardware from the customer's property.

termination during the Trial Period.]

(b) Customer shall not use the Equipment with any materials or products other than those recommended or approved by Nalco. Customer shall operate the Equipment in accordance with Nalco's recommendations. Nalco shall have the right to inspect and service Equipment during normal business hours. Customer assumes all risk of loss, damage or liability arising from its possession or use of Equipment, and shall indemnify Nalco from all such losses, damages or liabilities. Customer shall obtain and maintain for the term of this Agreement property damage and liability insurance and insurance against loss or damage to the Equipment including without limitation, loss by fire and such other risks of loss as are customarily insured against on the type of Equipment provided hereunder by businesses in which Customer is engaged.

(c) Customer shall provide the required utilities (power, air, water) for the equipment supplied by Nalco and other appropriate needs (shelter, tank pads, spill protection, etc.).

(d) Any software and documentation provided by Nalco remains the sole and exclusive property of Nalco, and shall be used only for purposes authorized by Nalco. Nalco has one or more patents related to the know-how (the "TRASAR Technology") that cover the practice of this Program. Nalco hereby grants Customer a non-exclusive and expressed license to practice the TRASAR Technology as part of this Program. The license granted by this Agreement is not transferable or assignable. Customer may not grant any sublicense in the TRASAR Technology. Any implied or expressed license grant by this Agreement ends upon termination of the Agreement.

## 7. CONFIDENTIALITY:

Customer shall not: (a) disclose to any third party and shall prevent third parties from obtaining or becoming aware of the composition, design, operation or application of the Program and the contents of this Agreement (collectively, the "Proprietary Information") without in each instance securing the prior written consent of Nalco; or (b) use the Proprietary Information for any purpose other than the purpose for which Nalco provided the Proprietary Information to Customer. Customer shall not be liable for the use or disclosure of information that: (a) is already in the public domain at the time of the use or disclosure; (b) becomes part of the public domain through no fault of Customer; (c) is disclosed to Customer by a third party having the right to make such disclosure; or (d) is in the possession of Customer at the time of disclosure by Nalco.

## 8. INDEMNIFICATION:

Nalco shall indemnify and hold harmless Customer for all losses, liabilities, costs (including, but not limited to, reasonable attorneys' fees), expenses and claims for personal injury or death, or tangible property damage or loss (collectively, the "Claims"), to the extent proximately caused by the negligence or willful misconduct of Nalco. Customer shall indemnify and hold harmless Nalco for all Claims to the extent proximately caused by the negligence or willful misconduct of Customer. In the event of a Claim arising out of the joint negligence or willful misconduct of Customer and Nalco, Customer and Nalco shall be liable to each other and to any damaged third party in proportion to their relative degree of fault.

## 9. TERMINATION:

Either party may terminate this Agreement if (a) the other party fails to perform or meet a material obligation under this Agreement and (b) such default is not cured within 45 days after written notice of the failure. Each delivery under this Agreement shall be considered a separate and independent contract. If Customer fails to make a payment when due or Customer's financial condition becomes unsatisfactory to Nalco, then Nalco, at its option, may (a) withhold future performance until Customer cures the default or improves its financial condition to Nalco's satisfaction; (b) require payment in advance; or (c) terminate this Agreement. This Agreement may be terminated before the end of the contract period by either party upon 30 days prior written notice to the other. If Customer terminates this Agreement for convenience, 80% of all remaining fees for the length of the contract period become due immediately and Customer shall return Equipment to Nalco at Customer's sole expense in the same condition as received, ordinary wear and tear excepted, within 30 days.

## 10. MISCELLANEOUS:

(a) This Agreement shall be governed by the Uniform Commercial Code and other laws of Illinois, and not by the United Nations Convention for the International Sale of Goods. Customer agrees that the courts of the United States have non-exclusive jurisdiction for the resolution of disputes with respect to this Agreement.

(b) Customer shall inform Nalco of any special or unusual safety precautions that should be taken because of conditions in Customer's plant or process.

(c) Failure by either party to require strict compliance with any provision hereof shall not be construed as a waiver of that provision or any other provision. If any competent authority holds that any provision hereof is wholly or partially void or unenforceable, this Agreement shall be deemed modified to conform to applicable law and shall continue to be valid.

(d) All prior and contemporaneous proposals, negotiations and agreements, written and oral, with respect to the transactions contemplated herein are merged into this Agreement, which constitutes the entire agreement between Customer and Nalco with respect to such transactions. This Agreement may not be altered, modified or amended except pursuant to a writing signed by both Customer and a senior executive of Nalco.

(e) Nalco shall be an independent contractor with respect to the services to be performed under this Agreement. Nalco, its subcontractors and their respective employees shall not be deemed to be the servants, employees or agents of Customer.

(f) Nalco shall be entitled to subcontract portions of the work to be performed under this Agreement provided that the subcontractor shall be acceptable to the Customer.

## EXHIBIT A

### SERVICES; TERM

**SERVICES**

- Site survey

- Hardware required for monitoring 2 separate RO trains with one or two stages (Hardware remain the property of Nalco Company)

- Nalco Global Gateway (NGG remain the property of Nalco Company)

- Standard installation (defined in attachment)

- Data transfer costs

- Secure customer 3DT web site with normalization, trending graphs and documentation of cost savings and performance vs. Best in class

- Alarms sent via e-mail and/or text message

- Alerts reviewed by System Assurance Center, and, as required, sent via e-mail and/or text message

- Weekly review of operating data by System Assurance Center (even if there are no alarms or alerts)

- Weekly reports with recommendations

- Quarterly calibration of 3D TRASAR for Membrane sensors

**[TRIAL PERIOD –OPTIONAL PROVISION**

## EXIBIT B

### INSTALLATION CRITERIA
### Standard Install

**Included In Monthly Fee:**

1. Install may consist of up to 4 man days (i.e. 1 person for 4 days or 2 people for 2 days), and will include the activities as described below. All work included in the basic install assumes the use of Nalco employees or Nalco approved contractors (at Nalco's discretion).

2. Install will include complete assembly and installation of all 3D TRASAR Technology for Membranes equipment. This includes assembly of skid components, electrical wiring of all components on the skid, connection of sampling lines to the RO skid, wiring of all sensors to the RO skid, and calibration of all RO skid components. 3D TRASAR Technology for Membranes skid should be located less than 20ft from the RO system.

3. Communications with the customer's PLC is also included (when applicable), provided that the customer has an open communications port and the necessary information to communicate with the PLC (i.e. protocol types, tags, etc…). Important, the PLC information must be confirmed prior to ordering equipment or scheduling the installation. Any other custom work around this will need to be quoted by Nalco separately (i.e. extra communication modules, custom programming, etc…).

**Not included in Monthly Fee (requires separate quote):**

1. RO Modifications are not included in the standard installation. All necessary sample points must have taps available for use, so that Nalco can properly tee the location. If additional pressure transducers need to be installed, there must also be

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 269 of 990   PageID
#: 5447

a proper tap location. Flow meters that do not have a 4-20ma output or do not come through the PLC, need to have a new Nalco flow meter installed at an additional cost.

2. All special requirements for plumbing materials (i.e. stainless steel, etc…), installation scheduling (i.e. special hours), creating additional taps (welded / drilled and tapped) or any other condition not within the scope outlined here, need be quoted by Nalco separately.

**Additional Requirements for Program:**

1. Electrical power for the RO skid needs to be within 5ft (1.5m) of the 3DTfM skid location. Reasonable customer conduit requirements and appropriate electrical codes will be met for all Basic Installations. Any additional requirements will need to be quoted by Nalco separately.

2. The customer is responsible for maintaining and calibrating all non-Nalco sensors on the RO system. It is critical that all customer sensors that Nalco is relying on for information (i.e. pressure transducers or flow meters) are verified to be operational before the installation is complete, so that the customer can take any necessary action required.

3. All Basic Installs assumes that scaffolding, work on ladders or use of fall protection is not required in order to perform the services included as part of this offering. Any special customer specific training requirements are limited to 1hr. If required, these would be considered additions to the standard offering and would have to be quoted separately.

```
                                                Page 1

  1                 UNITED STATES DISTRICT COURT

  2                 EASTERN DISTRICT OF TENNESSEE

  3                   CHATTANOOGA DIVISION

  4

  5   ECOLAB INC., and NALCO COMPANY, LLC

  6   d/b/a Nalco Water, an Ecolab Company

  7   and/or Nalco Water,

  8                   Plaintiffs,

  9      vs.                    Case No. 1:22-cv-00050-TRM-SKL

 10                             Hon. Travis R. McDonough

 11                             Mag. Judge Susan K. Lee

 12   ANTHONY RIDLEY, and CHEMTREAT, INC.,

 13                   Defendants.

 14    _____

 15

 16       CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

 17

 18       The Virtual Deposition of JOHN ALCORN

 19       Taken Via Remote Zoom Videoconference

 20       Commencing at 9:35 a.m.

 21       Tuesday, March 28, 2023

 22       Stenographically reported by:

 23       Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR

 24

 25   Job No. 5841471
```

Page 121

1    Q.   Why was he terminated?

2    A.   For violation of our policies.

3    Q.   Which policy?

4    A.   The one that you referenced earlier, the certification

5         about confidential and other employer information.

6    Q.   Okay. Can you pull that up?  That's 52.

7    A.   Yes, sir.

8    Q.   Okay. Just as a background question, Mr. Alcorn, is

9         there a policy, a written policy that ChemTreat has

10        that relates to this certification that's marked as 52?

11   A.   I'm not sure I understand the question.

12   Q.   Sure, sure. I mean, I'll try to make it better for you.

13        Okay. You testified it was a violation of his policies.

14        And then you referenced this certification. Okay.

15        That's been marked as 52, right?

16   A.   Yes.

17   Q.   And so what I'm asking you, sir, is are there any like

18        policies, portions of the handbook, stand-alone

19        policies that are separate but relate to this

20        certification?

21   A.   Specifically to this certification?

22   Q.   Yes, sir.

23   A.   I'm unaware if there is that -- anything like that.

24   Q.   Okay. So but when you said violation of policies, you

25        were referring to the violation of the certification

1          that's been marked as 52?

2     A.   Yes.

3     Q.   Okay. Were there any other policies that you were

4          referring to as a basis for Mr. Ridley's termination?

5     A.   No, sir.  It was this certification.

6     Q.   Okay. So which paragraphs of the certification was Mr.

7          Ridley fired for violating?

8     A.   Really it was tied to number two that I returned all

9          the information and, in particular, the email to myself

10         information.

11    Q.   Okay. And what, what, what was the basis of your belief

12         that Mr. Ridley violated point two in the cert -- in

13         the certification that we've marked as Exhibit 52?

14    A.   I became aware that Mr. Ridley had emailed himself a

15         document believed to be a Nalco document that I was

16         informed was a response to a request for proposal, and

17         then he had emailed that from a personal email address

18         to his ChemTreat email address.

19    Q.   Have you ever seen that document?

20    A.   I have seen that document for the first time Sunday.

21    Q.   Okay. As a part of your prep for your deposition,

22         correct?

23    A.   Yes.

24    Q.   So what -- explain to me the process for coming to the

25         decision to terminate Mr. Ridley?  Did you have, you

Page 196

1                           CERTIFICATE OF NOTARY

2       STATE OF MICHIGAN   )

3                           ) SS

4       COUNTY OF WAYNE     )

5

6                   I, JOANNE MARIE BUGG, certify that this

7          remote deposition was taken before me on the date

8          hereinbefore set forth; that the foregoing questions

9          and answers were reported by me stenographically and

10         reduced to computer transcription; that this is a true,

11         full and correct transcript of my stenographic notes so

12         taken; and that I am not related to, nor of counsel to,

13         either party nor interested in the event of this cause.

14

15

16

17

18

19                          *Joanne M. Bugg*

20

21                          JOANNE MARIE BUGG, CSR-2592

22                          Notary Public

23                          Wayne County, Michigan

24                          My Commission expires: 2-26-2025

25

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF TENNESSEE
 2                 CHATTANOOGA DIVISION
 3   _____
                            )
 4   ECOLAB Inc., and NALCO  )
     COMPANY, LLC d/b/a      )
 5   Nalco Water, an Ecolab  )
     Company and/or Nalco    )
 6   Water,                  )
                             )
 7            Plaintiffs,   )   No.
                             )   1:22-cv-00050-TRM-SKL
 8        -vs-               )
                             )
 9   ANTHONY RIDLEY,         )
     andCHEMTREAT INC.,      )
10                           )
              Defendants.   )
11   _____
12                **CONFIDENTIAL**
             (PORTIONS HIGHLY CONFIDENTIAL)
13          PURSUANT TO PROTECTIVE ORDER
14
        VIDEOTAPED DEPOSITION TAKEN REMOTELY VIA
15                  VIDEOCONFERENCE
                        OF
16            RICHARD CISSELL, JR.
17
                WILLIAMS & CONNOLLY LLP
18               680 MAINE AVENUE SW
                WASHINGTON, DC 20024
19                 APRIL 6, 2023
                    9:02 A.M.
20
21
22
23   REPORTED BY:
24   DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE
25   JOB NO. 5857250
```

1  we can talk next week."

2                    Do you see that?

3        A.      I do.

4        Q.      So do you remember what -- why

5  you were reaching out to Mr. Ridley?

6        A.      I don't recall specifically.  But

7  just, you know, reading on down through the

8  text, it was for the position that I had open

9  in Chattanooga area for the upcoming

10  retirement of David Ellis.

11                   And then it appears that we had a

12  corporate account job open in primary metals

13  as well.

14        Q.      And why did you think Mr. Ridley

15  might be good for those jobs?

16                   MS. MIRMIRA:  Objection to form.

17                   THE WITNESS:  David Ellis was a

18            long-term senior rep in the Chattanooga

19            area, I needed -- with a lot of, you

20            know, unique accounts.  So I needed a

21            rep who had, you know, quite a bit of

22            experience; and I knew that, from my

23            previous relationship with Anthony, that

24            he lived in the Chattanooga area, so

25            that was why I began discussions with

1         him.

2    BY MR. WINSMAN:

3         Q.    Do you remember if you reached

4    out to anyone else?

5         A.    I would have reached out to a lot

6    of different people.  I don't recall anyone

7    specific.  I know there was -- oh, there's a

8    couple of guys that work for SUEZ in the area.

9    A guy named Sam Bledsoe is with Veolia SUEZ,

10   another company.  I believe I interviewed him,

11   talked to him.  That's the only one that comes

12   to mind.

13        Q.    But you believe that there would

14   have been a number of people that you reached

15   out to?

16        A.    Yes.

17        Q.    And is it two separate jobs that

18   you're talking about in this exchange?

19        A.    Yes.  The one in Chattanooga

20   would have been preparing for the departure of

21   David Ellis and then the -- the other one, I'm

22   not -- I don't have a lot of details on.  I

23   don't work in our corporate accounts group,

24   but I know that there was a primary metals CAM

25   position open at the time.

1          A.      I don't recall.

2          Q.      How do you find out that he was

3    being hired by ChemTreat?

4          A.      Probably just by the rumor mill,

5    heard about it.

6          Q.      Okay.  If you look further down

7    on that page, you ask Mr. Ridley to send you

8    his non-compete.

9                  Do you see that?

10         A.      I do.

11         Q.      Why did you need that?

12         A.      It's standard procedure for us to

13   request those documents for our HR to review

14   them.

15         Q.      Prior to this, had you ever

16   discussed with Mr. Ridley his non-compete

17   agreement at all?

18         A.      I don't recall that I had or

19   hadn't, no.

20         Q.      Did you have any concern about

21   whether the position he was entering --

22   interviewing for at ChemTreat would implicate

23   his non-compete agreement?

24                 MS. MIRMIRA:  Objection to form.

25                 THE WITNESS:  That is -- you

1          know, part of our process, as I

2          indicated, is for the -- for human

3          resources to review that documentation,

4          and they would have input on that.

5                    THE REPORTER:  Mr. Cissell, I'm

6          going to ask you to put your hand down.

7                    MS. MIRMIRA:  Yeah, I was just

8          about to --

9                    THE WITNESS:  Is that what it is?

10          Sorry.

11                    MS. MIRMIRA:  I think that's

12          what's causing some of the audio issues.

13          If you could put your hand down, then

14          the voice will come through a little bit

15          better.

16                    Thanks.

17                    THE WITNESS:  Do I need to repeat

18          that or did you get it?

19                    THE REPORTER:  No, I'm fine.

20                    THE WITNESS:  Okay.  My

21          apologies.

22    BY MR. WINSMAN:

23          Q.    Okay.  Did you ever -- prior to

24    him -- prior -- strike that.

25                    Prior to Mr. Ridley starting work

1    at ChemTreat, did you ever discuss his

2    Nalco/Ecolab non-compete agreement with him?

3         A.    There's no conversation that

4    comes to mind where we discussed it.

5         Q.    Prior to Mr. Ridley starting at

6    ChemTreat, did you ever discuss with him

7    whether he should bring any Nalco or Ecolab

8    documents with him?

9         A.    I did not.

10         Q.    Did you ever instruct him that he

11    should not bring any Nalco or Ecolab documents

12    with him?

13         A.    I did.

14         Q.    When did you discuss that?

15         A.    I can't recall the specific

16    dates, but on multiple occasions I informed

17    Mr. Ridley that it was against ChemTreat

18    policy, that we did not want him to bring

19    anything from his former employer, that we

20    didn't need anything from his former employer.

21              And we actually have all our new

22    employees sign a Certificate of Compliance

23    stating that they know that that is a

24    violation of ChemTreat policies.  Should they

25    do that, there would be, and could be,

```
 1   significant consequences up to and including
 2   termination.
 3        Q.    And you -- is your testimony that
 4   you specifically discussed all that with
 5   Mr. Ridley?
 6        A.    It is.  It's also my testimony
 7   that I recall -- I remember Steve Leavell
 8   communicating that to him at our interview.
 9        Q.    And which interview was that?
10        A.    Bristol.
11        Q.    Do you remember anything else
12   about that interview in Bristol?
13        A.    That just pop -- that just popped
14   into my head because of us discussing it.
15             MR. WINSMAN:  Vidya, I think
16        maybe now is a good time to take another
17        10-minute break.  Does that work for
18        you?
19             MS. MIRMIRA:  Sure thing.
20             MR. WINSMAN:  Okay.  So come back
21        at 11:46?
22             MS. MIRMIRA:  Sounds good.
23             THE VIDEOGRAPHER:  The time is
24        11:36 a.m.  This ends unit two.  We're
25        off the record.
```

1   want to go back and look quickly at Exhibit

2   41, and just compare and confirm that February

3   3rd was also the day that you were meeting

4   with Mr. Leavell to talk about Mr. Ridley.

5           A.      Got it.

6                   Those appear to be the right

7   dates, yes.

8           Q.      So --

9           A.      What was -- what -- which exhibit

10  are we on now, 51?

11          Q.      I'm sorry.  Back to 63.

12          A.      63.  Okay.

13          Q.      So that same day that you were

14  meeting with Mr. Leavell, you write to

15  Mr. Ridley and ask him to put together a

16  three-year business plan.  You say, "Nothing

17  fancy just send est," I'm guessing that's

18  maybe estimate, "of the dollars you can sell

19  year one, two, and three.  I like using rep's

20  estimates to put together their compensation

21  model."

22                  Do you see that?

23          A.      I do.

24          Q.      So did Mr. Leavell ask you to

25  have Mr. Ridley put together a business plan?

1                    MS. MIRMIRA:  Objection to form.

2                    THE WITNESS:  I don't recall if

3         he did or did not.

4    BY MR. WINSMAN:

5         Q.    Okay.  So is this something that

6    you normally ask reps to do during the

7    recruitment process?

8                    MS. MIRMIRA:  Objection to form.

9                    THE WITNESS:  It's common.  But

10        we don't do it all the time, no.

11   BY MR. WINSMAN:

12        Q.    Yeah, but when you say, "just an

13   est of the dollars you can sell year one, two,

14   and three," what -- what do you mean "of the

15   dollars you can sell"?

16        A.    So in a -- in a pay plan, part of

17   the calculation that ultimately generates a

18   potential income are -- is a new business

19   dollar value.  I will normally have candidates

20   input on that because I don't want to build a

21   compensation plan that is outside the scope of

22   what they feel like they can do --

23        Q.    And --

24        A.    -- unrealistic.

25        Q.    -- had you talked at all with

1          A.     It looks like it claims an

2     attachment, Ridley Business Plan 2021 through

3     '22 and '23.

4          Q.     And in a moment, we can go ahead

5     and look at that attachment.  I just wanted to

6     ask you a couple questions about the e-mail

7     first.

8          A.     Okay.

9          Q.     He -- Mr. Ridley says, "I did

10    make some assumption for transition into the

11    role, learning the ChemTreat business and

12    chemistries, time needed to transfer accounts,

13    and my non-compete."

14               Looking at that -- the portion of

15    that where he says the "time needed to

16    transfer accounts," had you talked with him

17    about transferring accounts at all?

18         A.     Yes, that would have been in

19    regards to Davis Ellis -- the David Ellis

20    business that we would have been transferring

21    to Anthony.

22         Q.     And what kind of time would be

23    needed to transfer those accounts?

24         A.     As much time as necessary to

25    secure the territory, so that ChemTreat didn't

Page 107

1    lose any -- any business.

2         Q.    Okay.  And then he said -- he

3    also mentions that he makes assumptions for

4    his non-compete.

5              At this point, had you had any

6    discussions with him about his non-compete?

7         A.    I don't recall whether I had or

8    had not.  It -- you know, it would have been

9    reviewed by Human Resources.  That's our --

10   our typical policy.  When we have non-competes

11   that are being reviewed, they do it.

12        Q.    And you had -- did you testify

13   earlier that you had multiple conversations

14   with Mr. Ridley about not bringing any Nalco

15   information with him to ChemTreat?

16        A.    I did.

17        Q.    So you recall having multiple

18   conversations with him about that, but you're

19   not sure whether you had any conversations

20   with him about his non-compete agreement at

21   all?

22        A.    Correct, not the content.

23        Q.    But you were very clear with him

24   about not bringing any Nalco information?

25        A.    Yes.

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 285 of 990   PageID #: 5463

Page 108

1      Q.     All right.  If you could go ahead
2  and look at Exhibit 44.
3              (Exhibit 44, multipage document
4        titled RIDLEY - 2020/2021 Bridge, was
5        previously marked for identification.)
6      A.     All right.
7      Q.     And I'll represent to you,
8  Mr. Cissell, that this is the attachment to
9  that e-mail that we just looked at that was
10  Exhibit 43.
11      A.     Okay.
12      Q.     And I know it -- it could be hard
13  to read, possibly, in whatever fashion it
14  shows up on.  So if you need to zoom in at
15  all, please go ahead.
16              But if you could just take a
17  general look at it and let me know when you're
18  done.
19      A.     I think I can -- I think I can
20  make it all out.
21      Q.     Okay.
22      A.     (Reviewing document.)
23              I'm good.
24      Q.     Okay.  Do you recognize this
25  document at all?

1          A.      I think I recall seeing this

2     document, yes.

3          Q.      And what is it?

4          A.      This is the business plan that

5     Anthony provided to me that I had requested.

6          Q.      And --

7          A.      He uses -- he uses the

8     $800,000.00 number there as the 2020 base.

9          Q.      And do you see at the top of --

10    excuse me -- for example, that -- the first

11    page where it says, "RIDLEY - 2020/2021

12    Bridge"?

13         A.      I see that.

14         Q.      What is a bridge?

15              MS. MIRMIRA:  Object to form.

16              THE WITNESS:  A bridge is like a

17         forecast.

18    BY MR. WINSMAN:

19         Q.      Does ChemTreat ask its reps to

20    prepare bridge plans at all?

21         A.      We do not.

22         Q.      Do you recall seeing documents

23    that look like this from your time at Nalco?

24              MS. MIRMIRA:  Object to form.

25              THE WITNESS:  I recall that Nalco

```
                                  Page 110

  1          did use bridge documents, but it's been

  2          long enough ago that I really don't

  3          recall the content of them.

  4   BY MR. WINSMAN:

  5          Q.      Did you ever have to prepare

  6   bridge plans or any bridge documents at --

  7   when you were at Nalco?

  8          A.      As a District Manager I did have

  9   to prepare a bridge plan, yes.

 10          Q.      Did they look like this?

 11                  MS. MIRMIRA:  Object to form.

 12                  THE WITNESS:  I really don't

 13          recall the -- the format.  I mean,

 14          ChemTreat uses bridge plans.  I did not

 15          recognize that -- this to be a Nalco

 16          format or a Nalco document.  To me it's

 17          just a -- you know, an Excel document

 18          that Anthony chose to send me his

 19          forecast in.

 20   BY MR. WINSMAN:

 21          Q.      Okay.  Do you know who Mike

 22   Chmelovski is?

 23          A.      I do know Mike.

 24          Q.      Who is he?

 25          A.      Mike was a -- he was an old
```

Case 1:22-cv-00050-TRM-SKL  Document 253-2  Filed 05/25/23  Page 288 of 990  PageID #: 5466

```
 1        somewhere else?
 2                MR. WINSMAN:  I'm sorry.
 3        I apologize.  I appreciate that, Vidya.
 4   BY MR. WINSMAN:
 5        Q.    What -- what does an -- a
 6   ChemTreat employee have to do to reach a
 7   certain bonus level?
 8                MS. MIRMIRA:  Objection to form,
 9        but you may answer.
10                THE WITNESS:  So a field
11        salesperson does not have a opportunity
12        to make a bonus with ChemTreat.
13   BY MR. WINSMAN:
14        Q.    And is field sales the position
15   that you were discussing with Mr. Ridley?
16        A.    Yes, I believe so at this point.
17   Mr. Ellis would have communicated his
18   retirement was going to be fish -- official at
19   the end of the year and we were moving towards
20   placing Anthony into David Ellis's position.
21        Q.    And I just want to make sure I
22   understand.
23                Did you say that a field -- a
24   ChemTreat field sales employee is not able to
25   make a bonus?
```

1    bringing in new clients to ChemTreat?

2              MS. MIRMIRA:  Objection to form.

3              THE WITNESS:  I don't recall

4         doing that.  Mr. Ridley's priority would

5         be, first, would be to integrate,

6         secure, and keep all the business that

7         we were transferring from Mr. Ellis.

8         That would be -- that would take some

9         time.  David -- I think David retired in

10        December, so Anthony would have spent a

11        lot of time with him from his hire date

12        till when Mr. Ellis retired.

13   BY MR. WINSMAN:

14        Q.    Okay.  And I think, if I'm

15   remembering correctly, the number that you

16   gave Mr. Ridley for the size of the territory

17   that he would inherit from Mr. Ellis was

18   approximately $800,000.00 in revenue.

19              Is that correct?

20        A.    Yeah, that was the number I told

21   him to use.

22        Q.    So if, for argument sake, that

23   was the number, that $75,000.00 in new sales

24   would be on top of that $800,000.00 in

25   existing revenue; is that right?

Page 149

1  Exhibit 52.

2                    (Exhibit 2, document titled

3          Certification of Compliance of

4          Obligations to Prior Employers, bearing

5          Bates Number CHEMR-000000142, was

6          previously marked for identification.)

7                    THE WITNESS:  All right.  Okay.

8          I've got it.

9  BY MR. WINSMAN:

10         Q.     And what is this?

11         A.     This looks like our Certificate

12  of Compliance of Obligation to Prior Employers

13  that we require all our employees to sign.

14         Q.     And did you discuss this

15  certification with Mr. Ridley?

16         A.     This would have been run through

17  our HR department.  They would have had those

18  conversations, but I will reiterate the fact

19  that I did communicate to Mr. Ridley that we

20  did not want him to bring anything from his

21  previous employer.  We did not want him to

22  send himself anything, no confidential

23  information was to come over with him on more

24  than one occasion; and that if he did do that,

25  you know, ramifications could be serious.

Page 150

1    Q.    And you -- so your testimony is

2  that you specifically talked about the

3  possible ramifications of bringing over

4  information from his prior employer?

5    A.    Yes.

6    Q.    And do you remember when you had

7  that discussion with him?

8    A.    Would have been in our

9  interviews.

10    Q.    And was that before he signed

11  this certification?

12    A.    It would have been -- I

13  specifically remember doing it in the Bristol

14  interview and in the Nashville interview, but

15  I do not recall the dates.  I -- I think they

16  were before this was signed.  Well, I know, it

17  is.  Yes, it was.

18    Q.    Okay.

19    A.    I just noticed the date down

20  there at the bottom.

21    Q.    And did you -- did you talk to

22  him specifically about this certification?

23         MS. MIRMIRA:  Objection to form;

24    asked and answered.

25         THE WITNESS:  We did not review

Page 151

1          this certification.  We talked about it
2          at a high level, that it was ChemTreat's
3          expectation that he would not bring
4          anything with him.  ChemTreat is a very
5          large company.  We don't need any of
6          their confidential information.  We
7          don't need anything from Nalco.  We
8          don't need you to bring anything.  We
9          don't want you to bring anything.  It's
10         basically the spiel that I give to each
11         candidate that I interview.
12    BY MR. WINSMAN:
13         Q.    So you give that same speech, as
14    you called it, to everyone that you interview?
15         A.    Yes.
16         Q.    So there was nothing unique about
17    giving it to Mr. Ridley?
18         A.    Other than I think I did it
19    twice.
20         Q.    Do you remember him asking you
21    any questions about that at all?
22         A.    I don't.  I think he accepted it
23    for what it was, understood it.
24         Q.    Okay.  Did you have to sign a
25    certification similar to this when you joined

JA-294

1    BY MR. WINSMAN:

2         Q.      How was Mr. Ridley's performance

3    once he joined ChemTreat?

4         A.      From what I knew, as far as I

5    knew, it was -- it was okay.

6         Q.      When you say as far as you knew,

7    is there someone who would know better?

8         A.      I mean -- so Mr. Ridley was with

9    us for seven or eight months.  I mean, the

10   first five to six months of that time span he

11   was in the truck with David Ellis

12   transitioning accounts, meeting people,

13   relationship building, that kind of thing,

14   process -- learning their processes and our

15   applications.

16              So outside of David Ellis being

17   in the truck with him, there was only a short

18   amount of time where Anthony Ridley would have

19   been on his own.

20        Q.      I mean, we saw earlier the -- the

21   model for the compensation plan.  And I think

22   that included commissions on both transferred

23   business as well as new business; is that

24   correct?

25        A.      It did.

Case 1:22-cv-00050-TRM-SKL  Document 253-2  Filed 05/25/23  Page 294 of 990  PageID #: 5472

Page 214

1  litigation brought by Nalco/Ecolab that you
2  were aware of?
3                    MS. MIRMIRA:  Objection to form;
4           asked and answered just now.
5                    But go ahead.
6                    THE WITNESS:  Yeah, the -- this
7           is the only one that I was aware of, and
8           I didn't have a lot of the detail on
9           that one.
10  BY MR. WINSMAN:
11          Q.    Okay.
12                   MR. WINSMAN:  Vidya, could we
13          just take, like, five minutes?  I think
14          we might be just about done here.
15                   MS. MIRMIRA:  Sure thing.  We can
16          go off the record.
17                   MR. WINSMAN:  All right.
18                   THE VIDEOGRAPHER:  The time is
19          4:16 p.m.  We're off the record.
20                   (A recess is held from 4:16 p.m.
21          to 4:25 p.m.)
22                   THE VIDEOGRAPHER:  The time is
23          4:25 p.m.  We're on the record.
24  BY MR. WINSMAN:
25          Q.    All right.  Mr. Cissell, just a

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 295 of 990  PageID #: 5473

Page 221

```
 1                    CERTIFICATE
 2  STATE OF NEW JERSEY    )
 3                         ) ss:
 4  COUNTY OF CAMDEN       )
 5       I, Debra Sapio Lyons, a Registered
    Diplomat Reporter, a Certified Realtime
 6  Reporter, a Certified Realtime Captioner, an
    Approved Reporter of the United States
 7  District Court for the Eastern District of
    Pennsylvania, a Certified Court Reporter for
 8  the State of New Jersey and Notary Public
    within and for the State of New Jersey, do
 9  hereby certify:
10       That Richard Cissell, Jr., the witness
    whose deposition is hereinbefore set forth,
11  appeared remotely using Zoom videoconference
    audio/visual communication technology, was
12  remotely duly sworn by me and that such
    deposition is a true record of the testimony
13  given by such witness, to the best of my
    ability and thereafter reduced to typewriting
14  under my direction.
15       I further certify that I am not related to
    any of the parties to this action by blood or
16  marriage and that I am in no way interested in
    the outcome of the matter.
17
         In witness whereof, I
18  hand this 10th of April, 2(
19
                        _____
20                      DEBRA SAPIO LYONS
                        CRR, RDR, CRC, CCR, CPE, CLR
21                      CCR License No. XI00881
                        Notary Public I.D. No. 2036088
22                      Expiration 10/26/2027
23
24
25
```

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF TENNESSEE
   ------------------------------------------------------
 3
   ECOLAB INC., and NALCO COMPANY, LLC
 4 d/b/a Nalco Water, an Ecolab Company
   and/or Nalco Water,
 5
                    Plaintiffs,
 6
      -vs-            Case No. 1:22-cv-00050-TRM-SKL
 7
   ANTHONY RIDLEY, and CHEMTREAT, INC.,
 8
                    Defendants.
 9
   ------------------------------------------------------
10
11            Video Examination of COREY DeMARCO,
12 taken at the instance of the Defendants, under and
13 pursuant to the Federal Rules of Civil Procedure,
14 before Dawn M. Lahti, a Certified Realtime Reporter,
15 Registered Professional Reporter and Notary Public
16 in and for the State of Wisconsin, with some
17 participants appearing via Zoom videoconference, at
18 SpringHill Suites, 1011 Tony Canadeo Run, Green Bay,
19 Wisconsin, on April 24, 2023, commencing at 9:11
20 a.m. and concluding at 4:29 p.m.
21
22
23
24
25
```

1      specifically?

2   A   No.

3   Q   Did you make any notes regarding Topic 3?

4   A   No.

5   Q   So who are the employees that Nalco/Ecolab

6      claims that ChemTreat improperly solicited?

7   A   Well, there was Anthony Ridley.  There was

8      Tracy Guddendorf, Doug Glanz, Simon Walker,

9      Jessica Grailer.

10  Q   Anyone else?

11  A   Not that I recall off the top of my head.

12  Q   All right.  Let's start with Mr. Guddendorf.

13             When did ChemTreat solicit

14     Mr. Guddendorf?

15  A   I don't know the exact date.

16  Q   What was the time period, roughly?

17  A   Roughly 2021.

18  Q   And was that solicitation improper?

19  A   I don't believe so.

20  Q   When did Ecolab learn about the solicitation?

21  A   When he resigned.

22  Q   And when did he resign?

23  A   I believe in 2021.

24  Q   And how did Ecolab learn about the

25     solicitation?

1    A    Through his resignation.

2    Q    What did Ecolab do when it learned about the

3         solicitation?

4    A    I don't -- I don't believe we did -- I don't

5         think we're -- I don't think we're contesting

6         that he -- he went to work for ChemTreat.

7    Q    For example, did Ecolab run a Digital Guardian

8         report on Mr. Guddendorf's activity?

9    A    I don't know that.

10   Q    Do you know if Mr. Guddendorf had signed an

11        agreement like the Employee Sales, Service,

12        Marketing & Inventions Agreement at Exhibit 77?

13   A    Yes.

14   Q    How do you know that?

15   A    I saw a copy of it.

16   Q    Do you know if it had all the same terms as

17        Exhibit 77?

18   A    I believe it was a different version of this.

19   Q    And do you know how it was different?

20   A    It was with regard to him being a manager-level

21        employee, and it prevented him from going to

22        work as a direct employee for a competitor.

23   Q    So did Mr. Guddendorf breach a contractual duty

24        that he owed to Ecolab?

25   A    I believe so.

```
 1   Q    And what duty was that?
 2   A    That he shouldn't go to work for a competitor.
 3   Q    Did Mr. Guddendorf breach any duty not to
 4        solicit employees of Ecolab?
 5   A    I don't know that.
 6   Q    Well, does Ecolab believe that Mr. Guddendorf
 7        breached a duty to solicit -- not to solicit
 8        employees of Ecolab?
 9   A    I don't -- I don't believe so.  I don't know.
10   Q    Does Ecolab believe that Mr. Guddendorf
11        breached a contractual duty not to solicit
12        customers of Ecolab?
13   A    Not at this time.  I don't believe so.
14   Q    Does Ecolab believe that Mr. Guddendorf
15        breached a duty not to take confidential
16        information from Ecolab?
17   A    Not at this time.
18   Q    The next employee you identified was Mr. Glanz.
19                  When did ChemTreat solicit
20        Mr. Glanz?
21   A    It was roughly the same time period, 2021, I
22        believe.
23   Q    And who at ChemTreat solicited Mr. Glanz?
24   A    I don't know that.
25   Q    And was ChemTreat's solicitation of Mr. Glanz
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 300 of 990  PageID #: 5478

```
 1       improper?
 2   A    I don't --
 3                 MR. HONEYCUTT:   Object.
 4   BY MS. LUND:
 5   Q    You can go ahead and answer unless he instructs
 6        you not to answer.
 7   A    I don't believe it was.
 8   Q    When did Ecolab learn about Mr. Glanz's
 9        solicitation?
10   A    When he resigned.
11   Q    And how did Ecolab learn about that
12        solicitation?
13   A    He told us.
14   Q    What did Ecolab do when it learned about the
15        solicitation?
16   A    I believe we tried to keep him as an employee.
17   Q    And that was unsuccessful?
18   A    Yes.
19   Q    Do you know what Ecolab did to try and keep
20        Mr. Glanz as an employee?
21   A    I don't know exactly what the offer was to try
22        to keep him.
23   Q    Did Mr. Glanz sign a restrictive covenant or a
24        non-compete agreement like what we see in
25        Exhibit 77?
```

1   A    Similar to this one.

2   Q    Have you seen the agreement he signed?

3   A    Yes.

4   Q    Is it different from Exhibit 77 in some of its

5        terms?

6   A    Yes.

7   Q    How does it differ?

8   A    It prevents him from going to work for a direct

9        competitor.

10  Q    So does Ecolab believe that Mr. Glanz breached

11       a contractual duty that he owed to Ecolab?

12  A    Yes.

13  Q    And what duty was that?

14  A    That he went to work for a direct competitor in

15       a similar role to what he held with us.

16  Q    Does Ecolab believe that Mr. Glanz breached a

17       duty not to solicit other Ecolab employees?

18  A    I don't -- I don't believe so.

19  Q    Does Ecolab believe that Mr. Glanz breached a

20       duty not to solicit Ecolab customers?

21  A    I don't believe so.  Not that I'm aware of.

22  Q    Does Ecolab believe that Mr. Glanz breached a

23       duty not to take confidential information of

24       Ecolab's?

25  A    I don't believe so.

```
1   Q    When Mr. Glanz told Ecolab that he was going to
2        ChemTreat, what did Ecolab do other than make
3        an offer to try to retain him?
4   A    I believe that was it.
5   Q    Do you know whether they ran a Digital Guardian
6        report of his online activity?
7   A    I don't know that.
8   Q    The next person you identified was Simon
9        Walker.  What was Mr. Walker's role at Ecolab?
10  A    He was a sales representative.
11  Q    In what area?
12  A    In our heavy business.
13  Q    And what is heavy business?
14  A    It's related to heavy industry.
15  Q    Did ChemTreat solicit Mr. Walker?
16  A    Yes.
17  Q    When did ChemTreat solicit Mr. Walker?
18  A    I believe about the same time period, 2021.
19  Q    And how do you know that ChemTreat solicited
20       Mr. Walker?
21  A    He told us he was going to work for them.
22  Q    And do you know whether Mr. Walker reached out
23       to ChemTreat or ChemTreat reached out to
24       Mr. Walker?
25  A    Sorry, excuse me.  I made an error there.  We
```

```
 1        actually terminated Mr. Walker.
 2   Q    So Ecolab fired Mr. Walker?
 3   A    Yes.
 4   Q    And then at some point after Ecolab fired him,
 5        he went to work for ChemTreat; is that correct?
 6   A    Yes.  He sought employment with them.
 7   Q    And so when did Ecolab learn that Mr. Walker
 8        had accepted a position at ChemTreat?
 9   A    I believe 2021 time frame.
10   Q    And how did Ecolab learn about that?
11   A    I don't know.
12   Q    And what did Ecolab do when it learned that
13        Mr. Walker had gone to work for ChemTreat?
14   A    I believe they did run a Guardian report.
15   Q    A Digital Guardian report?
16   A    Yes.
17   Q    And what did that show?
18   A    That a large number of files were -- were
19        taken.
20   Q    And when were they taken?
21   A    I believe they were taken just prior to and
22        immediately after his termination.
23   Q    And how were they taken?
24   A    They were downloaded.
25   Q    On to what?
```

```
 1   A    An external device of some sort.
 2   Q    Did Mr. Walker sign an agreement like
 3        Exhibit 77?
 4   A    Yes.
 5   Q    And have you seen that agreement?
 6   A    Yes.
 7   Q    Is it the same in all respects as Exhibit 77?
 8   A    I believe it is.
 9   Q    So did Mr. Walker breach a contractual duty
10        that he owed to --
11   A    Yes.
12   Q    -- Ecolab?
13   A    Yes.
14   Q    And what duty was that?
15   A    It would be under number two that he was to
16        protect confidential and trade secret
17        information.
18   Q    Did Mr. Walker breach any duty not to solicit
19        former -- not to solicit employees of Ecolab?
20   A    I don't know that.
21   Q    Does ChemTreat believe that Mr. Walker breached
22        a duty not to solicit employees of Ecolab?
23   A    I don't know if ChemTreat knows that.
24   Q    Sorry.  Does Ecolab believe that Mr. Walker
25        breached a duty not to solicit employees of
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2~  Filed 05/25/23  Page 305 of 990  PageID #: 5483

1    Ecolab?

2 A  I don't know that.

3 Q  Does Ecolab believe that Mr. Walker breached a

4    duty not to solicit customers of Ecolab?

5 A  Could you repeat that?

6 Q  Sure.  Does Ecolab believe that Mr. Walker

7    breached a duty not to solicit customers of

8    Ecolab?

9 A  Yes.

10 Q  And how did he breach that duty?

11 A  I believe he called on customers, his current

12    customers or his Ecolab customers immediately

13    after leaving.

14 Q  What customers did he call on?

15 A  I know for sure Nucor.

16 Q  And how do you know for sure that he called on

17    Nucor?

18 A  Well, it was a jeopardy account for us.

19 Q  So what do you mean when you say Nucor was a

20    jeopardy account?

21 A  It was an account that we had that became in

22    jeopardy immediately after his leaving.

23 Q  Did anyone at Nucor tell you that Mr. Walker --

24 A  No.

25 Q  -- called on -- I'm sorry, you have to let me

1       finish my question.  Like I said, you'll know

2       whether I'm going, but you have to let me get

3       it out.

4                 Did anyone at Nucor tell you

5       that Mr. Walker called on them after he left --

6  A   Not that I'm aware of.

7  Q   Try that again.  Did anyone at Nucor tell you

8       that Mr. Walker called on them after he left

9       Ecolab?

10  A   Not that I'm aware of.

11  Q   So is there any factual basis for Ecolab's

12      belief that Mr. Walker called on Nucor after he

13      was terminated by Ecolab?

14  A   I don't know that.

15  Q   Is there -- does Ecolab believe that Mr. Walker

16      called on Nucor while employed by ChemTreat?

17  A   Yes.

18  Q   And what is the basis for that belief?

19  A   It was part of the investigator's report.

20  Q   And what report is that?

21  A   Well, the investigation by our investigators

22      into Mr. Walker.  I've only been told of it,

23      and I trust their information.

24  Q   So who are your investigators that you're

25      referring to?

1  A   I don't -- I don't know them.

2  Q   So how do you know that they did an

3      investigation?

4  A   I had a discussion regarding Mr. Walker.

5  Q   A discussion with whom?

6  A   Mr. Honeycutt.

7  Q   So what facts is Ecolab aware of that leads

8      Ecolab to believe that Mr. Walker called on

9      Nucor while employed by ChemTreat?

10 A   I don't know that there are any facts.  It's an

11     intuition, I guess.

12 Q   The next individual that you identified was

13     Jessica Grailer?

14 A   Um-hum.  Yes.

15 Q   And where did Ms. Grailer work for Ecolab?

16 A   She was a sales representative.

17 Q   Was she a managerial employee?

18 A   No.

19 Q   Did she sign a restrictive covenant like

20     Exhibit 77?

21 A   Yes.

22 Q   Have you seen that agreement?

23 A   Yes.

24 Q   Is it the same as Exhibit 77?

25 A   Yes.

1      Ecolab employees in violation of a contractual
2      duty?
3    A    No.
4    Q    Does Ecolab believe that Ms. Grailer solicited
5         Ecolab customers in violation of a contractual
6         duty?
7    A    Not that I'm aware of at this point in time.
8    Q    So coming back to Mr. Guddendorf, with regard
9         to Mr. Guddendorf, does Ecolab believe that
10        ChemTreat encouraged Mr. Guddendorf to breach a
11        contractual duty that he owed to Ecolab?
12   A    Well, by hiring him, I would say yes.
13   Q    Did ChemTreat do anything other than hire
14        Mr. Guddendorf that Ecolab believes caused a
15        breach of any duty owed by Mr. Guddendorf to
16        Ecolab?
17   A    Not that I'm aware of.
18   Q    What about Mr. Glanz, does Ecolab believe that
19        ChemTreat did anything to encourage Mr. Glanz
20        to breach a contractual duty that he owed to
21        Ecolab?
22   A    Similar to Mr. Guddendorf, yes.
23   Q    And that would be that ChemTreat hired him?
24   A    Yes.
25   Q    But not that ChemTreat did anything else other

1       than hiring him?

2   A   That's all I'm aware of at this point.

3   Q   And what about Mr. Walker, does Ecolab believe

4       that ChemTreat did anything to encourage

5       Mr. Walker to breach a contractual duty that he

6       owed to Ecolab?

7   A   I don't know.

8   Q   Who at Ecolab would know that?

9   A   I don't know.

10  Q   What about Ms. Grailer, does Ecolab believe

11      that ChemTreat did anything to encourage

12      Ms. Grailer to breach a contractual duty that

13      she owed to Ecolab?

14  A   Inasmuch as they asked her to produce a

15      business plan.

16  Q   And when did ChemTreat ask Ms. Grailer to

17      produce a business plan?

18  A   Prior to hiring her.

19  Q   And what is your basis for that assertion?

20  A   An email exchange in which Ms. Grailer

21      referenced her business plan.

22  Q   And have you seen the business plan that she

23      prepared?

24  A   I have not.

25  Q   And why would preparation of that business plan

Case 1:22-cv-00050-TRM-SKL  Document 255-2   Filed 05/25/23   Page 310 of 990   PageID #: 5488

```
 1       be a breach of a duty that was owed to Ecolab?
 2   A   I believe it encourages her to use her
 3       knowledge of our information to produce a
 4       business plan that would benefit them.
 5   Q   Do you know -- but you said you haven't seen
 6       the business plan?
 7   A   I have not.
 8   Q   So you don't actually know what it includes?
 9   A   I do not.
10   Q   Okay.  Was Ms. Grailer prohibited from seeking
11       employment with ChemTreat?
12   A   No.
13   Q   Was she prohibited from showing ChemTreat that
14       she had the knowledge and skills to be a
15       successful employee at ChemTreat?
16   A   If it included our information and her
17       knowledge that she had access to at our
18       company.
19   Q   So I want to make sure we're very clear here.
20                  Do you have any reason to
21       believe that the business plan you say
22       Ms. Grailer prepared included confidential
23       information from Ecolab?
24   A   I've come to the conclusion based on the fact
25       that she took trade secret and confidential
```

```
 1        information and produced a business plan for
 2        ChemTreat that she used that information to
 3        produce the business plan.
 4   Q    But you haven't seen the business plan, so
 5        that's really just speculation on your part,
 6        correct?
 7                    MR. HONEYCUTT:  Object.
 8                    THE WITNESS:  I have not seen the
 9        business plan.
10   BY MS. LUND:
11   Q    So you don't know what it contains?
12                    MR. HONEYCUTT:  Object.
13                    THE WITNESS:  I do not.
14   BY MS. LUND:
15   Q    So you're just speculating that it includes
16        Ecolab's information?
17                    MR. HONEYCUTT:  Object.
18                    THE WITNESS:  Yes.
19   BY MS. LUND:
20   Q    And if the business plan contains only
21        ChemTreat's information, would that be a breach
22        of any contractual duty that Ms. Grailer owes
23        to Ecolab?
24   A    Potentially.
25   Q    How?
```

1   Q    Was that solicitation improper?

2   A    I don't know.

3   Q    Does Ecolab believe that Mr. Ridley violated a

4        contractual duty that he owed to Ecolab?

5                    MR. HONEYCUTT:   Object.

6                    THE WITNESS:  Yes.

7   BY MS. LUND:

8   Q    What contractual duty does Ecolab believe that

9        Mr. Ridley violated?

10  A    That he took trade secrets.

11  Q    And is there any other contractual duty that

12       Ecolab believes Mr. Ridley violated?

13  A    I believe Mr. Ridley recruited Mr. Bates.

14  Q    And does Ecolab believe that that recruitment

15       was a violation of Mr. Ridley's contractual

16       duty not to solicit Ecolab employees?

17                   MR. HONEYCUTT:   Object.

18                   THE WITNESS:  I don't recall.

19  BY MS. LUND:

20  Q    Did Mr. Ridley manage Mr. Bates at Ecolab?

21  A    I don't believe so.

22  Q    Did Mr. Ridley supervise Mr. Bates at Ecolab?

23  A    I don't believe so.

24  Q    Did Mr. Ridley have material contact with

25       Mr. Bates as an employee of Ecolab?

1    A    I don't know.

2    Q    Does Ecolab believe that Mr. Ridley violated a

3         contractual duty not to solicit employees of

4         Ecolab as to anyone other than Tyler Bates?

5    A    I don't believe so.

6    Q    Does Ecolab believe that Mr. Ridley violated a

7         contractual duty it owed to Ecolab not to

8         solicit customers of Ecolab?

9    A    Could you repeat that?

10   Q    Sure.  Does Ecolab believe that Mr. Ridley

11        violated a contractual duty he owed to Ecolab

12        not to solicit customers of Ecolab?

13   A    We're unsure at this time.

14   Q    So right now it's April 24th of 2023, correct?

15   A    Yes.

16   Q    And do you know when Mr. Ridley stopped working

17        for ChemTreat?

18   A    I don't know that off the top of my head.

19   Q    I will represent to you that it was March 18th

20        of 2022.

21   A    Okay.

22   Q    So that's more than a year, correct?

23   A    It is.

24   Q    So what has Ecolab done to find out in that

25        intervening year whether Mr. Ridley while

1    employed by ChemTreat solicited any Ecolab

2    employees who were within the scope of his

3    employment agreement at Exhibit 77?

4  A  We typically just have employees keep their

5    eyes open while they're visiting the customer

6    sites.

7  Q  And so has any employee of Ecolab reported to

8    Ecolab that Mr. Ridley solicited a customer he

9    was not permitted to after leaving Ecolab?

10 A  I don't believe so.

11 Q  So does Ecolab have any factual basis for

12   believing that Mr. Ridley solicited a customer

13   of Ecolab in violation of his employment

14   agreement at Exhibit 77?

15 A  I don't think we're arguing that he -- whether

16   he solicited a customer or not.  I think we are

17   questioning whether -- we're questioning the

18   amount of confidential information that he took

19   with him.

20          MS. LUND:  I think we're at a good

21   place for a break if we want to go off the

22   record.

23          VIDEO OPERATOR:  Going off the record

24   at 10:18.

25          (Recess taken from 10:18 a.m. to

```
 1       10:40 a.m.)
 2               VIDEO OPERATOR:  We're back on the
 3       record at 10:40.
 4  BY MS. LUND:
 5  Q    Mr. DeMarco, before we took our break, we were
 6       talking about current and former Ecolab
 7       employees that ChemTreat had solicited.  Do you
 8       remember that discussion?
 9  A    Yes.
10  Q    Can you think of anybody who we haven't talked
11       about that Ecolab contends has been solicited
12       by ChemTreat?
13  A    No.  I mean, just sticking to the five people
14       that we had called out, Mr. Ridley, Simon
15       Walker, Jess Grailer, and the others, Tracy
16       Guddendorf and Doug Glanz.
17  Q    All right.  Then let's go ahead and turn to
18       Topic 2.  If you can look at Exhibit 100, the
19       Rule 30(b)(6) notice.
20               If you look at page 6, you'll
21       see Topic 2 relates to "Information in the
22       possession, custody, or control of Ecolab
23       regarding any customers that provide the basis
24       in whole or in part for any damages or harm
25       that Ecolab alleges it has suffered as a result
```

1    of the conduct alleged in this litigation."

2                    Do you see that?

3  A   Yes.

4  Q   Are you prepared to testify today on behalf of

5      Ecolab as to Topic 2?

6  A   Yes.

7  Q   What did you do to prepare to testify on

8      Topic 2?

9  A   Just had discussions with Mr. Honeycutt.

10 Q   Did you speak to any current or former

11     employees of Ecolab?

12 A   No.  I don't believe we're claiming any damages

13     at this time.

14 Q   Okay.  And what is that based on, that belief?

15                MR. HONEYCUTT:  Object.

16                THE WITNESS:  We're just not making

17     any claims at this time, claims to damages.

18 BY MS. LUND:

19 Q   So as Ecolab's designated corporate

20     representative, you are testifying today that

21     Ecolab is not seeking any monetary damages in

22     this litigation?

23                MR. HONEYCUTT:  Object.

24                THE WITNESS:  At this time.

25

1    BY MS. LUND:

2    Q    So --

3                     MR. HONEYCUTT:  I just want to

4         correct that.  As to Topic 2 for

5         customer-related damages, correct?

6                     THE WITNESS:  Yes.

7                     MR. HONEYCUTT:  Is that what you

8         meant?  Okay.

9    BY MS. LUND:

10   Q    So let me be clear.  You understand that Ecolab

11        has retained an accountant who has prepared an

12        expert report that alleges that Ecolab has

13        suffered up to $158.5 million in damages in

14        this litigation.

15                     You understand that, correct?

16                     MR. HONEYCUTT:  Object.

17                     THE WITNESS:  I have not read that

18        report, no.

19   BY MS. LUND:

20   Q    Do you understand that Ecolab is seeking

21        $158.5 million in this litigation?

22                     MR. HONEYCUTT:  Object.

23                     THE WITNESS:  I have not read that

24        report.

25

```
 1   BY MS. LUND:
 2   Q    My question to you testifying as the
 3        representative of Ecolab, do you understand
 4        that Ecolab is seeking $158.5 million in this
 5        litigation?
 6   A    I'm not aware.
 7   Q    You haven't seen that number at all?
 8   A    I have not.
 9   Q    You haven't heard that number at all?
10   A    I have not.
11   Q    Does that number surprise you?
12   A    It doesn't.
13   Q    Why doesn't it surprise you?
14   A    Because these are large corporations, and they
15        seek damages against each other all the time.
16   Q    But you just testified that as far as you know,
17        Ecolab has not lost any customers at all as a
18        result of any actions by Mr. Ridley or
19        ChemTreat that are at issue in this litigation;
20        is that correct?
21             MR. HONEYCUTT:  Object.
22             THE WITNESS:  I think we're still
23        trying to determine that.
24   BY MS. LUND:
25   Q    Okay.  Well, Mr. DeMarco, you are here to
```

```
 1        testify as to everything Ecolab knows about the
 2        customers that are the source of any damages or
 3        harm it claims it has suffered as a result of
 4        the actions of Mr. Ridley or ChemTreat.  You
 5        understand that?
 6   A    Yes.
 7   Q    Okay.  So are there any customers for which
 8        Ecolab contends it has suffered damages or harm
 9        as a result of Mr. Ridley's actions?
10   A    I don't believe we're making any claim
11        against -- about a specific customer at this
12        time.
13   Q    Are there any customers that Ecolab contends
14        form the basis for damages or harm that it
15        suffered as a result of ChemTreat's actions?
16   A    I don't think we're making any claims to that
17        at this time.
18   Q    Is Archer Daniels Midland a customer of Ecolab?
19   A    They are.
20   Q    And what specific ADM facilities did Ecolab
21        service as of July 2020?
22   A    I believe all of them in North America.
23   Q    Has Ecolab lost any of ADM's business since
24        July 2020?
25   A    Not that I'm aware of.
```

1   Q    So Ecolab is not contending it's lost any

2        business with ADM as a result of any actions of

3        Mr. Ridley or ChemTreat?

4                   MR. HONEYCUTT:  Object.  Asked and

5        answered.

6                   THE WITNESS:  I don't believe we're

7        claiming any lost customers at this time.

8   BY MS. LUND:

9   Q    So my question to you was, Ecolab is not

10       claiming that it has lost any business with ADM

11       as a result of any actions of Mr. Ridley or

12       ChemTreat; is that correct?

13  A    At this time.

14  Q    What about Anheuser-Busch, is that a customer

15       of Ecolab?

16  A    It is.

17  Q    Has Ecolab lost any business with

18       Anheuser-Busch since July 2020?

19  A    I believe we have.  I don't know the details of

20       every customer we have.

21  Q    Does Ecolab contend that any of the business

22       that was lost with Anheuser-Busch was lost as a

23       result of the actions of Mr. Ridley or

24       ChemTreat?

25  A    I don't think we're claiming any -- any loss at

```
 1      this time.
 2  Q   What about Blue Bell Creameries, is that a
 3      customer of Ecolab?
 4  A   I can honestly say I don't know every customer.
 5  Q   So do you know whether Ecolab is claiming that
 6      it has lost any business with Blue Bell
 7      Creameries as a result of the actions of
 8      Mr. Ridley or ChemTreat?
 9  A   I don't think we're claiming anything at this
10      time.
11  Q   What about Bungee or Bungee, are they a
12      customer of Ecolab's?
13  A   Yes.
14  Q   And has Ecolab lost any business with Bungee
15      since July of 2020?
16  A   I believe we have.
17  Q   Is Ecolab claiming that that business was lost
18      as a result of the actions of Mr. Ridley or
19      ChemTreat?
20          MR. HONEYCUTT:  Object.
21          THE WITNESS:  I don't think we're
22      claiming damages or loss at this time.
23  BY MS. LUND:
24  Q   So is that a no?
25  A   We're not claiming damages or loss at this
```

```
 1        time.
 2   Q    What about Cargill Meat Solutions, was that a
 3        customer of Ecolab in July of 2020?
 4   A    They are.
 5   Q    Are they still a customer of Ecolab?
 6   A    Yes.
 7   Q    Has Ecolab lost any business with Cargill Meat
 8        Solutions since July of 2020?
 9   A    I don't know.  I don't know.
10   Q    So Ecolab is not claiming that any business
11        lost from Cargill Meat Solutions was the result
12        of any actions of ChemTreat or Mr. Ridley?
13   A    I don't believe we're claiming any loss at this
14        time.
15   Q    What about Coca-Cola, is that a customer of
16        Ecolab?
17   A    Yes.
18   Q    Has Ecolab lost any business with Coca-Cola
19        since July of 2020?
20   A    I don't know.
21   Q    So Ecolab is not claiming that any business
22        from Coca-Cola has been lost as a result of
23        actions by Mr. Ridley or ChemTreat?
24   A    I don't believe we're claiming any damages or
25        loss at this time.
```

1  Q   What about The Chattanoogan, is that a customer
2      of Ecolab?
3  A   That I don't know.
4  Q   Do you know whether that used to be a customer
5      of Ecolab?
6  A   I don't know.
7  Q   Do you know whether Ecolab has lost any
8      business with The Chattanoogan since July of
9      2020?
10 A   I don't think we're claiming any damages or
11     loss at this time.
12 Q   So Ecolab is not claiming that it lost any
13     business with The Chattanoogan as a result of
14     the actions of Mr. Ridley or ChemTreat?
15 A   I don't think we're claiming any damages or
16     loss at this time.
17 Q   What about Country Delight Farms, is that a
18     customer of Ecolab?
19 A   I don't know.
20 Q   So you don't know whether Ecolab has lost any
21     business with Country Delight Farms?
22 A   We're not claiming any damages or loss at this
23     time.
24 Q   So Ecolab is not claiming that it lost any
25     business with Country Delight Farms as a result

1       of any actions by Mr. Ridley or ChemTreat?

2   A   Not at this time.

3   Q   What about Dart Container Corporation, is that

4       a customer of Ecolab?

5   A   I believe it is.

6   Q   Has Ecolab lost any business with Dart

7       Container Corporation since July of 2020?

8   A   I don't know.

9   Q   Ecolab is not claiming that it lost any

10      business with Dart Container Corporation as a

11      result of any actions of Mr. Ridley or

12      ChemTreat?

13  A   We're not claiming any damages or loss at this

14      time.

15  Q   Is Dean Foods a customer of Ecolab?

16  A   Yes.

17  Q   Has Ecolab lost any business with Dean Foods

18      since July of 2020?

19  A   I couldn't say the specifics if we have.

20  Q   Ecolab is not claiming that it lost any

21      business with Dean Foods as a result of the

22      actions of Mr. Ridley or ChemTreat?

23  A   We're not claiming any damages or loss at this

24      time.

25  Q   Is Duracell a customer of Ecolab?

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 325 of 990   PageID #: 5503

```
 1    A    I don't know.
 2    Q    Do you know whether Ecolab lost any business
 3         with Duracell since July of 2020?
 4    A    I don't know.
 5    Q    Ecolab is not claiming it lost any business
 6         with Duracell as a result of the actions with
 7         Mr. Ridley or ChemTreat?
 8    A    We're not claiming any damages or loss at this
 9         time.
10    Q    What about Frito-Lay, is that a customer of
11         Ecolab?
12    A    Yes.
13    Q    Has Ecolab lost any business with Frito-Lay
14         since July of 2020?
15    A    I can't say specifically.
16    Q    Ecolab is not claiming that it lost any
17         business with Frito-Lay as a result of the
18         actions of Mr. Ridley or ChemTreat, correct?
19    A    Yes, we're not claiming any damages or loss at
20         this time.
21    Q    What about General Mills, is that a customer of
22         Ecolab?
23    A    Yes.
24    Q    Has Ecolab lost any business with General Mills
25         since July of 2020?
```

```
 1   A    None that I'm specifically aware of at this
 2        time.
 3   Q    Ecolab is not claiming that it lost any
 4        business with General Mills as a result of any
 5        action of Mr. Ridley or ChemTreat?
 6   A    We're not claiming any damages or loss at this
 7        time.
 8   Q    What about Grand Packaging Company, is that a
 9        customer of Ecolab?
10   A    Yes.
11   Q    Has Ecolab lost any business with Grand
12        Packaging Company since July of 2020?
13   A    Yes.
14   Q    And what business has it lost?
15   A    All of it.
16   Q    Who did it lose that business to?
17   A    I'm not aware specifically who they lost it
18        to -- who we lost it to.
19   Q    Why did Ecolab lose that business?
20   A    I'm not aware of the specifics.
21   Q    Do you know if Grand Packaging Company chose a
22        different water treatment company because they
23        were unhappy with Ecolab?
24   A    I don't know.
25   Q    Ecolab is not claiming that it lost the Grand
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 327 of 990  PageID #: 5505

```
 1        Packaging Company business as a result of any
 2        action of Mr. Ridley or ChemTreat, correct?
 3   A    I don't think we're claiming any damages or
 4        loss at this time.
 5   Q    What about Lazy Boy, is that a customer of
 6        Ecolab?
 7   A    I don't know.
 8   Q    Do you know if Ecolab has lost any Lazy Boy
 9        business since July of 2020?
10               MR. HONEYCUTT:  Object.
11               THE WITNESS:  I don't know the -- any
12        specifically.
13   BY MS. LUND:
14   Q    Ecolab is not claiming that it lost any
15        business with Lazy Boy as the result of any
16        action by Mr. Ridley or ChemTreat?
17   A    We're not claiming any damages or loss at this
18        time.
19   Q    What about Maggotteaux Pulaski, is that a
20        customer of Ecolab?
21   A    I don't know.
22   Q    Do you know whether Ecolab has lost any
23        business with Maggotteaux Pulaski since July of
24        2020?
25   A    I'm not aware.
```

```
 1    Q    Ecolab is not claiming that it lost any
 2         business with Maggotteaux Pulaski as a result
 3         of any action by Mr. Ridley or ChemTreat?
 4    A    We're not making any claim of damage or loss at
 5         this time.
 6    Q    What about Mars Petcare, is that a customer of
 7         Ecolab?
 8    A    Yes.
 9    Q    Has Ecolab lost any business with Mars Petcare
10         since July of 2020?
11    A    I don't know any specifically.
12    Q    So Ecolab is not claiming it's lost any
13         business with Mars Petcare as a result of any
14         action by Mr. Ridley or ChemTreat?
15    A    We're not claiming any damages or loss at this
16         time.
17    Q    What about Mayfield Dairy Farms, is that a
18         customer of Ecolab?
19    A    I don't know.
20    Q    Has Ecolab lost any business with Mayfield
21         Dairy Farms since July of 2020?
22    A    I don't know.
23    Q    Ecolab is not claiming that it lost any
24         business with Mayfield Dairy Farms as a result
25         of any action by Mr. Ridley and Mr. ChemTreat,
```

JA-330

1       correct -- sorry, Mr. Ridley at ChemTreat,
2       correct?
3    A  We're not claiming any damages or loss at this
4       time.
5    Q  Is Owens Corning a customer of Ecolab?
6    A  I believe it is.
7    Q  Has Ecolab lost any business with Owens Corning
8       since July of 2020?
9    A  I believe we have.
10   Q  And what business has Ecolab lost since
11      July 2020?
12   A  I don't know the specifics.
13   Q  So you don't know who Ecolab lost that business
14      to?
15   A  No.
16   Q  And you don't know why Ecolab lost that
17      business?
18   A  I'm not familiar with the specifics.
19   Q  But Ecolab is not claiming that any business it
20      lost was a result of any action by Mr. Ridley
21      or ChemTreat, correct?
22   A  We're not claiming any damages or loss at this
23      time.
24   Q  What about Pepsi Bottling Group, is that a
25      customer of Ecolab?

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 330 of 990  PageID #: 5508

1    A    Yes.

2    Q    Has Ecolab lost any business with Pepsi

3         Bottling Group since July of 2020?

4    A    I don't believe so.

5    Q    So Ecolab is not claiming its lost any business

6         with Pepsi Bottling Group as a result of any

7         action by Mr. Ridley or ChemTreat, correct?

8    A    We're not claiming any damages or loss at this

9         time.

10   Q    Is Pilgrim's Pride a customer of Ecolab?

11   A    Yes.

12   Q    Has Ecolab lost any business with Pilgrim's

13        Pride since July of 2020?

14   A    I'm not aware of any specifically.

15   Q    So Ecolab does not claim it lost any business

16        with Pilgrim's Pride as a result of any action

17        by Mr. Ridley or ChemTreat?

18   A    We're not claiming any damages or loss at this

19        time.

20   Q    What about Pinnacle Foods Group, is that a

21        customer of Ecolab?

22   A    I believe it is.

23   Q    Has Ecolab lost any business with Pinnacle

24        Foods Group since July of 2020?

25   A    I'm not aware of any specific loss.

1   Q    So Ecolab is not claiming that it's lost any

2        business with Pinnacle Foods Group as a result

3        of any action by Mr. Ridley or ChemTreat?

4   A    We're not claiming any damages or loss at this

5        time.

6   Q    What about Porex Technologies, is that a

7        customer of Ecolab?

8   A    I'm not familiar with that.

9   Q    You don't know whether Ecolab has lost any

10       business with Porex Technology since July of

11       2020?

12  A    I'm not aware.

13  Q    Ecolab is not claiming that any business it

14       lost with Porex Technologies was the result of

15       any action by Mr. Ridley or ChemTreat?

16  A    We're not claiming any damages or loss at this

17       time.

18  Q    What about Red Gold, Inc., is that a customer

19       of Ecolab?

20  A    I'm not aware.

21  Q    So you don't know whether Ecolab has lost any

22       business with Red Gold, Incorporated since July

23       of 2020?

24  A    Yes, I'm not aware.

25  Q    But Ecolab is not claiming that it lost any

```
 1        business with Red Gold, Incorporated as a
 2        result of any actions by Mr. Ridley or
 3        ChemTreat, correct?
 4   A    We're not claiming any damages or loss at this
 5        time.
 6   Q    What about Saputo Dairy Farms, is that a
 7        customer of Ecolab?
 8   A    It is.
 9   Q    Has Ecolab lost any business with Saputo Dairy
10        Farms since July of 2020?
11   A    I'm not sure.
12   Q    Ecolab is not claiming that any business it may
13        have lost with Saputo Dairy Farms was the
14        result of any action by Mr. Ridley or
15        ChemTreat, correct?
16   A    We're not claiming any damages or loss at this
17        time.
18   Q    What about Shaw Industries, is that a customer
19        of Ecolab?
20   A    I believe it is.
21   Q    Has Ecolab lost any business with Shaw
22        Industries since July of 2020?
23   A    I'm unaware of any.
24   Q    Ecolab is not claiming any business it may have
25        lost with Shaw Industries was lost as a result
```

```
 1        of any action by Mr. Ridley or ChemTreat,
 2        correct?
 3   A    We're not claiming any damages or loss at this
 4        time.
 5   Q    Is 7UP Snapple Southeast a customer of Ecolab?
 6   A    I believe they are.
 7   Q    Do you know whether Ecolab has lost any
 8        business with 7UP Snapple Southeast since July
 9        of 2020?
10   A    I'm unaware of any specifically.
11   Q    So Ecolab is not claiming it lost any business
12        with 7UP Snapple Southeast as a result of any
13        actions by Mr. Ridley or ChemTreat?
14   A    We're not claiming any damages or loss at this
15        time.
16   Q    What about Southern Mills, Incorporated, is
17        that a customer of Ecolab?
18   A    I don't know.
19   Q    So you don't know whether Ecolab has lost any
20        business with Southern Mills, Incorporated
21        since July of 2020?
22   A    I don't know of any specifically.
23   Q    So Ecolab is not claiming it lost any business
24        with Southern Mills, Incorporated as a result
25        of any actions by Mr. Ridley or ChemTreat?
```

```
 1    A    We're not claiming any damages or loss at this
 2         time.
 3    Q    What about Stevison Ham Company, is that a
 4         customer of Ecolab?
 5    A    I'm not familiar with it.
 6    Q    So you don't know whether Ecolab has lost any
 7         business with Stevison Ham Company since July
 8         of 2020?
 9    A    Correct, I don't know.
10    Q    But Ecolab is not claiming it lost any business
11         with Stevison Ham Company as a result of any
12         action by Mr. Ridley or ChemTreat?
13    A    We're not claiming any damages or loss at this
14         time.
15    Q    What about Treehouse Foods, is that a customer
16         of Ecolab?
17    A    Yes.
18    Q    Has Ecolab lost any business with Treehouse
19         Foods since July of 2020?
20    A    I think we have.
21    Q    And what business has Ecolab lost?
22    A    I would need a list to look at specifics.  I
23         don't know any off the top of my head.
24    Q    Is Ecolab contending that any of the business
25         that it has lost with Treehouse Foods since
```

1        July of 2020 was the result of any action by

2        Mr. Ridley or ChemTreat?

3    A   We're not claiming any damages or loss at this

4        time.

5    Q   What about Tropicana Products, Incorporated, is

6        that a customer of Ecolab?

7    A   I don't know.

8    Q   So you don't know whether Ecolab has lost any

9        business with Tropicana Products, Incorporated

10       since July of 2020?

11   A   I'm not aware.

12   Q   But Ecolab is not claiming that it lost any

13       business with Tropicana Products, Incorporated

14       as a result of any action by ChemTreat or

15       Mr. Ridley, correct?

16   A   We're not claiming any damages or loss at this

17       time.

18   Q   Are you claiming that anything Mr. Ridley or

19       ChemTreat has done has injured Ecolab's

20       reputation?

21   A   We're not making any claims to damage or loss

22       at this time.

23   Q   So when you say that, Mr. DeMarco, is it fair

24       to understand that your answer is a no?

25                   MR. HONEYCUTT:  Object.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 336 of 990  PageID #: 5514

1           THE WITNESS:  It's fair to say that

2      we're not claiming any damages or loss at this

3      time.

4   BY MS. LUND:

5   Q   So based on what Ecolab knows today, when you

6      say they are not claiming any damages or loss

7      at this time, as to all of the various

8      customers we've talked about, what you're

9      saying is that Ecolab does not presently have

10     any factual basis to claim it has been harmed

11     by Mr. Ridley or ChemTreat as to those

12     customers, correct?

13  A   I think I'm just saying we're not going to

14     claim damages or loss at this time.

15  Q   All right.  Then let me be really clear.

16           Has Ecolab been harmed as to any

17     of those customers but is choosing not to claim

18     damages for some reason?

19  A   We're not claiming any damages or loss at this

20     time.

21  Q   Right.  But you said that wasn't the same as

22     saying that you hadn't been -- Ecolab hadn't

23     been harmed.

24           So I'm trying to understand, are

25     you contending that Ecolab has been harmed but

```
 1        is not claiming damages as to any of those
 2        customers?
 3   A    I think we're leaving it open as future and
 4        other litigations played out.  We're not making
 5        any claims of damage or loss at this time.
 6   Q    So is it fair to say that based on the facts
 7        known to Ecolab today, Ecolab does not have any
 8        reason to believe it has been damaged or harmed
 9        as to any of those customers that we've talked
10        about?
11   A    I don't think that's fair to say.
12   Q    Okay.  So what about that is an unfair
13        statement?
14   A    I think we're saying we're not going to make
15        any claims or state any damages or loss at this
16        time.
17   Q    Does Ecolab as of today have any factual basis
18        to believe that any action by Mr. Ridley has
19        led to any harm with respect to any customer of
20        Ecolab?
21             MR. HONEYCUTT:  Object.
22             THE WITNESS:  I don't know all the
23        details.  What I know is we're not making any
24        claims of damage or loss at this time.
25
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 338 of 990  PageID #: 5516

 1  BY MS. LUND:

 2  Q    And unless Ecolab discovers new information

 3       that it doesn't currently have, is it fair to

 4       say it has no basis to claim it has been harmed

 5       by any action by Mr. Ridley with regard to its

 6       customers?

 7  A    I don't know how else to say it, I guess.

 8       We're not making any claims of loss or damage

 9       at this time, and we reserve the right to make

10       those in the future.

11  Q    Okay.  If I can direct your attention back to

12       Exhibit 100, which is the 30(b)(6) notice, I

13       want to direct your attention to page 5,

14       Topic 1.

15               You'll see that topic says,

16       Information in the possession, custody, or

17       control of Ecolab related to each of the eight

18       categories of information, customer files,

19       customer documents, business plans,

20       playbooks/best practices, training documents,

21       employee compensation documents, fact packs,

22       and customer contact information, the Ecolab

23       identified in its response to ChemTreat's

24       Interrogatory No. 1 as modified by the Court's

25       February 24, 2023, order found in the docket at

1    paths.  I'm going to warn you this is a large

2    document.

3              (Exhibit 101 was marked for

4    identification.)

5              MS. LUND:  Then we'll get that loaded

6    to the Exhibit Share as well.

7    BY MS. LUND:

8    Q    So, Mr. DeMarco, I will represent to you that

9         Exhibit 101 is a document that was produced by

10        Ecolab.  It's titled Files Exfiltrated by

11        Anthony Ridley.  Do you see that title up at

12        the top?

13   A    I do.

14   Q    And you see it's got a list of file paths on

15        it?

16   A    I see that.

17   Q    Have you seen this document before?

18   A    I'm not sure.  I know that through our Digital

19        Guardian report that it appears Mr. Ridley had

20        downloaded 16,000-plus files.  I'm assuming

21        this is that list.

22   Q    And does this look familiar to you in terms of

23        the way that the file paths appear?  Is that

24        similar to what you saw previously?

25   A    It's curious that it's a D drive.  I don't --

1      I'm not familiar with that prefix.
2   Q  All right.  But otherwise in terms of the file
3      paths, does it look familiar?
4   A  Yeah.  Otherwise it looks like a lot of file
5      names that would be somewhat common.
6   Q  And if you look at the bottom of the page,
7      you'll see that there are page numbers.  And
8      obviously because this is such a large file,
9      it's going to be important to keep these in
10     order to the extent that you can.
11  A  Okay.
12  Q  All right.  I want to direct your attention to
13     page 1.  Do you see that I believe six lines
14     down there is a file path that says d:\kirks
15     files, VW Chattanooga, paint shop, Nalco 7330
16     biocide product bulletin.pdf.
17              Do you see that?
18  A  Yes.
19  Q  Who is Kirk?
20  A  I don't know.
21  Q  And do you know if whoever is Kirk is still an
22     employee of Ecolab?
23  A  I don't know.  I don't know who Kirk is.
24  Q  So you don't know whether Ecolab still has
25     access to all of Kirk's files?

1   A    I don't know that at this time.

2   Q    Okay.  What is this product bulletin?

3   A    That's a product bulletin for isothiazolinone

4        biocide for a cooling tower.

5   Q    Okay.  And can you explain what that is?

6   A    It's a chemical used in a cooling tower to

7        control microbiology.

8   Q    Is that a chemical that Ecolab still sells?

9   A    Yes.

10  Q    And is that a chemical that is available from

11       other suppliers other than Ecolab?

12  A    Nalco 7330 is only available through Ecolab.

13  Q    Right, but the actual chemical composition of

14       it, is that something that other people also

15       sell?

16  A    I think so, yes.

17  Q    So this product bulletin, what information is

18       in that?

19  A    It would have specific gravity, possibly the

20       name of the active ingredient, a little bit

21       about what it does.

22  Q    And who created that product bulletin?

23  A    I don't know.  Our marketing group.

24  Q    When was it created?

25  A    A long time ago.  I don't know.

1    Q    Where did the information in it come from?

2    A    From our experts.

3    Q    Chemical experts?

4    A    Yeah.

5    Q    And if it's a chemical compound, presumably

6         somebody could run a chemical analysis on it

7         and determine what its components are, correct?

8    A    Yes.

9    Q    So you said that it was likely created by the

10        marketing department?

11   A    The product bulletin is probably created by our

12        product marketing team.

13   Q    So would they have a copy of this bulletin?

14   A    I'm assuming so, yeah.

15   Q    Do you know who else would have a copy of this

16        bulletin?

17   A    Probably any -- would have a copy of it or

18        access to a copy of it?

19   Q    Sure.  Either.

20   A    Our product bulletins are available to

21        employees, field sales employees.

22   Q    Are they available on a SharePoint?  Where are

23        they available?

24   A    They're available through our -- you'll have

25        to -- we've recently converted from our

1       connections system to a core plus system, but

2       it's our knowledge sharing system, and so it's

3       kept on there.  It's searchable.

4    Q  So product bulletins are kept on the knowledge

5       sharing system, correct?

6    A  Um-hum.

7    Q  Sorry, you have to say yes or no.

8    A  Yes.

9    Q  What else is kept on that knowledge sharing

10      system?

11   A  There are all kinds of marketing information,

12      product information, things of that nature.

13   Q  Can you give some examples?

14   A  There's information about our equipment, our

15      programs, product bulletins.  We have other

16      documents called CPPs that are confidential

17      product forms that give even more trade secret

18      detail about our applications and chemicals.

19   Q  So is this biocide product bulletin something

20      that was shared outside of Ecolab?

21   A  It could be as part of a proposal.

22   Q  Do you know whether it was shared?

23   A  Oh, I'm sure it has been shared outside of

24      Ecolab.

25   Q  Is this a trade secret?

```
 1              MR. HONEYCUTT:  Object.
 2              THE WITNESS:  The product bulletin?
 3      I don't know that it's a trade secret.
 4  BY MS. LUND:
 5  Q   All right.  If you look two lines down, you'll
 6      see there is a file path d:\kirks files, VW
 7      Chattanooga, paint shop, fiberglass, pot
 8      feeder, spec br-05.
 9              Do you see that?
10  A   Yes.
11  Q   What is this document?
12  A   It looks like either a product bulletin or a
13      specification sheet related to a piece of feed
14      equipment.
15  Q   Have you actually reviewed this document?
16  A   No.
17  Q   Do you know what information is in it?
18  A   I've reviewed documents similar to it, and it
19      would contain all the specifications about that
20      particular piece of equipment from dimensions
21      to flow rates that it can handle and things
22      like that.
23  Q   So who created this specification brochure?
24  A   I would assume our product marketing team.
25  Q   And is this something that would also be on
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 345 of 990  PageID #: 5523

```
 1        that knowledge sharing site that you talked
 2        about?
 3   A    Possibly.
 4   Q    Do you know?
 5   A    I'm not aware of every document that's on
 6        there, no.
 7   Q    Do you know whether this document was shared
 8        outside of Ecolab?
 9   A    I don't know in particular if this one was.
10   Q    Is this specification brochure a trade secret?
11             MR. HONEYCUTT:  Object.
12             THE WITNESS:  I don't know because
13        I'm not familiar with this specific one.
14   BY MS. LUND:
15   Q    If you could count five lines down, you'll see
16        that there is a file path d:\kirks files,
17        Waddington North America, commercial, WNA
18        updated C to C transfer form.
19                  Do you see that?
20   A    Yes.
21   Q    What is this?
22   A    I do not know.
23   Q    Is Waddington North America still an Ecolab
24        customer?
25   A    I don't know.
```

```
1    Q    Do you know when they stopped being an Ecolab
2         customer?
3    A    I don't know.
4    Q    Do you know what information is in this
5         document?
6                   MR. HONEYCUTT:  Object.
7                   THE WITNESS:  I don't.
8    BY MS. LUND:
9    Q    Do you know who created it?
10                  MR. HONEYCUTT:  Object.
11                  THE WITNESS:  I don't.
12   BY MS. LUND:
13   Q    Do you know when it was created?
14   A    I don't.
15   Q    Do you know how it was created?
16   A    I'm assuming through Excel.
17   Q    Do you know what information was used to create
18        it?
19   A    I do not.
20   Q    Do you know who else in Ecolab might have a
21        copy of this document?
22   A    I do not.
23   Q    Do you know whether this document was shared
24        outside of Ecolab?
25   A    I do not.
```

```
1    Q    Do you know whether this document is a trade
2         secret?
3                   MR. HONEYCUTT:   Object.
4                   THE WITNESS:   I do not.
5    BY MS. LUND:
6    Q    If I can have you turn to the next page,
7         please, page 2.
8                        And you will see if you look
9         about halfway down, there's a file called
10        d:\kirks files, Waddington North America,
11        commercial img_2532.jpg.
12                        Do you see that?
13   A    Yes.
14   Q    Have you ever seen that document before?
15   A    No.
16   Q    Do you know what this is?
17   A    It looks like a picture.
18   Q    A photo of something?
19   A    Yes.
20   Q    And do you know whether it's a photo of
21        something at the Waddington North American
22        plant?
23   A    I have no idea what it is.
24   Q    If it was something at the plant, anyone who
25        visited the plant could see the same thing,
```

```
 1      correct?
 2                MR. HONEYCUTT:  Object.
 3                THE WITNESS:  I don't know what it
 4      is, so I don't know if they could see something
 5      similar.
 6  BY MS. LUND:
 7  Q    You don't know who created it?
 8  A    I personally do not know.  I assume Kirk.
 9  Q    You don't know when it was created?
10  A    No.
11  Q    You don't know what it shows?
12  A    No.
13  Q    Do you know whether this was shared outside of
14      Ecolab?
15  A    I do not know that.
16  Q    Do you know whether this was a trade secret?
17                MR. HONEYCUTT:  Object.
18                THE WITNESS:  I don't.
19  BY MS. LUND:
20  Q    Okay.  Let's go ahead and go to page 3.  You
21      will see about halfway down there's a file path
22      d:\kirks files, VW Chattanooga, badge form and
23      drug screen result form, August 5, 2015.
24                Do you see that?
25  A    Yes.
```

1   Q   Do you know what this document is?

2   A   Based on the title it appears to be a form that

3       was filled out to receive a badge and contains

4       drug screen results.

5   Q   You haven't seen this document, though, have

6       you?

7   A   I have not.

8   Q   So you don't know what specific information is

9       in it?

10  A   No.

11  Q   And you don't know who created it?

12  A   No.

13  Q   And you don't know when it was created?

14  A   No.

15  Q   And you don't know what information was used to

16      create it?

17  A   No.

18  Q   You don't know who else in Ecolab has a copy?

19  A   No.

20  Q   Do you know whether it was shared outside of

21      Ecolab?

22  A   I do not know.

23  Q   Is it a trade secret?

24  A   I don't know that.

25  Q   A little further down the page you will see

1    that there is -- this is still page 3 -- a file
2    path d:\kirks files, VW Chattanooga,
3    commercial, quotes, Volkswagen quote for 3D
4    Trasar maintenance materials 10.17.16.
5  A    Yes.
6  Q    Have you seen that document before?
7  A    No.
8  Q    Do you know what it is?
9  A    Based on the title, it appears to be a quote
10   for maintenance material.
11 Q    Do you know what specific maintenance materials
12   it's a quote for?
13 A    Looks like it's for a 3D Trasar system.
14 Q    We spoke a little bit about the 3D Trasar
15   system, correct?
16 A    Yes.
17 Q    Is the 3D Trasar system something that Ecolab
18   has updated over the years?
19 A    Yes.
20 Q    Do you know, have there been any updates to the
21   3D Trasar equipment since 2017?
22 A    Yes.
23 Q    Do you know whether the information that's in
24   this document is still current?
25 A    I don't know that.  I think the historical

1    perspective is important on it, though, as the
2    technology is built upon itself over the years,
3    so anything historical is relevant to today.
4 Q  So a quote that was offered to Volkswagen on
5    October 17th of 2016, that's still relevant
6    today, April 24th of 2023?
7 A  It could be.  It could be useful information.
8    It tells about the specific equipment or
9    details -- details could be gleaned from it
10   about our proprietary system.
11 Q  So does this quote contain proprietary
12   information?
13              MR. HONEYCUTT:  Object.
14              THE WITNESS:  It quite possibly
15   could.
16 BY MS. LUND:
17 Q  Do you know whether it does?
18 A  I don't.
19 Q  Do you know who created it?
20 A  I don't.
21 Q  Do you know who else in Ecolab has a copy?
22 A  I do not.
23 Q  Do you know whether this was shared outside of
24   Ecolab?
25 A  I'm assuming it was.

1    Q    Do you know to whom it was given?

2    A    I don't.  I'm assuming the customer.

3    Q    Is it a trade secret?

4                    MR. HONEYCUTT:  Object.

5                    THE WITNESS:  I would think it is,

6         yes.

7    BY MS. LUND:

8    Q    And what specific information in this quote is

9         a trade secret?

10   A    Pricing.

11   Q    So pricing from October 2016 is a trade secret?

12   A    I think --

13                   MR. HONEYCUTT:  Object.

14                   THE WITNESS:  -- any historical

15        information is relevant because it creates an

16        institutional history of a relationship with an

17        account.

18   BY MS. LUND:

19   Q    But there's a difference between something

20        being relevant and something being a trade

21        secret, correct?

22                   MR. HONEYCUTT:  Object.

23   BY MS. LUND:

24   Q    You can answer.

25   A    It could be both.

1  Q    And so it's your testimony on behalf of Ecolab

2       that pricing from October of 2016 is a trade

3       secret?

4                 MR. HONEYCUTT:  Object.

5                 THE WITNESS:  I think in compilation

6       with all the other documents listed, it could

7       be construed as a trade secret, yes, invaluable

8       to our company.

9  BY MS. LUND:

10 Q    So how long does Ecolab keep a pricing offer

11      open?

12 A    Typically anywhere from 30 to 90 days.

13 Q    So VW Chattanooga could not come to Ecolab

14      today and say I have this quote for 3D Trasar

15      maintenance materials from 2016, I'd like to

16      accept that, please?

17 A    No, but we would likely say we will give you an

18      updated quote.

19 Q    And the update would include updated pricing

20      information, correct?

21 A    Yes.

22 Q    Would it also be updated to provide them with

23      the latest 3D Trasar technology?

24 A    If it required it.  It depends.

25 Q    Depends on what?

```
1    A    Depends on the system that they have and what
2         equipment specifically they need.  If they
3         still have the same equipment, then the parts
4         would still be relevant.
5    Q    And 3D Trasar you said uses chemicals; is that
6         correct?
7    A    So there's two components.  There's the
8         equipment that controls the chemical, which is
9         proprietary.  Then there's the chemical which
10        is proprietary.
11   Q    And the chemical is chosen based on the
12        particular needs of the customer, correct?
13   A    Yes.
14   Q    And that could include the particular quality
15        of the water that the customer is using,
16        correct?
17   A    Yes.
18   Q    And water quality can change over time,
19        correct?
20   A    It does.
21   Q    So the kinds of chemicals that were needed for
22        this plant in 2016 might not be the same
23        chemicals that are needed today, correct?
24   A    It's possible, or it's possible that it hadn't
25        changed at all and it's still the same.
```

1    Q    And before you updated this quote for VW

2         Chattanooga today, you would want to know what

3         equipment they use currently, correct?

4    A    Yes.

5    Q    And you would want to know what their water

6         quality is like now, correct?

7    A    Quite possibly, yes.

8    Q    And you would want to know what the current

9         chemicals that they are using to treat their

10        water is, correct?

11   A    I don't know if I would be concerned about what

12        their current chemistry is.  Possibly.

13   Q    And is that because you would want to make your

14        own determination as to what is the correct

15        chemical to sell to them today given their

16        current operations and needs?

17   A    I think we would take both into consideration.

18        We would look at the historical, what happened,

19        so that we could make wiser decisions today

20        about what we were going to propose or

21        recommend.

22   Q    Is Volkswagen still an Ecolab customer?

23   A    I don't know that.

24   Q    Did Volkswagen used to be an Ecolab customer?

25   A    Yes.

```
 1   Q    Do you know what business unit dealt with
 2        Volkswagen?
 3   A    So at that time it was probably our -- it would
 4        have been the Nalco Water Light Group, and we
 5        covered institutional business.  We covered
 6        manufacturing business.  We covered food and
 7        beverage business.  We've since segmented our
 8        business, and I believe that would now be
 9        covered by our transportation division.
10   Q    And do you know whether a copy of these files
11        were provided to the transportation division
12        when it took over the VW business?
13   A    I don't know that.
14   Q    Did you ask anyone?
15   A    I did not.
16   Q    Did you conduct any search to see whether a
17        copy of these files is held by anybody in the
18        transportation division?
19   A    We went through and tried to identify any
20        examples or people who may have actual copies
21        of these, but I don't -- I don't know that we
22        successfully found any.
23   Q    And what did that process involve?
24   A    Reaching out to current -- well, I don't know.
25        I don't know what all it involved.
```

1   Q   So you don't know --

2   A   I didn't do it myself.

3   Q   You don't know which employees were actually

4       asked whether they had copies of these files?

5   A   No, I don't know.  I do know that Mr. Ben Irwin

6       who took over as district manager had reached

7       out to Mr. Ridley for copies of files for

8       accounts and was told he didn't have any.

9   Q   So VW Chattanooga wasn't in Ben Irwin's purview

10      when he took over as district manager for

11      Mr. Ridley, correct?

12  A   That I can't say.

13  Q   So you don't know whether Mr. Irwin asked for

14      VW Chattanooga files?

15  A   I don't know which specific files Mr. Irwin

16      asked for.

17  Q   And did you speak to Mr. Irwin about the files

18      that he asked for?

19  A   No.

20  Q   Okay.  So you don't have any direct

21      knowledge -- well, I guess it would be hearsay

22      regardless.

23                  You haven't asked Mr. Irwin for

24      his own personal recollection of his

25      discussions with Mr. Ridley?

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 388 of 990  PageID #: 5536

1  A   I have not.  I did not talk to Mr. Irwin about

2      Mr. Ridley.

3  Q   All right.  So let's go ahead and look at page

4      4.  And you will see about a third of the way

5      down there's a file d:\kirks files, VW

6      Chattanooga, gate 1 access form for Brent

7      Fiddler Nalco.

8                  Do you see that?

9  A   Yes.

10 Q   Have you reviewed this document?

11 A   No.

12 Q   Do you know what it is?

13 A   No, I don't know what it is.

14 Q   Do you know what information is in it?

15 A   I do not.

16 Q   Do you know who created it?

17 A   No.

18 Q   Do you know when it was created?

19 A   I do not.

20 Q   Do you know who else in Ecolab has a copy of

21     it?

22 A   I do not.

23 Q   Do you know whether this was shared outside of

24     Ecolab?

25 A   I do not.

1    Q    Is this a trade secret?

2    A    I don't know that.

3    Q    If you look at the file path, it looks like

4         it's about five or six down, d:\kirks files,

5         University of Tennessee-Chattanooga, copy of

6         2016.  And then there's just a string of

7         letters, appasrappatnappa attendees, 5-20-2016

8         for WL121.

9                   Do you see that file path?

10   A    No.  Repeat that.

11   Q    So it might be easiest if we just count down

12        from the gate access form.  It's six lines

13        down.

14   A    Okay.  Got it.

15   Q    All right.  Have you reviewed this document?

16   A    No.

17   Q    Do you know what it is?

18   A    No.

19   Q    Do you know who created it?

20   A    No.

21   Q    Do you know when it was created?

22   A    2016.

23   Q    And is University of Tennessee-Chattanooga a

24        customer of Ecolab?

25   A    I don't know if they are today.

1   Q    And this says it was a copy, correct?

2   A    It does say copy.

3   Q    Do you know who else in Ecolab has a copy?

4   A    No.

5   Q    Do you know whether this was shared outside of

6        Ecolab?

7   A    I don't know.

8   Q    Is this a trade secret?

9   A    I don't know.

10  Q    If you could --

11                MR. HONEYCUTT:  Could we take a break

12       again?  We're back at 12.

13                MS. LUND:  Yeah.  I'm just going to

14       go ahead and finish this one page, and then we

15       can take a break.

16  BY MS. LUND:

17  Q    If you could look at the very last line on this

18       page, d:\kirks files, VW Chattanooga, bid

19       October 2015, Nalco pricing, matrix bidders,

20       alternative program.

21                Do you see that file?  It's the

22       very last line.

23  A    Yep.

24  Q    Have you reviewed this document?

25  A    I have not.

1   Q    Do you know what it is?

2   A    No.  Based -- just based on experience, this is

3         a pricing file based on alternative programs --

4   Q    What's --

5   A    -- that we submitted as part of a bid.

6   Q    Sorry.  What's an alternative program?

7   A    So we many times may be asked for a -- optional

8         programs that includes different components.

9   Q    So it might say if you choose A, the pricing is

10        X.  If you choose A and B, the pricing is Y,

11        that kind of thing?

12   A    Yeah.  Based on my experience, that's what it

13        would be.

14   Q    But you don't know actually specifically what

15        pricing information is in it?

16   A    I'm assuming it's all relevant pricing to the

17        program.

18   Q    And what program is that specifically?

19   A    To the chemical program.

20   Q    And what chemical program is that specifically?

21   A    The water treatment chemical program.

22   Q    Right.  But what specific water treatment

23        chemical program?

24   A    I don't know that.

25   Q    So looking at this file path, you can't tell

1    whether this includes pricing for equipment,

2    correct?

3  A    It could.

4  Q    But you don't know if it does?

5  A    I don't know if it does.

6  Q    And you don't know whether it includes -- which

7    specific equipment it includes if it does

8    include equipment, correct?

9  A    No.

10  Q    Let me be clear.  Do you know what specific

11    equipment it includes if it includes equipment?

12  A    No.

13  Q    And you don't know what specific chemicals it

14    includes pricing for, correct?

15  A    Correct.

16  Q    And is it fair to say that Nalco's pricing has

17    changed since October of 2015?

18  A    It likely has.

19  Q    And is it fair to say Ecolab sells different

20    products now than it did in October 2015?

21  A    Some.

22  Q    Is it fair to say that Ecolab sells different

23    equipment now as it did in October 2015?

24  A    Some.

25  Q    And you don't know whether what is listed in

```
 1        this bid is equipment that Nalco no longer
 2        sells or equipment that Nalco still sells,
 3        correct?
 4   A    Correct.
 5   Q    And I forget if I asked you.  Do you know who
 6        created this document?
 7   A    I don't.
 8   Q    And do you know who else in Ecolab has a copy?
 9   A    No.
10   Q    Do you know whether this was shared outside of
11        Ecolab?
12   A    No.
13   Q    Is this a trade secret?
14                MR. HONEYCUTT:  Object.
15                THE WITNESS:  I can't tell by just
16        looking at the name.  My opinion is in looking
17        at the number of files all related to one
18        account, the entire body of work is of extreme
19        value to us and provides a history of our
20        relationship with this customer.
21                And if those files were in somebody
22        else's hands outside of our organization, it
23        would be extremely damaging.
24   BY MS. LUND:
25   Q    And how would it be damaging?
```

1   A   Because it provides an institutional history of

2       our relationship with the customer and would

3       give someone information that they would not

4       otherwise have.

5   Q   You said you didn't know whether VW Chattanooga

6       is still a customer of Ecolab, correct?

7   A   That's correct.  But as I look through here, I

8       can probably name plenty of customers we still

9       have.

10  Q   My question to you, Mr. DeMarco, is if VW

11      Chattanooga is not still a customer of Ecolab,

12      how does it harm Ecolab for somebody else to

13      have this historic information from 2013, 2014,

14      2015?

15  A   Well, I said that I don't know if they're still

16      a customer or not.  They may be.

17  Q   Okay.

18  A   It's not under my direct report.

19  Q   Okay.  And that's because it's in the

20      transportation group, correct?

21  A   Transportation and manufacturing, yes.

22  Q   And you said you didn't know whether all of

23      these files had been transferred to that

24      division when they took over this customer

25      relationship, correct?

1   A    Correct.  And if they weren't and then our

2        competitor had this information, it would be

3        even worse for us.

4                   MS. LUND:  All right.  Why don't we

5        go ahead and take a break for lunch.

6                   VIDEO OPERATOR:  Going off the record

7        at 12:06.

8                   (Lunch recess taken from 12:06 p.m.

9        To 1:00 p.m.)

10                  VIDEO OPERATOR:  We're back on the

11       record at 1:00.

12  BY MS. LUND:

13  Q    Mr. DeMarco, before we broke for lunch, we were

14       looking at Exhibit 101 which is a list of file

15       names that Ecolab has described as files

16       exfiltrated by Anthony Ridley.

17  A    Um-hum.

18  Q    And if I can ask you to turn to page 23.  I

19       will direct your attention to the file that is

20       six lines up from the bottom.  It is d:\kirks

21       files, IAC Dayton, MSDS product info, Nalco

22       3DT260 inhibitor MSDS.

23                  Do you see that line?

24  A    I do.

25  Q    What is this?

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 366 of 990  PageID #: 5544

1  A    It looks like a PDF of a product SDS sheet.

2  Q    What is an SDS sheet?

3  A    It is a document that gives you all the

4       information about the product with regard to

5       its oh, activity, it's hazards associated with

6       handling it, how to properly handle it.

7  Q    SDS stands for safety data sheet, correct?

8  A    It does.  Material safety data sheet which is

9       now called a safety data sheet.

10 Q    And that's something that's publicly available,

11      correct?

12 A    I believe it is.

13 Q    If you look at the next line, it's d:\kirks

14      files, Southeastern Container, equipment, Nalco

15      ultrasoft LI series twin alternating softener

16      spec 570.

17               Do you see that?

18 A    Yes.

19 Q    Do you know if Southeastern Container is still

20      a customer of Ecolab?

21 A    I don't know off the top of my head.

22 Q    And what is this document, do you know?

23 A    It looks like a spec sheet for a softener.

24 Q    And so this spec sheet is something that would

25      be publicly available?

1   A   I don't know that it's publicly available but

2       readily available possibly.

3   Q   And what's the difference in your mind between

4       publicly available and readily available?

5   A   Well, to me publicly available implies you can

6       easily go to the internet and find the

7       document.  Readily available would be if a

8       customer asked for the spec sheet, we would

9       likely provide it to them.

10   Q   And is this something that would be provided to

11       a potential customer if they wanted more

12       information before making a decision about

13       whether to select Nalco?

14   A   Yeah, probably.

15   Q   Now, the next line is d:\kirks files, Pilgrim's

16       Pride Chattanooga, PP survey questions.

17                 Do you see that?

18   A   Yes.

19   Q   Is Pilgrim's Pride Chattanooga still a customer

20       of Ecolab?

21   A   I don't know that.

22   Q   And what is this document?

23   A   I don't know.  It looks like at some point they

24       performed a survey, and this is a summary of

25       that survey.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 368 of 990  PageID #: 5546

1  Q   And do you know what the PP survey refers to?

2  A   I'm assuming it's Pilgrim's Pride survey.

3  Q   But you don't know what the specific

4      information in the survey is?

5  A   Not in this particular case, no, without --

6      without seeing the document myself.

7  Q   And do you know whether this was a trade

8      secret?

9  A   I don't know that.  I haven't seen the

10     document.

11 Q   Underneath that is d:\kirks files, Mayfield

12     Dairy Athens, sweetwater, B-1416 sweet water

13     best practices.

14             Do you see that?

15 A   Yes.

16 Q   What is this?

17 A   That looks to be an internal document around

18     the best practices associated with reading a

19     dairy sweet water system.

20 Q   And is Mayfield Dairy Athens currently a

21     customer of Ecolab?

22 A   I don't know that.

23 Q   All right.  What is sweet water?

24 A   Sweet water is a system used for cooling milk.

25     And because it is one what they call skin or

1      layer away from product, it has to be treated

2      at a very pure standard.

3  Q   So do you know what information is contained in

4      this document?

5  A   I believe it's around best practices for

6      keeping the system clean and treated --

7      microbiologically clean so that it doesn't

8      potentially hurt the milk product on the other

9      side of the heat exchanger.

10  Q   And what is that belief based on?

11  A   Just 30 years of experience and knowing what

12      best practices are for a sweet water system.

13  Q   Do you know who created this document?

14  A   Not off the top of my head.

15  Q   Do you know when it was created?

16  A   I don't.

17  Q   Do you know who else in Ecolab has a copy?

18  A   I do not.

19  Q   Do you know whether it was shared outside of

20      Ecolab?

21  A   Probably not.  That's not -- doesn't --

22      typically our best practice documents we don't

23      share outside the company.

24  Q   But you don't know whether this was shared with

25      Mayfield Dairy?

```
 1    A    It should not have been.

 2    Q    And why shouldn't it have been?

 3    A    It would pertain to information that's related

 4         to Nalco's -- the best practices that Nalco

 5         established.

 6    Q    But you said it was the best practices for

 7         maintaining the equipment at Mayfield Dairy,

 8         correct?

 9    A    Yes.

10    Q    So wouldn't that be important information for

11         Mayfield Dairy to have?

12    A    Yes.  Maybe not in this form, but how we

13         applied the chemical and the recommendation

14         that we make associated with the sweet water

15         system might come from this best practice

16         document.

17    Q    But you don't know for sure whether or not this

18         was shared, correct?

19    A    I don't know that.

20    Q    And is this a trade secret?

21              MR. HONEYCUTT:  Object.

22              THE WITNESS:  Without reading the

23         document, I don't know if it contained trade

24         secrets, but it very possibly is confidential.

25
```

1   BY MS. LUND:

2   Q    The next line is d:\kirks files, Mayfield Dairy

3        Athens, six service standards, Mayfield CMV

4        workbook, March 2016.

5                     Do you see that?

6   A    I do.

7   Q    What is this document?

8   A    It's our create and maintain value workbook for

9        this customer.

10  Q    And what information is in this create and

11       maintain value workbook?

12  A    So this is really the instruction book on how

13       we ask our reps to manage an account from

14       understanding the customer's business drivers

15       to developing continuous improvement projects

16       and monetizing the value associated with those

17       continuous improvement projects, and then how

18       we communicate it back to the customer in the

19       form of an annual business review.

20  Q    So have you seen this particular document

21       before?

22  A    No, but I've seen dozens and dozens of these

23       for other customers.

24  Q    Do they all contain the exact same information?

25  A    No.  It's very customer specific.

1  Q   Do you know who created this particular
2      workbook?
3  A   Who created the workbook?
4  Q   Yes.
5  A   I don't know who created the workbook.  I'm
6      assuming Kirk filled in the six service
7      standards, the information contained within the
8      CMV workbook.
9  Q   And where would Kirk or whoever filled this out
10     have gotten that information?
11 A   Probably while he was serving and working at
12     the customer site.
13 Q   So the account rep would go to the customer
14     site and get information about the customer's
15     facility and the customer's needs and so on and
16     then put it into this workbook?
17 A   Yes.
18 Q   Do you know who else in Ecolab has a copy of
19     this workbook?
20 A   It is likely posted in an account SharePoint
21     site.
22 Q   And do you know whether Ecolab has looked to
23     find this document in an account SharePoint
24     site?
25 A   I don't know if they looked for this specific

1       document.

2   Q   Are these kinds of six service standards

3       documents generally maintained in SharePoint

4       sites?

5   A   Yes.

6   Q   Is this a customer -- part of a customer file?

7   A   It would be part of the collection of documents

8       that we would consider a customer file.

9   Q   And are other parts of customer files also

10      maintained in the SharePoint sites?

11  A   Yes.  Copies of annual business reviews, yes,

12      program administration manuals.

13  Q   So as I understand it, the six service

14      standards relate to a set of standard documents

15      that are used with Ecolab's customers; is that

16      correct?

17  A   It is.

18  Q   And would you expect to find all six of those

19      documents maintained in that SharePoint site?

20  A   That would be the goal, yes.  We would want all

21      of our reps to do that.

22  Q   And would it only be the latest iteration of a

23      particular document, or would it be all of

24      them?

25  A   It would contain a history.

1  Q    All right.  The last document listed on this

2        page is d:\kirks files, Southeastern Container

3        proposal, PAM cover example.

4               Do you see that?

5  A    I do.

6  Q    What is this?

7  A    PAM cover example would be just the cover for a

8        program administration manual.

9  Q    So what information would be contained in this

10       document?

11  A   It's how -- it tells about the different

12       products that are used.  In our programs it is

13       a decision tree on what to do if something is

14       wrong or a product is out of spec or system

15       measurement is out of spec.

16  Q   And that's the program administration manual

17       that you're talking about, right?

18  A   Yes.

19  Q   So that's not the cover which is what this

20       document is?

21  A   Yeah.  This is probably just one slide that

22       they would put as a cover.

23  Q   And that's just an example of a cover, correct?

24  A   It's what it says.  I'm assuming so.

25  Q   And you don't know who created this?

1    A    No.

2    Q    And you don't know when they created it?

3    A    No.

4    Q    And you don't know who else in Ecolab has a

5         copy?

6    A    No.

7    Q    And presumably if somebody else at Ecolab had a

8         copy of the program administration manual, they

9         could make their own cover based on another

10        example of it?

11   A    Yeah, I would assume so.

12   Q    Is this a trade secret?

13              MR. HONEYCUTT:  Object.

14              THE WITNESS:  I haven't seen the

15        document, so I don't know.

16   BY MS. LUND:

17   Q    Okay.  Let's go ahead and go to page 61.  If I

18        can direct your attention to the file path that

19        is four lines down, which is Anthony's files

20        Volkswagen, Volkswagen quotes and bid letters,

21        Volkswagen quotes, Volkswagen coil cleaning

22        equipment and chemical package proposal,

23        10/28/2014.

24              Do you see that document?

25   A    Yep.

1  Q  And do you know what this document is?

2  A  It appears to be a proposal.

3  Q  Have you reviewed this document?

4  A  I have not.  I don't have a copy of it.

5  Q  So you don't know what information is in it?

6  A  I would have to assume that it's specifications

7     about the equipment that's called out, coil

8     cleaning equipment and chemical package as well

9     as pricing.

10 Q  But you don't know what specific equipment is

11    identified in this proposal?

12 A  No.  My assumption would be we have coil

13    cleaning equipment that we sell, and it's

14    probably that equipment, but I have not seen

15    this document.

16 Q  And does Ecolab sell the same coil cleaning

17    equipment that it did in 2014?

18 A  I believe we do.

19 Q  And have there been any changes in that

20    equipment?

21 A  I don't think so.

22 Q  What about the chemicals?  Does Ecolab still

23    sell the same chemicals that it did in 2014?

24 A  I would assume so, yes.

25 Q  And do you know whether they're all the same?

1    A    I have not seen this document, but I know that

2         our coil cleaning chemical product line has not

3         changed much.

4    Q    It's not changed much or it's not changed at

5         all?

6    A    I don't know.

7    Q    And presumably pricing has changed since 2014,

8         correct?

9    A    Presumably.

10   Q    Do you know who else in Nalco has a copy of

11        this document?

12   A    I do not.

13   Q    And do you know whether this document has been

14        shared outside of Nalco?

15   A    I've got to believe it was shared with a

16        customer, but I don't know that if it was ever

17        presented.

18   Q    And is this document a trade secret?

19              MR. HONEYCUTT:  Object.

20              THE WITNESS:  I would -- based on

21        experience, I would assume it does.

22   BY MS. LUND:

23   Q    What do you mean when you say you would assume

24        it does?

25   A    Because it says proposal.  It contains, you

1      know, trade secret or confidential information.

2  Q   Well, which one would it contain?

3              MR. HONEYCUTT:  Object.

4  BY MS. LUND:

5  Q   -- trade secret information or confidential

6      information?

7  A   It could contain both.

8  Q   But you don't know because you haven't seen it?

9  A   I have not seen this document.

10 Q   Okay.  Let's go ahead and go to page 66.  If I

11     can direct your attention to the line that is

12     nine lines down, d:\anthonys files, WNA, Inc.

13     Chattanooga facility, American Plastics

14     contract information, PMW American Plastics

15     2009 through 2010.

16              Do you see that line?

17 A   Yes.  You said six lines down?

18 Q   I think it's nine lines down.

19 A   Nine lines down, yes.

20 Q   What is that document?

21 A   It says contract information.

22 Q   And so what does PMW stand for?

23 A   I don't know.

24 Q   Is American Plastics still a customer of

25     Ecolab?

```
 1   A   I don't know.
 2   Q   And you said before that contract information
 3       would be kept in a central file that's
 4       maintained by the legal department; is that
 5       correct?
 6   A   Typically.  I know 2009, 2010 is prior to my
 7       time coming back to Nalco Water, so I don't --
 8       I can't speak to what their practice was in
 9       2009 or 2010.
10   Q   So you don't know who else at Nalco has a copy
11       of this document?
12   A   I don't.
13   Q   And you haven't reviewed this document
14       yourself?
15   A   I have not.
16   Q   If you could look three lines down, you'll see
17       d:\anthonys files, WNA, Inc. Chattanooga
18       facility, American Plastics east PSR 2004, WMA
19       American Plastics 05.04.04.
20               Do you see that?
21   A   Yes.
22   Q   What is this?
23   A   It's a service report.
24   Q   And how do you know that?
25   A   It says PSR 2004.
```

1    Q    And what does PSR stand for?

2    A    Personal service report.

3    Q    And you haven't personally reviewed this

4         document, correct?

5    A    No, but based on the title.  PSR is one of the

6         six service standards, and that's how we

7         designate it.

8    Q    How often are personal service reports

9         prepared?

10   A    Well, industry standard is typically monthly by

11        their representative or at a mutually agreed

12        upon frequency with the customer.

13   Q    So based on the title, it's your belief that

14        this is a monthly personal service report that

15        was prepared almost 19 years ago; is that

16        correct?

17   A    Yes.

18   Q    Do you know what information is in it?

19   A    It would most likely be a compilation of test

20        results and recommendations made to the

21        customer based on the test results from the

22        various systems we were treating at that time.

23   Q    And do you know whether American Plastics still

24        has the same systems in use today as they did

25        19 years ago?

1    A    I do not.

2    Q    Do you know whether they still use the same

3         chemicals today as they did 19 years ago?

4    A    I do not.

5    Q    Do you know whether their water quality is the

6         same as it was 19 years ago?

7    A    I do not.

8    Q    Do you know whether they're even making the

9         same products today as they were 19 years ago?

10   A    I do not.

11   Q    Do you know who else in Ecolab still has a copy

12        of this document?

13   A    I do not.

14   Q    Do you know whether this was shared outside of

15        Ecolab?

16   A    I would assume it was sent to the customer.

17   Q    And that's because this is information about

18        the customer's system, correct?

19   A    It's documentation of the rep's visit.

20   Q    And so is this something that the customer is

21        free to use as they choose after they receive

22        it?

23   A    Well, within expectation of confidentiality.

24   Q    And where is that expectation found?

25   A    Typically in a program management agreement or

1      other agreement.

2   Q  And if there's not such an agreement or not a

3      confidentiality provision in such an agreement,

4      then is the customer free to do what they want

5      with these documents?

6   A  Yeah, as far as I know.

7   Q  Has Ecolab ever taken over business from

8      somebody else who was providing water treatment

9      service to a customer?

10  A  Sure.  Yes.

11  Q  And when Ecolab did that, did they have access

12     to the historic records that the customer had

13     of the water treatment at their plant?

14  A  Not necessarily.

15  Q  But sometimes?

16  A  Typically we would have -- sometimes.

17     Typically we would have access to the test

18     results that the customer ran on the systems,

19     not necessarily to our competitor's

20     information.

21  Q  But sometimes the customer would provide you

22     that?

23  A  I have not experienced that personally.

24  Q  And so how do you know that the results you

25     were given were from tests that the customer

1    ran as opposed to tests the customer had run

2    for them by their previous water treatment

3    service or company?

4  A  Typically the water treatment company would

5    provide results in the form of it, some

6    personal service report.  The customers would

7    just keep a log sheet that's just a sequential

8    list of test results.

9  Q  So do the customers basically have results that

10   duplicate what the test results are that the

11   water treatment company provides to them?

12  A  Not necessarily.  Usually -- not necessarily.

13  Q  But the customer has the ability to test their

14   own water quality?

15  A  Yes, and they should.

16  Q  Okay.  So if you could look five lines up from

17   the bottom of page 66, you'll see it's

18   d:\anthonys files, Volkswagen, Volkswagen

19   quotes and bid letters, Volkswagen quotes,

20   Volkswagen quote for 3DT260.910, 02.08.2011.

21          Do you see that document?

22  A  Yes.

23  Q  What is this?

24  A  That is a quote for a 3DT260 in bulk presented

25   or built on February 8th of 2011.

1    Q    And have you seen this document before?

2    A    No.

3    Q    Do you know what information is in it?

4    A    Pricing for 3DT260 in bulk.

5    Q    And that's the pricing that was available from

6         Nalco in 2011?

7    A    I would assume so.

8    Q    Is that the same pricing that's available from

9         Nalco today?

10   A    Maybe, but I don't know.

11   Q    Is it your belief that Nalco has the same

12        pricing now as it did 12 years ago?

13   A    No.

14   Q    So is it fair to say that the pricing that's in

15        this quote has changed?

16   A    It may have changed.

17   Q    And you testified that Nalco only keeps quotes

18        open for 30 to 60 days, correct?

19   A    Yes.

20              MR. HONEYCUTT:  Object.

21   BY MS. LUND:

22   Q    So it would be unusual for them to keep a quote

23        open for 12 years?

24              MR. HONEYCUTT:  Object.

25              THE WITNESS:  That would be unusual.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 385 of 990  PageID #: 5563

1    BY MS. LUND:

2    Q    All right.  Do you know who created this quote?

3    A    I do not.

4    Q    And you said that this is a quote for bulk

5         material.  How can you tell that?

6    A    The .91 designation is bulk.

7    Q    Okay.  And what does bulk mean?

8    A    Larger than any of our packaged goods.

9    Q    And so how -- how long would a bulk order last

10        at a particular facility?

11   A    Oh, I don't know.  Typically you would want to

12        use bulk if the customer were using more

13        packaged goods than we could supply in a

14        month's time, so I mean it might last one to

15        two months, three months.

16   Q    And you said that this is related to a 3D

17        Trasar 260 model; is that correct?

18   A    That's a chemical, not a model; but yes, it's a

19        3DT260 is the product.

20   Q    And what is the specific chemical composition

21        of that product, if you know?

22   A    I'm not sure the formula off the top of my

23        head.

24   Q    What is it used for?

25   A    Typically 3DT products are used to treat

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 386 of 990  PageID #: 5564

1      cooling towers.

2  Q   And do you know, does Nalco still sell 3DT260?

3  A   I would have to go back and look to see if we

4      still sell it or if it's been eliminated.

5  Q   Who else at Nalco has a copy of this bid?

6  A   I don't know.

7  Q   Do you know whether this was shared outside

8      Nalco?

9  A   I would have to assume so since it says it was

10     a quote.

11 Q   And is this a trade secret?

12 A   It's confidential.  I don't know if it's a

13     trade secret or not.

14 Q   Is there a point at which pricing information

15     stops being confidential because it's so old?

16 A   I don't think there's an expiration on

17     confidentiality.

18 Q   Okay.  So in your view even pricing information

19     from 12 years ago would still be confidential?

20 A   I would hope a customer would respect that and

21     not provide it to somebody else.

22 Q   All right.  Let's go ahead and go to page 149.

23 A   149?

24 Q   149.  If I can direct your attention to the

25     line that is seven lines up d:\anthonys files,

1       Smurfit Stone Rocktenn, Smurfit Stone service

2       reports 2004, boiler inspection 2004,

3       DSC00053.jpg.

4                  Do you see that?

5   A   Yes.

6   Q   Is Smurfit Stone still a customer of Ecolab?

7   A   I don't know.

8   Q   And so what is this document?

9   A   It looks like a picture.

10  Q   Do you know what it's a picture of?

11  A   If it's a boiler inspection, I would assume

12      it's a picture of a boiler or the inside of a

13      boiler.

14  Q   But you haven't actually seen this picture,

15      correct?

16  A   No, but I'm making the assumption knowing what

17      types of photographs I would take at a boiler

18      inspection.

19  Q   So your best belief is that this is a picture

20      of a boiler at a plant from 2004, correct?

21  A   Yep -- yes.

22  Q   Do you know who took that picture?

23  A   I do not.

24  Q   Do you know who else in Ecolab has a copy of

25      that picture?

1    A    I do not.

2    Q    Do you know whether this was shared outside of

3         Ecolab?

4    A    I do not.

5    Q    Would you agree that anyone who inspected that

6         same boiler could see exactly what that picture

7         shows?

8    A    In 2004?

9    Q    Yes.

10   A    Potentially.  I think the reason we document

11        pictures during inspections is to give it an

12        idea of the condition of the boiler relevant or

13        in perspective to a specific date and time so

14        that, for instance, if a year later you open it

15        up and it looks different, you can have some

16        type of historical perspective on the condition

17        of the equipment.

18   Q    Do you know whether Smurfit Stone still has

19        that same boiler that it had in 2004?

20   A    I don't.  But boilers last a very long time

21        so...

22   Q    So it might be there?

23   A    Very well could be, yes.

24   Q    And if it were, somebody could look at it and

25        take a picture of its insides now, correct?

1    A    "Somebody" being somebody with anybody?

2    Q    Sure, somebody with anybody.

3    A    No, I would say not anybody could.  Someone

4         with the facility could.  Someone with the

5         water treatment company might be able to.

6    Q    So, for example, if Smurfit Stone wanted to

7         look at their own boiler, they could do that,

8         right?

9    A    They could.

10   Q    And if Smurfit Stone wanted to let another

11        water treatment company look at their own

12        boiler, they could do that too, right?

13   A    If they wanted to.

14   Q    So is this photo a trade secret?

15              MR. HONEYCUTT:  Object.

16              THE WITNESS:  I would say, again,

17        because it was taken by an individual who was a

18        Nalco employee, that it is a confidential

19        information.

20   BY MS. LUND:

21   Q    Is it a trade secret?

22              MR. HONEYCUTT:  Object.

23              THE WITNESS:  I don't know that.

24   BY MS. LUND:

25   Q    So I'm going to direct your attention to the

```
                                                Page 161
 1          second lineup from the bottom on page 149.
 2          D:\anthonys files, Smurfit Stone Rocktenn,
 3          boiler operator training, Smurfit Stone
 4          chemistry testing guidelines quick view.
 5                       Do you see that?
 6     A    Yes.
 7     Q    What is that document?
 8     A    It appears to be the guidelines for recommended
 9          chemical control within the system.
10     Q    And this says it's boiler operator training,
11          correct?
12     A    Yes.
13     Q    So that's training that was provided to boiler
14          operators at Smurfit Stone?
15     A    Yes.
16     Q    Do you know what information specifically is in
17          this document?
18     A    Typically what we provide a customer is
19          training on how to apply -- how Nalco would
20          recommend they apply our chemicals and control
21          their chemical programs to have a positive
22          result --
23     Q    And you --
24     A    -- with the equipment.
25     Q    Oh, I'm sorry.  You say typically because you
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 391 of 990  PageID #: 5569

1       haven't seen this document; is that correct?

2   A   I haven't, but I've seen many documents like

3       it.  I've performed customer training myself.

4   Q   Is customer training something that Ecolab does

5       regularly?

6   A   On a regular basis, yeah.

7   Q   And does it regularly create manuals and other

8       documents to provide to customers for use with

9       their systems?

10   A   Yes.

11   Q   And when those customers stop working with

12       Ecolab, does Ecolab require them to return

13       those materials?

14   A   Not necessarily.

15   Q   Does it ever require them to return those

16       materials?

17   A   Sometimes.

18   Q   Can you give me an example of when that's

19       happened in your knowledge?

20   A   Not off the top of my head a specific customer.

21       I know that we've taken equipment, program

22       administration manuals, documentation back

23       after we've been asked to leave customer sites

24       at times.

25   Q   Who have you taken it back from?

```
 1   A    A person or a customer?

 2   Q    A customer.

 3   A    Again, I can't recall a specific customer off

 4        the top of my head.

 5   Q    Okay.  And do you know who prepared this boiler

 6        operator training?

 7   A    I do not.  It was probably prepared in general

 8        format by our training group and then

 9        customized for the specific customer.

10   Q    And do you know when it was prepared?

11   A    I don't.

12   Q    Do you know whether Smurfit Stone has the same

13        equipment as it did when this manual was

14        prepared?

15   A    I don't.

16   Q    Do you know whether they used the same

17        chemicals as they did when this training

18        information was prepared?

19   A    I don't.

20   Q    Do you know whether this was shared outside of

21        Ecolab?

22   A    I'm assuming it was shared with the customers

23        they were training.

24   Q    And do you know whether the customers shared it

25        more broadly than that?
```

1  A    I don't.

2  Q    Is this a trade secret?

3              MR. HONEYCUTT:  Object.

4              THE WITNESS:  It probably contains

5        confidential information.

6  BY MS. LUND:

7  Q    Does it contain a trade secret?

8  A    I don't know.  I haven't looked at it.

9              MR. HONEYCUTT:  Object.

10  BY MS. LUND:

11  Q    I can direct your attention to page 199.

12        You'll see in the middle of the page there's a

13        file there called d:\anthonys files,

14        International Paper, International Paper 6SS

15        Microsoft PowerPoint, International Paper

16        people survey.

17              Do you see that?

18  A    Yes.

19  Q    Have you reviewed this document?

20  A    No, but I've reviewed dozens of documents

21        similar to it.

22  Q    What is this document?

23  A    It's a list of important contacts within the

24        customer site.

25  Q    And who created this document?

1    A    It's a Nalco document that all reps use to

2         document their people survey as part of their

3         six service standards.

4    Q    Who created this document?

5    A    I don't know that.  I haven't seen this

6         document.

7    Q    When was this document created?

8    A    I don't know.

9    Q    Do you know whether the people who are

10        identified in it are still at International

11        Paper today?

12   A    I don't.

13   Q    Where did the information to create this

14        document come from?

15   A    From surveying people at the customer site.

16   Q    So this is information that was developed by

17        talking to people at International Paper?

18   A    Yes.

19   Q    So it's International Paper's information?

20   A    No.  This is our information that we discovered

21        while working at International Paper.

22   Q    So it's a document that was created by Ecolab

23        employees using information they obtained from

24        International Paper, right?

25   A    By meeting people, yeah.  So this essentially

```
 1        would be a who's who of who works at the
 2        facility.
 3   Q    Who else at Ecolab would have a copy of this
 4        document?
 5   A    This exact document?
 6   Q    Yes.
 7   A    I don't know.
 8   Q    Is the information in a people's survey kept in
 9        a CRM system?
10   A    Probably not in a CRM system.  Maybe.  It could
11        be in CRM, but since this is a PDF document, it
12        very well could be in the SharePoint site for
13        the International Paper.
14   Q    So information about the personnel at
15        International Paper should be available to
16        Ecolab personnel; is that correct?
17                  MR. HONEYCUTT:  Object.
18                  THE WITNESS:  I don't know if it
19        should be.  Typically it's just a -- the
20        SharePoint is a repository for the rep to put
21        six service standards.
22   BY MS. LUND:
23   Q    Have you checked to see whether there's an
24        updated version of the information about
25        International Paper's personnel in the
```

```
 1       SharePoint for Ecolab?
 2    A   I have not.
 3    Q   Do you know whether this document was shared
 4        outside of Ecolab?
 5    A   It would not have been shared outside Ecolab.
 6              MS. LUND:  Can I have Exhibit 6,
 7        please?
 8    BY MS. LUND:
 9    Q   Mr. DeMarco, if you could take a look at the
10        document that was previously marked as
11        Exhibit 6, and let me know whether you
12        recognize this document.
13    A   Yes.
14    Q   And can you describe what this is?
15    A   This is a copy of a report that outlines the
16        six service standards, the key elements, and
17        how a rep would go about implementing six
18        service standards at their facility.
19    Q   So you see on the first page there's a heading
20        that says People Survey.  Do you see that?
21    A   Yes.
22    Q   That's what we've been talking about with this
23        file path, correct?
24    A   Yep.
25    Q   And if you look under Key Steps in the middle
```

1      manuals provided to them electronically?

2  A    No.

3  Q    So anyone who visited a plant could potentially

4      have seen the program administration manual and

5      the information in it?

6              MR. HONEYCUTT:  Object.

7              THE WITNESS:  If the customer had

8      printed it out and left it in a location where

9      someone could see it.

10 BY MS. LUND:

11 Q    Is this a trade secret?

12             MR. HONEYCUTT:  Object.

13             THE WITNESS:  It would contain trade

14     secrets, yes.

15 BY MS. LUND:

16 Q    What trade secrets would it contain?

17             MR. HONEYCUTT:  Object.

18             THE WITNESS:  It might contain

19     formula information.  It would contain best

20     practices based on Nalco's recommendations for

21     controlling a boiler system.  It's very

22     specific to Nalco products and programs.

23 BY MS. LUND:

24 Q    Let's go ahead and turn to page 218 of

25     Exhibit 101, please.

```
 1                    If I can direct your attention
 2         to the file d:\anthonys files, Duracell,
 3         Duracell service plan, Tasso service plan,
 4         2006.
 5    A    Um-hum.
 6    Q    Have you seen this document?
 7    A    Not this specific document, no.
 8    Q    Do you know what it is?
 9    A    A service plan document.
10    Q    And what is a service plan?
11    A    Essentially it's a document that lists out
12         exactly the activities that we're going to
13         perform at a facility related to the water
14         treatment programs.
15    Q    Is Duracell still an Ecolab customer?
16    A    I don't -- I don't know.
17    Q    Does Nalco still service the Tasso plant?
18    A    I don't know.
19    Q    Do you know what specific information was in
20         this Tasso service plan from 2006?
21    A    I don't.
22    Q    How often is a service plan updated?
23    A    Typically it's annually.
24    Q    And you don't know whether the plant still has
25         the same configuration as it did in 2006?
```

1   A    No.  I'm not familiar with that facility.

2   Q    You don't know whether it uses the same

3        equipment as in 2006?

4   A    I don't.

5   Q    You don't know whether it uses the same

6        chemicals as in 2006?

7   A    I don't.

8   Q    You don't know whether it has the same

9        treatment program for its water as in 2006?

10  A    No, I don't.

11  Q    Do you know who else in Nalco might have a copy

12       of this document?

13  A    I don't.  It's likely in the SharePoint site

14       for the account.

15  Q    Do you know whether this was shared with the

16       customer?

17  A    I don't.

18  Q    Would it typically be shared with the customer?

19  A    Yes.  It should be mutually agreed upon.

20  Q    In fact, if you look at Exhibit 6 under Service

21       Plan it says, "A customer-facing document,"

22       correct?  It's on the top left corner on the

23       second page.

24  A    Um-hum, yes.

25  Q    And do you know whether Duracell is prohibited

1      from disclosing the service plan it had in

2      2006?

3  A    No, it's not.

4  Q    So is this a trade secret?

5                MR. HONEYCUTT:  Object.

6                THE WITNESS:  Not necessarily.

7  BY MS. LUND:

8  Q    Why do you say "not necessarily"?

9  A    I think the entire six service standards format

10     is Nalco specific and Nalco's way to run an

11     account and how we teach our reps to manage

12     accounts.

13               And so while maybe a service

14     plan is -- could be conceived as being just a

15     smart way of organizing your service at a

16     facility, in whole the six service standards is

17     unique to Nalco Water and contains confidential

18     information and could contain trade secrets.

19 Q    But you don't know whether this specific

20     document contains trade secrets?

21 A    No, but I think the entirety of all the

22     documents is --

23               MR. HONEYCUTT:  Object.

24               THE WITNESS:  -- valuable.

25

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 401 of 990  PageID #: 5579

1    BY MS. LUND:

2    Q    Let's go ahead and go to page 228, please, in

3         Exhibit 101.

4    A    2 --

5    Q    228.  If I can direct your attention to a line

6         about halfway down the page.  D:\anthonys

7         files, Duracell, 3DT, sample effluent line.jpg.

8                    Do you see that line?

9    A    Yep.

10   Q    Have you seen that document before?

11   A    No.  It looks like a photograph.

12   Q    Do you know what it's a photograph of?

13   A    3DT sample effluent line.

14   Q    What does that mean?

15   A    The line that is leaving our 3DT unit.

16   Q    Do you know who created or who took this

17        picture?

18   A    No, I don't.

19   Q    Do you know when it was taken?

20   A    No.

21   Q    Do you know where in the plant this effluent

22        line is located?

23   A    On the 3DT unit.

24   Q    Do you know if there's more than one 3DT unit

25        to the plant?

1    A    I don't.

2    Q    Do you know who else in Ecolab has a copy of

3         this photo?

4    A    No.

5    Q    Do you know whether it was shared outside of

6         Ecolab?

7    A    I don't.

8    Q    Do you know whether it was given to Duracell?

9    A    I don't.

10   Q    Is this a trade secret?

11                  MR. HONEYCUTT:  Object.

12                  THE WITNESS:  Since it -- it looks

13        like it contains a picture of a 3DT unit.  It

14        could potentially contain trade secret

15        information.

16   BY MS. LUND:

17   Q    Is the appearance of the 3DT unit a trade

18        secret?

19   A    No, but I think they're viewing it.  You might

20        be able to determine some things.

21   Q    The next line is d:\service report notes,

22        service report technical notes.

23                  Do you see that?

24   A    Yes.

25   Q    Have you reviewed that document?

```
                                          Page 182
 1   A    No.
 2   Q    Do you know what information is in it?
 3   A    I do not.
 4   Q    Do you know who created it?
 5   A    I don't.
 6   Q    Do you know when it was created?
 7   A    I don't.
 8   Q    Do you know what information it was created
 9        using?
10   A    Say that again.
11   Q    Sorry.  Do you know where the information in it
12        was taken from?
13   A    I don't.  I'm assuming at a customer site, but
14        I don't know.
15   Q    Do you know who else at Ecolab has a copy of
16        the document?
17   A    I don't.
18   Q    Do you know if it was shared outside of Ecolab?
19   A    No.
20   Q    No, you don't know; or no, it wasn't shared?
21   A    I don't know.
22   Q    Is this a trade secret?
23              MR. HONEYCUTT:  Object.
24              THE WITNESS:  I don't know how I
25        could tell that without seeing the document.
```

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 404 of 990   PageID #: 5582

1    BY MS. LUND:

2    Q    The next line is d:\system calculation,

3         calculate the value of condensate to PPT.

4                        Do you see that?

5    A    Yes.

6    Q    Have you seen this document before?

7    A    No.

8    Q    Do you know what information is in it?

9    A    I'm assuming based on the title that this would

10        be a documentation of the monetized value of

11        recovering condensate would be to the customer.

12   Q    And you don't know whether it's just how to

13        calculate the value or the actual value, do

14        you?

15   A    Yeah, I don't know that.

16   Q    And you don't know who created it?

17   A    I don't.

18   Q    You don't know when it was created?

19   A    No.

20   Q    Do you know who else in Ecolab has a copy of

21        that?

22   A    No.

23   Q    Do you know if it was shared outside of Ecolab?

24   A    I don't.

25   Q    Is this a trade secret?

```
1                    MR. HONEYCUTT:  Object.
2                    THE WITNESS:  I don't know that.  I
3        haven't seen the document.
4   BY MS. LUND:
5   Q    The next document is d:\system calculation,
6        boiler ROI calculation, 2001.xls.
7                         Do you see that?
8   A    Yes.
9   Q    Do you know -- have you seen this document
10       before?
11  A    No.
12  Q    Do you know what information is in it?
13  A    No.
14  Q    Do you know who created it?
15  A    No.
16  Q    Do you know when it was created?
17  A    No.
18  Q    Do you know who else at Ecolab has a copy?
19  A    I do not.
20  Q    Do you know if it was shared outside of Ecolab?
21  A    I don't.
22  Q    Is this a trade secret?
23                   MR. HONEYCUTT:  Object.
24                   THE WITNESS:  I don't know.  I
25       haven't seen the document or the spreadsheet.
```

1  BY MS. LUND:

2  Q    Let's go ahead and go to page 235 of

3       Exhibit 101.

4                   MR. HONEYCUTT:  What page?

5                   MS. LUND:  235.

6  BY MS. LUND:

7  Q    If you look up seven lines up from the bottom,

8       you see a document d:\customer files Nalco

9       Water, Volkswagen, Volkswagen quotes and bid

10      letters, Volkswagen quotes, Volkswagen quote

11      for 3DT260.33, 09.24.2015.

12                   Do you see that document?

13 A    Yes.

14 Q    Have you viewed that document before?

15 A    No, but I can guess that it's a chemical quote

16      for 3DT260 and a .33 package size that was

17      given to the customer on or around

18      September 24th of 2015.

19 Q    And do you know what specific information is

20      included in this quote?

21 A    Usually package size, like gallons and volume

22      as well as the price.

23 Q    And do you know what specific pricing was

24      quoted to Volkswagen?

25 A    I don't.

1  Q    And as we've already discussed, Nalco/Ecolab

2       does not have the same pricing available today

3       as it did in 2015?

4  A    No, but it does -- I mean you called out 3DT260

5       previously.  You've called out quotes

6       previously.  And going back as far as 2001, I

7       believe, and that history and knowing the price

8       over a period of time and a period of years and

9       the 16,000 documents that were expatriated is

10      of substantial value to our company.

11                     I mean, in totality, this is a

12      lot of information, and historical knowledge of

13      our customers that was taken and could be used

14      against us to either create quotes, create

15      other proposals and used against us.

16  Q    So how would a competitor use a bid from

17      September 24, 2015, to compete against

18      Nalco/Ecolab today?

19  A    Well, they could take that.  And I'm sure if we

20      go through here line by line, we'll find here

21      Volkswagen quote, Volkswagen quote, Volkswagen

22      quote.

23                     There's dozens of these over

24      many years that could be taken, and you would

25      know a history of how pricing has progressed

1    over time, who the people are as six service

2    standards documents have been updated.

3                    They could take information from

4    PSR documents that are listed in here and know

5    exactly what's happened to that customer over

6    many years.  And it's all information that

7    perhaps wasn't ChemTreat's or anybody else's to

8    just take and use to unfairly attack our

9    business.

10   Q    So if a competitor had just this one quote from

11        September 24, 2015, would that help them

12        compete against Nalco/Ecolab?

13   A    I don't know that any single document is going

14        to be the end of the world, but I do think

15        16,000 documents were viewed as valuable or

16        else why would he have taken the time to

17        expatriate it.

18   Q    So what if there were five documents?  Would

19        five documents be enough to allow a competitor

20        to compete against Nalco/Ecolab?

21   A    It depends on what the documents are.

22   Q    And if they were all older pricing, would that

23        allow a competitor to compete against

24        Nalco/Ecolab?

25   A    Possibly; but if they were all new documents,

```
 1        then, yes, absolutely.  There's documents from
 2        2020.  That's not that long ago.  We can dig
 3        through and find plenty more.
 4   Q    So is this particular document the Volkswagen
 5        quote for 3DT260.33 from September 24, 2015, is
 6        that a trade secret?
 7                  MR. HONEYCUTT:  Object.
 8                  THE WITNESS:  It's confidential.
 9   BY MS. LUND:
10   Q    But is it a trade secret?
11                  MR. HONEYCUTT:  Object.
12                  THE WITNESS:  It's confidential.
13   BY MS. LUND:
14   Q    Is that a no, it's not a trade secret?
15                  MR. HONEYCUTT:  Object.
16                  THE WITNESS:  I don't know.  I
17        haven't seen the document.
18   BY MS. LUND:
19   Q    Okay.  Can we go to page 331 in Exhibit 101,
20        please?
21                  MR. HONEYCUTT:  301 or 331?
22                  MS. LUND:  331.
23   BY MS. LUND:
24   Q    You'll see there's a document three lines down,
25        customer files, Nalco Water, Duracell,
```

```
 1       Cleveland, Tennessee, Duracell business review,
 2       Duracell annual business review 2007.
 3                    Do you see that document?
 4   A   Yes, I do.
 5   Q   Do you know what this document is?
 6   A   It's an annual business review.
 7   Q   Have you seen this particular document before?
 8   A   No.
 9   Q   What is an annual business review?
10   A   It's a documentation of the work we've done in
11       the facility over the prior year as well as the
12       continuous improvement projects that we've
13       helped drive and the monetized value of those
14       projects.
15   Q   And part of the purpose of the annual business
16       review is marketing, correct?
17   A   I guess you could say that.
18   Q   Well, in fact, if you look at Exhibit 6 under
19       Business Review, it says the purpose is
20       reselling the value of Nalco Water?
21   A   Yeah.
22   Q   That's correct?
23   A   Absolutely.
24   Q   And it also says that you should recognize the
25       review as a sales opportunity?
```

1  A    Yes.

2  Q    So what information is included in the annual

3       business review?

4  A    It may include information about compliance to

5       recommended test ranges within the facility.

6       It might include a list of continuous

7       improvement projects we've worked on at the

8       facility with the customer.  It might include

9       recommendations for improvement for a system or

10      different programs that we administer.

11                   It really could contain any of

12      those things as well as opportunities to call

13      out other systems or programs that we could

14      provide to the customer.

15 Q    And how often is an annual business review

16      updated?

17 A    Annually.

18 Q    Who created this annual business review from

19      2007?

20 A    I don't know.

21 Q    Do you know whether the Duracell facility in

22      Cleveland, Tennessee has the same plant

23      configuration as it did in 2007?

24 A    I don't know.

25 Q    Do you know whether it uses the same equipment

1    as it did in 2007?

2  A    I don't know that.

3  Q    Do you know whether it uses the same chemicals

4       as it did in 2007?

5  A    I don't know that; but if I went back and I

6       looked at every year's annual business review

7       and compared them from one year to the next, I

8       could determine pretty quickly what's changed

9       throughout the years and have a much better

10      idea on how to approach this customer if I were

11      in ChemTreat's shoes.

12 Q    If ChemTreat wanted to get Duracell's business

13      at the Cleveland, Tennessee plant, they could

14      just go to that plant, couldn't they?

15 A    No.

16 Q    Why not?

17 A    Well, they could try but not saying they would

18      necessarily be let in the door.

19 Q    But that would be a decision that Duracell

20      would make, not Nalco/Ecolab, correct?

21 A    It would.

22 Q    So do you know who else in Nalco/Ecolab has a

23      copy of this 2007 annual business review?

24 A    I don't.

25 Q    Do you know whether it would be available in

1    the SharePoint site?

2  A    It might be.

3  Q    And in fact, annual business reviews are

4       supposed to be posted to the shared site,

5       correct?

6  A    Should be.

7  Q    And is this something that's shared with the

8       customer?

9  A    Yes.

10 Q    So the customer would have a copy as well?

11 A    Yes.

12 Q    And in fact, if you look at Exhibit 6, it says

13      that plan personnel should be copied on the

14      business review; is that correct?

15 A    Yes.

16 Q    And is Duracell prohibited from disclosing its

17      own business review?

18 A    No.  Again, business ethics would say you

19      shouldn't.  Our program management agreements

20      would say they shouldn't, but, you know, we

21      can't watchdog them all the time.

22 Q    Is this a trade secret?

23           MR. HONEYCUTT:  Object.

24           THE WITNESS:  It certainly could

25      contain trade secret information.

1    BY MS. LUND:

2    Q    Do you know whether it does contain trade

3         secret information?

4    A    Again, I have not seen this particular

5         document.

6    Q    Let's go ahead and go to page 366, 3-6-6.

7                         I'm going to direct your

8         attention to a line on the bottom half

9         d:\personal information, Christmas list 2010.

10                        Do you see that document?

11                   MR. HONEYCUTT:  What line?

12                   THE WITNESS:  Yes.

13   BY MS. LUND:

14   Q    Personal information, Christmas list 2010.

15                        Would you agree that is not a

16        Nalco/Ecolab document?

17   A    Yes.

18   Q    Underneath it is a document d:\2016 monthly

19        turn doc incentive reports, 12-December 2016,

20        turn doc incentive invoice.

21                        Do you see that?

22   A    Yes.

23   Q    Have you reviewed that document?

24   A    Not that particular one, but any of these

25        compensation documents would include for a

1   particular rep, say, Jack Stone on the next

2   line would include exactly what sales they made

3   during the prior month or two months and the

4   incentive associated with that.

5  Q   So this particular line, the 12 December 2016

6   turn doc incentive invoice, do you know who

7   that's an invoice for?

8  A   No, and I'm assuming it's not an actual

9   invoice.  It's a report of all invoices

10   associated with a territory.

11  Q   But you don't know what particular information

12   is in it because you haven't seen it?

13  A   No.  I've seen many like it, though.  It

14   contains the customer, the chemicals, or

15   services that they've purchased during the

16   month as well as the pricing information.

17  Q   Do you know who created this document?

18  A   It gets printed out of a Nalco system

19   typically.

20  Q   So this is information, sort of raw data that's

21   available through a Nalco system?

22  A   Yeah.  So when a rep is paid, this is

23   essentially the line-by-line itemization to

24   show -- to match up with his incentive for the

25   month.

1    BY MS. LUND:

2    Q    So if you can go five lines up from the bottom

3         of 427, you'll see that there's a document

4         called Nalco Water files, WL121 district

5         folder, coaching and people development,

6         inspirations, what it takes to be number one.

7                        Do you see that document?

8    A    Yes.

9    Q    Have you seen that document before?

10   A    No.

11   Q    Do you know what it is?

12   A    No.

13   Q    Do you know what information is in it?

14   A    No idea.

15   Q    Do you know who created it?

16   A    I do not.

17   Q    Do you know when it was created?

18   A    No.

19   Q    Do you know who else in Ecolab has a copy of

20        it?

21   A    I have no idea.

22   Q    Do you know whether it was shared outside of

23        Ecolab?

24   A    No.

25   Q    Is this a trade secret?

1   Q   All right.  In what context have you seen it?

2   A   So those would be we use the counselor

3       salesperson sales training program, and this

4       would be a sales call planner document.

5   Q   And is the counselor sales training the

6       commercially available program?

7   A   I'm assuming so, yes.

8   Q   So that's something that Ecolab purchased from

9       whoever created it?

10   A   Yes.

11   Q   What about this next file, d:\Nalco Water

12       files, WL121 district folder, coaching and

13       people development, coaching forms, coaching

14       trip.dotm.

15               Do you see that document?

16   A   Yes.

17   Q   Do you know what that is?

18   A   I don't.

19   Q   Do you know who created it?

20   A   I don't.

21   Q   Do you know what information it has?

22   A   I don't.

23   Q   Do you know who else in Ecolab has a copy?

24   A   I do not.

25   Q   Do you know whether it's available outside

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 418 of 990  PageID #: 5596

```
 1        Ecolab?
 2   A    I do not.
 3   Q    Do you know whether it's a trade secret?
 4               MR. HONEYCUTT:  Object.
 5               THE WITNESS:  I don't know what's in
 6        it, so I couldn't say.
 7   BY MS. LUND:
 8   Q    The next document is d:\Nalco Water files,
 9        WL121 district folder, coaching and people
10        development, counselor salesperson, counselor
11        planner discovering planner.doc.
12                    Do you see that?
13   A    Yes.
14   Q    Is that more of that commercially available
15        training program that we just spoke about?
16   A    I believe it is.
17   Q    The next document is d:\Nalco Water files,
18        WL121 district folder, coaching and people
19        development, Korn Ferry, DM and AM
20        responses.xlss.
21                    Do you see that document?
22   A    Yes.
23   Q    Do you know what that document is?
24   A    Yes.
25   Q    Have you seen it before?
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 419 of 990  PageID #: 5597

1          sum total of it all and determine the damages.
2     BY MR. POPE:
3     Q    Okay.  And what about the damages as alleged
4          related to the breach of contract provisions
5          that we've just reviewed, are you aware of any
6          damages that Nalco/Ecolab is requesting as a
7          result of that alleged behavior?
8     A    Say that again.
9     Q    Are you aware of any damages that Nalco/Ecolab
10         is alleging as a result of Mr. Ridley's alleged
11         breach of his employment contract?
12    A    So, again, I'm leaving it to the experts to
13         determine the amount.  I believe it was
14         mentioned earlier a large sum, I don't know,
15         $150 million or something.
16    Q    But you don't have any facts to support that
17         number?
18                   MR. HONEYCUTT:  Object.
19                   THE WITNESS:  Again, I'm leaving it
20         up to the experts to determine that.  I am not
21         an expert in that field.
22    BY MR. POPE:
23    Q    Okay.  So you're not aware of any customers --
24                   MR. HONEYCUTT:  Object.
25

1   BY MR. POPE:

2   Q     -- that Mr. Ridley assisted in violation of 292

3         that resulted in damages; is that right?

4                    MR. HONEYCUTT:  Asked and answered,

5         Lance.

6                    THE WITNESS:  We're not making any

7         claim specific to any customer at this time.

8   BY MR. POPE:

9   Q     Okay.  And then, likewise, you don't have any

10        specific facts about any employee that

11        Mr. Ridley induced or attempted to induce to

12        leave Nalco/Ecolab that resulted in any damages

13        to Nalco/Ecolab; is that right?

14                   MR. HONEYCUTT:  Object.

15                   THE WITNESS:  I don't believe we're

16        claiming damages associated with that at this

17        time.

18  BY MR. POPE:

19  Q     All right.  Ecolab is also alleging that

20        Mr. Ridley breached his fiduciary duty of

21        loyalty to the company?

22                    I'd like to point your attention

23        to paragraph 295.  Just let me know when you've

24        read that paragraph, Mr. DeMarco.

25  A     Okay.

```
 1        specific customers.
 2   BY MR. POPE:
 3   Q    Do you know any customers?
 4   A    No.  I mean, we run water samples regularly, so
 5        if you're talking about do I know what
 6        customers we run water analyses for, it's a
 7        lot.  If you're talking specific to this, I
 8        don't know which specific customers.
 9   Q    Okay.  Do you know of any specific customers
10        that Nalco had to rerun water analysis for as a
11        result of Mr. Ridley allegedly not providing
12        information to Mr. Irwin?
13   A    No.  I personally do not.  That is something
14        that Mr. Irwin would have taken care of.
15   Q    As a result of what Ecolab alleges is
16        Mr. Ridley's failure to provide information,
17        Mr. Irwin, are you aware of any damages
18        sustained by Nalco and Ecolab from any specific
19        customer?
20   A    I don't think we're claiming --
21                  MR. HONEYCUTT:  Object.
22                  THE WITNESS:  -- any damages at this
23        point pertaining to any specific customers.
24   BY MR. POPE:
25   Q    Okay.  So Ecolab is not claiming that they
```

1       sustained any damages because Mr. Ridley did
2       not provide this information to Mr. Irwin; is
3       that correct?
4    A  Yeah.  We are not claiming any damages at this
5       point pertaining to any specific customers.
6    Q  And the same for any losses?
7    A  Correct.
8                MR. HONEYCUTT:  Object.
9                THE WITNESS:  We're not claiming any
10      damages or losses pertaining to any specific
11      customers at this point.
12   BY MR. POPE:
13   Q  You've also mentioned a business plan that
14      Mr. Ridley emailed to Clay Cissel at
15      ChemTreat --
16   A  Yes.
17   Q  -- is that correct?
18   A  Yep.
19   Q  Have you reviewed the business plan?
20   A  I've seen a picture of the graph, yes.
21   Q  And the business plan doesn't list the name of
22      any customers, does it?
23   A  It does not that I'm aware of, no.
24   Q  And are you aware of any customers or business
25      that Nalco and Ecolab lost as a result of

1      Mr. Ridley emailing Clay Cissel that business

2      plan?

3  A   I'm not aware that we're claiming any damages

4      or loss associated with a customer.

5  Q   Mr. DeMarco, I'm going to put another exhibit

6      into the marked exhibits folder.

7              (Exhibit 103 was marked for

8      identification.)

9  BY MR. POPE:

10 Q   This is going to be Exhibit 103.  If you'll

11     refresh, it should be there now.

12 A   Yep.

13 Q   Exhibit 103 are Plaintiffs' Supplemental

14     Objections and Answers to Defendant Anthony

15     Ridley's First Set of Interrogatories.

16 A   Okay.

17 Q   If you'll look at the last page, page 13.

18             Do you see your signature there

19     on the verification page?

20 A   Yes.

21 Q   Is that an electronic signature, or did you

22     sign it again?

23 A   That is an electronic signature.  It's my

24     signature but an electronic version of it.

25 Q   I'm sorry?

1    substantial damage.

2  Q  Did they have a duty, contractual duty to

3     return the documents that were provided to them

4     during the course of their employment at the

5     end of their employment?

6  A  Absolutely, and they did not.

7  Q  Okay.  And there was a bunch of questions

8     earlier about the damages that we were claiming

9     as to customers.

10                What is the company's position

11     as to the damages that have been incurred as a

12     result of the misappropriations alleged against

13     Mr. Ridley?

14  A  It's contained in the expert's report, and it's

15     significant and substantial.

16  Q  Okay.  Now, as to the DLP report, ChemTreat's

17     counsel went through this with you and picked

18     out certain documents for you to look at.

19                How long would it take you to go

20     through and look at every one of the documents

21     in this?

22                What do you estimate that would

23     take you to look through all those?

24  A  It would be months and months to go through

25     them.

Page 289

1   STATE OF WISCONSIN      )

                            ) SS:

2   COUNTY OF MILWAUKEE     )

3

4               I, Dawn M. Lahti, RPR, CRR and Notary

5         Public in and for the State of Wisconsin, do

6         hereby certify that the preceding deposition

7         was recorded by me and reduced to writing under

8         my personal direction.

9               I further certify that I am not a

10        relative or employee or attorney or counsel of

11        any of the parties, or a relative or employee

12        of such attorney or counsel, or financially

13        interested directly or indirectly in this

14        action.

15              In witness whereof, I have hereunder

16        set my hand and affixed my seal of office on

17        this 26th day of April, 2023.

18

19

20

21

                    _____

22                      DAWN M. LAHTI, RPR/CRR

23                        Notary Public

                    In and for the State of Wisconsin

24

    My commission expires April 16, 2024

25

Page 1

1        IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF TENNESSEE

2

3

4  ECOLAB, INC., and NALCO COMPANY, )

  LLC d/b/a NALCO WATER, an      )

5  Ecolab Company and/or NALCO    )

  WATER,                     )

6                        )

       Plaintiffs,      )

7                        )

     vs.               )1:22-cv-00050-TRM-SKL

8                        )

  ANTHONY RIDLEY, and CHEMTREAT   )

9  INC.,                   )

                        )

10        Defendants.      )

11

12

13

14        Videotaped 30(b)(6) deposition of ECOLAB,

15  INC., by and through its corporate representative

16  DAVID GARZA, taken before NADINE J. WATTS, CSR, RPR, and

17  Notary Public, pursuant to the Federal Rules of Civil

18  Procedure for the United States District Courts

19  pertaining to the taking of depositions, at the

20  Renaissance Chicago O'Hare Suites Hotel, 8500 West

21  Bryn Mawr Avenue, in the City of Chicago, Cook County,

22  Illinois, commencing at 10:01 a.m. on the 26th day of

23  April, A.D., 2023.

24

1    provide Ecolab's knowledge as to this topic, correct?

2        A    That's correct.

3        Q    What did you do to prepare specifically to

4    provide information regarding this topic?

5        A    The same preparation I described earlier.

6        Q    All right.  So you understand that on July 1st,

7    2021 Mr. Ridley informed Ecolab that he was going to

8    work for ChemTreat, right?

9        A    That's correct.

10       Q    And you understand that at that time ChemTreat

11   was a competitor of Nalco/Ecolab, right?

12       A    I understand that ChemTreat is a competitor.

13       Q    Okay.  And you understand that Mr. Ridley's

14   supervisor, Jaqueline Herrera, knew that ChemTreat was a

15   competitor when he told her that he was leaving to take

16   a job there, right?

17       A    I mean, ChemTreat is known as a competitor, so I

18   would think.

19       Q    Was Ecolab concerned that Mr. Ridley was leaving

20   to work for a competitor?

21       MR. WINSMAN:  Objection to form, vague.

22       THE WITNESS:  I'm not aware of what a particular

23   individual is feeling about an associate leaving.

24       MS. LUND:  Q   A number of other Ecolab employees

1    had left to work at ChemTreat in previous months in

2    2021, correct?

3        A    I'm not aware of the exact details of who left,

4    but I know there's been people that may have left to go

5    to ChemTreat.

6        Q    Well, let's go ahead and look at what has been

7    previously marked as Exhibit 104, which is the

8    March 3rd, 2023 interrogatory responses by Ecolab to

9    ChemTreat's interrogatories.

10            (Document marked as Deposition

11            Exhibit 104 for identification.)

12       Q    And, Mr. Garza, is this a document that you

13   previously reviewed?

14       A    Yes, this is.

15       Q    Okay.  If I can direct your attention to page 23

16   of Exhibit 104, you'll see under Amended Response it

17   says, plaintiffs further state that prior to Ridley's

18   resignation multiple of plaintiff's employees had been

19   recruited away by ChemTreat, including Chris McCune,

20   January 11th, '21, Lanae Pierce, January 11th, '21, Tim

21   Weiler, March 19th, '21, Doug Glanz, April 12th, '21,

22   and John Minney, May 12th, '21.  Do you see that?

23       A    I do see that.

24       Q    Okay.  Do you know whether Ecolab believed any

```
 1   of those employees had misappropriated Ecolab's

 2   documents?

 3       MR. WINSMAN:  Objection, outside the scope.

 4       THE WITNESS:  I'm not aware of that.

 5       MS. LUND:  Q   Okay.  Ecolab did not issue a legal

 6   hold on Mr. Ridley's documents when it learned he was

 7   going to work for a competitor, right?

 8       A   Not on July 1st.

 9       Q   Okay.  Why not?

10       A   My understanding, there was no reason to do so

11   until further -- no, at that time.

12       Q   So just the fact that an Ecolab employee went to

13   work for ChemTreat was not a reason for suspicion or

14   concern of any kind?

15       MR. WINSMAN:  Objection, vague, calls for

16   speculation.

17       THE WITNESS:  That was determined by HR or legal I

18   guess.

19       MS. LUND:  Q   And Ecolab did not issue a legal hold

20   on Mr. Ridley's devices when it learned he was going to

21   work for a competitor, right?

22       A   Again, not on July 1st that I'm aware of.

23       Q   Okay.  On July 18, 2021 Kristin Mahre submitted

24   a request for review of Mr. Ridley's systems, correct?
```

1          (Previously marked Deposition

2          Exhibit 23 shown to witness.)

3      MS. LUND:  So I think we may need to correct the

4   record with regard to the Plaintiff's Amended Responses

5   to Certain of ChemTreat, Incorporated's First Set of

6   Interrogatories.  I believe that had been marked as

7   Exhibit 104, but it may not have.  So let's mark that as

8   Exhibit 106 just to be certain.

9          (Document marked as Deposition

10          Exhibit 106 for identification.)

11      MS. LUND:  Q  All right.  So, Mr. Garza, you should

12   now have in front of you a document that was previously

13   marked as Exhibit 23, which is titled Employee Data

14   Sheet for Anthony Ridley, Corporate Account Manager F&B,

15   No. 48937, July 23rd, 2021, 4:401 p.m. GMT.  Do you see

16   that?

17      A   I do have that.

18      Q   And it indicates it was generated by Jennifer

19   Semmler at Ecolab.com; is that correct?

20      A   It was Jennifer -- generated by Jennifer.

21      Q   Have you seen this document before?

22      A   I have seen this document.

23      Q   Oaky.  Do you know whether this is the report

24   that Ms. Semmler prepared regarding her review of

```
 1   Mr. Ridley's data?

 2       A   This is a report I've seen that she created,

 3   generated.

 4       Q   And Ms. Semmler transmitted a copy of this

 5   report on July 23rd, 2021, correct?

 6       MR. WINSMAN:  Objection to form, assumes facts not

 7   in evidence.

 8       THE WITNESS:  My understanding is that's when it was

 9   distributed.

10       MS. LUND:  Q   Okay.  And how was this report

11   transmitted?

12       A   I believe it was transmitted over e-mail, but I

13   could be wrong.  I'm not a hundred percent.

14       Q   Is --

15       A   I mean, it's not part of like the back and forth

16   of the report.  So I'm not sure.

17       Q   So this employee data review that Ms. Semmler

18   prepared, it included a Digital Guardian report,

19   correct?

20       A   That's correct.

21       Q   After Ms. Semmler concluded her July 23rd, 2021

22   review of Anthony Ridley's digital activity, including

23   the Digital Guardian report, did Ecolab issue a legal

24   hold on Mr. Ridley's documents?
```

1    A   Not at that time.

2    Q   Why not?

3    A   Again --

4    MR. WINSMAN:  Objection to form, outside the scope.

5    THE WITNESS:  If we were not instructed by legal at

6  that time, we would not have done that.

7    MS. LUND:  Q  Okay.  Did Ecolab issue a legal hold

8  on Mr. Ridley's devices on July 23rd, 2021 when the

9  employee data review was completed?

10    A   No, not that I'm aware of.

11    Q   Okay.  Why not?

12    A   Again --

13    MR. WINSMAN:  Objection to form, outside the scope.

14    THE WITNESS:  Unless instructed by legal, we

15  wouldn't have done it.

16    MS. LUND:  Q  Who received a copy of the employee

17  data review for Mr. Ridley that Ms. Semmler prepared?

18    A   I'm not sure of all parties, but Theresa Corona

19  I know was one of them.

20    Q   Did Kristin Mahre receive the report?

21    A   Yeah, I'm sorry, Kristin Mahre and Theresa

22  Corona I believe as part of the requesters.

23    Q   Do you know whether Jackie Herrera received a

24  copy of the report?

1    2021 Ecolab's counsel were involved with regard to the

2    question of whether Mr. Ridley had misappropriated

3    Ecolab's documents?

4        A    At that time legal was involved with the review.

5        Q    But Ecolab did not issue a legal hold for

6    Mr. Ridley's documents at that time?

7        A    IT did not receive a request for a legal hold at

8    the time.

9        Q    And Ecolab did not issue a legal hold for

10   Mr. Ridley's data at that time?

11       A    Not in July at that time, no.

12       Q    And Ecolab did not issue a legal hold on

13   Mr. Ridley's devices at that time?

14       A    At that time Mr. Ridley's devices, yeah, were

15   already part -- No, nothing was -- No legal hold was put

16   on the devices.  Sorry.

17       Q    Did Ecolab issue a legal hold for the OneDrive

18   folder containing Ms. Semmler's employee data review of

19   Mr. Ridley at that time?

20       A    No legal hold was applied at that time.

21       Q    Was a legal hold on Ms. Semmler's OneDrive

22   folder containing the employee data review of Mr. Ridley

23   ever applied?

24       A    My understanding is Mr. Ridley was put on legal

JA-435

```
 1   hold in January '22.

 2        Q    So my question was a little different.  If you

 3   look at Exhibit 23, you'll see that Ms. Semmler

 4   indicates that this report, along with the underlying

 5   reports, including the Digital Guardian report, were all

 6   stored in a OneDrive folder that --

 7        A    Okay.

 8        Q    -- she maintained, correct?

 9        A    Yeah.  Yes, sorry.  Yes.

10        Q    Yes.  So was that OneDrive folder of

11   Ms. Semmler's put on legal hold in January -- sorry, in

12   July of 2021?

13        A    I'm not aware of a legal hold being put on our

14   collection of -- this repository that you speak of, of

15   the OneDrive, no.

16        Q    So as far as you know, there has never been a

17   legal hold put on the folder where Ms. Semmler stored

18   the Digital Guardian report that she ran on July 23rd of

19   2021?

20        A    I'm not aware of a legal hold being put on it.

21        Q    Okay.  If I can direct your attention to page 2

22   of Exhibit 23, you'll see in the bottom half there's a

23   title that says DLP Files Transfer Data.  Do you see

24   that?
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 435 of 990  PageID #: 5613

1     A   I do.

2     Q   And it says, DLP activity for Mr. Ridley can be

3  reviewed accessing the link at the end of this report.

4  The data export-2021-07-23-11_24_30 report contains a

5  large amount of data.  Do you see that language?

6     A   I do.

7     Q   And do you understand that that is the name of

8  the Digital Guardian report that Ms. Semmler prepared on

9  July 23rd, 2021?

10    A   The data export, yes, I do know.  I see that.

11    Q   Do you know -- Sorry.  Do you know why the

12  version of the Digital Guardian report that Ecolab

13  produced in this litigation has a different file name

14  than the original Digital Guardian report listed in

15  Ms. Semmler's employee data review for Mr. Ridley as

16  reflected in Exhibit 23?

17    A   I'm not aware of the naming convention that she

18  used, why there would be a difference.

19    Q   Okay.  What did Ecolab do to forensically

20  preserve the original Digital Guardian report?

21    A   I think other than, you know, store it into

22  OneDrive with limited access, I don't think anything

23  more than that.

24    Q   And when --

1      A    Again, that report can be generated at any time

2   too.  Well, sorry, you're right.  There was nothing put

3   onto that at the time.

4      Q    And when you say limited access, what do you

5   mean?

6      A    Within -- As part of any investigation, only,

7   you know, the analyst and perhaps legal or HR would have

8   access to those.

9      Q    Would anyone who received the report at

10  Exhibit 23 have access through the link to the

11  information in that file?

12     A    If it was shared with them, they would have

13  access to it.

14     Q    All right.  So as I understand your testimony,

15  in July of 2021 the legal department was involved

16  because there was at least a suspicion that Mr. Ridley

17  may have misappropriated Ecolab's documents; is that

18  correct?

19     MR. WINSMAN:  Objection to form, misstates

20  testimony.

21     THE WITNESS:  That is when the request came in for

22  data access review.

23     MS. LUND:  Q    Ecolab did not contact Mr. Ridley at

24  that time?

1   have to understand it all flows together, right, when an

2   access request is made.

3       Q   So is it your testimony that when Ms. Mahre

4   submitted a request to Ms. Semmler to do the employee

5   data review, that at that time Mr. Ridley's OneDrive was

6   segregated in some way?

7       A   It was not set to be deleted.

8       Q   And who else had access to Mr. Ridley's OneDrive

9   in July of 2021?

10      A   At that time I believe Theresa Corona was the

11  primary person with access.

12      Q   And do you know whether Mr. Ridley's former

13  manager, Ms. Herrera, had access to his OneDrive in July

14  of 2021?

15      A   I am not aware of them having access -- her

16  having access.

17      Q   So is it your testimony that every time an

18  employee data review is requested that that employee's

19  OneDrive is taken out of the deletion queue?

20      MR. WINSMAN:  Objection to form --

21      THE WITNESS:  For that period of --

22      MR. WINSMAN:  -- misstates testimony.  Go ahead.

23      THE WITNESS:  For that period of time to give the

24  manager or HR or legal time to review it.  So that's

1   the same group of individuals.  She writes, morning all,

2   someone from legal just reached out asking about the

3   hard drive again.  Did we find it or are we still

4   looking for it.

5           Do you see that?

6       A   I do see that.

7       Q   And does that indicate to you that at least as

8   of January 19th, 2022 legal did not know the status of

9   that mobile drive?

10      A   They sent this e-mail.  It seemed that they were

11  still looking for it.

12      Q   And do you know why they didn't look for it

13  before January of 2022?

14      MR. WINSMAN:  Objection to form, assumes facts not

15  in evidence.

16      THE WITNESS:  I have no idea.

17      MS. LUND:  Q   Are you aware of any evidence that

18  legal did look for this mobile drive before January of

19  2022?

20      A   The primary interactions with legal was around

21  OneDrive and the data, so.

22      Q   Are you aware of any effort by Ecolab to reach

23  out to Insight at any time before January of 2022 to

24  locate the mobile drive that was returned by Mr. Ridley?

1     A    That would have been the Digital Guardian

2  report, yes.

3     Q    And that report went to Kristin Mahre and

4  Theresa Corona, correct?

5     A    That's my understanding.

6     MR. WINSMAN:  Objection.

7     THE WITNESS:  Oh, sorry.

8     MS. LUND:  Q    As well as potentially other people,

9  correct?

10    MR. WINSMAN:  Objection.

11    THE WITNESS:  My understanding was it went to

12 Theresa and Mahre, Ms. Mahre.

13    MS. LUND:  Q    And so from July 23rd of 2021 until

14 January 25th of 2022 Ecolab did not put a legal hold in

15 place for Mr. Ridley's data, documents, or devices; is

16 that correct?

17    A    We created the legal hold in January, that's

18 correct.

19    Q    Okay.  You created the legal hold on

20 January 25th of 2022, correct?

21    A    That's correct.

22    Q    And you said -- And you said at that time, on

23 January 25th of 2022, Mr. Lieb, who was an outside

24 forensic consultant retained by Ecolab, created an image

1    that shows the operation type.

2        A    Uh-huh.  DI or something.

3        Q    Yeah, yeah.  Can you explain again what the

4    operation type shows?

5        A    Yeah, that would show the action that was taken

6    for the file.  So file copy means to take a copy from --

7    you know, from one destination and make a copy at

8    another -- from one source to make a copy at another

9    destination.

10       Q    Okay.  And you'll see that here all of the

11   operation types that show up in Mr. Ridley's Digital

12   Guardian report have been expanded.  Do you see that?

13       A    Uh-huh.  I do.

14       Q    And can you confirm that delete does not appear

15   among the operation type?

16       A    I can.

17       Q    Okay.  And that's something where if deletion

18   had occurred, that would show, correct?

19       MR. WINSMAN:  Objection, misstates testimony.

20       THE WITNESS:  If that action was taken, the

21   operation type is where it would be shown.

22       MS. LUND:  Q   Right.  So if any deletion had

23   occurred, it would show up in operation type, correct?

24       MR. WINSMAN:  Objection to form, misstates

1    testimony.

2         THE WITNESS:  If that -- if a deletion occurred, it

3    would be in operation type.

4         MS. LUND:  Q  Okay.  And you'll see one of the types

5    that's listed is filed moved, correct?

6         A    That's correct.

7         Q    So let's go ahead and filter just for file move.

8    And, let's see, you might need to make the screen -- I

9    can't see.  We should see now how many results there are

10   for this.

11        A    There's like 1400.

12        Q    It's not showing up on my screen.  That might be

13   a problem with me.

14             So the total number you said is 1400?

15        A    One report I had looked at, it had that number.

16   I don't know.  I can't see --

17        Q    What does it show --

18        A    I can't see it here though.  Or is that 1,466?

19        Q    Oh, I see.  Yes.  So can you -- Mark, can you

20   put the cursor back down it briefly?  It showed up and I

21   don't know if that was you or me.

22             Is there a way to minimize it on your screen

23   so that we can -- All right.  Do you see that it shows

24   that 1,466 of the 94,489 records reflect a file move?

1     A    Not that I've seen that request made.

2     Q    Has Ecolab searched the files of Theresa Corona

3  for any of the allegedly misappropriated documents?

4     A    I have not seen that.

5     Q    Has Ecolab searched the files of Kerri Neitzel

6  for any of the allegedly misappropriated documents?

7     A    No, I have not seen that.

8     Q    Would customer files be held exclusively by

9  Mr. Ridley?

10    MR. WINSMAN:  Objection to form, vague, outside the

11  scope.

12    THE WITNESS:  I'm sorry, just --

13    MR. WINSMAN:  Calls for speculation.

14    MS. LUND:  Q    Sure.  Do you know enough about the

15  organization of the salesforce to know whether an

16  account representative would be the person who would

17  hold the primary file for a customer?

18    MR. WINSMAN:  Objection, outside the scope.

19    THE WITNESS:  Probably not.

20    MS. LUND:  Q    Okay.  Do you know whether Ecolab

21  searched the files of account representatives managed by

22  Mr. Ridley for the files that he allegedly

23  misappropriated?

24    A    I have not seen that.

1    Q   Do you know whether Ecolab searched the files of

2    other district managers who took over territory

3    previously covered by Mr. Ridley for the files allegedly

4    misappropriated by Mr. Ridley?

5    A   I have not seen the search criterias.

6    Q   Do you know whether Ecolab searched other

7    business units who took over customers previously

8    serviced by Mr. Ridley for the files allegedly

9    misappropriated by Mr. Ridley?

10   A   I have not seen that, no.

11   Q   Is it fair to say sitting here today that you

12   are unable to identify any searches that Ecolab

13   conducted of other digital locations to locate copies of

14   the files allegedly misappropriated by Mr. Ridley?

15   MR. WINSMAN:  Objection, misstates testimony.

16   THE WITNESS:  I've not seen any additional search

17   criteria to try to locate those files.

18   MS. LUND:  Q  So what efforts has Ecolab made to

19   locate the documents that Mr. Ridley allegedly

20   misappropriated?

21   A   I have not seen any activity that's in a search

22   to try to recover or find them outside of Mr. Ridley.

23   Q   Okay.  And when you say outside of Mr. Ridley,

24   what search was done with regard to Mr. Ridley?

1     A    Just the review that we spoke about earlier of a

2    OneDrive with Theresa Corona, so.

3     Q    Okay.  So if I can direct your attention to

4    Exhibit 100, which is the list of 30(b)(6) topics, and

5    if I can point your attention to page 10, topic 9,

6    you'll see it says, information in the possession,

7    custody, or control of Ecolab regarding your attempts to

8    locate, retrieve, preserve, or analyze any of the

9    documents you alleged Mr. Ridley misappropriated.  Do

10   you see that language?

11    A    Yes, I do.

12    Q    So your testimony as the corporate

13   representative of Ecolab is that the only effort or

14   attempt to locate, retrieve, preserve, or analyze any of

15   the documents Mr. Ridley mis -- allegedly

16   misappropriated related to Mr. Ridley's OneDrive; is

17   that correct?

18    A    That is what I'm aware --

19   MR. WINSMAN:  Objection, misstates testimony.

20   THE WITNESS:  That is what I'm aware of.

21   MS. LUND:  Q  Let's go ahead and look at what has

22   been previously marked as Exhibit 79.

23        (Previously marked Deposition

24        Exhibit 79 shown to witness.)

1  Exhibit 110, if you could flip to page 4 please.

2      A    Okay.

3      Q    You will see at the bottom it reflects that on

4  July 12th of 2021 Shreya Patel received at the Insight

5  depot from Mr. Ridley a laptop with the Serial No.

6  5CG84132TP, as well as a USB-C dock G4, a 65-watt

7  charger, and a mobile drive.  Do you see that?

8      A    I do see that.

9      Q    And this is the same information that was

10 reflected in Exhibits 108 and 109 that we looked at

11 previously, correct?

12     A    Correct.

13     Q    And you will see that those devices were not

14 moved to inventory until August 5th of 2021, correct?

15 It's the line immediately above.

16     A    The August 6th line there?

17     Q    Yes, you'll see it says moving to inventory

18 8-5-2021.

19     A    Yes, I see it.  Thank you.

20     Q    Okay.  So is it fair to say that if Ecolab had

21 issued a legal hold on July 1st, 2021 when Mr. Ridley

22 informed Ecolab he was departing to work for ChemTreat,

23 the competitor, that this laptop and the additional

24 accessories that Mr. Ridley returned on July 12th, 2021

1   could have been set aside and preserved?

2      MR. WINSMAN:  Objection, calls for speculation,

3   assumes facts not in evidence.

4      THE WITNESS:  Yes, if a legal hold would have been

5   issued, it would have been retained.

6      MS. LUND:  Q   And Insight, as a matter of course,

7   preserves all devices it receives for a two-week period

8   after it receives them, correct?

9      A   That's correct.

10     Q   So is it fair to say that if Ecolab had issued a

11  legal hold on July 18th, 2021 when it requested the

12  employee data review of Mr. Ridley's data, that the

13  laptop returned by Mr. Ridley, along with the various

14  accessories he returned, including the mobile drive,

15  could have been preserved?

16     MR. WINSMAN:  Objection to form, calls for

17  speculation, assumes facts not in evidence.

18     THE WITNESS:  Had a legal hold been in place, then

19  it would have been preserved.

20     MS. LUND:  Q   And is it fair to say that if Ecolab

21  had issued a legal hold on July 23rd, 2021 when the

22  results of Ms. Semmler's employee data review, including

23  the Digital Guardian report, were issued, that, again,

24  Mr. Ridley's laptop and the mobile drive that he

1  returned could have been preserved and the data on them

2  captured?

3      MR. WINSMAN:  Objection, assumes facts not in

4  evidence, calls for speculation.

5      THE WITNESS:  Had -- If they had enough time to

6  identify that and determine that, then yes.

7      MS. LUND:  Q   Okay.  Well, and, in fact, the laptop

8  wasn't moved into inventory until August 5th of 2021,

9  correct?

10     A   That's what the record shows.  That's what this

11 shows, yeah.

12     Q   So there was two weeks after the DLP, Digital

13 Guardian report, was prepared when a legal hold could

14 have been issued and the data on that laptop could have

15 been preserved, correct?

16     MR. WINSMAN:  Objection to form, calls for

17 speculation, assumes facts not in evidence.

18     THE WITNESS:  If a legal hold would have been

19 issued, yes, it could have been retained.

20     MS. LUND:  Q   And would you agree that it is more

21 likely that the mobile drive returned by Mr. Ridley

22 could have been preserved and the data on it reviewed if

23 Ecolab had issued a legal hold in July of 2021 rather

24 than waiting until January of 2022 to look for that

1   device?

2        MR. WINSMAN:  Objection to form, assumes facts not

3   in evidence, calls for speculation.

4        THE WITNESS:  Yes.  Yes, sorry.

5        MS. LUND:  Why don't we take a short break.

6        THE VIDEOGRAPHER:  Off the record at 2:56.

7            (Recess was taken.)

8        THE VIDEOGRAPHER:  Back on the record at 3:12.

9        MS. LUND:  Mr. Garza, I have no further questions at

10  this time.  I pass the witness.

11       MR. POPE:  Mr. Garza, I don't have any additional

12  questions for you other than those asked by Ms. Lund.

13       MR. WINSMAN:  All right.  You know what?  Can we go

14  off the record then for another break so I can come

15  back?

16       THE VIDEOGRAPHER:  Off the record at 3:12.

17           (Recess was taken.)

18       THE VIDEOGRAPHER:  Back on the record at 3:23.

19       MR. WINSMAN:  All right.  And I have nothing for the

20  witness.

21       MS. LUND:  Mr. Garza, thank you for your time.

22       THE WITNESS:  Thank you.  Safe travels.

23       MR. WINSMAN:  Thank you.

24       THE VIDEOGRAPHER:  And we're off the record at 3:23.

Page 179

1   STATE OF ILLINOIS  )

                      )  SS:

2   COUNTY OF C O O K  )

3           The within and foregoing deposition of the

4   aforementioned witness was taken before NADINE J.

5   WATTS, CSR, RPR, and Notary Public, at the place, date

6   and time aforementioned.

7           There were present during the taking of the

8   deposition the previously named counsel.

9           The said witness was first duly sworn and was

10  then examined upon oral interrogatories; the questions

11  and answers were taken down in shorthand by the

12  undersigned, acting as stenographer and Notary Public;

13  and the within and foregoing is a true, accurate and

14  complete record of all of the questions asked of and

15  answers made by the forementioned witness, at the time

16  and place hereinabove referred to.

17          Before completion of the deposition, review of

18  the transcript { } was {X} was not requested.  If

19  requested, any changes made by the deponent (and

20  provided to the reporter) during the period allowed are

21  appended hereto.

22          The undersigned is not interested in the

23  within case, nor of kin or counsel to any of the

24  parties.

Page 180

1          Witness my official signature and seal as
2     Notary Public in and for Cook County, Illinois on the
3     28th day of April, A.D. 2023.
4

                    *Nadine J Watts*

5                    _____
                     NADINE J. WATTS CSR, RPR
6                    Notary Public
                     License No. 084-002736
7                    One North Franklin Street
                     Suite 3000
8                    Chicago, Illinois  60606
                     Phone:  (312) 442-9087
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

```
                                          Page 1

 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF TENNESSEE
 2               CHATTANOOGA DIVISION
                      -   -   -
 3
      ECOLAB Inc., and NALCO     :
 4    COMPANY, LLC d/b/a         : NO.
      Nalco Water, an Ecolab     : 1:22-cv-00050-
 5    Company and/or Nalco       : TRM-SKL
      Water,                     :
 6                 Plaintiffs,   :
                                 :
 7        -vs-                    :
                                 :
 8    ANTHONY RIDLEY,            :
      and CHEMTREAT INC.,        :
 9            Defendants.   :
10                   -   -   -
11              April 12, 2023
12        Confidential Per Protective Order
13                   -   -   -
14
15         Videotaped deposition of HELEN
16    HAMILTON, taken via Zoom, beginning at 9:04
17    a.m., before LINDA ROSSI-RIOS, a Federally
18    Approved Registered Professional Reporter,
19    Certified Court Reporter and Notary Public.
20
21
22                   -   -   -
              VERITEXT LEGAL SOLUTIONS
23               MID-ATLANTIC REGION
           1801 Market Street - Suite 1800
24            Philadelphia, PA  19103
```

Page 121

1          Q.    It says, "ChemTreat promptly
2     undertook a reasonable, proportional, and
3     detailed investigation to determine whether
4     Ridley had placed any Ecolab Confidential
5     Information on any ChemTreat System."
6          A.    I see that.
7          Q.    Did you have any involvement in
8     that investigation?
9          A.    No, I did not have any involvement.
10         Q.    Other than counsel, did you
11    speak to anyone about that investigation?
12         A.    No, I did not.
13         Q.    So do you have -- strike that.
14               Is there -- strike that.
15               Why do you believe that the
16    investigation was reasonable, proportional,
17    and detailed?
18               MS. MIRMIRA:  Objection to form.
19               THE WITNESS:  I believe that
20          because I know that ChemTreat hired
21          Mr. Vaughn, an expert at forensic
22          analysis.
23    BY MR. WINSMAN:
24         Q.    Have you spoken with Mr. Vaughn?

1    BY MR. WINSMAN:

2         Q.    What happened to the computer

3    that was returned to ChemTreat by Mr. Ridley

4    in March of 2022?

5         A.    The computer was returned to

6    ChemTreat and was given to IT and was

7    re-imaged.

8         Q.    When you say it was re-imaged,

9    what does that mean?

10        A.    It was put to use for someone

11   else.

12        Q.    And what happened to all of the

13   data that was on the computer prior to it

14   being re-imaged?

15             MS. MIRMIRA:  Objection to form.

16             THE WITNESS:  I don't understand

17        that question.

18   BY MR. WINSMAN:

19        Q.    Did ChemTreat preserve the data

20   that was on the computer returned by Mr.

21   Ridley before it was re-imaged?

22        A.    I want to go back and make

23   something clear about that computer if I

24   could, please.  That computer came in from Mr.

Page 153

1  documents are saved to a computer?

2          MS. MIRMIRA:  Objection to form.

3      Scope.  You may answer.

4          THE WITNESS:  I'm not aware of

5      any policies about where to save what

6      files to.

7  BY MR. WINSMAN:

8      Q.    Other than the computers that

9  were used by Mr. Ridley, did ChemTreat collect

10 any other ChemTreat computers to search for

11 misappropriated Nalco information?

12          MS. MIRMIRA:  Objection to form.

13     Scope.

14          THE WITNESS:  Are you asking if

15     there are other Ridley devices that

16     ChemTreat had to look at?

17 BY MR. WINSMAN:

18     Q.    No.  What I'm saying is, other

19 than the computers that Mr. Ridley himself may

20 have used.  Are there computers that were used

21 by -- are there computers that were issued to

22 other ChemTreat employees that ChemTreat

23 searched during the course of its

24 investigation into whether it was in

                                        Page 154

1      possession of any Nalco or Ecolab information?

2                   MS. MIRMIRA:  Objection to form.

3            Foundation.  And scope.

4                   THE WITNESS:  Mr. Vaughn was

5            given a project to look at what

6            documents Mr. Ridley may have brought

7            over and whether those documents were

8            sent throughout the ChemTreat system.

9            He did what he needed to do to reach

10           the conclusions that determined that

11           they sat there and didn't go elsewhere.

12           I'm relying on those conclusions that

13           Mr. Vaughn in his report state.

14                   MR. POPE:  Ed, sorry, I hate to

15           interrupt you.  Are you getting close

16           to a one hour break?  I just got an

17           email from Greg requesting a response

18           to something this afternoon.  If we

19           could take a ten-minute break to reply

20           to his email, that would be great.

21                   MR. WINSMAN:  We can take a

22           ten-minute break now.

23                   VIDEOGRAPHER:  Going off the

24           video record.  The time is 4:01 p.m.

Page 224

1                    C E R T I F I C A T E

2

3          I do hereby certify that I am a Notary

4     Public in good standing, that the aforesaid

5     testimony was taken before me, pursuant to

6     notice, at the time and place indicated; that

7     said deponent was by me duly sworn to tell the

8     truth, the whole truth, and nothing but the

9     truth; that the testimony of said deponent was

10    correctly recorded in machine shorthand by me

11    and thereafter transcribed under my

12    supervision with computer-aided transcription;

13    that the deposition is a true and correct

14    record of the testimony given by the witness;

15    and that I am neither of counsel nor kin to

16    any party in said action, nor interested in

17    the outcome thereof.

18          WITNESS my hand and official seal this

19    13th day of April 2023.

20

21

22          Linda Rossi-Rios, RPR, CSR

          Notary Public

23

24

Page 1

1                    UNITED STATES DISTRICT COURT
                   EASTERN DIVISION OF TENNESSEE
2

3       ECOLAB, INC., and NALCO    )
        COMPANY, LLC, d/b/a        )
4       NALCO WATER, an Ecolab     )
        Comany and/or NALCO WATER,)
5                                  ) CASE NO.
                 Plaintiffs,       ) 1:22-cv-00050-TRM-SKL
6                                  )
        vs.                        )
7                                  )
        ANTHONY RIDLEY and         )
8       CHEMTREAT, INC.,           )
                                   )
9                  Defendants.     )
10

11              REMOTE VIDEOTAPED DEPOSITION
12                     Via ZOOM of
13                  JAQUELINE HERRERA
14                   April 21, 2023
15                   7:00 A.M. CST
16
17
18
19
20
21
22
23      STENOGRAPHICALLY REPORTED BY:
        JO ANN LOSOYA, CSR, RPR, CRR
24      LICENSE #:  084-002437
25

1          A.    January 1st, 2021.

2          Q.    And what role did he report to you?

3          A.    Corporate account manager.  He was the

4    corporate account manager.

5          Q.    That was at Ecolab, right?

6          A.    Correct.

7          Q.    What were Mr. Ridley's job duties when he

8    worked for you?

9          A.    As a corporate account manager, he was

10   responsible for a portfolio of business.  So he

11   needs to ensure that he maintains the relationship,

12   the business from the, you know, business and

13   technical side, and he orchestrated the strategy to

14   execution to grow the business for his portfolio.

15         Q.    And in that role, did Mr. Ridley oversee

16   a specific geographic area of any kind?

17         A.    No.  He had a portfolio and it was

18   basically, you know, in the U.S.

19         Q.    And did his portfolio focus on a specific

20   industry?

21         A.    Yes.

22         Q.    What was the industry he focused on?

23         A.    Protein.

24         Q.    Protein.  Can you give me a sense of

25   exactly what -- what type of customers the protein

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 459 of 990   PageID #: 5637

1    Q.    Sorry.  Ms. Herrera, the nature of the

2  deposition is that I -- that I ask the questions

3  and --

4    A.    Oh, okay.

5          Okay, I'm sorry.  I didn't know I

6  couldn't ask questions.

7    Q.    Apologies.  Now, if you could please pull

8  up Exhibit 90.

9    A.    Okay.  Yes, I have it open.

10    Q.    Take a moment just to review that.

11          All right.  Do you see your email of

12  July 1st at 9:08 a.m.?

13    A.    Yep.

14    Q.    And you say you just got off the phone

15  with Anthony Ridley, correct?

16    A.    Hm-hmm, yeah, probably a little bit over,

17  yes.

18    Q.    And did your phone call with Mr. Ridley

19  follow his 8:52 a.m. email?

20    A.    Yes.  He called me and he then send the

21  email, yep.

22    Q.    And you say that he shared the reason of

23  his resignation is because he got an offer from

24  ChemTreat with a greater than 30 percent base salary

25  increase plus commissions.

1        Did I read that correctly?

2        A.    Hm-hmm, yes.

3        Q.    So Mr. Ridley was -- so as of July 1st at

4    9:08 a.m. you were aware that Mr. Ridley was going

5    to work for ChemTreat, correct?

6        A.    You know, I didn't recall that because

7    when he called me, I didn't ask him, he didn't

8    share.  I mean, I will say what I shared earlier.

9    Right.  So, yeah, it might have been -- I would have

10   to check on the text.  So yeah, he shared about the

11   family, he shared about the increase in salary, and

12   so forth.  So, yep.

13       Q.    And you also state that he will move back

14   to a field sales leadership position leading the

15   east Tennessee area, right?

16       A.    Hm-hmm.

17       Q.    So as of July 1st at 9:08 a.m. you were

18   aware that Mr. Ridley was going to work for

19   ChemTreat and that he would be in a field sales

20   leadership position in the east Tennessee area?

21       A.    Hm-hmm.

22       Q.    And you sent this email to Luciano Leme

23   and Kristin Mahre high importance, correct?

24       A.    Yes.

25       Q.    And then you forwarded this email to Judy

1      you put the documents into to be saved to the cloud?
2          A.      It works.
3          Q.      Yeah.  Have you ever confirmed that?
4          A.      Yes.
5          Q.      Have you ever had a synchronization
6      problem of any kind with your One Drive account?
7          A.      No, no, I have not.
8          Q.      Who else has access to your One Drive
9      account?
10         A.      So I think I guess for sure IT.  Right.
11     Because when we get new computers or so, they are
12     the ones who, you know, help us switch new
13     computers, information just swap in seconds.  And I
14     would say HR, high level HR, I would say, and IT.
15         Q.      Have you ever shared any folders in your
16     One Drive account with anyone else?
17         A.      We can.  When we're working on projects,
18     right, that's one of the things that you share with
19     your peers you're working with, you know, in a
20     specific files, One Drive allows you to do that
21     safely.
22         Q.      Other than One Drive, where else do you
23     store documents that you might use for purposes of
24     your work other than, you know, the USB drives that
25     you discussed with Mr. Pope earlier?

1          Q.    Okay.  In that same vein, did you also

2     receive access to all of Anthony's files for his

3     customers in that portfolio?

4               MR. WINSMAN:  Objection.

5     BY THE WITNESS:

6          A.    I had it already.  So, yeah, managers

7     have the portfolio -- we give the portfolio to the

8     corporate account manager.  So that is the

9     information that we managers give to the corporate

10    account managers.

11         Q.    Okay.

12         A.    It is not that I requested special

13    access.

14         Q.    I understand.  You had access before

15    Anthony left?

16         A.    Yes.  I mean, to the regular files that

17    are generated, not necessarily to his hard drive or

18    anything, but the portfolio itself.  Okay.  These

19    are the customers you have, these are the codes,

20    these are the activity, that is information that the

21    managers provide to their corporate account

22    managers.

23         Q.    Okay.  And does that include his One

24    Drive files?

25         A.    The files in the cloud from One Drive?

1    for him as a corporate account manager.  Because

2    despite he had many years with Ecolab, he was fairly

3    new as a corporate account manager so it was a lot

4    of work on the onboarding, and so I personally

5    didn't, you know, go into or try to go into his One

6    Drive.

7           Q.    Okay.  So if you needed access to some

8    particular file, for example, let's just use Tyson

9    Chicken as an example, if you needed access to a

10   Tyson chicken file, how would you find it,

11   Ms. Herrera?

12          A.    Depending on what type of file.

13          Q.    Okay.  Tell me the different ways.

14          A.    So, for example, if it is for, let's say,

15   sales, revenue, well, that is the information that

16   business ops, you know, will have for every single

17   corporate account.  Right.  So if I need Tyson's

18   revenue, I could get that.  But then there are

19   information that each corporate account manager

20   would have specifically about, you know, that

21   customer and so they might have it in the One Drive

22   or they might keep it for themselves, but they're

23   required to make sure the backup is always in the

24   One Drive.

25          Q.    Okay.  And then after Anthony resigned,

1    you had access to all of those files -- all those

2    files for his corporate accounts?

3              MR. WINSMAN:  Objection to form,

4    misstates testimony.

5              You can go ahead, Ms. Herrera.

6    BY THE WITNESS:

7        A.   I assume so.  Quite frankly, Mr. Pope, I

8    didn't have the time to -- how it was, when he left,

9    he left, and as I said, there were RFPs going on

10   that he didn't have to deal with, some were just

11   like starting, and so I was extremely busy working

12   on those RFPs, and I didn't have the bandwidth to go

13   and make all those, you know, deep dive.

14             MR. POPE:  Okay.

15             MR. WINSMAN:  I think it's been close to

16   ten minutes, and so I just want to -- let her know

17   if this is something where it is one more minute

18   or --

19             THE WITNESS:  It's going over.  I know

20   you might have more questions.  I do have to go.  I

21   would like to also make sure that maybe it makes

22   sense to split.  So how much time we have left so I

23   make sure that for next Tuesday, I'm going to be

24   5:00 a.m. for me, and how much time are we aiming?

25             MR. POPE:  How long have we been on the

Page 170

1                    REPORTER CERTIFICATION

2

3

4          I, JO ANN LOSOYA, a Certified Shorthand

5    Reporter of the State of Illinois, do hereby certify

6    that I reported in shorthand the proceedings had at

7    the deposition aforesaid, and that the foregoing is

8    a true, complete and correct transcript of the

9    proceedings of said deposition as appears from my

10   stenographic notes so taken and transcribed under my

11   personal direction.

12          IN WITNESS WHEREOF, I do hereunto set my

13   hand at Chicago, Illinois, this April 23, 2023.

14

15

16   _____

     JO ANN LOSOYA, CSR, RPR, CRR

17   C.S.R. No. 084-002437

18

19

20

21

22

23

24

25

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF TENNESSEE
2         CASE NO. 1:22-cv-00050-TRM-SKL
                     - - -
3

     ECOLAB INC., and NALCO
4    COMPANY, LLC d/b/a NALCO
     WATER, an Ecolab Company
5    and/or NALCO WATER,
6             Plaintiffs,
     vs.
7

     ANTHONY RIDLEY, and
8    CHEMTREAT, INC.,
9             Defendants.
10     *********************************
                    VOLUME II
11   CONTINUED ZOOM VIDEOTAPED DEPOSITION OF
                JACQUELINE HERRERA
12               April 25, 2023
                 5:00 a.m. HST
13     *********************************
14
15   TAKEN BY:
            LANCE POPE, ESQ.
16          ATTORNEY FOR DEFENDANT
17   REPORTED BY:
            BELLE VIVIENNE, RPR, CRR, NJ-CRR,
18          WA/CO/NM-CCR
            NATIONALLY CERTIFIED REALTIME
19          COURT REPORTER
            VERITEXT LEGAL SOLUTIONS
20          JOB NO. 5889316
            866.299.5127
21
22
23
24
25

1          Q.    All right.  Ms. Herrera, let
2     me -- let me tell you what's going on
3     about the -- about the -- the court
4     reporter.  After I ask you a question,
5     sometimes Mr. Winsman has an objection to
6     my question, and the court reporter needs
7     you to give Mr. Winsman time to state his
8     objection and then you answer because
9     what's happening is you all are speaking
10    over each other and the court reporter
11    can't take down both statements at the
12    same time.  Does that make sense?
13         A.    I apologize, Mr. Pope, I'll
14    wait.
15         Q.    Okay.  That's fine.  That's
16    fine.
17              And so my -- my question is
18    about the OneDrive files that were
19    uploaded to the cloud.  After Mr. Ridley
20    left, his OneDrive files remained
21    available to you and your team so you all
22    could service his portfolio; is that
23    right?
24         A.    Yes.
25              MR. WINSMAN:  Objection to form.

1                    CERTIFICATION

2

3          I, BELLE VIVIENNE, a Nationally

4    Certified Realtime Reporter, do hereby

5    certify:

6          That the witness whose testimony

7    as herein set forth, was duly sworn by

8    me; and that the within transcript is a

9    true record of the testimony given by

10   said witness.

11         I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I

14   am in no way interested in the outcome of

15   this matter.

16         IN WITNESS WHEREOF, I have

17   hereunto set my hand this 26th day of

18   April 2023.

19

20         *Belle Vivienne*

21         BELLE VIVIENNE, CRR, CCR, RPR

22

23                *       *       *

24

25

1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF TENNESSEE

3

4    ECOLAB Inc., and NALCO COMPANY,)
     LLC d/b/a Nalco Water, an      )
5    Ecolab Company and/or Nalco    )
     Water,                         )
6                                   )
                                    )
7              Plaintiffs,          )
                                    ) CONFIDENTIAL
8    vs.                            )
                                    ) Case No.
9    ANTHONY RIDLEY, and CHEMTREAT, ) 1:22-cv-00050-TRM-
     INC.,                         ) SKL
10                                  )
                                    )
11             Defendants.          )
     --------------------------------

12

13

14              C O N F I D E N T I A L

15               (ATTORNEYS' EYES ONLY)

16

17              Videotaped Deposition of

                     BENJAMIN IRWIN
18
                  Taken on behalf of the
19
                      Defendants
20
                    March 7, 2023
21
                     9:05 a.m.
22

23

                     Reported by:
24              Harpeth Court Reporters
                  Franklin, Tennessee
25              Ariela Kelley, LCR, CSR

(615) 933-6786
www.harpethcourtreporters.com
Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 470 of 990   PageID #: 5648
1

1   hand-delivered copies.  PDFs usually is what we have a

2   practice of doing.

3   Q.      Sure.

4   A.      And so it can't be edited.  But, yeah, the

5   proposal would be there.  It would be their copy and

6   it would be a quote, and it would be good for a

7   certain time period; 30, 60, maybe 90 days.

8   Q.      Right.  And so any time within that period of

9   time, whatever it might have been, the customer could

10  have made a decision to call you back and say, hey, we

11  want to go with Nalco for this proposal that you made;

12  is that right?

13          MR. WALTON:  Objection to the form.

14          But you can answer.

15          THE WITNESS:  They could always call back, and

16  we could rediscuss doing business together, yes.

17  BY MR. POPE:

18  Q.      Sure.  And I guess that would be part of the

19  reason why you would want them to keep that proposal,

20  so they could refer to it and see what services

21  you-all offered and for what price?

22  A.      We would want the customer to have a recent

23  quote.  We would not want them to reference chemical

24  pricing from years ago.  We may not also want them to

25  reference chemical from years ago because chemicals do

(615) 933-6786
www.harpethcourtreporters.com
Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 471 of 990   PageID
#: 5649

24

1  change over time, and so the process of building the

2  quote, if too much time has passed, would need to be

3  done again.

4  Q.      Sure.  So I think I know, but you tell me.

5  Why would you not want the customer to have a quote

6  from years ago or a proposal from years ago?

7  A.      Not all the information would be accurate.

8  There's a chance that especially the pricing would

9  change year over year and would need to be reviewed or

10  updated.

11  Q.      What else could change that would make the old

12  proposal or quote irrelevant?

13  A.      Things that could change; if a plant expanded

14  or contracted, added more equipment, removed

15  equipment, if a local city ordinance changed requiring

16  maybe more stringent water quality.  I guess it could

17  go less stringent.  We don't normally see that.

18  Q.      Sure.

19  A.      I think that -- that sums it up.

20  Q.      All those are just sort of what you've listed,

21  the plant expanding, price changing, or the plant

22  contracting?

23  A.      People could also change.  I should say that,

24  too.  Engineers, maintenance managers, plant managers.

25  The personnel at the plant that we presented the

(615) 933-6786
www.harpethcourtreporters.com
Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 472 of 990  PageID
#: 5650
25

1  information to, say, they called with an original

2  problem, if those people left, that problem that --

3  those discussions would have to start over.

4  Q.    Sure.  And so all of those things would just

5  be changes in the circumstances on the ground or the

6  data supporting the quote -- for example, the price --

7  that just makes it where the quote is not something

8  upon which the customer can rely anymore?

9        MR. WALTON:  Objection to the form.

10       But you can answer if you can.

11       THE WITNESS:  Can you say that again?

12  BY MR. POPE:

13  Q.    Yeah.  And so the factors that you've talked

14  about: change in price, the plant expanding or

15  contracting, the removal of equipment, change of

16  personnel at the plant, or a city ordinance changing;

17  those are just things that would make the prior quote

18  that you've sent to that customer no longer

19  applicable?

20       MR. WALTON:  Objection to the form.

21       But you can answer if you can.

22       THE WITNESS:  It would need to be reviewed for

23  accuracy.

24  BY MR. POPE:

25  Q.    Right.  And is that the reason that you put --

1   that you-all put a time limitation on a customer's

2   ability to accept a quote after you provide it to

3   them, because things could change?

4   A.      We put a limit on the time because the costs

5   change; shipping, raw material markets change very

6   rapidly anymore.  It used to be less often, but in the

7   last few years, it's become to where these markets

8   will change every 30 days, and so the prices will

9   fluctuate, which means the costs fluctuate, and we

10  would want to offer the most up-to-date pricing.

11  Q.      Okay.  In your time as a district manager over

12  WL121, has there been sort of a standard period of

13  time that a proposal or a quote is good for?

14  Thirty days or 60 days or 90 days or something

15  completely different?

16  A.      It really depends on the product.  I would

17  say, like, a glycol would be good for 30 days.  Other

18  pricing, 60 days would be more common.  And at any

19  point after 60 days, we would review that, and if

20  they -- it may not change, but we would review that

21  price and give them an updated price.

22  Q.      Okay.  And so it sounds like 30 days is sort

23  of the short end of that time frame.  You would

24  normally have your quote good for at least 30 days so

25  the customer can make a decision; is that right?

(615) 933-6786
www.harpethcourtreporters.com
Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 474 of 990   PageID
#: 5652
27

1  A.      Yes.  If you're presenting a quote, you're

2  looking for a decision within 30 days.

3  Q.      Okay.  And then so what is the -- sort of the

4  opposite end of the spectrum, sort of the longest

5  period of time that you would agree for a quote to be

6  good for for a customer or just that you've seen in

7  your experience?

8  A.      I don't -- don't think I've ever seen a quote

9  exceed 60 days without being reviewed.  It's just part

10  of our process.

11  Q.      Because things can just change, pricing can

12  change, anything can change; is that right?

13  A.      A war could start in Ukraine.

14  Q.      Right.  Okay.  And so when you provide these

15  quotes to a customer, are you often aware that the

16  customer is going to shop your quote?  They may have

17  someone else come in and bid the system and compare

18  your quote to a competitor's bid?

19          MR. WALTON:  Objection to the form.

20          But you can answer if you can.

21          THE WITNESS:  We generally ask if they are

22  looking at other people, if other people have looked

23  at the system before.

24  BY MR. POPE:

25  Q.      Okay.  Are they -- have you had experiences

(615) 933-6786
www.harpethcourtreporters.com
Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 475 of 990   PageID #: 5653                28

```
1                  REPORTER'S CERTIFICATE

2            I, Ariela Kelley, Court Reporter, do hereby

3     certify that I recorded to the best of my skill and

4     ability by machine shorthand all the proceedings in

5     the foregoing transcript, and that said transcript is

6     a true, accurate, and complete transcript to the best

7     of my ability.

8            I further certify that I am not an attorney

9     or counsel of any of the parties, nor a relative or

10    employee of any attorney or counsel connected with the

11    action, nor financially interested in the action.

12     SIGNED this 9th day of March 2023.

13

14                        Ariela Kelley

15    --------------------------------

16                        Ariela Kelley, LCR, CSR
                          Tennessee LCR No. 736
                          Expires:  6/30/2023
17

18

19

20

21

22

23

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF TENNESSEE
 3                    CHATTANOOGA DIVISION
 4    _____
 5    ECOLAB INC., and NALCO COMPANY,
 6    LLC, d/b/a Nalco Water, an Ecolab
 7    Company and/or Nalco Water,
 8           Plaintiffs,
 9        v.                              Case No.
10    ANTHONY RIDLEY and CHEMTREAT, INC.   1:22-cv-00050-
11           Defendants.                   TRM-SKL
12    _____
13                 VIDEOTAPED DEPOSITION OF
14                      LYNNE JAMES
15    DATE:         Wednesday, March 8, 2023
16    TIME:         8:40 a.m.
17    LOCATION:     Remote Proceeding
18                  Philadelphia, Pennsylvania 19103
19    REPORTED BY:  Jean Tompane, Notary Public
20    JOB NO.:      5800791
21
22
23
24
25
```

1      A    She sent it to me email.

2      Q    Do you still have a copy of that email?

3      A    I didn't go back to look.  I haven't

4  tampered with it, so it should still be there.  I

5  don't know how long information such as that is

6  retained.

7      Q    Okay.  All right.  My understanding is --

8  and please correct me if I'm wrong -- that your

9  connection with this case is that you received a

10  computer from Mr. Ridley at some point; correct?

11               MS. MIRMIRA:  Objection to form.

12  BY MR. WALTON:

13      Q    Is that accurate?

14      A    That is -- I received a partial.

15      Q    A partial?

16      A    I received a box.

17      Q    Okay.  Do you know what was in that box?

18      A    I had no idea what was in that box other

19  than --

20      Q    What did the box look like?

21      A    The box looked exactly like boxes that are

22  received that contain computer equipment.

23      Q    And what do those types of boxes look like?

24      A    They're square and brown.

25      Q    Is there any writing on those boxes?

1      A      It could be.  It can be, depending.

2      Q      Are those boxes connected with a certain

3  company like DHL or Federal Express?

4      A      No, no.

5      Q      So you received just a brown box?

6      A      That's correct.

7      Q      And there was no, like, corporate writing or

8  corporate logo on it?

9      A      There was not.

10      Q      Was there a shipping label on it?

11      A      There was a shipping label.

12      Q      Do you remember what the shipping label

13  said?

14      A      The shipping label said it was for Emily

15  Bates.

16      Q      Was there anything on the box that indicated

17  who the sender was?

18      A      I don't -- oh, the sender?  No.  I -- I

19  don't recall.  I don't know.

20      Q      And Ms. Bates works in your office; right?

21      A      Yes.

22      Q      Okay.  And do you remember when you received

23  this box?

24      A      I do not remember the date.

25      Q      Okay.  How many boxes like this do you

1  receive during the course of a month?

2      A    Oh, gosh.  It could be -- in the course of a

3  month?  It could be five.  It could be 15.

4      Q    Okay.  And this said -- this box -- this

5  brown box, was it as big as say a laptop -- the

6  average laptop computer?

7                MS. MIRMIRA:  Objection to form.

8  BY MR. WALTON:

9      Q    You can answer.

10     A    It was larger.

11     Q    Okay.  And did you open the box?

12     A    I did not open the box.

13     Q    What did you do after receiving this box?

14     A    Well, I was trying to be helpful, so

15  considering the box looked like a computer equipment

16  box, I walked the box to the IT workroom.

17     Q    Okay.  Why do you say it looked like a

18  computer equipment box?

19     A    Because the equipment that is shipped here

20  comes in solid boxes unless I have had boxes that come

21  in with the actual logo of Dell on the box.

22     Q    And so although this box was addressed to

23  Ms. Bates, you walked down I think you said to the IT

24  equipment room?

25     A    I did.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 480 of 990  PageID #: 5658

```
1              CERTIFICATE OF DEPOSITION OFFICER

2            I, JEAN TOMPANE, the officer before whom the

3    foregoing proceedings were taken, do hereby certify

4    that any witness(es) in the foregoing proceedings,

5    prior to testifying, were duly sworn; that the

6    proceedings were recorded by me and thereafter reduced

7    to typewriting by a qualified transcriptionist; that

8    said digital audio recording of said proceedings are a

9    true and accurate record to the best of my knowledge,

10   skills, and ability; that I am neither counsel for,

11   related to, nor employed by any of the parties to the

12   action in which this was taken; and, further, that I

13   am not a relative or employee of any counsel or

14   attorney employed by the parties hereto, nor

15   financially or otherwise interested in the outcome of

16   this action.

17                              JEAN TOMPANE

18                        Notary Public in and for the

19                            State of Maryland

20

21

22

23

24

25
```

1               CERTIFICATE OF TRANSCRIBER

2         I, JACOBEY RADTKE, do hereby certify that

3  this transcript was prepared from the digital audio

4  recording of the foregoing proceeding, that said

5  transcript is a true and accurate record of the

6  proceedings to the best of my knowledge, skills, and

7  ability; that I am neither counsel for, related to,

8  nor employed by any of the parties to the action in

9  which this was taken; and, further, that I am not a

10  relative or employee of any counsel or attorney

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of this action.

13

14

15                           JACOBEY RADTKE

16

17

18

19

20

21

22

23

24

25

```
                                              Page 1

 1            IN THE UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF TENNESSEE

 3                  CHATTANOOGA DIVISION

 4      ---------------------------:

 5      ECOLAB INC., and NALCO       :

 6      COMPANY, LLC, d/b/a Nalco    :

 7      Water, an Ecolab Company,    :

 8                   Plaintiffs,     : Case No.:

 9             vs.                   : 1:22-cv-00050

10      ANTHONY RIDLEY, and          : TRM-SKL

11      CHEMTREAT, INC.,             :

12                   Defendants.     : CONFIDENTIAL PURSUANT

13      ---------------------------:   TO PROTECTIVE ORDER

14

15         Videotaped Deposition of STEVE LEAVELL

16            All parties appearing via Zoom

17               Thursday, March 16, 2023

18                    9:13 a.m.

19

20      Job No. PA-5816394

21      Pages 1 - 252

22      Reported by:  Robert M. Jakupciak, RPR
```

```
                                              Page 36

1      resume'.  Is that the right document, sir?      09:45:52

2             MS. MIRMIRA:  I think he does have it.   09:45:55

3      Yes.  He is going to read from the bottom up.   09:45:56

4             MR. WALTON:  Take your time and read it, 09:45:59

5      Mr. Leavell, and let me know when you are ready to 09:46:01

6      talk about it.                                  09:46:03

7             THE WITNESS:  Okay.  Okay.              09:46:05

8      BY MR. WALTON:                                  09:47:04

9         Q    Mr. Leavell, was this the first time you 09:47:05

10     heard the name Anthony Ridley when you received this 09:47:07

11     email?                                          09:47:11

12        A    Yeah.  To my knowledge.  I don't recall  09:47:11

13     exactly, but --                                09:47:14

14        Q    But just to the best of your recollection? 09:47:18

15        A    To the best of my recollection, yes.   09:47:20

16        Q    Okay.  So this is an email from Mr.     09:47:23

17     Ridley -- I'm sorry -- from Mr. Ridley to Clay and 09:47:27

18     Clay then forwards you the email; right?        09:47:32

19        A    Yes.                                    09:47:34

20        Q    This is dated Friday, August 21st of 2020? 09:47:35

21        A    Yes.  That's the email I'm looking at.  09:47:38

22        Q    Were you guys looking for a position in  09:47:42
```

JA-485

1   the Tennessee area at this time?                    09:47:45

2        A    We had -- yes.  We were, with some        09:47:48

3   retirements.                                        09:47:54

4        Q    Sorry to interrupt you, sir.  Please      09:47:58

5   finish your answer.                                 09:48:00

6        A    I just say yeah, we were looking, due to  09:48:01

7   some looming retirements.                           09:48:04

8        Q    Was there a specific territory that Mr.   09:48:08

9   Ridley was going to -- strike that.  That's a       09:48:13

10  horrible question.                                  09:48:16

11       Who was retiring at the time that was          09:48:19

12  opening up these territories in Tennessee?          09:48:21

13       A    A gentleman by the name of David Ellis.   09:48:24

14       Q    Was there anybody else?                   09:48:31

15       A    We knew that Jim Sheely would be retiring 09:48:33

16  at some point.  They both had communicated their    09:48:37

17  interest in potentially retiring.                   09:48:44

18       Q    Was there anybody else, sir?              09:48:49

19       A    And in Chattanooga specifically, no.      09:48:52

20       Q    Yes, sir.  Okay.  Which individual's      09:48:56

21  territory, Mr. Ellis or Mr. Sheely, was Mr. Ridley  09:49:01

22  potentially going to fill?                          09:49:06

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 485 of 990   PageID #: 5663

Page 38

| 1 | A | Mr. Ellis. | 09:49:08 |

2    Q    Did Mr. Ellis ultimately retire?    09:49:09

3    A    Yes.    09:49:12

4    Q    Okay.  Do you remember when?    09:49:13

5    A    I don't recollect the date.    09:49:17

6    Q    All right.  So I want to focus on the top    09:49:20

7    email from Clay to you.  Okay?    09:49:24

8         It says:  Steve, this is the resume' for    09:49:28

9    the guy I recently interviewed in Nashville.    09:49:31

10         Did you know that Clay was going to be    09:49:35

11    interviewing Anthony Ridley in Nashville?    09:49:40

12    A    I don't recall if he mentioned that to me    09:49:43

13    or not.    09:49:45

14    Q    Is that something that Clay would normally    09:49:46

15    do, is tell you if he is interviewing somebody or    09:49:48

16    did he have kind of the freedom or authority to do    09:49:52

17    that and then fill you in later?    09:49:54

18         MS. MIRMIRA:  Object to form.    09:49:56

19    BY MR. WALTON:    09:50:01

20    Q    You can answer.    09:50:02

21    A    No.  Clay has the authority to go    09:50:03

22    cultivate and interview folks.    09:50:07

Page 40

1    worked for any other water treatment companies?    09:51:14

2        A    I don't know that off the top of my head,    09:51:18

3    no.  I'm not aware of whether he did or didn't.    09:51:20

4        Q    Now, when you said you understood he had a    09:51:23

5    good track record, what was that track record based    09:51:26

6    on, if you recall?    09:51:28

7        A    You know, I don't recall the exact    09:51:31

8    conversation with Clay about specifics.  It's just    09:51:33

9    that the individual had been around, had grown in    09:51:38

10    different positions through the organization, and,    09:51:43

11    you know, a solid experience.    09:51:47

12        Q    Okay.  And then Clay write to you:  He    09:51:59

13    knows we are in a hiring freeze right now.    09:52:04

14            Were you guys -- when I say you guys, I    09:52:06

15    mean ChemTreat.  Was ChemTreat in a hiring freeze at    09:52:09

16    that time?    09:52:14

17        A    You know, to the best of my knowledge, we    09:52:15

18    went through a freeze during this period of pandemic    09:52:18

19    and I don't remember the exact dates, but that's    09:52:23

20    correct.    09:52:29

21        Q    Okay.  Did the hiring freeze lift or abate    09:52:29

22    at some point?    09:52:37

1      A    At some point it did.  Correct.        09:52:38

2      Q    When?                                   09:52:40

3      A    I mean it's really been this year when we  09:52:45

4  have opened up the true hiring funnel, although we  09:52:50

5  would continue to hire on critical, critical needs.  09:52:56

6      Q    When you say this year, do you mean 2023?  09:53:02

7      A    2023.  Yeah.  We resumed a more normal   09:53:06

8  process, what we call FOS, feet on the street      09:53:14

9  process.                                           09:53:18

10     Q    So this position that Mr. Ridley was being  09:53:18

11 potentially considered for, you would call that a  09:53:22

12 critical position?                                 09:53:25

13     A    A retirement?                            09:53:27

14     Q    Yes, sir.                                09:53:29

15     A    When somebody is taking care of a lot of  09:53:30

16 business and, you know, very sound business,       09:53:32

17 profitable business, yeah, that is very critical   09:53:37

18 that we hire for those positions appropriately and  09:53:41

19 transition the business.                           09:53:45

20     Q    If you recall, sir, what was the total   09:53:47

21 volume of Mr. Ellis's territory or book of business  09:53:49

22 when he left or when he retired?                   09:53:54

1      very normal general generic first interview.          10:08:10

2           Q     When you left that meeting, were you        10:08:18

3      potentially interested in hiring Mr. Ridley for        10:08:21

4      ChemTreat?                                             10:08:25

5           A     I was interested in looking at potentially  10:08:26

6      advancing the process forward.                         10:08:29

7           Q     Why were you interested?                    10:08:32

8           A     We knew we had a need with the, an          10:08:35

9      individual, David Ellis, that was retiring.  He had    10:08:39

10     a large book of business, had been there a long        10:08:43

11     time, very strong customer relationships with some     10:08:45

12     very technical customers, and Anthony had a number     10:08:50

13     of years of experience, had been successful, and       10:08:55

14     thought that there may be an opportunity there for     10:08:58

15     Mr. Ridley to be a good backfill for David Ellis, to   10:09:02

16     take over that whole book of business and make sure    10:09:07

17     that we secure that.                                   10:09:10

18          Q     During this meeting did Mr. Ridley say      10:09:13

19     anything to you about whether he already made up his   10:09:15

20     mind to leave Nalco or anything like that?             10:09:21

21          A     I don't recall.                             10:09:24

22          Q     Was it your impression by the end of this   10:09:27

Page 93

| | | |
|---|---|---|
| 1 | with David Pearson about his contact with Mr. | 11:11:30 |
| 2 | Ridley? | 11:11:33 |
| 3 | A    No, it doesn't.  And I don't recall | 11:11:33 |
| 4 | whether I talked to David Pearson about it or not. | 11:11:36 |
| 5 | Q    Would you have exchanged text messages or | 11:11:43 |
| 6 | emails with David Pearson about his call with Mr. | 11:11:46 |
| 7 | Ridley? | 11:11:49 |
| 8 | MS. MIRMIRA:  Object to form.  Calls for | 11:11:50 |
| 9 | speculation. | 11:11:51 |
| 10 | A    I don't know whether I -- I just don't | 11:11:54 |
| 11 | recall whether it was -- I could have had -- whether | 11:11:57 |
| 12 | I had a personal phone call or any other | 11:12:00 |
| 13 | communication with David. | 11:12:03 |
| 14 | Q    As of this point on October 12th, okay, | 11:12:06 |
| 15 | October 12th, 2020, had ChemTreat made a decision | 11:12:10 |
| 16 | whether or not to make an offer to Mr. Ridley? | 11:12:14 |
| 17 | MS. MIRMIRA:  Object to form. | 11:12:18 |
| 18 | A    I can't remember the exact timing, but, | 11:12:22 |
| 19 | you know, we had interest in Mr. Ridley, we had Mr. | 11:12:25 |
| 20 | David Ellis retiring and we needed a backfill to | 11:12:31 |
| 21 | take on that service load from Mr. Ellis. | 11:12:37 |
| 22 | Q    As of October 12th, 2020 is it fair to say | 11:12:42 |

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 490 of 990   PageID #: 5668

Page 133

| 1 | Q   So it's your testimony here today is that | 12:19:12 |

you had no expectation that Mr. Ridley would bring   12:19:16

in new business from either EcoLab or Nalco?   12:19:20

A   No.   12:19:25

MS. MIRMIRA:  Object to form.  Asked and   12:19:26

answered.  But you may answer again.   12:19:27

A   I had no expectation that he would bring   12:19:30

in Nalco or EcoLab business.  When we hire somebody,   12:19:32

you know, with there's tremendous amount of   12:19:39

opportunities out there, and we expect them to grow   12:19:44

their business if that's the role that we hired them   12:19:46

for, but to grow it in such a way that they are   12:19:49

fully, legally compliant with their previous   12:19:52

employer's regulations, employment agreement, as   12:19:56

well as being compliant with the covenants of   12:20:03

conduct and so forth that exist in ChemTreat.   12:20:07

Q   Is it fair to say that as of -- if Mr.   12:20:11

Cissell is sending revenue numbers to Mr. Ridley, is   12:20:16

it fair to say that ChemTreat was pretty sure that   12:20:20

Mr. Ridley was going to join ChemTreat at some   12:20:24

point?   12:20:29

MS. MIRMIRA:  Object to form.  Foundation.   12:20:30

JA-492

Page 249

1     UNITED STATES OF AMERICA    )

2                                 ss:

3     DISTRICT OF COLUMBIA        )

4             I, ROBERT M. JAKUPCIAK, an RPR and Notary

5     Public within and for the District of Columbia do

6     hereby certify:

7             That the witness whose deposition is

8     hereinbefore set forth, was duly sworn and that the

9     within transcript is a true record of the testimony

10    given by such witness.

11            I further certify that I am not related to

12    any of these parties to this action by blood or

13    marriage and that I am in no way interested in the

14    outcome of this matter.

15            IN WITNESS WHEREOF, I have hereunto set my

16    hand this 20th day of March, 2023.

17

18            _____

19

20

21    My Commission Expires:

22    February 29, 2024

```
                                      Page 1

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF TENNESSEE

3

4    CASE NUMBER:  1:22-CV-00050-TRM-SKL

5    ECOLAB, INC., and NALCO COMPANY,

6    LLC, et al.,

7            Plaintiffs,

8            vs.

9    ANTHONY RIDLEY and CHEMTREAT, INC.,

10           Defendants.

11

12

13        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14

15              ATTORNEYS EYES ONLY

16         THE ORAL PROCEEDINGS OF THE

17          DEPOSITION OF KARRY MACKIE

18               March 1, 2023

19

20

21   REPORTER BY:  Paul Morse

22               Certified Court Reporter

23               and Notary Public
```

Page 353

1    suggested him just because they were friends.

2    I mean, the -- he was an engineer, I believe.

3    I don't know the specifics on Tyler Bates.  But

4    obviously he was qualified enough that Lilton

5    wanted to hire him.

6         Q.    All right.  And is that something

7    that Nalco-EcoLab encourages, that if it's

8    employees are aware of a potential prospect

9    who's qualified through their, you know,

10   personal contacts, that they could recommend

11   them for a position?

12        A.    We do have a referral program so

13   that if you, you know, know somebody that would

14   be a good fit and then works for the Company --

15   I don't know if it's 90 days or six months or

16   something like that, they get a referral bonus.

17        Q.    Okay.  And do you know if

18   Mr. Ridley got a bonus like that for Mr. Bates?

19        A.    I have no idea.

20        Q.    Okay.  How would we find that out?

21        A.    HR.

22        Q.    Okay.  So HR would have records

23   showing whether Mr. Ridley got some kind of

```
                                    Page 358

 1                REPORTER'S CERTIFICATE
 2    STATE OF ALABAMA,
 3    BALDWIN COUNTY,
 4         I, Paul Morse, Certified Court Reporter
 5    and Commissioner for the State of Alabama at
 6    Large, do hereby certify that the above and
 7    foregoing proceedings was taken down by me by
 8    stenographic means, and that the content herein
 9    was produced in transcript form by computer aid
10    under my supervision, and that the foregoing
11    represents, to the best of my ability, a true
12    and correct transcript of the proceedings
13    occurring on said date and at said time.
14         I further certify that I am neither of
15    kin nor of counsel to the parties to the action
16    nor in any manner interested in the result of
17    said case.
18
19
20              /s/ Paul Morse
21
22              Paul Morse, CCR
23         ACCR #588 Expires 9/30/23
```

```
                                        Page 1
 1          IN THE UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF TENNESSEE
 3                 CHATTANOOGA DIVISION
 4     _____
 5     ECOLAB INC., and NALCO COMPANY,
 6     LLC, d/b/a Nalco Water, an Ecolab
 7     Company and/or Nalco Water,
 8           Plaintiffs,
 9        v.                              Case No.
10     ANTHONY RIDLEY and CHEMTREAT, INC.    1:22-cv-00050-
11           Defendants.                   TRM-SKL
12     _____
13              VIDEOTAPED DEPOSITION OF
14                  PETE MUMPOWER
15     DATE:        Wednesday, March 8, 2023
16     TIME:        10:36 a.m.
17     LOCATION:    Remote Proceeding
18                  Philadelphia, Pennsylvania 19103
19     REPORTED BY: Jean Tompane, Notary Public
20     JOB NO.:     5800791
21
22
23
24
25
```

1  wipe about, you know, on average, every month?

2          MS. MIRMIRA:  Objection to form.

3  BY MR. WALTON:

4      Q    You can answer.

5      A    If I had to guesstimate?  Oh, it can vary.

6  I'd say anywhere between 5 to 25.

7      Q    Okay.  Do you understand that you, at some

8  point, wiped the laptop that was given to Mr. Ridley?

9      A    Yes.

10     Q    Okay.  And could you just tell me everything

11 that you remember about that?

12     A    The only thing I know is that his laptop, as

13 I said, it got mixed in with the normal set that we

14 prep to send out.  That's about as far as my

15 involvement with it is.

16         I took the laptop in -- process on it, and

17 reissued it to another user.

18     Q    But if I understand your testimony

19 correctly, you specifically don't recall doing that

20 for Mr. Ridley's laptop; correct?

21     A    Correct.

22     Q    Okay.  I just have to ask you some questions

23 just so I can just see what's in your memory.  So if

24 you can answer just to the best of your recollection.

25     A    Okay.

1      Q    Okay?  Ms. James testified that she was the

2  -- delivered a box that was addressed to Emily Bates,

3  who I understand is general counsel of your firm;

4  right?

5      A    Correct.

6      Q    Or of your company I should say.  And do you

7  remember ever receiving a box that was addressed to

8  Ms. Bates?

9      A    Truthfully, I don't recall, because we do

10  get a lot of boxes in.  To say it was specifically

11  from her?  No.

12      Q    Do you recall specifically getting a box

13  that was left outside of the door to the IT office by

14  a Ms. James?

15      A    She's done it frequently, so yeah.

16      Q    Okay.

17      A    We get boxes a lot.

18      Q    Okay.  And what's your process when you see

19  a box that was put there by Ms. James and it looks

20  like computer equipment, what's the process that you

21  generally go through?

22      A    Generally, when we take in equipment,

23  because this was during COVID, we had "stringer"

24  restrictions on it.  First thing we would do is a --

25  what we called a COVID cleaning.  Basically wiping

```
1    down the exterior shell, letting it sit for about ten
2    minutes with this Clorox bleach-type substance.
3              After that, generally we'll turn the unit
4    on, check the general condition, make sure it's still
5    working.  And then we perform a format on the unit to
6    prep it for another user.
7         Q    And you said we.  Is there somebody else
8    who's involved in that process other than you?
9         A    Oh, I'm sorry.  I'm just used to -- because
10   I'm on the help desk, I'm used to identifying us as a
11   team.  But it was me.  I was the one in the building.
12        Q    Okay.  But would there have been anybody
13   else who potentially was involved in wiping Mr.
14   Ridley's computer other than you?
15        A    No.  Again, at the time, this was during
16   COVID.  There was very, very few people in this
17   building.  And at that time, the only other person
18   that handles these computers was working from home.
19   So it would have been me.
20        Q    And you still went in the office every day
21   or periodically?
22        A    I had to.  I had just relocated to the area
23   and I didn't have a home to work out of.
24        Q    Okay.  So were you living at the office?
25        A    I was living at a hotel near the office.
```

1    CERTIFICATE OF DEPOSITION OFFICER

2            I, JEAN TOMPANE, the officer before whom the

3    foregoing proceedings were taken, do hereby certify

4    that any witness(es) in the foregoing proceedings,

5    prior to testifying, were duly sworn; that the

6    proceedings were recorded by me and thereafter reduced

7    to typewriting by a qualified transcriptionist; that

8    said digital audio recording of said proceedings are a

9    true and accurate record to the best of my knowledge,

10   skills, and ability; that I am neither counsel for,

11   related to, nor employed by any of the parties to the

12   action in which this was taken; and, further, that I

13   am not a relative or employee of any counsel or

14   attorney employed by the parties hereto, nor

15   financially or otherwise interested in the outcome of

16   this action.

17                              JEAN TOMPANE

18                    Notary Public in and for the

19                         State of Maryland

20

21

22

23

24

25

Page 50

CERTIFICATE OF TRANSCRIBER

I, JACOBEY RADTKE, do hereby certify that
this transcript was prepared from the digital audio
recording of the foregoing proceeding, that said
transcript is a true and accurate record of the
proceedings to the best of my knowledge, skills, and
ability; that I am neither counsel for, related to,
nor employed by any of the parties to the action in
which this was taken; and, further, that I am not a
relative or employee of any counsel or attorney
employed by the parties hereto, nor financially or
otherwise interested in the outcome of this action.

JACOBEY RADTKE

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF TENNESSEE
 2                   CHATTANOOGA DIVISION
    _____
 3                                       :
    ECOLAB INC., and NALCO COMPANY   :
 4  LLC d/b/a Nalco Water, an Ecolab : Civil Action No.
    Company and/or Nalco Water,          :
 5                                       : 1:22-cv-00050-TRM-SKL
                 Plaintiffs,             :
 6                                       :
                     vs.                 :
 7                                       :
    ANTHONY RIDLEY, and CHEMTREAT    :
 8  INC.,                                :
                                         :
 9               Defendants.             :
    _____:
10
11              DEPOSITION OF ANTHONY RIDLEY
12                    APRIL 17, 2023
13
14           Oral sworn video-recorded deposition of
15      ANTHONY RIDLEY, taken at the law offices of
16      Patrick, Beard, Schulman & Jacoway, P.C., 537
17      Market Street, Suite 300, Chattanooga, TN 37402,
18      before Lane C. Butler, RPR, CRR, CCR, and
19      Patricia R. Frank, RMR, CRR, CCR, Notaries Public
20      (Court Reporters appearing remotely), commencing
21      at 9:26 a.m. EDT, on the above date.
22
23                     _  _  _
24
```

```
 1              THE COURT REPORTER:  That's
 2     okay.
 3     BY MR. WALTON:
 4          Q.    Mr. Ridley, can you turn to
 5     the -- well, just let me ask you this first,
 6     do you -- you've had an opportunity to review
 7     this document?
 8          A.    Yes.
 9          Q.    Do you recognize this document?
10          A.    Yes.
11          Q.    What is it?
12          A.    This is the Employee Sales,
13     Service, Marketing & Inventions Agreement
14     that I signed in -- just prior to beginning
15     my job as a corporate account manager with
16     Ecolab's Food and Beverage Division.
17          Q.    And can you turn to the last
18     page of the document, please.  That's your
19     electronic signature there?
20          A.    That is.
21          Q.    And so you affixed that
22     signature there?
23          A.    Yes.
24          Q.    And by doing so, did you
```

1    first page, please.  This is an agreement

2    between you and Ecolab; correct?

3              A.      That is correct.

4              Q.      And that includes, it says at

5    the top, its parent company, sister

6    companies, and subsidiaries; correct?

7              A.      Yes.

8              Q.      All right.  I want to focus

9    initially on paragraph number 2.  Do you see

10   that?

11             A.      Yes.

12             Q.      It says, "The employee

13   acknowledges that as a result of the

14   employee's employment with Ecolab, the

15   employee will acquire knowledge of company's

16   trade secrets and confidential information

17   which may include, without limitation,

18   information regarding present and future

19   operations, customers and suppliers, pricing,

20   business strategies, business methods, and

21   employees."

22   Do you see that?

23             A.      Yes.

24             Q.      Did -- while you were employed

```
 1      Obviously --
 2              A.     The way Ecolab has defined
 3      trade secrets in this agreement.
 4              Q.     But did you -- to your
 5      knowledge, did you get any information at
 6      Nalco or Ecolab that would fall within the
 7      categories I just read aloud that are in this
 8      agreement?
 9              A.     At times.
10              MS. LUND:   Objection.
11      BY MR. WALTON:
12              Q.     You can answer.
13              A.     At times.
14              Q.     All right.  What specific in-
15      -- information do you recall that you believe
16      would fall within this definition of trade
17      secret?
18              A.     After this agreement was signed
19      or prior to this agreement being signed?
20              Q.     Both.
21              A.     After this agreement was
22      signed, I would have received information on
23      financial data and a list of potential
24      customers, pricing, purchasing patterns.  Due
```

1     to my job, I'm not real sure how much

2     formulation information I received because

3     that wasn't really a major component of a

4     corporate account manager.  That was more of

5     a component of the applications individuals.

6     I would get products names --

7                    THE WITNESS:  Lane, I'm sorry,

8     did you have a question?

9                    THE COURT REPORTER:  I'm sorry,

10    it was going out.  It wasn't really a

11    component of a manager.  It was more of a

12    component of the?

13                   THE WITNESS:  It wasn't a

14    component of the corporate account manager.

15    It was more of a component of the field sales

16    individuals.

17                   MR. WALTON:  Lane, I'm going to

18    move this microphone closer to the witness.

19                   THE COURT REPORTER:  Okay.

20                   MR. WALTON:  Because it's kind

21    of been blocked by the computer a little bit.

22    But if you can't hear me, I mean, I will

23    definitely try to project my voice.  Okay?

24    BY MR. WALTON:

 1            Q.    Okay.  So prior to signing this
 2     agreement, you -- you worked for Nalco;
 3     right?
 4            A.    That is correct.
 5            Q.    And you worked for Nalco for a
 6     long time?
 7            A.    Twenty-one years.
 8            Q.    All right.  Now during your 21
 9     years at Nalco, do you believe you got any
10     information from Nalco which would fall
11     within the categories of trade secrets that I
12     just read into the record?
13                  MR. POPE:   Objection to form.
14     "Got" is vague.
15                  MR. WALTON:  You can --
16     received.
17                  MS. LUND:  Okay.  Objection to
18     form because what you read into the record
19     wasn't the entire definition of trade
20     secrets.
21                  MR. WALTON:  Okay.
22     BY MR. WALTON:
23            Q.    You can answer.
24            A.    Yes.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 507 of 990  PageID #: 5685

1          Q.     What information?

2          A.     Prior to signing this

3    agreement, I would have received formulas,

4    formulas as being of chemistry used that were

5    components of the chemistries.

6                    THE COURT REPORTER:  That were

7    components of?

8                    THE WITNESS:  The chemistries.

9          A.     Not necessarily the formulas,

10   but the components.  The programs, financial

11   data, financial plans, list of customers,

12   pricing, purchasing power -- purchasing

13   patterns, and customer contacts.

14         Q.     For any -- all that information

15   that you just identified -- formulas,

16   programs, financial data, list of customers,

17   pricing, purchasing patterns, customers --

18   was any of that information publicly

19   available?

20                    MS. LUND:  Objection.

21   BY MR. WALTON:

22         Q.     You can answer.

23         A.     Yes.

24         Q.     What information was publicly

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 508 of 990  PageID #: 5686

1    the employee at any time during the 12-month

2    period immediately preceding the termination

3    of employee's employment, regardless of

4    reason, for the purpose of providing a

5    competing product or a competing service.

6              Do you see that?

7         A.    Yes, I do.

8         Q.    And you -- and you agreed to

9    that?

10        A.    Yes, I did.

11        Q.    Okay.  What accounts did you

12   supervise or were assigned to you during your

13   last 12 months of -- at Ecolab and Nalco?

14        A.    There were several, Mr. Walton.

15        Q.    Do you remember any names off

16   the top of your head?

17              MR. WALTON:  Sorry, Lane.

18        A.    Yes, I do.

19        Q.    Could you please state those

20   for the record.

21        A.    Engineered Floors, Tate & Lyle,

22   Oak Ridge National Laboratories, Shaw, Tyson.

23   Now, I'm giving you company names.  Do you

24   need specific locations?

1    Q.    No, sir.

2    A.    Because those have multiple --

3    Q.    Just the company names.

4         MR. POPE:   And, Dave, is this

5    at Ecolab or at Nalco?

6         MR. WALTON:  Let's start at

7    Nalco first.

8    A.    There's probably 165 --

9    Q.    Okay.

10   A.    -- Mr. Walton.

11   Q.    And that's for Nalco?

12   A.    Yes.

13   Q.    Is there a document that you're

14   aware of at Nalco that would -- that would

15   show what customers you supervised or were

16   assigned to during your last position at

17   Nalco?

18   A.    Yes.

19   Q.    Is it -- what's that -- see,

20   I'm stuttering there.  What's that document

21   called?

22   A.    One would be the fact pack.

23   Q.    Okay.  Would there be any

24   others, sir?

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 510 of 990  PageID #: 5688

```
 1          A.    Yes.  Yes, there would.
 2          Q.    What others?
 3          A.    There would be a -- there would
 4    be several reports in Nalco Direct, which is
 5    a program that would show which customers I
 6    was responsible for during my last term as a
 7    district manager in Nalco Water.
 8              THE COURT REPORTER:  I'm sorry,
 9    during your last term as?
10              THE WITNESS:  During my last
11    year of Nalco Water, as a district manager
12    for Nalco Water.
13    BY MR. WALTON:
14          Q.    Anything else?
15          A.    And then with -- when I became
16    a corporate account manager with Tyson --
17    sorry, a corporate account manager with
18    Ecolab in the -- what they call the protein
19    group, I was responsible for Tyson North
20    America, Simmons Foods, Butterball, Bar-S,
21    Costco, and others.
22          Q.    And would the fact pack show
23    that too or --
24          A.    It would not.  Ecolab operated
```

1     very -- Ecolab and Nalco operated very

2     independently of each other.  They were two

3     separate companies.

4          Q.    What documents at Ecolab would

5     show which customers you supervised or were

6     assigned to?

7          A.    There would be some sort of

8     remittance report that would show the

9     customers and the value assigned to those

10    customers.

11         Q.    Okay.  Thank you.

12               All right.  So then in Part B,

13    you also agreed you would not transact

14    business with any customer of the company

15    with whom employee did business or whose

16    account was supervised by or assigned to the

17    employee at any time during the 12-month

18    period immediately preceding the termination

19    of employee's employment, regardless of

20    reason, for the purpose of providing a

21    competing product or competing service.  Do

22    you -- do you see that?

23         A.    Yes, I do.  Part B, yes.

24         Q.    And you -- and you -- and you

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 512 of 990   PageID #: 5690

1        agreed to that, sir?

2              A.     Yes.  I did sign the document,

3        yes.

4              Q.     Okay.  Did you have any contact

5        with any customers -- sorry.

6                     So for the purpose of the -- of

7        these questions, I'm talking about at the

8        time that you ceased employment being a

9        district manager at Nalco.  All right?  Okay?

10       And you had a certain set of clients that you

11       were responsible up until that time period;

12       correct?

13             A.     Yes.

14             Q.     That was about 165 or so;

15       correct?

16             A.     Yes.

17             Q.     Okay.  Did you -- when you were

18       at ChemTreat, did you have contact with any

19       of those 165 customers?

20             A.     No.

21             Q.     Did you assist anybody in

22       soliciting, recruiting, or trying to get

23       business from any of those 165 customers?

24             A.     No.

```
 1      and other company property in his
 2      possession."  Do you see that?
 3           A.     Yes.
 4           Q.     Okay.  Upon your termination
 5      from Ecolab, did you return all Nalco Ecolab
 6      business information that was in your
 7      possession?
 8           A.     Upon my resignation, I returned
 9      everything that I knew I had at the time.
10           Q.     What do you mean, everything
11      that you knew you had at the time?
12           A.     Everything I could remember
13      having, and I was -- my memory was assisted
14      by the documents provided by Ecolab HR which
15      was kind of a checklist, no a kind of, it was
16      a checklist of things to return.  That's what
17      I used to go off of.  And I returned
18      everything that I remembered having during --
19      upon reading the document provided by Ecolab
20      HR.
21           Q.     Okay.  Sitting here today, are
22      you aware of any Nalco or Ecolab company data
23      that you did not return after your separation
24      from the company?
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 514 of 990  PageID #: 5692

1                    MR. POPE:  Objection to form.

2                    THE WITNESS:  Yes.

3       BY MR. WALTON:

4             Q.     What?

5             A.     There were three thumb drives.

6             Q.     Anything else?

7             A.     There were documents found on

8       an external hard drive which have all been

9       deleted.

10            Q.     When were they deleted?

11            A.     When they were found on the

12      external hard drive.

13            Q.     When were they found?

14            A.     There were a couple of

15      occasions which that occurred.

16                   THE COURT REPORTER:  There were

17      a couple what?

18                   THE WITNESS:  There were a

19      couple of occasions which that occurred.

20      BY MR. WALTON:

21            Q.     When was the first occasion

22      that that occurred?

23            A.     Sometime in August of 2021.

24            Q.     When was the second occasion?

1          A.     The second occasion was also in

2     August of 2021.

3          Q.     When was the next occasion?

4          A.     September of 2021.

5          Q.     When was the next occasion?

6          A.     And then lastly, in January of

7     2022.

8          Q.     So starting at the first

9     occasion in August of 2021, what documents

10    were deleted from the external drive?

11              MR. POPE:  Object to form.

12              THE WITNESS:  The -- I cannot

13    recall all of them.  I found some documents.

14    They were checked to see if the -- I was

15    surprised to find the documents on there.  I

16    did not remember they were on there, because

17    the WD was used at times -- I've had this WD

18    drive for years, and it was used to back up

19    my computer before Nalco -- and I say Nalco

20    specifically, before Nalco was even purchased

21    by Ecolab.  It was used to back up my company

22    computer, and it was used as essentially a

23    dump.  I would grab -- I would grab files in

24    -- from my -- from my PC file explorer, drag

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 516 of 990  PageID #: 5694

1    and dump to what was essentially usually my D

2    drive, or the -- the WD --

3                    THE COURT REPORTER:  Your E

4    drive on?

5                    THE WITNESS:  D drive, as in

6    delta, delta drive.

7            A.      And that WD was very, very,

8    very rarely hooked up to my computer.  It was

9    not something -- it was a remote, just an

10   external backup.  It was mostly used to dump

11   pictures.  The main purpose was to use to

12   dump pictures, videos of a personal nature, a

13   storage device for the many pictures that we

14   all take of family, friends, outings, and

15   videos.  That was its main purpose.  But

16   because of its size, it was able to handle a

17   dump of data.

18                    When I hooked to it to look at

19   pictures, I discovered some files.  They were

20   checked to confirm the file name was actually

21   the file and wasn't something that was

22   overwritten with the wrong file name.  And

23   then I found it and deleted the -- all the

24   files that were in -- all the files that were

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 517 of 990  PageID #: 5695

```
 1      found at that time.  I only checked one or
 2      two, though.
 3              Q.      What files did you delete?
 4                      MR. POPE:  Object to form.
 5                      THE WITNESS:  I don't know all
 6      of them.
 7      BY MR. WALTON:
 8              Q.      And do you know the general --
 9      well, strike that.  Do you have an estimate
10      regarding the number --
11                      MR. POPE:  Object.
12              Q.      -- that you deleted?
13                      MR. POPE:  Object to form.
14                      THE WITNESS:  I do not know an
15      estimate of the number.  There were a lot.
16      BY MR. WALTON:
17              Q.      Over 100?
18              A.      Yes.
19              Q.      Over 1,000?
20                      MR. POPE:  Object to form.
21                      THE WITNESS:  I don't know.
22      There's a big difference between 100 and
23      1,000, Mr. Walton, and that's hard to -- to
24      estimate.
```

```
 1      BY MR. WALTON:
 2           Q.    And that was during your first
 3      session, or the first time that you found
 4      them in August of 2021?
 5           A.    Yes.
 6           Q.    And like, how specifically did
 7      you find these documents?  I mean, what --
 8      you know, what I'm asking is, like what
 9      computer were you using when you were
10      accessing the WD external drive?
11           A.    A ChemTreat computer.
12           Q.    So, why were you -- so, why did
13      you -- why were you hooking up this WD drive
14      to your ChemTreat computer?
15                 MR. POPE:  Object to the form.
16                 THE WITNESS:  That's the
17      computer I had to use at the time.
18      BY MR. WALTON:
19           Q.    Okay.  But why were you -- but
20      why did you hook up or connect this old WD
21      drive to your ChemTreat computer?  What were
22      you trying to find on that drive?
23           A.    I was looking for -- I was
24      looking for some pictures.
```

1        Q.      Of what?

2        A.      My family.

3        Q.      On your ChemTreat computer?

4        A.      No.  On the WD drive.

5        Q.      Yeah, but you wanted to put

6    them on your ChemTreat com- --

7        A.      No.

8        Q.      -- computer?

9        A.      No.  Similar to Ecolab, and

10   when you worked for Nalco, you had the

11   ability to use your work computer for

12   personal purposes.  It was a common practice.

13   There's a lot of people, especially -- I

14   apologize for kind of identifying my age here

15   -- did not have other computers that they

16   used, personal computers.  They would use

17   their company computer to do personal

18   business.  That was a common practice both at

19   Nalco, after Ecolab purp- -- purchased Nalco,

20   and with ChemTreat.

21              Since I did not have a personal

22   computer, I needed to look through some

23   photos and also probably move some photos

24   from a -- I would actually use it to move

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 520 of 990  PageID #: 5698

1    photos, for example, a trail camera.  We put
2    in a -- had a little device that you could
3    use to get a memory -- not a memory stick --
4    a scan disc with the little flat things that
5    you put in a camera and move pictures from
6    that to the WD.
7         Q.    How did the pictures that you
8    were looking for originally get on the WD
9    drive?
10              MR. POPE:  Objection to form.
11              THE WITNESS:  They would have
12   been put on there through a Nalco or Ecolab
13   computer.
14   BY MR. WALTON:
15        Q.    Okay.  Have you -- have you
16   ever had a personal computer?
17              MR. POPE:  Objection to form.
18   Ever?
19              MR. WALTON:  Ever.
20              THE WITNESS:  Yes.
21   BY MR. WALTON:
22        Q.    When did you -- did you have a
23   personal computer during your last two years
24   of employment with Nalco?

1              A.      No.

2              Q.      With your last two -- with your

3      last, what, six, seven months with Ecolab?

4              A.      No.

5              Q.      What did you use as a personal

6      computer?  Your Nalco computer?

7              A.      Yes.  My Nalco -- my Nalco and

8      Ecolab computer was the computer I used for

9      everything.

10             Q.      Did you have any other

11     computers in your household as of the date of

12     your resignation from Ecolab?

13             A.      Clarify, please.

14             Q.      What do you need clarified?

15             A.      You asked did I have any

16     other --

17             Q.      Yeah.

18             A.      -- computers?  I did not own

19     any computers at my house.

20             Q.      Did you -- no, I said did you

21     have any in your household.

22             A.      Did I?  I did not own any

23     computers.

24             Q.      Were there any other computers

1    in your household?

2              A.    Yes.

3              Q.    What computers?

4              A.    My wife had a -- has a laptop.

5              Q.    When did she get that laptop?

6              A.    I do not know that.  It is

7    very, very old.

8              Q.    And that's the HP laptop?

9              A.    Yes.

10             Q.    And the external drive we're

11   talking about here is the WD external drive;

12   right?

13             A.    That is correct, yes.

14             Q.    Okay.  All right.  So let's

15   talk about the second time that you found

16   ChemTreat documents on that -- I'm sorry,

17   Nalco or Ecolab documents on that WD external

18   drive and you -- you deleted them.  And you

19   said that was in August -- again, in August

20   2021?

21             A.    Yes.

22             Q.    How did you find those

23   documents?

24             A.    Once again, I was -- I had

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 523 of 990  PageID #: 5701

1    Q.    Was it in 2021?

2    A.    No.

3    Q.    Was it in 2020?

4    A.    Yes.

5    Q.    Do you remember exactly when in

6    2020?

7    A.    I do not.

8    Q.    Do you remember generally when

9    in 2020?

10    A.    Prior to September of 2020.

11    Q.    And can we just establish

12    September 2020 is when you changed jobs from

13    Nalco to Ecolab?

14    A.    That is not accurate.

15    Q.    Oh.  What did I say wrong?

16    A.    I did not change jobs in

17    September.

18    Q.    When did you do?

19    A.    October.

20    Q.    October, thank you.

21    A.    You're very welcome.

22    Q.    Was it October 1st?

23    A.    It was.

24    Q.    Okay.  So as of the -- as of

Case 1:22-cv-00050-TRM-SKL  Document 253-2  Filed 05/25/23  Page 524 of 990  PageID #: 5702

1    that you saved to the WD drive in 2020, I

2    think my question was why were you saving

3    those documents to the WD drive.

4            A.    Okay.  Let me -- let me give

5    you a chronological answer to that, if I

6    could.

7            Q.    Yeah.

8            A.    The WD drive was used more

9    often prior to Ecolab, Nalco Water

10   implementing OneDrive.

11           Q.    Okay.

12           A.    And I'm very specific on that

13   because even when we -- Ecolab made the move

14   from Dropbox to OneDrive, there was a lot of

15   concern within the company, within Ecolab at

16   the time, that all the files would be

17   transferred accurately.  And prior to that,

18   everyone kept -- it was -- it was common

19   practice, it was preferred practice, it was

20   encouraged practice that people back up their

21   hard drives, back up their files from their

22   work computer and keep a backup copy with

23   them.  That -- it was encouraged to the point

24   that the company sent out the LaCie drives,

```
 1      LaCie drives, ever -- what name do you want
 2      me to use for --
 3            Q.     It doesn't matter to me.
 4            A.     -- for commonality within this
 5      conversation?  Because we're going to look at
 6      that at some point, I'm sure.
 7            Q.     Yes, sir.
 8            A.     Which -- which name would you
 9      like for me to use?
10            Q.     I'd like to use the name that
11      you're comfortable with.
12            A.     I'll let you pick, dealer's
13      choice.
14            Q.     LaCie drive.
15            A.     LaCie drive, fine.  They were
16      actually sent out, and mine, the one that I
17      sent back to Ecolab actually had a sticker on
18      the back of it that said, "Property of Nalco
19      Company."
20                   So it was -- it was common to
21      back up your computer onto an external drive.
22      The LaCie drives were not large enough to
23      take a -- an entire dump of documents from
24      our hard drives, or they were not big enough
```

1    to take multiple dumps, or multiple transfers

2    from the hard drive to the external hard

3    drive.  So I purchased with my own money a --

4    the WD drive, which was much larger, I

5    believe it was a terabyte or -- or larger, I

6    believe.  And at one point I could grab and

7    -- the way I would do it is I would go to my

8    file explorer, click on a group of files,

9    drag and drop into the connected device.  In

10   some cases, it was the WD.  In the case where

11   I was segregating files, it was the LaCie

12   drive.  I would drag --

13               THE WITNESS:  I cannot hear

14   you, Lane.  I can see you.

15               MR. WALTON:  Lane, can you hear

16   us?  Yeah.  We cannot hear you at all.

17               THE WITNESS:  I'm not touching

18   the computer because I'm not IT-proficient.

19               THE VIDEOGRAPHER:  Should we go

20   off the record?

21               THE WITNESS:  "Can we go off

22   the record."

23               MR. WALTON:  Yes, we can go off

24   the record.

```
 1                    THE VIDEOGRAPHER:  It's 12:59.
 2      We're back on the record.
 3      BY MR. WALTON:
 4            Q.     Mr. Ridley, we had a massive
 5      break here due to some technical issues, so I
 6      just want to make sure that you still
 7      understand that you are under oath.
 8            A.     Yes.
 9            Q.     Okay.  Just want to go back
10      over some issues just to make sure it's all
11      clear.
12                   We were talking about a WD
13      drive, right?
14            A.     Yes.
15            Q.     WD, would you agree with me, is
16      Western Digital?
17            A.     That I don't know.
18            Q.     Okay.  Would you agree with me
19      that that is a drive that you connect to a
20      computer through a USB port?
21            A.     Yes.
22            Q.     Okay.  And you purchased that
23      drive a few years ago, right?
24            A.     Many years ago.
```

1          Q.     Okay.  Now, at the time you

2     purchased the drive, had you already been in

3     possession of the LaCie drive that was issued

4     to you by Nalco?

5          A.     No.

6          Q.     Okay.  And it was a

7     one-terabyte drive, correct?

8          A.     I do not know the size.  I do

9     know it was large.  Well, much larger than

10    the LaCie drive.

11         Q.     And the LaCie drive was around

12    80 gigs?

13         A.     I believe that is accurate.

14         Q.     And you used this -- the

15    Western Digital drive while you were at Nalco

16    to back up your computer, correct?

17         A.     Yes.

18                MR. POPE:  Objection to form.

19    BY MR. WALTON:

20         Q.     And you -- now, I want to make

21    sure, when -- in terms of backing up the

22    computer, did you back up your entire

23    computer to it or just selected files and

24    folders?

```
 1              A.      The computer that I would have
 2      backed up using the WD drive was my Nalco
 3      computer, and that would have been an entire
 4      backup of the files that were on the
 5      computer.
 6              Q.      Okay.  And you also used a WD
 7      drive for personal things, right?
 8              A.      That was its primary use.
 9              Q.      Okay.  Now, when you backed up
10      your W -- I'm sorry, sir.
11              When you backed up your Nalco
12      computer, was there more than one backup on
13      there at a time?
14              A.      Yes.
15              Q.      And so you would back up your
16      computer.  Then when you backed it up again,
17      would you delete the old backup?
18              A.      No.
19              Q.      How many times did you back up
20      your Nalco computer to the WD drive?
21              A.      Several.  I do not know -- I do
22      not recall an exact number.
23              Q.      I understand, but I'm going to
24      follow up and ask you what you mean by
```

```
1      W -- when is the last time you remember
2      backing up your entire Nalco computer to the
3      WD drive?
4              A.      2017/2018 timeframe.  And
5      that's an estimate --
6              Q.      Sure.
7              A.      -- Mr. Walton.
8              Q.      Just to the best of your
9      recollection, sir.
10             A.      2017, 2018.  For a full backup.
11             Q.      Okay.  So the last backup that
12     you recall putting -- of your Nalco computer
13     that you recall putting on the WD drive is in
14     2017 or 2018, right?
15             A.      The last full backup.
16             Q.      Okay.  Did you ever do partial
17     backups?
18             A.      Potentially.
19             Q.      When did you do those?
20             A.      I cannot recall.
21             Q.      What in your mind is a partial
22     backup?
23             A.      Less than a full backup.
24             Q.      So when you say "potentially,"
```

1    the document -- by looking at the title, I

2    knew what the document should have been.   I

3    was making sure that it was -- that it

4    matched -- the document actually matched what

5    the name of the document was.  So I was

6    verifying that that had not been overwritten

7    somehow by another name, which is easily

8    done, and was verifying.  And then when I

9    found those files, they were deleted.

10           Q.     Okay.  And in August of 2021,

11   the first session, you couldn't recall

12   exactly what documents you found and deleted,

13   correct?

14           A.     Say that question one more

15   time.

16           Q.     The first time you found these

17   documents in August 2021 you couldn't recall

18   exactly the files you found and deleted,

19   correct?

20           A.     Oh, I could not recall all the

21   files that I found were deleted.  I just

22   verified a few.

23           Q.     What do you mean you verified a

24   few?

 1          A.     I verified a few of the files
 2     and then made the assumption that the other
 3     files were accurate and just -- and then
 4     deleted them.  They were not necessary.  I
 5     did not need them any longer.  They were not
 6     pertinent.  So they were deleted.
 7          Q.     And so you weren't using these
 8     for your ChemTreat employment at all.
 9          A.     Correct.
10          Q.     And back in your very first
11     session in August 2021, do you recall the
12     number of files that you deleted?
13               MR. POPE:  Object to form.
14     Asked and answered.
15               THE WITNESS:  I do not.
16     BY MR. WALTON:
17          Q.     I believe you said earlier it
18     was more than a hundred but less than a
19     thousand.  Does that sound right?
20          A.     I believe that is correct.
21          Q.     Okay.  So these 100 documents
22     that you deleted, or 100 or more that you
23     deleted during the first session in
24     August 2021, where did those documents come

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 533 of 990  PageID #: 5711

1    ChemTreat computer?

2         A.     Same reason as earlier.  I was

3    putting pictures on the computer.

4         Q.     Okay.  And what did you notice

5    on the drive that you believe was a Nalco or

6    Ecolab document?

7         A.     One time in particular was the

8    Arnold Air Force Base proposal from 2015.

9         Q.     And did you open that document?

10         A.     I believe I did, yes.

11         Q.     Now, at the same time you

12    opened that document, you had a folder on

13    your OneDrive called Arnold Air Force Base

14    opened as well, right?

15              MR. POPE:  Objection to form.

16              MS. LUND:  Objection.

17    Misstates the record.

18              THE WITNESS:  No.

19    BY MR. WALTON:

20         Q.     No?  All right.  Did you have a

21    OneDrive account at ChemTreat?

22         A.     Yes.

23         Q.     Did you have folders on the

24    OneDrive account that you created for

1      specific customers?

2             A.     Yes.

3             Q.     Was one of those customers

4      Arnold Air Force Base?

5             A.     Yes.

6             Q.     Okay.  So why did you open up

7      the document for Arnold Air Force Base from

8      2015?

9             A.     Once again, verifying just like

10     I did in August to verify the file.  That was

11     part of a -- that file was part of a large

12     backup from 2015, that I did at the end of

13     the year of 2015, and I deleted all the files

14     associated with that backup in 2015.

15            Q.     But why did you need to open up

16     a document to verify it when it said right in

17     the file name it was a 2015 document?

18                   MR. POPE:  Objection.  Asked

19     and answered.  You just asked him that, Dave.

20                   THE WITNESS:  Because I wanted

21     to verify that the file was what it said.  I

22     picked on a random file, clicked on it, and

23     verified that the file was what it said and

24     then deleted it.

1       Nalco/Ecolab computer, right?

2              A.     Yes.

3              Q.     And some files that you say

4       were accidentally put on there.

5              A.     Yes.

6              Q.     Was there anything else on

7       there at the time that you left Ecolab?

8              And when I say "there," I mean

9       was there anything else on the WD drive at

10      the time that you left Ecolab?

11             MR. POPE:  Objection to form.

12      Are you talking about any files, Dave, or

13      Nalco/Ecolab files?

14             MR. WALTON:  I'm talking about

15      Nalco/Ecolab files.  Thank you.

16             THE WITNESS:  No.

17      BY MR. WALTON:

18             Q.     Did anybody at ChemTreat have

19      access to that WD drive?

20             A.     No.

21             Q.     Do you know if anybody has ever

22      taken a look at your drive to determine

23      whether or not, in fact, the Nalco/Ecolab

24      files were permanently deleted from the WD

1      my job was to take over an existing
2      territory, an existing account base, for a
3      retiring ChemTreat manager, account manager.
4      So I was given a book of business.  The files
5      that were pertinent to me at that time were
6      really the files that David Ellis, provided
7      to me when we were working on the transition
8      of the book of business.
9               Q.      And, now, David Ellis was a guy
10     who was retiring and you were taking over his
11     territory at ChemTreat, right?
12               A.      Yes.
13               Q.      Okay.  But you were also
14     anticipating bringing in some new business to
15     that territory, too, right?
16               A.      Yes.
17               Q.      When is the last time you used
18     or accessed the WD drive?
19               A.      Probably February of --
20     probably when I received your letter.
21               Q.      So did you access the drive
22     after you received my letter.
23               A.      Yes.
24               Q.      Why?

```
 1          A.     To verify that what I knew that
 2     I had done, which is delete all the Nalco
 3     files in January.
 4          Q.     How specifically did you verify
 5     that?
 6          A.     Did a -- well, so the day I
 7     received your letter -- the day I received
 8     your e-mail, to be accurate, because a letter
 9     came later.  A letter came days later by
10     certified mail.
11          Q.     But it was an e-mail with a
12     letter attached to it, correct?
13          A.     Yes.
14          Q.     Yes.
15          A.     The day I received your e-mail
16     with the attachments was the first time I had
17     ever received something like that.  As a
18     matter of fact, I thought it was a joke
19     because it caught me offguard, and I actually
20     placed a call to your office that day.
21          Q.     You did?
22          A.     I did.  I did.
23          Q.     Who did you call?
24          A.     I called the number, the
```

1    contact information, and you were not at your

2    office.

3            Q.    So you called me?

4            A.    I did.  I called the contact

5    information that was on the e-mail because I

6    was completely clueless of why --

7            Q.    Were you going to yell at me or

8    something or --

9            A.    No.  I was confused.  I was --

10   I was uncertain what was going on to be the

11   best -- I mean, I had never had anyone accuse

12   me of something of that nature.  I had not --

13   since working at ChemTreat, I had not been in

14   any Nalco accounts, and I had done everything

15   that I thought appropriate --

16                 (The court reporter lost Zoom

17   connection.)

18                 MR. POPE:  I'll have him

19   restate his answer to your question.

20                 MR. WALTON:  Okay.

21                 MR. POPE:  And then she has the

22   video as well, and then she can fill in the

23   gaps, and it will be on the record that he's

24   restating it.  So both versions will be in

1         there.

2                    MR. WALTON:  Yes, absolutely.

3         That's fine.

4                    MR. POPE:  Just restate your

5         answer.

6         BY MR. WALTON:

7              Q.    Were you going to yell at me or

8         something?

9              A.    No.  My plan was not to yell at

10        you, Mr. Walton.  My plan was to get some

11        information to find out if this was,

12        unfortunately, real.

13             Q.    When you found these

14        Ecolab/Nalco documents on your WD drive, did

15        you contact anybody at Ecolab to tell them

16        that you found these?

17             A.    No.

18             Q.    Why not?

19             A.     In my opinion, I had forgotten

20        I'd had them.  I deleted them.  They were no

21        longer useful to me.  Most of them were very,

22        very old and were no longer pertinent or

23        relevant.  So I'm not even sure who I would

24        have called to raise the issue.  I just

1    deleted them, and they were not shared with

2    anyone at any time.  They were just deleted.

3         Q.    Did you ever save any

4    documents, Nalco or Ecolab documents, from

5    your WD drive to your ChemTreat computer?

6         A.    No.

7         Q.    Did you ever e-mail any

8    documents off that drive to anybody at

9    ChemTreat?

10        A.    Excluding myself, no.

11        Q.    What documents did you e-mail

12   yourself?

13        A.    The Arnold Air Force Base 2015

14   proposal got e-mailed from my Hotmail to my

15   ChemTreat e-mail address.

16        Q.    Okay.  We'll go over that in a

17   little bit.

18             Other than that, did you e-mail

19   any documents that were on the -- strike

20   that.

21             Other than that, did you e-mail

22   any Nalco or Ecolab documents that were on

23   the WD drive to anybody at all?

24        A.    No.  Let me -- no.

1          Q.     Would you like to say

2     something?

3          A.     I would.  So you've got to

4     remember that these documents a lot of times

5     were when I was part of as an account manager

6     in the Chattanooga area and also as a

7     district manager of the area in which I was

8     going to be a manager for with ChemTreat.

9               I've often found it funny when

10    individuals leave a company for sales,

11    whether it be Ecolab or ChemTreat or pick

12    your company, and they -- and they think

13    they're going to damage the other company.

14    Ecolab is a $15 billion a year business.

15    And, me, if I were to take any customer from

16    Ecolab or Nalco, it would have very, very

17    little impact on that company, but what it

18    would be impacting are the people that I

19    worked with every day, some of them for 20

20    years, 20 years, Mr. Walton.

21               If you looked at my employee

22    records, which I'm sure you have, you looked

23    at where my manager talked about the Nalco

24    family for WL121.  Those were my friends.

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 542 of 990   PageID #: 5720

1    Taking business for any company would have

2    not have been hurting Ecolab, but it would

3    have been hurting my friends.  Many of those

4    I hired; I trained; I went to dinner with

5    their families; they came to my house; they

6    came to my family events, my wedding, my --

7    what's the purpose?

8                    There are -- Nalco/Ecolab does

9    not have the majority share of water

10   treatment business in the territory that I

11   was managing for ChemTreat.  There are dozens

12   of other water treatment competitors that I

13   had competing against for 22 years

14   successfully for Nalco/Ecolab.  Why would I

15   jeopardize hurting my friends when I knew I

16   could successfully go after business that I

17   had proven track record for doing.  What

18   purpose does that serve?

19         Q.    When you found these

20   Nalco/Ecolab documents on your WD drive, did

21   you tell anybody at ChemTreat that you found

22   these documents?

23         A.    No.

24         Q.    Has anyone at ChemTreat ever

1    asked you to review that drive?

2             A.    No.

3             Q.    Do you know if ChemTreat has an

4    image of that drive?

5             A.    I have no reason to suspect

6    that they do.

7             Q.    When you worked for Nalco and

8    Ecolab, did you work from a home office?

9             A.    Most of the time -- yes and no.

10            Q.    Why do you say that, sir, "yes

11   and no"?

12            A.    From when I hired in Nalco on

13   November 1 of '99, we always worked remotely

14   as salespeople.  So I'd work mostly out of my

15   home until my daughter was born, and it's

16   very hard to work at home with a newborn, as

17   probably all of you can attest to.  Some

18   people I guess found it easier during COVID.

19   But I had some friends of mine that had an

20   office that I would work out of and I still

21   do to this day.

22            Q.    Where is that office?

23            A.    It's in Dayton, Tennessee,

24   where I live.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 544 of 990  PageID #: 5722

1          Q.     And what's the address of that

2     office?

3          A.     I think it is 225 East 16th

4     Street, Dayton, Tennessee.  It's the Liberty

5     Motor Club.

6          Q.     In your last, say, year at

7     Nalco -- I'm just asking about your last year

8     at Nalco -- did you work at the office at the

9     Liberty Motor Club or did you work from home

10    or both?

11         A.     Predominantly the Motor Club.

12         Q.     During your time at Ecolab,

13    when you were corporate account manager, did

14    you work at the Liberty or did you work from

15    home mostly?

16         A.     Predominantly at the Liberty.

17         Q.     And that's still where you work

18    for -- that's still where you currently work?

19         A.     That is not who I'm employed

20    by, no.

21         Q.     Okay.  But is that still -- do

22    you still use that office at the Liberty?

23         A.     Yes.

24         Q.     And you used it during your

1      tenure at ChemTreat.

2             A.      Yes.

3             Q.      Other than the Western Digital

4      drive and the three flash drives, the Nalco

5      flash drives that you eventually returned,

6      did you have any other memory devices as of

7      the time that you left Ecolab?

8             A.      No.

9             Q.      And your last year at

10     Ecolab/Nalco, did you have any other memory

11     devices other than those -- other than the WD

12     and the three Nalco USB drives?

13            A.      No.

14            Q.      Do you have a Dropbox account?

15            A.      Not to my knowledge.

16            Q.      Do you have like a Box account?

17            A.      I don't know what a Box account

18     is.

19            Q.      It's like Dropbox.  It's just

20     called something different.

21            A.      I -- not to my knowledge.

22            Q.      Do you have any cloud storage

23     accounts at all?

24            A.      No.

1     LaCie drive.  And that was done for a very

2     specific reason.

3           Q.    Okay.  But when you say you

4     segregated, you segregated on the OneDrive,

5     on your corporate -- the OneDrive account?

6           A.    No.

7           Q.    Okay.  So --

8           A.    What your question was is about

9     the transfer of files from my laptop to the

10     LaCie drive on May 20, 24th, correct?

11           Q.    Yes.

12           (Court reporter clarification.)

13           THE WITNESS:  I'm sorry.

14     Ms. Frank, I apologize.  That was my

15     misstatement.  On May 24 of 2021.

16     BY MR. WALTON:

17           Q.    Okay.  As of May 24, 2021, did

18     you have a OneDrive account with

19     Nalco/Ecolab?

20           A.    Yes.

21           Q.    What was on that account?

22           A.    That account contained both

23     Ecolab and Nalco files.

24           Q.    And how were those files

1          Q.      Did you read this Answer and

2     Counterclaim before you filed it?

3          A.      Yes.  So there is --

4                  MR. POPE:  Let him --

5     BY MR. WALTON:

6          Q.      Sure.  Go ahead.

7          A.      Yes.

8          Q.      Did you need to finish your

9     answer before I --

10         A.      I'm just saying it's more

11    accurate to say "transferred" than it is

12    "download."

13         Q.      Why -- what's the difference in

14    your mind between "transfer" and "download"?

15         A.      The intended action.

16         Q.      What do you mean by that

17    specifically?

18         A.      My intended action.  My

19    intended action during this process was I had

20    experience through my time at Ecolab and

21    Nalco is that when an individual computer,

22    the entire -- if an individual ever left, the

23    entire block of files were given to their

24    direct manager at the time, okay?

1         I had seen personally where I
2    had been given files -- and, once again, as
3    we stated earlier, it was common practice for
4    people to use their work computer for a
5    personal nature.  I had been given files by
6    individuals that had left the company that
7    whether I had taken over their previous book
8    of business or they worked for me as their
9    manager, I had been given their entire set of
10   files.  They were not segregated.  They were
11   not gone through.  They were not sanitized.
12   You just -- a massive data dump.
13        And by this period of time,
14   we -- I had been in communication with
15   ChemTreat about potential employment, and I
16   wanted to make sure that the Nalco files were
17   properly segregated.  In addition to that,
18   they were no longer a part of my job.  They
19   were no longer needed as a corporate account
20   manager.
21        Nalco and Ecolab, even though
22   we've talked about it in this case, are
23   mentioned one and the same, they operate
24   very, very, very differently.  They are two

1    separate companies.  Even from a tax

2    purposes, they're two separate companies.  In

3    2020, I received two different W-2s that year

4    because I was both a Nalco Water district

5    manager and an Ecolab corporate account

6    manager.  So in my mind, they are two

7    separate entities.

8              And I wanted to make sure that

9    the Nalco Water files were properly preserved

10   and would be properly segregated to the

11   correct individuals and that they would not

12   be mixed with the Ecolab files because it was

13   two separate businesses.  It was -- there

14   were little to -- there were actually no

15   overlap between the two.  And included with

16   those Nalco files, because I was a district

17   manager, there were extensive amount of

18   personnel files that did not need to make it

19   into the view of someone who potentially took

20   over my next business or my next book of

21   business with Ecolab because I had seen that

22   happen.  I had experienced it personally.

23        Q.    All right.  Let's back up a

24   step.

1                Whose files -- whose Nalco

2     files did you take over because they left the

3     company?  One was Quint McCreary, right?

4          A.     Yes.

5          Q.     Who -- sorry.

6                What other files did you have

7     from individuals who left the company?

8          A.     Austin Gauthier.

9          Q.     Anybody else?

10         A.     Brent Fiddler.

11         Q.     Brent?

12         A.     Brent Fiddler.

13         Q.     Anybody else?

14         A.     With just Nalco?

15         Q.     Yes, sir.

16         A.     That is the three specifically

17     with Nalco, yes.

18         Q.     Was there anybody from Ecolab?

19         A.     Yes.

20         Q.     Who?

21         A.     Wes Dunwoody.

22         Q.     Anybody else?

23         A.     Those are the only ones that

24     had left the company that I got files from.

1          Q.      Okay.  So Wes Dunwoody you got

2    the file from from when you were working for

3    Ecolab.

4          A.      That is correct.

5          Q.      And that would be in the Ecolab

6    folder then, correct?

7          A.      That would have been shared --

8    that would have been given to me -- yes, all

9    that was Ecolab -- no.  All that would have

10    just been shared to me with OneDrive.

11          Q.      Yeah.

12          A.      And it was put in my Ecolab

13    folder, yes.

14          Q.      On your OneDrive, correct?

15          A.      Yes.

16          Q.      Okay.  Now, when did you create

17    the Ecolab and Nalco folders on your

18    OneDrive?

19                MR. POPE:  Hold on one second.

20                (The court reporter lost Zoom

21    connection.)

22    BY MR. WALTON:

23          Q.      So let's back up.  So I think

24    you said, Mr. Ridley, that that -- the file

```
 1                    MR. POPE:  Objection to form.
 2                    THE WITNESS:  Yes.
 3      BY MR. WALTON:
 4           Q.     And you kept -- and you moved
 5      everything at some point that related to your
 6      old Nalco job under the Nalco folder,
 7      correct?
 8           A.     Yes.
 9           Q.     And that was soon after you
10      started your new position as a CAM, C-A-M, at
11      Ecolab, correct?
12           A.     Yes.
13           Q.     Okay.  And so my question back
14      to -- back to your answer here, why did you
15      download or transfer 4,891 files to the LaCie
16      drive on May 24, 2021?
17           A.     To ensure they would be
18      segregated from the files that were on my
19      computer.
20           Q.     What do you mean by that
21      specifically?
22           A.     I needed -- I wanted only
23      Ecolab files for my current role on the
24      computer that I was doing the corporate
```

1      account manager position with.  I wanted the

2      Nalco Water files on a Nalco Water-owned

3      device, which is the LaCie drive, so that

4      they'd be completely segregated.  I no longer

5      had use for those files.

6                  Then when I resigned in -- I

7      resigned, the Nalco -- the Ecolab-owned

8      computer and the LaCie drive were shipped

9      back to the -- Insights, which is the company

10     given to me by Ecolab HR.

11         Q.     When you switched jobs from

12     Nalco to Ecolab, you used the same OneDrive

13     account, right?

14         A.     Yes.

15         Q.     So just because you switched

16     companies from Nalco to Ecolab, you did not

17     get a new OneDrive account, right?

18         A.     No.

19         Q.     That's -- I just wanted to make

20     it clear.  You did not get a new OneDrive

21     account.

22         A.     Correct.

23                  MR. POPE:  Objection to form.

24     Asked and answered.

1    BY MR. WALTON:

2         Q.    And so why didn't you just

3    leave the files on there?  Why didn't you

4    just leave the Nalco files on there?

5         A.    Because I had seen where -- and

6    I'm going to use Mr. Dunwoody as an

7    example -- Mr. Dunwoody had files marked "Wes

8    Dunwoody personal files" that were given to

9    me when he left the company.  I did not need

10   to see those.  That was very personal

11   information.  And those files -- I actually

12   went to my direct manager at the time, made

13   them aware that I had personal files on there

14   from Wes Dunwoody, and went through and

15   deleted those files.

16              I did not want the same thing

17   to happen, because, remember, I had came from

18   being a manager -- I had came from being a

19   manager, and I did not want people to see

20   personal files that I had of performance

21   reviews, corrective action plans, merit

22   increases, and things of that nature.  I did

23   not think that that was needed.  And I took

24   that very personal that I had that

1    information, and I wanted to make sure that

2    it was segregated.  So I was making the

3    assumption, when the LaCie drive was sent

4    back to Insights and the computer was sent

5    back to Insights, that Insight would identify

6    or view both devices and save the information

7    on both devices and then segregate it to the

8    appropriate party since they were a -- since

9    they worked for Ecolab.

10   BY MR. WALTON:

11        Q.    As of May 24, 2021 then when

12   you started this downloading and transfer

13   process, you had a strong inclination that

14   you might leave Ecolab, right?

15        A.    I didn't have a strong because

16   I was still working through a lot of stuff at

17   that time so I can't say a strong.  But I

18   wanted to make sure that those -- and I did

19   not need -- the biggest thing is I did -- I

20   no longer needed the Nalco files.  They were

21   not relevant.  They were not pertinent.  The

22   two jobs had no overlap.  What we were

23   repping as Ecolab Food and Beverage did not

24   correlate to the water treatment industry, so

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 586 of 990  PageID #: 5734

1    it was -- there was no connection, and

2    they -- I put them on a company-owned device

3    to segregate the two.

4            Q.    But you made the switch

5    initially on October 1, 2020, correct?

6            A.    Yes.

7            Q.    And you didn't segregate these

8    files until eight, nine months later,

9    correct?

10           A.    Yes.

11           Q.    And so you had those Nalco

12   files on your OneDrive when you were working

13   for Ecolab for about eight months or so.

14           A.    Yes.  That eight-month period

15   proved to me that I no longer needed the

16   files any longer.

17           Q.    And as of May 24, is your

18   testimony here that you were not pretty

19   certain that you were going to go to

20   ChemTreat?

21           MR. POPE:  Objection to form.

22   BY MR. WALTON:

23           Q.    You can answer.

24           MR. POPE:  "Pretty certain."

1    Vague.

2    BY MR. WALTON:

3         Q.    You can answer.

4         A.    Pretty certain?

5         Q.    Yeah.  I mean, you were pretty

6    far down the process, right?

7              MR. POPE:  Objection to form.

8              THE WITNESS:  I was in the

9    process.  I mean, we were having

10   communications, yes.

11   BY MR. WALTON:

12        Q.    Well, up until May 24, you had

13   a lot of communications --

14             MR. POPE:  Objection to form.

15   BY MR. WALTON:

16        Q.    -- with ChemTreat, correct?

17        A.    I had communications with

18   ChemTreat prior to May 24, yes.

19        Q.    And you had a meeting with a

20   guy named Steve Leavell, right?

21        A.    Yes.

22        Q.    And you had a personal meeting

23   with him all the way back in August or

24   September, correct?

1          A.     Yes.

2          Q.     And that's August or September

3    of 2020, right?

4          A.     Yes.

5          Q.     And met with him at a hotel in

6    Bristol, correct?

7          A.     Yes.

8          Q.     With Clay Cissell, right?

9          A.     Yes.

10         Q.     And then after that, you had

11   several communications with Clay Cissell,

12   right?

13         A.     Yes.

14         Q.     And those communications were

15   about potentially joining ChemTreat, right?

16         A.     Yes.

17         Q.     And you exchanged several

18   compensation plans with Mr. Cissell, correct?

19         A.     I exchanged compensation plans

20   with Clay.  I don't know if several.

21         Q.     Well, more than one.

22         A.     We exchanged proposed pay

23   plans.

24         Q.     And you did that more than

1    once, right?

2              A.      Yes.

3              Q.      And you had several

4    conversations with Mr. Cissell about those

5    pay plans.

6                      MR. POPE:  Objection to form.

7                      THE WITNESS:  Yes.

8    BY MR. WALTON:

9              Q.      So what were you -- as of

10   May 24, 2021, what were you waiting on to

11   make your final decision as to whether to

12   join ChemTreat?

13             A.      So the role that ChemTreat

14   wanted me to take was a role that I no longer

15   really wanted to do with Nalco.  And what I

16   was trying to work through and what I was

17   trying to understand and the reason why we

18   had the conversations is I was trying to

19   understand the culture of difference between

20   the job title in Nalco Water versus the job

21   title in ChemTreat.  There's a lot of --

22   there's a lot of cultural -- the job is

23   different.  Even though they may on the job

24   description be very similar, the job is very,

1   very different between the two.

2                   As a field-level account

3   manager in Nalco, I no longer wanted to go

4   back to that type of job.  I left that type

5   of job for a reason.  And I didn't want to go

6   back to that type of job.  ChemTreat's field

7   account manager was much different even

8   though the job titles were very similar.

9           Q.    Well, when you met with

10  Mr. Leavell, after you met with him, you sent

11  him an e-mail saying that you were interested

12  in the job and moving forward, correct?

13          A.    One of the main things we

14  talked about during my meeting with Steve

15  Leavell was the corporate account manager

16  role within ChemTreat.

17          Q.    Okay.  And you were told him

18  that you are interested in making that move,

19  correct?

20                  MR. POPE:  Objection to form.

21  Vague.  "That move."

22  BY MR. WALTON:

23          Q.    That you were interested in

24  moving to ChemTreat.

```
                                      Page 180

 1            A.      I would have been interested in

 2      moving to ChemTreat.

 3            Q.      Okay.  So --

 4            A.      Or looking at potential job --

 5      looking at potential job possibilities with

 6      ChemTreat.

 7            Q.      So at some point is -- your

 8      testimony is that it changed from a corporate

 9      account role to a field, a field role?

10            A.      Yes.

11            Q.      When?

12            A.      As the progression moved -- I'm

13      not certain of when it made the move, and

14      I -- you know, a lot of it had to do with the

15      field role was a much more needed role for

16      ChemTreat than the corporate account manager

17      role because they had a gentleman with an

18      extensive base that was very experienced that

19      was about to retire.

20            Q.      But from the very beginning

21      Steve Leavell talked to you about taking over

22      Bill Ellis' territory and that's a field

23      role, right?

24            A.      That's not correct.
```

1    getting --

2    BY MR. WALTON:

3         Q.    No.  I'm just saying in

4    general.

5         A.    Am I --

6         Q.    No, no, no.  I'm not asking you

7    about anything specific.  I'm just asking you

8    about what you recall.  Just let me back up.

9              As of -- did you have customer

10   files when you were at Nalco?

11        A.    Yes.

12        Q.    Okay.  And where did you store

13   them?

14        A.    In the Nalco folder.

15        Q.    In the Nalco folder under the

16   Ridley Documents.

17        A.    Yes.

18        Q.    Okay.  And so were those

19   customer files -- did you download or

20   transfer some of those on May 24?

21             MR. POPE:  Objection to form.

22   Objection to form.

23             THE WITNESS:  There were

24   some -- I don't know what files got

1          Q.     Okay.  You had those as a

2     district manager, correct?

3          A.     Yes.

4          Q.     Okay.  And what kind of

5     information would be in those customer files?

6                MR. POPE:  Objection to form.

7                MR. WALTON:  What?  What's the

8     objection?

9                MR. POPE:  Listen, listen.

10    You're lumping every single customer file

11    into the exact same --

12    BY MR. WALTON:

13         Q.     What sort of information would

14    be in those customer files?

15         A.     The majority of the information

16    housed in a specific customer file, company

17    ABC, would be -- the most things people would

18    say also -- let me stop.

19                These customer files would go

20    all the way back to the days of me being an

21    account manager as well.

22         Q.     Okay.

23         A.     Okay?  So 1999, November 1 of

24    1999, is when I was hired to be an account

1    manager with Nalco.  Those were typically

2    service reports -- do I need to -- do you

3    want me to define what -- the service report?

4         Q.    No.  I mean, I just want you to

5    tell me in general what information would be

6    in the customer files.

7         A.    I'm trying to be helpful.

8         Q.    No.  That's okay.

9         A.    Service reports, program

10   administration manuals, any business reviews

11   that we had with the customer, proposals that

12   we gave to the customer, general customer

13   information that we would have shared openly

14   with a customer.

15        Q.    And these are customer files

16   that in some cases you had information from

17   going back to your time as an account manager

18   in 1999, correct?

19        A.    Yes.

20        Q.    Okay.  You also had customer

21   files for Austin Gauthier?

22        A.    Gauthier.

23        Q.    Gauthier.  All right.

24             Brent Fiddler, correct?

1          A.     Yes.

2          Q.     And also Quint McCreary,

3     correct?

4          A.     Yes.

5          Q.     Okay.

6          A.     Now -- go ahead.  I'm sorry.

7          Q.     No.  That's okay.

8                 And so these customer files

9     were in the Ridley Documents under the Nalco

10    folder, correct?

11         A.     Yes.

12         Q.     Okay.  And you transferred some

13    of them to the LaCie drive, correct?

14                MR. POPE:  Objection to form.

15    "Some of them."  Vague.

16                MR. WALTON:  What word would

17    you have me use other than "some"?

18                MR. POPE:  I'd like you to

19    identify what files you're alleging that he

20    transferred so he can answer your question.

21                MR. WALTON:  I'm alleging --

22    well, I'm starting broad to see what his

23    memory is.

24                MR. POPE:  Okay.

1                    MR. WALTON:  Okay?

2                    THE WITNESS:  I transferred

3       files to the LaCie drive.

4                    MR. WALTON:  Okay.

5                    THE WITNESS:  Nalco Water

6       files.  I transferred Nalco files to the

7       LaCie drive.

8       BY MR. WALTON:

9            Q.     Did that include customer

10      files?

11           A.     Yes.

12           Q.     Do you remember, sitting here

13      today, what customers they were for?

14           A.     No.

15           Q.     Now, when you transferred those

16      files, did you transfer all of the customer

17      files or did you pick certain ones to

18      transfer?

19           A.     I picked blocks of files to

20      transfer.

21           Q.     How did you decide which

22      customers to transfer?

23           A.     I didn't decide which

24      customers.  I transferred blocks of files.

```
 1                  THE WITNESS:  I do not know.
 2      BY MR. WALTON:
 3          Q.     Was it in 2021?
 4          A.     The LaCie drive was very rarely
 5      ever used.  It was stuck in a desk drawer and
 6      very rarely ever used.  I used it -- I went
 7      and sought it out and got it for this
 8      particular purpose to move files for two
 9      reasons: one, they were no longer needed with
10      my primary job; and, two, to segregate them
11      so they would be properly housed in one area.
12          Q.     Okay.
13          A.     Not on my computer.
14          Q.     So my question is, did you use
15      the LaCie drive before May 24, 2021, during
16      the year 2021?
17                  MR. POPE:  Objection to form.
18                  THE WITNESS:  I don't believe
19      so.
20      BY MR. WALTON:
21          Q.     Did you use it in 2020?
22          A.     I don't believe so.
23          Q.     Did you use it in 2019?
24          A.     I don't believe so.
```

1    other than you?

2              A.     My -- my OneDrive?

3              Q.     Yes, sir.

4              A.     Other than the people that I

5    shared files with?  Please clarify.

6              Q.     Sure.  I mean would Jerry

7    DeFord, for example, have full access to your

8    OneDrive account at Nalco/Ecolab?

9              A.     No.  He would have only had

10   files that I shared with him.

11             Q.     Gotcha.  So you would have to

12   like right click, create a link, and then

13   you'd link to that file or folder for him,

14   correct?

15             A.     Yes.

16             Q.     When you were -- on May 24,

17   when you were downloading and transferring

18   these 4,891 files, did you tell anybody at

19   Ecolab or Nalco that you were doing this?

20             A.     No.

21             Q.     Why not?

22             A.     I didn't think I needed to.

23             Q.     Now, your next download and

24   transfer activity was the next day, on

1    May 25, correct?  I'm looking at page --

2          A.    Page?

3          Q.    -- page 21, paragraph 58.

4          A.    That's what this says, yes.

5          Q.    Okay.  And you -- in your

6    answer to paragraph 58, you admitted that you

7    downloaded files on May 25, 2021, correct?

8          A.    Yes, that is my answer, very

9    similar to what happened on May the 24th of

10   2021.

11         Q.    And you -- sitting here today,

12   do you recall which files that you

13   downloaded?

14         A.    I do not.

15         Q.    And during this download

16   session, you selected certain files to

17   download and you transferred them over to the

18   LaCie drive, correct?

19              MR. POPE:  Objection to form.

20              THE WITNESS:  That's not

21   accurate.

22   BY MR. WALTON:

23         Q.    What's not accurate about it?

24         A.    I did not select particular

1    files.  I selected blocks of files to move.

2         Q.    Was it, in your testimony,

3    random or were you looking for certain files

4    to move?

5         A.    Random.

6         Q.    In the files that you

7    downloaded on May 25, they included fact

8    packs, correct?

9              MR. POPE:  Objection to form.

10   Foundation.

11             THE WITNESS:  You're getting

12   that from where?

13   BY MR. WALTON:

14        Q.    Paragraph 62.

15        A.    Sixty-two.  Okay.  You've

16   changed pages on me.  Okay.

17        Q.    All right?

18        A.    Fact packs, yes.

19        Q.    It says, in your answer to

20   paragraph 62, it's admitted that Ridley

21   downloaded files on May 25, correct?

22        A.    It says I downloaded files on

23   May 25.  That's what it says, yes.

24        Q.    Yeah, but I'm asking you about

```
 1      what you recall, okay?
 2              A.      I do not recall.
 3              Q.      Okay.  Do you recall ever
 4      downloading fact packs?
 5              A.      There would have been fact
 6      packs -- since I worked to transfer all the
 7      Nalco files that I had, there would have been
 8      fact packs included in those files.
 9              Q.      And this might be a stupid
10      question, but did you eventually put all of
11      the documents that were in the Nalco folder
12      under the Ridley Documents onto the LaCie
13      drive?
14              A.      Yes.  And that's not a stupid
15      question, Mr. Walton.  I think that's a
16      pretty -- I mean, that's a question that --
17      that was my intent, yes.
18              Q.      Okay.
19              A.      To put them all on there.
20              Q.      But instead of just doing it
21      all at once, is it fair to say that you did
22      it piecemeal?
23              A.      I did do it piecemeal.  The
24      transfer would have taken -- I mean, if you
```

```
 1      look back at your own produced document,

 2      there's 4,891 on one day.  There's 1,800 on

 3      another day.  If I keep flipping through

 4      here, there's going to be another substantial

 5      number on another day.  This is 21 years of

 6      files.

 7              Q.      Okay.

 8              A.      I mean, how many files are on

 9      your computer now if you had to move them all

10      at one time?

11              Q.      I wouldn't use a LaCie drive.

12                      Would you agree with me that

13      fact packs are something that Nalco/Ecolab

14      would not want you to share with the

15      competition?

16              MR. POPE:  Objection to form.

17      Speculation.  You're asking him what Nalco

18      and Ecolab --

19      BY MR. WALTON:

20              Q.      Well, was it your

21      understanding, as a Nalco/Ecolab employee,

22      that you should not share fact packs with the

23      competition?

24              A.      That's fair.
```

1          Q.     And was it your understanding,
2     as a Nalco/Ecolab employee, that you should
3     not share copies of client files with the
4     competition?
5          A.     That's fair.
6          Q.     All right.  Is it also fair to
7     say that fact packs have highly sensitive
8     company information in them?
9                MR. POPE:  Objection to form.
10               THE WITNESS:  A fact pack has a
11    lot of information in it.
12    BY MR. WALTON:
13         Q.     Would you agree with me that
14    it's confidential and sensitive?
15               MR. POPE:  Objection to form.
16               THE WITNESS:  Not all of it.
17    BY MR. WALTON:
18         Q.     All right.  Well, what part of
19    the information would you agree with me is
20    confidential and sensitive?
21         A.     There's revenue and -- revenue
22    and profit dollar information in one of
23    those, but it also includes the number of
24    sales calls a person made.  I'm pretty sure

1    that's not confidential information.

2            Q.    So why did you say then you

3    shouldn't share it with the competition?

4            A.    The document in its entirety

5    probably should not.  I mean, you know, as a

6    district manager, I would not want the

7    document shared in its entirety with the

8    competition.

9            Q.    And you wouldn't want your

10   employees to do that, correct?

11           A.    The employees had copies of

12   those --

13           Q.    Yeah.

14           A.    -- as well --

15           Q.    But --

16           A.    -- for their particular

17   territories.

18           Q.    And you wouldn't want -- as a

19   district manager for Nalco, you wouldn't want

20   any of the people under you to share fact

21   packs with the competition, correct?

22           A.    Not as entirety, no.

23           Q.    What's a Monthly Turndoc

24   Incentive Report?

1          A.    So how do you -- what answer I
2     give you, how do you know if that's the right
3     answer?
4          Q.    I -- well, you're under oath.
5          A.    Okay.
6          Q.    You're going to tell the truth,
7     aren't you?
8          A.    Yeah, I do.  I do.
9          Q.    Okay.
10         A.    So -- yeah, I do want to do the
11    right thing and tell the truth.
12         Q.    Well, then I shouldn't need
13    that document then, should I?
14         A.    Right.  No, you shouldn't.  So
15    a Monthly Turndoc is a document that I would
16    have created, or anyone at Nalco could have
17    created, through Nalco Direct.  It's just
18    a -- you go to Nalco Direct, which is a
19    program.  You put in some information.  You
20    put in either specific customers or a
21    specific rep or a specific district, you
22    know, some filtering term, and it would
23    generate what products were shipped in to a
24    customer over that monthly period.

```
1      files on May 26.

2                    Do you see that?

3           A.      Yes, I did.

4           Q.      And so sitting here today, do

5      you still admit that you downloaded files on

6      May 26 using a LaCie drive?

7           A.      That is what's stated here,

8      yes.  I have no reason to believe that I did

9      not.

10          Q.      And those files were training

11     documents.  Do you recall downloading or

12     transferring any training documents?

13          A.      I would have had training

14     documents in my Nalco folder.  So if they

15     were the ones that I selected on May the 26th

16     and they're the ones that I moved on May the

17     26th, then, yes, they could have been moved.

18          Q.      And is it fair to say that you

19     as a Nalco manager would not want your

20     subordinates sharing training documents with

21     the competition?

22          A.      That's not accurate.

23          Q.      Why is that not accurate?

24          A.      "Training documents" is a very
```

1     from Nalco/Ecolab to ChemTreat?

2              A.      It was not my intent to take

3     customer files from Ecolab to ChemTreat.

4              Q.      But you knew that you shouldn't

5     do that, correct?

6              A.      And I'm saying it was not my

7     intent to do that.

8              Q.      Okay.  Whether it was your

9     intent or not, as of the time that you

10    resigned from Ecolab, you knew that Ecolab or

11    ChemTreat -- I'm sorry -- or Nalco did not

12    give you permission to take any customer

13    files to ChemTreat, right?

14             A.      Correct.

15             Q.      Okay.

16             A.      Ecolab would not have wanted me

17    to take customer files to ChemTreat, that is

18    correct.

19             Q.      And is it also fair to say that

20    Ecolab/Nalco would not have wanted you to

21    take any training materials to ChemTreat?

22                 MR. POPE:  Objection to form.

23    Speculation.

24    BY MR. WALTON:

```
 1          Q.     Is it your understanding of
 2     that?
 3          A.     That's not -- there was a lot
 4     of training.  There was a lot of different
 5     types of training.
 6          Q.     Okay.  But, you know, was it
 7     your understanding, yes or no, that you were
 8     allowed -- that -- strike that.
 9                 Was it your understanding that
10     you should not take training materials from
11     Nalco/Ecolab to ChemTreat?
12          A.     I was instructed by ChemTreat
13     not to bring any materials over to -- over to
14     ChemTreat from Ecolab.
15          Q.     Okay.  But I'm asking from --
16     is it fair to say, from an Nalco/Ecolab
17     standpoint, that your understanding was you
18     should not take any training materials to
19     ChemTreat?
20          A.     Yes.
21          Q.     Okay.  Is it also fair to say
22     that Nalco/Ecolab would not want you to take
23     any fact packs over to ChemTreat?
24                 MR. POPE:  Objection to form.
```

1    Speculation.

2    BY MR. WALTON:

3           Q.      You can answer.

4           A.      Yes.

5           Q.      Okay.  And you never received

6    permission from Nalco/Ecolab to take any

7    files with you over to ChemTreat; is that

8    fair to say?

9           A.      Yes.

10          Q.      Okay.  Can you -- just to

11   prompt you, on page 26, paragraph 79, we

12   allege that on May 27 that you downloaded 149

13   more files, and those were the Monthly

14   Turndoc Incentive Reports.

15                  And I think we've been over

16   this already.  You remember downloading those

17   but not the specific date, correct?

18          A.      Correct.

19          Q.      And is it your understanding

20   that, based upon your experience as a

21   Nalco/Ecolab employee, Nalco/Ecolab did not

22   authorize you to take Monthly Turndoc

23   Incentive Reports to ChemTreat, correct?

24          A.      That is correct.

Case 1:22-cv-00050-TRM-SKL  Document 253-2   Filed 05/25/23   Page 580 of 990   PageID #: 5758

```
 1              Q.      And you never asked permission
 2       to take those documents, correct?
 3              A.      Did not know I was taking those
 4       documents.
 5              Q.      All right.
 6              A.      Remember, these were all going
 7       to the LaCie drive which I returned, and
 8       Insight has said that I returned, to the
 9       company.
10              Q.      But my understanding is that
11       you also had some of these documents on your
12       WD drive which you retained possession of
13       after your employment ended at Ecolab,
14       correct?
15                      MR. POPE:  Objection to form.
16       Misstates the testimony.  Misstates the
17       evidence.  "Some of these documents"?
18       BY MR. WALTON:
19              Q.      You can answer.
20              A.      There were.
21              Q.      I mean, I'll try to clean it
22       up.
23                      Were some of the documents --
24       were any of the documents that you downloaded
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 581 of 990  PageID #: 5759

1    to the LaCie drive also on the WD drive as of

2    the time of your last day of employment at

3    Ecolab?

4            A.     There might have been.

5            Q.     Are you aware of any

6    specifically?

7            A.     When I did a full backup in

8    2015 and 2016, there would have been many

9    customer files on there as well.  But most of

10   those, like I said, would have been service

11   reports, program administration manuals,

12   things of that nature.

13           Q.     And customer files are you

14   testifying would not be part of a partial

15   backup?

16           A.     That's not what I'm testifying

17   to.

18           Q.     So a customer file could be

19   part of a partial backup.

20           A.     A customer file could have been

21   part of a partial backup.  I do not know

22   whether it was or not.

23           Q.     Okay.  So let's skip up to

24   page 27, paragraph 87.

1          A.     I mean, I wouldn't even --
2    anything I gave you would be a complete guess
3    and wouldn't be worth the ink you wasted out
4    of your really nice pen there to write down
5    on.
6          Q.     Okay.  So for example on
7    page 29, paragraph 94 where it says that you
8    uploaded information from the corporate
9    OneDrive account to your Live.com account,
10   again, I just want to be clear, you deny
11   uploading any Nalco or Ecolab documents to a
12   Live.Com account, correct?
13         A.     That is correct.
14         Q.     Okay.
15         A.     I did not even know what a
16   Live.Com account was until this document was
17   shown to me.
18         Q.     Now, at some point you
19   downloaded your entire contacts to a thumb
20   drive, right?
21         A.     Yes.
22         Q.     Do you see on page 30
23   paragraph 98?
24         A.     Yes.

1          Q.     And we allege that you -- on

2     June 21 that you used a different mobile

3     drive to download and copy your entire

4     contacts from his Nalco/Ecolab account.

5                    Do you see that?

6          A.     What paragraph are you on, sir?

7          Q.     Ninety-eight.

8          A.     Yes.  On page 30?

9          Q.     Yes, sir.

10         A.     Yes.

11         Q.     Why did you do that?

12         A.     So the way the system was set

13    up, not by my choosing, really not by my

14    intervention at all, any number that I put

15    into my phone, for example, if I wanted

16    Mr. Dave Walton in my phone for whatever

17    reason, I put it into my phone, it would

18    immediately go to my Outlook contacts.

19                    I believe at that time I had

20    1,700-plus contacts in my phone.  The vast,

21    vast majority of those were personal

22    contacts, not business, and I would like to

23    have kept those contacts, not to lose the

24    vast majority of my contacts when I left

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 584 of 990  PageID #: 5762

1    Ecolab.

2         Q.    Did you ask anybody at Ecolab

3    or Nalco if you could take a copy of your

4    contacts?

5         A.    No.  That was not common

6    practice.

7         Q.    So it was not -- go ahead.

8         A.    No.  I was just saying in my

9    20-plus years, nobody ever asked if they

10   could take contacts with them somewhere.

11        Q.    Well, contacts would also have

12   client information, correct?

13        A.    There were customer names and

14   numbers in there, yes.

15        Q.    Okay.  And you believe that you

16   had the right to take that to ChemTreat?

17             MS. LUND:  Objection.

18   BY MR. WALTON:

19        Q.    Did you believe that you had

20   the right to take that to ChemTreat?

21        A.    I wasn't taking it to

22   ChemTreat.  I was keeping my contacts with

23   me.

24        Q.    Did you download those contacts

```
 1      onto the system at ChemTreat?
 2              A.    I downloaded -- I entered the
 3      contacts onto my contact list when I had a
 4      ChemTreat computer, but I don't think that
 5      list was viewable by anyone else at ChemTreat
 6      because it was my personal contact list.
 7              Q.    Is it still sitting on
 8      ChemTreat's system, all those contacts?
 9              A.    That I cannot answer.
10              Q.    What device did you use to take
11      a copy of your contacts to ChemTreat?
12              A.    It would have been --
13                    MR. POPE:  Objection to form.
14                    MS. LUND:  Objection.
15                    MR. POPE:  Misstates the
16      testimony.
17                    MR. WALTON:  I don't think it
18      does, but go ahead.
19                    MR. POPE:  Objection to form.
20      It misstates the testimony.
21                    THE WITNESS:  Ask your question
22      again, please.
23      BY MR. WALTON:
24              Q.    What USB device did you use to
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 586 of 990  PageID #: 5764

1      take your contacts to ChemTreat?

2                    MR. POPE:  Objection to form.

3                    MS. LUND:  Objection.

4                    THE WITNESS:  I used a thumb

5      drive to download my contacts off of the --

6      from my -- my Outlook to take those with me

7      so that I would have those on my phone.

8      Those contacts were not shared with anyone at

9      ChemTreat.  I did not take those to

10     ChemTreat.

11     BY MR. WALTON:

12            Q.    You -- when you said you

13     downloaded your contacts, but that was

14     downloaded from the Nalco/Ecolab system,

15     right?

16            A.    It was downloaded from my

17     Outlook.

18            Q.    From your Outlook.  From your

19     personal Outlook?

20            A.    From the Outlook that was on my

21     Ecolab computer.

22            Q.    Okay.  So it was -- when you

23     say it's your Outlook, it was your Outlook

24     that was assigned to you by Nalco/Ecolab; is

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 587 of 990  PageID #: 5765

```
 1      or less then going from 1,700 to 200 contacts
 2      was not a top priority at that point in time.
 3      BY MR. WALTON:
 4           Q.     Okay.  But my question is, is
 5      that did ChemTreat specifically tell you that
 6      you couldn't take your contacts?
 7           A.     They did not.  And I don't -- I
 8      can't remember for a fact if I asked for
 9      those contacts.  Once again, there was a lot
10      bigger things going on, Mr. Walton, than some
11      contacts.  And I'm not -- I'm not minimizing
12      your question by no means, but that was not
13      super important.  And when I imported my
14      number to the plan that I'm on now, I just
15      know there was a lot of my contacts were gone
16      and I needed to move on with my day, if you
17      understand what I'm saying.
18           Q.     And you didn't tell anybody at
19      Nalco/Ecolab that you were taking your
20      contacts?
21           A.     No.
22           Q.     And you didn't ask for
23      permission, correct?
24           A.     That was -- in my 20-plus
```

1          Q.     So these are exhibits that have

2     been marked previously.

3          A.     Okay.

4          Q.     Okay?

5                 MR. WALTON:  I don't know if

6     you want to check it out first.  Oh, that was

7     for him.  I forgot to give you another copy.

8                 THE COURT REPORTER:  I didn't

9     get that colloquy but ...

10                 MR. WALTON:  No.  I just said I

11    forgot to give Lance a copy.  And then the --

12    there's an attachment that goes to that

13    exhibit and that's -- if you want to check it

14    out first.  This is where I might need your

15    stapler, Lance.

16                 And for the record, I'm handing

17    the witness exhibits that have been marked

18    previously as Exhibits 43 and 44.

19    BY MR. WALTON:

20          Q.     Please take a look at both of

21    those documents, Mr. Ridley.

22                 All right.  Are you ready, sir?

23          A.     Yes, sir.

24          Q.     All right.  Let's start with

1    Exhibit 43.  First of all -- well, first of
2    all, can we establish that Exhibit 44 is the
3    attachment to Exhibit 43 based on the e-mail
4    that says Ridley Business Plan, attachments,
5    2021 through 2023?
6              A.    I have no reason to assume that
7    it's not.
8              Q.    Okay.  So let's start with the
9    e-mail at the top.  It says, "Clay, Attached
10   is the business plan that I prepared."  And
11   you wrote that, right?
12             A.    Yes.
13             Q.    And then you also wrote -- and,
14   first of all, this is an e-mail to Clay
15   Cissell with the attached business plan dated
16   March 2, 2021, correct?
17             A.    Yes.
18             Q.    And as of March 2, 2021, you
19   were an Ecolab employee?
20             A.    Yes.
21             Q.    And you were paid by Ecolab?
22             A.    Yes.
23             Q.    And would you agree with me
24   that you owed your fiduciary duty of loyalty

```
 1      to Ecolab because they were paying you at the
 2      time?
 3                      MR. POPE:  Objection to form.
 4      It calls for a legal conclusion.
 5                      THE WITNESS:  So this e-mail
 6      was constructed during my lunch break when I
 7      was sitting there eating lunch, and that's
 8      when I was eating lunch at my desk putting
 9      this together for Clay.
10      BY MR. WALTON:
11          Q.    But would you agree with me at
12      the time that you owed your loyalty to the
13      company that was signing your paycheck?
14          A.    I don't work for --
15                      MR. POPE:  Objection to form.
16      It calls for a legal conclusion.
17                      THE WITNESS:  I don't work for
18      Ecolab 24 hours a day.
19      BY MR. WALTON:
20          Q.    Okay.  But they were the only
21      one who was paying you at this point,
22      correct?
23          A.    Yes.
24          Q.    Okay.  So, "Attached is the
```

```
 1        business plan I prepared.  The Business Plan
 2        cover 2021 through 2023."
 3                    Do you see that?
 4             A.    Yes.
 5             Q.    Why did you use the term
 6        "business plan"?
 7             A.    Because that was the term that
 8        Clay used in his original communication with
 9        me about putting together a business plan.
10             Q.    And what was the nature of that
11        initial communication?  Was it by e-mail?
12        Text?  Phone call?
13             A.    Text.
14             Q.    And you say, "I used the
15        revenue numbers you provided".
16             A.    Correct.
17             Q.    How did he provide those
18        numbers to you?
19             A.    Text message.
20             Q.    Do you remember what the
21        revenue numbers were?
22             A.    800,000.
23             Q.    That was the only number he
24        gave you?
```

1          A.    That's correct.

2          Q.    He said -- and then you say,

3    "In the plan, I did make some assumption for

4    transition into the role."

5                What did you mean by that?

6          A.    So it's going to take time.

7    I'm moving into a customer base that I was

8    not familiar with and just the normal -- the

9    normal acumen period -- acu -- the normal

10   period to become acclimated to a new company,

11   new role, new customers.  It's got a little

12   bit of a distraction period there.

13         Q.    And you said also "learning the

14   ChemTreat business and chemistries, time

15   needed to transfer accounts, and my

16   non-compete."

17               And you wrote that, right?

18         A.    Yes, I did.

19         Q.    What did you mean when you said

20   "and my non-compete"?

21         A.    Which means in this business

22   plan there are no Nalco -- so ChemTreat does

23   not compete with Ecolab.  The Ecolab F&B

24   signed.  My corporate account manager signed.

1    So there -- this would be -- there was no

2    Nalco Water customers consumed -- or, excuse

3    me -- included in this business plan because

4    I'd had a non-compete, so I knew I was not

5    going back into Nalco Water customers that I

6    was prohibited from going into.  So when I

7    was figuring up the new business or new --

8    claimed new business sales for each of the

9    year periods, those were really assuming from

10   other water treatment companies in the -- in

11   the area.

12           Q.    So turning to Exhibit 44 --

13           A.    Okay.

14           Q.    -- how did you create this

15   document?

16           A.    So these were templates that we

17   would use.  It's not a business plan as per

18   what Nalco would call a business plan.  This

19   is just a bridge used to forecast the start

20   of one year to the end of -- or the end of

21   one year to the end of another year.

22                 It's just a forecasting tool.

23   It's just essentially an Excel document that

24   has addition and subtraction on there that

1          creates a graph.  It's just an Excel

2          document.  There's nothing special about it.

3               Q.     Did you create this Excel

4          document?

5               A.     This one you're looking at,

6          yes, I did create it.

7               Q.     Did you create the template?

8               A.     I did not.

9               Q.     Who created the template?

10               A.     According to the files that

11          Ecolab has produced, Mike Chemelovski would

12          have created this template.

13               Q.     Who's Mike Chemelovski?

14               A.     Mike Chemelovski is a retired

15          Nalco Water employee now, but he was the

16          sales -- he was the AVP of sales operations

17          for Nalco Water.

18               Q.     Do you know how much time and

19          effort it took Mr. Chmelovski to create this

20          template?

21               A.     Mike?  Probably very little.

22          Mike was a very talented individual.  It

23          probably took very little.  But the template

24          that he sent us in this form, this form has

1    been heavily modified from the one he sent.

2            Q.     This -- so did you use the --

3    so you're saying you used a modified version

4    of the form that he originally sent?

5            A.     So his form would have been

6    sent with words in the first column, blank

7    numbers, and then those numbers would have

8    then correlated to the graph.  However, just

9    spending years working with Mike to prepare

10   business plans -- and this would have been a

11   forecasting tool for just a single slide in

12   an overreaching business plan, or actually a

13   single picture on a single slide.  I didn't

14   like the way Mike had things set up.  It

15   didn't flow well for the way I talked through

16   things.  So I completely modified this.  And

17   I had other ones, other templates just like

18   this, that I used in conversations both at a

19   district level and an account manager level

20   to show individuals how they -- where they

21   ended in a year and what they needed to do to

22   be successful for the next year.

23                  So this is not a -- this is by

24   no means a proprietary thing.  Every number

1    under sales, every one of those numbers is a

2    number -- outside of the 800K at the very

3    top, every one of those numbers is a number

4    that I calculated and I came up with based

5    upon 20-plus years of history in this

6    industry.

7              Q.    Okay.  I'm going to ask you

8    about that in a second --

9              A.    Okay.

10             Q.    -- but what specifically did

11   you modify about this business template after

12   you got it from Mike Chemelovski?

13             A.    The wording.  Some of the

14   wording got changed over a little bit.  The

15   numbers were completely changed.  The

16   placement of the graphs are changed.  The

17   color of the graphs were changed.  Outside of

18   this thing had words on one column, numbers

19   in another column, and formulated a graph,

20   pretty much everything else had been changed.

21             Q.    So how did you specifically

22   create this document with the specific

23   numbers in there?

24             A.    So, sorry, ask your question

1       again, sir.

2                       (The court reporter lost Zoom

3       connection.)

4                       THE WITNESS:  How did I create

5       it?

6       BY MR. WALTON:

7            Q.     Yeah.

8            A.     Do you want me to walk you

9       through each number?

10           Q.     Yes.

11           A.     Okay.  Great.  So Clay Cissell

12      gave me the base of 800,000. I assumed

13      10 percent in non -- in what they call

14      non-repeat one-time sales.  That's just a

15      pure assumption.  That is pumps, analytical

16      equipment.  That would be a customer doing a

17      one-time cleaning.  That's just one-time

18      sales that are not going to repeat annually.

19      That's a SWAG number.  Ten grand is a pretty

20      good number for most territories.  Once

21      again, I've been running territory and

22      coaching territory managers for 20-plus

23      years.

24                      Then you have down accounts.

1    Down accounts are going to be a percentage of
2    your total base, otherwise called attrition.
3    Actually, Nalco would have called that
4    attrition under most care.  If you look at
5    the fact pack, you see the attrition report.
6    You see an attrition number in the fact pack.
7    Would you agree with that, sir?  Okay.  Good.
8    So --
9            Q.    I didn't agree or disagree, but
10   go ahead.
11           A.    Okay.  So down accounts would
12   be a percentage of the $800,000.  World-class
13   sales is somewhere around 7 percent.
14   10 percent and even sometimes 12 or
15   15 percent based upon the competitive nature
16   or the change that you're having in an
17   account.  Then you have lost accounts.  So
18   that's also going to be a SWAG number.
19                 Then you have price.  Price is
20   a template -- is typically a percentage of,
21   you know, how much price increase you think
22   you can get out of your business.  I was
23   coming in new to a territory.  I didn't
24   figure there was going to be a ton of price,

1    because I didn't want to be the new person

2    coming into an account and turn right around

3    and give a monster price increase even though

4    at this time with the market there was a lot

5    of competitive -- or sorry -- there was a lot

6    of price impact during this time.  If you all

7    remember, this is 2021.  So COVID, supply

8    chain, all that was heavily impacted.

9                    One-time new sales.  So, once

10   again, those are new sales.  So the

11   non-repeat one-time would be a negative

12   subtraction.  The new one-time would be a

13   positive subtraction.  I kept those

14   relatively the same to have a net zero if you

15   see that.  Both are $10,000.

16                    New repeat would be $37,000,

17   37,5, which is half of the $75,000 of claimed

18   new business.  Now, why is it half.  Because

19   typically in a year, you experience half the

20   revenue from your total claimed new business.

21   So if you sell 75, you know, if you sell an

22   account in January, of course you're going to

23   get all the revenue from the year.  If you

24   sell it in June, you're going to get half.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 600 of 990  PageID #: 5778

1    If you sell it in December, you're going to

2    get a 12th.  You average that out and you get

3    a half of all claimed new business.

4              So if you look on every page,

5    the new repeat is half of what you claim for

6    that year.  Then you have carry-over.

7    Carry-over is the other half of what you

8    claimed in the previous year.  So in 2020 --

9    or the 2020-2021 forecast, I came zero of

10   carry-over new because I had no claimed new

11   business.  If you see on the second page,

12   carry-over new was 37,5.  That's the other

13   half of the claimed new business.

14             So if you take this and you do

15   essential -- sorry -- simple addition -- or

16   subtraction first, then addition, you go

17   through and then you get a new number.  You

18   take that number, divide it to the first

19   number, and you get your percent increase

20   expected from -- for the year.

21        Q.    And which specific numbers did

22   you enter into this document?

23        A.    Every one of them.

24        Q.    Now, what about the numbers on

1    the graph?  Were they automatically created,

2    or did you manually input every single number

3    on the graph?

4           A.     They were automatically

5    inputted from the sales, and then I would

6    move those -- they were text blocks, and then

7    I would move those around to be clearer.  For

8    example, the three blocks that you see

9    down -- under "down" and the three blocks you

10   see under "up," the three little small

11   blocks, under Mike's original template, which

12   I didn't like, he had them actually up much

13   higher.  I don't think that flowed very well,

14   and it didn't make it very clear to the

15   reader, in my opinion.

16               Same thing with the price.  And

17   all these were moved around and also you had

18   to change the scale, because these templates

19   could be used on an account level or it could

20   be used on a district level.  When I was

21   doing this as a district manager, this was

22   20 -- this was $16 million.  It wasn't

23   $820,000.

24           Q.     What did you mean when you said

1    claimed new business in 2021 was 75,000?

2            A.    That was the -- that was the

3    business that I thought I could claim and new

4    business, and that includes -- that includes

5    two components: one, inside sales business,

6    which means inside existing ChemTreat

7    accounts, so if ChemTreat sells one

8    application but does not sell another

9    application for whatever reason, picking up

10   that business, and also new -- new

11   competitive business, going and taking

12   business from a competitor.  In all of 2020

13   and 2021, I mean, most -- none of this

14   includes any Nalco Water business.  It was

15   all based upon business that I thought I

16   could get from other competitors.

17           Q.    Where did you get -- the

18   document that you started from, where did you

19   get that?  Was that off of your computer or

20   your OneDrive?

21           A.    That was off of my computer.

22           Q.    Okay.

23           A.    I had several of these

24   templates.  I grabbed one.

1          Q.     Was it the Ridley -- was it
2     within the Ridley Documents Nalco folder?
3          A.     I do not know that.
4          Q.     But these were templates that
5     you used --
6          A.     I'm sorry.  Let me clarify
7     that.  Because most of the time when I
8     grabbed any documents, it was off the Ridley
9     Document folder.  I very rarely went to the
10    OneDrive web, so it would be off the Ridley
11    Documents folder.
12         Q.     Okay.  And my question was, was
13    this in the Nalco folder under your Ridley
14    Documents folder?
15         A.     It would either have been under
16    that or account management examples tab,
17    account management templates tab -- folder.
18    Excuse me.
19         Q.     So you typed in the numbers on
20    the left, and then that populated this graph
21    on the right; is that fair?
22         A.     You're really simplifying it.
23    There was a lot more modification than that,
24    Mr. Walton.

1          Q.     A lot more modification that

2     you did specifically for this one that you

3     sent to Clay Cissell?

4          A.     Yes.

5          Q.     What specific modification did

6     you do for this one that you sent to Clay

7     Cissell?

8          A.     I think I covered that.  You

9     want me to go through it again?

10          Q.     No.  I mean just like you moved

11     the boxes up and down or --

12          A.     Well, the wording was

13     different.  Where he had down accounts or

14     lost business, that would have been

15     attrition.  There was a lot of different

16     information there.  The numbers were all

17     different.  The color of the charts are

18     different.  The placement of the bars graphs

19     are different.  The percentages are

20     different.  The location are different.  This

21     thing was heavily modified.  And once again,

22     it's just a simple Excel document that adds

23     and subtracts and does some division.

24          Q.     I guess what I'm confused on is

1      when did you modify it as per your testimony?

2                  Did you modify right before you

3      sent it to Clay Cissell for the purposes of

4      this document, or had you modified this

5      template prior to that?

6            A.    Prior.  And prior -- and for

7      this exercise.

8            Q.    And how long did it take you to

9      do this document?

10           A.    Thirty minutes.  You got to

11     remember, I've been doing this for 20-plus

12     years.  It wouldn't -- it doesn't take me

13     long to do something like this.

14           Q.    What else did you use this

15     template for that you started with with this

16     document?

17           A.    Well, if it came from Mike, the

18     original purpose was when we put together our

19     annual business plans as district managers,

20     but we also -- but I also would use this

21     template and other templates just like it to

22     do -- because I built several of these

23     myself -- to do coaching and to work both

24     managing my own territory, managing my own

1    district, and working with other account

2    managers to show them how if they ended --

3    where they ended one year and how they could

4    be successful in their next year.

5         Q.    So Clay Cissell didn't send you

6    a template to use?

7         A.    No.

8         Q.    Did he ask you to use a Nalco

9    template?

10        A.    No.

11        Q.    Why did you choose to use a

12   Nalco template for this business plan that

13   you created for ChemTreat?

14             MS. LUND:  Objection.

15   BY MR. WALTON:

16        Q.    You can answer.

17        A.    I grabbed a template.  It just

18   happened to be the one that Mike had created

19   initially, but I'd modified all these, and I

20   just grabbed that template that I had used in

21   the past for forecasting that had been

22   modified.

23        Q.    And you -- is it fair to say

24   that you were not authorized to send a

JA-608

1      business planning template to ChemTreat?

2                    MR. POPE:  Objection to form.

3      Characterization of "business planning

4      template."

5      BY MR. WALTON:

6            Q.    You can answer.

7            A.    This is not a business planning

8      template.

9                    MR. WALTON:  Well, he just

10     followed your coaching there appropriately.

11                   THE WITNESS:  No, sir.  No,

12     sir.  No, sir.  This is not a business plan

13     template by the definitions of Nalco or

14     Ecolab, and that comes for somebody that's

15     been doing business plans for 20-plus years.

16     BY MR. WALTON:

17           Q.    And you called this a business

18     planning in your e-mail, correct?

19           A.    I called that a business plan

20     because that's what Clay Cissell called it

21     initially.  Common communication.

22           Q.    Clay Cissell asked you for a

23     business plan; this is what you sent him,

24     correct?

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 608 of 990  PageID #: 5786

1          A.     Correct.

2          Q.     So --

3          A.     But this is not a Nalco

4    business plan.

5          Q.     Do you -- did you ask

6    permission to use this template to create a

7    business plan for ChemTreat?

8               MS. LUND:  Objection.

9               THE WITNESS:  I saw no need to

10   ask permission from anybody to use a simple

11   Excel document.

12   BY MR. WALTON:

13         Q.     Did you tell anybody that you

14   were going to use Mike Chemelovski's template

15   and send it to ChemTreat?

16               MR. POPE:  Objection.

17   Characterization.

18               THE WITNESS:  This is not Mike

19   Chemelovski's template.  This is my template.

20   I modified the template.  Mike Chemelovski

21   was essentially the original creator of the

22   template.

23   BY MR. WALTON:

24         Q.     And you used your Nalco

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 609 of 990  PageID #: 5787

```
1        computer to create this?
2               A.    I used an Ecolab computer when
3        I did this because I didn't have a personal
4        computer.
5               Q.    When you switched jobs from
6        Nalco to Ecolab, did you keep the same
7        computer or did they give you a brand-new
8        one?
9               A.    Same computer.  Sorry.  To
10       clarify, you said when I switched jobs from
11       Nalco to Ecolab?  Yes, same computer.
12              Q.    Were you projecting attrition
13       rate at ChemTreat of 3.7 to 5 percent?
14                    MS. LUND:  Objection to form.
15                    THE WITNESS:  Be more like --
16       sir, you handed the note.  Are you talking
17       about a certain year?
18       BY MR. WALTON:
19              Q.    No.  He is not allowed to ask
20       you questions.
21              A.    Oh, I'm sorry.  I don't do this
22       regularly.
23              Q.    2021.
24              A.    '21.  I am projecting in 2021
```

1    to be down 5.5000 or five and a half thousand

2    dollars from 0.7 percent of total attrition.

3        Q.    Okay.  And, again, you never

4    told Jackie Herrera that you were going to

5    send this document to ChemTreat, correct?

6        A.    No.

7        Q.    All right.  So when you

8    returned the LaCie drive -- so at the time

9    you downloaded the documents to the LaCie

10   drive that we went over earlier, did you save

11   copies of any of the documents that were on

12   the LaCie drive anywhere else?

13       A.    No.

14       Q.    Okay.  Did you hook the LaCie

15   drive up to any other computer?

16       A.    Other than what?

17       Q.    Sure.  I'll make it clear.

18            The questions I'm asking deal

19   with the time period after you were

20   downloading the documents to the LaCie drive

21   up until the time that you resigned from

22   Ecolab, okay?

23            So between that time period did

24   you connect the LaCie drive to any other

```
 1        computer or device?
 2             A.    I did not.
 3             Q.    Did you do anything else with
 4        the documents on the LaCie drive?
 5             A.    No.  Just returned them to
 6        Ecolab.
 7             Q.    Now, when you returned them to
 8        Ecolab, did you alert anybody at Ecolab that
 9        you were returning the LaCie drive with your
10        Nalco Water folder on it?
11             A.    No.  I was instructed by Ecolab
12        HR to return all company devices, which
13        included the LaCie drive, to Insights at the
14        address they provided with the shipping
15        label.
16             Q.    Okay.  And you didn't put
17        anything on the drive in terms --
18                   (The court reporter lost Zoom
19        connection.)
20        BY MR. WALTON:
21             Q.    At the address they --
22             A.    -- they provided, with the
23        shipping label they provided.
24                   MR. WALTON:  Can you hear us
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 612 of 990  PageID #: 5790

1    when you returned the drive -- give me a

2    second.  I've lost my train of thought.

3              All right.  We'll just move

4    forward.  I lost my train of thought.

5         A.    May I move these to the side,

6    sir?

7         Q.    Yeah.  Yes, you can.

8              During your employment -- or

9    strike that.

10             Have you ever read the report,

11   the forensic report, by Jim Vaughn?

12        A.    Which person is Jim Vaughn?

13   Can you clarify that?

14        Q.    He is ChemTreat's --

15        A.    There's a lot of people.

16        Q.    He is ChemTreat's forensic

17   expert.

18        A.    I've read parts of it, yes.

19        Q.    Are you aware that he found

20   that you accessed seven Ecolab documents?

21        A.    Yes.

22        Q.    And you admit doing that?

23        A.    I do not admit to not doing it.

24        Q.    What does that mean?

```
 1          A.    It means I don't remember
 2    accessing those specific documents on a
 3    specific date.
 4          Q.    Why did you access those
 5    documents?
 6          A.    Well, I believe those documents
 7    correspond with the ones that I looked at
 8    when I found files on my WD and then deleted
 9    those, because those were all attached to a
10    Hard Disk 5 and a Hard Disk 6.
11          Q.    Why does that indicate the WD?
12    You said a Hard Drive 6, Hard Drive 5.  What
13    does that have to do with the WD drive?
14                MR. POPE:  Objection to form.
15    He didn't -- that's not the testimony.
16    BY MR. WALTON:
17          Q.    Okay.  Well, what did you mean
18    when you said a Hard Drive 5 and Hard
19    Drive 6?
20          A.    That's what's in Mr. Vaughn's
21    report.  You asked me if I'd read
22    Mr. Vaughn's report, and I was taking
23    information from Mr. Vaughn's report.
24          Q.    All right.  And then Mr. Vaughn
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 614 of 990  PageID #: 5792

1    says that while you were at ChemTreat you

2    accessed on your ChemTreat computer a

3    document with Hard Disk Volume 5, and it was

4    a document called Account Management Examples

5    Master Proposal.

6             A.    Um-hum.

7             Q.    Do you remember accessing that

8    document?

9             A.    I do.  I remember accessing a

10   document when I found documents on my WD

11   drive, making sure that it matched what it

12   should have been, and, you know, we clicked

13   on it.  It said Master Proposal.  That was my

14   proposal template that I created myself to

15   use to make my job more efficient.  It flowed

16   well for me.  It was the way I liked to

17   present things to customer and present things

18   to prospects.  And I viewed it, saw that it

19   was on there, and then realized that it

20   shouldn't be and deleted the files and

21   everything I saw and associated with that

22   file.

23            Q.    And your testimony is you had

24   to open up the document to verify that the

1      master proposal was actually the master
2      proposal and that's why you opened it.
3              A.      Yes.
4              Q.      And you're saying this is a
5      master proposal that you created?
6              A.      Yes.
7              Q.      You created as a Nalco
8      employee?
9              A.      Yes.
10             Q.      And you used at Nalco.
11             A.      Yes.  Well, I used the
12     proposal.  The proposal was then modified.
13     I'd open it, save a new copy to whatever
14     customer it was, do the modifications in it,
15     and that way the master proposal stayed
16     sanitary -- sanitized.  Excuse me.
17     Sanitized.
18             Q.      And your master proposal is set
19     up, like you said, the way you like to do
20     things, correct?
21             A.      The way I like to do things,
22     yes.
23             Q.      All right.  And despite that,
24     your testimony is here today you did not open

1    up that master proposal document for the

2    purposes of using it at ChemTreat.

3              A.      No.   Actually, I did not.

4    ChemTreat has a wonderful group of

5    individuals that actually creates proposals

6    for ChemTreat employees.   They are very, very

7    well done, and it takes a ton of the work off

8    the ChemTreat account managers and corporate

9    account managers putting together proposals.

10   They put together -- they contain all the

11   Safety Data Sheets.   They put in all the lab,

12   laboratory capabilities, all the

13   certifications.   They put together all the

14   Ph.D.s that ChemTreat has.   They put together

15   all the testing that ChemTreat can provide.

16   All you need to do is provide them the

17   chemistry that you plan on using, the cost --

18   or, sorry -- the pricing, and they put

19   together a very wonderful document that has

20   all the proper trademarks on it, has all the

21   proper logos on it.   It is -- it is very

22   impressive.   If I had something like that

23   when I was at Nalco, it would have saved me a

24   ton of time.

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 617 of 990   PageID
#: 5795

1      Q.      I was going to ask you, does

2     Nalco or Ecolab have a department that does

3     that?

4      A.      No, not even -- no, no.  Nalco

5     certainly excels at some things over

6     ChemTreat and ChemTreat certainly excelled at

7     things over Nalco, but that was not something

8     that Nalco or Ecolab had that was available

9     to the sales team.

10      Q.      All right.  So this -- do you

11     remember when you opened this specific

12     document, the master proposal?

13      A.      I do not.

14      Q.      All right.  Mr. Vaughn also

15     says that you opened up a document on your

16     ChemTreat computer called Account Management

17     Examples Service Plan 2020.  Do you remember

18     opening that document on your ChemTreat

19     computer?

20      A.      I believe I do, yes.

21      Q.      Okay.  And --

22      A.      That was another template that

23     I created.  Once again, every customer with

24     Nalco had a service plan that was specific to

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 618 of 990   PageID #: 5796

1   them based upon the requirements of the

2   customer.  And so you would have a

3   conversation with the customer, what do you

4   need, what frequency do you need, what's best

5   for your systems, how many systems do you

6   have, and then it was always good to build a

7   service plan for that customer so that

8   everyone understood the roles and

9   responsibility of each party and the

10  frequency that those were going to be done.

11              So in order to do that and make

12  it quick and easy, you wanted to have a

13  template that I built.  I had both, one as a

14  Word document and one as an Excel document,

15  depending upon which way the customer liked

16  to get it, to use.  Once again, I would open

17  it, immediately save the blank template as

18  the customer name, and then that way the

19  original template stayed sanitized.

20        Q.    And you opened up this document

21  because you wanted to use it for ChemTreat?

22        A.    No.  I opened up that document

23  because I found it and, once again, verifying

24  it, what it was, you know, that it shouldn't

1    be there; let me get rid of this.

2         Q.    Well, I mean, this document --

3    these two documents that we're talking about,

4    the master proposal and service plan, they

5    were within a folder called Nalco Water

6    Files, correct?

7         A.    You're looking at the report.

8    I'm not.

9         Q.    But do you recall having a

10   folder on your WD drive that was Nalco Water

11   Files?

12        A.    Yes.  There probably would have

13   been more than one because I would have done

14   massive backups.  Those probably -- the

15   master proposal may have come from a 2015,

16   2014, or 2016 full computer backup.  The 2020

17   was one of those that I did not think should

18   have been there, because that would have been

19   probably one of the partial backups or a

20   missed -- a drag and drop.

21        Q.    An accidental drag and drop.

22        A.    An accidental drag and drop.

23   In 2020 it shouldn't have been there.  But I

24   will tell you none of those contained any

```
 1        type of Nalco company or customer
 2        information.  They were blank templates.
 3                Q.      Well, this blank template you
 4        created, the service plan in 2020, you
 5        created that as a Nalco employee, correct?
 6                A.      Yes.
 7                Q.      And you created that for the
 8        use of completing your job responsibilities
 9        at Nalco, correct?
10                A.      Yes.
11                Q.      And what I'm trying to
12        understand now is that if you opened up
13        documents that were in a Nalco Water Files
14        folder, why did you have to open up the
15        document to verify its contents if that
16        document was in a Nalco Water Files folder?
17                A.      Just to verify it.  And it was
18        not used for any of the customers that I was
19        currently working with.  And how I can state
20        that is David Ellis did a really good job of
21        putting together service plans or something
22        similar to those service plan or service
23        frequency, whatever he called it, with his
24        existing customers.
```

```
 1              I had taken over existing
 2      business that had existing service schedules
 3      and existing roles and responsibilities
 4      currently outlined.  Those documents were not
 5      needed any longer.  It did not serve a
 6      purpose in my current position with
 7      ChemTreat.
 8          Q.    Did you create any service
 9      plans while you were at ChemTreat?
10          A.    I did.
11          Q.    And which clients did you
12      create the service plans for?
13          A.    I think I modified service
14      plans for a few of them that already existed.
15      When I say I created them, I mean they were
16      modified existing service plans.  So I
17      created new ones during -- so what I liked to
18      do is, when I took over an account was sit
19      down and have a discussion with a customer
20      of, hey, how are we doing, what would you
21      like to see different, and how can we
22      continue to meet your expectations, and part
23      of that is maybe adjustments to the service
24      plan.
```

```
1              David Ellis did a really good
2     job of providing me with a lot of the
3     documents he had already put together.  So
4     since they had seen an existing service plan,
5     it was really easy to take what they had
6     already seen and what they were used to
7     reading and what they were used to seeing and
8     just modifying it based upon the
9     conversations that I had with the customers.
10            Q.     Did you create any service
11    plans for ChemTreat using your service plan
12    template from Nalco?
13            A.     Not to my knowledge.
14            Q.     Did you create any proposals
15    for ChemTreat using your master proposal
16    document --
17            A.     No.
18            Q.     -- for Nalco?
19            A.     I only created two proposals
20    for ChemTreat, and neither one -- and both of
21    those were a proposal that was -- stemmed
22    from the proposal create -- and I can't
23    remember the exact name, but it's the
24    proposal creation team within ChemTreat.
```

1          Q.     And Mr. Vaughn's report said

2     that you got these documents from a Hard Disk

3     Volume 5.  Do you have any idea what that is?

4          A.     That would be the WD is my

5     assumption on that.  And the reason I'm

6     assuming that is some of the older documents

7     on there would have been from complete

8     downloads when I was backing up my computer.

9          Q.     All right.  So then --

10          A.     For example, the Volkswagen

11     2014 PSR file.

12          Q.     Yeah, I'll get to that one in a

13     second.

14          A.     Okay.

15          Q.     The next document on my list is

16     Mr. Vaughn said you downloaded from Device

17     Hard Disk Volume 5\Nalco Water Files\Quint

18     McCreary files\Magotteaux\PSR\gotteaux PSR

19     2019 05 10 doc, dot doc.

20               Do you remember opening that

21     document --

22          A.     Yes.

23          Q.     -- on your ChemTreat computer?

24          A.     Yes.  I did not download it.  I

1        accessed it, which means --

2              Q.      You opened it and viewed it.

3              A.      I opened it and viewed it.

4        Once again, it was never put on a ChemTreat

5        system.  It was never saved to ChemTreat.  No

6        one at ChemTreat ever had access to that

7        document.

8              Q.      Except for you.

9              A.      Except for me.

10             Q.      And you viewed that document

11       from your WD drive, correct?

12             A.      Correct.

13             Q.      All right.  Then -- do you

14       remember when you did that?

15             A.      No.  It was either August --

16       one of the August dates or -- probably one of

17       the August dates.

18             Q.      Okay.  And the next document is

19       Device Hard Disk Volume 5\Nalco Water

20       Files\Quint McCreary\Frito-Lay\PSR\Nalco

21       Report PepsiCo Service Water Fayetteville

22       September 2018.xlxs?

23             A.      Yep.  Those were probably

24       viewed at the same time is my guess.  Once

1    again, I don't know why they were on there,

2    and which was -- which I found odd that they

3    were on there, actually.  And, also, those

4    accounts for my -- the territory that I had

5    with ChemTreat, the customer base that I had.

6    Those were very, very far west accounts.

7    Quint actually covered North Alabama and

8    Middle Tennessee, which is somewhere that

9    I -- was handled by other people, not me, in

10   ChemTreat.

11          Q.    And, again, those two files

12   were within a folder called Nalco Water

13   Files, correct?

14          A.    I'm assuming, yes.  That's the

15   file path name, yes.

16          Q.    Okay.  And then the next

17   document that Mr. Vaughn found that you

18   accessed on your ChemTreat computer was --

19   and I'll read the file path to you, okay?

20          A.    Okay.

21          Q.    A Device Hard Disk Volume 5

22   Nalco Water Files.  So that's the folder,

23   right?  Yes?

24          A.    You're reading it.  I'm --

```
 1        sorry.  I shook my head in acknowledgment
 2        that you're reading it to me.  Sorry.
 3               Q.     Yeah.  That's the Nalco Water
 4        Files, but that's a folder that you had on
 5        the WD drive, correct?
 6               A.     Yes.
 7               Q.     Okay.  Customer Files - Nalco
 8        Water\Volkswagon\Volkeswagen service
 9        reports\Volkswagen - Media Center\Volkswagen
10        Media PSR 2014\Media Center - Chilled Water
11        System 06.11.2014.docx.
12                      Do you remember opening that
13        document?
14               A.     Yes.
15               Q.     When did you open that document
16        on your ChemTreat computer?
17               A.     When I found the files on my WD
18        drive.
19               Q.     But we talked about four
20        different times that you found those files,
21        right?
22               A.     Um-hum.
23               Q.     Yes?
24               A.     Yes.
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 627 of 990  PageID #: 5805

1          Q.      And so which time did you open
2     this document?
3          A.      I do not remember.
4          Q.      All right.  So what is the
5     Volkswagen Media PSR 2014?
6          A.      That's just a personal service
7     report that was done by either myself or
8     Barry Phillips when Barry Phillips worked for
9     us that was e-mailed out to a customer.  Just
10    results from testing data.
11         Q.      Did you do any -- were you
12    involved in any efforts at all at ChemTreat
13    to get business from Volkswagen?
14         A.      Absolutely not.  And I'd like
15    to expound on that because that goes back to
16    a conversation that I had or a statement that
17    I made earlier.  Volkswagen is under the
18    management of Robert McClure and Patrick
19    Sweeney.  Patrick Sweeney is the district
20    manager.  Those two gentlemen are very, very,
21    very close personal friends of mine, and I
22    would never do anything to harm them.
23         Q.      Okay.  Did you ever -- at
24    ChemTreat did you ever work or were you

1    involved in any efforts to get business from
2    PepsiCo?
3            A.      No.
4            Q.      Were you -- at ChemTreat were
5    you involved in any efforts to get business
6    from Magotteaux?
7            A.      Absolutely not.
8            Q.      Okay.  So then the next
9    document is, and I'll read the path --
10           A.      Sorry.  And, furthermore, if
11   I'm not mistaken, both those customers are --
12   were still Nalco customers all the way
13   through my time at ChemTreat.
14           Q.      During your time at ChemTreat
15   in Tennessee, okay, are you aware of any
16   customers that switched Nalco to ChemTreat?
17                   MR. POPE:  Objection to form.
18                   MS. LUND:  Objection.
19                   THE WITNESS:  In the entire
20   state of Tennessee?
21   BY MR. WALTON:
22           Q.      Yes, sir.
23           A.      Not for the entire state.  I
24   would have no knowledge of that.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 629 of 990  PageID #: 5807

1          Q.    Okay.  But are you aware of any

2     within the State of Tennessee of any -- I'm

3     just asking if you're aware.

4          A.    I only know of one.

5          Q.    Who's that?

6          A.    National Aerospace Solutions.

7          Q.    Is that Arnold Air Force Base?

8          A.    National Aerospace Solutions is

9     a company on Arnold Air Force Base.

10         Q.    Okay.  So if there's a client

11    folder for Arnold Air Force Base, would that

12    be National Aerospace Solutions?

13         A.    It is not.

14               MS. LUND:  Objection.

15               MR. POPE:  Objection to form.

16               THE WITNESS:  No.

17    BY MR. WALTON:

18         Q.    No.  It's different.

19         A.    Yes, it's different.

20         Q.    So if there would be work that

21    would be done for the base, it would be

22    different than NAS, right?

23         A.    National Aerospace -- when I

24    took -- when I was responsible for work on

1    the base, Nationals Aerospace Solutions was

2    not on Arnold Air Force Base.

3         Q.    Were you involved at all in

4    changing the business from Nalco to Ecolab

5    for National Aerospace?

6         A.    State your question again?

7         Q.    Sure.  That was a bad question.

8              Were you involved at all in

9    trying to get business at ChemTreat for

10   National Aerospace?

11        A.    Yes.

12        Q.    What was your involvement?

13        A.    So every year -- I'm sorry.

14   Every three to five years certain things

15   would go out for bid on the base.  One of the

16   things that came up for bid -- and they had a

17   list of bidders, because I went through this

18   previously -- they had a list of bidders that

19   bid on that business every year because,

20   being a government entity, they had to get

21   three competitive bids.  ChemTreat was one of

22   the names that they would contact every time

23   something came up for bid.  The referral came

24   into me being the local ChemTreat

```
 1      representative, and I worked through the
 2      posted RFQ.
 3              Q.      That's request for proposal
 4      or --
 5              A.      Request for quotation.  RFP,
 6      request for proposal.
 7              Q.      Did you work for National
 8      Aerospace at Nalco?
 9              A.      I did not.
10              Q.      Who did?  Who handled that
11      account?
12              A.       It was handled out of Nalco's
13      institutional division which was not -- I
14      have no idea who the rep was or who the
15      district manager was, but I believe it was
16      handled out of the district out of Atlanta
17      which -- so I worked for Nalco Water Food and
18      Beverage Manufacturing.
19              Q.      Um-hum.
20              A.      Then there was Nalco Water
21      Heavy.
22              Q.      Um-hum.
23              A.      And then there was Nalco Water
24      Institutional.  Institutional business
```

1      covered Nalco Water's government facilities,

2      office buildings, hotels, hospitals, things

3      of that nature. Nalco Water Food and

4      Beverage Manufacturing handled food and

5      beverage customers and all manufacturing

6      plants other than automotive. Nalco Water

7      Heavy covered pulp and paper, primary metals,

8      chemical, and power.

9              I never had -- so my district

10     and the accounts that really I managed for my

11     last several years with Nalco were all in the

12     Food and Beverage Manufacturing team. So

13     Arnold Air Force Base and any company that

14     operated on Arnold Air Force Base would have

15     been handled by Nalco Water Institutional,

16     not my group or my people or my division.

17            Q.    Was there -- okay. So as of

18     the time that you stopped working for Nalco,

19     okay, so October 1 or September 30 of 2020,

20     were any of the people who worked for you

21     handling any business at Arnold Air Force

22     base or for National Aerospace?

23            A.    No.

24            Q.    All right. So then the next

1    document is Device Hard Disk Volume 6\Nalco

2    Water Files\service report notes\service

3    report technical notes - version 3.docx.

4              Do you remember opening that

5    document?

6         A.    Yes.

7         Q.    When did you open that

8    document?

9         A.    When I found those on the WD

10   and then reviewed them and deleted them.  And

11   they're essentially the same file.  They're

12   the same information.  It's just Version 3 is

13   a modified -- that's a Word document, and

14   what that is, is when you would write a

15   service report, you would write -- you know,

16   there's only so many things you can find

17   wrong when you go into a customer's or a

18   facility, customer's account or prospect

19   account.  And instead of having to type out

20   the same thing every time, the same words, I

21   wrote a document with my words on there that

22   I would then copy and paste.  And as over

23   time and I would, you know, find a new way to

24   say something or do something differently, I

1    would revise it and then make a revision.

2                    You know, service report notes

3    was the first one, and then all the way

4    through revision 3 at least.  There may have

5    been -- excuse me.  There may have been other

6    revisions but at least a revision 3 of new

7    ways of saying essentially the same thing

8    that I would use in my service reports.

9         Q.    So did you open this document

10   to your -- during your August, September, or

11   January sessions?

12                    MR. POPE:  Objection.

13                    THE WITNESS:  I do not recall.

14   BY MR. WALTON:

15        Q.    Okay.  Do you know why it says

16   Hard Disk Volume 6 as opposed to Hard Disk

17   Volume 5?

18        A.    I do not.

19        Q.    And so this was a document that

20   you created to help do your job at Nalco?

21        A.    Yes.

22        Q.    And it was like a template type

23   document?

24        A.    It was just a Word document

with words typed on it, with paragraphs, high hardness, high connectivity, low connectivity, low hardness, or, you know, high inhibitor residual, low inhibitor residual, high halogen residual, low halogen residual. It was just -- and then paragraphs with each of those.

Q. And the next document that Mr. Vaughn said that you accessed using your ChemTreat computer was Device Hard Disk Volume 6\Nalco Water Files\service report notes\service report technical notes.doc.

Do you remember opening that document?

A. Yes.

Q. Why did you open that document?

A. Once again, to verify and then to delete those.

Q. Do you remember when you opened that document?

A. I do not.

Q. So it could have been August, September, or January.

A. Could be, yes.

1   2016, for example.  So I would have dragged

2   and dropped the entire folder into a

3   different Nalco Water 2015, Nalco Water 2016.

4                   Does that make sense?

5          Q.     I mean --

6          A.     And none of the files were --

7   if -- when I got asked if I wanted to

8   overwrite a file, I would not overwrite a

9   file.  I would -- it would create a new file.

10         Q.     I guess what I'm trying to

11  figure out is, when you would drag and drop

12  all these files from -- and you're saying

13  drag and drop from at the time it was your

14  Nalco computer onto the WD drive --

15         A.     That's correct.

16         Q.     -- right?

17                So when you were dragging

18  dropping all these files from your Nalco

19  computer onto the WD drive, would you place

20  them on the WD drive under a folder that was

21  called Nalco Water Files?

22         A.     No.  I would drag and drop the

23  entire Nalco Water file.

24                MS. LUND:  Dave, when we get to

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 637 of 990   PageID #: 5815

1          Q.     Before you received this
2     document, did you have any communications
3     with Clay Cissell or Steve Leavell about not
4     taking or bringing any Nalco or Ecolab
5     confidential information?
6          A.     Yes, I did.
7          Q.     When?
8          A.     In a couple of the -- in at
9     least one of the interviews with Clay and
10    then at the dinner meeting with Clay and
11    Steve on the 14th we discussed not bringing
12    anything.
13         Q.     What did they say to you
14    specifically when they said that?
15         A.     Do not bring anything.  All we
16    want is you and your -- the knowledge you
17    possess in your head.
18         Q.     And Clay told you something
19    similar later?
20         A.     Yes.
21         Q.     What specifically did he say
22    then?
23         A.     Essentially the same thing.
24         Q.     All right.  In part number 2

1    here, you certify "I have returned to my
2    prior employer all hard copies of and
3    electronic versions of confidential
4    information of my prior employer and have not
5    copied, downloaded, removed or e-mailed to
6    myself improperly any confidential
7    information belonging to my prior employer."
8                Do you see that?
9        A.    I do.
10       Q.    And the date that you agreed to
11   this you were still an Ecolab employee,
12   correct?
13       A.    I was.
14       Q.    Now, had you already accepted a
15   job with ChemTreat at the time that you
16   signed this document?
17       A.    I do not remember what date I
18   had signed the document on to accept my
19   position with ChemTreat.
20       Q.    Had you received a formal job
21   offer from ChemTreat as of June 19, 2021?
22       A.    I don't remember the exact
23   dates.  It was somewhere in and about there.
24   Very close proximity.

Case 1:22-cv-00050-TRM-SKL  Document 255-2   Filed 05/25/23   Page 639 of 990   PageID #: 5817

```
1                    MR. POPE:  Let me check.  Yeah,
2      I think so, 81.
3                    THE WITNESS:  Are we done with
4      this one, sir?
5                    MR. WALTON:  Yes, sir.
6                    MS. LUND:  Dave, before you
7      start on the new exhibit, we're about to --
8      you know, we're at about an hour.  Do you
9      want to take a stretch or do just want to
10     push through?
11                   MR. WALTON:  Just let me do
12     this one.
13                   MS. LUND:  Dave, I think this
14     was previously marked as Exhibit 66.
15                   MR. WALTON:  Okay.  Lance, do
16     you mind if I change this to 66 then?
17                   MR. POPE:  No, that's fine.
18     BY MR. WALTON:
19          Q.    Mr. Ridley, please let me know
20     when you've had a chance to review this
21     document.
22          A.    Do you want me to read the
23     whole thing, Mr. Walton, or are you going to
24     ask me specific questions?
```

1          Q.     I'm going to ask you specific
2     questions, but I can't stop you from reading
3     the whole thing if you really want to do
4     that.  If you just want to leaf through it so
5     you can familiarize yourself with it, that
6     might be helpful.
7               All right.  Mr. Ridley, do you
8     recognize this document?
9          A.     Yes, I do.
10         Q.     Oh.  What is it?
11         A.     The document is a proposal that
12    I submitted to ATA on September 24, 2015 to
13    Mr. Chris Gipson for a cooling treatment
14    program for cooling towers on Arnold Air
15    Force base.
16         Q.     Well, that's the attachment,
17    correct?
18         A.     Yes.
19         Q.     The cover e-mail is dated
20    Wednesday, September 29, 2021, correct?
21         A.     It is.
22         Q.     The subject is "AEDC response,"
23    correct?
24         A.     That is correct.

1          Q.      And this is from your Anthony

2     Ridley aridley75@hotmail.com?

3          A.      Yes, it is.

4          Q.      And you're sending it to your

5     ChemTreat e-mail address, correct?

6          A.      Yes, I did.

7          Q.      And the attachment is AEDC

8     proposal for purchasing - HVAC Cooling

9     Towers - October 2015.doc, correct?

10         A.      Yes, it is.

11         Q.      Why did you send this document

12    from your Hotmail account to your ChemTreat

13    account on September 29, 2021?

14         A.      Mr. Walton, this is the

15    document that has probably caused me more

16    sleepless nights and more heartache and more

17    confusion than anything in this entire

18    process.  I have no recollection of sending

19    this e-mail.  I have no memory of sending

20    this e-mail.  I did not need this e-mail.  I

21    had no use for this e-mail or the

22    attachments.  This -- I have -- since

23    March 18 of 2020, I have racked my head

24    multiple times trying to figure out why this

```
 1      e-mail got sent, and I have no good answer
 2      for you.
 3                I clearly sent it, but I can
 4      tell you that the proposal and the
 5      information containing in the proposal was
 6      irrelevant to me at my current role and had
 7      no bearing.  It was very old.  It was very
 8      outdated, antiquated.  It wasn't pertinent to
 9      anything.  How this got sent I really have --
10      I really have no recollection about.  And,
11      trust me, I wish I sit here today and I had a
12      good reason not for you and not for anybody
13      in this room but for myself.
14           Q.    So this document was in -- I
15      mean, where did you get this document from?
16           A.    The only -- so the document,
17      this proposal right here, would have been in
18      the massive backups that were done at the end
19      of 2015/2016 time frame.  This document would
20      have resided on the WD drive.
21           Q.    And did you --
22           A.    And I have told you earlier
23      today that I accessed the WD drive twice in
24      August, once in September, and once in
```

1    January.  And the reason I say I had to do it

2    in September is this document would have been

3    on the WD drive.

4            Q.    Would this document --

5            A.    And I would have loved to have

6    a really good reason for you because this

7    document right here is completely useless.

8            Q.    Why do you say it's completely

9    useless?

10           A.    A couple reasons.  One is the

11   company, ATA, is no longer even in existence.

12   They don't exist.  Two, the buildings, the

13   chemistry here Nalco doesn't even sell and

14   hasn't sold 3DT265 in years.  The fee points

15   have changed.  The system standards have

16   changed.  The service requirements have

17   changed.

18               I couldn't -- there has been

19   multiple bids provided by Nalco because of

20   the -- I know the bid cycle for -- there's

21   been multiple bids provided by Nalco to this

22   customer since 2015.  There's no telling how

23   many price increases Nalco has passed along

24   since 2015.

1              The information in this is

2     completely antiquated and irrelevant.  The

3     parameters of the system have changed.  The

4     controllers that they use have changed.

5     Everything about this program -- everything

6     about this program and this proposal is

7     antiquated and useless.

8          Q.    What computer did you use to

9     send this document from your Hotmail to your

10    ChemTreat e-mail?

11         A.    It had to have been my

12    ChemTreat computer because the WD drive

13    wasn't connected to any other device in my

14    house.

15         Q.    And did you open up this

16    document before you sent it?

17         A.    I don't remember opening it,

18    no.

19         Q.    This is the document that

20    ChemTreat claims is the basis for your

21    termination?

22              MR. POPE:  Objection to form.

23              THE WITNESS:  Yes, it is.  And

24    I -- the first time I saw this document -- to

1    tell you the complete story, the first time I
2    saw this document or it was brought to my
3    attention was on March the 18th at probably
4    4:30 in the afternoon when Ms. Helen Hamilton
5    showed it to me on a computer screen and her
6    and John Alcorn terminated me that afternoon
7    on a Friday.
8    BY MR. WALTON:
9         Q.    Is this -- is this e-mail still
10   sitting in your Hotmail account?
11        A.    It never was -- no.
12        Q.    It's not in the sent items?
13        A.    No.
14        Q.    Have you ever checked?
15        A.    By this time others had copies
16   of my Hotmail, counsel did, and they have
17   checked and it's not in there.
18        Q.    Did you ever delete this e-mail
19   from your Hotmail account?
20        A.    I don't remember sending this
21   e-mail much less deleting it.
22        Q.    So that's a no, you have never
23   deleted this e-mail?
24        A.    I did not delete this e-mail.

1        Q.     When John Alcorn and Helen

2    Hamilton called you to your termination

3    meeting, please tell me everything that you

4    recall about that.

5        A.     So I received a text message

6    that afternoon.  They were asking me -- they

7    wanted to hop on a quick call to discuss the

8    lawsuit.

9        Q.    And what happened next?

10       A.     And I told them -- they said,

11   hey, can you hop on a call in 10 or 15 -- in

12   about 10 minutes, a quick call to discuss the

13   lawsuit.  And that text was from John Alcorn

14   to me.  And then I hopped on the call

15   expecting other people to be on there.

16   Counsel, things of that nature.  And that's

17   the first time -- first and only time I've

18   had a discussion with Ms. Helen Hamilton, and

19   that's the last time I've have a conversation

20   with John Alcorn.

21       Q.    And what happened during that

22   call that you could recall?

23       A.     So we opened up the call.

24   Everybody did their nice, polite, you know,

1     greetings.  Then -- it was via a Microsoft

2     Teams call, so everybody did their nice

3     greetings.  And since we all had computer

4     cameras, Ms. Hamilton held up the form you

5     have, Exhibit 52, to the screen, asked me if

6     I remember signing that, and asked me if that

7     was my signature, asked me if I remember

8     reading it.  I told her the same thing.

9     Vaguely.  And then she held -- and I said,

10    Ms. Hamilton, I'm having a hard time seeing

11    it, because, you know, she was just holding

12    it up to a camera.  And I said hold on, time

13    out, I'm confused about where this is going.

14    You're -- I thought we were going to have a

15    conversation about the lawsuit, and you're

16    holding up documents that I signed about

17    confidentiality of documents.  I don't

18    understand.  Can somebody please explain to

19    me what's going on.

20             And then this e-mail got held

21    up to me.  And they said this -- you sent

22    this e-mail.  And I asked for more

23    clarification.  I asked for some clarity.  I

24    said, I don't remember that e-mail.  I have

1    no idea what that e-mail is that.  Can you
2    show me where that e-mail came from.  She
3    asked me, she said, is your e-mail address
4    aridley75@hotmail.  I said yes.  She said,
5    you sent this from your computer, from
6    your -- you sent this from your e-mail --
7    sorry -- personal e-mail to your work e-mail.
8    We went back and forth for a few seconds.  I
9    said, I don't understand.  I don't remember
10   typing that.  There was no reason for typing
11   that.  John Alcorn interrupted and he said,
12   look, here's the thing.  You violated policy.
13   You're terminated effectively -- or, sorry --
14   you're terminated effective immediately.
15                At that time I remember a
16   very -- feeling like I'd just been kicked in
17   the gut and clueless, bewildered.  Up until
18   your e-mail, that was probably the most --
19   the most bewildered I'd had gotten of why
20   this was occurring.  You know, funny they
21   happened less than -- or right around a month
22   apart.
23                And then John said, listen,
24   Helen is going to be your point of contact

1    for your separation that's effective

2    immediately.  And I literally watched my

3    computer programs start to close and shut

4    down minus Teams.  And then he said, I'll

5    send you Helen's contact information; contact

6    her on Monday.  And when I tried to reach out

7    to her, I got redirected to another lady in

8    HR, and that was that.  I went down and told

9    my wife that I had been terminated.

10        Q.    Just -- and we'll take a break

11   in a second.

12             Did you have any conversations

13   with Clay Cissell about your termination

14   after that call with John Alcorn and Helen

15   Hamilton?

16        A.    No.

17        Q.    Did you have any

18   conversations --

19        A.    I tried to call Clay, and I got

20   no answer from him.  Once again, this was

21   late Friday afternoon.  Because I was

22   confused.  I was literally shocked and

23   confused and bewildered at just what was

24   going on.  I mean, you could imagine being in

```
 1              A.     Yes.
 2              Q.     Did you ever give --
 3              A.     But now to be -- to clarify and
 4      to be accurate, I was brought on to ChemTreat
 5      to take over an existing book of business for
 6      a rep that had been at ChemTreat for many
 7      years and was retiring.  That was the sole
 8      reason for being brought to ChemTreat, was to
 9      take over a book of business.
10              Q.     Did you give ChemTreat the list
11      of clients you had to stay away from when you
12      joined ChemTreat?
13              A.     I do not think an actual list
14      was produced to ChemTreat, no.
15              Q.     What do you mean you don't
16      think an actual list was --
17              A.     I don't remember giving a list
18      of -- I was just told not to go into any --
19      any accounts that I had managed 12 months
20      prior to leaving.
21              Q.     After Tyler Bates joined
22      ChemTreat, did you work with him?
23              A.     Did I work with him?
24              Q.     Yeah.
```

1          A.     We worked -- we worked for the
2     same company.
3          Q.     Did you work in partnership
4     with him at all?
5          A.     We worked -- we worked -- his
6     customers that he was going to be taking over
7     were very close to mine.  We worked together.
8     I mean, we worked for the same company in
9     close proximity.
10          Q.     Were you his mentor at all?
11          A.     No.  Tyler was hired -- similar
12     to me, he was hired to take over a book of
13     business from a gentleman that was retiring
14     as well, and that gentleman did more
15     mentoring with Tyler than -- more or less --
16     more than anybody.
17          Q.     Did you recommend Tyler to
18     ChemTreat?
19          A.     I connected -- I told Clay that
20     Tyler could be a potential candidate and --
21     but I wouldn't say -- since I was not a
22     hiring manager and I had been a hiring
23     manager before, I let hiring managers make
24     the recommendations, not me.  I stay in my

1       own lane.

2               Q.      While you were at ChemTreat,

3       did you ever take a Nalco/Ecolab document and

4       copy and paste from it and use that to create

5       a document for ChemTreat?

6               A.      Not to my knowledge.

7               Q.      That employment agreement that

8       we went over earlier, do you have any reason

9       to believe that it's not enforceable?

10              MR. POPE:  Objection to form.

11      It calls for a legal conclusion.

12              THE WITNESS:  I can't answer

13      that.

14      BY MR. WALTON:

15              Q.      Do you believe that ChemTreat

16      has done anything to breach that employment

17      agreement?

18              MS. LUND:  Objection.

19              MR. POPE:  Objection.

20      BY MR. WALTON:

21              Q.      No.  Wait.  I said ChemTreat.

22              Do you have any reason to

23      believe that Ecolab or Nalco has done

24      anything to breach that employment agreement?

Case 1:22-cv-00050-TRM-SKL  Document 255-2   Filed 05/25/23   Page 653 of 990   PageID #: 5831

```
 1                    MR. POPE:  Objection to form.
 2      Calls for a legal conclusion.
 3                    THE WITNESS:  I don't -- I
 4      don't know how to answer that question.
 5      BY MR. WALTON:
 6           Q.    Do you believe that Nalco or
 7      Ecolab has failed to live up to any of its
 8      obligations or promises in that agreement?
 9                    MR. POPE:  Objection to form.
10                    THE WITNESS:  I don't know how
11      to answer that question.
12      BY MR. WALTON:
13           Q.    Why don't you know how to
14      answer that?
15                    MR. POPE:  Objection to form.
16                    THE WITNESS:  There is a lot of
17      legal stuff in that agreement that I
18      essentially don't know the full ramifications
19      of and fully comprehend to say that somebody
20      has lived up to it or not.
21                    MR. WALTON:  That's all I got
22      pending any questions from counsel.  Thank
23      you very much.
24                    Do you guys want to take a
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 654 of 990  PageID #: 5832

1      break before you start your questions?

2                      MR. POPE:  Yeah, let's take

3      just five minutes.

4                      THE VIDEOGRAPHER:  8:25.  We're

5      going off the record.

6                      (Brief recess.)

7                      THE VIDEOGRAPHER:  The time is

8      8:34 and we're on the record.

9      BY MS. LUND:

10             Q.     Good evening, Mr. Ridley.

11             A.     Good evening, ma'am.

12             Q.     We met this morning, but my

13     name is Juli Ann Lund, I represent ChemTreat

14     in this litigation, and I have a few

15     questions for you, okay?

16             A.     Okay.

17             Q.     Great.  You recall that

18     Mr. Walton asked you some questions about

19     Tyler Bates; is that correct?

20             A.     Yes.

21             Q.     How do you know Mr. Bates?

22             A.     Mr. Bates and I have been

23     acquainted with each other since he came --

24     since he joined college -- or started

```
 1    college.
 2              Q.    And how did you meet him when
 3    he started college?
 4              A.    Tyler Bates joined the
 5    fraternity that I joined when I was in
 6    college many years before Tyler.
 7              Q.    And so would you say that you
 8    had a friendly relationship for a number of
 9    years?
10              A.    Yes.
11              Q.    Did there come a time where you
12    told Mr. Bates that there was an opening at
13    Nalco?
14              A.    Yes.
15              Q.    Did anyone at Nalco instruct
16    you to tell Mr. Bates about that job
17    opportunity?
18                    MR. POPE:  Objection.  At
19    Nalco?
20                    THE WITNESS:  No.
21    BY MS. LUND:
22              Q.    Did anyone --
23              A.    Wait.  I'm sorry.  Clarify --
24    ask your question again.  I'm sorry.
```

```
 1                      MS. LUND:  Sure, sure.
 2      BY MS. LUND:
 3           Q.     So just to give you a little
 4      background, you recall there came a time in
 5      the spring of 2020 where there was a job
 6      opening at Nalco, and am I correct that you
 7      mentioned that job opening to Mr. Bates?
 8                      MR. WALTON:  Objection to form,
 9      but you can answer.
10                      THE WITNESS:  Yes.
11      BY MS. LUND:
12           Q.     Did anyone at Nalco instruct
13      you to tell Mr. Bates about that job
14      opportunity?
15           A.     No.
16           Q.     Did anyone at Ecolab instruct
17      you to tell Mr. Bates about that job
18      opportunity?
19           A.     No.
20           Q.     Did anyone at Nalco instruct
21      you to give Mr. Bates advice about applying
22      to Nalco?
23           A.     No.
24           Q.     Did anyone at Ecolab instruct
```

1    you to give Mr. Bates advice about applying

2    to Nalco?

3            A.    No.

4            Q.    Was giving advice to Mr. Bates

5    part of your job duties at Nalco?

6            A.    No.

7            Q.    Was it part of your job duties

8    at Ecolab?

9            A.    No.

10           Q.    You didn't interview Mr. Bates

11   for the position he was given at Nalco, did

12   you?

13           A.    No.

14           Q.    You did not have any authority

15   to hire Mr. Bates for the position he was

16   given at Nalco, correct?

17           A.    Correct.

18           Q.    In fact, you had already left

19   Nalco and moved to Ecolab at the time that

20   Mr. Bates was interviewed by Nalco, correct?

21           A.    That is correct.

22           Q.    You never managed Tyler Bates

23   at Nalco, correct?

24           A.    That is correct.

1          Q.     You never managed Tyler Bates

2     at Ecolab, correct?

3          A.     That is correct.

4          Q.     You never supervised Tyler

5     Bates at Nalco, correct?

6          A.     That is correct.

7          Q.     You never supervised Tyler

8     Bates at Ecolab, correct?

9          A.     That is correct.

10          Q.     Tyler Bates never reported to

11     you at Nalco, correct?

12          A.     Yes.

13          Q.     Tyler Bates never reported to

14     you at Ecolab, correct?

15          A.     That is correct.

16          Q.     I think you have in front of

17     you Exhibit 52.  It's the Certification of

18     Compliance.  Can you pull that in front of

19     you, please.

20                 All right.  And you talked

21     about Exhibit 52 with Mr. Walton a little.

22     This is the Certification of Compliance of

23     Obligations to Prior Employers that you

24     signed as a condition of working for

1    ChemTreat, correct?

2            A.    Yes.

3            Q.    If I can direct your attention

4    to the first sentence of paragraph 6, it

5    says, "I am being hired for my general skills

6    and knowledge in the industry rather than any

7    confidential or proprietary information that

8    I may have had access to or possessed prior

9    to my relationship with the Company."

10            Do you see that language?

11            A.    I do, yes.

12            Q.    Is that consistent with your

13    understanding of why you were hired by

14    ChemTreat?

15            A.    Yes.

16            Q.    Now, when Mr. Walton was asking

17    you questions about meetings that you had

18    with Mr. Cissell and Mr. Leavell leading up

19    to your hiring by ChemTreat, you testified

20    that you were told that all we want is you

21    and the knowledge you possess in your head.

22            Is that -- do you recall that

23    testimony?

24            A.    Yes.

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 660 of 990  PageID #: 5838

1          Q.     Is that consistent with the

2     sentence I just read to you in paragraph 6?

3          A.     Yes, ma'am, it is.

4          Q.     Now, when you received

5     Mr. Walton's letter or e-mail attaching a

6     letter on February 9, 2022, you testified

7     that you e-mailed Mr. Cissell about that.

8               Do you recall that testimony?

9          A.     Yes, ma'am, I do.

10          Q.     All right.  And I am going to

11     hand you what has been previously marked as

12     Exhibit 65 and ask you just to take a look at

13     that.

14               Just to orient you, you'll see

15     the bottom of this e-mail, the first e-mail,

16     is the e-mail that Mr. Walton sent to you at

17     your Hotmail account on February 9, 2022; is

18     that correct?

19          A.     Yes.

20          Q.     Okay.  And then do you see the

21     e-mail that is immediately above that?

22          A.     Yes, I do.

23          Q.     And can you read into the

24     record what you wrote to Mr. Cissell?

1          A.      "Clay, Yesterday, I received

2     the attached letter from a law firm

3     representing Ecolab/Nalco Water.  I do not

4     have any files from Nalco" -- "from Ecolab or

5     Nalco Water that contain proprietary

6     information, classified information, trade

7     secrets, or pricing information.  Do you have

8     some time today to discuss this issue and

9     determine the best path forward."

10          Q.      And so that's an e-mail that

11    you sent to Mr. Cissell on February 10, 2022,

12    at 6:04 a.m., correct?

13          A.      February 10, 2022, at 6:04,

14    yes.

15          Q.      And the statement that you made

16    to Mr. Cissell was consistent with the

17    Certification of Compliance of Obligations to

18    Prior Employers that we looked at previously,

19    correct?

20               MR. WALTON:  Objection to form,

21    but you can answer.

22               THE WITNESS:  Yes.

23    BY MS. LUND:

24          Q.      You can put that aside.

```
 1              Do you recall earlier today
 2    Mr. Walton was asking you some questions
 3    about OneDrive files and how they get moved
 4    around at Ecolab when people depart, and you
 5    testified that you had actually been given
 6    access to OneDrive files from somebody named
 7    Wes Dunwoody.
 8              Do you recall that?
 9         A.    Yes.
10         Q.    And that was while you were
11    working at Ecolab as a corporate account
12    manager, correct?
13         A.    Yes.
14         Q.    And then you said that among
15    the files that you received from Mr. Dunwoody
16    were some files containing personal
17    information, correct?
18         A.    Yes.
19         Q.    And you testified that you went
20    onto the OneDrive and deleted those files
21    because you didn't feel anyone should have
22    access to them; is that correct?
23         A.    Yes.
24         Q.    Do you recall roughly when that
```

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 663 of 990  PageID #: 5841

```
 1     was?
 2            A.     I do not recall when that --
 3     when that actually occurred.
 4            Q.     So you started working at
 5     Ecolab in October of 2020; is that correct?
 6            A.     October 1 of 2021.  No.  2020.
 7            Q.     And you worked there through
 8     July 1 of 2021, correct?
 9            A.     That is correct.
10            Q.     So it had to happen sometime in
11     that time period, correct?
12            A.     Yes, that's correct.
13            Q.     Can you ballpark it at all in
14     terms of whether it was in the first half of
15     your time at Ecolab or the second half of
16     your time?
17                   MR. WALTON:  Objection to form,
18     but you can answer.
19                   THE WITNESS:  Probably the back
20     half.
21     BY MS. LUND:
22            Q.     Okay.  So to the best of your
23     recollection, you received access to
24     Mr. Dunwoody's files sometime in 2021.
```

1      if we still had that laptop, we would be able

2      to confirm what was on it, on the C drive, in

3      terms of what had synced, correct?

4              A.      Should, yes.

5              Q.      And you returned that laptop to

6      Insight per the directions of Ecolab's HR

7      after you left Ecolab, correct?

8              A.      Yes, immediately -- well, not

9      immediately.  The next -- I believe it was

10     within the next couple business days.

11             MR. WALTON:  I'm going to

12     object to form.  I think you're talking about

13     different laptops.

14     BY MS. LUND:

15             Q.      The second laptop that you had,

16     the one you received on or around June 9,

17     2021, you returned that to Insight per Ecolab

18     HR's instructions after you left Ecolab,

19     correct?

20             A.      Yes.

21             MS. LUND:  Thank you,

22     Mr. Ridley.  I have no further questions.  I

23     pass the witness.

24

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 665 of 990   PageID #: 5843

```
 1    BY MR. POPE:
 2           Q.    I have just a few questions
 3    about Exhibit 77.
 4                 MR. WALTON:  Is that the
 5    employment agreement?
 6                 MR. POPE:  It is, yes.
 7    BY MR. POPE:
 8           Q.    Do you have Exhibit 77 there in
 9    front of you, Mr. Ridley?
10           A.    I do.
11           Q.    Okay.  Earlier today Mr. Walton
12    pointed your attention to paragraph 4 of the
13    agreement.
14                 Paragraph 4, it says, Employee
15    agrees that Employee will not transfer or
16    store any Company information on any device
17    other than [sic] storage medium (physical or
18    virtual) not provided or authorized by the
19    Company unless authorized to do so in writing
20    by the Company.
21                 Is that right?  Is that what it
22    says?
23           A.    It does.
24           Q.    Okay.  And the date on this
```

1    agreement, Exhibit 77, is September the 16th

2    of 2020; is that correct?

3         A.    It is correct.

4         Q.    Okay.  And you also testified

5    about doing backups from your Nalco/Ecolab

6    laptop and partial backups in 2020; is that

7    right?

8         A.    That is correct.

9         Q.    Do you recall if those backups

10   occurred before or after September the 16th

11   of 2020?

12        A.    I believe they occurred before

13   because I do not remember ever hooking the WD

14   drive up to my Ecolab computer in the back

15   half of 2020.

16        Q.    Okay.

17        A.    Or even the front half of 2021.

18        Q.    Okay.  And paragraph 4, the

19   last sentence says, "Employee will not wipe,

20   delete, transfer or cause any Company data to

21   be wiped, deleted or transferred from any

22   such device before returning the device to

23   the Company."

24                Mr. Walton asked you several

1    asking for permission to use a personal

2    device to transfer company information for

3    purposes of their job?

4          A.    Say that again, please?

5          Q.    Are you aware of an instance

6    where anyone ever has obtained the permission

7    of the company to use a storage medium that

8    Nalco did not provide to transfer a company

9    file?

10          A.    No.  It was never -- it was

11   never a procedure or policy.  Thumb drives

12   and other devices were used regularly

13   throughout Nalco and Ecolab.

14          Q.    Okay.

15          A.    With -- and I've never heard of

16   anybody or never seen a form or heard of

17   anybody getting written permission from

18   anyone with Insight, Nalco, or Ecolab.

19               MR. POPE:  Okay.  That's all

20   the questions I have for Mr. Ridley.

21               MR. WALTON:  I just have, I

22   think, one follow-up.

23   BY MR. WALTON:

24          Q.    Did you take your Nalco/Ecolab

Case 1:22-cv-00050-TRM-SKL  Document 255-2  Filed 05/25/23  Page 668 of 990  PageID #: 5846

1       company iPhone?

2              A.      Please clarify.

3              Q.      Sure.  Mr. Pope asked you a

4       bunch of questions about your company phone

5       at Nalco/Ecolab, correct?

6              A.      Yes.

7              Q.      Was that an iPhone?

8              A.      Yes, it was.

9              Q.      Did you return that phone?

10             A.      I did not.

11             Q.      Was that the iPhone 8 that you

12      kept?

13             A.      That's the iPhone 8 that was

14      wiped and sold.

15             Q.      Yeah, but --

16             A.      That we discussed earlier.

17             Q.      All right.  So that was

18      actually a Nalco/Ecolab phone.

19             A.      No.  That was my phone.

20             Q.      Who bought that phone?

21             A.      It was given as part of the

22      cell phone plans, so I don't know who bought

23      it.

24             Q.      The cell phone plans from whom?

```
1            A.      From Nalco and Ecolab.
2            Q.      All right.  So you got that
3       phone from Nalco and Ecolab.
4            A.      The phone was sent to us, but
5       once they sent it to us, no one ever returned
6       them.
7            Q.      I understand that, but you did
8       not buy the phone personally.
9            A.      I did not pay for the phone
10      outright, no.
11           Q.      And as far as you know,
12      Nalco/Ecolab paid for that phone.
13           A.      I do not know who paid for the
14      phone.
15           Q.      Well, Nalco/Ecolab was the one
16      who sent it to you, right?
17           A.      No.  It was sent to me by at
18      the time AT&T because I think we changed
19      plans.
20           Q.      So AT&T just sent you a phone
21      out of thin air.
22           A.      You asked me who sent me the
23      phone, and the phone was sent via AT&T
24      because it was an AT&T phone.
```

1          Q.     Okay.  But I also asked you who
2    purchased the phone for you.
3          A.     I don't know who purchased the
4    phone.
5          Q.     You don't believe it was Nalco?
6          A.     Nalco -- or Ecolab/Nalco paid
7    for the cell phone bill.
8          Q.     Do you know who arranged for
9    the phone to be sent to you?
10         A.     I did, because I would call
11   a -- call the wireless provider and pick the
12   phone that I wanted.
13         Q.     But you didn't pay for it,
14   right?
15         A.     I did not pay out of my own
16   personal pocket, no.
17         Q.     You said it was part of a
18   company plan.  That was a Nalco/Ecolab
19   company plan, right?
20         A.     It was part of a corporate
21   plan, yes.
22         Q.     And that was a Nalco/Ecolab
23   corporate plan, correct?
24         A.     Yes.

```
1              Q.      And you kept that phone after

2       your separation from Nalco/Ecolab, right?

3              A.      For a very brief period, yes.

4              Q.      You sold that phone.

5              A.      Correct.

6              Q.      And how much did you sell it

7       for?

8              A.      Thirty bucks, I guess.  It was

9       a very small amount because it was a very old

10      phone.

11                   MR. WALTON:  That's all I got.

12                   MR. POPE:  That's all.

13                   MS. LUND:  That's all.

14                   THE VIDEOGRAPHER:  The time is

15      9:05.  This marks the end of this deposition,

16      and we're going off the record.

17             (The deposition concluded at 9:05 p.m. EDT.)

18                        *  *  *  *  *

19

20

21

22

23

24
```

1

2                    C E R T I F I C A T E

3    STATE OF ALABAMA    )

     COUNTY OF JEFFERSON )

4

5              I hereby certify that the above

6    and foregoing proceeding was taken down by me

7    by stenographic means, and that the content

8    herein was produced in transcript form by

9    computer aid under my supervision, and that

10   the foregoing represents, to the best of my

11   ability, a true and correct transcript of the

12   proceedings occurring on said date at said

13   time.

14              I further certify that I am

15   neither of counsel nor of kin to the parties

16   to the action; nor am I in anywise interested

17   in the result of said case.

18

                 _Lane C. Butler_ (signature)

19   _____

     Lane C. Butler

20

21   LANE C. BUTLER, RPR, CRR, CCR

22   CCR# 418 -- Expires 9/30/23

23   Commissioner, State of Alabama

24   My Commission Expires:  2/11/25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 461

1          C E R T I F I C A T I O N

2

3          I, Patricia R. Frank, a Registered Merit

4     Reporter, Certified Realtime Reporter, and Notary

5     Public, do hereby certify that I reported the

6     deposition in the above-captioned matter; that the

7     said witness was sworn by Lane C. Butler; that the

8     foregoing is a true and correct transcript of the

9     stenographic notes of testimony taken by me in the

10    above-captioned matter.

11          I further certify that I am not an

12    attorney or counsel for any of the parties, nor a

13    relative or employee of any attorney or counsel

14    connected with the action, nor financially

15    interested in the action.

16

17          _____

18          Patricia R. Frank, CRR, RMR #9764

19

20    Dated:  April 19, 2023

21

22

23

24

```
                                    Page 1

 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF TENNESSEE
 3    -------------------------------------------------
 4    ECOLAB, INC., and NALCO COMPANY, LLC d/b/a Nalco
      Water, and Ecolab company and/or Nalco Water,
 5
                    Plaintiffs,
 6
      vs                    Case No. 1:22-cv-00050-TRM-SKL
 7
      ANTHONY RIDLEY, and CHEMTREAT, INC.,
 8
                    Defendants.
 9    -------------------------------------------------
10                        *    *    *
11              VIDEO DEPOSITION TESTIMONY OF
12                   JENNIFER SEMMLER
13                 THURSDAY, MARCH 9, 2023
14                 MINNEAPOLIS, MINNESOTA
15                        *    *    *
16
17
18
19
20
21
22
23    REPORTED BY:
      Rebecca Klanderud, RPR, CSR
24
25
```

1              MR. POPE:  And I can share my screen

2        or if someone there could pull up that exhibit

3        there for her, that would be great.

4        BY MR. POPE:

5              Q.   Ms. Semmler, do you have Exhibit 23

6        in front of you?

7              A.   I have 23 in front of me.

8              Q.   Okay.  And so as I understand your

9        testimony, there were sort of three different,

10       um, aspects of your, uh, report for this -- from

11       XSOAR and the first is the DLP report that's

12       referenced at, um, PLAINTIFFSR 956 in Exhibit

13       23, in the middle of that page?

14             MR. WINSMAN:  Objection to form.

15             Is -- is there a question there?

16             MR. POPE:  Yeah.  I'm having her look

17       at just that page number.

18       BY MR. POPE:

19             Q.   It's 2 of 3, Ms. Semmler.

20             A.   Oh, I see -- I have the report in

21       front of me.

22             Q.   Okay.  And the DLP report that you

23       generated based on this request, is that the

24       file name data-export-2021-07-23-11_24_30?

25             A.   Yes.

1          Q.    Okay.  And -- and so you believe that

2     is the file name that you created as a result of

3     your, um, receiving this request.

4               Is that right?

5               MR. WINSMAN:  Objection to form.

6               THE WITNESS:  The report name would

7     be generated by the system.

8     BY MR. POPE:

9          Q.    All right.  And then you included

10    that report name in this portion of your, um,

11    XSOAR report?

12         A.    Yes.

13         Q.    Okay.  And you testified earlier that

14    all of the artifacts or reports that you

15    generated, um, as a result of your actions were

16    saved to a OneDrive file, your OneDrive file.

17              Is that right?

18              MR. WINSMAN:  Objection to form.

19              You can answer.

20              THE WITNESS:  Yes.

21    BY MR. POPE:

22         Q.    Okay.  And so you think that report

23    is saved to a OneDrive folder?

24         A.    Yes.  It should be in the OneDrive

25    folder.

1            C E R T I F I C A T I O N

2

3            I, REBECCA KLANDERUD, Registered

4    Professional Reporter, Certified Shorthand

5    Reporter, certify that the foregoing is a true

6    and accurate transcript of the foregoing

7    deposition; that the witness was first sworn by

8    me at the time, place, and on the date herein

9    before set forth.

10            I further certify that I am neither

11   attorney nor counsel for, not related to nor

12   employed by any of the parties to the action in

13   which this deposition was taken; further, that I

14   am not a relative or employee of any attorney or

15   counsel employed in this case, nor am I

16   financially interested in this action

17

18

19

20   _____

21            Rebecca Klanderud
          Registered Professional Reporter

22            Certified Shorthand Reporter

23            (The foregoing certification of this
     transcript does not apply to any reproduction of

24   the same by any means unless under the direct
     control and/or supervision of the certifying

25   reporter.)

Page 1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TENNESSEE
2                       CHATTANOOGA DIVISION
3

         _____
4                                       :
     ECOLAB, INC., and NALCO    :
5    COMPANY, LLC, d/b/a NALCO:
     WATER, an ECOLAB COMPANY :
6    and/or NALCO WATER,        :
                                        :
7         Plaintiffs,            :
                                        :
8      v.                        : No.
                                        : 1:22-cv-00050-TRM-SKL
9    ANTHONY RIDLEY, and        :
     CHEMTREAT, INC.,            :
10                                      :
          Defendants.            :
11   _____:
12
13              Thursday, April 27, 2023
14
15           Video Deposition of JAMES D. VAUGHN,
16   with the witness participating remotely via Zoom
17   videoconference from the Law Offices of Williams
18   & Connolly LLP, 680 Maine Ave SW, Washington, DC,
19   beginning at 9:26 a.m. Eastern Standard Time,
20   before Ryan K. Black, a Registered Professional
21   Reporter, Certified Livenote Reporter and Notary
22   Public in and for the District of Columbia.
23
24
25

1          Foundation.  Speculation.

2                  THE WITNESS:  I don't know.

3          BY MR. UPPAL:

4              Q.   Okay.  Thank you.

5                  Let's go to Page 12 of your report.

6              A.   Okay.

7              Q.   Sir, I want to point you to Page 12

8          of your report, the first full paragraph,

9          next-to-last sentence, you see where you wrote,

10         "The data I received showed certain activities

11         that occurred on August 17, 2021; August 20, 2021

12         and January 28, 2022?

13             A.   Yes, sir.  I see that.

14             Q.   Okay.  And this activity on those dates

15         that you're referring to, is this -- does this

16         activity pertain to a Western Digital hard drive

17         -- I'm sorry, a Western Digital drive or some

18         other drive?

19             A.   This -- this -- this activity reflects

20         a single WD My Book, and there's a -- there's a

21         correction in my report because of that.  And

22         the way I documented it in my report, I actually

23         documented it wrong in one area and right in the

24         other area.

25             Q.   Okay.  Let's take that step by step.

1       When you say "WD My Book," is that, essentially,

2       like a brand name of a particular type of

3       external drive?

4           A.   Yes, sir.  That's made by Western

5       Digital.

6           Q.   Okay.  So WD and Western Digital are

7       interchangeable; is that right?

8           A.   Yes, sir.  Most of us just call it WD,

9       just to shorten it.

10          Q.   Okay.  All right.  Fine.

11              So when you wrote on Page 12 of

12      your report, "The data I received showed certain

13      activity that occurred on August 17, 2021, August

14      20, 2021 and January 28, 2022, were you referring

15      to activity on the WD drive?

16          A.   Ultimately, yes, I was.  I was referring

17      to --

18          Q.   Okay.

19          A.   -- activity on the WD drive, yes.

20          Q.   Are those the only dates on which you

21      saw activity on the WD drive?  Let -- let me --

22      actually, let me rephrase it.

23              Are August 17, 2021; August 20, 2021 and

24      January 28th, 2022, the only dates on which you

25      saw activity on the WD drive?

Page 181

1                    C E R T I F I C A T E

2

3          I do hereby certify that I am a Notary

4      Public in good standing, that the aforesaid

5      testimony was taken before me, pursuant to

6      notice, at the time and place indicated; that

7      said deponent was by me duly sworn to tell the

8      truth, the whole truth, and nothing but the

9      truth; that the testimony of said deponent was

10     correctly recorded in machine shorthand by me and

11     thereafter transcribed under my supervision with

12     computer-aided transcription; that the deposition

13     is a true and correct record of the testimony

14     given by the witness; and that I am neither of

15     counsel nor kin to any party in said action, nor

16     interested in the outcome thereof.

17

18          WITNESS my hand and official seal this

19     1st day of May, 2023.

20

21

                    _____

22                        Notary Public

23

24

25

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

VIDYA ATRE MIRMIRA
(202) 434-5352
vmirmira@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 21, 2022

**VIA ELECTRONIC MAIL**

David J. Walton
Fisher & Phillips LLP
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
dwalton@fisherphillips.com

Re:     *Anthony Ridley*

Dear Dave:

I write to update you on the actions that ChemTreat, Inc. ("ChemTreat") has taken in connection with information you provided regarding Anthony Ridley's possible retention of material belonging to Ecolab, Inc. ("Ecolab") and its subsidiary, Nalco Company, LLC ("Nalco").

ChemTreat expressly prohibits its employees from "retain[ing] any confidential information, records or documents in hard copies or an electronic format from a prior employer." *See* Ex. 1 (Certification of Compliance of Obligations to Prior Employers ("Certification")). ChemTreat additionally requires employees to certify that they have "returned to [their] prior employer all hard copies of and electronic versions of confidential information of [the] prior employer" and that they "have not copied, downloaded, removed or e-mailed to [themselves] improperly any confidential information belonging to [the] prior employer." *Id.* The Certification is just one of several policies and procedures that prohibit employees from retaining or disclosing to ChemTreat information that may belong to a former employer. ChemTreat requires employees to agree to these policies and procedures as a condition of their ChemTreat employment and regularly trains employees on these policies. Mr. Ridley certified his compliance with these requirements prior to beginning employment with ChemTreat. *Id.* He further acknowledged his understanding that he could be "subject to discipline, including termination of [his] employment with the Company," if ChemTreat learned that he had falsely certified compliance with, or failed to adhere to, these mandatory requirements. *Id.*

WILLIAMS & CONNOLLY LLP

David J. Walton
March 21, 2022
Page 2

Consistent with its policies, ChemTreat took seriously the allegations in your February letter regarding Mr. Ridley, which you echoed with additional detail in Ecolab's and Nalco's March 3, 2022 complaint ("Complaint"), and promptly undertook a diligent investigation of those allegations. Last week, ChemTreat's investigation revealed that Mr. Ridley sent a Nalco document (a September 2015 response to a request for quotation) from his personal email account (aridley75@hotmail.com) to his ChemTreat email account. This is the only Ecolab or Nalco document located during the course of ChemTreat's investigation. The document is not marked confidential and does not bear indicia that would support trade secret status. However, it is a Nalco document that Mr. Ridley emailed to himself, in violation of ChemTreat's policies and Mr. Ridley's Certification. ChemTreat has zero tolerance for such conduct, and it accordingly terminated Mr. Ridley's employment on March 18, 2022.

As to the single Nalco document located in the course of ChemTreat's investigation (transmitted from Mr. Ridley's personal email account to his ChemTreat email account), our investigation found no evidence that it was transmitted further (either to other ChemTreat employees or outside of the organization) or saved to any ChemTreat network or cloud storage. Upon discovery, ChemTreat immediately segregated the document on its email system. Only counsel for ChemTreat have reviewed it, and it remains segregated pending your instructions regarding its disposition. Please let us know Nalco's preference in that regard.

With regard to your clients' Complaint, we presume that Nalco and Ecolab will dismiss ChemTreat from the pending litigation. A review of the Complaint makes clear that the allegations regarding ChemTreat's alleged complicity with Mr. Ridley's conduct rest solely on "information and belief." As the facts detailed here make clear, such "information and belief" is unfounded and contrary to ChemTreat's demonstrated commitment to ethical and lawful business conduct. There is no basis for any claim that ChemTreat induced or participated in Mr. Ridley's retention of any materials from your clients, and his termination by ChemTreat forecloses any risk that any such materials will be disclosed to or used by ChemTreat. We also note that all of the claims pled against ChemTreat are preempted under settled law. *See, e.g.*, *Knox Trailers, Inc. v. Maples*, 2022 WL 248093 (E.D. Tenn. Jan. 25, 2022).

Although we expect that Ecolab and Nalco will now dismiss ChemTreat from the suit against Mr. Ridley, we remain willing to discuss these issues with you cooperatively. Please let me know if you would like to schedule a time to discuss the foregoing.

Sincerely,

Vidya Atre Mirmira

WILLIAMS & CONNOLLY LLP
David J. Walton
March 21, 2022
Page 3


Encl.

cc:     J. Gregory Grisham
        Pavneet S. Uppal
        Ryan T. Holt
        W. Scott Sims
        Michael R. O'Neill

# EXHIBIT 1

CERTIFICATION OF COMPLIANCE OF
OBLIGATIONS TO PRIOR EMPLOYERS

I HEREBY CERTIFY THE FOLLOWING:

1. I will not disclose to ChemTreat Inc. (the "Company") or use in my work at the Company, any confidential information and/or trade secrets belonging to others, including my prior employers.

2. I have returned to my prior employer all hard copies of and electronic versions of confidential information of my prior employer and have not copied, downloaded, removed or e−mailed to myself improperly any confidential information belonging to my prior employer.

3. I am not subject to any restrictive covenants or obligations that would prevent me from fully performing my duties for the Company.

4. I will immediately inform my Supervisor at the Company and its designated legal representative, if any, in writing if I am asked to reveal any confidential information belonging to others.

5. I have not retained any confidential information, records or documents in hard copies or an electronic format from a prior employer.

6. I am being hired for my general skills and knowledge in the industry rather than any confidential or proprietary information that I may have had access to or possessed prior to my relationship with the Company. I have been expressly told by the Company that it is not hiring me for any confidential information I may possess and that it does not want me to reveal any confidential information belonging to others.

7. I have been instructed by the Company to consult with my personal attorney before accepting employment with the Company and cannot rely upon any information provided to me by the Company or its counsel regarding any obligations I may owe to any prior employer.

8. I understand that I may be subject to discipline, including termination of my employment with the Company, if I have falsely certified the information herein or do not follow the certifications I have made herein.

Signature: _Anthony L. Ridley_____

Print Name: Anthony Ridley_____

Date: 06/19/2021_____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, | |
| Plaintiffs, | Case No.: 1:22-cv-00050-TRM-SKL |
| v. | |
| ANTHONY RIDLEY, and CHEMTREAT, INC., | |
| Defendants. | |

## PLAINTIFF'S RULE 26(a)(1)(A) INITIAL DISCLOSURES

Plaintiffs Ecolab Inc., and Nalco Company, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water (collectively "Plaintiffs") make the following initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A). By making these disclosures, Plaintiffs do not represent that they are identifying all witnesses, documents, and other evidence they may possibly use to support their claims or defenses. Plaintiffs also do not waive their right to object to the admissibility of all or a portion of the documents identified and/or all or a portion of the testimony of each or any witness. Plaintiffs object to any disclosure to the extent it would require the disclosure of information or materials subject to a claim of protection by the attorney-client privilege, attorney work product, or materials prepared in anticipation of litigation.

**A.      Individuals Likely to Have Discoverable Information That Plaintiffs May Use to Support Its Defenses.**

1. Jackie Herrera (Ms. Herrera may be contacted solely through Plaintiffs' counsel)

Ms. Herrera is likely to have information regarding. Ridley's employment; his job responsibilities and performance at Ecolab; Ridley's improper downloading of Nalco/Ecolab's trade secrets and highly confidential information; the highly confidential nature and trade secret status of the documents that Ridley improperly downloaded; the measures taken by Nalco/Ecolab to protect its trade secrets and highly confidential information; Ridley's resignation from Ecolab; and the damages caused by Mr. Ridley's misconduct.

2. Karry Mackie (Ms. Mackie may be contacted solely through Plaintiffs' counsel)

Ms. Mackie is likely to have information regarding Ridley's employment; his job responsibilities and performance at Nalco; Ridley's improper downloading of Nalco/Ecolab's trade secrets and highly confidential information; the highly confidential nature and trade secret status of the documents that Ridley improperly downloaded; Ridley's resignation from Ecolab; ; the measures taken by Nalco/Ecolab to protect its trade secrets and highly confidential information; Ridley's relationship with Tyler Bates; and the damages caused by Ridley's misconduct.

3. Ben Irwin (Mr. Irwin may be contacted solely through Plaintiffs' counsel)

Mr. Irwin is likely to have information regarding Ridley's job responsibilities at Nalco; his efforts to replace Ridley; his efforts to secure information from Ridley; Ridley's false statements regarding the availability of this information; the damages caused by Ridley's withholding of important information from Mr. Irwin and Ridley's lack of cooperation; the efforts taken by Plaintiffs to protect trade secrets and highly confidential information; Ridley's job performance at Nalco; and the damages incurred by Plaintiffs as a result of Ridley's misconduct and breach of the duty of loyalty.

4. Anthony Ridley, Defendant.

Mr. Ridley is likely to have information regarding all the misconduct and related facts outlined in the Amended Complaint.

5. Tyler Bates, former employee of Plaintiffs now employed by ChemTreat. Mr. Bates will have knowledge of his communications with Ridley and other ChemTreat employees regarding his recruitment to ChemTreat and his job duties and interactions with Ridley and other ChemTreat employees after he began working for ChemTreat.

6. A manager in Plaintiffs' IT department to be designated. This individual will have knowledge of some of the policies and procedures Plaintiffs have implemented to secure its confidential and proprietary information and trade secrets and will have knowledge of the Digital Guardian software program and the spreadsheet that identifies the computer files (confidential and proprietary information and trade secrets) misappropriated by Defendant Ridley that belong to Plaintiffs.

7. All individuals (who are unknown by Plaintiffs at this time) who were involved in the alleged "administrative error" that resulted in the wiping and recirculation of Mr. Ridley's computer at ChemTreat.

8. Any other witnesses or individuals identified by the parties in their respective pleadings, in the course of discovery, and potentially others unknown at this time.

9. Any individuals identified by Defendants in their respective Rule 26(a)(1) Initial Disclosures

10. All individuals necessary for rebuttal and/or impeachment.

**B. Documents, Electronically Stored Information, and Tangible Things That Plaintiffs May Use to Support Their Claims.**

By identifying documents or files herein, Plaintiffs do not waive any objections they may have to producing portions of the identified documents or files on the grounds that portions of the documents

or files are not discoverable because they are subject to the attorney-client privilege or work product doctrine, because they are materials prepared in anticipation of litigation, or because the documents or files are not subject to discovery for other appropriate reasons provided for in the Federal Rules of Civil Procedure. Moreover, Plaintiffs will not produce any confidential and proprietary information and trade secrets that may be relevant unless it is produced subject to an appropriate agreed protective order. Subject to the foregoing, Plaintiffs state that the following documents may be used to support their claims:

1.   Ridley's Employment Agreements with Plaintiffs

2.   Relevant documents from Ridley's Nalco/Ecolab personnel file

3.   Relevant documents from Ridley's ChemTreat personnel file

4.   Ridley's Employment Agreements with ChemTreat

5.   Any separation agreement or document reflecting any severance package received by Ridley related to his termination form ChemTreat.

6.   Emails, instant messages, messages on social media or communications through apps, and voice mail messages between Ridley and any employee of ChemTreat from September 1, 2020, to present.

7.   Emails, instant messages, messages on social media or communications through apps, and voice mail messages between Ridley and any employee of Nalco/Ecolab from the date his employment with Plaintiffs ended to present.

8.   Emails, instant messages, messages on social media or communications through apps, and voice mail messages between Ridley and any customer of Nalco/Ecolab from May 1, 2021, to present.

9. The hard drive of any personal computer used by Ridley from September 2020 to present.

10. Any external hard drive or other data storage device (such as thumb drives) used by Ridley from September 2020 to present.

11. Any emails, text messages, voice mail messages or instant messages sent or received by Ridley during his employment with ChemTreat that referenced or contained information about customers that Ridley knew did business with Nalco/Ecolab.

12. Ridley's cellphone records for the period September 1, 2020, through the end of his employment with ChemTreat for Ridley's personal cellphone(s) or cellphone provided by ChemTreat.

13. Documents that reflect ChemTreat's recruitment of or hiring of Nalco/Ecolab employees with Employment Agreements.

14. Plaintiffs' policies related to the security and protection of confidential and proprietary information and trade secrets.

15. A Digital Guardian Report related to Ridley's Ecolab computer.

16. All additional documents identified and/or produced during the course of discovery.

17. All deposition exhibits.

17. All documents identified and/or produced by Defendants.

**C.    Computation of Any Category of Damages Claimed by Plaintiffs.**

Plaintiffs are claiming damages but are in the process of quantifying their damages. Plaintiffs will supplement their Initial Disclosures once the computation is complete. Plaintiffs will also seek recovery of their attorneys' fees and costs, the amounts of which are unknown at this time.

**D.    Applicable Insurance Agreements**

None.

These Initial Disclosures are made based on information available to Plaintiffs at this juncture and based on its understanding of the matters alleged with particularity in the pleadings. Plaintiffs will supplement these Initial Disclosures with information learned during the course of discovery, as required by Fed. R. Civ. P. 26.

Submitted this 3rd day of June 2022.

ECOLAB INC. NALCO COMPANY, LLC
d/b/a Nalco Water, an Ecolab Company
and/or Nalco Water,
By Counsel

By:     /s/  *J. Gregory Grisham*
        J. Gregory Grisham (TN BPR #013810)
        FISHER & PHILLIPS LLP
        1715 Aaron Brenner Drive, Suite 312
        Memphis, Tennessee 38120
        Telephone: 901.526.0431
        Fax: 901.526.8183
        ggrisham@fisherphillips.com
        *Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the foregoing was sent via email to all counsel of record listed on

the Court's electronic filing system.


/s/ J. Gregory Grisham
 J. Gregory Grisham BPR # 013810

United States District Court
Eastern District of Tennessee
At Chattanooga

| | |
|---|---|
| Ecolab, Inc. and Nalco Company, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water<br><br>Plaintiffs<br><br>v.<br><br>Anthony Ridley and ChemTreat<br><br>Defendants | No. 1:22-CV-00050<br><br>TRM-SKL |

**Anthony Ridley's Answers and Objections to Plaintiffs' First Interrogatories**

Comes the Defendant, Anthony Ridley ("Ridley"), by and through counsel, and hereby answers the Interrogatories that have been submitted to him by Ecolab, Inc. and Nalco Company d/b/a/ Nalco Water.

**GENERAL OBJECTIONS AND RESERVATION OF RIGHTS**

**IN RESPONSE TO INTERROGATORIES**

Ridley asserts the following General Objections to Plaintiffs' Interrogatories:

1. Ridley objects to Plaintiffs' Interrogatories to the extent that they purport to impose upon Ridley any burden to respond beyond the scope of response required by the Federal Rules of Civil Procedure.

2. Ridley objects to Plaintiffs' Interrogatories to the extent that they request information that is protected from disclosure by the attorney-client and/or work product privileges or protected by any other applicable privilege or protection. In addition, to the extent that the information requested was prepared in anticipation of litigation or in preparation for trial by or for

- ChemTreat Laptop – received by Ridley on or after July 9, 2021 and retuned to ChemTreat in February 2022. Used by Ridley to access his WD My Book external hard drive and delete any EcoLab documents from the 2015/2016 file backup. Ridley has no access to any EcoLab files deleted with this device or the device.

- WD My Book external hard drive – currently in the possession of Ridley's counsel. Ridley has no access to any files on this device or the device.

- iPhone 8 used during Ridley's employment with EcoLab – sold shortly after Ridley left EcoLab in July 2021. Ridley has no access to any files that were on this device or the device.

*Interrogatory No. 4 is comprised of 3 interrogatories, for a total of 7 interrogatories.*

5.     Identify all Documents and Communications comprising, containing, or concerning Ecolab trade secrets, Confidential Information, or proprietary information that You shared, showed to, or sent to a ChemTreat employee, or otherwise allowed a ChemTreat employee to access, copy, download, upload, or use in any possible way.

RESPONSE:

Objection: Ridley objects to the terms "trade secrets, Confidential Information, or proprietary information" as vague and ambiguous. Plaintiffs do not define the term "trade secrets" or "proprietary information" in their first set of interrogatories. Accordingly, Plaintiffs have not defined with particularity what information they are seeking. Subject to and without waiving this objection or any other general objection Ridley states: None.

*Interrogatory No. 5 is comprised of 1 interrogatory, for a total of 8 interrogatories.*

7

<u>Objection:</u> This interrogatory is compound as it requests three separate and distinct categories of information. In accordance with Rule 33, Ridley will treat the interrogatory as three (3) distinct interrogatories. This interrogatory exceeds the number of interrogatories allowed by Fed. R. Civ. P. 33(a)(1). Subject to and without waiving this objection or any other general objection Ridley states: None.

*Interrogatory No. 18 is comprised of 3 interrogatories, for a total of 28 interrogatories.*

Respectfully Submitted:

**Patrick, Beard, Schulman & Jacoway, P.C.**

By: */s/ Lance W. Pope*
    Lance W. Pope, BPR No. 025054
    537 Market Street, Suite 300
    Chattanooga, TN 37402
    (423) 756-7117 – phone
    (423) 267-5032 – fax
    lpope@pbsjlaw.com

18

## VERIFICATION

*Anthony Ridley* (signature)

**Anthony Ridley**

STATE OF _Tennessee_ :
COUNTY OF _Hamilton_ :

Before me personally appeared Anthony Ridley, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged having read Anthony Ridley's Answers and Objections to Plaintiffs' First Set of Interrogatories, states that the facts and responses set forth therein are true and accurate to the best of his knowledge and belief.

WITNESS MY HAND this _20th_ day of _July_ , 2022.

_Jean A. Neveling_ (signature)
NOTARY PUBLIC

MY COMMISSION EXPIRES: _03/24/24_

(Notary seal: JEAN A. NEVELING — STATE OF TENNESSEE — NOTARY PUBLIC — HAMILTON COUNTY)

19

## Certificate of Service

The undersigned hereby certifies that a true and exact copy of this document has been served by email pursuant to the agreement of the parties to the following individuals:

J. Gregory Grisham, Esquire
FISHER & PHILLIPS LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, TN 38120
ggrisham@fisherphillips.com

Pavneet Singh Uppal, Esquire
FISCHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, AZ 85012-2487
puppal@fisherphillips.com

David J. Walton, Esquire
FISHER & PHILLIPS LLP
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
dwalton@fisherphillps.com

Brandon J. Crainer, Esquire
FISHER & PHILLIPS LLP
227 West Trade Street, Suite 2020
Charlotte, NC 28202
bcrainer@fisherphillips.com

Vidya Atre Mirmira, Esquire
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW,
Washington, DC 20024
vmirmira@wc.com

Michael R. O'Neill, Esquire
W. Scott Sims, Esquire
SIMS FUNK, PLC
3322 West End Ave. #200
Nashville, TN 37203
moneill@simsfunk.com
ssims@simsfunk.com

This 20 day of July 2022.

By: /s/ Lance W. Pope

20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

ECOLAB Inc., and NALCO COMPANY, LLC
d/b/a Nalco Water, an Ecolab Company and/or
Nalco Water,

             Plaintiffs,

v.

ANTHONY RIDLEY, and CHEMTREAT,
INC.,

             Defendants.

Case No. 1:22-cv-00050-TRM-SKL

Hon. Travis McDonough

**CHEMTREAT, INC.'S RESPONSES & OBJECTIONS
TO PLAINTIFFS' INTERROGATORIES**

Pursuant to Federal Rule of Civil Procedure 33, Defendant ChemTreat, Inc.
("ChemTreat"), by and through its undersigned counsel, hereby responds and objects to Plaintiffs
Ecolab Inc. and Nalco Company, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water
("Ecolab") First Set of Interrogatories to ChemTreat (the "Interrogatories"). ChemTreat's
responses and objections are made subject to the reservation of rights and general objections
below.

**RESERVATION OF RIGHTS**

1.     Any statement contained in these objections and responses that non-privileged
information or documents will be produced in response to a specific Interrogatory does not mean
that any such information or documents actually exist, but only that they will be produced to the
extent that they exist and can be obtained without undue burden.

2.     These responses are made without in any way waiving or intending to waive: (a)
any objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence,
for any purpose, of information produced in response to the Interrogatories; (b) the right to object

Exhibit 73

limitation and is not limited to Ecolab Confidential Information that Ridley allegedly took from Ecolab; instead, it asks whether anyone at ChemTreat (a company comprised of more than 1,000 employees) has *ever* had "access" to "Ecolab Confidential Information" (even if accessed legitimately) and asks ChemTreat to identify *every* piece of "Ecolab Confidential Information" to which any such person has *ever* had "access." Obviously, ChemTreat cannot reasonably investigate and respond to such an expansive interrogatory. ChemTreat will interpret this Interrogatory to ask whether any ChemTreat personnel, other than Ridley, had (or currently have) access to any Ecolab Confidential Information that Ridley allegedly took from Ecolab. ChemTreat further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or other applicable privileges. ChemTreat further objects to this Interrogatory because it is compound and improperly seeks to evade the 25-interrogatory limit set forth in Federal Rule of Evidence 33(a)(1) by combining multiple Interrogatories into one. *See also* Tenn. L.R. 33.1. Specifically, this Interrogatory contains two discrete subparts that constitute distinct Interrogatories: (1) a request that ChemTreat "state" whether it "ha[s] had (or currently ha[s]) access to any Ecolab Confidential Information"; and (2) a request that ChemTreat "identify" certain documents "comprising, containing, or concerning" any Ecolab Confidential Information to which ChemTreat has had access "at any time."

Subject to and without waiving the foregoing objections, ChemTreat states that it has not had and does not currently have access to any Ecolab Confidential Information. Further, ChemTreat did not know of, nor have any basis to believe, that Ridley had any Ecolab Confidential Information at the time that ChemTreat hired Ridley, nor at any time before ChemTreat received Ecolab's February 9, 2022 letter identifying their suspicions. To the contrary, ChemTreat required Ridley, as a mandatory requirement prior to his employment with ChemTreat, to certify that he had not retained any confidential information from any former employer; would not disclose any

confidential information from any former employer to ChemTreat; and would not reveal any confidential information from any former employer in performing his duties at ChemTreat.

Upon receiving Ecolab's February 9, 2022 letter, ChemTreat promptly undertook a reasonable, proportional, and detailed investigation to determine whether Ridley had placed any Ecolab Confidential Information on any ChemTreat System.[1]  ChemTreat retained Jim Vaughn, an independent forensic expert, to assist with its investigation.  That reasonable and proportional investigation included a review of (1) Ridley's ChemTreat email account; (2) the OneDrive folders accessible to Ridley; (3) both of Ridley's ChemTreat-issued laptops; (4) a Lexar USB Flash Drive issued to Ridley by ChemTreat; (5) the shared network folders accessible to Ridley; and (6) for Ridley's first ChemTreat-issued laptop, reports created by an antivirus software program called CrowdStrike, which identifies the names of files opened from any external device.  Based on that reasonable and proportional investigation, ChemTreat did not identify any Ecolab Confidential Information placed by Ridley on any ChemTreat System.  Because Ridley never placed any Ecolab Confidential Information on any ChemTreat System, ChemTreat did not have access to, and could not have accessed, any Ecolab Confidential Information allegedly misappropriated by Ridley, whether during the period of Ridley's employment (from July 12, 2021, to March 18, 2022) or since the termination of his employment.

As part of its investigation, ChemTreat also determined whether Ridley distributed any Ecolab Confidential Information to other ChemTreat employees.  After conducting its investigation, ChemTreat found no evidence that Ridley distributed any Ecolab Confidential Information to other ChemTreat employees.  In this respect, ChemTreat conducted certain searches across the email accounts and OneDrive folders accessible to custodians who had even limited

---

[1] "ChemTreat System" collectively refers to the ChemTreat OneDrive folders that Ridley was authorized to access, the ChemTreat shared network folders that Ridley was authorized to access, and Ridley's ChemTreat email account.

contact with Ridley during his employment by ChemTreat. ChemTreat's searches were targeted at determining whether Ridley placed any Ecolab Confidential Information onto any ChemTreat System or shared any Ecolab Confidential Information with any ChemTreat employee through any ChemTreat System.

As explained in ChemTreat's March 21, 2022 letter to David J. Walton, Doc. 52-1 at 2, ChemTreat's investigation identified only a single, non-confidential document (a September 2015 unsigned response to a request for quotation) that Ridley transferred from his personal email account to his ChemTreat email account. Ridley did not place that single, non-confidential document on any ChemTreat System other than his ChemTreat email account, nor did Ridley share that single, non-confidential document with any of the ChemTreat employees whose data sources were searched or share that single, non-confidential document using any ChemTreat System accessible to him. As ChemTreat informed Ecolab in its March 21, 2022 letter, that single, non-confidential document has been sequestered pending instructions from Ecolab; Ecolab has not provided any such instructions. ChemTreat has also voluntarily provided a copy of that single, non-confidential document to Ecolab.

**INTERROGATORY NO. 3:**

State whether You have had (or currently have) access to any Ecolab proprietary information or non-public business information. If so, please identify all Documents and Communications comprising, containing, or concerning Ecolab proprietary information or non-public business information that You had access to at any time.

**Objections and Responses to Interrogatory No. 3:**

ChemTreat objects to this Interrogatory because it is entirely duplicative of Interrogatory No. 2. Therefore, ChemTreat incorporates each of its objections to Interrogatory No. 2. ChemTreat further objects to this Interrogatory because the terms "proprietary information" and

applicable privileges. ChemTreat further objects to this Interrogatory because it is compound and improperly seeks to evade the 25-interrogatory limit set forth in Federal Rule of Evidence 33(a)(1) by combining multiple Interrogatories into one. *See also* Tenn. L.R. 33.1. Specifically, this Interrogatories contains two discrete subparts that constitute distinct Interrogatories: (1) a request that ChemTreat "[i]dentify and describe fully the process for securing Mr. Ridley's ChemTreat computer" and "identify all individuals who were involved in this process"; and (2) a request that ChemTreat "identify all steps taken by [ChemTreat] to recover the information that was ONCE on this computer."

Subject to and without waiving the objections set forth above, ChemTreat states that Ridley was instructed on or around March 2, 2022, to return his ChemTreat-issued laptop to ChemTreat's corporate headquarters in Glen Allen, Virginia, so that it could be imaged and preserved for this Lawsuit. Ridley was instructed to address the package to the attention of ChemTreat's in-house counsel and he complied with that instruction. Upon receipt at the front desk of ChemTreat's corporate headquarters on or around March 3, 2022, the front desk receptionist (Lynne James)— whose job duties include distributing packages delivered to the front desk—mistakenly routed the package she received from Ridley to ChemTreat's IT department rather than to ChemTreat's in-house counsel to whom it was addressed. ChemTreat's front desk regularly receives laptops returned by employees for various reasons (including departing employees or employees whose laptops need replacement), and these returned laptops are typically routed to ChemTreat's IT department. The laptops are packaged in a specific type of package that Ms. James is familiar with and recognizes, and she recognized the package she received from Ridley as a laptop because it was in the type of packaging used by ChemTreat employees to ship laptops. She mistakenly assumed that although the package was addressed to ChemTreat's in-house counsel, it was, in fact, intended for ChemTreat's IT department, which is why she routed it there.

When ChemTreat's IT department receives laptops returned by employees, it follows routine protocols for laptops routed to that department. Those protocols involve sterilizing the laptop pursuant to COVID-19 protocols and then cleaning the data from the laptop so that the laptop can be reissued to a new user at ChemTreat. The routine protocols used by ChemTreat's IT department do not impact any of the system-level data on ChemTreat's cloud-based systems or email servers. Instead, all email data and OneDrive data remains preserved even after the cleaning process is completed.

Pete Mumpower, the ChemTreat IT employee who processed Ridley's laptop, followed these routine protocols for all laptops he received for processing the day that he processed Ridley's laptop; this set included Ridley's laptop. Once this process was complete, Mr. Mumpower distributed the laptop to a new user in accordance with the routine protocol.

Once alerted to Ms. James' error in misrouting Ridley's laptop, ChemTreat took action to recover any available data or information from Ridley's ChemTreat-issued laptop by identifying its current location, recalling it from its current user, placing all files used by that user onto a USB drive, and mailing the laptop and USB drive to an external forensic consultant. The external forensic consultant determined that any usable data from the physical laptop had been lost during the cleaning process and was not recoverable. However, the external forensic consultant determined that information regarding documents accessed from an external USB device by the laptop while it was in Ridley's possession was available in CrowdStrike logs maintained by ChemTreat.

**INTERROGATORY NO. 6:**

Identify and describe fully all efforts made by You to investigate whether Ridley used or had access to any Ecolab information during his tenure at ChemTreat. In Your response, please

Subject to and without waiving the objections set forth above, ChemTreat states that it does not possess any statements regarding this Lawsuit.

As to objections only,

*/s/ Vidya Atre Mirmira*

Vidya Atre Mirmira (admitted *pro hac vice*)
Juli Ann Lund (admitted *pro hac vice*)
Troy C. Homesley (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-mail: vmirmira@wc.com
E-mail:  jlund@wc.com
E-mail:  thomesley@wc.com

W. Scott Sims
Michael R. O'Neill
SIMS FUNK PLC
3322 West End Ave. #200
Nashville, TN 37203
Telephone: (615) 425-7432
Facsimile: (615) 649-8565
E-mail:  ssims@simfunk.com
E-mail: moneill@simsfunk.com

*Attorneys for Defendant ChemTreat, Inc.*

## <u>VERIFICATION</u>

I declare under penalty of perjury that I have examined the responses to Interrogatories 1 through 16 and, where a response is given, the responses are true to the best of my information, knowledge, and belief based on information and records available to me.

Executed on July 22, 2022

By:

*Helen M. Hamilton*

Helen M. Hamilton
Vice President, Human Resources
ChemTreat, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and exact copy of the foregoing was served via email on

July 22, 2022, upon the following:

J. Gregory Grisham, BPR No. 013810
FISHER & PHILLIPS LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, Tennessee 38120
ggrisham@fisherphillips.com

Pavneet Singh Uppal
(*pro hac vice* to be filed)
FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
puppal@fisherphillips.com

David J. Walton
(*pro hac vice*)
FISHER & PHILLIPS LLP
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
dwalton@fisherphillips.com

*Attorneys for Plaintiff*

Lance W. Pope, BPR No. 025054
Jeremy M. Cothern, BPR No. 027166
Patrick, Beard, Schulman & Jacoway, P.C.
537 Market Street, Suite 300
Chattanooga, TN 37402
(423) 756-7117 – phone
(423) 267-5032 – fax
lpope@pbsjlaw.com

*Attorneys for Anthony Ridley*

/s/ Troy C. Homesley

United States District Court
Eastern District of Tennessee
At Chattanooga

---

Ecolab, Inc. and Nalco Company, LLC
d/b/a Nalco Water, an Ecolab
Company and/or Nalco Water

        Plaintiffs

        v.

Anthony Ridley and ChemTreat

        Defendants

No. 1:22-CV-00050

TRM-SKL

---

## Anthony Ridley's Answers and Objections to Plaintiffs' First Requests for Admission

---

Comes the Defendant, Anthony Ridley ("Ridley"), by and through counsel, and hereby answers the First Requests for Admission that have been submitted to it by Ecolab, Inc. and Nalco Company d/b/a/ Nalco Water.

## <u>GENERAL OBJECTIONS</u>

1.      By responding to these Requests for Admission, Defendant does not waive his right to object to the use of the discovery responses at any time or on any ground in this or any other proceeding. In addition, discovery in this action is still proceeding and, therefore, Plaintiff reserves the right to amend any response in light of later discovered facts in support of its position at trial.

2.      Defendant objects to these Requests for Admission to the extent they seek information that is neither relevant to the subject matter of the pending action nor appear reasonably calculated to lead to the discovery of admissible evidence.

94.     On June 1, 2021, You downloaded and copied more than 9,700 files and folders from Your Ecolab OneDrive account the LaCie Drive

RESPONSE: **Objection – After reasonable inquiry, the information that Ridley knows or can readily obtain is insufficient to enable him to admit or deny this request. Subject to and without waiving this objection, ADMITTED that Ridley moved EcoLab files from EcoLab's OneDrive to EcoLab's LaCie hard drive which he returned to EcoLab following his resignation, but he does not know the date that he moved the files or the number of files moved to the EcoLab LaCie hard drive.**

95.     On June 8, 2021, You uploaded a file named "2021 bar-s sanitation chemicals example rfp purchase agreement - october 2020.docx" from Your Ecolab computer to Your Microsoft account.

RESPONSE: **Objection – After reasonable inquiry, the information that Ridley knows or can readily obtain is insufficient to enable him to admit or deny this request.**

96.     On June 18, 2021, You uploaded a file named "tyson monthly tracking report 06-2021.xlsx" from Your Ecolab computer to Your Microsoft account.

RESPONSE: **Objection – After reasonable inquiry, the information that Ridley knows or can readily obtain is insufficient to enable him to admit or deny this request.**

97.     You did not inform Ecolab that you would be returning the LaCie Drive to Ecolab before You allegedly returned the LaCie Drive to Ecolab.

RESPONSE: **DENIED.**

98.     You deleted Documents from Your Ecolab OneDrive account in May 2021.

RESPONSE: **Objection – After reasonable inquiry, the information that Ridley knows or can readily obtain is insufficient to enable him to admit or deny this request. Subject to and**

without waiving this objection, **ADMITTED that Ridley deleted Documents from EcoLab's OneDrive that he saved to EcoLab's LaCie hard drive which he returned to EcoLab after his resignation. Ridley has no way to ascertain the dates he deleted from OneDrive the EcoLab Documents he saved to EcoLab's LaCie hard drive.**

99.     You did not communicate to Ecolab that You were going to delete Documents from Your Ecolab OneDrive account before you did so in May 2021.

RESPONSE: **ADMITTED – By way of further response and clarification, Ridley was not aware that he needed permission to delete from OneDrive EcoLab Documents which he saved to EcoLab's LaCie hard drive.**

100.     You deleted Documents from Your Ecolab OneDrive account in June 2021.

RESPONSE: **Objection – After reasonable inquiry, the information that Ridley knows or can readily obtain is insufficient to enable him to admit or deny this request. Subject to and without waiving this objection, ADMITTED that Ridley deleted Documents from EcoLab's OneDrive that he saved to EcoLab's LaCie hard drive which he returned to EcoLab after his resignation. Ridley has no way to ascertain the dates he deleted from OneDrive the EcoLab Documents he saved to EcoLab's LaCie hard drive.**

101.     You did not communicate to Ecolab that You were going to delete Documents from Your Ecolab OneDrive account before you did so in June 2021.

RESPONSE: **ADMITTED – By way of further response and clarification, Ridley was not aware that he needed permission to delete from OneDrive EcoLab Documents which he saved to EcoLab's LaCie hard drive.**

102.     While employed by ChemTreat, part of Your job involved attempting to secure business from Ecolab clients.

RESPONSE: **ADMITTED**

**Patrick, Beard, Schulman & Jacoway, P.C.**

By: /s/ ***Lance W. Pope***
 Lance W. Pope, TN BPR No. 025054
 Jeremy C. Cothern, TN BPR No. 027166
 537 Market Street, Suite 300
 Chattanooga, TN 37402
 (423) 756-7117 – phone
 (423) 267-5032 – fax
 lpope@pbsjlaw.com
 jcothern@pbsjlaw.com

 *Attorneys for Anthony Ridley*

## Certificate of Service

The undersigned hereby certifies that a true and exact copy of this document has been served by email pursuant to the agreement of the parties to the following individuals:

J. Gregory Grisham, Esquire
FISHER & PHILLIPS LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, TN 38120
ggrisham@fisherphillips.com

Pavneet Singh Uppal, Esquire
FISCHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, AZ 85012-2487
puppal@fisherphillips.com

David J. Walton, Esquire
FISHER & PHILLIPS LLP
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
dwalton@fisherphillps.com

Brandon J. Crainer, Esquire
FISHER & PHILLIPS LLP
227 West Trade Street, Suite 2020
Charlotte, NC 28202
bcrainer@fisherphillips.com

Vidya Atre Mirmira, Esquire
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW,
Washington, DC 20024
vmirmira@wc.com

Michael R. O'Neill, Esquire
W. Scott Sims, Esquire
SIMS FUNK, PLC
3322 West End Ave. #200
Nashville, TN 37203
moneill@simsfunk.com
ssims@simsfunk.com

This 10th day of August 2022.

By: */s/ Lance W. Pope* _____

United States District Court
Eastern District of Tennessee
At Chattanooga

| | |
|---|---|
| Ecolab, Inc. and Nalco Company, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,<br><br>        Plaintiffs,<br><br>        v.<br><br>Anthony Ridley and ChemTreat, Inc.,<br><br>        Defendants. | No. 1:22-CV-00050<br><br>TRM-SKL |

**Anthony Ridley's Answers and Objections to ChemTreat's
First Requests for Admission**

Comes the Defendant, Anthony Ridley ("Ridley"), by and through counsel, and hereby answers the First Requests for Admission that have been submitted to him by ChemTreat.

## **GENERAL OBJECTIONS**

1.     By responding to these Requests for Admission, Defendant does not waive his right to object to the use of the discovery responses at any time or on any ground in this or any other proceeding. In addition, discovery in this action is still proceeding and, therefore, Defendant reserves the right to amend any response in light of later discovered facts in support of its position at trial.

2.     Defendant objects to these Requests for Admission to the extent they seek information that is neither relevant to the subject matter of the pending action nor appear reasonably calculated to lead to the discovery of admissible evidence.

3.      By responding to these Requests for Admission, Defendant does not in any way adopt ChemTreat's purported definitions of words and phrases contained in ChemTreat's Requests. Defendant objects to those definitions to the extent they are inconsistent with either (a) the definitions set forth by Defendant in his answers, or (b) the ordinary and customary meaning of such words and phrases. Similarly, Defendant objects to ChemTreat's purported definitions to the extent they attempt to impose upon Defendant any obligations broader than, or inconsistent with, applicable discovery rules or common law.

4.      Defendant objects to these Requests for Admission to the extent they seek information protected by the attorney-client privilege, the work product doctrine or any other applicable privilege. Any inadvertent disclosure of material protected by any such applicable privilege or discovery immunity is not intended to, and should not be construed to, constitute a waiver of such privilege or immunity.

5.      Defendant objects to these Requests for Admission insofar as they seek discovery of any material that constitutes the mental impressions, conclusions, opinions or legal theories of Defendant's counsel.

6.      Defendant objects to these Requests for Admission insofar as they seek discovery of opinions of law which are beyond the scope of permissible discovery.

7.      Defendant does not hereby admit, adopt or acquiesce in any factual or legal contention, presumption, assertion or characterization contained in these Requests for Admission.

8.      Defendant objects to these Requests for Admission to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules of this Court.

9.     Defendant objects to these Requests for Admission to the extent they are unreasonably cumulative or duplicative, vague, ambiguous, overly broad, unduly burdensome, or do not specify the information sought with sufficient particularity.

10.     Defendant objects to these Requests for Admission to the extent they seek information that is publicly available, or that may be obtained from another source that is more convenient, less burdensome, or less expensive, or that is solely in the possession, custody, or control of third-parties.

11.     Defendant submits these answers without conceding the relevancy or materiality of the subject matter of any Request for Admission, and without prejudice to Defendant's right to object to further discovery or to object to the admissibility of any answer at the time of hearing or trial.

12.     Defendant reserves the right to amend or supplement these answers and objections.

13.     These general objections are incorporated by reference into each specific answer made by Defendant to Plaintiffs' Requests for Admission. Without waiver of its general objections. Defendant responds, as follows:

## REQUEST FOR ADMISSIONS

REQUEST FOR ADMISSION NO. 1: Admit that You have not shared Ecolab Confidential Information with a ChemTreat employee.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 2: Admit that You signed the Certification of Compliance of Obligation to Prior Employers, attached as Exhibit 1 to ChemTreat's motion to dismiss, Doc. 52-1 (the "Certification").

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 3: Admit that, during ChemTreat's interviews of You prior to You being employed by ChemTreat, no ChemTreat employee requested, induced, encouraged, or suggested that You bring Ecolab Confidential Information with You to ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 4: Admit that ChemTreat did not, at any time, request, induce, encourage, or suggest that You bring Ecolab Confidential Information with You to ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 5: Admit that You have not distributed Ecolab Confidential Information to a ChemTreat employee.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 6: Admit that You have not shared Ecolab Confidential Information with a ChemTreat employee.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 7: Admit that You have not saved documents containing Ecolab Confidential Information on OneDrive folders made accessible to You by ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 8: Admit that You have not emailed documents containing Ecolab Confidential Information to a ChemTreat employee.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 9: Admit that You have not saved documents containing Ecolab Confidential Information to ChemTreat's shared servers made accessible to You by ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 10: Admit that You returned the laptop issued to You by Ecolab to Insight on July 7, 2021.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 11: Admit that You returned the "LaCie Drive" referenced in the Second Amended Complaint to Insight on July 7, 2021.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 12: Admit that You sent three USB drives to Tyger Forensics after your departure from Ecolab.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 13: Admit that You did not manage Tyler Bates while You worked at Ecolab.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 14: Admit that You did not supervise Tyler Bates while You worked at Ecolab.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 15: Admit that You did not interact with Tyler Bates for Ecolab business after he was hired by Ecolab and before You departed Ecolab to work for ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 16: Admit that ChemTreat did not authorize You to solicit Tyler Bates for employment by ChemTreat before You departed Ecolab to work for ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 17: Admit that You did not solicit Tyler Bates for employment by ChemTreat before You departed Ecolab to work for ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 18: Admit that You did not interview Tyler Bates for employment at ChemTreat while You worked for ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 19: Admit that You did not have the authority to hire Tyler Bates to work for ChemTreat.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 20: Admit that, during Your employment at ChemTreat, You did not solicit any Ecolab Customers whose accounts You were assigned to, supervised, or did business with during the last twelve months of Your employment with Ecolab.

**Response**: Subject to and without waiving the general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 21: Admit that, during Your employment at ChemTreat, You did not induce any Ecolab Customers whose accounts You were assigned to, supervised, or did business with during the last twelve months of Your employment with Ecolab.

**Response**: Ridley objects to this Request as the term "induce" is vague, undefined, and not tethered to any other action of inducement.  Subject to and without waiving this objection or any general objections stated above, admitted.

REQUEST FOR ADMISSION NO. 22: Admit that, during Your employment at ChemTreat, You did not encourage any Ecolab Customers to enter into a contract with ChemTreat whose accounts

You were assigned to, supervised, or did business with during the last twelve months of Your employment with Ecolab.

**Response**: Subject to and without waiving the general objections stated above, admitted.


REQUEST FOR ADMISSION NO. 23: Admit that, during Your employment at ChemTreat, You did not transact business with any Ecolab Customers whose accounts You were assigned to, supervised, or did business with during the last twelve months of Your employment with Ecolab.

**Response**: Subject to and without waiving the general objections stated above, admitted.


Respectfully Submitted:

**Patrick, Beard, Schulman & Jacoway, P.C.**

By: /s/ Lance W. Pope_____
       Lance W. Pope, BPR No. 025054
       Jeremy M. Cothern, BPR No. 027166
       537 Market Street, Suite 300
       Chattanooga, TN  37402
       (423) 756-7117 – phone
       (423) 267-5032 – fax
       lpope@pbsjlaw.com
       jcothern@pbsjlaw.com

       *Attorneys for Anthony Ridley*

## Certificate of Service

The undersigned hereby certifies that a true and exact copy of this document has been served by email pursuant to the agreement of the parties to the following individuals:

J. Gregory Grisham, Esquire
FISHER & PHILLIPS LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, TN 38120
ggrisham@fisherphillips.com

Pavneet Singh Uppal, Esquire
FISCHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, AZ 85012-2487
puppal@fisherphillips.com

David J. Walton, Esquire
FISHER & PHILLIPS LLP
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
dwalton@fisherphillps.com

Brandon J. Crainer, Esquire
FISHER & PHILLIPS LLP
227 West Trade Street, Suite 2020
Charlotte, NC 28202
bcrainer@fisherphillips.com

Vidya Atre Mirmira, Esquire
Troy C. Homesly, Esquire
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW,
Washington, DC 20024
vmirmira@wc.com

Michael R. O'Neill, Esquire
W. Scott Sims, Esquire
SIMS FUNK, PLC
3322 West End Ave. #200
Nashville, TN 37203
moneill@simsfunk.com
ssims@simsfunk.com

This 12 day of September 2022.

By: /s/ Lance W. Pope _____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, | |
| Plaintiffs, | No. 1:22-cv-00050-TRM-SKL |
| v. | Hon. Travis McDonough |
| ANTHONY RIDLEY, and CHEMTREAT, INC., | Magistrate Judge Susan K. Lee |
| Defendants. | |

**PLAINTIFFS' AMENDED RESPONSES TO CERTAIN OF**
**CHEMTREAT, INC.'S FIRST SET OF INTERROGATORIES**

Plaintiffs, Ecolab Inc. and Nalco Company, LLC ("Plaintiffs"), by and through their undersigned counsel, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Eastern District of Tennessee, and the Court's January 11, 2023 Order (D.E. 111) and February 24, 2023 Order (D.E. 158), hereby amends its objection and responses to Defendant ChemTreat, Inc.'s ("ChemTreat") First Set of Interrogatories ("Interrogatories") as follows:

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:** Identify each document containing Ecolab trade secrets or confidential information allegedly misappropriated by Ridley. For purposes of this Interrogatory, Identify means to state the date of the document; the title of the document; the subject of the document; the custodian of the document; the author(s), sender(s), and recipient(s) of the document; the location of the document on Ecolab's electronic systems; the basis for Ecolab's claim that the document is a trade secret or that it contains Ecolab's confidential information; and whether You contend the document was accessed or used by ChemTreat.

**AMENDED RESPONSE:**

Pursuant to the Court's February 24, 2023 Order (D.E. 158), Plaintiffs identify the following categories of trade secrets, as well as exemplars falling under those categories:

- **Customer Files & Documents** – Ridley copied and retained numerous (and extensive) customer files and countless client documents which, as a compilation of documents with respect to each customer, constitute a trade secret under the DTSA and TUTSA. Some of the individual documents could constitute a trade secret on their own, but the basis for the trade secret with respect to the category lies in the compilation of documents for each customer. The trade secret is the customer folder containing a collection of individual files and documents relating to that customer. While some individual files within each category may have been shared with a customer, at no point was the entire folder of documents shared with that customer (or any other third party). The compiled client files are trade secrets and confidential information, under the DTSA and TUTSA, since Plaintiffs derive independent economic value from the information in the documents and the information is not being generally known nor readily ascertainable by proper means by other persons who would be able to obtain economic values from its disclosure or use, and Plaintiffs take reasonable measures under the circumstances to maintain its secrecy. The Customer Files and Documents (typically information compiled over a long period of time) are valuable to Plaintiffs because they provide Plaintiffs with information about each customer relative to their needs, preferences, service history, pricing history, their confidential information, information about key customer contacts, etc. which gives them a competitive advantage. For each of the ten exemplars identified below is a complete customer file that contains extensive information about each customer. This information is not publicly available and nor readily ascertainable by a competitor, but it is valuable to a competitor who could use the information to gain access to the customer and undercut Plaintiffs. Plaintiffs utilize agreements with employees as well as written policies and procedures to maintain secrecy of trade secret information as well as computer passwords and protective software to limit access to employees with a need to know. The aforementioned applies to each of the following exemplars, all of which can be found in the Digital Guardian report with a Source Directory beginning with:
    - c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\arnold's air force base
    - c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\conagra - newport, tn
    - c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\chattanooga coca-cola
    - c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\bunge - decatur al
    - c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\george a. dickel & co
    - c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\duracell - cleveland tn
    - c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco

       folder\documents\customers files - nalco water\the chattanoogan
- ○ c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\volkswagon
- ○ c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\wna, inc. chattanooga facility
- ○ c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\tyson accounts

As ChemTreat can see from the Digital Guardian Report, it appears that Mr. Ridley organized files on his OneDrive using subfolders that are associated with customer names. To find these files on the Digital Guardian report, ChemTreat needs only to search by client name. These customer files, at minimum, qualify as trade secrets as a compilation. These files contain everything a competitor would want to know about a Ecolab clients from, *inter alia,* pricing, purchase history, volumes, service history, bids, quotes, customer concerns; customer needs; chemical analysis; etc. These Customer Files and Documents clearly qualify for trade secret protection.

The document attached as Exhibit 5 to ChemTreat's Motion to Dismiss (D.E. 68-1) falls under the category of Customer Files and Documents. While not a trade secret individually it is part of a customer file, the compilation of which constitutes a trade secret under the DTSA and TUTSA.

Within the trade secret category of Customer Files and Documents, Plaintiffs identify the following 10 exemplar documents which, on their own, constitute trade secrets:
- ○ 7326 mn wl121 volkswagen - signed.pdf
  - ▪ This .pdf document qualifies as a trade secret under the DTSA and the TUTSA. It is a copy of notes regarding negotiations between Plaintiffs and a client regarding services to be provided by Plaintiffs. Ridley was a participant in these confidential negotiations. These notes includes details about the services to be provided, pricing, and estimated usage, none of which is publicly known or available, but all of which would be useful to a competitor seeking to secure the business of that client. Plaintiffs and the client agreed to keep the terms confidential. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.
- ○ volkswagen quote for 3dt260.33 06.10.2015.docx
  - ▪ This Word document qualifies as a trade secret under the DTSA and the TUTSA. It is a quote to a client for specific products to be provided by Plaintiffs. The quote was based on Plaintiffs' knowledge about the clients and its needs. The quote identifies the product, usage amount, and pricing, none of which is publicly known, publicly-available, or ascertainable by publicly-available sources , but all of which would be useful to a competitor seeking to secure the business of that client. Plaintiffs and the client agreed to keep information exchanges confidential. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this

outlines Plaintiffs' best practices with respect to using and maintaining closed loop cooling systems. This information is not generally known or ascertainable through publicly-available sources. A competitor could use this document to simulate Plaintiffs' own practices. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.

- o copy of nalco pilgrims best practice implementation 4.24.18 for quint mccreary.xlsx
  - ▪ This Excel spreadsheet qualifies as a trade secret under both the DTSA and the TUTSA. It contains information regarding Plaintiffs implementation of best practices at approximately fifty facilities for a particular customer, identifies certain failures in best practices, and outlines associated costs. This collected information is only known within the company.  It's not publicly-available or ascertainable via publicly-available sources. This information would be valuable to a competitor trying to steal the business of this client. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.
- o closed loop best practices.ppt
  - ▪ This PowerPoint presentation qualifies as a trade secret under both the DTSA and the TUTSA. It contains detailed technical information and outlines Plaintiffs' best practices with respect to closed loops, and in particular hot water loops and hot water boilers. This information is not generally known or ascertainable via publicly-available sources. A competitor could use this it to try to simulate Plaintiffs' own practices. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.
- o Volkswagen Group of America - CMV Plan 2012.xlsm
  - ▪ This Excel spreadsheet qualifies as a trade secret under both the DTSA and the TUTSA. It summarizes services to be provided by Plaintiffs, identifies the improvement projects that Plaintiffs have or will perform, and calculates a value for those projects. This information is not generally known or ascertainable via publicly-available sources. A competitor could use this it to try to simulate Plaintiffs' own practices. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems

agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.

- the sales leaders playbook-2019.pdf
  - This .pdf documents qualifies as a trade secret under both the DTSA and the TUTSA. It provides Plaintiffs' District Managers with guidance on how to establish and obtain specific growth targets for the coming year, and it would assist competitors with doing the same. This information is not publicly known or otherwise ascertainable through publicly-available sources. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.

- **Training documents**
  - spd mtr training.pptx
    - This PowerPoint presentation qualifies as a trade secret under both the DTSA and the TUTSA. It outlines key metrics on which to evaluate employees. This information was developed internally and is not generally known or ascertainable through publicly-available sources. A competitor could use this information both in recruiting Plaintiffs' employees and establishing its own comparable programs. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.
  - tt training presentation.pptx
    - This PowerPoint presentation qualifies as a trade secret under both the DTSA and the TUTSA. It outlines the program that Plaintiffs use to both evaluate and develop employees. This information was developed internally and is not generally known or ascertainable through publicly-available sources. This information could be used by a competitor both in recruiting Plaintiffs' employees and establishing its own comparable programs. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.
  - wl121 pac 1 training - august 2016.pdf
    - This .pdf document qualifies as a trade secret under the TUTA. It identifies all employees who participated in one of Plaintiffs' training sessions and some of the costs associated with the training. This information was developed internally and is not generally known or ascertainable through publicly-available sources. It could be used by a

Plaintiffs are producing a copy of an agreement outlining the confidentiality of information exchanged with client Volkswagen. Documents falling under the other trade secret/confidential documents listed on the Report (e.g., Fact Packs), including the exemplars previously identified by Plaintiffs, were not shown to clients.

**INTERROGATORY NO. 3:** Describe in Detail all efforts You made to investigate whether Mr. Ridley downloaded, copied, or transferred in any way documents belonging to Ecolab to a personal hard drive, device, cloud-based storage platform, OneDrive, or email account, including the date when you began the investigation and the identity of the individuals involved in the investigation.

**<u>AMENDED RESPONSE:</u>**

Pursuant to the Court's February 24, 2023 Order (D.E. 154), Plaintiffs further state that prior to Ridley's resignation, multiple of Plaintiffs' employees had been recruited away by ChemTreat, including:

- Chris McCune (1/11/21)

- Lanae Pierce (1/11/21)

- Tim Weiler (3/19/21)

- Doug Glanz (4/12/21)

- John Minney (5/12/21)

Subsequent to Ridley's resignation, Plaintiffs learned that Jeff Michel, who left Plaintiffs in September 2020 to join ChemTreat, was contacting Plaintiffs' District Manager Aaron Benarek and Sales Representative Ed Swenson. Kristen Mahre, a Human Resources Manager for Plaintiff, submitted a request for a review of Ridley's systems on July 18, 2021 based on a request from Plaintiffs' in-house counsel, Theresa Corona. Jennifer Semmler, a Security Engineer working for Plaintiffs generated a Digital Guardian and other reports on July 23, 2021. The Digital Guardian

Report revealed extensive downloading/uploading and file transfer activity that is outlined in detail in the Second Amended Complaint (and the proposed Third Amended Complaint). Ecolab's forensic expert, Larry Lieb, then conducted an analysis of the Digital Guardian report. Mr. Lieb also retrieved and then reviewed Ridley's OneDrive account from the Microsoft Azure Cloud. Ecolab's counsel worked with Mr. Lieb to verify the validity of the allegations in the Second Amended Complaint and its predecessor pleadings (and the proposed Third Amended Complaint). Ecolab's counsel also worked with Mr. Lieb to evaluate the proffered excuses (asserted by counsel for ChemTreat and Mr. Ridley) for the improper downloading/uploading and file transfer activity. Mr. Lieb debunked each one of these proffered excuses. Further, Mr. Lieb worked with Ecolab's counsel to investigate and analyze the flash drives returned by Mr. Ridley after he received Ecolab's cease-and-desist letter. This investigation showed that Mr. Ridley deleted files from these external drives just hours after receiving Ecolab' cease-and-desist letter. This analysis also revealed evidence that Mr. Ridley had a personal computer, even though Mr. Ridley has denied (and continues to deny) that he had a personal computer during the relevant time period. Plaintiffs continue to work to identify additional details regarding Ridley's misappropriation of thousands of Plaintiffs' documents, and reserve the right to supplement this Response as soon as such information is discovered.

**INTERROGATORY NO. 4:** Describe in Detail the current physical location or last known location of the following devices: (1) any computer or laptop issued to Ridley by Ecolab; (2) the "LaCie Drive"; (3) the "mobile drive" referenced in Your Second Amended Complaint; (4) the "thumb drives" referenced in Your Second Amended Complaint; and (5) any other devices issued by Ecolab to Ridley.

**AMENDED RESPONSE:**

Pursuant to the Court's February 24, 2023 Order (D.E. 158), Plaintiffs further state that on June 16, 2021, Plaintiffs' vendor, Insight, received Ridley's Ecolab laptop, serial No. 5CG82658K7, which he reported had a "constant buzzing and humming inside of it." Plaintiffs did not specifically direct anyone to wipe any data from the device. Rather, when one of Plaintiffs' devices is returned to Insight, it is set aside for a two-week period. After that two-week period, the device goes through a systems checks, any necessary repairs are made, the device is restored to factory settings, and it is then redeployed. Laptop computer No. 5CG82658K7 went through this process. It was moved to inventory on July 7, 2021, and was then redeployed to Julie Palmer on July 9, 2021, before Plaintiffs had run the DLP Report regarding Ridley. Before being redeployed, pursuant to the normal process, the device was restored to factory settings, thus wiping all data. Because the laptop had been restored to factory settings by July 7, 2021 and no data from Ridley's usage was recoverable, Plaintiffs did not attempt to recall the laptop from the subsequent user or otherwise attempt to recover any information from it. It was returned to Insight by Ms. Palmer on August 11, 2021, and then redeployed to Katie Vetter on November 15, 2021. It was returned to Insight by Ms. Vetter on November 15, 2021. It was disposed of by Insight on August 2, 2022.

Plaintiffs issued Ridley another laptop, Serial No. 5CG84132TP, on June, 9, 2021. He returned that laptop to Insight, which received it on July 12, 2021, eleven days after giving Plaintiffs notice of his resignation. Once again, Plaintiffs did not specifically direct anyone to wipe data from the device. The laptop went through the standard systems checks and was reset to factory settings. It was moved to available inventory on August 5, 2021, and it was redeployed to Matthew Rocca on September 10, 2021. Because the laptop had been restored to factory settings and no data from Ridley's usage was recoverable, Plaintiffs did not attempt to recall the laptop from the subsequent user or otherwise attempt to recover any information from it. Moreover, the improper

downloading and copying alleged in the Second Amended Complaint all occurred before this laptop was issued to Ridley. On June 13, 2022, the laptop was returned by Mr. Rocca to Insight. On July 12, 2022, it was assigned to be destroyed, and it has since been destroyed.

**INTERROGATORY NO. 5:** Describe in Detail the chain of custody for the following devices, including by identifying the names of all persons involved in receiving, preserving, or destroying any of these devices or data contained on them: (1) any computer or laptop issued to Ridley by Ecolab; (2) the "LaCie Drive"; (3) the "mobile drive" referenced in Your Second Amended Complaint; (4) the "thumb drives" referenced in Your Second Amended Complaint; and (4) any other devices issued by Ecolab to Ridley.

**AMENDED RESPONSE:**

Pursuant to the Court's February 24, 2023 Order (D.E. 158), Plaintiffs further state that on July 1, 2021, within a few hours of receiving notice of Ridley's resignation, Plaintiffs advised Ridley that he would need to make arrangements to return all company assets. Plaintiffs have produced the record from their vendor confirming that Ridley returned a "mobile drive" to Insight on July 12, 2021 and have produced the complete report reflecting this same information. See, e.g., PLAINTIFFSR-000000696. At the time the "mobile drive" was received, Plaintiffs were not aware of Ridley's misconduct. Insight did not record any serial number or other identifying information regarding the "mobile drive." The normal process for any external drive received from any of Plaintiffs' employees by Insight (of which there are many) is that the device goes into a disposal bin, the contents of which are destroyed (though not on any set schedule). As such, Plaintiffs believe that the "mobile drive" returned by Ridley has been destroyed. However, because no identifying information for the "mobile drive" was recorded, and because Insight does not record the contents of the disposal bin, it is impossible for Plaintiffs to confirm that it has been destroyed. Given that no identifying information for the "mobile drive" returned by Ridley was

recorded, Plaintiffs had no means to identify it, and no effort was made to locate the "mobile drive." With respect to the last two Ecolab computers used by Ridley, Plaintiffs refer to the chain of custody described in the amended response to Interrogatory No. 4. Plaintiffs reserve the right to supplement this response should any additional information be discovered.

Respectfully submitted,

ECOLAB INC. NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,

Dated: March 3, 2023          By:     */s/ Edward G. Winsman*
David J. Walton (*pro hac vice*)
Edward G. Winsman (*pro hac vice*)
FISHER & PHILLIPS LLP
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
Telephone:  610.230.6015/2142
Fax: 610.230.2151
dwalton@fisherphillips.com
ewinsman@fisherphillips.com

J. Gregory Grisham (TN BPR#013810)
FISHER & PHILLIPS LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, Tennessee 38120
Telephone: 901.526.0431
Fax: 901.526.8183
ggrisham@fisherphillips.com

*COUNSEL FOR PLAINTIFFS*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a true and exact copy of the foregoing was served via electronic mail on March 3, 2023, upon the following:

Vidya Atre Mirmira
Juli Ann Lund
Troy C. Homesley
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
vmirmira@wc.com
jlund@wc.com
thomesley@wc.com

W. Scott Sims
Michael R. O'Neill
SIMS FUNK PLC
3322 West End Ave. #200
Nashville, TN 37203
ssims@simfunk.com
moneill@simsfunk.com

*Attorneys for Defendant ChemTreat, Inc.*

Lance W. Pope, BPR No. 025054
Jeremy M. Cothern, BPR No. 027166
Patrick, Beard, Schulman & Jacoway, P.C.
537 Market Street, Suite 300
Chattanooga, TN 37402
lpope@pbsjlaw.com
jcothern@pbsjlaw.com

*Attorneys for Anthony Ridley*

*/s/ Edward G. Winsman*

## **VERIFICATION**

I, Corey DeMarco, declare as follows:

I have read the foregoing Plaintiffs' Amended Responses to Certain of ChemTreat, Inc's First Set of Interrogatories. I am authorized to make this verification on behalf of Plaintiffs, Ecolab Inc. and Nalco Company, LLC. To the extent I have personal knowledge of the matters set forth therein, the same are true and correct. Insofar as said matters are a composite of the information of many individuals, I do not have personal knowledge concerning all of the information contained in the above-mentioned document, but I am informed and believe that the information set forth therein for which I lack personal knowledge is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of March 2023.

_____
Corey DeMarco
Vice President
Ecolab Inc.



fisherphillips.com

**Philadelphia**
Two Logan Square
100 N. 18th Street
12th Floor
Philadelphia, PA 19103
(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6105

**Writer's E-mail:**
dwalton@fisherphillips.com

April 17, 2023

*VIA E-MAIL*

Lance W. Pope
Patrick, Beard, Schulman & Jacoway, P.C.
537 Market Street, Suite 300
Chattanooga, TN 37402
lpope@pbsjlaw.com

      Re:    *Ecolab et al v. Ridley and ChemTreat*
              Docket No: 1-22-CV-00050

Dear Lance:

      This responds to the letter you sent on April 12, 2023. There are many problems with your proposed protocol. Each problem is discussed below.

      First, the *List* case does not apply to the review of the WD external drive. We have way more than a mere "suspicion" that he used the WD drive to take Ecolab information. We know this for a fact. Vidya conceded this point in her prior correspondence. Mr. Ridley used this drive to back-up his Nalco/Ecolab computer. He apparently has an entire back-up of Nalco/Ecolab computer on this drive in his possession, and you still argue that you think we only have a "suspicion" that our information is on there? That is absurd.

      Second, your letter completely ignores Mr. Ridley's contractual obligations to return the WD drive as explained in my letter of April 7, 2023. As you know, in Mr. Ridley's Employee Sales, Service, Marketing & Inventions Agreement ("Agreement") with Ecolab, he promised that he would permit Ecolab to take a forensic image of all devices he used to access Ecolab (and Nalco) information:

**Fisher & Phillips LLP**

Atlanta · Baltimore · Bethesda · Boston · Charlotte · Chicago · Cleveland · Columbia · Columbus · Dallas · Denver · Detroit · Fort Lauderdale · Gulfport
Houston · Irvine · Kansas City · Las Vegas · Los Angeles · Louisville · Memphis · Minneapolis · Nashville · New Jersey · New Orleans · New York · Orlando
Philadelphia · Phoenix · Pittsburgh · Portland · Sacramento · San Diego · San Francisco · Seattle · Tampa · Washington, DC · Woodland Hills

FP 46883486.1

**12.** In the event the Employee violates, or the Company reasonably believes the Employee is about to violate, this Agreement, the Employee agrees that the Company is entitled to injunctive relief to prevent violation(s) and/or preserve the *status quo* and confidentiality of the Company's Confidential Information and Trade Secrets. The Employee agrees that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and the Company will have the right to conduct forensic examination(s) of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions. The Employee further agrees that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis.

(Agreement, ¶12 (highlighting added)). Inexplicably, your letter and proposed protocol does not even address this issue. By doing so, you are personally facilitating a continued breach of Mr. Ridley's contractual obligations.

Third, as I told you previously, we have no interest in seeing Mr. Ridley's personal, family photos and videos. Based on file types/formats, our forensic experts can work together to exclude those files. The existence of those "personal" files are not excuse for refusing to turn over the drive.

Fourth, you indicate that there are 44,000 files on the drive. That means you must have reviewed it. Yet, tellingly, you say nothing about the Ecolab files on that drive. Why not? Why do you continue to refuse to give us basic information about the information on that drive? That information might help us work with you to develop an appropriate protocol. But, instead, you are impeding our efforts to inspect the drive. Despite Mr. Ridley's contractual obligation to let us inspect the drive, you refused to voluntarily provide us an image of the image under any circumstances. Instead, you made us file a Request to Inspect, and now you object to that Request and place unreasonable conditions on our ability to inspect that drive.

Fifth, your proposed search method for the ED drive is grossly deficient in many ways. For example, you propose using only the file names from the DLP report to search the drive. By doing so, you know that the search would miss any documents for which Mr. Ridley changed the file name. And you are refusing to use basic search terms like "Nalco" and "Ecolab." Vidya told us that he used the WD drive to back up his Nalco/Ecolab computer. There could be a ton of Nalco/Ecolab files on there that would not be found by searching for the exact file names from the DLP report. You know this. I have explained this to you several times. But you still refuse to use basic search terms like Nalco and Ecolab when searching the drive.

Sixth, its pure effrontery for you to suggest that Ecolab should pay for a forensic analysis of Mr. Ridley's devices and accounts. Mr. Ridley stole our documents and then deleted numerous documents, including Ecolab's only copy of numerous customer files, literally on his way out the proverbial door to ChemTreat. He lied about returning all these documents. He clearly used some of these documents while at ChemTreat. He allegedly lied to ChemTreat when he certified that he would not use Ecolab information for his job at ChemTreat. He also created a business plan for ChemTreat, while being paid by Ecolab, and sent ChemTreat a confidential Nalco/Ecolab business planning document. He also lied about returning all Ecolab documents when he left Ecolab and joined ChemTreat. And, despite all of this undeniable and undisputed evidence, you suggest that Ecolab should pay for the forensic analysis of an independent forensic examiner?

Lance W. Pope
April 17, 2023
Page 3

Seventh, I apologize for calling Mrs. Ridley's personal computer a MacBook. Thank you for correcting me. Nonetheless, we are troubled by your refusal to search that computer. Merely two to three hours after receiving my February 9, 2022, cease-and-desist letter, Mr. Ridley accessed two Nalco flash drives and deleted information from them. In doing so, he created a folder referencing a personal computer. Despite repeated requests, you have refused to provide us any information about this personal computer. Also, Mr. Ridley has denied having a personal computer at that time. And we know from the Crowdstrike report (produced by ChemTreat) that Mr. Ridley did not use his ChemTreat computer to access these flash drives on February 9, 2022. So, he must have used another computer, and by process of elimination, the only computer left is Mrs. Ridley's. Now, if you want to provide us with information that makes it clear he used another computer to access these drives and that he never used Mrs. Ridley's computer to access any Ecolab information, then we may reconsider our request. But, you have continually failed to do this. In fact, during our last call, I asked you pointedly several times if Mr. Ridley ever used his wife's computer to access any Ecolab information. You refused to answer that question, saying only he never "worked on" Ecolab documents using his wife's computer. I asked the same question several times, and you kept using the same answer. I even asked you if his wife's computer "touched" any Ecolab documents. You refused to answer that question and continued your mantra that Mr. Ridley did not use that computer to "work" on documents. By dodging my question, it makes it appear you are being deceptive. "Working on" documents is much narrower than accessing, storing, copying, printing, transferring, uploading, and downloading documents. Based on your conduct and responses during our meet-and-confers, it is clear that Mr. Ridley used his wife's computer to access Ecolab information (and the two flash drives on February 9, 2022). Based on this, we have no choice but to seek access to "her" computer. Besides, you have provided no proof that Mrs. Ridley's computer is exclusively her computer. Did she buy it? Is she the only who uses it? Does Mr. Ridley use the computer? Is it really a family computer as opposed to hers exclusively? You have provided none of this information.

Eighth, regarding Mr. Ridley's iPhone, personal laptop, and Google Drive, you failed to indicate whether you searched this computer and cloud account for Nalco/Ecolab information. That is very telling.

Ninth, regarding the iCloud account, we discussed this several times. The issue is whether Mr. Ridley used this account to back-up with Ecolab and/or ChemTreat company phones. You still will not tell us that. If you have searched his iCloud account and checked whether it was used to back-up these phones or store any Ecolab information, then please tell us. Your refusal to provide this information leaves us no choice but to search it.

These are just some of the many problems with the proposals in your letter. We reserve our rights to raise more objections to the items in your letter.

FP-46883486.1

Lance W. Pope
April 17, 2023
Page 4

In sum, you have left no choice but to file a motion to compel based on these issues. We should not have to get the Court involved in this, but your strategy is clearly to delay rather than resolve issues.

Sincerely,

David J. Walton
Partner
For FISHER & PHILLIPS LLP

cc:     Vidya Are Mirmira (VMirmira@wc.com)
        Juli Ann Lund (jlund@wc.com)
        Troy C. Homesley (thomesley@wc.com)
        Michael R. O'Neill (moneil@simsfunk.com)
        W. Scott Sims (ssims@simsfunk.com)
        Edward G. Winsman (via email ewinsman@fisherphillips.com)
        Pavneet Singh Uppal (via email puppal@fisherphillips.com)
        Kathleen M. Laubenstein (via email klaubenstein@fisherphillips.com)
        Gregory Grisham (via email ggrisham@fisherphillips.com)

FP 46883486.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

ECOLAB INC., and NALCO COMPANY,
LLC d/b/a Nalco Water, an Ecolab Company
and/or Nalco Water,

     Plaintiffs,

v.

ANTHONY RIDLEY and CHEMTREAT,
INC.,

     Defendants.

No. 1:22-cv-00050-TRM-SKL

Hon. Travis McDonough

Magistrate Judge Susan K. Lee

## PLAINTIFFS' DISCOVERY CERTIFICATION

Pursuant to the Court's April 14, 2023 Order (D.E. 212), Plaintiffs Ecolab Inc. ("Ecolab") and Nalco Company LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water ("Nalco") (jointly referred to as "Nalco/Ecolab" or "Plaintiffs"), by and through their counsel, hereby certify that, following a reasonable search, they have produced all non-privileged, responsive documents that they agreed to produce in response to RFP Nos. 48-53. Plaintiffs continue to search for one document referenced in the Court's Order ("DLP-Data Loss Prevention") and will produce that document promptly in the event that it is located.

With respect to RFP Nos. 78-82, Plaintiffs are not claiming damages for lost customers at this time. Rather, Plaintiffs are seeking recovery as set forth in the February 24, 2023 Expert Report of Dana Trexler. Plaintiffs certify that that have produced all documents relied upon by Ms. Trexler.

Respectfully submitted,

ECOLAB INC. NALCO COMPANY, LLC
d/b/a Nalco Water, an Ecolab Company
and/or Nalco Water,

By Counsel

By:    */s/ Edward G. Winsman*
        J. Gregory Grisham (TN BPR#013810)
        FISHER & PHILLIPS LLP
        1715 Aaron Brenner Drive, Suite 312
        Memphis, Tennessee 38120
        Telephone: 901.526.0431
        Fax: 901.526.8183
        ggrisham@fisherphillips.com


        Pavneet Singh Uppal
        (*pro hac vice*)
        FISHER & PHILLIPS LLP
        3200 N. Central Avenue, Suite 1550
        Phoenix, Arizona 85012-2487
        Telephone: 602.281.3400
        Fax: 602.281.3401
        puppal@fisherphillips.com

        David J. Walton (*pro hac vice*)
        Edward G. Winsman (*pro hac vice*)
        FISHER & PHILLIPS LLP
        Two Logan Square, 12th Floor
        100 N. 18th Street
        Philadelphia, PA 19103
        Telephone:  610.230.6015/2142
        Fax: 610.230.2151
        dwalton@fisherphillips.com
        ewinsman@fisherphillips.com

        *COUNSEL FOR PLAINTIFFS*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and exact copy of the foregoing was served via electronic mail on April 27, 2023, upon the following:

Vidya Atre Mirmira
Juli Ann Lund
Troy C. Homesley
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
vmirmira@wc.com
jlund@wc.com
thomesley@wc.com

W. Scott Sims
Michael R. O'Neill
SIMS FUNK PLC
3322 West End Ave. #200
Nashville, TN 37203
ssims@simfunk.com
moneill@simsfunk.com

*Attorneys for Defendant ChemTreat, Inc.*

Lance W. Pope, BPR No. 025054
Jeremy M. Cothern, BPR No. 027166
Patrick, Beard, Schulman & Jacoway, P.C.
537 Market Street, Suite 300
Chattanooga, TN 37402
lpope@pbsjlaw.com
jcothern@pbsjlaw.com

*Attorneys for Anthony Ridley*

*/s/ Edward G. Winsman*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| | |
|---|---|
| ECOLAB INC., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, | |
| Plaintiffs, | No. 1:22-cv-00050-TRM-SKL |
| v. | Hon. Travis McDonough |
| ANTHONY RIDLEY and CHEMTREAT, INC., | Magistrate Judge Susan K. Lee |
| Defendants. | |

**AMENDED PRIVILEGE LOG OF PLAINTIFFS
ECOLAB, INC. AND NALCO COMPANY, LLC[1]**

| DATE | AUTHOR(S) | RECIPIENT(S) | DESCRIPTION | PRIVILEGE(S) |
|---|---|---|---|---|
| 7/1/2021 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Tina Grant, Senior Director, Human Resources | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/7/2021 | Tina Grant, Senior Director, Human Resources | Theresa Corona, Deputy General Counsel Kristin Mahre, Human Resources Manager | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/7/2021 | Theresa Corona, Deputy General Counsel | Tina Grant, Senior Director, Human Resources | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/7/2021 | Theresa Corona, Deputy | Tina Grant, Senior Director, | Email concerning resignation of Ridley | Attorney-client and Attorney Work Product |

[1] This log does not include documents reflecting privileged communications with outside counsel.

| | General Counsel | Human Resources Kristin Mahre, Human Resources Manager | and strategy regarding same | |
|---|---|---|---|---|
| 7/8/2021 | Theresa Corona, Deputy General Counsel | Tina Grant, Senior Director, Human Resources Kristin Mahre, Human Resources Manager | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/8/2021 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/8/2021 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Tina Grant, Senior Director, Human Resources | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/8/2021 | Theresa Corona, Deputy General Counsel | Kristin Mahre, Human Resources Manager Tina Grant, Senior Director, Human Resources | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/8/2021 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Tina Grant, Senior Director, Human Resources | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/8/2021 | Theresa Corona, Deputy | Kristin Mahre, Human Resources Manager | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |

| | General Counsel | Tina Grant, Senior Director, Human Resources | | |
|---|---|---|---|---|
| 7/12/2021 | Jaqueline Herrera, Assistant Vice President Corporate Accounts | Kristin Mahre, Human Resources Manager | Email concerning information about Ridley requested by Legal | Attorney-client and Attorney Work Product |
| | | | Protein-CAM Team Portfolio requested by Legal | Attorney-client and Attorney Work Product |
| | | | Assessment request by Legal | Attorney-client and Attorney Work Product |
| 7/13/2021 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Tina Grant, Senior Director, Human Resources | Email concerning information about Ridley provided by Jaqueline Herrera | Attorney-client and Attorney Work Product |
| 7/13/2021 | Theresa Corona, Deputy General Counsel | Kristin Mahre, Human Resources Manager Tina Grant, Senior Director, Human Resources | Email concerning information about Ridley provided by Jaqueline Herrera, including previously logged enclosures | Attorney-client and Attorney Work Product |
| 7/13/2021 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associated General Counsel | Email concerning information about Ridley provided by Jaqueline Herrera, including previously logged enclosures | Attorney-client and Attorney Work Product |
| 7/13/2021 | Theresa Corona, Deputy General Counsel | Kristin Mahre, Human Resources Manager Tina Grant, Senior Director, Human Resources | Email requesting information regarding Ridley | Attorney-client and Attorney Work Product |

| 7/13/2021 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Tina Grant, Senior Director, Human Resources | Email providing requested information regarding Ridley | Attorney-client and Attorney Work Product |
|---|---|---|---|---|
| 7/13/2021 | Theresa Corona, Deputy General Counsel | Cynthia Kadela, Human Resources Director Jared Palonis, HR Business Partner | Email concerning resignation of Ridley and strategy regarding same | Attorney-client and Attorney Work Product |
| 7/13/2021 | Theresa Corona, Deputy General Counsel | Cynthia Kadela, Human Resources Director | Email regarding Ridley's resignation and other resignation | Attorney-client and Attorney Work Product |
| 7/18/2021 | Kristin Mahre, Human Resources Manager | IS Security Risk Mgmt Research Theresa Corona, Deputy General Counsel | Email concerning Employee Data Review for Former Associate including attachment Global Information Security, Request for Employee Data Form seeking information concerning Ridley. | Attorney-client and Attorney Work Product |
| 7/18/2021 | Kristin Mahre, Human Resources Manager | IS Security Risk Mgmt Research Theresa Corona, Deputy General Counsel | Global Information Security – Request for Employee Data Form seeking information concerning Ridley. | Attorney-client and Attorney Work Product |
| 7/18/2021 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel | Email concerning Employee Data Access Form for Anthony Ridley and providing form as attachment. | Attorney-client and Attorney Work Product |
| 7/18/2021 | Erika Kain, HR Business Partner | Theresa Corona, Deputy General Counsel Claudia Currarino, Vice | Email regarding departures to ChemTreat | Attorney-client and Attorney Work Product |

| | | President Human Resources | | |
|---|---|---|---|---|
| | | | Spreadsheet regarding departures to ChemTreat | Attorney-client and Attorney Work Product |
| 7/23/21 | Information Security | Kristin Mahre, Human Resources Manager Daniel Sproul Scott Regener James Drink Jennifer Semmler Theresa Corona, Deputy General Counsel | Email concerning Employee Data Sheet for Ridley, and attached Employee Data Sheet | Attorney-client and Attorney Work Product |
| 7/23/21 | Theresa Corona, Deputy General Counsel | Kristin Mahre, Human Resources Manager | Email concerning review of Employee Data Sheet for Ridley, and attached Employee Data Sheet | Attorney-client and Attorney Work Product |
| 7/23/21 | Kristin Mahre, Human Resources Manager | Information Security Daniel Sproul Scott Regener James Drink Jennifer Semmler Theresa Corona, Deputy General Counsel | Email concerning review of Employee Data Sheet for Ridley requested by Legal | Attorney-client and Attorney Work Product |
| 7/23/21 | Kristin Mahre, Human Resources Manager | Information Security Daniel Sproul Scott Regener James Drink Jennifer Semmler Theresa Corona, Deputy General Counsel | Email concerning review of Employee Data Sheet for Ridley requested by Legal | Attorney-client and Attorney Work Product |
| 7/27/21 | Scott Regener | Kristin Mahre, | Email concerning analysis of Digital | Attorney-client and Attorney Work Product |

| | | Human Resources Manager Daniel Sproul James Drink Jennifer Semmler Theresa Corona, Deputy General Counsel | Guardian Report requested by Legal | |
|---|---|---|---|---|
| 7/27/21 | Scott Regener | | Spreadsheet concerning analysis of Digital Guardian report requested by Legal | Attorney-client and Attorney Work Product |
| 7/28/21 | Theresa Corona, Deputy General Counsel | Kristin Mahre, Human Resources Manager | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 7/29/21 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| | | | Spreadsheet concerning analysis of Digital Guardian report requested by Legal | Attorney-client and Attorney Work Product |
| 8/2/21 | Theresa Corona, Deputy General Counsel | Kristin Mahre, Human Resources Manager | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 8/2/21 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Cynthia Kadela, Human Resources Director | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| | | | Spreadsheet concerning analysis of Digital Guardian | Attorney-client and Attorney Work Product |

| Date | From | To | Description | Privilege |
|------|------|-----|-------------|-----------|
| | | | report requested by Legal | |
| 8/3/21 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning ChemTreat recruitment of Ecolab employees | Attorney-client and Attorney Work Product |
| | | | Spreadsheet concerning analysis of Digital Guardian report requested by Legal | Attorney-client and Attorney Work Product |
| 8/4/21 | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Theresa Corona, Deputy General Counsel | Email concerning ChemTreat recruitment of Ecolab employees | Attorney-client and Attorney Work Product |
| 8/8/21 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Cynthia Kadela, Human Resources Director | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 8/9/21 | Cynthia Kadela, Human Resources Director | Kristin Mahre, Human Resources Manager Theresa Corona, Deputy General Counsel Cynthia Kadela, Human Resources Director | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 8/9/21 | Kristin Mahre, Human Resources Manager | Theresa Corona, Deputy General Counsel Cynthia Kadela, Human | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |

| | | Resources Director | | |
|---|---|---|---|---|
| 8/18/21 | Theresa Corona, Deputy General Counsel | Cynthia Kadela, Human Resources Director | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 9/1/21 | Jennifer Semmler | Theresa Corona, Deputy General Counsel Cynthia Kadela, Human Resources Director | Email concerning information needed by Legal regarding Ridley | Attorney-client and Attorney Work Product |
| 9/10/21 | Theresa Corona, Deputy General Counsel | Scott Regener Jennifer Semmler Cynthia Kadela, Human Resources Director | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 9/10/21 | Scott Regener | Theresa Corona, Deputy General Counsel Jennifer Semmler Cynthia Kadela, Human Resources Director | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 9/10/21 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning legal strategy with respect to Ridley | Attorney-client and Attorney Work Product |
| 9/13/21 | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Theresa Corona, Deputy General Counsel | Email concerning legal strategy with respect to Ridley | Attorney-client and Attorney Work Product |

| 9/15/21 | Theresa Corona, Deputy General Counsel | Jaqueline Herrera, Assistant Vice President Corporate Accounts Karry Mackie, Assistant Vice President Cynthia Kadela, Human Resources Director | Email concerning legal strategy with respect to Ridley and additional information needed in support of same | Attorney-client and Attorney Work Product |
|---|---|---|---|---|
| 9/15/21 | Karry Mackie, Assistant Vice President | Theresa Corona, Deputy General Counsel Jaqueline Herrera, Assistant Vice President Corporate Accounts Cynthia Kadela, Human Resources Director | Email concerning legal strategy with respect to Ridley and request for additional information in support of same | Attorney-client and Attorney Work Product |
| 9/15/21 | Theresa Corona, Deputy General Counsel | Jaqueline Herrera, Assistant Vice President Corporate Accounts Karry Mackie, Assistant Vice President Cynthia Kadela, Human Resources Director | Email concerning legal strategy with respect to Ridley and request for additional information in support of same | Attorney-client and Attorney Work Product |
| 9/15/21 | Karry Mackie, Assistant Vice President | Theresa Corona, Deputy General Counsel | Email concerning legal strategy with respect to Ridley and | Attorney-client and Attorney Work Product |

| | | Jaqueline Herrera, Assistant Vice President Corporate Accounts Cynthia Kadela, Human Resources Director | request for additional information in support of same | |
|---|---|---|---|---|
| 9/17/21 | Theresa Corona, Deputy General Counsel | Scott Regener Cynthia Kadela, Human Resources Director Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 9/17/21 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning analysis of Digital Guardian Report | Attorney-client and Attorney Work Product |
| 9/17/21 | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Theresa Corona, Deputy General Counsel | Email concerning analysis of Digital Guardian Report and legal strategy | Attorney-client and Attorney Work Product |
| 9/17/21 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning analysis of Digital Guardian Report and legal strategy | Attorney-client and Attorney Work Product |

| | | | | |
|---|---|---|---|---|
| | | | | |
| 9/17/21 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning analysis of Digital Guardian Report and legal strategy | Attorney-client and Attorney Work Product |
| 9/20/21 | Theresa Corona, Deputy General Counsel | Scott Regener Cynthia Kadela, Human Resources Director | Email concerning analysis of Digital Guardian Report and additional information needed to develop legal strategy | Attorney-client and Attorney Work Product |
| 9/20/21 | Scott Regener | Theresa Corona, Deputy General Counsel Jack Anderson Toua Vue | Email responding to request from Legal regarding Ridley's laptop and OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | Jack Anderson | Theresa Corona, Deputy General Counsel Scott Regener Toua Vue | Email responding to request from Legal regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| | | | Request for Employee Data Form | Attorney-client and Attorney Work Product |
| 9/20/21 | Theresa Corona, Deputy General Counsel | Jack Anderson Scott Regener Toua Vue | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | IT Service Desk | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | IT Service Desk | Theresa Corona, Deputy General Counsel Jack Anderson | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | IT Service Desk | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |

| 9/20/21 | Theresa Corona, Deputy General Counsel | Jack Anderson IT Service Desk Kerri Neitzel | Email concerning Ridley's OneDrive, including litigation hold | Attorney-client and Attorney Work Product |
|---|---|---|---|---|
| 9/20/21 | IT Service Desk | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | IT Service Desk | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | Kerri Neitzel | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive, including litigation hold | Attorney-client and Attorney Work Product |
| 9/20/21 | Toua Vue | Theresa Corona, Deputy General Counsel Jack Anderson | Email concerning Ridley's OneDrive, including litigation hold | Attorney-client and Attorney Work Product |
| 9/20/21 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel Kerri Neitzel | Email concerning litigation holds for Ridley and others | Attorney-client and Attorney Work Product |
| | | | Spreadsheet regarding departures to ChemTreat | Attorney-client and Attorney Work Product |
| 9/20/21 | Theresa Corona, Deputy General Counsel | Jack Anderson Kerri Neitzel | Email concerning preservation of Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | Theresa Corona, Deputy General Counsel | Kerri Neitzel | Email concerning legal strategy | Attorney-client and Attorney Work Product |
| 9/20/21 | Jack Anderson | Theresa Corona, Deputy General Counsel Kerri Neitzel | Email concerning preservation of Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | Theresa Corona, Deputy | Jack Anderson Scott Regener | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |

| | General Counsel | Cynthia Kadela, Human Resources Director | | |
|---|---|---|---|---|
| 9/20/21 | Theresa Corona, Deputy General Counsel | Jack Anderson Kerri Neitzel | Email concerning preservation of Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | Jack Anderson | Theresa Corona, Deputy General Counsel | Email concerning preservation of Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/20/21 | Theresa Corona, Deputy General Counsel | Jack Anderson | Email concerning preservation of Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/21/21 | Theresa Corona, Deputy General Counsel | Jack Anderson Cynthia Kadela, Human Resources Director | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/21/21 | Jack Anderson | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/21/21 | IT Service Desk | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/21/21 | Theresa Corona, Deputy General Counsel | Jack Anderson | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/21/21 | Theresa Corona, Deputy General Counsel | Cynthia Kadela, Human Resources Director | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/21/21 | Kerri Neitzel | Jack Anderson Theresa Corona, Deputy General Counsel | Email concerning litigation holds | Attorney-client and Attorney Work Product |
| 9/27/21 | Scott Regener | Theresa Corona, Deputy General Counsel Jack Anderson | Email concerning preservation of Ridley's OneDrive | Attorney-client and Attorney Work Product |

| | | Cynthia Kadela, Human Resources Director | | |
|---|---|---|---|---|
| 9/27/21 | Theresa Corona, Deputy General Counsel | Scott Regener Jack Anderson Cynthia Kadela, Human Resources Director | Email concerning preservation of Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/27/21 | Her Lee, Client Service Analyst | Theresa Corona, Deputy General Counsel | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/27/21 | Theresa Corona, Deputy General Counsel | Her Lee, Client Service Analyst | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/27/21 | Jennifer Semmler | Theresa Corona, Deputy General Counsel | Email concerning request for information regarding Ridley's email activity | Attorney-client and Attorney Work Product |
| 9/27/21 | Theresa Corona, Deputy General Counsel | Jennifer Semmler | Email concerning request for information regarding Ridley's email activity | Attorney-client and Attorney Work Product |
| 9/27/21 | Her Lee, Client Service Analyst | Theresa Corona, Deputy General Counsel | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/27/21 | Theresa Corona, Deputy General Counsel | Her Lee, Client Service Analyst | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 9/27/21 | Theresa Corona, Deputy General Counsel | Jaqueline Herrera, Assistant Vice President Corporate Accounts | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |

| 9/27/21 | IT Service Desk | Theresa Corona, Deputy General Counsel | Email concerning Ridley's OneDrive | Attorney-client and Attorney Work Product |
|---|---|---|---|---|
| 10/1/21 | Theresa Corona, Deputy General Counsel | Her Lee, Client Service Analyst Jack Anderson | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 10/1/21 | Her Lee, Client Service Analyst | Theresa Corona, Deputy General Counsel Jack Anderson Jennifer Evans | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 10/1/21 | Theresa Corona, Deputy General Counsel | Jennifer Evans | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 10/1/21 | Theresa Corona, Deputy General Counsel | Her Lee, Client Service Analyst Jack Anderson Jennifer Evans | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 10/1/21 | Jennifer Evans | Theresa Corona, Deputy General Counsel Jack Anderson Her Lee, Client Service Analyst | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 10/1/21 | Theresa Corona, Deputy General Counsel | Her Lee, Client Service Analyst Jack Anderson Jennifer Evans | Email concerning request for information regarding Ridley's OneDrive | Attorney-client and Attorney Work Product |
| 11/4/21 | Karry Mackie, Assistant Vice President | Theresa Corona, Deputy General Counsel Jaqueline Herrera, Assistant Vice President Corporate Accounts Cynthia Kadela, Human | Email concerning legal strategy with respect to Ridley | Attorney-client and Attorney Work Product |

| | | Resources Director | | |
|---|---|---|---|---|
| 11/4/21 | Theresa Corona, Deputy General Counsel | Karry Mackie, Assistant Vice President Jaqueline Herrera, Assistant Vice President Corporate Accounts Cynthia Kadela, Human Resources Director Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning legal strategy with respect to Ridley and request for additional information in support of same | Attorney-client and Attorney Work Product |
| 11/10/21 | Karry Mackie, Assistant Vice President | Theresa Corona, Deputy General Counsel Jaqueline Herrera, Assistant Vice President Corporate Accounts Cynthia Kadela, Human Resources Director Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning legal strategy with respect to Ridley and responding to request for additional information | Attorney-client and Attorney Work Product |
| 11/10/21 | Theresa Corona, Deputy General Counsel | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning legal strategy with respect to Ridley | Attorney-client and Attorney Work Product |

| Date | From | To | Description | Privilege |
|---|---|---|---|---|
| 11/10/21 | Theresa Corona, Deputy General Counsel | Karry Mackie, Assistant Vice President | Email concerning legal strategy with respect to Ridley | Attorney-client and Attorney Work Product |
| 11/15/21 | Theresa Corona, Deputy General Counsel | Kerri Neitzel Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning Ridley's employment agreement | Attorney-client and Attorney Work Product |
| 11/15/21 | Kerri Neitzel | Theresa Corona, Deputy General Counsel Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning Ridley's employment agreement | Attorney-client and Attorney Work Product |
| 11/15/21 | Theresa Corona, Deputy General Counsel | Kerri Neitzel Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Email concerning Ridley's employment agreement | Attorney-client and Attorney Work Product |
| 11/18/21 | Joanne Mullen, Chief Compliance Officer and Associate General Counsel | Theresa Corona, Deputy General Counsel | Email concerning Ridley's employment agreement and legal strategy with respect to Ridley | Attorney-client and Attorney Work Product |
| 1/6/22 | Kerri Neitzel | Theresa Corona, Deputy General Counsel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/6/22 | Theresa Corona, Deputy General Counsel | Kerri Neitzel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |

| 1/6/22 | Kerri Neitzel | Theresa Corona, Deputy General Counsel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
|---|---|---|---|---|
| 1/6/22 | Theresa Corona, Deputy General Counsel | Kerri Neitzel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/6/22 | Kerri Neitzel | Theresa Corona, Deputy General Counsel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/6/22 | Theresa Corona, Deputy General Counsel | Kerri Neitzel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/13/22 | Theresa Corona, Deputy General Counsel | Kerri Neitzel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/13/22 | Kerri Neitzel | Theresa Corona, Deputy General Counsel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/13/22 | Kerri Neitzel | Theresa Corona, Deputy General Counsel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/13/22 | Theresa Corona, Deputy General Counsel | Kerri Neitzel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/13/22 | Theresa Corona, Deputy General Counsel | Kerri Neitzel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/13/22 | Kerri Neitzel | Theresa Corona, Deputy General Counsel | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |
| 1/13/22 | Kerri Neitzel | Theresa Corona, Deputy General Counsel Dave Garza Dinesh Agarwal | Email concerning files Ridley copied from OneDrive | Attorney-client and Attorney Work Product |

Respectfully submitted,

ECOLAB INC. NALCO COMPANY, LLC
d/b/a Nalco Water, an Ecolab Company
and/or Nalco Water,

By: */s/ Edward G. Winsman*
    J. Gregory Grisham (TN BPR#013810)
    FISHER & PHILLIPS LLP
    1715 Aaron Brenner Drive, Suite 312
    Memphis, Tennessee 38120
    Telephone: 901-526-0431
    Fax: 901-526-8183
    ggrisham@fisherphillips.com

    David J. Walton
    Edward G. Winsman
    Kathleen M. Laubenstein
    (*pro hac vice*)
    FISHER & PHILLIPS LLP
    Two Logan Square, 12th Floor
    100 N. 18th Street
    Philadelphia, PA 19103
    Telephone: 610-230-2150
    Fax: 610-230-2151
    dwalton@fisherphillips.com
    ewinsman@fisherphillips.com
    klaubenstein@fisherphillips.com

    Pavneet Uppal
    (*pro hac vice*)
    FISHER & PHILLIPS LLP
    3200 North Central Avenue, Suite 1550
    Phoenix, AZ 85012
    Telephone:  602-281-3400
    Fax: 602-281-3401
    puppal@fisherphillips.com

    COUNSEL FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was served via electronic mail upon counsel for all parties.

Vidya Atre Mirmira
Juli Ann Lund
Troy C. Homesley
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
vmirmira@wc.com
jlund@wc.com
thomesley@wc.com

W. Scott Sims
Michael R. O'Neill
SIMS FUNK PLC
3322 West End Ave. #200
Nashville, TN 37203
ssims@simfunk.com
moneill@simsfunk.com

*Attorneys for Defendant ChemTreat, Inc.*

Lance W. Pope, BPR No. 025054
Jeremy M. Cothern, BPR No. 027166
Patrick, Beard, Schulman & Jacoway, P.C.
537 Market Street, Suite 300
Chattanooga, TN 37402
lpope@pbsjlaw.com
jcothern@pbsjlaw.com

*Attorneys for Anthony Ridley*

*/s/ Edward G. Winsman*
Edward G. Winsman

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, | Case No. 1:22-cv-00050-TRM-SKL |
| Plaintiffs, | Hon. Travis McDonough |
| v. | Magistrate Judge Susan K. Lee |
| ANTHONY RIDLEY, and CHEMTREAT, INC., | |
| Defendants. | |

**REBUTTAL EXPERT REPORT OF ROBERT CUNNINGHAM**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

I.       Credentials and Background ...................................................................2

II.      Overview of Industrial Water Treatment Industry..................................6

III.     Essentials for Obtaining Business in the Water Treatment Industry. .................................8

IV.      The Typical Sales Process in the Water Treatment Industry...............................11

V.       Economic Realities Undermine Ms. Trexler's Foundational Assumptions......................15

         A.       Ms. Trexler's Customer Revenue Attrition Rates Are Artificially Deflated
                  As a Result of the COVID-19 Global Pandemic. ...................................16

         B.       Ms. Trexler Fails to Consider Alternative Explanations for Reduced
                  Customer Revenue. ...............................................18

         C.       Ms. Trexler Improperly Assumes Static Margins...................................20

         D.       Ms. Trexler Improperly Assumes that Pricing and Customer Information
                  Dating from 2019 or Earlier Remains Reliable, Relevant, or Useful in the
                  Future. ...............................21

         E.       Ms. Trexler Improperly Assumes that Historical and Technical
                  Information Regarding a Customer's Chemicals or Water Treatment
                  Processes Will Remain Reliable, Relevant, or Useful in the Future. ....................23

         F.       Ms. Trexler Improperly Assumes that a Customer's Technical
                  Information, Costs, Allocation of Budget to Water Treatment, and Water
                  Treatment Processes Belong to Nalco. .................................24

VI.      Specific Categories of Documents Addressed in Ms. Trexler's Report ...........................25

         A.       Financial Information Concerning Customers, Including Pricing, Price
                  Quotes, Revenues, and Margins...................................26

         B.       Six Service Standards ...................................27

VII.     The "Business Plan" Document Does Not Appear to Contain Nalco's Information ........30

CONCLUSIONS.................................................................31

# INTRODUCTION

This rebuttal expert report is provided in response to the February 24, 2023 Expert Report of Dana M. Trexler (the "Trexler Report"). In the course of reaching her conclusions regarding damages, Ms. Trexler repeatedly relies upon what she characterizes as "[t]he value of the misappropriated customer information." *E.g.*, Trexler Report, ¶ 31. Instead of analyzing specific documents in the context of specific customers, Ms. Trexler concludes broadly based on her "discussions with Karry Mackie" that "pricing and profitability information, along with the technical specifications of the products and services provided by Nalco to each customer" could be valuable to a competitor. Trexler Report, ¶ 34. For the reasons discussed in this report, Ms. Trexler's simplistic and non-specific claims regarding the purported value of the documents cited in her report (the "Allegedly Misappropriated Documents"[1]) are not consistent with the realities of the water treatment industry, based on my knowledge of the industry developed over the course of six decades of experience.

This report proceeds as follows: Part I provides further information about my nearly 60 years of experience in the water treatment industry; Part II describes the water treatment industry at a general level; Part III discusses what is essential for purposes of obtaining business in the industry (namely, a personal understanding of the problems or issues facing a customer and why the customer may be seeking a new supplier (the "why"), a personal understanding of how to fix those problems (the "how"), and a rapport or relationship with the customer built on trust,

---

[1] The Allegedly Misappropriated Documents I refer to herein are those relied upon by Ms. Trexler in her report, including the specific documents identified in paragraph 42 of her report. Ms. Trexler also attaches to her report a document titled "Files Exfiltrated by Anthony Ridley," but does not discuss the file names included in that document, nor does she assert that she has reviewed those file names or the underlying documents they correspond to. Therefore, I do not address those file names in this report.

1

experience, and technical know-how); Part IV describes the typical sales process in the water treatment industry; Part V discusses the practical and economic factors that render a number of Ms. Trexler's assumptions flawed; Part VI discusses the purported value of documents Ms. Trexler relies upon in her report; and Part VII provides my assessment of a "Business Plan" document cited in Ms. Trexler's report.

This rebuttal expert report is provided based on the information presently available to me. I understand that discovery in this matter is ongoing. To the extent additional information or documents are produced in this matter that may bear on my conclusions, I reserve the right to supplement this rebuttal expert report appropriately.

I have been provided copies of all documents, including forensic images, produced by each of the parties to this litigation as of the date of this report, as well as copies of interrogatory responses provided by all parties, and various public court filings by the parties. I have also received transcripts of all depositions that have taken place in this matter as of the date of this report. In the course of preparing this rebuttal expert report, including forming the opinions set forth below, I relied upon the facts set out in the materials cited herein. A complete list of the materials I relied upon for purposes of this rebuttal expert report is attached as Exhibit A.

## I.    Credentials and Background

I have nearly 60 years of experience in the water treatment industry, where I have worked in a variety of capacities for nearly a dozen different companies, and where I have also provided consulting services to water treatment providers and customers alike. My experience spans decades of immense changes in the water treatment industry, and my career has given me a detailed perspective on the industry as a whole.

I began my career at Calgon Corporation, at their headquarters in Pittsburgh, Pennsylvania, some months before graduating from the University of Pittsburgh with a B.S. in Chemistry.

2

Calgon was known at the time as one of the "big three" in the water treatment industry, along with Nalco in Napierville, Illinois, and Betz Laboratories ("Betz"), in Trevose, Pennsylvania. I started at Calgon in December 1964. My training class did not start until May 1965, so until the class started I was assigned to work with the Hall Laboratories consulting engineering staff, rotating between the staff engineers and the field water treatment sales/service engineers of the Pittsburgh District. I completed my last classes at the University of Pittsburgh at night, and graduated in June 1965.

After my training class for Calgon concluded in September 1965, I was given the opportunity to become the Assistant Product manager for Calgon's boiler water department. I was responsible for helping to develop and maintain a complete line of chemical products for the treatment of steam boilers, as well as field trials on the new products in selected customer plants. I was also responsible for assisting marketing with setting prices, and also assisted with cost control measures surrounding raw material purchasing.

In this position, I joined several technical societies and trade associations and attended meetings such as ASME and The Power conference, where I worked with customers, researchers, and competitors to provide ever better solutions to the industry's problems. While in this capacity I helped introduce the Chelants, a new approach to solving boiler scale and deposit problems, as well as new dispersant polymers and new filming amine products.

After six months in Calgon's boiler water department, I was given the chance to move over to the rapidly growing cooling water department. While the responsibilities were the same, now I was dealing with new and different equipment to protect, like cooling towers, evaporative condensers, chillers, and heat exchangers. I worked to help develop products for treating new processes, such as continuous casting in the steel industry. I was responsible for closed heating

3

and cooling system treatment products and technology. I had the opportunity to learn a lot of new technology, and I dealt with a new group of clients, equipment manufacturers, and different trade and technical societies, such as Cooling Technology Institute, ASHRAE, Eastern States Blast Furnace Association, and AISE. I also coordinated with our researchers and ran the field trials for our new products, including the organo-phosphonates. We introduced a new family of low molecular weight polymers, a new family of oil dispersants, new scale inhibitors, and new microbicides.

While the Calgon personnel had a good presence in the industrial market place, BAC (which had been acquired along with Calgon by Merck) focused on the heating, ventilating, and air conditioning (HVAC) and light industry marketplace. My role transitioned to helping BAC personnel learn to sell and to apply Calgon's water treatment technology. We were tasked with selling cooling water programs to the customers and associated people that they dealt with. This job allowed me to work with a manufacturer's representative sales force at BAC, as opposed to a direct employee sales force at Calgon. It was also an opportunity to learn the mechanical side of the cooling tower business, as well as to get to know and work with design engineers, specifying engineers, and entirely different customers. I had to impart water treatment and cooling water treatment technology to the BAC personnel, as well as to the customers and engineers. I also participated in new trade associations and technical societies.

After 18 months, I was approached by Zimmite Corp, a relatively new company which sold a variety of marine hardware and was looking to expand into the sale of water treatment chemicals to steel mills. Zimmite hired me to help develop a broader product line for the cooling market, expand the product line into the boiler water segment, and to hire, train, and supervise an expanded sales force.

4

This was my first direct responsibility for industrial sales management. I started as Assistant to the Vice President, quickly became Vice President of Sales, and then Vice President of Marketing. We rapidly expanded the product line and hired a small sales force of very experienced people from existing water treatment companies. We hired primarily Betz, Nalco, and Calgon personnel. We enjoyed a very rapid and profitable growth in sales, retained a large percentage of our business from year to year, and we cut our personnel attrition rate substantially. We targeted and were successful in substantially increasing our business in the steel industry, chemicals industry, as well as in oil refining, power, and petrochemical production.

I ultimately left Zimmite, expanding my knowledge of the industry, first with Olin Water Management in Southern California and then with Betz, in their Entec Group. I was ultimately promoted to District Manager of the South District for Entec. I held all of my business and sold considerably more new business. I hired and trained two new sales/service personnel with no prior water treatment background and opened a new district office with a new secretary in Mission Viejo.

After this, I was recruited by a new start-up water treatment firm owned by Atlantic Ritchfield. I was made District Manager of Southern California. Relying on my experience, I helped increase the sales in the district by over $1,000,000/year, added six more sales/service personnel to the district, opened a new district office, opened a sub-office in Bakersfield, California, and equipped, recruited, and staffed a specialty analytical lab. The new business was all in refining, steel, power, and oil production. In the second year, we grew the business by roughly 60%. None of the new business was generated from accounts where any of us had any previous business; they all were being serviced by larger water treatment companies.

5

Based on my extensive knowledge of and experience in the industry, I started my own water treatment company, Chemisis, Inc., in the 1980s. I continued to successfully operate Chemisis for the next four decades and continue to operate it today, overseeing all aspects of sales and service for customers.

Approximately ten years ago, I also joined Arthur Freedman Associates ("AFA"), a successful water treatment consulting company. In 2019, I started International Water Consultants, Inc. ("IWC"). IWC is my own consulting company. Today I split my consulting work between AFA and IWC. As a consultant I have gained experience and insight into every aspect of water chemistry, water treatment, and corrosion. I routinely work for former competitors, developing products and programs, as well as solving difficult technical problems in their customer facilities. I still work directly for refineries, petrochemical facilities, food processors, hospitals, large buildings, and governmental agencies to solve problems within their facilities.

Exhibit B, which is my curriculum vitae, further describes my qualifications and experience, including publications I have authored in the last ten years, and depositions or trials for which I have provided live testimony for at least the last four years.

AFA is compensated for my services in this matter at the rate of $375.00 per hour for time spent in my office. For my time spent away from my office, AFA is compensated at a rate of $500.00 per hour.

## II. Overview of Industrial Water Treatment Industry.

The industrial water treatment industry provides a wide range of water treatment services and products to companies in the United States and around the world. These water treatment services include the sales of products, chemicals, and services that aid industrial customers to treat water used in their manufacturing or industrial processes. Customers who require water treatment services operate in a wide variety of industries, including the oil and gas sector, mining sector,

6

petrochemical sector, computing sector, food and beverage sector, pharmaceutical sector, farming sector, and manufacturing sector, among others.

There are a wide range of industrial water treatment providers in the industry. Some of these providers are larger corporations, such as Nalco Water ("Nalco"[2]), ChemTreat, Inc. ("ChemTreat"), Suez (previously Betz, now owned by Veolia), Chem-Aqua, Inc., and Kurita Water Industries. These larger water treatment providers generally have over 1,000 employees and operate nationwide and, in some cases, worldwide. However, there are also a variety of smaller-scale water treatment providers that consist of 100 employees or less. It is not unusual for these smaller-scale water treatment providers to successfully compete with even the largest water treatment companies. There are now several hundred of these smaller national and regional companies in the United States, and many more worldwide. A few examples of such companies are Garratt Callahan, Aries, Aqua-Serv Engineers, Condor Technologies, Premier Water & Energy Technology, Cascade Water Services, Watertech, Inc., HOH Water Technology, Eastern Technologies, Aqua Process, Inc., and Guardian CSC.

Thus, competition within the water treatment industry is strong. As noted above, even water treatment companies with a limited number of employees are capable of obtaining business and customers from much larger corporations. In fact, some customers prefer smaller, local companies to large corporations like Nalco or ChemTreat.[3] And the various competitors in the industry routinely compete for top water treatment technicians, engineers, and salespeople. In my nearly 60 years of experience in the industry, I have seen customers switch to new suppliers on a

---

[2] Nalco Water is a division of Ecolab, Inc. References to Nalco in this report include the water treatment services provided by Nalco Water and, to the extent relevant, Ecolab.

[3] *See also* March 7, 2023 Deposition of Benjamin Irwin, at 108 (noting the loss of one customer to a "local" water treatment company).

7

regular basis, and have also seen a significant amount of employee mobility within the industry. Employee and customer mobility is the sign of a healthy and competitive industry.

### III.     Essentials for Obtaining Business in the Water Treatment Industry.

There are three essential elements to obtaining business in the water treatment industry that are well-known to any successful water treatment company:

(1) A water treatment professional ***must*** understand the "why"—why is the customer in need of a new supplier, why are they having a recurring problem at their plant (e.g., why are their boiler tubes routinely blowing out, or why are they having corrosion problems), or why is the customer unhappy with its current supplier?

(2) A water treatment professional ***must*** understand the "how"—that is, how to fix the problem faced by the customer. Before a customer can be motivated to hire a water treatment professional, he or she must realize that some tangible benefit will accrue to them personally, or to their business. Before such a realization can be achieved the customer will have to believe in the individual bringing the solution—that is, believe that the individual has the personal understanding of the complex chemical and mechanical issues involved in water treatment to assess the customer's problem and propose a solution. The solution can be something as simple as noting that the chemical that the customer is using is missing a key ingredient. An example would be seeing that a small section of an alloy like copper is being missed in a predominately all-steel system, and the copper alloy is contributing enough soluble copper to cause aggravated pitting-type corrosion on mild steel components and piping. The addition of a very small amount of an azole type copper corrosion inhibitor may very well solve the problem.

An alternative example would be seeing that a customer is having a foaming problem and recognizing that there is too much of a particular surfactant in the formulated corrosion inhibitor that the customer is using. By altering the formulation of the inhibitor, the foaming is easily solved.

8

In yet another example, a customer is having a pitting corrosion problem in a number of exchangers. It is possible that the problem is due to a cooling water flow problem. The inhibitor depends on not only dosage, but also on water chemistry, temperature, and flow for its success. If something in the cooling system equipment has altered the water flow rate in all or a part of the plant, this will affect not only the flow, but also the water side skin temperature. This can be fixed by checking flow rates at several locations. If only one section of the system is being affected, it may be simply adjusting a valve on that section's flow rate, or it may require repairs to the recirculating pump or pumps.

These are very simple examples out of hundreds or thousands of possibilities. They all require the water treatment professional who is trying to acquire the customer's business to spend time in the plant with the operators and engineers in order to sleuth out the problem. In doing so, they demonstrate to the decisionmaker that they know what they are doing. They are getting familiar with the customer's equipment and system. By solving a problem for the customer—one not solved by the current water treatment supplier—the water treatment professional demonstrates to the customer that its current representative has been too busy or too disinterested (or lacks the necessary chemical and mechanical know-how) to solve the problem.

 (3) A water treatment professional ***must*** build a relationship and rapport with the customer through routine face-to-face meetings and by "walking the plant."

These three elements are indispensable for purposes of obtaining and retaining customers in the water treatment industry. Notably, these elements are not met simply by reviewing a historical review of past service performed or test results obtained, reading a financial spreadsheet, going through a corporate-drafted checklist, or reading generalized training materials about how boiler systems and cooling towers work. Instead, to satisfy each of these elements—and to attract

9

customers—a sales professional in the water treatment industry has to put boots on the ground by "walking the plant"; build meaningful, personal relationships with key decisionmakers at the customer site; and leverage the water treatment professional's *own knowledge* of technical and/or chemical solutions. There is no document, manual, spreadsheet, or historical set of information that serves as a replacement for the "why" and the "how" as to current customer issues, or for the human element.

Having reviewed Nalco's description of the types of materials that were allegedly misappropriated, as well as the limited Allegedly Misappropriated Documents cited in Ms. Trexler's report, I conclude that Ms. Trexler's assumption that those materials would provide meaningful help to a water treatment professional in obtaining a customer is not supported by the evidence and not consistent with my nearly six decades in the water treatment industry. Ms. Trexler fails to identify the specific information that could be used to address a specific problem with a specific type of system operated by a customer. Without that level of specificity, Ms. Trexler's conclusion that the information allegedly misappropriated could be used to obtain a customer lacks support. Rather than provide such detailed information, she simply assumes— contrary to the evidence—that ChemTreat could convert up to 100% of Nalco's customers in certain regions. Based on my experience in the water treatment industry, the documents regarding water treatment that Ms. Trexler relies on for her opinion generally provide the same type of information that any well-developed water treatment company would already have in its stable, that any seasoned water treatment professional would already have as a result of his or her experience, and that any customer shopping around for new water treatment services would provide to a potential supplier. Separately, the financial documents that Ms. Trexler relies on for her opinion (to the extent they do not simply duplicate information that would be available to any

10

water treatment professional from other sources) generally do not provide the type of information that would assist a competitor in persuading a customer to hire them.

## IV.     The Typical Sales Process in the Water Treatment Industry.

The sales process in the water treatment industry is relatively unique because the industry is relatively transparent in several key ways.  There is no guessing involved in determining which industries and customers require water treatment services.  Instead, it is well known that major industrial manufacturers, food and beverage suppliers, oil and gas companies, mines, and other large industrial entities require water treatment services.  Therefore, the sales process in the water treatment industry is less focused on identifying *who* the customers are and instead much more focused on determining *how* to obtain those customers.  Also, unlike most industries, the sales process in the water treatment industry involves substantial transparency into the prices, profits, costs, products, and processes offered by competitors.  In other words, information about competitor prices, profits, costs, products, and processes is easily obtainable.  This is because the sales process, by its nature, involves more than a simple phone call and over-the-phone sales pitch to a customer.  Instead, an indispensable part of the sales process is what we call "walking the plant."  This means going to the customer's plant or manufacturing facility, speaking directly with key decisionmakers in the plant about their water treatment needs, and developing a plan to meet those needs.[4]  Someone who simply calls a plant manager and starts providing data points or a sales pitch will not succeed.

---

[4] Portions of the following video provide a sense of what "walking the plant" looks like.  YouTube, *Industrial Water Treatment Experts – ChemTreat*, accessible at https://www.youtube.com/watch?v=Ogo4XWbjInw.

11

"Walking the plant" provides a straightforward opportunity to gather a range of data points regarding a customer's current supplier, its costs, the amount the customer is spending on its water treatment needs, and the processes or chemical solutions being deployed by the current provider. By "walking the plant," a water treatment professional can decipher this information within just a few days. The water treatment professional will often begin by inspecting the drums (*i.e.*, barrels) of chemicals in the plant, which will show who the current supplier is and what chemicals the current supplier is using. If this information is not readily apparent, the water treatment professional can collect a sample of the chemical solution being used to treat the water at the site, send it back to a laboratory for analysis, and within days have a complete and accurate picture of the precise chemical components being used by the competing supplier. The water treatment professional can then cross-reference these components against widely-available comparison sheets to determine (1) the cost of the chemicals being sold by the current supplier; and (2) the comparative cost of similar chemicals that could provide the same end result.

Another piece of information that is easily gathered by "walking the plant" is the total spend a potential customer is allocating to water treatment services in a given year. Many customers freely provide this information, but even for those who do not, determining a potential customer's total yearly water treatment spend can be determined by viewing the water treatment processes they are using and estimating the value of their budget for those processes. For these reasons, I disagree with Ms. Trexler's simplistic and generalized claim that the Allegedly Misappropriated Documents would "not be publicly or readily available to a direct competitor in the market," Trexler Report, ¶ 42, which is not tied to any specific information cited by Ms. Trexler and is not consistent with my broad experience working at various industry competitors (and

12

running my own competing company) and obtaining similar information about a customer's costs, needs, and existing chemical and mechanical processes from potential customers.

Using information learned from "walking the plant," the water treatment professional can also assess—relying on his or her skill, training, education, and experience—whether an improvement to the chemical combination can be made or whether he or she can recommend an improved water treatment process. There is simply no manual, guidebook, or financial "Fact Pack" that exists for resolving the myriad technical difficulties and chemical conundrums that arise on a customer-by-customer basis. The water treatment professional must rely on his or her skill and knowledge and that of his or her colleagues to resolve these issues.

Yet another piece of information that can be easily obtained by "walking the plant" are current water chemistry test results. Generally, because these water chemistry test results are tests of water used in the customer's plant, the customer retains these water chemistry test results and is able to share them with a potential new water treatment provider. But even if a customer is unwilling to share these current water chemistry test results, a water treatment professional can take a sample of the water used at the customer's plant, run a quick test or analysis, and immediately determine the current chemical mix. As for historical testing results, these may provide additional context, but they are not the type of information that will convince a customer to switch to a new supplier: If the information relates to a previous problem that has been solved, it is not relevant to the customer's current decisionmaking, and if it relates to an ongoing problem that has not been solved by the existing supplier, its relevance is largely going to be to the customer's dissatisfaction with the existing supplier—and resulting willingness to hire a new supplier.[5] In any event, if a new water treatment provider needs access to these historical testing

---

[5] March 7, 2023 Deposition of Benjamin Irwin, at 216.

13

results, in my experience, it is not unusual for a customer to share those results. For these reasons, I disagree with Ms. Trexler's oversimplified claim that the information in the Allegedly Misappropriated Documents "could be leveraged to successfully solicit and convert Nalco/Ecolab's customers." *E.g.*, Trexler Report, ¶¶ 34, 42. As I have seen repeatedly during my six decades in the water treatment industry, it is the water treatment professional's personal knowledge and skill that must be "leveraged" to successfully obtain customers.

The final step in the sales process is building a relationship with key decisionmakers at the customer facility. This is an essential part of the process that cannot be replaced by relying on a spreadsheet or document. It requires building a human connection with the customer by demonstrating on-the-spot knowledge of specific issues faced by the customer, building trust by executing items reliably and competently, and building confidence through routine and professional communication. These skills cannot be learned by staring at a corporate-drafted training document or a financial spreadsheet or a list of historical test results.

A water treatment customer may bargain for a range of services from a water treatment provider. The services may be limited to the supply of chemicals which are then implemented by employees who work for the customer. Or the services may be more expansive, to include regular service visits and service reports provided by the water treatment provider. In some cases, a customer will request a comprehensive plan or design for improving water treatment processes at its facility. The range of services a water treatment vendor provides is dependent not only on the water treatment professional's ability to obtain the business, but also dependent on a wide range of economic factors that are entirely outside the control of the provider, including the customer's current production levels and the broader economy, as discussed in more detail below.

14

## V. Economic Realities Undermine Ms. Trexler's Foundational Assumptions.

Ms. Trexler's lack of any experience and background in the water treatment industry is demonstrated by the flawed foundational assumptions upon which she relies. Ms. Trexler fails to account for practical and economic realities in the industry that upend the foundations of her report. Specifically, the practical and economic realities of the water treatment industry render Ms. Trexler's assumptions regarding the following topics entirely inapplicable:

(1) Ms. Trexler assumes that customer revenue attrition rates operative during the COVID-19 global pandemic will remain constant for the next ten years and that Nalco would retain the customers it had in the 2020 time period for up to ten years;

(2) Ms. Trexler conducts no analysis whatsoever of alternative and independent reasons for customer revenue attrition that are entirely unrelated to Mr. Ridley's or ChemTreat's alleged conduct;

(3) Ms. Trexler improperly assumes that Nalco's average gross profit margins from 2017 through 2020 will remain constant for the next ten years;

(4) Ms. Trexler fails to account for fundamental shifts in the economic landscape that have rendered pricing and customer information pre-dating the global pandemic of COVID-19 largely unusable in today's volatile economic environment.

(5) Ms. Trexler improperly assumes that historical and technical information regarding a customer's chemicals or water treatment processes remains reliable or useful in the future.

(6) Ms. Trexler improperly assumes that the information gathered by Nalco in the course of providing water treatment services belongs to Nalco and Nalco alone.

15

A. **Ms. Trexler's Customer Revenue Attrition Rates Are Artificially Deflated As a Result of the COVID-19 Global Pandemic.**

Ms. Trexler mistakenly relies on data gathered from 2020—in the middle of the COVID-19 global pandemic—to extrapolate as to anticipated revenue and customer attrition rates over the next ten years. Trexler Report, ¶ 51. Ms. Trexler notes that the 2020 Fact Pack shows a customer retention rate of 86.7% for WL121, Trexler Report, ¶ 51, meaning that Nalco lost only 13.3% in customer revenue in the year 2020 (apparently through September of 2020).[6] Using this data, Ms. Trexler concludes that average customer retention rates will remain constant at 86.7% over the next *ten years*.

Ms. Trexler's foundational assumption is deeply flawed. The COVID-19 global pandemic had a fundamental impact on the water treatment industry. As discussed above, a critical element to obtaining new customers is "walking the plant." Absent the ability to do so, it is much more difficult to obtain new business and new customers. During the COVID-19 global pandemic, many companies in the industry imposed limitations on travel to customer sites, which limited a water treatment professional's ability to "walk the plant" and make additional sales. Moreover, during this time period, many customers were struggling to run their own plants as a result of constantly shifting labor issues, meaning most customers had no interest in switching water treatment vendors because doing so would only add to their workload. This means that Nalco's attrition rates during the time period upon which Ms. Trexler relies appear to have been at

---

[6] I note that Ms. Trexler does not explain how Nalco calculates its attrition figures. Depending on the context and company, attrition rates might include (1) a total count of lost customers, regardless of revenue; (2) a count of lost revenue that includes revenue lost to competitors, revenue lost as a result of permanent plant shutdowns, *and* revenue lost as a result of temporarily "offline" plants; or (3) a count of lost revenue that *excludes* revenue lost from temporarily "offline" plants. While Ms. Trexler's attrition rates appear based on revenue losses, she has not explained whether these attrition rates include or exclude revenue lost from temporarily "offline" plants.

16

*historically low* levels that are unlikely to be replicated again any time in the next ten years.[7]  Ms. Trexler's reliance on a single snapshot of attrition rates—one taken during a historical outlier—undermines her entire report.

This flawed assumption infects other portions of Ms. Trexler's report as well.  *See* Trexler Report, ¶ 46.  For example, Ms. Trexler presupposes that a fact finder could determine that ChemTreat is liable for Nalco's projected profits for "a period of up to 10 years."  Trexler Report, ¶ 46.  Ms. Trexler makes this proposal based on her view that "Nalco/Ecolab's customers have historically low attrition rates."  Trexler Report, ¶ 46.  Ms. Trexler goes further to claim that "[s]aid another way, Nalco/Ecolab has a high customer retention rate."  Trexler Report, ¶ 46.  Ms. Trexler does not cite to any evidence for her supposition, but apparently relies on the attrition rates discussed in paragraph 51 of her report.  But again, those attrition rates are derived from an extraordinarily unique economic environment that is unlikely to be replicated any time in the next ten years and that is not consistent with the same data provided by Nalco for periods before or after the limited timeframe used by Ms. Trexler.  Therefore, Ms. Trexler's ten-year projection proposal appears unfounded based on Nalco's data.  Moreover, I note that customer turnover is a common occurrence in the water treatment industry.  The industry is highly competitive, and customers routinely switch to new suppliers because the transaction costs of switching to new suppliers are low (with the exception being the COVID-19 time period, during which customers generally stayed with existing suppliers).[8]  Additionally, it is routine for customers to seek one-year contracts or supply agreements with water treatment providers, and I understand from the testimony of

---

[7] *Compare* PLAINTIFFSR-000000821 *with* PLAINTIFFSR-000001015 *and* PLAINTIFFSR-000001499 (see various "Results Graphs" tabs, showing attrition of 12-13% during the pandemic, which was at nearly 18% at one point in 2019 and returned back to 17% in December 2022).

[8] *See above*, n.7.

17

Nalco's witnesses that the majority of Nalco's service agreements with customers are for one year.[9] For example, customers can request a one-year supply of chemical (without any accompanying service agreement) from a water treatment provider, and then reassess whether they will obtain supplies from a different vendor after the one-year supply of chemical runs out.[10]

**B.    Ms. Trexler Fails to Consider Alternative Explanations for Reduced Customer Revenue.**

In support of her opinions, Ms. Trexler includes a document titled "Financial Impact, updated February 7, 2023."  Trexler Report, Ex. B.  This document appears to identify certain customers for whom Nalco contends it lost revenues in the year 2021 or the year 2022.  Ms. Trexler does not meaningfully analyze this document, nor does she provide any information about the reasons for these apparent reductions in revenue.  Additionally, Ms. Trexler does not state that any lost revenue is tethered to Mr. Ridley's or ChemTreat's conduct.  Indeed, for many of these customers, it appears that Nalco did not lose any revenue at all.[11]

To the extent Nalco did suffer a loss in revenue for these customers, it is notable that revenue reductions arise from a large variety of factual circumstances.  Revenues received from customers are inherently volatile, both because customers are free to switch suppliers at any time (unless they are under a contract), and because customers may adjust their purchases from a water treatment supplier at any time (unless they are under a contract).  But more fundamentally, any number of variables can result in revenue reductions, even where a contract is present.  These variables include at least the following:  supply shortages, driver shortages, weather that impacts the ability to ship chemical, the price of the underlying raw materials, fluctuations in plant

---

[9] March 7, 2023 Deposition of Benjamin Irwin, at 207-215.

[10] March 7, 2023 Deposition of Benjamin Irwin, at 210-213.

[11] March 7, 2023 Deposition of Benjamin Irwin, at 81-118.

18

production at the customer facility, and changes in the scope of revenue provided by the vendor.[12] Chemical payment arrangements in the water treatment industry can be made under a "ship-and-bill" agreement.[13] Under these arrangements, the customer does not pay for the chemical until it is actually shipped to them.[14] This explains why supply and driver shortages can have a major impact on revenues, and also explains why extreme weather conditions can impact revenues. If a product cannot be shipped or is delayed in shipment as a result of supply or driver shortages, or because a road has been damaged by extreme weather, that will impact the immediate revenues for the water treatment supplier.

Notably, the types of chemicals used in the water treatment industry can be hazardous if transported using regular tractor trailers. Therefore, these chemicals often require specialized handling and must be transported in customized vehicles that meet regulatory safety standards. At times, these shipments even require access to highly-trained drivers who can transport the chemicals safely.

It is well known that, as the country emerged from the COVID-19 global pandemic, the global supply chain was heavily impacted.[15] As demand for materials increased, and the workforce struggled to rebound from the pandemic, obtaining raw materials (and the drivers and trailers

---

[12] March 7, 2023 Deposition of Benjamin Irwin, at 72-80.

[13] March 7, 2023 Deposition of Benjamin Irwin, at 72-73.

[14] March 7, 2023 Deposition of Benjamin Irwin, at 72-73.

[15] Ernst & Young, *How COVID-19 impacted supply chains and what comes next* (Jan. 6, 2023), *accessible at* https://www.ey.com/en_us/supply-chain/how-covid-19-impacted-supply-chains-and-what-comes-next#:~:text=The%20pandemic%20continues%20to,new%20challenges%20for%20supply%20chains; World Economic Forum, *5 ways the COVID-19 pandemic has changed the supply chain* (Jan. 14, 2022), *accessible at* https://www.weforum.org/agenda/2022/01/5-ways-the-covid-19-pandemic-has-changed-the-supply-chain/

necessary to transport those materials) presented a new challenge to the water treatment industry.[16]

Not only did obtaining raw materials for shipment to customers become more difficult, but many customer facilities struggled to sustain their operations because *they too* were facing the same supply chain challenges in obtaining raw materials used to produce their primary products. These supply chain challenges have been exacerbated by the war in Ukraine, which has placed a further constraint on the supply of chemicals.[17] Notably, these extensive supply chain challenges (and resultant plant operation reductions) coincided with much of the revenue losses Ms. Trexler has identified in her "Financial Impact" document.

For these reasons, to the extent Ms. Trexler assumes that any reductions in revenue identified in her "Financial Impact" document arose solely from Mr. Ridley's and ChemTreat's alleged conduct, her assumptions are deeply flawed. Based on my experience and familiarity with the industry, including during the period at issue, I conclude that there are a variety of independent, alternative reasons that could explain these revenue reductions.

### C.     Ms. Trexler Improperly Assumes Static Margins.

To calculate gross profit margin and extrapolate gross profit margin for the next ten years, Ms. Trexler relies on the "average gross profit margins for October 2017 to September 2020 from the 'Sales Mgn Report All in USD' tab contained within the September 2020 Region Fact Pack."

---

[16] Exhibit C, BIS Research, *Analyst Note – Water & Wastewater Treatment Chemicals* (June 2020), at 6-10; Trinity Logistics, *Shortages are affecting the chemical industry* (Aug. 13, 2021), *accessible at* https://trinitylogistics.com/shortages-are-affecting-the-chemical-industry/; Chartered Institute of Procurement & Supply, *97% of chemicals manufacturers still plagued by supply chain disruption* (Aug. 29, 2022), *accessible at* https://trinitylogistics.com/shortages-are-affecting-the-chemical-industry/.

[17] OECD, *The supply of critical raw materials endangered by Russia's war on Ukraine* (Aug. 4, 2022), *accessible at* https://www.oecd.org/ukraine-hub/policy-responses/the-supply-of-critical-raw-materials-endangered-by-russia-s-war-on-ukraine-e01ac7be/; *see also* AG Chemical Group, *The Ukraine Conflict's Impact on Chemical Business and Beyond* (May 6, 2022), *accessible at* https://blog.agchemigroup.eu/the-ukraine-conflicts-impact-on-chemical-business-and-beyond/.

Trexler Report, ¶ 48. Based on my knowledge of the water treatment industry, Ms. Trexler's reliance on profit margins from October 2017 to September 2020 to calculate hypothetical profit margins for the next ten years is flawed because, again, the margins she relies upon were applicable *prior to* the emergence of substantial supply chain issues that have impacted the global economy generally, and the water treatment industry in particular, in recent years. These extraordinary supply chain constraints have reduced profit margins for suppliers in the water treatment industry because the costs of underlying chemicals and the costs of transporting those chemicals have skyrocketed.[18] These increasing costs have reduced the profit margins for water treatment suppliers, because most customers will not accept a corresponding increase in pricing sufficient to offset the supplier's increased costs. In general, price increases in the water treatment industry are hotly-contested by customers because of the large pool of alternative competitors available in the market.

### D. Ms. Trexler Improperly Assumes that Pricing and Customer Information Dating from 2019 or Earlier Remains Reliable, Relevant, or Useful in the Future.

Ms. Trexler relies most heavily on "customer revenue, profitability, and technical information" contained in the Allegedly Misappropriated Documents to assert that the information is valuable or "could be leveraged to successfully solicit and convert Nalco/Ecolab's customers." *E.g.*, Trexler Report, ¶¶ 34, 42. But the information and documents Ms. Trexler relies on date, for the most part, from 2020 or earlier (and, in some cases, as early as the 2000s).[19] Ms. Trexler

---

[18] WaterTech of America, *Supply Chain Challenges and the Ripple Effect on Water Treatment*, *accessible at* https://www.watertechusa.com/mobile/supply-chain-challenges-and-water-treatment; *see above* nn.16-17.

[19] *E.g.*, ECO9080.00070463 (cited in Ms. Trexler's report); *see also* "Files Exfiltrated by Anthony Ridley" (cited in Ms. Trexler's report) (showing Allegedly Misappropriated Documents dating back to 2009 or earlier).

21

appears to assume that this information would remain reliable, relevant, or useful months or even years after it is originally generated. *See* Trexler Report, ¶ 46. However, Ms. Trexler does not explain the impact of the fact that, even in 2021, much of the information she cites to was nearing or past even her longest threshold of ten years. Nor does she explain why, particularly in light of the economic realities of the past few years (discussed above), the revenue, profitability, and pricing information contained in the documents she cites will retain its alleged relevance and utility for the ten-year period she appears to use—or even for shorter periods of time. As Nalco's WL121 District Manager, Benjamin Irwin, recognized at his deposition, in today's economic environment, Nalco generally holds price quotes out for customers for a period of 30 days, and no longer than 60 days absent supervisor approval.[20] That is because Nalco "would not want [the customer] to reference chemical pricing from years ago" or even to "reference chemical from a year ago because chemicals change over time, and so the process of building the quote, if too much time has passed, would need to be done again."[21]

This is consistent with my experience in the water treatment industry, which teaches that revenue, profitability, and pricing information become obsolete quickly. This truism applies even more firmly to the post-pandemic marketplace, where the assumptions upon which those revenue, profitability, and pricing calculations are based are in a constant state of flux as a result of the economic factors described above, including supply chain challenges, an ongoing conflict in Ukraine, increasingly extreme weather conditions, and a range of other variables that quickly make such data obsolete.[22] Moreover, as described in more detail above, much of this type of information is easily ascertainable and publicly available to anyone who "walks the plant," such

---

[20] March 7, 2023 Deposition of Benjamin Irwin, at 27-28.

[21] March 7, 2023 Deposition of Benjamin Irwin, at 24-25.

[22] March 7, 2023 Deposition of Benjamin Irwin, at 25-28.

22

that the utility of the information is decreased (or eliminated) by its availability elsewhere (and its obsolescence to the extent conditions at the plant change). As noted, "walking the plant" is not a part of the process that a water treatment professional can simply skip—it is essential for purposes of obtaining business. Thus, even with access to a financial spreadsheet or historical testing data, a water treatment professional still must "walk the plant" to demonstrate his abilities and build a rapport with their potential customer.

For these reasons, I conclude that Ms. Trexler fails to explain how the revenue, profitability, and pricing information that she relies upon would provide significant value to a water treatment professional seeking to obtain customers. Her assumption that such information is valuable is not supported by any evidence in her report, and is contrary to my knowledge of current conditions in the water treatment industry, which result in such information typically becoming obsolete within a matter of months.

E.      **Ms. Trexler Improperly Assumes that Historical and Technical Information Regarding a Customer's Chemicals or Water Treatment Processes Will Remain Reliable, Relevant, or Useful in the Future.**

Ms. Trexler repeatedly refers to the value of certain "technical information" or "technical specifications of the products and services provided by Nalco to each customer." *E.g.*, Trexler Report, ¶¶ 34, 42. But in my experience, this historical technical information regarding a customer's chemical mix or the water treatment processes implemented by a customer years or decades ago typically becomes obsolete quickly, for several reasons. *First*, changes in a customer's equipment or output may require alterations to the chemical mix or water treatment processes used at a particular plant. These changes, which are quite common, render the prior chemical mixes and water treatment processes used by the customer obsolete. *Second*, changes in the nature of the water that is being treated require updates to the chemical mix or water treatment processes a water treatment professional will recommend for a particular customer. These changes

23

in the composition of the water being treated can be caused by a variety of factors, including changes to the customer's output, environmental changes, and changes to the equipment used by a customer. *Third*, the cost of chemicals used in the water treatment process is highly volatile, particularly in recent years (as described above), meaning that customers and water treatment professionals must constantly reassess which chemicals should be substituted for less expensive but equally effective chemicals. *Fourth*, technological innovations, the development and discovery of new chemicals, evolutions in the water treatment process, and changing regulatory requirements on a local, state, or national level mean that a water treatment professional must adjust and implement new innovations or adjust to these new requirements. I have seen these evolutions and discoveries accelerate in recent years, further undermining reliance on historical water treatment processes or records. I have also seen changes to the regulatory landscape at the local, state, or national level impact the solutions available to customers. Thus, historical and technical records regarding a customer's chemical mix or water treatment processes become less reliable or usable as time progresses.

F.    **Ms. Trexler Improperly Assumes that a Customer's Technical Information, Costs, Allocation of Budget to Water Treatment, and Water Treatment Processes Belong to Nalco.**

Ms. Trexler repeatedly refers to the value of certain "technical information" or "technical specifications of the products and services provided by Nalco to each customer." *E.g.*, Trexler Report, ¶¶ 34, 42. But as noted above, that information is generally easily obtainable and publicly available simply by "walking the plant," which is a necessary precursor to obtaining business from a customer in any event. Putting that issue aside, Ms. Trexler improperly assumes that the chemical processes or technical specifications of products used to treat a customer's facility *belongs to Nalco*. I disagree, as would many customers. A contract-by-contract analysis would be necessary to determine the specific contours of any confidentiality agreement between Nalco

24

and its customers. However, I understand that Nalco has largely not produced confidentiality agreements for the customers to which it contends the Allegedly Misappropriated Documents pertain, and its witnesses have testified that Nalco does not affirmatively seek such confidentiality agreements except as to new product development.[23] Absent these contracts, I rely on my experience in the industry. In my experience, customers view information regarding the technical specifications and technical processes deployed in their plants to belong to them. Indeed, customers can request this data directly from their vendor at any time, and customers routinely share information regarding their technical specification and technical processes with successor vendors so that the vendors can assess current technical needs and how the extant processes can be improved upon. It is my understanding from testimony of Nalco's witnesses that Nalco instructs its employees to provide this information (such as testing results) to customers immediately after (or even during) site visits, such that Nalco's customers should have access to all of this information themselves if Nalco's employees have followed these corporate instructions/best practices.[24] In my experience, customers routinely decide to provide this historical process and technical information to new suppliers so that they are aware of what has been implemented in the plant in the past. It is the customer's prerogative to do so.

## VI. Specific Categories of Documents Addressed in Ms. Trexler's Report

In her report, Ms. Trexler focuses on a few specific categories of documents that she contends are "high value" documents. Trexler Report, ¶ 42. None of these documents provide the essential elements for obtaining business in the water treatment industry: the "why," the "how," and the personal relationship-building aspect. *See above*, Section III. The water treatment industry

---

[23] March 1, 2023 Deposition of Karry Mackie, at 126.
[24] March 7, 2023 Deposition of Benjamin Irwin, at 31-33, 35-36.

is a service industry at the core, not simply a matter of selling products at a good price. A vendor attempting to obtain new business must persuade a customer that the vendor has the necessary technical knowledge, experience, professionalism, problem-solving ability, and interpersonal skills to handle the customer's water treatment problems efficiently and provide top-notch customer service. Therefore, I disagree with Ms. Trexler's over-simplistic claim, based on zero experience in the water treatment industry, that these documents "could be leveraged to successfully solicit and convert Nalco/Ecolab's customers." Trexler Report, ¶ 42. Indeed, Ms. Trexler's supposition is undone by the absence of evidence that ChemTreat *actually did* "convert" the customers to which the Allegedly Misappropriated Documents pertain during the employment of Mr. Ridley (or at any time after his termination). Putting these problems aside, Ms. Trexler fails to recognize that the information contained in these allegedly "high value" documents is the type of information that would quickly become obsolete because of the economic and practical realities outlined in the preceding section.

The information Ms. Trexler contends is of "high value" to a competitor falls into several categories, which I address below.[25]

### A. Financial Information Concerning Customers, Including Pricing, Price Quotes, Revenues, and Margins

As detailed above, much of the financial information that Ms. Trexler asserts is "high value" is at times shared by customers, easily ascertainable by "walking the plant" (which is a necessary precursor to obtaining business from a customer in any event), and becomes obsolete quickly under current economic conditions. Additionally, knowledge of a competitor's pricing,

---

[25] I note that Ms. Trexler does not cite any specific documents, other than the September 2020 Region "Fact Pack" and a summary of the "Six Service Standards," as part of her description of these "high value" documents. Trexler Report, ¶ 42. Therefore, I only assess these documents immediately below.

26

price quotes, revenues, and margins is not necessarily useful for purposes of obtaining a competitor's customer, because each water treatment supplier is necessarily constrained by the product offerings and process offerings available to it. This means that, even if a water treatment supplier knew a competitor's pricing structure or margins, that information would not allow the supplier to overcome the practical constraints imposed by the offerings (and associated pricing structures, costs, and margins) available to it. Finally, multiple Nalco witnesses have admitted that they don't always update their "Fact Packs" to reflect Lost Claimed customers, indicating that these "Fact Packs" are not particularly reliable or up-to-date, which further undermines their utility to a competitor.[26]

### B.    Six Service Standards

In general, the "Six Service Standards" documents referred to in Ms. Trexler's report appear to be the types of documents any sales professional in the water treatment industry would create for purposes of servicing a customer. Indeed, many of these documents are documents that I create when I service my customers. These documents do not provide particularly unique information that cannot be obtained by other methods and, in any event, these documents become obsolete when customer needs shift or the volatile variables discussed above change.

- **People Survey**: This document appears to contain customer contact information. This information is publicly available within the industry and online. As an exercise I picked three random refineries around the country and was able to quickly determine the current holders of the jobs of refinery manager, operations manager, technical manager, chief inspector, utilities process engineer, purchasing manager, and several other

---

[26] March 7, 2023 Deposition of Benjamin Irwin, at 99, 106-107; March 1, 2023 Deposition of Karry Mackie, at 52-53, 88, 100.

27

process engineers within the refineries in less than 20 minutes using nothing more than my phone and Google. These are the people that I would contact in order to begin a sales effort at these plants. Moreover, customer contact information is easily gathered at conferences and industry meetings routinely attended by representatives of water treatment suppliers.

- **Plant Survey**: This document appears to contain technical information about the processes and chemicals at use at a specific customer site. As described above, this information is readily available by "walking the plant." Additionally, customers routinely share this information with new vendors or potential new vendors.

- **Service Plans**: This document appears to contain the customer's existing service schedule and a plan for going-forward services, and is provided by Nalco to its customers, such that the customer is capable of sharing it with other vendors.[27] A customer's service schedule can be ascertained simply by "walking the plant." In any event, it is not useful to rely on a different company's service plans or service processes to assess the "why" and the "how" for a prospective new customer. The information contained in these documents may be outdated, unreliable, or untrustworthy. A new vendor would have to "walk the plant" and do the actual work to address the customer's needs, figure out how to resolve any water treatment problems the customer was having, and develop a service plan that would persuade the customer to choose the vendor over its existing supplier.

- **Personal Service Reports**: These documents appear to be historical records of projects undertaken by Nalco for a particular customer. First, it is common for

---

[27] March 1, 2023 Deposition of Karry Mackie, at 279.

28

customers to share these historical records with new vendors or potential new vendors to allow them to assess what has been done in the plant in the past and what can be improved upon. Indeed, testimony from Nalco's witnesses confirms that Nalco shares its service reports with customers, such that the customer is capable of sharing those service reports with other vendors.[28] Second, at heart, these records belong to the *customer*, because they reflect projects undertaken *in the customer's facilities and plants*. Third, while historical records can occasionally be useful for assessing the "why," as discussed above, they provide no useful information for purposes of assessing the "how." A water treatment professional and his team must rely on their experience, knowledge, and technical know-how to troubleshoot problems and assess how a predecessor's processes or chemical mixtures can be improved upon.[29]

- **Annual / Quarterly Business Reviews**: These documents appear to outline potential new sales opportunities and business opportunities with the customer. Again here, any water treatment professional who "walks the plant" can identify areas for potential customer growth, and "walking the plant" is an essential precursor to building a personal rapport and relationship with the key decisionmakers at the plant who will decide where to allocate business. Moreover, new sales opportunities are context-dependent, meaning that shifts in manufacturing demand or plant production quickly render sales opportunities that may exist one month obsolete months or years later.[30]

- **Program Admin Manual ("PAM")**: This appears to be a "customized definitive guide for proper application of Nalco Water programs." Trexler Report, ¶ 42. Because

---

[28] March 1, 2023 Deposition of Karry Mackie, at 283.
[29] March 16, 2023 Deposition of Steve Leavell, at 209-210, 246-247.
[30] March 7, 2023 Deposition of Benjamin Irwin, at 27-28.

this "guide" is specifically "customized" for "Nalco Water programs," it would not be useful to a competitor who is utilizing its own "programs." To the extent it contains information focused on the customer, such as the plant layout or water quality, those are issues that a water treatment professional would be able to identify as part of the essential process of "walking the plant." I also understand from deposition testimony that Nalco employees leave the PAM at the plant as a resource for customers,[31] meaning it is also available to be reviewed by any vendor who visits the plant.

## VII. The "Business Plan" Document Does Not Appear to Contain Nalco's Information

Ms. Trexler opines on the amount of salary Mr. Ridley would owe to Nalco for disloyalty based on a "business plan" he prepared with regard to his potential employment with ChemTreat and sent to ChemTreat on March 2, 2021. Trexler Report, ¶¶ 10, 58-59. I have reviewed this "Business Plan," which is simply an Excel spreadsheet with various bar graphs reflecting Mr. Ridley's projected performance if he were to be hired by ChemTreat.[32] It appears that ChemTreat personnel provided Mr. Ridley with base revenue figures for 2021 (based on existing ChemTreat customers he would be hired to service), and he then utilized those figures from the ChemTreat personnel to project his forecasted total revenue for 2021, 2022, and 2023 if he was hired by ChemTreat.[33] These types of projections are very common in the industry, and a fundamental part of any sales projection process. The concepts used in this forecast are not unique to Nalco, ChemTreat, or any other industry participant.[34] Nor is the terminology used in the forecast unique to Nalco, ChemTreat, or any other industry participant. For example, "Non-Repeat" is a

---

[31] March 1, 2023 Deposition of Karry Mackie, at 281-282.

[32] CHEMR-000000278; *see also* CHEMR-000000277.

[33] March 1, 2023 Deposition of Karry Mackie, at 336-348.

[34] *See* March 1, 2023 Deposition of Karry Mackie, at 336-348.

commonly-understood industry term that refers to sales that are made on a one-time basis and not expected to recur, such as one-time equipment sales.[35]  As another example, the term "Bridge" generally refers to how the water treatment professional will create a "bridge" between his or her existing revenue base and the forecasted, projected, or goal revenues.[36]  As yet another example, "Down Accounts" is a commonly used term that refers to accounts that are projected to decrease revenues for some reason, for instance as a result of decreased production.[37]  I also do not see any indication that the figures or data contained in this document belong to Nalco.  Rather, based on the documents, they are projections based on an assumption provided by ChemTreat.

## CONCLUSIONS

For these reasons, I conclude that Ms. Trexler's opinions regarding the value of the Allegedly Misappropriated Documents are not consistent with the available evidence or the nature of the water treatment industry, based on the knowledge of that industry I have developed over the course of my six decades of experience in it.

Signed: _Robert Cunningham_
Robert Cunningham

Dated: _March 23, 2023_

---

[35] *See* March 1, 2023 Deposition of Karry Mackie, at 337-338.
[36] *See* March 16, 2023 Deposition of Steve Leavell, at 139-140.
[37] *See* March 1, 2023 Deposition of Karry Mackie, at 337-339.

31

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, | Case No. 1:22-cv-00050-TRM-SKL |
| Plaintiffs, | Hon. Travis McDonough |
| v. | Magistrate Judge Susan K. Lee |
| ANTHONY RIDLEY, and CHEMTREAT, INC., | |
| Defendants. | |

**EXPERT REPORT OF JAMES D. VAUGHN**

1

## TABLE OF CONTENTS

I.    Credentials and Background ..................................................................4

II.   Facts and Assumptions Provided by Counsel ......................................5

III.  My Early 2022 Investigation Into Ecolab's Allegations of Misappropriation ...................7

     A.    Key Sources of Electronically Stored Information ...................................8

         1.    Mr. Ridley's Repositories ...........................................................9

             a.    Mr. Ridley's Emails ........................................................9

             b.    Mr. Ridley's OneDrive Documents ..............................10

             c.    Mr. Ridley's First ChemTreat-Issued Laptop ..............10

             d.    CrowdStrike Log ...........................................................11

             e.    Mr. Ridley's Second ChemTreat-Issued Laptop ..........15

             f.    Lexar USB Device – Returned by Mr. Ridley to ChemTreat ........16

         2.    Emails and OneDrive Documents of Potentially Relevant Custodians ...................17

     B.    Searches Conducted ..................................................................18

     C.    Search Results ...........................................................................20

     D.    Search of ChemTreat Shared Network Folders and Files.....................23

     E.    Conclusions Based on Early 2022 Investigation ................................24

IV.   Further Investigation in 2023 ................................................................24

     A.    The "DLP Report" .....................................................................25

     B.    Search Parameters .....................................................................26

     C.    Results .......................................................................................28

     D.    Mr. Ridley's Ecolab-Issued Laptop and "LaCie Drive" ....................30

     E.    Reasonableness of the Investigation I Conducted ...............................31

F.     Reliability of the CrowdStrike Log and Validation Testing ...................................35

     1.     Temporal Ranges of the CrowdStrike Log .................................36

           a.     Beginning Date of the CrowdStrike Log ......................................36

           b.     End Date of the CrowdStrike Log .................................37

     2.     Information Contained in the CrowdStrike Log ........................37

     3.     Validation and Testing Procedure..............................................38

     4.     Results.........................................................................................40

     5.     Conclusion Regarding Validity and Reliability of the CrowdStrike Log ..........................................................................................40

G.     Conclusion Arising from Further Investigation in 2023 ........................................40

V.     Conclusions......................................................................................................41

Case 1:22-cv-00050-TRM-SKL   Document 255-2   Filed 05/25/23   Page 893 of 990   PageID #: 6071

## I. Credentials and Background

My name is James D. Vaughn. I am a Managing Director of iDiscovery Solutions (iDS) and a court-recognized expert who has given testimony in more than 80 cases involving digital forensic methodologies, including the identification, collection, analysis, and production of electronically stored information. I have also trained hundreds of law enforcement officers, attorneys, and other examiners on digital forensics and high-technology-related issues involving best practices and methodologies. I previously served as a part-time instructor and course developer with the California Department of Justice, where I co-developed and taught digital forensics courses. I am a retired law enforcement officer; I spent the last several years of my law enforcement career conducting digital forensic investigations.

My credentials include professional certifications related to digital forensics. I am an EnCase Certified Examiner (EnCE),[1] as well as a GIAC Certified Forensics Examiner (GCFE).[2] To obtain these certifications, I attended formalized digital forensics training, took written tests, and have performed practical examinations, all of which are designed to measure proficiency. I am also required to renew these certifications by submitting continuing professional education and other formal training credits every three years. To demonstrate my expertise, I have voluntarily maintained active digital forensic certifications for more than 20 consecutive years. Conservatively speaking, I have more than 1,800 hours of formal training in computer, digital media, and mobile device forensics.

---

[1] The EnCase Certified Examiner (EnCE) program certifies both public and private sector professionals in the use of Opentext EnCase Forensic. EnCE certification acknowledges that professionals have mastered computer investigation methodology as well as the use of EnCase software during complex computer examinations.

[2] The GIAC Certified Forensic Examiner (GCFE) certification validates a practitioner's knowledge of computer forensic analysis, with an emphasis on core skills required to collect and analyze data from Windows computer systems.

4

I have significant experience performing forensic investigations of computers, mobile devices, storage media, and other devices in lawsuits alleging the misappropriation of trade secrets, confidential information, and intellectual property. I have served as an expert witness and have worked with clients on both the plaintiff and defense side of such disputes, as well as served as a third-party neutral on several occasions. Exhibit A, which is my curriculum vitae, further describes my qualifications and experience, including publications I have authored in the last 10 years, and depositions or trials for which I have provided live testimony for at least the last 4 years.

iDS is compensated for my services in this matter at the rate of $600.00 per hour, plus the cost of other iDS employees performing tasks on this project. That compensation does not affect my opinions in this matter. When I use the word "I" throughout this report, it is intended to represent tasks performed by myself or other iDS team members working under my direction and supervision.

This expert report is provided based on the information presently available to me. I understand that discovery in this matter is ongoing. To the extent additional information or documents are produced in this matter that may bear on my conclusions, I reserve the right to supplement this expert report appropriately.

## II.     Facts and Assumptions Provided by Counsel

I have been provided copies of all documents produced by each of the parties to this litigation, including any forensic images that have been produced by the parties as of the date of this report, as well as copies of interrogatory responses provided by all parties, and various public court filings by the parties. In the course of preparing this report, including forming the opinions

5

set forth below, I relied upon the facts set out in the materials cited herein.[3]  A complete list of the materials I relied upon for purposes of this report is attached as Exhibit B.

I also relied on certain assumptions provided by counsel for ChemTreat, Inc. ("ChemTreat").  These assumptions, in part, inform the conclusions I reach in this report.  The assumptions provided by counsel for ChemTreat upon which I relied in preparing this report are as follows:

- The personal email address for Anthony Ridley ("Mr. Ridley") is aridley75@hotmail.com.

- The file names identified in Search No. 1 are the file names Ecolab[4] identified in its original complaint as file names corresponding to Nalco/Ecolab ("Ecolab") documents Mr. Ridley allegedly misappropriated while employed by Ecolab.  Ecolab's March 3, 2022 Complaint, ¶¶ 39, 53, 93 (Doc. 1).

- The file names identified in Search No. 6 are file names corresponding to the file names on the CrowdStrike log in which the phrase "Nalco Water Files" appears in the file path.

- The file name identified in Search Nos. 4 and 5 is a file name of an Ecolab document attached to an email sent from Mr. Ridley's personal email address to his ChemTreat email address.

- The email addresses identified in Search No. 3 are personal or non-ChemTreat email addresses known or alleged to belong to Mr. Ridley.

---

[3] My opinions do not rely on any party's or witness's characterization of the facts set out in any document or discovery response.

[4] References to "Ecolab" in this report refer to Plaintiffs Ecolab Inc. and Nalco Company, LLC.

6

- The custodians whose data was provided to me, either during my initial investigation in 2022 or my further investigation in 2023, include individuals in Mr. Ridley's line of authority (including his immediate supervisor, the supervisor to Mr. Ridley's immediate supervisor, and the executive at the head of ChemTreat's North American field sales organization) as well as Mr. Ridley's predecessor, and a number of ChemTreat employees who may have interacted with Mr. Ridley.

- The Lexar USB I examined was issued to Mr. Ridley by ChemTreat and returned by Mr. Ridley to ChemTreat upon his termination.

- David Ellis retired from ChemTreat on December 10, 2021.

III. **My Early 2022 Investigation Into Ecolab's Allegations of Misappropriation**

I was retained by ChemTreat to investigate allegations made by Ecolab in a February 9, 2022 letter that Mr. Ridley had misappropriated Ecolab's documents and placed them on or distributed them through ChemTreat's systems.[5] I directed the search of potentially relevant ChemTreat repositories and documents in the possession of certain ChemTreat custodians to assess the accuracy of certain allegations made by Ecolab in the February 9, 2022 letter and in a legal complaint filed on March 3, 2022. I found no evidence that Mr. Ridley stored Ecolab's confidential information or documents on ChemTreat's Systems[6] or that he had distributed Ecolab's confidential information or documents to other ChemTreat employees using

---

[5] February 9, 2022 Ltr. from D. Walton to V. Mirmira (Doc. 42-2) (the "February 9, 2022 Letter").

[6] When I refer to "ChemTreat's Systems" in this report, I am referring to systems managed by ChemTreat that a user could utilize to distribute data, information, or documents, including cloud-based platforms such as OneDrive, network shared folders, and email. ChemTreat's Systems, as used in this report, does not refer to stand-alone devices such as individual laptops.

7

ChemTreat's Systems. In fact, the investigation revealed just one Ecolab document—a bid document from 2015.[7]

This Section describes the investigation that I conducted in February, March, and April of 2022. Section III.A discusses the sources of electronically stored information I collected and searched. Section III.B describes the searches I conducted. Section III.C describes the results of those searches. Section III.D discusses a search of ChemTreat network or shared folders I directed. Section III.E describes the conclusions I reached as a result of my early 2022 investigation.

### A. Key Sources of Electronically Stored Information

My investigation in early 2022 focused on various ChemTreat data repositories that Mr. Ridley could have used to store or distribute information electronically. These sources included: (1) a Microsoft cloud-based document storage platform named OneDrive; (2) a ChemTreat-issued email account that stores emails sent or received by Mr. Ridley; and (3) information regarding Mr. Ridley's activities derived from an enterprise level data protection software program named CrowdStrike, which I describe in further detail below.

Below, I discuss the various data files, information, documents, and devices I searched or analyzed as part of my forensic investigation and any results arising from my review of those data files, information, and documents. My investigation in early 2022 focused on two primary categories: (1) a search of locations Mr. Ridley may have stored documents or from which Mr. Ridley may have distributed documents (such as his email and a Microsoft cloud-based storage platform named OneDrive); and (2) a search of locations that could contain documents potentially

---

[7] CHEMR-000001631; CHEMR-000001632. I understand Ecolab has stated in this litigation that this document is "not a trade secret individually." Ecolab's January 27, 2023 Supplemental Responses & Objections to ChemTreat's Interrogatories, at page 4.

8

distributed by Mr. Ridley (such as the emails and OneDrive accounts of other custodians, or ChemTreat's shared network folders).

Based on more than 20 years of experience as a forensic investigator, this investigation was a reasonable search of these locations and would allow me to determine what, if anything, Mr. Ridley had distributed within ChemTreat's Systems or to others with whom I understand he interacted at ChemTreat using ChemTreat's Systems.

### 1.    Mr. Ridley's Repositories

I received from ChemTreat:  (1) emails contained in the ChemTreat Microsoft (O365) email system for Anthony Ridley for the period May 1, 2021 to March 16, 2022 (including emails that may have been deleted on or after February 9, 2022, when Ecolab alerted ChemTreat to Mr. Ridley's alleged misappropriation); (2) all OneDrive documents uploaded by or accessible to Mr. Ridley during his employment by ChemTreat (including OneDrive documents Mr. Ridley may have deleted on or after February 9, 2022); (3) the first laptop issued to Mr. Ridley by ChemTreat; (4) excerpts of a CrowdStrike log showing relevant files accessed (opened) from USB devices connected to Mr. Ridley's first ChemTreat-issued laptop before it was reformatted and redeployed; (5) the second laptop issued to Mr. Ridley by ChemTreat; and (6) a USB device returned to ChemTreat by Mr. Ridley upon his termination.

Below, I describe the analysis and search of each of these repositories and devices that I conducted.

### a.    Mr. Ridley's Emails

As noted above, I collected and searched emails contained in the O365 ChemTreat email system for Anthony Ridley for the period May 1, 2021, to March 16, 2022.[8]  The specific searches

---

[8] There were no emails to Mr. Ridley's ChemTreat email address prior to July 8, 2021, which appears to be the date Mr. Ridley's ChemTreat email address was activated.  As noted below, July

9

I conducted are detailed below. My investigation revealed a single Ecolab document,[9] which is discussed in further detail below.

### b.     Mr. Ridley's OneDrive Documents

As noted above, I also collected all OneDrive documents uploaded by or accessible to Mr. Ridley. OneDrive is a cloud-based document storage system offered by Microsoft that is used by many businesses, including ChemTreat. OneDrive allows users to share documents with one another using the cloud. However, not all documents within OneDrive are viewable by everyone at ChemTreat. Instead, documents are segmented in specific folders, and the "owner" of a given folder is the only one who has access to the documents in that folder, unless they "share" the folder with another individual at ChemTreat, or unless they have Administrator credentials. This is a standard security configuration that I have seen at dozens of other organizations I have consulted with over the years.

I conducted a search of Mr. Ridley's OneDrive documents. The details of that search are discussed below. The search did not reveal any documents that appeared to contain Ecolab's confidential information. Instead, many of the documents returned as a result of my investigation of Mr. Ridley's OneDrive were clearly ChemTreat documents, and the remainder were either Mr. Ridley's personal documents or documents that did not bear indicia that they belonged to Ecolab. The complete results of this search are described in further detail below.

### c.     Mr. Ridley's First ChemTreat-Issued Laptop

I received a laptop that had been issued by ChemTreat to Mr. Ridley near the beginning of his employment and shipped back to ChemTreat for purposes of preservation and analysis. I

---

13, 2021 is the first date on which Mr. Ridley sent emails from his ChemTreat email account. *E.g.*, Ex. C, July 13, 2021 email from A. Ridley to S. Freed.

[9] CHEMR-000001631; CHEMR-000001632.

10

conducted a forensic analysis of this laptop to determine the extent to which data, documents, and other digital forensics and artifacts could be retrieved from the laptop.

According to the discovery materials provided to me, this laptop was received by ChemTreat from Mr. Ridley on or about March 2, 2022 and was thereafter inadvertently placed with laptops designated for reformatting and redeployment by ChemTreat's IT department.[10] Based on the presence of a second user's profile on the laptop, I determined that the laptop had been redeployed and used by another ChemTreat employee before it was delivered to me. I forensically imaged the laptop's hard drive, but determined that the profile for Mr. Ridley, along with any documents and forensic artifacts associated to that profile, had been removed from the computer during the reformatting process.

### d. CrowdStrike Log

In my investigation, I determined that, although the data from Mr. Ridley's first ChemTreat-issued laptop had been removed from it during the reformatting process, other data regarding Mr. Ridley's use of his ChemTreat-issued laptop remained available. Specifically, I reviewed excerpts of a log from a data protection program implemented by ChemTreat called CrowdStrike.[11]

CrowdStrike is a global cybersecurity leader with an advanced cloud-native platform for protecting data.[12] Based on my experience, the CrowdStrike platform is a powerful tool that businesses can use to monitor the infiltration of data to business systems, or the exfiltration of data to external USB devices. CrowdStrike maintains a log of all external USBs plugged into a

---

[10] ChemTreat's July 22, 2022 Responses & Objections to Ecolab's Interrogatories, at pages 13-14.

[11] For purposes of my later investigation, I reviewed a complete copy of the CrowdStrike log. CHEMR-000002195. *See infra*, Sections IV.B and IV.F.

[12] CrowdStrike Home Page, *available at* https://www.crowdstrike.com/.

11

particular ChemTreat laptop.  CrowdStrike also maintains a log of all file names that were accessed by a particular ChemTreat laptop from an externally connected USB device.

I reviewed excerpts from the CrowdStrike log for Mr. Ridley's first ChemTreat-issued laptop that reflected interactions that laptop had with any files in a "Nalco Water Files" folder path.[13]  The information I reviewed showed external files were accessed from two USB devices that had been connected to Mr. Ridley's laptop, and reflected log entries for documents that were accessed from those external USB devices from folders whose file path contained the phrase "Nalco Water Files."  The data I received showed certain activity that occurred on August 17, 2021; August 20, 2021; and January 28, 2022.  The CrowdStrike log excerpts I reviewed is attached as Exhibit D.

The file paths and file names associated with each of these files are listed below:

    **a.**   \<value>\<text>\Device\HarddiskVolume5\Nalco Water Files\Account Mangement Examples\~$LCO Master Proposal.dotm\</text>\</value>

    **b.**   \<value>\<text>\Device\HarddiskVolume5\Nalco Water Files\Account Mangement Examples\~$mote Service Plan-2020 v1.docx\</text>\</value>

    **c.**   \<value>\<text>\Device\HarddiskVolume5\Nalco  Water  Files\Quint  McCreary Files\Magotteaux\PSR\~$gotteaux PSR 2019 05 10.doc\</text>\</value>

    **d.**   \<value>\<text>\Device\HarddiskVolume5\Nalco  Water  Files\Quint  McCreary Files\Frito  Lay\PSR\~$Nalco  Report  PepsiCo  Service  Water  Fayetteville Septemeber 2018.xlsx\</text>\</value>

---

[13] Upon receipt of the complete CrowdStrike report as part of my subsequent investigation in 2023, *see infra*, Section IV.F, I confirmed that the excerpts I received as part of my early 2022 investigation reflected all entries for files contained in a "Nalco Water Files" folder path.

12

**e.** &lt;value&gt;&lt;text&gt;\Device\HarddiskVolume5\Nalco Water Files\Customers Files - Nalco Water\Volkswagon\Volkswagen service reports\Volkswagen - Media Center\Volkswagen Media PSR 2014\~$lkswagen - Media Center - Chilled Water System 06.11.2014.docx&lt;/text&gt;&lt;/value&gt;

**f.** &lt;value&gt;&lt;text&gt;\Device\HarddiskVolume6\Nalco Water Files\service report notes\~$rvice report technical notes - ver.3.docx&lt;/text&gt;&lt;/value&gt;

**g.** &lt;value&gt;&lt;text&gt;\Device\HarddiskVolume6\Nalco Water Files\service report notes\~$rvice report technical notes.doc&lt;/text&gt;&lt;/value&gt;

The first five documents listed above appear to have been accessed from a USB device that CrowdStrike identified as "HarddiskVolume5." The last two documents listed above appear to have been accessed from another USB device that CrowdStrike identified as "HarddiskVolume6."

The fact that these file names appear in the CrowdStrike log does not mean that they were distributed within ChemTreat's Systems, or even that they were permanently or temporarily saved to Mr. Ridley's ChemTreat-issued laptop. Instead, when a file is accessed from an external storage device, an automatic temporary file is created, which is designated with the "~$" symbols that precede these file names. By design, the operating system deletes the temporary file when the user closes the file. To the extent the temporary file does not get automatically deleted, what remains on the laptop is not the actual file itself and therefore does not contain the content of the document; rather, the artifact that remains is merely a pointer to the actual document.

I searched the file names associated with these documents across all custodians' emails, attachments, and OneDrive folders as part of Search No. 6 below. That search showed that none of these files exist within the emails, attachments, or OneDrive folders for those custodians.

13

As discussed above, typically, CrowdStrike logs provide information about what files were accessed from external USB device(s) that have been connected to a particular laptop, as well as the date of access, file names, and extensions for those files. This, in combination with the OneDrive documents and emails on ChemTreat's Systems, replicates much of the relevant information that could have been derived from Mr. Ridley's first ChemTreat-issued laptop before it was reformatted. Information that may have been lost due to the reformatting of the laptop prior to redeployment would tend to show Mr. Ridley's personal interactions with any USB documents and the opening of documents on the laptop, as opposed to the dissemination of documents to other ChemTreat employees. For example, the lost data might have included what documents were saved to the desktop of the laptop, but data reflecting any distribution by Mr. Ridley of documents using the laptop would remain preserved through other information that would not be affected by the subsequent reformatting of the laptop, such as email data, or the presence of those files in the OneDrive account of Mr. Ridley or another custodian. Although my investigation was targeted to identify any such sharing, I found no evidence to show that any such sharing had occurred.

Thus, as it pertains to interactions between Mr. Ridley's first ChemTreat-issued laptop and external USB devices containing documents with the phrase "Nalco Water Files" in the file path, the CrowdStrike log contains almost all the relevant data that I would have procured had I been able to forensically image and analyze Mr. Ridley's ChemTreat-issued laptop prior to reformatting. That is, much of the information needed to determine insertion of a USB device, and access of these apparently Nalco-related documents from a USB device, is available through the CrowdStrike logs. Generally speaking, the only information regarding Mr. Ridley's actions that could have been derived from a forensic image of Mr. Ridley's first ChemTreat-issued laptop (and that is not retained in the CrowdStrike log) are artifacts such as evidence of documents that

14

might have been saved to or modified locally on the laptop hard drive, and (although potentially duplicative of the CrowdStrike log) evidence of documents being saved to the laptop from a connected USB.

As discussed in detail below, *infra*, Section IV.F, I later conducted validation testing to confirm the reliability of the CrowdStrike log, including specifically CrowdStrike's accuracy in logging (1) the serial number of external USB devices connected to a laptop, as well as (2) the file paths of documents accessed from such external USB devices when the log is run after the subject laptop has been reformatted, as it was with Mr. Ridley's first ChemTreat-issued laptop.

### e.      Mr. Ridley's Second ChemTreat-Issued Laptop

When Mr. Ridley's original ChemTreat-issued laptop was collected from him, ChemTreat issued a second laptop to Mr. Ridley that he could use for work purposes.[14]  Upon Mr. Ridley's termination from ChemTreat, ChemTreat IT personnel collected that second laptop from Mr. Ridley for purposes of preservation.[15]  That laptop was then sent to me for analysis.  I forensically imaged and conducted a forensic analysis of this laptop to assess whether it contained any Ecolab confidential information.

Upon examination of this second laptop, I did not find any evidence of copying or exfiltration of data from the laptop to any other source.  Additionally, I was able to identify three USB devices that had been accessed from the second laptop.  Two of these USB devices appeared to be devices used by ChemTreat's IT personnel to set up the laptop, as indicated by the username associated with these USBs: "wqadmin."  The third USB device was a Lexar USB Flash Drive

---

[14] ChemTreat's July 22, 2022 Responses & Objections to Ecolab's Interrogatories, at page 26.

[15] ChemTreat's July 22, 2022 Responses & Objections to Ecolab's Interrogatories, at page 26.

15

bearing serial number 56261F6B34AF1760, that had been connected to the second laptop on just one occasion, March 18, 2022. I discuss the Lexar USB in more detail below.

Based on the interaction with the Lexar USB Flash Drive, I inspected the file access history on the second laptop to determine which files were accessed on March 18, 2022, the date that the Lexar USB Flash Drive was connected to the second laptop. I determined that the only files accessed on that date (less than five documents total) were Mr. Ridley's personal documents based on their file names, including a Marriage Certificate.

I then conducted a search for potentially relevant file names across all "user files" on the second laptop. Specifically, I searched for the file names identified in Search Nos. 1, 4, and 6, described below. The search for these file names returned no hits, meaning that no user files on the second laptop have file names matching the file names searched for.

I also conducted a key word search across all user files on the second laptop. Specifically, I searched for "Nalco" or "Ecolab." After searching for these two key words across the user files on the second laptop, I received 2 results. I reviewed each of the results and determined that neither of the resulting documents bear any indicia that they are Ecolab's documents that may contain Ecolab confidential information. One document was a personal resume of Mr. Ridley, and one document contained personal login credentials.

### f. Lexar USB Device – Returned by Mr. Ridley to ChemTreat

When Mr. Ridley was terminated, he returned a USB device to ChemTreat that had been issued to him by ChemTreat. I forensically analyzed this device to assess whether it contained any Ecolab confidential information. The USB device was a Lexar USB Flash Drive, Serial Number: 56261F6B34AF1760, which is the same Lexar USB discussed immediately above.

16

I analyzed the device and determined that October 26, 2021 was the earliest date that any of the files located on the device had been loaded to it, which I understand is several months after Mr. Ridley departed Ecolab.[16]

I then conducted a search for potentially relevant file names across all files on the USB device. Specifically, I searched for the file names identified in Search Nos. 1, 4, and 6, described below. I also conducted a keyword search for "Nalco" or "Ecolab" across all files contained on the Lexar USB device. These searches resulted in no hits, indicating that there are no documents belonging to Ecolab on this USB device.

### 2. Emails and OneDrive Documents of Potentially Relevant Custodians

In addition to the repositories and devices associated to Mr. Ridley identified above, I also searched the emails[17] and OneDrive documents of various other custodians with whom Mr. Ridley may have interacted. Specifically, I received from ChemTreat all emails for the period May 1, 2021, to March 16, 2022 that were contained in the O365 ChemTreat email system of the following custodians:[18] Mr. Ridley's immediate supervisor (Clay Cissell), Mr. Cissell's supervisor (Steven Leavell), Mr. Ridley's predecessor (David Ellis), the executive at the head of ChemTreat's North American sales organization (John Alcorn), and a number of ChemTreat employees who may have interacted with Mr. Ridley (Albert DeNunzio, Larry Harmon, Matthew Hofer, Michael (Todd) Kraft, David Pearson, James (Jim) Shealy, George Sloan, and John Spalding). This search included available deleted files from the emails or OneDrive folders of these custodians.

---

[16] Ecolab's June 10, 2022 Second Amended Complaint, ¶ 108 (Doc. 42).

[17] References to "emails" herein refer to emails and their attachments, which are included in the data I received.

[18] I selected the beginning date of this temporal period because Ecolab alleged that Mr. Ridley's exfiltration of data began on May 22, 2021. Ecolab's March 3, 2022 Complaint, ¶ 39 (Doc. 1). The end date of this temporal period was the date these emails were collected from ChemTreat's O365 environment.

17

I also received all OneDrive documents accessible to or uploaded by the same custodians for whom I received emails, except for David Ellis.[19]

## B. Searches Conducted

After receiving the emails and OneDrive data identified above, I loaded the data to Nuix, a forensic industry standard database that iDS uses for processing, searching, and reviewing forensic data. Once processed, I conducted the following searches across these documents:

**1. Search No. 1**:

    i. <u>Repositories</u>: OneDrive documents and emails identified above.

    ii. <u>Custodians</u>: All custodians identified above.

    iii. <u>Search Terms</u>:[20]

        1. 2021 partnership and market overview - simmons foods.pptx

        2. 2021 partnership and market overview.pptx

        3. fb na sales 2021 exprice review for customers.pptx

        4. notes for Maytag 2006 contract.doc

        5. esisting inventory quote.doc

        6. e intensive cleaning procedure covid 19 goggles.docx

        7. monthly tracking report

---

[19] The OneDrive documents accessible to or uploaded by Mr. Ellis were no longer available at the time of my initial investigation because I am informed Mr. Ellis retired from ChemTreat on December 10, 2021, two months before Ecolab's February 9, 2022 Letter raised the allegations that I investigated. *See supra*, Section II. For the same reason, Mr. Ellis's emails were available dating back to April 29, 2021, which predates Mr. Ridley's earliest alleged downloading activity. Ecolab's March 3, 2022 Complaint, ¶ 39 (Doc. 1).

[20] These search terms are derived from paragraphs 39, 53, and 93 of Ecolab's original complaint, which was the operative complaint at the time of my investigation in early 2022. Ecolab's March 3, 2022 Complaint, ¶¶ 39, 53, 93 (Doc. 1).

2. **Search No. 2**:

     i. <u>Repositories</u>:  OneDrive documents received.

     i. <u>Custodians</u>:  Anthony Ridley

     ii. <u>Search Terms</u>:  ("Nalco" or "Ecolab")

3. **Search No. 3**:

     ii. <u>Repositories</u>:  OneDrive documents and emails received.

     iii. <u>Custodians</u>:  All custodians identified above.

     iv. <u>Search Terms</u>:

         1. "aridley75@hotmail.com"

         2. "aridley75@live.com"

         3. "aridley@ecolab.com"

4. **Search No. 4**:

     i. <u>Repositories</u>:  All emails received.

     i. <u>Custodians</u>:  All custodians identified above.

     ii. <u>Search Terms</u>:  "AEDC proposal for purchasing – HVAC Cooling Towers – October 2015.doc"

5. **Search No. 5**:

     i. <u>Repositories</u>:  All OneDrive documents.

     ii. <u>Custodians</u>:  All custodians identified above.

     iii. <u>Search Terms</u>:  "AEDC proposal for purchasing – HVAC Cooling Towers – October 2015.doc"

6. **Search No. 6**:

     i. <u>Repositories</u>:  All OneDrive documents and emails received.

19

ii.   Custodians:  All custodians identified above.

iii.   Search Terms:

1.   ~$rvice report technical notes - ver.3.docx

2.   ~$rvice report technical notes.doc

3.   ~$gotteaux PSR 2019 05 10.doc

4.   ~$Nalco Report PepsiCo Service Water Fayetteville Septemeber 2018.xlsx

5.   ~$lkswagen   -   Media   Center   -   Chilled   Water System  06.11.2014.docx

6.   ~$LCO Master Proposal.dotm

7.   ~$mote Service Plan-2020 v1.docx

8.   Service report technical notes - ver.3.docx

9.   Service report technical notes.doc

10. gotteaux PSR 2019 05 10.doc

11. Nalco Report PepsiCo Service Water Fayetteville Septemeber 2018.xlsx

12. Volkswagen   -   Media   Center   -   Chilled   Water System  06.11.2014.docx

13. NALCO Master Proposal.dotm

14. Remote Service Plan-2020 v1.docx

**C.   Search Results**

The results from each of these searches are detailed below.

**1.  Search No. 1 Results**:  After searching for the file names of the documents identified in Search No. 1, *supra* Section III.B.1, I received no results.  Therefore,

20

none of the file names identified in Search No. 1 exist within these custodians' emails, attachments, or OneDrive accounts.

2.  **Search No. 2 Results**:  After searching for the key words identified in Search No. 2, *supra* Section III.B.2, I received 14 results.  I reviewed each of the results and determined that none of the resulting documents appear to contain Ecolab confidential information. For demonstration, I am including several examples of non-Ecolab documents that hit on Nalco or Ecolab.  Document 1: a ChemTreat document dated January 23, 2021 (which I understand was about 6 months before Ridley left Ecolab),[21] that references Nalco in the context of identifying Nalco as the current provider being replaced by the customer with ChemTreat.  Document 2: a ChemTreat-branded PowerPoint documenting technology updates, one slide of which includes a feature comparison between ChemTreat and Ecolab.  This presentation shows a creation date of July 27, 2010, and the last time any modification occurred was on August 8, 2014.  Documents 3 & 4 were ChemTreat-branded presentations that were related to an event that occurred in New Orleans in 2017.  My review of the rest of these documents resulted in either the same type of documents clearly originating with ChemTreat, or Mr. Ridley's personal documents (such as a personal bank account statement that had the word Ecolab at the top of the statement, and a personal resume listing his employment with Nalco Water).  Based on my investigation, I concluded that none of these documents had indicia suggesting they were Ecolab's documents.

---

[21] Ecolab's March 3, 2022 Complaint, ¶ 1 (Doc. 1).

21

3. **Search No. 3 Results**: After searching for the e-mail addresses identified in Search No. 3, *supra* Section III.B.3, I received 81 results. I reviewed each of the results and determined that only one of the resulting documents bears any indicia that it is an Ecolab document that may contain Ecolab confidential information. This result was an attachment to an email contained in Mr. Ridley's ChemTreat-issued email account. Neither the attachment nor the email bearing this file name exist in any other of the custodians' email accounts or OneDrive folders, or in Mr. Ridley's OneDrive folder. The attachment to this email bears a "Nalco" logo at the top right-hand side of the page and the file is entitled "AEDC proposal for purchasing – HVAC Cooling Towers – October 2015.doc". The attached document is not labeled confidential. The email is an email from Mr. Ridley's personal email account, aridley75@hotmail.com, to his ChemTreat-issued email account, titled "AEDC Proposal." The email contains no body text. This document has been produced to Ecolab in this litigation.[22]

4. **Search No. 4 Results**: After searching for the file name identified in Search No. 4, *supra* Section III.B.4, I received one result. That document is an email with an attachment and is the same email and attachment that resulted from Search No. 3 above.

5. **Search No. 5 Results**: After searching for the file name identified in Search No. 5, *supra* Section III.B.5, I received no results. Therefore, there is no document

---

[22] CHEMR-000001631; CHEMR-000001632. I understand Ecolab has stated in this litigation that this document is "not a trade secret individually." Ecolab's January 27, 2023 Supplemental Responses & Objections to ChemTreat's Interrogatories, at page 4.

22

bearing the file name identified in Search No. 5 within the OneDrive accounts accessible to the aforementioned custodians.

6. **Search No. 6 Results**:   After searching for the file names of the documents identified in Search No. 6, *supra* Section III.B.6, I received no results containing those file names.  Therefore, none of the file names identified in Search No. 6 exist within these custodians' emails, attachments, or OneDrive accounts.

### D.  Search of ChemTreat Shared Network Folders and Files

ChemTreat has certain shared network folders that are distinct from SharePoint and OneDrive.[23]  I directed ChemTreat IT personnel to conduct searches across all shared network folders and files.[24]  Based on my conversation with ChemTreat IT personnel, these shared network folders and files are only accessible from one of three physical ChemTreat office locations or via the VPN function, and even then, they are only accessible if access is requested and granted.  There is no evidence or record that Mr. Ridley had read or write access to any of ChemTreat's shared network folders and files.  Nevertheless, I directed a search of the shared network folders and files.

Specifically, I instructed ChemTreat IT personnel to search for the file names identified in Search Nos. 1, 4, and 6 across all files on ChemTreat's shared networks.  I instructed ChemTreat IT personnel not to limit this search to folders or locations to which Mr. Ridley had access, but instead to include all user locations (rather than just Mr. Ridley and the custodians identified above).  Because it was not limited to Mr. Ridley or the identified custodians, but rather was run across ChemTreat's entire system, this search for the 15 file names identified in Search Nos. 1, 4,

---

[23] Similar to OneDrive, SharePoint is a cloud-based document storage platform.

[24] I did not collect all files in ChemTreat's shared network folders because collecting these files—which cover many gigabytes and potentially terabytes of data—would be time consuming and costly, with a low likelihood of resulting in discovery of data relevant to my forensic investigation.

and 6, which ChemTreat IT personnel conducted using TreeSize Version 5.2.3, took multiple days to run to completion. This search returned no results, meaning that none of the file names from Search Nos. 1, 4, and 6 exist within ChemTreat's shared network folders or files.

### E.    Conclusions Based on Early 2022 Investigation

Based on my investigation in early 2022, involving the searches discussed above, and the results from those searches, I concluded that—based on the information that had been provided by Ecolab as of the filing of their March 3, 2022 complaint[25]—there was no evidence to suggest that Mr. Ridley had stored Ecolab's confidential documents on ChemTreat's Systems or that he distributed Ecolab's confidential documents using ChemTreat's Systems. As to the sole non-confidential Ecolab document identified above, I did not locate that document in any of the custodial data I searched as part of Search Nos. 4 and 5, other than Mr. Ridley's ChemTreat email account.

## IV.    Further Investigation in 2023

Ecolab's March 3, 2022 complaint discussed Ecolab's investigation of their electronic data and systems, including detailing the information they learned through that investigation (such as specific times and dates when Mr. Ridley allegedly downloaded specific documents or files from his Ecolab OneDrive account) that led them to conclude that Mr. Ridley had misappropriated Ecolab documents. At the time of my investigation in early 2022, however, Ecolab had not provided ChemTreat with any written report or log regarding or reflecting the information detailed in their complaint. In December 2022, Ecolab produced to ChemTreat a data loss prevention report (also known as a "DLP Report") that they represented was created using software commercially available from Digital Guardian. Using the 11,713 de-duplicated file names from that Report, I

---

[25] Ecolab did not provide any additional information between the filing of their March 3, 2022 complaint and the time I concluded my early 2022 investigation.

searched an even broader set of custodians, data, and temporal ranges than I had searched in early 2022 to investigate whether those files existed on ChemTreat's Systems. For clarity, as with all of the searches described in my report, these searches were run across the file names of the collected documents, the content of the collected documents (when available), and the relevant metadata fields (as identified in the ESI protocol entered by the Court)[26] for the collected documents.

### A. The "DLP Report"

On December 19, 2022, Ecolab provided to ChemTreat a "DLP Report," which is a report Ecolab states was generated using Ecolab's Digital Guardian software.[27] Ecolab represented that the DLP Report was generated on July 23, 2021, using a 60-day range or "lookback" period.[28] Ecolab contends that the "Destination File Name" column of the DLP Report shows a file listing of all of the documents they allege Mr. Ridley misappropriated.[29] The DLP Report does not contain any of the actual, underlying documents whose file names are recorded in the DLP Report, nor does it include the MD5 hash values for those documents.

MD5 hash values are unique alphanumeric identifiers assigned to documents that allow a viewer to determine whether one document is identical to another document; they function as a document's "fingerprint." Without these MD5 hash values (and absent the underlying documents from the DLP Report), the only means of assessing whether the documents from the DLP Report are identical to other documents is to compare file names, although a more comprehensive search

---

[26] December 14, 2022 Agreed Order Regarding Protocol for Production of Hard Copy Documents and Electronically Stored Information (Doc. 91).

[27] Ex. E, December 19, 2022 1:18 p.m. email from D. Walton to J. Lund and T. Homesley.

[28] Ex. E, December 19, 2022 1:18 p.m. email from D. Walton to J. Lund and T. Homesley.

[29] *See* Plaintiffs' January 26, 2023 Notice of Completion of Post-Motion Meet and Confer, at 2 (Doc. 119); ChemTreat's February 13, 2023 ESI Report, at 2 (Doc. 143).

25

would involve a search for MD5 hash values. I have received the DLP Report and used it for the search discussed below.

### B.    Search Parameters

Because Ecolab alleges that Mr. Ridley stored, used, and potentially distributed the files listed on the DLP Report, I searched for the file names associated with all of those files across various potentially relevant custodians and repositories. The only means of identifying potentially overlapping documents is via a file name search (including by searching for the file names across the content of documents and relevant metadata), although this methodology is sure to return false "hits." I used the "Destination File Name" column of the DLP Report to determine which file names to search for. Many of the file names are duplicates, meaning that they are identical file names (for example, the file name "image1.jpg" appears on the DLP Report multiple times). After removing duplicates (which need not be searched twice), the total number of file names to be searched was 11,713. Attached as Exhibit F is a list of the file names I searched for (de-duplicated).

Using the file names listed on the DLP Report provided to ChemTreat by Ecolab, I conducted a search for all of the de-duplicated file names listed on the DLP Report across a broader set of data than I searched as part of my early 2022 investigations. Specifically, I searched for 11,713 unique file names across the emails and OneDrive data available for 14 custodians. These custodians were the same custodians used for purposes of my early 2022 investigation, but also included the addition of Tyler Bates, who had been identified by Ecolab in the intervening months as someone with whom Mr. Ridley may have shared Ecolab's confidential information.[30] Based

---

[30] Ecolab's June 10, 2022 Second Amended Complaint, ¶¶ 192-94 (Doc. 42). Mr. Bates's OneDrive documents were collected after Ecolab identified him in its Second Amended Complaint.

26

on that search, I concluded that none of the files listed on the DLP Report had been distributed or stored on ChemTreat's Systems.

Notably, many of the file names I searched for caused a high hit count based on the file name being "generic." Generic file names appear quite often with images. For example, the word "image" (e.g., image1.jpg, image2.jpeg, etc.) is contained within file names on the DLP Report. This is a common type of generic file name. I expected that these generic file names would return "hits" as a result of the search, even though they may not contain Ecolab's confidential information—or have anything to do with Ecolab at all. Files that generally have these "generic" file names include images associated with signature blocks, which are often split into separate documents and often reflect corporate logos or phrases. Based on my review of these generic "hits," it is clear that the generic "hits" are not related to Ecolab at all. For example, many of these generic "hits" are personal photographs, or images that bear ChemTreat's logo or information.

As noted, I searched for the search terms identified in Exhibit F across the potentially relevant custodians, devices, and repositories. For email data, an overbroad temporal range was used to ensure all potentially relevant emails from prior to Mr. Ridley's recruitment until after his termination.[31] Below are the repositories and custodians I searched:

- Mr. Ridley's ChemTreat emails.

- All documents accessible to Mr. Ridley via OneDrive.

- File names of all documents accessible to Mr. Ridley via SharePoint.[32]

---

[31] CHEMR-000000147 (showing Mr. Ridley's contact with ChemTreat on August 17, 2020); March 21, 2022 Ltr. from V. Mirmira to D. Walton (Doc. 52-1) (showing Mr. Ridley was terminated on March 18, 2022).

[32] For this search, I requested a file directory that would show the file names of the files accessible to Mr. Ridley via SharePoint, which was all that was necessary to determine if any of the at-issue file names existed in SharePoint folders accessible to Mr. Ridley.

27

- Mr. Ridley's ChemTreat-provided cell phone.[33]

- Emails of the following custodians for the temporal period July 1, 2020 through April 1, 2022: Tyler Bates, John Alcorn, Clay (Richard) Cissell, Albert DeNunzio, David Ellis, Larry Harmon, Matthew Hofer, Michael (Todd) Kraft, Steven Leavell, David Pearson, James (Jim) Shealy, George Sloan, and John Spalding.

- All documents accessible to the following custodians via OneDrive as of March 16, 2022: Tyler Bates, John Alcorn, Richard (Clay) Cissell, Albert DeNunzio, Larry Harmon, Matthew Hofer, Michael (Todd) Kraft, Steven Leavell, David Pearson, James (Jim) Shealy, George Sloan, and John Spalding.

- Mr. Ridley's Lexar USB device issued to him by ChemTreat.

- The complete CrowdStrike log.[34]

### C.     Results

Below is a chart that lists the results of my search. The vast majority of "hits" were on generic documents. I reviewed each "hit" and, as shown below, did not locate any documents that appeared to contain Ecolab's confidential information. Based on my review of these generic "hits," it is clear that the generic "hits" are not related to Ecolab at all. For example, many of these generic "hits" are personal photographs, or images that bear ChemTreat's logo or information.

---

[33] I forensically imaged Mr. Ridley's ChemTreat-provided cell phone when it was sent to me in early 2022. I searched the locations of Mr. Ridley's ChemTreat-provided cell phone where documents are routinely housed.

[34] Because I was unable to view the documents corresponding to file names in the CrowdStrike log, I relied on the file names to ascertain whether the documents appeared to contain Ecolab confidential information. These generic file names did not appear to correspond to any Ecolab confidential information. *See* Ex. H (listing the DLP Report file names that matched file names in the CrowdStrike log).

28

| Repository | Total Hits | Generic Hits | Non-Generic Hits | Ecolab Documents |
|---|---|---|---|---|
| Mr. Ridley's ChemTreat Emails | 171 | 170 | 1 | 1 (AEDC proposal for purchasing – HVAC Cooling Towers – October 2015.doc[35]) |
| Mr. Ridley's OneDrive Folders | 599 | 599 | 0 | 0 |
| Mr. Ridley's SharePoint Folders | 1 | 1 | 0 | 0 |
| Mr. Ridley's ChemTreat-Provided Cell Phone | 0 | 0 | 0 | 0 |
| Other Custodians' Emails[36] | 671 | 671 | 0 | 0 |
| Other Custodians' OneDrive Folders[37] | 1 | 1 | 0 | 0 |
| Mr. Ridley's Second ChemTreat-Issued Laptop | 277 | 277 | 0 | 0 |
| Mr. Ridley's Lexar USB (Serial No. 56261F6B34AF1760) | 3 | 3 | 0 | 0 |
| CrowdStrike Log | 25 | 25 | 1 | 1 (AEDC proposal for purchasing – HVAC Cooling Towers – October 2015.doc[38]) |

As shown above, there was only one non-generic file name corresponding to a file name in the DLP Report across all sources searched. That non-generic file name corresponded to the sole Ecolab document I had previously identified as part of my original investigation in early 2022.[39]

---

[35] CHEMR-000001632.

[36] *See* custodians referenced *supra*, Section IV.B.

[37] *See* custodians referenced *supra*, Section IV.B.

[38] CHEMR-000001632.

[39] CHEMR-000001632.

29

Finally, as an additional confirmatory measure, I searched across Mr. Ridley's outgoing emails to determine whether he sent any other ChemTreat employees any electronic links to files on his OneDrive or another networked location on ChemTreat's Systems, or links to allow sharing of his OneDrive files. I did not locate any such links or distribution of files via linked systems, indicating that Mr. Ridley did not provide access to his OneDrive folders to any other ChemTreat employees during his employment at ChemTreat.

### D. Mr. Ridley's Ecolab-Issued Laptop and "LaCie Drive"

Because Ecolab has not produced Mr. Ridley's Ecolab-issued laptop or a forensic image of that laptop in this litigation, I was unable to compare documents or data from Mr. Ridley's Ecolab issued laptop with documents or data on ChemTreat's Systems. Based on the discovery material I have reviewed, I understand that Ecolab has stated in this litigation that it "removed all data" from Mr. Ridley's Ecolab-issued laptop when the laptop was returned to Ecolab by Mr. Ridley in July 2021 and that Ecolab "restored [the laptop] to factory settings."[40]

Ecolab also has not produced the "LaCie Drive," serial number def10dce9db4 (as reflected on the DLP Report), which is an external hard drive that the DLP Report reflects many of the allegedly misappropriated files may have been transferred to. Based on Ecolab's complaint, I understand it is unable to confirm whether the "mobile drive" that Mr. Ridley returned to Ecolab in July 2022 was the "LaCie Drive" identified in the DLP Report.[41] Based on the discovery material I have reviewed, I understand that Ecolab has stated that it cannot locate and may have "destroyed" the "mobile drive" that was returned to them and so does not know whether that "mobile drive" is the same external hard drive as the "LaCie Drive" referenced in the DLP

---

[40] Ecolab's January 27, 2023 Supplemental Responses & Objections to ChemTreat's Interrogatories, at page 13.
[41] Ecolab's June 10, 2022 Second Amended Complaint, ¶ 151 (Doc. 42).

30

Report.[42]  Based on the discovery material I have reviewed, I further understand that Mr. Ridley

has stated under oath that he returned the "LaCie Drive" to Ecolab.[43]

To determine whether Mr. Ridley accessed documents on the "LaCie Drive" using his first

ChemTreat-issued laptop, I searched in the CrowdStrike log for the serial number associated with

the "LaCie Drive" in the DLP report provided by Ecolab.  In order to conduct this search, I received

a complete copy of the CrowdStrike log.[44]  Neither the serial number (def10dce9db4) nor the term

"LaCie" appeared in the CrowdStrike log, meaning that Mr. Ridley did not access any files from

the "LaCie Drive" on his first ChemTreat-issued laptop.

### E.       Reasonableness of the Investigation I Conducted

Based on more than 20 years of experience as a digital forensics examiner, the search I

conducted was reasonable and sufficient to identify and locate any files on ChemTreat's Systems

that may contain the file names corresponding to the documents Ecolab alleges Mr. Ridley

misappropriated.   As noted above, while the searches I conducted during my early 2022

investigation and my subsequent investigation returned some "hits," upon review, it was clear that

the "hits" corresponded to documents that do not contain Ecolab's confidential information (with

the exception of the sole Ecolab document identified during my early 2022 investigation, as

discussed above).  I briefly describe here why the parameters of the investigation I conducted were

both reasonable and appropriate under the circumstances.

Search Terms:  As discussed above, during my investigation in early 2022, I searched for

file names based on the allegations in Ecolab's March 3, 2022 complaint, and performed additional

---

[42]  Ecolab's January 27, 2023 Supplemental Responses & Objections to ChemTreat's
Interrogatories, at page 14.
[43] Ridley's July 20, 2022 Responses & Objections to Ecolab's Interrogatories, at pages 19-20.
[44] CHEMR-000002195.

31

searches on Mr. Ridley's OneDrive using the broad terms "Nalco" and "Ecolab". After Ecolab provided the DLP report to ChemTreat, I used the file names from the "Destination File Name" field of the DLP Report as search terms when conducting my investigation of the file names identified on the DLP report. Also as described above, given that Ecolab has not produced the underlying documents corresponding to the file names in the DLP Report and has not provided the MD5 hash values associated with those file names, searching for these file names was the only comprehensive means of searching for Ecolab's allegedly misappropriated confidential information. I understand that Ecolab has taken the position that a comprehensive investigation requires ChemTreat to search for the file names "identified on the Digital Guardian data loss prevention report,"[45] which is what I have done.

Temporal Range: The temporal range applicable to the investigation I conducted was reasonable and comprehensive. The beginning of the temporal range extended more than a month before what I understand was ChemTreat's earliest discussions with Mr. Ridley regarding his potential employment.[46] The end of the temporal range extended almost two weeks beyond Mr. Ridley's departure from ChemTreat.[47] And, as for the OneDrive documents, the investigation I conducted was of the various custodians' OneDrive documents as they existed contemporaneously with (but immediately prior to) Mr. Ridley's termination by ChemTreat, meaning the investigation would reveal any relevant OneDrive documents as they existed immediately prior to Mr. Ridley being informed of his termination.

---

[45] Ecolab's January 26, 2023 Notice of Completion of Post-Motion Meet and Confer Process, at 2 (Doc. 119).

[46] CHEMR-000000147 (showing Mr. Ridley's contact with ChemTreat on August 17, 2020).

[47] ChemTreat's July 22, 2022 Responses & Objections to Plaintiffs' Interrogatories, at page 9.

32

Custodians:  Based on the assumptions provided to me by ChemTreat's counsel, the custodians whose data I searched included the business people at ChemTreat with whom Mr. Ridley may have interacted, including those within Mr. Ridley's line of authority.  These individuals include Mr. Ridley himself, Mr. Ridley's immediate supervisor, the supervisor to Mr. Ridley's supervisor, Mr. Ridley's predecessor, the executive at the head of ChemTreat's North American field sales organization, and a number of ChemTreat employees who may have interacted with Mr. Ridley.

Repositories:  The repositories I investigated include each of the repositories that a digital forensics examiner seeking to confirm the presence or absence of Ecolab's confidential information on ChemTreat's system would investigate to determine whether Mr. Ridley had distributed or stored such information.  My investigation involved a broad range of repositories, including cloud accounts (such as OneDrive and, for Mr. Ridley, SharePoint); email searches that would show email distributions of documents or links to documents, as well as communications about the at-issue file names; and even searches of devices issued to Mr. Ridley during his tenure at ChemTreat.  Despite the breadth of my investigation, my investigation did not reveal any evidence supporting Ecolab's allegations that Mr. Ridley stored or distributed Ecolab's confidential information on ChemTreat's systems.  For example, while I located a single Ecolab document in Mr. Ridley's email account (CHEMR-000001632), which does not bear any confidentiality designation and which I understand Ecolab has indicated is not a standalone trade secret,[48] I did not see any evidence of Mr. Ridley transmitting this document to anyone else.  I also

---

[48] Ecolab's January 27, 2023 Supplemental Responses & Objections to ChemTreat's Interrogatories, at page 4.

33

did not see any evidence of Mr. Ridley emailing any other Ecolab documents (whether confidential or otherwise) to himself or to any other ChemTreat employees.

As noted above, ChemTreat has certain shared network folders beyond OneDrive and SharePoint. Based on my conversation with ChemTreat IT personnel, these shared network folders and files are only accessible from one of three physical ChemTreat office locations or via the VPN function, and then only accessible if access is requested and granted. There is no evidence or record that Mr. Ridley had read or write access to any of ChemTreat's shared network folders and files. While I searched these shared network folders as part of my initial investigation for a relatively small number of file names that had been identified as potentially relevant file names at that time, I subsequently determined that no further search was necessary as there was no evidence Mr. Ridley had access to these folders. Moreover, it would not be relevant or economical to search these shared network folders for the 11,713 file names identified in Exhibit F. As discussed above, when I directed ChemTreat to run searches for the 15 file names identified in Search Nos. 1, 4, and 6 as part of my investigation in early 2022, the search for just those 15 file names took multiple days to run to completion.

Searches Are Burdensome: Here, I note that searching for documents and file names is a time consuming and burdensome endeavor. Therefore, the ability to search for documents should not be limitless. Searches for documents across complex digital systems should be confined by specific parameters. The investigation I conducted balanced these burden concerns against the need to search the repositories and custodians potentially likely to contain relevant information.

34

## F.       Reliability of the CrowdStrike Log and Validation Testing

Ecolab has asserted in this litigation that, during his employment by ChemTreat, Mr. Ridley accessed or used documents he allegedly misappropriated from Ecolab.[49]  In order to assess this allegation, I reviewed and searched the CrowdStrike log produced in this litigation, which was generated in March 2022 by Adam Fisher, a Cybersecurity Engineer in ChemTreat's Water Quality Group.  As discussed above, *see supra*, Section III.A.1.d, the CrowdStrike log would show Mr. Ridley's interactions with any documents that were accessed from any external USB device, using his first ChemTreat-issued laptop, as well as any documents that were saved on that laptop after being opened from an external device.  As discussed above, that search revealed Mr. Ridley's interaction with a narrow set of documents that could potentially belong to Ecolab.

Although the underlying documents are not available, such that I cannot assess whether they actually contain Ecolab's confidential information, given that the CrowdStrike log created after the reformatting of Mr. Ridley's first ChemTreat issued laptop reflects Mr. Ridley's limited interactions with documents containing the phrase "Nalco Water Files" in the file path name, I wanted to validate that a CrowdStrike log created after the reformatting of a laptop is capable of capturing all of the user's interactions with documents from external devices predating that reformatting.  To validate the interactions reflected on the CrowdStrike log for Mr. Ridley's first ChemTreat-issued laptop, I conducted the validation procedures identified below.  Based on those validation procedures, I was able to confirm that CrowdStrike logs all interactions a subject laptop has with any documents accessed from an external device, and retains that information even after the subject laptop is reformatted.  Accordingly, I conclude that the limited interactions between Mr. Ridley's first ChemTreat-issued laptop and documents accessed from an external USB device

---

[49] Ecolab's June 10, 2022 Second Amended Complaint, ¶ 108 (Doc. 42).

35

that are reflected on the CrowdStrike log produced by ChemTreat in this litigation accurately reflect the full scope of interactions that Mr. Ridley had with documents that were accessed from any external USB device using his first ChemTreat-issued laptop, or that were contemporaneously saved to the laptop after being opened from the connected USB device.

### 1. Temporal Ranges of the CrowdStrike Log

The CrowdStrike log shows activity on Mr. Ridley's first ChemTreat-issued laptop covering the period from July 9, 2021, through February 28, 2022. To confirm that the log was properly created and captured all of Mr. Ridley's relevant activity for the time period of his possession of the laptop, I validated this time period by considering various factual circumstances based on the documents and information available to me.

### a. Beginning Date of the CrowdStrike Log

I understand that Mr. Ridley resigned from Ecolab on July 1, 2021.[50] The contemporaneous documents I reviewed reflect that, due to supply chain issues, Mr. Ridley did not receive his first ChemTreat-issued laptop until July 12, 2022 at the earliest.[51] The first activity in the CrowdStrike log associated with Mr. Ridley's user profile occurred on July 12, 2021. July 13, 2021 is the first date on which Mr. Ridley sent emails from his ChemTreat email account.[52] Based on this information, I conclude that July 12, 2021 is the first date that Mr. Ridley accessed or used his ChemTreat-issued laptop. The CrowdStrike log shows activity as early as July 9, 2021, but that activity is not associated with Mr. Ridley's user profile. The presence of that activity on the CrowdStrike log is consistent with the log capturing activity associated with ChemTreat's IT personnel setting up the laptop before it was sent to Mr. Ridley. Based on my experience, it would

---

[50] Ecolab's June 10, 2022 Second Amended Complaint, ¶ 1 (Doc. 42).
[51] CHEMR-000001543; CHEMR-000001530.
[52] *E.g.*, Ex. C, July 13, 2021 email from A. Ridley to S. Freed.

36

be unusual not to have such activity reflected on a log such as the CrowdStrike log, as businesses with dedicated IT personnel typically have a standard process for setting up laptops before deployment to employees, including installing standard software and security measures.

### b. End Date of the CrowdStrike Log

The CrowdStrike log for Mr. Ridley's first ChemTreat-issued laptop reflects no activity associated with Mr. Ridley's user profile after February 28, 2022. Based on my review of the contemporaneous documents and discovery material I was provided, this end date is consistent with Mr. Ridley returning his first ChemTreat-issued laptop to ChemTreat for preservation purposes at the end of February 2022.[53] Mr. Ridley was provided a second ChemTreat-issued laptop to replace his first ChemTreat-issued laptop when he was instructed to return that first ChemTreat-issued laptop. Mr. Ridley's second ChemTreat-issued laptop was collected and preserved upon his termination. As discussed above, I forensically imaged and forensically analyzed Mr. Ridley's second ChemTreat-issued laptop.

### 2. Information Contained in the CrowdStrike Log

The CrowdStrike log tracking Mr. Ridley's interactions with external USB devices contains the following "headers" reflecting information collected and logged by CrowdStrike:

```
<field>time</field>
<field>name</field>
<field>VolumeDriveLetter</field>
<field>VolumeName</field>
<field>DeviceManufacturer</field>
<field>DeviceProduct</field>
<field>DeviceSerialNumber</field>
<field>DeviceInstanceID</field>
<field>TargetFileName</field>
```

---

[53] *See* CHEMR-000001840.

37

Each of these "headers" or fields provide information about the name of a file accessed from an external USB device, the date and time it was accessed, and the USB device from which it was accessed. These fields are relevant because these fields capture information a forensic examiner like myself would rely on regarding interactions with external USB devices, and files on those devices. There is no other material field, that is not included, that prevents me from reaching the conclusions I have reached regarding my CrowdStrike log analysis. Based on my review of the CrowdStrike log generated by ChemTreat, it is apparent that Mr. Fisher used a query that captured the broadest possible set of information regarding Mr. Ridley's user activity on his first ChemTreat-issued laptop.

The CrowdStrike log contains 12,354,453 lines of XML data. This amount of data can be lost when converted to an Excel format, so the CrowdStrike log was exported to an XML format to ensure all data was captured. [54]

### 3. Validation and Testing Procedure

I used the following validation and testing procedure to confirm the accuracy, reliability, and completeness of the CrowdStrike log of Mr. Ridley's first ChemTreat-issued laptop. First, I requested that ChemTreat provide me with a laptop that used the same OS (operating system) as Mr. Ridley's first ChemTreat-issued laptop, which I understand was Windows 10. Second, I requested that ChemTreat provide me with the same access parameters available to Mr. Ridley. Third, I requested that ChemTreat confirm whether the CrowdStrike platform used by them during the time period of my validation testing (February 2023) was materially similar to the CrowdStrike platform used by ChemTreat at the time ChemTreat's IT personnel generated the CrowdStrike log

---

[54] Excel specifications and limits, *available at* https://support.microsoft.com/en-us/office/excel-specifications-and-limits-1672b34d-7043-467e-8e27-269d656771c3.

38

of Mr. Ridley's first ChemTreat-issued laptop (March 2022). I determined that ChemTreat's CrowdStrike configurations have remained materially constant for the last two years, such that there are no material differences in the information collected or logged by CrowdStrike in March 2022 and February 2023. While ChemTreat has deployed regular "sensor updates," these "sensor updates" would not materially impact the activities captured by CrowdStrike.

After determining that these variables were consistent, I conducted a testing procedure on the test laptop I requested from ChemTreat. Specifically, I conducted various experiments with the test laptop by (1) plugging in an external USB and opening files from that USB using Microsoft Office and PDF applications; (2) plugging in an external USB and opening files from that USB using Windows Explorer; and (3) plugging in an external USB, opening and then saving files from that USB to the test laptop's hard drive.

Following these experiments, I sent the laptop back to ChemTreat with the instruction that their IT personnel should reformat the laptop in the same manner that they had reformatted Mr. Ridley's first ChemTreat-issued laptop. I then requested that Mr. Fisher generate a CrowdStrike log for this validation laptop that contained the same "headers" contained in the original CrowdStrike log he generated for Mr. Ridley's first ChemTreat-issued laptop. Next, I analyzed the CrowdStrike log generated for the validation laptop to determine whether it reflected the various electronic activities described above.[55]

---

[55] *See* Ex. G, Validation CrowdStrike Log. The Validation CrowdStrike Log was exportable as a csv file because it contained just 35,043 rows of data and thus was orders of magnitude smaller than the CrowdStrike log produced in this litigation. The CrowdStrike log produced in this litigation had to be exported as an XML file to capture all relevant data because it covered a broader time frame, more activity, and contained over 12 million lines of data.

39

### 4. Results

Based on this validation and testing procedure, I confirmed that the CrowdStrike log generated for the validation laptop accurately and reliably captured all of the activity described above, despite the intervening reformatting of that validation laptop. Additionally, the CrowdStrike log generated for the validation laptop accurately captured the serial number of the USB device used for validation purposes. This is exactly how CrowdStrike is supposed to function: It does not depend on the continued existence of a physical device, but acts as an endpoint protection and antivirus software that detects and logs the presence of external devices and access to external files in real time. CrowdStrike perceives those files as a potential threat, even if they are benign, which is why it logs each and every interaction with a file that is accessed from an external device.

### 5. Conclusion Regarding Validity and Reliability of the CrowdStrike Log

Having conducted this validation and testing procedure, I can state to a reasonable degree of certainty, based on my expertise as a digital forensics examiner, that the CrowdStrike log produced to Ecolab in this litigation accurately and reliably reflects the file names of any files from any external devices (such as a USB or external hard drive) that Mr. Ridley interacted with using his first ChemTreat-issued laptop.

### G. Conclusion Arising from Further Investigation in 2023

Consistent with the findings of my investigation in early 2022, I did not locate any evidence that Mr. Ridley distributed or stored documents containing Ecolab's confidential information on or through ChemTreat's Systems.

## V.     Conclusions

Based on the foregoing and relying upon my more than 20 years of experience and expertise as a certified digital forensics examiner, I conclude, based upon the analysis of all evidence available to me, that there is no evidence that Mr. Ridley stored Ecolab's confidential information on ChemTreat's Systems. I further conclude that there is no evidence that Mr. Ridley distributed Ecolab's confidential information to other ChemTreat employees using ChemTreat's Systems. Finally, I conclude that Mr. Ridley may have interacted with a very limited set of documents that bear file names indicating that they may have originated with Ecolab, although he did not upload those documents to ChemTreat's Systems or use ChemTreat's Systems to distribute them. However, because I do not have access to those documents, either from ChemTreat or from Ecolab, I cannot review them to determine whether they contain indicia suggesting they actually belong to Ecolab or contain Ecolab's confidential information.

Signed:     James D. Vaughn

Dated:        February 21, 2023

41

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,<br><br>        Plaintiffs,<br><br>v.<br><br>ANTHONY RIDLEY, and CHEMTREAT, INC.,<br><br>        Defendants. | Case No. 1:22-cv-00050-TRM-SKL<br><br>Hon. Travis McDonough<br><br>Magistrate Judge Susan K. Lee |

**REBUTTAL EXPERT REPORT OF JAMES D. VAUGHN**

**TABLE OF CONTENTS**

I.  Introduction ........................................................................................................ 1

II.  Materials Relied Upon ..................................................................................... 2

III.  Mr. Lieb's Report Suffers from Fundamental Analytical Deficiencies ............................. 3

    A.  Mr. Lieb's Intent-Based Determinations Are Not Grounded in Forensic Facts ....................................................................................... 3

    B.  Mr. Lieb Is Not Qualified to Reach Non-Forensic, Legal Conclusions .................. 4

    C.  Mr. Lieb Has Not Analyzed or Reviewed the Documents He Claims Are "Ecolab Files" ..................................................................... 4

    D.  Mr. Lieb Did Not Conduct a "Forensic Analysis" of the DLP Report .................. 5

    E.  Mr. Lieb Failed to Analyze Vital Documents Produced by Ecolab that Disprove or Undermine His "Conclusions" ........................................................... 6

    F.  Mr. Lieb Failed to Analyze, Seek, or Obtain Relevant Devices ............................. 7

IV.  Mr. Lieb's Conclusion that Mr. Ridley Permanently Deleted or "Destroyed" Ecolab Files from Mr. Ridley's Ecolab OneDrive Account Is Not Supported by Forensic Evidence ........................................................................................... 8

    A.  Mr. Lieb Improperly Equates Files Originating from Mr. Ridley's Laptop to Files Originating from Mr. Ridley's Ecolab OneDrive ....................................... 9

    B.  The Absence of "ridley's nalco folder" in the Collected Version of Mr. Ridley's Ecolab OneDrive Does Not Support Mr. Lieb's Conclusions Regarding Mr. Ridley's File Deletion Activity ..................................................... 10

    C.  The DLP Report Does Not Reflect Any Deletion Activity ................................... 14

    D.  Any Deleted Files Remained Recoverable by Ecolab ........................................... 16

    E.  Ecolab's Failure to Promptly Collect Mr. Ridley's Ecolab OneDrive Undermines Mr. Lieb's Conclusions ................................................................... 17

    F.  Ecolab's Failure to Locate the "LaCie Drive" Invalidates Mr. Lieb's Conclusion that Mr. Ridley "Destroyed" Ecolab's Documents ........................... 19

    G.  Conclusion Regarding Alleged Deletion Activity ............................................... 19

V.  Ecolab's O365 Audit Log—Which Mr. Lieb Failed to Analyze—Contradicts Mr. Lieb's Analysis ........................................................................................... 20

i

VI.    Mr. Lieb Improperly Concludes that Mr. Ridley hHad no Need to "Declutter" his OneDrive Account......................................................................................22

VII.   Mr. Lieb Does Not, and Cannot, Assert that the Files Mr. Ridley Transferred to the "LaCie Drive" Were Used During Mr. Ridley's Tenure at ChemTreat or that ChemTreat Had Access to the Files ......................................................................23

VIII.  Mr. Lieb's Conclusions Regarding Mr. Ridley's "Personal Microsoft Cloud Account" Are Unsupported by the Available Evidence ....................................24

     A.    "Live.com" Is a Domain Name Associated with Business and Personal Accounts ....................................................................................................27

     B.    The "Live.com" Domain Addressed in Mr. Lieb's Report Likely Corresponds to Mr. Ridley's ChemTreat OneDrive Account ..............................27

     C.    The Document Accessed by Mr. Ridley After Visiting the "Live.com" Domain Is a ChemTreat Document ......................................................28

IX.    The CrowdStrike Log I Relied Upon for Purposes of my Affirmative Expert Report Is Complete and Reliable..........................................................................30

     A.    The CrowdStrike Log Captured All Relevant Data ...............................30

     B.    The CrowdStrike Log Captured Mr. Ridley's Access to Files on Cloud-Based Platforms ..................................................................................31

     C.    CrowdStrike Captured Necessary Fields...............................................32

     D.    Mr. Ridley's ChemTreat-Issued Laptop Is Neither the Primary Source Nor the Sole Source of Information Regarding Mr. Ridley's Personal Microsoft Activity ..................................................................................33

X.     The "Missing" AmazonBasics USB Device Is Clearly Irrelevant ....................33

XI.    Ecolab's Extensive Failure to Preserve Critical Data and Devices Renders Mr. Lieb's Report Unreliable and Incomplete ..........................................................34

     A.    The "LaCie Drive" or "mobile drive" .....................................................35

     B.    Mr. Ridley's First Ecolab-Issued Laptop: .............................................38

     C.    Mr. Ridley's Second Ecolab-Issued Laptop .........................................40

     D.    Mr. Ridley's Ecolab OneDrive..............................................................42

     E.    Ridley Contacts.CSV..............................................................................43

     F.    Conclusions Regarding Ecolab's Failure to Preserve Devices and Data .............44

XII.    Ecolab Did Not Take Reasonable Steps to Maintain the Secrecy of its Documents.........45

XIII.   Conclusions .................................................................................................................48

## I.    Introduction

This rebuttal expert report is provided in response to the February 24, 2023 Expert Report of Laurence D. Lieb (the "Lieb Report").[1]  This rebuttal expert report is provided based on the information presently available to me.  I understand that discovery in this matter is ongoing.  To the extent additional information or documents are produced in this matter that may bear on my conclusions, I reserve the right to supplement this rebuttal expert report appropriately.

My name is James D. Vaughn.  I am a Managing Director of iDiscovery Solutions (iDS) and a court-recognized expert who has given testimony in more than 80 cases involving digital forensic methodologies, including the identification, collection, analysis, and production of electronically stored information.  I have also trained hundreds of law enforcement officers, attorneys, and other examiners on digital forensics and high-technology-related issues involving best practices and methodologies.  I previously served as a part-time instructor and course developer with the California Department of Justice, where I co-developed and taught digital forensics courses.  I am a retired law enforcement officer; I spent the last several years of my law enforcement career conducting digital forensic investigations.

My credentials include professional certifications related to digital forensics.  I am an EnCase Certified Examiner (EnCE),[2] as well as a GIAC Certified Forensics Examiner (GCFE).[3]  To obtain these certifications, I attended formalized digital forensics training, took

---

[1]  Mr. Lieb incorrectly dated his report as February 24, 2022.

[2]  The EnCase Certified Examiner (EnCE) program certifies both public and private sector professionals in the use of Opentext EnCase Forensic. EnCE certification acknowledges that professionals have mastered computer investigation methodology as well as the use of EnCase software during complex computer examinations.

[3]  The GIAC Certified Forensic Examiner (GCFE) certification validates a practitioner's knowledge of computer forensic analysis, with an emphasis on core skills required to collect and analyze data from Windows computer systems.

1

written tests, and have performed practical examinations, all of which are designed to measure proficiency. I am also required to renew these certifications by submitting continuing professional education and other formal training credits every three years. To demonstrate my expertise, I have voluntarily maintained active digital forensic certifications for more than 20 consecutive years. Conservatively speaking, I have more than 1,800 hours of formal training in computer, digital media, and mobile device forensics.

I have significant experience performing forensic investigations of computers, mobile devices, storage media, and other devices in lawsuits alleging the misappropriation of trade secrets, confidential information, and intellectual property. I have served as an expert witness and have worked with clients on both the plaintiff and defense side of such disputes, as well as served as a third-party neutral on several occasions. Exhibit A, which is my curriculum vitae, further describes my qualifications and experience, including publications I have authored in the last 10 years, and depositions or trials for which I have provided live testimony for at least the last 4 years.

iDS is compensated for my services in this matter at the rate of $600.00 per hour, plus the cost of other iDS employees performing tasks on this project. That compensation does not affect my opinions in this matter. When I use the word "I" throughout this rebuttal expert report, it is intended to represent tasks performed by myself or other iDS team members working under my direction and supervision.

## II. Materials Relied Upon

I have been provided copies of all documents, including forensic images, produced by each of the parties to this litigation as of the date of this report, as well as copies of interrogatory responses provided by all parties, and various public court filings by the parties. I have also been provided any final deposition transcripts for depositions that have taken place in this matter as of the date of this report. In the course of preparing this rebuttal expert report, including forming the

2

opinions set forth below, I relied upon the facts set out in the materials cited herein.  A complete list of the materials I relied upon for purposes of this rebuttal expert report is attached as Exhibit B.

### III.  Mr. Lieb's Report Suffers from Fundamental Analytical Deficiencies

####     A.     Mr. Lieb's Intent-Based Determinations Are Not Grounded in Forensic Facts

Mr. Lieb states that he was retained to provide opinions "regarding . . . forensic analysis of a data loss prevention system report and [certain] documents."  Lieb Report, ¶ 5.  But Mr. Lieb repeatedly strays away from this assignment and reaches conclusions that cannot be drawn from the forensic evidence.  In particular, Mr. Lieb reaches conclusions regarding Mr. Ridley's intent, mental state, and motivations that have no basis in the forensic evidence outlined in Mr. Lieb's report.  A few examples of such non-forensic conclusions are listed below:

- "It is my opinion that Ridley exfiltrated the many Ecolab files documented in this report *specifically to utilize them while employed at ChemTreat*."[4]  Lieb Report, ¶ 24.

- "Mr. Ridley deleted the files listed below in Table 2 in a *failed attempt to hide the fact that the drive contained Ecolab files*."  Lieb Report, ¶ 35.

- "Ridley *attempted, but failed to hide the fact* that he was in possession of the above-mentioned Ecolab files."  Lieb Report, ¶ 40.

- "Ridley exfiltrated and then destroyed a significant number of Ecolab files in an *attempt to deprive his former employer access to these same files*."  Lieb Report, ¶ 41.

- "It is my opinion that there was absolutely no need to 'declutter' his OneDrive account, but in fact *this act of deletion was designed to deprive Ecolab access to these same files*."  Lieb Report, ¶ 48.

- "[A]ll evidence is consistent with the fact that Ridley exfiltrated thousands of Ecolab files and *then deleted those same files to deprive Ecolab access to them*."  Lieb Report, ¶ 50.

---

[4] Unless otherwise noted, all emphasis is added.

3

Based on the forensic evidence and documents available to me, based on the information presented in Mr. Lieb's report, and based on my own forensic analysis, I am unable to confirm these speculative suppositions, and I am unable to reach any of these conclusions. In fact, as detailed in this report, several of Mr. Lieb's suppositions, and the facts that Mr. Lieb relies upon to reach them, are demonstrably incorrect based on the forensic evidence, or have nothing to do with the conclusion being a "forensic opinion."

### B.  Mr. Lieb Is Not Qualified to Reach Non-Forensic, Legal Conclusions

Beyond these blatantly intent-based determinations, Mr. Lieb also reaches certain non-forensic conclusions that seem to be legal or psychological, in which I believe he has no training, experience, or background. Specifically, Mr. Lieb reaches the "conclusion that Ridley misappropriated thousands of Ecolab files." Lieb Report, ¶ 14. "Misappropriation" is a legal term of art that is often defined by statute.[5] Neither I nor Mr. Lieb are qualified to opine on whether Mr. Ridley's conduct falls within the scope of the statutorily-defined term "misappropriation."

### C.  Mr. Lieb Has Not Analyzed or Reviewed the Documents He Claims Are "Ecolab Files"

Mr. Lieb routinely speculates about the content of files he has apparently never viewed, read, or even accessed. Specifically, Mr. Lieb repeatedly speculates that certain file names correspond to "Ecolab files." *E.g.*, Lieb Report, ¶¶ 24, 35. But my understanding is that Ecolab has not found or produced such files, and Mr. Lieb does not state that he had access to, analyzed, or reviewed any of the documents whose file names he claims are "Ecolab files." Indeed, many of the file names throughout Mr. Lieb's report that he claims are "Ecolab files" do not bear any indicia that they in fact belong to Ecolab. *E.g.*, Lieb Report, ¶ 35. Some of the documents Mr. Lieb contends are "Ecolab files" are clearly nothing of the sort. For example, one file name Mr.

---

[5] *E.g.*, Tenn. Code Ann. § 47-25-1701 *et seq.*; 18 U.S.C. § 1839.

4

Lieb claims is an "Ecolab file" contains "Music" and another contains "Pictures."  Lieb Report, ¶ 35.  Another document is simply called "Sales Planning Tools," which could be a file name corresponding to either an Ecolab document, a ChemTreat document, or the document of a different entity entirely.  The Digital Guardian report referenced in Mr. Lieb's report (the "DLP Report")[6] lists file names and file paths, but does not enable access to the underlying documents referenced in that report.  Nor does the DLP report include MD5 hash values for any of the documents it lists.[7]  Such MD5 hash values are the only way to forensically confirm that documents produced by Ecolab are the same documents listed on the DLP Report.  I understand that Ecolab has not produced the files described immediately above (such as the "Sales Planning Tools") nor produced files corresponding to the vast majority of the documents listed on the DLP Report.  This means Mr. Lieb is left to speculate about the nature, content, and information contained in the thousands of documents listed on the DLP Report.  Without obtaining access to these files, neither I nor Mr. Lieb can draw any conclusions about whether these are, in fact, "Ecolab files," and, if they are, the nature of the content.

### D. Mr. Lieb Did Not Conduct a "Forensic Analysis" of the DLP Report

Notably, Mr. Lieb repeatedly states conclusions reached as a result of a purported "forensic analysis" of the DLP Report.  *E.g.*, Lieb Report, ¶¶ 15-22.  Mr. Lieb does not describe *how* he executed this "forensic analysis" or what the "forensic analysis" involved.  Mr. Lieb simply states conclusions "revealed" by his "forensic analysis."  In reality, it does not appear that Mr. Lieb conducted any "forensic analysis" of the DLP Report.  Instead, he simply appears to have read

---

[6] Ecolab has produced modified versions of the DLP Report with certain columns hidden at PLAINTIFFSR-000000951 and PLAINTIFFSR-000000952.

[7] A MD5 hash value is the equivalent of a digital human fingerprint.  The MD5 hash value from two different files either match or they do not.  In this case, Mr. Lieb had no MD5 hash value and therefore could not have relied on this method for concluding any two files were the "exact same."

5

portions of the DLP Report and then summarized portions of that DLP Report—that is not a "forensic analysis." Indeed, according to his report, Mr. Lieb has done nothing to assess the reliability or completeness of the DLP Report generated by Ecolab and produced in this matter. Therefore, I have not found any support for Mr. Lieb's assertion that he conducted a "forensic analysis" of the DLP Report, and Mr. Lieb's failure to describe his "analysis" or how it was conducted in several portions of his report prejudices my ability to test his theories.

Mr. Lieb's mischaracterization of his work is significant, because Mr. Lieb uses the term "forensic analysis" to lend a perception of heightened credibility to the DLP Report, despite his failure to actually analyze its completeness, reliability, or meaning, which is the standard approach when a forensic examiner relies upon these types of reports.

### E. Mr. Lieb Failed to Analyze Vital Documents Produced by Ecolab that Disprove or Undermine His "Conclusions"

I also note that while Mr. Lieb asserts that he relied partly on his "review of the documents and information contained within Ecolab former employee, Anthony Ridley's OneDrive account and Ecolab's digital loss prevention tool, Digital Guardian's report which captured Anthony Ridley's human interaction with Ecolab's files, and ChemTreat's CrowdStrike report," Lieb Report, ¶ 7, Mr. Lieb's report is notable primarily because of what he did *not* rely upon. For example, Mr. Lieb did not rely on any of the following documents produced by Ecolab in this litigation, despite the fact that they are clearly relevant to his analysis:

- PLAINTIFFSR-000000953 – An O365 Audit Log that affirmatively disproves Mr. Lieb's theory that Mr. Ridley "destroyed" or deleted documents he transferred to the "LaCie Drive."

- PLAINTIFFSR-000000812 – Ecolab's "Employee Data Review" IT Procedure, which sets policies for Ecolab Security Engineers who generate DLP Reports and requires the Security

6

Engineers to include the "File Delete" value, which would show whether any files listed on the DLP Report were actually deleted.

- PLAINTIFFSR-000000955 – The "Employee Data Sheet" generated by Ecolab's Security Engineer, Jennifer Semmler, on July 23, 2021, that describes which reports she generated for Mr. Ridley's digital activity.

- PLAINTIFFSR-000000942 – A "Computer Details" report showing the chain-of-custody for Mr. Ridley's first Ecolab-issued laptop.

- PLAINTIFFSR-000000948 – A "Computer Details" report showing the chain-of-custody for Mr. Ridley's second Ecolab-issued laptop.[8]

- As noted above, Mr. Lieb has apparently not reviewed the vast majority of documents that appear on the DLP Report. Indeed, he could not have done so, given that only approximately 70 of the over 11,000 file names contained in the DLP Report appear in the version of Mr. Ridley's Ecolab OneDrive produced by Ecolab and that Ecolab has only produced an additional approximately 87 documents that it represents are copies of files listed in the DLP Report. *See* Exhibit C. Therefore, Mr. Lieb cannot opine that each of these documents is an "Ecolab file."

I address these documents in further detail below.

### F. Mr. Lieb Failed to Analyze, Seek, or Obtain Relevant Devices

Based on his report, Mr. Lieb did not analyze or apparently seek to analyze several relevant devices that were at one time in Ecolab's possession. Specifically, Mr. Lieb did not retrieve or analyze either of the Ecolab-issued laptops Mr. Ridley allegedly used to "exfiltrate" Ecolab's files,

---

[8] *See also* INSIGHTR-00000005.

or the "mobile drive" (also suspected to be the "LaCie Drive") returned to Ecolab by Mr. Ridley.[9] Mr. Lieb broadly concludes that the absence of Mr. Ridley's "former work computers have *literally no effect*" on his opinions. Lieb Report, ¶ 12. Mr. Lieb is incorrect; I address that issue in further detail below. Mr. Lieb makes no mention whatsoever of the impact on his opinions of Ecolab's failure to preserve or produce the "mobile drive" Mr. Ridley returned upon his departure from Ecolab (which Mr. Ridley has alleged is the "LaCie Drive" that he has stated he returned).[10] The full range of data and devices Mr. Lieb failed to analyze, and which apparently have been lost or destroyed by Ecolab, is described below.

For these reasons and those described in the remainder of this report, Mr. Lieb's conclusions are not premised on or based in the application of forensic expertise to facts, but appear more accurately characterized as supposition, theorizing, and speculation divorced from any recognized forensic expertise.

## IV. Mr. Lieb's Conclusion that Mr. Ridley Permanently Deleted or "Destroyed" Ecolab Files from Mr. Ridley's Ecolab OneDrive Account Is Not Supported by Forensic Evidence

Beyond the global deficiencies identified above, Mr. Lieb's specific conclusions are also fundamentally flawed. One of Mr. Lieb's primary conclusions is that "[a]ll evidence is consistent with the fact that Ridley exfiltrated thousands of Ecolab files and then deleted those same files to

---

[9] Ecolab's January 27, 2023 Amended Responses & Objections to Certain of ChemTreat's Interrogatories, at page 14; Ridley's July 20, 2022 Responses & Objections to Ecolab's Interrogatories, at page 6; Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at pages 25-27.

[10] Ecolab's January 27, 2023 Amended Responses & Objections to Certain of ChemTreat' Interrogatories, at page 14; Ridley's July 20, 2022 Responses & Objections to Ecolab's Interrogatories, at page 6; Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at pages 25-27.

8

deprive Ecolab access to them."[11]  Lieb Report, ¶ 50; *see also id.* ¶ 41.  Mr. Lieb concludes that Mr. Ridley deleted files from his Ecolab OneDrive after transferring them to Mr. Ridley's "LaCie Drive."  Mr. Lieb reaches this conclusion based on a single assumption:  that a folder called "ridley's nalco folder" at one time existed in the OneDrive Mr. Lieb collected.  Lieb Report, ¶ 45.  Although Mr. Lieb does not specify when he collected Mr. Ridley's Ecolab OneDrive, based on the forensic image of that OneDrive, it was not forensically preserved until January 25, 2022, approximately seven months after Mr. Ridley left Ecolab's employment.  Mr. Lieb's report does not include any chain of custody information for Mr. Ridley's Ecolab OneDrive during those seven months.

### A.    Mr. Lieb Improperly Equates Files Originating from Mr. Ridley's Laptop to Files Originating from Mr. Ridley's Ecolab OneDrive

Mr. Lieb appears to have assumed that the "ridley's nalco folder" existed in Mr. Ridley's Ecolab OneDrive simply because the DLP Report shows that a folder with that name existed on Mr. Ridley's Ecolab *laptop*.  As the DLP Report reflects, consistent with the standard configuration of a Windows computer, the hard drive for Mr. Ridley's Ecolab laptop was designated as a C:\ drive.  Mr. Lieb fails to mention the fact that the source file path for the vast majority of the documents shown on the DLP Report demonstrates that the documents were transferred from the C:\ drive (the hard drive of Mr. Ridley's Ecolab laptop) to the "LaCie Drive," not from Mr. Ridley's Ecolab OneDrive to the "LaCie Drive."[12]  Because the DLP Report identifies these

---

[11]  Because I have not seen any forensic evidence demonstrating that Mr. Ridley stole sensitive data and retained it during his tenure at ChemTreat, I understand Mr. Lieb's use of the term "exfiltrate" to mean the egress or transfer of documents from one computer system or device to another computer system or device (in this case, from Mr. Ridley's Ecolab-provided computer(s) to Mr. Ridley's Ecolab-provided "LaCie Drive").

[12] The few files that were not accessed from the C:\ drive appear to have originated from various websites or, on limited occasions, from an unidentified "D:\" drive.

documents as having been located on the hard drive of Mr. Ridley's laptop(s), which Mr. Lieb admits he did not review, Mr. Lieb cannot reliably conclude, based on his cited analysis, that these files ever existed in Ecolab's OneDrive system, let alone that they were deleted from that system by Mr. Ridley sometime in May or June 2021.

**B.** **The Absence of "ridley's nalco folder" in the Collected Version of Mr. Ridley's Ecolab OneDrive Does Not Support Mr. Lieb's Conclusions Regarding Mr. Ridley's File Deletion Activity**

While Mr. Lieb asserts without support that "[f]orensic analysis" showed that Mr. Ridley's Ecolab OneDrive account "originally held" a folder called "ridley's nalco folder," Mr. Lieb does not and cannot draw conclusions about what was contained in this folder, or that the folder even existed in Mr. Ridley's Ecolab OneDrive to begin with. In other words, Mr. Lieb does not identify any forensic evidence for his assumption that the "ridley's nalco folder" existed in Mr. Ridley's Ecolab OneDrive prior to Mr. Ridley's departure from Ecolab. Mr. Lieb provides no support for the assertion that this folder was "originally held" in Mr. Ridley's Ecolab OneDrive account, and does not describe the "forensic analysis" he conducted, or the forensic evidence he relied on, to reach that conclusion. Although it is unclear, it appears that Mr. Lieb bases this conclusion on entries contained in the DLP Report. But as Mr. Lieb notes, "Digital Guardian is designed specifically to record the exfiltration of trade secrets, intellectual property and company files by employees." Lieb Report, ¶ 12. To achieve this purpose, Digital Guardian "captures and records events at the *system, user, and data level*."[13] This means that the DLP Report captures digital activity that occurs not only within OneDrive, but also on the *internal storage* of a computer. Testimony from an Ecolab IT Security Engineer, Jennifer Semmler, confirms that much of the

---

[13] Digital Guardian, Endpoint DLP, *available at* https://www.digitalguardian.com/products/endpoint-dlp.

10

activity shown on the DLP Report is activity that occurred on the *internal storage* of Mr. Ridley's Ecolab-issued computer(s), not within Ecolab's OneDrive environment.[14]  Specifically, many of the documents on the DLP Report show that their source was the "C:\" drive.  A "C:\" drive is the drive that corresponds to a computer's internal storage, rather than cloud-based applications.  Out of the 94,490 lines in the DLP Report, there are only 979 that do not contain "C:\" in the Source Directory field, as shown below.



Some examples of the file paths that appear to have existed only on the internal storage of Mr. Ridley's Ecolab-issued laptop include the following:

1.      c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\arnold's air force base

This customer file contains 235 or more unique documents.

2.      c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\conagra - newport, tn

This customer file contains 19 or more unique documents.

---

[14] March 9, 2023 Deposition of Jennifer Semmler, at 181-182.

11

3.        c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\chattanooga coca-cola

This customer file contains 63 or more unique documents.

4.        c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\bunge - decatur al

This customer file contains 61 or more unique documents.

5.        c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\george a. dickel & co

This customer file contains 250 or more unique documents.

6.        c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\duracell - cleveland tn

This customer file contains 766 or more unique documents.

7.        c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\the chattanoogan

This customer file contains 131 or more unique documents.

8.        c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\volkswagon

This customer file contains 1094 or more unique documents.

9.        c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\wna, inc. chattanooga facility

This customer file contains 424 or more unique documents.

10.       c:\users\aridley\onedrive - ecolab\ridley ecolab - nalco water files\ridley's nalco folder\documents\customers files - nalco water\tyson accounts

12

This customer file contains 97 or more unique documents.

I understand from the testimony of Ecolab employees that at some point in time Ecolab's system was set up so that information stored on an employee's hard drive was automatically synchronized with the employee's OneDrive.[15] I have not seen any evidence that identifies the date when such automatic synchronization went into effect. I have not seen any evidence to suggest that the internal storage of the computers issued to Mr. Ridley automatically synced to his Ecolab OneDrive account. Further, I understand that at least one of Mr. Ridley's laptops had to be returned because it suffered from hardware defects, such as "constant buzzing and humming inside of it," demonstrating that Mr. Ridley's laptop may not have been operating correctly (including potentially failing to synchronize desktop and other internal storage files with his OneDrive account).[16]

The only means of verifying Mr. Lieb's apparent supposition that files stored on the hard drive of Mr. Ridley's laptop(s) were synchronized with Mr. Ridley's Ecolab OneDrive, such that the "ridley's nalco folder" that the DLP report identifies as located on Mr. Ridley's C:\ drive also appeared on Mr. Ridley's Ecolab OneDrive, would be to (1) review a forensically preserved collection of Mr. Ridley's Ecolab OneDrive from prior to any alleged deletion activity, (2) for Ecolab to have run a recovery of files from Mr. Ridley's Ecolab-issued OneDrive system within the retention window to see if any of them had ever been stored there, or (3) review the contents of Mr. Ridley's Ecolab-issued computers, to determine whether those laptop(s) were configured so that files stored on the internal storage were set to automatically synchronize to Mr. Ridley's Ecolab OneDrive. Even had files been set to synchronize; it does not mean that the

---

[15] March 1, 2023 Deposition of Karry Mackie, at 202.
[16] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25; *see also* PLAINTIFFSR-000000942.

13

synchronization was working.  Again here, because Ecolab or Mr. Lieb apparently did not preserve Mr. Ridley's Ecolab OneDrive until January 2022, and Ecolab or its vendor destroyed both laptops used by Mr. Ridley during the relevant time period, it is not possible to analyze either Mr. Ridley's Ecolab OneDrive or those laptops to determine whether the documents Mr. Lieb asserts Mr. Ridley "destroyed" were, in fact, synchronized between the internal storage of those computers and Mr. Ridley's Ecolab OneDrive.  This is yet another reason why I strongly disagree with Mr. Lieb's conclusion that the absence of these computers has "literally no effect" on his conclusions or analysis.  Lieb Report, ¶ 12.  Thus, to the extent Mr. Lieb relies upon the appearance of a "ridley's nalco folder" in the DLP Report to conclude that this folder or all of its contents at one time existed within Mr. Ridley's Ecolab OneDrive, Mr. Lieb's conclusion is wholly unsupported by the available digital and forensic evidence.

### C.     The DLP Report Does Not Reflect Any Deletion Activity

The DLP Report does not contain any evidence that Mr. Ridley deleted *any* files or folders—even though this information is readily available from the Digital Guardian software and Ecolab's policies explicitly require employees who generate DLP reports to query for this information.[17]  Jennifer Semmler, the Ecolab employee who generated the DLP Report relied on by Mr. Lieb, testified that she followed this policy in generating the DLP Report.  Mr. Lieb fails to identify a specific date or dates on which any of the files that appear on the DLP Report were allegedly deleted.  Because the DLP report produced by Ecolab in this litigation did not identify any deletion activity for the time period covered (May 22, 2021, through July 23, 2021), Mr. Lieb cannot forensically verify that any files were deleted.  If Mr. Ridley had in fact deleted files, evidence of deletion should appear on the DLP Report, but it does not.

---

[17] PLAINTIFFSR-000000812.

14

I understand that Ecolab has policies directing employees who generate DLP Reports using Digital Guardian to include specific fields that will provide the most critical information necessary to assess a given employee's electronic conduct.[18]  These policies specifically direct Ecolab employees who generate DLP Reports to include the "File Delete" field as one of the operations that Digital Guardian identifies in such reports.[19]  Jennifer Semmler, the Ecolab Security Engineer who generated the DLP Report, has testified that she always "double-check[s]" to ensure that this field and all others required by Ecolab's policies are included.[20]  Ms. Semmler also testified that she never excludes this "File Delete" field (or any other fields required by Ecolab's policies) when generating DLP Reports.[21]

If this field is selected, and *if* any files appearing on the DLP Report have been deleted, the subsequently generated DLP Report would include a value in Column EH identifying whether a particular document had been deleted by the user.  The DLP Report produced by Ecolab in this dispute did not include this value in Column EH, as shown below.[22]

---

[18] PLAINTIFFSR-000000812.

[19] PLAINTIFFSR-000000812.

[20] March 9, 2013 Deposition of Jennifer Semmler, at 99-102.

[21] March 9, 2013 Deposition of Jennifer Semmler, at 208-209.  Ms. Semmler also testified that Digital Guardian is capable of capturing information dating back 90 days from the date the DLP Report is generated.  March 9, 2013 Deposition of Jennifer Semmler, at 103-105.  However, the DLP Report produced in this matter only provides data dating back to May 22, 2021 (63 days before the DLP Report was generated on July 23, 2021).  PLAINTIFFSR-000000951.  Given Ms. Semmler's testimony, I would expect the DLP Report to show data dating back to April 24, 2021 or earlier.

[22] PLAINTIFFSR-000000951.

15



The absence of this value in Column EH affirmatively demonstrates that Mr. Ridley did not delete any of the files listed in the DLP Report. Thus, I disagree with Mr. Lieb's conclusion that the "deleted all the[] folders and files from his Ecolab OneDrive account" that were transferred to the "LaCie Drive." Lieb Report, ¶ 43. In fact, the DLP Report expressly contradicts Mr. Lieb's conclusion.[23]

### D. Any Deleted Files Remained Recoverable by Ecolab

Assuming for the sake of argument that Mr. Lieb's unverified claim that Mr. Ridley deleted thousands of Ecolab's files from his Ecolab OneDrive is true, there is no forensic evidence that by doing so Mr. Ridley "deprived" Ecolab of access to those files. When a user deletes files from

---

[23] To the extent Mr. Lieb asserts, despite Ms. Semmler's testimony, that this field was not queried when the DLP Report was generated, that assertion undermines Mr. Lieb's conclusion that "[t]he fact that [he] was not able to forensically analyze Ridley's former Ecolab work computers has literally no effect on [his] strongly held opinion that Ridley exfiltrated thousands of Ecolab files," Lieb Report, ¶ 12, because access to Mr. Ridley's Ecolab-issued computer(s) may allow a forensics examiner to discover any deletion activity.

16

OneDrive, by default, they apparently remain in a recycle bin for a period of 93 days.[24]  Even if the user "double-deletes" those documents by deleting them from the first-stage recycle, they should remain accessible to the Ecolab Administrator from a second-stage recycle bin for the remaining 93 days.[25]  I understand Ecolab has not produced any documents or policies demonstrating that they have altered these default OneDrive retention policies.  I understand that Ecolab first requested an investigation into Mr. Ridley's digital activity on July 18, 2021 and that the DLP Report was generated on July 23, 2021.[26]  Ecolab alleges that Mr. Ridley's download activity began for the first time on May 22, 2021.[27]  Because Ecolab has stated that it was on notice of Mr. Ridley's alleged wrongdoing no later than July 18, 2021, it appears that Ecolab could have located, preserved, restored, and collected *all* of the files Mr. Ridley allegedly deleted from his OneDrive—even if the files were "double-deleted."  However, Mr. Lieb did not collect Mr. Ridley's OneDrive until January 25, 2022, as reflected by the date the collection was created.[28]

> **E.  Ecolab's Failure to Promptly Collect Mr. Ridley's Ecolab OneDrive Undermines Mr. Lieb's Conclusions**

Ecolab's and Mr. Lieb's failure to collect and forensically image Mr. Ridley's OneDrive in a timely fashion (*i.e.*, waiting approximately seven months after Mr. Ridley's departure) raises substantial preservation and data integrity concerns that impact Mr. Lieb's deletion-related

---

[24] Microsoft, *Restore Deleted Items from the Site Collection Recycle Bin*, *available at* https://support.microsoft.com/en-us/office/restore-deleted-items-from-the-site-collection-recycle-bin-5fa924ee-16d7-487b-9a0a-021b9062d14b.

[25] Microsoft, *Restore Deleted Items from the Site Collection Recycle Bin*, *available at* https://support.microsoft.com/en-us/office/restore-deleted-items-from-the-site-collection-recycle-bin-5fa924ee-16d7-487b-9a0a-021b9062d14b.

[26] Ecolab's January 27, 2023 Amended Responses & Objections to Certain of ChemTreat's Interrogatories, at 11.

[27] Ecolab's June 10, 2022 Second Amended Complaint (Doc. 42), ¶ 40.

[28] PLAINTIFFSR-000000951.  Mr. Lieb's report does not identify the date that he created the forensic image of Mr. Ridley's Ecolab OneDrive that he relies on in his report.  Lieb Report, ¶ 10.

17

assumptions.[29]  While Mr. Lieb emphasizes that "Best Practices" require assessing "chain of custody" information that will illuminate "which specific person has sole control over a specific single source of electronic evidence up to a time and date certain," Lieb Report, ¶ 11, Mr. Lieb does not provide any "chain of custody" information for Mr. Ridley's Ecolab OneDrive.  Indeed, Mr. Lieb entirely omits the fact that Mr. Ridley's Ecolab OneDrive was not preserved or collected for approximately seven months following Mr. Ridley's departure.  Mr. Lieb's report does not reflect any investigation as to (1) who had access to Mr. Ridley's Ecolab OneDrive during this time period; (2) who had access to Mr. Ridley's Ecolab OneDrive prior to this time period; (3) whether there were any changes to Mr. Ridley's Ecolab OneDrive during this time period; or (4) whether any data was lost, erased, deleted, or overwritten, whether by an individual or by an automatic process, during this time period.

Notably, deposition testimony in this case makes clear that Mr. Ridley shared access to a OneDrive folder with another Nalco employee, Benjamin Irwin, as early as November 2020.[30]  This means that Mr. Irwin could potentially have altered, deleted, moved, or otherwise modified files contained in the shared folder of Mr. Ridley's OneDrive at any time after he received access.  These data integrity concerns undercut Mr. Lieb's supposition that Mr. Ridley "destroyed" any Ecolab documents prior to his departure from Ecolab.

---

[29] Mr. Lieb asserts that he "made a [bit-for-bit] forensic image of Anthony Ridley's Ecolab OneDrive account contents using AccessData's FTK Imager version 4.5.03."  Lieb Report, ¶ 42. This description is inaccurate.  "FTK Imager" does not create a bit-for-bit forensic image of all data, it is only capable of doing a logical collection of OneDrive.  Ecolab has stated in interrogatory responses that Mr. Lieb "retrieved . . . Ridley's OneDrive account from the Microsoft Azure Cloud."  Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 24.  Because data can be lost, rearranged, or modified when restoring or retrieving deleted OneDrive accounts, the timing/methodology Mr. Lieb used to restore that OneDrive account is essential to assessing the integrity of the data derived from that restore process.

[30] March 7, 2023 Deposition of Benjamin Irwin, at 148:1-9.

18

F. **Ecolab's Failure to Locate the "LaCie Drive" Invalidates Mr. Lieb's Conclusion that Mr. Ridley "Destroyed" Ecolab's Documents**

Mr. Lieb's assertion that Mr. Ridley "destroyed" Ecolab's documents is contradicted by Mr. Ridley's sworn interrogatory response stating that he returned the "LaCie Drive" to Ecolab upon his departure and contradicted by Ecolab's admission that Mr. Ridley returned a "mobile drive."[31]  Indeed, devices like the "LaCie Drive" are commonly referred to as "mobile drives" generally in the forensics and/or IT sector.  As Mr. Lieb asserts, the vast majority of allegedly exfiltrated documents appear to have been loaded to the "LaCie Drive."  Lieb Report, ¶¶ 25-31. Because Ecolab cannot locate the "LaCie Drive," or the "mobile drive" that was returned to it, there is no means of verifying whether (1) the "mobile drive" and the "LaCie Drive" are one and the same; (2) whether the "LaCie Drive" contained the documents Ecolab alleges, based on the DLP Report, Mr. Ridley downloaded to it; and (3) whether and when those documents were accessed, modified, or altered by Mr. Ridley after he downloaded them to the "LaCie Drive."  Mr. Lieb wholly fails to address the absence of the "LaCie Drive" or "mobile drive" in his report.

G. **Conclusion Regarding Alleged Deletion Activity**

For these reasons, I conclude that there is no available digital or forensic evidence to support Mr. Lieb's supposition that Mr. Ridley deleted the files that appear on the DLP Report.  In fact, the absence of the "File Delete" value in Column EH of the DLP Report demonstrates that none of those files were deleted by Mr. Ridley.[32]

---

[31] Ecolab's January 27, 2023 Amended Responses & Objections to Certain of ChemTreat's Interrogatories, at page 14; Ridley's July 20, 2022 Responses & Objections to Ecolab's Interrogatories, at page 6; Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at pages 25-27.

[32] Because the DLP Report assesses digital activity tied to an employee's user ID, deletion of files on Mr. Ridley's Ecolab OneDrive by another user would not be reflected on the DLP Report. March 9, 2013 Deposition of Jennifer Semmler, at 205.

19

**V.  Ecolab's O365 Audit Log—Which Mr. Lieb Failed to Analyze—Contradicts Mr. Lieb's Analysis**

Ecolab also appears to have generated an Office365 audit log ("O365 Log") showing Mr. Ridley's "OneDrive and Sharepoint activity."[33]  This report is produced at PLAINTIFFSR-000000953.[34]  This report reflects deletion activity by Mr. Ridley within Ecolab's OneDrive, SharePoint, or email systems for the same time period as the DLP Report.  If Mr. Ridley deleted documents from his OneDrive, SharePoint, or email account, I would expect evidence of that deletion to appear in this O365 Log.

I analyzed the O365 Log produced by Ecolab and determined that it does not support Mr. Lieb's conclusion that Mr. Ridley deleted a large number of Ecolab's documents from his OneDrive folder.  I began by filtering the O365 Log (PLAINTIFFSR-000000953) to show any deletion activity in the "event.action" column (Column T).  The O365 Log captures a wide range of deletion activity, including the following:  "FileDeleted," "FileDeletedFirstStageRecycleBin," "FileDeletedSecondStageRecycleBin," "FolderDeleted," "FolderDeletedFirstStageRecycleBin," "FolderDeletedSecondStageRecycleBin," "SoftDelete," and "HardDelete."  Filtering for this activity revealed 589 deleted files, showing that the O365 Log was capturing deletion activity.  The vast majority of these files were emails, which are not relevant to Mr. Lieb's conclusion that Mr. Ridley deleted a large number of files from his OneDrive or deleted files that were transferred to the "LaCie Drive."  After removing entries for deleted emails, designated in the event provider column (Column C) with the word "Exchange," the O365 Log reveals the deletion of just 43 folders or files.  None of the deleted folders are the "ridley's nalco folder" that Mr. Lieb concludes

---

[33] PLAINTIFFSR-000000955.

[34] Ecolab also produced what I understand to be a separate "ProofPoint" report at PLAINTIFFSR-000000954.  This ProofPoint report does not show any deletion activity at all.

Mr. Ridley deleted. Therefore, the available digital evidence does not support, and in fact contradicts, Mr. Lieb's conclusion.

By analyzing the "file.name" column (Column AG), I was able to review the names of the 43 files/folders for which the O365 Log reflects deletion activity. The O365 Log shows the deletion of 16 folders, 12 of which corresponded to "Pictures," "Saved Pictures," "Screenshots," or photographs from Mr. Ridley's "camera roll." The four remaining folders were "Documents" (unspecified) contained in a "personal" folder and a folder in Mr. Ridley's "Ecolab Folder" called "Tyson." While the O365 Log shows deletion of 27 specific files, 9 of these deleted files are links to a Google Chrome website browser or a collaboration tool known as Microsoft Teams, 6 are named with what makes them appear to me to be Mr. Ridley's paystubs, and the remaining 12 appear related to Tyson.

In any event, all deletion activity shown on the O365 Log occurred between June 11, 2021 and June 23, 2021.[35] As discussed above, any files deleted from Mr. Ridley's OneDrive would presumably have been recoverable as of July 1, 2021 when Ecolab was informed Mr. Ridley was departing Ecolab to work for "the competition," or at a minimum, on July 23, 2021 when the DLP Report was generated.

For these reasons, I have not identified any digital or forensic evidence to support Mr. Lieb's supposition that "all evidence is consistent with the fact that Ridley . . . deleted . . . files to deprive Ecolab access to them." Lieb Report, ¶ 50. Again, the available digital and forensic evidence affirmatively disproves Mr. Lieb's notion.

_____

[35] Notably, this deletion activity does not align with any of the alleged "downloading and copying" activity described in Mr. Lieb's report. Lieb Report, ¶¶ 27-31 (describing alleged "downloading and copying" activity that allegedly occurred between May 24, 2021 and May 27, 2021).

21

## VI. Mr. Lieb Improperly Concludes that Mr. Ridley hHad no Need to "Declutter" his OneDrive Account.

Mr. Lieb states that he was "informed" that Mr. Ridley "asserts that he deleted the files in order to 'declutter' his OneDrive account." Lieb Report, ¶ 48. Mr. Lieb claims that "there was absolutely no need to 'declutter' his OneDrive account, but in fact this act of deletion was designed to deprive Ecolab access to these same files." Lieb Report, ¶ 48. Mr. Lieb again offers a non-forensic opinion about another person's intent.

I have reviewed Mr. Ridley's responses to Plaintiffs' Requests for Admission, which state that "Ridley deleted Documents from EcoLab's OneDrive that he saved to EcoLab's LaCie hard drive which he returned to EcoLab after his resignation."[36] My review of the O365 Log above shows the deletion of a narrow set of folders and files that may have originated from Mr. Ridley's OneDrive, none of which are from a folder titled "ridley's nalco folder." Per the O365 Log, Mr. Ridley's deletion activity was limited to a narrow set of documents and folders located on Mr. Ridley's Ecolab OneDrive, rather than every document allegedly transferred from his laptop(s)'s hard drive to the "LaCie Drive." Indeed, there are approximately 10,473 files on the DLP Report that show transfer from the C:\ drive of Mr. Ridley's laptop(s) to the "LaCie Drive" that do not appear as deleted files in the O365 Log.

As a result, the forensic evidence does not support Mr. Lieb's non-forensic conclusion that Mr. Ridley deleted the files identified on the DLP Report "to deprive Ecolab access to" those files. Lieb Report, ¶ 50.

---

[36] Ridley's Aug. 10, 2022 Responses & Objections to Ecolab's Requests for Admission, at page 24.

22

**VII.   Mr. Lieb Does Not, and Cannot, Assert that the Files Mr. Ridley Transferred to the "LaCie Drive" Were Used During Mr. Ridley's Tenure at ChemTreat or that ChemTreat Had Access to the Files**

Notably, while Mr. Lieb repeatedly asserts that Mr. Ridley exfiltrated certain documents from Ecolab's system, he does not identify the final destination for the vast majority of these documents.  That is, while Mr. Lieb repeatedly claims that "Ridley exfiltrated thousands of Ecolab files," primarily by transferring them to the "LaCie Drive," Mr. Lieb does not tether the transfer of those files to any ChemTreat system.  *E.g.*, Lieb Report, ¶ 12.  Mr. Lieb's failure to do so is not surprising given that (1) the "LaCie Drive" does not appear in the CrowdStrike log, conclusively demonstrating that Mr. Ridley did not access the "LaCie Drive" from his first ChemTreat-issued computer, CHEMR-000002195; *see also* February 21, 2023 Expert Report of James D. Vaughn ("Vaughn Aff. Report"), at 30-31; (2) the "LaCie Drive" was never connected to Mr. Ridley's second ChemTreat issued computer; and (3) my searches for all file names identified in the DLP Report revealed just a single, non-confidential Ecolab document that Mr. Ridley emailed from his personal email account to his ChemTreat email account, which was not transmitted to anyone else via ChemTreat's Systems,[37] CHEMR-000002195; *see also* Vaughn Aff. Report, at 24-40.

The sole piece of evidence Mr. Lieb relies upon to speculate that Mr. Ridley *could have* accessed a *limited number* of Ecolab documents on ChemTreat's Systems rests on his mistaken assumption regarding a document that he concludes, without having reviewed it, belonged to Ecolab, when in reality, it is a document that I understand originated from and belongs to ChemTreat—a ChemTreat-created order form for ChemTreat supplies.[38]

---

[37] When I refer to "ChemTreat's Systems" in this report, I am referring to systems managed by ChemTreat that a user could utilize to distribute data, information, or documents, including cloud-based platforms such as OneDrive, network shared folders, and email. ChemTreat's Systems, as used in this report, does not refer to stand-alone devices such as individual laptops.

[38] CHEMR-000004841.

23

Therefore, Mr. Lieb has failed to demonstrate that Mr. Ridley accessed Ecolab documents using ChemTreat's Systems.

## VIII.  Mr. Lieb's Conclusions Regarding Mr. Ridley's "Personal Microsoft Cloud Account" Are Unsupported by the Available Evidence

Mr. Lieb concludes that Mr. Ridley "upload[ed]" a handful of documents to a "personally owned Microsoft account."  Lieb Report, ¶¶ 15-24.  Mr. Lieb conjectures that Mr. Ridley (1) transferred eight documents to a "personally owned Microsoft account," and (2) accessed that "personally owned Microsoft account" during his tenure at ChemTreat.  Lieb Report, ¶¶ 54-60. Mr. Lieb's "analysis" fails at every turn.

As an initial matter, while Mr. Lieb states that "[f]orensic analysis revealed" Mr. Ridley "uploading" a total of eight files to a "personally owned Microsoft account," Lieb Report, ¶¶ 15-24, Mr. Lieb offers *no explanation* of what this "[f]orensic analysis" involved or what he analyzed to reach his assumption.  Because Mr. Lieb has failed to identify what, if any, "[f]orensic analysis" he performed (*e.g.*, on what data sources or documents, and what within those materials allowed him to reach his conclusion), I am unable to assess his assertion.

However, relying upon my experience, I attempted to provide an explanation for Mr. Lieb's conclusion—*i.e.*, absent any analysis from Mr. Lieb, I was left to wonder about what could possibly lead him to his conclusion that these eight files were "upload[ed] . . . to a personally owned Microsoft account."  Lieb Report, ¶¶ 15-24.  I noticed that the DLP Report (PLAINTIFFSR-000000951, at Column CZ) shows these eight files have a destination file path called "https://ocws.officeapps.live.com/ocs/docs/recent."  This appears to be the only common entry in the DLP Report for the eight files in question.  If that is, in fact, what Mr. Lieb relied upon to reach his conclusion, Mr. Lieb is simply wrong.  Officeapps.live.com is associated to the home page view when a user is logged into a business-issued Microsoft 365 account.  To demonstrate

24

this, as an example, if a corporate user were to log in to their Office 365 corporate account and navigate to any application (*e.g.*, Microsoft Outlook to read emails), and they were to then paste https://officeapps.live.com into their web browser, the browser would direct the person back to the home page view of their Microsoft Office 365 business-issued account. Additionally, the "recent" portion of the file path indicates that these files were files recently accessed within the Microsoft environment. The DLP Report does not reflect the account name or credentials used to access this Microsoft service. Thus, reviewing the DLP Report, it is more likely that Mr. Ridley was accessing these files within the Ecolab Microsoft Office 365 environment, not from a "personally owned Microsoft account." This is consistent with the fact that 5 of these 8 files appear in the collection of Mr. Ridley's Ecolab OneDrive account produced by Ecolab.[39]

Because Mr. Lieb cannot demonstrate that Mr. Ridley loaded these files to a "*personally owned* Microsoft account" or personal OneDrive account, Mr. Lieb also cannot identify any forensic evidence that Mr. Ridley actually accessed any of these files from such an account during his tenure at ChemTreat. In any event, Mr. Lieb's report identifies no evidence to support a conclusion that Mr. Ridley accessed these documents from a personal OneDrive account on ChemTreat's Systems or from any other source while employed by ChemTreat. CHEMR-000002195; *see also* Vaughn Aff. Report. I address the various additional analytical failures that culminate in Mr. Lieb's baseless conclusion below.

Even assuming for the sake of argument that Mr. Lieb's conclusion is correct, which I do not believe it is, I note that only 15of the files on the DLP Report appear to have been uploaded to

---

[39] Specifically, the following files appear in that collection: "2021 Partnership and Mark overview – Simmons Foods.pptx"; "2021 Partnership and Market overview.pptx"; "FB NA Sales 2021 exPrice Review for Customers.pptx"; "2021 Bar-S Sanitation Chemicals Example RFP Purchase Agreement – October 2020.docx"; and "Tyson Monthly Tracking Report 06-2021.xlsx."

what Mr. Lieb characterizes as a "personally owned Microsoft account" (*i.e.*, accessed from "https://ocws.officeapps.live.com/ocs/docs/recent")[40]  *See* Exhibit D.  This means that, out of the thousands of files that appear on the DLP Report, Mr. Lieb has reached the conclusion that only a maximum of *15* of those files could have been accessed by Mr. Ridley during his tenure at ChemTreat.  As detailed in my affirmative report, I searched for each of these file names (and over 11,000 others) and found that they do ***not*** exist on ChemTreat's Systems.  CHEMR-000002195; *see also* Vaughn Aff. Report, at 24-40.

The available digital and forensic evidence does not support Mr. Lieb's conclusion that Mr. Ridley's activity is "evidence of Ridley accessing the exfiltrated Ecolab files from his personal Microsoft OneDrive account in order to use the content of the exfiltrated files."  Lieb Report, ¶ 56.  To reach this conclusion, Mr. Lieb relies on a single purported fact:  that Mr. Ridley visited a website called "cdn.odc.officeapps.live.com" one minute before accessing a document in his ChemTreat OneDrive account called "EMS-103A Empty Container Requirements.docx."  Lieb Report, ¶¶ 54-55.  Mr. Lieb claims, without support, that "Live.com is Microsoft's website for individual, non-organizational customers of Microsoft online email and document storage services."  Lieb Report, ¶ 54.  Mr. Lieb's claims are erroneous for multiple reasons.  First, the "Live.com" domain name can correspond to personal *and* business accounts.  Second, Mr. Lieb shortened the domain from "OfficeApps.Live.Com" to "Live.com".  Third, the forensic evidence supports the conclusion that "cdn.ods.officeapps.live.com" corresponds to Mr. Ridley's *ChemTreat* account.  Fourth, the sole "Ecolab file" Mr. Lieb asserts was accessed by Mr. Ridley on ChemTreat's Systems is a document that belongs to ChemTreat.

---

[40] PLAINTIFFSR-000000951.  Mr. Lieb only identified eight of these files in his report.  Lieb Report, ¶¶ 15-22.

26

### A. "Live.com" Is a Domain Name Associated with Business and Personal Accounts

Mr. Lieb is incorrect that "Live.com" is a Microsoft domain name that corresponds *solely* to "individual, non-organizational customers of Microsoft online email and document storage services." Lieb Report, ¶ 54. This domain name also corresponds to corporate-managed email and document storage services, including OneDrive platforms offered by a corporation like Ecolab or ChemTreat through Microsoft, when those platforms are accessed via the Internet rather than through a native application.[41] Specifically, "officeapps.live.com" is a domain name used for Microsoft 365 and Office Online. Therefore, the foundation of Mr. Lieb's supposition—that "Live.com" must correspond to Mr. Ridley's "personal Microsoft OneDrive account"—is incorrect. The CrowdStrike log does not reveal any digital or forensic evidence that Mr. Ridley accessed any "personal Microsoft OneDrive account" using his ChemTreat-issued laptop.

### B. The "Live.com" Domain Addressed in Mr. Lieb's Report Likely Corresponds to Mr. Ridley's ChemTreat OneDrive Account

The digital and forensic evidence identified by Mr. Lieb in his report, Lieb Report, ¶ 55, contradicts Mr. Lieb's conclusion that Mr. Ridley accessed his "personal Microsoft OneDrive account" when he accessed "cdn.odc.officeapps.live.com." Mr. Lieb notes that the CrowdStrike log reveals Mr. Ridley accessing a document that originated from his *ChemTreat OneDrive account* "less than one minute" after visiting "cdn.odc.officeapps.live.com."[42] Lieb Report, ¶ 55.

---

[41] Office 365 URLs and IP address ranges, *available at* https://learn.microsoft.com/en-us/microsoft-365/enterprise/urls-and-ip-address-ranges?view=o365-worldwide, listed under the header of Microsoft 365 Common and Office Online, at line 91.

[42] I note that this location is not the same location to which the DLP Report shows Mr. Ridley transferred 15 Ecolab files. The DLP Report shows that Mr. Ridley may have transferred these 15 files to the following location (or accessed them from this location): "https://ocws.officeapps.live.com/ocs/docs/recent." *See supra*, Section VIII. This location is different from "cdn.odc.officeapps.live.com."

27

This forensic artifact demonstrates that "Live.com," or more correctly identified as the "OfficeApps.Live.Com" domain can correspond to OneDrive for Business, which would include ChemTreat's OneDrive system. Demonstrating the point, I pasted "cdn.odc.officeapps.live.com" into my Google Chrome web browser, hit enter, and it directed me to the business Office 365 account that is assigned to me at iDS (my place of work). In other words, the forensic evidence supports a conclusion that this URL was used to access a business Office 365 account. Therefore, contrary to Mr. Lieb's assertion, I conclude that the available digital and forensic evidence leads to the conclusion that when Mr. Ridley visited "cdn.odc.officeapps.live.com," he was viewing his ChemTreat OneDrive from the Internet, and then opened or accessed what appears to be a ChemTreat document from that site.

> **C.** **The Document Accessed by Mr. Ridley After Visiting the "Live.com" Domain Is a ChemTreat Document**

Mr. Lieb opines that Mr. Ridley's access of a file called "EMS-103A Empty Container Requirements.docx" on October 30, 2021 is "evidence of Ridley accessing the exfiltrated Ecolab files." Lieb Report, ¶¶ 55-56. However, "EMS-103A Empty Container Requirements.docx" on its face is a ChemTreat document.[43] It contains ChemTreat's logo and appears to be a template for ordering empty containers.[44] I understand this template was provided to Mr. Ridley by another ChemTreat employee on October 26, 2021, and Mr. Ridley appears to have filled it out on October 30, 2021, consistent with the CrowdStrike log, which shows his access to the document on October 30, 2021 from his ChemTreat OneDrive account.[45] Therefore, Mr. Ridley's access to this

---

[43] CHEMR-000004841.

[44] CHEMR-000004841.

[45] CHEMR-000004838; CHEMR-000004839.

28

document provides no "evidence of Ridley accessing the exfiltrated Ecolab files."[46]  Lieb Report, ¶¶ 55-56.

Mr. Lieb's report does not identify any forensic evidence of access or use by Mr. Ridley while employed by ChemTreat of any of the 14 documents he allegedly uploaded to a personal "Live.com" account.  The sole document that Mr. Lieb relies on for his opinion in this regard does not appear on the DLP Report, is not identified in any evidence produced by Ecolab as an Ecolab document, and, to the contrary, on its face is clearly a ChemTreat document.  For these reasons, Mr. Lieb's attempt to tie 14 of the allegedly misappropriated documents to ChemTreat's Systems or to show that Mr. Ridley accessed these documents during his tenure with ChemTreat is unsupported by (and even contradicted by) the available digital and forensic evidence.[47]

---

[46] Mr. Lieb inaccurately claims that "Arnold Air Force Base was one of the customers whose files were uploaded by Ridley to his personal Microsoft account from Ridley's former Ecolab work computer on May 24, 2021."  Lieb Report, ¶ 57.  That is objectively wrong.  The DLP Report does not show Mr. Ridley "upload[ing] to his personal Microsoft account" any files whose file names correspond to Arnold Air Force Base or to the customer, ATA, that Ecolab serviced at Arnold Air Force Base.  CHEMR-000001632.

[47] Mr. Lieb asserts that ChemTreat's termination of Mr. Ridley in March 2022 "is consistent with [his] analysis of the Digital Guardian Report, which uncovered evidence of Ridley uploading Ecolab files to his personal Microsoft account."  Lieb Report, ¶ 23.  I understand Mr. Ridley was terminated because he violated ChemTreat's policies when he sent a 2015 Nalco document from his personal email account to his ChemTreat email account.  CHEMR-000001632.  The DLP Report does not show that this document was transferred to any "personal Microsoft account" by Mr. Ridley during his tenure at Ecolab.  Therefore, ChemTreat's termination of Mr. Ridley is not "consistent with" Mr. Lieb's "analysis of the Digital Guardian Report," Lieb Report, ¶ 23, which shows only a handful of documents—none of which are the document Mr. Ridley emailed to himself—being transferred to any "personal Microsoft account."  Finally, I note that the CrowdStrike log contradicts Mr. Lieb's contention, because Mr. Ridley did not access the domain associated with the purported "personal Microsoft account" on September 29, 2021, which is the day that he sent the non-confidential Ecolab document from his personal email address to his ChemTreat email address.  CHEMR-000001631.

## IX.  The CrowdStrike Log I Relied Upon for Purposes of my Affirmative Expert Report Is Complete and Reliable

Mr. Lieb criticizes the CrowdStrike log that I analyzed as part of my affirmative report because it is "not a data loss prevention tool" and because it does not include certain fields that are included in the DLP Report.  Lieb Report, ¶¶ 58-59.  Mr. Lieb apparently relies on this analysis to reach his conclusion that "[f]orensic analysis of the now wiped ChemTreat laptop would have provided the detail as to which specific exfiltrated files Ridley was accessing from his personal Microsoft OneDrive account while interacting with the related ChemTreat files."  Lieb Report, ¶ 60.  Notably, in contrast to the detailed analysis I conducted to assess the veracity and reliability of the CrowdStrike log, Mr. Lieb conducted no analysis of the DLP Report whatsoever to determine its veracity or completeness.  Moreover, as detailed above, Mr. Lieb failed to analyze or assess the vital values—such as "File Delete"—that do *not* appear in the DLP Report.  Putting these problems aside, Mr. Lieb's criticism of the CrowdStrike log is unfounded.

### A.  The CrowdStrike Log Captured All Relevant Data

Mr. Lieb's focus on terminology rather than function misses the point.[48]  In this case, Ecolab has not alleged that Mr. Ridley "exfiltrated" data from *ChemTreat's Systems*.  Instead, Ecolab has alleged, and Mr. Lieb opines, that Mr. Ridley used his first ChemTreat-issued laptop to load certain Ecolab documents *onto* ChemTreat's Systems or otherwise used that laptop *to access* such documents.  Therefore, even assuming Mr. Lieb's premise is correct, it is not relevant that Digital Guardian serves as a "data loss prevention tool" while CrowdStrike, although offering features consistent with data loss identification, does not serve that purpose as its primary function.

---

[48] As Mr. Lieb points out, the purpose of Digital Guardian is to prevent data loss, but it failed to perform that function in allowing Mr. Ridley to allegedly "exfiltrate" thousands of documents. Lieb Report, ¶ 58.  Mr. Lieb does not contend that Digital Guardian's alleged failure to perform its central function, apparently based on Ecolab's failure to use the appropriate settings in the Digital Guardian software, does not mean that Digital Guardian is not a "data loss prevention tool."

30

What matters is whether the CrowdStrike log provides the necessary information regarding documents accessed with, or saved to, Mr. Ridley's first ChemTreat-issued laptop.  As detailed in my affirmative report, the CrowdStrike log "contains almost all the relevant data that I would have procured had I been able to forensically image and analyze Mr. Ridley's ChemTreat-issued laptop prior to reformatting."  Vaughn Aff. Report at 14, 35-40; *see also* CHEMR-000002195.  Just as Digital Guardian "capture[s] and memorialize[s]" the "downloading and copying of . . . files to external USB media," Lieb Report, ¶ 12, the CrowdStrike log memorialized Mr. Ridley's access to files *from* external USB media, and likewise would have memorialized Mr. Ridley's loading of files *to* external USB media had that occurred.   CHEMR-000002195.  As detailed in my affirmative report, I conducted searches across multiple custodians and multiple data sources for each of the file names appearing on the DLP Report and confirmed that, consistent with the CrowdStrike log, none of the file names appearing on the DLP Report were saved to any of ChemTreat's Systems from either of Mr. Ridley's ChemTreat issued-laptops, and only *one* of the file names appearing on the DLP report (sent from Mr. Ridley's personal email account to his ChemTreat email account) was located across all data on ChemTreat's Systems.  *See also* Vaughn Aff. Report, at 29.  This means that even if Mr. Ridley somehow accessed additional files that are not reflected in the CrowdStrike log, there is no evidence that he distributed such files to others at ChemTreat using ChemTreat's Systems.  CHEMR-000002195; *see also* Vaughn Aff. Report, at 24-40.

**B.     The CrowdStrike Log Captured Mr. Ridley's Access to Files on Cloud-Based Platforms**

While Mr. Lieb speculates that the CrowdStrike log would not capture files accessed from cloud-based storage platforms or would not capture Mr. Ridley "interacting with . . . related ChemTreat files," Lieb Report, ¶ 60, Mr. Lieb's own citation to "EMS-103A Empty Container

31

Requirements.docx" disproves that point. Indeed, the CrowdStrike log shows that document was most likely accessed from Mr. Ridley's ChemTreat OneDrive folder and not a personally-owned Microsoft account, demonstrating that CrowdStrike captured the file names of documents accessed from the OneDrive account.

Excerpt from CrowdStrike Report:

<result offset='853201'>

## C. CrowdStrike Captured Necessary Fields

Mr. Lieb points out that the CrowdStrike log does not capture the following fields: "attaching mail," "Network Transfer Download," "Network Transfer Upload," "Print," or "Send Mail." Lieb Report, ¶ 58. But Mr. Lieb makes no effort to explain why the absence of these fields *matters* for purposes of his analysis, nor does he attempt to explain what these fields mean. For example, Mr. Lieb makes no attempt to explain what prevents me from providing my opinion simply by not having a "Network Transfer Download" and "Network Transfer Upload" field on the CrowdStrike log. Mr. Lieb does not explain why these additional fields would provide necessary forensic information. The absence of these fields in the CrowdStrike log does not undermine or impact my conclusions regarding the CrowdStrike log, the reliability of it, or the utility of the CrowdStrike log in lieu of recoverable data from Mr. Ridley's first ChemTreat-issued laptop. CHEMR-000002195; *see also* Vaughn Aff. Report, at 35-40.

32

### D. Mr. Ridley's ChemTreat-Issued Laptop Is Neither the Primary Source Nor the Sole Source of Information Regarding Mr. Ridley's Personal Microsoft Activity

To the extent Mr. Lieb contends that Mr. Ridley's first ChemTreat-issued laptop would have shown "which specific exfiltrated Ecolab files Ridley was accessing from his personal Microsoft OneDrive account," I note that there are several alternative, and forensically preferable, methods available for assessing what exists within Mr. Ridley's "personal Microsoft OneDrive account." Lieb Report, ¶ 60. For example, Mr. Lieb could have reviewed the actual documents that are held within any "personal Microsoft OneDrive account" associated with Mr. Ridley. If none of those files belong to Ecolab, Mr. Lieb's point is moot. And if any of those files *do* exist in any "personal Microsoft OneDrive account" belonging to Mr. Ridley, Mr. Lieb could have analyzed when they were last accessed, modified, created, etc. Mr. Ridley's first ChemTreat-issued laptop is neither the primary source of the information that Mr. Lieb believes is in Mr. Ridley's "personal Microsoft OneDrive account" nor the only source of this information. Mr. Lieb's report does not address his failure to request or review the primary, and forensically preferable, information regarding the contents of any "personal Microsoft OneDrive account" associated with Mr. Ridley.

### X. The "Missing" AmazonBasics USB Device Is Clearly Irrelevant

Relying on the same CrowdStrike log he criticizes, Mr. Lieb asserts that there is a "[m]issing AmazonBasics" USB Drive that has not been "provided" to him. Lieb Report, ¶¶ 52-53. Based on the available evidence, this device has no relevance to Mr. Ridley's or ChemTreat's alleged misappropriation. *First*, as detailed in my affirmative report, the CrowdStrike log shows that this device is not associated with Mr. Ridley's user profile and was used *prior to* Mr. Ridley's receipt of his first ChemTreat-issued laptop. Vaughn Aff. Report, at 36-37. *Second*, the serial number associated with this device (180129000600) does not appear in the DLP Report, meaning

33

that Mr. Ridley did not load any of the allegedly misappropriated documents to this device. Therefore, the evidence reflects there is no connection between Mr. Ridley's alleged misappropriation of Ecolab documents and the AmazonBasics USB device, such that the absence of this device has no impact on the forensic analysis or investigation into whether Mr. Ridley accessed or used Ecolab's documents on ChemTreat's Systems. For these reasons, Mr. Lieb's statement offers no forensic value.

## XI. Ecolab's Extensive Failure to Preserve Critical Data and Devices Renders Mr. Lieb's Report Unreliable and Incomplete

Mr. Lieb's analysis suffers from a core deficiency: It does not account for or even reference Ecolab's failure to preserve clearly relevant data and devices, and it omits any discussion about the impact of this unpreserved and/or destroyed data on the opinions he offers in his report. Notably, Mr. Lieb represents that he "counsel[s] and assist[s] clients in the preservation, extraction and analysis" of "electronic data" using "industry-standard practices." Lieb Report, ¶ 4. Mr. Lieb's failure to analyze these devices does not comport with the "industry-standard practices" or "Best Practices" referenced in Mr. Lieb's report, and upon which he claims to have relied. Lieb Report, ¶¶ 4, 11.

Below, I identify the devices and data that I understand Ecolab failed to preserve, as well as the information that could have been derived from these devices and data. I then describe my understanding of the timing of the destruction or loss of each of these devices and data and how they are critical to the analysis of issues here because they are the primary sources that would prove or disprove key points in dispute. Based on my review of the information and documents available to me, I conclude that Ecolab failed to take reasonable and timely steps to preserve these devices and data. Indeed, for several devices, Ecolab admits that it never made any effort to locate, collect, preserve, or analyze them.

34

## A. The "LaCie Drive" or "mobile drive"

Information That Could Have Been Gathered from the Unpreserved "Mobile Drive": I understand that Mr. Ridley alleges he returned the "LaCie Drive" identified in the DLP report to Ecolab and that Ecolab has failed to locate it.[49]  I understand that Ecolab admits that it received a "mobile drive" from Mr. Ridley and that, because it has failed to locate that "mobile drive," Ecolab cannot say whether the "mobile drive" it received from Mr. Ridley is the same "LaCie Drive" identified in the DLP report.  If Ecolab had preserved the "mobile drive" returned by Mr. Ridley, we would be able to forensically determine whether it is the "LaCie Drive" identified in the DLP report.  We would also be able to forensically review the data and documents stored on, as well as artifacts of the data and documents deleted from the drive, if applicable. The "mobile drive" would provide information about which files were transferred to it, and when or if those files were last accessed or modified, which could indicate transfer to another device.  If, as Mr. Ridley alleges, the "mobile drive" were the same as the "LaCie Drive," it would also provide information about whether the allegedly "destroyed" documents remained available on that drive, as Mr. Ridley alleges.

Ecolab's Failure to Preserve the "Mobile Drive": Ecolab admits that Mr. Ridley returned a "mobile drive" on July 12, 2021.[50]  As noted above, Ecolab contends that because it has failed to locate that "mobile drive," Ecolab cannot say whether the "mobile drive" it received from Mr. Ridley is the same "LaCie Drive" identified in the DLP report.  However, even after Ecolab generated the DLP Report on July 23, 2021, Ecolab admits it made "*no effort* to locate the 'mobile

---

[49] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 26; Ridley's July 20, 2022 Responses & Objections to Ecolab's Interrogatories, at page 6; *see also* PLAINTIFFSR-000000942.

[50] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at pages 26-27.

35

drive.'"[51]  Ecolab states that it "believe[s] that the 'mobile drive' returned by Ridley has been destroyed" because the "normal process for any external drive received from any of Plaintiffs' employees by Insight . . . is that the device goes into a disposal bin, the contents of which are destroyed."[52]  Ecolab acknowledges that these devices are not destroyed "on any set schedule."[53]  Ecolab's Statement of Work with Insight notes that "[e]very refreshed device received" by Insight "will be held for two (2) weeks prior to processing to insure the user has all required data."[54]  Thus, it is clear that the "mobile drive" was not destroyed as of July 12, 2021, at which point I understand Mr. Ridley had already informed Ecolab that he was going to work for a competitor.  Moreover, it is possible—even likely—that as of July 18, 2021 (when the DLP Report was requested) and July 23, 2021 (when the DLP Report was generated), the "mobile drive" remained available and recoverable.  If Ecolab had promptly requested a "Legal Hold" under its Statement of Work with Insight, the "LaCie Drive" would have been "kept in a secure location" by Insight.[55]  Ecolab states that "it is impossible for Plaintiffs to confirm that [the "LaCie Drive"] has been destroyed."[56]  However, I understand that any devices slated by Insight for destruction are sent to a third-party vendor named Sipi.[57]  Each device sent to Sipi is given a tracking number by Insight, and Sipi supplies a "Certificate of Erasure" or a certificate of destruction once the device has been properly

---

[51] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 26.

[52] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 26.

[53] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 26.

[54] INSIGHTR-00000024, at 5.

[55] INSIGHTR-00000024, at 5.

[56] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 26.

[57] *See* INSIGHTR-00000003; *see also* Sipi, ITAD – Secure IT Asset Disposition, *available at* https://www.sipicorp.com/itad/.

cleansed of data.[58]  No "Certificate of Erasure" or certificate of destruction related to the "mobile drive" has been produced by Ecolab, so I cannot conclude that this device has been destroyed or cleaned of all recoverable data.  Ecolab claims it "had no means to identify" the "LaCie Drive."[59] That is incorrect.  These types of devices have a distinctive appearance.  They are generally rectangular with sharp edges and a silver finish, or have a silver metal finish with orange bumpers on the sides.  I have included photographs of these types of devices below.[60]  If Ecolab had made any "effort" to locate the "mobile drive" returned by Mr. Ridley within the days and weeks immediately following Mr. Ridley's return of that drive, Ecolab would be able to confirm whether it was the "LaCie Drive" Ecolab provided to Mr. Ridley, as Mr. Ridley alleges.  To do so, Ecolab could have asked Shreya Patel, who is the technician at Insight who appears to have handled Mr. Ridley's devices.[61]

---

[58] *See* INSIGHTR-00000003; *see also* Sipi, ITAD – Secure IT Asset Disposition, *available at* https://www.sipicorp.com/itad/.

[59] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 27.

[60] The Lacie "Porsche Design" is a specific model of "LaCie Drive," but would still show up on electronic monitoring programs such as the DLP Report as a "LaCie Drive" because of the manufacturer.  *See* LaCie Support, Portable Storage and Legacy Products, *available at* https://www.lacie.com/support/products/.

[61] PLAINTIFFSR-000000696.

37



LaCie Rugged Hard Disk



Porsche Design Mobile Drive P'9220

## B.    Mr. Ridley's First Ecolab-Issued Laptop:

Information that Could Have Been Gathered from Mr. Ridley's First Ecolab-Issued Laptop:  I understand that Mr. Ridley returned his first Ecolab-issued laptop to Ecolab, that it was "restored to factory settings," and that Ecolab has not attempted to recall or recover this laptop.[62] Mr. Ridley's first Ecolab-issued laptop may have provided information about whether the allegedly "destroyed" documents in fact remained on the internal storage of Mr. Ridley's laptop, as well as how and when Mr. Ridley interacted with those documents on the internal storage of his laptop.  Mr. Ridley's first Ecolab-issued laptop also may have provided information about the configuration of the laptop, including whether documents stored in the "ridley's nalco folder" on the hard drive of the laptop were being synchronized with Mr. Ridley's Ecolab OneDrive.  Mr. Ridley's first Ecolab-issued laptop may have also provided information about the date(s) of any deletion of Ecolab files, and may have allowed for the recovery of any deleted files.  Lieb Report,

---

[62] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at pages 25-26.

38

¶ 12.  Therefore, Mr. Lieb's claim that the absence of this laptop has "literally no effect" on his analysis is simply speculative at best, and untrue at worst.  Lieb Report, ¶ 12.

      <u>Ecolab's Failure to Preserve Mr. Ridley's First Ecolab-Issued Laptop</u>:  Ecolab admits that Mr. Ridley's first Ecolab-issued laptop (Serial No. 5CG82658K7) was returned to Insight on June 16, 2021 and that the device was "set aside for a two-week period" or longer.[63]  It appears this laptop was not deployed to a new user until July 9, 2021.[64]  Ecolab admits it "did not attempt to recall the laptop . . . or otherwise attempt to recover any information from it."[65]  Ecolab states that Insight "disposed of" this laptop on August 2, 2022.[66]  But Sipi did not supply a Certificate of Erasure for Mr. Ridley's Second Ecolab-Issued Laptop until January 31, 2023.[67]  This means that Ecolab could have taken steps at any time between July 1, 2021 and January 31, 2023 to locate, recover, and preserve that laptop in accordance with standard preservation requirements.  Because Ecolab did not attempt to locate or recover this laptop, there is no means of assessing whether any data on this laptop remained recoverable.  While Ecolab states that the device "was restored to factory settings, thus wiping all data" before it was deployed to a new user,[68] there are various methods for "restor[ing]" laptops to factory settings.  Some of these methods do not result in the "wiping [of] all data," and depending on the method used, the laptop may still contain recoverable data from a prior user.  Indeed, my forensic training and forensic tools available to me allow for

---

[63] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.
[64] PLAINTIFFSR-000000942, at 3.
[65] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.
[66] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.
[67] INSIGHTR-00000048, at 2 (*see* Device ID No. 5CG82658K7).
[68] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.

39

the recovery of files that may appear unrecoverable to a novice user, including from laptops that have been factory restored without the option to have all user data wiped.

### C.    Mr. Ridley's Second Ecolab-Issued Laptop

Information that Could Have Been Gathered from Mr. Ridley's Second Ecolab-Issued Laptop:  I understand that Mr. Ridley returned his second Ecolab-issued laptop to Ecolab, that it was "restored to factory settings," and that Ecolab has not attempted to recall or recover this laptop.[69]  By contrast, ChemTreat retrieved Mr. Ridley's second ChemTreat-issued laptop and I conducted a search of that laptop.  Vaughn Aff. Report, at 15-16.  Mr. Ridley's second Ecolab-issued laptop may have provided information about whether the allegedly "destroyed" documents in fact remained on the internal storage of Mr. Ridley's laptop, as well as how and when Mr. Ridley interacted with those documents on the internal storage of his laptop.  Mr. Ridley's second Ecolab-issued laptop also may have provided information about the configuration of the laptop, including whether documents stored in the "ridley's nalco folder" on the hard drive of the laptop were being synchronized with Mr. Ridley's Ecolab OneDrive.  Mr. Ridley's second Ecolab-issued laptop may have also provided information about the date(s) of any deletion of Ecolab files, and may have allowed for the recovery of any deleted files.  Therefore, Mr. Lieb's claim that the absence of this laptop has "literally no effect" on his analysis is simply speculative at best, and untrue at worst.[70] Lieb Report, ¶ 12.

---

[69] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at pages 25-26.

[70] Ecolab has stated that it did not need to preserve this laptop because "the improper downloading and copying alleged in the Second Amended Complaint all occurred before this laptop was issued to Ridley."  Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at pages 25-26.  This is not true.  The Second Amended Complaint alleges a variety of misappropriation that allegedly occurred *after* June 9, 2021, when Mr. Ridley received his second Ecolab-issued laptop.  Ecolab's June 10, 2022 Second Amended Complaint, ¶¶ 94-107 (Doc. 42) (alleging misappropriation on June 18, June 21, and June 28, 2021).

Ecolab's Failure to Preserve Mr. Ridley's Second Ecolab-Issued Laptop:  Ecolab admits that Mr. Ridley's second Ecolab-issued laptop (Serial No. 5CG84132TP) was returned to Insight on July 12, 2021 and that the device "was reset to factory settings."[71]  Because devices are "set aside for a two-week period" once received by Insight, the data on this laptop remained fully preserved and recoverable as of July 26, 2021 (or later).[72]  Consistent with this "two-week [waiting] period," this laptop was not moved to inventory by Insight until August 5, 2021.[73]  This laptop was not deployed to a new user until September 10, 2021.[74]  Ecolab admits that it "did not attempt to recall the laptop from the subsequent user or otherwise attempt to recover any information from it."[75]  Ecolab states that this laptop was later returned, "assigned to be destroyed," and "has since been destroyed."[76]  Sipi did not supply a Certificate of Erasure for Mr. Ridley's Second Ecolab-Issued Laptop until January 31, 2023.[77]  This means that Ecolab could have taken steps at any time between July 1, 2021 and January 31, 2023 to locate, recover, and preserve that laptop in accordance with standard preservation requirements.  Because Ecolab did not attempt to locate or recover this laptop, there is no means of assessing whether any data on this laptop

---

Moreover, Mr. Lieb explicitly relies upon alleged misappropriation occurring after June 9, 2021. Lieb Report, ¶¶ 22, 39.

[71] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.

[72] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.

[73] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25; *see also* PLAINTIFFSR-000000948.

[74] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.

[75] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 25.

[76] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 26.

[77] INSIGHTR-00000003, at 2 (*see* Device ID No. 5CG84132TP).

41

remained recoverable. While Ecolab states that the device "had been restored to factory settings" and that "no data from Ridley's usage was recoverable," as noted above, this laptop was not restored to factory settings until July 26, 2021 *at the earliest*, which is *after* Mr. Ridley informed Ecolab he was going to work for a competitor, after the DLP Report was requested, and after Ecolab generated the DLP Report that Ecolab alleges demonstrates Mr. Ridley's misappropriation. In any event, there are various methods for "restor[ing]" laptops to factory settings. Some of these methods do not result in all data becoming "[un]recoverable," and depending on the method used, the laptop may still contain recoverable data from a prior user. Indeed, my forensic training and forensic tools available to me allow for the recovery of files that may appear unrecoverable to a novice user, including from laptops that have been factory restored without the option to have all user data wiped.

### D. Mr. Ridley's Ecolab OneDrive

Information that Could Have Been Gathered from Mr. Ridley's Ecolab OneDrive if Promptly Preserved: As detailed above, Ecolab apparently did not collect Mr. Ridley's Ecolab OneDrive account until January 25, 2022 (approximately seven months after Ridley left Ecolab's employment). Prompt preservation and collection of Mr. Ridley's Ecolab OneDrive account would have allowed Ecolab to determine whether, in fact, there was a "ridley's nalco folder" on Mr. Ridley's Ecolab OneDrive. If there was, prompt preservation and collection of Mr. Ridley's Ecolab OneDrive account could have allowed Ecolab to recover the allegedly "destroyed" files and assess them. Moreover, prompt preservation and collection of Mr. Ridley's Ecolab OneDrive account would have protected the integrity of the data in that account, as described above, and minimized the risk of tampering, modification, or deletion during the approximately seven-month interim time period between Mr. Ridley's departure from Ecolab and Ecolab's collection of Mr. Ridley's Ecolab OneDrive account. Finally, prompt collection of Mr. Ridley's Ecolab OneDrive

42

also may have provided information about the synchronization settings between Mr. Ridley's laptop and his Ecolab OneDrive account, including whether documents stored in the "ridley's nalco folder" on the hard drive of the laptop were being synchronized with Mr. Ridley's Ecolab OneDrive, and if so, whether the synchronization actually occurred.

Ecolab's Failure to Preserve Mr. Ridley's Ecolab OneDrive:  As detailed above, Ecolab did not collect Mr. Ridley's Ecolab OneDrive account until January 25, 2022 (**seven months** after Mr. Ridley departed Ecolab for a competitor).  Thus, for more than seven months after Mr. Ridley departed Ecolab for a competitor, Mr. Ridley's Ecolab OneDrive could have been subject to the vagaries of electronic data loss, manipulation, or inadvertent modification, but, at a minimum, was not collected for analysis.

### E.    Ridley Contacts.CSV

In his report, Mr. Lieb opines that Mr. Ridley deleted a file named "Ridley Contacts.CSV" from a USB device in Mr. Ridley's possession on February 9, 2022.  Lieb Report, ¶ 39.  Mr. Lieb then concludes, without any basis and without having reviewed the file, that this is "the exact same file Ridley exfiltrated from Ecolab."  Lieb Report, ¶ 39.  However, without access to the "Ridley Contacts.CSV" file Ridley allegedly transferred from Ecolab's systems on June 21, 2021, Mr. Lieb cannot reach this conclusion.  To determine if these two files are "the exact same," an MD5 hash value or a content-to-content comparison is necessary.  Mr. Lieb neither reviewed the content, nor did he assert that he relied on a MD5 hash value, to conclude these two files are the "exact same," which makes his conclusion pure and improper speculation.  I understand that Ecolab has admitted

that it failed to preserve the "Ridley Contacts.CSV" file on its system, which would have existed in Mr. Ridley's Ecolab Outlook account.[78]

Ecolab admits that "Ridley's contact list is not available."[79]  That is because Ecolab apparently made no effort to locate, retrieve, or preserve Mr. Ridley's Outlook contacts until *February 7, 2023*—more than 19 months after Mr. Ridley informed Ecolab he was departing for a competitor.[80]  Ecolab explains this by stating that "the [Veritas email] archive does not maintain a user's contact list."[81]  However, Mr. Ridley's Outlook contacts would have remained available for collection and preservation as of July 23, 2021 if Ecolab had made any effort to collect and preserve them.  Ecolab failed to do so.

For nearly all of these devices and data repositories, Ecolab's preservation failures appear to have resulted in the destruction or deletion of the very files and trade secrets they allege that Mr. Ridley misappropriated and then "destroyed."  If Ecolab had properly preserved these devices and data repositories, the files Ecolab contends were misappropriated likely would be available for assessment, as would critical forensic evidence confirming or refuting that alleged misappropriation.

### F.    Conclusions Regarding Ecolab's Failure to Preserve Devices and Data

Ecolab's failure to follow routine and standard preservation practices has resulted in the destruction of data, devices, and forensic artifacts.  Ecolab's initial preservation failures are

---

[78] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 21.

[79] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 21.

[80] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 21.

[81] Ecolab's March 3, 2023 Amended Responses & Objections to Certain of ChemTreat's First Set of Interrogatories, at page 21.

44

compounded by its apparent failure to make *any effort at all* to locate or recover devices at the center of Ecolab's allegations, including both of Mr. Ridley's Ecolab-issued laptops and the "mobile drive" or "LaCie Drive" returned by Mr. Ridley to Ecolab in July 2021. Ecolab's lack of effort to locate these relevant devices, including even after Ecolab initiated this litigation, contradicts well-accepted preservation standards and protocols. The absence of this primary evidence fundamentally prevents Ecolab from proving its allegations based on any forensic conclusions offered by Mr. Lieb. Even in the absence of this evidence, the available digital and forensic evidence does not support several of Mr. Lieb's foundational assumptions and speculative claims, and as described where applicable, contradict his conclusions.

## XII. Ecolab Did Not Take Reasonable Steps to Maintain the Secrecy of its Documents

I understand that Ecolab has claimed a top end value of $158 million for the documents it alleges Mr. Ridley misappropriated.[82] I also understand that Ecolab has asserted that the reason it cannot produce the alleged trade secrets is because Mr. Ridley deleted them, indicating that Mr. Ridley had the one and only copy of these purported trade secrets.[83] Given the extraordinary value Ecolab appears to place on these documents, I would expect Ecolab to take reasonable steps to

---

[82] February 24, 2023 Expert Report of Dana M. Trexler, at 23.

[83] *E.g.*, Ecolab's June 10, 2022 Second Amended Complaint (Doc. 42), ¶¶ 53, 164 (stating that Ridley "deleted the primary copy Nalco/Ecolab had of these files"); Ecolab's November 30, 2022 Memorandum in Opposition to ChemTreat's Motion to Compel (Doc. 83), at 4-5 ("[A]t the same time that Ridley was misappropriating documents, he was also deleting them from Plaintiffs' computer system . . . Plaintiffs cannot produce what they do not possess."); Ecolab's January 20, 2023 Motion to Alter or Amend (Doc. 113), at 2 ("[M]any of the files listed in the DLP Report provided to ChemTreat were deleted by Defendant Ridley and this has been confirmed by Plaintiffs' forensic expert."); Ecolab's December 20, 2022 Memorandum in Support of its Motion to Compel (Doc. 95-1) ("Because of Ridley's unique efforts not only to steal Plaintiffs' information but simultaneously delete it from Plaintiffs' possession, Plaintiffs are in the unfortunate position of having to obtain their stolen documents and information from ChemTreat and Ridley"); Ecolab's September 7, 2022 Responses & Objections to ChemTreat's First Set of Requests for Production, at 5 ("[B]ecause Ridley deleted many of the documents and files at issues [sic], Plaintiffs are prevented from producing all of them.).

maintain the secrecy of these documents, and to prevent their deletion or destruction. Mr. Lieb states that Ecolab uses Digital Guardian as a "digital loss prevention tool." Lieb Report, ¶ 7. Mr. Lieb claims that "Digital Guardian is designed specifically to record the exfiltration of trade secrets, intellectual property and company files by employees." Lieb Report, ¶ 12. But based on materials created by Digital Guardian, the Digital Guardian software is capable of much more. For example, Digital Guardian's Endpoint DLP program is a "No-Compromise Data Loss Prevention [program] to stop breaches before they happen."[84] The program contains "[g]ranular controls" that allow a user to "fine tune responses [to data egress] based on user, risk level, or other factors."[85] Indeed, the program can perform a range of functions from "simply logging all actions" to "automated blocking" which "can prevent data loss before it happens."[86] The program is designed to "reduce[] risk of data loss at [the] greatest point of risk – the endpoint."[87]

Specifically, Digital Guardian allows an organization to "Block" the transfer of certain data entirely, receive "Alerts" when data is transferred externally (for example, to a USB device), and impose "Justify" requirements on users who attempt to move data externally.[88] If enabled, these configurations allow an organization like Ecolab to receive instantaneous alerts when sensitive or highly-valued data or documents are transferred, to require users to provide further information before interacting in certain ways (such as downloading or copying to an external device) with

---

[84] Digital Guardian, Endpoint DLP, *available at* https://www.digitalguardian.com/products/endpoint-dlp.

[85] Digital Guardian, Endpoint DLP, *available at* https://www.digitalguardian.com/products/endpoint-dlp.

[86] Digital Guardian, Endpoint DLP, *available at* https://www.digitalguardian.com/products/endpoint-dlp.

[87] Digital Guardian, Endpoint DLP, *available at* https://www.digitalguardian.com/products/endpoint-dlp.

[88] Exhibit E, Digital Guardian Technical Overview, at 12.

46

designated information—or to stop the transfer of such information altogether.

Thus, Ecolab had access to powerful software that could have alerted Ecolab to Mr. Ridley's alleged mass "exfiltration" of Ecolab's purportedly sensitive data and documents instantaneously. Additionally, Ecolab had access to software it could have used to stop the movement of this data entirely. Particularly given that Mr. Lieb opines that Mr. Ridley's "exfiltration" occurred on multiple days spanning more than a month-long period, it appears that Ecolab could have prevented some or all of this alleged "exfiltration" had it used the features available on the Digital Guardian software. It is unclear whether Ecolab utilized these features, as Ecolab has not provided any information in discovery showing that it did so, or even alleged that it did so.[89] If Ecolab did not utilize these features, it did not take reasonable steps that were available to it to protect the secrecy of its documents (which it values at some $158 million). If Ecolab *did* utilize these features, and simply chose to ignore the "Alerts" generated by these features during the course of Mr. Ridley's alleged misappropriation (or failed to "Block" external transfers or impose "Justify" requirements on users who engage in external transfers), it also failed to take reasonable steps to protect the secrecy of these documents.

There is also no forensic (or non-forensic) evidence that Ecolab made any effort to restore or retrieve its allegedly highly valued documents when Ecolab became aware of Mr. Ridley's alleged "exfiltration" of these documents no later than July 23, 2021. Instead of restoring these documents or otherwise making efforts to retrieve them, Ecolab apparently allowed them to disappear. Ecolab therefore participated in the destruction of its own documents by making "no effort" to obtain Mr. Ridley's Ecolab-issued laptops or to timely preserve Mr. Ridley's Ecolab OneDrive account, and by destroying or losing the data contained in the "mobile drive" or "LaCie

---

[89] March 9, 2023 Deposition of Jennifer Semmler, at 55-57.

47

Drive" returned by Mr. Ridley.

The entire positioning by Ecolab in this regard, based on my review of its assertions,[90] appears to be that Ecolab allowed Mr. Ridley to be the *sole holder* of these confidential, high-value, trade secrets documents; that he was allowed to copy them to a USB device without any alerts to Ecolab and without limitation; and that he was then allowed to purge the one and only copy of each of these alleged trade secrets in his possession. Out of the hundreds of cases I have examined across my decades of experience as a forensics examiner, this is the first in which a company has permitted one person to exercise such extensive and boundless control over its alleged trade secrets. This, in my expert opinion, reflects a complete absence of technical security and controls.

In light of the value Ecolab claims to place on the allegedly misappropriated or deleted documents; in light of the extensive monitoring, alert, and control features available to Ecolab through Digital Guardian; in light of Ecolab's own failure to preserve the "mobile drive" that may have contained the copied sensitive documents; and in light of Ecolab's apparent assertion that Mr. Ridley could copy, then delete, the one and only copy of the alleged trade secret documents, I conclude that Ecolab did not take reasonable steps to protect the secrecy of the allegedly misappropriated documents, particularly in light of Ecolab's assertion that the trade secrets are worth over $158 million.

## XIII.  Conclusions

For all the reasons provided, I conclude that the opinions offered by Mr. Lieb in his report lack factual support, are contradicted by record evidence, and/or are unsupported by forensic analysis. In short, they are, not well-founded in the forensic evidence, do not conform to the

---

[90] *See supra*, n.83.

48

standards expected of a forensic examiner in the industry, and are not "conclusions" that an experienced and knowledgeable forensic expert would offer based on the evidence available in this case.

Signed: _James D. Vaughn_
James D. Vaughn

Dated: _March 20, 2023_

49

Exhibit C - DLP File Names in Ecolab Productions.xlsx

JA-985

| Control Number | File Name | Document Extension | MD5 Hash | Date Created | Date Last Modified | Author | Company Name | Title | Original Folder Path |
|---|---|---|---|---|---|---|---|---|---|
| PLAINTIFFSR-000000004 | Terminated Associate Access to Workday.pdf | pdf | 7a48694987aafb448d4582475770f2cb | 11/1/2017 | 11/6/2017 | Ward, Jennifer | | Terminated Associate Access to Workday_Assoc_en_US_v1 | Herrera, Jaqueline\Chemtreat - Herrera_3.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000610 | Ridley payslip 06.15.2021.pdf | pdf | 17602e64555a1f0c1c2f11ad84cec247 | 6/21/2021 | 6/21/2021 | aridley | | 4f322165-4a5e-4d64-167c-7121295f1b57 | Ridley, Anthony\EM001-ANTHONY-RIDLEY\Anthony Ridley    - email 2021_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000611 | Ridley payslip 09.30.2020.pdf | pdf | 9278aa0636be2c988a8d1d7d03ce4cf8 | 6/21/2021 | 6/21/2021 | aridley | | 92b2b6ad-ff18-4799-be22-125dc73dd732 | Ridley, Anthony\EM001-ANTHONY-RIDLEY\Anthony Ridley    - email 2021_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000621 | FB NA Sales 2021 exPrice Review for Customers.pptx | pptx | 10c3bf8593fe0adb16bf94f1ab947cda | 7/29/2019 | 5/22/2021 | Hellkamp, Daniel | | PowerPoint Presentation | Ridley, Anthony\Files\Ridley Ecolab Files\Ridley's Ecolab Folder\2021 Extraordinary Pricing Playbook |
| PLAINTIFFSR-000000634 | 2021 Partnership and Market overview.pptx | pptx | b67be31304a20d38c3c5b93e179a61f9 | 10/7/2019 | 5/22/2021 | Kotval, Jenny | | PowerPoint Presentation | Ridley, Anthony\Files\Ridley Ecolab Files\Ridley's Ecolab Folder\2021 Extraordinary Pricing Playbook |
| PLAINTIFFSR-000000670 | 2021 Partnership and Market overview - Simmons Foods.pptx | pptx | 2727a792a979be722cedd3c8a5949e54 | 10/7/2019 | 5/22/2021 | Kotval, Jenny | | PowerPoint Presentation | Ridley, Anthony\Files\Ridley Ecolab Files\Ridley's Ecolab Folder\2021 Extraordinary Pricing Playbook |
| PLAINTIFFSR-000000696 | image001.png | png | 9547dfc36ced5d17c008f9a432946f3c | 1/24/2023 | 1/24/2023 | | | | Ecolab\2023.01.24 Data |
| PLAINTIFFSR-000000822 | 07 - District Fact Pack WL121 July 2020.xlsb | xlsb | 4ef4e4a576974321404cc8fbe2c5265d | 2/28/2013 | 9/3/2020 | Trevor Guthke | | | Ridley, Anthony\Chemtreat - Ridley 2020 email_2\Chemtreat - Ridley 2020 email_2.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000823 | 08 - District Fact Pack WL121 August 2020.xlsb | xlsb | 4bfecff1f8a770a9a87559ce72d9a464 | 2/28/2013 | 9/11/2020 | Trevor Guthke | | | Ridley, Anthony\Chemtreat - Ridley 2020 email_2\Chemtreat - Ridley 2020 email_2.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000918 | District WL121 Fact Pack December 2014.xlsx | xlsx | 4398caf5175434139bd4260aa4c8031b | 2/28/2013 | 12/5/2016 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000919 | WP127 District Fact Pack 200912.xls | XLS | 537f9b349150590527643dc2c3418cc0 | 11/11/2009 | 12/5/2016 | tguthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000920 | WP127 Fact Pack Revision 2010-12.xls | XLS | 551159c512433e229bfbe78ba3018eee | 10/12/2010 | 12/5/2016 | tguthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000921 | WP127 Fact Pack 2011-12.xlsx | xlsx | 526d91b1d717bf55e44bdaeaa07559ea | 3/9/2011 | 12/5/2016 | tguthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000922 | WP127 Fact Pack All-in-One 201211.xlsx | xlsx | 898fa95adc0fdad7792d10eb4958568f | 9/11/2012 | 12/5/2016 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000923 | WP127 Fact Pack December 2013.xlsx | xlsx | 2db4ac10ea66abd47d4ad5577280a5c4 | 2/28/2013 | 12/5/2016 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000924 | District WL121 Fact Pack December 2016 RESTATEMENT.xlsb | xlsb | acd1ca5784475427f9f171ab89869cdf | 2/28/2013 | 1/27/2017 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| PLAINTIFFSR-000000925 | 12 - District Fact Pack WL121 December 2017 - revised with manual update.xlsb | xlsb | b7202a3a8ca989cdd0c4f0a808c9754a | 2/28/2013 | 1/10/2018 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |

| | Control Number | File Name | Document Extension | MD5 Hash | Date Created | Date Last Modified | Author | Company Name | Title | Original Folder Path |
|---|---|---|---|---|---|---|---|---|---|---|
| 19 | PLAINTIFFSR-000000926 | District Fact Pack WL121 2017 Restatement.xlsb | xlsb | df2813f92a3ab66c3b9715553b021262 | 2/28/2013 | 3/28/2018 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 20 | PLAINTIFFSR-000000927 | 20180621_Fact Pack Season Update V2.xlsx | xlsx | 186a7b8abec13716bf08ed2b90d3a6cc | 7/31/2017 | 6/27/2018 | Owens, Bryon | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 21 | PLAINTIFFSR-000000928 | District Fact Pack WL121 December 2018 Restatement.xlsb | xlsb | 9855f435a204138d11a902ccfc5e1c29 | 2/28/2013 | 2/11/2019 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 22 | PLAINTIFFSR-000000929 | District Fact Pack WL121 December 2018 Restatement.xlsb | xlsb | 73a49ffccfcf9c732dd7b0d4ee85a167 | 2/28/2013 | 2/12/2019 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 23 | PLAINTIFFSR-000000930 | 12 - District Fact Pack WL166 December 2019.xlsb | xlsb | 41582893e4af57e6424031e112f4b2c8 | 2/28/2013 | 1/18/2020 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 24 | PLAINTIFFSR-000000931 | District Fact Pack WL121 December 2019 Restated.xlsb | xlsb | bbb3d9bd5bc806ca313815edd78641a9 | 2/28/2013 | 1/31/2020 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 25 | PLAINTIFFSR-000000932 | District Fact Pack WL166 December 2019 Restated.xlsb | xlsb | bdfe86e8d931b64f6cbdfe578fdc33b6 | 2/28/2013 | 1/31/2020 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 26 | PLAINTIFFSR-000000933 | District Fact Pack WL166 December 2019 Restated.xlsb | xlsb | bdfe86e8d931b64f6cbdfe578fdc33b6 | 2/28/2013 | 2/2/2020 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_1\Ridley - fact pack search_1.pst\Top of Personal Folders\Archive |
| 27 | PLAINTIFFSR-000000935 | District WL121 Fact Pack December 2014.xlsx | xlsx | 4398caf5175434139bd4260aa4c8031b | 2/28/2013 | 1/12/2015 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_2\Ridley - fact pack search_2.pst\Top of Personal Folders\Archive |
| 28 | PLAINTIFFSR-000000936 | District WL121 Fact Pack December 2014 RESTATEMENT.xlsx | xlsx | 321ff31f529579428f4bb386656c407d | 2/28/2013 | 2/3/2015 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_2\Ridley - fact pack search_2.pst\Top of Personal Folders\Archive |
| 29 | PLAINTIFFSR-000000937 | WL121 WL126 Temp Fact Pack Restatement March 2015.xlsb | xlsb | 3e628558ead6f369a1fd70504ef289db | 2/28/2013 | 4/9/2015 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_2\Ridley - fact pack search_2.pst\Top of Personal Folders\Archive |
| 30 | PLAINTIFFSR-000000938 | District WL121 Fact Pack December 2014.xlsx | xlsx | 4398caf5175434139bd4260aa4c8031b | 2/28/2013 | 8/31/2015 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_2\Ridley - fact pack search_2.pst\Top of Personal Folders\Archive |
| 31 | PLAINTIFFSR-000000939 | WP127 Fact Pack December 2013.xlsx | xlsx | 2db4ac10ea66abd47d4ad5577280a5c4 | 2/28/2013 | 8/31/2015 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_2\Ridley - fact pack search_2.pst\Top of Personal Folders\Archive |
| 32 | PLAINTIFFSR-000000940 | District WL121 Fact Pack December 2015 Restatement.xlsx | xlsx | cc0b5465a1f430b479a235b289310146 | 2/28/2013 | 2/5/2016 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_2\Ridley - fact pack search_2.pst\Top of Personal Folders\Archive |
| 33 | PLAINTIFFSR-000000941 | District WL121 Fact Pack December 2015 Restatement.xlsx | xlsx | cc0b5465a1f430b479a235b289310146 | 2/28/2013 | 2/5/2016 | Trevor Guthke | | | Ecolab\Ridley - fact pack search_2\Ridley - fact pack search_2.pst\Top of Personal Folders\Archive |
| 34 | PLAINTIFFSR-000000968 | Ridley payslip 06.15.2021.pdf | pdf | 17602e64555a1f0c1c2f11ad84cec247 | 6/21/2021 | 6/21/2021 | aridley | | 4f322165-4a5e-4d64-167c-7121295f1b57 | Ecolab\2023.02.16 Data\2023.02.16 Ingestion\OneDrive_1_2-16-2023\ARidley_1.pst\Top of Personal Folders\Archive |

Exhibit C - DLP File Names in Ecolab Productions.xlsx

JA-987

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Control Number | File Name | Document Extension | MD5 Hash | Date Created | Date Last Modified | Author | Company Name | Title | Original Folder Path |
| 35 | PLAINTIFFSR-000000969 | Ridley payslip 09.30.2020.pdf | pdf | 9278aa0636be2c988a8d1d7d03ce4cf8 | 6/21/2021 | 6/21/2021 | aridley | | 92b2b6ad-ff18-4799-be22-125dc73dd732 | Ecolab\2023.02.16 Data\2023.02.16 Ingestion\OneDrive_1_2-16-2023\ARidley_1.pst\Top of Personal Folders\Archive |
| 36 | PLAINTIFFSR-000001187 | The Chattanoogan - Nalco 3DT260 Quote 01.09.2012.pdf | pdf | 3e8b19de4c017ee924a88b43d5f49e6e | 1/9/2012 | 1/9/2012 | ARIDLEY | | | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 37 | PLAINTIFFSR-000001227 | The Chattanoogan - Nalco 3DT260 Quote 07.19.2013.pdf | pdf | bf1733c1c72c4fcb3c6411e0bb5332d2 | 7/21/2013 | 7/21/2013 | ARIDLEY | | | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 38 | PLAINTIFFSR-000001229 | The Chattanoogan - Nalco 3DT260 Quote 08.19.2013.pdf | pdf | 1b1c242b068f50b36039e4276da30ba9 | 8/19/2013 | 8/19/2013 | ARIDLEY | | | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 39 | PLAINTIFFSR-000001235 | ADM Transition Playbook.docx | docx | 70711d0e4cf5529d659aecefc1134209 | 1/9/2015 | 2/17/2015 | Frank Sospenzi | | | Ridley, Anthony\adm transition playbook_1\adm transition playbook_1.pst\Top of Personal Folders\Archive |
| 40 | PLAINTIFFSR-000001242 | The Chattanoogan Water Treatment Contract Jan - June 2015.pdf | pdf | 1b4d7ebbef1152d95186e8bdbdc93c3d | 2/19/2015 | 2/19/2015 | Nalco | | | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 41 | PLAINTIFFSR-000001243 | The Chattanoogan Water Treatment Contract Jan - June 2015.xlsx | xlsx | 83370ad74cce9bafc4a19de2138913c7 | 11/16/2004 | 3/6/2015 | Nalco | | | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 42 | PLAINTIFFSR-000001244 | The Chattanoogan Water Treatment Contract Scope of Work - July 2015 - June 2016.pdf | pdf | 2052347933bcd758af6dfc17b075a7b5 | 9/1/2015 | 9/1/2015 | Nalco | | | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 43 | PLAINTIFFSR-000001245 | The Chattanoogan Water Treatment Contract July 2015 - June 2016 SIGNED AGREEMENT.pdf | pdf | 8d6e30e376eaab6b0df985936badfd88 | 9/17/2015 | 9/17/2015 | | | | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 44 | PLAINTIFFSR-000001246 | WL121 PAC 1 Training - August 2016.pdf | pdf | ec84a9f55bfac74d82e9c5ebdf3228d4 | 9/21/2016 | 9/21/2016 | | | | Ridley, Anthony\wl121 pac 1 training august 2016_1\wl121 pac 1 training august 2016_1.pst\Top of Personal Folders\Archive |
| 45 | PLAINTIFFSR-000001250 | 2017 WL121 DM Bridge PlanTemplate-FINAL.pptx | pptx | cd193df043801c1e18359a4d8d57afa2 | 6/25/2010 | 2/10/2017 | John Schoen | | Slide 1 | Ridley, Anthony\2017 wl121 dm bridge plantemplate_1\2017 wl121 dm bridge plantemplate_1.pst\Top of Personal Folders\Archive |
| 46 | PLAINTIFFSR-000001257 | Copy of Bridge by Components - WL121 2017.xlsx | xlsx | 50b74f3901954fcf1c1da5c5083d724e | 10/1/2015 | 2/10/2017 | Michael Chmelovski | | | Ridley, Anthony\2017 wl121 dm bridge plantemplate_1\2017 wl121 dm bridge plantemplate_1.pst\Top of Personal Folders\Archive |
| 47 | PLAINTIFFSR-000001258 | District Bridge Data - 2017.xlsx | xlsx | f807377022d8e2dbe707d31a9ec43505 | 1/28/2017 | 2/10/2017 | Chmelovski, Michael | | | Ridley, Anthony\2017 wl121 dm bridge plantemplate_1\2017 wl121 dm bridge plantemplate_1.pst\Top of Personal Folders\Archive |
| 48 | PLAINTIFFSR-000001259 | Jack Stone 04 - 2017 Nalco Sales Incentives Details Report.xlsx | xlsx | f2d3c420d3fb8bf30f3d21c24233308b | 5/24/2017 | 6/6/2017 | Ridley, Anthony | | | Ridley, Anthony\2017 nalco sales incentives details report_1\2017 nalco sales incentives details report_1.pst\Top of Personal Folders\Archive |
| 49 | PLAINTIFFSR-000001260 | Jerry DeFord 05 - 2017 Nalco Sales Incentives Details Report.xlsx | xlsx | 7758f25d6a4b08a71cd02869f235fd7f | 6/7/2017 | 6/7/2017 | Ridley, Anthony | | | Ridley, Anthony\jerry deford 05_1\jerry deford 05_1.pst\Top of Personal Folders\Archive |
| 50 | PLAINTIFFSR-000001261 | Robert McClure 05 - 2017 Nalco Sales Incentives Details Report.xlsx | xlsx | 0f81b57b05b8d3c8e2d20608300a535b | 6/7/2017 | 6/7/2017 | Ridley, Anthony | | | Ridley, Anthony\robert mcclure 05_1\robert mcclure 05_1.pst\Top of Personal Folders\Archive |

Exhibit C - DLP File Names in Ecolab Productions.xlsx

JA-988

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Control Number | File Name | Document Extension | MD5 Hash | Date Created | Date Last Modified | Author | Company Name | Title | Original Folder Path |
| 51 | PLAINTIFFSR-000001262 | Patrick Sweeney 03 - 2017 Nalco Sales Incentives Details Report.xlsx | xlsx | 1f67f9aa495d2beccaf609e954a4a3c5 | 7/26/2017 | 7/26/2017 | Ridley, Anthony | | | Ridley, Anthony\patrick sweeney 03_1\patrick sweeney 03_1.pst\Top of Personal Folders\Archive |
| 52 | PLAINTIFFSR-000001263 | Copy of Nalco Pilgrims Best Practice Implementation 4.24.18 for Quint McCreary.xlsx | xlsx | 624353420ddd1ee89b7a21514e280324 | 9/5/2016 | 4/24/2018 | Robert Pomeroy | | | Ridley, Anthony\copy of nalco pilgrims best practice implementation_1\copy of nalco pilgrims best practice implementation_1.pst\Top of Personal Folders\Archive |
| 53 | PLAINTIFFSR-000001264 | The Sales Leaders Playbook-2019.pdf | pdf | 14c4ae4c5d00b7ba897e09400b0fd73c | 12/29/2018 | 12/29/2018 | Michael Chmelovski | | | Mackie, Kerry\Exemplar Documents\Mackie___OneDrive_files_1of3.zip_files\SharePoint\ecolab-my.sharepoint.com\personal\kamackie_ecolab_com\documents\josh wl127\district info\district manager\dm meetings\2019 |
| 54 | PLAINTIFFSR-000001361 | Industrial-Manager-Playbook_2ndEdition-INTERACTIVE-PDF.pdf | pdf | bc083c97bd4370136d342000e46b5355 | 8/22/2019 | 8/22/2019 | | | | Ecolab\2023.02.28 Data |
| 55 | PLAINTIFFSR-000001372 | Copy of WL121 2020 Price Plan.xlsx | xlsx | cae9e3de1d0954bc8429bd2186348cde | 7/6/2016 | 10/11/2019 | Power BI | | | Ridley, Anthony\copy of wl121 2020 price plan_1\copy of wl121 2020 price plan_1.pst\Top of Personal Folders\Archive |
| 56 | PLAINTIFFSR-000001373 | Copy of WL166 2020 Price Plan.xlsx | xlsx | 42d55adf1b4af5002b8dbbcc25c360b6 | 7/6/2016 | 10/11/2019 | Power BI | | | Ridley, Anthony\copy of wl166 2020 price plan_1\copy of wl166 2020 price plan_1.pst\Top of Personal Folders\Archive |
| 57 | PLAINTIFFSR-000001374 | WL166 - 2020 DM Business Plan.pptx | pptx | afb8eb8d2924c64dccab4e00d52497c4 | 6/4/2019 | 11/4/2019 | Olszewski, Heidi | | PowerPoint Presentation | Ridley, Anthony\wl166 2020 DM_1\wl166  2020 DM_1.pst\Top of Personal Folders\Archive |
| 58 | PLAINTIFFSR-000001393 | Associate Development Toolkit Final.pdf | pdf | 002a0618e7888c0ec99a9b37be9853e2 | 4/30/2018 | 9/17/2019 | | | | Ridley, Anthony\placemat 9-box_1(1)\placemat 9-box_1.pst\Top of Personal Folders\Archive |
| 59 | PLAINTIFFSR-000001415 | Volkswagen Quote for 3DT260.33 06.10.2015.docx | docx | 58b1b756a5ca3cc0d1d05901459de607 | 6/10/2015 | 8/27/2020 | aridley | | | Ridley, Anthony\Chemtreat - Ridley 2020 email_2\Chemtreat - Ridley 2020 email_2.pst\Top of Personal Folders\Archive |
| 60 | PLAINTIFFSR-000001416 | Volkswagen Quote for 3DT260.33 09.24.2015.docx | docx | f94962889afd6d34fac89bbf92cb0ced | 9/24/2015 | 8/27/2020 | aridley | | | Ridley, Anthony\Chemtreat - Ridley 2020 email_2\Chemtreat - Ridley 2020 email_2.pst\Top of Personal Folders\Archive |
| 61 | PLAINTIFFSR-000001417 | Volkswagen Quote for Annual Analytical Analysis 08.17.2015.docx | docx | 31491a63adc1c81f33cce6cb1f25112a | 8/16/2015 | 8/27/2020 | aridley | | | Ridley, Anthony\Chemtreat - Ridley 2020 email_2\Chemtreat - Ridley 2020 email_2.pst\Top of Personal Folders\Archive |
| 62 | PLAINTIFFSR-000001418 | 08 - August 2020 Sales Incentives Invoice Details Statement - Ridley WL121.xlsx | xlsx | 7b2c44956bd52b54b40018d9f92ead2d | 9/24/2020 | 10/6/2020 | Ridley, Anthony | | | Ridley, Anthony\Chemtreat - Ridley 2020 email_2\Chemtreat - Ridley 2020 email_2.pst\Top of Personal Folders\Archive |
| 63 | PLAINTIFFSR-000001419 | 7326 MN WL121 Volkswagen - signed.pdf | pdf | d5ae5d2f7b2c6a2f952f9dd1fb896751 | 8/24/2016 | 8/24/2016 | | | | Ridley, Anthony\EM001-ANTHONY-RIDLEY\Anthony Ridley   - email 2021_2.pst\Top of Personal Folders\Archive |
| 64 | PLAINTIFFSR-000001465 | Value Creation - Role Play Set up and CSP Review.pptx | pptx | 6807185332c852dee39e233c2907a216 | 12/8/2005 | 2/3/2023 | Nancy Stan | | Title of Presentation | Mackie, Kerry\Exemplar Documents\Mackie___OneDrive_files_1of3.zip_files\SharePoint\ecolab-my.sharepoint.com\personal\kamackie_ecolab_com\documents\josh wl127\district info\district manager\regional meeting\2016 |

Exhibit C - DLP File Names in Ecolab Productions.xlsx

JA-989

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Control Number | File Name | Document Extension | MD5 Hash | Date Created | Date Last Modified | Author | Company Name | Title | Original Folder Path |
| 65 | PLAINTIFFSR-000001473 | 2018 Nalco Water FB_MN Regional Sales Accelerator (Conv Role) Plan.docx | docx | 24d9f2ce7a49e7eb9b07404cbe4eb687 | 3/6/2018 | 2/3/2023 | Janice Prestigiacomo | | | Mackie, Kerry\Potential Exemplar Documents\Mackie___OneDrive_files_2of3.zip_files\SharePoint\ecolab-my.sharepoint.com\personal\kamackie_ecolab_com\documents\josh wl127 files\district info\district manager\comp\2018 |
| 66 | PLAINTIFFSR-000001476 | ROLE PLAY SCORECARD.pptx | pptx | 5f6346a3177a941db0a75dc89cd7f118 | 4/15/2014 | 2/28/2023 | James Gage | | PowerPoint Presentation | Ecolab\2023.02.28 Data |
| 67 | PLAINTIFFSR-000001477 | 2020 NC Region Bridge v2.xlsx | xlsx | 2a d5827b02bb3802e80e3ea56856bac1 | 10/1/2015 | 2/28/2023 | Michael Chmelovski | | | Ecolab\2023.02.28 Ingestion |
| 68 | PLAINTIFFSR-000001478 | District Tax Form v2.0.xlsx | xlsx | 32719e0536c3ea577b8923acc3d00cb6 | 2/5/2015 | 2/28/2023 | Corey DeMarco | | | Ecolab\2023.02.28 Ingestion |
| 69 | PLAINTIFFSR-000001480 | WL14X Business Plan.pptx | pptx | dd4f707a72930578d41d09ad6a4a81e8 | 6/25/2010 | 2/28/2023 | John Schoen | | Slide 1 | Ecolab\2023.02.28 Ingestion |
| 70 | PLAINTIFFSR-000001500 | Corey's Interview Guide_NW_DR_Light.docx | docx | 1c495 9d99f9f0338e1033729672647a4 | 2/25/2019 | 3/1/2023 | Ward-Lake, Lora | | | Ecolab\District Fact Pack WL121 December 2019.xlsb and more |
| 71 | PLAINTIFFSR-000001511 | 2020 NC Region Bridge v2.xlsx | xlsx | 2ad5827b02bb3802e80e3ea56856bac1 | 10/1/2015 | 3/1/2023 | Michael Chmelovski | | | Ecolab\District Fact Pack WL121 December 2019.xlsb and more |
| 72 | PLAINTIFFSR-000001513 | District Tax Form v2.0.xlsx | xlsx | 32719e0536c3ea577b8923acc3d00cb6 | 2/5/2015 | 3/1/2023 | Corey DeMarco | | | Ecolab\District Fact Pack WL121 December 2019.xlsb and more |
| 73 | PLAINTIFFSR-000001515 | WL14X Business Plan.pptx | pptx | dd4f707a72930578d41d09ad6a4a81e8 | 6/25/2010 | 3/1/2023 | John Schoen | | Slide 1 | Ecolab\District Fact Pack WL121 December 2019.xlsb and more |
| 74 | PLAINTIFFSR-000001530 | SPD MTR Training.pptx | pptx | 8cc7e0f176ce4a9d999a2d1f1360ce44 | 12/8/2005 | 2/3/2023 | cldemarco@ecolab.com | | Title of Presentation | Irwin, Benjamin\Exemplar Documents\Irwin___OneDrive_data_1of2.zip_files\SharePoint\ecolab-my.sharepoint.com\personal\benjamin_irwin_ecolab_com\documents\wl 143 files\documents\monthly territory review |
| 75 | PLAINTIFFSR-000001544 | 01-Best Practices General Closed Systems v2013.pptx | pptx | 93288fbb9b9da73bab6a21cb7c872324 | 10/7/2013 | 2/3/2023 | Dejan (Danny) Blagojevich | | General Best Practices Closed Systems | Irwin, Benjamin\Exemplar Documents\Irwin___OneDrive_data_2of2.zip_files\SharePoint\ecolab-my.sharepoint.com\personal\benjamin_irwin_ecolab_com\documents\12. #12 files\technical files |
| 76 | PLAINTIFFSR-000001634 | TT Training Presentation.pptx | pptx | 3b85da56685bc95b93b0b5c9e39102d7 | 6/18/2013 | 2/3/2023 | Michelle Stoltz | | PowerPoint Presentation | Mackie, Kerry\Exemplar Documents\Mackie___OneDrive_files_1of3.zip_files\SharePoint\ecolab-my.sharepoint.com\personal\kamackie_ecolab_com\documents\josh wl127\district info\district manager\dm meetings\2015\ops calls\03 |
| 77 | PLAINTIFFSR-000001659 | Pilgrim's-JBS Boiler Operator Training Final 4kwk.ppt | ppt | 2f2235e378ce4f295ade4a7ab3bf9914 | 6/16/1997 | 10/1/2018 | ML | | wtDeaeration.ppt | Ridley, Anthony\boiler operator training_1\boiler operator training_1.pst\Top of Personal Folders\Archive |
| 78 | PLAINTIFFSR-000001808 | Dosage Calculation worksheet - ver3.xls | XLS | 440a8617b2b17a139d7375991b54fcf5 | 2/11/2010 | 7/15/2013 | aridley | | | Ridley, Anthony\dosage calculation worksheet_1\dosage calculation worksheet_1.pst\Top of Personal Folders\Archive |
| 79 | PLAINTIFFSR-000001809 | Service report technical notes.doc | doc | 552fb440460c7dafa0da918dab2625c8 | 9/3/2008 | 2/12/2012 | aridley | | Service report technical notes: | Ridley, Anthony\the chattanoogan_1\the chattanoogan_1.pst\Top of Personal Folders\Archive |
| 80 | PLAINTIFFSR-000001813 | Volkswagen Group of America - CMV Plan 2012.xlsm | xlsm | af5fe9627f12076f4ce71e70840fb888 | 3/20/2010 | 2/9/2012 | rkaesler | | | Ecolab\2023.03.02 Delivery\Volkswagon - cmv plan_1\Volkswagon - cmv plan_1.pst\Top of Personal Folders\Archive |

Exhibit C - DLP File Names in Ecolab Productions.xlsx

JA-990

| | Control Number | File Name | Document Extension | MD5 Hash | Date Created | Date Last Modified | Author | Company Name | Title | Original Folder Path |
|---|---|---|---|---|---|---|---|---|---|---|
| 81 | PLAINTIFFSR-000001814 | Volkswagen ABR 2013.pptx | pptx | 1afdf891aa51435c05d006f6f5ef5b4b | 1/24/2013 | 11/22/2013 | Jessica Stines | | PowerPoint Presentation | Ecolab\2023.03.02 Delivery\volkswagen abr 2013_1\volkswagen abr 2013_1.pst\Top of Personal Folders\Archive |
| 82 | PLAINTIFFSR-000001846 | NA Auto Training 2012 - Auto Industry Overview and Nalco Auto Strategy.pptx | pptx | 0e47e2ba37a3e98085cfbc419eeba864 | 12/8/2005 | 11/22/2013 | MJ Monahan | | Auto Industry Overview with focus on NA and Global Strategy | Ecolab\2023.03.02 Delivery\volkswagen abr 2013_1\volkswagen abr 2013_1.pst\Top of Personal Folders\Archive |
| 83 | PLAINTIFFSR-000001873 | chemical treatment RFQ.docx | docx | 54cfd46f60a6c2166b44c01cf311fd42 | 11/25/2014 | 2/26/2015 | Johnson, Chris (CI-F) | | | Ecolab\2023.03.02 Delivery\volkswagen abr 2014_1\volkswagen abr 2014_1.pst\Top of Personal Folders\Archive |
| 84 | PLAINTIFFSR-000001893 | Volkswagen Group of America PAM.pdf | pdf | 505791fec10ed8651ce10f39d054a5d8 | 12/12/2012 | 12/12/2012 | | | Microsoft Word - Volkswagen Group of America PAM | Ecolab\2023.03.02 Delivery\volkswagen group of america pam.doc volkswagen group of america_1\volkswagen group of america pam.doc volkswagen group of america pam_1.pst\Top of Personal Folders\Archive |
| 85 | PLAINTIFFSR-000001907 | Volkswagen service plan 2015.pdf | pdf | 869341d9bcd2dcb6462cbcce4898f5be | 1/23/2015 | 1/23/2015 | Ondeo Nalco | | | Ecolab\2023.03.02 Delivery\volkswagen service plan_1\volkswagen service plan_1.pst\Top of Personal Folders\Archive |
| 86 | PLAINTIFFSR-000001908 | Volkswagen Program Agreement 2016.pdf | pdf | 150f312d08e914ec0fd91b8defbe3fae | 3/10/2016 | 3/10/2016 | Ondeo Nalco | | Master Sales Agreement | Ecolab\2023.03.02 Delivery\volkswagen service plan_1\volkswagen service plan_1.pst\Top of Personal Folders\Archive |
| 87 | PLAINTIFFSR-000001917 | Volkswagen Group of America Water Treatment - Nalco Proposal 10.30.2015.pdf | pdf | 8e136efa3decb2bb86bb19192d4165a1 | 3/8/2016 | 3/8/2016 | William Hubbard | | Water Treatment Program Proposal | Ecolab\2023.03.02 Delivery\volkswagen service plan_1\volkswagen service plan_1.pst\Top of Personal Folders\Archive |
| 88 | PLAINTIFFSR-000001962 | Volkswagen Service Plan 2016.pdf | pdf | c4bf2f68a1c48f980ed0b8db9773e08e | 3/1/2016 | 3/1/2016 | Ondeo Nalco | | | Ecolab\2023.03.02 Delivery\volkswagen service plan_1\volkswagen service plan_1.pst\Top of Personal Folders\Archive |