United States District Court
Eastern District of Tennessee
At Chattanooga

| | |
|---|---|
| Ecolab, Inc. and Nalco Company, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water | No. 1:22-CV-00050 |
| **Plaintiffs** | TRM-SKL |
| v. | |
| Anthony Ridley and ChemTreat | |
| **Defendants** | |

### Anthony Ridley's Response to the Plaintiffs' Motion for Partial Summary Judgment

## I. Introduction

The Plaintiffs have moved the Court for summary judgment on their breach-of-contract claim against Anthony Ridley. The facts supporting his breaches, they claim, are simple. His failure to return three USB drives, an iPhone, and an external hard drive violated post-termination procedures in his employment contract. He "used" and "disclosed" their confidential information in violation of a confidentiality provision. He transferred company data to an unapproved device in violation of a data-use provision. And he refused to allow the Plaintiffs to inspect a hard drive during discovery in violation of a litigation-cooperation clause.

But none of that is entirely true. Ridley returned the USB drives before litigation began and did so as soon as he found them. The hard drive was one Ridley bought and used primarily for personal purposes, not a company-issued device that was subject to "return" upon his termination. His nefarious data transfers occurred between company approved devices at a time when his employment was governed by a different contract that did not forbid that practice. There is no proof

from any source that he "used" or "disclosed" any of the information at issue in this suit. And his "refusal" to allow inspection of a hard drive did not happen—he simply objected to the breadth and timing of a discovery request and offered the hard drive up for inspection under terms that the Plaintiffs found unacceptable.

Though those factual disputes are fatal to the Plaintiffs' motion, they are not the only obstacles the Plaintiffs face under Rule 56. The breach claims related to the iPhone and the device-inspection dispute are not in the Plaintiffs' pleadings and are therefore not subject to summary judgment. The breach of the confidentiality clause is actionable only if the Plaintiffs have particularly identified particular information as "trade secrets" and established that the information satisfies the evidentiary criteria for trade-secret protection under Tennessee law, neither of which the Plaintiffs attempted to do in their motion. And the essential element of damages is missing because the lone form of damages they claim—attorneys' fees they incurred in suing Ridley for breaches that have not otherwise harmed them—will not suffice unless they separately show that proof of a contract violation somehow fundamentally alters the parties' relationship to their benefit, something that they also fail to demonstrate.

The Court should therefore deny the Plaintiffs' motion.

## II. Background

In the 20 years that he worked for Nalco, Ridley's role was focused on the company's customer accounts. Nalco hired him in 1999 as an account representative for its Southeast Tennessee service area.[1] He spent around 16 years in that position, and he then became a District Manager for Nalco, managing a group of salespeople, engineers, and service techs.[2]

---

[1] Doc. 229 at Page ID # 4483 (Pls.' Third Am. Compl.).

[2] *Id.*

During that time, the company changed the method by which its employees would store and share documents and, for a period of time, employees like Ridley safeguarded against inaccurate file transfers by backing up their computers and keeping their backups with them as they worked.[3] So Ridley used an external WD hard drive that he purchased—and which he primarily utilized for the storage of photos and other personal files—to back up his laptop and other files until early 2020.[4] Ridley also had the use of a LaCie external hard drive that Nalco had provided him for backing up files.[5]

By the summer of 2020, Ridley had decided that he no longer wanted a "field-level account manager" position like he had at Nalco and that he was ready for a move to a corporate account position.[6] Another company, ChemTreat, contacted him about potentially taking a "field account manager" position.[7] But he did not accept it because of the similarity to his job at Nalco.

Instead, in October 2020, Ridley left his position as a district manager with Nalco and became a corporate account manager for Ecolab, Nalco's parent company.[8] In that position Mr. Ridley had a portfolio of corporate accounts that he serviced "in the food and beverage industry."[9]

Though Ecolab and Nalco were related, Ridley observed stark distinctions between his previous work for Nalco and his new work for Ecolab. They were two distinct companies, of course,

---

[3] Ridley at 74:8-75:2 (JA-528–29).

[4] *Id.* at 59:7–17 (JA-517), 448:4–15 (JA-667).

[5] *Id.* at 74:12–76:12 (JA-525–27).

[6] *Id.* at 176:17–179:8. (JA-558–61).

[7] *Id.* (noting that initially "ChemTreat wanted [him] to take . . . a role that [he] no longer really wanted to do with Nalco").

[8] Doc. 229 at Page ID# 4483.

[9] *Id.* at ¶¶ 26–27.

so he received two separate W-2s in 2020 when he split the year between both, and he had to sign a new employment agreement upon his move to Ecolab.[10] But he also saw that they "operate[d] very, very, very differently," and there was "no overlap" or "connection" between his work for the "Food and Beverage" division at Ecolab and the "water treatment industry" work he did for Nalco.[11] So Ridley found himself with a volume of Nalco computer files that simply "were no longer part of [his] job" as a corporate account manager with Ecolab.[12]

That eventually led him in the spring of 2021 to begin transferring his old Nalco files to the LaCie drive that Nalco had given him years before.[13] The files "were not pertinent" to his role at Ecolab, so he transferred them to the LaCie drive to segregate them from his Ecolab work.[14]

Ridley had not yet accepted a position with ChemTreat and he was still uncertain of what he would do.[15] But he was far enough along in their discussions to understand the potential for his departure. And, having experienced firsthand the issues that could arise with file transfers on OneDrive when a coworker at Nalco or Ecolab left the business—such as unnecessarily shared personnel files and unintentionally retained personal documents—Ridley was reassured in his decision to segregate old Nalco information to a Nalco device away from his Ecolab files.[16]

In June 2021, Ridley accepted a position with ChemTreat where he would be taking over the

---

[10] Ridley Dep. at 166:21–167:15; (JA-549–JA-550). *See* JE-20 at JA-57.

[11] Ridley Dep. at 166:21–167:7 (JA-549–JA-550), 174:11–175:3 (JA-556–57).

[12] *Id.* 166:17–20 (JA-549).

[13] *Id.* at 171:13–172:5 (JA-553–54), 174:11–175:3 (JA-556–57).

[14] *Id.* (noting that he wanted Nalco Water files on a Nalco Water-owned device, which was the LaCie drive, so that they'd be completely segregated since he "no longer had use for those files").

[15] *Id.* at 174:11–17 (JA-556).

