THIS PAGE WAS
FILED UNDER SEAL

THIS PAGE WAS
FILED UNDER SEAL

AJA-993

THIS PAGE WAS
FILED UNDER SEAL

AJA-994

THIS PAGE WAS
FILED UNDER SEAL

# EMPLOYMENT AGREEMENT
## NALCO CHEMICAL COMPANY

*THIS AGREEMENT* made and entered into by and between

**Anthony Lee Ridley, Jr.**

(hereinafter called "Employee") and Nalco Chemical Company, a Delaware corporation with its principal office in Illinois, (hereinafter called "Nalco").

*WITNESSETH*

*WHEREAS*, Employee is being employed by Nalco and occupies a trusted position whereby he is enabled to obtain confidential information concerning the business of Nalco as well as confidential information concerning the business of Nalco affiliates, subsidiaries, prospective customers, customers, consultants, licensees and other business associates (hereinafter collectively called "Third Parties"), including customer lists, sales and service data, trade secrets and other confidential information concerning the processes, products and activities of Nalco and Third Parties; and

*WHEREAS*, Employee may during his employment make or acquire interests in inventions as herein defined; and

WHEREAS, Employee represents that his training and experience have been such that he earn a livelihood through employment by commercial firms which do not compete with Nalco; and

*WHEREAS*, Nalco and Employee agree that the covenants and agreements hereinafter set forth are a part of Employee's employment.

*NOW, THEREFORE*, in consideration of Employee's employment and payment of compensation by Nalco, and in view of Employee's trusted position with Nalco, it is agreed as follows:

1. During his employment by Nalco, Employee shall devote all his time and attention and give his best efforts and skill exclusively to the interests of Nalco during reasonable business hours and shall perform such services for Nalco as may from time to time be assigned to him. Employee shall in all respects use his best efforts to conserve and promote the best interests and welfare of Nalco.

2. Employee shall not, directly or indirectly, under any circumstances or at anytime, either during his employment by Nalco or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of or incident to his employment, relating to or regarding any inventions, discoveries, improvements, devices, processes, products, formulae, designs, projects, mixtures and/or compounds, whether patentable or not, (hereinafter collectively called "technical information") that may have been, are now, or may hereafter during the term of his employment by Nalco be made, used, devised, considered or investigated by or for Nalco or Third Parties, and he will at all times keep and hold inviolate said technical information, the Employee hereby agreeing that all the foregoing has been and shall be received by him as confidential communications, provided, however, that the obligations of this paragraph shall not apply in the event and to the extent that the afford matters are or become generally known to and available for use by the public otherwise than by the act or omission of Employee, except that Employee shall in no event, at any time without Nalco's consent, disclose any identity or correlation between

matters publicly known and available and Nalco's technical information or said Third Parties' technical information.

3. Employee shall not, directly or indirectly, under any circumstances or at any time, either during the term of his employment or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent:

   (a) any information acquired by him in the course of or incident to his employment relating to or regarding the names of customers of Nalco or Third Parties, the sales or service data of Nalco or Third Parties, furnished to him or by him in the course of his employment, or any data or information concerning the business or activities of Nalco or Third Parties; or,

   (b) any computer software owned by Nalco or licensed by Nalco from a Third Party, or any computer access codes belonging to Nalco or a Third Party.

4. All property of Nalco including but not limited to identification cards, keys, office equipment, books, laboratory notebooks, credit cards, customer lists, sales and service manuals and data and all other writings, records and documents made by or coming into the possession of employee in the course of or incident to his employment, concerning any of the matters referred to in paragraphs 2, 3 or 6 of this agreement or otherwise concerning the business or activities of Nalco or Third Parties, shall be returned to Nalco upon termination of employee's employment or on request of Nalco at any other time.

5. Employee will not, directly or indirectly, during his employment and for a period of two (2) years immediately after termination of his employment:

   (a) engage or assist in the same or any similar line of business competing with the line of business now or hereafter conducted or operated by Nalco during the term of Employee's employment by Nalco, whether as consultant, employee, officer, director, or representative of such competing business within the United States of America; provided, however, that in the event that the Employee's position with Nalco immediately prior to termination is that of field representative, then the geographic area of this non-competition covenant shall be limited to that geographic area within the United States of America for which Employee was responsible at any time during the two-year period immediately preceding termination; and,

   (b) alone or in concert with others, employ or attempt to employ, induce, or solicit for employment in the same or any similar line of business now or hereafter conducted or operated by Nalco during the term of Employee's employment by Nalco, other employees of Nalco;

   provided further that in the event that any court of competent jurisdiction shall find that the above restrictions are unreasonable with respect to their territorial extent and/or period of time involved, that such finding shall not invalidate any of the foregoing provisions with respect to the territorial extent or period of time which is reasonable, and said restrictions shall be construed to apply only to the territory and period of time so found to be reasonable by said court.

CONFIDENTIAL

PLAINTIFFSR-000000150

6.  Employee will communicate and disclose in writing to his superior in Nalco or to such person as may be designated by Nalco both during his employment and thereafter, all of those inventions, discoveries, improvements, machines, devices, designs, processes, products, software, treatments, formulae, mixtures and/or compounds whether patentable or not as well as patents and patent applications (all the foregoing being hereinafter collectively called "inventions") made, conceived, developed or acquired by Employee or under which he acquired the right to grant licenses or become licensed, whether alone or jointly with others, during his employment by Nalco. All his right, title and interest in, to and under such inventions, including licenses and right to grant licenses shall be the sole property of Nalco and Employee hereby assigns and agrees to assign the same to Nalco. Any invention disclosed by Employee to anyone within one (1) year after termination of his employment with Nalco, which relates to any matters pertaining to, applicable to, or useful in connection with, the business of Nalco shall be deemed to have been made or conceived or developed by Employee during his employment by Nalco, unless proved to him to have been made and conceived and developed after termination of his employment with Nalco.

7.  As to all such inventions as defined in paragraph 6, employee will, upon request of Nalco, during his employment or thereafter:

    (a)  execute and deliver all documents which Nalco shall deem necessary or appropriate to assign, transfer and convey to Nalco, all his right, title, interest in and to such inventions, and enable Nalco to file and prosecute applications for Letters Patent of the United States and any foreign countries on inventions as to which Nalco wishes to file patent applications, and,

    (b)  do all other things (including the giving of evidence in suits and other proceedings) which Nalco shall deem necessary or appropriate to obtain, maintain, and assert patents for any and all such inventions and to assert its rights in any inventions not patented.

8.  Employee's obligation under paragraphs 6-7 does not apply to inventions for which no equipment, supplies, facility or trade secret information of Nalco was used, and which were developed entirely on the employee's own time unless:

    (a)  the inventions relate
        (i) to the business of Nalco or,
        (ii) to Nalco's actual or demonstrably anticipated research or development; or,
    (b)  the inventions result from any work performed by the employee for Nalco.

9.  Employee hereby assigns to Nalco the copyright in all works prepared by Employee which are either:

    (a)  within the scope of his employment; or,
    (b)  based upon information acquired from Nalco not normally made available to the public; or,
    (c)  commissioned by Nalco not within Employee's scope of employment.

    Employee agrees to submit all such works to his Nalco Supervisor for approval prior to publication or oral dissemination.

10.  Employee hereby releases and allows Nalco to use, for any lawful purpose, any voice reproduction, photograph, or other video likeness of employee made in the scope of his employment.

11.  All expenses incident to any action required by Nalco or taken in its behalf pursuant to the terms of this agreement shall be borne by Nalco, including a reasonable payment for Employee's time and expenses involved in case he is not then in Nalco's employ, which payment for his time shall in no event amount to more than double his salary for a similar period of time at the rate being paid to such Employee by Nalco at time of termination of his employment.

12.  It is expressly understood and agreed that the covenants, agreements and restrictions undertaken by or imposed on Employee hereunder, which are stated to exist or continue after termination of Employee's employment with Nalco shall exist and continue irrespective of the method or circumstances of such termination.

