# Exhibit 1

1                    UNITED STATES DISTRICT COURT

                     EASTERN DISTRICT OF TENNESSEE

2                       CHATTANOOGA DIVISION

      _____

3                                         :

      ECOLAB INC., and NALCO COMPANY      :

4     LLC d/b/a Nalco Water, an Ecolab : Civil Action No.

      Company and/or Nalco Water,         :

5                                         : 1:22-cv-00050-TRM-SKL

                     Plaintiffs,          :

6                                         :

                     vs.                  :

7                                         :

      ANTHONY RIDLEY, and CHEMTREAT       :

8     INC.,                               :

                                          :

9                    Defendants.          :

      _____:

10

11               DEPOSITION OF ANTHONY RIDLEY

12                     APRIL 17, 2023

13

14          Oral sworn video-recorded deposition of

15     ANTHONY RIDLEY, taken at the law offices of

16     Patrick, Beard, Schulman & Jacoway, P.C., 537

17     Market Street, Suite 300, Chattanooga, TN 37402,

18     before Lane C. Butler, RPR, CRR, CCR, and

19     Patricia R. Frank, RMR, CRR, CCR, Notaries Public

20     (Court Reporters appearing remotely), commencing

21     at 9:26 a.m. EDT, on the above date.

22

23                        — — —

24

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 2 of 92  PageID #: 9707

 1                    MS. LUND:  This is Juli Ann

 2      Lund from Williams & Connolly.  With me is my

 3      colleague Troy Homesley.  We represent

 4      ChemTreat, Incorporated.

 5                    MR. POPE:  This is Lance Pope

 6      from Patrick, Beard, Schulman & Jacoway, and

 7      I represent Anthony Ridley.

 8                         — — —

 9                      ANTHONY RIDLEY,

10            having been duly sworn, was examined and

11            testified as follows:

12      BY MR. WALTON:

13            Q.    Mr. Ridley, we just met for the

14      first time; right?

15            A.    Yes.

16            Q.    Do you understand that you are

17      here today to give testimony in connection

18      with the lawsuit -- lawsuit that my client,

19      Nalco Ecolab, has brought against you?

20            A.    Yes.

21            Q.    And also against your former

22      employer Chem- -- ChemTreat?

23            A.    Yes.

24            Q.    Okay.  Do you understand that

1                    THE COURT REPORTER:  That's

2     okay.

3     BY MR. WALTON:

4          Q.     Mr. Ridley, can you turn to

5     the -- well, just let me ask you this first,

6     do you -- you've had an opportunity to review

7     this document?

8          A.     Yes.

9          Q.     Do you recognize this document?

10         A.     Yes.

11         Q.     What is it?

12         A.     This is the Employee Sales,

13    Service, Marketing & Inventions Agreement

14    that I signed in -- just prior to beginning

15    my job as a corporate account manager with

16    Ecolab's Food and Beverage Division.

17         Q.     And can you turn to the last

18    page of the document, please.  That's your

19    electronic signature there?

20         A.     That is.

21         Q.     And so you affixed that

22    signature there?

23         A.     Yes.

24         Q.     And by doing so, did you

1      and other company property in his

2      possession."  Do you see that?

3              A.      Yes.

4              Q.      Okay.  Upon your termination

5      from Ecolab, did you return all Nalco Ecolab

6      business information that was in your

7      possession?

8              A.      Upon my resignation, I returned

9      everything that I knew I had at the time.

10             Q.      What do you mean, everything

11     that you knew you had at the time?

12             A.      Everything I could remember

13     having, and I was -- my memory was assisted

14     by the documents provided by Ecolab HR which

15     was kind of a checklist, no a kind of, it was

16     a checklist of things to return.  That's what

17     I used to go off of.  And I returned

18     everything that I remembered having during --

19     upon reading the document provided by Ecolab

20     HR.

21             Q.      Okay.  Sitting here today, are

22     you aware of any Nalco or Ecolab company data

23     that you did not return after your separation

24     from the company?

1                    MR. POPE:  Objection to form.

2                    THE WITNESS:  Yes.

3      BY MR. WALTON:

4            Q.     What?

5            A.     There were three thumb drives.

6            Q.     Anything else?

7            A.     There were documents found on

8      an external hard drive which have all been

9      deleted.

10           Q.     When were they deleted?

11           A.     When they were found on the

12     external hard drive.

13           Q.     When were they found?

14           A.     There were a couple of

15     occasions which that occurred.

16                   THE COURT REPORTER:  There were

17     a couple what?

18                   THE WITNESS:  There were a

19     couple of occasions which that occurred.

20     BY MR. WALTON:

21           Q.     When was the first occasion

22     that that occurred?

23           A.     Sometime in August of 2021.

24           Q.     When was the second occasion?

1           A.      The second occasion was also in
2      August of 2021.
3           Q.      When was the next occasion?
4           A.      September of 2021.
5           Q.      When was the next occasion?
6           A.      And then lastly, in January of
7      2022.
8           Q.      So starting at the first
9      occasion in August of 2021, what documents
10     were deleted from the external drive?
11                  MR. POPE:  Object to form.
12                  THE WITNESS:  The -- I cannot
13     recall all of them.  I found some documents.
14     They were checked to see if the -- I was
15     surprised to find the documents on there.  I
16     did not remember they were on there, because
17     the WD was used at times -- I've had this WD
18     drive for years, and it was used to back up
19     my computer before Nalco -- and I say Nalco
20     specifically, before Nalco was even purchased
21     by Ecolab.  It was used to back up my company
22     computer, and it was used as essentially a
23     dump.  I would grab -- I would grab files in
24     -- from my -- from my PC file explorer, drag

1      and dump to what was essentially usually my D

2      drive, or the -- the WD --

3                    THE COURT REPORTER:  Your E

4      drive on?

5                    THE WITNESS:  D drive, as in

6      delta, delta drive.

7           A.      And that WD was very, very,

8      very rarely hooked up to my computer.  It was

9      not something -- it was a remote, just an

10     external backup.  It was mostly used to dump

11     pictures.  The main purpose was to use to

12     dump pictures, videos of a personal nature, a

13     storage device for the many pictures that we

14     all take of family, friends, outings, and

15     videos.  That was its main purpose.  But

16     because of its size, it was able to handle a

17     dump of data.

18                    When I hooked to it to look at

19     pictures, I discovered some files.  They were

20     checked to confirm the file name was actually

21     the file and wasn't something that was

22     overwritten with the wrong file name.  And

23     then I found it and deleted the -- all the

24     files that were in -- all the files that were

```
1       BY MR. WALTON:
2              Q.      And that was during your first
3       session, or the first time that you found
4       them in August of 2021?
5              A.      Yes.
6              Q.      And like, how specifically did
7       you find these documents?  I mean, what --
8       you know, what I'm asking is, like what
9       computer were you using when you were
10      accessing the WD external drive?
11             A.      A ChemTreat computer.
12             Q.      So, why were you -- so, why did
13      you -- why were you hooking up this WD drive
14      to your ChemTreat computer?
15                     MR. POPE:  Object to the form.
16                     THE WITNESS:  That's the
17      computer I had to use at the time.
18      BY MR. WALTON:
19             Q.      Okay.  But why were you -- but
20      why did you hook up or connect this old WD
21      drive to your ChemTreat computer?  What were
22      you trying to find on that drive?
23             A.      I was looking for -- I was
24      looking for some pictures.
```

```
 1              MR. POPE:  Objection.
 2              THE WITNESS:  I do not know.
 3     BY MR. WALTON:
 4         Q.     Was it more than 500?
 5         A.     I do not know.
 6         Q.     Then I think you said your
 7     third session was in -- that in September of
 8     2021 was the third time that you deleted
 9     Nalco or Ecolab documents off that drive?
10         A.     Yes.
11         Q.     Just let me go back.  The
12     second session in August, the second time in
13     August 2021, was that also -- did you access
14     that drive with your ChemTreat computer as --
15         A.     Yes.  Yes, I did.
16         Q.     -- as well?
17         A.     I'm sorry, I interrupted you.
18         Q.     That's all right.
19         A.     Yes, I did.
20         Q.     Okay.  It's okay.  That
21     happens.
22              So in September 2021, you also
23     used your ChemTreat computer to access the
24     drive; correct?
```

```
1        LaCie drives, ever -- what name do you want
2        me to use for --
3                Q.      It doesn't matter to me.
4                A.      -- for commonality within this
5        conversation?  Because we're going to look at
6        that at some point, I'm sure.
7                Q.      Yes, sir.
8                A.      Which -- which name would you
9        like for me to use?
10               Q.      I'd like to use the name that
11       you're comfortable with.
12               A.      I'll let you pick, dealer's
13       choice.
14               Q.      LaCie drive.
15               A.      LaCie drive, fine.  They were
16       actually sent out, and mine, the one that I
17       sent back to Ecolab actually had a sticker on
18       the back of it that said, "Property of Nalco
19       Company."
20                       So it was -- it was common to
21       back up your computer onto an external drive.
22       The LaCie drives were not large enough to
23       take a -- an entire dump of documents from
24       our hard drives, or they were not big enough
```

1     to take multiple dumps, or multiple transfers

2     from the hard drive to the external hard

3     drive.  So I purchased with my own money a --

4     the WD drive, which was much larger, I

5     believe it was a terabyte or -- or larger, I

6     believe.  And at one point I could grab and

7     -- the way I would do it is I would go to my

8     file explorer, click on a group of files,

9     drag and drop into the connected device.  In

10    some cases, it was the WD.  In the case where

11    I was segregating files, it was the LaCie

12    drive.  I would drag --

13              THE WITNESS:  I cannot hear

14    you, Lane.  I can see you.

15              MR. WALTON:  Lane, can you hear

16    us?  Yeah.  We cannot hear you at all.

17              THE WITNESS:  I'm not touching

18    the computer because I'm not IT-proficient.

19              THE VIDEOGRAPHER:  Should we go

20    off the record?

21              THE WITNESS:  "Can we go off

22    the record."

23              MR. WALTON:  Yes, we can go off

24    the record.

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 12 of 92   PageID #: 9717

```
 1                    THE VIDEOGRAPHER:  It's 12:59.
 2      We're back on the record.
 3      BY MR. WALTON:
 4           Q.     Mr. Ridley, we had a massive
 5      break here due to some technical issues, so I
 6      just want to make sure that you still
 7      understand that you are under oath.
 8           A.     Yes.
 9           Q.     Okay.  Just want to go back
10      over some issues just to make sure it's all
11      clear.
12                    We were talking about a WD
13      drive, right?
14           A.     Yes.
15           Q.     WD, would you agree with me, is
16      Western Digital?
17           A.     That I don't know.
18           Q.     Okay.  Would you agree with me
19      that that is a drive that you connect to a
20      computer through a USB port?
21           A.     Yes.
22           Q.     Okay.  And you purchased that
23      drive a few years ago, right?
24           A.     Many years ago.
```

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 13 of 92  PageID #: 9718

1          Q.     Okay.  Now, at the time you

2     purchased the drive, had you already been in

3     possession of the LaCie drive that was issued

4     to you by Nalco?

5          A.     No.

6          Q.     Okay.  And it was a

7     one-terabyte drive, correct?

8          A.     I do not know the size.  I do

9     know it was large.  Well, much larger than

10    the LaCie drive.

11         Q.     And the LaCie drive was around

12    80 gigs?

13         A.     I believe that is accurate.

14         Q.     And you used this -- the

15    Western Digital drive while you were at Nalco

16    to back up your computer, correct?

17         A.     Yes.

18              MR. POPE:  Objection to form.

19    BY MR. WALTON:

20         Q.     And you -- now, I want to make

21    sure, when -- in terms of backing up the

22    computer, did you back up your entire

23    computer to it or just selected files and

24    folders?

1          A.     The computer that I would have
2     backed up using the WD drive was my Nalco
3     computer, and that would have been an entire
4     backup of the files that were on the
5     computer.
6          Q.     Okay.  And you also used a WD
7     drive for personal things, right?
8          A.     That was its primary use.
9          Q.     Okay.  Now, when you backed up
10     your W -- I'm sorry, sir.
11               When you backed up your Nalco
12     computer, was there more than one backup on
13     there at a time?
14          A.     Yes.
15          Q.     And so you would back up your
16     computer.  Then when you backed it up again,
17     would you delete the old backup?
18          A.     No.
19          Q.     How many times did you back up
20     your Nalco computer to the WD drive?
21          A.     Several.  I do not know -- I do
22     not recall an exact number.
23          Q.     I understand, but I'm going to
24     follow up and ask you what you mean by

1      "several."  By "several," when you use that

2      term, do you mean more than five?

