# EXHIBIT B

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TENNESSEE

                      - - -

ECOLAB INC., and NALCO        :   Case No.
COMPANY, LLC d/b/a NALCO      :   1:22-cv-00050-
WATER, an Ecolab Company      :   TRM-SKL
and/or NALCO WATER,           :
                              :
            Plaintiffs        :
                              :
         vs.                  :
                              :
ANTHONY RIDLEY, and           :
CHEMTREAT, INC.,              :
                              :
            Defendants.       :

                      - - -

            WEDNESDAY, APRIL 19, 2023

                      - - -

     Video Recorded and Remote Zoom Deposition
of LAURENCE LIEB, taken pursuant to Notice, at
the law offices of Fisher & Phillips LLP, 100
North 18th Street, Two Logan Square, 12th
Floor, Philadelphia, Pennsylvania, commencing
at approximately 10:08 a.m., on the above
date, before Rose A. Tamburri, RPR, CM, CCR,
CRR, USCRA Speed and Accuracy Champion and
Notary Public.

                      - - -
              VERITEXT LEGAL SOLUTIONS
                 Mid-Atlantic Region
           1801 Market Street - Suite 1800
           Philadelphia, Pennsylvania  19103
```

1    Q.   Are there any cases not listed in
2    your CV where you've provided some form of
3    sworn written testimony, such as an affidavit
4    or declaration?
5         A.   No.
6         Q.   Has any judge ever determined that
7    you were not qualified to testify as an
8    expert?
9         A.   No.
10        Q.   Has any judge ever determined that
11   one of your opinions was unreliable?
12        A.   No.
13        Q.   Has any judge ever precluded you from
14   testifying, in whole or in part, as to any of
15   your opinions?
16        A.   No.
17        Q.   What is your current position?
18        A.   I am the CEO, President and Owner of
19   Tyger Forensics, that's Tyger with a Y.
20        Q.   And how did you choose the name Tyger
21   Forensics?
22        A.   My father was an English professor,
23   biblical scholar, and so I am a William Blake
24   fan.
25        Q.   "Tyger Tyger, burning bright"?

```
 1        A.   Yes.  For a cultured person, yes.
 2        Q.   All right.
 3             How many people work for Tyger
 4   Forensics?
 5        A.   I have one full-time employee and
 6   then one 1099 employee.
 7        Q.   Does Tyger Forensics own any other
 8   businesses?
 9        A.   No.
10        Q.   Do you personally own any other
11   businesses?
12        A.   No.
13        Q.   Are you an employee of any other
14   businesses?
15        A.   I am not.
16        Q.   Are you a consultant for any other
17   businesses?
18        A.   I am not.
19        Q.   So what does Tyger Forensics do?
20        A.   Tyger Forensics provides computer
21   forensic services, which involves forensic
22   preservation and collection of electronic
23   evidence, generation of forensic databases to
24   enable analysis of electronic evidence,
25   forensic analysis of evidence, and then
```

1    reporting declarations, testimony, if
2    required.
3        Q.   So you said one of the things that
4    Tyger Forensics does is the forensic
5    preservation and collection of electronic
6    evidence; is that correct?
7        A.   That is.
8        Q.   Can you give me an overview of what
9    that process involves?
10                MR. WINSMAN:   Objection to form.
11                THE WITNESS:   Certainly.  We use
12   industry standard tools to create forensic
13   image preservations of Smartphones, laptop,
14   desktop computers, server data, cloud-based
15   evidence, social media evidence.
16   BY MS. LUND:
17       Q.   You referenced industry standard
18   tools.  What makes them industry standard?
19       A.   In my opinion, industry standard
20   tools are tools that are used in -- widely in
21   criminal cases and have -- evidence produced
22   from those tools have been accepted in
23   thousands of criminal cases.
24       Q.   Other than the tools, are there other
25   industry standards that, in your view, apply

Page 29

A. Well, over -- over the years, I've taken many forensic training courses. I typically budget $5,000 a year for myself and my employees for training.

So I usually take one to two or more training classes each year, and those encompass best practices as well.

Q. Is there any particular source or reference that you look to in particular for guiding your understanding of industry best practices?

A. I don't -- can you define "source"? I don't know what you mean by source.

Q. For example, lawyers, we would look to case books; that would be some of our sources. Or we might look to --

A. Oh.

Q. -- you know, the American Law Journal or something like that.

Is there something similar that you would look to as sort of a -- a guide or a helpful reference for the industry that you would look to if you wanted to understand best practices?

A. In terms of if -- I don't really

1     Q.    Okay.
2              So if we can look at the DLP
3     report.
4     A.    Okay.
5     Q.    And I believe that's already there.
6     I'm just trying to find the exhibit it was
7     previously marked as so I can read it into the
8     record.
9     A.    That's going to be a mass -- is it a
10    PDF or do you have it as an Excel file?
11              MR. HOMESLEY:  I can pull it up as
12    a CSV.
13              THE WITNESS:  Oh, okay.
14              MR. HOMESLEY:  So it was
15    previously entered as Exhibit 27.
16              THE WITNESS:  I don't know if
17    there is Excel on this machine because it
18    really -- that's -- that's what -- Excel is
19    what opens up CSV files for them to be
20    readable.  I'll wait to -- maybe -- maybe
21    there's Excel on -- I'll see if there's Excel
22    on this machine.  Maybe there is.  I doubt it.
23    No.  I see an Excel -- oh, there is Excel on
24    here.  Okay.
25              MR. HOMESLEY:  All right.  It

