# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| ECOLAB INC. and NALCO COMPANY, LLC d/b/a NALCO WATER, AN ECOLAB COMPANY and/or NALCO WATER | ) ) ) ) ) | Case No. 1:22-cv-50 |
| | ) | Judge Travis R. McDonough |
| *Plaintiffs*, | ) ) | Magistrate Judge Susan K. Lee |
| v. | ) ) | |
| ANTHONY RIDLEY and CHEMTREAT, INC. | ) ) ) | |
| *Defendants*. | ) ) | |

---

## MEMORANDUM AND ORDER

---

At the core of this misappropriation-of-trade-secrets case are questions of what electronic files former employee Defendant Anthony Ridley downloaded from Plaintiffs Ecolab Inc. and Nalco Company, LLC (collectively, "Ecolab/Nalco") before resigning, and, what, if anything, he did with the files once he went to work for Defendant ChemTreat, Inc. ("ChemTreat"). (*See generally* Doc. 229.) But both Ecolab/Nalco and ChemTreat have failed to preserve evidence that might have answered those questions. Both spoliation culprits now point fingers at their adversaries in cross-motions for sanctions. (Docs. 261, 276, 292.) The Court is left to sort the specks from the planks, a plentiful commodity in this case.

Also before the Court is ChemTreat's motion for sanctions based on Ecolab/Nalco's failure to comply with Court orders (Doc. 268), and Ecolab/Nalco's motion to strike ChemTreat's motion for sanctions (Doc. 286). Finally, Ecolab/Nalco has moved for a hearing on the pending spoliation motions (Doc. 332) and to reopen discovery, in part, because it contends

that additional discovery is needed in connection with Ridley's spoliation of electronically-stored information.  (Doc. 295.)

For the following reasons the Court will **GRANT IN PART** Ridley and ChemTreat's respective motions for spoliation sanctions (Docs. 261, 276), and will **GRANT IN PART** Ecolab/Nalco's motion for spoliation sanctions (Doc. 292).  The Court will **DENY** ChemTreat's motion for sanctions based on Ecolab/Nalco's failure to comply with Court orders related to discovery (Doc. 268), and will **DENY AS MOOT** Ecolab/Nalco's motion to strike ChemTreat's motion for sanctions (Doc. 286).  The Court will also **GRANT IN PART** Ecolab/Nalco's motion for a hearing on the pending spoliation motions (Doc. 332) and **GRANT** Ecolab/Nalco's motion to reopen discovery (Doc. 295).

## I.        BACKGROUND AND PROCEDURAL HISTORY

### A.        Factual Background

Prior to 2020, Ridley worked for Nalco,[1] first as a senior account manager and later as a district manager.  (Doc. 313-1, at 1–3.)  Ridley testified that, while working for Nalco between 2015 and 2018, he downloaded full and partial backups of his company-issued laptop to a personal external hard drive—the "WD Drive."[2]  (Doc. 303-1, at 4–7, 10–11, 14.)

In 2019, Ridley began discussing potential employment opportunities with ChemTreat, and those discussions continued into 2020, primarily with ChemTreat employee Clay Cissell.  (Doc. 293-1, at 55–56.)  In October 2020, however, Ridley transferred from his district-manager

---

[1] Nalco is a division of Ecolab, with each company providing distinct services.

[2] Ridley also testified that he saved Ecolab/Nalco documents to the WD Drive as late as 2020. (Doc. 303-1, at 15.) Ridley's sworn interrogatory responses, which he served prior to his deposition in this case, simply state he "believes that he backed up the files sometime in 2015 or 2016."  (Doc. 225-3, at 3.)

position with Nalco to a corporate-account-manager position with Ecolab. (*Id.* at 69.) In this capacity, Ridley signed an "Employee Sales, Service, Marketing, and Inventions Agreement" (the "Ecolab Agreement"). (*Id.* at 4, 88–92.) Under the Ecolab Agreement, Ridley agreed, among other things, not to transfer or store any company information to devices not provided by Ecolab/Nalco, to return all company property and information upon separation, and to allow Ecolab/Nalco to inspect any of his devices if it reasonably believed them to contain confidential company information. (*Id.*) Around this time, Ridley continued discussing the possibility of employment with ChemTreat, and, in January 2021, he sent a copy of his Ecolab Agreement to Cissell. (*Id.* at 75.) In March 2021, Ridley discussed detailed compensation plans with Cissell (Doc. 293-4, at 3, 7), and, on May 11, 2021, Cissell e-mailed Ridley a hyperlink so that he could formally apply for a position with ChemTreat. (Doc. 303-2, at 2.)

After applying for employment with ChemTreat, Ridley began transferring Ecolab/Nalco files from the hard drive of his company-issued laptop to an external hard drive (the "LaCie Drive"), a process he described as "drag[ging] and drop[ping]" batches of documents. (Doc. 276-2, at 3; *see also* Doc. 303-3, at 8.) Around this time, according to Ecolab/Nalco's forensic expert, Lawrence Lieb, Ridley also uploaded Ecolab/Nalco documents to a "personally owned Microsoft account." (Doc. 303-3, at 6–7.)

On June 9, 2021, Ridley sent his company-issued laptop to Ecolab/Nalco's third-party I.T. vendor, Insight, "because it had a very loud fan motor running, and it was disruptive to conference calls." (Doc. 276-2, at 20.) Insight received Ridley's laptop on June 16, 2021, and issued a replacement laptop.[3] (Doc. 276-4, at 4.) According to Ecolab/Nalco's interrogatory

---

[3] Ecolab/Nalco argues that Ridley claimed his laptop was not working and asked for a replacement because he knew that he was going to accept a job with ChemTreat and that Insight

responses: (1) Ridley reported that the laptop had a "constant buzzing and humming inside of it"; (2) after a two-week waiting period, Insight completed a systems check, made necessary repairs, and restored the computer to factor settings, which included wiping all data from the computer; and (3) Insight redeployed the computer to Julie Palmer, another Ecolab/Nalco employee, on July 9, 2021.[4] (*Id.*)

After returning his computer and receiving a replacement computer from Insight, Ridley continued negotiating potential employment with ChemTreat, and, on June 16, 2021, Ridley signed a ChemTreat document agreeing that he would not take any Ecolab/Nalco information with him to ChemTreat. (Doc. 293-1, at 61–62, 79.) On June 18, 2021, ChemTreat extended a formal offer of employment to Ridley (Doc. 293-7, at 2–3), and, on July 1, 2021, Ridley notified Ecolab that he intended to resign and accept a position with ChemTreat.[5] (Doc. 276-1, at 1–2.) That same day, Jaqueline Herrera, Ridley's supervisor at Ecolab, e-mailed Ecolab's human-resources department, instructing that Ecolab needed to "shut down the information to [Ridley]" because "he is going to the competition." (*Id.* at 1.) According to Ecolab/Nalco's privilege log, Kristin Mahre, Ecolab's human resources manager, also emailed Theresa Corona, Ecolab's Deputy General Counsel, and Tina Grant, Ecolab's Senior Director of Human Resources, on July

---

would wipe and redeploy the laptop, thereby concealing his downloading of company information to the LaCie Drive. (Doc. 293, at 6.)

[4] Ecolab/Nalco's interrogatory responses further provide that Palmer returned the computer to Insight on August 11, 2021, and it was redeployed to Katie Vetter on November 15, 2021. (Doc. 276-4, at 4.) Vetter returned the computer to Insight that same day, and Insight ultimately disposed of the computer on August 2, 2022. (*Id.*)

[5] Ridley testified that he took a vacation in June 2021 and that he resigned the day or the day after he returned from vacation. (Doc. 293-1, at 44–45.)

4

1, 2021, concerning Ridley's "resignation" and "strategy regarding the same."[6]  (Doc. 276-5, at

1.)  Ecolab/Nalco did not, however, issue an internal litigation hold notice at the time.  (Doc.

276-7, at 15.)

Ridley began working for ChemTreat on July 2, 2021.  According to James Vaughn,

ChemTreat's forensic expert, Ridley received his ChemTreat-issued laptop on July 12, 2021, at

the earliest.  (Doc. 255-2, at 926.)

> The contemporaneous documents I reviewed reflect that, due to supply chain
> issues, Mr. Ridley did not receive his first ChemTreat-issued laptop until July 12,
> 202[1] at the earliest.  The first activity in the CrowdStrike log associated with
> Mr. Ridley's user profile occurred on July 12, 2021.  July 13, 2021 is the first date
> on which Mr. Ridley sent emails from his ChemTreat email account.  Based on
> this information, I conclude that July 12, 2021 is the first date that Mr. Ridley
> accessed or used his ChemTreat-issued laptop.  The CrowdStrike log shows
> activity as early as July 9, 2021, but that activity is not associated with Mr.
> Ridley's user profile.  The presence of activity on the CrowdStrike log is
> consistent with the log capturing activity associated with ChemTreat's IT
> personnel setting up the laptop before it was sent to Mr. Ridley.

(*Id.*)  Ridley also avers that he received his ChemTreat laptop "around July 13, 2021."  (Doc.

313-1, at 5.)  With regard to the other "activity" occurring as early as July 9, 2021, ChemTreat's

CrowdStrike log indicates that an "Amazon Basics" flash drive was connected to this computer

on July 9, 2021.  (Doc. 255-2, at 926; Doc. 293-12, at 20.)  This Amazon Basics flash drive has

not been located by Ridley or ChemTreat and is currently unaccounted for.

Following his resignation, Ecolab/Nalco arranged for Ridley to return company

electronic devices.  (Doc. 276-8, at 1–3; Doc. 303-6, at 2.)  On July 12, 2021, Insight confirmed

that it received Ridley's electronic devices, which included his Ecolab/Nalco replacement laptop

---

[6] Ecolab/Nalco's privilege log indicates that Herrera, Mahre, Grant, and Corona emailed
numerous times about Ridley in July 2021, including about "information about Ridley requested
by Legal" and "strategy" regarding Ridley resignation.  (Doc. 276-5, at 1–5.)

and a "mobile drive."[7]  (Doc. 276-9, at 1.)  Ridley did not return the WD Drive or three other Nalco flash drives in his possession, testifying during his deposition that he "forgot" there was information on the WD Drive.  (Doc. 303-1, at 4–5, 53.)

On July 18, 2021, Mahre, at Ecolab/Nalco's Deputy Legal Counsel's direction, submitted a request for a review of Ridley's "systems."  (Doc. 276-4, at 2.)  Around this time, Ecolab/Nalco's information-security team removed Ridley's OneDrive account from the automatic-deletion queue, recovered all files deleted from the OneDrive account during the previous ninety-three days, and provided access to Ridley's OneDrive account to in-house counsel.  (Doc. 276-7, at 24–26.)  Ecolab/Nalco did not, however, forensically image the OneDrive account before providing it to in-house counsel.  (*Id.* at 30–31.)  Additionally, Ecolab/Nalco did not terminate pre-existing access to various folders on OneDrive that Ridley had given to other employees.  (*See* Doc. 276-7, at 6.)

