# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

ECOLAB INC. and NALCO COMPANY, )
LLC d/b/a NALCO WATER, AN )    Case No. 1:22-cv-50
ECOLAB COMPANY and/or NALCO )
WATER )    Judge Travis R. McDonough
    )
    *Plaintiffs*, )    Magistrate Judge Christopher H. Steger
    )
v. )
    )
ANTHONY RIDLEY and CHEMTREAT, )
INC., )
    )
    *Defendants*. )

---

## MEMORANDUM AND ORDER

---

Before the Court are the following motions:  (1) Defendant ChemTreat, Inc.'s ("ChemTreat")  and Defendant Anthony Ridley's motions to exclude certain opinions of Laurence D. Lieb (Docs. 257, 265); (2) ChemTreat and Ridley's motions to exclude the opinions of Dana M. Trexler (Docs. 266, 271); and (3) Plaintiffs Ecolab, Inc. and Nalco Company, LLC's (collectively "Ecolab/Nalco") motion to strike the expert report of James Vaughn (Doc. 273). For the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** ChemTreat and Ridley's motions to exclude certain opinions of Laurence D. Lieb, **GRANT** ChemTreat and Ridley's motions to exclude certain opinions offered by Dana M. Trexler, and **DENY** Ecolab/Nalco's motion to strike the expert report of James Vaughn.

# I. ECOLAB/NALCO'S MOTION TO STRIKE JAMES VAUGHN'S EXPERT REPORT

Ecolab/Nalco has moved to strike portions of James Vaughn's expert report and to preclude him from offering his opinions at trial based on ChemTreat's failure to comply with the Federal Rule of Civil Procedure 26(a).[1] (Doc. 273.)

## A. Background

In this case, Ecolab/Nalco alleges, among other things, that its former employee, Defendant Anthony Ridley, and his subsequent employer, ChemTreat, misappropriated its trade secrets. (*See generally* Doc. 229.) On July 1, 2021, Ecolab/Nalco terminated Ridley's employment after he notified it that he intended to resign and accept a position with ChemTreat, a direct competitor. At various points prior to his termination, however, Ridley downloaded Ecolab/Nalco documents from his Ecolab/Nalco company-issued computers to various external hard drives. With regard to one external hard drive in particular, which Ridley later identified as the "WD Drive," his interrogatory responses state that he: (1) had previously "backed up files from his work laptop while employed with Nalco Water to an external hard drive before the company had a cloud based back up system"; (2) "believes he backed up the files sometime in 2015 or 2016"; (3) "located those files [on the WD Drive] after he left Ecolab in July 2021 and deleted those files"; and (4) "no longer has access to or a copy of those files." (Doc. 225-3, at 3.) During his deposition, Ridley explained that, on one occasion, he found Ecolab/Nalco documents on the WD Drive when he connected it to his ChemTreat computer while "looking for some pictures." (Doc. 225-1, at 6.) He further testified that he connected the WD Drive to his ChemTreat computer and found Nalco documents on at least three other occasions between

---

[1] Ecolab/Nalco has requested oral argument on this motion, but the Court finds that oral argument is unnecessary.

August 2021 and January 2022, and that he deleted those files when he found them. (*Id.* at 3–5.) Additionally, and despite the representations made in his interrogatory responses, Ridley testified during his deposition that he likely saved Nalco documents to the WD Drive as late as 2020. (*Id.* at 7.) To date, Ridley has not corrected or supplemented his interrogatory responses to address the discrepancy between his interrogatory response and his deposition testimony regarding when he last downloaded Ecolab/Nalco documents to the WD Drive. Complicating matters further, ChemTreat reformatted and forensically wiped Ridley's company-issued computers, making it difficult to determine the extent to which Ridley accessed Ecolab/Nalco documents on the WD Drive using his ChemTreat-issued computer. (*See* Doc. 52-3.)

After Ridley served his interrogatory responses, but before he was deposed, ChemTreat disclosed James Vaughn as an expert in digital forensics and served Ecolab/Nalco with a copy of his report. (Doc. 283-2.) In his report, Vaughn states that he was "retained to investigate allegations made by Ecolab . . . that Mr. Ridley misappropriated Ecolab's documents and placed them on or distributed them through ChemTreat's Systems."[2] (Doc. 274-1, at 7.) As part of that effort, Vaughn conducted file-name searches across certain devices and data repositories, including searching for all of the file names identified in the data loss prevention report Ecolab/Nalco generated after it terminated Ridley's employment. (*Id.* at 24–28.)

Vaughn's report also includes opinions regarding the circumstances under which Ridley accessed files from external USB devices using his ChemTreat-issued laptop. The report explains that, although ChemTreat forensically wiped and reformatted Ridley's company-issued laptop, he was able to discern certain information about Ridley's use of external USB drives

---

[2] Vaughn's report defines "ChemTreat's Systems" as "systems managed by ChemTreat that a user could utilize to distribute data, information, or documents, including cloud-based platforms such as OneDrive, network shared folders, and e-mail." (Doc. 274-1, at 7 n.6.)

from CrowdStrike, an electronic platform that, among other things: (1) "maintains a log of all USBs plugged into a particular ChemTreat laptop"; (2) "maintains a log of all file names that were accessed by a particular ChemTreat laptop from an externally connected USB device"; and (3) "provides information about what files were accessed from external USB device(s) that have been connected to a particular laptop, as well as the date of access, file names, and extensions for those files." (*Id.* at 11–12, 14.) As a result, Vaughn states that "the CrowdStrike log contains almost all the relevant data that [he] would have procured had [he] been able to forensically image and analyze Mr. Ridley's ChemTreat-issued laptop prior to reformatting." (*Id.* at 14.) Vaughn goes on to opine that "based on [his] expertise as a digital forensics examiner, that the CrowdStrike log produced to Ecolab in this litigation accurately and reliably reflects the file names of any files from any external devices (such as USB or external hard drive) that Mr. Ridley interacted with using his first ChemTreat-issued laptop." (*Id.* at 40.)

Vaughn's report does not, however, mention or reference the WD Drive. According to Vaughn's report, the CrowdStrike log indicates that Ridley accessed seven external files with a "Nalco Water Files" path from USB hard drives connected to his ChemTreat laptop on August 17, 2021, August 20, 2021, and January 28, 2022. (*Id.* at 12.) Of these seven documents, "[t]he first five documents listed above appear to have been accessed from a USB device that CrowdStrike identified as "HarddiskVolume5," and "[t]he last two documents listed above appear to have been accessed from another USB device that CrowdStrike identified as "HarddiskVolume6." (*Id.* at 13.) Based on this information, as well as other facts and data contained in his report, Vaughn ultimately opines that: (1) "there is no evidence that Mr. Ridley stored Ecolab's confidential information on ChemTreat's Systems"; (2) "there is no evidence that Mr. Ridley distributed Ecolab's confidential information to other ChemTreat employees

using ChemTreat's Systems": and (3) "Mr. Ridley may have interacted with a very limited set of documents that bear file names indicating that they may have originated with Ecolab," but "he did not upload those documents to ChemTreat's Systems or use ChemTreat's Systems to distribute them." (*Id*. at 41.)

Ecolab/Nalco eventually took Vaughn's deposition on April 27, 2023, the last day of the discovery period in this case. During his deposition, Vaughn testified that hard drives referenced in his report as "HarddiskVolume5" and "HarddiskVolume6" were, in fact, a single USB drive —the WD Drive.

> Q. Okay. Before you – before you make your correction, my first question is, is it your position that hard disk Volume 5 or hard disk Volume 6 are the WD Drive?
>
> A. Yes.
>
> Q. Okay. What's the correction you want to make?
>
> A. That there's one device, not two. . . .
>
> Q. Okay. Your position is that hard disk Volume 5 and hard disk Volume 6 both refer to the WD Drive; is that right?
>
> A. Yes, sir.
>
> Q. Okay. So why did you separately refer to them in your report as hard disk Volume 5 and hard disk Volume 6?
>
> A. Sure. Thanks for asking. When I – I was drafting my report and I was referring to – I was looking at these entries and I was doing by documentation about, oh, it's a hard disk Volume 5, hard disk Volume 6 so I naturally just said, oh, that's two different USB devices. But then as I got over to – and I'll tell you were I am going here – when I got over to the section where I was documenting the – the CrowdStrike entries, I actually wrote it correctly that it's one device – it's one drive and it's listed in the CrowdStrike report, but I forgot to go back and update my report to say that it's one drive, not two drives. So that's how – that's how it happened.
>
> . . .

> Ultimately the CrowdStrike report shows it as one USB device, which is the Western Digital "WD My Book" device that is, as I understand it, currently with [Ridley's] attorney.

(Doc. 274-2, at 3–5.) Vaughn then testified that it was an "error" to reference HardDisk Volume 5 and HardDisk Volume 6 as separate USB devices in his report.

