United States District Court
Eastern District of Tennessee
At Chattanooga

| | |
|---|---|
| Ecolab, Inc. and Nalco Company, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water<br><br>Plaintiffs<br><br>v.<br><br>Anthony Ridley and ChemTreat<br><br>Defendants | No. 1:22-CV-00050<br><br>TRM-SKL |

**Anthony Ridley's Brief Regarding Sanctions for Reopening Discovery
and the Role of the Special Master**

# I. Introduction

After the hearing on August 10, 2023, the Court directed the Parties to submit briefs identifying the specific sanctions they are asking the Court to impose in connection with reopening discovery, the reasons for such, the role the special master should play in overseeing the reopening of discovery, and any other matters the Court should consider in appointing a special master under Rule 53.[1] Ridley therefore submits this brief and requests that the Court only reopen discovery on a limited basis to allow a special master to: 1) search his wife's HP laptop to determine what Nalco/Ecolab files Ridley accessed with that computer following his resignation from Ecolab; 2) search for any connections between the LaCie external hard drive and his wife's laptop; and 3) search his wife's HP laptop for any evidence of deletion of Nalco/Ecolab files after February 9,

---

[1] Doc 356 at Page ID # 14792.

2022. Ridley submits that these threshold searches by the special master will identify any relevant issues related to the interactions between his wife's laptop and his personal WD drive without reopening discovery to an unnecessary degree.[2]

## II. Background

Plaintiffs filed their initial complaint in this matter on March 3, 2022.[3] At that time, Ridley was still employed by ChemTreat and represented by counsel from Sherrard Roe Voight and Harbison, PLLC. Following Ridley's termination from ChemTreat, Ridley retained undersigned counsel who filed a notice of substitution on March 25, 2022.[4] Almost immediately upon undersigned counsel's entry of appearance, Plaintiffs began attempting to negotiate a stipulated injunction.[5] Plaintiffs ultimately presented a proposed stipulated injunction that included terms Ridley could not agree to. In response to Plaintiffs' proposal, Ridley's counsel sent Plaintiffs an email on April 20, 2022 outlining the steps Ridley had taken to preserve evidence in the case and reiterating that Ridley was not in possession of or using any of Plaintiffs' alleged trade secrets or confidential information. This email correspondence specifically identified Ridley's wife's laptop and advised Plaintiffs that Ridley had imaged the device at his own expense.[6] Despite Plaintiffs' assertions that they would seek a preliminary injunction from the Court, and that they possessed evidence that Ridley and ChemTreat were utilizing Plaintiffs' information to harm them, Plaintiffs never filed

---

[2] The Court's order directs the parties not to brief sanctions they will request the Court to impose at trial. Ridley has not requested that the Court reopen discovery and has therefore requested no sanctions related to the reopening of discovery. Accordingly, Ridley focuses his brief on the role of the special master in overseeing any reopening of discovery allowed by the Court.

[3] Doc 1.

[4] Doc 16.

[5] See Exhibit 1, Email Exchanges with Dave Walton, March 25, 2022-April 13, 2022.

[6] See Exhibit 2, Email to Dave Walton, April 20,2022.

any motion for a preliminary injunction and never presented evidence that Ridley retained possession of any of Plaintiffs' information or was using any of Plaintiffs' information in anyway.

After abandoning their attempts to negotiate or obtain a preliminary injunction, Plaintiffs served their First Request for Production of Documents and First Set of Interrogatories on Ridley on June 17, 2022. Ridley provided his written responses on July 18, 2022 and July 20, 2022 respectively.[7] In response to Plaintiffs' First Set of Interrogatories, Ridley identified his wife's HP laptop as a device that he used "from January 1, 2021 through the present."[8] Plaintiffs' First Request for Production of Documents focused primarily on documents and communications and did not request that Ridley produce any forensic artifacts other than the metadata of the responsive documents. After Plaintiffs finally agreed to the terms of a proposed protective order that ChemTreat ultimately had to prepare, Ridley produced responsive documents.

