# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

ECOLAB Inc., and NALCO COMPANY,
LLC d/b/a Nalco Water, an Ecolab Company
and/or Nalco Water,

     *Plaintiffs*,

v.

ANTHONY RIDLEY and CHEMTREAT,
INC.,

     *Defendants*.

Case No. 1:22-cv-00050

District Judge Travis R. McDonough

Magistrate Judge Christopher H. Steger

---

## CHEMTREAT'S SUPPLEMENTAL BRIEF ON THE USE OF A SPECIAL MASTER

---

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

I.  Discovery To Remedy ESI Lost When ChemTreat Reformatted Ridley's Laptop.............3

    A.  CrowdStrike ....................................................................................3

    B.  Hard Drives of Salesforce Employees ...................................................5

        1.  Plaintiffs have failed to show the "Other Salesforce Employees"
            are likely to have relevant information. ......................................6

        2.  Plaintiffs have failed to show their requested discovery is tailored
            to remedy the loss of ESI on the reformatted laptop. ..................8

            a.  Plaintiffs have not identified a non-speculative basis to
                search the hard drives of other ChemTreat employees...................8

            b.  Plaintiffs have not shown that a search of other employees'
                hard drives would remedy the loss of ESI from Ridley's
                laptop...................................................................10

II.  Discovery To Remedy ESI Lost When Plaintiffs Spoliated Ridley's Devices. ...............12

    A.  The LaCie Drive ..............................................................................13

    B.  The "OfficeApps.Live.Com" Website ....................................................13

    C.  Chain-of-Custody Evidence Regarding Plaintiffs' Alleged Trade Secrets............14

    D.  Ridley's Alleged Deletion of Documents from Ecolab's OneDrive. ..................16

CONCLUSION......................................................................................................20

i

## INTRODUCTION

As discussed at the August 10, 2023 hearing, ChemTreat agrees the Court should appoint a special master to oversee any further discovery the Court permits as a curative measure under Rule 37. Consistent with Rule 37's direction that sanctions be "no greater than necessary to cure the prejudice caused by the parties' spoliation," Fed. R. Civ. P. 37, any such discovery must be narrowly drawn to address the specific ESI the Court has determined was lost through spoliation.

The additional discovery Plaintiffs seek as to ChemTreat does not satisfy this requirement. Plaintiffs have not shown (and cannot show) that the information they seek would have been available on the laptop that ChemTreat reformatted. Plaintiffs instead speculate as to what information might exist on the laptops of ChemTreat's salesforce employees (and all other ESI of those individuals) and ask the Court to authorize a fishing expedition to see what turns up. At the August 10 hearing, however, Plaintiffs were unable to provide the Court with any record evidence supporting their conjecture about the existence of this information or the relevance of the majority of the potential custodians. That is not surprising: Plaintiffs did not seek this information in discovery, and now belatedly seek to cure an evidentiary gap created by their own strategic decisions, not ChemTreat's spoliation. Plaintiffs likewise did not identify any alleged gap in the extensive repository searches conducted by ChemTreat's counsel, in response to Plaintiffs' dozens of document requests, and by Vaughn, in the course of his expert work, both of which were disclosed to Plaintiffs in February, *see* Doc. 143; Doc. 151-6, beyond the facially unreasonable claim that ChemTreat should have searched over 600,000 documents for the terms "Nalco" and

1

"Ecolab," without any limitation.[1]  Ex. 1 at 55:13-19.[2]  Instead, Plaintiffs' position appears to be that the limited loss of ESI by ChemTreat—confined to a single laptop used by Ridley—justifies granting them free rein to root around in *every* email sent or received and *every* document created by employees at *every* echelon of their direct competitor, with no explanation as to how such discovery satisfies the baseline requirements of Rule 26 (relevance and proportionality), much less the additional requirements imposed by Rule 37(e) of a narrowly tailored remedial purpose. Simply put, Rule 37(e) does not countenance Plaintiffs' wish list of discovery unmoored from any identified prejudice (or the actual loss of ESI) and bounded only by what they can "dream up." Ex. 1 at 41:6-24.

By contrast, ChemTreat detailed at the August 10 hearing the role the special master could serve in addressing the evidentiary gap created by Plaintiffs' spoliation, citing to documents produced by Plaintiffs and testimony from Plaintiffs' witnesses.  As ChemTreat also detailed at the hearing, the undisputed record developed in discovery permits the Court to impose the evidentiary sanctions sought in ChemTreat's spoliation motion.  If the Court nonetheless concludes the record is not clear on these issues—and particularly if it chooses to entertain the new arguments Plaintiffs made at the hearing (based on alleged expert opinions they did not disclose during discovery)—then the Court should task the special master with conducting discovery on the factual issues implicated by Plaintiffs' spoliation, as discussed below.

---

[1] Plaintiffs did not address the disclosed fact that ChemTreat's counsel searched "Nalco" and "Ecolab" with only very minor limiters (such as "Ridley") in responding to Plaintiffs' discovery requests, nor that ChemTreat's counsel searched its full database of over 600,000 documents for any appearance of "Nalco" or "Ecolab" in the metadata.

[2] For the Court's convenience, ChemTreat attaches to its filing the full transcript of the August 10, 2023 hearing.

## I.   Discovery To Remedy ESI Lost When ChemTreat Reformatted Ridley's Laptop.

At the hearing, Plaintiffs sought two categories of additional discovery:  (1) access to ChemTreat's CrowdStrike license; and (2) discovery from the hard drives and/or email and OneDrive repositories of various salesforce employees.[3]  Neither category is consistent with the remedial purpose of Rule 37(e)(1).  As to the hard drives of salesforce employees, Plaintiffs have not established the relevance of their requested discovery, much less the connection between that discovery and the ESI lost when Ridley's ChemTreat laptop was reformatted.  Consistent with the Advisory Committee's Note to Rule 37(e), further discovery, if any, should be tailored "to restore or replace" information lost due to spoliation, using efforts that are "proportional to the apparent importance of the lost information to claims or defenses in the litigation."  Fed. R. Civ. P. 37(e), adv. comm. notes.

