```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF TENNESSEE

 3                     CHATTANOOGA DIVISION

 4    ----------------------------------------------------------
                                     :
 5    ECOLAB, INC., et al.,          :
                                     :
 6                 Plaintiffs,       :
                                     :
 7    v.                             :        1:22-CV-50
                                     :
 8    ANTHONY RIDLEY, et al.,        :
                                     :
 9                 Defendants.       :
      ----------------------------------------------------------
10                              Chattanooga, Tennessee
                                August 10, 2023
11
                  BEFORE:  THE HONORABLE TRAVIS R. MCDONOUGH
12                         CHIEF UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14             FOR THE PLAINTIFFS:

15             DAVID J. WALTON
               Fisher & Phillips LLP
16             Two Logan Square
               100 N. 18th Street
17             12th Floor
               Philadelphia, Pennsylvania  19103
18
               PAVNEET SINGH UPPAL
19             Fisher & Phillips LLP
               3200 N. Central Avenue
20             Suite 1550
               Phoenix, Arizona  85012
21
               TED BOEHM
22             Fisher & Phillips LLP
               1230 Peachtree Street, NE
23             Suite 3300
               Atlanta, Georgia  30309
24
25                          MOTION HEARING
```

```
 1   APPEARANCES:  (Continuing)

 2

 3              FOR THE DEFENDANT RIDLEY:

 4              LANCE W. POPE
                Patrick, Beard, Schulman & Jacoway
 5              537 Market Street, Suite 202
                Chattanooga, Tennessee  37402
 6

 7

 8              FOR THE DEFENDANT CHEMTREAT INC.:

 9              JULI ANN LUND
                VIDYA ATRE MIRMIRA
10              Williams & Connolly, LLP
                680 Maine Avenue SW
11              Washington, DC  20024

12              KYLE W. EISELSTEIN
                Miller & Martin
13              832 Georgia Avenue
                1200 Volunteer Building
14              Chattanooga, Tennessee  37402

15

16                            - - -

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  All right, Madam Clerk, call the case,

 2    please.

 3              THE COURTROOM DEPUTY:  Civil Action 1:22-CV-50,

 4    Ecolab, Incorporated, et al., versus Ridley, et al.

 5              THE COURT:  Okay.  Counsel, make appearances, please.

 6              MR. WALTON:  Yes, Your Honor.  This is Dave Walton

 7    from Fisher Phillips for the plaintiffs.

 8              THE COURT:  Mm-hmm.

 9              MR. UPPAL:  Pavneet Singh Uppal, Fisher Phillips.

10              THE COURT:  All right.

11              MR. BOEHM:  Good morning, Judge.  Ted Boehm for the

12    plaintiffs.

13              THE COURT:  Yeah.

14              MR. UPPAL:  Your Honor, with us is our client

15    in-house counsel Kate Middleton, in-house counsel for Ecolab.

16              THE COURT:  Okay.  Good morning.  Welcome.

17              MS. MIDDLETON:  Thank you, Your Honor.

18              THE COURT:  All right.

19              MR. POPE:  Your Honor, I'm Lance Pope --

20              THE COURT:  Yeah.

21              MR. POPE:  -- with Patrick, Beard, Schulman &

22    Jacoway.  I'm here for Mr. Ridley.

23              THE COURT:  All right.

24              MS. LUND:  Good morning, Your Honor.  Juli Ann Lund

25    from Williams & Connolly on behalf of defendant ChemTreat,
```

```
1    Incorporated.
2              MS. MIRMIRA:  Good morning, Your Honor.  Vidya
3    Mirmira from Williams & Connolly, also for ChemTreat.
4              MR. EISELSTEIN:  Good morning, Your Honor.  Kyle
5    Eiselstein, Miller & Martin, also for ChemTreat.
6              THE COURT:  All right.
7              Okay.  So you guys have -- you've run one judge off
8    of this case, Judge Lee.  So we're going to try to keep it to
9    just her.  Hopefully I can survive what's going to happen the
10   next few weeks.
11             Let's -- so we called this hearing, as you know, to
12   talk about sanctions, discovery sanctions under Rule 37.  And
13   what I'd like to do, if we can, is -- and we've got, you know,
14   a couple of hours here.  We don't have to use it all.
15   Hopefully we can be efficient.  But what I'd like to do is
16   hear from each side.  If there's a -- if there's a sanction
17   you're requesting, tell me what it is.  Be specific.  Tell me
18   -- tell me what you're asking for.  Tell me what it's related
19   to, what act of spoliation it's related to, right?  And then
20   -- and then tell me what prejudice it caused and -- and how
21   would your proposed sanction cure that prejudice.
22             Now, that's for the majority of the issues.  I know
23   we still have the issue about Mr. Ridley and whether that's --
24   whether his conduct falls under 37(e)(2) or (e)(1).  We can
25   talk about that, too.  But that's the way I'd like it to go.
```

```
1    And so if -- you know, come up, tell me what you're asking

2    for, tell me why, tell me what it's related to, tell me how it

3    cures the prejudice.  Then I'm going to hear from the other

4    side.  We'll go back and forth.  So should be -- should be a

5    lot of standing and sitting.

6            And we'll get started.  I want to do that, we'll

7    talk about the Special Master idea, we'll talk about what

8    we're going to do after today, because I think we'll have to

9    make a few changes here.

10           So start with the plaintiff.  Who wants to speak for

11   the plaintiff?

12           MR. WALTON:  I'd like to start, Your Honor --

13           THE COURT:  Yes, sir.

14           MR. WALTON:  -- if that's all right.

15           THE COURT:  Yes.  Come on up.

16           (Brief pause.)

17           THE COURT:  Mr. Walton, right?

18           MR. WALTON:  Yes, Your Honor.

19           THE COURT:  Okay.

20           MR. WALTON:  Very nice to meet you.

21           THE COURT:  Yes, sir.

22           MR. WALTON:  And may it please the Court.

23           Based on your comments, Your Honor, I assume that

24   you'd like me to address spoliation motions, not address the

25   motion involving the WD drive and the reopening of discovery?
```

```
 1              THE COURT:  Well, we can -- let's start with --
 2   I really don't care.
 3              MR. WALTON:  Okay.  Sure.
 4              THE COURT:  If you want to talk about the WD drive --
 5              MR. WALTON:  Sure.
 6              THE COURT:  -- first and you want to tell me why it's
 7   intentional and deprived you of that, then I'll hear it.
 8              MR. WALTON:  Sure.
 9              THE COURT:  But I just want to take it one issue at a
10   time.
11              MR. WALTON:  Absolutely.  Well, I mean, there's a --
12   there's a lot of crossover from our standpoint, Your Honor.
13              THE COURT:  Okay.
14              MR. WALTON:  So I'll start with the WD drive issue.
15   That --
16              THE COURT:  Okay.
17              MR. WALTON:  That drive has been wiped.
18              THE COURT:  Yep.
19              MR. WALTON:  In our motion we asked for the computer
20   that was used to wipe the drive.
21              THE COURT:  Right.
22              MR. WALTON:  We asked counsel --
23              THE COURT:  The per- -- the personally owned
24   computer.
25              MR. WALTON:  Yes, sir.
```

```
 1              THE COURT:  Yeah.

 2              MR. WALTON:  Well, we assume it's a personally owned

 3     computer.  After we received Your Honor's order on August 1st,

 4     I asked Mr. Pope if he would tell me what computer was used and

 5     if he imaged it, and he wouldn't tell me.  So I don't know,

 6     standing here --

 7              THE COURT:  All right.  Let's see if he'll tell me.

 8     Let's see if he'll tell me.

 9              Mr. Pope --

10              MR. POPE:  Yes, Your Honor.

11              THE COURT:  -- what are we dealing with?  What --

12     what's the computer?  There had to be -- I assume there had to

13     be a computer to use this hard drive, this external hard drive.

14     So do you know what it was?

15              MR. POPE:  Yes.  I believe it's his wife's laptop,

16     actually.

17              THE COURT:  Okay.  All right.  And tell -- describe

18     it for me.  What is it?

19              MR. POPE:  I believe it's an HP computer, Your Honor.

20              THE COURT:  Okay.

21              MR. POPE:  It's an old laptop that his wife has had

22     for some period of time.

23              THE COURT:  Okay.  And he didn't -- did he -- well,

24     tell me what you know about it.  Did he use it frequently, or

25     just on this one special occasion, or --
```

1          MR. POPE:  No, Your Honor.  It's my understanding

2     that it was his wife's laptop and she used it, he would

3     periodically --

4          THE COURT:  Yeah.

5          MR. POPE:  -- use it as well, not routinely.

6          THE COURT:  Okay.

7          MR. POPE:  Your Honor is well aware that we put in a

8     declaration that talked about Mr. Ridley's interaction with the

9     WD drive.

10          THE COURT:  Right.

11          MR. POPE:  But despite his recollection that he

12     believed that he used the CCleaner program from a different

13     laptop, we believe that it's his wife's laptop --

14          THE COURT:  Okay.

15          MR. POPE:  -- and that was connected to that computer

16     from, I think, February the 12th through February the 14th,

17     which means that was the -- that was the computer that --

18          THE COURT:  Okay.

19          MR. POPE:  -- was used to wipe the drive.

20          THE COURT:  And where is the computer now?

21          MR. POPE:  The computer is -- they still have it.

22     It's in their possession.

23          THE COURT:  All right.

24          MR. POPE:  After I got the Court's order, I of course

25     asked them to set it aside so that it would be preserved.

```
 1              THE COURT:  Okay.
 2              MR. POPE:  Early in the case we had just an image
 3  taken of the computer, Your Honor.
 4              THE COURT:  Okay.
 5              MR. POPE:  That image, I believe, was conducted on
 6  April -- around April the 16th of 2022, right at the beginning
 7  of discovery.  So there would be a -- be a image from after --
 8  from later than when the allegation is that he ran the
 9  CCleaner program --
10              THE COURT:  Is that -- is that a year, or is that
11  just two months?  I can't -- is it --
12              MR. POPE:  Two months.
13              THE COURT:  Two months, yeah.  Okay.
14              MR. POPE:  Two months, yeah.  Yes, Your Honor.
15              THE COURT:  All right.  So was anything produced from
16  that computer?  Did you search that computer?
17              MR. POPE:  Nothing was produced from the computer,
18  no.
19              THE COURT:  Okay.
20              All right, Mr. Walton, does that help?
21              MR. WALTON:  Yes, sir.  Thank you very much.
22              So we would like to have an image of I think the
23  April 2022 image that Mr. Pope referred to, and we would also
24  like the opportunity to take a current -- to take a current
25  image.  That's pretty standard under a forensic protocol.
```

```
 1           THE COURT:  Okay.

 2           MR. WALTON:  Now, if the Court feels more comfortable

 3  doing that with us working through a Special Master, we have no

 4  objection to that.

 5           THE COURT:  Why do you need -- why do you need two

 6  images?  Why wouldn't you want the --

 7           MR. WALTON:  Excuse me?

 8           THE COURT:  Why wouldn't you want the 2022 image?

 9  Why is that not enough?

10           MR. WALTON:  Because we want to see if there's

11  anything else that's been added to it since 2022, if there's

12  been any other Nalco files that have been added to it since

13  2022, if there's any other thing that might be relevant to this

14  case that's been added to it since 2022, because in this

15  matter, Your Honor, there's a lot of USB drives floating around

16  that aren't accounted for.

17           THE COURT:  Yeah.  Well, we've got to stop somewhere,

18  though, right?

19           MR. WALTON:  Yes, sir.

20           THE COURT:  I mean, he probably went to the library,

21  too, and clicked around on the -- on the internet.  We can't --

22  you're not going to get those.

23           MR. WALTON:  Oh, yeah.  But I'm -- but I'm not asking

24  for that.  I mean, he --

25           THE COURT:  Yeah.
```

1    MR. WALTON:  -- he hasn't been truthful about his

2  wife's computer from the beginning and there has to be a reason

3  and he's been trying to hide it.

4    THE COURT:  Mm-hmm.

5    MR. WALTON:  And it took us until this point, five

6  minutes ago, to find out that he used his wife's computer to do

7  this.  He previously denied in request for admissions he had a

8  personal computer.  In his deposition he said he never used his

9  wife's computer for any Nalco or Ecolab documents.  And so

10  we -- in order to protect my client, Your Honor, we have to

11  cast a wide net but not as wide as -- as a library, as the

12  internet and everything else.

13    THE COURT:  Okay.  All right.  Go ahead.

14    MR. WALTON:  Okay.  And we brought our forensic

15  examiner here, Mr. Lieb, in case Your Honor wanted to ask him

16  any questions.

17    THE COURT:  Okay.

18    MR. WALTON:  And I believe he would tell you from a

19  forensic standpoint he would want the image of the image and

20  the new image.

21    THE COURT:  Okay.

22    MR. WALTON:  Okay?

23    THE COURT:  All right.  So let me -- let me hear

24  from -- is that about all you have on that issue?

25    MR. WALTON:  Yes, sir.

```
 1              THE COURT:  That's really -- we've already skipped

 2   over a little bit, probably, to what the Special Master might

 3   be charged with, but that's okay.  So let me hear from the

 4   defendants.

 5              Who wants to -- who wants to start?

 6              MR. POPE:  Sure.  I'm happy to start, Your Honor.

 7              THE COURT:  Yeah.  Come on up.

 8              (Brief pause.)

 9              MR. POPE:  So I think the order that you mentioned is

10   related to the sanctions under Rule 37.

11              THE COURT:  Mm-hmm.

12              MR. POPE:  We of course filed a request for sanctions

13   against the plaintiffs --

14              THE COURT:  Yep.

15              MR. POPE:  -- related to their failure to preserve

16   the LaCie drive and Mr. Ridley's --

17              THE COURT:  Is that how you say it?  LaCie?  Is

18   that --

19              MR. POPE:  It's been called the LaCie drive.

20              THE COURT:  Okay.

21              MR. POPE:  It's been called the LaCie drive.  I don't

22   know that anyone's sure about it.  But I call it the LaCie

23   drive, Your Honor.

24              THE COURT:  Okay.

25              MR. POPE:  And so you'll recall, Judge, the case --
```

```
 1              THE COURT:  Mr. Lieb may know how to say it.

 2              (To Mr. Lieb)  How do you say it?

 3              MR. LIEB:  I say LaCie.

 4              THE COURT:  LaCie?  Okay.  That's what I had in my

 5    head at least.  So I guessed right, I guess.

 6              (To Mr. Pope)  Go ahead.

 7              MR. POPE:  The case started, Your Honor, in --

 8    I guess really in February of 2022 when the plaintiffs sent my

 9    client and ChemTreat a demand letter.

10              THE COURT:  Yep.

11              MR. POPE:  First time they'd heard from Ecolab since

12    Mr. Ridley resigned on July 1st of 2021.  And then a short

13    period of time attempting to exchange some information.  And

14    then in March of 2022 the plaintiffs filed their first version

15    of the complaint.

16              THE COURT:  Right.

17              MR. POPE:  And it squarely focused on the LaCie drive

18    and all of these what they allege to be download sessions to

19    the LaCie drive, 16,000 files referenced on the DLP report

20    where they allege that Mr. Ridley deleted files off the

21    corporate OneDrive, transferred them to the LaCie drive, and

22    took them with him to ChemTreat to use in competition with

23    plaintiffs.

24              From the very beginning Mr. Ridley has advised the

25    plaintiffs that he returned the LaCie drive when he left.  He
```

1    produced -- we have produced communications with his

2    supervisor, Jackie Herrera, where he reached out to her --

3            THE COURT:  What's the name, again?

4            MR. POPE:  Jackie Herrera.

5            THE COURT:  Herrera.

6            MR. POPE:  Yes, sir.

7            THE COURT:  Okay.

8            MR. POPE:  -- where he reached out and said, "Will

9    you send me a shipping label where I can send my computer and

10   accessories?"

11           She did that.  He returned them.  And months into

12   the case we received a subpoena response from the plaintiff's

13   IT provider --

14           THE COURT:  Mm-hmm.

15           MR. POPE:  -- that indicated they received a computer

16   and the LaCie drive.

17           THE COURT:  Right.  But I think what Mr. Walton was

18   really -- what we're focused on so far—and we'll get to your

19   request—is the WD drive, right?

20           Isn't that right, Mr. Walton?

21           MR. WALTON:  Yes, Your Honor.

22           THE COURT:  So let's talk about -- so he -- he -- the

23   only thing I heard -- I didn't hear, really, a request -- the

24   only sanctions request I heard was, "We want two images."  So

25   what do you say about that?

```
 1              MR. POPE:  Right.

 2              THE COURT:  Two images of the -- the wife's computer.

 3              MR. POPE:  Okay.  So --

 4              THE COURT:  So how does that -- is this -- I didn't

 5    hear Mr. Walton say -- ask for anything, really, under

 6    37(e)(2).  What I hear him asking for is a sanction that would

 7    fall under (e)(1).  So how do you feel about the images?

 8              MR. POPE:  Yes, Your Honor.  And I -- we advised the

 9    Court in our response to the plaintiff's motion for sanctions

10    that there is certainly a category of information that is

11    missing from the WD drive, from the last time that he deleted

12    files from the WD drive to the time that the cleaner program

13    was run.

14              THE COURT:  Mm-hmm.

15              MR. POPE:  And it seems appropriate for the Court to

16    allow additional discovery as it relates to that category of

17    information.  And so the plaintiffs' request for an image of

18    the drive from the one that we took from April of 2022, to run

19    some searches on that, seems appropriate, Your Honor.

20              THE COURT:  Okay.

21              MR. POPE:  And so I think really the focus should be

22    on what the search would be about.  But --

23              THE COURT:  So why don't they already have it?

24    What -- why are we here in August and they haven't -- you said

25    you didn't give them any discovery from the image and they have
```

1   not had access to the image.  Why not?

2           MR. POPE:  Well, so the discovery request,

3   Your Honor, requested documents, Nalco and Ecolab documents.

4           THE COURT:  Mm-hmm.

5           MR. POPE:  And there was never a request for any

6   inspection of a device --

7           THE COURT:  Okay.

8           MR. POPE:  -- until late in the discovery period.

9   And the plaintiff's inspection request included many, many,

10  many devices other than the WD drive and other than the wife's

11  laptop, which --

12          THE COURT:  But that was, like, what, December or

13  something, right?

14          MR. POPE:  No, Your Honor.

15          THE COURT:  A few months ago, right?

16          MR. POPE:  No.  It was in -- as I re- -- I'll have to

17  look, but, as I recall, it was in, I think, February of --

18          THE COURT:  Oh, right before discovery?  Yep.

19          MR. POPE:  -- right before discovery closed --

20          THE COURT:  Yep.

21          MR. POPE:  -- that's right.

22          THE COURT:  Yep.  That's right.

23          MR. POPE:  We objected.  And then after we objected,

24  we engaged in a meet-and-confer about what we would agree to

25  exchange but not this -- not every single document that was

```
 1    in -- or device or cloud storage program and all of that that

 2    was in Mr. Ridley's orbit.

 3              THE COURT:  Right.  But my question is, under these

 4    lights you say it's reasonable to give them this -- this image.

 5              MR. POPE:  (Moving head up and down.)

 6              THE COURT:  It's August.  What are we doing?  Why

 7    take so long?  Why -- if a piece of what you have is

 8    reasonable, why don't they have it?  Why didn't we make more

 9    progress?  Why do we have to, you know, have a donnybrook every

10    time anybody has a little disagreement?

11              MR. POPE:  Right.  Well, I understand, Your Honor.

12    I think it's -- I think it's important for the Court to keep in

13    context where -- what happened by way of discovery.

14              We received discovery requests and then we worked to

15    produce documents responsive to the discovery requests and so

16    part of that inquiry was whether there were documents on these

17    devices that were responsive to the discovery requests.

18              THE COURT:  Mm-hmm.

19              MR. POPE:  What we're talking about now are not

20    documents, it's forensic artifacts and proof of --

21              THE COURT:  I know, but they asked for them five or

22    six months ago, right?  And you're -- and you're telling me

23    today that it -- "Yeah, it makes sense.  We'll give it to

24    them."  And so I'm wondering what -- what have we been doing

25    for -- it's a rhetorical question.  I'm not trying to -- I've
```

1   made my point.  What -- so --

2            All right, Mr. Walton, sounds --

3            (To Mr. Pope)  Okay.  So what about the second

4   image, a newer image?  I'm not sure I -- how I feel about

5   that, but what's your position on that?

6            MR. POPE:  Your Honor, I -- Mr. Ridley's wife's

7   laptop is set aside.  I think if they want to take a subsequent

8   image of the laptop, they're more than -- I don't know that

9   there's any additional value to the case --

10           THE COURT:  Yeah.

11           MR. POPE:  -- but I don't -- given the way the proof

12  has developed, Mr. Ridley is not going to object to the

13  plaintiffs' looking at an additional image of his wife's

14  laptop --

15           THE COURT:  Okay.

16           MR. POPE:  -- if the image from April of 2022 is not

17  sufficient.

18           THE COURT:  All right.  So we've made a little

19  progress, then.

20           Mr. Walton --

21           (To Ms. Lund)  Or do you want to be heard on this

22  issue?  On the wife's laptop?

23           MS. LUND:  If I can, Your Honor.

24           THE COURT:  Okay.  Come on up, Ms. Lund.

25           (Brief pause.)

```
1          MS. LUND:  Your Honor, we understand the Court's

2    ruling to reflect that it has already determined it's

3    appropriate to permit a limited inquiry into this evidentiary

4    gap with regard to how the WD drive interacted with

5    Mr. Ridley's wife's laptop.

6          THE COURT:  Mm-hmm.

7          MS. VARNELL:  And so the question is, what is the

8    best means to do that.  ChemTreat believes that a Special

9    Master is appropriate.  We think given the unfortunate history

10   of the parties' inability to reach compromises --

11         THE COURT:  I think Mr. Walton is -- I don't think

12   anybody's disagreeing with that, right?

13         MS. LUND:  Right.  Well, and I think that an issue

14   that neither Mr. Walton nor Mr. Pope have touched upon is the

15   question of what else could be on this image.  And our concern

16   with regard to ChemTreat is twofold.  This is a known/unknown.

17   We don't know what's on that laptop.  We didn't realize it had

18   been used.  What we do know is that for a while Mr. Ridley, as

19   an employee of ChemTreat, was within the corporate privilege.

20   And there may be privileged communications that he put --

21         THE COURT:  Okay.

22         MS. LUND:  -- onto that laptop, we don't know.  We

23   also know that Mr. Ridley had access to, you know, highly

24   confidential, potentially trade-secret material that we have

25   designated AEO in this case, attorneys' eyes only.  Again, we
```

```
 1    don't know if there's any material such as that that's on the
 2    laptop.  And we do not want a direct forensic image of
 3    everything that's on that laptop, which could include attorney
 4    confidences, could include attorneys' eyes only material,
 5    directly provided to the plaintiffs.  And --
 6            THE COURT:  No, I understand.  What I'm -- so just to
 7    be clear, my -- and I can be moved from this, but my -- my
 8    starting point is Special Master who is charged with doing
 9    things, looking for things, filtering things --
10            MS. LUND:  (Moving head up and down.)
11            THE COURT:  -- and then it comes to me, and then if
12    it's appropriate to share, we'll share.  So I understand that.
13    And --
14            MS. LUND:  (Moving head up and down.)
15            THE COURT:  -- I was more worried about personal
16    content than --
17            MS. LUND:  Right.
18            THE COURT:  -- than -- I didn't know that was a
19    possibility.  So thank you for --
20            MS. LUND:  Right.
21            THE COURT:  Yeah.
22            MS. LUND:  And of course, Your Honor, that's a
23    possibility, too, as you said.  And I think that we were
24    viewing your court's order in the same way that you have just
25    articulated, which is that -- a way of pulling the parties out
```

```
1    of what seems to be, you know, an endless return of litigation

2    and of disputes between the experts as to what forensic

3    artifacts mean and so on is to charge the Special Master with

4    that first level of searching, of review, of analysis.

5                THE COURT:  Mm-hmm.

6                MS. LUND:  And then the only thing that we request in

7    addition to that is what whatever materials go to the

8    plaintiffs or Mr. Ridley, that ChemTreat have equal access to

9    any forensic images, documents, and artifacts.

10               THE COURT:  Yep.  Yeah.  Yeah.  Okay.  All right.

11               MS. LUND:  Thank you, Your Honor.

12               THE COURT:  Thank you.

13               Mr. Walton, what's --

14               MR. WALTON:  I'd first like to --

15               THE COURT:  -- let's see if we can put a bow on this

16   issue.

17               MR. WALTON:  Yeah.  The first thing I'd like to do,

18   Your Honor, is, I think I inadvertently misled the Court.  My

19   understanding of the Court's order said that we would

20   potentially get access to the computer that was used to wipe

21   the WD drive, to determine -- and then determine whether

22   sanctions under 37(b)(2) are warranted.  So I guess the way

23   I see this, Your Honor, it's like following a string of

24   breadcrumbs.  So the --

25               THE COURT:  Okay.
```

```
 1              MR. WALTON:  So I want to reserve --

 2              THE COURT:  You've not backed off that.  You've --

 3              MR. WALTON:  Okay.

 4              THE COURT:  You're not there.  I mean --

 5              MR. WALTON:  Yes, Your Honor.

 6              THE COURT:  Okay.  That's fine.  I understand.

 7              MR. WALTON:  Exactly.  Exactly.

 8              THE COURT:  I understand.  Okay.  So --

 9              MR. WALTON:  And --

10              THE COURT:  -- so have we solved that issue, the

11    issue with the personal --

12              MR. WALTON:  Yes.  I think, Your Honor.  But I have

13    one question for the Court --

14              THE COURT:  All right.

15              MR. WALTON:  -- if I may.

16              THE COURT:  Okay.

17              MR. WALTON:  When you say "Special" -- when the Court

18    says "Special Master," Your Honor, are you thinking about

19    hiring a lawyer as the Special Master and then having that

20    lawyer bring in a third-party forensic expert, or are you --

21              THE COURT:  Yes.

22              MR. WALTON:  Okay.  All right.  So my suggestion is,

23    is that whomever's hired as the Special Master brings in the

24    third party, that then the parties work with the Special Master

25    to negotiate a protocol, and we don't have to get into all
```

```
 1    those specifics right now.

 2            THE COURT:  No, I -- absolutely.

 3            MR. WALTON:  Okay.

 4            THE COURT:  I mean, I -- you know, I'll get involved

 5    if I have to, but I hope I don't have to.  So...

 6            MR. WALTON:  Okay.  All right.  And then we still

 7    have the right -- I just want to make sure -- we still have the

 8    right to seek 37(b) -- (e)(2) sanctions on down the road.

 9            THE COURT:  Sure.

10            MR. WALTON:  Okay.  All right.  And so that, I think,

11    closes the issue on the WD drive, at least --

12            THE COURT:  Well, now, okay, so is there -- but is

13    there anything else you're asking -- okay, is there anything

14    under (e)(1) you want to talk about today with regard to the WD

15    drive?  Is there something --

16            MR. WALTON:  To the WD drive, yes.  I think the only

17    thing that we would ask for, Your Honor, is, if he has any

18    other drives or computers or an iPad that he ever used either

19    to connect to his ChemTreat computer or to touch a Nalco file,

20    we would like to get images of those, too.

21            THE COURT:  Okay.

22            MR. WALTON:  We -- we do know he had an iPad --

23            THE COURT:  But there's been discovery requests about

24    that, and I assume they've been answered, right?  I mean, has

25    he essentially asked you what he just asked, in discovery?
```

```
1              MR. POPE:  Yes, Your Honor.

2              THE COURT:  And you've answered that?

3              MR. POPE:  Yes, I have.

4              THE COURT:  And the only thing in play is this one

5    personal computer?  This one?

6              MR. POPE:  Yes, that's correct.

7              MR. WALTON:  Well, and this is where we have a point

8    of disagreement, Your Honor, is that we do know from their

9    CrowdStrike logs that he attached a -- his iPad to his

10   ChemTreat computer.  So we -- so we do know that connection was

11   made.  There are several other USB drives that are unaccounted

12   for.  If he says he doesn't have them, I have to take him at

13   his word.  But we do know that there is an iPad he did connect

14   to his ChemTreat computer, and we would like to have that

15   searched as well with the Special Master.

16             THE COURT:  Okay.  What about that, Mr. Pope?

17             MR. POPE:  Your Honor, of course this has not been

18   subject to any motion that's before the Court.

19             THE COURT:  Okay.

20             MR. POPE:  Mr. Walton made a discovery request about

21   this, a request to inspect.  The -- we objected to this based

22   on the fact that whether it was included in his motion or not,

23   it wasn't included in the list of devices originally, and --

24             THE COURT:  In what list of devices?

25             MR. POPE:  In the original request to inspect, the
```

 1   iPad was not included in that.  Then in a subsequent motion, as

 2   I recall, Mr. Walton asked to compel the inspection of that

 3   device, but it was never included in his request to inspect.

