# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

ECOLAB INC. and NALCO COMPANY, LLC d/b/a NALCO WATER, AN ECOLAB COMPANY and/or NALCO WATER

     *Plaintiffs*,

v.

ANTHONY RIDLEY and CHEMTREAT, INC.,

     *Defendants*

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:22-cv-50-TRM-CHS

Judge Travis R. McDonough

Magistrate Judge Christopher H. Steger

---

## REPORT OF THE SPECIAL MASTER

---

The undersigned was appointed to resolve certain discovery disputes under Rule 53 of the *Federal Rules of Civil Procedure.* (Doc. 361 ("Order Appointing Special Master").) These discovery disputes arise from claims of trade secret misappropriation, and the District Court's finding that "Plaintiffs Ecolab, Inc., and Nalco Company, LLC (collectively "Ecolab/Nalco"), as well as Defendants Anthony Ridley and ChemTreat, ("ChemTreat"), spoliated evidence in this case." (*Id.* at p. 1 (citing Doc. 349).) The Special Master's role was circumscribed to the "reopening discovery on a limited basis to be overseen and executed by the Special Master to mitigate the prejudice caused by spoliation." (Doc. 361 at p. 2.) This report sets forth "the Special Master's orders, findings, reports, or recommendations" under the Order Appointing Special Master at Section IV. (Doc. 361 at pp. 5-6.)

1

## FACTUAL BACKGROUND

The context of this trade secret case has been set forth in several prior orders of the Court, including the Memorandum and Order regarding the parties' competing motions for spoliation sanctions. (*See* Doc. 349.) Defendant Anthony Ridley was previously employed by Plaintiffs Nalco and Ecolab. (Doc. 313-1 at pp. 1–3; Doc. 293-1 at p. 69.) On July 1, 2021, Ridley notified Plaintiffs that he was resigning and accepting a position with ChemTreat. (Doc. 276-1 at pp. 1–2.) Plaintiffs allege that Ridley misappropriated their trade secrets by downloading and copying proprietary, confidential, and trade-secret information. (Doc. 349 at p. 7.) The core questions of this case are what information Ridley downloaded while employed by Plaintiffs and what Ridley did with that information once he resigned and went to work for ChemTreat. (Doc. 349 at p. 1.)

Discovery revealed that each of the parties had destroyed relevant ESI. (Doc. 361 at p. 1.) As a result, Plaintiffs and Defendants brought cross-motions for sanctions against the other for spoliation. (Doc. 349 at p. 1.) On June 9, 2021, Ridley sent his company issued laptop to Insight, Plaintiffs' IT vendor, to fix the laptop's fan. (Doc. 276-2 at p. 20.) Once Insight received Ridley's laptop, it issued Ridley a replacement laptop. (Doc 276-4 at p. 4.) When Insight receives a laptop for repair, it sets the laptop aside for two weeks. (*Id*.) After that waiting period, Insight makes the necessary repairs and factory resets the computer—destroying the data on the computer in the process. (*Id*.) The laptop is then redeployed to another employee. (*Id*.) In this instance, the waiting period ended on June 30, 2021, and the data on the laptop was wiped sometime between June 30 and July 7. (*Id*.) The laptop was then redeployed to another Ecolab/Nalco employee on July 12, 2021. (*Id*.)

On July 12, 2021, Ridley returned his replacement computer along with a "mobile drive" to Insight. (Doc. 276-9 at p. 1.) In August of 2021, Insight factory reset the replacement laptop

and moved it to its inventory. (Doc. 276-4 at pp. 2–3.) When Ecolab/Nalco asked Insight where it could find Ridley's computers and the mobile drive, Insight informed Ecolab/Nalco that the computers had been wiped and the mobile drive was destroyed. (Doc. 276-14 at p. 1–3.)

Because Plaintiffs asserted work-product privilege for documents dating as far back as July 1, 2021, the Court held that Plaintiffs had a duty to preserve relevant evidence beginning July 1, 2021. (Doc. 349 at p. 24.) Since it is unclear if the data on the first computer was erased before July 1, 2021, the Court denied Defendants' motion for spoliation sanctions based on Plaintiffs' failure to preserve data on the first laptop. (Doc. 349 at p. 26.) But, because Ecolab/Nalco failed to take reasonable steps to preserve Ridley's second laptop and the mobile drive after July 1, the Court granted Defendants' motion for spoliation sanctions "to the extent that Ecolab/Nalco destroyed ESI on Ridley's replacement laptop and the mobile drive he returned after his resignation." (Doc. 349 at p. 27.)

While working for Nalco between 2015 and 2018, Ridley downloaded partial backups of his company issued computer to a personal hard drive ("WD Drive"). (Doc. 303-1 at pp. 4–7, 10–11, 14.) Following his resignation, Ridley did not return the WD Drive and three other Nalco flash drives, claiming that he forgot there was Ecolab/Nalco information on the WD Drive. (Doc. 303-1 at pp. 4–5, 53.) During Ridley's employment at ChemTreat, he connected the WD Drive to his ChemTreat issued laptop on multiple occasions. (Doc. 293-1 at pp. 5–7.) On February 9, 2022, Plaintiffs sent Ridley a letter accusing him of downloading trade secret information before his resignation and instructing him to preserve any potentially relevant information. (Doc. 293-16; Doc. 293-17.) On that same day, Ridley erased documents from the Nalco flash drives, which he later returned to Plaintiffs. (Doc. 293-6 at pp. 8–10.) Five days later, Ridley used a program called CCleaner to destroy data on the WD Drive. (Doc. 293-14 at pp. 27–36.)

Plaintiffs brought a motion for spoliation sanctions based on Ridley's destruction of the data on the WD Drive. (Doc. 349 at p. 31.) Although some of the data from the USB drives that Ridley returned was recovered, the data on the WD Drive could not be recovered. (*Id.* at pp. 32–33.) The Court found that "no reasonable person would immediately delete ESI after receiving a letter expressly explaining preservation obligations." (*Id*. at p. 32.) The Court granted in part the Plaintiffs' motion for spoliation sanctions. (*Id.*) The court reserved ruling on whether Ridley destroyed the evidence with an intent to deprive the parties of evidence under Rule 37(e)(2) of the *Federal Rules of Civil Procedure.* (*Id.*)

Plaintiffs also sent a preservation letter to ChemTreat. (Doc. 293-16; Doc. 293-17.) On March 2, 2022, ChemTreat instructed Ridley to send his laptop to headquarters so that the data might be preserved. (Doc. 314-1 at p. 2.) Then, on March 18, 2022, Ridley was terminated from ChemTreat for sending an Ecolab/Nalco document from his personal email account to his ChemTreat email account. (Doc. 293-19 at pp. 2–6; Doc. 293-20 at p. 3.) Although the package containing Ridley's ChemTreat laptop was apparently addressed to ChemTreat's general counsel, the package was accidently delivered to ChemTreat's IT department; it was wiped of data and redeployed to another employee. (Doc. 293-21 at p. 3; Doc. 314-1 at p. 2.)

The Court found that "ChemTreat [did] not appear to have internal I.T. department procedures in place to avoid data loss in situations where mistakes [were] made." (Doc. 349 at p. 28.) As such, ChemTreat's "efforts overall [fell] unreasonably short in guarding against the loss of data." (*Id.*) Because ChemTreat failed to "take reasonable steps to preserve the information on Ridley's laptop," resulting in prejudice to the Plaintiffs, the Court granted in part Plaintiffs' motion for spoliation sanctions against ChemTreat. (*Id*. at p. 30.) However, the Court refused to find that ChemTreat acted with an intent to deprive Plaintiffs of evidence. (*Id*.)

4

# PROCEDURAL BACKGROUND

At the time of the Special Master's appointment, the Parties had completed the substantive discovery in this case and trial had been scheduled for September 11, 2023. (Doc. 356 (resetting trial date to January 29, 2024 and setting other pre-trial deadlines).) The Order Appointing Special Master was entered on August 23, 2023, and provided that "The Special Master shall complete his duties, as set forth below, on or before November 1, 2023."[1] (Doc. 361 at p. 2.) Because each of the parties spoliated evidence, the Court, as a sanction, reopened discovery to be overseen and executed by a special master. (Doc. 361 at p. 2.) Under the Order Appointing Special Master, the Special Master's duties included:

- The duty to review any case filings necessary to educate himself in connection with his duties. (Doc. 361 at p. 2.)

