UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| ECOLAB INC. and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,<br><br>    *Plaintiffs*,<br><br>v.<br><br>ANTHONY RIDLEY and CHEMTREAT, INC.,<br><br>    *Defendants*. | No. 1:22-cv-00050<br><br>District Judge Travis R. McDonough<br><br>Magistrate Judge Christopher H. Steger |

**DEFENDANT CHEMTREAT, INC.'S
OBJECTION TO THE REPORT OF THE SPECIAL MASTER**

Defendant ChemTreat, Inc. respectfully objects to the Special Master's recommended cost allocation. (Special Master Report, Doc. 413 at 30.)

## INTRODUCTION

Allocating only 55% of the Special Master's costs to Plaintiffs Ecolab Inc. and Nalco Company, LLC and 45% to ChemTreat does not equitably reflect the record evidence that (1) the expensive and wide-ranging Special Master process identified *zero* documents or forensic artifacts evidencing misappropriation by ChemTreat, (2) Plaintiffs' insistence on "leaving no stone unturned" was unproductive and unnecessary, and (3) Plaintiffs repeatedly delayed—for weeks, and in one case, for more than a month—providing basic information the Special Master requested, even though the entire process was for their benefit, while ChemTreat, "tasked with doing more work than Ecolab/Nalco," was "very responsive and made the work able to proceed very

efficient[ly]." (*Id.*[1])

When the Court discussed appointing a Special Master with the parties, it contemplated that costs initially would be evenly split between ChemTreat and Plaintiffs because both sides had spoliated potential evidence. (Aug. 10, 2023 Hrg. Tr., Doc. 357 at 171:22–173:19.) But the Court made very clear to Plaintiffs that if the Special Master "find[s] nothing," then the costs would be "coming your way." (*Id.* at 172:4–17.) As to ChemTreat, "nothing" is exactly what the Special Master found:

- The Special Master found "there was ***nothing*** responsive in Priority Custodians' information"[2];
- The Special Master found that, "despite extensive searching and review, the process ***did not reveal any production-eligible documents***" from ChemTreat computers[3];
- The Special Master found "***no evidence*** of any problematic deletion" by ChemTreat[4];
- The Special Master extended the relevant time period beyond the period designated by the Court "to make certain nothing was relevant," and still found "***nothing*** of relevance."[5]
- The Special Master's forensic expert reviewed tens of thousands of hits on the search terms requested by Plaintiffs—"Nalco" and "Ecolab"—all of which were determined to be "***benign***,"[6] leading the Special Master to find that "after extensive review, using a variety of searching, sampling and other review strategies, ***no responsive documents were found***."[7]

In light of these findings, the Special Master's recommendation that Plaintiffs bear only slightly more than half of the costs is inconsistent with the Court's warning that if nothing was found, the

---

[1] Unless noted, all emphasis is added and quotations are cleaned up with internal citations omitted.

[2] Doc. 413 at 20; *see also id.* at 24 (finding that emails hitting on "Nalco" or "Ecolab" "were reviewed, and none were found to contain content probative to the issues in this case").

[3] *Id.* at 20.

[4] *Id.* at 22.

[5] *Id.* at 23.

[6] Doc. 413-13 at 165–66, 166, 168, 170–74 (Special Master Ex. 75).

[7] Doc. 413 at 25.

2

costs would be "coming [Plaintiffs'] way."

