UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| ECOLAB INC. and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water,<br><br>  *Plaintiffs*,<br><br>v.<br><br>ANTHONY RIDLEY and CHEMTREAT, INC.,<br><br>  *Defendants*. | No. 1:22-cv-00050<br><br>District Judge Travis R. McDonough<br><br>Magistrate Judge Christopher H. Steger |

**DEFENDANT CHEMTREAT, INC.'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO REPORT OF THE SPECIAL MASTER**

  Defendant ChemTreat, Inc. submits this response in opposition to Plaintiffs Ecolab Inc. and Nalco Company, LLC's Objections to the Special Master's report. (Doc. 416.) Plaintiffs' Objections are baseless, contrary to the record, and should be overruled.

**I. The Special Master Properly Exercised His Discretion in Determining Which ChemTreat Hard Drives To Collect and Search.**

  Plaintiffs object to the Special Master's report and, indeed, the entire Special Master process, because the Special Master did not collect and search hard drives from all 13 current and former ChemTreat employees identified as potential sources of information responsive to Plaintiffs' discovery requests. (Doc. 416 at 1–2.[1]) Plaintiffs first accuse the Special Master of violating the Court's appointment order (Order Appoint. Special Master, Doc. 361) by not requiring ChemTreat to immediately produce the hard drives for all 13 custodians, regardless of

---

[1] Unless noted, all emphasis is added, and quotations are cleaned up with internal citations omitted.

whether the Special Master ultimately determined those hard drives should be searched. Plaintiffs then contend the Special Master abused his discretion by focusing his forensic evaluation principally on the custodial hard drives of the three ChemTreat employees that ***the parties agreed*** "were most likely to have responsive ESI," designated the "Priority Custodians."[2] (Doc. 416 at 2–3; Doc. 413 at 19.)

But Plaintiffs' argument that the Special Master should have required ChemTreat to collect forensic images of hard drives from all 13 ChemTreat custodians (including those who used personally owned computers not within ChemTreat's control) is based on an erroneous reading of the Court's order—a reading the Special Master expressly rejected in an order Plaintiffs chose not to timely appeal. And while Plaintiffs now contend the Special Master got it wrong, they never explain how. The same is true as to Plaintiffs' other complaint: that the Special Master should have searched the hard drives of all 13 custodians. Setting aside that Plaintiffs themselves did not pursue that request during the Special Master process, instead advocating for a shifting subset of custodians beyond the three agreed-on Priority Custodians, Plaintiffs fail in their Objections (like they failed before the Special Master) to identify any evidentiary basis for concluding that a search of the other custodians' hard drives would be either relevant or proportional. Instead, Plaintiffs simply insist, without support and contrary to the record developed by the Special Master, that they might yet discover some evidence that they have been harmed if the Court will let them overturn just one more stone. (*See* Doc. 416 at 3–4; Doc. 413 at 30.) Plaintiffs' objection to the Special Master's exercise of his discretion to determine which hard drives to collect and search should be overruled.

---

[2] As discussed below, the Special Master subsequently expanded his examination to an additional custodial hard drive based on text messages identified during the Special Master process.

### A. The Special Master Properly Exercised His Discretion in Determining Which ChemTreat Hard Drives To Collect.

Plaintiffs contend the Court ordered ChemTreat to immediately collect and produce to the Special Master forensic images of local hard drives from all 13 ChemTreat custodians identified in the order appointing the Special Master, regardless of whether the Special Master ultimately determined those hard drives should be searched—and regardless of whether those hard drives were even within ChemTreat's possession, custody, or control. As the Special Master correctly determined, after all parties had a full opportunity to present their positions both orally and in writing, that argument is wrong. Plaintiffs' argument is contrary to the plain language of the appointment order, which grants the Special Master discretion regarding the repositories to be collected and searched and requires the Special Master to consider proportionality when exercising that discretion. It is also contrary to settled precedent establishing the bounds of an employer's control over property owned by an employee. And, in any event, it was waived by Plaintiffs, who knowingly elected months ago not to pursue a timely objection to the Special Master's determination.

