# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | |
|---|---|
| ECOLAB Inc., and NALCO COMPANY, LLC d/b/a Nalco Water, an Ecolab Company and/or Nalco Water, | Case No. 1:22-cv-00050 |
| *Plaintiffs*, | District Judge Travis R. McDonough |
| v. | Magistrate Judge Christopher H. Steger |
| ANTHONY RIDLEY and CHEMTREAT, INC., | |
| *Defendants*. | |

## DEFENDANT CHEMTREAT, INC.'S TRIAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     PLAINTIFFS WILL NOT PREVAIL ON THEIR TRADE SECRET CLAIMS AGAINST CHEMTREAT..............................................................................2

    A.     Plaintiffs Cannot Prove the Existence of a Trade Secret. ......................................3

        1.     Plaintiffs' plan to use secondary evidence to establish trade secrets is prohibited by the best evidence rule, impractical, and unfair. ................4

        2.     Plaintiffs cannot prove that the documents they produced contain trade secrets........................................................................................6

    B.     Plaintiffs Cannot Prove ChemTreat Misappropriated Plaintiffs' Alleged Trade Secrets..............................................................................8

        1.     Plaintiffs cannot prove ChemTreat knowingly acquired their trade secrets by improper means............................................................9

        2.     Plaintiffs cannot prove ChemTreat used Plaintiffs' alleged trade secrets........................................................................................11

    C.     Plaintiffs Have No Evidence of Trade Secret Damages. ......................................13

II.     PLAINTIFFS WILL NOT PREVAIL ON THEIR STATE-LAW CLAIMS...................15

    A.     Plaintiffs' Tortious Interference and Procurement of Breach of Contract Claims Will Fail..............................................................................15

    B.     Plaintiffs' Civil Conspiracy Claim Will Fail. ......................................................19

III.     BIFURCATED PROCEEDINGS ARE NEEDED TO ADDRESS CLAIMS FOR ATTORNEYS' FEES AND PUNITIVE DAMAGES. ....................................................20

IV.     THE COURT SHOULD IMPOSE THE EVIDENTIARY SANCTIONS REQUESTED BY CHEMTREAT FOR PLAINTIFFS' SPOLIATION. ........................21

V.     THE COURT SHOULD REJECT PLAINTIFFS' IMPROPER REQUEST FOR AN ADVERSE INFERENCE INSTRUCTION REGARDING CHEMTREAT'S NEGLIGENT SPOLIATION. ..........................................................................22

i

# TABLE OF AUTHORITIES

## CASES

*BNA Assocs. LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 63 F.4th 1061 (6th Cir. 2023) ....................................................................................................16

*Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, 2020 WL 5797974 (M.D. Tenn. Sept. 29, 2020) ............................................................................19

*Corso Enterprises, Inc. v. Shop at Home Network, Inc.*, 2004 WL 7082309 (M.D. Tenn. Sept. 27, 2004) ............................................................................................19

*Ellington v. Cajun Operating Co.*, 2021 WL 507888 (Tenn. Ct. App. Feb. 10, 2021) ................13

*Erskine v. Consol. Rail Corp.*, 814 F.2d 266 (6th Cir. 1987) ..........................................................6

*IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002)..................................................10

*In re Simons Broad., LP*, 2013 WL 9542015 (W.D. Tex. Nov. 19, 2013) ....................................11

*Johnson v. Univ. Hosps. Health Sys., Inc.*, 2023 WL 5538980 (M.D. Tenn. Aug. 28, 2023) ........................................................................................................................15

*Knox Trailers, Inc. v. Maples*, 2023 WL 2570970 (E.D. Tenn. Feb. 14, 2023) .............................3

*Knox Trailers, Inc., et al., v. Billy Maples, et al.*, Case No. 3:20-cv-137 ...............................20, 21

*Rotello v. Clayton Homes of Del., Inc.*, 2006 WL 842931 (E.D. Tenn. Mar. 28, 2006) ..............21

*Shipwash v. United Airlines, Inc.*, 28 F. Supp. 3d 740 (E.D. Tenn. 2014) ...................................20

*Silver State Broad., LLC v. Beasley FM Acquisition*, 2016 WL 320110 (D. Nev. Jan. 25, 2016) ......................................................................................................................14

*Stratienko v. Cordis Corp.*, 429 F.3d 592 (6th Cir. 2005) ............................................................11

*Synopsys, Inc. v. Risk Based Security, Inc.*, 70 F.4th 759 (4th Cir. 2023)..................................7, 8

*Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.*, 840 S.W.2d 933 (Tenn. Ct. App. 1992) ........................................................................................................................13

*United States v. Modena*, 302 F.3d 626 (6th Cir. 2002) ...............................................................18

*WEG Elec. Corp. v. Pethers*, 2016 WL 1441793 (D. Minn. Apr. 12, 2016)..................................7

## STATUTES AND RULES

18 U.S.C. § 1836..........................................................................................................................13

ii

18 U.S.C. § 1839 ............................................................................................................3, 8

Federal Rule of Civil Procedure 37 .........................................................................18, 22

Federal Rule of Evidence 403 ..................................................................................5, 14

Federal Rule of Evidence 602 ........................................................................................5

Federal Rule of Evidence 702 ......................................................................................14

Federal Rule of Evidence 901 ........................................................................................4

Federal Rule of Evidence 1002 ......................................................................................4

Federal Rule of Evidence 1004 ..................................................................................4, 5

Federal Rule of Evidence 1006 ....................................................................................18

Tenn. Code Ann. § 29-39-104(a) .................................................................................21

Tenn. Code Ann. § 47-25-1702 .................................................................................3, 8

Tenn. Code. Ann. § 47-25-1703 ..................................................................................13

Tenn. Code. Ann. § 47-25-1704 ..................................................................................13

Tenn. Code Ann. § 47-50-109 .....................................................................................15

## SECONDARY AUTHORITIES

Restatement (Second) of Agency § 239 (1958) ............................................................13

# INTRODUCTION

This is a case about the difference between allegations and reality. Plaintiffs Ecolab Inc. and Nalco Company, LLC (collectively "Plaintiffs") have *alleged* hair-raising claims of trade secret misappropriation and conspiracy—according to Plaintiffs, their former employee of 20 years, Defendant Anthony Ridley, downloaded thousands of their confidential documents onto external storage devices, deleted Plaintiffs' remaining copies of those documents, and then brought those documents to one of Plaintiffs' primary competitors, Defendant ChemTreat, Inc., so that he and ChemTreat could harm Plaintiffs' business. Plaintiffs seek an award of millions of dollars from ChemTreat for this alleged conduct.