[16] *Id.* at 167:8–169:15 (JA-550–52), 173:2–15 (JA-555) (stating his belief that a potential successor should not see personal documents like "performance reviews" and "merit plans").

territory of a retiring ChemTreat employee. Soon after accepting the job, Ridley informed his direct supervisor, Jackie Herrera, that he intended to resign effective July 14, 2021.[17] Ecolab did not accept that and instead terminated Ridley's employment effective July 1, 2021.[18]

In the days following his termination, Ridley communicated with Ecolab about how he should return his company assets, such as his computer and accessories.[19] Ecolab emailed him a FedEx shipping label for everything, and Ridley used the label to send his Ecolab laptop, the LaCie drive, and other equipment to Ecolab's I.T. vendor, Insight.[20] Only days later, on July 12, 2021, Insight confirmed that it had received what Ridley had sent:



SP  Shreya Patel (20337632)

Your device has been received at the depot on: 7/12/2021
Assigned User Name: Anthony Ridley (00116331)
Device Received: 5CG84132TP
Tracking: 281165642252
INC/TASK: N/A
Additional Accessories included: USB-C Dock G4, 65w charger, mobile drive

[21]

Soon after Insight received Ridley's computer and the LaCie drive, Ecolab analyzed Ridley's data transfer activity and created a Digital Guardian Data Loss Prevention ("DLP") Report. The DLP report—dated July 23, 2021—detailed all of Ridley's recent file transfers to the Nalco LaCie drive.[22]

Ecolab did not, however, contact Insight regarding the equipment that Ridley had returned

---

[17] Herrera Dep., April 21, 2023, at 59:7–60:20 (JA-460–61).

[18] HR Information Email, July 1, 2021, 17:26 (JA-215).

[19] Anthony Ridley text to Jackie Herrera, July 6, 2021, 8:01(JA-244).

[20] Ridley Dep. at 171:22–172:10 (JA-553–54), 446:5–10 (JA-446).

[21] Asset Portfolio Detail, P.4 (JA-73).

[22] Garza Dep. at 89:11–90:20 (JA-431–32).

or otherwise seek to preserve it.[23] So around three weeks later in August 2021, Insight moved Ridley's old laptop and LaCie drive "to inventory."[24]

It was not until January 2022 that Ecolab's legal team began reaching out to Insight regarding Ridley's old devices. But it was too late—Insight could not locate the LaCie drive that Ridley returned the previous July.[25] And the laptop had been reassigned to another person.[26]

Armed with the knowledge that it had not preserved Ridley's returned equipment, Ecolab on February 9, 2022, contacted Ridley for the first time since his resignation.[27] Ridley was employed with ChemTreat, so ChemTreat responded to Ecolab's letter and advised that Ridley returned his Ecolab laptop and the LaCie drive in July 2021.[28] ChemTreat also informed Ecolab that Ridley had located some USB thumb drives with Nalco logos and offered to have Ridley return them to Ecolab as well.[29]

ChemTreat also noted that Ridley had a personal hard drive that he used at times to back up his Nalco laptop, but that Ridley had deleted all Nalco or Ecolab data from it since its purpose now was for personal use.[30] As Ridley would later confirm, he had forgotten about the old Nalco files on the WD drive and began deleting them in 2021 after starting work at ChemTreat when he

---

[23] Garza Dep. at 94:4-16 (JA-434).

[24] Garza Dep. at 175:3–176:19 (JA-446–47).

[25] Email from Bryan Sheppard, Jan. 19, 2022, 10:57am (JA-47).

[26] Asset Portfolio Detail, P.4 (JA-73).

[27] JE-15 at JA-36–JA-41.

[28] Doc. 242-7.

[29] *Id.*

[30] *Id.*

noticed that they were still there.[31] He had not shared them "with anyone at any time" or saved them on a ChemTreat computer.[32]

Less than a month later, Ecolab started this litigation.

### III. Discussion

#### A. Under Rule 56, the Court must view the evidence and possible inferences from it in Ridley's favor, and refrain from weighing the parties' competing proof.

The Plaintiffs may obtain summary judgment if they prove that "there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law."[33] Because Rule 56 essentially "operates to deny a litigant his day in court," a motion thereunder should be granted "only with extreme caution . . . ."[34] It is for this reason that the Court must consider the evidence, as well as any evidentiary inferences it can make, "in the light most favorable to the party opposing the motion."[35]

Under this cautious approach, the Court may not resolve the Plaintiffs' Rule 56 motion by "weighing conflicting evidence" or "assess[ing] [its] probative value . . . ."[36] So "even if" the Court "believes that the evidence presented by [Ridley] is of doubtful veracity," it must leave the resolution of "conflicting evidence" and witness credibility to the jury.[37]

In other words, the Court may grant the Plaintiffs summary judgment "only if the record

---

[31] Ridley Dep. at 98:10–99:9, 106:4–107:24, 123:13–124:6 (JA-532–35, 540–41).

[32] *Id.* at 123:13–124:6 (JA-540–41).

[33] Fed. R. Civ. P. 56(a).

[34] *Smith v. Hudson*, 600 F.2d 60, 63, (6th Cir. 1979).

[35] *Id.*

[36] *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990).

[37] *Snyder v. Kohl's Dep't Stores, Inc.*, 580 F. App'x 458, 461 (6th Cir. 2014); *Smith v. Ohio Nat'l Life, Ins. Co.*, No. 3:07-0655, 2008 U.S. Dist. LEXIS 23161, *16 (M.D. Tenn. March 24, 2008).

shows that" they proved their claims "so clearly that no rational jury could have found to the contrary."[38]

## B. There is a genuine dispute about whether Ridley breached his contract by failing to return USB drives, a personal hard drive, and an iPhone.

The Plaintiffs claim that Ridley breached Paragraph 11 of his contract in three ways when he "failed to return" certain devices to them after he left Ecolab's employment. He "failed to return" three company-issued USB thumb drives that "had Nalco files stored on them." He "failed to return" his personal WD hard drive "that contained Nalco documents." And he "failed to return" a company-purchased iPhone.

But for multiple reasons, the Plaintiffs have failed to establish an entitlement to summary judgment on any of those alleged breaches. First and foremost, the Plaintiffs cannot obtain summary judgment on one of these alleged breaches because it is not in any of the Plaintiffs' pleadings. The Plaintiffs' allegation that Ridley's "failure to return" his iPhone constituted a breach of contract is new. They did not include it in any of the four versions of their complaint, and instead waited to assert it for the first time in their summary-judgment motion.

That is improper. When "a case has progressed to the summary judgment stage," the parties' pleadings dictate the scope of allegations upon which a court can render judgment under Rule 56.[39] The "liberal pleading standards" that benefit plaintiffs at the outset of litigation are simply "inapplicable" at this point, and cannot permit a court to grant judgment on an unpleaded claim or a "new theory raised for the first time at the summary judgment stage . . . ."[40]

---

[38] *Snyder*, 580 F. App'x at 461.