13.  Employee and Nalco agree that if any of the covenants agreements or restrictions on the part of Employee are held to be invalid by a court of competent jurisdiction, such holding will not invalidate any of the other covenants, agreements and/or restrictions herein, it being intended that the covenants, agreements and/or restrictions herein contained shall be severable and that the invalidity of one shall not invalidate any others.

14.  Employment with Nalco Chemical Company is contingent upon the signing of this Employment Agreement.

15.  This Agreement and its terms are applicable from the date the Employee's employment with Nalco began. It is understood and agreed to by both Employee and Nalco that this Agreement does not create or provide for any period of employment of Employee by Nalco, that said employment of Employee shall be at-will and said employment can be terminated with or without cause, and with or without notice, at any time by either Employee or Nalco.

16.  As used herein, in case of female Employees signing this Agreement the masculine shall mean the feminine. The references herein to affiliates of Nalco mean corporations, domestic or foreign, more than twenty-five per cent (25%) of whose voting stock is owned directly or indirectly by Nalco.

17.  This Agreement shall inure to the benefit of the successors and assigns of Nalco. Insofar as the same may be applied thereto the terms and provisions hereof shall apply to and bind Employee's heirs, legal representatives and assigns.

*IN WITNESS WHEREOF* Employee has read, understood and has duly executed this instrument and Nalco has caused this instrument to be duly executed by its authorized officer.

*Anthony Ridley Jr.*
Employee's Name

*Anthony R. Ridley Jr.*
Employee's Signature

*Chattanooga, TN*
Place of Signature (City and State)

*10-21-99*
Date of Signature

NALCO CHEMICAL COMPANY
By: _____
Title: _____
Director, Recruiting & Employment
Date: _____

CONFIDENTIAL

PLAINTIFFSR-000000151

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF TENNESSEE
   ------------------------------------------------------
 3
   ECOLAB INC., and NALCO COMPANY, LLC
 4 d/b/a Nalco Water, an Ecolab Company
   and/or Nalco Water,
 5
                    Plaintiffs,
 6
      -vs-              Case No. 1:22-cv-00050-TRM-SKL
 7
   ANTHONY RIDLEY, and CHEMTREAT, INC.,
 8
                    Defendants.
 9
   ------------------------------------------------------
10
11            Video Examination of COREY DeMARCO,
12 taken at the instance of the Defendants, under and
13 pursuant to the Federal Rules of Civil Procedure,
14 before Dawn M. Lahti, a Certified Realtime Reporter,
15 Registered Professional Reporter and Notary Public
16 in and for the State of Wisconsin, with some
17 participants appearing via Zoom videoconference, at
18 SpringHill Suites, 1011 Tony Canadeo Run, Green Bay,
19 Wisconsin, on April 24, 2023, commencing at 9:11
20 a.m. and concluding at 4:29 p.m.
21
22
23
24
25
```

1    A    Yes.

2    Q    And I know there will come a time when you'll

3         hear my question and you know how I'm going to

4         end it and you just want to jump in and start

5         giving your answer, but I'm going to ask you to

6         please wait until I finish asking my question,

7         okay?

8    A    Yes.

9    Q    Great.  If I accidentally interrupt you, just

10        let me know and go ahead and finish your

11        answer, okay?

12   A    Yes.

13   Q    Great.  Now, that takes me to the next rule

14        which is that because we have a transcript, all

15        of your answers need to be audible.

16                  So it's really common to want to

17        shake your head yes or shake it no or say

18        uh-huh or uh-uh, but it's important that you

19        give a verbal answer, okay?

20   A    Yes.

21   Q    Great.  Now, if you don't understand a question

22        that I ask, I want you to go ahead and ask me

23        to clarify it, okay?

24   A    Yes.

25   Q    And if you don't ask me to clarify, I'll assume

1          that you understand the question and your

2          response is responding to my question.  Does

3          that make sense?

4     A    Yes, it does.

5     Q    If you remember something while we're going

6          through the deposition that relates to an

7          earlier question, go ahead and let me know

8          that, okay?

9     A    Yes.

10    Q    And we're going to take breaks regularly; but

11         if there comes a point where you need a break,

12         just let me know, all right?

13    A    Yes.

14    Q    Is there any reason that you would not be able

15         to give truthful and accurate testimony today,

16         any medical condition or medications that

17         you're taking?

18    A    No.

19    Q    Can you tell me, did you prepare for today's

20         deposition?

21    A    Yes.

22    Q    How did you prepare?

23    A    I had two phone calls with Mr. Honeycutt.

24    Q    When was the first of those phone calls?

25    A    Thursday.

1   Q   And how long was that phone call?

2   A   Approximately three hours.

3   Q   And when was the second phone call?

4   A   Friday.

5   Q   And how long was that phone call?

6   A   An hour and a half.

7   Q   Did you have any other phone calls related to

8       this deposition?

9   A   No.

10  Q   Did you meet with anybody in person related to

11      this deposition?

12  A   No.

13  Q   Did you review any documents in preparation for

14      this deposition?

15  A   Yes.

16  Q   And did any of those documents refresh your

17      recollection?

18  A   To some extent, yes.

19  Q   And what documents were those?

20  A   They were the interrogatories.

21  Q   And when you say "the interrogatories," are

22      those interrogatory responses that you verified

23      on behalf of Ecolab?

24  A   Yes.

25  Q   And now, my understanding is that Nalco is a

1    division or a subsidiary of Ecolab; is that
2    correct?
3  A    That's correct.
4  Q    If I say "Ecolab," will you understand that I
5    mean both Nalco and Ecolab?
6  A    Yes.
7  Q    And if at some point you need to distinguish
8    between the two because it matters for your
9    answer, will you go ahead and do that?
10 A    Yes.
11 Q    All right.  Thank you.  Did you bring any
12   documents with you today?
13 A    I did not.
14 Q    And were there any other documents that you
15   reviewed that helped you remember the facts in
16   this case?
17 A    No.
18 Q    You understand that you've been designated as
19   Ecolab's corporate witness on certain topics,
20   correct?
21 A    Yes.
22 Q    Let's go ahead and mark the notice which will
23   be Exhibit 100.
24            (Exhibit 100 was marked for
25   identification.)