3              A.      Yes.

4              Q.      Do you mean more than ten?

5              A.      No.

6              Q.      So somewhere between five and

7      ten; is that fair?

8              A.      That would be fair, yes.

9              Q.      And you saved documents to that

10     WD drive as late as 2020, correct?

11             A.      Yes.

12             Q.      And that was after you had the

13     LaCie drive, correct?

14             A.      Yes.

15             Q.      Okay.  So in 2020, what

16     documents did you save to the WD drive?

17                     MR. POPE:  Objection to form.

18     He can of course answer to the best of his

19     recollection.

20                     MR. WALTON:  Yeah, sure.

21                     THE WITNESS:  Clarify, please.

22     BY MR. WALTON:

23             Q.      Sure.  What do you need me to

24     clarify?

1           A.      Restate the question.

2           Q.      Sure.  In 2020, what Nalco

3    documents did you save to the WD drive?

4           A.      I do not recall all of the

5    documents that were saved to the WD drive in

6    2020.

7           Q.      In 2020, when you were saving

8    Nalco information to the WD drive, was that a

9    complete backup of the computer?

10           A.      I do not believe it was.  To my

11    recollection, that was -- that did not occur.

12           Q.      So why were you saving Nalco

13    files to the WD drive after you had received

14    the LaCie drive?

15           A.      The -- any backup that would

16    have been done to the WD drive would have

17    been done solely because it had a larger

18    capacity than the LaCie drive.

19           Q.      So is it fair to say that, if

20    you were backing up files in 2020 to the WD

21    drive, backing up Nalco files, you were using

22    the WD drive because it had a larger capacity

23    than the LaCie drive, right?

24           A.      Yes.

1          Q.     I thought we just went down --
2     so you didn't save any -- so now you're
3     saying you didn't save any Nalco or Ecolab
4     documents to -- I'm sorry.  I screwed up.
5               In 2020 did you save any
6     documents, Nalco or Ecolab files, to the WD
7     drive?
8          A.     Yes.
9          Q.     Okay.  What was the number --
10    can you give me an estimate of the number
11    that you saved to the WD drive in 2020?
12         A.     There were very few.
13               MR. POPE:  And I object to the
14    form of the question.
15    BY MR. WALTON:
16         Q.     And very few, less than ten?
17               MR. POPE:  Object to the form.
18               THE WITNESS:  I don't know.
19    BY MR. WALTON:
20         Q.     And what documents did you
21    specifically save?
22         A.     The only one that I know was
23    saved was a service report or personal
24    service report that was created by Quint

```
 1        these other documents that he downloaded in
 2        2020 to -- or he copied in 2020 to the WD
 3        drive.
 4                  MR. POPE:  Same objection.
 5        BY MR. WALTON:
 6             Q.      You can answer.
 7             A.      Restate your question, please.
 8             Q.      Sure.  In 2020 the documents
 9        that you down -- that you copied to the WD
10        drive, they were all available to you on the
11        OneDrive, correct?
12             A.      Yes.
13             Q.      If those documents were
14        available to you on the OneDrive, why did you
15        also copy them to the WD drive?
16             A.      It is my opinion that those
17        documents got copied to the WD drive in
18        error.  There was no reason for them to be on
19        there.
20             Q.      What was the specific error?
21             A.      The method that I used to
22        select on a file and drag and drop, if you
23        hover over a file, it could -- or you hover
24        over a device, you can accidentally drop one
```

```
1        into a device mistakenly.
2               Q.    All right.  So you're saying
3        that those files, the files that you copied
4        to the WD drive in 2020 from Nalco, were
5        accidentally placed on there.
6               MR. POPE:  Objection to form.
7        Misstates his testimony.
8        BY MR. WALTON:
9               Q.    Isn't that what you just told
10       me?
11              A.    I'm saying that there wasn't a
12       whole lot of reason for me to duplicate those
13       files in 2020, and I believe it was done in
14       error.
15              Q.    It was done by accident.  Is --
16              MR. POPE:  Objection to form.
17       BY MR. WALTON:
18              Q.    Is there a difference in your
19       mind between error and accident?
20              A.    No.  Error and accident, in my
21       definition, would be the same.
22              Q.    All right.  So then we're
23       talking about how you then still had that
24       drive -- well, just let me back up on the
```

1    W -- when is the last time you remember

2    backing up your entire Nalco computer to the

3    WD drive?

4         A.    2017/2018 timeframe.  And

5    that's an estimate --

6         Q.    Sure.

7         A.    -- Mr. Walton.

8         Q.    Just to the best of your

9    recollection, sir.

10        A.    2017, 2018.  For a full backup.

11        Q.    Okay.  So the last backup that

12   you recall putting -- of your Nalco computer

13   that you recall putting on the WD drive is in

14   2017 or 2018, right?

15        A.    The last full backup.

16        Q.    Okay.  Did you ever do partial

17   backups?

18        A.    Potentially.

19        Q.    When did you do those?

20        A.    I cannot recall.

21        Q.    What in your mind is a partial

22   backup?

23        A.    Less than a full backup.

24        Q.    So when you say "potentially,"

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 21 of 92  PageID #: 9726

```
 1        would that have been potentially after 2017
 2        and 2018?
 3               A.      Potentially, yes.
 4               Q.      Had you ever checked the drive
 5        since the beginning of this lawsuit to see
 6        what backups are on there?
 7               A.      I have not had that drive in
 8        months.
 9               Q.      Okay.  So you gave that to your
10        first attorney?
11               A.      That is correct.
12               Q.      And since then, you have not
13        had access to the drive at all?
14               A.      That is correct.
15               Q.      How did you get your pictures
16        off there?  Or strike that.
17                       Did you get your pictures and
18        your personal stuff off that drive?
19               A.      No.
20               Q.      Did you have another copy of
21        those pictures and your personal stuff
22        somewhere else other than that drive?
23               A.      No.
24               Q.      Okay.  So the last full backup
```

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 22 of 92  PageID #: 9727

1      information; or two was to get personal

2      information or view personal information, put

3      personal information on it or to do some sort

4      of backup of Nalco documents.

5              Q.     All right.  And so my question

6      to you, sir, is, other than the backups, full

7      and partial, and the documents that you

8      testified that were put on the drive

9      accidentally in 2020, were there any other

10     documents that were placed on the WD drive?

11             MR. POPE:  Objection to form.

12     BY MR. WALTON:

13             Q.     And I'm talking Nalco

14     documents.

15             A.     There -- no.

16             Q.     Okay.  So was there any other

17     times that you believe that documents, Nalco

18     documents or Ecolab documents, were put on

19     that drive in error other than what you've

20     already testified about?

21             A.     The ones that were put on there

22     in error would have been specifically a

23     service report done by Quint McCreary, and

24     there were also some documents put on there

1       moment.

2               Q.      Okay.  And these templates and

3       service report notes are things that you said

4       you created from scratch?

5               A.      Yes.

6               Q.      Did you access any of these

7       documents at all after you left Ecolab?

8                       MR. POPE:  Objection to form.

9       BY MR. WALTON:

10              Q.      You can answer.

11              A.      Yes.

12              Q.      When did you access those

13      documents?

14              A.      Those are example -- those are

15      some of the documents that I accessed when I

16      found the documents on my WD drive.

17              Q.      And those were the times that

18      we talked about, two times in August 2021,

19      one time in September 2021, and one time in

20      January 2022, correct?

21                      MR. POPE:  Objection to form.

22                      THE WITNESS:  Yes.

23      BY MR. WALTON:

24              Q.      And when you accessed those

1    documents, you did it through your ChemTreat

2    computer, correct?

3              A.      Yes.

4              Q.      Now, did you -- when you

5    accessed those documents -- and I think this

6    is where we got cut off before.  We were in

7    the middle of going over those different

8    sessions.

9                      But when you accessed those

10   documents using your ChemTreat computer, did

11   you actually open them up?

12             A.      Yes.

13             Q.      Why did you actually open them?

14             A.      I was determining to make sure

15   that the file matched -- the file name

16   matched the actual document to ensure that it

17   had not been overwritten, and the data was

18   not matching the file name.

19             Q.      You couldn't tell what the

20   document was just by looking at the title?

21             A.      Yes.

22             Q.      So why did you need to open it

23   then?  I still don't understand.

24             A.      I was verifying.  I knew what

1      deleted?

2             A.      I do not.

3             Q.      Did that include some backups?

4             A.      Yes.

5             Q.      Now, when you deleted these

6      files, how specifically did you do that?

7                     MR. POPE:  Objection to form.

8                     THE WITNESS:  I would see the

9      list of files and clicked on the top one, hit

10     shift, click on the bottom one and delete.

11     BY MR. WALTON:

12            Q.      Okay.  Did you ever use a

13     wiping program with the WD drive?

14            A.      Periodically I would, yes.

15            Q.      What wiping program would you

16     use?

17            A.      Like the Microsoft Disk Cleanup

18     or defrag, and it was only used on free

19     space.

20            Q.      What do you mean "only used on

21     free space," sir?

22            A.      Well, if you do a disk cleanup

23     or a defrag or some of the programs that are

24     on your typical Microsoft program, it allows

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 26 of 92   PageID #: 9731

1      you to select free space or entire device,

2      and I would only select free space.

3              Q.      And that was -- you were able

4      to use that Microsoft utility on the WD

5      drive?

6              A.      Yes.

7              Q.      And that was by using your

8      ChemTreat computer?

9              A.      I did that on both a Nalco

10     computer, Ecolab computer, and ChemTreat

11     computer.

12             Q.      Okay.  And how many times did

13     you wipe documents from the WD drive using

14     your ChemTreat computer?

15                     MS. LUND:  Objection.

16                     THE WITNESS:  I do not know.

17     BY MR. WALTON:

18             Q.      Was it more than one?

19             A.      Yes.

20             Q.      Was it more than five?

21             A.      No.

22             Q.      So between one and five,

23     correct?

24             A.      Yes.

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 27 of 92  PageID #: 9732

1    recollection, I did not.

2    BY MR. WALTON:

3         Q.    All right.  So back to my other

4    question.  So in January 2022, what happened

5    when you deleted documents from the WD drive?

6         A.    State your question again.

7         Q.    Sure.  In January 2022 when you

8    deleted Nalco files, Nalco/Ecolab files from

9    the WD drive, what specifically -- what

10   specifically occurred then?

11        A.    I clicked on the files, and at

12   that time I actually started -- since this

13   was -- I now found files three times prior to

14   that, I actually went in and started kind of

15   sorting a few things and making sure nothing

16   else was left -- nothing else was remaining

17   on the WD.

18        Q.    How specifically did you do

19   that?

20        A.    Started clicking and

21   segregating things into folders and dragging

22   things into folders.

23        Q.    And how long did that take you?

24        A.    I'm not sure, Mr. Walton.

1      my job was to take over an existing
2      territory, an existing account base, for a
3      retiring ChemTreat manager, account manager.
4      So I was given a book of business.  The files
5      that were pertinent to me at that time were
6      really the files that David Ellis, provided
7      to me when we were working on the transition
8      of the book of business.
9           Q.    And, now, David Ellis was a guy
10     who was retiring and you were taking over his
11     territory at ChemTreat, right?
12          A.    Yes.
13          Q.    Okay.  But you were also
14     anticipating bringing in some new business to
15     that territory, too, right?
16          A.    Yes.
17          Q.    When is the last time you used
18     or accessed the WD drive?
19          A.    Probably February of --
20     probably when I received your letter.
21          Q.    So did you access the drive
22     after you received my letter.
23          A.    Yes.
24          Q.    Why?

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 29 of 92   PageID #: 9734

1    deleted them, and they were not shared with

2    anyone at any time.  They were just deleted.

3            Q.    Did you ever save any

4    documents, Nalco or Ecolab documents, from

5    your WD drive to your ChemTreat computer?

6            A.    No.

7            Q.    Did you ever e-mail any

8    documents off that drive to anybody at

9    ChemTreat?

10           A.    Excluding myself, no.

11           Q.    What documents did you e-mail

12   yourself?

13           A.    The Arnold Air Force Base 2015

14   proposal got e-mailed from my Hotmail to my

15   ChemTreat e-mail address.

16           Q.    Okay.  We'll go over that in a

17   little bit.

18                 Other than that, did you e-mail

19   any documents that were on the -- strike

20   that.

21                 Other than that, did you e-mail

22   any Nalco or Ecolab documents that were on

23   the WD drive to anybody at all?

24           A.    No.  Let me -- no.

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 30 of 92  PageID #: 9735

1          Q.      Do you have a Microsoft Live

2     account?