```
 1   should be up there as Exhibit 27.
 2                THE WITNESS:  Okay.
 3                MR. HOMESLEY:  You'll have to
 4   download it.
 5                THE WITNESS:  Okay.  There we go.
 6                Yeah, I'm going to have to --
 7   there's -- I'm going to have to download this
 8   because there's no way to --
 9                MS. LUND:  Yes.
10                THE WITNESS:  There's no way to --
11   it has to be done with Excel.
12                (Brief pause.)
13                THE WITNESS:  It's a large file.
14   Okay.  Hopefully this version of Excel is
15   registered.
16                Okay.
17                MS. LUND:  Okay.
18   BY MS. LUND:
19       Q.   So if you could go ahead --
20       A.   Create and edit files.  Okay.  I'll
21   use -- do you want me -- sorry.
22       Q.   No, that's okay.
23                If you could go ahead and share
24   your screen so that we can all be seeing what
25   you're looking at.
```

```
 1        A.   Well, I -- I am sharing.  You're not
 2   -- you're not seeing this?
 3             MR. HOMESLEY:  Yep.
 4             THE WITNESS:  It's just -- the ver
 5   -- this doesn't have Excel on it.
 6             MS. LUND:  Okay.  Yep.  Great.
 7   BY MS. LUND:
 8        Q.   And then if you could go to the
 9   Operation Type column.
10        A.   Okay.  Is it -- is it okay if I do
11   what I norm -- what I described in my
12   analysis?
13        Q.   Yes, go ahead.
14        A.   Because it's going to make this --
15        Q.   Yes.
16        A.    -- infinitely easier for everyone
17   involved.
18             So -- so I go up to view -- if it
19   allows -- it's not letting me do it because
20   I -- crap.
21             So normally I go to freeze pane
22   and freeze top row, because there's not a --
23   this is not a -- a registered version of --
24   let me see if I can do it.  It says "Use free
25   at office.com.  Let's see if it allows me to
```

1  do it.
2           MS. LUND:  You know what, let's go
3  ahead and go off the record.
4           THE VIDEOGRAPHER:  The time is now
5  2:09.  Going off the video record.
6           (Brief pause.)
7           THE VIDEOGRAPHER:  The time is now
8  2:13.  Back on the video record.
9  BY MS. LUND:
10     Q.   All right.
11          Mr. Lieb, before we took a break
12  to work out our technical issues, you were
13  telling us the -- what you did with the
14  Digital Guardian report to make it workable
15  and you were going to walk us through that
16  report which is now up on the screen.
17          Can you go ahead, please.
18     A.   Absolutely.
19          So this is -- I'm replicating what
20  my forensic analysis steps were.
21          So I -- first I highlighted the --
22  the top row, which is column headers.  I go to
23  view, freeze pane, freeze top row.  So that
24  allows me to then scroll with the top -- the
25  top row just remaining.

1    add to that in terms of your forensic
2    analysis?
3         A.   No.
4         Q.   Okay.
5              And then you say you came to the
6    forensic observations and opinions set forth
7    in this report; correct?
8         A.   Correct.
9         Q.   And your opinion, as set forth in
10   paragraph 14, is that the Digital Guardian
11   report captured and recorded an extensive
12   amount of files being exfiltrated by Ridley
13   using his former EcoLab laptop, and that's
14   your opinion?
15        A.   It is.
16        Q.   Okay.
17             And what do you mean when you say
18   "exfiltrated"?
19        A.   It's a -- a forensic term meaning
20   taken up -- copied to an external USB drive
21   that a former employee will take with them to
22   use in their own company that they establish,
23   or a competitor, sent to -- documents that are
24   sent -- any document activity copying, moving
25   to -- from a company-owned device or account

1  A.  Well, I believe "misappropriated" may
2  be a legal term of art, so I -- I believe --
3  it's my opinion that he took those files to
4  use them to compete against his former
5  employer.
6       Q.  Okay.
7           Let's look at your opinion in your
8  report at paragraph 14.
9       A.  Okay.
10      Q.  And you'll see the second sentence of
11 paragraph 14, you say, "From a forensic
12 analysis standpoint, the Digital Guardian
13 Report provides more than sufficient amount of
14 information for me to arrive at my conclusion
15 that Ridley misappropriated thousands of
16 Ecolab files."
17          Is that still your opinion?
18      A.  It is.
19      Q.  Okay.
20          Even though misappropriated, you
21 just testified, is actually a legal term?
22      A.  It could be a legal term.  In my --
23 in plain English, it's theft.
24      Q.  Okay.
25          And so it's your opinion, based on