Ecolab/Nalco then analyzed Ridley's data-transfer activity during the last two months of his employment and created a "Digital Guardian Report," which "revealed extensive downloading/uploading and file transfer activity," including Ridley's downloading of thousands of documents to the LaCie Drive prior to his resignation.  (Doc. 276-4, at 2–3.)  Nonetheless, in August 2021, Insight moved Ridley's replacement computer and the LaCie Drive to "available inventory," and then redeployed the replacement computer to another employee.  (Doc. 276-4, at 4–5.)  According to Ecolab/Nalco's interrogatory responses:

---

[7] ChemTreat contends that the "mobile drive" is the LaCie drive, primarily based on Ridley's testimony that he returned the LaCie Drive after his resignation.  (*See* Doc. 276-2, at 23; Doc. 277, at 15.)  Ecolab contends that Ridley's testimony is not credible and that neither Ridley nor ChemTreat can demonstrate that he returned the LaCie Drive, especially since he could have returned a different external drive or flash drive that would have also met the description of the "mobile drive."  (Doc. 303, at 7.)

> Because the laptop had been restored to factory settings and no data from Ridley's usage was recoverable, [Ecolab/Nalco] did not attempt to recall the laptop from the subsequent user or otherwise attempt to recover any information from it. . . . On July 12, 2022, it was assigned to be destroyed, and it has since been destroyed.

(*Id.*)  Additionally, according to Ecolab's privilege log, between August 2021 and November 2021, Ecolab/Nalco in-house counsel and employees in its corporate-compliance and human-resources departments continued discussions regarding "legal strategy with respect to Ridley," as well as preserving Ridley's OneDrive and "litigation holds."  (Doc. 276-5, at 6–17.)

During this time, and while employed at ChemTreat, Ridley connected the WD Drive to his ChemTreat-issued laptop on multiple occasions, including in August 2021, September 2021, and January 2022.  (Doc. 293-1, at 5–7.)  Ridley testified that he opened Nalco documents on the WD Drive from his ChemTreat computer to "verify" that they were Nalco documents before deleting them.  (Doc. 303-1, at 29.)

In January 2022, Ecolab/Nalco asked Insight about Ridley's laptops and the LaCie Drive, but Insight informed Ecolab/Nalco that Ridley's two Ecolab/Nalco computers had been wiped and the mobile drive destroyed.  (Doc. 276-14, at 1–3.)  Ecolab finally issued an internal litigation hold with respect to Ridley on January 25, 2022.  (Doc. 276-7, at 42.)  Around this time, Ecolab/Nalco also retained an outside digital-forensics investigator and imaged a copy of Ridley's cloud-based OneDrive account.  (*Id.* at 42–44.)

On February 9, 2022, Ecolab/Nalco sent Ridley and ChemTreat letters accusing Ridley of downloading and copying proprietary, confidential, and trade-secret information prior to his resignation.  (Doc. 293-16; Doc. 293-17.)  The letters also instructed Ridley and ChemTreat to preserve potentially relevant information.  (Doc. 293-16; Doc. 293-17.)  According to Ecolab/Nalco's digital forensics expert, that same day, Ridley deleted files from Nalco USB drives, which he later returned to Ecolab/Nalco.  (Doc. 293-6, at 8–10.)  Lieb's report, however,

suggests that he was able to recover some, but not all, the files Ridley deleted. (*See* Doc. 293, at 15; Doc. 293-14, at 11.) Lieb further avers that, five days later, on February 13, 2022, Ridley used a software program called "CCleaner" to wipe information from the WD Drive.[8] (Doc. 293-14, at 27–36.) Ridley testified that he used this software program on the WD Drive periodically, both while employed by Ecolab/Nalco and ChemTreat, to "perform a disk clean on the free space of that drive . . . to make sure that things were deleted and space was freed up properly." (Doc. 313-2, at 3; *see also* Doc. 313-1, at 4, 9.) Ridley further avers that he deleted all Nalco files from the WD Drive prior to February 2022—"[t]o the best of my recollection, I deleted all of the Nalco files from my WD hard drive prior to February 14, 2022. I do not recall deleting any Nalco Water files at any time in February 2022 from the WD Drive." (Doc. 313-1, at 9.) According to Ridley, he ran the CCleaner program to ensure that the Nalco files he previously deleted were fully deleted from the WD Drive, and he "did not perform the disc clean on the WD Drive on February 14, 2022 with the intent to deprive Nalco or Ecolab of any evidence in this case." (*Id.* at 10.) Nonetheless, Ridley concedes that "[e]ven with Ridley's deletion of the last Nalco files from the WD Drive in January 2022, a category of electronically stored information may have been present on the WD Drive before he ran the disk clean program

---

[8] On February 22, 2022, ChemTreat's counsel disclosed to Ecolab/Nalco the existence of a "personal external hard drive," likely the WD Drive, and explained that Ridley previously deleted Ecolab/Nalco information from that external hard drive:

> Mr. Ridley has a personal external hard drive that he purchased – i.e., it was not provided by Nalco Water or Ecolab. He at times backed up his Nalco/Ecolab computer to that drive, which also contained personal documents, such as family pictures. We understand that after leaving Ecolab[,] Mr. Ridley deleted information pertaining to Nalco/Ecolab from his personal external hard drive, and he continues to use that external drive for personal use. ChemTreat has not handled Mr. Ridley's personal hard drive.

(Doc. 242-7.)

in February 2022," and that "[t]his electronically stored information is lost . . . and cannot be restored or replaced with additional discovery."  (Doc. 313, at 14.)

On March 2, 2022, ChemTreat instructed Ridley to send his laptop to its headquarters. (Doc. 314-1, at 2.)  ChemTreat's I.T. department subsequently wiped and reformatted the laptop, which it claims was due to an administrative error.  (Doc. 293-13, at 3.)  Pete Mumpower, a ChemTreat I.T. employee who processes laptops for redeployment, testified that his department had not received a litigation hold notice before receiving Ridley's laptop.  (Doc. 293-13, at 4.)  In fact, it was not normal practice for his department to receive a computer subject to a litigation hold.  (Doc. 314-8, at 10–11.)

On March 18, 2022, ChemTreat terminated Ridley after it discovered that he sent an Ecolab/Nalco document from his personal e-mail account to his ChemTreat e-mail account on September 29, 2021, in violation of his agreement not to bring Ecolab/Nalco information to ChemTreat.  (Doc. 293-19, at 2–6; Doc. 293-20, at 3.)  On March 21, 2022, ChemTreat informed Ecolab/Nalco that it terminated Ridley.  (Doc. 293-19, at 2–6.)  On March 25, 2022, ChemTreat's counsel e-mailed Ecolab/Nalco's counsel describing its efforts to preserve evidence related to Ridley and notifying them that Ridley's laptop had been wiped and redeployed.  (Doc. 293-21, at 3.)

> Mr. Ridley's ChemTreat email account and the cloud storage locations accessible to Mr. Ridley have been fully preserved.  Upon being notified of your clients' allegations, ChemTreat recalled Mr. Ridley's laptop for imaging and supplied him with a replacement laptop.  Unfortunately, due to an error by an administrative assistant, Mr. Ridley's original laptop was inadvertently placed with laptops designated for reformatting and redeployment, and the laptop was cleaned and redeployed before it could be imaged.  An independent forensic examiner has since examined the laptop, but was unable to recover files from the period of Mr. Ridley's use of the device.  While ChemTreat does not have an image of Mr. Ridley's original laptop, it does have CrowdStrike logs, which we understand provide much of the information that would have been recovered from a forensic image of Mr. Ridley's ChemTreat issued laptop.

(*Id.*)  During discovery, ChemTreat's interrogatory responses further described the series of events that led to ChemTreat wiping and redeploying Ridley's laptop before it was imaged:

> ChemTreat states that Ridley was instructed on or around March 2, 2022, to return his ChemTreat-issued laptop to ChemTreat's corporate headquarters in Glen Allen, Virginia, so that it could be imaged and preserved for this Lawsuit. Ridley was instructed to address the package to the attention of ChemTreat's in-house counsel and he complied with that instruction.  Upon receipt at the front desk of ChemTreat's corporate headquarters on around March 3, 2022, the front desk receptionist (Lynne James)—whose job duties include distributing packages delivered to the front desk—mistakenly routed the package she received from Ridley to ChemTreat's IT department rather than to ChemTreat's in-house counsel to whom it was addressed.

(Doc. 314-1, at 2.)  Lynne James later testified that the shipping label on Ridley's computer was addressed to ChemTreat's general counsel, and that, upon receipt, she walked the box to the I.T. workroom because "the box looked like a computer equipment box" and she "was trying to be helpful."  (Doc. 314-7, at  6–7.)  She further explained that she did not contact ChemTreat's general counsel because she thought the box "was mis-shipped."  (*Id.* at 8.)

Around this time, Ridley also returned three USB flash drives to Ecolab/Nalco.  (*See* Doc. 293-1, at 5–6.)  Lieb's analysis of these flash drives indicates that Ridley deleted certain Ecolab/Nalco files from the flash drives before returning them.  (Doc. 293-6, at 8–10.)

## B.  Procedural History

Ecolab/Nalco initiated the present action on March 3, 2022 (Doc. 1),[9] and the Court convened a case-management conference on July 18, 2022 (Doc. 55).  Prior to the case-management conference, the parties submitted a discovery plan, as required by Federal Rule of

---

[9] In the operative complaint, Ecolab/Nalco asserts claims against Ridley and ChemTreat for violating the Defend Trade Secrets Act, violating the Tennessee Uniform Trade Secrets Act, and civil conspiracy.  (Doc. 229, at 47–65.)  Ecolab/Nalco separately asserts claims against Ridley for breach of contract and breach of fiduciary duty of loyalty, and against ChemTreat for tortious interference with contractual relationships and procurement of breach of contract.  (*See id.*)

Civil Procedure 26(f).  (Doc. 39.)  Under Rule 26(f), the discovery plan should have included the parties' views and proposals on  "any issues about disclosure, discovery, or preservation of electronically stored information, including the form or forms in which it should be produced." Fed. R. Civ. P. 26(f).  Despite this requirement—and despite all the missteps described above— with regard to production of electronically stored information, the parties' Rule 26(f) report generically states:

> As required by Local Rule 26.1(e), the parties have conferred as to whether they will seek discovery of electronically-stored information ("e-discovery") and have reached an agreement that electronically stored information ("ESI") will be sought during discovery.  To the extent that disclosure or discovery of such ESI becomes an issue, the parties will meet to confer over the handling of the same and will supplement this Joint Rule 26(f) Report accordingly.
>
> The parties agree that any electronic discovery is subject to the limitations set forth in Rule 26(b)(2)(B).  The parties agree to preserve electronic discovery.  The parties further agree to enter into an ESI protocol that will govern the form of ESI production.