> Q.    Okay. In the middle of the page you wrote, "The first five documents listed above appear to have been accessed from a USB drive that CrowdStrike identified as hard disk Volume 5. The last two documents listed above appear to have been accessed from another USB device that CrowdStrike identified as hard disk Volume 6." Do you see where you wrote that?

> A.    Yes.

> Q.    Okay. So in this paragraph, you were stating, essentially, that hard disk Volume 5 and hard disk Volume 6 are two different USB devices, right?

> A.    In this location, I did initially write that. You are correct. And I left that error in my report. You are correct.

(Doc. 274-2, at 5–6.) Vaughn described how the CrowdStrike log supported this testimony, explaining that the log captured the USB device serial numbers Ridley interacted with on his ChemTreat-issued computer and that his testimony regarding his interactions with the WD Drive were consistent with the serial numbers associated with HardDisk Volume 5 and HardDisk Volume 6 and Ridley's testimony regarding the dates he accessed the WD Drive on his ChemTreat computer. (Doc. 283-11, at 17; *see also* Doc. 283-12, at 2–5 (compiling information from CrowdStrike log, including device serial numbers, in connection with Ridley accessing various USB drives from his ChemTreat computer).)

> Q.    Mr. Vaughn, read for me – read – quote the language on Page 37 of your report that you contend reveals in any way that hard disk Volume 5 and hard disk Volume 6 are, in fact, the WD Drive.

> A.    Sure. Page 37, Number 2, it starts by saying "The CrowdStrike log tracking Mr. Ridley's interactions with external USB devices contains the following headers reflecting information collected and logged by Crowd Strike."

> It then goes on to list the device manufacturer, the product, the serial
> number. All of those are listed in the chart for Number 2. That combined
> with the CrowdStrike log, in and of itself, documents the information
> you're looking for, which is the make, model and serial number of the
> Western Digital MyBook. That's what I was trying to explain.

(Doc. 283-11, at 17.) Nonetheless, Vaughn conceded that he did not expressly reference the WD Drive in his report and that the CrowdStrike logs were not attached as an exhibit to his report. (*Id.* at 7–11, 17; *but see* Doc. 283-3 at 1 (identifying the "Complete CrowdStrike Log" in his list of materials relied upon in his expert report).)

Ecolab/Nalco has moved to strike portions of Vaughn's expert report and to preclude him from offering his opinions at trial, arguing that his report fails to comply with Rule 26. (Doc. 273.) Specifically, Ecolab/Nalco contends that, because Vaughn's report does not reference the WD Drive, and because his report states that HardDisk Volume 5 and HardDisk Volume 6 are separate USB devices, his deposition testimony stating that HardDisk Volume 5 and HardDisk Volume 6 are actually the WD Drive means that his report fails to contain a complete statement of all opinions and the reasons for his opinions, as well as the facts and data he considered in forming those opinions. (*See* Doc. 274, at 8–14.)

### B. Standard of Law

Rule 26(a)(2) requires parties to disclose the identity of any witness it may use at trial to present evidence under Rules 702, 703, or 705. Additionally, any witness disclosed must provide a written report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts and data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). As the Sixth Circuit has explained, under Rule 26(a), "an expert opinion must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation." *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Brainard v. Am. Skandia Life Assurance Corp.*, 432

F.3d 655, 657 (6th Cir. 2005)).  Further, a "report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources."  *Id*. (quoting *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 742 n.6 (7th Cir.1998)).  This means that a report "must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."  *Id*.

Nonetheless, Rule 26 contemplates that an expert may need to supplement or correct information contained in his or her initial report.  "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e).  The advisory committee notes to Rule 26, however, suggest that formal supplementation or correction of a report may be unnecessary when an expert corrects information contained in an earlier report during a deposition:

> The obligation to supplement disclosures and discovery responses applies whenever a party learns that its prior disclosures or responses are in some material respect incomplete or incorrect.  There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition or when an expert during a deposition corrects information contained in an earlier report.

Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment.  Indeed, as another district judge in this Court explained, "[a]fter parties make their mandatory expert disclosure, the experts are not turned to stone pending trial"; rather, "the rules anticipate experts will hone their opinions in light of new information . . . ."  *Williams v. City of Chattanooga*, No. 1:16-cv-477, 2018 WL 11463529, at *2 (E.D. Tenn. Feb. 1, 2018).  In the event "a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply

evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless."[3]  Fed R. Civ. P. 37(c)(1).

### C.  Analysis

In this case, Vaughn's report complies with Rule 26 because it includes a complete statement of his opinions, including that the CrowdStrike log contains a log of all USBs plugged into a particular ChemTreat laptop, the basis for his opinions, and the facts and data he considered in forming those opinions.  Vaughn's report is not cursory, and it includes "how" and "why" he reached his conclusions.  The fact that Vaughn initially believed that the USB drives identified in his report as HardDisk Volume 5 and HardDisk Volume 6 were two separate USB drives and, after having the benefit of reviewing portions of Ridley's deposition testimony (Doc. 283-11, at 23–24), later clarified in his deposition that they were actually a single USB drive— WD Drive—does not mean that his report fails to include all of his opinions or the facts and data he considered in forming those opinions.  Rather, Vaughn corrected information contained in his initial report, which is permitted under Rule 26, especially since he did so before the parties' deadline for pretrial disclosures.

---

[3] Harmlessness generally involves an innocent mistake coupled with sufficient knowledge by the other party.  *See Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Vance ex rel. Hammons v. United States*, 182 F.3d 920 (6th Cir. 1999)).  In determining whether a party's omitted or late disclosure is substantially justified or harmless, courts consider the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id*. (quoting *Russell v. Absolute Collection Servs., Inc.,* 763 F.3d 385, 396–97 (4th Cir. 2014)). The burden is on the potentially sanctioned party to prove harmlessness.  *Id.*

Circumstances in which courts strike an expert report or preclude an expert from testifying based on failure to comply with Rule 26 are starkly different from the present circumstances. For example, in *R.C. Olmstead*, the Sixth Circuit affirmed a district court's decision to bar a party from using an expert report in a copyright and trade-secrets case for failure to comply with Rule 26, noting that the expert's two-page report "provided only cursory support" for his opinion that the defendant company developed its software by copying the plaintiff company's software. 606 F.3d at 271. The Sixth Circuit further explained that the expert's identification of four examples of similarities between the software was insufficient because his report failed to discuss the basis for his conclusion that the similarities were the result of copying, leaving the opposing party "only slightly more informed" than it would have been merely by reading the complaint. *Id.* Similarly, in *King v. Ford Motor Co.*, 209 F.3d 886, 901 (6th Cir. 2000), the Sixth Circuit affirmed the district court's exclusion of expert testimony at trial regarding whether "load limiters" were feasible in the 1992 Ford Escort because of "Ford's unexcused failure to disclose that its experts would testify regarding Hyundai Excel load limiters did not allow plaintiffs the opportunity to prepare properly for these witnesses." Unlike these situations, Vaughn's report is not cursory, and it does not fail to disclose the subject matter of his anticipated testimony such that Ecolab/Nalco cannot properly prepare for cross-examination at trial.

Vaughn's expert report satisfies the requirements of Rule 26, and providing a correction to that report during his deposition testimony is also consistent with Rule 26.[4] Accordingly, the Court will **DENY** Ecolab/Nalco's motion to strike Vaughn's expert report (Doc. 273).

---

[4] Even if the Court considered Vaughn's testimony to be an omitted or late disclosure under Rule 26, it is harmless. Vaughn's testimony does not suggest that he was trying to hide important information in his expert report, and Ecolab/Nalco cannot legitimately claim surprise that he

## II. CHEMTREAT AND RIDLEY'S MOTIONS TO EXCLUDE LAURENCE D. LIEB AND DANA M. TREXLER

ChemTreat and Ridley have moved to exclude the opinions of Ecolab/Nalco's damages expert, Dana M. Trexler, pursuant to Rules 403 and 702 of the Federal Rules of Evidence. (Docs. 266, 271.)  ChemTreat and Ridley have also moved to exclude certain opinions offered by Laurence D. Lieb, Ecolab/Nalco's digital forensics expert, under Rules 403 and 702.[5]  (Docs. 257, 265.)

### A. Standard of Law

Federal Rule of Evidence 702 governs the admissibility of testimony by expert witnesses and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588–95 (1993) (construing Rule 702).  However, "the Rule 702 inquiry is 'a flexible one.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal citations omitted).  "*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test'" and "adds that the

---

corrected information in his report after having the benefit of reviewing Ridley's deposition testimony.  Further, how and to what extent Ridley used USB devices with Ecolab/Nalco information on his ChemTreat-issued laptop remains an issue and there is sufficient time for ChemTreat to account for Vaughn's deposition testimony such that it will not disrupt trial.