Plaintiffs served Ridley with a Rule 34 Request for Inspection on February 13, 2023.[9] Plaintiffs' Request for Inspection requested unrestricted access to every device, computer, email account, and cloud storage account that Ridley used or accessed from August 1, 2020 "to present." Ridley objected because many of the devices and accounts had no connection to the litigation, Plaintiffs provided no provisions for the protection of Ridley's or his wife's personal information, and because Plaintiffs had submitted no evidence that Ridley had failed to produce documents responsive to Plaintiffs' discovery requests.[10]

The Court has now granted Plaintiffs the ability to obtain additional limited discovery related

---

[7] Doc 135-1, Doc 135-2.

[8] Doc 135-1, Page ID # 1744.

[9] Doc 225-4.

[10] *See generally* Doc 225-5.

to Nalco/Ecolab files accessed or deleted from Ridley's wife's HP laptop. For the reasons set forth below, the Court should require the additional analysis to be conducted by a special master instead of Plaintiffs and should limit the additional discovery to evidence related to any Nalco/Ecolab files accessed by Ridley from his wife's laptop and any connections with the LaCie drive so that the special master can determine if any of those files, which are actually relevant to the Plaintiffs' claims, where shared with or transmitted to ChemTreat. The Court should restrict the special master's role to those issues that matter in this case and not allow the limited reopening of discovery to unnecessarily prolong and multiply this litigation.

### III. Discussion

**A.  Plaintiffs' statements at the August 10 hearing establish the need for a special master to oversee the limited reopening of discovery.**

At the August 10 hearing, Plaintiffs made numerous statements about the evidence in this case that are not supported by the record. Those statements, as detailed below, underscore the necessity for the Court to require the special master to oversee the limited reopening of discovery as opposed to requiring Ridley to provide additional discovery materials directly to Plaintiffs for independent analysis.

   **i.  Plaintiffs represented that Ridley had the only copy of Nalco customer files, but Plaintiffs' 30(b)(6) designee testified otherwise.**

At the August 10 hearing, Plaintiffs represented that Ridley had the only copy of many of the Nalco customer files and that his alleged deletion of those files resulted in Nalco not having information about those customers. Plaintiffs continued that Ridley's deletion of these customer files caused them to have to create exemplar documents to produce in discovery and, if Ridley had not deleted those files from his personal WD drive, Plaintiffs would have been able to produce the files in discovery.

> ```
>  9          MR. WALTON:  And she keeps saying we deleted them,
> 10   and we didn't, he did.  And so we then had to go back --
> 11   because a lot of his files, Your Honor, were, like, 10 -- were,
> 12   like, I'm sorry, 20 years of customer files that only he had.
> 13          THE COURT:  Mm-hmm.
> 14          MR. WALTON:  You know, when you were in private
> 15   practice, I'm sure that you had client files, I'm sure.  He
> 16   took all those with him.  So there wasn't any other source of
> 17   those.  So if we had the WD drive, if he didn't wipe it, we
> 18   would know exactly what he took and we would have been able to
> 19   produce them to them in discovery.  Because we didn't have
> 20   them, we had to create some exemplars, which Judge Lee
> 21   specifically allowed us to do.
> 22          THE COURT:  Mm-hmm.
> ```
> [11]

Not only do those statements not make sense from an organizational standpoint, but they also are not supported by the deposition testimony of Plaintiffs' employees.

In evaluating these statements by Plaintiffs, it is critical for the Court to recall that Ridley originally began working for Nalco in 1999 and worked his way up through Nalco's various levels for account representatives.[12] In April 2015 (over six years before he resigned from Ecolab) Nalco promoted Ridley to the position of District Manager.[13] In this new position, Ridley no longer had the primary contact with Nalco customers and instead managed account representatives in Nalco's WL121 District which was part of the larger East Central Region.[14] As a District Manager, Ridley

---

[11] August 10, 2023 Hrg. Tr. 166:9–22.

[12] Doc 229 at Page ID # 4483.

[13] Id.