### A.   CrowdStrike

Plaintiffs contend access to ChemTreat's CrowdStrike license is necessary because their forensic expert had difficulty searching the CrowdStrike log without using licensed software.  Ex. 1 (Aug. 10, 2023 Tr.) at 56:16-20, 69:23-24 (asserting Lieb "broke three forensic—two or three forensic tools trying to search this").[4]  Plaintiffs assert Lieb could not simply purchase his own software license because CrowdStrike was "going to charge him a couple hundred thousand

---

[3] At the hearing, Plaintiffs spent almost no time discussing ChemTreat's systems—i.e., ChemTreat's email accounts and OneDrives—contending instead that searching those repositories is inherently inadequate because, Plaintiffs speculate, ChemTreat's employees might do "tricky stuff" outside the network to avoid detection by ChemTreat.  *See* Ex. 1 at 54:7-12.  ChemTreat accordingly focuses here on Plaintiffs' claim that they are entitled to discovery from the hard drives of all salesforce custodians based on Plaintiffs' speculation that Ridley may have transferred some unknown documents through some unknown means to some unidentified employee in this broad group of custodians.  But ChemTreat's arguments regarding the lack of relevance, proportionality, and a narrowly tailored remedial focus apply equally to the network repositories that have already been thoroughly searched as to Plaintiffs' new demand for access to hard drives.

[4] Unless noted, all emphasis is added and quotations are cleaned up with internal citations omitted.

dollars." Ex. 1 at 71:4-5. Setting aside the question of whether ChemTreat could lawfully provide access to a third party such as Lieb (or the special master) consistent with the terms of its software license, Plaintiffs have not established their requested sanction is appropriate.

Per CrowdStrike's website, a CrowdStrike license is not "a couple hundred thousand dollars," but $499.95 annually after a 15-day free trial.[5] Nor is such a license necessary to effectively search the CrowdStrike log produced by ChemTreat. Although, due to its extensive detail, the CrowdStrike log exceeds the size limitations of Excel files and so exists as an Extensible Markup Language (XML) file, the freely available software Notepad++[6] can be used on XML files like the CrowdStrike log to quickly identify all matches for a given term. For example, using the "Find All in Current Document" function, Notepad++ can identify all instances of "Nalco" in the CrowdStrike log with only a single search, creating a list from which intended hits can be easily distinguished from false positives ("External**nalco**ntracts.dll"). *See* Ex. 2. Searches are not limited to single terms. Because an XML file is text-based, the automated ability to search "concurrently for thousands of search terms" (Doc. 293-14, ¶11) can be accomplished using grep, a freely available command line utility.[7] Indeed, even fields—such as "DeviceSerialNumber"—can be searched using these freely available resources. *See* Ex. 3. Search results can be either converted to a .csv file and reviewed as is, *id.* at 4-20, or imported to Excel to make a pivot table identifying each serial number logged for USB devices that were connected to Ridley's ChemTreat laptop, along with the sum of how many times each such device appears in the log, *id.* at 3. The entire

---

[5] *See* https://www.crowdstrike.com/products/?ct-q2-2023-bn-products-nav. The information on CrowdStrike's website is inconsistent with Lieb's assertion that "the CrowdStrike log analysis software costs thousands of dollars including an annual subscription, and CrowdStrike unfortunately was not willing to provide me with a trial version." Doc. 293-14, ¶ 15.

[6] https://notepad-plus-plus.org/

[7] https://www.gnu.org/software/grep/manual/grep.html#Matching-Control

4

process should take a reasonably skilled forensic examiner less than an hour.

In any event, Plaintiffs have had the CrowdStrike log since December 2022. Even though Lieb was apparently unaware of these common and freely available resources to analyze text-based files, such as the XML data in the CrowdStrike log (*see, e.g.*, Doc. 293-14, ¶¶ 13-14), Plaintiffs have not explained why Lieb could not have searched the log for the terms they identified at the hearing—such as "Nalco" and "Ecolab"—during the intervening eight months. Ex. 1 at 56:25-57:3. Plaintiffs have not justified the sanction they seek with regard to the CrowdStrike log.[8]

## B.     Hard Drives of Salesforce Employees

There are two groups of salesforce employees at issue in Plaintiffs' request that the Court order ChemTreat to collect and provide the special master access to an entirely new set of data repositories, their laptop hard drives. (Ex. 1 at 55:24-56:3). Those two groups are: (1) the four individual custodians for whom discovery established relevant contact with Ridley (John Alcorn, Steve Leavell, Clay Cissell, and Tyler Bates); and (2) eight other salesforce employees (Albert DeNunzio, Larry Harmon, Matt Hofer, Michael (Todd) Kraft, David Pearson, James (Jim) Shealey, George Sloan, and John Spalding) for whom discovery did not establish any relevant

---

[8] Plaintiffs also proposed for the first time at the hearing that they, or a special master, should be permitted to create new CrowdStrike logs regarding whether specific USB devices appear anywhere in ChemTreat's CrowdStrike data. Ex. 1 at 57:7-12. Although Plaintiffs did not identify the USB devices for which they are belatedly seeking such information, ChemTreat presumes Plaintiffs seek to know whether USB devices the CrowdStrike log identifies as having been connected to Ridley's ChemTreat laptop appear in the data for other ChemTreat employees. As ChemTreat noted at the hearing, Ex. 1 at 65:3-20, Plaintiffs' failure to seek this information in the 15 months since they filed suit means that data from the period of Ridley's employment (except for the data related to Ridley's reformatted laptop, which ChemTreat preserved) is no longer available. Following the August 10 hearing, ChemTreat searched the available CrowdStrike data (which covers a trailing period of 13 months) for the serial numbers of the 10 potential USB storage devices the CrowdStrike log identified as having been connected to the reformatted laptop (including all USB storage devices identified by Lieb) and confirmed that none appear in ChemTreat's available CrowdStrike data.

contact with Ridley.[9]  *See* Ex. 4.[10]  As to both groups of employees, Plaintiffs have not identified any non-speculative basis to believe that searches of their hard drives will "restore or replace" the ESI lost from the reformatted ChemTreat laptop or remedy any prejudice caused by the loss of that ESI.