 4   We objected to it, in the -- in the briefing.

 5          THE COURT:  Well, I guess the question at this point,

 6   though, is, why does it not make sense as a -- as a sanction to

 7   include it?

 8          MR. POPE:  Well, a couple of reasons.  Mr. Walton's

 9   reference to it being connected to the CrowdStrike computer --

10   several things could have been connected to the ChemTreat

11   computer and show up in the CrowdStrike report.  But there's no

12   information at all in the CrowdStrike report that any Nalco or

13   Ecolab file was ever accessed from the iPad.

14          And as I recall the testimony, Your Honor, there is

15   no evidence whatsoever that the connection that was made to

16   the ChemTreat computer would have even allowed a document

17   transfer to occur.  You know, people plug up their laptops --

18   their iPads to laptops all the time, to charge them or

19   whatever.  There is just -- there's no evidence to support any

20   sort of inspection of Mr. Ridley's iPad.  There's no evidence

21   that I'm aware of in the record anywhere that any device was

22   accessed or transferred from the iPad.

23          THE COURT:  Well, let me ask you this way,

24   Mr. Walton.  What does -- here's my very oversimplified

25   understanding of what --

```
 1              MR. WALTON:  Sure.

 2              THE COURT:  -- where we are because of spoliation,

 3    right?  We have trouble knowing what Mr. Ridley took, because

 4    of shortcomings on your side of the v, right?  And we have

 5    trouble knowing what Mr. Ridley did with whatever he took,

 6    because of shortcomings over here.  (Indicating.)

 7              We -- what are you going to gain from the iPad?

 8              MR. WALTON:  Okay.  Sure.  First of all, on the LaCie

 9    drive, we do know what he downloaded --

10              THE COURT:  Right.

11              MR. WALTON:  -- from the DLP report, data loss

12    prevention report.  Okay?  What we don't know is what happened

13    to the LaCie drive afterwards.  Okay?

14              THE COURT:  Right.

15              MR. WALTON:  The WD drive --

16              THE COURT:  But you know -- but here is my point.

17              MR. WALTON:  Sure.  Yeah.

18              THE COURT:  You know -- according to your theory --

19              MR. WALTON:  Yes.

20              THE COURT:  -- you know he had things that you didn't

21    want him to have.

22              MR. WALTON:  Yes.

23              THE COURT:  And so whether it was on an iPad or on

24    the LaCie drive, I mean, that -- you say you know that he had

25    things.
```

```
1              MR. WALTON:  Yes, sir.

2              THE COURT:  So isn't at that point what's important

3    to figure out what he did with them, how he used them --

4              MR. WALTON:  Exactly.  What --

5              THE COURT:  -- how he shared them?

6              MR. WALTON:  And, Your Honor --

7              THE COURT:  So if he's just copying them in a circle

8    on every digital device he has, who cares, right?

9              MR. WALTON:  Exactly.

10             THE COURT:  What I think you ought to be more

11   interested in is whether he disseminated it, right?

12             MR. WALTON:  Exactly right.  And the iPad is a way --

13             THE COURT:  But the iPad is just his.

14             MR. WALTON:  Well, it's his, but it's also a way to

15   disseminate that information.

16             THE COURT:  It is.  But if you go and look at places

17   where the information would almost certainly have been

18   disseminated to if it were any benefit to ChemTreat, right --

19             MR. WALTON:  Mm-hmm.

20             THE COURT:  -- doesn't matter where it came from,

21   it's either there or it's not there, right?

22             MR. WALTON:  Exactly right, Your Honor.  But you've

23   got to backtrack a little bit to say, "Okay, what do we do

24   have?" so that we can find the breadcrumbs to track it.  Okay?

25             And so I understand what you're saying is, "Why
```

```
 1   don't you go to the end repository and look there?"

 2           THE COURT:  Mm-hmm.

 3           MR. WALTON:  Well, there could be a thousand end

 4   repositories.  And the way forensically to figure out which end

 5   repositories you should focus on is to follow the trail of

 6   breadcrumbs that you have, which includes the iPad.

 7           Plus, we have a disagreement that -- of -- Mr. Lieb

 8   has found that Mr. Ridley had his own cloud-based OneDrive

 9   account.  Mr. Ridley denies that.  The iPad might show

10   evidence of that.

11           THE COURT:  Mm-hmm.

12           MR. WALTON:  So I suggest, respectfully, that this

13   could be something that the Special Master deals with.

14           THE COURT:  But all this, everything you just said,

15   doesn't amount to much unless -- at this point in the

16   litigation --

17           MR. WALTON:  Yeah.

18           THE COURT:  -- unless it gets somewhere else within

19   ChemTreat, right?

20           MR. WALTON:  Yeah.  But it could be --

21           THE COURT:  So why don't we start there?  Why don't

22   we -- why don't we start at the end?

23           MR. WALTON:  Because then what we're going to have to

24   do—and that's going to be part of our request against

25   ChemTreat—is grab all the local hard drives for the 12
```

```
 1   custodians that they picked --

 2              THE COURT:  Mm-hmm.

 3              MR. WALTON:  -- and start to search all those.  Okay?

 4   And that's a massive undertaking.

 5              THE COURT:  I don't know that it is.

 6              MR. WALTON:  It --

 7              THE COURT:  I mean --

 8              MR. WALTON:  Well, it might not -- it might not be

 9   that big, but these people also have their own personal

10   stuff --

11              THE COURT:  Yeah, but come on --

12              MR. WALTON:  -- you know, and so --

13              THE COURT:  -- I mean, we -- we're -- hm-mmm, not

14   yet, not yet.

15              MR. WALTON:  We can start chasing down rabbit holes

16   here easily --

17              THE COURT:  That's what we're not going to do.

18              MR. WALTON:  -- easily.  And so that's why I said

19   that the iPad, if you follow the breadcrumb trail, it -- if you

20   follow the trail, it helps you stop chasing down the rabbit

21   holes.

22              Now, if you want to give us --

23              THE COURT:  But you don't really care -- you don't

24   care what device it came from if it's on another device --

25              MR. WALTON:  Yeah --
```

```
 1              THE COURT:  -- at ChemTreat --

 2              MR. WALTON:  Yeah.  That's true.  That's --

 3              THE COURT:  -- right?  So why -- I mean, yeah, it may

 4    be --

 5              MR. WALTON:  That's true.

 6              THE COURT:  -- an interesting academic exercise, or

 7    it -- or maybe, you know, if you find some -- some other

 8    evidence, you know, at the end of the line, there might -- I

 9    can't manage what it would be --

10              MR. WALTON:  Yeah.

11              THE COURT:  -- there may be a reason to come back and

12    look.  But I don't see that it adds much at this point.

13              MR. WALTON:  Well, here's where I slightly disagree,

14    respectfully, with the Court.  Okay?

15              THE COURT:  Mm-hmm.

16              MR. WALTON:  We might find on the iPad, for example,

17    that Clay Cissell has a personal Dropbox account and Ridley was

18    sending stuff to Clay Cissell's personal Dropbox account and

19    the only way he was doing that was through his iPad.  Okay?

20    And there would be no other way that we could find it.  So

21    that's why we would want access to the iPad, just to see --

22              THE COURT:  Well, it may -- but you asked him about

23    this, right?  I mean, you asked other people about this, didn't

24    you?

25              MR. WALTON:  Yeah, but they all deny it.  But, you
```

```
 1    know, I don't want to rip Mr. Ridley's credibility here, but

 2    we've had a lot of problems with his credibility.

 3              THE COURT:  I mean, even -- even setting aside his

 4    credibility, you asked other sources about that, I'm sure,

 5    right?

 6              MR. WALTON:  Well, we asked Clay Cissell, and they

 7    all deny it.  But there's been a lot of denials, Your Honor,

 8    that we've chased down and have proven that they were false

 9    denials.

10              And so the iPad, I think, as compared to the WD

11    drive, it is a small piece, but because it was connected to

12    the ChemTreat computer, we think that's enough to get -- to

13    get us access to it.

14              THE COURT:  Okay.  All right.  I hear you.  Let's--

15    All right.  Does that take care of sanctions other than

16    possible (e)(2) issues related to the WD drive?

17              MR. WALTON:  Yes, Your Honor.

18              THE COURT:  Okay.  What do you want to talk about

19    next?

20              MR. WALTON:  Well, I think we want to talk about the

21    spoliation of the Chem- -- of Ridley's ChemTreat computer and

22    what we can ask for for that.  I think Your Honor has already

23    ruled that that's 37(e)(1) sanctions.

24              THE COURT:  Right.  Mm-hmm.  Hang on just a second.

25              (Brief pause.)
```

```
 1                THE COURT:  All right.  Let's talk about the

 2   ChemTreat laptop.

 3                MR. WALTON:  All right.

 4                THE COURT:  Anything else from over here on -- to --

 5                MS. LUND:  No, Your Honor.

 6                THE COURT:  -- wrap it up?

 7                (To Mr. Walton)  Okay.  Go ahead.

 8                MR. WALTON:  Just a brief background.  The ChemTreat

 9   laptop was wiped about two or three weeks after they received

10   our preservation notice.  I -- Your Honor's already found that

11   it was -- it was negligence under 37(e)(1).

12                THE COURT:  Mm-hmm.

13                MR. WALTON:  So the first thing that we were going to

14   ask for was access to the WD drive, which we've already talked

15   about.  Second thing was access to these data repositories that

16   were searched by Jim Vaughn which were -- which are now subject

17   to an objection that we had to Judge Lee's ruling on the motion

18   to compel access to those data repositories.

19                THE COURT:  What was the subject of the --

20                MR. WALTON:  Sure.  It was a motion to compel the --

21   that we get access to the data repositories that were searched

22   by their expert.  And that's up in front of Your Honor on the

23   objection from an order from Judge Lee.

24                THE COURT:  Give me a minute.

25                MR. WALTON:  Sure.
```

```
 1              (Brief pause.)

 2         THE COURT:  We may have to take a break.  My

 3  computer's not charging.

 4         MR. WALTON:  Okay.

 5         THE COURT:  Okay.  All right.  Start over,

 6  Mr. Walton.  I got distracted.  I apologize.

 7         MR. WALTON:  Yeah, sure.  And so there is a -- so

 8  there's these data repositories that their forensic expert Jim

 9  Vaughn searched.  And it includes --

10         THE COURT:  Mm-hmm.

11         MR. WALTON:  -- some e-mails and some OneDrive

12  accounts.  And he searched them, and he opines that he didn't

13  find any Nalco or Ecolab documents in there.

14         THE COURT:  Right.

15         MR. WALTON:  And so we, from a commonsense

16  standpoint, just wanted to get access -- if he's going to

17  testify to that, we think we should have access to the same

18  repositories.

19         THE COURT:  Right.  This is -- this is your Rule 26

20  disclosure --

21         MR. WALTON:  Yes.

22         THE COURT:  -- motion.

23         MR. WALTON:  Yes.

24         THE COURT:  Okay.

25         MR. WALTON:  And so this is something, if you have a
```

 1    Special Master, I think it would be perfect for a Special

 2    Master for, because I'm sure counsel's going to stand up and

 3    say that they have deep privacy concerns, and I understand

 4    that.  So I think this is something that we can work out in

 5    terms of the access with the Special Master.

 6           Now, what we've also asked for as part of that,

 7    Your Honor, is also the local hard drives, to the extent

 8    they've been preserved, of the 12 custodians that they picked,

 9    because what their expert did is, he searched their OneDrive

10    using very specific search terms, not general terms, very,

11    very specific terms, and he did not search their local hard

12    drives.

13           Now, we have had testimony from at least one

14    high-ranking executive witness who --

15           THE COURT:  Let me ask, is that accurate, the way

16    that was described, Ms. Lund?

17           MS. LUND:  Well, Your Honor, I'm taken aback,

18    honestly, because this is not an issue they raised.  And

19    they've known since we filed our ESI report on February 13th of

20    this year that the custodians' hard drives were not searched by

21    counsel.  Mr. Vaughn is really separate.  As I understand

22    Rule 37, we're focusing on what counsel did.

23           But with regard to his request for the custodians'

24    hard drives, I'm -- I'm sort of caught flatfooted, because

25    that's just not something that they had asked for in discovery

1  at all, or with regard to their sanctions motion, and it's --

2  it's obviously not connected to Mr. Ridley's laptop, which is

3  the only issue for which the Court has found ChemTreat

4  spoliated evidence.

5         THE COURT:  Well, okay.  Let me -- let me try to --

6  let me offer this.  What I think the theory is is that if -- if

7  we had the ChemTreat computer that Mr. Ridley used, then it --

8  we would be able to look at it and see whether there's evidence

9  that he shared data with others at ChemTreat, right?

10         MR. WALTON:  Yes.

11         THE COURT:  And since we don't have that and we have

12  to go look at the potential recipients, which you -- which you

13  guys did, Mr. Vaughn did, to some extent, what -- my question

14  is, was it only OneDrive that you searched?

15         MS. LUND:  No, Your Honor.  To be clear, both

16  Mr. Vaughn and counsel, in response to the extensive discovery

17  requests that plaintiffs served, searched Mr. Ridley's entire

18  ChemTreat e-mail account and his entire ChemTreat OneDrive

19  account.

20         THE COURT:  Right.

21         MS. LUND:  Mr. Vaughn searched specifically for the

22  broad terms Nalco and Ecolab --

23         THE COURT:  Right.

24         MS. LUND:  -- across all of that.  All of those hits

25  were produced to plaintiffs.  It was 2023 hits.

```
 1              THE COURT:  And what was he -- where was he

 2    searching?

 3              MS. LUND:  Through all of Mr. Ridley's e-mail --

 4              THE COURT:  Yeah.

 5              MS. LUND:  -- and all of Mr. Ridley's OneDrive in

 6    full.

 7              THE COURT:  Right.  But then he also searched other

 8    repositories, so --

 9              MS. LUND:  Yes.  And, Your Honor, I actually have a

10    demonstrative that I think would show these various accounts,

11    the repositories, and --

12              THE COURT:  Okay.  Yeah.  Let me --

13              MS. LUND:  -- who searched them, if that would be

14    helpful.

15              THE COURT:  Yeah.  Let me see it.

16              MS. LUND:  I can use the Elmo.

17              THE COURT:  Sure.  Or is it on your -- oh, it's

18    paper?

19              MS. LUND:  Yeah.

20              THE COURT:  Okay.  Yeah.  Go ahead.

21              MS. LUND:  And actually Ms. Mirmira has hard copies

22    she can distribute to everybody so --

23              MR. WALTON:  Can I see it first, Your Honor?

24              THE COURT:  Sure.

25              (Brief pause.)
```

```
 1              MR. WALTON:  Can I keep this as an exhibit?

 2              MS. LUND:  Yes.  We have hard copies --

 3              MR. WALTON:  Okay.

 4              MS. LUND:  -- as well as putting it on the Elmo.

 5              MS. MIRMIRA:  Your Honor, may I approach to give you

 6  a hard copy?

 7              THE COURT:  Mm-hmm.  Thank you.

 8              MS. LUND:  And, Your Honor, I don't know if there is

 9  something that needs to turn on the monitors.  Everything is

10  on --

11              THE COURT:  Ms. Hinton is working on it, I think.

12              (Brief pause.)

13              THE COURT:  Still having issues?

14              MS. LUND:  We have -- I think since everybody has a

15  hard copy --

16              THE COURT:  That's fine, yep.

17              MS. LUND:  -- we can just proceed with that.

18              So essentially you can see here we've tried to

19  visually represent what these repositories are and how the

20  flow of information connects to the laptop from which the ESI

21  was lost, and you'll see that's at the top of the pyramid.  It

22  was in Mr. Ridley's possession from July 12th of 2021 through

23  February 20th of 2022.  So that's time the time period we're

24  focused on, because the purpose of Rule 37, obviously, is to

25  have measures no greater than to remedy the prejudice.
```

```
 1            And so then the question is, what is the potential

 2   prejudice that was suffered here.  And as Your Honor found,

 3   the question is, what, if anything, Mr. Ridley did with files

 4   that -- after he took them, allegedly, from plaintiffs.  And

 5   we don't know whether they were stored on his laptop, but we

 6   do know that there are only a very limited number of ways that

 7   any information could flow from that laptop out into the wider

 8   ChemTreat system.

 9            THE COURT:  Mm-hmm.

10            MS. LUND:  And so you'll see one of those ways is

11   ChemTreat's e-mail that was searched by counsel and by

12   Mr. Vaughn.

13            THE COURT:  So let me -- just to make sure

14   I understand --

15            MS. LUND:  Yes.

16            THE COURT:  -- anything on here with the blue circle

17   is what -- no.  Tell -- did you search everything on here --

18   represented on here?

19            MS. LUND:  So if you can see, everything that has a

20   blue circle was searched by ChemTreat's counsel in the course

21   of discovery.

22            THE COURT:  Okay.

23            MS. LUND:  And we detailed the kinds of searches that

24   we did in our ESI report, which is Docket Entry 143.

25            THE COURT:  Yep.
```

1    MS. LUND:  Everything with a red circle was searched

2    by Mr. Vaughn.  So you'll see sometimes there's an overlap

3    where both Mr. Vaughn and counsel searched a particular thing.

4        And then there are several repositories that were

5    not searched by ChemTreat's counsel or Mr. Vaughn because they

6    are not in ChemTreat's possession.  Those are Ridley's

7    personal e-mail account and text messages that Mr. Ridley sent

8    to certain key custodians, the three people in his chain of

9    contain, who were deposed by plaintiffs, as well as Tyler

10   Bates, who Your Honor knows features in plaintiffs'

11   allegations with regard to their common law state claims.  And

12   so both those text messages and the personal e-mail were

13   searched by Mr. Pope in response to plaintiffs' discovery

14   requests.

15       So when -- when plaintiffs are talking -- when

16   Mr. Walton says to you, "We need to search all of these

17   repositories," you can see two things.  First, we're not

18   talking about a few e-mails and a few OneDrives.  We are

19   literally talking about thousands -- hundreds of thousands of

20   documents.  Just the material that ChemTreat searched,

21   represented by the blue circles, is over 600,000 documents.

22   And Mr. Vaughn searched more broadly.

23       So plaintiffs are essentially asking for a complete

24   reopening of discovery and a very broad-based discovery that

25   they didn't even seek during the discovery process.  And

1    what's particularly striking about their request is that they

2    are now saying that these hard drives or the hard drives or

3    the computers that were used by various ChemTreat custodians

4    should also be imaged and produced to them, which, again, is

5    not something they sought in discovery, although they had

6    sufficient time, more than sufficient time.  And there's no

7    connection.  Essentially these are remote employees.

8    Mr. Cissell, for example, works out of Illinois, which

9    obviously is not next door to Mr. Ridley in Tennessee.

10            THE COURT:  Mm-hmm.

11            MS. LUND:  And so there's no way the information

12   could have moved through ChemTreat's systems from Mr. Ridley's

13   laptop to Mr. Cissell's laptop unless it passed through one of

14   these gatekeeping functions, which would be the ChemTreat

15   e-mail --

16            THE COURT:  Mr. Walton, do you disagree with that?

17   Is there any other way to get it from --

18            MR. WALTON:  Yes, I very much disagree with that.

19            THE COURT:  Why?  Why?

20            MR. WALTON:  Because you could do it through USB

21   drives, which is what Mr. Ridley did in this case.

22            THE COURT:  Right.  But other than what we've talked

23   about, is there any evidence that there were USB drives --

24            MR. WALTON:  Well, there is no --

25            THE COURT:  -- going between Tennessee and Ohio?

```
 1              MR. WALTON:  -- there is no evidence -- we don't have
 2    the computer, because his computer is wiped.  So that --
 3              THE COURT:  I know, but I'm -- really simple
 4    question.
 5              MR. WALTON:  Yes.
 6              THE COURT:  I know we can dream up things.
 7              MR. WALTON:  Yes, sir.
 8              THE COURT:  I mean, maybe Ridley was, you know,
 9    having dinner with Kim Jong Un at times.
10              MR. WALTON:  Yeah.
11              THE COURT:  We don't -- we don't know that, either.
12    I doubt it, but...
13              MR. WALTON:  Yeah.
14              THE COURT:  Other than just speculating, is there any
15    evidence that there were USB -- physical USB -- this -- I mean,
16    I do agree with Ms. Lund, this seems like the very most likely
17    way this sort of information gets from Mr. Ridley to another
18    person, right?
19              MR. WALTON:  This is -- this is why I disagree,
20    because there are several USB drives that, according to their
21    CrowdStrike logs, were attached to his ChemTreat computer.
22    Okay?  And so we do have evidence that there was other USB
23    drives that nobody's accounted for that were attached to his
24    computer.
25              And I respectfully disagree with Your Honor.  If you
```

 1   wanted to transfer documents and hide it, you would do it off

 2   of the network, so you wouldn't do it in the ways that -- that

 3   you would do it here, you would do it by USB drives or you

 4   would do it by using your computer when it's not connected to

 5   the ChemTreat VPN, and doing it through personal account, like

 6   iCloud, Dropbox, stuff like that.

 7           And so I disagree, because, also, all of the

 8   external hard drives should have been searched in discovery.

 9   So we did ask for that.  They -- they have conceded that these

10   12 individuals are custodians, but they have intentionally not

11   searched their local drives, even though that's where we have

12   testimony these people keep most of their information.  So --

13           THE COURT:  And you're talking about the group under

14   "Other Salesforce Employees"?

15           MR. WALTON:  Yes, on the individual --

16           THE COURT:  That's -- those are the ones you're

17   really worried about?

18           MR. WALTON:  Yes, sir.  It's these here, it's the

19   individual custodians and the other sales force employees.

20   Their local hard drives should have been searched already in

21   order to respond to our discovery request, because they have

22   conceded that they are custodians.  But they -- they've

23   intentionally not searched those local hard drives.  And that's

24   what we're asking for as part of the sanction under 37(e)(1)

25   against ChemTreat.

1     THE COURT:  Okay.  Let's hear you on that, Ms. Lund.

2     MS. LUND:  Your Honor, just to be clear, we have not

3  conceded that those other sales force employees are relevant

4  custodians.  We actually cast an incredibly broad net because

5  we knew at the outset that we had had this unfortunate incident

6  where the receptionist had delivered the computer to the wrong

7  place and it got forensically wiped, and so we immediately took

8  steps to try to cure that as much as we could and that is why

9  we created the CrowdStrike log.  That's not information that

10  was preexisting that plaintiffs could acquire in discovery.

11     THE COURT:  Right.

12     MS. LUND:  We created it from data that was

13  available.  In the same way, we immediately had Mr. Vaughn see

14  if anything was recoverable from that laptop.  Unfortunately it

15  was not.  The other step that we took is that we cast as broad

16  a net as possible.  And if you look at our ESI report at

17  Document Entry 143, you'll see that we specify that certain

18  custodians are people who have relevant information and other

19  people are people who just may have relevant information, may

20  have interacted with Mr. Ridley.

21     And so, you know, the notion that all of these

22  individuals are -- are custodians for whom a detailed

23  deep-dive search is justified when it could have been

24  performed during discovery and when plaintiffs have not

25  identified anything other than this, you know, hypothetical

1    speculation as to, "Well, maybe Mr. Ridley copied it onto a

2    USB and then maybe he sent it to somebody else who --" who

3    then what?  Did they load it onto the OneDrive?  The OneDrives

4    have also been searched.  Did they --

5            THE COURT:  Mm-hmm.

6            MS. LUND:  -- e-mail it to somebody?  The e-mails

7    have also been searched.  Did they communicate about it via

8    text?  The texts have been searched and produced to plaintiffs.

9            I mean, at the end of the day what I hear from

10   plaintiffs is that they want to reopen discovery, they want to

11   take this very narrow remedy that Rule 37 permits --

12           THE COURT:  Mm-hmm.

13           MS. LUND:  -- which specifically provides that you

14   have measures no greater than necessary to cure the prejudice,

15   and use that to just open wide the doors of discovery when we

16   have already gone through that process for over a year, they

17   have served literally, I believe, more than 100 requests for

18   production, and we were, before this hearing, just weeks from

19   trial.  And so I think that is a fundamental mismatch with the

20   goal of Rule 37 and the targeted approach that Rule 37 focuses

21   on, what is curative as to the ESI and the laptop, not what is

22   plaintiffs' dream wish list of discovery they wish they had

23   gotten during the process.

24           THE COURT:  Okay.  Who -- who are these -- tell me

25   about these employees, "Other Salesforce Employees."

1          MS. LUND:  Yes.  So essentially, Your Honor, as

2    I said at the outset, we cast a very broad net.  We, you know,

3    captured the information of people who we understood Mr. Ridley

4    knew just in the industry.  As you probably have seen from our

5    briefing, the water treatment industry is a relatively tight

6    industry.  People run into each other constantly at trade --

7          THE COURT:  Mm-hmm.

8          MS. LUND:  -- fairs and so on, and there's a lot of

9    kind of touch bases, you know, LinkedIn and so on.  And so

10   individuals who Mr. Ridley said, "You know, from my 20 years at

11   Ecolab, I know this individual, and he's at ChemTreat," some of

12   those people were put on our list as well.  And that's why

13   we've distinguished between the individual custodians, who are

14   the people in his chain of command, versus the custodial

15   groups.