- Regarding the forensic images of Ridley's Wife's laptop—which Ridley was to produce to the Special Master—the duty to establish reasonable search protocols and to, in the Special Master's discretion, search the forensic images for evidence regarding:

    o The Circumstances under which Ridley ran CCleaner software on the WD Drive after receiving Ecolab/Nalco's February 9, 2022 preservation notice;

    o Files and data deleted from the WD Drive as a result of running the CCleaner software;

    o Whether Ridley connected the LaCie Drive to his wife's laptop; and

    o Whether Ridley stored and/or accessed Ecolab/Nalco documents on his wife's laptop." (Doc. 361 at pp. 2–3.)

- Regarding the forensic image of the iPad that Ridley connected to his Ecolab/Nalco and ChemTreat laptops and any forensic image of any other USB device that Ridley connected to those laptops—which Ridley was to produce to the Special Master—the duty to establish reasonable search protocols, and to, in the Special Master's discretion, search the forensic images for "evidence regarding whether Ridley stored and/or transferred Ecolab/Nalco files using these devices during his employment at ChemTreat." (Doc. 361 at p. 3.)

---

[1] This deadline was subsequently extended until November 17, 2023 to account for some developments that occurred late in the process. (Doc. 401.)

- Regarding the ESI data sources of the custodians listed in the August 28 Order, including email repositories, OneDrive repositories, and forensic images of local hard drives—which ChemTreat was to produce—the duty to establish reasonable search protocols and to, in the Special Master's discretion, search the repositories "for evidence regarding whether Ridley transferred Ecolab/Nalco files to these custodians during his employment at ChemTreat." (*Id.*)

- The duty, when developing the search protocols, to be guided by the Court's rulings on the parties' cross-motions for spoliation sanctions and Federal Rule of Civil Procedure 26(b)(1)'s instructions that discovery should be "proportional to the needs of the case." (*Id.* at p. 4.)

- The discretion to require the parties to produce any data or documents previously collected or produced during discovery and any other related information so that the Special Master may use such data or documents in discharging his duties. (*Id.*)

- The discretion to direct that work be performed by other Baker Donelson attorneys or support personnel, as well as third-party IT vendors, as necessary. Further, the discretion to appoint the Special Master's own expert witness pursuant to Federal Rule of Evidence 706. (*Id.*)

- The duty to develop a "protocol that adequately protects against disclosure of privileged and personal information and that adequately protects the parties' confidential business information as set forth in the parties [sic] agreed protective order." (*Id.*)

- The ability to petition the Court for any additional authority necessary to execute his duties. (*Id.*)

The Special Master acted in accordance with these express duties when overseeing and executing discovery.

An initial planning conference with the Special Master and Counsel for the Parties was held on August 30, 2023; status conferences were held on September 6, 2023; September 13, 2023; September 20, 2023; September 27, 2023; October 11, 2023; October 19, 2023; October 25, 2023; October 30, 2023; November 9, 2023 and November 16, 2023.[2] These Party Conferences were intended for the Special Master to both hear the Parties' input on the process, as well as to seek input from the Parties on certain searching and scoping issues.

---

[2] Each of these conferences will be referred to by its date and the moniker "Conf." (e.g. ("8.23.2023 Conf.")), and, collectively, all will be referred to as the "Party Conferences."

The Party Conferences are being entered into the record as exhibits to this Report. The Special Master regularly entered as exhibits all substantive communications between the Parties and the Special Master that had occurred between the Party Conferences. These Exhibits 1 through 77 set out the substantive submissions on issues before the Special Master and argument of the Parties.[3] These exhibits will be filed with the Court in the ECF and will be referred to in this report by their exhibit numbers. The Special Master sought the input of all the parties as to whether any of the exhibits qualified for protection under the Agreed Protective Order in the matter. No party requested that any of the Exhibits (or argument at the Party Conferences) be redacted or withheld under a claim of confidentiality under the Agreed Protective Order. (Exs. 71-73.)

The Special Master retained two different vendors to support the Special Master's efforts. First, Brett Harrison, a Senior Managing Director and Head of Digital Forensics & Investigations FTI, was retained to assist with the digital forensic performed work on the various devices. After disclosing a list of digital forensic experts being considered, the Parties all agreed to the retention of Mr. Harrison. (8.30.2023 Tr. at pp. 92:2-103:9; Exhibit 8.) Mr. Harrison's contract was provided to the Parties contemporaneously with his retention. (Doc. 361 at p. 6 ("The Special Master shall disclose to the Court and the parties the costs for utilizing third-party information technology vendors and rate of compensation for any expert designated by the Special Master pursuant to Federal Rule of Evidence 706, which the Court will review for reasonableness.").) No party objected to Mr. Harrison's rates. Mr. Harrison's scope of work included the forensic examination and analysis of the subject computers, at the direction of the Special Master. (Exhibit 13 at p. 1 ("FTI's work is to provide digital forensics analysis and to provide subject matter expertise in support of legal process in accordance with Section 1 of the Court's August 23, 2023

---

[3] The Special Master entered as exhibits only those things that were not in the extant ECF docket, excepting Exhibit 1, which was the Order Appointing Special Counsel.

7

Order . . . .").)  Certain preliminary findings by Mr. Harrison were provided to the parties on September 18, 2023, (Ex. 30); his final report was provided on November 10, 2023, (Ex. 75). Further, the Special Master made Mr. Harrison available to the parties at the November 16, 2023 Conference and the Parties' questions about the final report were answered.

Second, the Special Master retained Innovative Driven to act as the eDiscovery vendor in support of the substantive review efforts.  Once assets were received by FTI, FTI sent those assets to Innovative Driven for processing and searching (as will be further outlined below, and as set forth in Appendix A).  Innovative Driven then processed the data pursuant to the direction of the Special Master and conducted searches and made data available for review by the Special Master and his delegates.  (Exhibit 14.)  The Innovative Driven contract was negotiated to ensure that the rates were market-competitive, and the contract was provided to the Parties.  No objections were received.

## DISCOVERY FINDINGS

As with many eDiscovery cases involving claims of a computer used as the instrumentality of a tort, the eDiscovery process in this setting had both a digital forensic component and an eDiscovery component.  Any eDiscovery searching protocol begins by identifying the custodians and or data source, which defines and begins to narrow the universe from the available ESI at a company (like ChemTreat) or in the possession of an individual (like Ridley).  The Order Appointing Special Master provided guidance on this point and is divided between the Ridley ESI Sources and the ChemTreat ESI sources.  On all issues, the Special Master heard from the parties and considered the approach and work.  The Special Master emphasized relevance and proportionality as the touchstones in directing the work by the retained vendors and deciding where to stop.

8

The specifics of the disputes and scoping of this project will be covered within the individual sections of this report.  The assets can be broken into two different buckets: (1) assets owned or controlled by Defendant Anthony Ridley ("Ridley"), including forensic images of his wife's computer, his iPad, and USB devices; and (2) certain electronically stored information ("ESI") repositories of identified and relevant ChemTreat custodians.  The Party Conferences were used to identify the assets, provide direction for delivering them to the vendors retained by the Special Master, and creating the searching procedures employed against those assets.  (Doc. 361 at pp. 2-4.)

The scope of discovery includes "'any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.'" *Apex Bank v. Rainsford*, No. 3:19-CV-130, 2020 WL 12840131, at *3 (E.D. Tenn. Oct. 30, 2020) (quoting Fed. R. Civ. P. 26(b)(1)).  When determining whether discovery was proportionate to the needs of the case, the Special Master considered the six relevant factors as required by Rule 26(b)(1) of *the Federal Rules of Civil Procedure*. Those factors include:

> (1) "the importance of the issues at stake in the action," (2) "the amount in controversy," (3) "the parties' relative access to relevant information," (4) "the parties' resources," (5) "the importance of the discovery in resolving the issues," and (5) [sic] "whether the burden or expense of the proposed discovery outweighs its likely benefit."