The Special Master's recommendation is also incongruent with the factors the Court identified to guide its "reapportioning of costs" following the conclusion of the Special Master process: "the results of the Special Master's work, the ultimate necessity or productivity of the parties' requests for the Special Master to conduct searches or other action, and the reasonableness of the parties' conduct in working with the Special Master to produce, review, and analyze the electronically stored information and data repositories" at issue. (Order Appoint. Special Master, Doc. 361 at 7.) Each of these three factors militates in favor of Plaintiffs bearing the costs for a proceeding that they demanded based on speculation that the absence of evidence supporting their misappropriation claims was the result of discovery misconduct by ChemTreat, rather than the lack of merit to those claims.[8] That speculation was disproven by the results of the Special Master proceeding, but not before Plaintiffs' insistence on unreasonable and ultimately unproductive searches resulted in the time-consuming and costly review of tens of thousands of entirely benign "hits" by the Special Master and/or his designated expert. Yet despite the compressed timeframe and expansive scope of information at issue, ChemTreat was, as the Special Master found, "very responsive and made the work able to proceed very efficient[ly]." (Doc. 413 at 30.) Plaintiffs, by contrast, were not—as the Special Master found and the record confirms. (*Id.*; *see also infra* at 11–13.)

---

[8] In particular, Plaintiffs insisted that ChemTreat's decision not to use the search terms "Nalco" and "Ecolab," without limiters, was a deliberate effort to conceal wrongdoing rather than a legitimate proportionality assessment. *See, e.g.*, Doc. 357 at 55:16-19 ("But when he searched on all the red here, he didn't use basic terms like Nalco and Ecolab. Why not? Because there's Nalco and Ecolab stuff on there."); Aug. 30, 2023 Hrg. Tr., Doc. 413-1 at 140:15–22 ("[T]he reason she's pushing so hard against 'Nalco' and 'Ecolab,' just using those basic searches, is because she knows there are documents on there that are Nalco and Ecolab documents."). As discussed below, the Special Master process revealed, to the contrary, that using those terms resulted in the significant expenditure of time and money, without producing any relevant results.

3

To the extent the Court determines that some measure of monetary sanctions against ChemTreat is warranted,[9] the Court should reallocate the Special Master's costs in a manner that takes into account both ChemTreat's culpability for the spoliation at issue in the Special Master process (which the Court determined was, "at worst," negligent (Memo. and Order, Doc. 349 at 30)), and the Special Master's findings regarding that process, which noted the expansive demands from Plaintiffs, the diligent efforts by ChemTreat, and the ultimate lack of any evidence of misappropriation by ChemTreat. ChemTreat submits that, applying these factors, any allocation of costs to ChemTreat should not exceed 10% of the Special Master's costs, with the remainder allocated to Plaintiffs.

## STANDARD OF REVIEW

A district court reviews *de novo* the findings of fact and conclusions of law made or recommended by a special master to which an objection is asserted. Fed. R. Civ. P. 53(f).

## ARGUMENT IN SUPPORT OF CHEMTREAT'S OBJECTION

The Court articulated three factors relevant to the allocation of the Special Master's costs: (1) "the results of the Special Master's work," (2) "the ultimate necessity or productivity of the parties' requests for the Special Master to conduct searches or other action," and (3) "the reasonableness of the parties' conduct in working with the Special Master to produce, review, and analyze the electronically stored information and data repositories…." (Doc. 361 at 7; *see also* Doc. 413 at 30.)

### I. The Special Master Found No Evidence of Misappropriation by ChemTreat.

The Special Master was appointed to determine "whether [Defendant Anthony] Ridley

---

[9] ChemTreat recognizes that Rule 37(e)(1) authorizes the imposition of monetary sanctions for unintentional spoliation such as the Court found occurred in connection with the reformatting of Ridley's ChemTreat-issued computer.

4

transferred Ecolab/Nalco files" to identified custodians "during his employment at ChemTreat." (Doc. 361 at 3–4.) The result of that work is the Special Master found no evidence of any such transfer. (Doc. 413 at 18–28.) Even the tiniest "breadcrumbs" located by the Special Master's thorough searching were easily deemed irrelevant. For example, the Special Master identified a few text messages between Ridley and Albert DeNunzio discussing exchanging documents. After further review, it was clear that Ridley texted DeNunzio to ask about *ChemTreat* documents. (Doc. 413-13 at 130, 134 (Special Master Exs. 64, 66); Doc. 413 at 22 (finding "the forensic examination of the computers did **not** contain probative evidence") (emphasis in original).)