#### 1. Plaintiffs Misread the Plain Language of the Appointment Order.

In sole support of their argument that ChemTreat was required to immediately produce forensic images of all custodial hard drives, Plaintiffs point to the phrase "ChemTreat shall produce" in the appointment order. (Doc. 416 at 4.) Plaintiffs' argument ignores the remainder of the cited sentence and the paragraph in which it appears, which make clear that the production shall occur only "***as directed***" by the Special Master, in the exercise of his discretion regarding which repositories to search:

> ChemTreat shall produce to the Special Master (or his vendor or delegate) electronically stored information data sources, including e-mail repositories, OneDrive repositories, and forensic images of local hard drives, as directed for the custodians listed below. The Special Master, with the input of the parties, shall

3

> establish reasonable search protocols and may, but is not required to, search one or more of these data repositories for evidence regarding whether Ridley transferred Ecolab/Nalco files to these custodians during his employment at ChemTreat.

(Doc. 361 at 3.)

Plaintiffs first raised their argument that the appointment order required ChemTreat to immediately produce all custodial hard drives during the initial Special Master hearing on August 30, 2023. The Special Master heard argument from all parties and determined that Plaintiffs were misreading the appointment order, but "invited [Plaintiffs] to submit a written argument regarding this issue if [they] continued to disagree with the Special Master's initial finding." (Doc. 413-12 at 128 (Special Master Ex. 18); Aug. 30, 2023 Hrg. Tr., Doc. 413-1 at 161:8–163:18.) Plaintiffs did not submit a written argument in response to the Special Master's invitation. Nevertheless, they raised the issue again during the next Special Master hearing on September 6, 2023. (Sept. 6, 2023 Hrg. Tr., Doc. 413-2 at 99:7–102:15.) After hearing additional argument, the Special Master ordered briefing. (*Id.* at 102:16–116:20.) Plaintiffs submitted their brief on September 8, 2023 (Doc. 413-12 at 103–09 (Special Master Ex. 16)), and ChemTreat submitted its response on September 12, 2023 (*id.* at 110–27 (Special Master Ex. 17)).

On September 13, 2023, the Special Master held, "[T]he Court has ordered that the Special Master retains discretion in directing the parties to produce certain data sources." (*id.* at 128 (Special Master Ex. 18).) The Special Master compared the Court's requirement, excerpted above, that ChemTreat produce identified data sources, such as forensic images of hard drives, "***as directed***," with the Court's non-discretionary instruction for Defendant Anthony Ridley "to immediately produce" certain ESI. (*Id.*) The Special Master correctly concluded this contrasting language means "he has discretion to direct if and when the ChemTreat data sources are produced for possible searching." (*Id.*) Although Plaintiffs contend the Special Master erred in so holding,

4

they offer no response to the Special Master's rationale. Plaintiffs' objection should be overruled as to this issue.

### 2. Plaintiffs Ignore Settled Authority on the Scope of an Employer's Control of an Employee's Personal Property.

Plaintiffs also take issue with the Special Master's conclusion that ChemTreat does not control, and so could not be required to collect, hard drives from computers personally owned by current or former employees. (Doc. 416 at 2–3; *see also* Doc. 412-12 at 129 n.1 (Special Master Ex. 18).) At the threshold, Plaintiffs' objection on this issue is doubly moot, as the Special Master rejected both Plaintiffs' atextual claim that ChemTreat was required to collect and produce all repositories, regardless of whether they were ultimately searched, as well as Plaintiffs' unsupported arguments that custodians other than the Priority Custodians satisfied the foundational requirements of relevance and proportionality. As such, the Special Master's conclusion that personally owned hard drives fell outside the scope of the proceeding had no impact on what he ultimately determined should be searched.

Even if the issue were not moot, Plaintiffs offer no basis to find the Special Master erred on the merits. In explaining why it does not have control over its employees' personal property, ChemTreat cited both settled precedent and the Court's prior rulings on the scope of ChemTreat's control of its employees' devices and information. (Doc. 413-12 at 114 (Special Master Ex. 17); *see also* Doc. 413-12 at 128–29 (Special Master Ex. 18); Sept. 13, 2023 Hrg. Tr., Doc. 413-3 at 25:23–27:12.) Plaintiffs' objection neither discusses nor distinguishes this authority. Plaintiffs' objection likewise ignores the Special Master's determination that he had the ability to require ChemTreat to produce **the ChemTreat information** on the personal computers of current and former employees—*if* he determined it was relevant and proportional. (Doc. 412-12 at 129 (Special Master Ex. 18) ("ChemTreat has indicated that it has **control** over the ChemTreat

5

information in the possession of [these] employees, and could obtain that ChemTreat information 'on demand.'" (emphasis in original)).)  As discussed below, the Special Master did not order ChemTreat to collect its information from the custodians' personally owned devices because Plaintiffs repeatedly failed to identify an evidentiary basis to do so.