The *reality* of what happened in no way resembles Plaintiffs' unfounded allegations. More than a year of expansive discovery (which included a Special Master's independent examination of ChemTreat's employees' emails, network folders, and hard drives) has revealed *no evidence* that ChemTreat hired Ridley to "steal" Plaintiffs' customers or documents; *no evidence* that Ridley distributed any allegedly stolen documents to ChemTreat; *no evidence* that ChemTreat used any allegedly stolen documents—to "steal" Plaintiffs' customers or for any other purpose; and *no evidence* that Plaintiffs suffered any actual loss (or ChemTreat experienced any unjust enrichment) as a result of the alleged misappropriation. The evidence confirms that: (1) ChemTreat hired Ridley as a replacement for a retiring employee, and his primary duty was to service existing ChemTreat customers, not find new ones; (2) prior to his hiring, ChemTreat required Ridley to certify in writing that during his employment with ChemTreat he would not use or disclose confidential information belonging to his former employer (the "Certification"); (3) when Plaintiffs finally (*seven months after Ridley resigned*) raised their concerns with ChemTreat, ChemTreat investigated their allegations; and (4) ChemTreat terminated Ridley's employment when that investigation revealed he violated the Certification by emailing a 2015 Nalco bid

1

proposal from his personal email account to his ChemTreat email account. These indisputable facts lead to one conclusion—ChemTreat has never wanted, used, or benefitted in any way from Plaintiffs' alleged trade secrets.

A reasonable plaintiff might take solace in learning, through discovery and with the aid of a court-appointed special master, that its allegedly valuable confidential information has not been exploited by a competitor. Plaintiffs here, however, remain intent on presenting their baseless conspiracy theories to a jury, in part based on evidence that was not properly disclosed in discovery, and seeking millions in "damages," comprised solely of the attorneys' fees they have incurred in this litigation—evidence that also was not properly disclosed in discovery. No trial is needed to resolve Plaintiffs' claims against ChemTreat. For the reasons provided in ChemTreat's pending motion for summary judgment (Docs. 255, 256, 323), Plaintiffs have failed to meet their burden of demonstrating a triable issue of fact as to any of their claims against ChemTreat. In the event that any of Plaintiffs' claims survive summary judgment, ChemTreat submits this trial brief to address the legal and evidentiary issues it expects may arise at trial, given what it understands are Plaintiffs' current allegations and intentions for trial.[1]

## ARGUMENT

## I.    PLAINTIFFS WILL NOT PREVAIL ON THEIR TRADE SECRET CLAIMS AGAINST CHEMTREAT.

Plaintiffs' claims under the Defend Trade Secrets Act and Tennessee Uniform Trade Secrets Act, if they survive summary judgment, will likely take up the majority of the five days the Court has allotted for trial. To succeed on these claims, Plaintiffs must prove by a

---

[1] Several of ChemTreat's pre-trial motions remain pending, including its motion for summary judgment and omnibus motion *in limine*. ChemTreat respectfully requests the right to supplement this trial brief, if necessary, to account for the Court's eventual resolution of those motions.

preponderance of the evidence: "(1) the existence of a trade secret; (2) communication of that trade secret to the defendant while the defendant was in a position of trust and confidence; (3) use of the trade secret; and (4) damage to the plaintiff." *Knox Trailers, Inc. v. Maples*, 2023 WL 2570970, at *3 (E.D. Tenn. Feb. 14, 2023).[2] Plaintiffs' trade secret claims are beset by legal and evidentiary obstacles that will prevent them from succeeding at trial.

### A. Plaintiffs Cannot Prove the Existence of a Trade Secret.

Plaintiffs have the burden of proving that the information they allege Ridley and ChemTreat misappropriated was a trade secret. To do so, Plaintiffs must prove that: (i) they took "reasonable measures to keep such information secret," (ii) the information has economic value because it is "not generally known" or "readily ascertainable through proper means," and (iii) another person could "obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); Tenn. Code Ann. § 47-25-1702(4). Plaintiffs have not identified with any particularity the information that they contend is a trade secret. Rather, based on Plaintiffs' summary judgment and motion *in limine* briefing, it appears that Plaintiffs will argue at trial that an unknown number of the more than 16,000 documents they allege Ridley took contain trade secrets. Aside from the practical concern of how Plaintiffs could possibly prove that thousands of unproduced documents contained trade secrets within the time available for their case in chief, there are several legal and evidentiary challenges that will prevent Plaintiffs from establishing the existence of even one trade secret, let alone thousands.

---

[2] Unless noted, all emphasis is added and quotations are cleaned up with internal citations omitted.

3

### 1. Plaintiffs' plan to use secondary evidence to establish trade secrets is prohibited by the best evidence rule, impractical, and unfair.

The best evidence rule, codified in Federal Rule of Evidence 1002, prohibits Plaintiffs from asserting trade secret claims related to documents that they failed to produce. Doc. 256 at 8–9; Doc. 376 at 4–6. Plaintiffs wrongly contend that, under Rule 1004, they can avoid the best evidence rule and use secondary evidence to prove that the thousands of unproduced documents on which they ground their misappropriation claims contain trade secrets. But to avoid application of the best evidence rule using the narrow carve-out in Rule 1004, Plaintiffs must prove they conducted an exhaustive search for the unproduced documents at issue and are not responsible for losing or deleting those documents. Doc. 323 at 1–3; Doc. 407 at 2–5.[3] Plaintiffs have never made that showing in any of their pre-trial briefing, nor can they. To the contrary, the Special Master process confirmed that Plaintiffs cannot establish the necessary predicate under Rule 1004, as they were able to produce many of the supposedly "lost" documents when requested to do so by the Special Master. Doc. 407 at 3–4.