[39] *Wolfe v. Alexander*, No. 3:11-cv-0751, 2014 U.S. Dist. LEXIS 138326, at *29–30 (M.D. Tenn. Sep. 30, 2014).

[40] *Id.* (noting that since a Rule 56 movant did not "amend his complaint to include" the new claim, it was "not properly before the Court").

Second, there are genuine factual disputes that the Court cannot resolve under Rule 56. The allegation that Ridley "failed to return" the three USB thumb drives, for instance, is false. When the Plaintiffs asked Ridley in February 2022 to return any of their devices that he still had, he searched his home, found the USB drives at the bottom of an old backpack, and quickly returned them.[41]

The iPhone allegation is similarly in dispute. Though the Plaintiffs arranged for Ridley to have an iPhone and paid for his cell phone plan during his employment, he received it directly from AT&T and used it as his personal phone.[42] Likewise, when he upgraded his phone over the years of his employment with the Plaintiffs, he was "never" required to "turn in" his old phone to the Plaintiffs.[43] And like all his coworkers who left the Plaintiffs' employment, Ridley kept his phone when he was terminated.[44] There is therefore proof from which a juror could conclude that Ridley's personal iPhone was a form of compensation, not company property that had to be returned when he left.

As for the alleged breach arising from Ridley's "failure to return" the WD drive, the proof shows that the drive belonged to Ridley, not the Plaintiffs.[45] And while the WD drive indeed once contained backups of Ridley's company-issued laptop, he returned that laptop to the Plaintiffs upon his termination.[46]

---

[41] Ridley Dep. at 345:14–351:16 (AJA-1021–27).

[42] *Id.* at 456:3–458:24 (JA-669–71).

[43] *Id.* at 451:6–18 (AJA-1028).

[44] *Id.* at 457:2–8 (JA-670).

[45] *Id.* at 74:4–76:6 (JA-525–27).

[46] *Id.* at 91:1–15 (JA-531), 446:5–20 (JA-665).

And third, even if there is no dispute that Ridley violated Paragraph 11 of the contract with respect to his return of the USB drives or his failure to "return" his personal cell phone and hard drive, the Plaintiffs' argument would still fail because there is a genuine dispute about whether Ridley substantially complied with Paragraph 11 of the contract despite his alleged conduct. Tennessee law dictates that "[w]here a party has substantially performed or complied with a contract," it will "ordinarily" be free from "liability for breach."[47] That result flows from long-standing equitable principles that place form over substance—as the Tennessee courts have recognized for over 100 years, a "technical breach which causes no [more] damages" than "literal compliance" with a contract or "slight differences" between a party's performance and the letter of a contract cannot "be taken advantage of" by a contracting party as a premise for litigation.[48] So long as "there has been no willful departure from the terms" of "and no violation of an essential point" in a contract, a parties' substantial performance will suffice.[49]

Here, Ridley returned three company USB drives upon the Plaintiffs' request for him to search for and return any of their property that he had, treated his personal cell phone just like every other one that the Plaintiffs had purchased for him, and kept his personal hard drive that,

_____

[47] *Hill v. Winnebago Indus.*, No. 3:17-cv-00678, 2018 U.S. Dist. LEXIS 187209, at *10 n.2 (M.D. Tenn. Nov. 1, 2018) (denying a party's summary-judgment motion because there was a disputed fact about whether an opposing party "substantially complied" with a contract).

[48] *Ivy v. Binswanger & Co.*, 214 S.W. 74, 78 (Tenn. 1919). *Cf. Farmers Mut. v. Atkins*, No. E2014-00554-COA-R3-CV, 2014 Tenn. App. LEXIS 847, at *30–32 (Tenn. Ct. App. Dec. 15, 2014) (noting that "substantial performance" of a contract exists where there is no "willful" violation of the contract and no violation of its "essential" terms and recognizing that a technical breach by a party in substantial compliance with a contract will not bar the party from recovering damages thereunder since there is no "material breach" of the contract).

[49] *Hill*, 2018 U.S. Dist. LEXIS 187209 at *10 n.2. *See also Anderson v. Amazon.com, Inc.*, 478 F. Supp. 3d 683, 694 (M.D. Tenn. 2020) (recognizing that the substantial-performance "standard applies in Tennessee" and noting that the nature of "what it was the parties bargained for" is relevant to the inquiry about whether a party substantially complied with a contract).

alongside with pictures and other personal documents, once had backups of files from a company-issued laptop that he had already returned to the Plaintiffs. The Plaintiffs claim no actual losses because of those alleged breaches but are instead seeking to "take advantage" of Ridley's conduct under the contract.

Whether to allow the Plaintiffs to do that or to instead recognize Ridley's performance as substantially in compliance with the parties' contract should therefore be for the jury to decide.

## C. There is a genuine dispute about whether Ridley transferred or stored the Plaintiffs' information on unauthorized devices and whether he "wiped" or "deleted" their data from company-issued devices.

The Plaintiffs claim that Ridley breached Paragraph 4 of the parties' contract, which bars employees from transferring the Plaintiffs' information to or storing it on unauthorized devices, dictates that employees conduct company business only on company devices, and prohibits employees from deleting that information from any company-issued device "before returning" it to the Plaintiffs. The proof that the Plaintiffs cite in support of that theory is varied, though it primarily hinges upon, (1) the allegation that Ridley "deleted" data from a company OneDrive account, (2) the allegation that Ridley placed company information upon an unapproved external hard drive (the WD drive), and (3) the allegation that Ridley deleted the Plaintiffs' information from the WD drive after he left their employment.[50]

That argument, like the one related to Paragraph 12 of the contract, fails under Rule 56 because it turns on disputed facts about Ridley's alleged breach. The WD drive that he utilized in

---

[50] The Plaintiffs also cite facts about Ridley's possession of three company USB drives and ChemTreat's communications with him about a "business plan" as support for this claim. But they have not explained how or to what extent those facts have anything to do with Ridley's contractual duties related to transferring company information to unauthorized devices or deleting data from company devices before returning them. Further, the "business plan" contained only ChemTreat's business information, not the Plaintiffs'. JE-6 at JA-10, JE-7 at JA-11–13, Ridley Dep. at 293:11–23 (JA-598), 298:3–16 (JA-603); Cissell Dep. at 106:9-107:1 (JA-284–85).

backing up his company laptop years ago was not unauthorized. Rather, he backed up files to that drive because that is want his employer wanted—the Plaintiffs "preferred" their employes to back up their work computers on external hard drives and "encouraged" them to do so.[51] Since the Plaintiffs had not provided him with a company issued LaCie drive yet, he used a hard drive that he bought instead.[52]

Likewise, there is a dispute about whether Ridley "deleted" anything on his OneDrive account as the Plaintiffs claim. The DLP report—which the Plaintiffs themselves generated—shows that Ridley did not delete any files from the Plaintiffs' system before he left to join ChemTreat.[53]

The Plaintiffs have also ignored the fact that when Ridley backed up files to the WD drive for storage, he did so before he signed the contract that they now rely upon. Until September 2020, Ridley was employed by Nalco, and his employment was governed by a separate contract that he signed in 1999.[54] That contract did not contain a provision like Paragraph 4 that barred him from transferring information to any types of devices for storage.[55] So even if the WD drive was "unauthorized"—and, again, it was not—his decision to transfer and store information on that device before September 2020 would not be actionable. And since he testified that the last time he used the WD drive for storing Ecolab or Nalco related files was in the first half of 2020,[56] there is evidence from which a juror could conclude that he did not breach the 2020 contract.