```
 1   BY MS. LUND:
 2   Q    Mr. DeMarco, if you could take a moment to
 3        review that, and let me know whether you've
 4        seen that before.
 5   A    Yes, I have.
 6   Q    And you understand that you've been designated
 7        to give testimony as to Topics 1, 2, and 3?
 8   A    Yes.
 9   Q    And are you prepared to provide Ecolab's
10        knowledge regarding those topics today?
11   A    Yes, to the best of my knowledge.
12   Q    Does Ecolab prohibit its employees from
13        considering jobs with other employers?
14   A    They do.
15   Q    And can you tell me where that prohibition is?
16   A    In the employee agreement.
17   Q    And which employee agreement are you referring
18        to?  And you can go ahead and set Exhibit 100
19        aside.
20   A    So the employee agreement, non-compete
21        agreement that every employee signs.
22   Q    So Ecolab requires every employee to sign a
23        non-compete agreement?
24   A    Yes.
25   Q    And when did that requirement go into effect?
```

1    A    If she used any documentation to create the

2         business plan that was created through Ecolab.

3    Q    And what kind of documentation could she use?

4    A    Business plan templates, any other product

5         information.  Any knowledge that she gained

6         while she was here.

7    Q    When you say a business plan template, are you

8         talking about an Excel spreadsheet template?

9    A    Could be an Excel spreadsheet template.  Could

10        be a PowerPoint template.

11   Q    And Ecolab doesn't own Excel, correct; that's

12        Microsoft?

13   A    Correct.

14   Q    And Ecolab doesn't own PowerPoint; that's

15        Microsoft, correct?

16   A    Correct.

17   Q    And Microsoft instructs users or provides

18        instructions for users on how they can create

19        bar charts, correct?

20                MR. HONEYCUTT:  Object.

21                THE WITNESS:  I assume so.

22   BY MS. LUND:

23   Q    So if Ms. Grailer, for example, created a bar

24        chart using Excel, that wouldn't be Ecolab's

25        bar chart, would it?

1          MR. HONEYCUTT:  Object.

2          THE WITNESS:  Only if the information

3     in the bar -- the template that was used

4     contained Ecolab formulas and information to

5     create the bar chart.

6  BY MS. LUND:

7  Q    And if Ms. Grailer simply used her personal

8     knowledge and skills regarding the industry to

9     create a plan of how she could succeed as a

10    ChemTreat employee, would that breach a duty

11    that she owed to Ecolab?

12 A    I don't believe so.

13 Q    Are you familiar with an employee named Chris

14    McCune?

15 A    Yes.

16 Q    Is that somebody who ChemTreat solicited?

17 A    Yes.

18 Q    When did ChemTreat solicit that employee?

19 A    I believe that was in '21 or maybe early '22.

20 Q    Who at ChemTreat solicited -- is it Mr. or Mrs.

21    McCune?

22 A    Mr.

23 Q    Who at ChemTreat solicited Mr. McCune?

24 A    I don't know that.

25 Q    Was that solicitation improper?

1  BY MS. LUND:

2  Q    And unless Ecolab discovers new information

3       that it doesn't currently have, is it fair to

4       say it has no basis to claim it has been harmed

5       by any action by Mr. Ridley with regard to its

6       customers?

7  A    I don't know how else to say it, I guess.

8       We're not making any claims of loss or damage

9       at this time, and we reserve the right to make

10      those in the future.

11 Q    Okay.  If I can direct your attention back to

12      Exhibit 100, which is the 30(b)(6) notice, I

13      want to direct your attention to page 5,

14      Topic 1.

15                 You'll see that topic says,

16      Information in the possession, custody, or

17      control of Ecolab related to each of the eight

18      categories of information, customer files,

19      customer documents, business plans,

20      playbooks/best practices, training documents,

21      employee compensation documents, fact packs,

22      and customer contact information, the Ecolab

23      identified in its response to ChemTreat's

24      Interrogatory No. 1 as modified by the Court's

25      February 24, 2023, order found in the docket at

1     158 at page 10 and footnote 10.
2                    Do you see that language?
3  A   Yes.
4  Q   Are you prepared to testify on behalf of Ecolab
5     as to Topic 1?
6  A   Yes.
7  Q   What did you do to prepare to testify on
8     Topic 1?
9  A   I reviewed the interrogatory.
10 Q   Did you do anything else to prepare?
11 A   As part of that review, I spoke with
12     Mr. Honeycutt.
13 Q   Did you speak to any current or former Ecolab
14     employees?
15 A   No.
16 Q   Other than the interrogatory response, did you
17     review any documents?
18 A   No.  I believe we reviewed a list of examples
19     of the documents but not the documents
20     themselves by title only.
21 Q   So you looked at a list of the titles of
22     documents but not at the actual documents?
23 A   And the path, some similar documents, maybe not
24     the exact documents.
25 Q   So when you say "similar documents," did you

```
 1        look at the actual documents that were similar
 2        or the file paths for those documents?
 3   A    We looked at the file paths, and in some cases
 4        we looked at actual documents.
 5   Q    What actual documents did you look at?
 6   A    Oh, gosh, I can't remember the specific names
 7        off the top of my head.
 8   Q    Okay.
 9   A    I think business plan document we reviewed,
10        fact packs.  I'm very familiar with fact packs.
11        I think that was it.
12   Q    Can you remember any other documents that you
13        reviewed?
14   A    Not specifically.  Do you have a document in
15        mind you want to share?
16   Q    I'm trying to understand what you did to --
17              MR. HONEYCUTT:  Answer her questions.
18   BY MS. LUND:
19   Q    -- to testify on this subject, and so it sounds
20        like you reviewed the interrogatory responses
21        that you verified; is that correct?
22   A    Correct.
23   Q    And then you reviewed a document that listed
24        file paths for various documents, correct?
25   A    Yes.
```

1  Q    And then you looked at some documents that --
2       were they documents whose names appeared in the
3       list of documents you saw?
4  A    No, not the actual documents but similar
5       documents to those.
6  Q    And approximately how many documents did you
7       review that were the actual documents and not
8       just the file paths?
9  A    I got to think about it.  It may have even been
10      an example that we reviewed, like the business
11      plan.
12  Q   Anything other than the business plan and fact
13      packs that you reviewed?
14  A   Again, similar examples, I'm very familiar with
15      what goes into customer files, so I can tell by
16      the -- you know, for 30 years' of experience I
17      can tell what a -- I know what is in a service
18      report, things like that.
19  Q   Does Ecolab still have hard copies of its
20      documents?
21  A   No.  I would say most are electronic at this
22      point in time.
23  Q   What did Ecolab do with its old hard copy
24      documents?
25  A   I don't know.

Case 1:22-cv-00050-TRM-SKL  Document 288-2  Filed 06/15/23  Page 18 of 62  PageID #:
8829

```
 1   Q   You said it was rolled up even above the
 2       regional manager, correct?
 3   A   Well, it gets rolled up, but the information in
 4       the district manager's plan is used to create
 5       the region plan.  They don't roll up -- they
 6       don't physically move the district manager plan
 7       up to the next level.
 8   Q   And this says it's a template, correct?
 9   A   Yeah, it does say template.
10   Q   So do you know whether it contains any actual
11       business information in it?
12   A   It does.  Some of the formulas and things are
13       what we came up with that we know specifically
14       about Nalco Water business, so it's very Nalco
15       specific based on what we know about our
16       business in composite.
17   Q   When you say "some of the formulas," what
18       formulas specifically are linked to Nalco
19       Water's business?
20   A   Well, there's assumptions that we use that
21       comes from Nalco, just our history and
22       knowledge of our business over many years.
23   Q   And are those assumptions that the DMs use when
24       they create the business plans?
25   A   They were built into the template, and then it
```

Case 1:22-cv-00050-TRM-SKL  Document 288-2  Filed 06/15/23  Page 19 of 62  PageID #: 8830

1       is rolled up as they entered information into

2       it.

3    Q  So you're saying those are calculations that

4       the Excel spreadsheet does?

5    A  Based on knowledge and assumptions of our

6       historical business.

7    Q  So is it essentially like for a particular

8       cell, Excel will take -- multiply cell one

9       times cell two?

10   A  No, it's more complex formulas than that.  You

11      would take some of the historical information

12      that we might know about our business, and

13      different aspects of our business would be

14      built into the formulas.

15   Q  And what specifically?  Give me an example of a

16      formula that is based on Nalco/Ecolab's

17      historic information that would be contained in

18      this bridge plan template.

19   A  Well, like a percent of -- how can I explain

20      it?  We know a certain percent of our

21      business -- new business claimed each year

22      grows by a certain percent the next year, and

23      so we use historical data to build in some of

24      the logic behind that, so it's very Nalco

25      specific.

1   Q   So if somebody used a different percentage,

2        that wouldn't be Nalco specific?

3   A   No, I wouldn't think so.  I don't know.

4   Q   And do you know whether Nalco's historic

5        experience is consistent with the historic

6        experience of other water treatment providers?

7   A   I don't know anything about other water

8        treatment providers.  I've only worked here.

9   Q   The next file is d:\Nalco Water files, WL121

10       district folder, 2020 price plan, copy of

11       WL121, 2020 price plan.xlsx.

12              Do you see that document?

13   A   Yes.

14   Q   Have you seen that document before?

15   A   Maybe not this specific one, WL121, but one

16       very similar to it.

17   Q   And how do you know it's very similar?

18   A   Because every district receives a price plan

19       file, and that is a list of every customer by

20       product, the price at current pricing, and the

21       expected price increase and what we expect to

22       get as additional revenue as a result of

23       implementing price.

24   Q   So is this related to the price increase that

25       you testified before was rolled out in 2020?

Page 289

```
 1   STATE OF WISCONSIN    )
                           ) SS:
 2   COUNTY OF MILWAUKEE   )

 3

 4              I, Dawn M. Lahti, RPR, CRR and Notary

 5        Public in and for the State of Wisconsin, do

 6        hereby certify that the preceding deposition

 7        was recorded by me and reduced to writing under

 8        my personal direction.