3          A.      Not to my knowledge.

4          Q.      Do you have a Hotmail account?

5          A.      I do.

6          Q.      When did you open up that

7     Hotmail account?

8          A.      Let me go back.  I need to

9     restate something.

10         Q.      Go ahead.

11         A.      Because I don't -- and I

12     apologize for my technical ignorance.  So if

13     I -- my phone -- the pictures on my phone are

14     backed up to a cloud storage, is that the

15     same thing?

16         Q.      Yes, it is.  Well, it depends

17     on the phone.  What phone are you talking

18     about?

19         A.      This phone.

20         Q.      Is that an iPhone?

21         A.      It is an iPhone.

22         Q.      Okay.  And you had an iPhone 8

23     as of the time that you left Ecolab, correct?

24         A.      I do not know the model.

1    Q.    Okay.  But you had an iPhone.

2    A.    I had an iPhone.

3    Q.    You sold that iPhone, right?

4    A.    It is gone, yes.

5    Q.    Who did you sell it to?

6    A.    It was wiped, and there is a

7    little electronic store in Dayton that buys

8    used phones.

9    Q.    When did you wipe and sell that

10   phone to this store in Dayton?

11   A.    When I say "wiped," you just

12   click on factory default.

13   Q.    A factory reset.

14   A.    Factory reset.

15   Q.    Yes, sir.

16   A.    Thank you.  And shortly

17   after -- or when I did the -- yes.  When I

18   did the transfer to the ChemTreat file, the

19   portal transfer.

20   Q.    So that was a personal iPhone?

21   A.    Yes.

22   Q.    And you wiped it by doing a

23   factory reset?

24   A.    Yes.

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 32 of 92   PageID #: 9737

1    what you recall, okay?

2           A.      I do not recall.

3           Q.      Okay.  Do you recall ever

4    downloading fact packs?

5           A.      There would have been fact

6    packs -- since I worked to transfer all the

7    Nalco files that I had, there would have been

8    fact packs included in those files.

9           Q.      And this might be a stupid

10   question, but did you eventually put all of

11   the documents that were in the Nalco folder

12   under the Ridley Documents onto the LaCie

13   drive?

14          A.      Yes.  And that's not a stupid

15   question, Mr. Walton.  I think that's a

16   pretty -- I mean, that's a question that --

17   that was my intent, yes.

18          Q.      Okay.

19          A.      To put them all on there.

20          Q.      But instead of just doing it

21   all at once, is it fair to say that you did

22   it piecemeal?

23          A.      I did do it piecemeal.  The

24   transfer would have taken -- I mean, if you

1      that's not confidential information.

2              Q.      So why did you say then you

3      shouldn't share it with the competition?

4              A.      The document in its entirety

5      probably should not.  I mean, you know, as a

6      district manager, I would not want the

7      document shared in its entirety with the

8      competition.

9              Q.      And you wouldn't want your

10     employees to do that, correct?

11             A.      The employees had copies of

12     those --

13             Q.      Yeah.

14             A.      -- as well --

15             Q.      But --

16             A.      -- for their particular

17     territories.

18             Q.      And you wouldn't want -- as a

19     district manager for Nalco, you wouldn't want

20     any of the people under you to share fact

21     packs with the competition, correct?

22             A.      Not as entirety, no.

23             Q.      What's a Monthly Turndoc

24     Incentive Report?

1          A.      Where are we at now?

2                  MR. POPE:  Are you asking from

3      the answer or --

4                  MR. WALTON:  I'm asking him,

5      period, but if he wants to look at the

6      document, I have no problem referring him to

7      the document.

8                  MR. POPE:  I just didn't know

9      if you were talking about a paragraph or not.

10                 MR. WALTON:  No, no.  I mean,

11     no.  I mean, I am using a paragraph for my

12     prompt.  If he wants to take a look at it,

13     I'm not going to --

14                 THE WITNESS:  Do you have one

15     you want to show me?

16     BY MR. WALTON:

17         Q.      Well, I just want to say do you

18     know what a Monthly Turndoc Incentive Report

19     is?

20         A.      Yes.

21         Q.      What is it?

22         A.      Do you have one you want to

23     show me?

24         Q.      I don't have one.

1    A.    So how do you -- what answer I
2    give you, how do you know if that's the right
3    answer?
4    Q.    I -- well, you're under oath.
5    A.    Okay.
6    Q.    You're going to tell the truth,
7    aren't you?
8    A.    Yeah, I do.  I do.
9    Q.    Okay.
10    A.    So -- yeah, I do want to do the
11    right thing and tell the truth.
12    Q.    Well, then I shouldn't need
13    that document then, should I?
14    A.    Right.  No, you shouldn't.  So
15    a Monthly Turndoc is a document that I would
16    have created, or anyone at Nalco could have
17    created, through Nalco Direct.  It's just
18    a -- you go to Nalco Direct, which is a
19    program.  You put in some information.  You
20    put in either specific customers or a
21    specific rep or a specific district, you
22    know, some filtering term, and it would
23    generate what products were shipped in to a
24    customer over that monthly period.

1          Q.     And you never asked permission
2     to take those documents, correct?
3          A.     Did not know I was taking those
4     documents.
5          Q.     All right.
6          A.     Remember, these were all going
7     to the LaCie drive which I returned, and
8     Insight has said that I returned, to the
9     company.
10          Q.     But my understanding is that
11     you also had some of these documents on your
12     WD drive which you retained possession of
13     after your employment ended at Ecolab,
14     correct?
15               MR. POPE:  Objection to form.
16     Misstates the testimony.  Misstates the
17     evidence.  "Some of these documents"?
18     BY MR. WALTON:
19          Q.     You can answer.
20          A.     There were.
21          Q.     I mean, I'll try to clean it
22     up.
23               Were some of the documents --
24     were any of the documents that you downloaded

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 37 of 92  PageID #: 9742

1      to the LaCie drive also on the WD drive as of

2      the time of your last day of employment at

3      Ecolab?

4           A.     There might have been.

5           Q.     Are you aware of any

6      specifically?

7           A.     When I did a full backup in

8      2015 and 2016, there would have been many

9      customer files on there as well.  But most of

10     those, like I said, would have been service

11     reports, program administration manuals,

12     things of that nature.

13          Q.     And customer files are you

14     testifying would not be part of a partial

15     backup?

16          A.     That's not what I'm testifying

17     to.

18          Q.     So a customer file could be

19     part of a partial backup.

20          A.     A customer file could have been

21     part of a partial backup.  I do not know

22     whether it was or not.

23          Q.     Okay.  So let's skip up to

24     page 27, paragraph 87.

1      onto the system at ChemTreat?

2              A.      I downloaded -- I entered the

3      contacts onto my contact list when I had a

4      ChemTreat computer, but I don't think that

5      list was viewable by anyone else at ChemTreat

6      because it was my personal contact list.

7              Q.      Is it still sitting on

8      ChemTreat's system, all those contacts?

9              A.      That I cannot answer.

10             Q.      What device did you use to take

11     a copy of your contacts to ChemTreat?

12             A.      It would have been --

13                  MR. POPE:  Objection to form.

14                  MS. LUND:  Objection.

15                  MR. POPE:  Misstates the

16     testimony.

17                  MR. WALTON:  I don't think it

18     does, but go ahead.

19                  MR. POPE:  Objection to form.

20     It misstates the testimony.

21                  THE WITNESS:  Ask your question

22     again, please.

23     BY MR. WALTON:

24             Q.      What USB device did you use to

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 39 of 92  PageID #: 9744

1      that fair?

2             A.     Yes.

3             Q.     Okay.  And what flash drive did

4      you use to do this?

5             A.     It was one of the three that I

6      returned to Ecolab.

7             Q.     Did you delete your contacts

8      off that flash drive?

9             A.     I do not remember.

10            Q.     Okay.

11            A.     But those contacts were not

12     shared with anyone in ChemTreat.

13            Q.     Okay, but I just want to

14     understand.  So after you went to ChemTreat,

15     you took that same Nalco flash drive, right?

16            A.     I took a flash drive that I had

17     that I had used while at Nalco.

18            Q.     And that was a flash drive that

19     you returned to Nalco.

20            A.     Yes.

21            Q.     Okay.  So you took that flash

22     drive with your contacts on it and you

23     plugged it into your ChemTreat computer,

24     correct?

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 40 of 92   PageID #: 9745

1           A.      Yes.

2           Q.      And you copied it over to

3      where?

4           A.      To my Outlook on -- my

5      ChemTreat Outlook.

6           Q.      And you -- and as far as you

7      know, nobody else had access then except for

8      you.

9           A.      That is correct.

10          Q.      Are you sure about that?

11          A.      No.  I felt pretty sure I

12     didn't delete files from when I moved

13     LaCie -- things from the LaCie drive.  So,

14     no, I'm not.

15          Q.      On your ChemTreat iPhone, could

16     you see all those contacts that you copied

17     over on the flash drive?

18               MS. LUND:  Objection.

19               THE WITNESS:  I do not

20     remember.

21     BY MR. WALTON:

22          Q.      Do you still have access to

23     those contacts?

24          A.      I do not.  I lost them all,

1      your ChemTreat computer because it was

2      broken?

3              MS. LUND:  Objection.  Dave, I

4      think you meant to say Ecolab, not ChemTreat.

5              MR. WALTON:  Yes, I did.  Yes,

6      I did.  See, I'm just trying to multitask,

7      right?

8      BY MR. WALTON:

9          Q.     In June 2021 did you return

10     your Ecolab computer to IT because it was

11     broken?

12         A.     I returned an Ecolab computer

13     because it had a very loud fan motor running,

14     and it was disruptive to conference calls.

15     As a matter of fact, I remember it did not

16     take much communication with the IT when I

17     called the computer help desk because they

18     could actually hear it going over my phone.

19              So it was -- you know, during

20     that time it was COVID, and there was a

21     significant amount of conference calls being

22     held, and it was quite disruptive.  So I

23     don't know if I would call it broken.  It

24     certainly was not functioning as designed and

1      properly.

2              Q.      Was it working fine except for

3      the fan?

4              A.      Yes.

5              Q.      In terms of when you were

6      downloading and transferring the documents to

7      the LaCie drive, the computer was working,

8      correct?

9              A.      Yes.

10             Q.      Okay.  Now, as of -- now, if I

11     told you that you returned this computer and

12     handed it back to IT on June 9, would you

13     have any reason to disagree with that?

14             MR. POPE:  Objection to form.

15     Foundation.  Objection to form, formation.

16     BY MR. WALTON:

17             Q.      You can answer.

18             A.      I have no reason to -- I don't

19     know the date, Mr. Walsh.  Mr. Walton.  I'm

20     sorry.  I apologize.

21             Mr. Walton, I do not know the

22     date that computer was returned.

23             Q.      Was it after you had already

24     downloaded or transferred the documents from

```
 1      the LaCie drive?
 2              A.      I cannot recall at those
 3      instances how they corresponded with each
 4      other.
 5              Q.      If -- as of June 9, 2021, had
 6      you already made your decision to leave
 7      Ecolab and join ChemTreat?
 8              A.      I don't know that to be true.
 9      I don't know that to be false either.  I
10      don't know.
11              Q.      Okay.
12              A.      I can't recall.
13              Q.      Were you planning a vacation in
14      June 2021?
15              A.      Yes.
16              Q.      Where were you going on
17      vacation?
18              A.      Destin, Florida.
19              Q.      And how long did you plan that
20      vacation in advance?
21              A.      I don't know that either.
22              Q.      Did you take that vacation
23      before you -- did you plan that vacation, I
24      should say, before you knew that you were
```

```
 1        going to leave Ecolab and join ChemTreat?
 2             A.      Probably, because that hotel
 3        you have to book pretty far in advance.
 4             Q.      Where did you stay?
 5             A.      Sandestin Hilton.  We stay
 6        there every year.
 7             Q.      And when did you go on that
 8        vacation in June?  Do you remember the dates?
 9             A.      I do not.
10             Q.      Do you remember how long were
11        you back from vacation before you resigned
12        from Ecolab?
13             A.      I think I resigned on the day I
14        returned --
15             Q.      Which --
16             A.      -- or the day after I returned.
17                     THE COURT REPORTER:  I'm sorry?
18                     THE WITNESS:  I resigned either
19        on the day I returned or the day after I
20        returned from Ecolab.
21        BY MR. WALTON:
22             Q.      And do you recall how long your
23        vacation was?
24             A.      I do not.
```