```
 1    thousands of Nalco-related files.
 2        Q.   So if I can have you answer my
 3    question, which is what objective standard do
 4    you use to determine whether the transfer of
 5    files from one company-issued device to
 6    another company-issued device is exfiltration
 7    or theft and when it's not?
 8        A.   I don't know what you mean by
 9    "objective standard."
10        Q.   Okay.
11             Well, as we discussed this
12    morning, you have testified that everything
13    you do is, quote, 100 percent based upon
14    science and can 100 percent be replicated by a
15    qualified peer.
16        A.   Yes.
17        Q.   And I'm asking you what objective
18    standard can a qualified peer apply to reach
19    the same conclusion you did that this was
20    theft as opposed to ordinary course of
21    business?
22        A.   Well, it would be the timing that the
23    activity occurred, the business circumstances
24    under which it occurred, a knowledge of an
25    employee having already accepted or looking
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Case 1:22-cv-00050-TRM-SKL   Document 298-2   Filed 06/21/23   Page 13 of 15   PageID #: 9961

1   for another work -- another job, the volume
2   and -- the volume and amount and frequency by
3   which the data was stolen, and then
4   subsequent -- you know, Jim -- Jim Vaughn's
5   report confirmed my findings.
6              So I -- I'm vindicated.
7       Q.   Okay.
8              What -- what, in particular, do
9   you believe that Mr. Vaughn's report confirmed
10  with regard to your findings?
11      A.   The CrowdStrike report showed Mr.
12  Ridley interacting with some of the
13  exfiltrated files using his ChemTreat laptop.
14      Q.   Were --
15      A.   So he took them to use while working
16  at ChemTreat.
17      Q.   So that's a conclusion you've drawn.
18      A.   No, that's what the CrowdStrike
19  report shows.
20      Q.   The CrowdStrike report shows the
21  LaCie drive being plugged into ChemTreat's
22  laptop?
23      A.   It shows Ridley interacting with
24  Nalco Water files while using his now wiped
25  ChemTreat laptop.

```
 1   That is my expert opinion.
 2       Q.   Right.
 3            And my question to you is, you are
 4   offering an opinion about Mr. Ridley's intent
 5   that he did something specifically for a
 6   purpose to utilize them while employed at
 7   ChemTreat.
 8            That is your opinion; correct?
 9       A.   Which he -- which he -- which he did.
10       Q.   I understand that's your opinion, Mr.
11   Lieb.
12            I'm asking you, what is --
13       A.   No, that's not opinion.  That's what
14   shows in the CrowdStrike report and what I've
15   been informed that he admitted to on -- doing
16   on less four -- less than four no -- no less
17   than four occasions in his deposition
18   yesterday.
19       Q.   Mr. Lieb, it's important that we not
20   talk over each other, so please do not
21   interrupt me when I'm asking you a question
22   and then you can answer my question.
23            Okay?
24       A.   Okay.
25       Q.   Great.  All right.
```