(Doc. 39, at 4.)

Only July 20, 2022, two days after the case-management conference, Ridley served interrogatory responses confirming the existence of the WD Drive and that he deleted Ecolab/Nalco files from the hard drive sometime "after he left EcoLab in July 2021."  (Doc. 135-1, at 4–7.)  What happened in the four months between July 20, 2022, and November 9, 2022, is unclear to the Court.  November 9, 2022, however, appears to mark the date on which the parties started to work on this case in earnest (*see* Doc. 74), even though the Court's scheduling order initially set the close of discovery for March 13, 2023 (*see* Doc. 59).  On November 9, 2022, ChemTreat filed a motion for entry of a protective order and ESI protocol.  (Doc. 74.)  Although not initially filed as a joint motion, on November 30, 2022, Ecolab/Nalco filed a response to ChemTreat's motion indicating agreement to ChemTreat's proposed protective order and ESI

protocol with two limited exceptions.  (Doc. 84, at 1.)  Pursuant to Court order, the parties filed a joint motion for protective order and ESI protocol on December 13, 2022.  (Doc. 90.)

Shortly thereafter, the parties jointly asked the Court to amend the scheduling order, noting that:  (1) "[t]he Parties have been engaged in written discovery efforts"; (2) the Court recently entered an agreed-upon ESI protocol and protective order, "both of which will facilitate the production of documents by the Parties"; and (3) "[t]he parties have been attempting to work through discovery disputes," but "[s]ome disputes will need to be resolved by the Court."[10] (Doc. 94, at 2.)  The representation that the parties had "been engaged in written discovery efforts" and that the ESI protocol and protective order "will facilitate production of documents" suggests that, as of December 14, 2022, the parties had not made significant headway in answering written discovery or producing documents, electronic or otherwise.[11]

The parties then proceeded to engage in "numerous discovery disputes."[12]  (Doc. 158, at 2.)  Although the parties attempted to resolve some of those disputes by agreement, more disputes arose after the Court reduced some of those agreements to writing in an order on January 11, 2023.  (*See* Doc. 111; Doc. 158, at 3.)  On February 1, 2023, ChemTreat filed a motion to compel compliance with the Court's January 11, 2023 order and for sanctions.  (Doc.

---

[10] On December 22, 2022, the Court granted the parties' joint motion to amend the scheduling order and set discovery to close on April 27, 2023.  (Doc. 99.)

[11] Additionally, the parties' discovery shortcomings were confirmed at a hearing before United States Magistrate Judge Lee on February 3, 2023, at which ChemTreat's counsel represented that Ecolab/Nalco had not asked it to disclose its ESI search terms in connection with searching for documents responsive to certain discovery requests.

[12] What the parties meant when they stated that "some [discovery] disputes will need to be resolved by the Court" (Doc. 94, at 2), was that the Court would need to devote significant time and resources to resolving discovery disputes at every turn, often on an "emergency" or "expedited" basis.  (*See e.g.*, Docs. 76, 95, 122, 124, 135, 142, 159, 164, 187, 190, 193, 195, 204, 221, 224, 231.)

122.)  On February 24, 2023, Magistrate Judge Lee entered an order granting in part and denying

in part ChemTreat's motion to compel.  (Doc. 158.)  With regard to ChemTreat's request for

sanctions, Magistrate Judge Lee noted the parties' difficulties in meeting their discovery

obligations:

> The Court remains concerned with [Ecolab/Nalco's] failure to fully abide by the
> January 11 Order, and with the parties' conduct in discovery more generally.
> Once again, the parties are reminded that the Federal Rules of Civil Procedure,
> including those governing discovery, "should be construed, administered and
> employed by the court and the parties to secure the just, speedy, and inexpensive
> determination of every action and proceeding." Fed. R. Civ. P. 1.  Thus far, the
> parties have done precisely the opposite of Rule 1's directive.  The Court's
> Orders, even when based on negotiated agreements between the parties, have had
> the unintended effect of spawning additional rounds of extensive motion
> practice requesting compliance, clarification, status conferences, hearings,
> extensions of time, reconsideration, sanctions and so forth, with the parties
> refusing each other basic professional courtesies and inundating the Court with
> filings at every turn.   The Court's efforts to keep the parties focused on gathering
> relevant information and moving through discovery in a cooperative and efficient
> manner appear to have been in vain.

(Doc. 158, at 35.)[13]

Even with these admonishments, what followed was, according to Magistrate Judge Lee,

a "tardy and fragmented production" by Ecolab/Nalco after a "significant delay . . . even after the

protective order was entered."  (Doc. 212, at 2–3.)  As a result, on March 22, 2023, ChemTreat

filed another motion to compel Ecolab/Nalco's production of documents.  (Doc. 190.)  On April

---

[13] Magistrate Judge Lee went on to deny ChemTreat's motion for sanctions with leave to refile,
subject to certain conditions:

> ***Any renewed request for sanctions or to alter the deadlines of the January 11
> Order must be supported with appropriate evidence, and shall not be filed unless
> the parties have first engaged in mediation to resolve this case.***   If said mediation
> does not resolve this case in whole, any renewed motion must be filed within
> seven days of the conclusion of the mediation, along with the mediation
> report required by Eastern District of Tennessee Local Rule 16.4(m).

(Doc. 158, at 35–36 (emphasis added).)

14, 2023, Magistrate Judge Lee entered an order granting in part and denying in part

ChemTreat's motion to compel, finding, among other things, that Ecolab/Nalco "unreasonably

delayed production of responsive documents . . . and obscured the status of production for other

RFP, thereby making an already difficult discovery phase worse." (Doc. 212, at 17.)

Accordingly, Magistrate Judge Lee ordered Ecolab/Nalco:

> [T]o produce a sworn certification which addresses each RFP addressed in the
> instant motion to compel. For each RFP, [Ecolab/Nalco] **SHALL** attest they have
> produced all responsive non-privileged documents within their custody,
> possession, or control, or that no responsive, non-privileged documents within
> their custody, possession, or control exist.

(*Id.* at 4.) Magistrate Judge Lee ordered Ecolab/Nalco to produce the sworn declaration

regarding each RFP to ChemTreat within five days of entry of the order (*id.*), and further ordered

Ecolab/Nalco to produce documents responsive to particular RFPs:

- For RFP Nos. 20-22, and 27, Magistrate Judge Lee ordered Ecolab/Nalco "to produce all responsive, non-privileged documents as well as the sworn certification addressed above within **FIVE DAYS** of entry of this Order." (*Id.* at 8.)

- For RPF No. 45, Magistrate Judge Lee ordered Ecolab/Nalco to produce "two relevant job descriptions as well as the sworn certification discussed above within **FIVE DAYS** of entry of this Order." (*Id.* at 9.)

- For RFP Nos. 48-53, Magistrate Judge Lee ordered Ecolab/Nalco to produce "the referenced 'DLP-Data Loss Prevention" policy document, any other policy documents responsive to RFP nos. 48-53, and the sworn certification discussed above within **FIVE DAYS** of entry of this Order." (*Id.* at 11.)

- For RFP No. 72, Magistrate Judge Lee ordered Ecolab/Nalco to produce "referenced communications" between ChemTreat's counsel and Plaintiff's counsel and the sworn certification "within **FIVE DAYS** of entry of this Order." (*Id.* at 12.)

- For RFP Nos. 75-77, Magistrate Judge Lee ordered Ecolab/Nalco to produce "all non-privileged documents responsive to RFP nos. 75-77, along with the certification discussed above, within **FIVE DAYS** of entry of this Order." (*Id.* at 13.)

- For RFP Nos. 78-82, Magistrate Judge Lee, explained that "ChemTreat is entitled to more than what Plaintiffs have produced thus far, but ChemTreat needs to narrow [its] RFPs," and ordered "the parties to meet and confer in good faith to attempt to resolve the dispute concerning these RFP[s]." She further ordered that the meet-and-confer

take place within two days of the entry of her order and that "responsive documents **SHALL** be produced, along with the certification addressed above, within **FIVE DAYS** of entry of this Order." (*Id.* at 17.)

On April 19, 2023, five days after Magistrate Judge Lee entered her order, Ecolab/Nalco made a supplemental production.[14] (Doc. 268-6, at 3.) Ecolab/Nalco also provided its "Discovery Certification" on that date. (Doc. 286-7.) The certification provides that: (1) Ecolab/Nalco has produced "all responsive, non-privileged documents that [it] agreed to produce in response to RFP Nos. 1-3, 7, 39-40, 43–44, 56-57, 66-68, 89-91"; (2) "there are no responsive documents to RFP Nos. 8 and 9"; (3) it has produced "all non-privileged, responsive documents that [it] agreed to produce in response to RPF Nos. 20-22, and 27"; (4) it has produced "all non-privileged, responsive documents that [it] agreed to produce in response to RFP 45" and that it is "producing documents reflecting the job descriptions for the last two positions held by Ridley when he was employed by [Ecolab/Nalco]"; (5) it has "not identified any documents in [its] possession that are responsive to RFP No. 72"; and (6) it has "produced all non-privileged, responsive documents that [it] agreed to produce in response to RFP Nos. 75-77" and that it is "producing documents reflecting the information sought with respect to the final position at Ecolab." (Doc. 268-7, at 1–2.) The certification is electronically signed by counsel. (*Id.*) Additionally, in an e-mail dated April 19, 2023, Ecolab/Nalco's counsel communicated to ChemTreat that "while [it has] already produced documents responsive to RFP Nos. 48-53 and 78-82, [it is] working diligently to identify any additional responsive documents and will

---

[14] ChemTreat's brief in support of its motion for sanctions represents that Ecolab/Nalco's production consisted of only four documents. (Doc. 269, at 7–8.) The e-mail attached to the motion to support this assertion, however, does not include the documents produced by Ecolab/Nalco as part of its supplemental production. (*See* Doc. 268-6, at 3.)

supplement [its] production and certification in this regard as quickly as possible." (Doc. 268-6, at 3.)