[5] ChemTreat recently filed a motion to strike Lieb's supplemental report, arguing that it is untimely.  (Doc. 315.)  The Court will address that motion in a separate memorandum opinion.

gatekeeping inquiry must be "'tied to the facts' of a particular 'case.'" *Id.* (quoting *Daubert*, 509 U.S. at 591–93). The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under Rule 702: (1) "the witness must be qualified by knowledge, skill, experience, training, or education"; (2) "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) "the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

With respect to the first requirement, courts consider whether the expert's qualifications "provide a foundation for a witness to answer a specific question," as opposed to considering his or her qualifications in the abstract. *Burgett v. Troy-Bilt, LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The party offering the expert testimony must prove the expert's qualifications by a preponderance of the evidence. *Id.* (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)).

To determine whether expert testimony is relevant, a court must, as a preliminary matter, consider whether the proffered expert testimony is relevant under Rule 401. *Daubert*, 509 U.S. at 587 (citing Fed. R. Evid. 401). Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (citations omitted). In addition to relevance as defined in Rule 401, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. This

aspect of the relevance requirement—described in *Daubert* as "fit"—concerns whether the method on which the testimony is based is scientifically valid for the "pertinent inquiry" in the case. *Id.*

Reliability, the third requirement, is assessed using the factors set out in Rule 702 itself—whether the testimony is based on sufficient facts or data, whether the testimony is the product of reliable principles and methods, and whether the principles and methods used were reliably applied. *In re Scrap Metal*, 527 F.3d at 529 (citing Fed. R. Evid. 702). To be reliable, an expert's testimony must be supported by "'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 595). A reliable expert opinion also "rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30. Courts "generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Id.* at 530. Thus, reliability—distinct from "credibility and accuracy"—focuses on the methodology employed rather than the conclusions drawn. *Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *In re Scrap Metal*, 527 F.3d at 529); *see Daubert*, 509 U.S. at 595.

In determining whether expert testimony "is the product of reliable principles and methods," Fed. R. Evid. 702(c), courts may consider whether the methods and principles have been and are capable of being tested, whether they have been subjected to peer review and publication, their known or potential rate of error, and whether they are generally accepted within the relevant scientific community. *See Daubert*, 509 U.S. at 593–94; *see also United States v. Mallory*, 902 F.3d 584, 592–93 (6th Cir. 2018) (noting that all of the factors do not necessarily apply in every case). The inquiry, however, is flexible, and the district court may also consider other factors that bear on the reliability of the expert's testimony. *See Kuhmo*, 526

U.S. at 149–50 ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."); *see, e.g.*, *Johnson v. Manitowic Boom Trucks, Inc.*, 484 F.3d 426, 434–35 (6th Cir. 2007) (approving consideration of the extent to which an expert's opinion was prepared solely for litigation in determining its reliability).

"[R]ejection of expert testimony is the exception rather than the rule," *In re Scrap Metal*, 527 F.3d at 530, and "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact," *Burgett*, 579 F. App'x at 376 (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998)).  "A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel."  *Id.* at 376–77; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Additionally, as the United States Supreme Court explained in *Daubert*, "a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules."  509 U.S. at 595 (citing Rule 403, among other examples); *see also id.* ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." (internal citations and quotation marks omitted)).  Pursuant to Rule 403,

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. Rule 403 provides an independent basis to exclude expert testimony that otherwise comports with the Federal Rules of Evidence. *See, e.g.*, *United States v. Semrau*, 693 F.3d 510, 516 (6th Cir. 2012).

### B. Laurence D. Lieb

ChemTreat and Ridley have moved to exclude certain opinions offered by Ecolab/Nalco's digital forensic expert, Laurence Lieb. (*See generally* Doc. 258, 265.)

### i. Background

As referenced above, this is a misappropriation-of-trade-secrets case concerning information that Ridley allegedly took from Ecolab/Nalco to his subsequent employer, ChemTreat. (*See generally* Doc. 229.) The parties are, however, working at a significant information deficit regarding what precisely happened. The company-issued laptop that Ridley primarily used while at Ecolab/Nalco was wiped and redeployed to another employee without being imaged. The company-issued laptop Ridley used during his eight months of employment at ChemTreat was also wiped and redeployed to another employee without being imaged.[6] Given the inability to access evidence that would have been found on these devices, the parties are relying on reports they generated, which provide limited information about Ridley's activity on those devices. More specifically, after Ridley resigned from Ecolab/Nalco, it generated a "Digital Guardian Report," which captured and detailed Ridley's data-transfer activity in the last two months of his employment at Ecolab/Nalco. (Doc. 298-1, at 5–6.) Similarly, ChemTreat produced the CrowdStrike log, which: (1) "maintains a log of all USBs plugged into a particular ChemTreat laptop"; (2) "maintains a log of all file names that were accessed by a particular

---

[6] These preservation failures are the subject of cross-motions for spoliation sanctions, which the Court has addressed and will continue address separately.

ChemTreat laptop from an externally connected USB device"; and (3) "provides information about what files were accessed from external USB device(s) that have been connected to a particular laptop, as well as the date of access, file names, and extensions for those files."  (Doc. 274-1, at 11–12, 14.)

To aid in understanding those reports, as well as other electronic evidence in this case, Ecolab/Nalco and ChemTreat have both retained experts in the field of digital forensics.  Both experts authored expert reports and rebuttal reports.  Ecolab/Nalco retained Laurence D. Lieb to "provide expert opinions regarding [his] forensic analysis of a data loss system report and documents" in this litigation.  (Doc. 298-1, at 3.)  Lieb is the President of Tyger Forensics, Inc., a company that provides "computer forensics and electronic discovery services to litigation attorneys and their clients."  (*Id*.)  In his role, Lieb counsels and assists clients "in the preservation, extraction, and analysis of electronic data, using industry-standard practices" and analyzes "human interaction with electronic data from smartphones, computers, cloudbased sources, and a myriad of other electronic devices."  (*Id*.)  Lieb has published continuing legal education classes on subjects including "employee turnover and forensic analysis best practices," as well as "theft of trade secrets best practices."  (*Id*. at 29.)  Lieb has been retained as an expert in digital forensics in seventy-five cases and has never been precluded from offering opinion testimony.  (*Id*. at 20–27; Doc. 298-2, at 3.)

In his report, Lieb opines, among other things, that:  (1) based on his review of the Digital Guardian report, Ridley "exfiltrated thousands of Ecolab files"; (2)  "Ridley exfiltrated the many Ecolab files documented in [his] report specifically to utilize them at ChemTreat"; (3) Ridley downloaded and copied "significant number of documents and Ecolab data to two separate USB drives in the two months prior to [his] resignation from Ecolab"; (4) "[f]orensic analysis of

Ridley's Ecolab One Drive account uncovered that Ridley exfiltrated and then destroyed a significant number of Ecolab files in an attempt to deprive his former employer access to these same files"; (5) forensic analysis of the CrowdStrike log indicates that Ridley accessed "the exfiltrated Ecolab files from his personal Microsoft OneDrive account in order to use the content of those exfiltrated files"; (6) the CrowdStrike tool "is not a data loss prevention tool"; and (7) "[f]orensic analysis of the now wiped ChemTreat laptop would have provided the detail as to which specific exfiltrated Ecolab files Ridley was accessing from his personal Microsoft OneDrive account." (*See generally* Doc. 298-1.) In his rebuttal report, Lieb opines that Vaughn's review of Ridley's ChemTreat OneDrive account, Ridley's ChemTreat-issued e-mail account, and the CrowdStrike log is insufficient for him to determine what, if anything, Ridley distributed within ChemTreat's systems or to others he interacted with at ChemTreat using ChemTreat's systems. (Doc. 315-3, at 4.) According to Lieb, to make those determinations, Vaughn's review should have also included Ridley's colleagues' workstations, network stored backups of Ridley's wiped workstation, and Ridley's personal devices and accounts. (*Id*. at 10–11.)

ChemTreat and Ridley have moved the Court to exclude certain opinions offered by Lieb, arguing that: (1) Lieb is not qualified to opine regarding the Digital Guardian Report and CrowdStrike log generated in this case, and his corresponding opinions are not reliable; (2) Lieb's opinions regarding Ridley's Ecolab/Nalco OneDrive account are unreliable; (3) Lieb cannot offer opinions about Ridley's intent or about legal conclusions regarding misappropriation; and (4) Lieb's rebuttal opinions regarding the scope of Vaughn and ChemTreat's search for information in connection with this case are misleading and unfairly prejudicial. (*See* Docs. 258, 265.)

### ii. Analysis

ChemTreat and Ridley first argue that the Court should exclude Lieb's opinions regarding the Digital Guardian Report and CrowdStrike log based on his limited experience with those software applications. (Doc. 258, at 10–14.) They also argue that Lieb's opinions about the Digital Guardian Report and CrowdStrike log are not based on a reliable methodology. (*Id.* at 14–15.)