[14] Doc 247 at Page ID # 4943.

no longer had the primary responsibility for maintaining customer files for the customers in his district – that was the role of the specific customer's account representative. Plaintiffs' Rule 30(b)(6) designee and the vice president of sales, Corey Demarco, confirmed as much during his deposition on April 24, 2023:

```
 8   Q   Okay.  Whose primary responsibility is it to
 9       maintain the documentation related to the
10       accounts?
11   A   Typically the rep would be the one responsible.
12   Q   And what would the rep do with the documents
13       related to a particular account?
14   A   It depends on the document.  If it was anything
15       related to the six service standards we
16       outlined previously, they would hang those in a
17       SharePoint site.
18                Anything else, quotes and things
19       like that, would be kept in a folder typically
20       on their computer or linked to a OneDrive.
21   Q   Okay.  And in your experience, would the
22       account reps then share that information
23       specific to those accounts with their district
24       manager?
25   A   Potentially, yeah.
```
<sup>15</sup>

DeMarco even confirmed that there would be some customer documents, maintained by the customer's account representative, that a district manager such as Ridley could not access.

---

[15] DeMarco Dep. at 233:8–25. Excerpts of Corey Demarco's deposition transcript are Exhibit 3 to this document.

> ```
> 1   Q    I guess you as a DM wouldn't be able to see
> 2        access to your account reps' documents related
> 3        to their customers; is that right?
> 4   A    Yes.  I mean, it depends on the documents, you
> 5        know.  As a district manager, I would work very
> 6        closely with my reps on proposals.  If there
> 7        was an issue in an account, I would get very
> 8        involved and want more information.  And if
> 9        everything was going good, I really did not get
> 10       involved with the accounts or the
> 11       documentation.  I assumed everything was good.
> 12  Q    When you say you "assumed everything was good,"
> 13       you just assumed that your account rep was
> 14       handling that customer, had all the
> 15       documentation they need and really didn't need
> 16       you in a support role at that particular time?
> 17  A    At the site, yes.  I mean, they -- I still
> 18       believe in proactively coaching people to
> 19       develop them as sales representatives or sales
> 20       professionals.
> 21  Q    Okay.  I understand, but that's really more
> 22       contact with the account rep about how they can
> 23       do a better job, right?
> 24  A    Yeah, sure.
> ```
[16]

So how can Plaintiffs make the statements, as they did at the August 10 hearing, that Ridley was the only person that had 20 years of Nalco customer files? Their statements must necessarily relate to Nalco customer files that fall into two categories: 1) customer files for Nalco customers

---

[16] DeMarco Dep. at 234:1–24.

Ridley serviced during his years as an account representative prior to April 2015 when he was promoted to district manager; or 2) customer files that he received from account representatives during the time he was a District Manager after April 2015.

As for the first category of customer files related to Nalco customers that Ridley serviced prior to 2015, are Plaintiffs now taking the position that customer files which were already six years old at the time of Ridley's resignation and had been available for Nalco to access, copy, or review during Ridley's entire employment somehow became critically important customer files only after Ridley resigned in July 2021? If that was the case, why didn't Nalco or Ecolab reach out to Ridley after he left and ask him about the files? If these pre-2015 customer files were so critical to maintaining Nalco's relationship with its customers, how is it that this issue did not come up in the six years that Ridley remained employed with Nalco and Ecolab after his promotion from account representative to district manager? These questions demonstrate the many issues with Plaintiffs' statements at the hearing.

The second category of customer files that Ridley had access to during his employment with Nalco were the files shared with him by the account representatives in the WL121 district when he served as district manager from April 2015 to October 2020. Plaintiffs are apparently including these files in the "twenty years of customer files" they allege "only he had."[17] This statement is directly contradicted by the testimony of Corey DeMarco cited above. The account representatives maintain the customer files for the customers they service, and they share some of those files with their district manager. It follows from DeMarco's testimony that every one of the customer files that Ridley acquired while he was district manager from 2015 to 2020 would also be in the possession of the account representatives that had primary contact with a particular Nalco customer

---

[17] August 10, 2023 Hrg. Tr. 166:11–12.

and had the responsibility to maintain their customer's files. This structure of the account representatives maintaining their customer files makes perfect sense from an operational perspective, but does not fit Plaintiffs' narrative of the case, so they disregard it, and disregard the deposition testimony of their Rule 30(b)(6) designee when making arguments to the Court for sanctions and attempting to justify a wide reopening of discovery.