### 1. Plaintiffs have failed to show the "Other Salesforce Employees" are likely to have relevant information.

The party seeking sanctions bears the burden of proof of establishing their propriety. Plaintiffs have not met this burden for the "other salesforce employees." When pressed by the Court at the hearing, Plaintiffs were unable to identify any basis for their claim that these eight employees have relevant information, other than the fact that ChemTreat included them as custodians on its ESI Report. Ex. 1 at 132:23-133:5. But as the ESI Report reflects, ChemTreat included the "other salesforce employees" prophylactically—as individuals who "may have interacted" with Ridley—rather than based on any discernable relevance to Plaintiffs' claims. *Compare, e.g.*, Doc. 143 at 2 (identifying Cissell as "Mr. Ridley's supervisor who was also involved in Mr. Ridley's hiring"), *with id.* at 3 (identifying the eight "other salesforce employees" as employees "with whom Mr. Ridley may have interacted").

Discovery confirmed that the inclusion of these individuals was indeed prophylactic, as

---

[9] This list does not include a ninth salesforce employee, David Ellis, as he retired months before Plaintiffs notified ChemTreat of their allegations, such that his hard drive, like his OneDrive, was not longer available when ChemTreat received Plaintiffs' preservation notice. *See* Ex. 1 at 45:16-46:3.

[10] Exhibit 4, which was previously provided at the August 10 hearing, is being resubmitted to correct an inadvertent error ChemTreat identified after the hearing as to the repositories of the "HR Employees" and "IT and Admin Employees." *See also* Ex. 5 (identifying repositories searched by ChemTreat's counsel or Vaughn).  ChemTreat understands from counsel's representations at the hearing that those repositories are not included in the additional discovery Plaintiffs seek.  Ex. 1 at 131:19-132:8.

searches of the combined 110 GBs of their email accounts, *see* Ex. 5,[11] resulted in **no** evidence of interactions between any of these custodians and Ridley responsive to any of Plaintiffs' document requests. Only one of the eight custodians had any responsive documents at all: Kraft was part of a company-wide hiring task force pursuant to which he was copied on hiring updates that referenced Ridley. *See, e.g.*, Ex. 6.[12]

Although Plaintiffs now claim that these other salesforce employees are "very important" and they "believe [Ridley] would have been trading data with" them, Ex. 1 at 132:24-25, they chose not to conduct any discovery to substantiate that belief: They did not serve any document requests, interrogatories, or even requests for admission regarding these individuals or request to depose them. Plaintiffs did not even ask Ridley about any of these individuals at his deposition. *See* Ex. 9 at Index. And after Plaintiffs successfully litigated the right to compel Ridley to produce his text messages with ten ChemTreat employees, Doc. 165 at 9, Plaintiffs did not include a single one of these "other salesforce employees" on their list, instead choosing to use only eight of their ten allotted custodians. *See* Ex. 10. Whether Plaintiffs' decision was strategic or negligent, they indisputably knew about these individuals as of Feb. 13, 2023 (before any depositions were taken and months before discovery closed) and yet did not seek information about their interactions with

---

[11] Pursuant to the Court's Order (Doc. 356, ¶ 4), Exhibit 5 identifies the size of each data repository searched by ChemTreat's counsel or its designated forensic expert, James Vaughn.

[12] Kraft also had two emails, located when ChemTreat's counsel searched "Nalco" and "Ecolab" across the metadata properties fields of the more than 600,000 documents in their database (*see* Doc. 143), in which Kraft forwarded to his ChemTreat email account a 2007 email originally sent to his personal email account by a Nalco employee, attaching a checklist for training that identified such tasks as "Read Nalco Water handbook Chapters 1 - The Water Molecule (7 pages" and "Set up your water test kit with help of Primary trainer." *See* Ex. 7; Ex. 8. Plaintiffs have never claimed this training checklist is a trade secret, nor could they given its anodyne content. Instead, it was identified and produced by ChemTreat as "non-public information" bearing "indicia that it originated from" Plaintiffs pursuant to the broad definition of "confidential information" established by Judge Lee for purposes of Plaintiffs' discovery requests. *See* Doc. 137 at 30.

Ridley.  There is thus no evidence that would support Plaintiffs' belated effort to categorize these other salesforce employees as relevant to the narrower scope of remedial discovery under Rule 37.

### 2. Plaintiffs have failed to show their requested discovery is tailored to remedy the loss of ESI on the reformatted laptop.

As to both the individual custodians and the other salesforce employees, Plaintiffs speculate that Ridley could have transmitted ESI from his laptop to other ChemTreat employees without using ChemTreat's systems, such as by uploading information to an iCloud or Dropbox account, or by transferring information stored on USB devices.  Ex. 1 at 40:22-42:6.  There is no evidence that Ridley did so, and as such, no basis under Rule 37 to search the hard drives of the individual custodians or other salesforce employees—those searches by definition will not restore or replace" the ESI lost from the reformatted laptop or otherwise remedy the loss of that ESI.