16          And the only person who Mr. Ridley actually had

17   close contact with from among these other sales force

18   employees is David Ellis.  That was the individual who he came

19   in to replace.  And there was -- Mr. Ellis was retiring and so

20   there was an overlap in which Mr. Ellis was essentially his

21   mentor and introduced him to the existing customers that he

22   was taking over.  And so Mr. Ellis's e-mail has been searched

23   both by ChemTreat's counsel in response to discovery requests

24   and by Mr. Vaughn in the context of his search.  We do not

25   have Mr. Ellis's OneDrive because he retired some months

```
 1    before plaintiffs notified us that they thought that there had

 2    been any misappropriation by Mr. Ridley.  So that is just not

 3    available.

 4            THE COURT:  Mm-hmm.  And how did you come up with

 5    these other names?

 6            MS. LUND:  As I said, Your Honor, it was based on

 7    information that we obtained from Mr. Ridley, just factually,

 8    who were his friends and contacts in the industry.  So just as

 9    an example, you know, some of these people were people who were

10    technical workers, who go and actually test the -- the water

11    quality --

12            THE COURT:  Mm-hmm.

13            MS. LUND:  -- but they were people that Mr. Ridley

14    knew from his time at Ecolab or from his time in the industry.

15    And, you know, at that time we didn't know who might he be

16    communicating with.  Plaintiffs had sent us this letter saying

17    that they were very concerned about the extensive number of

18    documents.  So we cast, honestly, the widest net I've seen in,

19    you know, over two decades of litigation, just to make sure

20    that we were sweeping everything in because of the unfortunate

21    loss of the laptop's ESI.

22            THE COURT:  Mm-hmm.

23            MS. LUND:  But, you know, we do have all of the

24    e-mails between these individuals, and all of them have been

25    searched in response to plaintiffs' discovery requests by
```

1    counsel, and that search would include any e-mail that

2    Mr. Ridley sent to any of those custodians that included the

3    words Nalco or Ecolab, not just in the text but in the metadata

4    as well.

5           THE COURT: Okay. What about these flash drives that

6    Mr. Walton raised? What --

7           MS. LUND: Well, Your Honor, Mr. Walton and

8    plaintiffs in general had the opportunity to inquire of every

9    ChemTreat employee that they deposed whether these theories

10    that Mr. Walton just put before you with regard to flash drives

11    or some kind of cloud drive or some kind of Dropbox account had

12    been used. And I don't believe that that question was actually

13    asked of, for example, Mr. Cissell. And so there's no evidence

14    on that. But, again, I think about how do we get to

15    ChemTreat's systems. We have two standalone computers, for

16    example, Mr. Ridley's computer and Mr. Cissell's computer.

17    Even if Mr. Ridley put information from his computer onto a USB

18    drive, mailed it to Mr. Cissell, Mr. Cissell stuck that USB

19    drive into his computer, where would it go? It would have to

20    go either through his e-mail if he was going to use it or

21    through the OneDrive if he was going to use it. And if he was

22    going to use it --

23           THE COURT: Why would it not -- why could it not be

24    locally saved?

25           MS. LUND: Well, because -- I mean, the document

```
 1   itself could be saved, but it couldn't be used unless it went

 2   beyond a laptop, right?  For example, if you used it with a

 3   customer, although there's no evidence of any customer use, as

 4   plaintiffs concede, or if you moved it up to a OneDrive so that

 5   the, you know, sales force would use it, those were also

 6   searched.  And so we would have these, you know, electronic

 7   crumbs of information that would let us know whether or not

 8   that document transfer had occurred.  But, you know, there's

 9   no --

10           THE COURT:  So tell me the -- what -- what was

11   Alcorn's job?

12           MS. LUND:  So Mr. Alcorn is the vice president.  He

13   is in charge of all sales --

14           THE COURT:  Mm-hmm.

15           MS. LUND:  -- in North America.  He is the ultimate

16   supervisor of Mr. Ridley.

17           THE COURT:  All right.  Were -- how many of these

18   were deposed?

19           MS. LUND:  So Mr. Alcorn --

20           THE COURT:  Mm-hmm.

21           MS. LUND:  -- Mr. Leavell, and Mr. Cissell were all

22   deposed.

23           THE COURT:  Okay.

24           MS. LUND:  That's his chain of command.  And it

25   essentially goes from the top down.  Mr. --
```

```
 1              THE COURT:  Okay.

 2              MS. LUND:  -- Alcorn is in charge of all North

 3    American sales, Mr. Leavell is in charge of sales for Eastern

 4    North America and Canada, and then Mr. Cissell was the

 5    conference leader at the time for the Southeast.  He's now --

 6    it's the Central conference.

 7              THE COURT:  Okay.  What about the "Other Salesforce

 8    Employees" box?

 9              MS. LUND:  No, none of those individuals were

10    d posed.  Plaintiffs did not request depositions of any of

11    these individuals.

12              THE COURT:  And give me an idea of -- you told --

13    essentially Mr. Ridley replaced Mr. Ellis, right?

14              MS. LUND:  That is correct.

15              THE COURT:  So who are these other folks?

16              MS. LUND:  So Albert DeNunzio was another sales

17    individual who worked in Central Tennessee.  It's my

18    understanding that Mr. Ridley knew him in a social function.

19              Mr. Harmon was a technical worker in Northern

20    Alabama.  And you're testing my memory here, Your Honor, but

21    I believe that he was an individual who was RIF'd, laid off,

22    from Nalco.

23              THE COURT:  But is it fair to say that all or most of

24    these are salespeople?  Is that --

25              MS. LUND:  They all work on the sales side.  Like
```

1    I said, there are --

2            THE COURT:  Okay.

3            MS. LUND:  -- some technical workers such as

4    Mr. Harmon.  But that is correct, Your Honor, generally they --

5    they are all involved in sales.

6            THE COURT:  Okay.  So the rub here is whether they

7    had hard drives, right?  Is that what you did?

8            MS. LUND:  (Moving head up and down.)

9            THE COURT:  Okay.

10            MS. LUND:  Right.  And, I mean, as Your Honor said,

11    we can certainly speculate about all the different ways in

12    which information could flow.  But plaintiffs had a full --

13    more than a full year of discovery to track that down through

14    sources other than the laptop ESI, sources other than

15    Mr. Ridley who they consider incredible, and they had the

16    opportunity to depose these individuals, ask about them,

17    seek --

18            THE COURT:  Yeah.

19            MS. LUND:  -- you know, to expand the custodians

20    that -- we filed the ESI report specifically at plaintiffs'

21    request after a hearing in front of Magistrate Judge Lee on

22    February 3rd, and so, you know, this was a contested

23    proceeding.  If they had any concerns about the scope of those

24    custodians and the scope of what we were searching, they could

25    have said so.  And in fact they did come back and raise certain

```
 1   issues about the searches that they presented to Magistrate

 2   Judge Lee --

 3            THE COURT:  Right.

 4            MS. LUND:  -- and she rejected those.

 5            THE COURT:  I know, and I'm familiar with that, I --

 6   Okay.  Just -- we're talking about sanctions, right?

 7            MS. LUND:  Yes, Your Honor.

 8            THE COURT:  This is a little different, little

 9   different.  So...  Okay.  I think I understand.

10        Mr. Pope, do you want to add anything to this

11   discussion?

12            MS. LUND:  Oh, actually if I can just add one thing,

13   Your Honor --

14            THE COURT:  Sure, mm-hmm.

15            MS. LUND:  -- because I wasn't sure if Mr. Walton was

16   done presenting what the plaintiffs had requested, but I did

17   hear him talk about sort of a trail of breadcrumbs, and I did

18   want to flag that that is consistent with our understanding

19   that, you know, to the extent the Special Master gets involved,

20   that the appropriate way to do that is to have an incremental

21   and iterative approach, such that you would begin with sort of

22   the first stage, where could this ESI go, well, it could go to

23   Mr. Ridley's e-mail or Mr. Ridley's OneDrive, and then if any

24   evidence was found on that or any evidence was found on his

25   wife's laptop of some transfer outside --
```

```
1              THE COURT:  Right.

2              MS. LUND:  -- of sort of the ChemTreat universe, that

3     then the Special Master could say what is the next level.  But

4     what we don't think is appropriate is to start as broad as

5     possible and narrow down.  That seems inconsistent both with

6     Rule 37 and with best practices for forensic analysis.

7              THE COURT:  Seems a lot faster, though, doesn't it?

8              MS. LUND:  It doesn't, actually, because the problem

9     is, as I said -- and you can see this in --

10             THE COURT:  For me, not for you.

11             (Laughter.)

12             MS. LUND:  Well -- well, but for the Special Master,

13    unfortunately, because if you -- if you look at our ESI report

14    you'll see the -- you know, like I said, it's over 600,000

15    documents that we searched.  And if you add in the repositories

16    that Mr. Vaughn looked at as well, we're talking, you know,

17    some number greater than that.  And so even if you have a very

18    tight set of search terms; although, plaintiffs have not, you

19    know, identified, for example, what the alleged trade secret

20    information is such that we could search those phrases, that's

21    still an enormous amount of time --

22             THE COURT:  Do we know how much data that is?

23             MS. LUND:  -- for the Special Master to review.

24    Pardon?

25             THE COURT:  Do we know how much data it is?  Can we
```

```
 1   measure it?
 2           MS. LUND:  Oh, you know what?  It's --
 3           THE COURT:  Ballpark?
 4           MS. LUND:  I'm afraid I have this written down and I
 5   don't have it anymore.  I wanted to say it was, like, 30
 6   terabytes, but I could be completely wrong with that.
 7           THE COURT:  Thirty?
 8           MS. LUND:  Yes.  And if --
 9           THE COURT:  Okay.
10           MS. LUND:  -- Your Honor is interested, we could
11   certainly get that information for you.
12           THE COURT:  Is that a lot?  I'm kidding.
13           (Laughter.)
14           MS. LUND:  Again, that's -- this is outside my area
15   of expertise.  And so what I think of is in the number of files
16   that have to be searched, because as an attorney what you do is
17   you put eyes on documents, right?  And what a Special Master --
18           THE COURT:  Yeah.
19           MS. LUND:  -- would do is put eyes on documents.  And
20   he would need to put eyes on whatever the hits are of --
21           THE COURT:  Okay.
22           MS. LUND:  -- you know, half a million to a million
23   documents.
24           THE COURT:  Okay.  Anybody else on this issue?
25           MS. LUND:  Thank you, Your Honor.
```

```
 1              THE COURT:  Yes, sir.

 2              MR. WALTON:  May I respond to a couple of things,

 3  Your Honor --

 4              THE COURT:  Absolutely.  Mm-hmm.

 5              MR. WALTON:  -- or would you like to move on?

 6              THE COURT:  No, no.  Let's hear it.

 7              MR. WALTON:  Okay.  So, first of all, if you were

 8  trying to hide what you were doing, you would trade -- you

 9  would not do anything on the network that could be tracked, you

10  would do it through personal e-mail, through personal cloud

11  accounts, you'd do it through USB drives.  And we have evidence

12  that he was doing tricky stuff like this.  In fact, he got

13  fired --

14              THE COURT:  Mm-hmm.

15              MR. WALTON:  -- for sending himself a personal

16  e-mail.

17              So Steve Leavell, who works under John Alcorn, who

18  is a top executive, says most people just save things to their

19  local hard drive.  That's the key repository of information

20  just for basic discovery, not even apart from sanctions.

21  Okay?  But now we're asking for sanctions, that -- those --

22  the hard drives for all the custodians that --

23              THE COURT:  Let me just reiterate, discovery's

24  closed.

25              MR. WALTON:  Yeah, absolutely.  Well --
```

1          THE COURT:  Discovery is closed.

2          MR. WALTON:  -- I'm talking about sanctions now.  I'm

3    talking about a sanction now.

4          THE COURT:  Okay.

5          MR. WALTON:  The -- because the computer is gone,

6    which is the Number 1 receptacle --

7          THE COURT:  Mm-hmm.

8          MR. WALTON:  -- because the WD drive's gone, which is

9    the Number 2 receptacle, right, the most likely place that this

10   information would be would be on the local hard drives for the

11   12 custodians that they picked and -- because that's where

12   everybody saves their information.

13          And when their expert ran his search terms and when

14   he ran them on the OneDrive and the e-mail, he didn't use

15   basic terms like Nalco, he didn't use basic terms like Ecolab.

16   When he searched Ridley's stuff, he used those terms.  But

17   when he searched on all the red here, he didn't use basic

18   terms like Nalco and Ecolab.  Why not?  Because there's Nalco

19   and Ecolab stuff on there.  And that doesn't even include the

20   local hard drives.

21          So there is two issues here.  One is—and this deals

22   with the objection that we filed with Your Honor—everything

23   that is circled in red here we should get access to to rebut

24   Jim Vaughn's opinion.  That's separate from the sanctions.  As

25   part of the sanctions, then, Your Honor, we should get access

1    to all the local hard drives for the 12 custodians that they

2    identified, then we should search them per a protocol that we

3    could work out with the Special Master.

4              THE COURT:  Okay.

5              MR. WALTON:  Okay.  I can move on to my --

6              THE COURT:  What else are you asking for?

7              MR. WALTON:  All right.  So you've heard about these

8    CrowdStrike logs.  Okay?  And we submitted a report from

9    Mr. Lieb.  And Mr. Lieb, if you want, can pull up his computer

10   and show you these if you really want to see them.  But we got

11   these CrowdStrike logs, which are 12 million lines of data.

12   All right?  And we got them in a format that we couldn't

13   automatically index or search them.

14             We've done some research on CrowdStrike, and that

15   CrowdStrike data was made to be read by a software program, by

16   a CrowdStrike program.  So as part of our sanctions here,

17   Your Honor, we would like to have access to ChemTreat's

18   CrowdStrike software program, or perhaps the Special Master

19   could, so we could search that 12 million lines of data that

20   were never meant to be read by humans.  Okay?

21             Also on --

22             THE COURT:  What were they given?  Tell -- explain

23   it.  Explain to me what -- what -- give me an example of a

24   search you'd like to run, and tell me how it would work.

25             MR. WALTON:  Well, on the CrowdStrike, we would like

1  to search for Nalco, we would like to search for Ecolab, we

2  would like to search for documents that were deleted, we would

3  like to search for programs that he used, we would like to

4  search for other CrowdStrike logs.  And I can get into that in

5  a second, Your Honor.  That's a little bit of a tangential

6  issue, but I can get into that.

7           We also understand that the CrowdStrike, depending

8  on what type of CrowdStrike software you have, you can

9  identify a specific USB device and run, looking for that

10 specific USB device, through all the CrowdStrike data and

11 issue a report just -- just like that.  (Indicating.)  And we

12 would like that, too.

13          So, you know, part of the problem with the

14 CrowdStrike, Your Honor, is, the way the CrowdStrike works is,

15 it does a hash value, if Your Honor knows what a hash value

16 is --

17          THE COURT:  Mm-hmm.

18          MR. WALTON:  -- it's like a digital fingerprint of a

19 digital document.  And it's not a forensic tool.  It's a

20 malware detection tool.  And what it does is, when these files

21 come in, the first thing that CrowdStrike does is says, "Is

22 this file capable of having executable malware code in it?"

23 Like, a pdf, for example, is used a lot by hackers to ingest

24 code.

25          THE COURT:  Mm-hmm.

1    MR. WALTON:  And then if it's like that type document

2    which allows executable code, okay, it then takes an image of

3    that document and it assigns a hash value to it, which is like

4    a digital fingerprint, and it cleans -- and it checks that

5    document.  If that document is then cleared, okay, it goes into

6    a list of this massive CrowdStrike log that, my understanding,

7    is searchable, that then it knows all those documents are

8    clear.  So if those documents ever pop up on USB again,

9    CrowdStrike doesn't register that document, which is why

10   I believe we have numerous USB drives that are attached to the

11   ChemTreat computer and there's no file activity afterwards,

12   which doesn't make sense, because who attaches a USB drive to a

13   computer, then doesn't do anything with it?  Okay?  But the

14   reason there's no file activity afterwards is because --

15           THE COURT:  Let me just --

16           MR. WALTON:  Yeah.

17           THE COURT:  I know this is a little off-topic, but --

18           MR. WALTON:  Yeah.

19           THE COURT:  -- the context of this is, you didn't

20   lose any customers.

21           MR. WALTON:  No.  Absolutely right.  But --

22           THE COURT:  So they -- how much could they have done

23   with it?

24           MR. WALTON:  Well, they -- they could have our whole

25   playbook sitting there, thousands and thousands of documents.

```
 1    It's like the entire way that we do business.

 2            On that WD drive was exponentially more than what

 3    was on the LaCie drive.  That's why our misappropriation case

 4    is much more about the LaCie drive -- I'm sorry, much more

 5    about the WD drive than it is the LaCie drive.  Okay?  The

 6    LaCie drive and the OneDrive and all that just relates to our

 7    sabotage claim.  That's different.

 8            So when you're really talking about the

 9    misappropriation now, it's the LaCie drive --

10            THE COURT:  Mm-hmm.

11            MR. WALTON:  -- I'm sorry, it's the WD drive.  I keep

12    misspeaking, Your Honor.

13            THE COURT:  That's all right.  I understand what

14    you're saying.

15            MR. WALTON:  And so that had exponentially more files

16    than the LaCie drive, because it had multiple backups of his

17    Nalco computer and that includes everything.  So they could

18    have our whole playbook.

19            I'm not sure if you're a football fan, Your Honor,

20    but they could -- it's like -- it's like the Eagles getting,

21    you know, Washington Redskins' playbook.  Okay?  And it's --

22            THE COURT:  And not using it, though.

23            MR. WALTON:  Well, but you don't know if they're

24    using it, because -- because the main receptacles that I have

25    to -- to show use --
```

1          THE COURT:  Well, wait a minute.  So I assume

2   ultimately the way they would use it would result in a loss of

3   customers, right?  Isn't that the whole -- isn't that the way

4   you score in this game?

5          MR. WALTON:  Well, it could also result in the loss

6   of employees.  It could also result --

7          THE COURT:  Is there any evidence of that?

8          MR. WALTON:  Excuse me?  I'm sorry.

9          THE COURT:  Is there any evidence of that?

10         MR. WALTON:  Yeah.  We've been losing employees all

11  over the place.  Can -- can we connect them directly to what

12  Ridley took?  No, because things have been wiped and deleted.

13  It's -- it's very difficult for us to show use.

14         And I saw Your Honor's opinion yesterday, and I know

15  what Your Honor's thinking about use.  And we might

16  respectfully agree to disagree.  But assume that we have to

17  show use.  The most important thing that would show use would

18  be his ChemTreat computer.  That's gone.  The second most

19  important thing that would show use is his WD drive.  That's

20  gone.  Okay?  Then there's also some USB drives with deleted

21  information.  Now we find out for the first time that he

22  actually did use his wife's computer for work.  Okay?

23         So I understand where Your Honor's coming from about

24  showing use --

25         THE COURT:  Well, I'm trying -- I'm trying to be --

```
 1   you know, as I think about sanctions, I'm trying to be
 2   reasonable, right?
 3            MR. WALTON:  Yes, sir.
 4            THE COURT:  So it's -- this would be a much -- the
 5   sanctions calculus, I think, would be much different if you
 6   gave me a list of customers and you had lost $25 million in
 7   revenue, right?
 8            MR. WALTON:  Yes.
 9            THE COURT:  Then we'd really start digging.  I don't
10   know how hard to dig, though, when that number's zero.
11            MR. WALTON:  Yeah, but, you know, the -- you know,
12   maybe part of this lawsuit stopped that, and maybe part of this
13   lawsuit that we get at the end of the day is a permanent
14   injunction from the Court that says that if they find this
15   information, that they can't use it, they have to return it,
16   that they're not allowed to --
17            THE COURT:  You'd probably agree to that today, won't
18   you?
19            MS. MIRMIRA:  (Moving head up and down.)
20            THE COURT:  Anybody not agree with that today?
21            MR. WALTON:  I mean, if they would agree to a
22   permanent injunction on -- on that, Your Honor, that would --
23   that, you know, might solve a piece of this.  But, again, we
24   would still want to know what we don't know and do a little bit
25   of digging to make sure that they don't have our corporate
```

```
 1    playbook --

 2              THE COURT:  Yeah.

 3              MR. WALTON:  -- because they can be sitting on it,

 4    because it's more than just -- it's more than just losing

 5    customers -- I'm sorry, Your Honor.

 6              THE COURT:  That's okay.  Happens every hearing.

 7              MR. WALTON:  I'm half-Italian, so I talk with my

 8    hands.

 9              It's more than just losing customers.  It's they're

10    seeing the entire way that we do business, everything from

11    financials to the way we pay our people to what territories

12    were, customers.

13              THE COURT:  Well, Ridley -- we think Ridley did.

14              MR. WALTON:  Ridley did, but he took -- he took --

15              THE COURT:  But he saw that before he left.

16              MR. WALTON:  But he took multiple backups of his

17    computer that had much more than just his information.

18              THE COURT:  I understand.  I understand.  But -- but

19    we don't know that it went any further.

20              MR. WALTON:  Well, yeah, and we don't know because

21    that's wiped.

22              THE COURT:  Mm-hmm.

23              MR. WALTON:  Okay?

24              THE COURT:  I understand.

25              MR. WALTON:  And so where we started down this road
```

1    was, as part of our sanction under 37(b) -- I keep saying

2    (b)(1), but I mean (e)(1) --

3                THE COURT:  Yep.

4                MR. WALTON:  -- is that we would get access to their

5    CrowdStrike software so we could properly search the

6    CrowdStrike data.

7                THE COURT:  Okay.  And that's related to the loss

8    of -- we're still on the WD drive and the -- and the ChemTreat

9    computer.

10               MR. WALTON:  Yes, sir.

11               THE COURT:  Okay.

12               MR. WALTON:  Yes, sir.

13               THE COURT:  All right.  So who wants to take that?

14   CrowdStrike.

15               MS. LUND:  Your Honor --

16               THE COURT:  Mm-hmm.

17               MS. LUND:  -- CrowdStrike is commercially available

18   third-party software.  A license is available.  My

19   understanding is, it costs a few hundred dollars a month.

20               Plaintiffs, who have, you know, chosen to litigate

21   this case and have chosen to litigate this case in an

22   aggressive manner that has really driven up attorneys' fees,

23   certainly could have afforded to pay for Mr. Lieb to have that

24   access and to simply pay for a handful of months to search the

25   CrowdStrike log that we've provided.  It sounds, as I

1    understand what Mr. Walton just said, as if they --

2            THE COURT:  Tell me what -- is the log an Excel

3    spreadsheet or something?  Is that essentially --

4            MS. LUND:  So here's the problem, Your Honor.  A

5    smaller log would be able to come out in an Excel spreadsheet,

6    but because we gave plaintiffs as much data as possible --

7            THE COURT:  Right.

8            MS. LUND:  -- literally every field that could be

9    produced from this software was provided to them, it is

10   12 million fields.  And so as a result you have to open it, you

11   know, in a -- something like a Notepad and then convert it into

12   something else.  And so, you know --

13           THE COURT:  But they have that?

14           MS. LUND:  They have it.  They've had that since the

15   end of December of last year.  And their expert has had full

16   access to that.  He has searched terms such as <u>Nalco</u> on it.  So

17   I'm not entirely sure why they're saying they need access to

18   that third-party software in order to conduct further searches.

19           And then I heard Mr. Walton say that now they

20   actually want direct access to ChemTreat's system so that they

21   can create new CrowdStrike logs and search those or perhaps

22   just create new CrowdStrike searches.  And for that I think

23   it's important to understand what the CrowdStrike software is.

24           This is, as I believe Mr. Walton alluded to, sort of

25   a software that is intended to prevent, you know, malware or

```
 1    threats, and it just runs in the background --

 2              THE COURT:  Mm-hmm.

 3              MS. LUND:  -- and it basically records if something

 4    is connected that is a potential threat, so that if you later

 5    discover an infection or intrusion into your system, you can

 6    track that back.  But it is not something where logs are

 7    constantly being produced.  It is only information that can be

 8    queried.  And because of the enormous amount of information it

 9    creates, it is information that is constantly refreshing.  And

10    so there is, you know, as I understand it -- although,

11    plaintiffs did not request this in discovery and so this is my

12    best understanding --

13              THE COURT:  Mm-hmm.

14              MS. LUND:  -- Your Honor, there is only, you know, a

15    certain trailing period.  And at this point, given that

16    plaintiffs are asking about events that may have occurred

17    between July 12th of 2021 and February 28th of 2022 and we are

18    now here on August 10th of 2023, I honestly don't know if any

19    of the data that they say they want is even available anymore,

20    because they just -- they didn't ask for that in discovery.

21              I do want to, if I can, Your Honor, just briefly

22    respond to a few of the points that Mr. Walton made.

23              THE COURT:  Mm-hmm.

24              MS. LUND:  First, you know, with regard to this

25    question of use, as Your Honor indicated in the order yesterday
```

1    and then again today, use would -- it would be visible in some

2    place other than just Mr. Ridley's laptop, right?  To have some

3    kind of commercial exploitation, you have to exploit it, and

4    that leaves trails outside of just the ESI of the laptop.

5           And Mr. Walton has now speculated, "Well, maybe they

6    have this and they're holding onto it and maybe they've used

7    it to get our employees."

8           Again, they had a full discovery period in which

9    they could have said, you know, "Here are the employees that

10   we have lost that overlap with information that we believe was

11   taken from us, and we want discovery on them.  We want to, you

12   know, depose these individuals."

13          They didn't do that.  Now, I will tell you that they

14   have engaged in a -- a very dedicated course of litigation

15   against ChemTreat and employees that ChemTreat has hired.

16   This is now one of five lawsuits that have been brought --

17   well, six with the one that they had to dismiss when they

18   found it could not be substantiated at all, that they've

19   brought against these employees.  And we view it, honestly, as

20   sort of a campaign of terror against the employees.

21          If you looked at some of the deposition testimony we

22   attached, both Ms. Mackie and Mr. DeMarco made it clear that

23   Ecolab frowns on or outright prohibits individuals from

24   seeking separate employment or employment other than

25   Ecolab/Nalco.  And so the notion that they are going to

1    leverage what is the freedom of every at-will employee to

2    choose a superior or different employee -- employer, and to

3    say, "From that, we should now be able to conduct this

4    broad-based search --

5           THE COURT:  Mm-hmm.

6           MS. LUND:  "-- of everything in ChemTreat's accounts"

7    because some of Nalco/Ecolab's employees choose to come to

8    ChemTreat, I mean, again, that just has nothing to do with

9    Rule 37(e) at all.

10         And then finally I did want to flag this issue of

11    the Nalco/Ecolab search, because if I understood Mr. Walton

12    correctly, he said, "Well, Mr. Vaughn didn't search that and

13    that's because those -- that information would be there."

14    Just to be clear --

15           THE COURT:  Of everybody but Mr. Ridley, right?

16           MS. LUND:  Right.  Yes.  So just to be clear, he did

17    search Nalco/Ecolab in Mr. Ridley's account, but with regard to

18    everybody else, I mean, these are two major competitors in a

19    small field and so there is -- the words Nalco and Ecolab

20    appear all over, because of trade fairs, industry events, you

21    know, a hiring pipeline --

22           THE COURT:  Mm-hmm.

23           MS. LUND:  -- competitive intelligence where you say

24    things like, "Here is an automatic Google report where I get a

25    news report every time there's an article about one of my

1    competitors."  Those are all there.  You also have when you go

2    up for a bid in an RFP process, "Who are we competing against?

3    I've heard that Nalco's going to bid," right?

4            THE COURT:  Mm-hmm.

5            MS. LUND:  And so as you will see again in our ESI

6    report, again, Docket 143, we detailed that with regard to all

7    of the other e-mails that we searched, we did use Nalco/Ecolab

8    in association with other terms, because obviously if you just

9    use Nalco and Ecolab you're going to get their material data

10   safety sheets, which, I mean, those are not -- those are not

11   trade secrets.