*Stein v. U.S. Xpress Enterprises, Inc.*, No. 1:19-CV-98, 2022 WL 17573900, at *2 (E.D. Tenn. Dec. 9, 2022) (quoting Fed. R. Civ. P. 26(b)(1)).  Of course, the Order Appointing Special Master was the guiding authority because "[t]he power and authority of a Master is dependent upon the District Court's order of reference. "*Agric. Servs. Ass'n, Inc. v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1071 (6th Cir. 1977).

9

## I. Ridley Devices Forensic Work

For the Ridley ESI Sources, the Order Appointing Special Master required, that "Ridley shall immediately produce to the Special Master (or his vendor or delegate as directed)" the following: [1] "the April 2022 forensic image of his wife's laptop, as well as a new forensic image of his wife's laptop[,]" ("Ridley's Wife's Computer"), and [2] "a forensic image of the iPad [Ridley] connected to his ChemTreat or Ecolab/Nalco laptops [("Ridley's iPad")], as well as [3] a forensic image of any USB device in his possession that he connected to the ChemTreat or Ecolab/Nalco laptops [("Ridley USBs")]."  (Doc. 361 at pp. 2-3.)

### A. Forensic Analysis of Ridley's Wife Computer

Ridley is alleged to have deleted certain relevant information from his WD Drive.  A core factual dispute revolves around Ridley's use of a wiping program called CCleaner on the WD Drive in around mid-February 2022 after receiving the preservation demand.  (*See* Doc. 313-1 (Ridley Declaration discussing use of the WD Drive and the CCleaner Program).)  Ridley's identification of the specific computer used to deploy CCleaner on the WD Drive has changed.

On July 7, 2023, Mr. Ridley discussed his use of the WD Drive in a Declaration.  [Doc. 313-1.]  Ridley averred that "I do not recall the exact dates of each time I ran a disc clean or defragmenting program on the WD Drive.  I would generally do this around the time I deleted a significant number of files from the drive."  (Doc. 313-1 at p. 9 (at ¶ 49.)  He also stated that "[w]hen I testified during my deposition, **I thought I ran the disc clean program from my ChemTreat laptop**."  (Doc. 313-1 at p. 10 (at ¶ 56) (emphasis added); Exhibit 28.)

However, when the issue came up before the Court in the August 10, 2023 hearing, Ridley's counsel explained that a different computer (Ridley's Wife Computer) was used to run the CCleaner program.  (Doc. 357 at pp. 3:14-10:4.)  Counsel for Ridley noted at the hearing that

this is "an old laptop that his wife has had for some period of time," (Doc. 357 at p. 7:21-22); and that "despite [Ridley's] recollection [from his prior declaration] that he believed that he used the C-Cleaner program from a different laptop, we believe that it's his wife's laptop . . . and that was connected to that computer from, I think, February the 12th through February the 14th, which means that was the . . . the computer that . . . was used to wipe the drive," (Doc. 357 at pp. 8:11-22.) Ridley's counsel also confirmed that an image had been taken of the Ridley's Wife Computer "around April the 16th of 2022, right at the beginning of discovery." (Doc. 357 at p. 9:5-7.) Thus, the image of Ridley's Wife Computer from April 2022 was taken approximately two months after Ridley allegedly ran the CCleaner program. (Doc. 357 at p. 9:5-12.)[4]

Based on that representation, the Court directed that the Ridley's Wife's Computer be provided to the Special Master and searched as part of the litigation—both the previous forensic image from April 2022 and a new, current image. At the August 30, 2023 Conference, Counsel for Ridley presented an exhibit that showed "Jamie Ridley's Laptop" as the Ridley's Wife's Computer, along with listing other devices. (Exhibit 6.) Ridley's Counsel confirmed he had possession of the computer as it existed presently, as Ridley had delivered it to his office. (8.30.2023 Conf. Tr. at p. 14.) In addition, Ridley confirmed that his vendor, Frontline, had already taken a full forensic image of the Ridley's Wife's Computer in April 2022. (8.30.2023 Conf. Tr. at pp. 17:10-18:17.) The Parties agreed that the April 2022 image could be shipped and used by Mr. Harrison. (8.30.2023 Conf. Tr. at pp. 18:19:24.)

Moreover, the parties agreed that Ridley's vendor, Frontline, would also make a copy of the current Ridley's Wife's Computer (as of August 2023). (8.30.2023 Tr. at pp. 20:15-22:20.)

---

[4]    Contemporaneous documents confirm that the image was taken at this time. (*See* Exhibit 7 (Frontline Property Release Form showing Ridley's Wife Computer was received by a forensic imaging company for imaging on April 15-15, 2022 and then released back to Ridley on April 19, 2022).)

The process employed ensured that the April 2022 forensic image of Ridley's Wife Computer, as well as the current image of Ridley's Wife's Computer, was received by Mr. Harrison for forensic analysis on September 12, 2022 (and later processed by Innovative Driven for eDiscovery searching).

Two days after Mr. Harrison's receipt of the Ridley's Wife's Computer, however, on September 14, 2023, Counsel for Ridley informed the Special Master that Ridley's Wife's Computer was **not** used to wipe the WD Drive. Instead, Counsel stated that Ridley "believes he ran the C-Cleaner program from a laptop his father provided to him after Mr. Ridley's stepmother had passed away [("**Discarded Father's Computer**")]. . . . Mr. Ridley advises that he returned the laptop to his father after searching for the pictures and personal files and running the C-Cleaner program and his father disposed of the laptop. Mr. Ridley believes that the WD drive was connected to his father's laptop when he ran the C-Cleaner program." (Exhibit 29.)

Subsequently, Mr. Ridley provided a more detailed Declaration of Anthony Ridley setting out the circumstances regarding the use of the Discarded Father's Computer to run CCleaner on the WD Drive. (Exhibit 39.) That Declaration states that Mr. Ridley "ran the C-Cleaner program on my father's laptop and I also ran the C-Cleaner program on the free space only of my WD drive while it was connected." (Exhibit 39 at p. 2 (at ¶ 14).) Mr. Ridley also reports that he "retuned the HP laptop to my father when I took him to his heart doctor on February 22, 2022," (Exhibit 29 at p. 2 (at ¶ 17)), and that he believes, based on what his father reported, that the Father's Discarded Laptop was disposed of "the last week of February or the first week of March of 2022," (Exhibit 29 at p. 2 (at ¶ 19)). Ecolab Counsel wrote regarding the Discarded Father's Computer:

> Based on Mr. Ridley's sworn declaration that his father's laptop was fully disposed of and not recoverable, Plaintiffs do not see an opportunity to conduct any searches of this device. However, Plaintiffs reserve all rights to seek to search this device if it is

12

> discovered that Mr. Ridley's declaration regarding his father's laptop is inaccurate.

(Exhibit 41.)

The Special Master directed that Mr. Harrison's analysis focus on the April 2022 image of the Ridley's Wife's Computer as the closest in time to the misconduct. Using the more current image, which would have information from April 2022 to the present, was not proportional given that it would be reflecting new activity that would occurred after Ridley's employment with ChemTreat ended; activity would have been after Ridley engaged counsel and was involved in this litigation; the activity would have been after he deleted the contents of the WD Drive; and, as such, present image would have a much lower likelihood of containing actionable user activity. Moreover, the analysis of the April 2022 revealed some probative activity, making an analysis of the later image (taken in September 2023) less likely to be relevant. Given the dictates of proportionality, the later image was not forensically examined by Mr. Harrison.

At my direction, Mr. Harrison performed forensic work on Ridley's Wife Computer. Given the original understanding of the centrality of that device to the issues in the litigation, specifically regarding the use of the CCleaner program on the WD Drive, that computer was prioritized for early examination. At the Special Master's request, the Parties submitted a protocol for the examination of Ridley's Wife's Computer. (Exhibit 20.) The Special Master directed that the unallocated space of the computer be carved, and then that broad search terms (Ecolab, Chemtreat and Nalco) be run against that data. Because this was a personal device, it was reasonable to use all three company names as search terms. The Special Master directed that the work that Mr. Harrison did was proportional and reasonable given the allegations of spoliation in this case, the fact that Ridley's Wife's Computer is the only extant device that could have accessed

13

the WD Drive or other materials out of the at least three known possibilities,[5] and further to provide reasonable certainty about the user activity on this remaining device.