The only other "breadcrumb" the Special Master identified was a folder in ChemTreat's network shared files regarding a bid for Gaylord Opryland business that some of the designated custodians worked on "around the same time period" when there was activity on Ridley's wife's computer concerning that customer. (Doc. 413 at 27–28.) ChemTreat voluntarily produced the entire bid folder. (*Id.*; *see also* Nov. 9, 2023 Hrg. Tr., Doc. 413-10 at 11:5–10.) Plaintiffs reviewed the Gaylord Opryland bid documents for "the presence of any Nalco- or Ecolab-specific documents" or "any information that may have been transferred from a Nalco document into a ChemTreat document," but identified *none*. (Doc. 413-10 at 8:15–9:25.)

All told, the Special Master worked intensively for 12 weeks and uncovered only two meager breadcrumbs that, when examined, were quickly swept away. The first and most important cost allocation factor weighs overwhelmingly in ChemTreat's favor.

## II. Plaintiffs' Requests to the Special Master Were Irrelevant, Disproportionate, and Unproductive.

The second factor, the necessity or productivity of the parties' requests to the Special Master, also weighs heavily in ChemTreat's favor. Plaintiffs ignored the lodestar for all discovery—relevance—insisting they were entitled to any discovery that (in Plaintiffs' view)

5

would not be unduly burdensome, without regard for their inability to connect such discovery to the scope of the Special Master process.[10]

Plaintiffs likewise disregarded the Court's admonition that the Special Master "be guided by" Rule 26(b)(1)'s "instruction that discovery should be proportional to the needs of the case." (Doc. 361 at 4.) Plaintiffs instead insisted on the immediate transmission to the Special Master of all repositories identified by the Court, without regard to whether the Special Master ultimately determined searching those repositories would be proportional;[11] extensive "human activity" searches of such repositories, unlimited by the time period the Court deemed relevant;[12] and exceptionally broad word searches, divorced from the purpose of the process identified by the Court: to search for "evidence regarding whether Ridley transferred Ecolab/Nalco files to these custodians during his employment at ChemTreat."[13] (Doc. 361 at 3.) Indeed, the Special Master noted in his report that Plaintiffs' literal request to "leave no stone unturned" is "an apt description of Ecolab/Nalco's general position throughout this process." (Doc. 413 at 30.) Yet nothing was found under any stone. As the Special Master observed: "[T]hroughout this process, Ecolab/Nalco argued for the most comprehensive analysis and, ultimately, the Special Master adopted that more comprehensive approach *with no results*." (*Id*. at 30.)

---

[10] *See, e.g.*, Doc. 413-10 at 23:19–25:21 (Special Master rejecting Plaintiffs' argument that bid folders should be produced simply because they can be marked Attorney's Eyes Only); Doc. 413 at 21 (noting Plaintiffs were "unable to provide a specific foundation for any additional custodians beyond the Priority Custodians and Mr. DeNunzio").

[11] *See, e.g.,* Doc. 413-2 at 111:21–112:9 (Plaintiffs' position "is the phrase 'as directed for the custodians listed below' means as directed by the Court"); Doc. 413-12 at 104–05 (Special Master Ex. 16) (arguing that the Court mandated the production of hard drives, even though the Special Master could elect not to search them).

[12] *See* Doc. 413-12 at 143–49 (Special Master Ex. 22).

[13] *See* Doc. 413-12 at 150–53 (Special Master Ex. 23); Doc. 413-13 at 74–77 (Special Master Ex. 52).