Plaintiffs do not contend the control issue ultimately impacted either the scope of the Special Master proceeding or the substance of the Special Master's report.  Instead, Plaintiffs' belated objection to the Special Master's ruling on the control issue appears to serve primarily as an excuse for Plaintiffs to level a baseless claim of spoliation against ChemTreat.  According to Plaintiffs, "ChemTreat has not disclosed whether or when these ChemTreat custodians were instructed to preserve information relevant to this lawsuit," which, in their estimation, "means that ChemTreat would have further spoliated discoverable information." (Doc. 416 at 3–4, 6.)  The record defeats these false histrionics.

As an initial matter, a spoliation claim requires showing the existence of *relevant* evidence, and Plaintiffs have never crossed that fundamental threshold with respect to the ChemTreat custodians whose hard drives were not collected and searched.  (*See generally* Doc. 413 at 19–21 (discussing Plaintiffs' failure to establish the relevance of additional custodians).)  Moreover, although Plaintiffs first suggest, then baldly assert, that ChemTreat failed to preserve evidence (Doc. 416 at 3–4), their claim rests entirely on the premise that "ChemTreat has not disclosed whether or when these ChemTreat Custodians were instructed to preserve information relevant to this lawsuit" (*id.* at 3).  Plaintiffs must—or at least should—know that premise is false because ChemTreat already stated on the record during the first hearing before the Special Master (where Plaintiffs were represented by four attorneys) that "***all the custodians have been under a***

6

*preservation order since early 2022*."[3] (Aug. 30, 2023 Hrg. Tr., Doc. 413-1 at 119:10–120:21.) ChemTreat made this clear disclosure as to both "whether [and] when these ChemTreat Custodians were instructed to preserve information relevant to this lawsuit" during the same hearing at which counsel—including Plaintiffs' counsel—discussed the fact that a subset of the 13 ChemTreat custodians used personally owned computers. (*Id.* at 109:17–20; 158:10–160:12.) ChemTreat reiterated at the September 13 hearing (where Plaintiffs were represented by five attorneys) that *all* of the designated custodians were already subject to a litigation hold, and noted that, pursuant to the Special Master's ruling, all of the custodians using personal computers in connection with ChemTreat work would be *reminded* of that hold.[4] (Sept. 13, 2023 Hrg. Tr., Doc. 413-3 at 23:2–5.) That Plaintiffs—contrary to a record they helped create—now assert that ChemTreat never provided this information is astonishing.

Plaintiffs' related argument that ChemTreat failed to timely disclose that it did not search its employees' personal computers is also inaccurate. As the Special Master noted, Plaintiffs knew well before the close of discovery that ChemTreat did not search *any* employees' hard drives. (Doc. 413 at 19.) ChemTreat filed an ESI Report on February 13, 2023, disclosing "the custodians and ESI repositories ChemTreat has searched in connection with discovery in this case, including to identify and produce documents responsive to Plaintiffs' discovery requests and to locate

---

[3] Plaintiffs do not argue—nor could they—that ChemTreat was required to forensically image the hard drives of the designated custodians, in addition to issuing litigation holds. During the August 30, 2023 hearing, the Special Master asked whether it was Plaintiffs' position "that the only way to appropriately set a legal hold is to take a forensic image of that computer." (Aug. 30, 2023 Hrg. Tr., Doc. 413-1 at 121:21–23.) Plaintiffs' counsel responded by emphatically repeating (ten times) "no." (*Id.* at 121:24–122:7.)

[4] That Plaintiffs understood at the time that a litigation hold had previously been issued by ChemTreat is clear from the September 13 hearing transcript, which reflects that Plaintiffs' counsel clarified with the Special Master that ChemTreat employees using personally owned computers "still have to *remain* under a legal hold." (Sept. 13, 2023 Hrg. Tr., Doc. 413-3 at 21:23–22:23.)

7

documents identified in the DLP Report provided to ChemTreat by Plaintiffs." (ChemTreat ESI Rpt., Doc. 143 at 1.) The ESI Report identifies 17 ChemTreat custodians (including the 13 custodians listed in the Court's appointment order), briefly describes their actual or potential relevance to the litigation, and discloses that ChemTreat searched only their OneDrives and email data. (*Id.* at 2–4.)[5] The ESI Report does not identify the local hard drives of the custodians' computers as a repository searched by ChemTreat, making it clear that the information on those hard drives was not included in the "reasonable and proportional search" ChemTreat identified as the foundation for its responses to Plaintiffs' discovery requests—including the document request discussed in Plaintiffs' Objections. (*Compare* Doc. 416 at 4, *with* ChemTreat's Resp. to Pls.' First RFPs, Doc. 95-3 at 17.) The record thus establishes, just as the Special Master's report notes, that Plaintiffs knew in February 2023 that ChemTreat did not collect or search *any* local hard drives—whether owned by ChemTreat or individual employees.