The legal impediments to Plaintiffs' planned use of secondary evidence do not end there—Plaintiffs contend that, at trial, Plaintiffs' employees can use the filenames listed in the DLP report "to testify to" the contents of the unproduced documents. Doc. 399 at 4. The DLP report, however, should not be admitted into evidence. Federal Rule of Evidence 901(a) requires the party offering a document to "produce evidence sufficient to support a finding that the [document] is what the proponent claims it is." Fed. R. Evid. 901. As ChemTreat has explained, there are multiple discrepancies between the DLP report that Plaintiffs produced and the DLP report they claim to have created on July 23, 2021—discrepancies that Plaintiffs have never been able to explain

---

[3] Citations to ChemTreat's prior briefing use the internal page numbering of the cited briefs, not the ECF branding, where the numbering varies due to, *e.g.*, tables of contents and authorities.

4

despite ChemTreat's repeated inquiries, including during the testimony of the creator of the DLP report (Jennifer Semmler) and the testimony of Plaintiffs' designated corporate representative (David Garza). *See* Doc. 376 at 21.[4]

Moreover, Rule 1004 merely creates a limited exception to the best evidence rule when the proponent establishes that one of the enumerated circumstances applies; it does not excuse the proponent from obligations established by the other rules of evidence, including the separate—and mandatory—requirement that "a witness may testify to a matter ***only*** if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Plaintiffs have not identified any witness who has the requisite personal knowledge to testify regarding the substance of each of the 16,000 documents they claim are alleged trade secrets. Indeed, during discovery, Plaintiffs' designated witness, Corey DeMarco, repeatedly admitted he had never seen the underlying documents and could only speculate as to their contents. Doc. 376 at 6–7. This obvious flaw in Plaintiffs' apparent plan to prove that thousands of documents that no one at trial (including the testifying witness) has seen satisfy the statutory requirements for trade secret status based only on file names is magnified by the fact that Plaintiffs have likewise identified no witness who has the necessary personal knowledge to establish the key predicate fact as to each of the thousands of unproduced documents: that the file names listed on the DLP report accurately reflect the actual contents of those documents. Rule 403 squarely

---

[4] As ChemTreat has explained, permitting Plaintiffs to cure this known defect at trial through testimony or other evidence that they failed to provide during discovery, despite ChemTreat's repeated requests, would reward Plaintiffs for withholding the requested information in discovery and would effectively endorse a trial by ambush. Doc. 407 at 2–5. This is particularly true given that Plaintiffs have now identified Semmler (who previously denied, under oath, any ability to explain the discrepancies between the report she created and the report Plaintiffs produced) as the authenticating witness for the DLP report in the parties' joint exhibit list (proposed exhibit 174).

5

applies here, and bars Plaintiffs' plan to stack speculation on speculation under the misleading rubric of "secondary evidence."

Plaintiffs' plan to use secondary evidence also creates a substantial risk of an unfair trial in another regard. Despite repeatedly taking the position that they would rely on secondary evidence to prove the contents of their unproduced documents, Plaintiffs have ***never*** identified either the specific witness(es) who will testify about the contents of each alleged trade secret or the substance of that testimony—other than the admitted speculation from DeMarco. This has stymied ChemTreat's ability to prepare a defense. To permit Plaintiffs to present at trial testimony they did not present when asked in discovery would condone just the sort of trial by ambush the Sixth Circuit does not permit. *See Erskine v. Consol. Rail Corp.*, 814 F.2d 266, 273 (6th Cir. 1987) (finding an impermissible "trial by ambush" where a party "engaged in a systematic course of dilatory conduct which clearly deprived" the opposing party of "the opportunity to develop the facts necessary to support his case").[5]

### 2. Plaintiffs cannot prove that the documents they produced contain trade secrets.

Plaintiffs also cannot establish that the limited documents they produced and placed on the exhibit list are trade secrets. As an initial matter, to the extent the documents (i) were produced after the close of discovery, or (ii) are singular parts of "customer files" or "contact lists" that Plaintiffs failed to produce in full (in violation of this Court's orders, *see* Doc. 111, Doc. 158), those documents are inadmissible for the reasons noted in ChemTreat's omnibus motion *in limine*.

---

[5] Plaintiffs' plan is also inherently prejudicial to ChemTreat and confusing to the jury, as it is functionally impossible for Plaintiffs to present, and ChemTreat to cross-examine, testimony regarding thousands of individual alleged trade secrets in the five days allotted for trial, and it is equally impossible for the jury, without the benefit of the underlying documents, to effectively evaluate each individual alleged trade secret.

Doc. 376 at 3–7, 17–19.  As to the documents that fall outside of those two categories, Plaintiffs face a series of hurdles, each of which is independently dispositive, in attempting to prove their documents satisfy the necessary elements for trade secret status.

*First*, as detailed in ChemTreat's motion for summary judgment, many, if not all, of these documents are obsolete bids, business reviews, handbooks, and service reports that are not trade secrets as a matter of law because they are stale or otherwise lack information of value.  Doc. 256 at 10; *see also WEG Elec. Corp. v. Pethers*, 2016 WL 1441793, at *3 (D. Minn. Apr. 12, 2016) (explaining that "information that has or will quickly become obsolete does not have independent economic value to be considered a trade secret").  Plaintiffs did not identify admissible evidence in response to ChemTreat's summary judgment argument on this point.  Doc. 323 at 2–3.

*Second*, "not everything with commercial value constitutes a trade secret"; instead, Plaintiffs must show that their "alleged trade secrets had value ***because they remain secret***." *Synopsys, Inc. v. Risk Based Security, Inc.*, 70 F.4th 759, 772 (4th Cir. 2023) (affirming summary judgment) (emphasis in original).  Plaintiffs' descriptions of their alleged trade secrets, although skeletal, confirm that most, if not all, of those documents involve information that is designed to be disclosed, and regularly is disclosed, to actual or potential customers (*e.g.*, business proposals, testing results, maintenance plans, and manuals of various kinds).[6]  Moreover, Plaintiffs have admitted that they regularly provide such information without requiring a nondisclosure agreement.  Thus, whatever the supposed value of Plaintiffs' documents, it does not derive from secrecy, as required to establish a trade ***secret***.

---

[6] Even many purely internal documents share this defect.  For example, Plaintiffs' training regarding sales techniques is facially designed for the purpose of Plaintiffs' employees ***using*** those sales techniques in interactions with actual or potential customers, such that those techniques are known or, at a minimum, readily ascertainable, and thus not trade secrets.