_____

[51] Ridley Dep. at 74:12–76:12 (JA-525–27).

[52] *Id.*

[53] Garza Dep. at 155:3–156:6 (JA-441–JA-442).

[54] 1999 Employment Contract (AJA-995–96).

[55] *Id.*

[56] Ridley Dep. at 59:7–17 (JA-517), 91:1–15 (JA-531), 448:4–15 (JA-667).

Ridley's deletion of old work-related data from his WD drive is similarly outside the scope of Paragraph 4. The language regarding deletion of data in that paragraph contemplates only devices that Ridley would be "returning" to the Plaintiffs.[57] But the 2020 contract obligated Ridley to return devices only if they were "Company property."[58] The WD drive was not the Plaintiffs' device but was instead Ridley's personal property.

But even if any of that conduct technically violated the terms of Ridley's 2020 contract, there would still be a question about how material that violation was and whether he substantially performed. Ridley backed up work-related computer files per his employer's encouraged practice even though his employer had yet to provide him with a device to do so, and then stopped doing that before he signed a contract that restricted his business activity to company-issued devices only. And since he was not supposed to "return" that personal device to the Plaintiffs, he deleted what old information remained on it after his employment ended.

Those facts, coupled with the absence of any proof that the Plaintiffs have suffered any actual losses from Ridley's alleged breaches, create a jury question over whether his performance substantially complied with the contract.

## D. There is no undisputed proof that Ridley "used" or "disclosed" the Plaintiffs' "confidential information" in violation of his contract.

Though the Plaintiffs have moved for summary judgment on their claim that Ridley breached a contractual bar against the "use" or "disclosure" of "confidential information," they have provided insufficient proof that any of the information they refer to was protectible as "confidential" or that Ridley "used" or "disclosed" it. The "confidential" information they cite in their brief is

---

[57] 2020 Employment Contract at ¶ 4 (JA-6).

[58] 2020 Employment Contract at ¶ 11 (JA-8).

identified only broadly, either by generic categories such as "financial data" or "financial plans" or by nondescript vagaries like "files" and "documents." And the allegations of "use" and "disclosure" are simply absent—nowhere do they claim to possess evidence of Ridley using any of the alleged trade secrets or disclosing them to anyone. Those failures are fatal to their motion.

1. **The Plaintiffs' "confidential" information is only protectable to the extent it qualifies as "trade secrets," but they have failed to identify that information with the particularity required by law or prove that it is in fact a trade secret.**

Before Tennessee's General Assembly adopted any version of the Uniform Trade Secrets Act, Tennessee courts conflated "the terms 'trade secret' and 'confidential information'" and used them "interchangeably" in their jurisprudence.[59] That meant that bald assertions of "confidentiality" in contracts like the one between the Plaintiffs had Ridley sign would not suffice to create a legally protectable interest. Instead, "confidential business information such as customer lists, knowledge of the buying habits and needs of particular clients, and pricing information, was protectable" in Tennessee courts "only to the extent that it satisfied the" common-law "definition of a trade secret."[60]

That conflation of "confidential business information" and "trade secrets" survived the passage of the Uniform Act.[61] So even now, "the terms 'trade secret' and 'confidential information' as used in Tennessee case law are synonymous for all practical purposes . . . ."[62] And that still means that under Tennessee common law, "confidential business information is only protectible to the

---

[59] *Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 Tenn. App. LEXIS 55, *37–38 (Tenn. Ct. App. Jan. 28, 2010).

[60] *Id.*

[61] *Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 Tenn. App. LEXIS 685, *15 (Tenn. Ct. App. Aug. 25, 2015). *Accord Wachter, Inc,* 387 F. Supp. 3d at 845–46.

[62] *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 26 F. Supp. 2d 1029, 1031 (M.D. Tenn. 1998); *supra*, Sec. C.2.

extent that it qualifies as a trade secret."[63]

In practice, then, employers cannot "mechanically recite the phrase" "trade secrets" or "confidential information" in contracts and expect automatic protection.[64] They must instead confront the reality that "trade secrets are made up of confidential information, and confidential information will only be subject to protection to the extent it qualifies as a trade secret . . . ."[65] And that is true "even where a former employee signs a contract promising never to divulge confidential information . . . ."[66]

To succeed on their contract claim as a matter of law, then, the Plaintiffs must first identify the "confidential" information at issue with "reasonable particularity,"[67] which requires more than "indefinite illustrations," "general categories of alleged 'trade secrets' information," or lists of "software" or "processes that a plaintiff developed, owned, or licensed."[68] A claimant must instead "identify what information is known to the trade and which is not" by "provid[ing] concrete

---

[63] *Hickory Specialties, Inc.*, 26 F. Supp. 2d at 1031.

[64] *Id.* at 1032.

[65] *Id.*

[66] *Id.*

[67] *Id.*; *Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*, No. 3:19-CV-508-CEA-JEM, 2022 U.S. Dist. LEXIS 241013, at *5–6 (E.D. Tenn. July 13, 2022) (noting that plaintiffs who claim "that all information in or about its [product] is a trade secret" are prosecuting cases that are "both too vague and too inclusive" to go to a jury); *SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. 20-2970, 2021 U.S. Dist. LEXIS 249750, at *31 (E.D. La. May 28, 2021) (confirming that "on summary judgment, it is appropriate to require the plaintiff to identify its trade secrets with greater particularity than in its complaint").