 9              I further certify that I am not a

10        relative or employee or attorney or counsel of

11        any of the parties, or a relative or employee

12        of such attorney or counsel, or financially

13        interested directly or indirectly in this

14        action.

15              In witness whereof, I have hereunder

16        set my hand and affixed my seal of office on

17        this 26th day of April, 2023.

18

19

20

21

                    _____

22                    DAWN M. LAHTI, RPR/CRR

23                      Notary Public

                   In and for the State of Wisconsin

24

     My commission expires April 16, 2024

25
```

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TENNESSEE
 2                  CHATTANOOGA DIVISION
        _____
 3                                       :
        ECOLAB INC., and NALCO COMPANY   :
 4      LLC d/b/a Nalco Water, an Ecolab : Civil Action No.
        Company and/or Nalco Water,      :
 5                                       : 1:22-cv-00050-TRM-SKL
                  Plaintiffs,            :
 6                                       :
                     vs.                 :
 7                                       :
        ANTHONY RIDLEY, and CHEMTREAT    :
 8      INC.,                            :
                                         :
 9                Defendants.            :
        _____:
10
11              DEPOSITION OF ANTHONY RIDLEY
12                    APRIL 17, 2023
13
14           Oral sworn video-recorded deposition of
15      ANTHONY RIDLEY, taken at the law offices of
16      Patrick, Beard, Schulman & Jacoway, P.C., 537
17      Market Street, Suite 300, Chattanooga, TN 37402,
18      before Lane C. Butler, RPR, CRR, CCR, and
19      Patricia R. Frank, RMR, CRR, CCR, Notaries Public
20      (Court Reporters appearing remotely), commencing
21      at 9:26 a.m. EDT, on the above date.
22
23                      _  _  _
24
```

1          Q.     What information?

2          A.     Prior to signing this

3     agreement, I would have received formulas,

4     formulas as being of chemistry used that were

5     components of the chemistries.

6                THE COURT REPORTER:  That were

7     components of?

8                THE WITNESS:  The chemistries.

9          A.     Not necessarily the formulas,

10    but the components.  The programs, financial

11    data, financial plans, list of customers,

12    pricing, purchasing power -- purchasing

13    patterns, and customer contacts.

14         Q.     For any -- all that information

15    that you just identified -- formulas,

16    programs, financial data, list of customers,

17    pricing, purchasing patterns, customers --

18    was any of that information publicly

19    available?

20                MS. LUND:  Objection.

21    BY MR. WALTON:

22         Q.     You can answer.

23         A.     Yes.

24         Q.     What information was publicly

1      available?

2            A.      For example, components of

3      products would have been available on SDS's.

4            Q.      What's an SDS?

5            A.      Safety data sheet.

6            Q.      And is that something that

7      Nalco made public?

8            A.      Yes.

9            Q.      Anything else that was public?

10           A.      A lot of the programs were made

11     public through program administration

12     manuals.

13           Q.      What do you -- what do you mean

14     when you say "programs"?  I want to make sure

15     I understand.

16           A.      The chemical programs that

17     Nalco would have developed -- or not

18     developed, that's not the right word -- would

19     have offered to customers to treat their

20     systems, those were outlined in a program

21     administration manual and then posted openly

22     at a customer site for any and everyone to

23     read.

24           Q.      Okay.

```
 1                    THE COURT REPORTER:  I'm sorry,
 2      posted openly at a?
 3                    THE WITNESS:  Customer
 4      facility.
 5                    THE COURT REPORTER:  Thank you.
 6                    MR. WALTON:  It doesn't seem to
 7      be working.
 8                    THE WITNESS:  I'll talk louder,
 9      Lane.
10                    THE COURT REPORTER:  It's
11      not -- I can hear you volume-wise.  Just some
12      words cut out, and I don't know why.  I am
13      sorry.
14                    THE WITNESS:  That's fine.  No,
15      you're doing a great job.  Thank you.
16                    THE COURT REPORTER:  Thank you.
17                    MR. WALTON:  Just like a sales
18      guy, so.
19            A.     And furthermore, training.  A
20      lot of the program, we gave open training
21      sessions.  Operator training, trade -- trade
22      shows.  Training for both customers and
23      potential customers was all done openly.
24      Let's see here.  In addition to that, we
```

AJA-1017

1   would review financial -- financial data at a

2   customer site openly, financial plans with

3   customers openly, product plans.  We would

4   talk about new products being developed with

5   customers to drive new -- new sales.  At

6   times, we would talk about actual and

7   potential customers.  We would use that as a

8   -- what we called a third-party reference.

9                  If I was making a call, Mr.

10  Walton, on your facility and I had the

11  business down at Mr. Pope's facility and you

12  were neighbors and you were working in the

13  same industry, I would use Mr. Pope as a

14  third-party reference to gain your trust and

15  to show my knowledge of both your

16  applications and the industry.  So that

17  was -- that was very -- that was very common.

18  Pricing information could be shared depending

19  upon the situation.  Information about

20  customer contacts; we would often give out

21  customer information as references.

22                  Now, that was your standard

23  customer contact information that could be

24  deemed from any -- any source: Google, a

AJA-1018

1    business card.  We typically did not keep

2    in-depth customer information.  For example,

3    I'm talking about a specific customer

4    particularly.  If I was keeping your

5    information, Mr. Walton, it would be your --

6    your name and your phone number to con- --

7    you know, method of contacting you.

8    Did that accurately answer your question, sir?

9         Q.    Well, I mean, I think it's -- I

10   think it's -- I think the question is is you

11   determine the accuracy.  I mean, it's your

12   answer, so.  I do have a couple of

13   follow-ups, though.

14              So, I mean, in terms of -- in

15   terms of the financial data, are you -- are

16   you saying that you would -- you would expose

17   all financial data to customers or only

18   specific types?

19              MR. POPE:  Objection, misstates

20   the testimony.

21   BY MR. WALTON:

22         Q.    You -- you can answer.

23         A.    Financial data, I mean, it

24   specifies financial data in here.  If we're

1    in a business review with a customer, we're

2    openly discussing costing and pricing with

3    that customer in an open forum.

4              Q.    Okay.

5              A.    Also in addition to that, if we

6    were in a conversation with a potential

7    prospect, so someone we did not have the

8    business with, in an open forum we would be

9    discussing pricing and costing with them.  In

10   my opinion, it would be financial data.

11             Q.    But that costing and pricing

12   for that client, not for other clients;

13   right?

14             A.    Yes, that is correct.

15             Q.    Okay.  And have you ever heard

16   of a document called a fact pack?

17             A.    Yes.

18             Q.    Is that a financial document?

19             A.    The fact pack would be a

20   document that had financial information in

21   it, yes.

22             Q.    And is -- was that something

23   that was confidential at Nalco?

24                   MR. POPE:  Objection.

1          Q.     Okay.  And you said sometimes

2     you would share pricing information with a

3     customer, but that would be for that customer

4     only.  It wouldn't be like if you were doing

5     business with me, you wouldn't share the

6     pricing information for Mr. Pope, for

7     example; right?

8          A.     There's a lot of times that

9     pricing was shared across multiple customers.

10          Q.     Okay.

11               THE COURT REPORTER:  I'm sorry.

12     There's a lot of time that pricing was?

13               THE WITNESS:   Was shared

14     across multiple customers.

15     BY MR. WALTON:

16          Q.     And why was that?

17          A.     One example I can think of is

18     commodity pricing.  Nalco would sell

19     commodity products, products not manufactured

20     by Nalco, and that pricing would be shared

21     across multiple customers.

22               THE COURT REPORTER:  Across

23     multiple?

24               THE WITNESS:  Customers.

1        Q.      Do you remember receiving this

2    document by e-mail on or about February 9,

3    2022?

4        A.      Yes.

5        Q.      After you received this

6    document, you accessed some flash drives,

7    correct?

8              MR. POPE:  Objection to form.

9              THE WITNESS:  Yes.

10   BY MR. WALTON:

11       Q.      And that was on the same day

12   that you received this document, correct?

13       A.      Yes.

14       Q.      And why did you access those

15   flash drives?