1          Q.      So you returned on July 1 and
2     that's when you resigned from Ecolab?
3                    MS. LUND:  Objection.
4                    THE WITNESS:  I don't know if I
5     returned on July the 1st, but I believe July
6     the 1st is the day I resigned from Ecolab.
7     BY MR. WALTON:
8          Q.      Okay.  And your memory is, is
9     that you resigned on the day you returned
10    from vacation?
11                   MR. POPE:  Objection to form.
12    Misstates his testimony.
13    BY MR. WALTON:
14         Q.      Is that your memory?
15         A.      It was within -- I returned
16    from vacation either the day before or a
17    couple days before I resigned, yes.
18         Q.      Okay.  All right.  And so when
19    you asked for a new computer because you were
20    having problems with conference calls, that
21    was right before you went on vacation, right?
22         A.      If I -- if I went on vacation
23    at or before resigning, which was July the
24    1st, and I got my new computer on you said

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 46 of 92  PageID #:
9751

1        So there -- this would be -- there was no
2        Nalco Water customers consumed -- or, excuse
3        me -- included in this business plan because
4        I'd had a non-compete, so I knew I was not
5        going back into Nalco Water customers that I
6        was prohibited from going into.  So when I
7        was figuring up the new business or new --
8        claimed new business sales for each of the
9        year periods, those were really assuming from
10       other water treatment companies in the -- in
11       the area.
12               Q.      So turning to Exhibit 44 --
13               A.      Okay.
14               Q.      -- how did you create this
15       document?
16               A.      So these were templates that we
17       would use.  It's not a business plan as per
18       what Nalco would call a business plan.  This
19       is just a bridge used to forecast the start
20       of one year to the end of -- or the end of
21       one year to the end of another year.
22                       It's just a forecasting tool.
23       It's just essentially an Excel document that
24       has addition and subtraction on there that

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 47 of 92  PageID #: 9752

1        creates a graph.  It's just an Excel
2        document.  There's nothing special about it.
3                Q.      Did you create this Excel
4        document?
5                A.      This one you're looking at,
6        yes, I did create it.
7                Q.      Did you create the template?
8                A.      I did not.
9                Q.      Who created the template?
10               A.      According to the files that
11       Ecolab has produced, Mike Chemelovski would
12       have created this template.
13               Q.      Who's Mike Chemelovski?
14               A.      Mike Chemelovski is a retired
15       Nalco Water employee now, but he was the
16       sales -- he was the AVP of sales operations
17       for Nalco Water.
18               Q.      Do you know how much time and
19       effort it took Mr. Chmelovski to create this
20       template?
21               A.      Mike?  Probably very little.
22       Mike was a very talented individual.  It
23       probably took very little.  But the template
24       that he sent us in this form, this form has

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 48 of 92  PageID #: 9753

1          A.      It means I don't remember
2     accessing those specific documents on a
3     specific date.
4          Q.      Why did you access those
5     documents?
6          A.      Well, I believe those documents
7     correspond with the ones that I looked at
8     when I found files on my WD and then deleted
9     those, because those were all attached to a
10    Hard Disk 5 and a Hard Disk 6.
11         Q.      Why does that indicate the WD?
12    You said a Hard Drive 6, Hard Drive 5.  What
13    does that have to do with the WD drive?
14              MR. POPE:  Objection to form.
15    He didn't -- that's not the testimony.
16    BY MR. WALTON:
17         Q.      Okay.  Well, what did you mean
18    when you said a Hard Drive 5 and Hard
19    Drive 6?
20         A.      That's what's in Mr. Vaughn's
21    report.  You asked me if I'd read
22    Mr. Vaughn's report, and I was taking
23    information from Mr. Vaughn's report.
24         Q.      All right.  And then Mr. Vaughn

1    says that while you were at ChemTreat you

2    accessed on your ChemTreat computer a

3    document with Hard Disk Volume 5, and it was

4    a document called Account Management Examples

5    Master Proposal.

6            A.    Um-hum.

7            Q.    Do you remember accessing that

8    document?

9            A.    I do.  I remember accessing a

10   document when I found documents on my WD

11   drive, making sure that it matched what it

12   should have been, and, you know, we clicked

13   on it.  It said Master Proposal.  That was my

14   proposal template that I created myself to

15   use to make my job more efficient.  It flowed

16   well for me.  It was the way I liked to

17   present things to customer and present things

18   to prospects.  And I viewed it, saw that it

19   was on there, and then realized that it

20   shouldn't be and deleted the files and

21   everything I saw and associated with that

22   file.

23           Q.    And your testimony is you had

24   to open up the document to verify that the

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 50 of 92  PageID #: 9755

1     sorry.  I shook my head in acknowledgment

2     that you're reading it to me.  Sorry.

3              Q.     Yeah.  That's the Nalco Water

4     Files, but that's a folder that you had on

5     the WD drive, correct?

6              A.     Yes.

7              Q.     Okay.  Customer Files - Nalco

8     Water\Volkswagon\Volkeswagen service

9     reports\Volkswagen - Media Center\Volkswagen

10    Media PSR 2014\Media Center - Chilled Water

11    System 06.11.2014.docx.

12                    Do you remember opening that

13    document?

14             A.     Yes.

15             Q.     When did you open that document

16    on your ChemTreat computer?

17             A.     When I found the files on my WD

18    drive.

19             Q.     But we talked about four

20    different times that you found those files,

21    right?

22             A.     Um-hum.

23             Q.     Yes?

24             A.     Yes.

1    reconnected to any device.

2    BY MR. WALTON:

3         Q.    Did you do anything else to

4    preserve information that might relate to

5    this case?

6              MR. POPE:  Objection.

7              THE WITNESS:  I didn't access

8    anything or did not do anything to ...

9    BY MR. WALTON:

10        Q.    Now, our expert found that on

11   the same day that you accessed these flash

12   drives that you accessed one of the drives

13   and created a folder called Ridley's

14   Personal -- Documents from Ridley's Personal

15   Computer.

16        A.    I remember seeing that in

17   Mr. Lee's report, yes.

18        Q.    Did you do that?

19        A.    I do not recall doing that, and

20   I don't know any reason why I would have done

21   that.

22        Q.    What personal computer did you

23   have access at the time?

24        A.    See, that's the thing.  The

1      only personal computer that I had -- the only

2      personal computer that was not a

3      company-owned computer at the house at that

4      time was my wife's.

5              Q.    In 2020 did you sell any

6      personal computers?

7              A.    No.

8              Q.    Did you discard any personal

9      computers?

10             A.    Not to my knowledge.

11             Q.    Did you give away any personal

12     computers?

13             A.    Not to my knowledge.

14             Q.    In 2021 did you sell any

15     personal computers?

16             A.    Not to my knowledge.

17             Q.    Did you give any away?

18             A.    Not to my knowledge.

19             Q.    Did you discard any?

20             A.    Not to my knowledge.

21             Q.    You keep saying not to your

22     knowledge.  That's something that you would

23     recall, isn't it?

24             A.    I don't recall, no.  I don't

```
 1        recall having a personal computer.
 2              Q.     In 2022 did you discard any
 3        personal computers?
 4              A.     No.
 5              Q.     Did you discard any -- strike
 6        that.
 7                     Did you discard any computers
 8        that were part of your household in either
 9        2020 or 2021?
10              A.     No.
11              Q.     Did you discard any computers
12        that were part of your household in 2022?
13              A.     No.
14              Q.     Back to 2022, did you sell any
15        computers?
16              A.     No.
17              Q.     Did you give away any
18        computers?
19              A.     No.
20              Q.     Who did you -- who, if anyone,
21        did you have discussions with regarding
22        this -- the letter not involving ChemTreat's
23        counsel?
24              A.     So the -- when I received this
```

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 54 of 92   PageID #: 9759

1    ChemTreat.

2         Q.    When did Clay reach out to you?

3         A.    It was even sometime back in

4    2019.  I think that's been confirmed with

5    text messages between me and Mr. Cissell.

6         Q.    And why did it take you from

7    2019 until August 2020 to send in your

8    resume?

9         A.    You know, Clay had reached out

10   to me about potential opportunities, some of

11   the opportunities they had at the time.  You

12   know, I was pretty happy where I was, to be

13   honest.  You know, if you had asked me even

14   in 2015, 2016, 2017, you know, I was very,

15   very happy at Nalco, very happy with the

16   leadership, very happy with the direction of

17   the district that I was running, and I was

18   extremely happy with the team that I was

19   managing at the time.

20              Once again, those individuals

21   were very close friends of mine.  We were

22   working as a cohesive unit doing things that

23   really had never been done a whole lot before

24   in Nalco.  We were -- I don't know if you've

1      heard the term before in any of these

2      deposition of "double double" whereas a

3      district is able to achieve greater than

4      10 percent revenue and profit growth in a

5      year.  We were able to do that four out of

6      five years.  The fifth year we were still up,

7      but we hit the greater than 10 percent on the

8      profit margin but not on the revenue.  And we

9      were doing great things.  So I certainly was

10     not ready to move.

11              Then in 2020 he said, I have

12     got some opportunities, do you mind, you

13     know, putting together a resume for me and

14     sending it over, and so I did it and sent it

15     over to him, and we started having more and

16     more discussions.

17        Q.     Did you ever tell him that you

18     were just fed up with Nalco at this point?

19        A.     Those are Clay's words to

20     Steve.  That's not an e-mail that I wrote or

21     had privilege to.  So those are Clay's words,

22     not mine.

23        Q.     Okay, yeah, but I'm not asking

24     you why -- well, I guess I'm saying do you

1    correct?

2            A.    Yes.

3            Q.    And you had a -- I think we

4    went over this briefly earlier, but you had a

5    lunch meeting or a dinner meeting with

6    Mr. Leavell at a hotel in Bristol, correct?

7            A.    No.  We had a dinner meeting at

8    a restaurant.

9            Q.    At a restaurant.

10           A.    In Bristol.

11           Q.    In Bristol.  Okay.  That's

12   Bristol, Virginia, or Bristol, Tennessee?

13           A.    Both.

14           Q.    Okay.  And what do you remember

15   about that meeting?

16           A.    Just to clarify, the state line

17   runs right down the middle of the town.

18           Q.    Yeah, I have family out there

19   so, yeah.

20           A.    So nothing really specifically.

21   We were talking -- I met with Steve Leavell

22   and Mr. Clay Cissell at this dinner meeting.

23   We talked generally about the -- really the

24   main focus of the meeting was the ChemTreat

1      company and the ChemTreat culture was really

2      the main focus of the meeting because, you

3      know, that was something that I was not very

4      familiar with and, you know, I wanted to

5      learn about before making any decisions at

6      all about relocating to a different company,

7      because the culture of a company is very

8      important to me, being with a company that

9      has a good, strong culture, that values their

10     people, and has good opportunities for

11     advancement within the organization.

12            Q.    Do you remember anything else

13     about that meeting?

14            A.    Specifically?  I don't know

15     what you mean.

16            Q.    I'm just asking if you remember

17     anything else about it.

18            MR. POPE:  I'm going to object,

19     just to vagueness.

20            THE WITNESS:  It was a

21     general -- it was a general dinner meeting

22     where they were telling me about ChemTreat.

23     No specifics, no job offer, no anything.  We

24     were just talking about ChemTreat as an

1      organization.

2      BY MR. WALTON:

3          Q.      Did you express any

4      dissatisfaction with Nalco during that

5      meeting?

6          A.      That meeting was about me --

7      sorry.  That meeting was about me learning

8      about ChemTreat, not about talking about

9      Nalco.

10         Q.      Did you talk about specific

11     potential opportunities at ChemTreat?

12         A.      Briefly, briefly, and it was

13     very general, and it was kind of mentioning

14     more to the specific opportunities that Clay

15     outlined in his e-mail to Steve that we

16     reviewed in Exhibit 32.

17         Q.      Now, Clay Cissell was

18     conference leader.

19         A.      That is correct.

20         Q.      Would he be involved in hiring

21     you for a corporate account position?

22                 MR. POPE:  Objection.

23     Speculation.

24                 THE WITNESS:  Clay, like any

1          ready, Mr. Ridley.

2                     Are you ready, Mr. Ridley?

3          A.     Yes.

4          Q.     Okay.  All right, Mr. Ridley.

5     The first e-mail at the bottom, this is an

6     e-mail that you sent to Steve Leavell and

7     Clay Cissell on September 16, 2020, correct?

8          A.     Yes.

9          Q.     All right.  And this is kind of

10    like a thank you for the interview type of

11    e-mail; is that fair to say?

12         A.     It's thanking him for taking

13    the time to meet with me, yes.

14         Q.     Okay.  And you wrote this

15    e-mail, right?

16         A.     I did, yes.

17         Q.     And this e-mail, now that

18    you've had a chance to take a look at it,

19    that accurately reflects your feelings and

20    your perceptions at the time, correct?