On April 25, 2023, ChemTreat's counsel e-mailed Ecolab/Nalco's counsel, asserting that Ecolab/Nalco had not complied with Magistrate Judge Lee's order, particularly with regard to RFP Nos. 48-53 and 78-82, and requesting that Ecolab/Nalco produce all "outstanding documents, and the certification required by the Court, *no later than 5:00 p.m. today*." (*Id.* at 2 (emphasis in original).) Ecolab/Nalco's counsel responded that he was "getting on a plane shortly" and was "trying to address this by tomorrow." (*Id.* at 1.) On April 26, 2023, Ecolab/Nalco produced another document, and, on April 27, 2023, Ecolab/Nalco's corporate representative brought another document to the Rule 30(b)(6) deposition, which Ecolab/Nalco's counsel produced later that day. (Doc. 268-8.) That same day, Ecolab/Nalco's counsel provided another discovery certification. (Docs. 268-2, 268-9.) This certification represented that: (1) Ecolab/Nalco has "produced all non-privileged, responsive documents that [it] agreed to produce in response to RFP Nos. 48-53," but that it "continue[s] to search for one document referenced in the Court's Order ("DLP-Data Loss Prevention") and will produce that document promptly in the event that it is located"; and (2) "[w]ith respect to RFP Nos. 78-82, [Ecolab/Nalco] is not claiming damages for lost customers at this time" and that it has "produced all documents relied upon" by its damages expert. (Doc. 268-2.) Again, the certification was electronically signed by Ecolab/Nalco's counsel. (*Id.*)

Around this time, Ecolab/Nalco filed a motion to compel inspection of the WD Drive.[15] (Doc. 224.) As detailed above, *see supra* Section I.A., on May 11, 2023, Ridley produced the

_____

[15] On February 13, 2023, more than six months after Ridley served his initial interrogatory responses, but still almost two-and-a-half months before the close of discovery, Ecolab/Nalco served a request to inspect on Ridley, seeking, among other things, an image of the WD Drive

WD Drive to Ecolab/Nalco's forensic expert, Laurence Lieb. (Doc. 303-9, at 27.) After receiving the WD Drive, Lieb discovered that Ridley used an undisclosed computer (i.e., not his ChemTreat-issued laptop) to run a software program called "CCleaner" to wipe information from the WD Drive on February 13, 2022—just five days after receiving Ecolab/Nalco's preservation notice.[16] (*Id.* at 32–33.)

In sum, despite the Court's sustained, months-long, near-constant intervention in this case, the parties have made a mess of it. Rather than refining the issues by engaging in discovery in an efficient and productive manner—the normal lifecycle of litigation—these parties' actions and failures create more issues, further complicate the dispute, and only continue to multiply the need for the Court to hand-hold. The Court, as it has done every step of the way since this case was filed, must now attempt to clean up the parties' latest mess, starting with the pending motions for spoliation sanctions and the interrelated motions arising out of the parties' discovery conduct.

---

and "Ridley's personal computer and any personal computer in his house, that was used on one or more occasions from August 1, 2020, to present." (Doc. 225-4.) Ridley's counsel objected to the request to inspect and notified Ecolab/Nalco that he would not produce the WD Drive. (Doc. 225-5.) The parties then met and conferred to negotiate parameters for production of the WD Drive but were ultimately unable to reach an agreement. (*See* Doc. 295-9.)

[16] Ridley does not dispute that he ran CCleaner on the WD Drive. In a later-filed declaration, Ridley avers that he used this software program on the WD Drive periodically, both while employed by Ecolab/Nalco and ChemTreat, to "perform a disk clean on the free space of that drive . . . to make sure that things were deleted and space was freed up properly." (Doc. 313-2, at 3; *see also* Doc. 313-1, at 4, 9.) Ridley further avers that he deleted all Nalco files from the WD Drive prior to February 2022—"[t]o the best of my recollection, I deleted all of the Nalco files from my WD hard drive prior to February 14, 2022. I do not recall deleting any Nalco Water files at any time in February 2022 from the WD Drive." (Doc. 313-1, at 9.) According to Ridley, he ran the CCleaner program to ensure that the Nalco files he previously deleted were fully deleted from the WD Drive and he "did not perform the disc clean on the WD Drive on February 14, 2022 with the intent to deprive Nalco or Ecolab of any evidence in this case." (*Id.* at 10.)

## II.     MOTIONS FOR SPOLIATION SANCTIONS

The parties have, in large part, abandoned their focus on the merits of the underlying claims, and, instead, wrangle over whose evidence-preservation failures are more important. Consistent with that approach, Ridley and ChemTreat have filed motions asking the Court to impose spoliation sanctions on Ecolab/Nalco based on its failure preserve Ridley's Ecolab/Nalco computers, the LaCie Drive, Ridley's Ecolab/Nalco OneDrive, and the electronically-stored information contained therein.  (Docs. 261, 276.)  And Ecolab/Nalco has moved for spoliation sanctions based on ChemTreat's wiping and reformatting of Ridley's company-issued laptop, as well as sanctions against Ridley for deleting information from USB drives and the WD Drive after Ecolab/Nalco sent its preservation letter.  (Doc. 292.)

### A.     Standard of Law

#### i.     *Physical Evidence*

The authority to impose sanctions for spoliated evidence arises from "a court's inherent power to control the judicial process."  *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009).  As it relates to physical evidence, a court may sanction a litigant for spoliation of evidence if:  (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party destroyed the evidence with a culpable state of mind; and (3) the destroyed evidence was relevant to the opposing party's claim or defense.  *Byrd v. Alpha Alliance Corp.*, 518 F. App'x 380, 383–84 (6th Cir. 2013); *McCarty v. Covol Fuels No. 2, LLC*, 664 F. App'x 372, 378 (6th Cir. 2016).  An obligation to preserve arises "when a party should have known that the evidence may be relevant to future litigation."  *Byrd*, 518 F. App'x at 384 (quoting *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010)).  In determining whether a party should have known that evidence may be relevant to future litigation, courts

apply an objective, not subjective, standard.  *Id.* at 384.  A culpable state of mind "requires a showing that the party destroyed the evidence knowingly or negligently."  *Id.*  Finally, demonstrating that destroyed evidence was "relevant" requires "showing that the evidence would have been relevant to a contested issue . . . such that a reasonable trier of fact could find that it would support [the moving party's] claim."  *Id.* (quoting *Beaven*, 622 F.3d at 554–55) (alteration in original).  "The court may consider circumstantial evidence in analyzing the import or specifics of destroyed evidence."  *Id.*  "[T]he point of the relevance prong of the spoliation analysis is not to inquire whether the lost or destroyed evidence was dispositive; rather, the party seeking the spoliation sanction must make a showing indicating that the destroyed evidence would have been relevant to the contested issue . . . such that a reasonable trier of fact could find that it would support that claim."  *McCarty*, 644 F. App'x at 379.

Courts have broad discretion to craft sanctions for spoliated evidence, but any sanction imposed must "serve both fairness and punitive functions" and "should have some correlation to the degree of fault."  *Byrd*, 518 F. App'x at 384; *see also Adkins*, 554 F.3d 652.

> [A] proper sanction will serve the purposes of leveling the evidentiary playing field and sanctioning the improper conduct.  Because failures to produce relevant evidence fall along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality, the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault.

*Byrd*, 518 F. App'x at 384 (quoting *Adkins*, 554 F.3d 652).  "A district court may impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence."  *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014).

### ii.      *Electronically Stored Information*

A court's authority to impose sanctions for the spoliation of electronically stored

information ("ESI") comes from Federal Rule of Civil Procedure 37(e).

> If electronically stored information that should have been preserved in the
> anticipation or conduct of litigation is lost because a party failed to take
> reasonable steps to preserve it, and it cannot be restored or replaced through
> additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information,
>> may order measures no greater than necessary to cure the prejudice; or
>>
>> (2) only upon finding that the party acted with the intent to deprive
>> another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information
>>> was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  Unlike the standard for destruction of physical evidence, Rule 37(e)(1)

does not include an "intent" requirement.  As a result, a party need not act willfully, deliberately,

intentionally, or with any objective or subjective bad faith to justify sanctions.  *Yoe v. Crescent

Sock Co.*, Case No. 1:15-cv-3, 2017 WL 5479932, at *8 (E.D. Tenn. Nov. 14, 2017).  Sanctions

under Rule 37(e)(2), however, require a finding that the party accused of destroying evidence

"acted with the intent deprive another party of the information's use in the litigation."  *Id.*  Under

Rule 37(e)(2), "a showing of negligence or even gross negligence will not do the trick"; instead,

an "intent to deprive" the other party of the evidence is required.  *Applebaum v. Target Corp.*,

831 F.3d 740, 745 (6th Cir. 2016).

In determining whether sanctions for destruction of ESI are appropriate, courts employ

the following step-by-step analysis:

First, was there a duty to preserve the data at issue? If not, the analysis ends. Second, were reasonable steps taken to avoid the loss of the data? If so, the analysis ends. Third, can the lost data be restored or replaced through additional discovery? If so, the analysis ends. Fourth, was the other party prejudiced by the loss of data? If not, the analysis ends, but if there was prejudice, the court can impose measures no greater than necessary to cure the prejudice. Such measures may include, allowing the injured party to comment on or introduce evidence about lost data at trial. If data were lost with the intent to deprive another party of the use of the lost data, prejudice is assumed and the court can allow a permissive or mandatory adverse inference or impose a case-terminating spoliation sanction.

*Yoe*, 2017 WL 5479932, at *9. With regard to the prejudice inquiry, prejudice "may be found where a party has been required to piece together information from other sources to try to recover relevant documents." *Id.* (quoting *Moody v. CSX Transp.,Inc.*, No. 07-cv-6398, 2017 WL 4173358, at *13-14 (W.D.N.Y Sept. 21, 2017)). The advisory committee notes to Rule 37 further provide:

> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The party alleging spoliation has the burden of proof. *Yoe*, 2017 WL 5479932, at *9 (citing *Byrd*, 518 F. App'x at 383–84).

## B.      Analysis

### i.      *ChemTreat and Ridley's Motions for Spoliation Sanctions*

ChemTreat and Ridley have moved for spoliation sanctions based on Ecolab/Nalco's failure to preserve Ridley's company-issued laptops and the mobile drive he returned after his resignation from Ecolab. ChemTreat and Ridley also move for spoliation sanctions under Rule

37(e) based on Ecolab/Nalco's failure to preserve the ESI located on those electronic devices. (*See* Docs. 261, 276.)

a. <u>Ridley's Ecolab/Nalco Laptops and Mobile Drive</u>

The first question the Court must answer is whether Ecolab/Nalco had an obligation to preserve the devices at the time they were destroyed. With respect to the first laptop, Ridley testified that he sent the laptop to Insight for repair "because it had a very loud fan motor running, and it was disruptive to conference calls." (Doc. 276-2, at 20.) Ecolab/Nalco, however, contends that this explanation is pretext for covering up Ridley's downloading of company information in preparation for his move to ChemTreat. More specifically, Ecolab/Nalco argues that Ridley is generally not credible and that his laptop may not have actually been broken, but he nonetheless sent it for "repair" because he knew Insight would wipe the data on the computer and redeploy it. (*See e.g.*, Doc. 293, at 6.)[17] In response, ChemTreat argues that preservation of the physical laptop itself prior to Insight's repair would have enabled the parties to determine whether the laptop was in fact in need of repair. Thus, the question, as it relates to Ridley's first laptop, is whether Ecolab/Nalco was under an obligation to preserve it at the time Insight made any physical alterations or modifications to the laptop.