During his deposition, Lieb acknowledged that he had limited experience with the Digital Guardian and CrowdStrike software applications prior to this case. (Doc. 257-1, at 10–11.) For example, Lieb testified that: (1) his personal experience with Digital Guardian began with this case; (2) he has never been trained on Digital Guardian; and (3) he had not previously run a Digital Guardian Report. (*Id.*) Additionally, when asked to describe his methodology for analyzing and interpreting the Digital Guardian Report, Lieb explained that he opened the report in Microsoft Excel, used the filter function to see the categories of information included in the report, focused on the "rule violation" column, and filtered the results by date of activity to determine which files Ridley exfiltrated on a specific day. (*Id.* at 34–35, 47–48.) Despite his report stating that Ridley exfiltrated "thousands" of Ecolab/Nalco documents, when he attempted to recreate his results during his deposition, he generated a list of only 576 "rule violations." (*Id.* at 48.) Lieb conducted a similar forensic analysis of the CrowdStrike log, which he also admitted he had limited experience with prior to this case. (Doc. 257-1; at 62–63, 67–68.)

Lieb's limited experience with Digital Guardian and CrowdStrike does not preclude him from offering opinions about those software programs in this case, because he possesses sufficient experience in the field of digital forensics. As his report details and as he testified

during his deposition, he is the president of a company that counsels and assists clients "in the preservation, extraction, and analysis of electronic data, using industry-standard practices" and analyzes "human interaction with electronic data from smartphones, computers, cloudbased sources, and a myriad of other electronic devices." (Doc. 298-1, at 3.) He has published continuing legal education classes on subjects including "theft of trade secrets best practices" (*id*. at 29), and he has been retained as an expert in digital forensics in seventy-five cases and has never been precluded from offering opinion testimony. (*Id*. at 20–27; Doc. 298-2, at 3.) Such experience makes him more than qualified to opine on matters regarding the Digital Guardian Report and the CrowdStrike log, even if he has little to no experience with those exact software programs. Lieb's limited experience with Digital Guardian and CrowdStrike goes to his credibility, not the admissibility of his opinions. *See Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208–09 (6th Cir. 2015) ("Although a witness is not a qualified expert simply because he self-identifies as such, [courts] take a liberal view of what knowledge, skill, experience, training, or education is sufficient to satisfy the requirement."); *see also Thomas v. S. Health Partners*, No. 2:21-cv-012, 2023 WL 3635047, at *34–35 (E.D. Ky. June 9, 2023) (denying a motion to exclude a digital forensic expert and noting that any weaknesses in the basis of her factual opinions were the proper subject of cross examination because they bear on weight, not admissibility). Accordingly, the Court will deny ChemTreat and Ridley's motion to the extent they argue that Lieb is not qualified to give opinions regarding the Digital Guardian Report and the CrowdStrike log.

Similarly, Lieb's opinion that Ridley copied and downloaded "thousands" of Ecolab/Nalco files is not methodologically unsound simply because his attempt to recreate his analysis of the Digital Guardian report during his deposition only resulted in 576 "rule

violations" (Doc. 257-1 at 48), especially because Ridley has admitted that he downloaded and copied thousands of files from his Ecolab/Nalco OneDrive account to his LaCie hard drive (Doc. Doc. 298-3, at 3–5). As the Sixth Circuit instructs, "mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir.1993)); *see also Burgett*, 579 F. App'x at 376 ("A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel."); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). To be sure, much of the testimony elicited during Lieb's deposition provides ample opportunity to attack his opinions on cross-examination, but he is qualified to testify on the matters in his report, and his opinions are sufficiently reliable to be admissible under Rule 702.

ChemTreat and Ridley next argue that the Court should exclude Lieb's opinions regarding Ridley's OneDrive activity because he imaged that data repository from the hard drive of an Ecolab/Nalco paralegal seven months after Ridley resigned. (Doc. 258, at 15–19.) ChemTreat and Ridley contend that the delay in imaging, coupled with the fact that other Ecolab/Nalco employees had access to Ridley's OneDrive folder, means that Lieb cannot be sure the data he analyzed accurately reflects how it existed at the time Ridley resigned. (*Id.*)

In responding to ChemTreat and Ridley's motions, Ecolab/Nalco filed a declaration from Lieb stating that he testified incorrectly during his deposition. (Doc. 298-4.) Specifically, Ecolab/Nalco and Lieb represent that, upon reviewing ChemTreat and Ridley's motions to exclude and his file on the matter, it came to Lieb's attention that his testimony regarding how he

obtained Ridley's OneDrive account was mistaken. (*Id.* at 2.) According to Lieb, his file "reflects that on January 25, 2023, [he] participated in a telephone call with Ecolab's Information Technology ("IT") department, during which IT assisted [him] in accessing the OneDrive Account directly from Ecolab's Microsoft Compliance Center." (*Id.* at 3.) Lieb also confirmed with IT "that in August of 2021, IT ran a Powershell script to restore the OneDrive account contents." (*Id.*) As a result, Lieb avers that he "obtained the OneDrive Account in its entirety from Ecolab's Microsoft Compliance Center, rather than as a forensic image residing on Ecolab's paralegal's computer, as he mistakenly testified during [his] deposition." (*Id.*) Finally, Lieb avers that his "mistaken testimony does not impact the opinions stated in [his] expert report or rebuttal report."[7] (*Id.* at 3.)

ChemTreat's arguments regarding how Lieb imaged Ridley's OneDrive account go to the credibility and accuracy of his opinions, not their admissibility. If Lieb imaged Ridley's OneDrive account from the hard drive of an Ecolab/Nalco paralegal seven months after Ridley resigned, that is evidence ChemTreat can use to attack the credibility and accuracy of Lieb's opinions regarding Ridley's OneDrive account activity. *See In re Scrap Metal Litig.*, 527 F.3d at 530 (explaining that courts' "rejection of expert testimony is the exception, rather than the rule" and that courts "will generally permit testimony based on erroneous facts when there is some support for those facts in the record"). Similarly, Lieb's changed explanation regarding how he collected Ridley's OneDrive account from Ecolab/Nalco after his deposition also goes to the credibility and accuracy of his opinions, not their admissibility.[8] Again, these facts provide

---

[7] Ecolab/Nalco's response brief also represents that it "would honor any requests from Defendants to re-depose Lieb on this limited issue of how he accessed Ridley's OneDrive account." (Doc. 298, at 9.)

[8] In its reply brief, ChemTreat argues that Lieb's declaration qualifies as a sham affidavit because the averments in his declaration directly contradict his prior sworn deposition testimony.

ample fodder for ChemTreat's cross-examination, and a jury may ultimately agree that these facts make Lieb's opinions about Ridley's OneDrive account activity less credible. These facts do not, however, make Lieb's opinions regarding Ridley's OneDrive account activity unreliable and do not render his opinions wholly inadmissible under Rule 702. Accordingly, the Court will deny ChemTreat and Ridley's motion to the extent they seek to exclude Lieb's opinions regarding Ridley's Ecolab/Nalco OneDrive activity leading up to his resignation.[9]

ChemTreat and Ridley also argue that the Court should exclude any of Lieb's opinion testimony regarding Ridley's state of mind or his intent in taking certain actions, as well as any opinions which qualify as legal conclusions, including, but not limited to, whether Ridley's actions constitute "misappropriation." (Doc. 258, at 19–22.)

In his reports and deposition testimony, Lieb opines, among other things that ChemTreat and Ridley: (1) took documents "specifically to utilize them while employed at ChemTreat (Doc. 298-1, at 7); (2) that he deleted files "in a failed attempt to hide the fact that he drive contained Ecolab files (*id*. at 9); (3) "attempted, but failed to hide the fact that he was in possession" of Ecolab files (*id*. at 10); (4) destroyed files "in an attempt to deprive his former employer of access to these same files" (*id*. at 10, 12); and (5) took files "to use them to compete

_____

(Doc. 317, at 5–10.) ChemTreat is correct that Lieb's declaration contradicts his prior testimony, but the sham-affidavit rule is primarily concerned with avoiding attempts to create a genuine issue of material fact after a party moves for summary judgment. *See Boykin v. Fam. Dollar Stores of Mich.*, 3 F.4th 832, 842 (6th Cir. 2021) (noting that the sham-affidavit rule "provides that a party cannot create a genuine issue of material fact with an affidavit that conflicts with the party's earlier testimony about the fact"). As far as the Court can tell, Lieb's changed testimony regarding how he imaged Ridley's OneDrive account will not impact whether there are genuine issues of material fact or the merits of the parties' pending cross motions for summary judgment.

[9] To the extent ChemTreat is suspicious of Lieb's changed testimony, it should take advantage of Ecolab/Nalco's offer to re-depose Lieb on this limited issue. Doing so will permit ChemTreat to gain additional details and prevent it from being surprised by unexpected testimony at trial.

with his former employer" and to use "while working at ChemTreat."  (Doc. 257-1, at 54–55.)

Further, Lieb expressly testified that he is offering an opinion as to Ridley's intent:

> Q.     . . . [Y]ou are offering an opinion about Mr. Ridley's intent with regard to the actions you say he took?
>
> A.     Yes.  That I use the word "intent" there and that is . . . my opinion as to why he stole those files.