Additionally, the Court should consider that Ridley remained employed by Ecolab as a corporate account manager from October 2020 to July 2021 after he transitioned from his role as the district manager for WL121 for Nalco. At least for those nine months, all of the files Ridley received in his role as a district manager were on Nalco/Ecolab's systems and could have been preserved, imaged, or copied by Plaintiffs if anyone in the organization needed the files and Ridley, for some reason, actually possessed the only copy. Plaintiffs apparently chose not to do that, but now seek sanctions against Ridley for deleting duplicate information from a personal drive when they never valued the original data enough to attempt to preserve it.

Plaintiffs' statements to the Court that Ridley possessed the only copy of these customer files are also undermined by the fact that Ridley has maintained that the files on his personal WD drive were <u>backups</u> of his Nalco issued laptop. So, Plaintiffs would have had all of files Ridley backed-up to his WD drive had they preserved his company issued laptop and the LaCie drive which Ridley returned to Insight per their instructions after he resigned. Plaintiffs failed to do that also, but still seek Ridley to be sanctioned for deleting the backup of the files from his personal device.

The statements by the Plaintiffs at the August 10 hearing that Ridley had the only copy of twenty years of Nalco customer files, and it was his deletion those files from his WD drive that prevented the Plaintiffs from producing the documents that they allege are trade secrets, are simply not supported by the evidence in the case and make no practical sense. The Plaintiffs are

9

attempting to leverage statements such as these to justify their request for a broad reopening of discovery when in fact the Court should only reopen discovery on a very narrow basis and require the limited discovery to be conducted by a special master to prevent Plaintiffs from "multiplying discovery litigation unnecessarily."[18]

      ii.      **Plaintiffs represented that Ridley's actions caused them to have to "recreate" fact packs and other documents, but the testimony of Plaintiffs' Rule 30(b)(6) designee does not support their representations to the Court.**

At the August 10 hearing, Plaintiffs argued that Ridley's actions of deleting documents from his WD drive deprived them from having the "only copy" of fact packs and that they had to "go back and recreate them" and in doing so exceeded their discovery obligations in the case.

```
14        First of all, I can't believe that she said that the
15   documents that are deleted was caused solely by us.  He took
16   the OneDrive, and now we know he used his wife's computer to
17   wipe it; we had nothing to do with that -- I'm sorry, the WD
18   drive.  We had nothing to do with that, absolutely nothing to
19   do with that.
20        What we had to do with discovery in this case,
21   Your Honor, is, a lot of the documents that we had to produce
22   as exemplars, according to the rulings from Judge Lee, we had
23   to go back and recreate as a company.  We had to go back and
24   run scripts, we had to go back and run searches of our
25   databases, because he had the only copies of that.  We didn't
```

---

[18] *See* Doc 349 at Page ID # 14452.

```
 1  have copies of the fact packs and stuff like that laying
 2  around.  We had to go back and recreate them.  So a lot of
 3  these exemplar documents, we had -- you know, I think we
 4  exceeded our discovery obligations by going back and
 5  recreating them, but that's what we had to do.
```
[19]

Plaintiffs' statements at the August 10 hearing regarding the availability of fact packs within Nalco/Ecolab are again directly undermined by the testimony of their Rule 30(b)(6) designee, Corey DeMarco. DeMarco made it clear that not only does a district manager get a fact pack for his district, but the regional manager for the region also receives a fact pack that includes all of the information for all of the districts within the region.

```
16  Q    Who receives fact packs for a district?
17  A    The district manager.
18  Q    Anyone else?
19  A    The district manager receives a fact pack for
20       his district.  The regional manager receives
21       one for their region.
22  Q    Does the regional manager's fact pack include
23       all the information for the districts within
24       that region?
25  A    Repeat that, please.
```