### a. Plaintiffs have not identified a non-speculative basis to search the hard drives of other ChemTreat employees.

It is undisputed that salesforce employees at ChemTreat generally save documents to their hard drive rather than their OneDrives—with the notable exception of Ridley, whose ChemTreat OneDrive contains thousands of documents.  *See* Ex. 5.  But other ChemTreat employees' practices regarding their hard drives is irrelevant to the question of whether remedial discovery of those hard drives is appropriate under Rule 37, absent some non-speculative basis to believe that ESI stored on Ridley's laptop was transmitted to any of the salesforce employees outside of ChemTreat's systems.[13]  Plaintiffs, however, largely chose not to seek the discovery—from ChemTreat, Ridley, or third parties—that may have provided the necessary evidentiary basis for the additional

---

[13] Plaintiffs have not requested any further discovery of Ridley's ChemTreat email account or his ChemTreat OneDrive.  As discussed at the hearing, both ChemTreat's counsel and Vaughn searched these custodial repositories for the terms "Nalco" and "Ecolab," as well as for any hits on the thousands of file names listed in the DLP report, and Plaintiffs already have all documents from Ridley's repositories that hit on those searches.  Ex. 1 at 35:11-40:9.

8

discovery they now seek.  And the limited discovery they did conduct on the issue does not support their speculation.

For example, at the hearing, Plaintiffs' counsel conjectured as to how a transfer of information from Ridley to Cissell outside of ChemTreat's systems might have occurred:

> We might find on the iPad, for example, that Clay Cissell has a personal Dropbox account and Ridley was sending stuff to Clay Cissell's personal Dropbox account and the only way he was doing that was through his iPad.  Okay?  And there would be no other way that we could find it.

Ex. 1 at 30:16-20.  When Plaintiffs deposed Cissell, however, they chose not to ask him whether he had a "personal Dropbox account," an iCloud account, or any other cloud account through which such a hypothetical transfer could have occurred.  Ex. 11 at Index.  Plaintiffs also failed to ask Cissell about other potential means Ridley could have transferred to Cissell ESI potentially saved on Ridley's laptop, such as through a Hotmail account, a share file, a flash drive, a thumb drive, or a USB drive.  *Id.*  Plaintiffs never even asked Cissell the obvious question of whether Ridley transferred any Nalco/Ecolab files to Cissell at any time during Ridley's employment by ChemTreat—by any method.  *Id.*  Plaintiffs likewise failed to ask Alcorn any of these questions.  Ex. 12 at Index.  Plaintiffs did ask Leavell whether he had an iCloud, Dropbox, or Box.com account, and whether he had seen any of the documents allegedly misappropriated by Ridley:  He testified "no" as to each.  Ex. 13 at 239:17-22, 340:1-5.

Plaintiffs attempt to excuse their failure to ask these foundational questions with the claim that "witnesses lie."  Ex. 1 at 75:19.  Yet, Plaintiffs made no effort during discovery to obtain non-testimonial evidence on these issues either.  Plaintiffs did not, for example, issue a Rule 45 subpoena to Apple (for iCloud account information), or Microsoft (for Live.com account

information), or any other cloud provider (such as Dropbox or Box.com).[14]  Plaintiffs speculated at the hearing that discovery as to the email accounts of Ridley and these ChemTreat sales employees was insufficient because "if you were trying to hide what you were doing, you would trade—you would not do anything on the network that could be tracked, you would do it through personal e-mail, through personal cloud accounts, you'd do it through USB drives," Ex. 1 at 54:7-12, but the record does not support that claim either.  Plaintiffs obtained Ridley's text messages with Alcorn, Cissell, Leavell, and Bates, *see* Ex. 10—i.e., communications not "on the network"— and found no evidence regarding their allegedly misappropriated documents or any attempts by Ridley to transmit those documents to the ChemTreat salesforce employees.  Nor does Plaintiffs' claimed "evidence" of Ridley "doing tricky stuff like this" (Ex. 1 at 54:11-12) support the discovery they seek:  that "evidence" is the email Ridley sent from his personal email account ***to his own ChemTreat email account, not to other ChemTreat employees***.  Ex. 14.

Plaintiffs could have sought information about any documents transferred by Ridley to other employees outside of ChemTreat's systems during the ordinary course of discovery, through any of the channels available under the Federal Rules, such as document requests, interrogatories, requests for admission, depositions, or third-party subpoenas.  They did not do so.  Rule 37(e) does not relieve Plaintiffs of their decision not to pursue that discovery.

> **b.    Plaintiffs have not shown that a search of other employees' hard drives would remedy the loss of ESI from Ridley's laptop.**

Plaintiffs' tardy request for discovery from other ChemTreat employees' hard drives

---

[14] There is thus no record evidence that Plaintiffs "asked Clay Cissell" about his use of Dropbox or any other cloud account, that there were "a lot of denials" by ChemTreat witnesses as to such accounts, that Plaintiffs "chased down" any denials by ChemTreat witnesses regarding such accounts, or that Plaintiffs "have proven" the denials they did not receive to questions they did not ask "were false denials."  Ex. 1 at 31:6-9.

suffers from an additional defect: Plaintiffs have not shown it is within the narrow scope of Rule 37(e) discovery. Unlike ordinary discovery, which need only be relevant and proportional, remedial discovery undertaken pursuant to Rule 37(e) must in addition be "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e). Plaintiffs have not even explained, much less established, how the discovery they now seek would "replace or restore" the ESI lost when ChemTreat reformatted Ridley's laptop, *id.*, so as to remedy the prejudice caused by the loss of that ESI.

Certainly, if the ESI on Ridley's ChemTreat laptop had been preserved, all parties would know what documents, if any, Ridley had saved to the hard drive.[15] But there is no evidence that the ESI on the laptop would have shown what documents, if any, Ridley transferred to a location outside ChemTreat's system (such as a USB storage device), much less that the laptop's ESI could have shown to whom Ridley transmitted the hypothetical USB device.[16] Because such information is not ESI that was lost when ChemTreat reformatted Ridley's laptop, it is not information within the scope of Rule 37(e).