12           THE COURT:  Mm-hmm.

13           MS. LUND:  And so, again, that is -- that is ground

14   that has been plowed already in the course of discovery based

15   on their very broad discovery requests to us.  So this is

16   not -- this is not -- what Mr. Vaughn did is not the be-all and

17   end-all, it is really just a very small piece of the overall

18   scope of what has been provided to plaintiffs.

19           And as I believe I indicated to Your Honor,

20   Mr. Vaughn produced all of his hits to plaintiffs.  That was

21   2023 documents.  But in addition to that, in the course of

22   discovery, we produced, for the, you know, seven months that

23   Mr. Ridley was employed by us, a full -- I'm looking for the

24   number here -- I believe it was 1336 documents.  And just to

25   give you a contrast, plaintiffs produced just over 500

1  documents for, you know, the entire period that Mr. Ridley

2  worked there, which was just over two decades --

3          THE COURT:  Mm-hmm.

4          MS. LUND:  -- and despite claiming that they have

5  16,000 trade secrets that were stolen.

6          So I think we have engaged in very thorough

7  discovery efforts.  And I view the goal of Rule 37(e)(1) as

8  essentially trying to fill any evidentiary gaps that remain.

9  And the question really is whether plaintiffs have, after this

10  enormous discovery effort, identified any evidentiary gaps

11  that are actually specifically tied to the ESI that could have

12  been on Mr. Ridley's laptop as opposed to some other wish list

13  of information that they would like with regard to what other

14  ChemTreat employees might be doing, what other information

15  ChemTreat might have.

16          THE COURT:  Okay.  Thank you.

17          Yes, sir.

18          MR. WALTON:  Thank you, Your Honor.

19          Just about the CrowdStrike, what we're trying to do

20  is, we just want to have an even playing field.  Their expert

21  got to use the software that was designed to read 12 million

22  lines of data and search it easier.  We had -- I can put

23  Mr. Lieb on the stand.  He broke three forensic -- two or

24  three forensic tools trying to search this.  Okay?  Broke

25  forensic tools.  He had to spend hours using -- have you ever

```
1    seen the Microsoft Notepad application --

2            THE COURT:  Mm-hmm.

3            MR. WALTON:  -- on your desktop, Your Honor?

4            THE COURT:  Mm-hmm.

5            MR. WALTON:  He had to search it in that

6    individually.  We were hamstrung by -- by this.  Now, Mr. Lieb

7    will also tell you he -- if we put him up here, he --

8            THE COURT:  What were you looking for?

9            MR. WALTON:  We were looking for any evidence of

10   Nalco -- of connecting Nalco -- connecting USB drives,

11   accessing Nalco files, et cetera.  And it just was extremely

12   difficult to search.  We were also looking --

13           THE COURT:  I mean, what do you search for if it's a

14   -- if it's a Notepad file?

15           MR. WALTON:  Mr. Lieb did single word searches,

16   because that's all he could do on a Microsoft Notepad.

17           THE COURT:  Yeah.

18           MR. WALTON:  And so he would search Nalco, he would

19   search the worth delete, he searched for CCleaner.  But there's

20   much more powerful search capabilities if we just had access to

21   the software.  Okay?

22           THE COURT:  Okay.  But you don't have access to the

23   software?

24           MR. WALTON:  No, we don't have access to the

25   software.  And counsel keeps saying it's only a couple hundred
```

1    bucks.  Mr. Lieb looked into it.  It would be several hundred

2    thousand dollars.  If it was a couple hundred bucks, we

3    wouldn't be here talking about this.  Okay.  So he tried to get

4    a trial version, he couldn't get it, and they were going to

5    charge him a couple hundred thousand dollars.  So it was -- so

6    all we have is the raw data --

7                 THE COURT:  Ecolab doesn't use CrowdStrike?

8                 MR. WALTON:  We have the CrowdStrike raw data logs

9    but not the software to search them.

10               THE COURT:  Is it two different pieces of software?

11   What's the --

12               MS. LUND:  Yeah.  As I understand it, Your Honor, and

13   just to be clear, we gave plaintiffs, to pass on to Mr. Lieb,

14   the exact same file we provided to Mr. Vaughn.  He, as far as

15   I know, does not have a CrowdStrike license.  We did not

16   provide him with a license.  He and his data shop IDS simply

17   did, you know, the processing of the data.  And it's my

18   understanding there are in fact simple scripts you can use to

19   run Boolean searches on that data.  Apparently Mr. Lieb is not

20   familiar with those.  But if you Google it, you can identify

21   those searches.

22               But I guess my broader question is, you know,

23   Mr. Lieb has now had that log for eight months.  He has had

24   full opportunity, even searching one term at a time, to go

25   through those terms.  And I'm not understanding why --

```
 1              THE COURT:  So --

 2              MS. LUND:  -- why they believe an appropriate --

 3              THE COURT:  Yeah.  So let me --

 4              MS. LUND:  -- you know, curative sanction would be to

 5    access that.

 6              THE COURT:  -- let me make sure i understand,

 7    Mr. Walton.  You don't -- there's no dispute that you have all

 8    the data that --

 9              MR. WALTON:  Yes.  There is no dispute about that,

10    yes, sir.

11              THE COURT:  What's the -- okay.  I haven't heard

12    that.

13              MR. WALTON:  There is no -- no, no, no, there is no

14    dispute that we have the data.

15              THE COURT:  Okay.

16              MR. WALTON:  We have the data.

17              THE COURT:  Okay.

18              MR. WALTON:  We have it in a format --

19              THE COURT:  You just need help looking at it.

20              MR. WALTON:  Exactly.  We just want a -- we asked for

21    spreadsheets.  We asked for other formats.  I'm just working

22    with my expert Mr. Lieb --

23              THE COURT:  Yeah.

24              MR. WALTON:  -- and what he's telling me --

25              THE COURT:  But you're just looking for words?
```

1              MR. WALTON:  Words and evidence of activity, like,

2    for example --

3              THE COURT:  So how do you do that?  How do you find

4    that it was plugged into a USB?

5              MR. WALTON:  Well, Mr. Lieb's been doing it through

6    the Notepad app.  There is a whole --

7              THE COURT:  I know, but what I'm saying -- if --

8              MR. WALTON:  Yes.

9              THE COURT:  -- whatever you're using, how do you find

10   a USB was introduced to this device?

11             MR. WALTON:  There is a whole search capability in

12   the dashboard on the CrowdStrike software that you can do that.

13   Mr. Lieb, if you're asking me how he searches for USBs and

14   stuff, I think he searches for the names of the USB.  I would

15   have to have you ask him to do that --

16             THE COURT:  Yeah.

17             MR. WALTON:  -- you know.  I don't know how

18   specifically he does that.

19             THE COURT:  Okay.

20             MR. WALTON:  Okay?  But --

21             THE COURT:  So you want access to ChemTreat's

22   CrowdStrike license?

23             MR. WALTON:  If they can segregate it.  I don't want

24   to see all their data.  I don't want to have unfettered access

25   to it.

1          THE COURT:  I can't imagine that that's contractually

2    okay, right?

3          MS. MIRMIRA:  (Moving head up and down.)

4          MR. WALTON:  Yeah.  Yeah, that's a good point, you

5    know.  So, I -- you know, I -- that's a good point.  I think

6    that's a fair point, yeah.

7          THE COURT:  Okay.

8          MR. WALTON:  Yeah.

9          THE COURT:  All right.  So let's go to the next

10   issue, then.

11         MR. WALTON:  All right. so we can maybe discuss that

12   with the Special Master.

13         THE COURT:  Yeah.

14         MR. WALTON:  But the other thing is, too, is that we

15   understand that there's logs you can run for USB devices on the

16   CrowdStrike.  We do not want access or into their -- I do not

17   want to get into their CrowdStrike.  I would have the Special

18   Master or some third party do that --

19         THE COURT:  Okay.  I understand.  Is that it for --

20         MR. WALTON:  -- on the CrowdStrike.

21         THE COURT:  -- the sanctions you're asking for?

22         MR. WALTON:  Well, just a couple other things.

23         THE COURT:  Okay.

24         MR. WALTON:  I was going to ask for this, Your Honor,

25   and I know in light of yesterday's opinion this is going to

```
 1    raise other issues, so I don't want to get too far out on a

 2    tangent --

 3              THE COURT:  Mm-hmm.

 4              MR. WALTON:  -- but one of the things that we were

 5    going to do is ask for a ruling from the Court that they can't

 6    make an argument that we didn't use the materials.  Now, I know

 7    that's going to cause some controversy here, especially in

 8    light of the Court's opinion yesterday.  But here's our thought

 9    process on it, is that they have hamstrung us from showing use.

10              Now, I think under the DTSA, acquisition or use

11    is -- is part of the definition of misappropriation.  If the

12    Court is going to make us show use, we would ask for an

13    instruction that they can't argue that we can't show use,

14    because the main receptacles to show the use are gone.  And so

15    we're kind of getting whacked on both ends.

16              THE COURT:  Well, but not everything in the universe

17    is digital yet, right?  So there are other ways to prove that.

18    Witnesses.

19              MR. WALTON:  Yeah, but witnesses lie, Your Honor.

20    You know, e-mails -- you know, I mean, that's the good thing

21    about digital evidence is that it's contemporaneous --

22              THE COURT:  Right.

23              MR. WALTON:  -- and it's objective if you get

24    forensic artifacts.

25              THE COURT:  Okay.
```

1          MR. WALTON:  And in this case we feel like we have

2     been led astray multiple times, especially by Mr. Ridley.  And

3     so why -- why hasn't he come clean from the beginning, for

4     example, about using his wife's computer to wipe the WD drive?

5     Why hasn't he come clean from the beginning that he wiped the

6     WD drive?

7          THE COURT:  Mm-hmm.

8          MR. WALTON:  Why didn't he come clean from the

9     beginning that he had multiple backups on his WD drive going up

10    to 2018?  We feel like we've just been chasing lie after lie

11    after lie.  And so I don't trust witnesses.  I'm looking -- I'm

12    looking for objective forensic evidence.

13         THE COURT:  Mm-hmm.

14         MR. WALTON:  And so that's why we would ask for an

15    instruction from the Court that they're not allowed to argue

16    that we didn't use it.

17         THE COURT:  Well, you've got a lot of evidence,

18    right?  You've got -- there are things missing, but we have a

19    lot of evidence -- of digital evidence.

20         MR. WALTON:  Well, if you look at just the amount, we

21    got some, but, you know, for example, one of the key searches

22    that wasn't done was of the local hard drives.  So it's not --

23    so we don't have the evidence from the right sources.  And we

24    certainly can't get the evidence from the wiped ChemTreat

25    computer, we certainly can't get the evidence from the wiped WD

```
 1    drive.  So, yes, we might have some evidence, but it's from the

 2    wrong sources.

 3              THE COURT:  Mm-hmm.  Okay.  Anything else?

 4              MR. WALTON:  Okay.  Just on two more quick things.

 5    One is, we would like to move the trial date so we can conduct

 6    this additional work --

 7              THE COURT:  Mm-hmm.

 8              MR. WALTON:  -- with the Special Master.  We would

 9    like our fees and costs -- I'm sure they'll ask for it, too,

10    but we'd like our fees and costs against both Mr. -- you know,

11    both the sanctions against Mr. Ridley and both the sanctions

12    against ChemTreat.

13              And this pertains a little bit to yesterday, so this

14    -- you might tell me this is not proper to ask for yet,

15    Your Honor --

16              THE COURT:  Go ahead.

17              MR. WALTON:  -- is that Ms. Trexler, she did not --

18    when she did her expert opinion, she did not know about the WD

19    drive, the data that was on the WD drive, and the wiping of the

20    WD drive.  All that we found out after her opinion was

21    submitted.  So we would like the opportunity to submit a new

22    expert report which encompasses all the data which is

23    exponentially more than LaCie drive.

24              THE COURT:  What does that change?

25              MR. WALTON:  I'm sorry, Your Honor?
```

```
 1              THE COURT:  Why does that matter?

 2              MR. WALTON:  It matters because she did not know

 3      about the WD drive, she did not -- we did not know --

 4              THE COURT:  I know, but so what?

 5              MR. WALTON:  Well, because it's exponentially more

 6      information, Your Honor, that we hope the jury will be allowed

 7      to infer that they acquired.

 8              THE COURT:  But she was -- okay.  I hear you.  What

 9      else?

10              MR. WALTON:  Okay.  That's it, Your Honor.

11              THE COURT:  All right.

12              MR. WALTON:  Thank you.

13              THE COURT:  Anything on that, defendants?

14              MS. LUND:  Your Honor, just briefly.

15              THE COURT:  Mm-hmm.

16              (Brief pause.)

17              MS. LUND:  So I just wanted to clarify.  I heard

18      Mr. Walton say that the main receptacles to show use are gone.

19      And with regard to the sanctions against ChemTreat, the only

20      thing that has been spoliated was ESI and the laptop.  And as

21      we've discussed, use requires commercial exploitation.

22      Mr. Ridley was just a boots-on-the-ground salesperson.  His job

23      was to go around, knock on doors, walk plants, sell product,

24      right?

25              THE COURT:  Mm-hmm.
```

1          MS. LUND:  And that means if he was engaged in any

2    commercial exploitation separate from ChemTreat's system, that

3    we would see it with regard to customers.  And as plaintiffs

4    have said, they have no evidence of any customer being lost.

5    In fact, Mr. DeMarco testified they have no evidence of any

6    customer even being solicited using their information.

7          And any other kind of commercial exploitation would

8    require Mr. Ridley to transmit that information to somebody

9    else and for somebody else to use it in a way that could put

10   ChemTreat's stamp on it.  And that means it would need to be

11   on something like, you know, their -- an e-mail communication

12   or, again, passing through a OneDrive and a OneDrive file

13   sharing.

14          And so we don't think that -- to the extent that it

15   is appropriate to get the Special Master involved because

16   Your Honor believes there are evidentiary gaps, then we think

17   the thing that makes the most sense is to have plaintiffs

18   identify what are their actual -- what is their actual trade

19   secret information, what is -- what are the phrases or the

20   terms that are unique to Nalco/Ecolab, not something like best

21   practices, or training, but something that they actually, you

22   know, can -- can show is unique to them.  And then the Special

23   Master could, again, engage in that incremental, iterative

24   process of starting to see is there anything in that first

25   wave point when you leave with these laptop -- either his

1    e-mail or his OneDrive, that reflects that content.  And if

2    there is, then he can continue an iterative search.  If

3    there's not, then I think we've reached a null set and we can

4    feel confident that the evidentiary gap has been closed.

5                 THE COURT:  Okay.

6                 All right, Mr. Walton, have we gotten through all

7    your requests, sanction-wise?

8                 (Off-the-record discussion between plaintiffs'

9                 counsel.)

10               MR. WALTON:  No, Your Honor, we are done.

11               THE COURT:  You're done?

12               MR. WALTON:  Yes, sir.

13               THE COURT:  Okay.

14               All right.  Who -- who wants to ask me for something

15   over here?

16               (Laughter.)

17               MR. POPE:  Your Honor?

18               THE COURT:  Yes, sir.

19               MR. POPE:  On behalf of Mr. Ridley.

20               (Brief pause.)

21               MR. POPE:  Your Honor, before I begin with

22   Mr. Ridley's request, I'd like to address just a few things

23   that Mr. Walton has said.

24               First, he said that he's been led astray multiple

25   times by Mr. Ridley and that they didn't have information that

1    he had wiped the WD drive.  That's absolutely not the case,

2    Your Honor.  As early as February the 22nd of 2022——and the

3    correspondence is in the court file, attached to

4    pleadings——ChemTreat was aware that Mr. Ridley had a WD drive,

5    a personal laptop --

6              THE COURT:  Mm-hmm.

7              MR. POPE:  -- that he used to backup his Nalco/Ecolab

8    files --

9              THE COURT:  Right.

10              MR. POPE:  -- and that he had deleted those files

11    from the drive.  Your Honor, that's information that Ecolab did

12    not know until they sent their demand letter and Mr. Ridley

13    told them that, told them that.

14              So to the extent that Mr. Walton says that they've

15    been led astray by Mr. Ridley not telling them that he wiped

16    the WD drive, that's incorrect, that there were multiple

17    backups of the WD drive, that's incorrect, or -- and he also

18    argues that he used his wife's computer for work, Your Honor,

19    there's -- there's not evidence of that.  What we're talking

20    about here is a personal external hard drive and his wife's

21    personal computer.  The personal external hard drive

22    Mr. Ridley used for work purposes for years.  He became

23    employed at Ecolab in 1999 --

24              THE COURT:  Right.

25              MR. POPE:  -- and he worked there until 2021.  Until

1    he signed his employment contract on September the 16th of 2020

2    when he transitioned from Nalco to become a corporate account

3    manager for Ecolab, he had no restriction on the use of that WD

4    drive.  He used it in the normal course of work for years and

5    years and years, his personal device.

6             THE COURT:  Mm-hmm.

7             MR. POPE:  The plaintiffs' allegations, Your Honor,

8    at the beginning of the lawsuit all relate to the LaCie drive

9    and the activity that's on the DLP report, and they allege,

10   ad nauseam, on certain dates he transferred large numbers of

11   files to the LaCie drive and that all of that activity is

12   captured in the DLP report.

13            Your Honor, that DLP report does not capture

14   activity on the WD drive.  None of that activity relates to

15   the WD drive, none of it.

16            THE COURT:  Mm-hmm.

17            MR. POPE:  For the entire look-back period of the DLP

18   report, there is no association with the WD drive.  Those are

19   two completely separate devices, WD drive that he used while at

20   Nalco --

21            THE COURT:  Mm-hmm.

22            MR. POPE:  -- and the LaCie drive that's the subject

23   of the entire complaint.

24            THE COURT:  Okay.

25            MR. POPE:  And so when Mr. Walton stands up and tells

1    the Court that the focus is now on the WD drive, the focus is

2    now on the WD drive, it's much more about the WD drive, and

3    only the sabotage claim is related to the LaCie drive, that's a

4    complete pivot on behalf of the plaintiffs from what caused

5    them to initiate this lawsuit.  And the reason is, Your Honor,

6    because their claims related to the LaCie drive have been shown

7    to have no merit, no merit whatsoever, so they have to pivot

8    away.

9           But still, but still, even in light of that,

10   Your Honor, Mr. Walton wants to be able to make the argument

11   that the LaCie drive relates to the sabotage claim.  And the

12   plaintiffs want to be able to do that despite the fact,

13   despite the fact, that they were in possession of the LaCie

14   drive that was returned to them by Mr. Ridley after this

15   lawsuit was initiated.  They want to be able to benefit from

16   the fact that that drive was not maintained or preserved in

17   any way whatsoever.

18           THE COURT:  Mm-hmm.

19           MR. POPE:  And so our request for sanctions against

20   the plaintiffs is that since they did not maintain and preserve

21   the drive, that they not be able to argue that Mr. Ridley --

22   that they not be able to contest that Mr. Ridley returned the

23   drive, that he returned it to the plaintiffs.  That's our

24   request for sanctions against Mr. Ecolab -- against Ecolab --

25           THE COURT:  Right.

1      MR. POPE:  -- and that they not be able to argue that

2  Mr. Ridley transferred any of those files off the LaCie drive,

3  because if we had the LaCie drive and we had Mr. Ridley's

4  computer we'd be able to see that, and they not be able to

5  argue that Mr. Ridley deleted the files and that they no longer

6  have those files that were included in the DLP report as being

7  transferred to the LaCie drive.  And the reason is, Your Honor,

8  if -- when Mr. Ridley returned the LaCie drive to the

9  plaintiffs at the end of his employment --

10      THE COURT:  Mm-hmm.

11      MR. POPE:  -- he's not sabotaging the plaintiffs in

12  any way, he's taking their information, putting it on their

13  device, and returning it to their vendor.  That's -- that's the

14  opposite of sabotage, Your Honor.

15      And so our request for sanctions is that the

16  plaintiffs not be able to stand up and tell the jury that the

17  LaCie drive was involved in the sabotage claim, that

18  Mr. Ridley kept it, that Mr. Ridley took it to ChemTreat.

19  None of that has been borne out in the case whatsoever.

20      The ChemTreat CrowdStrike report shows absolutely no

21  connection to the LaCie drive, none whatsoever.  That's

22  further evidence that Mr. Ridley did in fact, exactly as he

23  said, return the -- return the drive.

24      THE COURT:  Okay.  Anything else?

25      MR. POPE:  As it relates to a few of the comments

```
 1   Mr. Walton made regarding reopening discovery, I want to say

 2   just a few things.  The plaintiffs have gotten a lot of

 3   traction in this case and made some headway by relying on the

 4   volume of the documents that they allege Mr. Ridley

 5   misappropriated and not talking about the specifics.

 6              THE COURT:  Mm-hmm.

 7              MR. POPE:  So as it relates to the WD drive --

 8              MR. UPPAL:  Your Honor?  Your Honor --

 9              MR. POPE:  May I --

10              MR. UPPAL:  -- I don't mean to interrupt counsel, but

11   could we follow the same protocol where you took it step by

12   step?

13              THE COURT:  Are we skipping to something new?

14              MR. UPPAL:  It seems like we're going from the LaCie

15   to the WD.  So before we do that, I'd like to address counsel's

16   arguments about the LaCie and the sanctions we've requested.

17              THE COURT:  Okay.  Give me just a second.

18              Go ahead, Mr. --

19              MR. POPE:  May I go ahead?  May I go ahead,

20   Your Honor?

21              THE COURT:  Mm-hmm.

22              MR. POPE:  What I was going to say is that as it

23   relates to any searches that's going to take place on the WD

24   drive --

25              THE COURT:  Mm-hmm.
```

1    MR. POPE:  -- we really should focus on the documents

2  that any search of his wife's laptop shows that Mr. Ridley

3  accessed, if there are any there, and then see, see, if any of

4  that material that Mr. Ridley accessed from his wife's computer

5  on his personal WD drive were used in any way to hurt the

6  plaintiffs.  Mr. Walton indicates that Mr. Ridley and ChemTreat

7  has their playbook, has their playbook.

8    THE COURT:  Mm-hmm.

9    MR. POPE:  Well, let's actually -- let's actually

10  look at the search, have the Special Master look at that, see

11  if Mr. Ridley ever accessed a playbook and if that playbook was

12  ever transferred to ChemTreat in any way whatsoever.  If not,

13  Your Honor, it doesn't affect anything in the case and it's

14  just a pivot of the plaintiffs away from the LaCie drive and

15  trying to make the entire case about spoliation when the other

16  claims regarding taking customers or damages or irreparable

17  harm just have no legs whatsoever.

18    THE COURT:  Okay.  Thank you, sir.

19    Yes, sir, come on up.

20    MR. UPPAL:  Good morning, Your Honor.

21    I'm going to start with -- first of all, my name is

22  Pavneet Uppal.

23    THE COURT:  Mm-hmm.

24    MR. UPPAL:  I'm going to start with addressing the

25  sanctions that opposing counsel has just requested with respect

 1   to the LaCie drive.  He began by telling the Court that we

 2   should have known all along that the documents were deleted

 3   from the WD drive and we have suddenly engaged in this giant

 4   pivot from the focus from the LaCie to the WD.  But as

 5   Your Honor has noted in your order at Doc. 353 --

 6           THE COURT:  Mm-hmm.

 7           MR. UPPAL:  -- Mr. Ridley has told a series of just

 8   preverifications -- prevarications, misleading statements, and

 9   mendacious lies, and has not corrected his interrogatory

10   responses.  That is a statement that Your Honor has made in his

11   own order.

12           So let's go back for a second and -- and start with

13   what opposing counsel said.  He said, "Hey, you've known about

14   the WD drive from the beginning of the case and the fact

15   that -- you know, you should have known about this wiping."

16           But let's go look at that.  In your order at

17   Doc. 353, at Page 2, you make the following observations about

18   Mr. Ridley's sworn interrogatory responses.  You note that

19   Mr. Ridley, in his interrogatory responses, says that he

20   backed up files from his work laptop while he was employed by

21   Nalco to an external drive before the company had a

22   cloud-based storage system.  Well, that's a lie, because he

23   continued to back up files to this WD drive well after a cloud

24   storage system was implemented.

25           The cloud storage system, namely, a OneDrive

1    account, was implemented by Ecolab in 2018.  Your Court has

2    already made -- Your Honor has already made the finding that

3    Mr. Ridley did not limit himself to backing up to his external

4    drives before the company had a cloud storage-based system.

5    He continued through two -- 2020, in terms of backing up to

6    the WD drive.  And then he continued until 2021 backing up to

7    the LaCie drive.  So there's one lie.

8              Secondly --

9              THE COURT:  Well, let me try to focus this, because I

10   -- I'm not arguing with anything you're saying.  Okay?  But

11   what I'd like to focus on is the three things Mr. Pope asked me

12   to sanction Ecolab -- the three ways he asked me to sanction

13   Ecolab:  One is, you don't get to argue that Mr. Ridley didn't

14   return the LaCie drive; two is, you don't get to argue that

15   Ridley transferred these other files that are at issue from the

16   LaCie drive to any other device; three, that -- that he would

17   ask me to order that you not get to take the position that

18   Ridley deleted or moved any of the files identified -- is it

19   the DLP report?  Is that what you referred to?

20             MR. POPE:  That's right.

21             THE COURT:  Yeah.  -- from the Ecolab/Nalco system.

22             So let's focus on -- the first two talk about the

23   LaCie drive.  So we know how --

24             MR. UPPAL:  Okay.

25             THE COURT:  -- the LaCie drive was lost.  So now what

```
 1   do we do about it?
 2              MR. UPPAL:  Okay.  I'll come back to -- I'll do
 3   exactly what you're saying.  I'll come back to the fact that
 4   Mr. Ridley lied in his interrogatories saying that he last used
 5   the WD in 2015 and '16 --
 6              THE COURT:  But that didn't -- but that didn't cause
 7   you to lose the LaCie drive.
 8              MR. UPPAL:  Right.  Okay.  So let's --
 9              THE COURT:  So let's talk about the LaCie drive.
10              MR. UPPAL:  Okay.  So as to the LaCie drive, the
11   story that defendants want to tell is that, first of all, the
12   loss of the data on the LaCie drive is somehow proximately
13   caused by my client's failure to timely preserve the LaCie
14   drive.
15              But the proximate cause of the data actually being
16   lost from the vast amount of material that was downloaded to
17   the LaCie drive is actually Mr. Ridley.  What happened here is
18   that Mr. Ridley unleashed a torrent of deceptive misconduct
19   and laid a series of traps for my client and now wants to turn
20   around and argue that his intentional misconduct should be
21   overlooked and my client should be held liable for what
22   Your Honor has characterized as negligence, because remember
23   what happens here, okay?
24              THE COURT:  I don't -- I don't think you're answering
25   my question, Mr. Uppal --
```

1          MR. UPPAL:  I'm saying that the --

2          THE COURT:  -- I don't, I really don't.

3          MR. UPPAL:  Okay.

4          THE COURT:  And I don't want to waste time, because

5    I've got other things I've got to get to and we're already an

6    hour and a half in.  I need you to tell me your position on

7    what I should do about what Mr. Pope has asked.  Let's just

8    talk about the first two issues regarding the LaCie drive.

9          MR. UPPAL:  None of those sanctions should be

10   awarded.