The Court's instruction on the forensic examination of Ridley's Wife's Computer was multi-faceted. First, the Court ordered that the forensic examiner "search . . . for evidence regarding . . . The circumstances under which Ridley ran C-Cleaner software on the WD Drive after receiving Ecolab/Nalco's February 9, 2022 preservation notice," (Doc. 361 at p. 2), as well as "Files and data deleted from the WD Drive as a result of running the C-Cleaner Program, (*Id*. at p. 3). As discussed above, the CCleaner program was subsequently revealed to have been done on the Discarded Father's Computer, versus this device. Ridley's Wife's Computer showed no CCleaner activity at all. (Ex. 75 at pp. 3-4.)

Second, the Court ordered that the forensic examination of the Ridley's Wife's Computer determine "[w]hether Ridley connected the LaCie Drive to his wife's laptop." (Doc. 361 at p. 3.) Based on the forensic examination, Mr. Harrison determined that two of the relevant devices were connected to Ridley's Wife's Computer: [a] the WD Drive, and [b] a PNY USB 2.0 FD Serial Number AA00000000017935. This latter was not the LaCie Drive, which had a had a Serial Number def10dce9db4. (Doc. 274-1 at p. 30.)

Third, the Court ordered that the forensic examination of Ridley's Wife's Computer determine "[w]hether Ridley stored and/or accessed Ecolab/Nalco documents on his wife's laptop." (Doc. 361 at p. 3.) Here, Mr. Harrison's analysis revealed certain activity that is probative to the issues in the case. Mr. Harrison found evidence that Ridley's Wife's Computer

---

[5]     The other computers, such as his Ecolab computers, his ChemTreat computer, multiple USB devices, and the Discarded Father's Computer, do not exist. Given this, the Special Master directed a more comprehensive analysis of the Ridley's Wife's Computer.

14

was used to access information in both August 2021 and September 2021 from the WD Drive.[6] (Ex. 75 at pp. 5-6.)  Each of the following files was indicated as having been opened on Ridley's Wife's Computer on the date indicated, and other aspects of the file examination revealed that these were accessed from the WD Drive:

| Last Opened/Accessed (UTC) | Path | Volume Serial Number |
|---|---|---|
| 9/29/2021 19:44 | E:\Nalco Water Files\Customers Files - Nalco Water\Arnold's Air Force Base\Bid Package for HVAC cooling water systems 2009-2014\AEDC proposal for purchasing - HVAC Cooling Towers - October 2015.doc | 1843759F |
| 9/29/2021 19:44 | E:\Nalco Water Files\Customers Files - Nalco Water\Arnold's Air Force Base\Bid Package for HVAC cooling water systems 2009-2014\AEDC proposal for purchasing - HVAC Cooling Towers - October 2015.pdf | 1843759F |
| 9/28/2021 2:07 | E:\Nalco Water Files\2018 Monthly Turndoc Incentive Reports\09 - September 2018 Turndoc Incentive Invoice.xlsx | 1843759F |
| 9/28/2021 2:06 | E:\Nalco Water Files\2018 Monthly Turndoc Incentive Reports\11 - November 2018 Turndoc Incentive Invoice.xlsx | 1843759F |
| 9/28/2021 2:03 | E:\Nalco Water Files\WL121 District Folder\Fact Packs - 2018\12 - District Fact Pack WL121 December 2018.xlsb | 1843759F |
| 9/28/2021 2:00 | E:\Nalco Water Files\Customers Files - Nalco Water\George A. Dickel & Co\Proposal for George Dickel RO Program 121417EC (002) - December 2017.docx | 1843759F |
| 9/28/2021 1:47 | E:\Nalco Water Files\Customers Files - Nalco Water\Arnold's Air Force Base\GENERAL SERVICES ADMINISTRATION - GSA Pricing 02.01.2017.pdf | 1843759F |
| 9/28/2021 1:35 | E:\Nalco Water Files\2018 Monthly Turndoc Incentive Reports\12 - December 2018 Turndoc Incentive Invoice.xlsx | 1843759F |
| 9/28/2021 1:32 | E:\Nalco Water Files\2019 Monthly Turndoc Incentive Reports\01 - January 2019 Sales Incentives Invoice Details Statement - Ridley WL121.xlsx | 1843759F |
| 9/28/2021 1:27 | E:\Nalco Water Files\2019 Monthly Turndoc Incentive Reports\09 - September 2019 Sales Incentives Invoice Details Statement - Ridley WL121.xlsx | 1843759F |
| 8/6/2021 20:44 | E:\Nalco Water Files\WL121 District Folder\Fact Packs - 2019\12 - District Fact Pack WL121 December 2019.xlsb | 1843759F |

---

[6]     Ridley noted in his Answers and Objections to Plaintiffs' First Interrogatories that, as to the files he "backed up" to the WD Drive "sometime in 2015 or 2016," that "Ridley located those files after he left Ecolab in July 2021 and deleted the files."  (Doc. 225-3 at pp. 3-4.)

| | | |
|---|---|---|
| 8/6/2021 20:43 | E:\Nalco Water Files\Customers Files - Nalco Water\Gaylord Opryland - Marriott\Gaylord Opryland Contract Worksheet March 2019.xlsx | 1843759F |
| 8/6/2021 20:40 | E:\Nalco Water Files\Customers Files - Nalco Water\Gaylord Opryland - Marriott\Gaylord Opryland Service Plan 2017.xlsx | 1843759F |
| 9/29/2021 19:39 | E:\Nalco Water Files\Customers Files - Nalco Water\Arnold's Air Force Base\Bid Package for HVAC cooling water systems 2009-2014\AEDC proposal for purchasing - HVAC Cooling Towers - October 2015.doc | 1843759F |
| 9/28/2021 2:00 | E:\Nalco Water Files\Customers Files - Nalco Water\George A. Dickel & Co\Proposal for George Dickel RO Program 121417EC (002) - December 2017.docx | 1843759F |

This activity is probative to issues in the case, given that Ridley was accessing these files during his employment with ChemTreat. The subject matter of the documents, particularly those related to Gaylord Opryland, also are relevant to later findings regarding the Network File Shares. There were no other files of relevance found during the forensic analysis of Ridley's Wife's Computer.

### B. Forensic Analysis of Ridley's iPad

Ridley's Counsel confirmed the existence of Mr. Ridley's iPad at the August 30, 2023 Conference, (Ex. 6), and further that Ridley's Counsel had possession of it, (8.30.2023 Conf. at p. 14:6-12). The Ridley iPad was imaged using the latest version of its iCloud back-up.[7] A forensic analysis was then performed on the recovered iPad back-up. Mr. Harrison's forensic examination of that device did not find any files of relevance. (Ex. 75 at p. 7.)

### C. USB Devices in Ridley's Possession

During the August 30, 2023 Conference, Ridley's Counsel shared an exhibit that set out the USB devices (and other devices) that Ridley had in his possession. While the WD Drive was also included on the list of forensic images that Ridley's Counsel had, Ecolab and ChemTreat

---

[7]       Notably, Mr. Harrison also looked for iPad back-ups that might have existed on the Ridley's Wife's Computer and there were none. (Ex. 75 at p. 5.) The Parties engaged in some argument regarding the iCloud back-up and ensuring that the different versions that might exist were accounted for in the process. (8.30.2023 Conf. Tr. at pp. 22:21-35:3.) But, the Special Master directed that the forensic activity focus on the oldest copy of the active iPad. (Ex. 75 at p. 7.)

agreed that new analysis of the WD Drive was unnecessary given the work already done in this case. (8.30.2023 Conf. Tr. at pp. 13:1-2, 15:9-16:1.) Mr. Ridley also included three thumb drives:

1. Thumb Drive—TD01, USB Disk 2.0 USB Device, SN: 910101099030;

2. Thumb Drive—TD02, General UDisk USB Device USB Device, SN: Oxecc03000851e8; and

3. Thumb Drive—TD03, General USB Flash Disk USB Device, SN: 416080000012762.

(Exhibit 6 ("Ridley Thumb Drives"); 8.30.2023 Conf. Tr. at p. 12:25-13:16.) These three forensic images of the Ridley Thumb Drives were stored with Ridley's vendor, Frontline. (8.30.2023 Conf. Tr. at p. 13:14-23.) However, Ridley's counsel reported that discovery had already been conducted on the Ridley Thumb Drives, and Ecolab and ChemTreat agreed that they did not need additional work conducted in this Special Master setting. (8.30.2023 Conf. Tr. at pp. 16:2-8.)