6

Plaintiffs' approach is exemplified in their insistence on using generic search terms such as "Ecolab" and "Nalco," without any limiting terms, when searching the hard drives of ChemTreat custodians. (Doc. 361 at 3–4). ChemTreat explained in response to Plaintiffs' proposal that such vague and overly broad search terms were bound to produce irrelevant results, as those terms appeared in a variety of anodyne contexts—e.g., industry news reports, resumes of job applicants, internal market assessments, and inquiries from current or potential customers. (Aug. 30, 2023 Hrg. Tr., Doc. 413-1 at 136:19–137:12, 142:24–143:10.) Although the Special Master cautioned, "I'm going to make a recommendation that the party that insisted upon that rabbit trail that didn't bear fruit should bear the freight for that," Plaintiffs were undaunted and insisted on using the bare terms "Nalco" and "Ecolab." (*Id.* at 135:21–151:19.) Rather than address ChemTreat's explanation as to why searching "Nalco" and "Ecolab" without any limitation would be disproportionate and produce significant irrelevant results, Plaintiffs' counsel resorted to conspiracy theories to justify their request:

> Now, the final thing I'll say is that the reason she's pushing so hard against 'Nalco' and 'Ecolab,' just using those basic searches, is because she knows there are documents on there that are Nalco and Ecolab documents. There's no other reason in the world for her to be fighting this hard on that other than the fact that she already knows they exist.

(*Id*. at 140:15–22.[14]) As set forth in Appendix A to his report, the Special Master used the terms "Nalco" and "Ecolab" to collect documents from ChemTreat custodians' hard drives, and then applied search terms suggested by the parties to create a set for his manual review. (Doc. 413 at 34–35).[15] The Special Master ultimately reviewed "thousands of files from those computers" as a

---

[14] As discussed in connection with the third factor, below, Plaintiffs regularly resorted to asserting such conspiracy theories in lieu of providing substantive responses to ChemTreat's arguments.

[15] Among other things, the Special Master ran terms through the collection set to look for documents containing (1) customer names, (2) industry terms, (3) Ecolab's trade names, and (4) file names listed in the DLP Report. (Doc. 413 at 34–35.)

7

result. (*Id.* at 25.) "No evidence was found showing that Ridley transferred Ecolab/Nalco files to ChemTreat on the ChemTreat computers that were reviewed."[16] (*Id.*; *see also* Nov. 16, 2023 Hrg. Tr., Doc. 413-11 at 22:5–23:3 (noting that on Mr. Leavell's hard drive, running the terms "Ecolab" and "Nalco" resulted in over one million hits, which the Special Master's forensic vendor determined were clearly false positives and did not elevate to the Special Master).

Even when the Special Master ultimately rejected Plaintiffs' demands as irrelevant or disproportionate (or both), getting there required unnecessary expenditures of time and resources. For example, although the Court granted the Special Master discretion to limit his analysis to a targeted set of repositories, Plaintiffs insisted the Court's Order required the transfer of all ChemTreat repositories identified in the Court's Order, including those the Special Master ultimately determined did not merit analysis. Plaintiffs' atextual reading of the Court's Order necessitated briefing and argument over the course of three lengthy hearings and a written decision by the Special Master. (Doc. 413-12 at 103–29 (Special Master Exs. 16–18); Doc. 413-1 at 156–64; Doc. 413-2 at 101–22; Doc. 413-3 at 13–27.) Similarly, although the Court granted the Special Master discretion to determine which of the 13 identified custodians satisfied the requirements of relevance and proportionality, Plaintiffs insisted, without identifying any supporting evidence of relevance, that the hard drives of all 13 ChemTreat custodians should be analyzed. (Doc. 413-1 at 105:23–106:1, 108:8–12.) The Special Master resolved the issue by directing the parties to identify a set of "Priority Custodians" whose data would be searched. (Doc. 413 at 19.) Plaintiffs

---

[16] The Special Master's search of ChemTreat's email repositories was similarly broad and also failed to find responsive documents. As to the email repositories, "the Special Master directed that ChemTreat provide the emails for the Priority Custodians that contained the term 'Ecolab' or 'Nalco' and which had not been reviewed and which did not hit on the privilege terms. Those emails were reviewed, and none were found to contain content probative to the issues in this case." (Doc. 413 at 24.)