### 3. Plaintiffs Waived Their Objection to the Special Master's September 13 Decision Regarding the Scope of His Authority.

Even if Plaintiffs had good grounds to object to the determinations by the Special Master regarding the scope of his authority (they do not), they have waived that objection. In the Special Master's September 13, 2023 decision letter, he made clear he would formalize his decision in an order filed on the Court docket "[t]o the extent that either party would like immediately to object to this finding, pursuant to Section IV of the Court's" appointment order. (Doc. 413-12 at 129 (Special Master Ex. 18).) Section IV of the Court's order permits parties to object to the Special Master's findings within one week after filing, and makes clear that the failure to object amounts

---

[5] As ChemTreat has explained to the Court, it never represented that all 13 ChemTreat custodians have relevant information. Rather, these custodians were identified and made subject to a litigation hold because ChemTreat "cast an incredibly broad net" as part of its effort to mitigate the spoliation of Ridley's ChemTreat-issued laptop. (Aug. 10, 2023 Hrg. Tr., Doc. 357 at 43:2-20.)

8

to a waiver. (Doc. 361 at 6.) The Special Master elaborated during a hearing that same day that formalizing his ruling for objection would give the parties an opportunity to get a definitive ruling from the Court at the outset of the process. (Sept. 13, 2023 Hrg. Tr., Doc. 413-3 at 27:24–28:14.) After a discussion of his ruling on the collection and control issues, the Special Master further explained, "If nobody's objecting, I prefer to spend my time and resources and, quite frankly, the parties' money looking at the documents and actually starting the searching protocol, which we're going to talk about. But just let me know by Friday close of business if anybody is standing on any objections to what I've ordered . . . ." (*Id.* at 28:5–12.) In response, Plaintiffs' counsel announced, "I think we're all on the same page, sir." (*Id.* at 28:15–16; *see also id.* at 27:16–17 ("No. I don't think we disagree, Mr. Sanko.").) Plaintiffs did not request that the Special Master formalize and file his decision, and thus, the Special Master and the parties, by agreement, worked for the next nine weeks under the scope of the proceeding as determined in that ruling.

By choosing to acquiesce in the Special Master's (correct) decision rather than pursuing their right to object under Section IV of the Court's Order, Plaintiffs made a knowing decision to waive the argument they now untimely assert. "Doctrines like waiver and estoppel ensure efficiency and fairness by precluding parties from raising arguments they had previously disavowed." *Wilkins v. United States*, 598 U.S. 152, 158 (2023). Plaintiffs were offered the opportunity to object to the Special Master's decision—a ruling that defined the Special Master's view of his authority under the appointment order—and obtain immediate review by the district court. Rather than accept that offer, Plaintiffs knowingly chose to proceed—and only belatedly changed their minds when the process to which they agreed did not produce their desired result. Sustaining Plaintiffs' tardy objection would effectively endorse a do-over of the Special Master process, which lasted almost three months and cost hundreds of thousands of dollars, and reward

9

Plaintiffs for their gamesmanship on this issue. But preventing such gamesmanship, rather than rewarding it, is precisely why courts routinely hold that untimely objections are waived—and why this Court should invoke that doctrine here. *See, e.g.*, *Superior Production P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 321 (6th Cir. 2015) (affirming district court denial of motion to compel because moving party failed to timely object to magistrate judge's earlier ruling on same grounds and because granting motion would effectively undo discovery procedures implemented by magistrate judge).

### B. The Special Master Properly Exercised His Discretion in Determining Which ChemTreat Hard Drives To Search.

Plaintiffs object that they were "necessarily prejudiced" when the Special Master, exercising his discretion, declined to order that the hard drives for all 13 ChemTreat custodians be searched. (Doc. 416 at 5; *see also id.* at 1 ("[I]t was essential that all of the devices be produced to the Special Master and searched.").) Plaintiffs' argument requires the Court to conclude that it did not mean what it said—that despite ***explicitly*** committing to the Special Master the discretion to determine which repositories would be searched (and holding the Special Master was "not required to" search any particular repository (Doc. 361 at 3)), the Court ***implicitly*** predetermined that only by searching the hard drives for all 13 custodians could the Special Master "accomplish the Court's goal" (Doc. 416 at 1).