7

*Third*, both economic value derived from secrecy *and* reasonable efforts to maintain that secrecy are required to satisfy the statutory definition of a trade secret. *Id.* at 769. Plaintiffs' own deliberately dilatory conduct here precludes them from showing they took such reasonable efforts. The evidence shows that day after day, week after week, and month after month, Plaintiffs—despite having since July 2021 the same DLP report they claim provides incontrovertible proof of Ridley's trade secret misappropriation—took *no efforts* to protect their alleged trade secrets until February 2022. They did not seek a temporary restraining order, or a preliminary injunction, or file suit. They did not send a cease-and-desist letter to ChemTreat or Ridley. They did not notify ChemTreat or Ridley of their concerns in any manner, formal or informal, orally or in writing. Instead, despite believing (or at least claiming now to believe) that ChemTreat conspired with Ridley to "steal" their alleged trade secrets for the express purpose of using those trade secrets to benefit ChemTreat and harm Plaintiffs, Plaintiffs stood idly by and did not take reasonable—or any—steps to protect the "secrecy" of their alleged trade secrets until *seven months* after they learned of the supposed misappropriation of their documents by Ridley.

### B. Plaintiffs Cannot Prove ChemTreat Misappropriated Plaintiffs' Alleged Trade Secrets.

Under the DTSA and TUTSA, trade secret "misappropriation" means either (1) the acquisition of a trade secret "by a person who knows or has reason to know that the trade secret was acquired by improper means" or (2) the disclosure or use of a trade secret by a person who, "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret" was improperly acquired. 18 U.S.C. § 1839(5); Tenn. Code Ann. § 47-25-1702(2). Plaintiffs cannot prove their claim of misappropriation by ChemTreat under either rubric.

8

### 1. Plaintiffs cannot prove ChemTreat knowingly acquired their trade secrets by improper means.

Plaintiffs' statutory misappropriation claims will fail because neither ordinary discovery nor the Special Master process authorized by the Court adduced any evidence that ChemTreat knowingly acquired Plaintiffs' trade secrets by improper means.

Over the course of nearly a year of discovery, Plaintiffs identified and produced only five documents allegedly misappropriated by Ridley with any potential connection to ChemTreat's systems: a "Business Plan," a 2015 bid document, and three templates. ChemTreat has explained why Plaintiffs cannot establish that any of these documents contain trade secret information:

- The "Business Plan" is nothing more than an Excel chart Ridley constructed using information that ChemTreat provided him and his own knowledge of the water treatment market. Doc. 256 at 11–12. Although Plaintiffs have argued that the "Business Plan" contains their "built-in presumptions and calculations that were based on Plaintiffs' knowledge and industry experience," Plaintiffs have never identified those supposed "presumptions and calculations" nor where they can be found "built-in" to the "Business Plan." Doc. 323 at 3–4. The reason is simple: The evidence shows that the presumptions underlying the "Business Plan" created by Ridley differ markedly from those in the "bridge plans" that Plaintiffs claim are the source of Ridley's "Business Plan," confirming his testimony that he created the Excel chart based on his knowledge and experience, not any supposed "trade secrets" belonging to Plaintiffs. Doc. 288 at 8–10.

- Plaintiffs admit that the 2015 bid document that Ridley sent to his ChemTreat email account is not a trade secret. They instead argue that it is part of a customer file that is, along with the other documents in that file, a compilation trade secret—but Plaintiffs have never produced that customer file despite being ordered to do so. Doc. 323 at 4; Doc. 376 at 3. In any event, the document (1) was over six years old by the time that Ridley sent it to his ChemTreat email, (2) was designed to be disclosed to a potential customer, and (3) is directed to a potential customer that has been defunct since long before Ridley left Plaintiffs' employ. Such information cannot satisfy the requirements for a trade secret, as it is neither secret nor economically valuable.

- As for the three templates, Plaintiffs have never attempted to explain why the "Service report technical notes.doc" file is a trade secret, even when confronted with such a challenge in ChemTreat's motion for summary judgment. Doc. 323 at 4–5. Plaintiffs' arguments as to the other two templates—that Ridley testified he used a similar document when he worked for Plaintiffs and that the templates made his job "more efficient"—miss the mark. Under Plaintiffs' logic, every document

9

used by employees to perform their jobs would constitute trade secrets. The law does not support such a result. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (holding that it is "too vague and too inclusive" to assert that "all information in or about" a company's product "is a trade secret"). Moreover, Ridley's testimony reflects that he used such templates in preparing reports designed to be ***shared with customers***; thus, to the extent such information has any economic value, that value does not derive from secrecy as required to be a trade secret.

Even if Plaintiffs could establish these documents constituted trade secrets (although the evidence precludes such a finding), that would not suffice to impose liability on ChemTreat. To prove that ChemTreat misappropriated a trade secret under the DTSA and TUTSA, Plaintiffs must also prove ***ChemTreat's*** knowledge of Ridley's allegedly wrongful conduct as to these documents. That is, Plaintiffs must show that ChemTreat—separate and apart from Ridley—knew or should have known at the time that Ridley interacted with these documents (*i.e.*, in the months before Plaintiffs notified ChemTreat of their claims) that Ridley had done so. *See* Doc. 256 at 16. Here, too, Plaintiffs have failed to adduce the necessary evidence: There is no evidence that ChemTreat monitored what documents Ridley accessed using his ChemTreat computer or what documents were sent (by Ridley or anyone else) to Ridley's ChemTreat email account.[7]

Nor is there any evidence that Ridley transmitted any of these documents to anyone else at ChemTreat. After the close of discovery, Plaintiffs insisted they could cure their lack of proof that Ridley transmitted any alleged trade secrets to other ChemTreat employees by permitting further discovery into ChemTreat's repositories. But although the Court authorized further discovery by an independent Special Master, that process simply confirmed the lack of evidence of ChemTreat's knowing acquisition of any trade secret belonging to Plaintiffs. After extensive searches into ChemTreat's emails, ChemTreat's network folders, and the hard drives of the ChemTreat

---

[7] As discussed next, there is also no evidence that Ridley or anyone else at ChemTreat "used" any such documents within the meaning of the DTSA or TUTSA.

custodians that Plaintiffs identified as the "most likely" to have their allegedly misappropriated documents, the Special Master ultimately concluded that that there was **no evidence** that Ridley transferred any of Plaintiffs' documents to anyone at ChemTreat.  Doc. 413 at 18–28.[8]