[68] *SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. 20-2970, 2021 U.S. Dist. LEXIS 249750, at *31 (E.D. La. May 28, 2021) (confirming that "on summary judgment, it is appropriate to require the plaintiff to identify its trade secrets with greater particularity than in its complaint"); *Capricorn Mgmt. Sys. v. Gov't Emples. Ins. Co.*, No. 15-cv-2926 (DRH)(SIL), 2019 U.S. Dist. LEXIS 123723, at *53-56 (E.D.N.Y. July 22, 2019).

information that 'clearly refer[s] to tangible trade secret material.'"[69]

And once they have properly identified the alleged trade secrets at issue, claimants must then prove that the information at issue qualifies for protection under Tennessee law. That burden requires claimants to show that the information is (1) secret, (2) business related, and (3) afforded the employer a competitive advantage.[70] The types of evidence relevant to that showing include proof of "the extent to which the information is known" to outsiders, "the extent to which it is known by employees and others involved in [the] business," the efforts that a company takes to keep the information secret, the "value of the information," the money and resources a company expends to develop it, and the "ease or difficulty" of duplicating the information.[71]

The Plaintiffs have not done any of that in their motion. Among the 12 "undisputed facts" that the Plaintiffs cited to support their allegation of a breach of Paragraph 2 of the parties' contract, only one references specific allegedly "confidential" information that Ridley allegedly "used" or "disclosed"—his contacts list from Microsoft Outlook. The rest of the references to "used" or "disclosed" documents in those "facts" range from nonspecific categories of information that Ridley allegedly "received" but that are not tied to any customer, employee, date, or content set—"Fact Packs," "programs," "financial data," "financial plans," a "list of customers," "purchasing patterns," "pricing," and "customer contacts"—to wholly generic descriptors like "files" and "documents."[72] Those are exactly the kind of vague, non-specific categories that courts flatly reject as

---

[69] *SMH Enters.*, 2021 U.S. Dist. LEXIS 249750 at *31; *Source Prod. & Equip. Co.*, 2019 U.S. Dist. LEXIS 168365 at *19–20.

[70] *Hickory Specialties, Inc.*, 26 F. Supp. 2d at 1032.

[71] *Venture Express v. Zilly*, 973 S.W.2d 602, 607 (Tenn. Ct. App. 1998) (finding that a company's "customer rates did not constitute confidential information").

[72] Doc. 264 at Page ID # 6639–42 (¶¶ 18, 19, 23, 25, 32, 33, 34, 36, 37, 41, 42, 44), 6645 (citing those 12 statements of "fact" as the basis for summary judgment on its claim that Ridley breached

insufficient under the reasonable particularity standard.[73]

Regardless, though, even if the Plaintiffs had identified the trade secrets at the heart of the Rule 56 motion with "reasonable particularity," their argument would still fail because they have not provided the Court with sufficient proof that any of the information qualifies as a "trade secret." None of the 12 paragraphs they cited provide the Court with any facts, undisputed or otherwise, about outsiders' and employees' knowledge of the information at issue, the measures that the Plaintiffs took to keep any of the information a secret, the information's value, the cost that they incurred in developing the information, or the effort that would be required to duplicate it.[74] Without that evidence, the Plaintiffs cannot prove as a matter of law that any of the information they reference to support their position is protectable as "confidential."

The Plaintiffs may try to skirt their evidentiary failure by alleging as a "fact" that Ridley "admitted" that he "received" "trade secrets" while in their employment.[75] But that is not true. The

<hr>

Paragraph 2 of the contract).

[73] *Capricorn Mgmt. Sys.*, 2019 U.S. Dist. LEXIS 123723 at *53–56; *SMH Enters.*, 2021 U.S. Dist. LEXIS 249750 at *31–32; *X6D Ltd. v. Li-Tek Corps. Co.*, No. CV 10-2327-GHK (PJWx), 2012 U.S. Dist. LEXIS 207418, at *21–24 (C.D. Cal. Aug. 27, 2012). The lone exception to that failure—the Outlook contacts list—does not save the Plaintiffs' position. As Ridley confirmed in his deposition, most of the contacts on that list "were personal contacts." Ridley Dep. at 451:19–453:6 (AJA-1028–30). And the "customer contact information" among the contacts was the kind of "very basic information that" one could glean from sources like "a business card" or a call to a "receptionist at the company"—a contact's name, their company's name, "and a contact number and potential contact email." *Id.* Under Tennessee law, that type of information does not qualify as a "trade secret" and is therefore not protectable as "confidential" under the parties' contract. *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 645 (Tenn. Ct. App. 1999) (confirming that "because customer identities are not secret, they cannot be considered confidential" and citing past precedent where a court found that "customer lists, customer credit information, pricing information, and profit and loss statements did not constitute confidential information because such information is easily available from sources other than the employer").

[74] *Venture Express*, 973 S.W.2d at 607.

[75] Doc. 264 at Page ID # 6640 (¶ 25), 6645 (citing ¶ 25 as support for the proposition that Ridley breached Paragraph 2 of the parties' 2020 contract).

pages of Ridley's deposition that the Plaintiffs cite in support of that "fact" only reflect Ridley's testimony that he "at times" received information from the Plaintiffs that was in the "categories" of information they included in their contract's definition of "trade secrets."[76] In other words, they claim that Ridley "admitted" he received "trade secrets" because he admitted receiving information from categories that they themselves claimed to constitute trade secrets in their contract.

And even then, they failed to acknowledge the portion of that testimony that undermines their position. At the end of the discussion they cite, Ridley confirmed that the information the Plaintiffs unilaterally declared to be "trade secrets" included data that was in fact not secret:

> Q.      For any -- all that information
> that you just identified -- formulas,
> programs, financial data, list of customers,
> pricing, purchasing patterns, customers --
> was any of that information publicly
> available?
>                 MS. LUND:  Objection.
> BY MR. WALTON:
>         Q.      You can answer.
>         A.      Yes.[77]

**2.      The Plaintiffs have not proved that Ridley "used" or "disclosed" the allegedly confidential information they identified in support of their motion.**

If the Plaintiffs had carried their burden to prove as a matter of law that the information they accuse Ridley of taking was in fact a trade secret and therefore "confidential," their next task would

---

[76] Doc. 264 at Page ID # 6640 (¶ 25); Ridley Dep. at 30:4–33:23 (JA-505–08).

[77] Ridley Dep. at 33:14–23 (JA-508).

have been to show that he "used" or "disclosed" that information in violation of the contract.[78] Because those prohibitions—like the rest of ¶ 2—directly track state and federal statutes, their scopes are well established.