16       A.      So I got this document.  Once

17   again, as I stated earlier, earlier today, I

18   was very bewildered and very distraught by

19   the -- both the wording and the document in

20   itself.  I actually stated earlier that I

21   actually called -- Mr. Walton, I actually

22   called your office trying to figure out the

23   why of this.  Luckily, I did not talk to you

24   because I think that would have been in poor

1    judgment.

2                     But then I started trying to

3    figure out what documents and what I could

4    have had in my possession from my days at

5    Ecolab and Nalco.  So I actually went home

6    after I finished my workday, because I

7    actually got this while I was out -- while I

8    was working, went back to my home and started

9    digging through old bags and trying to locate

10   anything that could have potentially -- that

11   I used during my time at Nalco and Ecolab.

12          Q.    And where did you find those

13   three flash drives?

14          A.    I found those -- the flash

15   drives in the bottom of an old Tumi bag.

16          Q.    Tumi bag like in T-U-M-I?

17          A.    T-U-M-I, yes.  I'd actually

18   been awarded the bag for winning what they

19   call All Pro with Nalco Water.  It was a

20   pretty nice leather backpack.  Actually, it

21   didn't travel very well but it was a

22   nice-looking leather backpack, and I had used

23   it during my time at both Nalco Water and

24   Ecolab.

1          I had actually moved to a
2     different bag when I began work with
3     ChemTreat, so that bag was set aside or
4     actually set in the attic, and I went through
5     it and found three thumb drives in the bag.
6     I accessed those thumb drives to see what
7     they had on those -- or what they had on them
8     and then set those three thumb drives to the
9     side.
10          Q.     Did you delete any documents
11     from the -- that were on the flash drives?
12          A.     I do not recall deleting any
13     documents.
14          Q.     And this -- and you found and
15     accessed those flash drives the same day you
16     received my letter, correct?
17          A.     That's correct.
18          Q.     And was that the first time
19     that you saw or accessed these flash drives
20     since the end of your employment at Ecolab?
21          A.     Yes.  To my knowledge, it was,
22     yes.
23          Q.     I thought you told me earlier
24     that you used one of these flash drives to

Case 1:22-cv-00050-TRM-SKL  Document 288-2  Filed 06/15/23  Page 33 of 62   PageID #: 8844

1     transfer your contacts.

2           A.    You are correct, yes.  That

3     is -- I had not used those flash drives in

4     quite some time.  So when I got my new

5     ChemTreat computer, I did use one of the

6     flash drives, but they had not been used in

7     quite some time.  Yes, that is correct.

8           Q.    So then you found those flash

9     drives when you first accessed your ChemTreat

10    computer?

11          A.    When I --

12                MR. POPE:  Objection to form.

13                THE WITNESS:  When I -- before

14    I purchased my new backpack, I was using the

15    Tumi bag for a very brief period of time

16    during my employment with ChemTreat.

17    BY MR. WALTON:

18          Q.    When did you purchase a new

19    backpack?

20          A.    I'm not certain of the time.

21          Q.    Was this a new backpack for

22    your job at ChemTreat?

23          A.    Yes.

24          Q.    So during your -- at the

```
1       beginning of your job at ChemTreat, you were
2       using the Tumi backpack with these three
3       flash drives in it.
4               A.     Yes.
5                      MS. LUND:  Objection.
6       BY MR. WALTON:
7               Q.     And how long did you use the
8       Tumi bag at ChemTreat with these three flash
9       drives?
10              A.     Not very long.
11              Q.     What's not very long?  A month?
12              A.     Maybe a month or two at best.
13              Q.     In one of your interrogatory
14      responses -- and I can show it to you later
15      if you want -- you stated that you found the
16      three flash drives after we filed this
17      lawsuit.
18                     Do you remember stating that in
19      your interrogatory responses?
20                     MR. POPE:  Objection to form.
21      Foundation.
22                     THE WITNESS:  I believe that's
23      what I just stated to you, is I went looking
24      for them after receiving your e-mail.
```

```
 1      BY MR. WALTON:
 2           Q.     Okay.  But my e-mail is
 3      different than a lawsuit.  Do you understand
 4      that?
 5           A.     No, I do not.
 6           Q.     Okay.  Do you understand that
 7      we filed a lawsuit against you?
 8           A.     Yes.
 9           Q.     Do you understand -- do you
10      understand that that's different than the
11      letter I sent you by e-mail?
12                  MR. POPE:  Objection to form.
13      Asked and answered.
14                  THE WITNESS:  Yes.  I'm sorry,
15      Patty.  That's me stuttering.  I'm sorry.
16                  THE COURT REPORTER:  No.  I
17      sneezed.  I'm fine.
18                  THE WITNESS:  Yes, I guess
19      there is a difference between a letter and a
20      lawsuit, e-mail and a lawsuit.
21      BY MR. WALTON:
22           Q.     So the lawsuit wasn't filed
23      until a couple weeks after this letter,
24      correct?
```

Case 1:22-cv-00050-TRM-SKL   Document 288-2   Filed 06/15/23   Page 36 of 62   PageID #:
8847

```
 1              A.     Yes.
 2              Q.     So you found the flash drives
 3      after you received the letter, not after we
 4      filed the lawsuit, right?
 5                     MR. POPE:  Objection to form.
 6                     THE WITNESS:  That is correct.
 7      BY MR. WALTON:
 8              Q.     So if your interrogatory answer
 9      says something different, then your
10      interrogatory response is wrong.
11                     MR. POPE:  Objection to form.
12                     THE WITNESS:  I do not
13      believe -- it is my recollection that these
14      three thumb drives were set -- were found,
15      set aside, and if I'm not mistaken, they were
16      sent back to Ecolab via counsel.
17      BY MR. WALTON:
18              Q.     Did you take any steps to
19      preserve potentially relevant evidence in
20      this case after you received my letter which
21      has been marked as Exhibit 80?
22                     MR. POPE:  Objection to form.
23      Vague.
24                     THE WITNESS:  Clarify, please.
```

1    manager for Ecolab that when employees left

2    they were allowed to keep their telephones?

3            A.     Yes.  I had several employees

4    leave, and I was never instructed to collect

5    their phones.

6            Q.     Okay.  Over the time that you

7    were employed with Ecolab, did you ever

8    upgrade phones?

9            A.     Yes.

10           Q.     Go from one version of an

11    iPhone to a newer version of an iPhone?

12           A.     Yes.

13           Q.     When you were employed by

14    Ecolab, Ecolab or Nalco --

15           A.     Yes.

16           Q.     -- were you ever required to

17    turn in your old phone?

18           A.     Never.

19           Q.     Okay.  Mr. Walton asked you

20    several questions about a contacts file.

21                  As I understand your testimony,

22    the contacts file included also your personal

23    contacts; is that right?

24           A.     The majority of the contacts in

1       the contacts file were personal contacts.

2              Q.     Okay.  And along with the

3       personal contacts, you testified that there

4       was some customer contact information in

5       there as well; is that right?

6              A.     That is correct.

7              Q.     The customer contact

8       information that was in your contacts file,

9       where did you get that customer contact

10      information?

11             A.     Through interactions with

12      customers.  It was essentially no more than a

13      name, a company they were working for, and a

14      contact number and potential contact e-mail.

15      Most of them didn't even have that.

16             Q.     Okay.  So you said a name, a

17      contact number, and an e-mail; is that right?

18             A.     Yes.

19             Q.     For your customer contacts, did

20      you put any other information in the contacts

21      file like, you know, their favorite

22      restaurant or how many kids they had or

23      anything like that, or was it name, contact

24      information, and e-mail address?

Case 1:22-cv-00050-TRM-SKL   Document 288-2   Filed 06/15/23   Page 39 of 62   PageID #: 8850

1         A.    It was only very basic

2    information that could be deemed from a

3    business card.

4         Q.    Okay.

5         A.    Or calling the receptionist at

6    the company.

7         Q.    During the time that you were

8    employed with Ecolab or Nalco, had you ever

9    had anyone make a request to you for

10   permission to take their contacts?