21         A.     Mr. Walton, I'm a sales guy.

22    That's a salesman's e-mail.  You've seen

23    them.  You know it is.  That's me selling

24    myself.  I'm always selling.

 1                    Okay.  Do you remember when it

 2      ended?

 3              A.     No, sir, not exactly.

 4                    MR. WALTON:  Just give me a

 5      second, Mr. Ridley.  I've got to find some

 6      documents.

 7                    THE WITNESS:  No, sir.  You are

 8      fine.

 9                    MR. WALTON:  All right.  Let's

10      use this as the next exhibit.  Patty, we're

11      going to use Exhibit 52.

12      BY MR. WALTON:

13              Q.     Mr. Ridley, we've handed you a

14      document which has been marked previously as

15      Exhibit Number 52.  Do you recognize this

16      document?

17              A.     I do.

18              Q.     Okay.  What is this document?

19              A.     Reading from the top, it is a

20      Certificate of Compliance of Obligation to

21      Prior Employers.

22              Q.     Is that your signature on the

23      bottom, or at least your electronic

24      signature?

1          A.      It appears to be, yes.

2          Q.      Do you remember receiving this

3     document?

4          A.      Vaguely, yes.

5          Q.      Do you remember applying your

6     electronic signature?

7          A.      Vaguely, yes.

8          Q.      Did you put the date there of

9     6/19/2021?

10          A.      I believe that was

11     automatically generated.

12          Q.      To your knowledge, sir, is that

13     an accurate date of when you signed this

14     document?

15          A.      Should be, yes.

16          Q.      Okay.  What did you understand

17     this document to require you to do?

18          A.      This document was essentially

19     informing me not to bring any information

20     from a previous employer with me to

21     ChemTreat.

22          Q.      And that previous employer

23     would have been Ecolab/Nalco, correct?

24          A.      That is correct.

```
 1              Q.      Well, since 2020, right?

 2              A.      Probably, yes.

 3              Q.      And this is 2021?

 4              A.      Yes.

 5              Q.      So your testimony here today is

 6       you completely forgot -- at the time that you

 7       signed this document, you completely forgot

 8       that there was Ecolab/Nalco information on

 9       that WD drive.

10              A.      Yes, I did.

11              Q.      Had you already e-mailed to

12       yourself any Ecolab or Nalco information?

13              A.      No, I had not.

14              Q.      Have you ever -- did you

15       ever -- while you were at Nalco, okay, did

16       you ever e-mail or send documents to your

17       Hotmail -- send Nalco documents to your

18       Hotmail account?

19                      MR. POPE:  Objection to form.

20       Ever?

21                      MR. WALTON:  Ever.

22                      MR. POPE:  Ever.

23                      MR. WALTON:  I'm asking ever.

24       Did I stutter?  I said ever.
```

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 63 of 92  PageID #: 9768

1                    MR. POPE:  Let me check.  Yeah,
2       I think so, 81.
3                    THE WITNESS:  Are we done with
4       this one, sir?
5                    MR. WALTON:  Yes, sir.
6                    MS. LUND:  Dave, before you
7       start on the new exhibit, we're about to --
8       you know, we're at about an hour.  Do you
9       want to take a stretch or do just want to
10      push through?
11                   MR. WALTON:  Just let me do
12      this one.
13                   MS. LUND:  Dave, I think this
14      was previously marked as Exhibit 66.
15                   MR. WALTON:  Okay.  Lance, do
16      you mind if I change this to 66 then?
17                   MR. POPE:  No, that's fine.
18      BY MR. WALTON:
19           Q.    Mr. Ridley, please let me know
20      when you've had a chance to review this
21      document.
22           A.    Do you want me to read the
23      whole thing, Mr. Walton, or are you going to
24      ask me specific questions?

1          Q.     And this is from your Anthony
2     Ridley aridley75@hotmail.com?
3          A.     Yes, it is.
4          Q.     And you're sending it to your
5     ChemTreat e-mail address, correct?
6          A.     Yes, I did.
7          Q.     And the attachment is AEDC
8     proposal for purchasing - HVAC Cooling
9     Towers - October 2015.doc, correct?
10         A.     Yes, it is.
11         Q.     Why did you send this document
12    from your Hotmail account to your ChemTreat
13    account on September 29, 2021?
14         A.     Mr. Walton, this is the
15    document that has probably caused me more
16    sleepless nights and more heartache and more
17    confusion than anything in this entire
18    process.  I have no recollection of sending
19    this e-mail.  I have no memory of sending
20    this e-mail.  I did not need this e-mail.  I
21    had no use for this e-mail or the
22    attachments.  This -- I have -- since
23    March 18 of 2020, I have racked my head
24    multiple times trying to figure out why this

1      to Littleton Moore.

2              Q.      When you returned your computer

3      to -- your ChemTreat computer, when you

4      returned it the first time before your

5      termination, right, and you were told to send

6      it to the general counsel -- do you recall

7      that?

8              A.      Yes, I was.

9              Q.      All right.

10             A.      Sorry.  Yes, I do remember,

11     and, yes, that's what I was instructed.

12             Q.      All right.  Were you instructed

13     to put any sort of special labeling or

14     anything on the box?

15             A.      No.  I was told it to send to a

16     person's specific instructions.

17             Q.      Who was that?

18             A.      Emily Bates.

19             Q.      Did she give you those

20     instructions in a writing?

21                     MS. LUND:  Objection.  So just

22     to be clear, again, Emily Bates is in-house

23     counsel, and it's fine for Mr. Ridley to

24     testify to the fact that he was instructed to

1       send the laptop to Ms. Bates, that that's

2       what the label said.  I believe it's been

3       produced.  But, you know, any conversation

4       that he may have had with Ms. Bates outside

5       of that instruction, I'm going to instruct

6       Mr. Ridley not to answer.

7                       MR. WALTON:  Well, I mean, I

8       disagree because I don't think instructions

9       on returning a computer is something that's

10      going to be privileged but --

11                      MS. LUND:  Right.  And I said

12      he can testify to that.

13                      I'm just saying, like, I just

14      want to be very cautious that you hesitate

15      before you answer any question to make sure I

16      have a chance to object and instruct you,

17      because you are not to discuss what Ms. Bates

18      may or may not have told you about anything

19      other than the simple fact of sending your

20      computer back.

21                      THE WITNESS:  Yes, ma'am.

22      BY MR. WALTON:

23              Q.      Did Ms. Bates give you those

24      instructions in a writing?

1          A.     I received the label I believe

2    via e-mail.

3          Q.     Okay.

4          A.     I am not sure if that

5    communication would happen via a phone call

6    or via an e-mail.  But, yes, I did get

7    instructed to send my computer back.

8          Q.     After your termination from

9    ChemTreat, did you -- have you kept any of

10   your documents or files from ChemTreat?

11         A.     No, sir.

12         Q.     Were you involved at all in

13   interviewing, recruiting, Tyler Bates?

14              MR. POPE:  Objection to form.

15              THE WITNESS:  I am not a

16   hiring -- I was not a hiring manager with

17   ChemTreat.

18   BY MR. WALTON:

19         Q.     Did you participate in his

20   interview?

21         A.     I was present --

22         Q.     Did you say anything --

23         A.     -- at a meeting.

24         Q.     Did you say anything during the

Case 1:22-cv-00050-TRM-SKL  Document 296-1  Filed 06/20/23  Page 68 of 92  PageID #: 9773

```
 1      was?
 2              A.      I do not recall when that --
 3      when that actually occurred.
 4              Q.      So you started working at
 5      Ecolab in October of 2020; is that correct?
 6              A.      October 1 of 2021.  No.  2020.
 7              Q.      And you worked there through
 8      July 1 of 2021, correct?
 9              A.      That is correct.
10              Q.      So it had to happen sometime in
11      that time period, correct?
12              A.      Yes, that's correct.
13              Q.      Can you ballpark it at all in
14      terms of whether it was in the first half of
15      your time at Ecolab or the second half of
16      your time?
17                      MR. WALTON:  Objection to form,
18      but you can answer.
19                      THE WITNESS:  Probably the back
20      half.
21      BY MS. LUND:
22              Q.      Okay.  So to the best of your
23      recollection, you received access to
24      Mr. Dunwoody's files sometime in 2021.
```

1     agreement, Exhibit 77, is September the 16th

2     of 2020; is that correct?

3          A.     It is correct.

4          Q.     Okay.  And you also testified

5     about doing backups from your Nalco/Ecolab

6     laptop and partial backups in 2020; is that

7     right?

8          A.     That is correct.

9          Q.     Do you recall if those backups

10    occurred before or after September the 16th

11    of 2020?

12         A.     I believe they occurred before

13    because I do not remember ever hooking the WD

14    drive up to my Ecolab computer in the back

15    half of 2020.

16         Q.     Okay.

17         A.     Or even the front half of 2021.

18         Q.     Okay.  And paragraph 4, the

19    last sentence says, "Employee will not wipe,

20    delete, transfer or cause any Company data to

21    be wiped, deleted or transferred from any

22    such device before returning the device to

23    the Company."

24               Mr. Walton asked you several

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 70 of 92   PageID #: 9775

| | |
|---|---|
| **Date:** | Friday, August 21 2020 02:09 PM |
| **Subject:** | FW: Anthony Ridley's resume |
| **From:** | Cissell, Clay |
| **To:** | Leavell, Steven R <STEVEL@chemtreat.com>; |
| **Attachments:** | Ridley Resume 2020.pdf |

Steve

This is the resume for the guy I recently interviewed in Nashville. He lives just outside of Chattanooga TN. He has been a high performer in Nalco, but is just fed up. He knows we are in a hiring freeze right now, but is ready to come. I think he has a lot of potential and he will to meet you halfway between Chattanooga and Charlottesville. Do you think you could take a day and sit down with him (maybe in mid-September). He could be field sales guy, I think he could do corporate sales and maybe even a potential guy for a Conference Leader. He is a pretty capable guy.

Let me know your thoughts.

Clay

**From:** Anthony Ridley [mailto:aridley75@hotmail.com]
**Sent:** Monday, August 17, 2020 8:39 PM
**To:** Cissell, Clay <richard.cissell@chemtreat.com >
**Subject:** Anthony Ridley's resume

Clay,

Attached is my update resume. If you have any questions or need any additional information, don't hesitate to give me a call or send me an email.

Best Regards,

Anthony Ridley
mobile: 423-322-9506

**Exhibit 32**
3/16/2023

# Anthony Ridley, MBA
Dayton, TN
(423) 322-9506
aridley75@hotmail.com

## EXECUTIVE SUMMARY

- Leadership and Management
- Value-Based Selling
- Develop Strategic Sales Processes
- Sales Pyramid Development
- Communication
- Skilled Negotiation

## PROFESSIONAL EXPERIENCE

Nalco Water

### District Sales Manager - Dayton, TN                                    4/15-Present

Responsible for leading and managing a team of sales professionals to deliver revenue and profit growth of programs and services to customers in a targeted geography. Customer portfolio ranging between $8M - $15M, in revenue. Continuously overachieved district objectives by identifying and prioritizing business drivers and offering solutions to problems and challenges by understanding and evaluating industry trends and market conditions.

**Main Responsibilities:**
- Drive growth to meet defined district revenue and profit increase goals by developing and executing a strategic sales strategy.
- Regularly interact across functional areas with senior management and executives to ensure objectives are met.
- Generate sales forecasts.
- Participate in strategic & tactical planning for the district by leveraging, allocating, and maximizing resources to meet the needs of the customer.
- Construct business plans incorporating essential market drivers and all obtainable analytics, while monitoring and adjusting plan according to shifts, emerging conditions, and threats to the business.
- Demonstrate strong leadership by championing corporate initiatives.
- Reinforce a clear vision, for the team, related to strategic objectives.
- Provide coaching and development to a team of sales engineers and technical service representatives to drive sales while creating and maintaining value in various industrial segments.
- Support team and internal partners by identifying trends, understanding market conditions, and sharing expertise and knowledge.
- Work closely with large, strategic customers and prospective customers to understand business needs.

**Achievements:**

- o *2019 Andy Miciotto Award - Recognizes a sales professional that continuously contribute to the success of NALCO Water.*
- o *Summit Award Winner: 2015, 2016, 2018*
- o *Delivered sales increase of greater than 10% revenue and profit growth in 2015, 2016, 2018, and 2019*
- o *Seven (7) Years of consecutive sales increase*

### Account Manager / Sr. Account Manager – Chattanooga, TN               08/05–04/15

Responsible for generating revenue and profit growth of programs and services to customers in an assigned territory. Used a consultative sales approach to build relationships with existing customers by developing programs that met the customer's key business needs. Applied strong account leadership, to convert strategic, competitive accounts to customers and implemented advanced technologies to existing customers.