According to Ecolab/Nalco's interrogatory responses, when Insight received the laptop on June 16, 2021, it "set it aside for a two-week period." (Doc. 276-4, at 4.) After that two-week period, the computer went through "a systems check[ ]," necessary repairs were made, the device was restored to factory settings, and it was redeployed. (*Id.*) Ridley's first laptop "went through this process" and "was moved to inventory on July 7, 2021." (*Id.*) The foregoing

---

[17] It is impossible to know, but this seems less likely than the laptop having a legitimate issue. The two employees who were assigned the same laptop after Ridley held it for thirty three days and one day, respectively. It then sat in storage for months before being discarded.

22

suggests that Insight performed its repair and restoration process sometime between June 30, 2021, and July 7, 2021. (*Id.*) Ridley notified Ecolab/Nalco on July 1, 2021, that he was resigning, and, that same day, his supervisor e-mailed Ecolab/Nalco's human resources department, indicating that the company needed to "shut down the information to [Ridley]" because "he is going to the competition." (Doc., 276-1, at 1.) Human resources employees and in-house counsel also emailed on July 1, 2021, concerning Ridley's "resignation" and "strategy regarding the same." (Doc. 276-5, at 1.) Even assuming that Ecolab/Nalco had an obligation to preserve evidence beginning the same day, ChemTreat and Ridley have failed to demonstrate that Insight altered, modified, or repaired Ridley's first laptop at a time when Ecolab/Nalco was under a duty to preserve the physical laptop. Insight's two-week waiting period expired on June 30, 2021, the day before Ridley resigned. If Insight performed its systems checks, made necessary repairs, and restored the device to factory settings any time before Ecolab/Nalco employees began communicating in anticipation of potential litigation against Ridley, then Ecolab/Nalco did not alter the laptop at a time when it was under an obligation to preserve evidence. Without more precise evidence of when Insight acted, Ridley and ChemTreat have failed to demonstrate that Ecolab/Nalco destroyed, altered, or modified Ridley's laptop while under an obligation to preserve it.

Ecolab/Nalco's treatment of the mobile drive, however, is a different story. In its complaint, Ecolab/Nalco alleges that Ridley downloaded thousands of company documents to his company-issued LaCie Drive immediately prior to his resignation and move to ChemTreat. (*See* Doc. 229, at 17–27.) Ridley avers that the "mobile drive" he returned after his resignation was the LaCie Drive. (Doc. 313-1, at 4.) Ecolab/Nalco does not believe him. It contends that the "mobile drive" could be any number of flash drives or external hard drives that Ridley used

prior to resigning and that he could have still possessed the LaCie Drive while employed by ChemTreat. (Doc. 302, at 1, 11–19.) It is impossible to conclusively determine whether Ridley returned the LaCie Drive or some other device, because Ecolab/Nalco believes Insight destroyed the mobile drive and that it did so before Ecolab/Nalco appreciated Ridley's misconduct. (Doc. 276-4, at 5.) According to Ecolab/Nalco's interrogatory responses, Insight received the mobile drive on July 12, 2021. (*Id.*)

> Insight did not record any serial number or other identifying information regarding the "mobile drive." The normal process for any external hard drive received from any of Plaintiffs' employees by Insight (of which there are many) is that the device goes into a disposal bin, the contents of which are destroyed (though not on any set schedule). As such, Plaintiffs believe that the "mobile drive" returned by Ridley has been destroyed. However, because no identifying information for the mobile drive was recorded, and because Insight does not record the contents of the disposal bin, it is impossible for Plaintiffs to confirm that it has been destroyed.

(*Id.*) But, between July 1 and July 12, 2021, Ecolab/Nalco employees sent at least ten e-mails "concerning resignation of Ridley and strategy regarding the same." (*Id.*) Ecolab/Nalco has not produced those documents in discovery, because it has asserted that the e-mails are privileged attorney-client communications and attorney work product. (*Id.*) By designating the e-mails as privileged work product, Ecolab/Nalco is representing that the e-mails were sent in anticipation of litigation, which triggers an obligation to preserve evidence it knows or should have known may be relevant to future litigation. Moreover, the day Ridley resigned, his supervisor e-mailed employees in Ecolab's human-resources department, indicating that Ecolab needed to "shut down the information to [Ridley]" because "he is going to the competition." (Doc., 276-1, at 1.) Viewed together, Ecolab/Nalco's e-mails in the wake of Ridley's resignation make very clear that it was concerned about Ridley having access to company information and that it was contemplating legal action against him. If that was the case, the next reasonable step would have been to issue a litigation hold to ensure that physical evidence (and ESI) was preserved in the

event that actual litigation followed. Under these circumstances, Ecolab/Nalco's duty to preserve electronic devices on which he stored company information certainly arose before July 12, 2021, the date Insight received his second laptop and the mobile drive at issue.

Having found that Ecolab/Nalco's duty to preserve the mobile drive arose sometime between July 1, 2021, and July 12, 2021, the Court must recognize that Ecolab/Nalco, at a minimum, negligently allowed the mobile drive to be destroyed. Even though its in-house legal counsel was sending e-mails in anticipation of litigation, Ecolab/Nalco undertook no efforts to preserve the mobile drive. Instead, Ecolab/Nalco's I.T. vendor put the device in a disposal bin without recording any identifying information. The physical mobile drive is relevant to a contested issue in this litigation because Ecolab/Nalco has put it at issue. Ridley testified that the mobile drive he returned after his resignation was the LaCie Drive. Ecolab/Nalco challenges Ridley's credibility witness and conveniently urges that "it should be left to the jury to decide whether Ridley even returned the LaCie Drive." (Doc. 303, at 7.) But the reason this mystery exists for the jury is a direct result of Ecolab/Nalco's failure to preserve after it first anticipated litigation against Ridley.

Accordingly, the Court will **DENY** ChemTreat and Ridley's motion for spoliation sanctions based on Ecolab/Nalco's failure to preserve Ridley's first laptop and will **GRANT** their motions for spoliation sanctions based on Ecolab/Nalco's failure to preserve the mobile drive that Ridley returned to Insight after his resignation.

        b.    ESI on Ridley's Laptops and Mobile Drive

ChemTreat and Ridley next argue that the Court should impose spoliation sanctions on Ecolab/Nalco pursuant to Rule 37(e)(1) based on the failure to preserve ESI stored on Ridley's

company-issued laptops and the mobile drive he returned after his resignation.[18] (Doc. 277, at 9–12.) As it relates to the ESI on Ridley's first laptop—the one he returned to Insight because it was buzzing loudly—ChemTreat and Ridley have not demonstrated that Ecolab/Nalco had a duty to preserve that data before Insight repaired, restored, and wiped the computer. As detailed above, the record leaves open the possibility that Insight repaired Ridley's computer and restored it to factory settings, including wiping all data contained therein, before he resigned on July 1, 2021. That possibility precludes finding that Ecolab/Nalco destroyed the ESI on Ridley's first laptop at a time it was under an obligation to preserve such data. Accordingly, the Court will **DENY** ChemTreat and Ridley's motion for spoliation sanctions based on Ecolab/Nalco's failure to preserve ESI on Ridley's first laptop.

Again, however, the Court reaches the opposite conclusion as it relates to the mobile drive and laptop Ridley returned after his resignation. For the same reasons detailed above, the duty to preserve electronic information in anticipation of potential litigation against Ridley arose, at a minimum, sometime before July 12, 2021, the date Insight received the mobile drive and Ridley's replacement laptop. Similarly, and for the same reasons discussed above, Ecolab/Nalco did not take reasonable steps to avoid the loss of ESI on the mobile drive and replacement laptop; to the contrary, Ecolab/Nalco did not inquire about the status of these devices until January 2022. Moreover, the ESI on the mobile drive is likely central to some, if not all, of Ecolab/Nalco's claims against Ridley and ChemTreat, and it does not appear that the lost data can be restored or replaced. Indeed, Ecolab/Nalco alleges that Ridley downloaded thousands of company documents to the LaCie Drive immediately before he moved to ChemTreat and that

---

[18] ChemTreat and Ridley do not argue that Ecolab/Nalco destroyed ESI with the intent to deprive another party of the information's use in the litigation as required for sanctions under Rule 37(e)(2).

Ridley and ChemTreat subsequently misappropriated the trade secret and confidential information that Ridley downloaded onto the LaCie Drive.

Ecolab/Nalco's destruction of the ESI on the mobile drive forecloses the parties' ability to identify with certainty what documents and information Ridley downloaded to the LaCie Drive and what devices Ridley connected the LaCie Drive to before returning it to Ecolab/Nalco. It also significantly limits the parties' ability to determine whether the documents and information he downloaded qualify as trade secrets or confidential information subject to protection under the Tennessee Uniform Trade Secrets Act and the Defend Trade Secrets Act. These limitations, coupled with ChemTreat's destruction of Ridley's ChemTreat-issued laptop, make it incredibly difficult to know whether Ridley misappropriated any of Ecolab/Nalco's trade secrets, and, if so, to what extent. The same goes for Ridley's replacement laptop, even though he possessed it for a relatively short period of time before resigning. The inability to restore or replace these data prejudices ChemTreat and Ridley's ability to defend the claims against them. Accordingly, the Court will **GRANT** ChemTreat and Ridley's motion for spoliation sanctions to the extent Ecolab/Nalco destroyed ESI located on Ridley's replacement laptop and the mobile drive he returned after his resignation.