(*Id*. at 58.)  Lieb's report also opines that Ridley "misappropriated thousands of Ecolab files."

(Doc. 298-1, at 6.)  Finally, Lieb's reports and his deposition testimony repeatedly use the term

"exfiltrate" as it relates to Ridley copying and downloading Ecolab/Nalco documents.  (*See e.g.*,

*id*. at 5–7, 10; Doc. 257-1, at 35, 50.)  Lieb defines the term "exfiltrate" as  follows:

> It's a – a forensic term meaning take up – copied to an external USB drive that a former employee will take with them to use in their own company that they establish, or a competitor, sent to – documents that are sent – any document activity copying, moving to – from a company-owned device or account for purposes of being used for themselves or another company.

 (Doc. 257-1, at 50–51.)

Although Ecolab/Nalco represents that Lieb "does not opine on Ridley's intent and

purpose related to the Ecolab data in either report or rebuttal report, and did not intend to testify

at trial regarding those issues" (Doc. 298, at 12), his report and deposition testimony suggest that

he is seeking to offer opinions about Ridley's intent and legal conclusions regarding

"misappropriation."  Such evidence falls outside the scope of permissible expert testimony under

Rule 702, because state of mind is "subjective," and any opinion as to a person's "state of mind"

is necessarily "speculative."  *Little v. City of Morristown*, No. 2:21-cv-47, 2023 WL 2769446, at

* 3 (E.D. Tenn. Mar. 31, 2023).  Similarly, it is improper for Lieb to opine that Ridley

"misappropriated" Ecolab/Nalco's files, because that is a legal conclusion.  *See DeMerrell v.*

*City of Cheboygan*, 206 F. App'x 418, at 426 (6th Cir. 2006) (noting that while experts are

permitted to provide testimony embracing the "ultimate issue" under Rule 704(a), the testimony

must be limited to stating "opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue"; expert testimony may not, however, express a "legal conclusion" that goes "beyond stating opinions that suggest the answer to the ultimate issue").  The Court will instruct the jury as to the definition of misappropriation, and it will be the jury's job to determine whether Ridley did, in fact, misappropriate Ecolab/Nalco's files.  Accordingly, the Court will **GRANT** ChemTreat and Ridley's motion to exclude Lieb's opinions to the extent he seeks to opine on Ridley's state of mind and to the extent that he offers an opinion about whether Ridley "misappropriated" Ecolab/Nalco's information or trade secrets.  The Court will not permit Lieb to offer opinion testimony regarding why Ridley took certain actions or his motivations for taking those actions. To that end, Lieb will not be permitted to use the term "exfiltrate" in his testimony, because his own definition of that term suggests that Ridley took Ecolab/Nalco's documents "for purposes of being used for . . . another company," thereby offering an opinion as to Ridley's state of mind.

Finally, ChemTreat and Ridley argue that the Court should exclude Lieb's rebuttal opinions regarding the scope of ChemTreat's and Vaughn's search for evidence of misappropriation because they are misleading and unfairly prejudicial under Federal Rule of Evidence 403.  (Doc. 258, at 22–24.)  In his rebuttal report, Lieb opines that Vaughn's review of Ridley's ChemTreat OneDrive account, Ridley's ChemTreat-issued e-mail account, and the CrowdStrike log is insufficient for him to determine what, if anything, Ridley distributed within ChemTreat's systems or to others he interacted with at ChemTreat using ChemTreat's systems. (Doc. 315-3, at 4.)  According to Lieb, to make those determinations, Vaughn's review should have also included Ridley's colleagues' workstations, network stored backups of Ridley's wiped workstation, and Ridley's personal devices and accounts.  (*Id*. at 10–11.)  At this stage of the

litigation, the Court does not have sufficient information to determine whether Lieb's opinions regarding the scope of ChemTreat's and Vaughn's search for evidence of misappropriation are relevant, and, if so, whether any unfair prejudice outweighs their probative value under Federal Rules of Evidence 401 and 403. The Court will, therefore, deny ChemTreat and Ridley's motion to exclude these opinions at this time. ChemTreat and Ridley may, however, reassert their objections to these opinions and testimony prior to trial.

### C. Dana M. Trexler

ChemTreat and Ridley have moved to exclude the opinions offered by Dana M. Trexler, Ecolab/Nalco's trade-secrets damages expert, arguing that her opinions are based on erroneous legal assumptions, her damages model is unreliable, and her damages opinions are irrelevant and do not fit the facts of this case.[10] (Doc. 266, at 1–3.)

Claims under the Defend Trade Secrets Act ("DTSA") and the Tennessee Uniform Trade Secrets Act ("TUTSA") have "largely the same" elements, and their definitions of the relevant terms are similar. *BNA Assocs., LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, No. 3:21-cv-00481, 2022 WL 1449707, at *4 (M.D. Tenn. May 9, 2022) (quoting *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, No. 3:19-cv-00966, 2019 WL 5964531, at *5 (M.D. Tenn. Nov. 13, 2019)). Under the TUTSA and the DTSA, "the elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *PartyLite Gifts, Inc. v.*

---

[10] Trexler also offers opinions as to damages resulting from Ridley's alleged breach of the fiduciary duty of loyalty. (*See* Doc. 275-3, at 26–27.) Neither ChemTreat nor Ridley has moved to exclude these opinions. (*See* Doc. 267, at 5; Doc. 271, at 1.) As a result, the Court's analysis is limited to whether Trexler's opinions regarding trade-secrets damages are admissible under Rule 702 of the Federal Rules of Evidence.

*Swiss Colony Occasions*, No. 3:06-cv-170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006), *aff'd*, 246 F. App'x 969 (6th Cir. 2007).

Under the TUTSA, damages for trade-secret misappropriation "can include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Tenn. Code Ann. § 47-25-1704. Similarly, under the DTSA, a court may award "damages for actual loss caused by the misappropriation of the trade secret" or "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss." 18 U.S.C. § 1836(b)(3)(B)(i)–(ii).

Nonetheless, courts have observed that "[d]amages in trade secrets cases are difficult to calculate." *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 485 (6th Cir. 2002). "When the misappropriated trade secret is used to field competing products," calculating damages is more straightforward, as "the best measure of damages is the plaintiff's lost profits or the defendant's illicit gains." *Id.* "However, where the misappropriated secrets were not directly used to field competing products, but were used, for example, to save research and manufacturing resources, plaintiffs have used a number of different methods of calculation to determine damages." *Id.* Those methods include calculating "the value of the secret at the time of misappropriation, the value derived from savings because of increased productivity, or the value derived from savings in research costs." *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-cv-450, 2013 WL 4498993 (W.D. Mich. Aug. 19, 2013) (quoting *Avery Dennison*, 45 App'x at 486.).

In this case, Ecolab/Nalco is not pursuing trade-secret damages based on its "actual loss" (Doc. 266-2, at 4) or based on ChemTreat's future profits resulting from the alleged

misappropriation (Doc. 266-1, at 22).  Rather, and as discussed in detail below, Trexler purports to calculate Ecolab/Nalco's trade-secrets damages as measured by the value of the misappropriated information to ChemTreat at the time of misappropriation.  (*See* Doc. 275-3.)

### i.  *Background*

Trexler is a certified public accountant and is credentialed in financial forensics.  (*Id*. at 3.)  She is the Managing Director at Stout Risus Ross, LLC, an advisory firm that, among other services, provides business, economic, financial, and consulting services to clients in a variety of industries.  (*Id*.)

According to Trexler, the amount of unjust enrichment to ChemTreat and Ridley is equivalent to the value of Ecolab/Nalco's "Misappropriated Customer Information."  (*Id*. at 19.) Trexler does not, however, specifically identify "Misappropriated Customer Information." Instead, her report lists and describes the "types of high value documents misappropriated by Ridley," including "Fact Packs" and "Six Service Standards," noting that these types of documents "would have provided a competitive advantage given that the customer revenue, profitability, and technical information contained in these documents would not be publicly or readily available to a direct competitor" and that "this type of information could be leveraged to successfully solicit and convert Nalco/Ecolab's customers."  (*Id*. at 20–21.)  Importantly, however, Trexler's valuation of the "Misappropriated Customer Information" is derived entirely from the "September 2020 Region Fact Pack WL East Central," which contains financial statistics, including sales and gross-margin statistics broken down by customer within Ecolab/Nalco's East Central Region, for the period between September 2017 and August 2020. (*Id*. at 21.)  The East Central Region also includes "District WL 121," a smaller geographic region where Ridley worked while employed by Ecolab/Nalco.  (*Id*. at 4–5, 21.)