---

[19] August 10, 2023 Hrg. Tr. 152:14–153:5.

```
1  Q    Does the regional manager's fact pack include
2       all of the information for the districts within
3       that region?
4  A    Yes.
5  Q    What period is covered by a fact pack?
6  A    There's a new fact pack every month, and it
7       covers approximately three years of data.
8  Q    Is older information available?
9  A    Yes.
```
[20]

So contrary to Plaintiffs' statements to the Court that they had to "recreate" the fact packs, DeMarco's deposition testimony establishes that the information contained in the fact packs is readily available and the same information contained in the district fact pack was included in the regional fact pack distributed monthly to the regional managers. To date, Plaintiffs have not alleged that Ridley somehow deleted his regional manager's files too, so there would be no need for Plaintiffs to "recreate" anything. In fact, Demarco confirmed the fact packs were transmitted by email and Ecolab had no restrictions in place that prevented people from sharing fact packs via email.

```
25 Q    So fact packs were previously sent by email; is
1       that correct?
2  A    Yes.
3  Q    Did Ecolab have any restrictions in place that
4       prevented people from sharing fact packs via
5       email?
6  A    No.
```
[21]

---

[20] DeMarco Dep. at 226:16–227:9

[21] DeMarco Dep. at 227:25–228:6

So, unless Plaintiffs are now attempting to claim that Ridley somehow deleted all of the fact pack emails ever sent to him from his email account and from the sender's email account, then Plaintiffs should have had an exact copy of every single fact pack they allege Ridley deleted and could have easily obtained those fact packs from numerous locations. Of course, this proof doesn't fit with Plaintiffs' narrative that Ridley harmed them on his way out the door by alleged deleting his copy of these fact packs and that he caused them great harm by deleting any fact pack that he had backed up to his WD drive. This Court should not give Plaintiffs additional evidence which they can attempt to contort to suit their narrative and should instead require a special master to conduct and oversee any additional discovery allowed to ensure that any representations about the evidence are accurate.

### iii. Plaintiffs' reference to iPads or other devices are an indication of their intentions if allowed to receive additional discovery materials directly.

At the August 10 hearing Plaintiffs referenced an iPad and other USB devices listed in the Crowd Strike log that were connected to Ridley's ChemTreat laptop and requested the Court to allow additional inspection and discovery of those devices as a sanction even though there is no evidence from the Crowd Strike log that the iPad transferred any files to or from the ChemTreat laptop.[22] Plaintiffs' request again disregards the record evidence in the case.

Jim Vaughn made it clear during his deposition that the iPad would show a connection to the ChemTreat computer in the Crowd Strike log if it was being charged from the computer, but the Crowd Strike log showed no evidence of files being transferred to or from the iPad.

---

[22] August 10, 2023 Hrg. Tr. 23:16–28:22.

> 4  　　　　　　The lightning cable you described is one
> 5  way of charging an iPad, yes. So I could see
> 6  this entry showing up if you -- if this device
> 7  was plugged into that computer with that cable,
> 8  then that would explain why it's showing up on
> 9  this report.
> 10 　　Q. Okay. And you can also use that kind of
> 11 cable to transfer data between a laptop and an
> 12 iPad; isn't that right?
> 13 　　A. No. No, sir. That's not right.
> 14 　　Q. How do you know that?
> 15 　　A. Because a lightning cable that you
> 16 described is a charging cable. It's not a data
> 17 transfer cable.[23]

Vaughn went on to say that the Crowd Strike log did not include any "interacted files" for the iPad, and that the entry on the log was consistent with the device being plugged in for charging.

> 13 　　　　　　But what I can say is, to the extent
> 14 there would have been anything on this device,
> 15 and to the extent it would have been interacted
> 16 with at ChemTreat, it wasn't on this long and
> 17 therefore didn't pop up in any of my searches.
> 18 BY MR. UPPAL:
> 19 　　Q. Well, it is on the log, because I'm
> 20 showing it to you, right?
> 21 　　A. Well, I mean, interacted files are not
> 22 on the log. The device itself being plugged in,
> 23 which would be normal if you're plugging it in to
> 24 charge it, that -- that part I agree with.[24]

---

[23] Vaughn Dep. at 146:4–17. Excerpts of James Vaughn's deposition are Exhibit 4 to this document.