Nor have Plaintiffs shown how their proposed discovery satisfies Rule 37(e)'s proportionality requirement. Fed. R. Civ. P. 37(e), adv. comm. note. All the hard drives Plaintiffs

---

[15] Plaintiffs have previously suggested that Ridley could have copied the content of their allegedly misappropriated documents and pasted it into a new document saved on his laptop. *See, e.g.*, Doc. 293-14, ¶ 75. That claim could be addressed by a further search of Ridley's repositories using unique terms or phrases found in the body of Plaintiffs' alleged trade secrets. Ex. 1 at 79:14-80:4. Plaintiffs did not address that issue at the hearing.

[16] As Plaintiffs acknowledge, their theory is that "if we had the ChemTreat computer that Mr. Ridley used, then it—we would be able to look at it and see whether there's evidence that he shared data with others at ChemTreat." Ex. 1 at 35:6-10. Plaintiffs have offered no evidence supporting that theory. To the contrary, despite submitting five separate reports/declarations, totaling nearly 100 pages (*see* Doc. 257-2; Doc. 293-14; Doc. 298-4; Doc. 327-1; Doc. 337-5), Lieb has never opined that, but for ChemTreat's reformatting of the laptop, such information would have been available from an examination of the laptop.

11

now seek to search are for ChemTreat's salesforce employees. Plaintiffs have not explained why Ridley would have transmitted their alleged trade secrets to such employees other than for use in making sales, but Plaintiffs admit they have no evidence of use of their alleged trade secrets—by anybody—in the form of lost sales or even of customer solicitation. *See* Doc. 314 at 14-15, 23-24.[17] The fact that Plaintiffs have no measurable damages impacts the "sanctions calculus" applicable under Rule 37(e). Ex. 1 at 61:9-10 (contrasting situation if Plaintiffs had substantial damages: "Then we'd really start digging. I don't know how hard to dig, though, when that number's zero."). Plaintiffs have not shown a non-speculative basis for their discovery, nor that such discovery is tailored to "restore or replace" the ESI lost when ChemTreat reformatted Ridley's laptop. As such, they have not met their burden of establishing that expanding the already significant ESI repositories searched by ChemTreat (totaling over 600,000 documents, Doc. 143) is proportional to the importance of the evidence to their trade secret misappropriation claims that they hypothesize they might find in those new repositories.

## II. Discovery To Remedy ESI Lost When Plaintiffs Spoliated Ridley's Devices.

ChemTreat's spoliation motion identified four evidentiary sanctions that the Court could properly enter, based on the record developed during discovery regarding the impact of Plaintiffs' spoliation of Ridley's devices on ChemTreat's ability to defend itself. *See* Doc. 277. At the hearing, ChemTreat discussed the role the special master could play in conducting discovery should the Court determine further development of the record is necessary as to those issues.

---

[17] Plaintiffs have speculated this litigation might have forestalled such use, but they delayed eight full months before notifying either ChemTreat or Ridley that they suspected Ridley of misappropriation. *E.g.*, Doc. 301 at 22. Plaintiffs offer no explanation as to why their documents, if actually misappropriated by Ridley and disclosed to ChemTreat employees, would not have been used during that substantial intervening period when there was no reason for any alleged wrongdoer to believe the claimed misappropriation had been detected.

12

## A. The LaCie Drive

Plaintiffs urged the Court to permit the special master to determine whether the LaCie drive was connected to Ridley's wife's computer and, if so, when.  Ex. 1 at 119:19-120:2.  ChemTreat agrees that is an appropriate area of inquiry for the special master.[18]

## B. The "OfficeApps.Live.Com" Website

Plaintiffs did not dispute that the DLP report reflects that Ridley visited the same "officeapps.live.com" website on multiple occasions between May 22, 2021, and July 1, 2021 (the period covered by the DLP report produced to ChemTreat), using both his first and second laptops.  *See* Ex. 15; *see generally* Doc. 229 ¶¶ 71-72, 84, 98, 107, 116, 124.  Nor did Plaintiffs dispute that, if they had not spoliated the second laptop, it would contain ESI relevant to the question of whether the "officeapps.live.com" website Ridley visited was a personal or corporate website, a question that—due to Plaintiffs' spoliation—is instead the subject of an expert dispute.  *See* Doc. 293-6 ¶¶ 54-56; Doc. 326-3 at 4; Ex. 16 at 2-5.  Instead, Plaintiffs suggested the question was not an important one to them and that, "at most, that would indicate that we should not be allowed, I suppose, to argue that there was some nefarious interaction with Live.com, that's it."  Ex. 1 at 157:15-18; *see also id.* at 156:19-23.[19]

---

[18] As indicated at the hearing, ChemTreat does not otherwise take a position on the scope of Plaintiffs' discovery regarding that computer, but asks only that the Court ensure the special master uses a protocol that adequately protects any of ChemTreat's privileged or business confidential information that Ridley may have placed on his wife's computer.  Ex. 1 at 19:13-21:9.

[19] Plaintiffs' counsel also argued that the second laptop was simply not relevant because (1) "the Digital Guardian Report shows that from June 2 through June 20 there's no activity," and (2) at the end of June 2021, Ridley "takes a six-day vacation where he doesn't take the laptop with him because he never takes it."  Ex. 1 at 138:17-18, 139:2-7, 140:1-3.  Neither is correct.  The DLP report shows activity on Ridley's laptop *every weekday* between June 2 and July 1, 2021, except for June 30; it also shows activity on Ridley's second laptop *every day (including weekends)* between June 21 and June 29, reflecting that he took a working vacation.  Ex. 17; *see also* Doc. 270 (manual filing of full report).  This is consistent with Ridley's actual testimony:  "I have never been on a trip without my work computer."  Ex. 9 at 282:3-14.

13

ChemTreat agrees that, if Plaintiffs are stipulating to such a bar on evidence or argument regarding Ridley's "interaction with Live.com," there is no need for further discovery by the special master. But absent such a stipulation, this is an area where the special master could properly conduct discovery sufficient to determine whether Plaintiffs' undisputed use of cloud-based Microsoft Office applications (such as, for example OneDrive) results in Plaintiffs' employees visiting "officeapps.live.com" in the ordinary course of their employment. Consistent with Rule 37(e), such discovery by the special master would be appropriately and narrowly tailored to address the ESI lost by Plaintiffs' spoliation of the second Ecolab laptop.