11         THE COURT:  Okay.  Why not?  Just because he's --

12   he's worse?

13         MR. UPPAL:  No.

14         THE COURT:  Okay.

15         MR. UPPAL:  Because --

16         THE COURT:  That's what you've argued so far.  So

17   let's talk about 37(e)(1).  Okay?

18         MR. UPPAL:  Because Mr. Ridley is the cause of the

19   loss of the data on the LaCie drive, because what he did was,

20   he downloaded -- and Mr. Ridley --

21         THE COURT:  I haven't -- but I haven't sanctioned

22   Mr. Ridley for doing that.

23         MR. UPPAL:  No, but --

24         THE COURT:  You didn't ask me to sanction Mr. Ridley

25   for doing that or to find that -- that he didn't preserve it.

1    I have found that you didn't preserve it.  We're past what

2    you're trying to argue.  You lost data.  What do I do about it?

3              MR. UPPAL:  Your Honor, none of those sanctions that

4    Mr. Pope has argued for should be awarded because we contest

5    that Mr. Ridley returned the LaCie drive.  The only evidence --

6              THE COURT:  I know.  And that's one of the sanctions

7    that he's asking for --

8              MR. UPPAL:  Yes.

9              THE COURT:  -- is for you to not be able to take that

10   position, because if we had the LaCie drive or what he said was

11   the LaCie drive, we would -- we would know.

12             MR. UPPAL:  But, Your Honor, that assumes that he

13   returned the LaCie drive.

14             THE COURT:  No.

15             MR. UPPAL:  It does.  I -- I respectfully disagree.

16   Because if he did not return the LaCie drive, then we would

17   have nothing to preserve.  Your Honor has already made the

18   observation --

19             THE COURT:  Wouldn't we know whether he returned it

20   if you had preserved it, whatever he returned?

21             MR. UPPAL:  I'm sorry, Your Honor, could you repeat

22   that?

23             THE COURT:  I mean, am I missing this?

24             MR. POPE:  No, you're not.

25             THE COURT:  Okay.

```
 1            MR. POPE:  No, Your Honor, you're not.

 2            THE COURT:  If you -- if Ecolab hadn't lost whatever

 3    he returned, wouldn't we know whether it was the drive you

 4    expected to be returned?  I mean, I think that's a tautology,

 5    honestly, but what -- you're losing me.

 6            MR. UPPAL:  Sure, Your Honor, but the jury should be

 7    allowed to hear that in light of all the lies that Mr. Ridley

 8    has told, in light of the finding that Your Honor has already

 9    made in your order that Mr. Ridley lacks credibility, a finding

10    similar to Judge Lee's comments about Mr. Ridley's lack of

11    credibility, the jury has ample basis to conclude that although

12    Mr. Ridley, conveniently for him, claims that he returned the

13    LaCie drive, he never in fact did so.  So if, for example --

14            THE COURT:  But -- okay.  I hear you.  If -- but

15    you're telling me that the device that was -- what happened to

16    the LaCie drive?  Was it wiped, or was it destroyed?

17            MR. POPE:  It was destroyed.

18            THE COURT:  Okay.  If we had that in hand, wouldn't

19    we be able to answer that question that you just asked, whether

20    he returned the LaCie drive?

21            MR. UPPAL:  Your Honor, if my client had it --

22            THE COURT:  Answer my question.  If we had that in

23    hand, wouldn't we know the answer to this question you're

24    posing toward Mr. --

25            MR. UPPAL:  But the reason we -- the reason why --
```

```
 1              THE COURT:  Answer my question.  Would we know?

 2              MR. UPPAL:  But, Your Honor, that assumes --

 3              THE COURT:  Would we know?  I'm going to --

 4              MR. UPPAL:  If he had --

 5              THE COURT:  Last time -- last attempt, and then I'm

 6    going to ask you to sit down.  Would we know?  If we had this

 7    in hand, would we know what you're alleging about Mr. Ridley is

 8    true or false?

 9              MR. UPPAL:  When you say if we had it --

10              THE COURT:  All right.  Sit down.  Sit down.  All

11    right.  Let me hear from--  Sit down.

12              Ms. Lund, do you want to respond?

13              MS. LUND:  Yes, Your Honor.  And given that the

14    sanctions that ChemTreat is requesting with regard to

15    plaintiffs' spoliation overlap to some extent with the

16    sanctions that Mr. Ridley is requesting --

17              THE COURT:  Mm-hmm.

18              MS. LUND:  -- I thought it would make sense to go

19    ahead and provide two additional demonstratives that we

20    prepared to help explain, as the judge -- as Your Honor

21    indicated, the sanction that we are requesting, what spoliation

22    it's tied to, what prejudice we have suffered --

23              THE COURT:  Mm-hmm.

24              MS. LUND:  -- and how we're going to cure it.  So if

25    Ms. Mirmira can approach --
```

```
 1              MS. MIRMIRA:  May I approach, Your Honor?

 2              THE COURT:  Sure.

 3              MS. LUND:  -- the bench, she has hard copies to

 4    distribute.

 5              (Brief pause.)

 6              THE COURT:  This looks more complicated, Ms. Lund.

 7              MS. LUND:  So just to orient you to what you have

 8    here, there is one demonstrative that lays out the sanctions

 9    that we proposed in our motion.

10              THE COURT:  Which one are you looking at?

11              MS. LUND:  Remedial Sanctions for Plaintiffs'

12    Spoliation.

13              THE COURT:  All right.  All right.

14              MS. LUND:  And essentially what we have done is taken

15    the four sanctions that we identified in our motion and we have

16    allocated them based on the potential for the -- an inquiry by

17    the Special Master.  And so I'll walk through those.

18              But just in case it comes up, because I know there

19    were a lot of things happening sort of at the same time, we've

20    also prepared a timeline that shows, for example, when

21    plaintiffs have alleged that there were downloads or uploads,

22    when they had access to the documents, when they failed to

23    preserve, just to the extent that it's helpful.  You know,

24    this doesn't necessarily need to be referred to, but, as

25    I said, I know that the briefing has been extensive, there
```

1    have been a lot of dates flying around.  And so you'll see

2    that each discussion has a citation to the docket entry that

3    specifies that evidence so that you can refer back to it.

4          So if everybody has received their copies, the first

5    sanction that we wanted to talk about and which Mr. Pope also

6    referred to, that we believe can be entered now, is that

7    plaintiffs should not be allowed to make any claim that

8    Mr. Ridley deleted the allegedly misappropriated documents

9    before resigning.

10         Now, the reason that we think that this is a very

11   clearly appropriate sanction is because --

12              THE COURT:  This is the LaCie drive, right?

13              MS. LUND:  This -- well, this is the LaCie drive and

14   the laptop --

15              THE COURT:  Okay.

16              MS. LUND:  -- because essentially what happens here

17   is --

18              THE COURT:  Okay.  The second laptop that he only had

19   for a few days?

20              MS. LUND:  Yes.  Well, it was actually -- it was

21   several weeks, Your Honor.  But essentially the way that

22   Mr. Garza, who is their corporate representative and is the

23   individual who was actually involved in recovering documents

24   from Mr. Ridley's OneDrive, to the extent any were deleted,

25   explained it, he said that the way the Ecolab system is set up

1    is that there is a folder on the individual's hard drive that

2    syncs -- it's a two-way sync to the OneDrive that's in the

3    cloud.  So essentially there's an icon that's on the laptop,

4    that is on the C drive, the hard drive, that stores OneDrive

5    documents, and that has a two-way sync to the cloud OneDrive,

6    so that if you put something on the cloud it shows up on your

7    laptop, if you put something on your laptop it shows up on the

8    cloud.

9            And this is critical, because what plaintiffs claim

10   the DLP report shows is that Mr. Ridley copied materials that

11   were on his C drive.  They've referred to it as his OneDrive,

12   which is technically accurate, but it was not the cloud

13   OneDrive.  The DLP report is clear that it was the C drive

14   version, that he copied that to the LaCie drive.  That was

15   principally with the first laptop.  And then what happened

16   was, when he returned his first laptop and received his second

17   laptop, he synced it to the cloud, so that we know immediately

18   whatever was in the cloud OneDrive moved onto his second

19   laptop.

20           And given that the DLP report, as Mr. Garza

21   confirmed, shows absolutely no deletion, and that that is a

22   function that is searched for in every DLP report, as

23   Ms. Semmler, who ran the report, confirmed, we know that if

24   Mr. Ridley had deleted anything, whether from his laptop or

25   from the cloud, it would appear on the DLP report.  It does

1   not appear there.  And that means that every one of these

2   allegedly misappropriated documents remained in the cloud

3   OneDrive when he got his second laptop and every one of those

4   documents was synced to his second laptop.  They spoliated

5   that second laptop.  It was copied to the LaCie drive.  They

6   spoliated the LaCie drive.

7           And the other key point, Your Honor, I think, is

8   that with regard to the second laptop, if plaintiffs' theory

9   is right, if somehow their DLP report is not, as they have

10  asserted, as their expert has testified, a complete reflection

11  of every human interaction that Mr. Ridley had with those

12  files, and if in fact there was some mass deletion that the

13  DLP report failed to capture, and that no automated e-mail

14  went out, even though we have seen that such automated e-mails

15  do go out, but if, setting aside all the actual

16  incontrovertible evidence, you were to believe there was some

17  deletion, we would see that on the second laptop, because it

18  was disconnected from the system entirely when plaintiffs cut

19  off Mr. Ridley's access on July 1st, 2021, it would be a

20  snapshot of what he had on his hard drive and therefore on the

21  cloud OneDrive on that day.

22          But because plaintiffs spoliated that laptop, we

23  have no way of knowing -- we have this evidentiary gap that

24  leaves us with only the evidence on the DLP report.  And the

25  evidence on the DLP report says no deletion.  And so we think

```
1   it's very clear that plaintiffs should not on the one hand be

2   able to rely on the DLP report as this complete recounting of

3   everything that Mr. Ridley did and on the other hand say, "Oh,

4   but as to this one thing, it's inaccurate."

5            We think that given their spoliation of the second

6   laptop and of the LaCie drive, the mobile drive that would

7   allow us to see what, if anything, had been preserved on those

8   two --

9            THE COURT:  Mm-hmm.

10           MS. LUND:  -- physical devices and their ESI, that

11  this is a sanction that can be entered now without any further

12  inquiry.

13           THE COURT:  Has this been -- have you briefed this

14  issue?

15           MS. LUND:  Yes, Your Honor.  You -- it -- you will

16  see that we laid out these sanctions in our opening motion.

17           THE COURT:  But the issue about --

18           MS. LUND:  The second laptop.

19           THE COURT:  -- the second laptop being reflective of

20  what the first laptop would have shown?

21           MS. LUND:  Yes.  That is in our reply brief.  And we

22  specifically cite --

23           THE COURT:  Okay.

24           MS. LUND:  -- I believe, to the testimony of

25  Mr. Garza that talks about the two-way sync.  But to the extent
```

```
 1    that that is not attached, Your Honor, we can submit that to

 2    the Court.

 3              THE COURT:  Okay.  I'm sure it's there.

 4              MS. LUND:  Yeah.

 5              THE COURT:  I'll just have to review it.

 6              MS. LUND:  Okay.  So then moving to the next

 7    sanction, which --

 8              THE COURT:  So let me hear from Mr. Uppal about the

 9    first --

10              MS. LUND:  Yes.

11              THE COURT:  -- the first sanction.

12              All right.  So, Mr. Uppal, I'm going to start this

13    again.  If we had the device that was returned, we would know

14    what device that was, right?

15              MR. UPPAL:  Yes, Your Honor, if in fact it was

16    returned.

17              THE COURT:  Okay.  All right.  So let's move forward.

18              MR. UPPAL:  Your Honor, if I may, I want to go back

19    to the LaCie drive.  So I believe I've conceded the point that

20    you're looking for.  But there's two issues with respect to

21    spoliation.  So there's no sanction, typically, for spoliation

22    if the same material exists in another repository or another

23    form.  And the reason -- what I was trying to say previously,

24    obviously inartfully, is that the reason that the material on

25    the LaCie drive, which is gone --
```

```
 1              THE COURT:  Right.

 2              MR. UPPAL:  -- does not exist is, at its core,

 3    because of Mr. Ridley, because what Mr. Ridley was doing was,

 4    he was downloading information from Ecolab's OneDrive account

 5    to the LaCie drive.  Let's start with he had no reason to do

 6    that.  You have a cloud drive system.  If you want to move

 7    files, if you want to organize them, you organize them on the

 8    cloud drive.  There's absolutely no legitimate or innocent

 9    reason for him to be downloading information from the OneDrive

10    to the LaCie drive.

11              Moreover—and this is the key issue here, in my

12    view, in terms of whatever sanctions Your Honor might be

13    considering—as he downloads material from Ecolab's OneDrive

14    account to the LaCie drive, which he has no innocent reason to

15    do, he contemporaneously deletes the information from the

16    OneDrive account.  Okay?  So because of what he was doing, in

17    a completely mendacious manner—you know, he's got no reason,

18    absolutely none, to be downloading to the LaCie drive—he

19    deletes it from the OneDrive.

20              So, Your Honor, if Your Honor is inclined to

21    conclude that he returned the LaCie drive to Insight, which is

22    a highly contested issue, that same information would have

23    existed on the OneDrive but for the fact that he chose to

24    deprive my client of that information by downloading it and

25    then deleting it from the OneDrive.
```

UNITED STATES DISTRICT COURT

1    So what I was trying to present to Your Honor last

2    time is that in terms of a sanction that you're indicating,

3    you're right that the LaCie drive is gone, but the information

4    on it would have still been present on the OneDrive had he not

5    deleted it on his way out the door.  And under that

6    circumstance I would say to Your Honor that Mr. Ridley has

7    completely unclean hands and no sanction is warranted.

8        The second thing that I want to address is, it would

9    be an anomalous and, I submit to you, an improper situation

10   for Your Honor to have handed down sanctions for alleged

11   spoliation of the LaCie drive if the jury were to conclude

12   that he never returned the LaCie drive.  And that's certainly

13   an open issue.  I haven't seen anything in Your Honor's order

14   to indicate that we are barred from presenting that to the

15   jury.  And there is a load of evidence that Mr. --

16       THE COURT:  Well, I -- look, there's a lot of what

17   I've heard in this case that's not going to be presented to the

18   jury, a lot --

19       MR. UPPAL:  Okay.

20       THE COURT:  -- a lot.  We're not going to -- this

21   case is not going to be two weeks of spoliation.  We're not

22   doing that.  That's a complete waste of time.

23       MR. UPPAL:  Fair enough.  But Your Honor and

24   Magistrate Lee have already indicated that Mr. Ridley lacks

25   credibility.  And so that lack of credibility certainly --

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 102 of 175
102

1    THE COURT:  Well, for our -- look, maybe -- we -- I

2    can't remember what Judge Lee -- but I have made observations

3    for the purposes I have.  I haven't branded him un- -- in- --

4    noncredible for the jury's -- I mean --

5    MR. UPPAL:  I understand.

6    THE COURT:  -- and they're not going to see my

7    orders, so...

8    MR. UPPAL:  Absolutely.  And I certainly understand.

9    And I know that we will follow whatever restrictions Your Honor

10   hands down.  But the point that I'm trying to make is, as

11   things currently stand --

12   THE COURT:  Mm-hmm.

13   MR. UPPAL:  -- we fully intend to argue to the

14   Court -- to the Court and to the jury that Mr. Ridley has a

15   problem with the truth, that he's repeatedly misled us and he's

16   repeatedly lied to us, and one of the many things that he is

17   lying about is returning the LaCie drive.

18   The point to that is, is that if the jury accepts

19   our argument on this issue --

20   THE COURT:  What evidence is there that he didn't

21   return it?

22   MR. UPPAL:  He lies about --

23   THE COURT:  I mean, but -- I understand that.  What

24   evidence is there that he didn't return it?

25   MR. UPPAL:  The evidence -- well, what would be his

 1    motive to have returned it?  The documents that he downloads to

 2    the LaCie drive are Nalco documents, right?  Your Honor has

 3    noted this in your order --

 4         THE COURT:  Right.

 5         MR. UPPAL:  -- that he's downloading while he's at

 6    Nalco.  And he goes over to Ecolab.  His replacement at Nalco

 7    was an individual named Ben Irwin.  And Ben Irwin asked him,

 8    "Hey, I need your Nalco customer files.

 9         THE COURT:  Mm-hmm.

10         MR. UPPAL:  "I need all of this data because I am

11    your replacement to service the same accounts."

12         And he says, "I don't have it.  I don't have it.

13    There's -- I have nothing to give to you."

14         So having made this false statement to Mr. Irwin --

15    and we know it's false because he has it in two forms.  At

16    that stage he has it on his LaCie drive and he also has it on

17    his WD drive.

18         So he outright lies to Mr. Irwin, claiming, "I don't

19    have any of this."  Clearly that's sabotage.  So if he's

20    willing to sabotage and lie to Mr. Irwin, why would he return

21    that LaCie drive at all?

22         (Off-the-record discussion between plaintiffs'

23         counsel.)

24         MR. UPPAL:  Also, Your Honor, some of my client --

25    excuse me, my colleague is reminding me that some of the files

1    that Mr. Ridley accessed on his ChemTreat computer were on the

2    LaCie.  And I suppose he could have had it from another source,

3    but that's certainly an indication that he didn't return the

4    LaCie.

5              So I understand your point.  As I understand it,

6    Your Honor takes --

7              THE COURT:  What -- you're not -- you're not telling

8    me there's an indication that -- say -- say that again.  What

9    did you just say?  Let me understand what you were trying to --

10             MR. UPPAL:  Some of the files that Mr. Ridley

11   accessed by using his ChemTreat computer were files that were

12   located on the LaCie.

13             THE COURT:  The same files?

14             MR. UPPAL:  The same file names.

15             THE COURT:  But not -- you're not telling me he at a

16   relevant time accessed the LaCie.

17             MR. UPPAL:  I don't know.

18             THE COURT:  Okay.

19             MR. UPPAL:  I don't know.  But he --

20             THE COURT:  All right.

21             MR. UPPAL:  -- he could have.  But my --

22             THE COURT:  He could have, like you -- yeah.

23             MR. UPPAL:  The overall point that I'm trying to make

24   is that it would be a strange and, I submit to you, improper

25   situation for your -- for the Court to sanction us for having

```
1    failed, as Your Honor lays out in your order, to preserve the

2    LaCie for the reasons Your Honor lays out, if the jury

3    concludes, which it can, because they're the fact-finder, that

4    Mr. Ridley never in fact returned the LaCie.  That's one issue,

5    that sanctions should not be handed down in this situation

6    where the jury can conclude as the fact-finder --

7              THE COURT:  And what's wrong with that?

8              MR. UPPAL:  Well, Your Honor, then you would be --

9    you would --

10             THE COURT:  I mean, we'd -- yeah, it's a sanction.

11   What's wrong with that?

12             MR. UPPAL:  But, Your Honor, I would -- so what's

13   wrong with that, in my view, is that the sanctions, under that

14   circumstance, would be improper, because if he never returned

15   the LaCie, how could we preserve it?

16             THE COURT:  But, again, we would know if you had it,

17   right?

18             MR. UPPAL:  We would know what he returned, sure.  If

19   we had -- if -- it's described as a -- the return is described

20   as a mobile drive --

21             THE COURT:  Right.

22             MR. UPPAL:  -- and if we had returned the mobile

23   drive, we would know is it a mobile drive or is it the LaCie,

24   yes.

25             THE COURT:  Okay.
```

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 106 of 175
                                                            106

1        MR. UPPAL:  But, Your Honor, the second point is also

2   true, had he not deleted the information from the OneDrive,

3   we'd have the same information that's on the LaCie.

4        THE COURT:  Well, you'd have -- you're saying you'd

5   have copies.

6        MR. UPPAL:  I'm sorry?

7        THE COURT:  You would -- it's not the same.  It's a

8   different bucket of evidence.

9        MR. UPPAL:  No.  No, Your Honor, it's the same,

10  because the information that he downloaded to the LaCie was

11  taken from Ecolab's corporate cloud drive, its OneDrive

12  account.  So if you don't -- like what Mr. Ridley did, as he's

13  downloading to the LaCie, he's making sure to delete it from

14  the OneDrive account because he knows he's leaving.

15       THE COURT:  Right.  But those are two different

16  locations.

17       MR. UPPAL:  Those are two different locations, but

18  typically sanctions are not awarded if the same information

19  that is allegedly gone --

20       THE COURT:  Okay.

21       MR. UPPAL:  -- is available in another source.  And

22  the only reason it's not available in another source is because

23  of Mr. Ridley.

24       THE COURT:  Okay.  Let me -- I'm going to give you

25  more time.  I'm afraid we're going to have to take a break.

1    Unless you tell me that there's a reason not to, I'm going to

2    resume at 2:00.  But does anybody want to address that issue

3    about -- the issue about whether the files on the LaCie drive

4    would have been available somewhere else?

5            MS. LUND:  Yes, Your Honor, if I could briefly be

6    heard.

7            THE COURT:  Okay.

8            MS. LUND:  So, Your Honor, just to clarify, I think

9    it's important to take a step back and understand what was on

10   the LaCie drive based on the DLP report.  The DLP report

11   reflects that Mr. Ridley copied from his hard drive version of

12   his OneDrive to the LaCie drive a group of folders that were

13   Nalco Water folders.  Those were also, per Mr. Ridley's

14   testimony, the same folders that he backed up onto his WD

15   drive.

16           Essentially, as we understand his testimony, he had

17   a habit of creating backups, because of a, you know, mistrust

18   of the cloud-based system where iteratively, say, 2015, 2016,

19   maybe in 2020, he would put copies of these Nalco Water files

20   onto his WD drive.  And then in 2021, as Mr. Uppal has alluded

21   to, he, according to the DLP report, put those same files onto

22   the LaCie drive.

23           So when Mr. Uppal tells you that the same file names

24   appeared on the CrowdStrike log, it doesn't prove it came from

25   the LaCie, because the LaCie is simply the -- the latest

1   iteration of the files that were on the WD drive.  What we do

2   know and as Your Honor is familiar with this because of the

3   order you issued yesterday, the CrowdStrike log actually

4   associates those files with Hard Disk Volume 5 and 6, which

5   are actually, as we have established -- or Mr. Vaughn has

6   established, associated with the serial number that is the WD

7   drive.

8          So, you know, unfortunately we don't have copies

9   from the WD drive, from the ChemTreat laptop, or from any of

10  the various devices or OneDrive that plaintiffs had of these

11  actual documents so that we can say, "Here is the chain of

12  custody."

13         THE COURT:  Mm-hmm.

14         MS. LUND:  The other issue I wanted to address is

15  that Mr. Uppal said repeatedly that Mr. Ridley downloaded these

16  documents and then contemporaneously deleted them.  But I

17  didn't hear him cite to any evidence of that, and the reason is

18  that there is no evidence.  That is in fact contrary to the DLP

19  report which says that no deletion happened, contrary to the

20  testimony of their corporate representative Mr. Garza who said

21  that if any deletion had occurred it would be reflected on the

22  DLP report, and contrary also to the testimony of Mr. Garza

23  where he said that in July of 2021, sometime between when the

24  DLP report was requested, which was July 18th, and the end of

25  the month, which is on the timeline, he participated in a

 1  working group where everything that had been deleted from that

 2  cloud-based OneDrive of Mr. Ridley's was recovered.

 3          THE COURT:  Mm-hmm.

 4          MS. LUND:  And he said that reached back 93 days.

 5  And you can see that that period, depending on whether it was

 6  the end of July or mid July, reaches back to sometime in April,

 7  long before any of the alleged misappropriation activity

 8  occurred.

 9          So even if all of those documents had been deleted,

10  although, again, plaintiffs' own documents reflect they

11  weren't, the undisputed testimony is that any deleted

12  documents were recovered.  What we know is that by the time

13  that plaintiffs finally forensically imaged a copy of that

14  cloud-based OneDrive that had been placed at some point in

15  time on the laptop of a paralegal who worked in Ecolab's

16  in-house legal department -- that was January 25th, 2022, that

17  Mr. Lieb forensically imaged that copy.  And what we know is

18  that by the time that was imaged, the copy produced to us did

19  not contain any of those Nalco Water files.

20          So at some point between when Mr. Garza recovered

21  them in July of 2021 and when plaintiffs forensically imaged

22  that OneDrive in January 2022, those files disappeared.  But

23  that was entirely within plaintiffs' control, and so they

24  cannot be heard now to complain that they don't have those

25  files.  That is attributable to their --

```
1              THE COURT:  All right.  We'll stop there, and I'll

2    hear from Mr. Uppal when we get back.

3              Also, talk about two things during the break.  One

4    is trial dates in January.  I think I can arrange to do this

5    any week.  And two is, talk about who you want to mediate your

6    case on September 11th, September 11th.

7              MR. WALTON:  Did you say mediate on September 11th?

8    My --

9              THE COURT:  I did.

10             MR. WALTON:  -- hearing is a little off in here.

11             THE COURT:  That's all right.  No, this room is --

12   the acoustics in here are not --

13             MR. WALTON:  But a beautiful room, Your Honor.  It's

14   not --

15             THE COURT:  It's beautiful, but it's not -- the

16   acoustics are not good.  So --

17             MR. WALTON:  Okay.

18             THE COURT:  -- talk about those two things.  I know

19   we'll have scheduling issues.  But I'll see you at 2:00.

20             (Luncheon recess.)

21             THE COURT:  All right.  Let's pick up where we left

22   off.  What about a trial date?  Where are we on that?

23             MS. MIRMIRA:  Your Honor, you asked about the trial

24   date?

25             THE COURT:  Yes.
```

```
 1          MS. MIRMIRA:  Yes.  So we've discussed it.  I think
 2   January 29th works for all parties to start trial.
 3          THE COURT:  Okay.  All right.  And then mediation?
 4   What are people saying about that?
 5          MR. WALTON:  Plaintiff says yes.
 6          THE COURT:  Yep.  Do you have any ideas about who
 7   or --
 8          MS. MIRMIRA:  I think we can work it out amongst the
 9   parties.
10          THE COURT:  Okay.  All right.  The reason -- and
11   obviously, you know, if we -- if you can get it set for a
12   different date, that's fine, but I will -- but I know you're
13   available on the 11th, right?
14          MS. MIRMIRA:  (Moving head up and down.)
15          MR. WALTON:  Yes.
16          (Laughter.)
17          MR. WALTON:  Yes.  But there's a lot of good
18   mediators, Your Honor.  We started checking schedules, and
19   their --
20          THE COURT:  Yeah.
21          MR. WALTON:  -- their schedules are pretty crammed.
22          THE COURT:  I know.  And that's -- that'll be an
23   issue.  Do you have anybody in mind?  Have you talked about
24   names?
25          MS. MIRMIRA:  No, we didn't quite -- well, they have
```

```
 1    one suggestion, but we haven't --

 2            THE COURT:  Yeah.

 3            MS. MIRMIRA:  -- gotten very far just in a few

 4    minutes.

 5            THE COURT:  Okay.

 6            MR. BOEHM:  Your Honor, I suggested Michael Russell,

 7    but I just checked his calendar and he's booked every day in

 8    September.  So...

 9            THE COURT:  Okay.

10            MS. MIRMIRA:  And we may have some suggestions as

11    well.  But I think we can work it out amongst the parties to

12    find somebody agreeable to everyone.

13            THE COURT:  Okay.  Where are the corporate offices?

14    I don't remember.

15            MR. WALTON:  Ecolab's are up in Minneapolis.

16            THE COURT:  Okay.

17            MS. MIRMIRA:  And the ChemTreat's headquarters is

18    near Richmond, Virginia, Glen Allen.

19            THE COURT: All right.  We'll work on that a little

20    bit more next week.

21            MR. WALTON:  Thank you, Your Honor.

22            THE COURT:  All right.

23            Okay.  Yes, sir, Mr. Uppal.  Take it away.

24            (Brief pause.)

25            MR. UPPAL:  Thank you, Your Honor.  I want to address
```

1    the issues that were raised by opposing counsel right before

2    the break.