After the August 30, 2023 Hearing, Ridley's Counsel revealed one other USB device. (Exhibit 9.) Counsel reported: "Mr. Ridley does have in his possession one Lexar 16gb flash drive that he used to save files to be used by his family in the event that Mr. Ridley passes away. Mr. Ridley does not specifically recall if this USB device was ever connected to a Nalco / Ecolab or ChemTreat laptop." (Exhibit 9; Exhibit 11.) Counsel provided a screenshot of the files, which were named consistently with estate and end-of-life planning. (Exhibit 9 ("Funeral Preparation USB Device").) Mr. Harrison's forensic analysis revealed that there was one deleted file on the Funeral Preparation USB Device that might have had a connection to Ecolab named "\C\Sales Leadership meeting – Pepsi Folder", but that folder was last accessed on February 12, 2017. (Ex. 75 at p. 8.) The rest of the files were consistent with end-of-life planning.

Pursuant to the Order Appointing Special Master, it was also required that "[t]o the extent Mr. Ridley is no longer in possession of those devices, he shall provide to the Special Master an affidavit or declaration explaining why they are no longer in his possession." (Doc. 363 at p. 3;

17

8.30.2023 Conf. Tr. at pp. 70:16-82:1.)  Mr. Ridley provided his Declaration of Anthony Ridley on September 12, 2023, outlining other USB devices that he once had, but no longer possesses. (Exhibit 19.)

## II.    ChemTreat Custodians

ChemTreat identified their document custodians during the main discovery phase of the case.  (*See* Doc. 143.)  In addition to two custodians that were listed as related to the Human Resources Department on-boarding of Mr. Ridley, as well as two custodians who were connected with facts regarding the receipt and reformatting of Ridley's ChemTreat laptop, ChemTreat identified thirteen (13) custodians.  Each is listed in the Court's Order Appointing Special Master as a potential custodian for analysis. (Document 361 at pp. 3-4.)  The custodians were:

- Richard (Clay) Cissell ("Cissell") and Steven Leavell ("**Leavell**"), who were both described as follows: "Mr. Ridley's supervisor who was also involved in Mr. Ridley's hiring." (Doc. 143 at. pp. 2-3.)

- John Alcorn ("Alcorn") was listed as an "executive at ChemTreat with knowledge of Mr. Ridley's hiring."[8] (Id. at p. 3.)

- Tyler Bates ("Bates") was a "ChemTreat employee identified in Plaintiffs' Second Amended Complaint as relevant to Plaintiffs' claims against ChemTreat."  (*Id*.)

- The remaining custodians were all listed as "a ChemTreat employee **with whom Mr. Ridley may have interacted**," including Albert DeNunzio.  (*Id*. (emphasis added).)

At the August 30, 2023 Conference, the Parties discussed ChemTreat custodians with a goal toward identifying and processing computers and data from the most important custodians first, and then letting that discovery guide whether any additional custodians were warranted. (Exhibit 5 (agenda for conference including prioritization of the ChemTreat Custodians and data sources); 8.30.2023 Conf. Tr. at pp. 103:10-121:1.)  The Special Master requested the Parties

---

[8]       Ecolab agreed that Alcorn was not a target custodian because he was "pretty high up".  (8.30.2023 Hg. Tr. at p. 113:13-19.)

18

discuss what discovery had already revealed about the high priority custodians. (Exhibit 5 ("This discussion will include, at a minimum, the following: [i] potential prioritization of certain ChemTreat Custodians and ESI sources; [ii] the relevant time frame; and [iii] search methods. To that end, the parties should be prepared to address, for the ChemTreat Custodians, what has already been produced in this case, and **what the production materials would show regarding likely priorities.**" (emphasis added)).) The purpose of this discussion was to prioritize both the custodians and then data sources that would be most likely to have relevant information.

A key point of focus was the hard drives of the relevant custodians' computers because those had not been searched in the ChemTreat processes (a fact known to Ecolab/Nalco because of the ChemTreat Discovery Report). (Doc. 143.) The Parties agreed that Clay Cissell, Tyler Bates, and Steve Leavell were most likely to have responsive ESI (the "Priority Custodians"). (8.30.2023 Conf. Tr. at p. 105:24-107:15; *see also* Doc. 357 at p. 133:22-24; 8.30.2023 Conf. Tr. at p. 115:14-18.) Mr. Vaughn provided images of those computers to Mr. Harrison for inspection. (8.30.2023 Hg. Tr. at pp. 116:13-118:25; Exhibit 12.)

The custodian list that ChemTreat provided was overbroad and included persons that were unlikely to lead to additional information "regarding whether Ridley transferred Ecolab/Nalco files to these custodians during his employment at ChemTreat." Counsel for ChemTreat characterized the Discovery Plan list this way: "the reason that [Ecolab] is unable even to identify who might be relevant besides Mr. Cissell and Mr. Bates is because **there was literally no discovery that Plaintiffs conducted on anybody except for the three that they deposed who are in Mr. Ridley's direct line of reporting**. Mr. Cissel, Mr. Leavell, and Mr. Elcorn. They didn't even depose Mr. Bates. They didn't have enough depositions left. **All the others [on the Discovery Plan list] are people who we [ChemTreat] identified as custodians solely because we cast an**

**incredibly broad net, given the allegations that Plaintiffs had raised**." (8.30.2023 Conf. Tr. at pp. 108:22-109:10 (emphasis added); 8.30.2023 Hg. Tr. at p. 11: 6-9 ("But many of these custodians are people who were identified solely because they knew Mr. Ridley socially or had, you know, like a single meal with him or something.").)

As a result, from the extant discovery, no additional custodians could be argued to be important. ChemTreat Counsel noted, without a differing claim from Ecolab: "And with regard to everyone else [besides Mr. Cissell, Mr. Leavell, Mr. Elcorn and Mr. Bates], **there was literally not a single document produced from them** except for one of them, Mr. Kraft. And for those, the documents related to his work on the general hiring committee." (8.30.2023 Hg. at p. 110:14-11:2 (emphasis added).) Ecolab argued that the documents that were produced—apparently in the form of text messages—pointed to Mr. Bates. (8.30.2023 Hg. Tr. at pp. 113:24-114:4.) Moreover, and importantly, as the process went forward there was nothing responsive in Priority Custodians' information. In fact, on the ChemTreat computers from the ChemTreat computers, and despite extensive searching and review, the process did not reveal any production-eligible documents.

Finally, many of the thirteen custodians also did not have ChemTreat-issued computers that the custodian used for work; instead, the custodians used personal computers that were not available for additional discovery searches on a local hard drive. (8.30.2023 Hg. Tr. at p. 109:17-25 ("If they use a computer at all, it's a personal computer that is not in ChemTreat's possession.").) The parties briefed the issue of whether ChemTreat had possession, custody or control of the personal computers of ChemTreat's employees. (Exs. 16-17.) The Special Master found that ChemTreat did not have such possession, custody or control, but directed certain preservation instructions and reporting by ChemTreat. (Exs. 18 (Special Master Finding) and 31 (ChemTreat disclosure).) As a result of this process, ChemTreat submitted, on September 20,

2023, a listing showing which of the 13 custodians from the Court's Order Appointing Special Master had ChemTreat-issued laptops. (Ex. 31.) There were only six of the custodians that had ChemTreat-issued laptops (Alcorn, Bates, Cissell, DeNunzio, Kraft and Leavell); of those six custodians, the Special Master reviewed four of the custodians (Bates, Cissell, Leavell and DeNunzio,[9] which comprised five computers.[10]

Despite numerous requests by the Special Master, Ecolab was unable to provide a specific foundation for any additional custodians beyond the Priority Custodians and Mr. DeNunzio. (*See, e.g.,* Exs. 33, 34, 37, 49.) Based on the materials provided, the manner for how the list by ChemTreat was constructed, and the lack of any specific evidence in the materials reviewed from the Priority Custodians or other searches, the Special Master overrules as disproportionate requests for custodians beyond those reviewed.