8

nevertheless insisted that the Special Master keep going and search the data of two, then four additional custodians, without identifying any evidence of relevance to justify those requests, instead relying on the mere fact that the custodians worked at ChemTreat and, in some cases, were former Nalco employees. Plaintiffs did not explain how it would be proportional to expand the Special Master's work to include these individuals, about whom Plaintiffs had previously elected not to conduct *any* discovery despite having this same information (i.e., that the custodians were ChemTreat employees, some of whom were former Nalco employees) during discovery. (Doc. 413-13 at 13–15 (Special Master Ex. 37).) The Special Master ultimately overruled Plaintiffs' requests as failing to satisfy even the threshold requirement of relevance, explaining that, "[d]espite numerous requests by the Special Master, Ecolab was unable to provide a specific foundation for any additional custodians beyond the Priority Custodians and Mr. DeNunzio." (Doc. 413 at 21.[17])

Plaintiffs' pursuit of irrelevant and disproportionate discovery is further exemplified by the proceedings relating to the network bid folders. As the original November 1, 2023 deadline for the end of the Special Master process approached, the Special Master identified from ChemTreat's network file shares five bid folders from 2021 that contained "hits" on customer names from the search terms requested by Plaintiffs. (Oct. 30, 2023 Hrg. Tr., Doc. 413-9 at 20:17–33:15.) Shortly thereafter, the Court granted a short extension of the deadline at the Special Master's request. (Order, Doc. 401.) After reviewing the five 2021 bid folders, and affirmatively identifying folders

---

[17] The Special Master was clear about what type of evidence was needed to justify adding additional custodians: "But what I am asking [for] is what you know based on the existing evidentiary record, what was found in discovery, depositions and documents that leads you to believe that these people are worthy of a look, if we go that far of going for a Round 2. It doesn't have to be a huge brief, but I would like some level of explanation." (Doc. 413-4 at 84:24–85:5.) Plaintiffs were not able to demonstrate even the minimal evidence of connection sought by the Special Master for any custodian beyond the Priority Custodians.

9

with customer name "hits" for bids in 2022, ChemTreat provided Plaintiffs with information about each bid folder during a conference of counsel on November 2, 2023. ChemTreat explained that only the Gaylord Opryland bid folder was potentially relevant, and promptly produced the entire folder under an "Attorney's Eyes Only" designation before the opening of business the next day. (Doc. 413-10 at 10:2–12:16, 19:8–22; Doc. 413-13 at 146 (Special Master Ex. 69).) As to the remainder of the "hits" from bids in 2021 and 2022, ChemTreat explained the "hits" were on the names of large national or multinational corporations (*e.g.*, Georgia Pacific) for bids involving work at facilities located outside the district managed by Ridley, or even the larger region encompassing that district. (Doc. 413-10 at 7:6–8:12 (identifying bid locations as, *e.g.*, Texas, Missouri, and Virginia).) ChemTreat identified the specific timing and locality for each bid, and Plaintiffs agreed they would confer with ChemTreat if their internal investigation identified any connection of those bids to the documents at issue in this case, raising any dispute with the Special Master only "as necessary" after that conferral process. (Doc. 413-13 at 147 (Special Master Ex. 70).)

Plaintiffs notified the Special Master of the parties' agreement (*id.*), and then promptly ignored it, leapfrogging past any conferral and, without notice to ChemTreat, demanding production of all the bid folders during the November 9, 2023 hearing. (Doc. 413-10 at 5:19–6:15.) In response, the Special Master requested that Plaintiffs provide the same information ChemTreat had requested on November 2, 2023: a reason to believe the remaining bid folders were relevant. (Doc. 413-9 at 64:6–65:6; Doc. 413-10 at 12:19–24, 19:23–22:11, 23:19–24:13.) Plaintiffs admitted they were still (a week after receiving information about those bids) in the process of gathering information from their clients to try to demonstrate the relevance of the other folders, but asserted the Special Master should nonetheless order production because (in their

10

view) the production would not be burdensome to ChemTreat and could be protected through an "Attorney's Eyes Only" designation. (Doc. 413-10 at 6:10–15, 14:12–15:15, 20:18–25:21.)