Plaintiffs never address the inconsistency between their argument and the express terms of the appointment order. Instead, they assert that the Special Master erred in exercising his discretion, because—in their view—the record "shows that discoverable information would exist on" the remaining custodians' hard drives such that "failing to search all of them necessarily prejudiced Plaintiffs." (*Id.* at 2, 5.) Plaintiffs' assertion is defeated by the very example they cite. Plaintiffs point to the testimony of ChemTreat witness Steve Leavell, who stated that ChemTreat

10

employees commonly save documents locally on their individual computers. (*Id.* at 2–3.) This testimony, Plaintiffs claim, establishes they were denied access to relevant information. (*See id.* at 3–6 (Plaintiffs asserting relevant sources were wrongly excluded from collection and searching).) It does no such thing. Leavell was a Priority Custodian—one whom the parties agreed was "most likely to have responsive ESI." (Doc. 413 at 19.) When Leavell's hard drive was forensically examined using Plaintiffs' overly broad search terms, it returned more than ***one million*** hits (FTI Report, Doc. 413-13 at 172–74 (Special Master Ex. 75)), ***all of which were false positives*** (Doc. 413 at 21–25). The result was the same for the other two Priority Custodians.[6] Plaintiffs do not acknowledge these facts, nor do they provide any evidentiary basis for their speculation that the other custodians—despite lacking the Priority Custodians' connection to Ridley—would have relevant documents when the Priority Custodians did not.

Nor do Plaintiffs address how their position that all 13 custodians' hard drives should have been searched accords with the proportionality requirement expressly adopted in the appointment order (Doc. 361 at 4)—an unsurprising omission given how expensive, and ultimately fruitless, the search of the Priority Custodians' hard drives was. The end result of the extensive searches performed by the Special Master and his designated forensic expert on the Priority Custodians' hard drives, which turned up no relevant documents *at all*, is powerful evidence that searching the hard drives of the remaining custodians (who had, at best, tangential connections to Ridley) would not be proportional and likewise would fail to produce anything probative. Plaintiffs ignore this logic, but it was not lost on the Special Master. (*See* Doc. 413 at 25 ("This lack of any responsive documents from the Priority Custodians . . . was further support for not collecting more

---

[6] More than 60,000 hits were returned from computers associated with Tyler Bates and Clay Cissell (Doc. 413-13 at 169–74), but the Special Master found, "despite extensive searching and review, the process did not reveal any production-eligible documents." (Doc. 413 at 20.)

11

ChemTreat custodians.").)  The Special Master's determination of which custodians to include in his search was reasonable, proportional, and appropriately guided by the evidence adduced prior to and during the Special Master process.[7]  It should be affirmed by the Court.

Plaintiffs argue that their failure to identify a colorable basis for the Special Master to expand his search to other custodians is not their fault, but the supposed result of ChemTreat's spoliation.  (Doc. 416 at 5.)  Plaintiffs do not explain how the loss of ESI on Ridley's ChemTreat-issued laptop supposedly interfered with their ability to develop information about the 13 designated custodians, and for good reason:  It obviously did not.  Rather, the "vacuum" in which Plaintiffs complain they were operating (*id.*) was caused by their own decision not to pursue information regarding those custodians during discovery—including in the weeks and months after ChemTreat disclosed in its ESI Report both the identities of those custodians and the limits on its search of their custodial repositories.  Plaintiffs never (1) served written discovery (whether interrogatories, requests to admit, or requests for production) to ChemTreat or Ridley inquiring about Ridley's interactions with the other custodians, (2) asked Ridley about those other custodians during his deposition, (3) asked ChemTreat witnesses about those custodians during their

---

[7] Although Plaintiffs' Objections make no mention of it, the Special Master added another ChemTreat custodian (Albert DeNunzio) based on text messages found during his search of Ridley's iPad.  The text messages between Ridley and DeNunzio that led the Special Master to include DeNunzio as a custodian were later shown to be anodyne discussions of ***ChemTreat*** documents, and the search of DeNunzio's ChemTreat-issued hard drive resulted in no relevant documents.  (Doc. 413 at 24–25 (concluding that DeNunzio's "text messages do not appear probative of Ridley transferring Ecolab/Nalco information to ChemTreat"); Doc. 413-13 at 174 (Special Master Ex. 75) (forensic examiner noting that all hits on DeNunzio laptop "were determined to be benign"); Doc. 413 at 25 (Special Master noting the "lack of any responsive documents from . . . DeNunzio").)  The Special Master's addition of DeNunzio as a custodian demonstrates that, consistent with the appointment order, the Special Master exercised his discretion to search repositories where there was an evidentiary basis to conclude relevant documents might be found—and not to search repositories where there was no such evidentiary basis.