2. **Plaintiffs cannot prove ChemTreat used Plaintiffs' alleged trade secrets.**

Plaintiffs' claims will also fail because there is **no evidence** that anyone at ChemTreat ever used Plaintiffs' trade secrets.  *See* Doc. 256 at 15; Doc. 323 at 5–8.  "Use," by definition, requires commercial exploitation.  Doc. 256 at 15, 23–24.  Plaintiffs have identified no evidence of commercial exploitation of their alleged trade secrets; indeed, they admit they have no evidence of any customer lost (or even improperly solicited) as a result of the claimed misappropriation of their alleged trade secrets.  Plaintiffs have instead attempted to replace the necessary evidence of **use** of their alleged trade secrets with evidence that Ridley **accessed** a handful of alleged trade secrets while employed by ChemTreat.  Simply accessing a document does not suffice to establish the "use" required to satisfy the DTSA or TUTSA.  *See Stratienko v. Cordis Corp.*, 429 F.3d 592, 602 (6th Cir. 2005) (affirming summary judgment where defendant had access to a trade secret but plaintiff did not provide evidence "to permit an inference of use"); *In re Simons Broad., LP*, 2013 WL 9542015, at *17 (W.D. Tex. Nov. 19, 2013) ("[T]he uncontroverted facts at trial establish that data from the [trade secret] was eventually accessed by [defendant].  However, without more, [plaintiff] did not present the jury with a fact-issue on the 'use' element.").

---

[8] Although it is an equitable question for the Court, not a legal issue to be tried to the jury, the lack of evidence that ChemTreat knowingly acquired any trade secret owned by Plaintiffs also precludes the permanent injunction Plaintiffs have requested, as Article III bars the Court from enjoining purely hypothetical conduct or granting relief for purely hypothetical harms.  Doc. 256 at 23-24 & n.19.

11

Plaintiffs seek to escape this fatal gap in their proof by requesting that, as a spoliation sanction, the Court prohibit ChemTreat from arguing that there is no evidence of trade secret use by Ridley or anyone else affiliated with ChemTreat. Doc. 397 at 1–5. But Plaintiffs do not explain how the sweeping sanction they request—which would relieve them of their burden of proof on an essential element of their claims—is properly directed to remedying the loss of ESI from the hard drive of Ridley's ChemTreat-issued laptop. The reason for Plaintiffs' failure is apparent: They cannot provide the necessary explanation, because their requested sanction lacks any logical connection to the limited spoliation the Court found occurred. Because "use" under the DTSA and TUTSA requires commercial exploitation, any "use" of Plaintiffs' alleged trade secrets by ChemTreat would necessarily result in evidence not impacted by ChemTreat's negligent spoliation of the ESI on the hard drive of Ridley's ChemTreat-issued computer. For example, if ChemTreat had used Plaintiffs' alleged trade secrets to convert Plaintiffs' customers, evidence of such customer conversion would be available from Plaintiffs' own files as well as the files of those customers. As Plaintiffs have admitted, however, they have no such evidence. Doc. 349 at 43. Nor did the extensive review conducted by the Special Master (a process the Court authorized to remedy any prejudice Plaintiffs suffered from the loss of ESI on Ridley's ChemTreat-issued laptop) produce any such evidence. Doc. 418 at 1–2, 13; *see also* Doc. 413 at 30 ("Ecolab/Nalco argued for the most comprehensive analysis, and, ultimately, the Special Master adopted that more comprehensive approach with no results.").

Even if Plaintiffs had adduced evidence of "use" of their alleged trade secrets by Ridley or another ChemTreat employee (they have not), such evidence, standing alone, would not suffice to hold a corporate entity like ChemTreat liable. To hold ChemTreat liable, Plaintiffs would additionally need to show that the use of their alleged trade secrets was within the scope of the

12

Case 1:22-cv-00050-TRM-CHS   Document 423   Filed 12/18/23   Page 16 of 27   PageID #: 18154

employee's employment with ChemTreat. *See Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992). As the Certification evidences, ChemTreat expressly prohibited its employees—including Ridley—from using confidential information belonging to a prior employer to perform their work for ChemTreat. Under Tennessee law, the settled rule is that an employer is not vicariously liable when an employee uses an unauthorized instrumentality (here, Plaintiffs' alleged trade secrets) to perform his duties, as such use is beyond the scope of his employment. *See* Restatement (Second) of Agency § 239 (1958); *see also Ellington v. Cajun Operating Co.*, 2021 WL 507888, at *4 (Tenn. Ct. App. Feb. 10, 2021) ("To help determine whether an employee acted within the scope of his employment, Tennessee courts have relied on the Restatement (Second) of Agency for guidance.").

**C.      Plaintiffs Have No Evidence of Trade Secret Damages.**

The DTSA and TUTSA recognize three types of monetary damages:

> (i) damages for ***actual loss*** caused by the misappropriation of the trade secret; and

> (ii) damages for any ***unjust enrichment*** caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

> (iii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a ***reasonable royalty*** for the misappropriator's unauthorized disclosure or use of the trade secret.

18 U.S.C. § 1836(b)(3)(B); Tenn. Code. Ann. §§ 47-25-1703, -1704. Plaintiffs have never made any claim for a reasonable royalty, presented fact or expert evidence regarding a reasonable royalty, or requested a reasonable royalty jury instruction. And Plaintiffs have repeatedly

disclaimed any damages based on actual loss or for "ChemTreat's future profits resulting from the alleged misappropriation." Doc. 353 at 26–27.[9]

Plaintiffs have instead sought damages only on an unjust enrichment theory, based on the opinions of their expert Dana Trexler, who argued that a jury could award Plaintiffs more than $158 million in damages without proof that ChemTreat or Ridley ever used Plaintiffs' trade secrets. *See* Doc. 376 at 1–3. The Court excluded Trexler's opinions under Rules 403 and 702, finding that "Trexler's model is not reliable and is not helpful to the trier of fact, because it permits the jury to award unjust-enrichment damages even if ChemTreat never used the trade secrets at issue or unfairly competed with Ecolab/Nalco." Doc. 353 at 36. Aside from Trexler's now-excluded opinions, Plaintiffs never produced ***any*** evidence that they suffered trade secret damages caused by ChemTreat's alleged misappropriation. Because proof of damage is required to succeed on a trade secret claim, Plaintiffs' lack of such proof defeats their claims as a matter of law. *See* Doc. 256 at 22–24; Doc. 323 at 8–10.