"Disclosure" occurs when a defendant does some unauthorized act "that enabled a third party to learn the trade secret."[79] And an unauthorized "use" occurs via "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant . . . ."[80] That means that "[m]erely copying trade secret information" without more "does not constitute 'use,'"[81] nor does "mere possession" of a secret that is "lawfully acquired."[82] Likewise, as another Tennessee District Court acknowledged, "the deletion of data" does not qualify as "use," either.[83]

Here, the 12 "facts" that the Plaintiffs cite to support their claim that Ridley breached Paragraph 2 of the contract contain no evidence of "use" or "disclosure." They claim that he

---

[78] 2020 Employment Contract at ¶ 2 (JA-5–6).

[79] *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) (*citing Restatement (Third) of Unfair Competition* § 40, cmt. c).

[80] *Agency Sols..Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1028 (E.D. Cal. 2011) (*quoting Restatement (Third) of Unfair Competition* § 40, cmt. c) (noting this "general" rule that equates use to exploitation resulting in damages to the owner even though there "are no technical limitations" of "use" in the governing statutes).

[81] *People Experts CA, Inc. v. Engstrom*, No. 2:17-cv-00318-KJM-CKD, 2017 U.S. Dist. LEXIS 154524, at *23 (E.D. Cal. Sep. 21, 2017) (noting that "copying" cannot constitute "use" "because copying does not affect the value of the trade secrets or otherwise enrich" a person who could already access them as part of their employment).

[82] *CMI Roadbuilding, Inc. v. SpecSys, Inc.*, No. CIV-18-1245-G, 2021 U.S. Dist. LEXIS 101527, at *31 (W.D. Okla. May 28, 2021). *See Camick v. Holladay*, 758 F. App'x 640, 645 (10th Cir. 2018) (recognizing that "an allegation that a defendant merely continues to possess a trade secret is not an allegation" that the person "disclosed" or "used" it).

[83] *Lifelinc Anesthesia, PLLC v. Wolfe*, No. 2:12-cv-02662-JPM-cgc, 2012 U.S. Dist. LEXIS 200321, at *5–6 (W.D. Tenn. Nov. 1, 2012) (dismissing a claim under the Tennessee Uniform Trade Secrets Act to the extent that it was premised upon a party's "act of deleting the [allegedly secret] data from" a company-issued "laptop and cell phone" because "the deletion of data is not covered by TUTSA's definition of 'misappropriation'").

"downloaded," "accessed," "failed to return" information, most of which the Plaintiffs fail to identify beyond the words, "documents" or "files."[84] But nowhere do they cite evidence that Ridley exploited the alleged trade secrets in a way that profited him or injured the Plaintiffs, and nowhere do they cite evidence that he facilitated ChemTreat's or anyone else's acquisition of or exposure to that information.[85]

### E. The Plaintiffs cannot obtain summary judgment on their claim that Ridley breached Paragraph 12 of the contract because they did not plead that claim and because it hinges upon disputed facts.

The Plaintiffs argued that they are entitled to summary judgment on a claim that Ridley breached Paragraph 12 of the parties' contract. That provision dictates that, during "any proceeding alleging breach" of contract, the Plaintiffs are permitted to have "forensic examinations" of Ridley's computers or other "electronic devices" that they "reasonably believe" to contain their "confidential information."[86] And Ridley's alleged breach of that provision is supported by a single "fact"—Ridley "refused to produce the WD Drive for inspection" when the "Plaintiffs requested it" during discovery.[87]

That argument fails on its face because the "claim" for which the Plaintiffs seek judgment does not exist. Nowhere in their Third Amended Complaint—which the Plaintiffs filed months after the discovery dispute over the WD drive—do the Plaintiffs allege that Ridley's discovery conduct constituted a breach of contract or that Ridley violated Paragraph 12 of the contract for

---

[84] Doc. 264 at Page ID # 6639–42 (¶¶ 23, 32, 36, 37, 41, 42, 44), 6645 (citing those seven paragraphs to support the claim that Ridley breached the confidentiality provision of the contract).

[85] *See also* Ridley Dep. at 123:13–124:6 (JA-540–41) (testifying that upon finding work-related files on his WD drive after leaving the Plaintiffs' employment, he deleted them and did not disclose or send them to anyone).

[86] 2020 Employment Contract at ¶ 12 (JA-8).

[87] Doc. 264 at 6642 (¶ 47), 6645 (citing ¶ 47 as the sole basis for summary judgment on this issue).

any reason. For that reason alone, the Court should deny the Plaintiffs of the relief they seek.[88]

Even if that claim existed, though, the Plaintiffs' argument would fail because it is premised upon a mischaracterization of fact. In February 2023, the Plaintiffs demanded for the first time to inspect and receive "forensic images" of a host of items: Ridley's "personal cell phone," any "personal computer" that he uses in his household," his "personal email accounts" and file-storage accounts, any "personal devices" Ridley had used to communicate with the parties' employees or customers, any "external storage device" Ridley had used in the past three years, and the WD drive.[89]

Given the extreme scope of that request, Ridley objected. He addressed the entirety of the Plaintiffs' request in his objection, but with respect to the WD drive specifically, he argued that the request was overly broad, disproportionate to the Plaintiffs' needs, and that the request for unfettered access was problematic given the amount of unrelated, personal information on the drive.[90]

The parties went back and forth, and Ridley offered to have a "neutral third-party forensic examiner" create images of the WD drive, search it for the Plaintiffs' information, and create a report of their findings.[91] But the Plaintiffs rejected that proposal and, four days before the close of discovery, moved the Court to compel the inspections they sought.[92] Ridley restated his position in a response, and the Plaintiffs replied. But in their reply, they considerably narrowed the scope

---

[88] *Wolfe*, 2014 U.S. Dist. LEXIS 138326 at *29–30 (confirming that courts should not a court to grant judgment on an unpleaded claim or a "new theory raised for the first time at the summary judgment stage" and noting that since a Rule 56 movant did not "amend his complaint to include" the new claim, it was "not properly before the Court").

[89] Doc. 225-4.

[90] Doc. 225-5 at Page ID # 4032–33, 4037–38.

[91] Doc. 225-11.

[92] Doc. 225.

of what they were requesting—instead of broadly seeking inspections and forensic images of almost any computer or electronic device that Ridley owned or accessed, now they claimed that they only sought inspection of the WD drive.[93] And the Court ultimately granted that request and allowed the Plaintiffs to inspect the drive using a protocol that the parties were to agree upon.[94]

Ridley therefore did not simply "refuse" to allow an inspection of the WD drive as the Plaintiffs state in support of their motion. Rather, he objected to an overbroad discovery request that the Plaintiffs ultimately abandoned and offered instead to allow inspection and imaging of the drive by a neutral third party. That creates a jury issue over whether the parties' discovery dispute resulted in a breach. So even if this allegation of breach was a pending claim in this lawsuit, the Plaintiffs would not be entitled to summary judgment.