11        A.    No.

12        Q.    Had you ever heard of anyone at

13   Ecolab making a request to Ecolab to take

14   their contacts file?

15        A.    Never.

16        Q.    Had you ever heard of anyone

17   being disciplined or reprimanded in any way

18   for taking their contacts file?

19        A.    Never.

20        Q.    Had you ever heard of anyone

21   being disciplined or reprimanded in any way

22   for taking their telephone?

23        A.    Never.

24        Q.    I want you to look at

Case 1:22-cv-00050-TRM-SKL   Document 288-2   Filed 06/15/23   Page 40 of 62   PageID #: 8851

1

2                    C E R T I F I C A T E

3       STATE OF ALABAMA    )

        COUNTY OF JEFFERSON )

4

5               I hereby certify that the above

6       and foregoing proceeding was taken down by me

7       by stenographic means, and that the content

8       herein was produced in transcript form by

9       computer aid under my supervision, and that

10      the foregoing represents, to the best of my

11      ability, a true and correct transcript of the

12      proceedings occurring on said date at said

13      time.

14              I further certify that I am

15      neither of counsel nor of kin to the parties

16      to the action; nor am I in anywise interested

17      in the result of said case.

18

                _____

19      _____

        Lane C. Butler

20

21      LANE C. BUTLER, RPR, CRR, CCR

22      CCR# 418 -- Expires 9/30/23

23      Commissioner, State of Alabama

24      My Commission Expires:  2/11/25

AJA-1032

1        C E R T I F I C A T I O N

2

3           I, Patricia R. Frank, a Registered Merit

4     Reporter, Certified Realtime Reporter, and Notary

5     Public, do hereby certify that I reported the

6     deposition in the above-captioned matter; that the

7     said witness was sworn by Lane C. Butler; that the

8     foregoing is a true and correct transcript of the

9     stenographic notes of testimony taken by me in the

10    above-captioned matter.

11          I further certify that I am not an

12    attorney or counsel for any of the parties, nor a

13    relative or employee of any attorney or counsel

14    connected with the action, nor financially

15    interested in the action.

16

17    _____

18           Patricia R. Frank, CRR, RMR #9764

19

20    Dated:  April 19, 2023

21

22

23

24

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### CHATTANOOGA DIVISION

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, | |
| Plaintiffs, | No. 1:22-cv-00050-TRM-SKL |
| v. | Hon. Travis McDonough |
| ANTHONY RIDLEY, and CHEMTREAT, INC., | Magistrate Judge Susan K. Lee |
| Defendants. | |

## PLAINTIFFS' AMENDED RESPONSES TO CERTAIN OF CHEMTREAT, INC.'S FIRST SET OF INTERROGATORIES

Plaintiffs, Ecolab Inc. and Nalco Company, LLC ("Plaintiffs"), by and through their undersigned counsel, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Eastern District of Tennessee, and the Court's January 11, 2023 Order (D.E. 111) and February 24, 2023 Order (D.E. 158), hereby amends its objection and responses to Defendant ChemTreat, Inc.'s ("ChemTreat") First Set of Interrogatories ("Interrogatories") as follows:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify each document containing Ecolab trade secrets or confidential information allegedly misappropriated by Ridley. For purposes of this Interrogatory, Identify means to state the date of the document; the title of the document; the subject of the document; the custodian of the document; the author(s), sender(s), and recipient(s) of the document; the location of the document on Ecolab's electronic systems; the basis for Ecolab's claim that the document is a trade secret or that it contains Ecolab's confidential information; and whether You contend the document was accessed or used by ChemTreat.

steal Plaintiffs' clients and prospective clients, as well as to identify and recruit Plaintiffs' top-performing employees. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.

- o wl14x business plan.pptx
  - ▪ This PowerPoint presentation qualifies as a trade secret under both the DTSA and the TUTSA. It has independent economic value because it outlines specific goals for a new year and how those goals can be achieved. It identifies business targets as well as high-performing employees. This information is not publicly known or otherwise ascertainable through publicly-available sources. A competitor could use this document, *inter alia*, to steal Plaintiffs' clients and employees. Plaintiffs utilize agreements with employees, including the one executed by Ridley as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.

- o district tax form v2.0.xlsx
  - ▪ This Excel spreadsheet qualifies as a trade secret under both the DTSA and the TUTSA. This document has independent economic value because it contains revenue, cost, and margin information for specific clients across multiple territories that is not publicly known or otherwise ascertainable. It further identifies sales goals for specific representatives as details efforts needed to achieve those goals. Plaintiffs utilize agreements with employees, including the one executed by Ridley as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiff's secure computer systems and was only shared with those employees who had a specific need to know about it. The information within this document is not publicly-available or ascertainable through publicly-available information.

- o wl166 - 2020 dm business plan.pptx
  - ▪ This PowerPoint presentation qualifies as a trade secret under both the DTSA and the TUTSA. It summarizes the successes to be built upon from the previous year as well as areas for improvement. It identifies performance goals for the upcoming year as well as how those goals can be achieved. It also highlights the performance of specific employees and projects their performance for the upcoming year. It identifies specific business opportunities within the District. None of this information is publicly known or otherwise ascertainable via publicly-available sources A competitor could utilize it to steal Plaintiffs' clients and prospective clients, as well as to identify and recruit Plaintiffs' top-performing employees. Plaintiffs utilize agreements with employees, including the one executed by Ridley, as

breakdown of revenue and margin information for the previous three years for each individual client account within the district. It also highlights potential new client opportunities. This information is not publicly known or ascertainable through publicly-available sources. This information would be extremely valuable to a competitor, as it would allow a competitor to identify and target Plaintiffs' customers and employees. Plaintiffs utilize agreements with employees, including the one executed by Ridley as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.

- o 05 - district fact pack wl121 may 2020.xlsb
  - ▪ This Excel spreadsheet qualifies as a trade secret under both the DTSA and the TUTSA. It contains numerous tabs that break down multiple aspects of Plaintiffs business within District WL 121 in May 2020. Information contained in this report includes new and lost accounts, revenue and margin information by territory, and a breakdown of revenue and margin information for the previous three years for each individual client account within the district. It also highlights potential new client opportunities. This information is not publicly known or ascertainable through publicly-available sources. This information would be extremely valuable to a competitor, as it would allow a competitor to identify and target Plaintiffs' customers and employees. Plaintiffs utilize agreements with employees, including the one executed by Ridley as well as written policies and procedures to maintain secrecy of this document. Further, this document was maintained on Plaintiffs' secure computer systems and was only shared with those employees who had a specific need to know about it.

- o **Customer Contact Information** – The is only one document in this category— Ridley's entire contact list, which he downloaded on June 21, 2021. His contact list contains the names and contact information of Plaintiffs' current, former, and prospective customers that Ridley amassed over his two-decade career with Plaintiffs, while using Plaintiffs' resources and being paid by Plaintiffs. Ridley's contact list constitutes a trade secret and confidential information under the DTSA and TUTSA, since Plaintiffs derive independent economic value from the compilation of contact information for actual and prospective customers, not all of which is generally known or readily ascertainable by proper means by other persons who would be able to obtain economic values from its disclosure or use, and Plaintiffs take reasonable measures under the circumstances to maintain its secrecy. A competitor could use this document to identify and steal every single one of Plaintiffs customers that worked with Ridley. Plaintiffs utilize agreements with employees as well as written policies and procedures to maintain secrecy of trade secret information as well as computer passwords and protective software to limit access to employees with a need to know. Ridley's contact list is not available. On February 7, 2023, Jack Anderson from Ecolab Global Information Security confirmed that while Ridley's emails are available in a Veritas email archive, the archive does not maintain a user's contact list.

recorded, Plaintiffs had no means to identify it, and no effort was made to locate the "mobile drive." With respect to the last two Ecolab computers used by Ridley, Plaintiffs refer to the chain of custody described in the amended response to Interrogatory No. 4. Plaintiffs reserve the right to supplement this response should any additional information be discovered.