**Main Responsibilities:**
- Executed strong team leadership by coaching and training other District Representatives, championing corporate initiatives, and by planning and leading District Meetings
- Generated and executed strategic sales plans to close new opportunities within existing customer base, and in major, competitively held accounts, to meet deferred territory revenue and profit increase goals.
- Worked closely with current and prospective customers to understand business needs and recommend continuous improvement and innovation projects that will maintain and grow sales

CONFIDENTIAL                                                                    CHEMR-000000157

- Develop strong relationships with key stakeholders within current and prospective customers, including plant or facility executives
- Engaged in problem solving by performing system analysis, interpreting data, and providing written recommendations to ensure customer operations are performing at optimal levels
- Demonstrated the ability to stabilize jeopardy business in large, strategic accounts

**Achievements:**
- o *Multiple All-Pro Winner*
- o *Multiple Double / Double Performances*
- o *Positive revenue and profit increase every year, but one as an Account Manager or Sr. Account Manager*

### District Representative: DRIII / DRII / DRI – Chattanooga, TN                    11/99–08/05

Accountable for revenue and profit growth of programs and services in targeted accounts. Focused on building relationships with existing customers by executing a problem-solving approach while implementing programs that met the needs of the customers. Using strong account leadership, strategic competitive accounts were converted to customer and delivered innovating technologies into existing customers.

**Main Responsibilities:**
- Generated and executed sales plans in existing customer base and in assigned competitively held accounts, to meet profit increase goals.
- Worked closely with current and prospective customers to understand business needs and recommend continuous improvement and innovation plans that will maintain and grow sales
- Developed strong relationships with key stakeholders within current and prospective customers, including plant or facility executives
- Provided technical support to customers by identifying, troubleshooting, and resolving customer challenges
- Actively sold and supported Nalco Water innovations and technology in assigned customers to promote long-term business relationships with Nalco Water

Achievements: Multiple All-Pro Winner

## EDUCATION & CERTIFICATIONS & LICENSES

The University of Tennessee at Chattanooga
Master of Business Administration (MBA)
Concentration: International Management / Entrepreneurship                    2008

The University of Tennessee at Chattanooga
Bachelor of Arts (B.A.) B.A. in Chemistry                    1998

Tennessee Commercial Biocide Certification C-14: Microbial Pest Control                    2009 - Present

## AFFILIATIONS & SKILLS

- Councilor Sales Professional
- Versatile Sales Professional
- Strategic Salesperson
- Situational Leadership
- Corporate Storytelling
- 7 Habits of Highly Successfully Professionals
- Crucial Conversation

Anthony Ridley                    RESUME                    Page 2

Case 1:22-cv-00050-TRM-SKL   Document 296-1   Filed 06/20/23   Page 73 of 92   PageID #: 9778

CONFIDENTIAL                    CHEMR-000000158

| Date: | Wednesday, September 16 2020 11:32 AM |
|---|---|
| Subject: | RE: Thank you for your time |
| From: | Leavell, Steven R |
| To: | Anthony Ridley <aridley75@hotmail.com>; Cissell, Clay <richard.cissell@chemtreat.com>; |

Anthony,
    It was a pleasure meeting with you and spending time together.  I look forward to exploring opportunities in Chemtreat with you as we get through this Covid situation hopefully before the end of the year.

Thanks,

Steve

**From:** Anthony Ridley <aridley75@hotmail.com>
**Sent:** Wednesday, September 16, 2020 11:22 AM
**To:** Cissell, Clay <richard.cissell@chemtreat.com>; Leavell, Steven R <STEVEL@chemtreat.com>
**Subject:** Thank you for your time

Steve and Clay,

I hope this email finds you well.  Thank you for the opportunity to interview with you for a position with ChemTreat.  Our conversations Monday evening and Tuesday morning were insightful and helped me better understand ChemTreat's structure, culture, and expectations.  The differences between what I am currently accustom to and ChemTreat is very evident.  Hopefully, I am someone who could find a place in your organization and delivery a positive impact.  My goal is to be in roles where I can use my skillset to building strong customer relationships and driving growth, in a competitive environment.  I look forward to continuing the process of building our relationship and taking the next steps, in the process.  If you have any additional questions, for me, don't hesitate to give me a call or send me an email.  Once again, I appreciate the time you spent with me.


Best Regards,


Anthony Ridley
Mobile: 423-322-9506
Email: aridley75@hotmail.com

Exhibit 37
3/16/2023

CONFIDENTIAL                                                                                                CHEMR-000000201

| Date: | Tuesday, March 2 2021 01:15 PM |
|---|---|
| Subject: | Ridley Business Plan |
| From: | Anthony Ridley <aridley75@hotmail.com> |
| To: | Cissell, Clay <richard.cissell@chemtreat.com>; |
| Attachments: | Ridley Business Plan 2021 - 2023.xlsx |

Clay,

Attached is the business plan that I prepared. The Business Plan cover 2021 - 2023. I used the revenue numbers you provided. In the plan, I did make some assumption for transition into the role, learning the ChemTreat business and chemistries, time needed to transfer accounts, and my non-compete. I did not add into the plan additional business from other ChemTreat reps that may retire in the near future. I assume that would be simply territory growth. Please let me know if you have any questions.

Best Regards,

Anthony Ridley

---

**From:** Cissell, Clay <richard.cissell@chemtreat.com>
**Sent:** Wednesday, January 13, 2021 4:40 PM
**To:** Anthony Ridley <aridley75@hotmail.com>
**Subject:** RE: Attached Image

This one is not signed........do you have a signed copy

**From:** Anthony Ridley [mailto:aridley75@hotmail.com]
**Sent:** Wednesday, January 13, 2021 3:39 PM
**To:** Cissell, Clay <richard.cissell@chemtreat.com>
**Subject:** Fw: Attached Image

Clay,

Good afternoon. Attached is the Employee Sales, Service, Marketing and Inventions Agreement that I signed when I moved into my new role with Ecolab. The information you are looking for is contained on Page 2 and 3.

Best Regards,
Anthony


Please be advised that this email may contain confidential information. If you are not the intended recipient, please notify us by email by replying to the sender and delete this message. The sender disclaims that the content of this email constitutes an offer to enter into, or the acceptance of, any agreement; provided that the foregoing does not invalidate the binding effect of any digital or other electronic reproduction of a manual signature that is included in any attachment.

**Exhibit 43**
3/16/2023

CONFIDENTIAL

CHEMR-000000277



**Exhibit 44**

3/16/2023



| | Sales |
|---|---|
| 2021 Base | $794.4 |
| Non-Repeat (1X) | $10.0 |
| Down Accounts | $38.0 |
| Lost Accounts | $32.0 |
| Price | $15.5 |
| New One-Time | $15.0 |
| New Repeat | $75.0 |
| Carryover New | $37.5 |
| 2022 Forecast | $857.4 |
| | $63.0 |





| | Sales |
|---|---|
| 2022 Base | $837.4 |
| Non-Repeat (1X) | $15.0 |
| Down Accounts | $45.0 |
| Lost Accounts | $40.0 |
| Price | $16.0 |
| New One-Time | $20.0 |
| New Repeat | $100.0 |
| Carryover New | $75.0 |
| 2023 Forecast | $948.4 |
| | $111.0 |

**RIDLEY - 2022 / 2023 Bridge**

Claimed New Business in 2023 was 200,000

I HEREBY CERTIFY THE FOLLOWING:

1. I will not disclose to ChemTreat Inc. (the "Company") or use in my work at the Company, any confidential information and/or trade secrets belonging to others, including my prior employers.

2. I have returned to my prior employer all hard copies of and electronic versions of confidential information of my prior employer and have not copied, downloaded, removed or e−mailed to myself improperly any confidential information belonging to my prior employer.

3. I am not subject to any restrictive covenants or obligations that would prevent me from fully performing my duties for the Company.

4. I will immediately inform my Supervisor at the Company and its designated legal representative, if any, in writing if I am asked to reveal any confidential information belonging to others.

5. I have not retained any confidential information, records cr documents in hard copies or an electronic format from a prior employer.

6. I am being hired for my general skills and knowledge in the industry rather than any confidential or proprietary information that I may have had access to or possessed prior to my relationship with the Company. I have been expressly told by the Company that it is not hiring me for any confidential information I may possess and that it does not want me to reveal any confidential information belonging to others.

7. I have been instructed by the Company to consult with my personal attorney before accepting employment with the Company and cannot rely upon any information provided to me by the Company or its counsel regarding any obligations I may owe to any prior employer.

8. I understand that I may be subject to discipline, including termination of my employment with the Company, if I have falsely certified the information herein or do not follow the certifications I have made herein.


Signature: *Anthony S. Ridley*

Print Name: Anthony Ridley

Date: 06/19/2021

**Exhibit
52**
3/16/2023

CONFIDENTIAL                                                                 CHEMR-000000142

| Date: | Wednesday, September 29 2021 03:45 PM |
| Subject: | AEDC response |
| From: | Anthony Ridley <aridley75@hotmail.com> |
| To: | Ridley, Anthony <anthony.ridley@chemtreat.com >; |
| Attachments: | AEDC proposal for purchasing - HVAC Cooling Towers - October2015.doc |

**Exhibit 66**

CHEMR-000001631



September 24, 2015

Mr. Chris Gipson
Arnold Air Force Base
ATA
1476 N. Hap Arnold Drive
AAFB, TN 37389-8000

Mr Gipson:

The following information is in response to ATA Request for Quotation for HVAC water treatment program, during the period of October 1, 2015 – September 30, 2016 . The Request for Quotation was regarding the cost associated with Nalco providing a water treatment program for the cooling towers at Building 1103 and Building 1088.   In the Request for Quotation ATA outlined several areas, which are to be met by Nalco.

The specifications of the Request for Quotation are that Nalco shall provide all labor, materials, equipment, a chemical storage system, and transportation necessary to provide a chemical treatment program for the cooling towers located at Building 1088 and Building 1103.   The vendor shall make an initial site visit to verify chemical feed points, make recommendations on changes to existing feed system, and determine location of any new chemical feed tanks.   The vendor shall supply all chemicals, make periodic on-site system evaluation and troubleshooting, chemical feed tanks, chemical deliveries, inhibitor monitoring equipment, wireless communication, and lab analysis as needed.  All chemicals must have a SDS (Safety Data Sheet) submitted for approval.  The contract shall be on an annual basis with a four-year option.  The selected chemicals will be purchased on an as needed basis.  Nalco will provide any training to on-site personnel that will be needed to monitor the chemical feed systems.  Materials and labor shall be provided in accordance with GSA contract number GS-10F-8607C, which is associated with Nalco.

Sincerely,

Anthony Ridley
District Manager
WPS Division
Nalco Company

CHEMR-000001632

# TREATMENT PROGRAM

The treatment program that has been selected for AEDC is one that meets the need of AEDC and also fits in with the system currently in place. All of the products in the program have a proven track record throughout the industry and are currently in place at other account with in this area. The treatment program for the cooling tower is as follows:

## Cooling Tower

- **Nalco 3DT265** is part of Nalco's new line of 3D TRASAR chemistries. Nalco 3DT265 is a scale and corrosion inhibitor that is monitored by a 3D TRASAR unit. The 3D TRASAR is a cooling water automation package that monitors the level of scale and corrosion inhibitor, conductivity, turbidity, OPR, pH, Nalco scale index, and Nalco Bio-Index on a real-time continuous basis. It automatically turns the chemical feed pumps on and off to maintain a proper chemical balance in the system. Because the 3D TRASAR ensures that the proper level of inhibitor will be in the system at all times, we are able to achieve higher cycles of concentration in the cooling tower, thereby saving the customer significant amounts of make-up water, bleed water to the sewer, and chemical. TRASAR comes with **Nalco *Dose and Diagnose Services*** that helps the customer exactly calculate critical system values like system volume, bleed rate, and holding time index. The TRASAR will also allow us to trace any leak that may occur in the system.

- **STA-BR-EX (ST70):** This patented Nalco innovation has changed the marketplace for a dual biocide approach to a single biocide approach. STA-BR-EX is highly persistent, stabilized bromine in a liquid format. Because it is so stable, it requires very nominal feed rates in order to achieve an effective kill of microorganisms. Bromine chemistry is much more effective biocide than chlorine-based biocides. In water, bleach will break down to $HOCl$ (hypochlorous acid) and $OCl^-$ stabilized bromine in water will form $HOBr$ and $OBr^-$ The relative concentrations of the hypohalous acid, which are more biocidally active, and the hypohalous ions, are dependent on pH. At a pH levels greater than 5.0, $HOCl$ concentration start to drop and $OCl^-$ begins to increase. At a pH of 8.5, the $HOCl$ level to $OCl^-$ is 10% to 90 %. At this pH, the $HOBr$ level to $OBr^-$ level is 60% to 40%, or six times more active than bleach. Also, since the product is stabilized, it is not susceptible to mechanical stripping across the tower and will not lose activity as it sits in a drum, as bleach is prone to do in as little as a weeks time. STA-BR-EX helps maximize heat transfer in the chillers and prevents corrosion caused by microorganisms. STA-BR-EX comes with **Nalco BioManage Services**, including lab analyses.