### ii. *Ecolab/Nalco's Motion for Spoliation Sanctions*

Ecolab/Nalco has also moved for sanctions against Ridley and ChemTreat under Rule 37(e) based on their failure to preserve ESI in this case. (Doc. 292.) Specifically, Ecolab/Nalco contends that ChemTreat wiped and redeployed Ridley's ChemTreat-issued laptop after receiving an evidence-preservation letter from Ecolab/Nalco in February 2022. (*Id.*) Ecolab/Nalco also asserts that Ridley deleted ESI from USB flash drives the same day he

received Ecolab/Nalco's preservation letter, and that, five days later, he used a software wiping program to delete ESI from the WD Drive.  (*Id.*)

### a.     ChemTreat

ChemTreat does not dispute that it was obligated to preserve evidence in connection with this case beginning on February 9, 2022, the date it received an evidence-preservation letter from Ecolab/Nalco's counsel.  (*See* Doc. 314, at 6–15.)  It nonetheless argues that it took reasonable steps to preserve ESI on Ridley's laptop and that Ecolab/Nalco has not demonstrated that it was prejudiced by ChemTreat wiping and redeploying the laptop.  (*See id.*)

Although ChemTreat appears to have taken some steps reasonably calculated to preserve the ESI from Ridley's ChemTreat-issued laptop, its efforts overall fall unreasonably short in guarding against the loss of data.  ChemTreat did instruct Ridley to return his laptop to the company at its headquarters and to address the package to its in-house counsel.  Those steps were reasonable.  What happened after the package arrived at ChemTreat, however, was not.  Even assuming that the administrative staffer's decision to take the package to I.T., rather than deliver it to the addressee, was an innocent mistake, ChemTreat does not appear to have internal I.T. department procedures in place to avoid data loss in situations where mistakes are made.  Mumpower testified that his department "get[s] a number of laptops continuously" and  Ridley's laptop "just kind of fell into [ChemTreat's] normal process," meaning that he just "wiped it and prepped it for another user."  (Doc. 293-13, at 3.)  Mumpower further testified that computers subject to litigation holds generally "wouldn't come into his workflow" and that, if he receives a computer, he assumes there is no litigation hold.  (*Id.* at 5–6.)  Even if ChemTreat never intended to send Ridley's computer to the I.T. department, the utter lack of any safeguard against such mistakes is unreasonable.  There is nothing unforeseeable about an employee deciding to walk a

laptop to where most computers delivered to ChemTreat's address go—the I.T. department. The absence of any communication with or guidance to the I.T. department about the significance of the laptop, therefore, is unreasonable. A few decades ago, the mistake might have resulted in only a box of allegedly misappropriated documents going to the file room instead of in-house counsel's office. But in today's world, ChemTreat had every reason to appreciate that a comparable, no-less-unexpected mistake with an equally relevant laptop would rob the parties, the jury, and the Court of crucial evidence—favorable or unfavorable. Employing reasonable procedures would have provided a backstop to guard against data loss even when innocent mistakes are made.

Additionally, the ESI lost from Ridley's ChemTreat laptop cannot be restored or replaced and the inability to do so necessarily prejudices Ecolab/Nalco. It is undisputed that Ridley connected the WD Drive to his ChemTreat computer and accessed Nalco documents. Ecolab/Nalco believes that Ridley connected other devices to his ChemTreat laptop and accessed other Ecolab/Nalco documents from his ChemTreat computer despite ChemTreat's and Ridley's representations otherwise. Confirming or disproving that belief, however, has been frustrated by ChemTreat's failure to preserve relevant ESI related to that issue, and Ecolab/Nalco's skepticism is somewhat justified given Ridley's actions. Moreover, while data in ChemTreat's CrowdStrike logs can provide certain, limited information about these drives and the documents Ridley accessed from those drives, the parties can no longer know the specific documents Ridley accessed using his ChemTreat-issued computer. This prejudices Ecolab/Nalco's ability to determine whether Ridley misappropriated its trade secrets and, if so, to what extent ChemTreat appreciated Ridley's actions. This remains true even if ChemTreat's CrowdStrike log suggests that Ridley never connected the LaCie Drive (the destination device for many of the documents

Ridley downloaded prior to leaving Ecolab/Nalco) to his ChemTreat-issued laptop, because there are other ways Ridley could have accessed Ecolab/Nalco documents without ever directly connecting the LaCie Drive to his ChemTreat-issued computer. As a result, Ecolab/Nalco has demonstrated that it is prejudiced by ChemTreat's actions.

Ecolab/Nalco has not, however, demonstrated that ChemTreat wiped and redeployed Ridley's laptop with the intent to deprive Ecolab/Nalco of the information's use. ChemTreat instructed Ridley to return his laptop to in-house counsel for imaging. He did exactly that, and an administrative assistant delivered his computer to the wrong location. Ecolab/Nalco's histrionics aside, there is nothing to suggest a grand conspiracy aimed at destroying the evidence Ecolab/Nalco needs to prove its case. At worst, the record reflects that ChemTreat was negligent in failing to preserve the ESI on Ridley's laptop. Accordingly, sanctions under Rule 37(e)(2) are not appropriate. Nonetheless, Ecolab/Nalco has demonstrated that ChemTreat destroyed ESI that should have been preserved, that it failed to take reasonable steps to preserve the information on Ridley's laptop, that the ESI cannot be restored or replaced through additional discovery, and that it has been prejudiced as a result. The Court will, therefore, **GRANT IN PART** Ecolab/Nalco's motion for spoliation sanctions against ChemTreat (Doc. 292).

### b. Ridley

#### 1. Amazon Basics USB Drive

Ecolab/Nalco first argues that it is entitled to sanctions against Ridley because ChemTreat's CrowdStrike log indicates that an Amazon Basics USB drive was connected to the computer ChemTreat issued to Ridley on July 9, 2021, and that flash drive has not been located or accounted for to date. (Doc. 293, at 8, 14–15.) The CrowdStrike log, however, does not provide any additional information regarding the circumstances under which the Amazon Basics drive was connected to the computer. Ridley avers that he received the computer around July 13,

2021 (Doc. 313-1, at 5), and ChemTreat's forensic expert opines that Ridley likely received his computer on July 12, 2021, three days after the Amazon Basics drive was connected to the computer. He further opines that the "activity on the CrowdStrike log is consistent with the log capturing activity associated with ChemTreat's IT personnel setting up the laptop before it was sent to Mr. Ridley." (Doc. 255-2, at 926.) Without additional evidence, Ecolab/Nalco has not demonstrated that Ridley ever possessed the Amazon Basics USB drive, that he connected it to the computer ChemTreat issued him, or that he destroyed the ESI that was on the flash drive at a time he was under an obligation to preserve it. Ecolab/Nalco has only demonstrated that, on July 9, 2021, an Amazon Basics USB drive was connected to a computer issued to Ridley and that the USB drive has not been located. That evidence is insufficient to merit spoliation sanctions under Rule 37(e) because, at a minimum, Ecolab/Nalco has not demonstrated that Ridley destroyed the Amazon Basics drive at a time he was obligated to preserve it. Accordingly, the Court will deny Ecolab/Nalco's motion to the extent it seeks spoliation sanctions based on Ridley's failure to locate and produce the Amazon Basics USB Drive.[19]

### 2. Nalco USB Drives and the WD Drive

Ecolab/Nalco next argues that the Court should sanction Ridley because he deleted files from two Nalco USB drives and files from the WD Drive after receiving Ecolab/Nalco's preservation letter on February 9, 2022. (Doc. 293, at 14–15.) With regard to the Nalco USB drives, Lieb has opined that Ridley deleted the following files on February 9, 2021: (1)

---

[19] Ecolab/Nalco's motion also suggests that ChemTreat should be subject to spoliation sanctions because it cannot locate and produce the Amazon Basics USB drive. But, assuming that ChemTreat's I.T. department connected the drive to the computer in the normal course of preparing it for deployment to Ridley, there is nothing on that drive that would be relevant to this litigation. Moreover, there is nothing in the record suggesting that ChemTreat lost or destroyed the USB drive after February 9, 2022.

"Pilgrim's JBS Boiler Operator Training Final 4kwk.ppt"; (2) "Sales Plan Strategies.pdf"; (3) "Planning Guides"; and (4) "Ridley Contacts.CSV." (Doc. 293-6, at 9–10.) In a supplemental report, however, Lieb states that he was able to recover some, but not all, of the files deleted on February 9, 2022. (Doc. 293-14, at 10–11, 15.) With regard to the WD Drive, Lieb opines that, on February 14, 2022, Ridley used a software program called "CCleaner" to "wipe the contents of the WD Drive's 'master file table,'" which "contains references to all file names stored on a given hard drive such as the WD Drive." (Doc. 293-14, at 32.) Lieb further opines that "[f]orensic analysis of the WD Drive revealed the fact that the majority of the WD Drive has been overwritten with zeros" and that "CCleaner is capable of overwriting hard drive contents with zeros in order to destroy files beyond recovery." (*Id.* at 33.)

In response, Ridley does not dispute that he deleted files from the Nalco USB drives, but argues that the Court should not sanction him, because Lieb was able to recover the files that Ridley deleted. (Doc. 313, at 8–9.) With regard to the WD Drive, Ridley admits that he ran the "CCleaner" program on February 14, 2022. He nonetheless avers that he ran the program to ensure that the Nalco files he previously deleted were fully obliterated from the WD Drive, and that he "did not perform the disc clean on the WD Drive on February 14, 2022 with the intent to deprive Nalco or Ecolab of any evidence in this case." (Doc. 313-1, at 10.)

Ridley's actions after receiving Ecolab/Nalco's evidence preservation letter on February 9, 2022, justify sanctions against him. Ridley does not dispute that he was under an obligation to preserve the ESI at issue, and, even if he thought the preservation letter was a "joke," as he testified during his deposition (Doc. 313-2, at 5), no reasonable person would immediately delete ESI after receiving a letter expressly explaining preservation obligations. While some of the ESI from the Nalco USB drives appears to have been recovered, the same cannot be said for the ESI,

whatever it may be, that is permanently lost because Ridley used the CCleaner program on the WD Drive. Ridley's failure to preserve this information necessarily prejudices Ecolab/Nalco because Ridley admits that he accessed Nalco files on the WD Drive using his ChemTreat-issued computer. While Ridley asserts that he accessed those documents to delete them from the WD Drive and that he ran the CCleaner software on the WD Drive to ensure that these files were permanently deleted (Doc. 313-1, at 9), his overall actions in this case cast significant doubt on his credibility. As a result, the Court will **GRANT IN PART** Ecolab/Nalco's motion for spoliation sanctions against Ridley (Doc. 292) and will **RESERVE RULING** as to whether he ran the CCleaner software on the WD Drive with the intent to deprive the parties of evidence in this case and whether sanctions against him under Rule 37(e)(2) are appropriate.