Trexler asserts that the "Value of the Misappropriated Customer Information" to ChemTreat and Ridley is equivalent to the "net present value of [Ecolab/Nalco's] projected future customer revenues multiplied by the calculated gross profit margin percentage, yielding [Ecolab/Nalco's] projected future customer profits" and then adjusted, based on a jury's factual findings, to account for, among other things: (1) the relevant valuation period; (2) customer attrition; (3) customer conversion probability; and (4) the appropriate geographic scope. (*Id*. at 22.) This methodology, according to Trexler, calculates the value of the "Misappropriated Customer Information" to ChemTreat and Ridley at the time of misappropriation, or what ChemTreat would have been willing to pay for the information. (Doc. 266-1, at 9, 14.)

In her report, Trexler explains that she utilized the "income approach"[11] to calculate the value of the "Misappropriated Customer Information because the value that [Ridley and ChemTreat] would have expected to derive from use of the information would be the generation of profits to the extent [Ridley and ChemTreat] were able to convert Nalco/Ecolab customers to ChemTreat." (Doc. 275-3, at 18.) Based on these considerations, Trexler opines that the "Value of Misappropriated Customer Information"—or, the amount by which ChemTreat and Ridley

---

[11] Trexler's report states that "[t]he income approach converts future amounts (for example, cash flows or income and expenses) to a single current (that is, discounted) amount. When the income approach is used, the fair value measurement reflects current market expectations about those future amounts." (Doc. 275-3, at 18.) She further explains that she elected not to utilize the "market approach," which "uses prices and other relevant information generated by market transactions involving identical or comparable . . . assets, liabilities, or a group of assets and liabilities" because "there would be no market comparables available for Misappropriated Customer Information, as the information is unique to Nalco/Ecolab and companies do not tend to sell their customer information to direct competitors." (*Id*.) Finally, Trexler explained that she did not use the "cost approach," which "assumes that the fair value would not exceed what it would cost a market participant to acquire or construct a substitute asset of comparable utility," because "there would be too much estimation involved to determine the number of hours and effort by Nalco/Ecolab to recreate the Misappropriated Customer Information, and [Ridley and ChemTreat] would lack the information to perform such a creation of the information." (*Id*. at 18–19.)

have been unjustly enriched—is within the following "range of values," leaving for the jury to decide factual issues like the appropriate customer conversion probability, the appropriate valuation period, and the appropriate geographic scope:

TABLE 1: SUMMARY OF THE VALUE OF THE MISAPPROPRIATED CUSTOMER INFORMATION – REGION CUSTOMERS[4]

| Customer Conversion Probability | Cumulative Net Present Value - 10 Year Period |
|---|---|
| 10% | $15,857,825 |
| 20% | $31,715,649 |
| 30% | $47,573,474 |
| 40% | $63,431,298 |
| 50% | $79,289,123 |
| 60% | $95,146,948 |
| 70% | $111,004,772 |
| 80% | $126,862,597 |
| 90% | $142,720,421 |
| 100% | $158,578,246 |

TABLE 2: SUMMARY OF THE VALUE OF THE MISAPPROPRIATED CUSTOMER INFORMATION – DISTRICT WL 121 CUSTOMERS[5]

| Customer Conversion Probability | Cumulative Net Present Value - 10 Year Period |
|---|---|
| 10% | $1,797,352 |
| 20% | $3,594,704 |
| 30% | $5,392,055 |
| 40% | $7,189,407 |
| 50% | $8,986,759 |
| 60% | $10,784,111 |
| 70% | $12,581,463 |
| 80% | $14,378,814 |
| 90% | $16,176,166 |
| 100% | $17,973,518 |

(*Id*. at 25–26.)  The corresponding net present value based on the selected customer conversion probability, as decided by the jury, represents the value of the misappropriated customer information that ChemTreat and Ridley theoretically avoided paying for by virtue of the alleged misappropriation:  "I'm essentially evaluating what I've defined as the misappropriated customer information, and to the extent that the defendants procured that information without having paid

for it, they – they didn't have – they avoided the cost of acquiring that information by taking it."
(Doc. 266-1, at 6.)

During her deposition, Trexler made clear that her damages methodology does not attempt to quantify ChemTreat's anticipated future profits based on customer conversions: "And I understand that unjust enrichment can be two forms. One is Defendants' profits; that's not what I'm calculating. And the other is the avoided costs. And the value of the misappropriated trade secrets is the avoided costs." (*Id*. at 22.) To that end, Trexler further testified her valuation model requires the jury to determine the "customer conversion probability" at the time of misappropriation, not actual customer conversion. (*Id*. at 14–17.) Moreover, Trexler maintains that the Misappropriated Customer Information had value to ChemTreat and Ridley regardless of whether ChemTreat or Ridley actually ever used the misappropriated information and regardless of whether they ever converted an Ecolab/Nalco customer.

> Q.   If the defendants did not use any of the information that was allegedly misappropriated, would you agree that the calculation in Table 1 of your report is no – no longer relevant?
>
> A.   No.
>
> Q.   Why not?
>
> A.   Whether the defendants utilized the information or not doesn't change the value of what they took.
>
> Q.   The value of what they took is that the information can be used to convert customers, correct?
>
> A.   Yes.
>
> Q.   So if they didn't use it, it has no value, right?
>
> A.   No.  If I steal a car worth $40,000 and I don't keep that car, I abandon it along the side of the road, that doesn't change the fact that that car has a value of $40,000.
>
> . . .

A.      If something was taken and not used, that doesn't change the value of what was taken.

Q.      If the information was taken but never used, and, therefore, no Nalco customers are ever converted, then the information has no value, right?

A.      No.

Q.      So if Mr. Ridley had taken the information and retired and gone and lived on an island in the Caribbean, is it still your opinion that the information would be worth $150 million?

A.      Well, first of all, 100 percent of the information taken would be $158 million without applying a customer conversion probability. Second of all, the value of what was taken is the value of that information.

         If Mr. Ridley doesn't use that information or provide that information – or – or ChemTreat doesn't use that information, then there aren't Defendants' profits to disgorge. There's still a cost that was avoided by taking the information instead of paying for it.

Q.      Doesn't the – the fact that your calculation includes a customer conversion probability necessarily imply that the information has to be used to convert customers in order to have value?

A.      No.

Q.      Well, if the information isn't used at all, then isn't the conversion probability zero percent?

A.      No.

Q.      In what circumstances can the conversion probability be greater than zero percent if the information's not used?

A.      A conversion probability is different from actual conversion.

Q.      In what sense?

A.      Well, a [conversion] probability is looking at the date that the information was misappropriated, what is reasonable for the parties to expect that they would be able to convert, what percentage of those customers, and that is the value that they didn't pay for.

         Actual conversion isn't a probability. That's what actually happened. And there are reasons why actual conversion may not have occurred.

> Q. So is it your opinion that Nalco is entitled to recover avoided costs, as you've defined it, even if the defendants do not use the information?
>
> A. They're two different concepts. I am valuing what was taken. I am not valuing Defendants' profits. They're two different things.
>
> Q. I didn't ask about profits.
>
> I asked: Is it your opinion that Nalco is entitled to avoided costs, even if the defendants do not use the information?
>
> . . .
>
> A. So again, I'm calculating the value of the information that was taken. I am not calculating the value of what the defendants actually used. One is an avoided cost. The other would be Defendants' profits.

(*Id.* at 24-28; *see also id.* at 14–17.) At another point in her deposition, Trexler acknowledged that if a jury determined the customer conversion probability at the time of misappropriation was zero percent, then the avoided cost "would be zero." (*Id.* at 16.) She went on to testify, however, that the value of the misappropriated customer information to ChemTreat and Ridley exists on a "spectrum" with "one end of the spectrum that has a zero conversion probability" and another end "that's 100 percent," concluding that "the answer likely lies somewhere in between and that's something for the jury to determine once they've heard all of the facts in evidence." (*Id.*; *see also* Doc. 275-3, at 24 (acknowledging that it is "unlikely" that ChemTreat would "convert 100% of Nalco/Ecolab customers for which [it] had access to the Misappropriated Customer Information")).

Finally, with regard to causation, Trexler's report states:

> In this matter, there is evidence that Ridley took the Misappropriated Customer Information, and there is quantitative evidence of the incremental value the Defendants could have expected to gain from the Misappropriated Customer Information (*e.g.*, profits derived from successfully converting a Nalco/Ecolab customer to ChemTreat). Therefore, a causal link exists between the value of Misappropriated Customer Information and the Defendants' misappropriation of Nalco's/Ecolab's information.

(Doc. 275-3, at 17.) During her deposition, however, Trexler further testified that, regardless of "whether the word 'causation' is used or not used, there is a linkage between the misappropriated information and the calculation of value," and her calculation of value is based on "the future cash flow of customer relationships." (Doc. 266-1, at 30–31.)