[24] Vaughn Dep. at 148:13–24.

Again here, in total disregard for the evidence in the case, Plaintiffs attempt to leverage an entry in the Crowd Strike log which references an iPad to justify additional discovery and inspection into devices which they have no proof are relevant to their claims. Plaintiffs' statements at the hearing related to this Crowd Stike entry further underscore the need for a special master to oversee any additional discovery the Court allows in this matter.

**B.    Ridley preserved more evidence than Plaintiffs and this Court should not overlook Plaintiffs' actions in determining sanctions against Ridley.**

In considering what sanctions to impose upon Ridley in this matter, the Court should consider that Ridley, as an individual defendant, preserved more evidence than Plaintiffs even given all their resources. Plaintiffs only could conduct forensic inspections and analysis of the WD drive because Ridley: 1) notified Plaintiffs of the existence of the WD drive; 2) notified Plaintiffs that he backed up and subsequently deleted Nalco files from the WD drive; 3) provided the WD drive to be forensically imaged; and 4) maintained the original WD drive. Plaintiffs had no knowledge of the WD drive when they sent the February 9, 2022 demand letter. The WD drive appears nowhere on the DLP report as a device that Ridley copied or transferred files to in the months before his resignation from Ecolab in July 2021. Plaintiffs' knowledge of the WD drive and their ability to attack Ridley about the drive are only possible because Ridley advised them of the WD drive's existence and maintained evidence from the drive.

If the Court compares Ridley's actions in notifying Plaintiffs about the WD drive with the Plaintiffs' actions, the Court can see that Plaintiffs have taken a different path. Plaintiffs knew by January of 2022 that they had not preserved the devices that were central to their claims against Ridley – Ridley's laptop and the LaCie Drive – yet they filed this lawsuit anyway. Then, even after filing the lawsuit, they refused to provide information regarding the actual files they represent are trade secrets despite their clear ability to do so based on the testimony of their Rule 30(b)(6)

designee, Corey DeMarco, as discussed above. In fact, Plaintiffs refused to provide complete information about Insight's receipt and handling of Ridley's Ecolab laptop and the LaCie drive and advised ChemTreat's counsel as late as January 31, 2023 that they had contacted Insight to clarify the status of the laptop and were awaiting further information.[25] Plaintiffs made these representations even though Plaintiffs' counsel had been communicating for months with Ecolab's in-house counsel while Ecolab's representatives were gathering information from Insight, over a year earlier in January 2022, about the devices Ridley returned.[26] Plaintiffs actions deprived Ridley of the ability to test the allegations in the complaint and then Plaintiffs further obfuscated and held back evidence of their vendor's actions through the discovery process. The Court must not overlook these actions of the Plaintiffs in determining appropriate sanctions.

**C.     The role of the Special Master will be limited as it relates to Ridley's wife's laptop and the Court should consider that limited role in determining sanctions.**

To the extent that the Court allows a limited reopening of discovery into the contents of Ridley's wife's laptop, the role of the special master should be limited to searching for evidence of Ridley accessing, deleting, or sharing any Nalco/Ecolab files and for any connections between Ridley's wife's laptop and the LaCie drive. The special master will only have to conduct these searches across one device associated with Ridley. Then, once the special master identifies any relevant files or file paths, he can search those limited file names against any ChemTreat repositories that the Court allows the special master to access. Accordingly, any role of the special master will be limited as to the searches he conducts related to Ridley and Ridley requests that the Court consider that limited role in determining appropriate sanctions for any reopening of discovery.

---

[25] Doc. 123 at Page ID # 1568.

[26] *See* Doc. 276-5 at Page ID # 8139-8140 and Doc. 276-9 at Page ID # 8210.