### C.    Chain-of-Custody Evidence Regarding Plaintiffs' Alleged Trade Secrets

The necessary predicate for Plaintiffs' statutory trade secret claims is proof that one or more documents that Ridley allegedly misappropriated contains trade secret information—a predicate that triggers application of the "best evidence" rule. Fed. R. Evid. 1002.[20] But Plaintiffs' spoliation of Ridley's devices, combined with their failure to preserve Ridley's OneDrive after their late-July 2021 restoration of any documents deleted from it, means that rather than producing the "original" documents found on Ridley's second laptop, his LaCie drive, or his OneDrive, Plaintiffs produced what they admit are "recreations" (or outright "creations") instead. Ex. 1 at 152:21-23 ("A lot of the documents that we had to produce as exemplars, according to the rulings from Judge Lee, we had to go back and recreate as a company."); *see also id.* at 66:14-21 ("Because we didn't have them, we had to create some exemplars.").

During discovery, the Court enforced an earlier Order requiring Plaintiffs to produce exemplars of the documents Ridley allegedly misappropriated, but permitted Plaintiffs to instead

---

[20] Per Rule 1001, "For electronically stored information, 'original' means any printout — or other output readable by sight — if it accurately reflects the information." Fed. R. Evid. 1001(d).

14

produce **similar** documents if Plaintiffs were unable, after diligent efforts, to locate copies of "the precise file[s]" Ridley allegedly misappropriated. Doc. 158 at 13, 22. As the Court explained, however, Plaintiffs' production of such substitute documents required disclosure and a sworn explanation:

> At the hearing, the parties and the Court discussed that Plaintiffs do not have the precise file Ridley downloaded and deleted, and they may not even have a copy of the precise file (i.e., the same Fact Pack Ridley deleted saved on someone else's computer), for each exemplar, for various reasons including reorganization of sales districts. ChemTreat agreed that for those exemplars for which a copy is not available after a reasonable and diligent search, it would accept a reasonably close approximation, along with a description of Plaintiffs' search efforts to locate the copy.
>
> *       *       *
>
> For any exemplars for which a copy is not available after a reasonable and diligent search, ***Plaintiffs may provide a reasonably close approximation along with a sworn statement describing Plaintiffs' search efforts to locate the copy***. Such description should address the individuals who performed the searches, the repositories searched, the terms used, the dates of the searches, the known differences between the exemplar and the actual document Ridley allegedly misappropriated, and other pertinent information.

Doc. 158 at 13, 22.

When Plaintiffs subsequently produced documents in connection with the Order, they did not disclose that the exemplars they produced were "recreations" or "creations," rather than copies of the "precise files" allegedly misappropriated by Ridley, nor did they provide the accompanying information required by the Court's Order for such "recreations" or "creations." Plaintiffs still have not identified which of the alleged trade secret documents they produced are actually "recreations," or entirely new "creations," nor have they explained what they did to recreate, or create, those documents. Moreover, in many instances, Plaintiffs obscured the source of the documents they produced by overwriting the original metadata with new, generic metadata, such as "Ecolab\2023.02.16 Data\2023.02.16 Ingestion\OneDrive_1_2-16-2023" or

15

"Ecolab\2023.02.23 Data." Ex. 18.  For other documents, Plaintiffs provided metadata suggesting the documents were obtained from Ridley's email archive, but failed to produce the emails to which the documents were apparently attached.  Because of these actions, ChemTreat cannot assess whether the documents Plaintiffs produced as "exemplars" of their alleged trade secrets are connected to Ridley, much less whether the content of such documents "accurately reflects the information" in the "precise file" Ridley allegedly misappropriated.

All of this—Plaintiffs' failure to preserve the "originals" of their allegedly misappropriated documents, their obscuring of the source of the documents they produced, and their tardy and incomplete admission that at least some of the produced documents are not the documents Ridley allegedly misappropriated—creates an evidentiary morass that could properly be subject to remedial discovery by the special master.  Discovery focused on the narrow question of the provenance of the alleged trade secrets produced by Plaintiffs (which, based on their trial exhibit list, Doc. 346, number less than 70) is properly tethered to the ESI the Court has determined Plaintiffs spoliated, and is necessary to cure the prejudice to ChemTreat's ability to defend itself against Plaintiffs' trade secrets claims caused by that spoliation.[21]

### D.  Ridley's Alleged Deletion of Documents from Ecolab's OneDrive.

Plaintiffs have never identified any evidence supporting their claim that after downloading copies of Plaintiffs' documents to the LaCie drive, Ridley "contemporaneously delete[d] the

---

[21] As detailed by ChemTreat in its briefing, and again at the hearing, testimony from Dave Garza, Plaintiffs' Director of Global Information Security, confirms there was an automatic bi-directional synchronization between the OneDrive folder on Ridley's laptop and his cloud-based OneDrive, such that Plaintiffs' spoliation of Ridley's second laptop caused the loss of the documents the DLP report indicates he copied from the OneDrive folder on his first laptop to the LaCie drive.  *See* Doc. 326 at 5 (citing testimony); *see also* Ex. 1 at 121:21-122:14.  As the files copied to the LaCie drive reflect the most recent iteration of Ridley's back-up of his OneDrive files, previously made to his WD drive, *see* Doc. 349 at 2-3, the remedial nature of this discovery applies to all claimed misappropriation.

16

information from the OneDrive account." Ex. 1 at 100:13-16. The evidence—based on business records produced by Plaintiffs and testimony given by Plaintiffs' employees—uniformly demonstrates the opposite:

- The DLP report does not show any deletion by Ridley, although "File Delete" data is identified in Plaintiffs' policy regarding the generation of DLP reports as an "Operation Type" to be included in the query used to create such reports. Ex. 19 at 2.