3              So, Your Honor, our expert is here.  I realize we're

4    pressed for time, but if Mr. Lieb had an opportunity to be put

5    on the stand, he would testify that he recovered, "he" being

6    our expert witness Mr. Lieb, recovered the contents of

7    Mr. Ridley's Ecolab OneDrive account as that account and its

8    contents existed as of the date of Ridley's departure from

9    Ecolab on July 1, 2021.

10             So, again, our expert, his position and he's willing

11   to testify under oath that it is whatever Mr. Ridley had on

12   his OneDrive account as of July 1, 2021, we have.  And, in

13   fact, we've produced that to the other side.

14             And here's the next point.  Mr. Lieb our expert's

15   report already makes clear and states that Mr. Ridley had a

16   top-level folder called Ridley's Nalco Folder, because,

17   remember, as of 2021 Mr. Ridley had left or transferred from

18   Nalco to Ecolab, right?  So on his OneDrive account Mr. Ridley

19   has Ecolab files and he has Nalco files.  The Nalco files

20   which are relevant to this case are all in a top-level folder

21   called Ridley's Nalco Folder.  This is already in the

22   disclosed report.  The Digital Guardian or DLP report shows

23   that everything that Mr. Ridley downloaded from his OneDrive

24   to his LaCie came from this Ridley's Nalco Folder.

25             Mr. Lieb's report further states that the Nalco --

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 114 of 175
114

1    the Ridley's Nalco Folder, although it existed, it was

2    deleted.  Let me say that again.  Ridley deleted the entire --

3    not just the contents, the entire folder that he named

4    Ridley's Nalco Folder.

5                    THE COURT:  Mm-hmm.

6                    MR. UPPAL:  Okay.  Now, because we know, because

7    Mr. Lieb will testify that he recovered the OneDrive as it

8    existed on July 1, 2021, which is Mr. Ridley's departure date,

9    and that recovered OneDrive account does not contain the folder

10   called Ridley's Nalco Folder, this means that Ridley deleted

11   the Ridley's Nalco Folder before he left Ecolab on July 1,

12   2021, and joined ChemTreat.

13                   This in turn also shows that Ridley's Nalco Folder

14   on the OneDrive never made it to the replacement computer.

15   You heard Mr. Lund -- Ms. Lund, excuse me, make the argument

16   to you that, "Hey, there's this replacement computer," and in

17   the briefing, you know, it's stated that that replacement

18   computer was issued to Mr. Ridley on or about July 9 --

19                   THE COURT:  Mm-hmm.

20                   MR. UPPAL:  -- so -- excuse me, June 9.  And Ms. Lund

21   essentially, if I understood her argument, is arguing that,

22   "Hey, the second replacement computer was not preserved, and if

23   you had preserved it, it would have synced up with the OneDrive

24   and therefore you would know what's on that OneDrive, and

25   therefore there's spoliation."

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 115 of 175
                                                                115

 1          But that's not correct, because the sync between the

 2   replacement computer and the OneDrive is only going to sync up

 3   to what exists on the OneDrive account, and that's all been

 4   deleted.  Mr. Ridley deleted the entire Ridley's Nalco One

 5   Folder from which he deleted onto the LaCie.

 6          So even if you indulge this argument that the

 7   replacement computer would have synced up to the OneDrive, it

 8   doesn't get you anywhere, because you can't sync up to

 9   something that doesn't exist on the OneDrive.  And it doesn't

10   exist on the OneDrive because Mr. Ridley deleted it.  And he

11   deleted it on or before his departure date of July 1, 2021.

12          All this is important because we take to heart

13   Your Honor's admonition and Your Honor's views on the fact

14   that the mobile drive should have been preserved.  But we hope

15   that Your Honor, in assessing whether sanctions are

16   appropriate in the first place --

17          THE COURT:  Mm-hmm.

18          MR. UPPAL:  -- or what level of sanctions should be

19   addressed, will consider that sanctions are not usually awarded

20   if the evidence that wasn't preserved is available on another

21   source.  And here it was available on another source except for

22   Mr. Ridley's misconduct in deleting it from that second source,

23   the OneDrive account.  And, again, bear in mind --

24          THE COURT:  Couldn't he say the same about you?

25   "Yeah, I know I deleted it, but it would be available if they

```
 1   hadn't deleted it," right?

 2           MR. UPPAL:  Yeah, but, sure, but, sure, that's

 3   circular, and it's his burden of proof --

 4           THE COURT:  Yeah.

 5           MR. UPPAL:  -- on sanctions, right?  Essentially, you

 6   know, that, to me, if you were to say the same thing, that, to

 7   me, is somewhat analogous of someone who, you know, goes about,

 8   you know, a home invasion robbery and trips on the way out on

 9   some snow and says, "You were negligent in not shoveling the

10   show off your driveway."

11           Yeah, that's theoretically possible, but there

12   should be some level -- obviously Your Honor has discretion on

13   this, and obviously the issue, at least obvious to me, the

14   issue of unclean hands should come into effect, because -- or

15   should be taken into account, because bear in mind not only

16   does he bear the burden of proof on this issue but all -- he

17   shouldn't be messing with the LaCie drive at all.  There's no

18   innocent reason for him to download documents onto the LaCie

19   drive when he has a OneDrive account available.

20           THE COURT:  What -- I think that goes a bit too far,

21   though, doesn't it?  What do you mean, there's no innocent

22   reason?  I -- look, I have hard drives, I have OneDrive, I have

23   local drives, USB.  I've got stuff strewn everywhere.  I mean,

24   I wish one weekend I could just sit down and make it neat --

25           MR. UPPAL:  Mm-hmm.
```

1        THE COURT:  -- you know?  And I spent about 20

2   minutes this weekend trying to do that, but I didn't get it.

3        MR. UPPAL:  But the difference is, you own all that

4   information, so you should do and can do to your heart's

5   content whatever you want to do with it.

6        THE COURT:  No, I know, but -- no, no, but the -- so

7   I don't understand how just using the LaCie drive is somehow

8   verboten.  What -- you said there's no innocent reason to use

9   it.

10       MR. UPPAL:  Mr. Ridley's contention is that before

11  Ecolab instituted or made available the OneDrive account,

12  individuals such as himself were encouraged to back up to local

13  drives, and Ecolab gave him the LaCie drive.

14       THE COURT:  Right.

15       MR. UPPAL:  Okay.  Let's just indulge that, that that

16  made sense once upon a time.  That's the only reason he's

17  offered.  But that reason goes away as of 2018 when Ecolab

18  institutes this robust Microsoft cloud drive-based system.  Now

19  there's no reason to back up to a local drive.  So, in any

20  event, Your Honor, there was this other source of information,

21  which is solely the fault of Mr. Ridley for it being vanished.

22       The next argument that opposing counsel makes is,

23  also, the DLP, also known as the Digital Guardian Report,

24  doesn't show deletions and therefore my client should be

25  precluded from arguing that there were deletions from

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 118 of 175
118

1   Mr. Ridley's OneDrive account or, more specifically, the

2   folder that he called Ridley's Nalco Folder.  But that fails,

3   because what they're not telling you or perhaps they don't

4   know is that the rules set on that Digital Guardian Report do

5   not account for deletions.  We've confirmed this during lunch

6   with our expert.  Okay?

7           So, remember, the purpose of the Digital Guardian

8   Report is essentially to show exfiltrations, downloading to

9   USB drives, downloading to external drives.

10          THE COURT:  Mm-hmm.

11          MR. UPPAL:  But deletions happen in the normal

12  course.  So as I stand here today I do not know whether the

13  Digital Guardian Report -- whether it's possible for that

14  report to be -- for rules to be set to show deletions.  But

15  let's assume that it is possible.  What I am telling you is,

16  I've confirmed with my expert during the lunch break that for

17  the Digital Guardian Report that's at issue in this case --

18          THE COURT:  Mm-hmm.

19          MR. UPPAL:  -- the rules were set so as to not log

20  deletions.  And there's nothing unusual about that, because

21  deletions happen in the normal course.

22          Finally, Your Honor, on this issue of sanctions, in

23  talking to my expert during the lunch break, he also had a

24  suggestion to Your Honor's point earlier on that is there some

25  indicia that files from the LaCie drive were transferred.

1  Well, first of all, as I said previously, there is some

2  indicia, because the same file packs and the same file names

3  exist on the WD drive.  Okay?  So the CrowdStrike report shows

4  the same file names on the WD drive as well as the LaCie

5  drive, and that is at least some indicia that there was a

6  transfer from whatever -- not from whatever, from the huge

7  amount of information and files that was downloaded to the

8  LaCie drive.

9         But if Your Honor, as I believe -- I'm not putting

10  words in your mouth, but if Your Honor is going to allow us to

11  inspect the wife's personal computer that we've learned about

12  for the first time today, should have been disclosed to us six

13  months ago, one of the things that we should be allowed to

14  look at on the wife's personal computer is, was the LaCie

15  drive hooked up to the wife's personal computer.  We know as

16  of today and today for the first time that it was hooked up to

17  the WD drive.  So why wouldn't it be hooked up to the LaCie

18  drive?  Certainly it's possible.

19         So this is a suggestion that if Your Honor believes

20  that some type of sanction such as precluding us from arguing

21  that the LaCie drive was returned is appropriate, then my

22  request would be please hold that in abeyance until we at

23  least get to look at the spouse's computer to see if the LaCie

24  drive was hooked up to it and when it was hooked up to it,

25  because if that computer shows that the LaCie drive was

UNITED STATES DISTRICT COURT

Case 1:22-cv-00050-TRM-CHS   Document 357-1   Filed 08/01/23   Page 119 of 175   PageID #: 14918
Case 1:22-cv-00050-TRM-CHS   Document 350-1   Filed 06/27/23   Page 119 of 175   PageID #: 9186

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 120 of 175
120

```
 1   connected to it after July 1 of 2021, then Your Honor knows

 2   that that LaCie drive was not returned.

 3              THE COURT:  Okay.

 4              MR. UPPAL:  Thank you, Your Honor.

 5              THE COURT:  Yes, ma'am.

 6              MS. LUND:  Your Honor --

 7              THE COURT:  Mm-hmm.

 8              MS. LUND:  -- if I may before I turn to Mr. Uppal's

 9   argument, there are two issues that I just wanted to close the

10   loop on for Your Honor with regard to questions that you had

11   asked in our morning session.

12              THE COURT:  Mm-hmm.

13              MS. LUND:  And the first one -- and I'm going to put

14   this on the Elmo, and I apologize for my poor handwriting, but

15   I checked to see what I was remembering about the terabytes.

16   That specifically relates to the network folders to which

17   Mr. Ridley had no access permissions; that is, he was not

18   allowed to upload, download, view.  So it's really separate.

19              THE COURT:  Mm-hmm.

20              MS. LUND:  But it has over 60 terabytes in the

21   network folders, which is roughly 4.5 billion pages.  So that

22   is just one of the repositories that plaintiffs are asking to

23   search.

24              THE COURT:  And what about the other ones?  Any

25   ballpark ideas about the other ones?
```

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 121 of 175
                                                           121

1          MS. LUND:  So everything that is identified as being

2     searched by ChemTreat's counsel with the blue --

3          THE COURT:  Mm-hmm.

4          MS. LUND:  -- that altogether is——let me just get

5     this number——623,346 files.  And that is in our ESI report that

6     we filed at --

7          THE COURT:  Mm-hmm.

8          MS. LUND:  -- Docket 143.  The things searched in red

9     I cannot attest to because that is information that we do not

10    have, but that would obviously be some incremental amount.

11         What I can tell you is that sales force employees in

12    general did not use their OneDrives very often.  That seems to

13    be much more of a function of Nalco/Ecolab people, not

14    ChemTreat people.  HR does use OneDrives as well as SharePoint

15    for things like their -- what they call the funnel, their

16    hiring funnel where they're considering hiring across the

17    ChemTreat network.  So that's where this SharePoint appears as

18    well.  But if you can see, Mr. Ridley had no upload or edit

19    permissions to any SharePoint file.

20         THE COURT:  Okay.

21         MS. LUND:  Okay.  Then the second thing I wanted to

22    address -- and this actually ties into an argument which

23    Mr. Uppal made, which is, we had discussed this issue about the

24    synchronization between the second laptop and the OneDrive.

25    And that citation and discussion is in our reply in support of

```
1    our sanctions motion.  It's Docket Entry 326, at Page 5.  In

2    the last sentence just above the header B, it reads, "Given

3    that both plaintiffs and Ridley agree that the contents of his

4    cloud-based OneDrive automatically synced to his laptop's hard

5    drive, the same ESI from Ridley's first laptop, as reflected in

6    the DLP report, would have been available on the second laptop

7    at the time plaintiffs admit they had a duty to preserve that

8    laptop's ESI."

9              And the citation there to Exhibit 19, that's the

10   specific testimony from Mr. Garza, their -- you know, their

11   corporate representative and individual who actually recovered

12   the files from the OneDrive, explaining about the

13   bidirectional automatic synchronization between the laptop and

14   the OneDrive.

15             So turning, then, to Mr. Uppal's arguments, this

16   ties in because he was very focused on his question of

17   deletion of the OneDrive.  Now, first of all, as I understood

18   his argument, plaintiffs' only evidence of this alleged

19   deletion is not the DLP report that Mr. Lieb opined was a

20   complete and thorough reflection of every interaction that

21   Mr. Ridley had with the OneDrive during the time period

22   covered, but, rather, Mr. Lieb's post hoc assessment seven

23   months later when he reviewed those files after they had been

24   collected in whatever manner they were collected.

25             I heard Mr. Uppal say now that Mr. Lieb is averring
```

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                Page 123 of 175
123

```
 1    that he recovered the OneDrive in January of 2022 as of the

 2    status it had on July 1st, 2021.  The problem is that, based

 3    on the sworn testimony of Mr. Garza, that is literally

 4    impossible.  Mr. Garza made clear and testified repeatedly and

 5    clearly that there is a 93-day period during which you can

 6    recover the OneDrive or materials from the OneDrive and then

 7    an additional 14-day period where with the outside assistance

 8    of Microsoft's tech people you can retrieve it.

 9              THE COURT:  Let me -- let me interrupt, because I --

10    you lost me about 90 seconds ago.  So start --

11              MS. LUND:  I apologize, Your Honor.  There's a lot of

12    facts and figures.

13              THE COURT:  Start this thought again.

14              MS. LUND:  And this is actually where it might be

15    helpful to just go ahead and look at our timeline, because --

16              THE COURT:  Okay.

17              MS. LUND:  -- you can see that the latest that

18    Mr. Garza could have recovered all the files that he recovered

19    on the OneDrive was at the end of July, and there was a 93-day

20    period for recovery.  And in fact --

21              THE COURT:  Okay.  But explain -- I'm still not

22    caught up.

23              MS. LUND:  Yeah.

24              THE COURT:  Explain to me how you --

25              MS. LUND:  And so -- and actually Your Honor actually
```

```
 1    put this in the spoliation order, which is Document 349, at

 2    Page 6, where you say, "Mr. Garza recovered the 93 days."  If

 3    you look at the testimony that was cited in support of that

 4    93-day period --

 5              THE COURT:  Right.  But tell me where you are on the

 6    -- on this graph here, is what I'm --

 7              MS. LUND:  Oh, so I'm just using this, I guess, to

 8    show -- well, first, the full period is 93 days.  And if you

 9    look at the testimony that we cited in our briefing,

10    Mr. Garza's testimony, when I examined him he explained 93 days

11    is the maximum period during which Ecolab can recover any

12    deleted files from a OneDrive or the OneDrive itself if it has

13    been deleted --

14              THE COURT:  Mm-hmm.

15              MS. LUND:  -- and then with outside help from

16    Microsoft there is an additional 14-day look-back period.  So

17    the point is that if Mr. Lieb is saying that in January of

18    2022 -- and I'll make it clear that this was, as Your Honor

19    knows from the order you issued yesterday, a disputed issue for

20    which you have granted us leave to seek a deposition -- I mean,

21    to take a deposition of Mr. Lieb.  If his position is now that

22    in January of 2022 he recovered the OneDrive as it existed

23    seven months earlier, that is literally impossible, for two

24    reasons, one, because if there actually were any deleted

25    documents, they were long gone, but, two, we know from
```

1    Mr. Garza's sworn testimony, as reflected in Your Honor's

2    order, that any deleted documents were recovered by Mr. Garza

3    as of the end of July of 2021 at the latest, and that that

4    93-day period without any outside assistance fully covers the

5    entire period covered by the DLP report.

6            THE COURT:  Okay.

7            MS. LUND:  Now, Mr. Uppal said that the DLP report

8    does not show deleted files.  Again, this is directly contrary

9    to the testimony of plaintiffs' corporate representative and

10   the person who is in charge of the group that deals with this,

11   which was Mr. Garza.

12           In addition, it's directly contrary to the testimony

13   of Ms. Semmler, who actually ran the DLP report.  And you will

14   see that we cited in our briefing the policy that she follows

15   that actually shows a screenshot of the rules that you can

16   select that includes deletion.  And she testified clearly and

17   repeatedly that she always double-checks to be sure that each

18   of those categories is marked, including deletion.

19           So we have the sworn testimony of plaintiffs' own

20   witnesses versus a new opinion being offered, via counsel,

21   from Mr. Lieb today.  And I do not think that this is the

22   point at which Mr. Lieb can be inserting new opinions

23   regarding what the DLP report would show, even if he had any

24   prior experience with DLP reports, which, as Your Honor knows

25   from the order issued yesterday, he does not.

1    So the next issue I wanted to address was, when

2    Mr. Uppal said that the synchronization that occurred with

3    Mr. Ridley's second laptop on July -- sorry, excuse me,

4    June 9th of 2021 would only reflect what was on his OneDrive

5    at the time.  And that's absolutely correct.  The problem for

6    plaintiffs is, that argument simply underscores the

7    significant prejudice that plaintiffs' spoliation of that

8    second laptop has worked on ChemTreat, because if we had that

9    laptop, which would show a snapshot of what was on it as of

10   July 1st, 2021, we would know had Mr. Ridley, contrary to the

11   DLP report, deleted those files from the OneDrive before he

12   left, in which case they would not appear on that second

13   laptop, or, as the DLP report reflects, were those files

14   simply copied, not deleted, not moved and lost, but simply

15   copied, in which case all of those files would still appear

16   there.

17       And one other data point I want to add on that,

18   Your Honor, is that you will see in the record—and I believe

19   it's Plaintiffs' 2008, but I don't have the exhibit citation,

20   I'll pull that for you—there is a single e-mail that

21   plaintiffs produced that reflects a warning from OneDrive

22   deletion that went to Mr. Ridley, and it says, "Heads up.  We

23   see you just deleted a large volume of files from the

24   OneDrive.  You have 93 days to recover them."  That was sent

25   on May 11th.  It is the only heads-up e-mail they've sent.

1    There is an out-of-office bounce-back to that e-mail that

2    occurs a few weeks later, but that is the only e-mail that

3    reflects deletion.

4            And the important point there is, first, it occurred

5    on May 11th, before any of the alleged misappropriation shown

6    on the DLP report—and you'll actually see it's reflected

7    here, it's Document 303-16, the May 11, 2021, on the

8    timeline—and, second, that it obviously cannot relate to any

9    deletion from Mr. Ridley's OneDrive of the misappropriated

10   files because all of those files were, according to

11   plaintiffs, misappropriated after that, but, second, it's

12   within this recovery period where Mr. Garza's testimony

13   confirms any deleted documents were recovered.  So if that

14   related to the Nalco Water files rather than to, per

15   Mr. Ridley's testimony, some personnel files that he deleted,

16   they would have been recovered, regardless of the subject

17   matter of them.

18           And then, finally, Mr. Uppal referred to the idea

19   that there are the same file names in the CrowdStrike log as

20   appear on the DLP report as going to the LaCie drive.  But as

21   we discussed this morning, the CrowdStrike log makes it clear

22   that those same files, the Nalco Water files, were linked to

23   the serial number of the WD drive and not the LaCie drive.

24           I will say—and you'll see this actually on the

25   remedial sanctions we were discussing—that consistent with

```
 1    what Mr. Uppal just said regarding the sanction of the mobile

 2    drive, it is not our intent to seek a sanction that is

 3    counterfactual, it is our intent to seek a sanction that fills

 4    an evidentiary gap that has been created by plaintiffs.  So if

 5    in the Special Master's review of Mr. Ridley's wife's laptop

 6    he determines that the serial number of the LaCie drive was

 7    connected on or after Mr. Ridley testified that he returned

 8    that drive, then I think we need to revisit whether this is an

 9    appropriate sanction and perhaps craft an evidentiary sanction

10    rather than this specific proposed one.  But, otherwise, this

11    is a gap in the evidence that was created purely by

12    plaintiffs' spoliation that was, you know, at a minimum,

13    I would say, grossly negligent given that they were on notice

14    not only of potential litigation but of the importance of

15    external drives that Mr. Ridley had, that they didn't preserve

16    the mobile drive when they received it back from Mr. Ridley.

17              THE COURT:  Okay.  All right.  Any rebuttal to that,

18    or --

19              MR. POPE:  Your Honor, I have some points I'd like to

20    make here --

21              THE COURT:  Yeah.  Come on.

22              MR. POPE:  -- three points.

23              THE COURT:  Mm-hmm.

24              MR. POPE:  Mr. Uppal says that there's -- there would

25    be proof of what could have been recovered had Mr. Ridley not
```

1    deleted files from the OneDrive.  Your Honor, that's not the

2    proof that Mr. Ridley's interested in.  Mr. Ridley's interested

3    in the proof that shows all of the files that were downloaded

4    to the LaCie drive were returned to Ecolab.

5              THE COURT:  Mm-hmm.

6              MR. POPE:  He can't show that with anything that was

7    on OneDrive.  The only way that that can be shown is if Ecolab

8    produces the LaCie drive with the files that were on it when it

9    was returned.  There's no way for Mr. Ridley to overcome the

10   prejudice without having that device.  That's the first point.

11             The second point——and it follows some of what

12   Ms. Lund said——regarding Mr. Uppal's point that the DLP report

13   does not show deletion, Your Honor, the DLP report includes

14   over 16,000 files.  The files are there on the DLP report.

15   Those files do not show that they were deleted.  It just does

16   not show that on the DLP report.  It shows -- so to the extent

17   that Mr. Uppal indicates that there's some question about

18   whether those files were deleted, they are on the DLP report,

19   they do not show deleted.  Dave Garza, the 30(b)(6)

20   representative, indicates that that report shows no deletions.

21   That testimony seems clear.

22             THE COURT:  Mm-hmm.

23             MR. POPE:  And then the final point I'd like to make,

24   Your Honor, is that for the plaintiffs to be able to argue that

25   Mr. Ridley, because he made all these alleged

```
 1    misrepresentations about other things, did not return the LaCie

 2    drive completely cripples Mr. Ridley's ability to disprove what

 3    the plaintiffs are saying.

 4           They want to be able to say, "Well, he didn't return

 5    the LaCie drive."

 6           And Mr. Ridley would then want to say, "Well, show

 7    me what I did return.  Show me what I did return.  Show the

 8    jury that what I did return was not the LaCie drive."

 9           THE COURT:  Yeah.

10           MR. POPE:  And the plaintiffs have prevented that

11    evidence from going to the jury.  And that's just not

12    permitted, Your Honor.  That's just not permitted.

13           Those are the three points that I have.  Thank you.

14           THE COURT:  Yes, sir.

15           MR. WALTON:  Your Honor, we're going to -- I just

16    have two quick points to respond to Ms. Lund.  Excuse my

17    handwriting here.

18           THE COURT:  Mm-hmm.

19           MR. WALTON:  Jim Vaughn is in red.  Excuse my filling

20    in with the pen.  One issue is, if he's going to get up here on

21    the stand in front of this jury and testify that he searched

22    all these repositories in red and there's no Nalco or Ecolab

23    files in there, in fairness, do I want to look through

24    4.5 billion pages?  No.  But if he's going to testify to that,

25    I should be able to search that, too.
```

```
 1              Number 2, what we're asking for --
 2              THE COURT:  But that's not based on spoliation,
 3    it's --
 4              MR. WALTON:  No, sir.  That's based on the other
 5    objection that's in front of you that was mentioned in your
 6    order.
 7              And then the other thing is that she's talking about
 8    623,346 files for the "Individual Custodians."  Well, he's --
 9    they've searched those.  What we're asking for is everything
10    that Mr. Vaughn searched and the local hard drives for these
11    12 people.  So I just want to make that clear.
12              THE COURT:  Well, let me ask you -- so you say
13    "everything that Mr. Vaughn searched."  There are a couple of
14    entries on here that -- I'm not -- I'm not about to make any
15    hard-and-fast decisions on the fly here, but, you know, aren't
16    some of these repositories more relevant than others?
17              MR. WALTON:  Potentially, but then he shouldn't be
18    able to testify to them.
19              THE COURT:  I understand.  But for the purposes of
20    the Special Master --
21              MR. WALTON:  Yes.
22              THE COURT:  -- I mean, I assume you're more
23    interested in "Other Salesforce Employees" and "Individual
24    Custodians" --
25              MR. WALTON:  Yes.
```

1          THE COURT:  -- than you are "HR" and "IT and Admin,"

2     right?

3          MR. WALTON:  Absolutely.  Absolutely, Your Honor.

4     But, again, as long as Mr. Vaughn can't testify to them and

5     he's precluded from testifying about HR and IT and

6     everything -- and I did it again, I apologize --

7          THE COURT:  That's all right.

8          MR. WALTON:  -- then we don't need to see it.

9          THE COURT:  So, of those, within those two spaces

10    there, "Individual Custodians" and "Other Salesforce

11    Employees," tell me, you know, if you had to pick two of the

12    custodians and three of the ones in the other sales force, who

13    would you -- who would you say is the most necessary?

14         MR. WALTON:  Well, I think -- well, I'm not going to

15    answer your question directly, because I would say at minimum

16    we need four -- these four individuals here, because they are

17    by far the --

18         THE COURT:  "Individual Custodians"?

19         MR. WALTON:  Excuse me?  I'm sorry?

20         THE COURT:  The individual you pointed to --

21         MR. WALTON:  Yeah.  Maybe not John Alcorn as much,

22    but Steve Leavell, Todd Cissell, and Tyler Bates.  And then

23    I would say all the sales force employees are very important,

24    because they're the ones that we believe he would have been

25    trading data with that he took.