### III. ChemTreat Devices Forensic Work

ChemTreat provided forensic images of the computers of the Priority Custodians and confirmed the collection in an affidavit. (Ex. 12.) As to the ChemTreat computers, the Court specifically ordered that ChemTreat provide "**forensic** images of local hard drives . . . ." (Doc. 361 at p. 3 (emphasis added).) For the Priority Custodians, a more comprehensive analysis was performed to ensure that there was no evidence of deletion of Ecolab/Nalco materials, including carving of the unallocated spaces and reviewing for mass deletions. ChemTreat's objections to those processes are overruled.

The Parties provided input (along with several disagreements) regarding the scope and extent of the for the forensic work to be done on the ChemTreat computers. [Exhibit 22.] Given

---

[9] The DeNunzio computer showed very little (if any) actual user activity on the ChemTreat device by Mr. DeNunzio. (Ex. 75 at p. 13.)

[10] Cissell had two computers that were used during the period at issue.

the parties' prior history of spoliated evidence, it was reasonable and proportionate, particularly on the Priority Custodians, to undertake an analysis of both the unallocated and allocated space. For the Priority Custodians, the Special Master wanted substantial certainty about whether key information may have been deleted.[11]  With the forensic tools, Mr. Harrison used more narrow and single word search terms because of inherent limitations in the tools.  Because the process was focused on looking for "evidence regarding whether Ridley transferred Ecolab/Nalco files to these custodians during his employment at ChemTreat," (Doc. 361 at p. 3), Mr. Harrison was directed to simply use "Ecolab" and "Nalco" as the search terms for the forensic analysis.  (Conversely, for the active user files that were processed and searched by Innovative Driven, more complex, Boolean- and proximity-enabled searches were used, as discussed below and in Appendix A.)  Mr. Harrison also searched for the known list of file names alleged to have been misappropriated within the devices.

No evidence of any problematic deletion was found, and the Priority Custodians' devices did not contain any identifiable forensic traces of Ecolab or Nalco confidential documents.  (Ex. 75 at pp. 8-13.)  For the Priority Custodians, the forensic examination of the computers did **not** contain probative evidence concerning whether "Ridley transferred Ecolab/Naloc files to these custodians during his employment at ChemTreat."  (Doc. 361 at p. 3.)

## IV.    eDiscovery Searches of ESI Repositories

In addition to the forensic work, ESI was also processed by Innovative Driven for more complex searching.  Each process is discussed in this section of the report.  As an initial matter, there was a dispute regarding the timeframe.  Early in the Special Master process, ChemTreat's position was that the searches should be limited to the exact dates of Mr. Ridley's employment.

---

[11]    This is consistent with the agreement of counsel regarding the WD Drive, as well.  (Doc. 359-1 at p. 3 ("Our expert will carve out and recover all deleted file; he will make those files searchable as well.-Agreed.")).

(*See* Exhibit 23.)    Given that the Court's directive was to look for "evidence regarding whether Ridley transferred Ecolab/Nalco files to these custodians during his employment at ChemTreat," (Doc. 361 at p. 3), the Special Master determined that such evidence could exist after Mr. Ridley's employment ended.  For instance, if an Ecolab confidential document had been found after Mr. Ridley's employment ended, that would be potentially probative of distribution during his employment.  Moreover, ChemTreat did not take such a restrictive view during substantive discovery responses:

> ChemTreat began communicating with Mr. Ridley regarding potential employment in August 2020.  Plaintiffs allege that Mr. Ridley's misappropriation began on May 22, 2021.  Mr. Ridley was terminated by ChemTreat on March 18, 2022.  *See* Doc. 42 ¶ 40. ChemTreat used the July 1, 2020 to April 1, 2022 time period for all the ESI sources described above for all custodians with the exception of Mr. Mumpower and Ms. James.

(Doc. 143 at p. 5.)  As such, a modified time search was used.  As set forth in Appendix A, the Special Master used May 1, 2021 (a few months prior to the start of Ridley's employment) to April 15, 2022 (which is approximately one month after the end of Ridley's employment) for most eDiscovery searches at Innovative Driven.  Moreover, certain forensic activity, such as USB activity, was examined outside the Ridley employment time period to make certain nothing was relevant; nothing of relevance was located through that analysis and the Special Master directed that it not be reported on by Mr. Harrison as it was irrelevant.

A.    **Email Searches**

Email repositories were searched by ChemTreat Counsel during merits discovery.  (*See* Doc. 360-5 at p. 1 (chart of email that was searched).)  As reported in ChemTreat's ESI Report, (Doc. 143 at pp. 2-4), for these email repositories several searches were conducted:

> In connection with Plaintiffs' discovery requests, particularly Requests for Production Nos. 15-17, ChemTreat searched the ESI sources for other custodians (identified above) for all email

23

communications with Mr. Ridley's ChemTreat email address and Mr. Ridley's personal email address as identified by Plaintiffs in the Second Amended Complaint, or with Mr. Ridley's Ecolab email address. ChemTreat also searched the ESI sources for other custodians (identified above), in addition to Mr. Ridley's ESI sources for key terms related to Plaintiffs' other discovery requests (e.g., "Ridley and Bates," "Ridley and Nalco," "Ridley and Ecolab," among others).

(Doc. 143 at p. 4.) Because the email repositories for these custodians had already been processed and was available to ChemTreat Counsel, the Special Master directed certain search supplementation of the email repositories that were already captured in order to save on processing costs or duplicating work already performed by ChemTreat's counsel.

ChemTreat Counsel provided certain search term reports ("STRs") to the Special Master that showed certain search approaches for examination. (*See* Ex. 32 (setting out different searches, which were provided *ex parte* with Ecolab's agreement).) Based on reviewing these STRs, the Special Master directed that ChemTreat provide the emails for the Priority Custodians that contained the term "Ecolab" or "Nalco" and which had not been reviewed and which did not hit on the privilege terms. (Exhibit 51 at point 4.) Those emails were reviewed, and none were found to contain content probative to the issues in this case.

**B.   Ridley's iPad Search**

The iPad contained text messages. This included several texts that showed some exchanges between Mr. Ridley and Mr. DeNunzio. These texts were ambiguous, in that they simply revealed some reports being exchanged between the two custodians; but it was unclear the nature of the reports. Given that this was the only evidence of a demonstrable connection between Mr. Ridley and another custodian, Mr. DeNunzio was added as a custodian. (Ex. 64.) The responsive text messages were produced to the Parties. ChemTreat subsequently produced the emails that appear to be related to the text messages that the Special Master produced. (*See* Exhibits 62 & 66.) Based

on the Special Master's review, the text messages appear to reference ChemTreat reports and did not appear to be related to any particular or relevant customer information (and Ecolab has not so argued). Thus, the text messages do not appear probative of Ridley transferring Ecolab/Nalco information to ChemTreat. Mr. DeNunzio's ChemTreat computer showed very user activity at all. (Ex. 75 at p. 13.)

### C. ChemTreat Computer eDiscovery Searches

The user data from the Ridley and ChemTreat devices was processed by Innovative Driven and substantial searches were conducted. The Special Master (and his delegates) reviewed thousands of files from those computers. The ChemTreat computers, excepting DeNunzio, contained high volumes of user files. On October 25, 2023, the Special Master previewed for the Parties the searching methodology that was being employed by the Special Master. (Ex. 56.) The final searches that were done are set out in Appendix A to this Report. After extensive review, using a variety of searching, sampling and other review strategies, no responsive documents were found. The Special Master considered and adopted many (if not most) of the searching recommendations of the Parties. A robust review was done within the time period of Ridley's employment at ChemTreat, and before and after that time period, to ensure that no evidence existed. The Special Master, in many instances, reviewed all the hits of a particular search term set; for others, the Special Master sampled from those hits to gain confidence that no responsive documents were present. Based on the many hours of work done, the Special Master has determined that further review is unnecessary and disproportionate. No evidence was found showing that Ridley transferred Ecolab/Nalco files to ChemTreat on the ChemTreat computers that were reviewed. This lack of any responsive documents from the Priority Custodians and DeNunzio was further support for not collecting more ChemTreat custodians.