After the Special Master reiterated that relevance was a threshold consideration, Plaintiffs represented they would provide additional support for the requested production later that same day. (*Id*. at 21:16–19.) They did not do so. Instead, six days later—and just two days before the Special Master's extended November 17 deadline—Plaintiffs submitted a response asserting that the remaining bid folders should be produced because the parties compete in the same lines of business. (Doc. 413-13 at 178–79 (Special Master Ex. 77).) The Special Master found that Plaintiffs failed "to make a reasonable connection between Ecolab and any of those other bids" and declined to require an additional production. (Doc. 413 at 28.)

As these examples and the broader record demonstrate, Plaintiffs consistently took unreasonable and unsupported positions regarding the scope of the Special Master's work. As such, application of the second factor identified by the Court favors assessing to Plaintiffs the substantial majority of the costs, which resulted from their insistence—contrary to precedent— that the process should "leave no stone unturned." *See Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 273–74 (6th Cir. 2021) (rejecting "costly and delay-inducing efforts to look under every stone in an ediscovery world populated by many stones").

### III. Plaintiffs' Conduct Was Neither Reasonable Nor Diligent.

Plaintiffs did not act reasonably in working with the Special Master. As detailed above and throughout the Special Master's report, Plaintiffs' requests were at odds with principles of relevance and proportionality. (*See* Doc. 413 at 20–21 (declining Plaintiffs' "disproportionate requests" to search additional custodians), 28 (declining Plaintiffs' unreasonable request for additional discovery on bid folders).) And because Plaintiffs could articulate no legitimate grounds for their requests, all they offered was the same accusatory refrain:

> With due respect to my colleagues representing ChemTreat, it's telling that ChemTreat is objecting to basic search terms like 'Nalco' and 'Ecolab.' That means only one thing. ChemTreat has Nalco and Ecolab documents in their possession, and ChemTreat wants to keep hiding this from the Court. ChemTreat knows their employees send Nalco/Ecolab documents to each other. ChemTreat knows their employees have Nalco/Ecolab documents, form [*sic*] whatever source. They failed to produce these in discovery. And they don't want you to search for them. That is the only rational explanation for objecting to basic search terms like 'Nalco' and 'Ecolab.'

(Oct. 19, 2023 D. Walton Email to Special Master, Doc. 413-13 at 81 (Special Master Ex. 54).) Of course, there was, and has been throughout this entire case, another rational explanation for ChemTreat's objection—the explanation confirmed by the Special Master's Report: There is nothing to find, and Plaintiffs' unreasonable efforts to "leave no stone unturned" in pursuit of a conspiracy theory represent precisely the waste of time, money, and judicial resources that Rule 26's focus on relevance and proportionality is intended to prevent.[18] As the record reflects, Plaintiffs' requests drove up costs—including ChemTreat's substantial attorneys' fees that are not accounted for in the Special Master's invoices—and produced ***nothing*** in return. (Doc. 413 at 30 (finding "ChemTreat was tasked with doing more work than Ecolab/Nalco").)