12

depositions, or (4) served a request to inspect the computer hard drives of any ChemTreat custodians. (Doc. 413 at 19–20.) In short, Plaintiffs had "the chance to determine [whether] the non-searched ChemTreat custodians were potentially relevant" (Doc. 416 at 6), but chose not to do so. Any resulting lack of information about the ChemTreat custodians is the product of Plaintiffs' knowing decision not to seek such information in discovery, not any conduct by ChemTreat.[8] Plaintiffs' objection to the scope of the Special Master's search should be overruled.

## II. Plaintiffs' Objection to the Special Master's Cost Allocation Is Unsupported.

Plaintiffs' request to shift the Special Master's recommended cost allocation in their favor (Doc. 416 at 6–7) does not seriously confront the three factors identified by the Court as relevant to the cost allocation determination, much less provide an evidentiary basis to reduce that cost allocation. Plaintiffs do not dispute (nor could they) that the Special Master identified ***no evidence of misappropriation*** by ChemTreat. Indeed, they do not even address this factor. Plaintiffs also do not dispute (nor could they) that the Special Master traveled unproductive paths at Plaintiffs' insistence based on their leave-no-stone-unturned discovery strategy. Instead, they assert only that they "were within their rights" to make such demands. (Doc. 416 at 7.) But the Court put Plaintiffs on notice, both at the August 10 hearing and in the appointment order, that if Plaintiffs demanded expansive searches with limited (or no) results, they would be assessed the costs of doing so. (August 10, 2023 Hrg. Tr., Doc. 357 at 172:4–17; Doc. 361 at 7.) Finally, Plaintiffs claim they "worked diligently" to comply with the Special Master's requests, but do not dispute the Special Master's finding that Plaintiffs' responses were much slower than ChemTreat's despite the

---

[8] Plaintiffs' related claim that ChemTreat refused to explain "why the ChemTreat Custodians were identified" is debunked by the October 11, 2023 hearing, where ChemTreat disclosed (again) why it selected the 13 custodians and Plaintiffs admitted that they did not have any information establishing the relevance of those custodians because they failed to adduce it in discovery. (Oct. 11, 2023 Hrg. Tr., Doc. 413-6 at 10:1–18:19.)

13

significantly reduced number and scope of requests directed to them.[9] (Doc. 413 at 29–30.) The Court should overrule Plaintiffs' objection and—for the reasons set forth in ChemTreat's Objection to the Report of the Special Master (Doc. 415)—instead allocate no more than 10% of the Special Master's costs to ChemTreat and the remainder to Plaintiffs.

## CONCLUSION

For the reasons stated above, the Court should overrule Plaintiffs' Objections, allocate no more than 10% of the costs to ChemTreat (*see* Doc. 415), and adopt the remainder of the Special Master's report.

DATED: December 8, 2023

Respectfully submitted,

**MILLER & MARTIN PLLC**

By: /s/ Zachary H. Greene
  Kyle W. Eiselstein, Tenn. BPR No. 020727
  Zachary H. Greene, Tenn. BPR No. 024451
  Erin E. Steelman, Tenn. BPR No. 038463
1200 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone (423) 756-6600
kyle.eiselstein@millermartin.com
zac.greene@millermartin.com
erin.steelman@millermartin.com

**WILLIAMS & CONNOLLY LLP**

Vidya Atre Mirmira, *pro hac vice*
William T. Burke, *pro hac vice*
Juli Ann Lund, *pro hac vice*
Troy C. Homesley, *pro hac vice*
680 Maine Avenue, SW

---

[9] In the cost allocation brief it submitted during the Special Master process, ChemTreat provided examples of Plaintiffs' significant delays in responding to the Special Master's requests. (Doc. 413-13 at 113 (Special Master Ex. 62).) Notably, despite asserting their supposed diligence, Plaintiffs offer no rejoinder to that recitation of record evidence to the contrary.

Washington, DC 20024
Telephone (202) 434-5000
vmirmira@wc.com
wburke@wc.com
jlund@wc.com
thomesley@wc.com

***Attorneys for Defendant ChemTreat, Inc.***