As indicated in their opposition to ChemTreat's omnibus motion *in limine*, Plaintiffs apparently hope to plug this evidentiary gap at trial by relying on unidentified lay witnesses to support an unspecified claim for an unidentified amount of damages based on an undisclosed damages theory. Doc. 399 at 2–3. Plaintiffs' plan, again, would create just the sort of trial by ambush that is manifestly unfair, would derail the proceedings, and is not permitted by the Federal Rules of Civil Procedure or the Court's orders. *See Silver State Broad., LLC v. Beasley FM Acquisition*, 2016 WL 320110, at *4 (D. Nev. Jan. 25, 2016) ("Requiring the defendants to proceed to trial without an understanding of what damages the plaintiffs are seeking, what evidence

---

[9] *See also* Doc. 349 at 43 ("Ecolab/Nalco will not be permitted to introduce evidence related to lost customers at trial.").

supports those damages, or how those damages were calculated is trial by ambush."); *see also* Doc. 349 at 43; Doc. 353 at 25–41.

## II.    PLAINTIFFS WILL NOT PREVAIL ON THEIR STATE-LAW CLAIMS.

Plaintiffs' three state-law claims against ChemTreat, which are (and, to avoid preemption, must be) unrelated to their trade secret claims, are a sideshow. As the briefing on ChemTreat's summary judgment motion confirms, despite waiting eight months after Ridley's departure to file suit, Plaintiffs did not have then, and still do not have now, any evidence as to essential elements of those claims.

### A.    Plaintiffs' Tortious Interference and Procurement of Breach of Contract Claims Will Fail.

To succeed on their common-law tortious interference with contract claim, Plaintiffs must prove the following elements by a preponderance of the evidence: (1) a legal contract existed between Plaintiffs and Ridley; (2) ChemTreat was aware of the contract; (3) ChemTreat intended to induce a breach of that contract; (4) ChemTreat acted without legal justification; (5) a breach of the contract occurred; (6) ChemTreat's conduct was the proximate cause of the breach; and (7) Plaintiffs suffered damages as a result of the breach. *See* Doc. 384-1 at 120. Plaintiffs' statutory claim for procurement of breach of contract under Tenn. Code Ann. § 47-50-109 has the same seven elements. Doc. 384-1 at 136; *see also Johnson v. Univ. Hosps. Health Sys., Inc.*, 2023 WL 5538980, at *1 n.2 (M.D. Tenn. Aug. 28, 2023) ("In Tennessee, the common law action for tortious interference with contract and the statutory action for unlawful procurement of breach of contract have the same elements and operate as alternative theories of recovery."). The only difference in proof is that, to succeed on their statutory claim, Plaintiffs must establish those same seven elements by clear and convincing evidence. *See* Doc. 384-1 at 136.

15

Notwithstanding this long-settled law, Plaintiffs contend that the elements of the common-law tortious interference with contract claim are not the same as the elements of the statutory procurement of breach claim. *See* Doc. 384-1 at 121–22. As to their common-law claim, Plaintiffs instead ask the Court to instruct the jury as to the five elements that constitute the tort of intentional interference with business relationships, which they did not plead in the operative complaint. *Id.* at 121 n.278. The Sixth Circuit has explained that intentional interference with business relationships "does not apply to 'contractual relationships'" and has explicitly identified "inducement of breach of contract" as the proper tort to assert when a contractual relationship is at issue. *BNA Assocs. LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 63 F.4th 1061, 1064 (6th Cir. 2023). Here, Plaintiffs' claim for tortious interference concerns Ridley's breach of his employment contract with Plaintiffs. Thus, the tort of intentional interference with business relationships is not applicable. Instead, Plaintiffs must prove the same seven elements for both their common-law tortious interference and their statutory procurement of breach claims.

In any event, Plaintiffs' claims for tortious interference and procurement of breach have no support in the record. Over the course of the parties' summary judgment briefing, Plaintiffs attempted to defend only one of the several tortious interference theories they assert in the operative complaint: that ChemTreat induced Ridley to breach his employment contract with Plaintiffs by soliciting then-Nalco employee Tyler Bates to join ChemTreat.[10] As the summary

---

[10] Plaintiffs made no attempt, during summary judgment briefing, to defend their claim that ChemTreat induced Ridley to solicit Plaintiffs' customers in violation of his employment agreement or to explain how they can proceed with their claim related to the "Business Plan," despite the Court's conclusion that any tort claim related to that document is preempted by TUTSA due to Plaintiffs' allegation that the document contains confidential or trade secret information. Doc. 323 at 11–13. Plaintiffs' only defense to ChemTreat's summary judgment argument as to their tortious interference claims as to Simon Walker, Jennifer Grailer, Tracey Guddendorf, and Douglas Glanz was to point again to the unsworn allegations in various complaints—a functional concession that they lack the evidence necessary to raise a triable issue of fact on these claims. *Id.*

16

judgment briefing establishes, Plaintiffs have no evidence that Bates falls within the scope of the restrictive covenant in Ridley's employment contract with Plaintiffs, which applies only to employees whom Ridley managed or supervised, or with whom he had material contact on Plaintiffs' behalf, during his last 12 months of employment. Plaintiffs admit that Ridley never managed or supervised Bates, and evidence from Plaintiffs' own records and witnesses establishes that Ridley did not have material contact with Bates on Plaintiffs' behalf while Bates was employed by Nalco—indeed, the notion is nonsensical, as Bates was not hired by Nalco until Ridley had moved to Ecolab, at which time Ridley was performing different work, regarding different customers, under the supervision of different individuals than Bates. Doc. 256 at 25–26; Doc. 323 at 10–11.

Plaintiffs' lack of evidence of the requisite underlying breach is not the only substantive failing in their common-law and statutory contractual interference claims. Proof of damages proximately caused by the interference is a necessary element of both the common-law and statutory claims. Plaintiffs produced no evidence of such damages during discovery—despite being required to do so by both the Court's Order and their own agreement. Doc. 212 at 13–17; Doc. 268-5.[11] Only after ChemTreat raised this failure of proof in its summary judgment motion

---

In their opposition to ChemTreat's omnibus motion *in limine*, Plaintiffs suggested those claims were "collateral[]" to the claims that they intended to present at trial, but emphasized that they nonetheless anticipated raising the claims "as impeachment or rebuttal evidence, or for other proper purposes." Doc. 399 at 7.