**F.** **The Plaintiffs' damages disclosure did not include damages for breach of contract, and their claim for attorneys' fees should not satisfy the essential element of damages for breach of contract.**

The Plaintiffs cite two things that they claim satisfy the essential element of damages for their contract claim. First, they cite a damages report by an economic expert,[95] and second, they claim that the existence of a fee provision in the parties' contract relieves them of proving that they sustained some form of harm resulting from Ridley's alleged violations of the contract.[96] Both arguments fail.

The expert report that the Plaintiffs cite does not encompass their breach-of-contract claim. It instead purports to compute damages only for the Plaintiffs' statutory trade-secrets claims and

---

[93] Doc. 246 at Page ID # 4928–29.

[94] *Id.* at Page ID # 4931–33.

[95] Doc. 264 at Page ID # 6645 n.2.

[96] *Id.* at Page ID # 6645–46.

for their fiduciary-duty claim.[97] Therefore those damages are irrelevant to the contract claim.

Their argument based upon attorneys' fees is also misplaced. It is well established in Tennessee that damages are an essential element of contract claims.[98] That essentiality stems from the very function of a contract claim—"to place the injured party in the same position it would have been in had the contract been fully performed."[99] Duly, the lone fact of a party's violation of "a contract does not entitle the other party to an award of damages."[100] The party must first "sustain damages that consequently result from" the violation. If a party was entitled to recover damages notwithstanding the absence of loss, the party would "profit from the breach or be placed in a better position than had the contract been fully performed," which is impermissible under Tennessee law.[101]

Contract damages in Tennessee are therefore "only" for "persons who have actually sustained an injury or who have suffered an actual loss."[102] Without proof of those losses, "there can be no award of damages."[103]

_____

[97] JA-809–21. In fact, the Plaintiffs have disclosed no damages computation for their contract claim, either in their expert's report or their Rule 26 disclosures. JA-692.

[98] *Kindred v. Nat'l Coll. of Bus. & Tech., Inc.*, No. W2014-00413-COA-R3-CV, 2015 Tenn. App. LEXIS 124, at *15–16 (Tenn. Ct. App. Mar. 19, 2015) (perm. app. denied by 2015 Tenn. LEXIS 659 (Tenn., Aug. 13, 2015)).

[99] *Metro. Gov't of Nashville & Davidson Cty. v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 35 (Tenn. Ct. App. 2005) (perm. app. denied by 2006 Tenn. LEXIS 380 (Tenn., May 1, 2006)).

[100] *Id.*

[101] *Id.*

[102] *Custom Built Homes v. G. S. Hinsen Co.*, Appeal No. 01A01-9511-CV-00513, 1998 Tenn. App. LEXIS 89, at *10 (Tenn. Ct. App. Feb. 6, 1998). *See Kindred*, 2015 Tenn. App. LEXIS 124 at *19 (recognizing that contract damages are the "payment in money for actual losses" of the non-breaching party).

[103] *Kindred*, 2015 Tenn. App. LEXIS 124 at *19.

The Plaintiffs have not met that standard with the certainty required for relief under Rule 56, nor have they tried to. Instead, they argue that their lack of actual loss is irrelevant because the parties' contract contains a fee provision that entitles them to fees if they prevail in litigation over the enforcement of Ridley's 2020 employment contract.

But the lone authority they cite to support that position is very different from this case. The court in *HCTec Partners, LLC v. Crawford* indeed confirmed a fee award under a contract for a party who had sustained no monetary damages. But that party's entitlement to a fee under a contract hinged upon its substantive success. As the court recognized, the "touchstone of the prevailing party inquiry" for the purposes of a contractual attorneys' fees entitlement "must be the material alteration of the legal relationship of the parties."[104]

And in that case, the plaintiff indeed materially altered the parties' relationship to its benefit. It had proved not only that a former employee breached noncompetition and nondisclosure covenants in a contract, but that the former employee's conduct would immediately and irreparably harm it without injunctive relief.[105] The lack of monetary damages was therefore immaterial.

That result squared with the lone precedent that the *HCTec* court cited where another court awarded fees under a contract's fee provision absent other monetary damages. In *Otter's Chicken Tender, LLC v. Coppage*, the court also addressed a fee award to a prevailing party who obtained an injunction to enforce non-disclosure and noncompetition provisions in a contract.[106] The court in that case recognized that the "practical effect of having the temporary restraining order and

---

[104] *HCTec Partners, LLC v. Crawford*, No. M2020-01373-COA-R3-CV, 2022 Tenn. App. LEXIS 69, at *44 (Tenn. Ct. App. Feb. 24, 2022).

[105] *Id.* at *9–21.

[106] *Otter's Chicken Tender, LLC v. Coppage*, No. M2010-02312-COA-R3-CV, 2011 Tenn. App. LEXIS 347, *18–19 (Tenn. Ct. App. June 27, 2011).

temporary injunction issued was to alter the defendant's behavior."[107] As such, the "plaintiff [was] entitled to recover fees to the extent plaintiff prevailed in securing injunctive relief enforcing the non-disclosure and non-competition provisions" in the contract that contained the fee provision.[108]

The Plaintiffs' position in this case is far different. They have not received an injunction against Ridley, and they have not moved for that relief in their motion. But given they have not claimed any actual loss or harm on account of Ridley's conduct, let alone harm that is immanent or irreparable, their failure to move for an injunction is understandable.

Instead, they are doing exactly what Tennessee courts roundly forbid. They are seeking contract damages not for an "actual injury" or an "actual loss" that they sustained because of Ridley's alleged breach—they have no proof that those injuries or losses exist—but for damages that they sustained solely because they chose to sue him. That is not sufficient to demonstrate the damages element of their contract claim under Rule 56.

**G. Ridley's claim for fees under the state and federal trade-secrets statutes is indeed not yet ripe, but if it were, it would survive summary judgment because there is proof from which a jury could find bad faith.**

The Plaintiffs are correct in their assessment of the ripeness of Ridley's claim for attorneys' fees. Courts in multiple jurisdictions have confirmed that fee claims under state and federal trade-secrets statutes "do not ripen until one or another of the parties becomes the 'prevailing party."[109]

---

[107] *Id.*

[108] *Id.*

[109] *Capital Inv., Inc. v. Williams*, No. 1:20-CV-3224-LMM, 2021 U.S. Dist. LEXIS 263630, at *20-21 (N.D. Ga. June 15, 2021) (opining that successful litigants may move for fees under Rule 54(d) and collecting cases from the Fourth and Eleventh Circuits; *Elias Indus. v. Kissler & Co.*, No. 2:20-CV-01011-CCW, 2022 U.S. Dist. LEXIS 57370, at *18–19 (W.D. Pa. Mar. 29, 2022) (reasoning that fee requests under trade-secrets statutes "should be made through a motion" after the finder of fact determines the prevailing party); *Lamb v. Dobson Cellular Sys.*, No. 2005-CA-001219-MR, 2006 Ky. App. Unpub. LEXIS 1232, at *8 (Ky. Ct. App. May 19, 2006) (confirming that "the proper procedure is for a successful party to move for attorney's fees after receiving a

The Court therefore need not consider the matter further until after the trial when, if successful, Ridley may move for fees.