Respectfully submitted,

ECOLAB INC. NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,

Dated: March 3, 2023        By:        /s/ Edward G. Winsman
                                        David J. Walton (*pro hac vice*)
                                        Edward G. Winsman (*pro hac vice*)
                                        FISHER & PHILLIPS LLP
                                        Two Logan Square, 12th Floor
                                        100 N. 18th Street
                                        Philadelphia, PA 19103
                                        Telephone:  610.230.6015/2142
                                        Fax: 610.230.2151
                                        dwalton@fisherphillips.com
                                        ewinsman@fisherphillips.com

                                        J. Gregory Grisham (TN BPR#013810)
                                        FISHER & PHILLIPS LLP
                                        1715 Aaron Brenner Drive, Suite 312
                                        Memphis, Tennessee 38120
                                        Telephone: 901.526.0431
                                        Fax: 901.526.8183
                                        ggrisham@fisherphillips.com

                                        *COUNSEL FOR PLAINTIFFS*

# **CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was served via electronic mail on March 3, 2023, upon the following:

Vidya Atre Mirmira
Juli Ann Lund
Troy C. Homesley
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
vmirmira@wc.com
jlund@wc.com
thomesley@wc.com

W. Scott Sims
Michael R. O'Neill
SIMS FUNK PLC
3322 West End Ave. #200
Nashville, TN 37203
ssims@simfunk.com
moneill@simsfunk.com

*Attorneys for Defendant ChemTreat, Inc.*

Lance W. Pope, BPR No. 025054
Jeremy M. Cothern, BPR No. 027166
Patrick, Beard, Schulman & Jacoway, P.C.
537 Market Street, Suite 300
Chattanooga, TN 37402
lpope@pbsjlaw.com
jcothern@pbsjlaw.com

*Attorneys for Anthony Ridley*

*/s/ Edward G. Winsman*

## **VERIFICATION**

I, Corey DeMarco, declare as follows:

I have read the foregoing Plaintiffs' Amended Responses to Certain of ChemTreat, Inc's First Set of Interrogatories. I am authorized to make this verification on behalf of Plaintiffs, Ecolab Inc. and Nalco Company, LLC. To the extent I have personal knowledge of the matters set forth therein, the same are true and correct. Insofar as said matters are a composite of the information of many individuals, I do not have personal knowledge concerning all of the information contained in the above-mentioned document, but I am informed and believe that the information set forth therein for which I lack personal knowledge is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of March 2023.


_____
Corey DeMarco
Vice President
Ecolab Inc.

Error! Unknown document property name.

AJA-1039

```
 1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF TENNESSEE
 2                CHATTANOOGA DIVISION

 3    _____

 4   ECOLAB INC., and NALCO        )
     COMPANY, LLC d/b/a Nalco      )
 5   Water, an Ecolab Company      )
     and/or Nalco Water,           )
 6                                 ) CIVIL ACTION FILE
              Plaintiffs,          ) NO. 1:22-CV-00050-
 7                                 )     TRM-SKL
          vs.                      )
 8                                 )
     ANTHONY RIDLEY, and           )
 9   CHEMTREAT, INC.,              )
                                   )
10            Defendants.          )

11    _____

12

13                  FEBRUARY 3, 2023

14

                       MOTION
15

16

17

18

19

20

21

22

23           CATHY H. KERLEY, RPR
              HALL & ASSOCIATES
24            POST OFFICE BOX 428
         CHATTANOOGA, TENNESSEE  37401
25              423-267-4328
```

1  ChemTreat.

2          THE COURT:  What do you think that

3  2021 title -- it says -- not that anybody has

4  actually asked Mr. Ridley yet, but that title says

5  bridge.  What do you think that means?

6          So it's your -- it's your -- it's

7  your belief that he sent this a few months before

8  he quit his employment with your client to go to

9  work for the defendant.  And I -- I can't see

10 enough of the plan to know.  It looks like he's

11 talking about a plan for what.

12         MR. UPPAL:  Your Honor, I don't know

13 the answer to that question and I don't want to

14 speculate on it, but what I will tell you is the

15 metadata associated with this document that I'm

16 pointing to shows that the original author of this

17 document is an employee of the plaintiffs.

18         So not only is he violating his

19 undivided duty of loyalty, and I don't think it's

20 mere belief because you can confirm that from the

21 email itself, this is a document that ChemTreat

22 has produced dated March 2, 2021.  The statement

23 attached as the business plan that I prepared

24 speaks for itself.  And the business plan that

25 he's producing, and I know you can't see all of

1  them, which is why I'd asked for permission to

2  approach the bench --

3          THE COURT:  You're going to be able

4  to attach those and you can make them exhibits to

5  the hearing if you want.

6          MR. UPPAL:  Okay.

7          THE COURT:  I want everybody to be

8  able to see what you're referring to and circling.

9  That's why we invite everybody to download their

10  documents and utilize the equipment or the Elmo,

11  but I think everybody has been able to see what

12  you're circling and talking about.

13          MR. UPPAL:  So my main point in

14  showing the Court this document is while we have

15  been repeatedly told by ChemTreat that they don't

16  have any of our documents, they clearly do.

17          First of all, they fired Mr. Ridley

18  for forwarding a -- one of plaintiffs' documents

19  to his ChemTreat email.  They fired him for it.

20  They fired him for misconduct.

21          CLERK:  One minute left.

22          MR. UPPAL:  So there's a document

23  that they have in their possession.  And here is a

24  business plan which he produced in violation of

25  his duty of loyalty while he was employed with the

1  have our documents in their possession despite

2  what they say.  They fired Mr. Ridley for having

3  one of those documents in their possession after

4  they told us in writing up and down we're pure as

5  the driven snow.  We have nothing.  We've

6  investigated.

7              And recently they've turned over a

8  business plan, which I won't regurgitate.  Your

9  Honor gets the point, but it is also the first

10  point because let me give you a simple example.

11  Let's say that there is a document that somewhere

12  in the vast, you know, company that is Ecolab, we

13  have a copy of that, but Mr. Ridley gave it a

14  unique name.  Let's say he called it XYZ123 file,

15  which people do that all the time.

16              THE COURT:  Maybe if you deposed him,

17  you'd know.  All right.  Your time is up.  Sit

18  down.

19              All right.  Ms. Lund, are you

20  handling this?

21              MS. LUND:  I am, Your Honor.

22              THE COURT:  Oh, please provide -- are

23  you making these documents exhibits to the

24  hearing?

25              MR. UPPAL:  Yes, Your Honor.  I'll

1  provide them to the court reporter.

2             THE COURT:  No.  They'll have to be

3  scanned in and -- and I don't know how the

4  courtroom deputy is going to want to handle this

5  because let's say you all don't like my decision

6  and you want to appeal it, you're going to need to

7  have that in the record.

8             How do you all handle exhibits from

9  the court reporter and getting them into the

10 system?

11            CLERK:  I can send a copy with the

12 court reporter and I can attach them

13 electronically to the minutes today.

14            THE COURT:  I'm not really sure the

15 parties want that for documents that they have

16 claimed may be confidential.

17            CLERK:  Or keep them under seal in

18 the clerk's office.

19            THE COURT:  No.  There's no motion

20 pending on that.  We'll figure that out later.  If

21 you want them part of the record, you're going to

22 have to address that before you leave here.

23 We'll -- we'll do that later.  Think about what

24 you want to do.

25            MS. LUND:  Good afternoon, Your

1  to re-file them and it's a huge pain for everybody
2  and would probably not further anything.
3          So I did have one other thing I
4  wanted to address with you quickly besides this
5  schedule -- schedule and if you want a hearing,
6  hearing date.
7          And then a date if you -- if you want
8  to talk to each other about the practical aspects
9  of your lives and your experts that might need to
10 be involved, if you want to revisit any deadlines
11 or just letting me know that you had your ESI
12 update conferral.
13         And on the exhibits, what do you want
14 to do about the exhibits to the hearing?
15         MR. UPPAL:  I'd like to do whatever
16 is easiest for the Court and the Court's staff.
17         THE COURT:  You can hand them -- the
18 documents to her and they can be Exhibit 1 and
19 Exhibit 2.
20         MR. UPPAL:  That's what I'd like to
21 do, Your Honor.
22         MS. LUND:  Your Honor, just to make a
23 clarification, are these going into the public
24 docket?
25         THE COURT:  I haven't had any

1  argument otherwise.