- **FEEDPOINTS:** The 3D TRASAR will be piped into your current system. It will be connected into the recirculation line that flows through your conductivity meter. The STA-BR-EX will need to be feed into the return line of the cooling tower after the bleed off, or into the sump of the tower. The Nalco 3DT265 needs to be feed into the supply line coming off of the tower. These feedpoints locations are the correct locations to feed this chemical program. If for some reason these points are not acceptable adaptation can be made to fit your system.

# SERVICE PROGRAM

At Nalco Chemical Company our goal is to maintain the highest levels of customer satisfaction and to insure that our customers receive a return on their investment with us. With this in mind, it is important for you to understand how we view our relationship with our customer.

The system that we have in place is to insure that we meet your needs through the growth stages of our relationship is our industry-leading **Six Service Standards**. All of the Nalco field representatives have been extensively trained

CHEMR-000001633

in these standards to insure that they are followed as we work with you in your facilities. These standards are designed to insure that we are meeting the needs of our customers and working together with them as we move up the growth curve toward a permanent business partnership. The following is a brief summary of the standards and what they will mean to you:

**PEOPLE SURVEY:**
Good business relationships start with good communication. Our representatives work toward understanding your organization and its needs. The better we get to know your team, the better chance we have of helping you meet and exceed your business objectives.

**PLANT SYSTEM SURVEY:**
We make sure we know your system as well as your people. Through the use of line diagrams and the collection of system design data, we insure that the proper treatment program is implemented, and this allows us to understand opportunities for improvement.

**SERVICE PLAN:**
Our goal is to work on projects that provide you with a payback. Your Nalco representative will work with you to set goals and objectives for our program. This allows us to work with you in organizing our efforts and schedule activities to meet your priorities.

**PROGRAM ADMINISTRATION MANUAL:**
Effective day-to-day control is a critical part of the process. That is why operator training, detailed operator guidelines and written contingency plans are part of our service standard. This manual is prepared specifically for your site in order to provide your operating personnel with all of the necessary information to manage the water treatment program in a safe and efficient manner.

**PERSONAL SERVICE REPORTS:**
These reports provide a mechanism for monitoring the progress that is being made. These reports document the service that is performed by your representative and includes recommendations for improvement. These reports will follow the agreed upon service plan and update you on the status of each project and any corrective action which needs to be taken in order to correct the problems.

**BUSINESS REVIEWS:**
Perhaps the most important element in these service standards is a formal review of the accomplishment of our program with key members of your team. The business review is an ideal time to set goals for the next service plan and to discuss opportunities for additional projects, which will provide you a further return on your investment.

Our service program is customized to address your specific Water/Energy management needs. A Nalco representative shall visit your facility at least once every other week; at first once per week minimum until the transition is fully successful.

Service programs tailored to your needs coupled with Nalco's commitment to frequent service visits allow you to:

- Achieve the maximum benefit from your Nalco program and realize the maximum results.
- Keep your system operating with minimal problems and minimal downtime.
- Realize maximum energy savings and system performance.

Enclosed is the Nalco service schedule we will use at your facility. It lists the specific services provided and degree of service frequency.

A key aspect of our service program is our Personal Service Reports. Service reports are a useful tool for documenting program conditions and are thorough, direct, and legible.

Necessary information which we include in these reports, is listed below:

CHEMR-000001634

- Water analyses, including all-important tests for each water system.
- Recommended control ranges for all tests.
- Current feed-rates and appropriate changes, if necessary.
- Performance parameters.
- Summary and recommendations section, which fully explains the status of the program, the benefits of correct system control, and possible consequences when, items are out of control.
- System recommendations that will increase system efficiency or correct operational problems.
- Reports distributed and discussed with appropriate personnel prior to leaving each visit.

## NALCO SERVICE SCHEDULE

| SERVICE | FREQUENCY |
|---|---|
| ON-SITE WATER TESTING | ONCE EVERY 4 WEEKS |
| COLLECTION OF WATER SAMPLES FOR OUTSIDE ANALYSES | AS NEEDED |
| EQUIPMENT INSPECTIONS | ON SHUTDOWN/ANNUALLY |
| DEPOSIT ANALYSES | AS NEEDED |
| MICROBIOLOGICAL ANALYSES | NALCO – PER VISIT<br>PLANT PERSONNEL - WEEKLY |
| SPECIAL PROJECTS | ESTABLISHED DURING BUSINESS REVIEWS |
| CORROSION/FOULING STUDIES:<br>A) COOLING SYSTEMS (1),(2),(3)<br>B) DOMESTIC WATER SYSTEMS (1) | (1) CORROSION COUPONS - 30, 60, OR 90 DAYS<br>(2) DEPOSIT MONITOR (IF NEEDED)<br>(3) BIO-FOULING MONITOR (IF NEEDED) |
| PLANT PERSONNEL TRAINING SEMINARS | IMMEDIATELY UPON CHANGES IN PROGRAM<br>SPECIAL TOPICS - SEMI-ANNUALLY |
| CHEMICAL SAFETY REVIEWS | MINIMUM ONCE PER YEAR AND WHEN PRODUCTS CHANGE |
| REVIEW OF WATER TESTING LOGSHEETS | DURING VISITS WITH OPERATOR |
| PLANT MANAGEMENT MEETINGS | QUARTERLY BUSINESS REVIEWS<br>ANNUAL FORMAL PRESENTATIONS |

Another key element to understand how we do business at Nalco Chemical Company is to recognize our commitment to the environment, health, and safety associated with our programs. Nalco's efforts in this area are covered by our PRODUCT STEWARDSHIP PROGRAM.

Nalco's Product Stewardship efforts are guided by Chemical Manufacturer's Association Responsible Care code of management practice that establishes corporate leadership and commitment, identifies and characterizes potential

CHEMR-000001635

risks associated with products, and develops a system to manage those risks. PRODUCT STEWARDSHIP affects our employees, suppliers, contract manufacturers, distributors and customers. We feel strongly that we play a major role in your ability to provide your employees with a safe working environment and to reduce potential liabilities associated with the chemical treatment of your boiler and cooling water systems.

# CHEMICAL HANDLING SYSTEM

Nalco Chemical Company is concerned about the safety of our employees, our customers, and our environment. Nalco's commitment to safe chemical handling is a direct result of this concern and is demonstrated through many of the programs and activities developed to promote this important area. The concern for safety is exemplified by Nalco's **Porta-Feed** program, which eliminates drum handling and disposal.

Nalco's **Porta-Feed** program has become the new industry standard for chemical handling. This exclusive program provides a convenient, safer, more economical alternative to drums. To meet the widest variety of customer needs **Porta-Feed** units are currently available in 400, 200,110, 75, and 30-gallon units.

Nalco offers a delivery option to meet almost any need. The **Porta-Feed** program is initiated with the delivery of a full base unit right to the application site. When chemical supply gets low, a refill unit is delivered to the application site. The base tank is filled, and Nalco takes the empty refill unit away. This simple process eliminates drum handling and disposal by your personnel.

The **Porta-Feed** system has been engineered with safety in mind. Advanced design features including, full drain bottom, 10-gauge stainless steel construction or polyethylene construction, sturdy stacking legs, and flooded suction to the feed pump, provide **Porta-Feed** users with the following advantages:

- Reduces chemical handling for improved worker safety.

- Eliminates excess costs due to residual chemical left in drums.

- Allows for more efficient use of storage space.

- Improves results by reducing the number of chemical feed problems incurred with a vacuum-lift feed system.

- Eliminates costs, hassles, and environmental concerns of drum disposal.

As a leader in specialty chemicals for water treatment and process applications, Nalco is committed to providing you with the best chemical treatment programs. We continually strive to provide innovations such as the **Porta-Feed** program to help ensure safe, reliable, and cost effective results.

Our program for your plant utilizes the **Porta-Feed** program for all liquid products that are to be fed into your systems by Nalco. The use of **Porta-Feed** units along with the neat feed will eliminate your personnel having to come in contact with the chemicals.

CHEMR-000001636

# WATER AND ENERGY MANAGEMENT PROGRAM

There are several areas that Nalco plans to focus on to improve AEDC's current water and energy management program. These areas will be where most of Nalco's documented Return on Investment saving come from. These areas are as follows:

- Increase control of chemical program with 3D TRASAR program

- Implement a Wireless Gateway for communication with 3D TRASAR system, in order to monitor cooling tower systems

- Optimization of cooling water systems

- Increase knowledge and awareness of operators through comprehensive training program.

- Provide a strong and knowledgeable consulting staff in the fields of Chemistry and Engineering

# PROGRAM COSTS

The cost for the Nalco Chemical program for Arnold Air Force Base in Tullahoma, Tennessee can be broken down as follows:

## Cooling Tower for building 1088

**Line Items for Bid Comparison:**
1. Equipment cost per month: $100.00
2. Chemical cost (per lb. usage) for liquid bromine biocide (ST70): 1MM X 9ppm X $2.73 = $24.57
3. Chemical cost (per lb. usage) for scale/corrosion inhibitor (3DT265): 1MM X 100ppm X $3.89 = $389.00

Nalco will provide the following equipment:
      -Nalco Porta-Feeds (in stainless steel)
      -Nalco 3D TRASAR w/ Junction Box
Total annual cost for equipment: $ 1,500.00

- Chemical treatment with Nalco 3DT265 and Nalco ST70
  - One mini Porta-Feed of 3DT265 (518lbs @ $3.89)
  - One mini Porta-Feed of ST70 (556lbs @ $2.73)
Total chemical cost for one year: $3,532.90

## Cooling Tower for building 1103

**Line Item for Bid Comparison:**
1. Equipment cost per month: **$100.00**
2. Chemical cost (per lb. usage) for liquid bromine biocide (ST70): 1MM X 9ppm X $2.73 = **$24.57**
1. Chemical cost (per lb. usage) for scale/corrosion inhibitor (3DT265): 1MM X 100ppm X $3.89 = **$389.00**

Nalco will provide the following equipment:

CHEMR-000001637

-Nalco Porta-Feeds (in either stainless steel or polyethylene construction)
-Nalco 3D TRASAR w/ Junction Box
Total annual cost for equipment: $1,500.00

Chemical treatment with Nalco 3DT265 and Nalco ST70
- Two mini Porta-Feeds of 3DT265 (1,036lbs. @ $3.89)
- Two mini Porta-Feeds of ST70 (1,112lbs @ $2.73)
Total chemical cost for one year: $7,065.80

Total Cost of Chemical Treatment Program for October 2015 – September 2016: $13,598.70

## Optional Additional Cost:

- Service Twice Per Month by Nalco Representative: $4,500/year.

- Tower Cleaning Provide by Nalco Service Group: $11,800/year for both cooling tower systems

These numbers are based current system conditions of the cooing towers. The cooling tower in building 1103 has a recirculation rate of 2460 gpm. The cooling tower in building F-1088 has a recirculation rate of 688 gpm. This cost is also based on Arnold Air Force Base purchasing the chemicals on a per pound basis at GSA pricing. Nalco will not be expected to be held to this cost if there are extreme upsets in the system that Nalco has no control over. Such as Arnold Air Force Base's equipment was to malfunction or if there was some sort of operator error.

In all cases, the program costs include all treatment chemicals for the both cooling towers, equipment, transportation necessary to provide chemical treatment of the cooling towers, operator training seminars, on-site visits by the Nalco representatives, all value-added services listed above, including system troubleshooting, chemical deliveries, Nalco TRASAR, wireless gateway system monitoring, and the Nalco mini Porta-Feed program.