### C.     Sanctions

Having found that each of the parties spoliated evidence in this case, the Court must next determine appropriate sanctions that are "no greater than necessary to cure the prejudice" caused by the parties' spoliation.[20] In addition to considering the sanctions requested by the parties, some of which may be reasonable, but many of which are not, the Court is considering reopening discovery on a limited basis to cure some of the prejudice caused by the parties' spoliation. As explained further below, at a minimum, reopening discovery is necessary so that Ecolab/Nalco can obtain evidence from the computer Ridley used to run CCleaner on the WD Drive. Ecolab/Nalco may be able to obtain more information about what Ridley deleted and the circumstances under which he deleted that information, which may ultimately bear on whether additional sanctions under Rule 37(e)(2) are appropriate.

---

[20] As noted, the Court has reserved ruling on whether additional sanctions against Ridley are appropriate under Rule 37(e)(2). *See supra* Section II.B.ii.b.2.

Additionally, the lack of access to Ridley's ChemTreat-issued laptop has stymied Ecolab/Nalco's ability to determine how Ridley used the Ecolab/Nalco information he downloaded after beginning employment with ChemTreat. ChemTreat's forensic expert, James Vaughn, has nonetheless opined that, based on searches he ran across ChemTreat's "systems," there is "no evidence that Mr. Ridley stored Ecolab's confidential information on ChemTreat's Systems" and "no evidence that Mr. Ridley distributed Ecolab's confidential information to other ChemTreat employees using ChemTreat's Systems." (Doc. 274-1, at 41.) Ecolab/Nalco has not been given access to the data repositories Vaughn searched and has filed a motion to compel access to those repositories under the expert disclosure requirements set forth in Federal Rule of Civil Procedure 26.[21] Regardless whether Ecolab/Nalco is entitled to access to those ChemTreat repositories under Rule 26, granting discovery to those repositories has the potential to cure some of the prejudice resulting from ChemTreat's spoliation of Ridley's ChemTreat-issued laptop because reasonable searches may help disclose whether Ridley stored Ecolab/Nalco's confidential information on ChemTreat's systems or distributed confidential information through ChemTreat's systems—evidence that may have been available and more accessible had ChemTreat not spoliated Ridley's laptop.[22]

---

[21] On April 22, 2023, Magistrate Judge Lee entered an order granting in part and denying in part Ecolab/Nalco's motion to compel production of the data repositories referenced in Vaughn's report. (Doc. 223.) Magistrate Judge Lee granted the motion to the extent the parties agreed that ChemTreat would provide Ecolab/Nalco with forensic images of three specific laptops and a USB device, but denied the motion as to other ChemTreat data repositories that Vaughn searched. (*Id.* at 14.) Ecolab/Nalco objected to Magistrate Judge Lee's order (Doc. 250), and that objection remains pending before the Court.

[22] The justification for giving Ecolab/Nalco access to these data repositories, however, must be balanced against the fact that ChemTreat has produced a CrowdStrike log that, among other things, maintained a log of all USBs plugged into Ridley's ChemTreat laptop, maintained a log of all file names that were accessed by Ridley's laptop from an externally connected USB device, and provides information about what files were accessed from external USB device(s) that have been connected to Ridley's laptop. (*See* Doc. 274-1, at 11–12, 14.) According to

Given the procedural history of this case, however, the Court is likely unwilling to give Ecolab/Nalco unfettered access to the computer Ridley used to run CCleaner on the WD Drive or the ChemTreat data repositories Vaughn searched. To the extent the Court reopens discovery as a sanction for spoliation, the Court is inclined to appoint a special master pursuant to Federal Rule of Civil Procedure 53(a)(1)(C) to oversee production, review, and analysis of the computer Ridley used to run CCleaner on the WD Drive and the ChemTreat data repositories Vaughn searched. Appointing a special master appears necessary as a safeguard against the parties' proclivity to multiply discovery litigation unnecessarily. Further, under Rule 53(g), the Court retains the discretion to apportion the costs of a special master among the parties "after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the for the reference to the master." Fed. R. Civ. P. 53(g). Utilizing a special master should, thus, encourage the parties to strike an appropriate balance between searching for potentially relevant information while avoiding unnecessary fishing expeditions and preventing the parties' further abuse of the Court's resources.

Before appointing a special master or imposing other sanctions, however, the Court will hear arguments from the parties regarding appropriate sanctions based on the Court's rulings detailed herein.[23]

---

Vaughn, the information contained in the CrowdStrike log accurately captures the extent to which Ridley used his ChemTreat-issued laptop to access documents with the phrase "Nalco Water Files" in the file path from an external USB device. Such evidence may be a strong indication that Ecolab/Nalco will not uncover any of its trade-secret information on ChemTreat's systems if given access.

[23] As a result, Ecolab/Nalco's motion for a hearing in connection with the pending spoliation motions (Doc. 332) is **GRANTED IN PART** to the extent the Court will hear arguments on appropriate sanctions. The Court will not, however, entertain additional argument regarding its determination that the parties have spoliated evidence as detailed above. Additionally, the Court

## III.     ECOLAB/NALCO'S MOTION TO REOPEN DISCOVERY

Upon discovering that Ridley ran the CCleaner program on the WD Drive, Ecolab/Nalco moved to reopen discovery so that it can inspect the computer Ridley used to run the CCleaner software program on WD Drive.  (Doc. 295.)  Ecolab/Nalco argues that reopening discovery and inspecting the undisclosed computer is necessary because it may contain evidence regarding:  (1) Ridley's efforts to conceal evidence; (2) Ridley's dishonesty during the discovery process; (3) Ridley's non-compliance with Ecolab/Nalco's preservation notice; and (4) whether Ridley improperly took and used Ecolab/Nalco documents when he left the company, and, if so, to what extent.  (Doc. 296, at 9.)

District courts have "substantial discretion over pretrial matters such as the conduct of discovery."  *Shelbyville Hosp. Corp. v. Mosley*, No. 4:13-cv-88, 2017 WL 1155046, at *2 (E.D. Tenn. Mar. 27, 2017).  In determining whether reopening discovery is appropriate, courts consider the following factors:

> (1) whether the movant has shown good cause for reopening discovery, (2) whether the need for additional discovery is due to the movant's neglect, (3) the specificity of the discovery request, (4) the relevance of the discovery, and (5) whether the party opposing the reopening of discovery will suffer prejudice.

*Id.* (collecting cases).

In this case, Ecolab/Nalco has demonstrated that reopening discovery is appropriate so that Ecolab/Nalco can inspect the computer that Ridley used to run CCleaner on the WD Drive. First, good cause exists for reopening discovery because Ridley has consistently obscured his

_____

is cognizant that the foregoing largely focuses on potential sanctions in connection with Ridley and ChemTreat's spoliation and does not expressly discuss sanctions related to Ecolab/Nalco's spoliation of the LaCie Drive and Ridley's second Ecolab/Nalco-issued laptop.  To be sure, the Court will also hear the parties at the forthcoming hearing on the issue of appropriate sanctions against Ecolab/Nalco based on its spoliation.

conduct throughout this litigation. After disclosing the existence of a "personal hard drive," Ridley provided interrogatory responses indicating that he last downloaded Ecolab/Nalco files to that hard drive sometime in 2015 or 2016. (Doc. 225-3, at 3.) When he was deposed, however, he testified that he downloaded Ecolab/Nalco files to the WD Drive as late as 2020. (Doc. 296-1, at 16–17.) More importantly, though, when Ecolab/Nalco finally obtained the WD Drive, its forensic expert discovered that Ridley used an undisclosed computer to run the CCleaner software and delete information from the WD Drive five days after receiving Ecolab/Nalco's preservation notice.[24] (Doc. 295-2, at 27–43.) Ridley's conduct after receiving an evidence-preservation notice warrants affording Ecolab/Nalco the opportunity to inspect the computer he used to run CCleaner to determine if there is additional evidence regarding the information he deleted from the WD Drive or the circumstances under which he ran the CCleaner program.

Second, the need for additional discovery is not due to Ecolab/Nalco's neglect. Although Ecolab/Nalco has been aware of the WD Drive's existence and could have sought to inspect it earlier, it pursued inspection with two-and-a-half months left in the discovery period. When Ridley objected to Ecolab/Nalco's request for inspection, the parties unsuccessfully attempted to negotiate terms for inspection, which resulted in Ecolab/Nalco filing a motion to compel inspection at the end of the discovery period. Ecolab/Nalco could have pursued inspection of the WD Drive earlier in the litigation, but it began diligently pursuing inspection of the WD Drive

---

[24] Ecolab/Nalco further represents that Ridley denied deleting information from "personal devices" and "storage media" after receiving its evidence-preservation notice in responding to its requests for admission and specifically denied deleting information from the WD Drive after receiving the preservation notice during his deposition. (Doc. 296, at 3, 5.) Those representations may be accurate, but they are not supported by the exhibits attached to Ecolab/Nalco's motion. (*See* Docs. 296-1, 296-6.)

with plenty of time left in the discovery period.  Procedural brinksmanship in connection with Ridley's request to inspect, not neglect, ultimately delayed production of the WD Drive.

Ecolab/Nalco has also demonstrated that the computer Ridley used to run CCleaner on the WD Drive contains relevant information, and it has narrowly tailored its request to reopen discovery to obtain that information.  At a minimum, the computer likely holds additional information regarding the circumstances under which Ridley used CCleaner on the WD Drive.  It may also possess information about the files that were deleted from the WD Drive as a result of Ridley using the CCleaner program.  Additionally, inspection of the computer will likely reveal whether Ridley transferred any documents from the WD Drive to the computer prior to running CCleaner on the WD Drive or otherwise stored Ecolab/Nalco documents in a previously undisclosed location.  Such information is relevant given the claims at issue and the other evidence-preservation failures that have made it difficult for the parties to obtain relevant evidence in this case.