### ii. Analysis

Trexler's trade-secrets damages model is novel. She describes her valuation method as the "income approach," (Doc. 275-3, at 18–19), a phrase that typically denotes a generally accepted approach to valuating future cash flows. *See Horn v. McQueen*, 353 F. Supp. 2d 785, 791–92 (W.D. Ky. 2004). She also opines that her methodology calculates the value of the Misappropriated Customer Information to ChemTreat and Ridley at the time of misappropriation (Doc. 266-1, at 27)—also an accepted method for calculating a misappropriating party's unjust enrichment. *Avery Dennison*, 45 F. App'x at 486. The specifics of Trexler's valuation model, however, are different than what one would expect, based on the labels she uses. Assuming that ChemTreat possessed the Misappropriated Customer Information, Trexler's model permits a jury to award unjust-enrichment damages regardless of whether ChemTreat ever used the information and regardless of whether the misappropriation caused ChemTreat to gain an advantage.[12] Trexler's model requires the jury to stand in ChemTreat's shoes at the time of misappropriation

---

[12] Trexler repeatedly refers to Ridley and ChemTreat collectively as "Defendants" in her report and makes no effort to distinguish between trade-secret unjust-enrichment damages realized by Ridley that are separate from ChemTreat's purported unjust enrichment. Despite referring to Ridley and ChemTreat collectively, Trexler's report makes clear that she is ultimately attempting to quantify only the purported unjust enrichment to ChemTreat based on its theorized expectation that it could convert Ecolab/Nalco customers using this information. (*See* Doc. 275-3, at 5 ("I calculate the Net Present Value of the Misappropriated Customer Information over a 10-year period and provide values based on ChemTreat's probability of converting Nalco/Ecolab's customers in the first year that Misappropriated Customer Information was available to them.").)

and make certain factual determinations to ascertain what ChemTreat would have been willing to pay to obtain this information at the time of misappropriation, thereby calculating the supposed amount by which ChemTreat has been unjustly enriched. (*See* Doc. 275-3, at 19–25.) Thus, the questions before the Court are: (1) Is Trexler's trade-secrets damages methodology reliable and helpful to the trier of fact if it allows a jury to award unjust-enrichment damages even if ChemTreat never used the allegedly misappropriated information or gained an advantage from it?; and (2) If so, does Trexler's methodology reliably help the trier of fact in calculating the value of the misappropriated information to ChemTreat at the time of misappropriation based on the facts of this case?

The text of the TUTSA and the DTSA limits unjust-enrichment recovery to what has been "caused by the misappropriation." 18 U.S.C. § 1836(b)(3)(B)(i)–(ii); Tenn. Code Ann. § 47-25-1704. Typically, the value of a misappropriated trade secret to the misappropriating party is calculated based on a realized benefit from the trade secret's use. For example, in *Mar Oil Co. v. Korpan*, the plaintiff alleged that defendants used "seismic data" it developed to identify oil and gas trends and lease land "without expending the costs or time [the plaintiff] incurred for research and development." 973 F. Supp. 2d 775, 782 (N.D. Ohio 2013). Based on how the defendant used the data, the district court concluded that what the plaintiff spent and what the defendant thereby saved in developing this data "would be a proper yardstick" for calculating the defendant's unjust enrichment. *Id*. Similarly, in *Avery Dennison*, the Sixth Circuit noted that, because the defendant did not use the stolen trade secrets to bring directly competing products to market, the plaintiff's theory of damages appropriately "concentrated on the benefits that [the defendant] derived from use of the trade secrets," including savings on research costs and

increased productivity from streamlining its manufacturing processes.[13]  45 F. App'x at 486.[14]

Moreover, at least one district court has expressly rejected a plaintiff's argument that it is not

required to show "use" of the misappropriated trade secret to establish unjust enrichment,

reasoning that use of the trade secret is required because "[t]he law governing protection of trade

secrets essentially is designed to regulate unfair business competition, and is not a substitute for

criminal laws against theft or other civil remedies for conversion."  *Dana Ltd.*, 2013 WL

4498993, at *33 (quoting *Univ. Computing v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th

---

[13] In *Avery Dennison*, the Sixth Circuit noted, however, that when trade secret damages are based on a "reasonable royalty" theory, it is appropriate to measure the value of the secret to the defendant "at the time it was misappropriated, regardless of the commercial success."  *Id*. at 486. But, as the district court in *Dana Ltd*. explained, this language does not mean that a plaintiff does not have to show use by the defendant.  Instead, "[i]t merely provides that under a reasonable royalty approach, . . . the use does not have to result in profit."  2013 WL 4498993, at *33.

[14] In arguing that a defendant does not have to actually use a misappropriated trade secret for a plaintiff to recover unjust-enrichment damages, Ecolab/Nalco's discussion of *Avery Dennison* obscures the facts of that case.  Specifically, in its response brief, Ecolab/Nalco asserts that "[t]he *Avery* court noted that where the defendant does not directly use the trade secret . . . a plaintiff may use a variety of methods of calculation to determine damages.'"  (Doc. 301, at 8 (sic).) Ecolab/Nalco's use of an ellipsis and a dangling end quotation mark suggests that it intended to offer the Court a quotation from *Avery Dennison*.  But what *Avery Dennison* actually says is that "[w]here the misappropriated secrets were not directly used to field competing products, **but were used, for example, to save research and manufacturing resources,** plaintiffs have used a number of different methods of calculation to determine damages."  *Avery Dennison*, 45 F. App'x at 485 (emphasis added).  Ecolab/Nalco's use of an ellipsis—whether strategic or merely reckless—omits context necessary to understand that the case contrasted two types of "use," not use versus lack of use. The Sixth Circuit's analysis makes clear that, in analyzing the admissibility of  Avery's damages expert, the court of appeals focused on the benefits the defendant realized from its actual use of the misappropriated trade secret.  *Id* at 486 ("In this case, [the defendant] did not use the stolen trade secrets to bring directly competing products to market.  Rather, [the defendant] used the Avery secrets to create a panoply of new products, save significantly on time and resources devoted to research, and streamline their manufacturing products.  **Avery's theories of damages therefore concentrated on the benefits [the defendant] derived from the use of the secrets.**") (emphasis added); *see also id*. at 486 (noting that the expert's calculations proceeded from "several assumptions," including that the defendant "**used and modified** [Avery's] technology" and that "**the use of the stolen Avery technology** saved [the defendant] money") (emphasis added); *see also id*. ("Avery presented relevant and admissible evidence showing that [the defendant] valued, deciphered, modified, **and used** Avery trade secrets.") (emphasis added).

Cir. 1974)).  Stated another way, if the misappropriating party does not use the trade secret to unfairly compete, then there is no unjust enrichment "caused" by the misappropriation.[15]  Read together, the cases strongly suggest that, under the TUTSA and the DTSA, use of a misappropriated trade secret, independent of commercial success, is necessary to establish entitlement to unjust-enrichment damages.[16]

In this case, Trexler's model is not reliable and is not helpful to the trier of fact, because it permits the jury to award unjust-enrichment damages even if ChemTreat never used the trade secrets at issue or unfairly competed with Ecolab/Nalco, meaning that the jury could award unjust-enrichment damages that were not "caused" by the alleged misappropriation.[17]  As

---

[15] Both the TUTSA and the DTSA also provide that "[i]n lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or **use** of a trade secret." Tenn. Code Ann. § 47-25-1704; 18 U.S.C. § 1836(b)(3)(B)(iii) (emphasis added).  Conditioning an alternate method of damage calculation on a misappropriator's use (or unauthorized disclosure) further supports the Court's conclusion that damages in the preceding portions (loss to the plaintiff and unjust enrichment to the defendant) also contemplate use.

[16] Ecolab/Nalco may be correct that a plaintiff can maintain a claim for misappropriation under the TUTSA without proving actual use of the misappropriated trade secret because the statute contemplates a cause of action for acquisition of a trade secret by "improper means."  *See* Tenn. Code Ann. 47-25-1702(2)(A).  In such situations, equitable relief in the form of an injunction against future use may remedy "actual or threatened misappropriation," even in the absence of actual use by the misappropriating party.  Tenn. Code Ann. § 47-25-1703(a); *see also* 18 U.S.C. § 1836(b)(3)(A).  The TUTSA and the DTSA make clear, however, that damages are limited to actual loss and unjust enrichment "caused by the misappropriation," which, as discussed above, suggests actual use of the trade secret by the misappropriating party.  18 U.S.C. § 1836(b)(3)(B)(i)–(ii); Tenn. Code Ann. § 47-25-1704.

[17] Based on the plain language of the TUTSA and the DTSA, the evidence presented by the parties, and cases interpreting damages awards under those statutes, the Court anticipates instructing the jury that to award unjust-enrichment damages "caused" by misappropriation, Ecolab/Nalco must prove by a preponderance of the evidence that ChemTreat used the trade secrets at issue.  Trexler's testimony at trial, however, would invite the jury to award unjust-enrichment damages absent any such use by ChemTreat.  Such an opinion is contrary to law and would impermissibly compete with the Court's responsibility to instruct the jury as to the applicable law.