**D. Role of the Special Master.**

Plaintiffs alone have requested that the Court reopen discovery to allow additional inspection of Ridley's wife's laptop and to provide for searches of additional data repositories at ChemTreat. Plaintiffs have made this request to the Court without providing any evidence of customer related losses resulting from Ridley having possession of Nalco files after his resignation. The Court has ruled that it will allow a limited reopening of discovery to be overseen by a special master. The primary role of the special master should be to determine if Plaintiffs' allegations and shifting claims have merit, or if they are churning litigation unnecessarily. ChemTreat has not employed Ridley since March 2023 and Ridley has no ability to take Nalco or Ecolab's customers as an individual employed outside of the water treatment industry. So, the role of the special master should be to determine if Ridley accessed Nalco/Ecolab files from the WD drive or with his wife's laptop and then provided those files to ChemTreat to solicit or obtain customers in violation of his employment contract with Plaintiffs. To make that determination, Ridley proposes the special master follow this protocol:

1. Search the forensic image of Ridley's wife's laptop for evidence of access to any Nalco/ Ecolab files utilizing the same search terms Plaintiffs agreed to for the search of the WD drive pursuant to Judge Lee's prior order.[27]

2. For any hits from the search terms (which include search terms for privilege information) require Ridley to log any privileged, confidential, or personal information.[28]

3. Search the forensic image of Ridley's wife's laptop for proof of any access or

---

[27] Doc. 246.

[28] Attached as Exhibit 5 is the list of agreed upon search terms for the WD drive including privilege terms.

connection to the LaCie drive and determine the date of any such connection.

4. From the remaining list of non-privileged and non-confidential files matching the search terms from the special master's search of Ridley's wife's laptop, search the ChemTreat data repositories the Court allows access to pursuant to its order reopening discovery.

5. Produce a report of the results of the special master's searches.

By employing this protocol, the special master can focus his efforts on identifying any documents and data relevant to the claims in the lawsuit and prevent the Plaintiffs from using information provided directly to them to prolong the case and engage in additional unnecessary discovery disputes.

**E.     Allocation of Payment.**

Fed. R. Civ. P. 53(g)(3) requires the Court to allocate payment for a special master after considering: 1) the nature and amount of the controversy; 2) the parties' means; and 3) the extent to which any party is more responsible than other parties for the reference to a special master.[29] As Ridley's counsel indicated at the August 10 hearing, Ridley as an individual defendant has nowhere near the means or resources as the other two corporate parties. Ridley therefore requests the Court's consideration under the second factor of Rule 53(g)(3) as the Court allocates payment between the parties for the special master.

## IV. Conclusion

Plaintiffs' actions through the discovery phase of this case and their representations to the Court during the August 10 hearing underscore the need for a special master to oversee any additional discovery the Court allows as a sanction. The Court has no other way to ensure that Plaintiffs

---

[29] Fed. R. Civ. P. 53(g)(3).

will make proper use of the additional discovery materials or will make accurate representations about what the additional materials establish. By following a protocol similar to the one outlined above, the Court can focus the special master's efforts on identifying any documents or information that are actually relevant to the issues in the lawsuit and prevent any additional unnecessary discovery litigation. With a clear picture of the evidence from a neutral party, the Court can determine if Plaintiffs' allegations against Ridley and ChemTreat have merit or not, determine how to resolve the remaining pending motions, and plot a course to resolve any surviving triable claims.

Respectfully Submitted:

**Patrick, Beard, Schulman & Jacoway, P.C.**

By: /s/ *Lance W. Pope*
    Lance W. Pope, BPR No. 025054
    Jeremy M. Cothern, BPR No. 027116
    537 Market Street, Suite 300
    Chattanooga, TN 37402
    (423) 756-7117 – phone
    (423) 267-5032 – fax
    lpope@pbsjlaw.com
    jcothern@pbsjlaw.com

**Certificate of Service**

I certify that on August 17, 2023, this document has been served upon all the parties via the Court's ECF system.

By: /s/ Lance W. Pope