- Jennifer Semmler, who generated the DLP report at issue here, testified that Digital Guardian captures "File Delete" data and, consistent with Plaintiffs' policy (which she understands to be mandatory), she always searches for "File Delete" data when generating DLP reports—and that she "double-check[s] each time" that it has been selected as an "Operation Type" included in the query. Ex. 20 at 98:22-102:6, 125:12-126:2.

- Garza, Semmler's supervisor, likewise confirmed that, if Ridley had deleted any files, it would be captured on the DLP report, and further confirmed "that delete does not appear among the operation type[s]" listed in Ridley's DLP report, even though "if any deletion had occurred, it would show up in operation type." Ex. 21 at 154:3-156:3.

In addition to this clear, affirmative evidence from Plaintiffs' records and witnesses, Plaintiffs' document production demonstrates an *absence* of evidence that would exist if the claimed "contemporaneous" deletion had occurred:

- Microsoft automatically generates an email when an Ecolab employee "delete[s] a large number of files from your OneDrive," but the *only* such email Plaintiffs produced from their email archive (which captures all emails sent or received by any employee since September 2011, Ex. 21 at 29:13-15) is from May 11, 2021—nearly two weeks *before* Ridley allegedly misappropriated, then "contemporaneously" deleted, Plaintiffs' documents. *See* Ex. 22.

- Although Microsoft "provides a default audit log retention policy for all organizations" that "can't be modified and retains all Exchange Online, SharePoint Online, OneDrive for Business, and Azure Active Directory audit records *for one year*,"[22] the O365 audit log produced by Plaintiffs—which, per its metadata, was created on January 6, 2022 (and then saved, with unknown changes, on January 26, 2023, shortly before production, Ex. 23)—includes data *only* for the period of June 4, 2021, to July 1, 2021, thus excluding the key period of May 22, 2021, to June 3, 2021, when Plaintiffs claim the supposed "contemporaneous" deletion occurred. Ex. 23; *see also* Doc. 270 (manual filing of audit log).

---

[22] *See* https://learn.microsoft.com/en-us/purview/audit-log-retention-policies

Although ChemTreat raised in its spoliation motion the lack of any evidence in the DLP report (or anywhere else) of Ridley's alleged deletion of OneDrive documents, *see* Doc. 277 at 4, 14, Plaintiffs did not identify any contrary evidence—fact or expert—in their opposition. *See generally* Doc. 303. Instead, quoting Lieb's rebuttal report, Plaintiffs asserted that the DLP report constitutes "*a complete and exhaustive listing* of Ridley's human interaction with Ecolab files during Ridley's last few weeks of employment." Doc. 303 at 6.

At the August 10 hearing, however, Plaintiffs for the first time raised an entirely new argument—resting on an undisclosed opinion from Lieb—that the DLP report is not "a complete and exhaustive listing of Ridley's human interaction with Ecolab files," but rather a fundamentally flawed document that, by design, failed to capture evidence on this critical issue due to some unidentified "rules set." *See, e.g.*, Ex. 1 at 118:3-6 ("What they're not telling you or perhaps they don't know is that the rules set on that Digital Guardian Report do not account for deletions. We've confirmed this during lunch with our expert."); *see also id.* at 142:8-10, 154:21-23, 155:6-9.[23] If the Court chooses to entertain Plaintiffs' newly raised argument regarding the completeness of the DLP report they produced, then the special master should conduct discovery regarding the substantial authenticity issues with that report, including:

- Semmler testified that, at the time she ran Ridley's DLP report on July 23, 2021, Plaintiffs retained *90 days* of Digital Guardian data and she would have used that full time period for her query based on the request she received. Ex. 20 at 41:5-42:11, 142:16-145:6. The DLP report produced by Plaintiffs provides *only 62 days* of data— beginning on May 22, 2021 (the first date on which Plaintiffs allege misappropriation)

---

[23] The opinion Plaintiffs' counsel alluded to at the hearing, if actually disclosed, would be not only yet another new opinion, not disclosed in any of Lieb's five prior reports/declarations, but would also be *directly contrary to his prior disclosed opinions* regarding the supposedly "complete and exhaustive" nature of the DLP report. Doc. 303-14, ¶ 60; *see also* Doc. 298-1, ¶ 13. Plaintiffs did not address at the hearing why they are relying on testimony from Lieb (who admittedly has no prior experience with Digital Guardian, *see* Doc. 353 at 18), rather than testimony from their corporate representative, Garza (whose job duties include overseeing the Digital Guardian software), and Semmler (whose entire job is running DLP reports using Digital Guardian).

rather than April 24, 2021 (the full 90-day period); it thus excludes May 11, 2021, the date of the known deletion identified in the Microsoft-generated email discussed above, which would have resolved Plaintiffs' tardy challenge to whether the DLP report includes any deletion activity. *See* Ex. 27. Semmler denied she would have run a report for only a 62-day period based on the request she received. Ex. 20 at 173:25-174:25.

- Semmler also testified that Digital Guardian automatically assigns a file name to each DLP report she runs and that name is reflected in her report: "data-export-2021-07-23-11_24_30." Ex. 20 at 211:22-212:7; *see also* Ex. 24 at 2. The file name of the DLP report Plaintiffs produced in this litigation, however, is different: "export_1194arc01-ecolab_2021-05-22." Ex. 27. Semmler was unable to explain the reason for this difference between the report she created and the report Plaintiffs produced. Ex. 20 at 171:22-172:8. Garza was likewise unable to explain this variance. Ex. 21 at 95:21-97:13.