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 133 of 175
133

```
 1            THE COURT:  Well, tell me what -- I know you believe,
 2    but who was he actually interacting -- what does the evidence
 3    show --
 4            MR. WALTON:  You know, I don't -- they picked these
 5    12 people for a reason.  I don't know.  I can get back to the
 6    Court on that, or potentially list that, or potentially that's
 7    something we can address with the Special Master.  I can't
 8    adequately identify, for example, did he have more contact with
 9    Mr. DeNunzio versus Michael Kraft.  I just don't know standing
10    here right now, Your Honor.
11            THE COURT:  Is there anybody you would add to that
12    list?
13            MR. WALTON:  Not that I'm aware of right now.
14            THE COURT:  How many people are on there?  One,
15    two --
16            MR. WALTON:  Twelve, total.  It's the four and the
17    eight, I think.  One, two, three, four, five, six, seven,
18    eight, nine -- well, it's ten and the four.  And, really,
19    I mean, John -- John Alcorn and Steve Leavell are pretty high
20    up.
21            THE COURT:  Yeah.
22            MR. WALTON:  So I'm thinking, you know, if you made
23    me pick two, it would be Clay Cissell and Tyler Bates, out of
24    those four.  Okay?
25            THE COURT:  Okay.
```

```
1              MR. WALTON:  And then I would want as many
2    salespeople as I could get.  But I don't need HR.  I don't need
3    IT.
4              THE COURT:  Mm-hmm.
5              MR. WALTON:  I don't need secretaries, assistants.
6    And, again, that's --
7              THE COURT:  What about this enormous Network Folders?
8              MR. WALTON:  Excuse me, sir?  I'm sorry?
9              THE COURT:  What about the network folders?
10             MR. WALTON:  Network folders?  Well, again, if he's
11   not going to testify -- if Mr. Vaughn gets up and testifies,
12   "I searched the network folders and found no Nalco folders,"
13   then I want access to those network folders.  If he's precluded
14   from testifying about that, then I don't need access to them.
15             THE COURT:  Mm-hmm.  Is there -- I mean, other than
16   that, is there proof either way on that issue that anybody has,
17   other than Mr. Vaughn?
18             MR. WALTON:  I guess just Mr. Vaughn.  I think he's
19   the only one to testify about it.
20             THE COURT:  So if Vaughn didn't say that, it would
21   just be silent?
22             MR. WALTON:  I'm sorry, Your Honor, I'm having
23   trouble hearing you.
24             THE COURT:  That's all right.  If Vaughn -- I was
25   really directing it to Ms. Lund --
```

```
 1              MR. WALTON:  Okay.

 2              THE COURT:  -- but if Vaughn didn't testify about,

 3    for example, network folders, would we then hear other

 4    testimony or evidence about network folders?

 5              MS. LUND:  Well, Your Honor, as I indicated,

 6    Mr. Ridley did not have access to the network folders.

 7              THE COURT:  Right.  And that's why I'm asking.  Is

 8    there --

 9              MS. LUND:  Right.

10              THE COURT:  -- is there some other issue that's going

11    to show up and say, "Well, if it -- if he had stolen this, it

12    would be on the network folders, and I looked and I don't think

13    it was."  Is there anything like that?

14              MS. LUND:  If necessary, we could provide a witness

15    who could testify to that.

16              THE COURT:  A fact witness?

17              MS. LUND:  Yes, Your Honor.

18              THE COURT:  Who -- who would know that?

19              MS. LUND:  It would have to be somebody who dealt

20    with that.  Essentially the way that it works, as I understand

21    it, is that you have to specially request permission to get

22    access to a network folder.  And that goes through a

23    gatekeeper.  And I don't know the name of the individual or

24    group that is the gatekeeping function.

25              THE COURT:  Okay.
```

1          MS. LUND:  But it is -- it is impossible for

2    Mr. Ridley to have uploaded anything to that or downloaded

3    anything from that.  And that was searched for the names of all

4    11,000 plus unique file names on the DLP report, and there were

5    no hits.

6          THE COURT:  Okay.

7          MR. WALTON:  Well, I think if the testimony is,

8    Your Honor, that he didn't have access to it, it stops there,

9    they don't need to put anybody up on the stand to say that they

10   searched it and we don't need to have anybody up on the stand

11   to counter that.

12         THE COURT:  Okay.

13         MR. WALTON:  Okay?

14         THE COURT:  Yes, sir.  Anything else?

15         MR. WALTON:  Thank you, Your Honor, no.

16         THE COURT:  All right.

17         MS. LUND:  Sorry, I know Mr. Uppal wants to address

18   my other points --

19         THE COURT:  Yeah.

20         MS. LUND:  -- but I thought it might be most useful

21   to address what Mr. Walton said --

22         THE COURT:  Okay.  Sure.

23         MS. LUND:  -- given that that seemed to be more to

24   Rule 26 than to the spoliation.  So the only question --

25         THE COURT:  Well, honestly, let's punt for a minute

Case 1:22-cv-00050-TRM-CHS   Document 350-1 Filed 08/01/23 Page 136 of 175   PageID #: 14263

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 137 of 175
137

1   on Rule -- if you're about to focus on Rule 26.

2          MS. LUND:  No, I just wanted to make one point, and

3   it has nothing to do with Rule 26, and it's really just that

4   Mr. Walton said that all of the sales force employees are very

5   important.  And I would just note that we don't have any

6   evidence on that because plaintiffs, Mr. Walton, took

7   Mr. Ridley's deposition for the full permissible period under

8   the rule, and he did not ask about a single one of these

9   individuals, as I recall.  And that is certainly something

10  you would expect to happen if the plaintiffs felt that these

11  individuals were in fact all very important employees.

12         THE COURT:  Did -- were any of these people deposed?

13         MS. LUND:  No, Your Honor.

14         THE COURT:  Okay.

15         MR. WALTON:  I'll just say one more thing.  They

16  picked these people.  They must have thought that they were

17  important.  That's what I'm referring to.  But I'll turn it

18  over to Mr. Uppal at this point.

19         THE COURT:  Okay.

20         MR. UPPAL:  Your Honor, at your order on Doc. 349,

21  Page 19, you note that the relevance prong of the spoliation

22  analysis requires that the party seeking sanction must make a

23  showing indicative that the destroyed evidence would have been

24  relevant to the contested issue.  All right.  So we're talking

25  about the second replacement laptop here.

```
1              THE COURT:  Okay.

2              MR. UPPAL:  There's no way that that showing can be

3   made or has been made by opposing counsel, because, quite

4   frankly, as Your Honor notes, the second laptop was given to

5   Mr. Ridley for a very short period of time.  And, more

6   importantly, the evidence which opposing counsel cannot

7   overcome is that he did practically nothing with that second

8   laptop.

9              The Digital Guardian Report shows -- actually, let

10  me back up for a second.  Mr. Ridley, during his deposition

11  testimony, states that he doesn't know when he got the second

12  laptop, he can't remember.

13             THE COURT:  Mm-hmm.

14             MR. UPPAL:  This is in line with his not remembering

15  a bunch of things, like the fact that he'd kept the WD drive.

16  But it appears from our records that he got the second laptop

17  on or about June 9, 2021.  Okay?  The Digital Guardian Report

18  shows that from June 2 through June 20 there's no activity.

19             THE COURT:  For this laptop?

20             MR. UPPAL:  Right.  There's no -- there's no

21  downloading.  Okay?  Mr. Ridley also testifies -- remember,

22  there's only a three-week period there, essentially, between

23  him getting that second laptop on or about June 9, at the

24  earliest, and his departure on July 1.  From June 2 to June 20

25  there's nothing --
```

1          THE COURT:  Mm-hmm.

2          MR. UPPAL:  -- per the Digital Guardian Report.  As

3   for that last week, Mr. Ridley testified that he took a six-day

4   vacation right before he left --

5          THE COURT:  Mm-hmm.

6          MR. UPPAL:  -- and he didn't take the computer with

7   him because he never takes a computer with him.  So --

8          THE COURT:  So what are the dates of the vacation?

9   Is that --

10          MR. UPPAL:  Six days prior to his return on July 1.

11          THE COURT:  1.  Okay.

12          MR. UPPAL:  So, Your Honor, that shows in and of

13   itself that there's nothing of relevance to a contested issue

14   on that second laptop.  But, more importantly, there's been no

15   showing by the propounding party as to what Mr. Ridley did with

16   the second laptop.

17          Now, Ms. Lund and ChemTreat clearly have nothing to

18   say on this topic, unless, you know, they were engaged in some

19   conspiracy or fiduciary breach, right?  They don't know what

20   Mr. Ridley did, presumably, while he was still working for us.

21   So they really have nothing to say on the topic.  The only

22   person who might have something to say on the topic is

23   Mr. Ridley.  And there is nothing in the record as to what

24   Mr. Ridley did using that laptop.  He doesn't even remember

25   when he got it, but -- on or about June 9, 2021, through

1  July 1, 2021, but we do know there's nothing between June 2

2  and June 20 and he takes a six-day vacation where he doesn't

3  take the laptop with him because he never takes it.

4          THE COURT:  Mm-hmm.

5          MR. UPPAL:  Well, if you don't take the laptop with

6  you, then clearly you're not doing anything with it.  That

7  covers almost the entire period.  But even if now he wants to

8  claim, "Oh, there was something really important on that second

9  laptop, and it causes me great prejudice that you didn't

10  preserve the second laptop," at a minimum he's got to come

11  forward and show and testify to what he did with that second

12  laptop.

13          THE COURT:  Right.

14          MR. UPPAL:  There's nothing, like, literally nothing,

15  on that topic.

16          As to the other issues that were covered, on the

17  synchronization, Ms. Lund stated to you that it was covered in

18  her reply belief and that, you know, everyone seems to be in

19  agreement that a computer syncs with the OneDrive.  Yeah,

20  okay, but it can only sync with materials that are present on

21  the OneDrive.  If a file is not present on the OneDrive,

22  clearly there can be no synchronization of a nonexistent file

23  with the underlying replacement computer.

24          Furthermore, there has been argument by Ms. Lund

25  that Mr. Garza and Ms. Semmler -- or I think it was primarily

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 141 of 175
                                                                  141

1    Mr. Garza testified that there is a 93-three day period of

2    recovery and then another 14-day period of recovery with the

3    help of Microsoft.  Your Honor, that -- you know, the

4    commonsense understanding of that is, "Hey, if you delete

5    something, you can really only be assured of recovery if you

6    act within that 93-day period."  But they did not testify that

7    there's a hard stop at either 93 days or 14 days afterwards,

8    such that, you know, by luck or happenstance or whatever might

9    happen, that no materials are going to be present.

10                THE COURT:  Mm-hmm.

11                MR. UPPAL:  And if they had testified, that would be

12    incorrect and a correction should be made, because we're

13    talking about sanctions here right now.  And what happened here

14    in this case is that although Mr. Lieb was in fact retained

15    well after that 93-plus-14-day period, he found the Ecolab

16    documents.  Ecolab documents are all on there.  But the --

17    Ridley's Nalco folder from which he downloaded to the LaCie

18    drive, those are all gone.  And what his report states is that

19    those were all deleted, they were present at one time, he knows

20    they were, because it's on the Digital Guardian Report.  The

21    Digital Guardian Report shows that the file structure indicates

22    that there is Ridley's Nalco folder but it's gone, even though

23    Mr. Lieb was able to recover the OneDrive contents as they

24    existed on July 1, 2021.  Now, I realize opposing counsel may

25    not like that fact, but it is a fact.  We can establish it

1    through sworn testimony.  And it's their burden, which they

2    haven't carried, to show that sanctions should be awarded.

3            Also, Ms. Lund stated to you or represented to you

4    that Mr. Garza testified that the Digital Guardian Report

5    shows deletions.  Yes, it would show deletions if the rule was

6    set for deletion.  Ms. Lund and her colleagues never

7    specifically asked -- I wasn't at Garza's deposition, I just

8    want to make that clear, but if you go back, they never

9    specifically asked Mr. Garza or Ms. Semmler in this case were

10   the rules set on the Digital Guardian Report to log deletions.

11   All they're saying to you is, they can be set in that manner

12   or typically they are set in that manner.  But that doesn't

13   change the fact that in this case the rules were not set to

14   log deletions.  And we have an expert who can testify to that

15   fact, that in this case the rules were not set to log

16   deletions.  So they haven't carried their burden of proof on

17   this issue.

18           Mr. Pope.  I want to address one of his main

19   comments.  He stated that he -- his client has been greatly

20   prejudiced, not by his own conduct of engaging in this

21   downloading of material that he didn't own when he has no

22   business doing so given that he has a cloud drive account,

23   but, rather, his client has been gravely injured because if

24   the LaCie drive were preserved, it would show that Ridley

25   returned all files he downloaded onto the LaCie.  No, it

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 143 of 175
143

1   wouldn't, because it would only show that he returned the

2   LaCie, because, remember, Mr. Ridley downloaded the entire

3   contents of his computer --

4          THE COURT:  Mm-hmm.

5          MR. UPPAL:  -- his Nalco computer, to the WD.  So

6   this is a sleight of hand.  Okay?  Returning the LaCie would

7   only show -- or preserving the LaCie would only show that that

8   one path to the stolen material was returned.  But the critical

9   issue here is that all that same material -- there's, like --

10  Mr. Ridley testified he made six or seven backups of his Nalco

11  computer to his WD drive and as he made those backups he didn't

12  delete the old ones.

13         So if you back up the entire contents of your Nalco

14  computer to the WD and wipe the WD and deprive us of it, even

15  if things have gone perfectly with the LaCie, that wouldn't

16  establish that you -- that Mr. Ridley returned all the files

17  that he took, no; that would only show, at most, that he

18  returned a copy of the files that he stole and

19  misappropriated.

20         And what I want to leave you with, Your Honor, in

21  case you're wondering, is, why didn't this WD issue come up

22  before?  You've covered it in your order.  It's because

23  Mr. Pope's client Mr. Ridley gave us a sworn interrogatory

24  response that indicated he last used the WD drive in 2015 or

25  2016.  You see how much material we've had to cover.  We're

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 144 of 175
                                                            144

1    entitled to rely on the sworn representation of Mr. Ridley

2    that he last used the WD drive more than half a decade before

3    he departed, right?  So just like the Court, we have to pick

4    and choose our priorities.

5              THE COURT:  Mm-hmm.

6              MR. UPPAL:  Well, if you last used the two

7    thousand -- the WD drive in 2015 or 2016, I believe Your Honor

8    can appreciate why, relying on that sworn representation, our

9    focus wouldn't have been immediately on the WD drive until he

10   revealed otherwise during his deposition just in this year

11   that, "No, you know what, that WD drive contains multiple

12   backups, and I kept using it all the way through at least

13   2020."

14             And Your Honor has already noted, which hasn't come

15   up previously, although I tried to raise it, your order notes

16   that to this day Mr. Ridley has not corrected his

17   interrogatory responses.  And it begs the question of how his

18   counsel can stand on those interrogatory responses, not having

19   corrected them.

20             So given the totality of the misconduct here and the

21   fact that ChemTreat can't even speak to what Mr. Ridley did

22   with the second computer, how can they possibly have carried

23   their burden under the relevance prong of showing that the

24   so-called destroyed evidence on the LaCie drive, if in fact he

25   gave us back the LaCie drive, is relevant to any contested

1   issue.  It's not, because he didn't do anything with the

2   second computer.  If he did, he certainly hasn't made a

3   showing and certainly not a showing that would warrant

4   sanctions in this case.  Thank you, Your Honor.

5               THE COURT:  Okay.  Thank you.

6               MR. POPE:  Briefly, Your Honor.

7               Mr. Uppal says that there's no activity from June

8   the 2nd to June the 20th.  The plaintiffs' third amended

9   complaint, Doc. 229, at Page 25, alleges that Mr. Ridley took

10  certain action on June the 18th of 2021 related to Live.com,

11  on June the 21st of 2021, it's on Page 26 of the plaintiffs'

12  third amended complaint, and then on June the 29th of 2021,

13  that's Page 27 of the third amended complaint.

14              All of those actions would have been taken from the

15  second Ecolab laptop that Ecolab did not preserve.  Because

16  Ecolab did not preserve that laptop, Mr. Ridley has no ability

17  to challenge or fight against those allegations, because they

18  -- they don't have it.  One of those is related to

19  Mr. Ridley's contacts file.  I believe that's the June 21st

20  date.  Mr. Ridley admits that he downloaded his contacts.  So

21  it's less relevant.  But the other two are related to

22  Live.com.  And, Your Honor, as it relates to Live.com, if we

23  had Mr. Ridley's second Ecolab laptop, we would be able to

24  better test these allegations related to Live.com.  Mr. Ridley

25  denies that, denies that he uploaded his files to Live.com.

1  So that is prejudice that's a result of Ecolab's failure to

2  preserve the second laptop, the one that's at issue here.

3  That's all, Your Honor.

4         THE COURT:  Okay.

5         MS. LUND:  So, Your Honor, I'm going to put the

6  timeline back on the Elmo.  And I've actually highlighted one

7  of the entries that Mr. Pope just referred to that is directly

8  from plaintiffs' own complaint, Paragraph 124, where plaintiffs

9  allege that on June 18th of 2021, that is, nine days after he

10  received his second laptop on which Mr. Uppal said there was no

11  activity, the DLP report, they claim, shows that Mr. Ridley at

12  that time uploaded from his second laptop to an alleged

13  personal Live.com account one of their documents.  And that is

14  not, as Mr. Pope has flagged, the only instance where they

15  allege that, nor is it the only instance reflected on the DLP

16  report.

17         In fact, the DLP report shows that this same

18  Live.com account was visited on more than two dozen occasions

19  during the time period covered by the DLP report, including

20  eight separate days, five of which are after Mr. Ridley had

21  his second laptop.  More importantly, the DLP report indicates

22  both upload and download activity from between that Live.com

23  account and the second laptop.  So if in fact this was a

24  personal Live.com account or if it was, as we maintain, a

25  corporate account, that download from the account to the

UNITED STATES DISTRICT COURT

Case 1:22-cv-00050-TRM-CHS   Document 357-1 Filed 03/06/23   Page 146 of 175   PageID #: 14928
Case 1:22-cv-00050-TRM-CHS   Document 350-1 Filed 02/17/23   Page 146 of 175   PageID #: 14283

1    second laptop would obviously be probative.  We don't have

2    that probative evidence because plaintiffs spoliated the

3    second laptop, as Your Honor has ruled.

4         And I did not hear any response from Mr. Uppal to

5    the fact that if we had that spoliated second laptop we would

6    know for a certainty whether or not Mr. Ridley actually

7    deleted documents, we would know whether, as Mr. Lieb now

8    apparently opines, that those deletions were made before

9    July 1st, because Mr. Lieb claims he recovered all materials

10   as they existed as of July 1st, or if, to the contrary, as the

11   DLP report shows, that there were no deletions at all.

12        And with regard to these deletions, this notion that

13   that was not turned on to be logged, that is not testimony

14   that was provided by plaintiffs at all, it's not an opinion

15   that was offered by Mr. Lieb at all.  I believe Mr. Uppal said

16   that he was not at Ms. Semmler's deposition or Mr. Garza's

17   deposition, and that's correct.  I took those depositions.

18   I asked those witnesses whether there was any way to log or to

19   know what the query was that was run.  And Mr. Garza demurred.

20   He said specifically that he was not aware of any such log.

21   And you can find that testimony at Document Entry 276-7, which

22   is excerpts from his testimony, on Pages 65 and 66.

23        And, again, Ms. Semmler, regardless of what the

24   default is, specifically testified that she always

25   double-checks to confirm that the deletion record is turned

1  on.  So I'm not sure what sworn testimony plaintiffs believe

2  that they have -- they are going to submit on this issue, but

3  I will note, as I said, that Mr. Lieb did not offer an opinion

4  on it and that plaintiffs had the opportunity to submit errata

5  as to both Ms. Semmler and Mr. Garza and they did not do any

6  such errata for that.

7         And then, Your Honor, I did want to get into this

8  Live.com issue, which I heard Mr. Uppal refer to briefly,

9  because that relates to the last set of sanctions that we

10  haven't discussed yet that ChemTreat requested, but I don't

11  know if you wanted to move on to that or whether there's more

12  you wanted to hear on the issues that we have previously

13  discussed.

14         THE COURT:  Go ahead.  Go ahead.

15         MS. LUND:  Okay.  So the final two sets of issues

16  that we believe are sanctions that can be appropriately entered

17  either now or after the Special Master performs a review relate

18  to the loss of ESI caused by plaintiffs' spoliation.  And the

19  first one is specifically tied to this evidentiary gap that was

20  created by plaintiffs by -- because they spoliated both the

21  second laptop and the mobile drive that Mr. Ridley returned and

22  then they failed to preserve the OneDrive, in that, according

23  to Mr. Garza's testimony, everything was recovered, and by the

24  time Mr. Lieb actually created the forensic image seven to

25  eight months after the plaintiffs were on notice of their duty

```
 1   to preserve, it no longer contained those files that Mr. Garza
 2   testified that he recovered.
 3           And so right now we don't have any ability --
 4   because we don't have those originals, we don't have the
 5   copies of the originals or the copies of the copies of the
 6   originals, there's no way for us to determine either whether
 7   plaintiffs were actually trade secrets or whether any of the
 8   handful of documents that plaintiffs produced are actually the
 9   same documents that Mr. Ridley allegedly misappropriated.  And
10   the problem is that plaintiffs have obscured the source of the
11   documents they produced.  They did not provide the metadata
12   from the documents that they collected.  They're, rather,
13   produced largely in folders that have a date from this year,
14   so, for example, February 23rd, 2023rd, or something like
15   that, such that we have no way to determine this
16   chain-of-custody evidence.  And since we don't have the
17   originals, we have no way to know whether what plaintiffs have
18   produced in this litigation is actually what Mr. Ridley is
19   alleged to have misappropriated -- to have misappropriated.
20   And, again, that is an issue that was caused solely by
21   plaintiffs' spoliation of the second laptop, spoliation of the
22   mobile drive, failure to preserve the OneDrive.  And so we see
23   a potential role for the Special Master here, given that we
24   don't have any chain of custody information, given that we
25   cannot determine the provenance of these documents because
```

1    plaintiffs produced them in such a manner as to obscure the

2    metadata.  And we believe that the Special Master -- what we

3    believe, that Your Honor could simply enter the evidentiary

4    sanction that we have requested, given your finding of

5    spoliation, which is that plaintiffs not be permitted to claim

6    that any of the documents that they produced are the same

7    documents that Mr. Ridley allegedly misappropriated unless

8    they can substantiate that claim with chain of custody

9    evidence that shows that what they produced is the same as

10   what Mr. Ridley allegedly misappropriated without any changes.

11         But to the extent that Your Honor feels it would be

12   important to get further information on that subject, we do

13   believe that a Special Master could look into these documents

14   the plaintiffs produced, could have access and determine the

15   provenance or the chain of custody of them, and then

16   Your Honor could enter an appropriate sanction.

17         The second sanction, as you will see, relates to

18   this Live.com website.  And there is a disagreement between

19   the experts retained by Mr. Pope on behalf of Mr. Ridley and

20   by us on behalf of ChemTreat regarding whether that

21   OfficeApps.Live.com website is a personal Live.com website or

22   a corporate one.  And Mr. Garza testified that Ecolab

23   maintains its information in the Azure -- Microsoft Azure

24   Cloud, which is a cloud storage system such that you could

25   have a remote website like that.  Obviously if we had

Case 1:22-cv-00050-TRM-CHS   Document 350-1 Filed 08/01/23 Page 150 of 175 PageID
#: 14927

1    Mr. Ridley's second laptop we would be able to see what was

2    downloaded as -- from that website to his laptop, we would

3    also be able to check his internet history and see what pulls

4    up when you go to that website.  We don't have any of that

5    because plaintiffs spoliated the ESI on the second laptop.

6    And so, again, this is another evidentiary gap that was

7    created by plaintiffs.

8         The same website that was visited with the first

9    laptop was visited with the second laptop, such that even if

10   the activity were primarily on the first laptop, although it

11   was not, it would still be probative as to the entire period.

12   And so we think, here again, that the Court could simply enter

13   this evidentiary sanction and preclude plaintiffs from arguing

14   that any Live.com website Mr. Ridley visited while at Ecolab

15   was a personal rather than corporate account.

16        Alternatively we do believe that there's a role the

17   Special Master could play here where the Special Master could,

18   you know, access that website through the Ecolab system to

19   determine, when you go there, what is the landing page, is it

20   a personal account, or is it an Ecolab account.  Perhaps

21   there's some work to be done with the -- the particular IP --

22   and now we're sort of speaking beyond my knowledge, but in

23   terms of, like, what the site was that was accessed on the DLP

24   report, to determine -- Mr. Garza testified that you actually

25   would need to do some investigation with the DNS

1   identification to see whether that was associated with Ecolab.

2   And it's my understanding that because it links to the Azure

3   cloud, we would need to look into Ecolab's systems.

4           So there too we feel that these final two sanctions

5   are sanctions that could either be entered now or following a

6   Special Master investigation.

7           And then finally I will just note that with regard

8   to this briefing we would also seek our fees and costs.

9           Unless Your Honor has questions on that, I'll allow

10  Mr. Uppal to respond.

11          THE COURT:  Okay.

12          MR. WALTON:  Mr. Walton's actually going to respond

13  to that, Your Honor.

14          First of all, I can't believe that she said that the

15  documents that are deleted was caused solely by us.  He took

16  the OneDrive, and now we know he used his wife's computer to

17  wipe it; we had nothing to do with that -- I'm sorry, the WD

18  drive.  We had nothing to do with that, absolutely nothing to

19  do with that.

20          What we had to do with discovery in this case,

21  Your Honor, is, a lot of the documents that we had to produce

22  as exemplars, according to the rulings from Judge Lee, we had

23  to go back and recreate as a company.  We had to go back and

24  run scripts, we had to go back and run searches of our

25  databases, because he had the only copies of that.  We didn't

1    have copies of the fact packs and stuff like that laying

2    around.  We had to go back and recreate them.  So a lot of

3    these exemplar documents, we had -- you know, I think we

4    exceeded our discovery obligations by going back and

5    recreating them, but that's what we had to do.

6            And so for her to say that the deletion of those

7    actual documents that he took is our fault, I can't see how

8    she can say that.  It's the WD drive that was used to take

9    most everything in this case.  Yes, our third amended

10   complaint focuses on the LaCie drive, but that's all that we

11   knew about at the time.  We didn't know all the shenanigans

12   occurred with the WD drive.  We sure as heck didn't know he

13   had six to ten full backups of his Nalco computer on the WD

14   drive.  And at the time we filed the third amended complaint,

15   we sure as heck didn't know that he was plugging his WD drive

16   into his ChemTreat computer.  We had no idea about any of

17   that.  So we didn't delete the documents that he took, he did.