### D.    Network File Shares

The network file shares of an organization can be broken into two components: files shares that only an individual has access to and file shares that multiple people have access to (shared access). For these purposes, the process focused on the shared folders because the individual custodians had very little in way of network based storage, and Counsel for ChemTreat had already searched those limited repositories. The previous discovery searches of network materials are set forth in two ChemTreat submissions. First, in Document 360-5, attached to ChemTreat's Supplemental Brief on the Use of a Special Master, ChemTreat set out information regarding its network searches. Ridley's file share is the only personal repository where voluminous documents were stored (4,370 total documents); the remaining twelve custodians only have 41 total documents between them. Moreover, counsel searched the SharePoint information. That left the Network Folders (shared folders) that had approximately 60 Terabytes of information.

The Network Folders are an ESI source where substantial information was stored. ChemTreat's systems lack a native search functionality that would allow for searching the contents of files on the Network Folders. To make the contents of the Network Folders searchable would require processing 60 TB of data, which would have been prohibitively expensive and time-consuming. *In lieu* of processing and searching this information, the Special Master undertook to examine the folder structure and other information (such as screenshots of the documents stored inside particular folders). The process of exploring the folder structure for likely sources was a reasonable approach given proportionality considerations because, as the Special Master undertook the visual review of the folder structure, it revealed a highly organized folder structure that was relatively intuitive in terms of how the information was organized and stored.

With Ecolab's express agreement, the Special Master received file share screenshot information *ex parte*, but made as exhibits all exchanges with ChemTreat Counsel where that information was provided. (Exs. 47, 55, & 63)  The first level folder structure revealed the Network Folders overall folder structure, excluding any folders that had a "Last Accessed" date on or after July 2, 2021. (Ex. 47.)  This was used because Mr. Ridley's employment started on or before July 2, 2021; if the files were not accessed after that date, they could not have included anything received from Mr. Ridley after the start of his employment.

Using judgment based on the names themselves, the information provided in this process, and common sense understanding of how network file shares are generally used, the Special Master isolated from that original list down to top level folders that appeared more likely to contain relevant information. (Ex. 55.)  Documents and repositories that were named in a fashion clearly unrelated to the issues in this case were excluded.  As the Special Master looked down into the subfolders (and, in some instances, the actual file listings), certain folders were clearly not likely to retain discoverable information related to Ecolab/Nalco confidential information.

The Special Master reviewed certain folders that contained customer files and specifically requested that Counsel for ChemTreat provide a report on any customer files post-dating July 2, 2021 Last Access date, and which contained a Customer Name search term from Ecolab. (See Ex. 63; Ex. 24 (at Category 1 search terms ("Customer Names")).)  Counsel for ChemTreat ran that analysis and provided the Special Master five different files for specific customers that were included in that search instance. (Ex. 63.)

One customer stood out.  In folders that were stored by year and included bids, there were several file share folders for the Gaylord Opryland Hotel, and a bid that appeared to be included dated roughly from late-July 2021 through approximately August 9, 2021.  Given that Ridley's

27

Wife's Computer showed activity involving Ecolab documents concerning the Gaylord Hotel from around the same time period (August 6, 2021), and that the file shares showed a connection to Mr. DeNunzio with the ChemTreat Gaylord bid, the Special Master raised the issue at the conference on November 9, 2023. The Special Master ordered the parties to meet-and-confer around that discovery and to report back on the same. Subsequently, ChemTreat produced to Ecolab the contents of the Gaylord bid documents. (Ex. 69.) After ChemTreat made additional disclosures to Ecolab relating to the other bid documents in those folders, Ecolab was unable to make a reasonable connection between Ecolab and any of those other bids, such as that the bids related to the same facility or site, that there was a connection with a custodian, or that the timing showed a connection. (Exs. 76 and 77.) Given that lack of connection, the Special Master declines to require more discovery on these bid documents.

## V.     COST ALLOCATION

In considering cost allocation, Rule 53(g)(3) of the *Federal Rules of Civil Procedure* sets out the following factors: (1) the nature and amount of the controversy, (2) the parties' means, and (3) the extent to which any party is more responsible than other parties for the reference to a master. FED. R. CIV. P. 53. After the special master submits their findings as to culpability, the court may then also consider the parties' conduct during discovery that unnecessarily increased the costs associated with proceeding before a Special Master. *See Glover v. Wells Fargo Home Mortg.*, 629 F. App'x 331, 339 n.7 (3d Cir. 2015). Before the Special Master releases their findings as to which party is more culpable for the costs, the court should allocate costs according to the factors outlined in Rule 53(g)(3). *See Johnson v. SmithKline Beecham Corp.*, No. CV 11-5782, 2018 WL 2117982, at *3–4 (E.D. Pa. May 8, 2018). "An interim allocation may be amended to reflect a decision on the merits." FED. R. CIV. P. 53(g)(3). Ecolab argues that ChemTreat should have to pay all the

costs, because, among other things, "ChemTreat should have done this preservation, collection, and analysis in the normal course of discovery." (Ex. 60 at p. 2.) ChemTreat argues that Ecolab should pay all the costs because nothing from ChemTreat's assets was discovered in the process. (Ex. 61.)

Because the action does not involve a matter of public interest deserving of special protection, factor one is not of particular importance. *See* Fed. R. P. 53(g)(3) advisory committee's note to 2003 amendment. As far as means are concerned, Ecolab and ChemTreat have much greater means than Mr. Ridley. As noted in Mr. Ridley's brief, although he is currently an executive at Solecta, Inc., he is not "sitting on a pile of money." (Ex. 61 at p. 1.) Ecolab and ChemTreat are both large entities with able counsel.

Concerning the initial reference to the Special Master, both parties spoliated evidence, and this spoliation led to the need for a Special Master. In this context, while both spoliated, the Special Master's engagement was to find "whether Ridley transferred Ecolab/Nalco files to these custodians **during his employment at ChemTreat**." For that central question, and while ChemTreat's spoliation was accidental, having access to Ridley's machine that he used during his employment would have been very helpful and would have made answering the ultimate question more efficient. Moreover, given that this was a discovery true-up on assets that had not been reviewed by Counsel, it was ChemTreat who had not searched these local personal computers during discovery. However, the entire process was a sanction based on all the various spoliation issues in this case. (Doc. 361 at p. 1.)

The Order Appointing Special Master noted, on costs, the following: "The Court anticipates initially apportioning the costs of the Special Master equally between Ecolab/Nalco and ChemTreat but anticipates reapportioning the costs based on [1] the results of the Special

Master's work, [2] the ultimate necessity or productivity of the parties' requests for the Special Master to conduct searches or other action, and [3] the reasonableness of the parties' conduct in working with the Special Master to produce, review, and analyze the electronically stored information and data repositories set forth in Section I." (Doc. 361 at p. 7.) Here, while some new information was discovered on Ridley's Wife Computer, the ChemTreat searching resulted in no evidence of any transferred Ecolab/Nalco information. Moreover, throughout this process, Ecolab/Nalco argued for the most comprehensive analysis, and, ultimately, the Special Master adopted that more comprehensive approach with no results. Ecolab/Nalco's last submission noted: "After months of hard work by everyone involved in this process, Counsel for Ecolab requests that **we leave no stone unturned**." (Ex. 76 (emphasis added).) That is an apt description of Ecolab/Nalco's general position throughout this process.

Moreover, ChemTreat was tasked with doing more work than Ecolab/Nalco: providing email, providing file share information, providing the computers of the ChemTreat custodians, and providing information about the custodians' possession of individual computers. ChemTreat was very responsive and made the work able to proceed very efficient. While Ecolab/Nalco did provide information, it was sometimes slower to do so. Thus, these factors generally favor ChemTreat.

On the whole, the Special Master recommends to the Court that it adopt a cost allocation for ChemTreat paying 45% of the overall costs and Ecolab/Nalco being assessed 55% of the overall costs.

## CONCLUSION

This concludes the Special Master's duties under the Order Appointing Special Master. Absent instruction from the Court, Innovative Driven will be directed to de-activate and delete the database by the end of the month (November 31, 2023) to avoid any additional fees for December

2023.[12] FTI will issue a final invoice, which will be submitted to the Court. Moreover, the Special Master incurred $598.90 in Pacer fees accessing and reviewing background information, The Special Master requests that, when the Court issues its fee order, the Court expressly state that the Pacer fees are waived retroactively for the Special Master on this case. Finally, by Wednesday, November 22, 2023, the Special Master will endeavor to provide the Court the final invoices from FTI, the Special Master, and Innovative Driven (which will include all November charges, including the deletion work). The Special Master requests that the Parties be directed to pay FTI and Innovative Driven directly. The Special Master has already paid for the court reporting, which will be included on the Special Master's bills.

Respectfully submitted,

By:     /s/ Clinton P. Sanko
        Clinton P. Sanko, (BPR #023354)
        Baker, Donelson, Bearman, Caldwell
        & Berkowitz, PC
        633 Chestnut Street, Suite 1900
        Chattanooga, TN  37450-1800
        (423) 209-4168 (phone)
        (423) 752-9536 (fax)
        csanko@bakerdonelson.com

---

[12] Further to the Order Appointing Special Master, "The Special Master need not preserve for the record any documents received by the Special Master from counsel or the parties in this case." (Doc. 361 at p. 5 (at § III).)

31

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2023, a copy of the foregoing Report of the Special Master was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

By: /s/ Clinton P. Sanko
Clinton P. Sanko, (BPR #023354)

***eDiscovery Processing and Indexing***.  Innovative Driven ("ID") received the following assets:

| Short Name | Custodian | Device Information |
| --- | --- | --- |
| **"Bates Computer"** | Bates, Tyler | Dell Latitude 5320 SN:HCTMBL3 |
| **"Cissell Newer Computer"** | Cissell, Clay/Richard | Dell Latitude 5330 SN:97FXWL3 |
| **"Leavell Computer"** | Leavell, Steve | Dell Latitude 5310 2-in-1 SN:204XB63 |
| **"Ridley iPad"** | Ridley, Anthony | Apple iPad Pro |
| **"Ridley Wife Computer"** | Ridley, Anthony | HP Envy x360 SN:5CD4261KLL |
| **"Cissell Old Computer"** | Cissell, Clay | Dell Latitude 7280 SN:GJCBJM2 |
| **"DeNunzio Computer"** | DeNunzio, Albert | Dell Latitude 5430, S/N: GGHRDK3 |

Forensic images of the above assets (collectively, the "**Sources**") were shipped to ID by FTI. Forensic technicians at Innovative Driven then ran scripts[13] to extract user data from the Sources and used Nuix to process and load the processed data into a Relativity workspace setup as an early case assessment database ("**ECA Database**").

The Special Master adopted a general list of search terms based on party input and specific search terms to identify documents protected by the attorney client or work product privileges ("Privilege Terms").  All documents and their associated family members hitting on any of the Privilege Terms were excluded from subsequent searches and review.

---

[13]     After reviewing file listing reports of the Sources provided by ID, the Special Master approved a list of 100+ file extensions to load into the ECA Database for searching and reviewing. Any file with the approved file extension was loaded into the ECA Database, with the exception of any file that met the following exclusion criteria: (1) the file's MD5 hash was included on a NIST list; (2) the file size was zero; (3) file description was like bitmap, cluster, folder, internal, overwritten, stream, system, unallocated, or volume; (4) the file type was like java, cascading, doublspace, adobe font, C++; or (5) source path contained "\$hf_mig$", "\$MSI31Uninstall_KB893803v2$\", "\$NtServicePack", "\$NtUninstall", or "\System Volume Information\".

Two different search indexes were created in the Relativity ECA workspace and used in the searching:

(a) "Primary Index" - Included the extracted text plus the following metadata fields: Company; File Author; Last Saved By; Email From; Email To; Email CC; Email BCC; Email Subject; File Name

(b) "File Name Index" – Included the extracted text plus the following metadata fields: Email Subject; File Name; File Subject; Attachments; Title; Unified Title. Additionally, normally excluded noise words were included within this File Names Index so that noisy words could be used in searches.

These two search indexes included metadata fields as part of the index in addition to the extracted text to satisfy the request of the parties regarding the effective search of metadata. For example, if the search term "Ecolab" was run against the Primary Index then any document that contained the word "Ecolab" in either the body of the document or in the included metadata fields would be returned in the search results. (*See* Exhibit 36.)

ID ran the terms "Ecolab" and "Nalco" as independent search terms (using Primary search index) over all non-email data from May 1, 2021 (a few months prior to the start of Ridley's employment) to April 15, 2022 (which is approximately one month after the end of Ridley's employment) ("**the Primary Time Period**"). Those search term hits ("**Ecolab/Nalco Promotion**") were all promoted from the ECA Database to a separate Relativity database ("**Review Database**") where the review of documents occurred.

***eDiscovery Searches for Review.*** The Special Master employed the following searches to identify documents for review by the Special Master and or associates working at the direction of the Special Master:

1. **Customer Names and Industry Terms + (Ecolab or Nalco)**. Over the base Ecolab/Nalco Promotion, ID searched for the "Customer Names" and "Industry Terms" terms (*see* Exhibit 24). Those documents were reviewed. The net effect being that the documents would have included either Ecolab or Nalco, and included one of the other terms from the "Customer Names" or "Industry Terms", were eligible for review. Moreover, all non-messaging data that hit on the sole term "Ridley" was also reviewed, which included many of the text messages that would have been on the Ridley iPad.

2. **File Names Index.** ID searched for documents that were present in the Ecolab security report and ran the 12,232 identified file names over all available documents in the ECA Database, with no filters applied, and promoted these results plus family to the Review Database. Those have been reviewed and no responsive documents were found.

3. **AND NOT ChemTreat Search**. Using the Primary Index, ID ran the original "Customer Names", "Industry Terms" and "Names" terms, but added to each search string "AND NOT ChemTreat". Emails (and family members) were excluded. Documents outside the Primary Time Period were also excluded. Those documents have been reviewed and no responsive documents were found.

4. **ChemTreat Ecolab or Nalco Emails**. The email documents provided by ChemTreat's counsel (as outlined in Exhibit 51 at point 4) were processed and loaded into the Review Database and were reviewed. No responsive documents were located.

5. **Bucket 2 Terms**. Using the Primary index, the "Bucket 2" terms were run in the ECA database. Any search hits within the Primary Time Period were promoted to review. (*See* Exhibit 23.) Those documents were sampled and it was determined that no further review was necessary.

6. **TND for Ecolab Actual Files**. For the actual files that Ecolab found and provided to the Special Master (see Exhibit 50, "**Ecolab Actual Files**"), those files were loaded into the Review Database and a text near duplication ("**TND**") was conducted to look for any documents that had at least an 80% similarity or higher to those Ecolab Actual Files. No documents were identified through the TND process.

7. **Extended Time Period**. For the time period April 15, 2022 through June 15, 2022 ("**Extended Time Period**"), ID ran the terms from Exhibit 52, excepting the standalone terms "Nalco" and "Ecolab", and then included "AND (Ecolab or Nalco)" for each term. That time period is approximately three months after Mr. Ridley's separation from ChemTreat, and roughly commensurate with the filing of the Amended Complaint. These documents were promoted into the Review Database and were sampled/reviewed. No responsive documents were found.

8. **Trade Names**. Ecolab provided certain trade names that it used in its business. (Ex. 57.) Several of these trade names hit broadly. The Special Master sampled from these trade names and determined that no further review was necessary.

9. **Sampling of Remaining Documents**. As a final measure, for the Primary Time Period, the Special Master sampled documents that meet the following criteria: (1) the document was otherwise not search responsive to any of the above searches and was not reviewed; and (2) the document contains any of the terms listed in the "Customer Names", "Industry Terms" and "Names" search term lists (*see* Exhibit 24) ("**Sample Set**"). A 95/5 statistical sample of these remaining documents was considered.