Nor did Plaintiffs act diligently in responding to the Special Master's requests. When the Special Master process required that Plaintiffs, rather than ChemTreat, provide information to facilitate the proceeding, Plaintiffs dragged their feet—sometimes for weeks. (*See* ChemTreat Ltr. Br. on Cost Allocation, Doc. 413-13 at 113 (Special Master Ex. 62) (citing specific examples of delay); *see supra* at 7–9 (describing delay associated with Plaintiffs' request for production of

---

[18] Indeed, the extensive (and expensive) investigation conducted by the Special Master and his forensic expert, applying Plaintiffs' requested search terms of "Nalco" and "Ecolab" to the Priority Custodians' hard drives with *no* responsive results, confirms that ChemTreat correctly determined at the outset of discovery that searching such hard drives was not proportional to the needs of this case. Assessing to ChemTreat the costs for collecting and searching those hard drives during the Special Master process would thus unfairly penalize ChemTreat for correctly applying Rule 26(b)(1)'s mandate in the first instance.

12

additional bid folders).) For example, when the Special Master requested that Plaintiffs provide copies of documents accessed on Ridley's wife's computer (Doc. 413-13 at 6–11 (Special Master Ex. 36)), Plaintiffs delayed more than three weeks before complying (Doc. 413-13 at 70 (Special Master Ex. 50).) Similarly, Plaintiffs delayed for five weeks (until October 25) before responding substantively to the Special Master's September 13 request for "unique" or "high value" search terms. (Doc. 413-12 at 154–58 (Special Master Ex. 24).) Despite that significant delay, Plaintiffs' proposal was largely variations on terms originally suggested by ChemTreat weeks earlier, and facially non-unique terms like "service plan." (Doc. 413-13 at 94–95 (Special Master Ex. 57).) By contrast, when the Special Master made requests of ChemTreat, ChemTreat responded expeditiously, sometimes in less than 24 hours. (*E.g.*, *id.* at 123–24 (Special Master Ex. 63) (nine-hour turnaround by ChemTreat in response to a complicated request from the Special Master).) The Special Master recognized this disparity in effort:

> ChemTreat was tasked with doing more work than Ecolab/Nalco: providing email, providing file share information, providing the computers of the ChemTreat custodians, and providing information about the custodians' possession of individual computers. ChemTreat was very responsive and made the work able to proceed very efficient[ly]. While Ecolab/Nalco did provide information, it was sometimes slower to do so."

(Doc. 413 at 30.) Thus, the third cost allocation factor also weighs in ChemTreat's favor.

## CONCLUSION

The Special Master's report affirms ChemTreat's position in this case: even after a probing, independent forensic examination involving the review of thousands of documents from a range of custodial repositories, there is still no evidence of any wrongdoing by ChemTreat. For the reasons stated, to the extent the Court determines that monetary sanctions against ChemTreat are appropriate, ChemTreat respectfully requests that any allocation of costs to ChemTreat should not exceed 10% of the Special Master's costs, with the remainder allocated to Plaintiffs.

13

Respectfully submitted,

**MILLER & MARTIN PLLC**

By: */s/ Zachary H. Greene*
    Kyle W. Eiselstein, Tenn. BPR No. 020727
    Zachary H. Greene, Tenn. BPR No. 024451
    Erin E. Steelman, Tenn. BPR No. 038463
1200 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone (423) 756-6600
kyle.eiselstein@millermartin.com
zac.greene@millermartin.com
erin.steelman@millermartin.com

**WILLIAMS & CONNOLLY LLP**

Vidya Atre Mirmira, *pro hac vice*
William T. Burke, *pro hac vice*
Juli Ann Lund, *pro hac vice*
Troy C. Homesley, *pro hac vice*
680 Maine Avenue, SW
Washington, DC 20024
Telephone (202) 434-5000
vmirmira@wc.com
wburke@wc.com
jlund@wc.com
thomesley@wc.com

***Attorneys for Defendant ChemTreat, Inc.***

## CERTIFICATE OF SERVICE

       This certifies that a copy of this document was filed electronically with the Clerk of Court by using the Court's CM/ECF system and was served electronically to all counsel of record listed on the CM/ECF filing receipt. Parties may access this filing through the Court's CM/ECF system.

       Dated: December 1, 2023.

                                                                      */s/ Zachary H. Greene*