[11] As ordered by the Court in resolving ChemTreat's motion to compel on the issue, Plaintiffs and ChemTreat conferred—*and agreed*—on the narrowed scope of damages evidence Plaintiffs were required to produced. Doc. 212 at 17–18; Doc. 268-5 (setting forth parties' agreement after conferral). The attorneys' fees that Plaintiffs now claim provide the necessary proof of damages for their state law claims fall squarely within the scope of production the parties *agreed* was required by the Court's Order under RFP 78 (for which Plaintiffs agreed to produce "Documents sufficient to show *any damages* You allege You have suffered as a result of the actions of Ridley or ChemTreat and the date(s) on which You allege You suffered any such damages") and RFP 80 (for which Plaintiffs agreed to produce "Documents sufficient to show *any harm*, including to

17

did Plaintiffs belatedly attempt to reverse course on the damages issue, producing a handful of invoice cover sheets for attorneys' fees allegedly incurred in this litigation and asserting those fees constituted their substantive damages under the "independent tort" doctrine. Doc. 376 at 7–11. Plaintiffs' untimely attempt to supply *after* the close of discovery evidence that they were required—by the Court's Order and their own agreement—to provide ***during*** discovery is barred by both Rule 37(b)(2) and Rule 37(c)(1). Doc. 376 at 7–10.

In any event, even if the plain language of Rule 37 did not bar Plaintiffs from relying on this evidence that they chose to withhold until after the close of discovery, the limited evidence that Plaintiffs belatedly produced does not satisfy either Rule 1006 or the substantive requirements of the "independent tort" doctrine under Tennessee law. As ChemTreat previously explained, Plaintiffs' purported Rule 1006 summary does not satisfy any of the five elements required by Sixth Circuit precedent. *Id.* at 10-11 (discussing *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002)). And Plaintiffs' untimely production of 27 pages of invoice cover sheets, without the underlying attorneys' fees invoices, cannot substantiate a claim for fees as substantive damages under the "independent tort" doctrine (even had Plaintiffs properly alleged such a claim, *but see* Doc. 376 at 7 n.7) because **only** those fees incurred in litigating against Ridley regarding the two non-preempted contract breaches ChemTreat allegedly caused (not all fees Plaintiffs incurred in this litigation) are potentially recoverable as tortious interference damages under the "independent tort" doctrine. *Id.* at 10-11.

_____

Your goodwill, that You allege You suffered as a result of the actions of Ridley or ChemTreat"). Doc. 268-5. Rather than produce the documents they had ***agreed*** were required by the Court's Order, Plaintiffs certified, under oath, that they had fully complied with the Court's Order as to RFPs 78–82 by producing only the documents relied upon by their now-excluded damages expert, Trexler. Doc. 300-1 at 7.

18

## B.     Plaintiffs' Civil Conspiracy Claim Will Fail.

To succeed on their claim for civil conspiracy, Plaintiffs must prove the following elements by a preponderance of the evidence:  (1) a common design between Ridley and ChemTreat, each having the intent and knowledge of the other's intent; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting injury to Plaintiffs.  Doc. 384-1 at 140.  The law and the record in this case will prevent Plaintiffs from prevailing on this claim at trial even if it survives ChemTreat's motion for summary judgment.

To prove a civil conspiracy, Plaintiffs must prove that an underlying tort occurred.  *Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, 2020 WL 5797974, at *8 (M.D. Tenn. Sept. 29, 2020).  As discussed above and in ChemTreat's summary judgment briefs, Plaintiffs cannot prove their underlying tort claims.  *See* Doc. 256 at 24–29.  As a result, their derivative claim for civil conspiracy will necessarily fail.  But even if Plaintiffs had the requisite evidence to prove their underlying tort claims, their conspiracy claim would still fail for lack of the *sine qua non* of any conspiracy:  two or more conspirators.  The only torts alleged against ChemTreat involve the supposed interference with a contract to which Ridley is a party.  Because an individual cannot tortiously interfere with his own contract, Ridley cannot be the necessary second party to an alleged conspiracy to tortiously interfere with his contract with Plaintiffs.  *See, e.g., Corso Enterprises, Inc. v. Shop at Home Network, Inc.*, 2004 WL 7082309, at *5 (M.D. Tenn. Sept. 27, 2004) (dismissing conspiracy claim resting on alleged tortious interference with a contract to which an alleged conspirator was a party).  Likewise, because the alleged interference with the anti-solicitation covenants in Ridley's contract with Plaintiffs supposedly occurred ***during*** Ridley's employment with ChemTreat, the intracorporate conspiracy doctrine applies—and

19

precludes Ridley from being the necessary second party to the alleged conspiracy. *See, e.g.*, *Shipwash v. United Airlines, Inc.*, 28 F. Supp. 3d 740, 749 (E.D. Tenn. 2014).

## III. BIFURCATED PROCEEDINGS ARE NEEDED TO ADDRESS CLAIMS FOR ATTORNEYS' FEES AND PUNITIVE DAMAGES.

Plaintiffs and Ridley assert claims for statutory attorneys' fees and/or punitive damages that, per controlling law and this Court's prior practice, require the trial to be bifurcated. Specifically, Plaintiffs claim they are entitled to: (1) attorneys' fees and exemplary damages under the DTSA and TUTSA from ChemTreat and Ridley, due to their allegedly willful and malicious misappropriation of trade secrets; and (2) punitive damages from ChemTreat and Ridley under Tennessee law (related to their state-law tort claims). Ridley counterclaims for his attorneys' fees under the DTSA and TUTSA on the grounds that Plaintiffs filed their trade secret misappropriation claim in bad faith. In *Knox Trailers, Inc., et al., v. Billy Maples, et al.*, Case No. 3:20-cv-137, the Court explained that such claims should not be presented to the jury during the initial liability phase of trial. ChemTreat contends that the Court should follow the same procedure here, and, if requested, will file additional briefing on this issue.

The parties' claims for attorneys' fees and punitive/exemplary damages in *Knox Trailers* closely resembles the instant case. In *Knox Trailers*, the plaintiffs brought claims for attorneys' fees and exemplary damages under the DTSA and TUTSA, as well as claims for punitive damages under Tennessee law. *See id.*, ECF Nos. 391 and 486. The defendants, like Ridley, asserted a claim for their attorneys' fees on the grounds that the plaintiffs filed their misappropriation claim in bad faith. *Id.*, ECF No. 486. The Court initially held that the plaintiffs' claim for punitive damages under Tennessee law should be decided in a bifurcated proceeding, where the jury would first determine whether the plaintiffs were entitled to punitive damages and then, in a second proceeding, decide the amount of punitive damages (if necessary). *Id.*, ECF No. 391 at 3–4. The

20

Court later held that claims for attorneys' fees and exemplary damages under the DTSA and TUTSA would ultimately be decided by the Court and not the jury, *id.*, ECF No. 452, and, after briefing by the parties, bifurcated those claims from the liability and compensatory-damages phase of trial, *id.*, ECF No. 486 at 2–3.

The Court should follow the same procedure in this case:

- Plaintiffs' claim for punitive damages under Tennessee law against ChemTreat and Ridley should be bifurcated per the process required in Tenn. Code Ann. § 29-39-104(a). During the initial phase of trial, the jury should be asked to determine liability. If they find one or more of the defendants liable, the jury should proceed to a second phase of trial to determine questions related to the potential award of punitive damages. *See Rotello v. Clayton Homes of Del., Inc.*, 2006 WL 842931, at *1 (E.D. Tenn. Mar. 28, 2006).

- Ridley's counterclaim for attorneys' fees under the DTSA and TUTSA should be decided by the Court in the event the jury returns a verdict in his favor. *See Knox Trailers*, ECF No. 452 at 1 ("Attorney's fees are an equitable remedy, and both the federal and Tennessee statutes leave attorney fees and exemplary damages to the discretion of the Court.").

- Questions related to Plaintiffs' claims for attorneys' fees and exemplary damages under the DTSA and TUTSA should likewise be decided, if necessary, after the jury returns with its initial liability findings, with the Court determining whether any exemplary damages or attorneys' fees should be awarded.

## IV. THE COURT SHOULD IMPOSE THE EVIDENTIARY SANCTIONS REQUESTED BY CHEMTREAT FOR PLAINTIFFS' SPOLIATION.

In its spoliation motion, ChemTreat detailed both the evidence demonstrating Plaintiffs' spoliation and the proper remedy for that spoliation. Doc. 277 at 8–9 (sanctions for spoliation of mobile drive); *id.* at 12–15 (sanctions for spoliation of ESI). The Court found that Plaintiffs spoliated the physical mobile drive returned by Ridley and the ESI on that mobile drive, as well as on one of the two laptops used by Ridley while employed by Ecolab, but reserved its ruling on the appropriate sanctions to be imposed for Plaintiffs' spoliation. Doc. 349 at 25, 27, 35; Doc. 356 at 2. For the reasons previously set forth by ChemTreat, the Court should impose the evidentiary sanctions previously requested by ChemTreat as a remedy for Plaintiffs' spoliation of the physical

21

mobile drive and the ESI on the mobile drive and one of the two laptops used by Ridley while employed by Ecolab. Doc. 277 at 8–9, 12–15; Doc. 326 at 3–4, 8–10.

## V.    THE COURT SHOULD REJECT PLAINTIFFS' IMPROPER REQUEST FOR AN ADVERSE INFERENCE INSTRUCTION REGARDING CHEMTREAT'S NEGLIGENT SPOLIATION.

As a remedial sanction for ChemTreat's negligent spoliation of the ESI on Ridley's ChemTreat-issued laptop, the Court authorized the Special Master process and required ChemTreat to bear a substantial portion of the costs for that process. Doc. 361; Doc. 419. In addition to those sanctions, Plaintiffs have also requested the Court instruct the jury that it can draw an adverse inference against ChemTreat for its negligent spoliation. Doc. 374 at 8–9. ChemTreat has already explained why an adverse inference is not permitted by Rule 37(e), which reserves jury instructions regarding adverse inferences—whether mandatory or permissive—for *intentional* spoliation of ESI. Doc. 397 at 5–8. The language of Rule 37(e) is clear that intentional spoliation is a necessary predicate for any such jury instruction:

> ***only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation*** may . . . [the Court] instruct the jury that it may or must presume the information was unfavorable to the party.

Fed. R. Civ. P. 37(e)(2) (quoted in Doc. 349 at 20).

Although the Court quoted the controlling language of the rule in its spoliation order, and ChemTreat drew this issue to Plaintiffs' attention during motion *in limine* briefing (Doc. 397 at 5-7), Plaintiffs persist in seeking a remedy not permitted by Rule 37(e)(1) based on a legal standard that (as ChemTreat also previously brought to Plaintiffs' attention, *see id.* at 6 n.7) does not apply to the spoliation of ESI. *See* Doc. 420 at 6–11. However the Court chooses to address Plaintiffs' continued reliance on a standard they know does not apply to seek a remedy they know is prohibited, one thing is certain: Plaintiffs are not entitled to the impermissible jury instruction

they seek. The Court should reject Plaintiffs' request for an adverse inference jury instruction regarding ChemTreat's negligent spoliation of the ESI on Ridley's ChemTreat-issued laptop.

DATED: December 18, 2023          Respectfully submitted,

                                     */s/ Troy C. Homesley*
                                     Vidya Atre Mirmira (admitted *pro hac vice*)
William T. Burke (admitted *pro hac vice*)
Juli Ann Lund (admitted *pro hac vice*)
Troy C. Homesley (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-mail: vmirmira@wc.com
E-mail: wburke@wc.com
E-mail: jlund@wc.com
E-mail: thomesley@wc.com

Kyle W. Eiselstein, Tenn. BPR No. 020727
Zachary H. Greene, Tenn. BPR No. 024451
Erin E. Steelman, Tenn. BPR No. 038463
MILLER & MARTIN PLLC
1200 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 756-6600
E-mail: kyle.eiselstein@millermartin.com
E-mail: zac.greene@millermartin.com
E-mail: erin.steelman@millermartin.com

*Attorneys for Defendant ChemTreat, Inc.*

23