However, to the extent that the Court finds the issue ripe for consideration now, it should know that the premise of the Plaintiffs' substantive argument—that their misappropriation claim's survival at the Rule 12 stage bars Ridley's bad-faith claim "as a matter of law"—is unsupported by the lone precedent they cite. The Fourth Circuit Court of Appeals in *Akira Technologies, Inc. v. Conceptant, Inc.*, indeed affirmed a trial court's refusal to grant fees under the bad-faith provision of trade secrets statutes.[110] But the trial court in that case did not reject the fee claim because a claimant's survival of a Rule 12 motion forecloses the possibility of bad faith "as a matter of law" as the Plaintiffs imply. Rather, the trial court denied the fee claim because, after reviewing the case's "extensive record" under a "clear-and-convincing-evidence standard" after "the close of discovery," it found that the "record evidence" demonstrated that the claimant "had at least some chance of success."[111] Nowhere in its decision did the *Akira* court equate plausibility under Rule 12—which has nothing to do with the weight of the "record evidence" under any evidentiary standard[112]—with an absence of bad faith.

And as for the Plaintiffs' brief argument that the undisputed facts negate Ridley's fee claim, that, too, is insufficient. The Plaintiffs did not discuss or even refer to the legal standard governing

---

favorable judgment on a Uniform Trade Secrets Act claim").

[110] *Akira Techs., Inc. v. Conceptant, Inc.*, 773 F. App'x 122, 126 (4th Cir. 2019).

[111] *Id.*

[112] *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009) (confirming that "Rule 12(b)(6), besides some minor exceptions, does not permit courts to consider evidence extrinsic to the pleadings"); *Stratienko v. Chattanooga-Hamilton Cty. Hosp. Auth.*, No. 1:07-CV-258, 2009 U.S. Dist. LEXIS 21683, at *6 (E.D. Tenn. Mar. 17, 2009) (recognizing that when a court adjudicates "a motion to dismiss, the question is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his claims").

Ridley's claim but instead simply offer four sentences with "facts" that apparently defeat the possibility of a bad-faith finding. Three of those sentences are unaccompanied by any citation to the record. And the fourth simply asserts that Ridley backed up his Nalco laptop on the WD drive.

That argument falls far short of the Rule 56 standard, which requires the Court to view the evidence in a light favorable to Ridley and allows summary judgment only if the Plaintiffs prove their position "so clearly that no rational jury could have found to the contrary."[113]

But even aside from the Plaintiffs' shortcomings, Ridley has ample evidence from which a jury could find in his favor on the fee issue. Ridely can succeed so long as there is proof from which a jury could find that the Plaintiffs' misappropriation claim is "objectively specious" and that the Plaintiffs either filed or "maintained" the claim with bad faith.[114] That type of proof may take many forms, and courts tasked with reviewing fee requests in trade-secrets cases consider a host of factors.[115]

For example, in *Degussa Admixtures, Inc. v. Burnett*, the Sixth Circuit Court of Appeals affirmed a district court's fee award in a trade secrets case where a plaintiff maintained a trade-secrets suit against a former employee despite having "no direct evidence" that the employee "had used, or was threatening to use," their "alleged trade secrets."[116] The plaintiff tried to save itself with the theory that the defendant's "new employment" with a competitor would "inevitably lead him to rely on or disclose" trade secrets, but it could not even establish the minimum proof that

---

[113] *Snyder*, 580 F. App'x at 461.

[114] *Wyndham Vacation Resorts, Inc. v. Timeshare Advocacy Int'l, LLC*, No. 3:10-cv-1028, 2013 U.S. Dist. LEXIS 4039, at *10–13 (M.D. Tenn. Jan. 10, 2013).

[115] *Id.*; *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 536 (6th Cir. 2008) (noting that trial judges may "make factual findings in accordance with his or her own view of the evidence" when deciding whether to award fees under the Uniform Trade Secrets Act).

[116] *Degussa*, 277 Fed. Appx. at 534.

would have been required to argue that theory—it had only proved that the defendant "had knowledge of its alleged generalized trade secrets" such as "prices, margins, customers," "marketing strategies," and the like, which was not enough.[117]

Under the applicable standard, there is enough proof supporting Ridley's bad-faith claim to pass muster under Rule 56. The Plaintiffs have no proof that Ridley used or disclosed their alleged trade secrets, they have not identified their alleged trade secrets with sufficient particularity, they have identified no customers that they have lost because of Ridley's conduct, and they have no proof that they have suffered any actual loss or damages as a result of Ridley's alleged misappropriation. Despite that, the Third Amended Complaint that the Plaintiffs filed just before the close of discovery contains repeated allegations that Ridley "took" their "trade secrets" to ChemTreat, that he "used" or "disclosed" them, that they have suffered "irreparable" harm, and that they should recover "actual damages" like "lost profits."[118]

Ridley should be allowed to present that evidence in full if he prevails on the Plaintiffs' statutory trade-secrets claims.

## IV. Conclusion

The Plaintiffs have not met their burden under Rule 56. There are material disputed facts surrounding the Plaintiffs' claim for breach of contract, and there are multiple legal deficiencies in their claims—whether pleaded or unpleaded—that prevent the Court from adjudicating Ridley's alleged breach as a matter of law.

The Court should therefore deny the Plaintiffs' motion.

---

[117] *Id.*

[118] Doc. 229 at Page ID # 4506, 4525–30, 4544.

Respectfully Submitted:

**Patrick, Beard, Schulman & Jacoway, P.C.**

By: /s/ *Lance W. Pope*
　　　Lance W. Pope, BPR No. 025054
　　　Jeremy M. Cothern, BPR No. 027116
　　　537 Market Street, Suite 300
　　　Chattanooga, TN  37402
　　　(423) 756-7117 – phone
　　　(423) 267-5032 – fax
　　　lpope@pbsjlaw.com
　　　jcothern@pbsjlaw.com

## Certificate of Service

I certify that on June 15, 2023, this document has been served upon all the parties via the Court's ECF system.

By: /s/ *Lance W. Pope*