2          MS. LUND:  The only thing I wanted to

3  say is one of those two exhibits is a ChemTreat

4  document that has been designated as confidential

5  and I can't -- because I didn't realize this would

6  be an issue that Mr. Uppal would be presenting

7  that, that we might need to go ahead and we'd be

8  willing to waive the protection of the numerical

9  figure that relates to the value of the territory

10  at issue.

11          THE COURT:  So your position is that

12  a document that a person outside of your employ,

13  outside of your three months before he became an

14  employee, submitted to somebody in your recruiting

15  department is going to meet the extraordinarily

16  high bar to be a sealed exhibit even though the

17  transcript in the hearing is open.

18          And I'll let you think about that

19  during the break and then we can talk about that

20  some more and you can -- you can ask for some time

21  if you want to, but I'm going to have to have you

22  all back and have a hearing about that if it's

23  your position because I -- I am having a difficult

24  time understanding how a document that -- and I

25  understand there's a difference between -- and I

1    do want everybody to understand from the Court's
2    perspective, I am generally quite happy for the
3    lawyers to designate and maintain documents as
4    confidential during the discovery process, but
5    when you start using documents as exhibits in
6    public hearings and a public transcript, I think
7    you -- I think you have a very hard, hard hoe to
8    row there, but I'll -- I'll let you address it
9    because you weren't prepared for it and you didn't
10   use it.
11           And I understand you're saying you
12   designated it as confidential even though it came
13   from their employee at the time.
14           MS. LUND:  Right.  And, Your Honor,
15   if I can just clarify.  I absolutely agree with
16   you that it does not seem like it should be an
17   issue.  I understand the high burden.
18           The only thing I wanted to clarify is
19   that the particular figure that the territory is
20   worth hasn't been disclosed.  And I just don't
21   have authority from my client to say that it can
22   be publically disclosed.  And I would just -- I
23   can try to contact my client during the break.  I
24   think that's the only thing I was asking for.
25           THE COURT:  We'll take a break and

1 see if you can do that because the more things we

2 can get resolved today, the less time you have to

3 spend on that.

4          MS. LUND:  Absolutely, Your Honor.

5          THE COURT:  And if your client does

6 think that it needs to have any kind of

7 heightened -- you know, I can -- I can take proof

8 on it.  I'm prepared to stay as long as we need to

9 stay to address whether or not these documents

10 should be sealed.

11          You all may have to get your

12 respective people available or you -- you may be

13 able to make arguments that would justify it, but,

14 anyways, it's -- it's very typical in this context

15 that everything in discovery is claimed as

16 confidential and treated confidential among the

17 parties and then when you have to go to trial,

18 it's going to be obviously a much more narrow set

19 of information, but what I try to make sure that

20 I'm not doing in the discovery disputes is making

21 a decision that impacts whether or not something

22 actually is a trademark or -- I mean, your whole

23 case, right, everybody -- you're not ever going to

24 agree on this in all likelihood.  A Court

25 eventually is going to have to determine and

1   maybe -- maybe the jury is going to determine

2   whether or not something qualifies as a trade

3   secret.

4               So and I -- if I've misunderstood the

5   basis for a claim of this potentially needing to

6   be sealed as being anything other than a trade

7   secret, you can explain that to me after the break

8   after you talk to each other.

9               I don't feel like I need those

10  documents in the record for me to make my

11  decision.  You all could decide you don't want to

12  have those documents in the record, and I'll even

13  entertain a motion on that, but talk about it.

14  See if you can figure it out.  Let Ms. Camp know

15  when you're ready for me to come back.

16              Are you able to access the docket and

17  find those motions to seal?

18              MR. GRISHAM:  Unfortunately, I'm

19  having difficulty getting online, Your Honor, for

20  some reason.  My hotspot is not working well.

21              THE COURT:  This is the gig city.

22              MR. GRISHAM:  I know.  I'm

23  disappointed.

24              THE COURT:  This is gig city.  I

25  mean, go stand by this window at the break.  I

1  making up your long lists and stuff?  Is that
2  recreated, your -- like your -- your customer
3  files?
4            MR. UPPAL:  Oh.  Yes.  Let me explain
5  that, Your Honor.  I do want to get to that second
6  reason if you'll allow me to.
7            THE COURT:  I know.  Yeah.  I'll --
8            MR. UPPAL:  Okay.  The document that
9  you saw on the Elmo, which is, you know, the
10  94,000 files, that is generated from a data loss
11  prevention program called Digital Guardian.
12            THE COURT:  That was name I was
13  looking for, not C drive.  Thank you.  Say that
14  again.  What are you all calling that?
15            MR. UPPAL:  The name of the data loss
16  prevention program is called Digital Guardian.  We
17  were able to run a Digital Guardian report of
18  Mr. Ridley's predeparture activities.  What did he
19  download?  What were the names of those files that
20  he downloaded?  Where did he download them to?
21            But that DLP report has the file
22  names, the destinations, and the dates, but it
23  doesn't have the document that corresponds to each
24  file that he downloaded.  Remember, there's 16
25  gigabytes worth of that stuff.

```
 1    trying to catch a flight out of another city, but,
 2    Your Honor --
 3              THE COURT:  Just I'm sorry about
 4    that.  I will say --
 5              MR. UPPAL:  I'm not, Your Honor.  I
 6    appreciate the sentiment, but this was much more
 7    important than any flight.  Thank you for your
 8    time.
 9              THE COURT:  Is it -- just a sort of a
10    heads up, there's very few direct flights here, of
11    course, as you've experienced, but would you just
12    mind telling me where you're trying to fly to.
13              MR. UPPAL:  Phoenix, Your Honor.
14              THE COURT:  Oh, my gosh.  Yes.
15    Atlanta is probably your best bet at this point.
16    I am -- I regret that.
17              MS. LUND:  And, Your Honor, I
18    apologize if this was put on the record.  I
19    just -- I don't have it in my notes.  With regard
20    to the two exhibits.
21              THE COURT:  No.  We still need to
22    address that.  I'm glad you brought it up.  My
23    courtroom deputy told me that you all did want
24    them to be part of the record.  I'm admitting
25    plaintiff's Exhibit 1 and 2.
```

1          I'm instructing the clerk to maintain

2    them in the vault so they're not on the Internet,

3    which things in ECF are.  So did you all -- you

4    all can take that into account, but at least for

5    purposes of this hearing for somebody to actually

6    access those documents, they would have to

7    physically come to the courthouse and ask to see

8    the exhibits or file a motion or make another

9    appropriate request to get a copy of them.  So it

10   won't be on the Internet as a result of -- at

11   least as a result of you making them an exhibit

12   today.

13                    MR. UPPAL:  Thank you, Your Honor.

14                    MS. LUND:  Thank you, Your Honor.  We

15   appreciate that consideration.

16                              (Thereupon, Exhibit Nos.
                                 1 and 2 were marked and
17                              received.)

18                    END OF PROCEEDINGS

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

STATE OF TENNESSEE )
                   :  SS.
COUNTY OF HAMILTON )


              I, Cathy H. Kerley, LCR No. 95, RPR,
licensed court reporter and notary public, in and
for the State of Tennessee, do hereby certify that
the above hearing was reported by me and that the
foregoing ^ pages of the transcript is a true and
accurate record to the best of my knowledge,
skills, and ability.

              I further certify that I am not
related to nor an employee of counsel or any of
the parties to the action, nor am I in any way
financially interested in the outcome of this
case.

              I further certify that I am duly
licensed by the Tennessee Board of Court Reporting
as a Licensed Court Reporter as evidenced by the
LCR number and expiration date following my name
below.

              IN WITNESS WHEREOF, I have hereunto
set my hand and affixed my notarial seal this 7th
day of February, 2023.

_____
CATHY H. KERLEY, RPR, LCR #95
Expiration Date 6/30/2024
Notary Public in and for the
State of Tennessee.
My commission expires
June 7, 2026