CHEMR-000001638

# Employee Sales, Service, Marketing & Inventions Agreement

**This AGREEMENT is made and entered into between Ecolab Inc., a Delaware corporation, its parent companies, sister companies and subsidiaries** Anthony Ridley **(the "Employee").**

The Company's business is highly competitive and the Company has invested considerable sums of money in developing products, equipment, training programs, sales programs, technical service programs and account records for the proper servicing of its customers. Such records include, but are not limited to, the type of equipment installed, the prices paid by each customer, the names and positions of the customer's key personnel, the types of services performed, the frequency and destination of shipments, and the products generally ordered by the customer. The Company also invests substantial sums on the training and development of its employees and the development of technology. While employed with the Company, the Employee will receive valuable training under the Company's sales and/or service programs and will be entrusted with the information in the Company's account records and may be entrusted with information regarding Company's Trade Secrets. In return for the Company providing the Employee with this training and information, the Employee agrees not to use this training and information against the Company. The Employee also agrees that the restraints imposed by this Agreement are reasonable and necessary to protect the Company's business, goodwill, customer relationships, and the jobs of other Company employees.

Therefore, in consideration of the Employee's employment and the covenants and agreements contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.** The Company will employ the Employee in a sales or sales management position, or a service or service management position, for such period of time and for such compensation, including salary and employee benefits, as may be mutually agreeable to both parties. The compensation shall be deemed to be mutually agreeable to both parties if the Company pays the compensation and the Employee accepts the compensation. The Company may at any time, with or without adjusting the Employee's compensation, alter the geographic limits of any sales or service territory assigned to the Employee, or assign the Employee to a new territory, or change the customers assigned to the Employee. Both the Company and the Employee have the same right to terminate the employment with or without cause or notice at any time, and this at-will employment relationship may not be modified except in a writing signed by Employee and an authorized officer of the Company.

**2.** Employee acknowledges that as a result of Employee's employment with Ecolab, Employee will acquire knowledge of Company's Trade Secrets and its Confidential Information, which may include without limitation, information regarding present and future operations, customers and suppliers, pricing, business strategies, business methods, and employees (including the particular skills, talents and abilities of those employees).

Employee hereby agrees that Employee will hold in a fiduciary capacity for the benefit of Company and shall not, directly or indirectly, use or disclose any Trade Secrets, as defined hereinafter, that Employee may have acquired during the term of Employee's employment with Company for so long as such information remains a Trade Secret.

The term "Trade Secret" as used in this Agreement shall mean information pertaining to Company including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, financial data, financial plans, product plans, a list of actual or potential customers or suppliers, pricing information, information about customer contacts, requirements or purchasing patterns, or the identities of or contact information for actual or potential customers or suppliers of Company that both:

**(a)** derives economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

**(b)** is the subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

In addition to the foregoing and not in limitation thereof, Employee agrees that while employed with the Company and for a period of three (3) years after termination of Employee's employment with Company, Employee will hold in a fiduciary capacity for the



**Exhibit**
**077**

benefit of Company and shall not, directly or indirectly, use or disclose any Confidential Information, as defined hereinafter, that Employee may have acquired (whether or not developed or compiled by Employee and whether or not Employee was authorized to have access to such Confidential Information) during the term of, in the course of, or as a result of Employee's employment by Company.

The term "Confidential Information" shall mean Company's confidential data or information which is valuable to Company but substantially inaccessible to the public and to competitors of Company, including, without limitation, business information, financial data, product information, the identities and contact information of actual or potential customers or suppliers, pricing information, and other information of a proprietary nature regarding the Company's business operations, excluding Trade Secrets. Notwithstanding the foregoing, the term "Confidential Information" shall not include information that Employee can establish by competent proof: (i) was generally known to or accessible by the public at the time Company disclosed the information to Employee; (ii) became generally known to or accessible by the public after disclosure by Company through no act or omission by Employee; or (iii) was disclosed to Employee, after the Employee's termination of employment with the Company, by a third party having a bona fide right both to possess the information and to disclose the information to Employee, provided such third party is not subject to an obligation of confidentiality with respect to such information.

Employee understands Employee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that is made (a) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney if such disclosure is made solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and Employee does not disclose the Trade Secret except pursuant to a court order.

**3.** Ecolab is committed to compliance with applicable federal, state and local laws. As such, nothing in this Agreement prohibits Employee from reporting possible violations of law to any government agency if such report is made in confidence and good faith to a federal, state or local government official, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law or for pursuing an anti-retaliation lawsuit relating to such report. Nothing in this Agreement is to be construed to prohibit the Company from bringing any claims against Employee, including but not limited to, statutory claims for Trade Secret misappropriation. Nothing in this Agreement is to be construed to unlawfully limit any rights Employee may have under the National Labor Relations Act.

**4.** When Company owned computers, computer devices, e-mail addresses, phones, and/or other electronic technology are issued to Employee, Employee shall conduct Company business and communicate with customers, vendors and the public regarding Company business only on the Company computer network and using such Company-provided electronic technology. Employee agrees that Employee will not transfer or store any Company information on any device or other storage medium (physical or virtual) not provided or authorized by the Company unless authorized to do so in writing by the Company. Employee has no right to privacy with respect to any data that is stored on any device issued to Employee by the Company and/or authorized for Employee to use for Company business. As soon as Employee begins to consider leaving the Company or Employee realizes Employee's employment with the Company has or will soon come to an end, Employee will not wipe, delete or transfer or cause any Company data to be wiped, deleted or transferred from any such device before returning the device to the Company.

**5.** The Employee shall perform such services as may be assigned to Employee from time to time in accordance with the Company's policies and procedures. The Employee shall timely submit written sales and service reports using the Company's standard report forms. Employee will devote Employee's whole working time and ability to the services of the Company in such capacity as the Company from time to time shall direct. Employee further agrees that during the course of employment by the Company, Employee will not have any financial interest, whether direct or indirect, in any firm or organization engaged in competitive services or products. This provision is not intended to preclude personal investments of the Employee which do not require Employee's significant day-to-day attention and management. Employee agrees to promptly disclose to the Company any conflict of interest or employment matter which may be adverse to the Company's interest.

**6.** During employment with the Company and for a period of one (1) year immediately following the termination of his employment with the Company, the Employee will not:

**(a)** solicit, encourage or induce any customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service;

**(b)** transact business with any Customer of the Company with whom Employee did business or whose account was supervised by or assigned to the Employee at any time during the twelve (12) month period immediately preceding the termination of Employee's employment (regardless of reason) for the purpose of providing a Competing Product or Competing Service.

During said one (1) year following termination, the employee also will not assist any Competing Firm to engage in the aforementioned activities prohibited by Subsections 6(a) and 6(b). A Competing Firm means any person or organization (including one owned in whole or in part by the Employee) which is engaged in the development, production, use, marketing or sale of a Competing Product or Competing Service. A Competing Product or Competing Service means any product or service which is the same as, or similar to, and competes with, a product or service of the Company which was part of the product or service line handled by the Employee, or by persons supervised by the Employee, during Employee's last year of employment with the Company. If the Employee violates the covenants contained in this Section, the term of said covenant shall be extended for one (1) year from and after the later of (a) the date on which the Employee permanently ceases such violation; or (b) the date on which any court issues an order or judgment enforcing the covenant; provided, that in no event shall the term of the covenant be extended for a term beyond twenty-four (24) months following termination of the Employee's employment with the Company.

**7.** During Employee's employment with Company and for a period of one (1) year immediately thereafter, Employee will not hire or induce, attempt to induce or in any way assist or act in concert with any other person or organization in hiring, inducing or attempting to induce any employee or agent of Company to terminate such employee's or agent's relationship with Company. This restriction is limited to those employees that Employee managed, or supervised, or had material contact with on the Company's behalf during the last twelve (12) months of Employee's employment with Company.

**8.** Employee will communicate and disclose in writing to Employee's manager or to such person as may be designated by the Company both during employment and thereafter, all inventions, discoveries, improvements, machines, devices, design, processes, products, software, treatments, formulae, mixtures, and/or compounds whether patentable or not as well as patents and patent applications (all collectively called "Inventions") made, conceived, developed or acquired by Employee or under which Employee acquired the right to grant licenses or become licensed, whether alone or jointly with others, during Employee's employment by the Company. All Employee's right, title and interest in, to and under such Inventions, including licenses and right to grant licenses, shall be the sole property of the Company and Employee hereby assign the same to the Company. Any Invention disclosed by Employee to anyone within one (1) year after termination of Employee's employment with the Company, which relates to any matters pertaining to, applicable to, or useful in connection with, the business of the Company shall be deemed to have been made or conceived or developed by Employee during Employee's employment by the Company, unless proved by Employee to have been made and conceived and developed after termination of Employee's employment with the Company.

**9.** For all Employee's Inventions, Employee will, upon request of the Company, during Employee's employment and thereafter:

**(a)** execute and deliver all documents which the Company shall deem necessary or appropriate to assign, transfer, and convey to the Company, all Employee's right, title, interest in and to Employee's Inventions, and enable the Company to file and prosecute applications for Letters Patent of the United States and any foreign countries on inventions as to which the Company wishes to file patent applications, and

**(b)** do all other things (including giving of evidence in suits and other proceedings) which the Company shall deem necessary or appropriate to obtain, maintain, and assert patents for any and all such inventions and to assert its rights in any inventions not patented

**10.** Employee's obligations under Sections 8 and 9 of this Agreement do not apply to Inventions for which no equipment, supplies, facility or Confidential Information of the Company was used, and which were developed entirely on Employee's own time unless the inventions relate to the business of the Company or to the Company's actual or demonstrably anticipated research or development or the inventions result from any work performed by Employee for the Company.

**11.** Upon termination of Employee's employment and/or promptly upon request, the Employee will return in good order all Company property and information in the Employee's possession, custody or control. Upon termination, Employee shall return all Company data, business information, credit cards, keys, automobiles and any other Company property in his possession. Employee shall not erase or delete any Company data from Company phones or computer or other electronic devices except as may be necessary in the regular course of conducting business for the Company. For example, it would be a violation of this provision for Employee to accept a position with another entity and/or give notice of Employee's resignation and then delete and/ or erase Company data from Employee's Company assigned phone and/or computer device.

**12.** In the event the Employee violates, or the Company reasonably believes the Employee is about to violate, this Agreement, the Employee agrees that the Company is entitled to injunctive relief to prevent violation(s) and/or preserve the *status quo* and confidentiality of the Company's Confidential Information and Trade Secrets. The Employee agrees that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and the Company will have the right to conduct forensic examination(s) of any computers and/or electronic devices in the Employee's possession or control, if the Company reasonably believes such devices contain Company Confidential Information and/or Inventions. The Employee further agrees that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis.

**13.** All of the provisions of the Agreement which are to be effective following termination of the Employee's employment, shall be effective regardless of whether such termination was voluntary or involuntary. The Employee warrants that prior to entering into this Agreement he has disclosed to the Company any agreements with any previous employers which would prevent him from performing any duties for the Company.

**14.** The restrictive covenants and provisions contained in this Agreement including but not limited to each section and subsections, are severable. The parties further agree that if any of the restrictions set forth in any section and/or any paragraph and the subparagraphs contained therein shall be held not to be enforceable because they are overbroad for any reason whatsoever, it is agreed that the restriction shall be effective to such extent as it may be enforceable. The parties specifically authorize a court of competent jurisdiction to strike, amend and/or alter such provisions to the extent necessary to render them reasonable and enforceable as this is the mutual intent of the Parties. All references to Company shall be construed to include subsidiaries of Company.

**15.** This Agreement supersedes any previous agreements between the parties, written or oral, relating to this subject matter and may be amended or modified only in writing signed by the Employee and an authorized employee of the Company. Notwithstanding the previous sentence, should a court of competent jurisdiction invalidate the restrictive covenants set forth at Section 6 because of either: (1) lack of consideration, or (2) for being unenforceable and not subject to being reformed by severing or judicial modification, the next most recent agreement between Employee and Company containing such noncompete restrictions shall be given effect. If any of the provisions of this Agreement are held to be invalid or unenforceable by a court of competent jurisdiction or by an Arbitrator in an arbitration proceeding, such holding shall not invalidate any of the other provisions of this Agreement, it being intended that the provisions of this Agreement are severable. This Agreement shall inure to the benefit of the Company's successors or assigns.

**16.** In any successful proceeding brought to enforce the Company's rights under this Agreement, the Company shall recover court costs and reimbursement of Company's attorney's fee and disbursements. These damages are in addition to any other relief, including injunctive relief, to which the Company may be entitled.

**17.** This Agreement shall not become effective or be binding upon the parties until accepted on behalf of the Company by the signature hereon of an authorized employee of the Company.

Please review this Employee Agreement and sign with your **full legal name**.

I have carefully read and understand and agree to all of the terms of this agreement.

Accepted by:

Ecolab Inc.

Laurie Marsh

Executive Vice President, Human Resources

1 Ecolab Place, St. Paul, MN 55102

09/10/2020

**Signature:** *Anthony Ridley*
Anthony Ridley (Sep 16, 2020 13:45 EDT)

**Email:** aridley@ecolab.com