Finally, any prejudice that Ridley and ChemTreat could theoretically suffer by reopening discovery is outweighed by the need to understand the implications of Ridley running the CCleaner software on the WD Drive.  Ecolab/Nalco's inspection may not reveal any relevant evidence, in which case the Court can proceed in ruling on the pending motions based on the current record.  Conversely, given Ridley's evolving factual positions, Ecolab/Nalco's inspection of the computer could yield evidence that fundamentally alters the parties' arguments, particularly with regard to the cross-motions for spoliation sanctions and the cross-motions for summary judgment.  Simply put, Ecolab/Nalco is correct that the computer may contain evidence of:  (1) Ridley's efforts to conceal evidence; (2) Ridley's dishonesty during the discovery process; (3) Ridley's non-compliance with Ecolab/Nalco's preservation notice; and (4)

whether he improperly took and used Ecolab/Nalco documents when he left the company, and, if so, to what extent. At this point, understanding what is on that computer and how it impacts the case is necessary before the Court can rule on the pending motions and, if necessary, proceed to trial.[25] Accordingly, the Court will **GRANT** Ecolab/Nalco's motion to reopen discovery for the limited purpose of allowing Ecolab/Nalco to inspect the computer Ridley used to run the CCleaner program on the WD Drive.[26]

## IV. CHEMTREAT'S MOTION FOR SANCTIONS BASED ON ECOLAB/NALCO'S FAILURE TO COMPLY WITH COURT ORDERS DURING DISCOVERY

ChemTreat has also moved for sanctions against Ecolab/Nalco under Federal Rule of Civil Procedure 37(b)(2), arguing that Ecolab/Nalco has repeatedly failed to comply with its discovery obligations, ignored Court orders, and otherwise engaged in contumacious conduct during discovery.[27] (Doc. 268.) Specifically, based on Ecolab/Nalco's conduct during discovery, ChemTreat contends that Ecolab/Nalco's conduct merits dismissing all of its claims

---

[25] The Court recognizes that it previously indicated that discovery compelled by Magistrate Judge Lee in connection with discovery motions pending at the end of the discovery period would not constitute good cause for extending the dispositive-motions and *Daubert* deadlines or the trial date. (Doc. 243, at 6.) Perhaps naively, the Court did not envision a scenario in which discovery compelled by Magistrate Judge Lee would reveal that a party destroyed evidence shortly after being put on notice of his preservation obligations. The circumstances surrounding the destruction of that evidence must be investigated prior to moving forward with this case, regardless of the parties' or the Court's desire to press forward to trial.

[26] Reopening discovery so that Ecolab/Nalco can inspect the computer Ridley used to run the CCleaner program on the WD Drive is also an appropriate sanction that will mitigate the prejudice caused by Ridley's deletion of electronically stored information after receiving an evidence-preservation notice from Ecolab/Nalco.

[27] Ecolab/Nalco has moved to strike ChemTreat's motion for sanctions, contending that ChemTreat has failed to comply with the Court's prior order that the parties engage in mediation before filing additional motions for sanctions. (Doc. 286.) Because the Court finds that ChemTreat has not demonstrated that sanctions are appropriate under Rule 37(b)(2), Ecolab/Nalco's motion to strike is **DENIED AS MOOT**.

against ChemTreat with prejudice. (Doc. 269, at 6.) Alternatively, ChemTreat requests that the Court sanction Ecolab/Nalco by ordering that the following facts are established: (1) "[Ecolab/Nalco has] not suffered any damages as a result of the actions of ChemTreat or Ridley"; (2) "[Ecolab/Nalco has] not lost any customers as a result of the actions of ChemTreat or Ridley"; (3) "[Ecolab/Nalco has] not suffered any harm, including to [its] goodwill, as a result of the actions of ChemTreat or Ridley"; (4) "[Ecolab/Nalco] did not make any efforts to mitigate any harm [it] could have suffered as a result of the actions of ChemTreat or Ridley"; and (5) "[Ecolab/Nalco has] not lost any business as a result of the actions of ChemTreat or Ridley." (*Id.*) In response, Ecolab/Nalco argues that the Court should strike ChemTreat's motion for sanctions because Magistrate Judge Lee's February 24, 2023 order required the parties to engage in mediation prior to filing any additional motions for discovery sanctions and, to date, the parties have not engaged in mediation. (Doc. 286, at 2.) Ecolab/Nalco further argues that the Court should deny ChemTreat's motion because it provided the certification required by Magistrate Judge Lee's April 14, 2023 order, and it has otherwise complied Court's prior substantive rulings and orders on discovery motions. (Doc. 300.)

### A.     Standard of Law

Federal Rule of Civil Procedure 37(b)(2) provides that, "if a party . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders," including, but not limited to: (1) "directing that matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims"; (2) "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence"; (3) "dismissing the action in

whole or in part"; and (4) "rendering a default judgment against the disobedient party." *See* Fed. R. Civ. P. 37(b)(2)(A)(i)–(vii).[28]

**B.    Analysis**

In this case, Ecolab/Nalco's conduct in discovery does not qualify as the type of contumacious conduct warranting dismissal of its claims against ChemTreat or the type of conduct that warrants deeming certain matters established as fact.  First, Ecolab/Nalco's counsel provided two certifications signed by counsel explaining Ecolab/Nalco's efforts to comply with Magistrate Judge Lee's April 14, 2023 order.  Although those certifications are not sworn to under the penalty of perjury, by affixing counsel's signature, counsel certifies, among other things, that to the best of his or her knowledge, information, and belief, the matters therein are "formed after an inquiry reasonable under the circumstances" and are "not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b).  Such certifications are sufficient for the Court to hold Ecolab/Nalco and its counsel accountable if it determines that those certifications were not truthful or were made in an attempt to avoid compliance with Magistrate Judge Lee's April 14, 2023 order.  Moreover, Ecolab/Nalco's response to ChemTreat's motion attached a sworn verification from a company representative attesting to the accuracy of counsel's prior discovery certifications.  (Doc. 300-1, at 11.)  Although that verification could have (and likely should

---

[28] In its motion, ChemTreat seeks dismissal of Ecolab/Nalco's claims against it based on Ecolab/Nalco's failure to comply with Magistrate Judge Lee's April 14, 2023 order.  Because the Court finds that ChemTreat is not entitled to sanctions under Rule 37(b)(2), the Court need not analyze the factors necessary to determine whether dismissal is an appropriate sanction.

have) been provided much sooner, it is sufficient to avoid the harsh sanction of dismissal under Federal Rule of Civil Procedure 37(b)(2).[29]

Second, ChemTreat has not demonstrated that Ecolab/Nalco failed to use reasonable search methods to comply with Magistrate Judge Lee's April 14, 2023 order. To the extent ChemTreat argues that Ecolab/Nalco failed to comply with Magistrate Judge Lee's order regarding RFPs 20-22 and 27 because it did not produce a responsive e-mail exchange that Insight produced to ChemTreat, Magistrate Judge Lee already explained that, "[t]he Court has no greater insight into the nature or existence of any such documents than the parties do," and it "is not persuaded" that ChemTreat's identification of a responsive e-mail received from a third party "reveals some gaping inadequacy with [Ecolab/Nalco's] search efforts requiring further Court intervention." (Doc. 212, at 7–8.) The fact that ChemTreat received a responsive document that is likely in Ecolab/Nalco's possession, custody, or control from Insight does not mean that Ecolab/Nalco wholly failed to use reasonable and appropriate search efforts as ordered by Magistrate Judge Lee. Similarly, although Magistrate Judge Lee ordered Ecolab/Nalco to produce a copy of a "DLP-Data Loss Prevention" policy and related policy documents that David Garza, Ecolab/Nalco's Director of Global Information Security, referenced during his deposition, Ecolab/Nalco has certified that it is unable to locate those documents despite diligently searching. (Doc. 268-2, at 1.) Ecolab/Nalco's failure to locate and produce these policy documents may warrant a discussion about how those policies may be used at trial, but it does not demonstrate that Ecolab/Nalco's search was so unreasonable as to warrant sanctions.

---

[29] However, the Court does take issue with Ecolab/Nalco's assertion that the sworn-certification issue could have been resolved by the parties had ChemTreat simply made a phone call and asked for it. The procedural history of this case and parties' motions practice, particularly during discovery, renders risible Ecolab/Nalco's sunny retrospect.

Finally, RFPs 78 through 82 requested that Ecolab/Nalco produce documents relating to its claimed damages, including documents relating to customers it lost, harm to its goodwill, and its efforts to mitigate damages. Magistrate Judge Lee found that ChemTreat's requests were overbroad, but that it was entitled to "more than what [Ecolab/Nalco had] produced thus far." (Doc. 212, at 18.) Again, however, she also noted that "[t]he Court lacks sufficient information to order any specific production." (*Id.*) As a result, she ordered the parties to meet and confer in good faith within two days of her order to attempt to resolve the disputes concerning these RFPs, with any supplemental production taking place within five days of her order. (*Id.*) Unsurprisingly, the parties were again unable to agree as to the appropriate scope of production, and it does not appear that Ecolab/Nalco ever made a supplemental production. Ecolab/Nalco did, however, represent to ChemTreat that it "is not claiming damages for lost customers at this time." (Doc. 300-1, at 7.) The Court intends to hold Ecolab/Nalco to that representation. Ecolab/Nalco will not be permitted to introduce evidence related to lost customers at trial. The Court will otherwise deny ChemTreat's motion because it did not make any effort to raise Ecolab/Nalco's purported failure to comply with Magistrate Judge Lee's order before the expiration of the discovery period.[30] Accordingly, the Court will **DENY** ChemTreat's motion

---

[30] In support of its argument for sanctions, ChemTreat details other Ecolab/Nalco conduct during discovery that it contends shows Ecolab/Nalco has a history of delay and disregard for Court orders. (Doc. 269, at 6–8.) Specifically, ChemTreat recounts the procedural history and necessity for Court intervention in connection with issues regarding entering a protective order, defining Ecolab/Nalco's trade secrets, designating individuals permitted to view "Attorneys Eyes Only" designations, Ecolab/Nalco's Rule 30(b)(6) witness, and Ecolab/Nalco's privilege log. (*Id.*) As the Court has previously detailed, the parties have needlessly complicated the discovery process in this case, and all parties share responsibility for these complications. The Court, therefore, evaluated whether sanctions were appropriate based on whether ChemTreat has demonstrated that Ecolab/Nalco has failed to obey Magistrate Judge Lee's April 14, 2023 order.

for sanctions pursuant to Rule 37(b)(2) (Doc. 268), and will **DENY AS MOOT** Ecolab/Nalco's motion to strike ChemTreat's motion for sanctions (Doc. 286).

## V.   CONCLUSION

For the reasons stated herein, Ridley and ChemTreat's motions for spoliation sanctions (Docs. 261, 276) are **GRANTED IN PART**.  Ecolab/Nalco's motion for spoliation sanctions (Doc. 292) is **GRANTED IN PART**.  ChemTreat's motion for sanctions under Rule 37(b)(2) (Doc. 268) is **DENIED**, and Ecolab/Nalco's motion to strike ChemTreat's motion for sanctions (Doc. 286) is **DENIED AS MOOT**.  Ecolab/Nalco's motion to reopen discovery (Doc. 295) is **GRANTED**, and its motion for hearing on the parties' spoliation motions (Doc. 332) is **GRANTED IN PART**.  The Court **ORDERS** the parties to appear for an in-person hearing on **August 10, 2023, at 10:00 a.m**.  At the hearing, the Court will hear argument from the parties, not to exceed forty-five minutes per party, regarding appropriate sanctions in connection with the parties' spoliation, the extent to which the Court will reopen discovery, and the possible appointment of a special master.

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. McDONOUGH**
**UNITED STATES DISTRICT JUDGE**