Trexler admits in her deposition, under her damages model, the value of the misappropriated customer information to ChemTreat is completely divorced from ChemTreat's use of that information.  (Doc. 266-1, at 28 ("I am not calculating the value of what the defendants actually used."); *see also* Doc. 301, at 9–10 ("Ms. Trexler identifies the value of the trade secrets to Defendants irrespective of use."))  Indeed, Trexler expressly testified that her methodology would remain the same even if ChemTreat never used the misappropriated customer information.  (*Id*. at 24–28; *see also* Doc. 301, at 5 ("Defendants' failure to actually convert customers, generate profits or otherwise successfully exploit the stolen information is not relevant to Ms. Trexler's calculation under the income approach of the cost Defendants avoided by taking, rather than paying for, the trade secrets.").)  Trexler's damages model would therefore permit a jury to award unjust-enrichment damages even if ChemTreat never used the misappropriated customer information, meaning that the jury could award damages that were not "caused" by the misappropriation.  As a result, her damages methodology is unreliable, not helpful to the trier of fact, and inadmissible under Rule 702.

Additionally, even if a defendant could be unjustly enriched absent actual use of the trade secret at issue, using the net present value of Ecolab/Nalco's future customer profits adjusted for certain factual determinations by a jury as a proxy for the value of the misappropriated customer information is an unreliable method for calculating ChemTreat's unjust enrichment in this case. At its core, Trexler's model attempts to provide a "range of values" quantifying how much ChemTreat would have been willing to pay for one document—the Fact Pack—at the time of the alleged misappropriation.  (*See* Doc. 275-3, at 19; *see also* Doc. 301, at 2.)  The Fact Pack contains financial statistics, including sales and gross margin statistics for 971 Ecolab/Nalco customers within the East Central Region, for the period between September 2017 and August

2020, and is the "type of information [that] could be leveraged to successfully solicit and convert Nalco/Ecolab's customers." (Doc. 275-3, at 20; Doc. 275-5; Doc. 275-6.) Trexler opines that the value of this information to ChemTreat (i.e., what it would have been willing to pay for this information), is the net present value of Ecolab/Nalco's future anticipated profits for these customers adjusted for factual determinations made by the jury including, but not limited to, what percentage of Ecolab/Nalco's East Central Region customers, or, alternatively, what percentage of District WL 121 customers, ChemTreat reasonably believed it could covert. (Doc. 275-3, at 19-25; Doc. 266-1, at 24–28.) For example, under Trexler's model, if the jury decides that ChemTreat believed it could convert eighty percent of Ecolab/Nalco customers in the East Central Region in the first year it possessed the Fact Pack, then ChemTreat would have been willing to pay any amount short of the net present value of Ecolab/Nalco's anticipated future profits for the East Central Region—$126,862,597.

This methodology is unreliable, is not based on sufficient facts or data, and, ultimately, is unhelpful to the jury because it invites the jury to speculate as to what ChemTreat *expected* to happen if it obtained the misappropriated information. For a jury to use Trexler's model, the jury must ignore the fact that ChemTreat did not convert any customers and, instead, determine what percentage of customers ChemTreat expected to convert with this information, the anticipated number of years ChemTreat would retain any of the hypothetically converted customers, and the appropriate geographic region (i.e. Region customers or District customers) from which customers would be converted. (Doc. 275-3, at 19–25.) Neither Trexler nor Ecolab/Nalco, however, references or identifies any evidence that Ecolab/Nalco anticipates introducing at trial that would support Trexler's decision to offer a damages model that presumes such an expectation. Trexler's decision to stop time at the moment of misappropriation invites the jury to

disregard any lack of use of or benefit from misappropriated information and, instead, to speculate about contrary possibilities. While Ecolab/Nalco is correct that factual issues are for a jury to decide, Trexler's model ultimately invites the jury to speculate, consistent with an approach reflecting the imprimatur of an expert, but contrary to the facts the parties have presented to the Court. (*See* Doc. 266-2, at 4; *see generally* Doc. 304 (citing no evidence of use).)

Finally, the customer conversion probability percentages underpinning Trexler's "range of values" assume that the anticipated future profits for each of the customers in the Fact Pack are fungible. They are not. The Fact Pack includes sales data and gross margins for 971 customers in the East Central Region for the period between September 2017 and August 2020. (*See* Doc. 275-5.) There are 113 customers in District WL 121, which is a subset of the East Central Region. (*See* Doc. 275-6.) The revenues for these customers vary wildly. For example, between October 2017 and August 2020, one customer in the East Central Region had sales totaling $916,179, and another had sales totaling $204. (Doc. 275-5, at 1.) Despite these variances, Trexler's model aggregates all of the customers in the Region and the District, calculates the total anticipated future profits for all customers, and asks the jury to determine what percentage of the total customers ChemTreat believed it could convert at the time of misappropriation.[18] (Doc. 275-3, at 24; *see also* Doc. 266-1, at 27 ("Well, a [conversion]

---

[18] Ecolab/Nalco's briefing confirms that this is exactly what it will ask the jury to do at trial:

> In making this determination, the jury may consider, *inter alia*, evidence presented by the parties regarding the nature of the trade secret information which Defendants misappropriated, including: (1) the duration of the customer relationships upon conversion of the relationship to Defendants; (2) **what percentage of the customers Defendants would reasonably anticipate converting away from Plaintiffs**; and (3) whether trade secret information beyond just District was taken (i.e., Region). . . . Once the jury makes these determinations based on the facts presented at trial, then, Ms. Trexler's

probability is looking at the date that the information was misappropriated, what is reasonable for the parties to expect that they would be able to convert, what percentage of those customers, and that is the value that they didn't pay for.").)  This methodology has a significant potential to yield speculative unjust-enrichment damages that are completely untethered to the facts of this case.

Consider the following hypothetical.  Assume the Fact Pack contained only ten customers and the total net present value of the anticipated future profits for those ten customers was equal to $100,000,000.  Under Trexler's methodology, the value of the Fact Pack to ChemTreat would be $10,000,000 for each customer it reasonably believed it could convert.  But, if one of those ten customers accounted for fifty percent of the total anticipated future profits, and was unlikely to be converted, Trexler's method uses the presence of one whale, never to be caught, to drive up the average impact of more-accessible, minnow customers.  The value of the information to ChemTreat has no relation to what percentage of total customers it believed it could covert.  As a result, by lumping the customers in the Fact Pack together and treating them equally as it relates to anticipated future profits, Trexler is inviting the jury to rely on misleading information and unsupported speculation to arrive at the value of the Misappropriated Customer Information to ChemTreat.  Such a methodology is unreliable, unhelpful to the jury, and does not fit the facts of

---

valuation model will come into play and assist the jury in calculating the amount of recovery owed to Plaintiffs. For example, the jury could determine that trade secret information within the District was taken, and that the customers would have reasonably been retained for 5 years, **and it is reasonable for Defendants to assume a conversion success rate of 60%.** Then, all the jury has to do is look at Ms. Trexler's calculations in the valuation model and determine the value that corresponds with that particular factual determination.

(Doc. 301, at 21 (emphasis added).)

the case.[19]  As a result, Trexler's trade-secret damages opinions are inadmissible under Rule 702.

Accordingly, the Court will **GRANT** ChemTreat and Ridley's motions to exclude Trexler's

trade-secrets damages opinions (Docs. 266, 271).

## III.  CONCLUSION

For the reasons stated herein, ChemTreat and Ridley's motions to exclude certain opinions

of Laurence D. Lieb (Docs. 257, 265) are **GRANTED IN PART** and **DENIED IN PART.**

ChemTreat and Ridley's motions to exclude certain opinions offered by Dana M. Trexler (Doc.

266, 271) are **GRANTED**.  Ecolab/Nalco's motion to strike the expert report of James Vaughn

(Doc. 273) is **DENIED**.

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[19] Even if Trexler's trade-secret damages opinions were probative under Federal Rule of Evidence 401, the Court would still exclude them under Federal Rule of Evidence 403, because any probative value is substantially outweighed by the likelihood of Trexler confusing the issues in this case and misleading the jury.  Trexler's valuation analysis is derived from a single document, out of more than 16,000 documents allegedly downloaded by Ridley.  (*See* Doc. 275-3, at 21; *see also* Doc. 301, at 18 ("Ms. Trexler's report values the main document which Defendants did not spoliate, the Fact Pack.").)  Based on that single document alone, Trexler opines that ChemTreat has been unjustly enriched by an amount somewhere between $0 and $158,000,000 based on expected customer conversion probability and regardless of whether ChemTreat ever attempted to convert an Ecolab/Nalco customer using this information or otherwise used the information to its benefit.  Under these circumstances, suggesting to a jury that damages could be as high as $158,000,000, despite acknowledging such an amount of unjust enrichment was "unlikely," has the potential to be "powerful and quite misleading."  *See Daubert*, 509 U.S. at 595.  As a result, the likelihood of confusing the issues, misleading the jury, and wasting time substantially outweighs any probative value Trexler's opinions offer and provides another independent basis for excluding her trade-secrets damages opinions.