- Semmler testified she retains the materials associated with each employee data review she performs, including the reports, in a dedicated OneDrive/SharePoint folder named according to the employee at issue. Ex. 20 at 155:4-156:13, 199:23-200:2, 211:22-2112:25. Plaintiffs refused ChemTreat's request, made as a result of ChemTreat's discovery of the authenticity issues with the DLP report Plaintiffs produced, to produce a forensic image of Semmler's OneDrive folder containing Ridley's employee data review so that ChemTreat could see that report and its metadata.

- Garza subsequently testified that Plaintiffs' retained only *60 days* of Digital Guardian data. Ex. 21 at 36:24-37:3. Garza was unable to explain how, if that was the case, the report prepared by Semmler could cover a *62-day* period instead. Ex. 21 at 37:14-38:4.

- Garza testified that the retention period for Digital Guardian data would be documented in "knowledge-based articles" on the "Service Now support tool," an online "help desk tool," but he did not review that documentation in preparation for his deposition as Plaintiffs' designated Rule 30(b)(6) witness. Ex. 21 at 38:10-39:20. ChemTreat's counsel requested that Plaintiffs produce the policy documenting the retention period, but Plaintiffs refused to do so, and thereafter denied that it was the DLP policy cross-referenced in other materials, which the Court had ordered Plaintiffs to produce. *See* Doc. 269 at 12.

If the Court indulges Plaintiffs' untimely evidence and argument on the completeness of the DLP report, the special master should also conduct discovery on the related issue of Plaintiffs' failure to preserve the (1) Digital Guardian data Semmler searched to generate the DLP report regarding Ridley's activity (which Digital Guardian's documentation demonstrates can be preserved indefinitely and would only require 1MB per employee per day of data in addition to Digital Guardian's standard archive file storage requirements, *see* Ex. 25); (2) the query Semmler

19

used for that search (to the extent it is separate from the DLP report itself, an issue Garza, the Rule 30(b)(6) representative, was not prepared to testify on, *see* Ex. 21 at 65:8-66:9), and (3) the full year of Microsoft O365 data that should have been available when Plaintiffs created the O365 audit log on January 6, 2021 (ChemTreat expressly requested this data, which would have covered the critical May 1 to July 1, 2021 time period, and so would have squarely addressed the question of Ridley's alleged deletion, *see* Ex. 26). Discovery by the special master into these evidentiary issues constitutes proper remedial discovery under Rule 37(e), as Plaintiffs' spoliation of Ridley's second laptop—which would have contained a snapshot of the ESI in Ridley's OneDrive account as of July 1, 2021—prejudices ChemTreat by depriving it of the conclusive answer as to whether Ridley deleted documents from his OneDrive before resigning from Ecolab.

Otherwise, the record on Ridley's alleged deletion of Plaintiffs' documents is closed and the factual evidence—from Plaintiffs' own documents and witnesses—is clear and undisputed, such that the Court can address this issue at the evidentiary sanction stage.[24]

## CONCLUSION

ChemTreat respectfully requests that the Court appoint a special master to oversee, review, and analyze limited additional discovery pursuant to Rule 37(e) consistent with the foregoing.

---

[24] The question of whether Ridley deleted the allegedly misappropriated documents before resigning is distinct from the question of whether Plaintiffs have provided "originals" of those documents because, as the Court's Order notes, Plaintiffs in late July restored to Ridley's OneDrive account any documents deleted by him in the preceding 93 days. Doc. 349 at 6. As such, any loss of those documents between that restoration and when Lieb imaged the OneDrive folder on January 25, 2022, can only be attributable to Plaintiffs, not Ridley. Although Plaintiffs argued at the hearing that Lieb "will testify that he recovered the OneDrive as it existed on July 1, 2021," Ex. 1 at 114:7-8, neither Plaintiffs nor Lieb have explained how that is possible, given Garza's undisputed testimony that Plaintiffs did not image Ridley's OneDrive either before or immediately after Plaintiffs late-July 2021 restoration of all deleted documents, nor did Plaintiffs run any DLP reports that would identify changes to Ridley's OneDrive after July 1, 2021. Ex. 21 at 104:3-17, 136:22-137:9, 140:6-20. As such, there is no way to unwind that restoration and determine the content of "the OneDrive as it existed on July 1, 2021." Ex. 1 at 114:7-8. Only the second laptop could have answered that question, but Plaintiffs spoliated it.

20

DATED:  August 17, 2023                     Respectfully submitted,

                                            /s/  Troy C. Homesley
                                            Vidya Atre Mirmira (admitted *pro hac vice*)
                                            William T. Burke (admitted *pro hac vice*)
                                            Juli Ann Lund (admitted *pro hac vice*)
                                            Troy C. Homesley (admitted *pro hac vice*)
                                            WILLIAMS & CONNOLLY LLP
                                            680 Maine Ave. SW
                                            Washington, DC 20024
                                            Telephone: (202) 434-5000
                                            Facsimile: (202) 434-5029
                                            E-mail:  vmirmira@wc.com
                                            E-mail:  wburke@wc.com
                                            E-mail:  jlund@wc.com
                                            E-mail:  thomesley@wc.com

                                            Kyle W. Eiselstein, Tenn. BPR No. 020727
                                            Zachary H. Greene, Tenn. BPR No. 024451
                                            Erin E. Steelman, Tenn. BPR No. 038463
                                            MILER & MARTIN PLLC
                                            1200 Volunteer Building
                                            832 Georgia Avenue
                                            Chattanooga, Tennessee 37402
                                            Telephone: (423) 756-6600
                                            E-mail:  kyle.eiselstein@millermartin.com
                                            E-mail:  zac.greene@millermartin.com
                                            E-mail:  erin.steelman@millermartin.com

                                            *Attorneys for Defendant ChemTreat, Inc.*

**CERTIFICATE OF SERVICE**

This certifies that a copy of this document was filed electronically with the Clerk of Court by using the Court's CM/ECF system and was served electronically to all counsel of record listed on the CM/ECF filing receipt. Parties may access this filing through the Court's CM/ECF system.

/s/ *Troy C. Homesley*
Troy C. Homesley