18   We had nothing to do with that.

19           On the Live.com, we know that he has a personal

20   Live.com account.  They know he has a personal Live.com

21   account.  Why?  They fired him for sending an e-mail from his

22   Hotmail account, which is part of Live.com -- every time you

23   have a Hotmail account, it opens up a Live.com account for

24   you.  They know he has a Live.com account, because he has a

25   Hotmail account.  And they fired him for sending a personal

```
1    e-mail from his Hotmail account to his work account with a

2    Nalco document.  So there's no need for that sanction, either,

3    Your Honor.  Thank you.

4              MR. UPPAL:  Your Honor, may I address the other

5    points?

6              THE COURT:  Mm-hmm.

7              (Brief pause.)

8              MR. UPPAL:  Ms. Lund, again, during her last argument

9    before the Court, made representations to you about what Garza

10   or Semmler had to say about the Digital Guardian Report and

11   whether or not it shows deletions.  Your Honor, my expert

12   witness, Mr. Lieb, is here, and he's willing to show and

13   demonstrate to the Court right now, if Your Honor will let him,

14   that in this case the Digital Guardian Report, the rules for it

15   were not set to log deletions.

16             So if Ms. Lund wants to be heard to complain to the

17   Court that Ms. Semmler and Ms. Garza said something during

18   their depos that she believes was misleading to her or

19   incorrect, then so be it, I can understand that.  But what

20   we're talking about here is whether or not my client should be

21   sanctioned.  And for purposes of sanction, it's unrebutted

22   that the rules for the Digital Guardian Report were not set to

23   log deletions.  And therefore whatever Ms. -- Mr. Garza and

24   Ms. Semmler may have had to say on this topic is not relevant

25   to the issue of sanctions.
```

```
 1           And, again, Ms. Lieb -- excuse me, Ms. Lund did not

 2   dispute one of the issues that I presented to the Court, which

 3   is, you know, she told you that she took the depositions, and

 4   I'm not blaming her, I'm not saying that she's not a highly

 5   competent attorney or anything like that, but I said to you

 6   she or whoever took those depositions did not specifically ask

 7   Garza or Semmler in this case, "Did you set the rules on the

 8   Digital Guardian Report to log deletions?"  That just wasn't

 9   asked, and that's why she doesn't have that information.

10   I understand why she's unhappy with it.  I'll even be willing

11   to concede that in a perfect world Garza or Semmler maybe

12   should have known differently.

13           THE COURT:  Mm-hmm.

14           MR. UPPAL:  But we're still left with the fact that

15   the rules were not set to log deletions.

16           All right.  Turning to Mr. Pope.  I still don't

17   see -- Mr. Ridley clearly has a duty to correct his false

18   interrogatories, but so does Mr. Pope, his attorney.  Mr. Pope

19   cannot leave those false interrogatories hanging out there.

20   And if you noted, he had nothing to say on that topic.  And

21   the reason that is relevant is because the whole

22   prejudice-to-his-client argument rests on the fact that his

23   client misled us and prevaricated about his use of the Western

24   Digital drive and represented that the backups stopped in 2015

25   or 2016.  And I just don't see how, as a counsel for a client
```

1    who made that sworn representation, you as an attorney can

2    ethically let that knowingly false yet sworn interrogatory

3    hang out there without a correction.  And so given that

4    circumstance, it would seem that equity would demand that

5    Mr. Ridley has no route to sanctions at all.

6            But turning to the argument that I made that nothing

7    really was done with the second replacement computer, I said

8    to Your Honor that the DLP report shows no activity from

9    June 2 through June 20, and then after that for the six days

10   prior to his departure date of July 1, 2021, he went on

11   vacation and didn't take the computer.  Well, that's

12   uncontested.  Mr. Pope has nothing to say about that.  But

13   Mr. Pope gave three examples.  He said on June 18 there is an

14   indication that there was an interaction with Live.com.  Okay.

15   Well, that certainly falls between the dates of June 2 and

16   June 20.  But Live.com is not one of the major issues in this

17   case.  Yes, we put this out there, but it certainly doesn't

18   have to do with the WD drive, it certainly doesn't have to do

19   with the LaCie drive.  It's one interaction.  That certainly

20   doesn't carry the burden of showing that a contested issue --

21           THE COURT:  Mm-hmm.

22           MR. UPPAL:  -- is relevant to the failure to preserve

23   the second replacement laptop.

24           Second example he gave you of activity was on

25   June 21, which is outside that June 2 to June 20 period that

```
 1   I argued to Your Honor that the DLP report shows no activity

 2   with the replacement laptop.  But, more importantly, the only

 3   activity on June 21, according to Mr. Pope, was that

 4   Mr. Ridley downloaded his contacts.  But he told you——and we

 5   agree with this——that that's not a relevant incident, because

 6   although he took those contacts, Mr. Lieb was able to recover

 7   them from a USB drive.

 8            THE COURT:  Mm-hmm.

 9            MR. UPPAL:  So that certainly is not relevant to the

10   issue of sanctions.  And then on June 29, again, Mr. Pope, this

11   is the third example he gave you, that there is purportedly an

12   interaction with Live.com.  I don't have that in front of me,

13   but I'm going to take his word for it.  How does that carry

14   their burden of establishing that sanctions should flow from

15   the failure to preserve the second laptop?  At most, that would

16   indicate that we should not be allowed, I suppose, to argue

17   that there was some nefarious interaction with Live.com, that's

18   it.  But Mr. Pope's original argument of his client has been so

19   severely prejudiced by the failure to preserve that second

20   laptop, he clearly has not carried his burden of proving the

21   relevance prong.

22            And, Your Honor, I would ask you to keep in mind as

23   to why there is a second laptop.  The whole reason there's a

24   second laptop is because Mr. Ridley, knowing that he was

25   leaving, while in the midst of essentially having negotiated
```

```
 1   his deal with ChemTreat, decides to complain to Ecolab's IT

 2   that, "There is a noisy fan on my computer."  And, Your Honor,

 3   that was just clearly a setup, because he knew that if he

 4   turned in the first laptop, which he used, you know, to

 5   download all the information to the LaCie drive, that that

 6   laptop would be taken by IT and essentially cleaned such that

 7   nothing would be --

 8            THE COURT:  How would he know that?

 9            MR. UPPAL:  -- recovered from his laptop.

10   Your Honor, it's an inference.

11            THE COURT:  I gave my laptop to IT yesterday for four

12   hours, and they didn't wipe it.

13            MR. UPPAL:  But you don't have a history of --

14            THE COURT:  They just brought it back and said, "We

15   couldn't fix it."

16            MR. UPPAL:  But, Your Honor, you don't have a history

17   of making false albeit sworn statements.

18            THE COURT:  Oh, I do.  Actually I do.  I do it all

19   the time.  No, listen, I'm joking.  But I covered this in the

20   order.

21            MR. UPPAL:  Yes, Your Honor.

22            THE COURT:  It's -- it's -- I don't know what

23   happened, but I do know that the next two people who had the

24   computer didn't appear to be happy with it, either, right?

25   So...
```

1          MR. UPPAL:  Fair enough.  But there is one other

2     piece of testimony I want to leave you with.  On, you know,

3     this claim of, "Hey, I need a new laptop because the laptop is

4     noisy" --

5          THE COURT:  Mm-hmm.

6          MR. UPPAL:  -- during his deposition Mr. Ridley

7     testified that the first laptop was working fine during the

8     period that he downloaded to the LaCie drive.  Thank you,

9     Your Honor.

10          THE COURT:  Okay.  All right.  So, not directing this

11     to anybody in particular, just to everybody, but -- all right,

12     it is 2:15.  We've been doing this -- no, wait a minute, 3:10,

13     sorry.

14          MR. WALTON:  Yeah, it's 3:10.

15          THE COURT:  Had it reversed.  We've been doing this

16     three hours and ten minutes.  And think about what a jury trial

17     would look like if these were our issues.  I mean, just think

18     about that.  It's -- nobody thinks that's a good idea, right?

19     All right.

20          MS. LUND:  So, beginning with Mr. Walton, Mr. Walton

21     addressed the issue of the WD drive, and I'm not entirely sure

22     why, because the WD drive is not at issue in ChemTreat's

23     sanctions request.  But he said that, you know, Mr. Ridley, not

24     plaintiffs, is responsible for the loss of the ESI in the WD

25     drive.  And that is certainly true as far as it goes.  But as

```
 1   we know for a certainty, both the WD drive and the LaCie drive
 2   were simply copies of the originals that were on the laptop or
 3   the OneDrive, that same synced account --
 4            THE COURT:  Mm-hmm.
 5            MS. LUND:  -- and that is what was lost by
 6   plaintiffs.  And I think we have well-plowed the ground with
 7   regard to the evidence that shows that anything that Mr. Ridley
 8   deleted was recovered by Mr. Garza, such that if it no longer
 9   appeared at the time that Mr. Lieb imaged that copy of the
10   OneDrive, that is attributable to plaintiffs and not to anyone
11   else.
12            I did want to address, though, Mr. Walton's point
13   that they were forced, according to him, to recreate documents
14   and that he believes they, quote, exceeded their discovery
15   obligation.  And I think that is a surprising statement to
16   hear, given that we had to engage in the lengthy course of
17   getting the stipulated order after filing a motion to compel
18   and then filing a motion to compel compliance with that order
19   and having a hearing in front of Magistrate Judge Lee at which
20   she ordered plaintiffs to produce documents and she
21   specifically ordered that they either produce exemplars of
22   Mr. Ridley's actual documents or that they produce documents
23   that were similar and, if so, to provide an attestation
24   regarding what they had done to locate the original documents
25   and why you're being forced to use substitute documents
```

1    instead.

2            Plaintiffs did not provide that attestation.  They

3    did not tell us that their documents were recreations.  We had

4    no idea that these were not the documents that they had at

5    least -- that they at least believed were connected to

6    Mr. Ridley until we saw their spoliation opposition.  So

7    I think, given that, that this is another area in which the

8    Special Master could do yeoman's work in determining what

9    precisely was recreated and how it was recreated, because we

10   still don't even know which documents specifically that

11   plaintiffs produced were allegedly recreated and how they were

12   recreated, using what sources.  So that's the first issue.

13           The second issue with regard to Mr. Uppal's

14   argument, I think -- I didn't really hear anything --

15           THE COURT:  But does it -- does it matter how they

16   were recreated?  Why does it matter?

17           MS. LUND:  Well, it matters to the extent that -- for

18   example, if we're talking about financial documents --

19           THE COURT:  Because's here's why I ask, Mr. Lund.

20           MS. LUND:  Yes.

21           THE COURT:  And this is not only directed to you,

22   it's directed to everybody who's spoken, other than maybe

23   Mr. Pope.  Mr. Pope has a little different outlook here.

24           What -- I hear a lot of, "I want to know everything,

25   everything," which has never occurred in any case, with or

```
 1    without ESI, right?

 2              MS. LUND:  (Moving head up and down.)

 3              THE COURT:  At some point you have to say, "Okay,

 4    time to try it, time to try it."  So explain to me --

 5              MS. LUND:  Right.

 6              THE COURT:  I guess I could come up with why that's

 7    relevant, and I'm not sure how overwhelmingly convincing it

 8    would be, but --

 9              MS. LUND:  Right.  No, I'm glad you asked,

10    Your Honor.  And the reason is because, as you know, with

11    regard to the misappropriation claims the key question is

12    whether there was any disclosure of use of plaintiffs' trade

13    secrets.  But of course that requires plaintiffs to

14    substantiate that there were any trade secrets, and that

15    requires knowing the content of the documents.  So what the

16    documents show is critical.

17              THE COURT:  Mm-hmm.

18              MS. LUND:  And if, for example, we are talking about

19    a recreation of a financial document where essentially it is

20    generated from data that is stored in a central database and

21    that data hasn't changed, we don't have any concern -- we need

22    to know, but we're not concerned about whether that button was

23    pushed on a particular date in 2021 or a particular date in

24    2022, as long as there's no change of the data.  But when you

25    start talking about these other documents, which seem to be the
```

1    bulk of what they claim was misappropriated, the limited

2    metadata that we have, as I said, much of it just shows an

3    ingestion folder, where apparently a bunch of documents that

4    came from who knows where were put into a folder with the 2023

5    date.

6            But the ones for which we do have some metadata

7    show, for example, that Karry Mackie chose things that she

8    described as exemplars and she put them into a OneDrive folder

9    and that OneDrive folder was collected by plaintiffs' counsel.

10   Where did those documents come from?  Whose documents were

11   they?  Were they Mr. Ridley's documents?  Were they somebody

12   else's?  We don't know.  And given that, according to

13   plaintiffs' own testimony, they have these six service

14   standards which requires everybody to use sort of similarly

15   formatted documents, we just have no way of knowing whether

16   this is the document that Mr. Ridley allegedly had or if it

17   relates to somebody else.

18           Likewise, about half of the documents that they

19   produced as their alleged trade secrets appear to have come

20   from a PST archive which is an e-mail archive, but none of the

21   parent e-mails were produced.  So we have absolutely no

22   context at all, no way to know where these documents came

23   from, what dates they were, anything to connect them to

24   Mr. Ridley.  And so all of that is to say that we agree with

25   you, like, discovery has to come to an end.  We believe

1   discovery had come to an end.

2          If the Special Master has a role, it is a very

3   limited role, it is only to address these sort of corollary

4   issues regarding evidentiary gaps.  But, to us, this is a

5   critical issue.  And given that plaintiffs spoliated the

6   originals, if they are going to claim that something else they

7   have produced is in fact the document that Mr. Ridley took,

8   then we should be entitled to look into that, or Your Honor

9   could simply enter an evidentiary sanction that requires them

10  to provide that clear chain of custody evidence before they

11  can make that argument that anything was the same.

12          And then, finally, the last thing I just wanted to

13  address with regard to Mr. Uppal's argument, which, to me, I

14  don't believe any unique or new points were raised except with

15  regard to his, I would say, faint praise of my deposition

16  techniques where he suggested perhaps it's not my fault that I

17  didn't ask Ms. Semmler.  But in fact I did ask Ms. Semmler.

18  I asked her on Pages 100 to 101 of her deposition whether she

19  selected all of the operation types, which included deletions,

20  and she said yes.  And I said, "Do you confirm it?"

21          And she said, "I always confirm it.  I double-check

22  it."  And so that is clear.

23          THE COURT:  Mm-hmm.

24          MS. LUND:  And then, again, they haven't produced any

25  log, they haven't provided any opinion from Mr. Lieb.  And if

1    discovery has to come to an end, then these are all issues that

2    they could have raised before and, frankly, they could have

3    raised in any of the unfortunate number of pages that we have

4    all exchanged in briefing *Daubert* motions, spoliation motions,

5    sanctions motions, summary judgment motions, and yet this is

6    the first time, at this hearing, that we are now hearing them

7    claim that in fact that rule -- there is a rule, that there's a

8    way to log it, and the log shows that it was turned off.

9            I just think, you know, the horse is out of the barn

10   on that.  It's too late.  If they wanted to present that, they

11   should.  But for plaintiffs to raise an entirely new argument

12   that has never before been aired and then say, "Clearly

13   ChemTreat has not met its burden of proof," that really turns

14   it upside down.

15           THE COURT:  Okay.

16           MS. LUND:  We net our burden of proof.  We believe we

17   are entitled to sanctions.  Thank you, Your Honor.

18           THE COURT:  Okay.

19           Mr. Walton, I'll hear from you, and then this is

20   their motion so I'll give them the last word.  So let's wrap

21   it up.

22           MR. WALTON:  All right.  I just have to say,

23   Your Honor, it's just like when you were saying to Mr. Uppal if

24   we had the mobile drive we would know whether it was the LaCie

25   drive, right?

```
1          THE COURT:  Mm-hmm.

2          MR. WALTON:  The same concept applies here.  If

3    Mr. Ridley took documents -- he says he didn't take documents

4    with the LaCie drive.  He admits taking documents with the WD

5    drive.  He admits connecting them to his ChemTreat computer.

6    He admits now wiping that.  So if we had the WD drive, we would

7    have had the exact documents that he took.

8          THE COURT:  Mm-hmm.

9          MR. WALTON:  And she keeps saying we deleted them,

10   and we didn't, he did.  And so we then had to go back --

11   because a lot of his files, Your Honor, were, like, 10 -- were,

12   like, I'm sorry, 20 years of customer files that only he had.

13         THE COURT:  Mm-hmm.

14         MR. WALTON:  You know, when you were in private

15   practice, I'm sure that you had client files, I'm sure.  He

16   took all those with him.  So there wasn't any other source of

17   those.  So if we had the WD drive, if he didn't wipe it, we

18   would know exactly what he took and we would have been able to

19   produce them to them in discovery.  Because we didn't have

20   them, we had to create some exemplars, which Judge Lee

21   specifically allowed us to do.

22         THE COURT:  Mm-hmm.

23         MR. WALTON:  Okay.

24         THE COURT:  All right.  Anything else?  Have we

25   covered everybody's requests for sanctions?  Everybody's been
```

1    heard?  Anybody feel unheard?

2         (Brief pause.)

3         THE COURT:  All right.  Let's take a short break.  Is

4    anybody on the verge of missing a flight or anything?  Are we

5    on the edge?

6         MS. LUND:  Your Honor, I have a 5:00 flight, but

7    I also have the ability to delay that to a later --

8         THE COURT:  To not - to not go?

9         MS. LUND:  Well, tomorrow, tomorrow, but it's fine

10   because I can enjoy the lovely Chattanooga area.

11        THE COURT:  All right.  Let me -- just give me a

12   couple minutes and let me make sure.  If we have to end there,

13   we will, but let me...

14        (Brief recess.)

15        THE COURT:  So let me quickly tell you what's coming

16   so that before everybody gets on a plane you can radio back and

17   tell all those nameless associates to get to work.

18        (Laughter.)

19        THE COURT:  I'm going to put down an order, probably

20   tomorrow, and here are the things I'm going to do.  One thing

21   I'd like to know is, for all these repositories, how big each

22   one is.

23        Ms. Lund, so that's coming.  So you might want to

24   get somebody to work on that.

25        We talked about a trial date.  We -- with regard to

```
 1    the scheduling order, we -- we delayed -- what did we delay?

 2    Motions in limine?  Okay.

 3            Okay.  Let me think about jury instructions.  That's

 4    coming up in a little bit.

 5            Tell me -- and I want to ask you to tell me by

 6    Tuesday about the mediator situation.  If you can't nail it

 7    down -- and I know it's a -- I know it's a heavy lift, I'll

 8    get to work.  It may not be who you want or where you want,

 9    but I'll find somebody.

10            And then I think I'm going to have you brief,

11    essentially, what we've done today.  I've got this transcript.

12    I'll review this transcript.  But it occurs to me that if we

13    can have you put down in writing, like I said, what you're

14    asking for, what it's tied to, and sort of slow down a little

15    bit and remind me why this information isn't somewhere else,

16    or why it is somewhere else.  There was a lot of that that,

17    quite frankly, was hard for me to follow.  Okay?  I tried,

18    but -- and I got half of it.  So I'll go back and read the

19    transcript and I'll get 25 percent more.  And then hopefully

20    you can fill in the rest.

21            So what I'm thinking is, have -- have you brief your

22    motions, if it's -- if it's your spoliation motion, have you

23    brief it by a week from now at noon or so, and then respond

24    early that next week.  But tell me if that's asking too much.

25    Any input on that?
```

```
 1              MR. WALTON:  We can do that, Your Honor.  Now,
 2     I think technically there were three motions in front of the
 3     Court today -- well, more than three, because I think there was
 4     spoliation motions against them, spoliation motions against us.
 5     Do you want us to rebrief the issues regarding the computer
 6     that was used to wipe the WD drive, or would you like us to
 7     address that, too?  On getting access to the wife's computer
 8     and --
 9              THE COURT:  Well, if -- it's fine to include that.
10     I think -- I think by the end of -- within this hearing you
11     were asking for that as a sanction.
12              MR. WALTON:  Yes.  Yes.
13              THE COURT:  So that's fine.  What I want this to
14     focus on is what I should do in response to your motion for
15     sanctions.
16              MR. WALTON:  Gotcha.  Okay.
17              THE COURT:  And connect it to Rule 37.  Okay?
18              MR. WALTON:  Okay.
19              THE COURT:  I want you to do this.  I want the
20     Special Master -- and let me -- I'm sorry, I don't want you to
21     brief anything to do with what I would do at trial.
22              MR. WALTON:  Okay.
23              THE COURT:  So I don't need briefing on, "Don't let
24     them argue this.  Don't let them argue that.  Don't let them
25     take this position."
```

```
 1                  MR. WALTON:  Okay.

 2                  THE COURT:  I want to know what you propose the

 3     Special Master do.

 4                  MR. WALTON:  Understood.

 5                  THE COURT:  And tie it to sanctions, right?

 6                  MR. WALTON:  Gotcha.  Thank you.

 7                  THE COURT:  So just the Special Master.  I've got

 8     plenty to work with for trial.  Okay?

 9                  MR. WALTON:  Okay.

10                  THE COURT:  Does everybody understand that?

11                  MS. LUND:  (Moving head up and down.)

12                  MR. WALTON:  Thank you, Your Honor.

13                  THE COURT:  Okay.  I think that's all I have.  Any

14     questions or anything else anybody wants to raise?

15                  MS. MIRMIRA:  Your Honor, just a quick clarification.

16     We had agreed on January 29th, I believe.

17                  THE COURT:  29th, yeah.

18                  MS. MIRMIRA:  And so will the other pretrial

19     deadlines flow per Your Honor's default rules from before?

20                  THE COURT:  Let me look at it.  Let me look at it.

21     It's going to depend -- it's going to depend on -- I mean,

22     I think the most practical thing to do is see what the Special

23     Master comes up with and then decide whether you guys need to

24     edit your briefing at all, right?

25                  MS. LUND:  (Moving head up and down.)
```

```
1            MR. WALTON:  Okay.

2            THE COURT:  And so I don't know.  I don't know.  If

3    it changes, it will be to give me more time, though.

4            MS. MIRMIRA:  That's perfectly fine.  I just

5    didn't -- we didn't want to inundate the Court with paper to

6    move upcoming deadlines in August.

7            THE COURT:  That's fine.  We only have -- I think we

8    only have jury instructions, right?

9            MS. MIRMIRA:  We have the trial briefs and --

10           MR. WALTON:  Trial briefs.

11           MS. MIRMIRA:  -- there's a host of deadlines coming

12   due on the 21st.

13           MR. WALTON:  I'm sorry to interrupt you, but there's

14   trial briefs, there's depo designations.

15           MS. MIRMIRA:  Yes.

16           THE COURT:  Yeah.

17           MS. MIRMIRA:  It's all in the trial briefs, right?

18           THE COURT:  Let me look at it.

19           MR. WALTON:  I think a lot of it was August 21st.

20   I think that was the deadline.

21           MR. POPE:  The 14th is the depo designations.

22           THE COURT:  Let me also say, and you can address this

23   if you want to, I don't think it's worth -- I'm going to put a

24   page limit on the Special Master briefing tied to spoliation.

25   I -- you can address it if you want.  I wouldn't burn too many
```

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 172 of 175
172

```
 1    pages on this issue, because I think I know what I'm going to

 2    do.

 3              MS. LUND:  (Moving head up and down.)

 4              THE COURT:  But I will most likely start with you

 5    splitting the costs.  I don't know what to do about our second

 6    defendant over here.  I'll figure that out.  But there's --

 7    it's going to be split.  And depending on what is found or not

 8    found, the burden is going to move around.  Okay?

 9              MR. WALTON:  (Moving head up and down.)

10              THE COURT:  And if we -- if we get -- if we do it --

11    if the Special Master -- you know, we -- I talked to you about

12    who was the most important, for example.  If we -- if we go and

13    do some searches about, you know, half of these people and you

14    find the Comstock Lode, then, you know, these guys are going to

15    have to bear some costs; if you find nothing, it's coming your

16    way, right?  So --

17              MR. WALTON:  Yeah.

18              THE COURT:  But we'll start off trying to share it.

19              Mr. Pope, you may be the one who most needs to

20    address that.

21              MR. POPE:  Right.  Right.  That's my question,

22    Your Honor.  I mean, I know the Court has set a mediation date.

23    Mr. Ridley is extremely sensitive to the costs associated with

24    the Special Master, with the mediator, all of those things.

25    Your Honor, it's just untenable for him, it is.
```

Ex. 1 to ChemTreat's Supplemental Brief on
The Use of A Special Master                    Page 173 of 175
173

```
1              THE COURT:  Mm-hmm.

2              MR. POPE:  And so I would ask the Court, if there's a

3     chance that we're going to have the mediation soon, is there

4     any way that we could put the Special Master issue past the

5     mediation so that those costs aren't incurred before the

6     mediation, because... (Shrugging shoulders.)

7              THE COURT:  Well, I hear you, and I'm sensitive to

8     it.  I'll say two things.  I think the other parties in the

9     room can absorb this, no matter who's most blameworthy.  Okay?

10    And I think it's important to get this done quickly.  And it

11    might actually help at mediation, right?  I think it will help

12    at mediation.

13             MR. POPE:  Okay.

14             MR. WALTON:  (Moving head up and down.)

15             THE COURT:  So let me -- and if anybody disagrees

16    with any of that calculus I just threw out there, tell me,

17    because I know -- I mean, I understand it's a -- you know, if

18    Mr. Ridley were sitting on a pile of money, we'd be having a

19    different discussion, but...

20             MR. POPE:  The only other thing, Your Honor, is,

21    I believe our counter deposition designations are due this

22    coming Monday, the 14th.

23             THE COURT:  You've already designated depositions?

24             MR. POPE:  We've designated.

25             THE COURT:  Okay.
```

```
 1            MR. POPE:  And then it will be counter-designations.
 2    So if we are also going to brief by a week --
 3            THE COURT:  Yeah.  Yeah.
 4            MR. POPE:  -- I would ask for some limit there.
 5            THE COURT:  I'll look at that.  I'll look at that.
 6    All right.  Anything else?
 7            MR. UPPAL:  Your Honor, I have a quick clarification.
 8            THE COURT:  Mm-hmm.
 9            MR. UPPAL:  I was furiously trying to write down your
10    instructions --
11            THE COURT:  But I -- but you'll get an order
12    tomorrow, so -- but --
13            MR. UPPAL:  Gotcha.  If I can just ask this one
14    clarification.  SO --
15            THE COURT:  Yeah.
16            MR. UPPAL:  -- you said that the briefing should
17    focus on what the Special Master should do and "I don't want to
18    hear what" you -- what Your Honor will do at trial.
19            THE COURT:  Right.
20            MR. UPPAL:  So are you essentially saying in this
21    briefing don't put in arguments that "This argument or this
22    claim should be precluded"?
23            THE COURT:  Exactly.
24            MR. UPPAL:  Thank you.
25            THE COURT:  So let's focus on what as a sanction the
```

Case 1:22-cv-00050-TRM-CHS   Document 357-1   Filed 08/01/23   Page 174 of 175   PageID #: 14961

```
 1   Special Master should do.  And then we'll -- you know, if we

 2   know more later, I mean, it may change what we do at trial,

 3   right?  I mean, depending on what you find or don't find, it

 4   may change what it makes sense to do at trial.  So I don't

 5   think it -- I don't think it is the best use of everybody's

 6   time to focus on trial issues at this moment.  But push back if

 7   you disagree.  So... Okay.  Thanks, everybody.

 8              MR. WALTON:  Thank you, Your Honor.

 9              MS. MIRMIRA:  Thank you, Your Honor.

10                           END OF PROCEEDINGS

11

12

13         I, Elizabeth B. Coffey, do hereby certify that I
     reported by mechanical stenography the proceedings held on this
14   date in the above-styled cause, and that this transcript,
     produced by computer, is an accurate record of said
15   proceedings.

16                                s/Elizabeth B. Coffey

17                                Elizabeth B. Coffey,
                                  Official Court Reporter
18                                United States District Court
                                  Eastern District of Tennessee
19                                900 Georgia Avenue
                                  Chattanooga, Tennessee  37402
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT